UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Bartlett, et al.,

      *Plaintiffs*,

 v.

Société Générale de Banque au Liban S.A.L., et al.,

      *Defendants*.

Case No. 1:19-cv-00007

## **DECLARATION OF ACHRAF SAFIEDDINE**

 I, ACHRAF SAFIEDDINE, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am over 18 years of age and declare, pursuant to the provisions of 28 U.S.C. § 1746, the following based upon personal knowledge of the facts set forth below.  If called upon to testify, I could and would testify competently as to the matters set forth herein.

2. I am a U.S. citizen and a lawyer practicing in Lebanon.

3. As a part of my practice I assist around 35-50 active companies and individuals with corporate formation and offer legal advice and compliance in Lebanon and abroad.

4. Lebanese law requires each of LLCs and Corporations with capital accounts higher than $3500 to assign a lawyer. *See, e.g.*, "Setting Up A Joint Stock Company or S.A.L.," Lebanese Company *Registration Guide(s)*, Guardianship Authority, Presidency of the Council of Ministers of Lebanon (accessible at https://investinlebanon.gov.lb/Content/uploads/BSU-REGISTER_JOINT_STOCK_COMPANY.pdf) (last accessed on March 25, 2019) ("Step 3: Constitutive General Assembly and First Board of Directors Meetings — Hold a Constitutive General Assembly meeting to, mainly: **elect** a

Board of Directors, Appoint a Principal Auditor and *a Lawyer*.")(emphasis added).

5. Thus, such legal relationship is limited and established by a minimal retainer in return of a simple service of renewing and keeping the companies files in good standing.

6. In addition, as a U.S. citizen, I maintain relationships, both personal and business, with individuals in the U.S.

7. To my knowledge I am the only lawyer in Lebanon, and possibly in the Middle East, accredited as an U.S. International Traffic of Arms Regulations (ITAR), OFAC, and Export Administration Regulation Compliance Professional.

8. I have read Plaintiffs' complaint which involves claims arising under the 18 U.S.C. §§ 2333(a) and 2333(d) of the Anti-Terrorism Act ("ATA") and concerns purported conduct by financial institutions,—located in, *inter alia*, Lebanon—alleged to have aided and abetted activities of Hezbollah (the "Complaint").

9. Plaintiffs' 610-page Complaint purports to name hundreds of individuals in an effort to accuse them of participating in this scheme with Hezbollah operatives—for no apparent purpose that would support their claims against Defendants.

10. The Complaint alleges various conduct by purported associates and affiliates of the Lebanese brothers Kamel Amhaz and Issam Amhaz. *See* Complaint at ¶¶ 348 and 352.

11. The Plaintiffs' Complaint also makes various allegations against me, however and in full compliance with Department of Treasury's guidance, I have had no legal, financial, or contractual affiliation with the Amhaz brothers since July 2014—the date plaintiffs allege the brothers were designated "Specially Designated Global Terrorists" by the Department of Treasury. *See* Complaint at ¶ 332; *see also* Complaint at ¶¶ 348 and 352.

12. In fact, to my knowledge, all of these designated companies had to be closed and

liquidated as a result of the Department of Treasury designation.

13. Specifically, the gravamen of the false allegations against me include: (i) that he is "the attorney most associated with the Amhaz Network of companies;" and (ii) that he was involved with a scheme of "fraud," "corruption" and "money laundering." *See* Complaint at ¶ 348. Plaintiffs then repeat my name to give the imprimatur of the wrongdoing alleged in paragraph 348. *See* Complaint at ¶ 352.

14. However, as suspected, Plaintiff's counsel revealed that their allegations of wrongdoing on my part rely exclusively on a report by The Center for Advanced Defense Studies Inc. (C4ADS), alleging various conduct by purported associates and affiliates of the Lebanese brothers Kamel Amhaz and Issam Amhaz (the "C4ADS Report"). *See* ECF Doc. No 70.

15. However, as explained below, the alleged connections between the Amhaz brothers and I are nonexistent, and a simple review of documents disprove and/or cast serious doubt on the allegations and conclusions made in the C4ADS Report.

16. I formally (and informally) dissociated myself with the Amhaz brothers and every associated entity dating back to July 2014—as soon as I was informed of the U.S. Department of Treasury's sanctions against the Amhaz brothers.

17. While for most individuals and lawyers, my legal roles and unrelated relationships would be innocuous, the C4ADS Report distorts reality by mutilating minimal facts to create the appearance of impropriety on my part, when none exists.

18. As a result, the Complaint unfortunately highlights unfounded allegations and conclusions of wrongdoing made in the C4ADS Report.

**The C4ADS Report**

19. The gravamen of the C4ADS Report (and in turn the Complaint) with regards to me is that the Amhaz brothers illegally laundered money via their "unsanctioned" Lebanese

corporate entities (of which I was "affiliated") to me, and I, in turn, purchased real estate in California.

20. The C4ADS Report purportedly "corroborates" its slavish "reporting" regarding me, by alleging that I am a "business partner" involved in "previously reported illicit activity" in Liberia.

21. However, nothing could be further from the truth, and I vehemently deny engaging in any such wrongdoing alleged in either the C4ADS Report or the Complaint.

22. Like any other American, my ownership of any real estate in California does not reflect any wrongdoing and, given the legitimate, documented sources of my income, for sure cannot be considered money laundering.

23. C4ADS's conspiracy theories of "money laundering via real estate" in their report are easily debunked by publicly-available documents and information, which it conveniently omits.

24. In turn, Plaintiff's Complaint relies on these conspiracy theories, which have no basis in fact.

   *i. The C4ADS Report falsely links and/or associates my legal representative role with the Amhaz brothers*

25. First, I have no affiliation (corporate or otherwise) with the Amhaz brothers. Of the eight (8) Lebanese entities that the C4ADS Report identified as related to myself and Kamel Amhaz, in seven of them (Special Operations Group S.A.L., Teleserve Plus S.A.L. or any of the Stars Group Holding affiliated entities), I only acted as a legal representative for business formation purposes only.

26. I had no managerial or shareholder role in either of them.

27. My role in filing and assisting with business formation in Lebanon was ministerial in

nature and no different than LegalZoom's role in filing and assisting with business formation in the U.S.

28. While the C4ADS Report mentions my legal representative relationship with over 80 companies in Lebanon, which should not have come as a surprise given the corporate formation focus of his law practice, C4ADS ironically (and erroneously) claims—without any evidence or support—that there was something untoward with my legal representative role in those Amhaz brothers' entities.

29. Second, the C4ADS Report's allegation that Special Operations Group S.A.L. is currently "Amhaz-linked" is false.

30. For one, Kamel Amhaz was divested of any ownership stake in Special Operations Group S.A.L. in June 2014, over a month **before** the U.S. Department of Treasury sanctioned the Amhaz brothers. *See* annexed hereto as **Exhibit A**, a true and correct copy of "Transfer of Shares" for Special Operations Group S.A.L.

31. In addition, Special Operations Group S.A.L. was liquidated and dissolved in September 2017 by the shareholders. See annexed hereto as **Exhibit B**, a true and correct copy of "General Assembly Minutes of 11/9/2017" for Special Operations Group S.A.L.

32. Notably, neither I nor Mr. Amhaz are listed as shareholders on the attendance sheet of the General Assembly Minutes. *See* Exhibit B.

33. Third, the C4ADS Report's allegation that Liban Stars S.A.R.L. is or ever was "Amhaz-linked" is also false.

34. Liban Stars S.A.R.L. was a forgotten company that was never used, had no meetings, had no assets, had no bank account transactions from October 2007 until 2016 — when its bank account was closed at the request of Byblos Bank for inactivity, and was

deregistered in July 2017. See annexed hereto as **Exhibit C**, a true and correct copy of a response dated August 3, 2018 from the Lebanese Ministry of Justice regarding Liban Stars S.A.R.L. and indicating the entity was "Struck off since July 2017."

35. Fourth, besides for Liban Stars, which was created in but unused since 2007, Special Operations Group S.A.L did not exist when the supposedly questionable real estate transactions occurred in California in 2010 and 2011.

36. In other words, no money could have been "laundered" to avoid sanctions or otherwise, insofar as none of the companies were able to do the alleged money laundering.

37. As previously stated, none of the entities (sanctioned or unsanctioned) can be linked to the supposedly questionable real estate transactions, as I did not act as shareholder nor manager (i.e. had no authority, knowledge of or access to any monetary account of any of the remaining, accused entities).

38. In fact, none of these companies have any role or any legal presence in the United States at all.

39. Thus, the allegations in the C4ADS Report that I operate, am involved in or have any connection to an Amhaz-linked "corporate network" linked to "money laundering in Lebanon" is demonstrably false.

   ii. *No money, property, asset or anything of value was ever exchanged between the Amhaz brothers and myself*

40. Critically, no money or asset was ever given, gifted, transferred, pontificated or promised to me either via my role as legal representative for the abovementioned companies or with regard to the unused company that had no bank transactions (Liban Stars) from the Amhaz brothers.

41. This lack of monetary transfers is important, because the C4ADS Report (and Plaintiffs'

> Complaint) relies upon my mere association with these entities and the existence of real estate records in California as the basis for their conclusion that money laundering (specifically money laundering to avoid U.S. sanctions) occurred.
>
> iii. *I have de minimis interest in California real estate but I did not receive any money from the Amhaz brothers regarding same*

42. While the C4ADS Report is correct in stating that I was associated with "properties in California vis-à-vis his personal relationship with Bill Jamal," other assertions about my "ownership" of such property are false.

43. Indeed, the premise that I was involved in a coordinated "corporate network," including Special Operations Group S.A.L. and Liban Stars S.A.R.L., using real estate to launder money is false because neither Special Operations Group S.A.L. nor Liban Stars S.A.R.L. had the legal capacity nor financial capabilities to own or purchase real estate—whether in Lebanon or in the United States.

44. For example, Special Operations Group S.A.L.'s by-laws did not permit it to own property. *See* annexed hereto as **Exhibit D**, a true and correct copy of SOG By-Laws at Article 3.

45. Further, as stated above, Liban Stars S.A.R.L had no financial capabilities to do so (and no financial transactions existed).

46. Thus, the C4ADS Report's suspicions that I was actively involved in some money laundering scheme with the Amhaz brothers based on unrelated real estate transactions in which no money was exchanged has no basis in fact.

**The Complaint's Reliance on the C4ADS Report**

47. Plaintiffs' Complaint casts a negative light on me by amplifying and borrowing whole cloth from the false allegations of wrongdoing in the C4ADS Report.

48. Plaintiffs' counsel doubles down on these false assertions by referencing a *Wall Street Journal* article ("WSJ") article first published in July 2018 that refers the C4ADS Report. *See* ECF Doc. No. 70.

49. However, the version of the WSJ article that Plaintiffs' counsel relies was corrected and amplified in **October 2018** (over two months **before** Plaintiffs filed their complaint), to include clarifying references to me which reduce, if not outright negate, the imprimatur of authority of C4ADS's Report. *See* annexed hereto as **Exhibit E**, a true and correct copy of the updated WSJ article.

**Plaintiffs' Claims Cause Me Reputational Harm**

50. Plaintiffs' claims cause me reputational and a possible physical harm considering the C4ADS report in question is demonstrably false.

51. That harm is exacerbated by the fact that I am the only lawyer in Lebanon, and possibly in the Middle East, accredited as U.S. arms trafficking compliance professional, and such accusations appearing in a U.S.-based Complaint can and will harm my profession directly and much more than any other lawyer.

52. I believe that Plaintiffs' counsel deliberately inserted these false and defamatory allegations against me in a legal pleading and proceeding that does not provide me any opportunity to respond to, rebut or dispute these knowingly false claims.

53. "Hezbollah" is considered and enemy of state and on U.S. and several international terrorist organization prohibition lists, according to various U.S. and international laws. Hezbollah is not only accused of terrorism, but also drug trafficking and money laundering—activities I have never been engaged in. These accusations by Plaintiffs' counsel are not only filed in a U.S. court of law, they are also signed in the names of the

families of four hundred of our beloved U.S. armed forces soldiers and officers. Thus, the harm is not only to my name and business future, it is becoming real and could likely turn into physical harm at any time by the *real* agents of Hezbollah, on me, personally, and my family, including my wife and three children.

54. Indeed, Plaintiffs' counsel's admission that they relied upon the C4ADS Report, then conducted a post-hoc "investigation" —apparently not until I sought relief from the Court—that revealed no more detail than what was falsely alleged by C4ADS, is as troubling as it is revealing of their plan.

55. In sum, I have not ever been involved in the alleged wrongdoing attributed to me in the Complaint. As such, I believe that doing the right thing shall have an added positive impact on Plaintiffs' case as a whole, insofar as it removed allegations that are blatantly false such that their claims could be more credible, probative and provable.

56. While I have the utmost sympathy for the lives of the loved ones Plaintiffs now seek recompense for in this action, I respectfully request that such scandalous allegations inserted by their lawyers against me be stricken by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 25 2019.

                                                                                         _____
                                                                                         ACHRAF AFIEDDINE