UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

ROBERT BARTLETT, TERREL CHARLES :
BARTLETT, LINDA JONES, SHAWN BARTLETT, :
MAXINE E. CROCKETT, *individually and on behalf of* :
*the* ESTATE OF RICKY LEON CROCKETT, :
MARVISE L. CROCKETT, TRACIE ARSIAGA, :
*individually and on behalf of the* ESTATE OF ROBERT :
R. ARSIAGA, SYLVIA MACIAS, GILBERT :
ARSIAGA, JR., GEORGE ARSIAGA, MATTHEW :
ARSIAGA, ANGEL MUNOZ, ROBI ANN GALINDO, :
PATRICIA ARSIAGA *on behalf of the* ESTATE OF :
JEREMY ARSIAGA, CEDRIC HUNT, STEVEN :
GREENWOOD, STEPHEN W. HILLER, *individually* :
*and on behalf of the* ESTATE OF STEPHEN DUSTIN :
HILLER, JEREMY CHURCH, SANDRA HANKINS, :
INGRID FISHER, *individually and on behalf of the* :
ESTATE OF STEVEN SCOTT FISHER, KRISTIN :
WALKER, STEVEN T. FISHER, KATHLEEN :
GRAMKOWSKI, MARY CARVILL, PEGGY :
CARVILL-LIGUORI, *individually and on behalf of the* :
ESTATE OF FRANK T. CARVILL, DANIEL :
CARVILL, PAMELA ADLE-WATTS, *individually and* :
*on behalf of the* ESTATE OF PATRICK ADLE, JOHN :
WATTS, GLORIA NESBITT, *individually and on behalf* :
*of the* ESTATE OF DEFOREST L. TALBERT, D.J.H., *a* :
*minor*, CHIQUITA TALBERT, TAWANNA TALBERT :
DARRING, LATASHA MARBLE, JAMES TALBERT, :
MIRANDA PRUITT, VELINA SANCHEZ, *individually* :
*and on behalf of the* ESTATE OF MOSES ROCHA, :
ALOYSIUS SANCHEZ, SR., ROMMEL ROCHA, :
PHILLIP SANCHEZ, ALOYSIUS SANCHEZ, JR., :
GLORIA P. REYNOSO, *individually and on behalf of* :
*the* ESTATE OF YADIR G. REYNOSO, JASMIN :
REYNOSO, PATRICIA REYNOSO, JOSE REYNOSO, :
ASHLEY WELLS SIMPSON, *individually and on behalf* :
*of the* ESTATE OF LARRY LLOYD WELLS, CHAD :
WELLS, CRYSTAL STEWART, CHASITY WELLS- :
GEORGE, CANDICE MACHELLA, BILLY DOAL :
WELLS, HOPE ELIZABETH VEVERKA, DONNA :
JEAN HEATH, *individually and on behalf of the* :
ESTATE OF DAVID MICHAEL HEATH, LOLA JEAN :
MODJESKA, JOHN DAVID HEATH, OLGA LYDIA :
GUTIERREZ, *individually and on behalf of the* ESTATE :
OF JACOB DAVID MARTIR, ISMAEL MARTIR, :

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**19-cv-007 (CBA) (VMS)**

VICTORIA M. FOLEY, *individually and on behalf of* : 
*the* ESTATE OF ALEXANDER SCOTT : 
ARREDONDO, NATHANIEL FOLEY, MICHAEL : 
SCOTT DEWILDE, STEVEN MORRIS, DANIELLE : 
DECHAINE-MORRIS, NICHOLAS MORRIS, K.M., *a* : 
*minor*, MONICA ARIZOLA, ROBERTO AARON : 
ARIZOLA, ROBERTO ARIZOLA, SR., CECILIA : 
ARIZOLA, DANNY ARIZOLA, RICARDO ARIZOLA, : 
GREG KLECKER, RAYMOND MONTGOMERY, : 
PATRICIA MONTGOMERY, BRYAN : 
MONTGOMERY, TONY WOOD, JOEDI WOOD, : 
ADAM WOOD, MEGAN WOOD, LISA RAMACI, : 
*individually and on behalf of the* ESTATE OF STEVEN : 
VINCENT, ISABELL VINCENT, ESTATE OF : 
CHARLES VINCENT, MARIA VIDAL, TAMARA : 
HASSLER, RICHARD E. HASSLER, JOANNE SUE : 
HASSLER, SCOTT HUCKFELDT, KATHRYN : 
HUCKFELDT, ALISHA HUCKFELDT, MATTHEW : 
HUCKFELDT, TIMOTHY NEWMAN, PADRAIC J. : 
NEWMAN, AMENIA JONAUS, *individually and on* : 
*behalf of the* ESTATE OF JUDE JONAUS, : 
GERNESSOIT JONAUS, DAPHNIE JONAUS : 
MARTIN, RICKY JONAUS, MARCKENDY JONAUS, : 
CLAIRE JONAUS, SHAREN JONAUS MARTIN, : 
MASINA TULIAU, GWENDOLYN MORIN- : 
MARENTES, *individually and on behalf of the* ESTATE : 
OF STEVE MORIN, JR., ESTEBAN MORIN, : 
AUDELIA MORIN, ESTAVAN MORIN, SR., : 
BRIANNA RENEE NAVEJAS, MARGARITO A. : 
MARTINEZ, JR., AMY LYNN ROBINSON and : 
FLOYD BURTON ROBINSON, *individually and on* : 
*behalf of the* ESTATE OF JEREMIAH ROBINSON, : 
JACOB MICHAEL ROBINSON, LUCAS WILLIAM : 
ROBINSON, ALVIS BURNS, JODEE JOHNSON, : 
JAMES HIGGINS, WENDY COLEMAN, BRIAN : 
RADKE, NOVA RADKE, STEVEN VERNIER, JR., : 
CLIFFORD L. SMITH, JR., *individually and on behalf* : 
*of the* ESTATE OF KEVIN J. SMITH, GEORGIANNA : 
STEPHENS-SMITH, CORENA MARTIN, ADAM : 
MATTIS, TERRANCE PETERSON, III, PETRA : 
SPIALEK, DAVID G. CARDINAL, JR., *individually* : 
*and on behalf of the* ESTATE OF ANTHONY : 
CARDINAL, RICHELLE HECKER, *individually and on* : 
*behalf of the* ESTATE OF WILLIAM F. HECKER, III, : 
VICTORIA HECKER, W.H., *a minor*, C.H., *a minor*, : 
WILLIAM F. HECKER, JR., NANCY HECKER, JOHN :

D. HECKER, ROBERT F. MARIANO, *individually and*  :
*on behalf of the* ESTATE OF ROBBIE M. MARIANO,  :
DEBRA MARIANO, BOBBIE D. MARIANO, VICKIE  :
MICHAY WHITE, *individually and on behalf of the*  :
ESTATE OF STEPHEN J. WHITE, GLADYS E.  :
REYES CENTENO, VERONICA LOPEZ REYES,  :
*individually and on behalf of the* ESTATE OF JASON  :
LOPEZ REYES, ZORAIMA LOPEZ, JENNIFER LINK,  :
SHARON JOHNSTON, TARA HUTCHINSON,  :
KENNY LEE, TOM B. LEE, LING P. LEE, DEBORAH  :
NOBLE, *individually and on behalf of the* ESTATE OF  :
CHARLES E. MATHENY, IV, DAVID NOBLE,  :
CHARLES E. MATHENY, III, JUDY COLLADO,  :
KAIYA COLLADO, JUSTIN WALDECK, TANJA  :
KUHLMEIER, *individually and on behalf of the*  :
ESTATE OF DANIEL KUHLMEIER, K.K., *a minor*,  :
ROBERT J. KUHLMEIER, THERESA A.  :
KUHLMEIER, THERESA ANN KUHLMEIER,  :
EDWARD KUHLMEIER, THOMAS KUHLMEIER,  :
JOHN KUHLMEIER, ROBERT W. KUHLMEIER,  :
PATRICK FARR, *individually and on behalf of the*  :
ESTATE OF CLAY P. FARR, SILVER FARR,  :
CARROL ALDERETE, ANTHONY ALDERETE,  :
CHAD FARR, RAYANNE HUNTER, *individually and*  :
*on behalf of the* ESTATE OF WESLEY HUNTER,  :
W.H., *a minor*, T.H., *a minor*, FABERSHA FLYNT  :
LEWIS, CHRISTOPHER ANTHONY BERSHEFSKY,  :
LORENZO SANDOVAL, SR., *individually and on*  :
*behalf of the* ESTATE OF ISRAEL DEVORA-GARCIA,  :
LORENZO SANDOVAL, JR., ADRIAN SANDOVAL,  :
ROSA ESTHER SANDOVAL, HENRY J.  :
BANDHOLD, SR., *individually and on behalf of the*  :
ESTATE OF SCOTT BANDHOLD, AFONSO  :
BANDHOLD, MARIANA BANDHOLD, H. JOSEPH  :
BANDHOLD, DONALD C. BANDHOLD, JOSHUA P.  :
STEIN, NICOLE B. STEIN, R.M.S., *a minor*, J.S.S., *a*  :
*minor*, JESSE P. STEIN, MICHAEL PAUL ALAN  :
SHELSWELL, ERIK ROBERTS, E.C.R., *a minor*,  :
ROBIN ROBERTS, JAMES CRAIG ROBERTS, CARA  :
ROBERTS, COLIN ROBERTS, LUKE MURPHY,  :
WILLETTE MURPHY, SHANE IRWIN, T.R., *a minor*,  :
HELEN MARGUERITE IRWIN, NICOLE IRWIN,  :
MARIA GOMEZ, *individually and on behalf of the*  :
ESTATE OF JOSE GOMEZ, JOHN DANA GREER,  :
STEPHANIE C. SANDER, CHRISTOPHER D.  :
GREER, JOSEPH L. GREER, CARL K. GREER,  :

CHRISTOPHER JOYNER, ANNE P. JOYNER,                          :
NECOLE DUNLOW SMITH, MICHAEL R. MILLS,                       :
M.R.M., *a minor*, M.R.M., *a minor*, EDDIE JO               :
PALINSKY, *individually and on behalf of the* ESTATE        :
OF JERRY A. PALINSKY, JR., JERRY A. PALINSKY,                :
II, ADINA PALINSKY, JERRY A. PALINSKY, SR.,                  :
KATHLEEN HOKE, JOEL PALINSKY, KARALEEN                       :
HERB, ERIC BRANDON STONEKING, CARRIE SUE                     :
STONEKING, FAITH RENEE STONEKING,                            :
NANETTE SAENZ, *individually and on behalf of the*          :
ESTATE OF CARLOS N. SAENZ, JUAN SAENZ,                       :
JOAQINA SAENZ CHORENS, LUZ MARIA                             :
ESTRADA-PULIDO, FRANCES CATHERINE                            :
CASTRO, ELVA ESPINOZA, AMANDA VACHO *on*                     :
*behalf of the* ESTATE OF NATHAN J. VACHO *and on*           :
*behalf of* E.V., *a minor*, BAYLI VACHO, *individually*     :
*and on behalf of the* ESTATE OF NATHAN J. VACHO,            :
JOHN VACHO, *individually and on behalf of the*              :
ESTATE OF CAROL VACHO, ASHLEY VACHO                          :
LESLIE, RONALD VEVERKA, CAROL POLLEY,                        :
KEITH VEVERKA, DOUGLAS VEVERKA, SANDRA                       :
SOLIDAY, JEANETTE WEST, *individually and on*                :
*behalf of the* ESTATE OF ROBERT H. WEST,                    :
SHELBY WEST, DONNA ENGEMAN, *individually*                   :
*and on behalf of the* ESTATE OF JOHN W.                     :
ENGEMAN, SHANNON SHUMATE, LAUREN                             :
SHUMATE, L.S., *a minor*, L.S., *a minor*, NICOLE            :
DICENZO, *individually and on behalf of the* ESTATE         :
OF DOUGLAS ANDREW DICENZO, D.D., *a minor*,                  :
LARRY DICENZO, KATHY CRANE, JOHNNY                           :
ALLEN BLAIR, *individually and on behalf of the*            :
ESTATE OF ROBERT EDWARD BLAIR, CHARLEE                       :
BLAIR WEBB, SUZZETTEE LAWSON, *individually*                 :
*and on behalf of the* ESTATE OF ISAAC S. LAWSON,            :
C.L., *a minor*, ARNE EASTLUND, TINA EASTLUND,               :
SVEN EASTLUND, TAYLOR EASTLUND,                              :
ELIZABETH JO EASTLUND, MATTHEW                               :
ADAMSON, R.A., *a minor*, KATHY ADAMSON,                     :
RICHARD ADAMSON, CHRISTOPHER ADAMSON,                        :
JEFFREY ADAMSON, JUSTIN ADAMSON, JAMES                       :
SHEPARD, JOHN P. SKLANEY, III, KATHY                         :
CRABTREE, *individually and on behalf of the* ESTATE        :
OF DANIEL CRABTREE, M.C., *a minor*, JUDY ANN                :
CRABTREE, RONALD WAYNE CRABTREE,                             :
DEBRA WIGBELS, RONALD WILLIAM                                :
CRABTREE, JUDY HUENINK*, individually and on*                :

*behalf of the* ESTATE OF BENJAMIN J. SLAVEN,                  :
SEAN SLAVEN, CHASTITY DAWN LAFLIN,                            :
NICOLE LANDON, MISTI FISHER, STEVEN J.                       :
FRIEDRICH, A.F., *a minor*, PHILIP ALAN DERISE,              :
NORMA ALICIA CONTRERAS, JONATHAN                              :
CONTRERAS, SR., CARLOS CONTRERAS, CESAR                       :
CONTRERAS, HERNAN CONTRERAS, NOEL                             :
CONTRERAS, DANNYEL CONTRERAS, SHARON                          :
M. PUGH, *individually and on behalf of the* ESTATE OF :
KENNETH IRVING PUGH, BRITNEY E. CARTER,                       :
ALICIA PEARSON, DANIEL J. EVANS, JUSTIN                       :
EVANS, KEVIN GRAVES, NICHOLAS GENE                            :
KOULCHAR, MICHAEL KOULCHAR, SUHEIL                            :
CAMPBELL, *individually and on behalf of the* ESTATE :
OF EDGARDO ZAYAS, ALEXANDER ZAYAS, A.Z.-                      :
C., *a minor*, CATHY ANDINO, *individually and on*           :
*behalf of the* ESTATE OF EDWIN A. ANDINO, JR.,              :
LUIS JUNIOR PUERTAS, LIDIA SULLIVAN,                          :
GABRIELA D. PUERTAS VERGARA-DONOSO,                           :
CHRISTOPHER MICHAEL MELENDEZ, NARCISO                         :
MELENDEZ, CHRISTINA MELENDEZ, LAUREL                          :
BARATTIERI, *individually and on behalf of the*              :
ESTATE OF GUY BARATTIERI, PATRICIA                            :
WHEATLEY, REBECCA BARATTIERI, NICOLE                          :
BARATTIERI, GINA TESNAR, GLORIA L.                            :
MAGANA, *individually and on behalf of the* ESTATE :
OF KENNY FRANCES STANTON, JR., MARIO                          :
STANTON, BRANDIE STANTON, TERRYMARIE                          :
STANTON, FRED FRIGO, NANNETTE BRYNE-                          :
HAUPT, LYNN FOREHAND, *individually and on*                  :
*behalf of the* ESTATE OF RYAN HAUPT, LANCE                  :
HAUPT, RHONDA HAUPT, TIFANY THOMPSON,                         :
SABRINA CUMBE, WILLIAM WITTE, *individually* :
*and on behalf of the* ESTATE OF KEVIN M. WITTE,             :
MICHAEL MOCK, TAMMY DORSEY, ERIC PHYE,                        :
JAMES GMACHOWSKI, CONSTANCE BRIAN,                            :
*individually and on behalf of the* ESTATE OF BRIAN          :
BRIAN, AMBER HENSLEY, DAVID W. HAINES,                        :
DAWN HAINES, COLIN HAINES, MACKENZIE                          :
HAINES, KARAR ALABSAWI, MICHELLE                              :
TAYLOR, *individually and on behalf of the* ESTATE OF :
DAVID G. TAYLOR, JR., J.T., *a minor*, PHYLLIS               :
TAYLOR, JOHN TAYLOR, BRIAN G. TAYLOR,                         :
JUDAS RECENDEZ, TYLER NORAGER, SHALEE                         :
NORAGER, M.N., *a minor*, HARRY RILEY BOCK,                  :
JILL ANN BOCK, MARIAH SIMONEAUX, KOUSAY                       :

AL-TAIE, *individually and on behalf of the* ESTATE OF : \
AHMED AL-TAIE, NAWAL AL-TAIE, BASHAR AL- : \
TAIE, HATHAL K. TAIE, LAWRENCE KRUGER, : \
*individually and on behalf of the* ESTATE OF ERIC : \
KRUGER, CAROL KRUGER, C.K., *a minor*, E.K., *a* : \
*minor*, DOUGLAS KRUGER, KRISTY KRUGER, : \
JACKIE FARRAR-FINKEN, *individually and on behalf* : \
*of the* ESTATE OF PAUL FINKEN, EMILIE FINKEN, : \
C.F., *a minor*, J.F., *a minor*, STEPHEN FINKEN, ALAN : \
FINKEN, RICHARD FINKEN, DAVID FINKEN, : \
MARK FINKEN, PETER FINKEN, JEAN PRUITT, : \
JOAN HENSCHEID, LORI ANN MCCOY, *individually* : \
*and on behalf of the* ESTATE OF GREGORY MCCOY, : \
L.M., *a minor*, T.M., *a minor*, GLENN MICHAEL COX, : \
SANGSOON KIM, SEOP KIM, *individually and on* : \
*behalf of the* ESTATE OF JANG HO KIM, MICHELLE : \
KIM, KURTISS LAMB, FRANCIS L. COTÉ, NANCY : \
COTÉ, CHRISTOPHER COTÉ, SAMANTHA : \
DUNFORD, MAXIMILLIAN SHROYER, CASEY : \
REUBEN, BREE REUBEN, PATRICK REUBEN, : \
JACKIE STEWART, MARK MUNNS, CRISTA : \
MUNNS, SHARON DEBRABANDER, DENNIS : \
DEBRABANDER, NICOLE DEBRABANDER, : \
JOELLA PRATT, HELEN FRASER, RICHARD : \
FRASER, *individually and on behalf of the* ESTATE OF : \
DAVID M. FRASER, TRICIA ENGLISH, NATHAN : \
ENGLISH, N.C.E., *a minor*, A.S.E., *a minor*, TODD : \
DAILY *on behalf of the* ESTATE OF SHAWN L. : \
ENGLISH, JOSHUA STARKEY, BRENT HINSON, : \
WILLIAM HINSON, FRAN HINSON, HILARY : \
WESTERBERG, LINDA GIBSON, JOHN GIBSON, : \
STEPHANIE GIBSON WEBSTER, SEAN ELLIOTT, : \
TRAVIS GIBSON, WILLIAM RONALD LITTLE, : \
BRENDA LITTLE, *individually and on behalf of* : \
WILLIAM RONALD LITTLE, JR., KIRA SIKES, : \
JOSHUA DENMAN, RANDOLPH DELBERT NANTZ, : \
JOSHUA RYAN NANTZ, LORI ANN MCCORMICK, : \
*individually and on behalf of the* ESTATE OF : \
CLINTON MCCORMICK, DEBORAH BEAVERS, : \
DENISE VENNIX, *individually and on behalf of the* : \
ESTATE OF ALAN R. BLOHM, JEREMY BLOHM, : \
*individually and on behalf of the* ESTATE OF CHRIS : \
BLOHM, KIANA BLOHM, JAMES SMITH, MEGAN : \
MAUK, ROBERT VACCARO, JOANNE GUTCHER, : \
CHARLOTTE FREEMAN, *individually and on behalf of* : \
*the* ESTATE OF BRIAN S. FREEMAN, G.F., *a minor*, :

I.F., *a minor*, KATHLEEN SNYDER, RANDOLPH : 
FREEMAN, KATHALEEN FREEMAN, ALBERT : 
SNYDER, RICHARD LEE, DANNY CHISM, : 
ELIZABETH CHISM, *individually and on behalf of the* : 
ESTATE OF JOHNATHAN B. CHISM, VANESSA : 
CHISM, JULIE CHISM, RUSSELL J. FALTER, : 
*individually and on behalf of the* ESTATE OF SHAWN : 
P. FALTER, LINDA FALTER, MARJORIE FALTER, : 
RUSSELL C. FALTER, JOHN SACKETT, JASON : 
SACKETT, MICHAEL LUCAS, MARSHA NOVAK, : 
DAVID LUCAS, TIM LUCAS, ANDREW LUCAS, : 
SHANNON MILLICAN, *individually and on behalf of* : 
*the* ESTATE OF JOHNATHON M. MILLICAN, PAUL : 
MITCHELL MILLICAN, NOALA FRITZ, *individually* : 
*and on behalf of the* ESTATE OF JACOB FRITZ *and* : 
*the* ESTATE OF LYLE FRITZ, DANIEL FRITZ, : 
ETHAN FRITZ, BILLY WALLACE, STEFANIE : 
WALLACE, AUSTIN WALLACE, DEVON : 
WALLACE, C.W., *a minor*, EVAN KIRBY, MARCIA : 
KIRBY, STEVEN KIRBY, JOHNNY WASHBURN, : 
MARVIN THORNSBERRY, CYNTHIA : 
THORNSBERRY, A.B., *a minor*, M.T., *a minor*, N.T., *a* : 
*minor*, L.T., *a minor*, TRACY ANDERSON, JEFFREY : 
ANDERSON, ADAM G. STOUT, ANDREW JEFFREY : 
ANDERSON, ELIZABETH LYNN ISLAS, : 
ANASTASIA FULLER, *individually and on behalf of* : 
*the* ESTATE OF ALEXANDER H. FULLER, A.F., *a* : 
*minor*, SAMANTHA BALSLEY, *individually and on* : 
*behalf of the* ESTATE OF MICHAEL C. BALSLEY, : 
L.R.-W., *a minor*, HEATH DAMON HOBSON, JODI : 
MICHELLE HOBSON, M.D.H., *a minor*, DEADRA : 
GARRIGUS, *individually and on behalf of the* ESTATE : 
OF MICKEL D. GARRIGUS, DAVID GARRIGUS, : 
NICHOLE GARRIGUS, KYLA OSTENSON, : 
MATTHEW GARRIGUS, SHAWN RYAN, SHARON : 
Y. DUNN SMITH, *individually and on behalf of the* : 
ESTATE OF TERRENCE DUNN, DENNIS DUNN, : 
RICHARD LANDECK, VICTORIA LANDECK, : 
LAVONNA HARPER, MELBA ANNE F. HARRIS, : 
PAUL D. HARRIS, HYUNJUNG GLAWSON, : 
*individually and on behalf of the* ESTATE OF CURTIS : 
E. GLAWSON, YOLANDA M. BROOKS, CURTIS : 
GLAWSON, SR., KIERRA GLAWSON, SABRINA : 
GLAWSON *on behalf of the* ESTATE OF CORTEZ : 
GLAWSON, JAZMON REYNA, RYAN SABINISH, : 
R.J.S., *a minor*, S.J.S., *a minor*, CARRIE THOMPSON, :

*individually and on behalf of the* ESTATE OF SEAN M.   :
THOMAS, A.T., *a minor*, DANIEL THOMAS, SR.,   :
DIANA THOMAS, DANIEL THOMAS, JR., KELLY   :
GILLIS, MELINDA FLICK, ANN CHRISTOPHER,   :
*individually and on behalf of the* ESTATE OF KWESI   :
CHRISTOPHER, NANCY FUENTES, *individually and*   :
*on behalf of the* ESTATE OF DANIEL A. FUENTES,   :
ARMANDO FUENTES, JULIO FUENTES, TATYANA   :
FUENTES, EMMA MCGARRY, D.J.F., *a minor*, JOHN   :
KIRBY, MICHAEL MURPHY-SWEET, ELIZABETH   :
MURPHY-SWEET, ANONA GONELLI, LINDSAY   :
YOUNG, *individually and on behalf of the* ESTATE OF   :
BRETT A. WALTON, S.W., *a minor*, LEASA   :
DOLLAR, EUGENE DELOZIER, MICHELLE   :
KLEMENSBERG, *individually and on behalf of the*   :
ESTATE OF LARRY R. BOWMAN, SCOTT LILLEY,   :
FRANK LILLEY, JOLENE LILLEY, MATTHEW   :
LILLEY, AVA TOMSON, *individually and on behalf of*   :
*the* ESTATE OF LUCAS V. STARCEVICH, RICHARD   :
TOMSON, BRADLEY STARCEVICH, GLENDA   :
STARCEVICH, ARIANA STARCEVICH, TRENTON   :
STARCEVICH, SAMANTHA TOMSON, ANDREW   :
TOMSON, JARED S. STEVENS, SUSAN MARIA   :
DOSKOCIL HICKS, *individually and on behalf of the*   :
ESTATE OF GLENN DALE HICKS, JR., GLENN   :
DALE HICKS, SR., DAVID JAMES HICKS, JOHN   :
CHRISTOPHER HICKS, S.L.H., *a minor*, KAREN   :
FUNCHEON, *individually and on behalf of the* ESTATE   :
OF ALEXANDER J. FUNCHEON, ROBERT   :
FUNCHEON, DWIGHT MARTIN, *individually and on*   :
*behalf of the* ESTATE OF JAY E. MARTIN, DOVE   :
DEANNA ADAMS, RAVEN ADAMS, LARK   :
ADAMS, HOLLY BURSON, *individually and on behalf*   :
*of the* ESTATE OF JEROME POTTER, NANCY   :
UMBRELL, *individually and on behalf of the* ESTATE   :
OF COLBY J. UMBRELL, MARK UMBRELL, CASEY   :
BOEHMER, JEREMY D. SMITH, DANIEL DIXON,   :
*individually and on behalf of the* ESTATE OF ILENE   :
DIXON *and the* ESTATE OF ROBERT J. DIXON,   :
JESSICA HUBBARD *on behalf of the* ESTATE OF   :
ROBERT J. DIXON, M.R., *a minor*, L.R., *a minor*,   :
DAVID DIXON, DANIEL AUSTIN DIXON,   :
GRETCHEN LANG, REBECCA J. OLIVER, DANIEL   :
C. OLIVER, KIMBERLEE AUSTIN-OLIVER,   :
TIFFANY M. LITTLE, *individually and on behalf of the*   :
ESTATE OF KYLE A. LITTLE, K.L., *a minor*,   :

SHELLEY ANN SMITH, DAKOTA SMITH-LIZOTTE, :
SHYANNE SMITH-LIZOTTE, ERIN LEE DRUCTOR, :
*individually and on behalf of the* ESTATE OF BLAKE :
STEPHENS, TRENT STEPHENS, KATHLEEN :
STEPHENS, DEREK STEPHENS, RHETT STEPHENS, :
SUMMER STEPHENS, BRITTANI HOBSON, :
CYNTHIA CONNER, WILLIAM FARRAR, SR., :
*individually and on behalf of the* ESTATE OF :
WILLIAM A. FARRAR, JOSHUA BROOKS, JOYCE :
BROOKS, DANNY BROOKS, DANIEL TYLER :
BROOKS, DELILAH BROWN, *individually and on* :
*behalf of the* ESTATE OF SCOTT J. BROWN, TONYA :
K. DRESSLER, ARDITH CECIL DRESSLER, :
MELISSA DRESSLER, TANYA SUZZETTE :
DRESSLER, DANIEL DRESSLER, JAMES :
DRESSLER, ELIZABETH MASTERSON, *individually* :
*and on behalf of the* ESTATE OF JOSHUA D. BROWN, :
MARIAN BROWN, WAYNE BROWN, DANIELLE :
SWEET, *individually and on behalf of the* ESTATE OF :
RYAN A. BALMER, A.B., *a minor*, G.B., *a minor*, :
DONNA KUGLICS, *individually and on behalf of the* :
ESTATE OF MATTHEW J. KUGLICS, LES :
KUGLICS, EMILY ADAMS, DEREK GAJDOS, :
TAMMY DENBOER, BRANDEAUX CAMPBELL, :
RYAN WILSON, JAMI LIN WILSON, MATTHEW :
LAMMERS, ALICIA LAMMERS, BARBARA :
LAMMERS, GARY LAMMERS, STACY PATE, :
ANGEL GOMEZ, DENISE JACKSON, SCOTT HOOD, :
FLORA HOOD, DIXIE FLAGG, STEPHANIE HOOD, :
CHEYENNE FLAGG, WILLIAM PARKER, MEGHAN :
PARKER-CROCKETT, ANDREW MOORES, SHEILA :
TRACY, *individually and on behalf of the* ESTATE OF :
JACOB TRACY, DONALD TRACY, NICHOLE :
SWEENEY, CHRISTINA SHERIDAN, MATTHEW :
BENSON, MELISSA BENSON, C.B., *a minor*, B.B., *a* :
*minor*, DANIEL P. BENSON, CAROL BENSON, :
DANIEL R. BENSON, ANDREW JAMES RAYMOND, :
RAYMOND NIGEL SPENCER, SR., SYLVIA :
JOHNSON SPENCER, MICHAEL DEAN MOODY, :
SR., *individually and on behalf of the* ESTATE OF :
MICHAEL DEAN MOODY, JR., CONNIE MOODY, :
KEDRICK DANTE MOODY, DREW EDWARDS, :
DONIELLE EDWARDS, ARIFAH HARDY, T.C., *a* :
*minor*, AUNDRA CRAIG, JOYCE CRAIG, DEBRA :
COOK-RUSSELL, NASHIMA WILLIAMS CRAIG, :
MATTHEW CRAIG, JONATHAN CRAIG, ANDRE :

BROWN, MICHAEL COOK, VALENCIA COOK,          :
KATHERINE M. CROW, *individually and on behalf of*   :
*the* ESTATE OF WILLIAM J. CROW, K.A.C., *a minor*,   :
K.E.C., *a minor*, CANDACE CATHRYN HUDSON,     :
*individually and on behalf of the* ESTATE OF        :
KATHRYN ANN MONDINI, AMANDA B. ADAIR,        :
PATRICK TUTWILER, CRYSTAL TUTWILER,          :
SHIRLEY STEARNS and JOHN STEARNS,            :
*individually and on behalf of the* ESTATE OF        :
MICHELLE R. RING, KAREN HALL, MARILYN        :
HAYBECK, MARC STEARNS, JAMES COLE *on*       :
*behalf of* B.C., *a minor*, JOHN D. LAMIE, DONNA    :
LEWIS, *individually and on behalf of the* ESTATE OF :
JASON DALE LEWIS, J.L.*, a minor*, J.L., *a minor*,  :
G.L., *a minor*, JEAN MARIANO, KATHERINE      :
MCRILL-FELLINI, *individually and on behalf of the*  :
ESTATE OF ROBERT MCRILL, BRETT COKE,         :
BRIAN COKE, RONALD MCRILL, MATTHEW L.        :
MERGELE, RENE POOL, DEREK ALLEN              :
HOLLCROFT, PAULA C. BOBB-MILES, *individually*     :
*and on behalf of the* ESTATE OF BRANDON K. BOBB,   :
JOHNNY JAVIER MILES, SR., JOHNNY JAVIER       :
MILES, JR., RACQUEL ARNAE BOBB MILES,        :
URSULA ANN JOSHUA, *individually and on behalf of*   :
*the* ESTATE OF RON J. JOSHUA, JR., TAMMY      :
KINNEY, DANIEL PRICE, STEVEN PRICE,          :
TAUSOLO AIETI, IMO AIETI, LISI AIETI, POLOKA  :
AIETI, CHRISTOPHER BOUTEN, ERIN BOUTEN,      :
DANIEL DUDEK, MARGARET DUDEK, KATIE          :
WOODARD, SARAH DUDEK, ANDREW DUDEK,          :
EMANUELA FLOREXIL, *individually and on behalf of*   :
*the* ESTATE OF CAMY FLOREXIL, JOSEPH T.       :
MILLER, SEAN HARRINGTON, JESSICA             :
HEINLEIN, *individually and on behalf of the* ESTATE :
OF CHARLES T. HEINLEIN, JR., CHARLES         :
HEINLEIN, SR., JODY LYN HEINLEIN,            :
MARGARITA ARISTIZABAL, *individually and on*       :
*behalf of the* ESTATE OF ALFRED H. JAIRALA, J.J., *a* :
*minor*, SEBASTIAN NIUMAN, RICHARD           :
NEIBERGER, MARY NEIBERGER, AMI               :
NEIBERGER, ROBERT NEIBERGER, ERIC            :
NEIBERGER, *individually and on behalf of the* ESTATE :
OF CHRISTOPHER NEIBERGER, BRIAN J. CASEY,     :
BRITTANY HOGAN, SHELLEY ANN CASEY,           :
RICHARD CASEY, SALLY CHAND, *individually and*     :
*on behalf of the* ESTATE OF MICHAEL CHAND, SR.,    :

MICHAEL CHAND, JR., CHRISTINA MAHON,  :
RYAN CHAND, BRENDA CHAND, MARIO BOWEN,  :
JAMES DAVID HOCHSTETLER, LEANNE  :
LIZABETH HOCHSTETLER, J.H., *a minor*, P.H., *a*  :
*minor*, KYLE AUSTIN MARSHALL, JOHN RICHARD  :
TULLY, *individually and on behalf of the* ESTATE OF  :
MICHAEL TULLY, MARILYN LOUISE TULLY,  :
SLADE VICTOR TULLY, JOHN RICHARD TULLY,  :
II, HEATHER ANN FARKAS, ROBERT JAMES  :
HUNT, M.A.H., *a minor*, A.M.H., *a minor*,  :
BOONCHOB PRUDHOME, MICHELE WHITE,  :
*individually and on behalf of the* ESTATE OF DELMAR  :
WHITE, S.W., *a minor*, SHELBY WHITE, PERRY  :
WHITE, ROBERT WHITE, JOSHUA P.G. WOLD,  :
E.W., *a minor*, P.A., *a minor*, CELESTE YANTIS,  :
MARICEL MURRAY, *individually and on behalf of the*  :
ESTATE OF JOEL L. MURRAY, J.M., *a minor*,  :
BRYAN S. SHELTON, *individually and on behalf of the*  :
ESTATE OF RANDOL S. SHELTON, DARLENE  :
SHELTON, AMANDA SHELTON, BRIAN T.  :
SHELTON, DAN LAIRD, ANGELA M. LAIRD,  :
JORDAN M. LAIRD, HUNTER L. LAIRD, C.L., *a*  :
*minor*, LESLIE K. REEVES-HARDCASTLE,  :
*individually and on behalf of the* ESTATE OF JOSHUA  :
REEVES, J.R., *a minor*, JAMES L. REEVES, W. JEAN  :
REEVES, JARED REEVES, SHERRI C. HOLIMAN,  :
JONI ARIEL REEVES LITTLE, WILLIAM LEE,  :
ALEXANDRIA L. LEE, WILLIAM J. LEE, LILLIE  :
LAI LEE, JENNIFER LYNN HUNT, CHRISTOPHER  :
GOLEMBE, KATHRYN HEAD, CHRISTOPHER  :
WATTS, JANET L. RIOS, ANITA BAKER, JENNIE L.  :
MORIN, RANDALL GEIGER, *individually and on*  :
*behalf of the* ESTATE OF WAYNE M. GEIGER,  :
KIMBERLY GEIGER, JESSECA LYN TSOSIE, ERIC  :
DONOHO, TYLER GINAVAN, TIMOTHY TIFFNER,  :
*individually and on behalf of the* ESTATE OF  :
BENJAMIN DAVID TIFFNER, JUDITH TIFFNER,  :
JOSHUA TIFFNER, SETH TIFFNER, SARAH  :
CROSBY, ALAN BURKS, *individually and on behalf of*  :
*the* ESTATE OF PETER BURKS, JACKIE MERK  :
HLASTAN, G.B., *a minor*, ALISON BURKS MCRUIZ,  :
SARAH PHILLIPS, ZACHARY BURKS, BRIDGET  :
JUNEAU, *individually and on behalf of the* ESTATE OF  :
WILLIAM JUNEAU, STEPHANIE JUNEAU, TAMMY  :
VANDERWAAL, A.L.R., *a minor*, PRESTON SHANE  :
REECE, SHAYLYN C. REECE, ELENA SHAW, C.S.,  :

*a minor*, L.S., *a minor*, EMILY SHAW, MELISSA       :
DOHENY, *individually and on behalf of the* ESTATE    :
OF MICHAEL DOHENY, KATHY KUGLER,                      :
ROBERT KUGLER, TANYA EVRARD, BILLY                    :
JOHNSON, JUDY HOFFMAN, ASHLEY GUDRIDGE               :
HOUPPERT, JOSHUA SCHICHTL, MARK                       :
SCHICHTL, KATHERINE PROWSE, NICHOLAS                  :
PROWSE, H.S., *a minor*, S.S., *a minor*, C.S., *a minor*,  :
A.S., *a minor*, STEVE WADLEIGH, LEA-ANN              :
WADLEIGH, MICHAEL LUKOW, RIKKI LUKOW,                 :
BRUCE LUKOW, JOSEPH LUKOW, ANDREW                     :
LUKOW, KRISTEN KELLEY, MAIRA ALVAREZ,                 :
*individually and on behalf of the* ESTATE OF CONRAD  :
ALVAREZ, K.A., *a minor*, ANGELA ALVAREZ *on*         :
*behalf of* A.A. and C.A., *minors*, BELINDA GARCIA,  :
JASON WHITEHORSE, JEFFREY C. MANN,                    :
MICHELLE WEST, REBECCA L. SAMTEN-FINCH,               :
*individually and on behalf of the* ESTATE OF TENZIN  :
LOBSANG SAMTEN, D.A.S., *a minor*, M.B.S., *a*        :
*minor*, AVA LANETTE BRADLEY, *individually and on*   :
*behalf of the* ESTATE OF JUANTREA TYRONE             :
BRADLEY, A.D.B., *a minor*, T.T.B., *a minor*, J.T.B., *a*  :
*minor*, ANTHONY HUDSON, AUSTIN BEWLEY,               :
CHRISTOPHER LEVI, ERIC LEVI, DEBRA LEVI,              :
EMILY LEVI, KIMBERLY VESEY, MARION                    :
CRIMENS, TIMOTHY W. ELLEDGE, MARY                     :
CATHERINE MCLAUGHLIN, BRENDA                          :
HABSIEGER, *individually and on behalf of the* ESTATE :
OF ANDREW J. HABSIEGER, MICHAEL                       :
HABSIEGER, AMBER HABSIEGER *on behalf of the*         :
ESTATE OF JACOB MICHAEL HABSIEGER, KELLI              :
D. HAKE, *individually and on behalf of the* ESTATE OF :
CHRISTOPHER HAKE, G.H., *a minor*, DENICE             :
YORK, RUSSEL YORK, PETER HAKE, JILL HAKE,             :
ZACHARY HAKE, KERI HAKE, SKYLAR HAKE,                 :
JENNIFER RENEE YORK, JASON YORK, MARIA E.             :
CALLE, *individually and on behalf of the* ESTATE OF  :
GEORGE DELGADO, CYNTHIA DELGADO,                      :
TABITHA MCCOY, *individually and on behalf of the*    :
ESTATE OF STEVE A. MCCOY, LOGAN MCCOY,                :
R.M., *a minor*, MATTHEW FIESER, BENJAMIN             :
DANIEL CARRINGTON, JONATHAN HESLOP,                   :
RUSSELL MASON, ANDY POOL, FRANK L.                    :
CONVERSE, *individually and on behalf of the* ESTATE  :
OF PAUL R. CONVERSE, ANTHONY M. GERBER,               :
CHARLES B. GREGSTON, KIMBERLY MILLER,                 :

MICHAEL J. MILLER, CARL REIHER, WALTER : 
BAILEY, CASSANDRA BAILEY, KACEY GILMORE, : 
TERRELL GILMORE, JR., KYNESHA DHANOOLAL, : 
*individually and on behalf of the* ESTATE OF DAYNE : 
D. DHANOOLAL, JASON ROBINSON, FRANCES : 
ROBINSON, E.R., *a minor*, WILLIAM JUSTIN : 
WEATHERLY, MICHAEL WEATHERLY, GRANT : 
VON LETKEMANN, MERLESE PICKETT, : 
*individually and on behalf of the* ESTATE OF : 
EMANUEL CROMITY, HARRY CROMITY, MARLEN : 
PICKETT, KEMELY PICKETT, VIVIAN PICKETT, : 
KYSHIA SUTTON, RACHEL M. GILLETTE, : 
REBEKAH SCOTT, LEE WOLFER, *individually and on* : 
*behalf of the* ESTATE OF STUART WOLFER, L.W., *a* : 
*minor*, M.W., *a minor*, I.W., *a minor*, BEVERLEY : 
WOLFER, PATRICIA SMITH, MICHAEL SMITH, : 
JACQUELINE A. SMITH, THOMAS SMITH, : 
RACHELLE IDOL, JAMES VAUGHN, JEANNINE : 
VAUGHN, CLIFFORD VAUGHN, DAVID HARTLEY, : 
*individually and on behalf of the* ESTATE OF JEFFERY : 
HARTLEY, DAVID WAYNE HARTLEY, KAYLIE : 
HARTLEY, LISA DUNCAN, VIRGINIA BILLITER, : 
ERIC BILLITER, ADRIANNE KIDD, ALLEN : 
SWINTON, TEMIKA SWINTON, T.S., *a minor*, T.S., *a* : 
*minor*, T.B., *a minor*, LINDA PRITCHETT, WILLIAM : 
ALLMON, *individually and on behalf of the* ESTATE : 
OF WILLIAM E. ALLMON, RONALD SLOAN, : 
MARY JANE VANDEGRIFT, *individually and on* : 
*behalf of the* ESTATE OF MATTHEW R. : 
VANDEGRIFT *and the* ESTATE OF JOHN : 
VANDEGRIFT, MARK E. THOMSEN, ARDELL : 
THOMSEN, RALPH THOMSEN, EVAN D. BOGART, : 
LANI D. BOGART, DOUGLAS R. BOGART, : 
CHRISTOPHER BOGART, CANA HICKMAN, LUIS : 
ROSA-VALENTIN, M.R., *a minor*, ILIANA M. ROSA- : 
VALENTIN, PAM MARION, DONNIE MARION, : 
ADRIAN MCCANN, DON JASON STONE, PRESTON : 
CHARLES KAPLAN, NICOLE A. KAPLAN, NONI : 
KAPLAN, DAVID KAPLAN, JAIME ZARCONE, : 
JESSALYN HOLT, DAVID WOODARD, D.M.W., *a* : 
*minor*, ADAM MAGERS, LUIS GARZA, SUSAN : 
ARNOLD, *individually and on behalf of the* ESTATE : 
OF RONALD J. TUCKER, DAVID ARNOLD, : 
SAMANTHA TUCKER, BRANDON ARNOLD, : 
DAISY TUCKER, JOHN DAGGETT, COLLEEN : 
CZAPLICKI, RUSSEL HICKS, SR., RUSSEL HICKS, :

JR., WESLEY WILLIAMSON, JESSE WILLIAMSON,   :
PATRICK O'NEILL, JOHN O'NEILL, DIANNE   :
O'NEILL, DANIEL LUCKETT, BREANNA LYNN   :
GASPER, *individually and on behalf of the* ESTATE OF   :
FRANK J. GASPER, JAMIE BARNES, MAX W.   :
HURST, *individually and on behalf of the* ESTATE OF   :
DAVID R. HURST, LILLIAN HURST,   :
CHRISTOPHER HURST, MARK HURST, DONNA   :
FARLEY, NOEL J. FARLEY, SR., BARBARA   :
FARLEY, BRETT FARLEY, CAMERON FARLEY,   :
CHRIS FARLEY, VICKIE MCHONE, NOEL S.   :
FARLEY, DAVID C. IVERSON, DANIEL MENKE,   :
*individually and on behalf of the* ESTATE OF   :
JONATHAN D. MENKE, PAULA MENKE,   :
MATTHEW MENKE, NICHOLE LOHRIG, JESSICA   :
H. WILLIAMS, *individually and on behalf of the*   :
ESTATE OF JAMES M. HALE, J.M.H., *a minor*, J.J.H.,   :
*a minor*, J.H., *a minor*, ROSEMARIE ALFONSO, K.B.,   :
*a minor*, TYLER LATHAM, MICHELLE   :
BENAVIDEZ, *individually and on behalf of the*   :
ESTATE OF KENNITH W. MAYNE, DANIEL   :
BENAVIDEZ, CHRISTINA BIEDERMAN, DANIEL   :
BENAVIDEZ, JR., JENNIFER MORMAN,   :
CHRISTOPHER MILLER, BRYANT BEARFIELD,   :
ANGELINE JACKSON, KAYTRINA JACKSON,   :
SHILYN JACKSON, TONY GONZALEZ, MARLYNN   :
GONZALES, TAMARA RUNZEL, MEGAN PEOPLE,   :
SHAULA SHAFFER, CARLLIE PAUL, KARI   :
CAROSELLA, *individually and on behalf of the*   :
ESTATE OF JUSTIN BAUER, GREGORY BAUER,   :
CONNIE HADDOCK, JACOB BAUER, JEREMY   :
BAUER, ANDREW BRADLEY, JULIE SALHUS,   :
KRISTEN GALEN, PATRICK WARD, JARRETT   :
WARD, ROBERTO ANDRADE, SR., *individually and*   :
*on behalf of the* ESTATE OF ROBERTO ANDRADE,   :
JR., VERONICA PENA ANDRADE, SANDRA   :
VALENCIA, ANGELICA ANDRADE, VERONICA   :
DENISSE ANDRADE, RICHARD HEDGECOCK, II,   :
KARA CONNELLY, JEAN DAMMANN, MARK   :
DAMMANN, KEVIN CONNELLY, RYAN BOWMAN,   :
MATTHEW C. BEATTY, THERESA DAVIS,   :
RHONDA KEMPER, ROBERT CANINE, S.C., *a*   :
*minor*, JANET JONES, CALVIN CANINE, JAMES   :
CANINE, JENNIFER ROOSE, RHETT MURPHY,   :
ROADY LANDTISER, NATHAN RICHARDS,   :
STEVEN RICHARDS, CHRISTOPHER SONGER,   :

KIMBERLY SONGER, C.S., *a minor*, LINDA DAVID, :
*individually and on behalf of the* ESTATE OF :
TIMOTHY A. DAVID *and the* ESTATE OF MICHAEL :
DAVID, CHRISTOPHER DAVID, KENNETH J. :
DREVNICK, RANDALL KLINGENSMITH, MEGAN :
MARIE SABATINO, *individually and on behalf of the* :
ESTATE OF ZACHARY T. MYERS, R.N.S., *a minor*, :
TONYA FREEMAN, JERRY L. MYERS, JEFFREY D. :
PRICE, CASSIE COLLINS, *individually and on behalf* :
*of the* ESTATE OF SHANNON M. SMITH, DEBORAH :
SMITH, JAMES SMITH, CORY SMITH, CHRISTINA :
SMITH, JOSEPH HELTON, SR., *individually and on* :
*behalf of the* ESTATE OF JOSEPH D. HELTON, JR., :
JESSICA CABOT, JEANNE RHEA MCMANUS, :
VICTOR RAY WISE, II, STEPHEN W. EVANS, :
THEODORE LESTER, KATRINA COE, *individually* :
*and on behalf of the* ESTATE OF KEITH COE, K.A.C., :
*a minor*, K.A.C., *a minor*, K.A.C., *a minor*, RHONDA :
SMITH, MATTHEW COE, SABRINA CHAPMAN, :
NICHOLAS BAUMHOER, MATTHEW WHITESIDE, :
KANDI DANIELLE WHITESIDE, M.T.W., *a minor*, :
SHARON SMITHEY WHITESIDE, JACKSON WILEY :
WHITESIDE, CHRISTOPHER WHITESIDE, JAMES :
KINSEY, ANGELA M. GARCIA, *individually and on* :
*behalf of the* ESTATE OF CHRISTIAN ANTHONY :
SARACHO GARCIA, K.M.G., *a minor*, K.R.G., *a* :
*minor*, JOEL HERNANDEZ, CHRISTOPHER :
SATTERFIELD, VICTORIA HERNANDEZ, :
MICHAEL PASCO, ANGEL MAYES, *individually and* :
*on behalf of the* ESTATE OF ANTONIO STIGGINS, :
LUKE STIGGINS, DONALD MAYES, RHONDA :
BEATTIE, *individually and on behalf of the* ESTATE :
OF CLIFFORD BEATTIE, JAYDEAN HAMILTON, :
STEPHANIE KIDDER, TONI ATTANASIO, :
*individually and on behalf of the* ESTATE OF :
CHRISTOPHER BROOK FISHBECK, GARY :
DOUGLAS FISHBECK, ANA M. GOMEZ, RANDI :
JEAN MARTZ, RENE GUTEL, MARK A. HALL, :
ATHENA HALL, M.J.H., *a minor*, KIERSTEN HALL, :
KAITLYN ADAMS, MACKENZIE G. HALL, :
ABIGAIL HALL, ANDREW HALL, GEORGE D. :
WHITE, NATALIA WHITE, KRISTIN WHITE, :
GEORGE J. WHITE, EDNA LUZ BURGOS, JOHN :
MCCULLEY, STEPHANIE MCCULLEY, T.M., *a* :
*minor*, R.M., *a minor*, DONALD FIELD, ANGELICA :
FIELD, SENOVIA FIELD, SELICIA FIELD, :

THERESA HART, WAYNE NEWBY, NATHAN            :
NEWBY, TYLER NICHOLAS OGDEN, SHERYL          :
ANN CHEN JERRIN OGDEN, SEAN M. NIQUETTE,     :
LAUREN NIQUETTE, MARY NIQUETTE, THOMAS       :
NIQUETTE, DANIEL KENNEY, BROOKE KENNEY,      :
J.K., *a minor*, H.K., *a minor*, ED ELLIOTT, BRIAN    :
CLARK ALLDRIDGE, JOANN ALLDRIDGE,            :
ANDREW CHARLES MAJOR, ASHLEY MEIKEL          :
MAJOR, A.M.M., *a minor*, DIANNA ALLDRIDGE,      :
RONALD ALLDRIDGE, TODD ALLDRIDGE,            :
VERONICA HICKMAN, DAVID EUGENE               :
HICKMAN, and DEVON FLETCHER HICKMAN,         :
                                             :
                    Plaintiffs,              :
                                             :
-against-                                    :
                                             :
SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL,     :
FRANSABANK SAL, MEAB BANK SAL, BLOM          :
BANK SAL, BYBLOS BANK SAL, BANK AUDI SAL,    :
BANK OF BEIRUT SAL, LEBANON AND GULF         :
BANK SAL, BANQUE LIBANO-FRANÇAISE SAL,       :
BANK OF BEIRUT AND THE ARAB COUNTRIES        :
SAL, JAMMAL TRUST BANK SAL, FENICIA BANK     :
and JOHN DOES 1-50,                          :
                                             :
                    Defendants.              :
-----------------------------------------------------------------------x

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................. 1

II.     HISTORICAL BACKGROUND ......................................................................... 4

III.    THE STRUCTURE OF LEBANON'S ECONOMY IS DEPENDENT ON
        HEZBOLLAH'S INFLOWS OF U.S. DOLLARS, AND DEFENDANTS'
        PROFITABILITY IS DEPENDENT ON U.S. CORRESPONDENT BANK
        ACCOUNTS AND U.S. DOLLAR CLEARING ON HEZBOLLAH'S BEHALF ... 12

IV.     THE LEBANESE CANADIAN BANK INVESTIGATION REVEALED THE
        MECHANICS OF THE SYSTEM ...................................................................... 18

V.      JURISDICTION AND VENUE ........................................................................ 27

VI.     THE DEFENDANTS ........................................................................................ 27

        A.      SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL ("SGBL") ............. 27

        B.      FRANSABANK SAL ................................................................................ 32

        C.      MEAB BANK SAL ................................................................................... 36

        D.      BLOM BANK SAL ("BLOM") ................................................................ 40

        E.      BYBLOS BANK SAL ("BYBLOS") ......................................................... 43

        F.      BANK AUDI SAL .................................................................................... 45

        G.      BANK OF BEIRUT SAL ......................................................................... 49

        H.      LEBANON AND GULF BANK SAL ("LGB") ............................... 52

        I.      BANQUE LIBANO-FRANÇAISE SAL ("BLF") ........................... 54

        J.      BANK OF BEIRUT AND THE ARAB COUNTRIES SAL ("BBAC") ........ 56

        K.      JAMMAL TRUST BANK SAL ................................................................ 59

        L.      FENICIA BANK ...................................................................................... 62

VII.    ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC) ....................................... 64

VIII.   HEZBOLLAH ................................................................................................... 67

        A.      HEZBOLLAH'S INITIAL TERRORIST OPERATIONS AND
                ORGANIZATIONAL STRUCTURE ............................................... 67

i

**B.** **HEZBOLLAH'S KEY LEADERS AND CURRENT ORGANIZATIONAL STRUCTURE** ................................................................................. 72

    **1.** **HEZBOLLAH'S EMBRACE OF TERRORISM IS OPEN AND PUBLIC** ........................................................................................ 73

    **2.** **SHURA COUNCIL (MAJLIS AL-SHURA)** ........................................ 74

    **3.** **EXECUTIVE COUNCIL** ................................................................... 75

    **4.** **PARLIAMENTARY COUNCIL** ........................................................ 75

    **5.** **JIHAD COUNCIL** ............................................................................ 75

        **a.** **Imad Mughniyah** ..................................................................... 76

        **b.** **Mustafa Badr al-Din** .............................................................. 78

        **c.** **Muhammad Kawtharani** ........................................................ 80

    **6.** **THE JIHAD COUNCIL'S ISLAMIC JIHAD ORGANIZATION ("IJO") OR EXTERNAL SECURITY ORGANIZATION ("ESO")** ...... 81

        **a.** **Talal Hamiyah** ........................................................................ 82

        **b.** **Wafiq Safa** .............................................................................. 82

**C.** **HEZBOLLAH'S "SOCIAL WELFARE" SECTOR – THE *DA'WA*** ............ 83

    **1.** **IRSO – THE ISLAMIC RESISTANCE SUPPORT ORGANIZATION** 83

    **2.** **JIHAD AL-BINA** ............................................................................. 88

        **a.** **Meamar Company for Engineering and Development SARL** ...................... 91

        **b.** **Seasons Corporation for Agricultural Projects and Services SARL** ........... 91

        **c.** **Arch Consulting SARL** ........................................................... 92

        **d.** **Al-Raed SARL** ........................................................................ 94

    **3.** **THE MARTYRS FOUNDATION–LEBANON** ....................................... 95

        **a.** **Al-Rasul al-Azam Hospital and Other Hezbollah-controlled Hospitals** ...... 99

        **b.** **Atlas Holding SAL** ................................................................. 101

            **i.** **Shahed Pharm Drugstore SARL** ................................. 103

            **ii.** **Al-Amana SARL** ........................................................... 103

            **iii.** **Amana Plus Company SAL** .......................................... 104

            **iv.** **Société Orientale Libanaise d'Investissement et Développement SAL** 104

            **v.** **Medical Equipments and Drugs International Corporation SAL** ........ 105

            **vi.** **Al-Kawthar** .................................................................. 106

            **vii.** **City Pharma SARL** ...................................................... 106

        viii.Global Touristic Services SAL ................................................................. 106

    **4. AL-MABARRAT CHARITABLE SOCIETY** ......................................... 107

        a. **Arab Lebanese Trading & Contracting Company** ...................................... 109

        b. **Assaha International Group (Offshore) SAL** ................................................. 109

        c. **Assaha Travel and Tourism SARL** ............................................................... 109

        d. **Al-Aytam Company for General Trading and Fuels** .................................. 110

        e. **The Lebanese-Arab Company for Touristic Services SARL** ...................... 111

        f. **Rayan Foods SAL** .......................................................................................... 111

    **5. IMAM KHOMEINI RELIEF COMMITTEE – LEBANON ("IKRC")** 112

    **6. WOUNDED ASSOCIATION** ................................................................. 114

**D.**   **HEZBOLLAH MEDIA** .................................................................................. 114

    **1. LEBANESE COMMUNICATION GROUP** ........................................... 114

        a. *Al-Manar* ........................................................................................................ 115

        b. *Al-Nour* ........................................................................................................... 116

    **2. HEZBOLLAH'S *BAQIYAT ALLAH* MAGAZINE** ................................. 116

    **3. LEBANESE ARTS COUNCIL** .............................................................. 117

**E.**   **HEZBOLLAH'S BUSINESS AFFAIRS COMPONENT (BAC)** ................. 117

    **1. HEZBOLLAH BAC LEADERSHIP** ..................................................... 119

        a. **Abdallah Ali Safieddine** ............................................................................... 119

        b. **Adham Hussein Tabaja** ................................................................................ 119

        c. **Sultan Khalifa As'ad** .................................................................................... 139

        d. **Ali Youssef Charara** ..................................................................................... 140

        e. **The Tajideen Family** ..................................................................................... 146

            i. **Kassim Tajideen** ................................................................. 148
            ii. **Ali Muhammad Tajideen** ................................................. 152
            iii. **Hussein Muhammad Tajideen** ......................................... 156
            iv. **Ahmad Muhammad Tajideen** .......................................... 157
            v. **Jaffar Muhammad Tajideen** ........................................... 160
            vi. **Fatimah Muhammad Tajideen** ........................................ 160
            vii. **Mahmoud Muhammad Tajideen** ..................................... 161
            viii.**Youssef Muhammad Tajideen** ........................................ 161
            ix. **Hassan Muhammad Tajideen** ......................................... 164
            x. **Ibrahim Muhammad Tajideen** ........................................ 164

    f.   **Muhammad Ibrahim Bazzi**..........................................166

    g.   **Saleh Ali Assi**.................................................................171

    h.   **Kamel Amhaz**................................................................173

    i.   **Hassan Shateri**.............................................................176

    j.   **Imad Abdul Reda Bakri**..............................................178

**2.**   **HEZBOLLAH'S CONFLICT DIAMOND AND MONEY LAUNDERING NETWORK**...................................... 180

    a.   **The Nassour Clan Network**..........................................182

    b.   **The Ahmad Clan Network**...........................................187

        i.   **Said Ali Ahmad**.................................................193
        ii.   **Nazim Said Ali Ahmad**.....................................195
        iii.  **Hassan Said Ali Ahmad**...................................200
        iv.  **Ali Said Ali Ahmad**..........................................202
        v.   **Ibtisam Said Ali Ahmad**..................................203
        vi.  **Seada Said Ali Ahmad**......................................203
        vii. **Youssef Ali Ahmad**...........................................203
        viii.**Suleiman Ali Ahmad**........................................204
        ix.  **Ahmad Ali Ahmad**...........................................206

    c.   **The Issawi Family Network**.........................................210

        i.   **Ibrahim Ahmad Issawi**...................................210
        ii.   **Hussein Ahmad Issawi**....................................214
        iii.  **Wa'el Ahmad Issawi**........................................215
        iv.  **Ha'el Ahmad Issawi**.........................................215

    d.   **The Abu Darwish Family Network**..............................216

    e.   **The Darwish Family Network**......................................220

    f.   **The Khalil Nazem Ibrahim Network**...........................225

**3.**   **NARCOTICS TRAFFICKING NETWORKS**........................ 226

    a.   **Operation Titan**...........................................................227

    b.   **Ayman Joumaa Network**.............................................229

    c.   **The Role of the Lebanese Exchange Houses**.................232

        i.   **New Line Exchange Network**...........................234
        ii.   **Elissa Exchange Network**.................................236
        iii.  **Hassan Ayash Exchange Network**....................239
        iv.  **Halawi Exchange Network**...............................239
        v.   **Mecattaf Exchange Network**............................241
        vi.  **Kassem Rmeiti Network**..................................244
        vii. **Fayed Exchange Network**.................................245

**4.**   **ARMS DEALING**........................................................... 246

        a.    **Weapons Trafficking in the United States**......................246

        b.    **Weapons Trafficking in Nigeria** ................................249

        c.    **Weapons Trafficking and Dual-Use Technologies**.......251

    **5.**   **ILLICIT INTERNATIONAL TRADE** ....................... 252

    **6.**   **LEBANESE LAWYERS ASSOCIATED WITH BAC COMPANIES**.. 258

        a.    **Ali Hassan Berro** ...................................................258

        b.    **Fadi Adel Jamal al-Din**..........................................259

        c.    **Ali Hussein al-Ashi**................................................261

        d.    **Amer Afif Abu Khalil** ...........................................262

        e.    **Ashraf Assem Safieddine**.......................................263

        f.    **Muhammad Hussein Dakrub** .................................264

        g.    **Muhammad Farid Mattar**......................................265

        h.    **Nabil Kamil al-Akhras** .........................................265

        i.    **Osama Abbas Ramal** .............................................266

        j.    **Joseph George Zgheib**...........................................267

        k.    **Aline George Choucair Prince** ..............................268

        l.    **Claire Elias Assaf Abu Rajili** ...............................268

    **7.**   **LEBANESE ACCOUNTANTS / AUDITORS ASSOCIATED WITH BAC COMPANIES**................................................ 269

        a.    **Jihad Muhammad Qansu**.......................................269

        b.    **Mashhur Abd al-Nabi Hamqah** .............................270

        c.    **Shawqi Ra'if Abu Khalil** ......................................270

        d.    **Edmond Youssef Saadeh** .......................................271

        e.    **Zuhayr Habib Saydani** .........................................272

**IX.**   **DEFENDANTS' MATERIAL SUPPORT TO HEZBOLLAH** ................. 273

  **A.**   **BANK AL MADINA: THE BETA TEST FOR LEBANESE CANADIAN BANK**................................................................. 273

  **B.**   **SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL** ........... 279

    **1.**   **SGBL'S PREDECESSOR, LCB, CONSPIRED WITH AND AIDED AND ABETTED HEZBOLLAH** ............................................. 279

a. LCB Participated in Hezbollah's Narcotics Money Laundering Operations and Transferred Over $250 Million for Hezbollah Through its New York Correspondent Bank Accounts ............................... 281

b. LCB Maintained Accounts for Various Hezbollah-Controlled Entities ..... 286

c. LCB Disregarded Anti-Money Laundering Rules for Individuals and Entities Associated with Hezbollah ................. 291

d. LCB's Gambian Subsidiary, Prime Bank, Was Co-Owned by Muhammad Bazzi (SDGT) ............................... 294

e. LCB'S Subsidiary Société Financière de Banque SARL Was Used to Launder Money for Hezbollah ..................... 297

2. SGBL ACQUIRED LCB'S LIABILITIES ............................... 297

3. SGBL AIDED AND ABETTED AND CONSPIRED WITH HEZBOLLAH IN ITS OWN CAPACITY BEFORE AND AFTER ITS PURCHASE OF LCB'S ASSETS AND LIABILITIES .... 301

C. FRANSABANK SAL ...................................... 305

D. BLOM BANK SAL ....................................... 309

E. MEAB BANK ........................................... 316

F. BYBLOS BANK SAL ..................................... 322

G. BANK AUDI SAL ....................................... 327

H. LEBANON AND GULF BANK SAL ......................... 333

I. BANQUE LIBANO-FRANÇAISE SAL ....................... 339

J. BANK OF BEIRUT SAL ................................... 346

K. BANK OF BEIRUT AND THE ARAB COUNTRIES SAL ........ 350

L. JAMMAL TRUST BANK SAL .............................. 354

M. FENICIA BANK ......................................... 356

X. THE IRGC DEPLOYED HEZBOLLAH'S SIGNATURE WEAPONS IN IRAQ 360

XI. HEZBOLLAH'S CRITICAL ROLE IN TERRORIST ATTACKS IN IRAQ ....... 364

XII. HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ ............... 383

A. THE BADR CORPS (a/k/a BADR ORGANIZATION) ............... 383

B.     **ASA'IB AHL AL–HAQ ("AAH" OR THE "LEAGUE OF THE RIGHTEOUS")**.......................................................... 385

C.     **JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY") AND THE PROMISED DAY BRIGADES ("PDB")**........................................ 388

D.     **KATA'IB HEZBOLLAH ("KH")** ........................................................ 389

**XIII.**   **THE PLAINTIFFS** ............................................................................... 395

1.     **THE MAY 3, 2005 ATTACK – BAGHDAD** ...................................... 395

2.     **THE JANUARY 12, 2004 ATTACK – BAGHDAD** ............................ 397

3.     **THE APRIL 4, 2004 ATTACK – BAGHDAD** .................................... 397

4.     **THE APRIL 9, 2004 ATTACK – BAGHDAD** .................................... 401

5.     **THE JUNE 4, 2004 ATTACK – BAGHDAD** ..................................... 403

6.     **THE JUNE 29, 2004 ATTACK – BAGHDAD** ................................... 404

7.     **THE JULY 27, 2004 ATTACK – BALAD RUZ** ............................... 405

8.     **THE AUGUST 5, 2004 ATTACK – NAJAF** ..................................... 406

9.     **THE AUGUST 6, 2004 ATTACK – NAJAF** ..................................... 409

10.     **THE AUGUST 15, 2004 ATTACK – NAJAF** ................................... 410

11.     **THE AUGUST 16, 2004 ATTACK – SADR CITY** ........................... 411

12.     **THE AUGUST 18, 2004 ATTACK – SADR CITY** ........................... 412

13.     **THE AUGUST 25, 2004 ATTACK – NAJAF** ................................... 412

14.     **THE AUGUST 26, 2004 ATTACK – NAJAF** ................................... 413

15.     **THE FEBRUARY 10, 2005 ATTACK** .............................................. 414

16.     **THE JUNE 8, 2005 ATTACK – BAGHDAD** ..................................... 415

17.     **THE JUNE 27, 2005 ATTACK – BAGHDAD** ................................... 416

18.     **THE JULY 3, 2005 ATTACK – BAGHDAD** ..................................... 417

19.     **THE JULY 27, 2005 ATTACK**......................................................... 418

20.     **THE AUGUST 2, 2005 ATTACK – BASRA**..................................... 419

21.   THE AUGUST 7, 2005 ATTACK – BAGHDAD ........................................... 420

22.   THE SEPTEMBER 2, 2005 ATTACK – BAGHDAD .................................. 421

23.   THE SEPTEMBER 6, 2005 ATTACK – BAGHDAD .................................. 424

24.   THE SEPTEMBER 26, 2005 ATTACK – BAGHDAD ................................ 426

25.   THE SEPTEMBER 28, 2005 ATTACK – UMM QASR ............................. 426

26.   THE OCTOBER 6, 2005 ATTACK – BAGHDAD ...................................... 428

27.   THE DECEMBER 8, 2005 ATTACK – BAGHDAD ................................... 433

28.   THE DECEMBER 25, 2005 ATTACK – BAGHDAD ................................. 436

29.   THE JANUARY 5, 2006 ATTACK – NAJAF ............................................ 437

30.   THE JANUARY 5, 2006 ATTACK – BAGHDAD ...................................... 440

31.   THE JANUARY 18, 2006 ATTACK – BASRA ......................................... 441

32.   THE FEBRUARY 14, 2006 ATTACK – BAGHDAD ................................ 442

33.   THE FEBRUARY 17, 2006 ATTACK – BAGHDAD ................................ 443

34.   THE FEBRUARY 18, 2006 ATTACK – BAGHDAD ................................ 444

35.   THE FEBRUARY 20, 2006 ATTACK –HINDIYAH ................................. 445

36.   THE FEBRUARY 20, 2006 ATTACK – BAGHDAD ................................ 446

37.   THE FEBRUARY 26, 2006 ATTACK – BAGHDAD ................................ 448

38.   THE MARCH 13, 2006 ATTACK – RUSTAMIYAH ............................... 450

39.   THE MARCH 26, 2006 ATTACK – BAGHDAD ...................................... 451

40.   THE APRIL 1, 2006 ATTACK – BAGHDAD ........................................... 452

41.   THE APRIL 12, 2006 ATTACK – MISIAB ............................................... 453

42.   THE APRIL 16, 2006 ATTACK – BAWB ASH-SHAM ........................... 454

43.   THE APRIL 25, 2006 ATTACK – SADR CITY ....................................... 457

44.   THE APRIL 28, 2006 ATTACK – BAGHDAD ......................................... 460

45.   THE MAY 2, 2006 ATTACK – BAGHDAD .............................................. 461

46.    **THE MAY 3, 2006 ATTACK – NASIRIYAH** ................................................. 465

47.    **THE MAY 5, 2006 ATTACK – BAGHDAD** ................................................ 468

48.    **THE MAY 6, 2006 ATTACK – DIWANIYAH** ............................................. 471

49.    **THE MAY 14, 2006 ATTACK – BAGHDAD** .............................................. 472

50.    **THE MAY 21, 2006 ATTACK – MOSUL** .................................................. 473

51.    **THE MAY 25, 2006 ATTACK – BAGHDAD** .............................................. 474

52.    **THE JUNE 5, 2006 ATTACK – BAGHDAD** ............................................... 476

53.    **THE JUNE 8, 2006 ATTACK – AL KUT** ................................................... 482

54.    **THE JUNE 9, 2006 ATTACK – DIWANIYAH** ........................................... 484

55.    **THE JUNE 10, 2006 ATTACK – RUSTAMIYAH** ...................................... 485

56.    **THE JULY 11, 2006 ATTACK – KARBALA** .............................................. 486

57.    **THE JULY 15, 2006 ATTACK – BAGHDAD** ............................................. 486

58.    **THE JULY 17, 2006 ATTACK – BAGHDAD** ............................................. 488

59.    **THE JULY 22, 2006 ATTACK – SADR CITY** ............................................ 489

60.    **THE JULY 25, 2006 ATTACK – BAGHDAD** ............................................. 490

61.    **THE AUGUST 26, 2006 ATTACK – JISR DIYALA** .................................. 490

62.    **THE SEPTEMBER 3, 2006 ATTACK – BAGHDAD** .................................. 492

63.    **THE SEPTEMBER 20, 2006 ATTACK – BAGHDAD** ............................... 492

64.    **THE SEPTEMBER 30, 2006 ATTACK – BAGHDAD** ............................... 494

65.    **THE OCTOBER 4, 2006 ATTACK – BAGHDAD** ..................................... 495

66.    **THE OCTOBER 13, 2006 ATTACK – BAGHDAD** ................................... 496

67.    **THE OCTOBER 17, 2006 ATTACK – BAQUBAH** ................................... 497

68.    **THE OCTOBER 20, 2006 ATTACK – BAGHDAD** ................................... 499

69.    **THE OCTOBER 22, 2006 ATTACK – BAGHDAD** ................................... 500

70.    **THE OCTOBER 22, 2006 ATTACK – BAGHDAD** ................................... 501

71.   THE OCTOBER 22, 2006 ATTACK – BAGHDAD .................................... 502

72.   THE OCTOBER 22, 2006 ATTACK – SADR CITY .................................. 507

73.   THE OCTOBER 23, 2006 ATTACK – BAGHDAD .................................... 508

74.   THE OCTOBER 2006 ATTACK – BAGHDAD ........................................ 509

75.   THE NOVEMBER 2, 2006 ATTACK – BAGHDAD .................................. 510

76.   THE NOVEMBER 9, 2006 ATTACK – BAGHDAD .................................. 513

77.   THE NOVEMBER 13, 2006 ATTACK – BAGHDAD ................................ 515

78.   THE NOVEMBER 16, 2006 ATTACK – BASRA ...................................... 516

79.   THE NOVEMBER 26, 2006 ATTACK – BAGHDAD ................................ 520

80.   THE DECEMBER 3, 2006 ATTACK – BAGHDAD .................................. 521

81.   THE DECEMBER 4, 2006 ATTACK – BAGHDAD .................................. 523

82.   THE DECEMBER 10, 2006 ATTACK – BAGHDAD ................................ 524

83.   THE DECEMBER 20, 2006 ATTACK – BAGHDAD ................................ 525

84.   THE DECEMBER 22, 2006 ATTACK – BAGHDAD ................................ 527

85.   THE DECEMBER 27, 2006 ATTACK – BAGHDAD ................................ 528

86.   THE DECEMBER 30, 2006 ATTACK – BAGHDAD ................................ 529

87.   THE DECEMBER 31, 2006 ATTACK – BAGHDAD ................................ 529

88.   THE DECEMBER 31, 2006 ATTACK – BAQUBAH ................................ 530

89.   THE JANUARY 14, 2007 ATTACK – BAGHDAD .................................. 531

90.   THE JANUARY 18, 2007 ATTACK – BAGHDAD .................................. 532

91.   THE JANUARY 20, 2007 ATTACK – KARBALA .................................... 533

92.   THE JANUARY 22, 2007 ATTACK – BAGHDAD .................................. 547

93.   THE JANUARY 25, 2007 ATTACK – BAGHDAD .................................. 548

94.   THE JANUARY 27, 2007 ATTACK – BAGHDAD .................................. 550

95.   THE JANUARY 27, 2007 ATTACK – TAJI ............................................ 551

96.     THE FEBRUARY 1, 2007 ATTACK – BAGHDAD ................................... 552

97.     THE FEBRUARY 2, 2007 ATTACK – MAHMUDIYAH ........................... 553

98.     THE FEBRUARY 26, 2007 ATTACK – DIWANIYAH ............................. 554

99.     THE MARCH 15, 2007 ATTACK – BAQUBAH .......................................... 555

100.    THE MARCH 20, 2007 ATTACK – BAGHDAD .......................................... 556

101.    THE MARCH 23, 2007 ATTACK – NASIRIYAH ...................................... 557

102.    THE MARCH 27, 2007 ATTACK – BAGHDAD .......................................... 559

103.    THE MARCH 31, 2007 ATTACK – DIWANIYAH ...................................... 560

104.    THE APRIL 4, 2007 ATTACK – NASIRIYAH ........................................... 561

105.    THE APRIL 6, 2007 ATTACK – BAGHDAD .............................................. 562

106.    THE APRIL 6, 2007 ATTACK – SADR CITY ............................................. 563

107.    THE APRIL 7, 2007 ATTACK – BAGHDAD .............................................. 564

108.    THE APRIL 9, 2007 ATTACK – BAGHDAD .............................................. 565

109.    THE APRIL 13, 2007 ATTACK – BAGHDAD ............................................ 566

110.    THE APRIL 15, 2007 ATTACK – BAGHDAD ............................................ 567

111.    THE APRIL 16, 2007 ATTACK – BAGHDAD ............................................ 568

112.    THE APRIL 28, 2007 ATTACK – BAGHDAD ............................................ 570

113.    THE APRIL 28, 2007 ATTACK – SALMAN PAK ..................................... 570

114.    THE APRIL 29, 2007 ATTACK – BAGHDAD ............................................ 572

115.    THE MAY 3, 2007 ATTACK – BAGHDAD ................................................ 574

116.    THE MAY 3, 2007 ATTACK – MUSAYYIB ............................................... 574

117.    THE MAY 5, 2007 ATTACK – KAMALIYAH ............................................ 575

118.    THE MAY 6, 2007 ATTACK – BAGHDAD ................................................ 576

119.    THE MAY 6, 2007 ATTACK – BAGHDAD ................................................ 578

120.    THE MAY 8, 2007 ATTACK – SALMAN PAK ........................................... 579

**121.** **THE MAY 8, 2007 ATTACK – BAGHDAD** ................................................... 580

**122.** **THE MAY 9, 2007 ATTACK – AL-HILLAH** ................................................. 581

**123.** **THE MAY 11, 2007 ATTACK – AL ISKANDARIYAH** ............................ 582

**124.** **THE MAY 14, 2007 ATTACK – BAGHDAD** ............................................... 583

**125.** **THE MAY 18, 2007 ATTACK – BAGHDAD** ............................................... 584

**126.** **THE MAY 29, 2007 ATTACK – SADR CITY** ............................................ 585

**127.** **THE JUNE 2, 2007 ATTACK – BAGHDAD** ............................................... 585

**128.** **THE JUNE 5, 2007 ATTACK – KIRKUK** ................................................... 587

**129.** **THE JUNE 6, 2007 ATTACK – BAGHDAD** ............................................... 589

**130.** **THE JUNE 8, 2007 ATTACK – BAGHDAD** ............................................... 590

**131.** **THE JUNE 10, 2007 ATTACK – BAGHDAD** ............................................. 591

**132.** **THE JUNE 11, 2007 ATTACK – BAGHDAD** ............................................. 594

**133.** **THE JUNE 13, 2007 ATTACK - SCANIA** ................................................... 595

**134.** **THE JUNE 14, 2007 ATTACK – SCANIA** ................................................. 596

**135.** **THE JUNE 17, 2007 ATTACK – BAGHDAD** ............................................. 597

**136.** **THE JUNE 20, 2007 ATTACK – BAGHDAD** ............................................. 600

**137.** **THE JUNE 21, 2007 ATTACK – BAGHDAD** ............................................. 600

**138.** **THE JUNE 23, 2007 ATTACK – BAGHDAD** ............................................. 601

**139.** **THE JUNE 25, 2007 ATTACK – BAGHDAD** ............................................. 602

**140.** **THE JUNE 28, 2007 ATTACK – BAGHDAD** ............................................. 605

**141.** **THE JUNE 29, 2007 ATTACK – BAGHDAD** ............................................. 606

**142.** **THE JUNE 30, 2007 ATTACK – BAGHDAD** ............................................. 607

**143.** **THE JULY 5, 2007 ATTACK – BAGHDAD** ............................................... 607

**144.** **THE JULY 6, 2007 ATTACK – BAGHDAD** ............................................... 609

**145.** **THE JULY 6, 2007 ATTACK – BAGHDAD** ............................................... 609

146.    THE JULY 6, 2007 ATTACK – BAGHDAD ................................................ 612

147.    THE JULY 7, 2007 ATTACK – BAGHDAD ................................................ 612

148.    THE JULY 11, 2007 ATTACK – BAGHDAD .............................................. 613

149.    THE JULY 17, 2007 ATTACK – BAGHDAD .............................................. 614

150.    THE JULY 17, 2007 ATTACK – SADR CITY ........................................... 615

151.    THE JULY 17, 2007 ATTACK – BAGHDAD .............................................. 618

152.    THE JULY 19, 2007 ATTACK – HUSSEINYAH ........................................ 619

153.    THE JULY 23, 2007 ATTACK – BAGHDAD .............................................. 620

154.    THE JULY 24, 2007 ATTACK – BAGHDAD .............................................. 621

155.    THE JULY 24, 2007 ATTACK – UMM QASR ........................................... 621

156.    THE JULY 31, 2007 ATTACK – BAGHDAD .............................................. 622

157.    THE AUGUST 6, 2007 ATTACK – BAGHDAD ......................................... 624

158.    THE AUGUST 14, 2007 ATTACK – BAGHDAD ....................................... 626

159.    THE AUGUST 17, 2007 ATTACK – BASRA ............................................. 627

160.    THE AUGUST 23, 2007 ATTACK – BAGHDAD ....................................... 628

161.    THE AUGUST 23, 2007 ATTACK – AZIZIYAH ....................................... 629

162.    THE SEPTEMBER 2, 2007 ATTACK – BAGHDAD .................................. 633

163.    THE SEPTEMBER 2, 2007 – RUSTAMIYAH ............................................ 634

164.    THE SEPTEMBER 4, 2007 ATTACK – BAGHDAD .................................. 635

165.    THE SEPTEMBER 12, 2007 ATTACK – BAGHDAD ................................ 637

166.    THE SEPTEMBER 22, 2007 ATTACK – RUSTAMIYAH ......................... 638

167.    THE SEPTEMBER 26, 2007 ATTACK – BAGHDAD ................................ 640

168.    THE SEPTEMBER 29, 2007 ATTACK – BAGHDAD ................................ 642

169.    THE SEPTEMBER 30, 2007 ATTACK – BAGHDAD ................................ 643

170.    THE OCTOBER 18, 2007 ATTACK – BAGHDAD .................................... 644

171. THE OCTOBER 21, 2007 ATTACK – ISKANDARIYAH ......................... 645

172. THE OCTOBER 29, 2007 ATTACK – UMM QASR .................................. 646

173. THE NOVEMBER 7, 2007 ATTACK – BAGHDAD .................................. 647

174. THE NOVEMBER 14, 2007 ATTACK – BAGHDAD ................................ 648

175. THE NOVEMBER 26, 2007 ATTACK – AZIZIYAH ................................ 649

176. THE DECEMBER 1, 2007 ATTACK – BAGHDAD .................................. 650

177. THE DECEMBER 9, 2007 ATTACK – AZ ZUBAYDIYAH ...................... 651

178. THE JANUARY 6, 2008 ATTACK – BAGHDAD ....................................... 655

179. THE JANUARY 30, 2008 ATTACK – BAGHDAD ..................................... 658

180. THE FEBRUARY 19, 2008 ATTACK – BAGHDAD .................................. 660

181. THE FEBRUARY 19, 2008 ATTACK – BAGHDAD .................................. 662

182. THE MARCH 11, 2008 ATTACK – BABIL PROVINCE ........................... 663

183. THE MARCH 12, 2008 ATTACK – CAMP ADDER .................................. 664

184. THE MARCH 14, 2008 ATTACK – MUSAYYIB ....................................... 666

185. THE MARCH 17, 2008 ATTACK – BAGHDAD ......................................... 667

186. THE MARCH 17, 2008 ATTACK – BAGHDAD ......................................... 668

187. THE MARCH 23, 2008 ATTACK – BAGHDAD ......................................... 670

188. THE MARCH 23, 2008 ATTACK – BAGHDAD ......................................... 681

189. THE MARCH 27, 2008 ATTACK – SADR CITY ....................................... 682

190. THE MARCH 29, 2008 ATTACK – BAGHDAD ......................................... 684

191. THE MARCH 29, 2008 ATTACK – BAGHDAD ......................................... 685

192. THE MARCH 30, 2008 ATTACK – BAGHDAD ......................................... 685

193. THE MARCH 30, 2008 ATTACK – BAGHDAD ......................................... 686

194. THE MARCH 31, 2008 ATTACK – BAGHDAD ......................................... 687

195. THE APRIL 3, 2008 ATTACK – SADR CITY ............................................ 688

196.    THE APRIL 4, 2008 ATTACK – BAGHDAD ................................................. 689

197.    THE APRIL 6, 2008 ATTACK – BAGHDAD ................................................. 690

198.    THE APRIL 6, 2008 ATTACK – BAGHDAD ................................................. 691

199.    THE APRIL 7, 2008 ATTACK – BAGHDAD ................................................. 693

200.    THE APRIL 7, 2008 ATTACK – BAGHDAD ................................................. 694

201.    THE APRIL 8, 2008 ATTACK – KHARGULIAH .......................................... 695

202.    THE APRIL 9, 2008 ATTACK – SADR CITY .............................................. 696

203.    THE APRIL 12, 2008 ATTACK .................................................................... 697

204.    THE APRIL 12, 2008 ATTACK – BAGHDAD ............................................. 699

205.    THE APRIL 17, 2008 ATTACK – SADR CITY ............................................ 699

206.    THE APRIL 21, 2008 ATTACK – BASRA ................................................... 700

207.    THE APRIL 21, 2008 ATTACK – SADR CITY ............................................ 701

208.    THE APRIL 21, 2008 ATTACK – BAGHDAD ............................................. 702

209.    THE APRIL 21, 2008 ATTACK – SADR CITY ............................................ 703

210.    THE APRIL 28, 2008 ATTACK – BAGHDAD ............................................. 704

211.    THE APRIL 28, 2008 ATTACK – SADR CITY ............................................ 706

212.    THE APRIL 28, 2008 ATTACK – SADR CITY ............................................ 707

213.    THE APRIL 29, 2008 ATTACK – BAGHDAD ............................................. 708

214.    THE APRIL 29, 2008 ATTACK – SADR CITY ............................................ 710

215.    THE APRIL 30, 2008 ATTACK – BAGHDAD ............................................. 710

216.    THE MAY 1, 2008 ATTACK – SADR CITY ................................................ 711

217.    THE MAY 2, 2008 ATTACK – BAGHDAD ................................................. 712

218.    THE MAY 9, 2008 ATTACK – BAGHDAD ................................................. 713

219.    THE MAY 9, 2008 ATTACK – SADR CITY ................................................ 715

220.    THE MAY 9, 2008 ATTACK – SADR CITY ................................................ 716

221.	THE MAY 11, 2008 ATTACK – BAGHDAD ............................................... 716

222.	THE MAY 11, 2008 ATTACK – BALAD ................................................. 718

223.	THE MAY 25, 2008 ATTACK – AN-NAJAF ......................................... 718

224.	THE JUNE 7, 2008 ATTACK – BAGHDAD ........................................... 719

225.	THE JUNE 24, 2008 ATTACK - BAGHDAD .......................................... 720

226.	THE AUGUST 4, 2008 ATTACK – BAGHDAD ....................................... 723

227.	THE AUGUST 13, 2008 ATTACK – BAGHDAD ..................................... 724

228.	THE AUGUST 26, 2008 ATTACK – SADR CITY .................................. 725

229.	THE SEPTEMBER 4, 2008 ATTACK – BAGHDAD ................................ 728

230.	THE OCTOBER 5, 2008 ATTACK – MUSAYYIB .................................. 730

231.	THE OCTOBER 16, 2008 ATTACK – BAQUBAH .................................. 731

232.	THE DECEMBER 28, 2008 ATTACK – SADR CITY .............................. 732

233.	THE DECEMBER 28, 2008 ATTACK – SADR CITY .............................. 733

234.	THE JANUARY 10, 2009 ATTACK – BAGHDAD ................................... 733

235.	THE JANUARY 18, 2009 ATTACK – BAGHDAD ................................... 737

236.	THE FEBRUARY 18, 2009 ATTACK – MAYSAN PROVINCE ............... 738

237.	THE FEBRUARY 26, 2009 ATTACK – ADHAMIYAH ........................... 739

238.	THE APRIL 13, 2009 ATTACK .......................................................... 740

239.	THE APRIL 22, 2009 ATTACK – SALADIN PROVINCE ....................... 741

240.	THE APRIL 22, 2009 ATTACK – BAGHDAD ....................................... 742

241.	THE MAY 16, 2009 ATTACK – BASRA ............................................... 743

242.	THE MAY 17, 2009 ATTACK – BAGHDAD ......................................... 743

243.	THE JUNE 14, 2009 ATTACK – BALAD .............................................. 748

244.	THE JUNE 28, 2009 ATTACK – BAGHDAD ........................................ 749

245.	THE JULY 16, 2009 ATTACK – BASRA ............................................... 750

**246.** THE AUGUST 21, 2009 ATTACK – BAGHDAD ........................................ 751

**247.** THE SEPTEMBER 8, 2009 ATTACK – TIKRIT ................................. 752

**248.** THE SEPTEMBER 8, 2009 ATTACK – BAGHDAD ................................. 754

**249.** THE OCTOBER 12, 2009 ATTACK – AMARA ................................. 756

**250.** THE JANUARY 18, 2010 ATTACK – BAGHDAD ................................. 757

**251.** THE APRIL 27, 2010 ATTACK – KHALIS ................................. 758

**252.** THE SEPTEMBER 1, 2010 ATTACK – MAYSAN PROVINCE ............. 760

**253.** THE MARCH 10, 2011 ATTACK – BAGHDAD ................................. 761

**254.** THE APRIL 2, 2011 ATTACK – ISKANDARIYAH PROVINCE ............ 762

**255.** THE APRIL 15, 2011 ATTACK – BAGHDAD ................................. 763

**256.** THE APRIL 22, 2011 ATTACK – NUMANIYAH ................................. 764

**257.** THE MAY 22, 2011 ATTACK – BAGHDAD ................................. 765

**258.** THE JUNE 6, 2011 ATTACK – BAGHDAD ................................. 765

**259.** THE JUNE 18, 2011 ATTACK - AL-QADISIYAH ................................. 767

**260.** THE JUNE 29, 2011 ATTACK – WASIT PROVINCE ............................. 768

**261.** THE JULY 3, 2011 ATTACK – AMARA ................................. 772

**262.** THE JULY 7, 2011 ATTACK – BAGHDAD ................................. 773

**263.** THE JULY 8, 2011 ATTACK – BAGHDAD ................................. 774

**264.** THE JULY 10, 2011 ATTACK – MAYSAN PROVINCE .......................... 775

**265.** THE JULY 15, 2011 ATTACK – BASRA ................................. 777

**266.** THE OCTOBER 12, 2011 ATTACK – AMARA ................................. 778

**267.** THE NOVEMBER 14, 2011 ATTACK – BAGHDAD ................................. 779

**CLAIMS FOR RELIEF** ........................................ 780

**FIRST CLAIM FOR RELIEF** ........................................ 780

**SECOND CLAIM FOR RELIEF** ........................................ 782

**THIRD CLAIM FOR RELIEF** ................................................................................ 784

**FOURTH CLAIM FOR RELIEF** .......................................................................... 785

**PRAYER FOR RELIEF** ........................................................................................ 787

Plaintiffs, by their attorneys, allege the following:

## I.     NATURE OF THE ACTION

1.     This is a civil action brought under 18 U.S.C. § 2333(a) and (d) of the Anti-Terrorism Act ("ATA") by American nationals who were injured, and by the estates and families of American nationals who were killed or injured, by reason of terrorist attacks in Iraq between 2004 and 2011 that were committed, planned and authorized by the United States-designated Foreign Terrorist Organization ("FTO") Hezbollah[1] in coordination with the United States-designated FTO Iran's Islamic Revolutionary Guard Corps ("IRGC") and its external directorate, the IRGC Qods Force ("IRGC-QF").[2]

2.     Each attack set forth in the Complaint was committed by Hezbollah and the IRGC as part of a campaign to drive the U.S. and Multi-National Force - Iraq ("MNF-I") out of Iraq. To implement its terror campaign, the IRGC and Hezbollah worked together to recruit, train, fund and arm proxies and directed them to attack U.S. and other MNF-I personnel in Iraq. The weapons the IRGC and Hezbollah provided to their agents in Iraq included a signature anti-armor weapon designed by Hezbollah and supplied by the IRGC-QF known as an Explosively Formed Penetrator ("EFP").

3.     In a 2017 interview, Jamal Ja'far Muhammad Ali al-Ibrahimi, a Specially

---

[1]     Hezbollah is transliterated in a variety of ways. The U.S. government prefers the spelling "Hizballah," but for the sake of consistency, all spellings in the Complaint use the more common iteration, "Hezbollah." In 1997, the United States designated Hezbollah an FTO (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")). *See Foreign Terrorist Organizations* (U.S. Department of State, October 8, 1997), *available at* https://www.state.gov/foreign-terrorist-organizations/. Hezbollah has remained designated an FTO since that time.

[2]     In 2019, the United States designated the IRGC an FTO (as that term is defined in 8 U.S.C. § 1189 of the AEDPA). *See Designation of the Islamic Revolutionary Guard Corps* (U.S. Department of State, April 8, 2019), *available at* https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/. The IRGC has remained designated an FTO since that time. The IRGC-QF was designated a Specially Designated Global Terrorist in 2007. See *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (U.S. Department of the Treasury, October 25, 2007), *available at* https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx. The IRGC-QF has remained designated an SDGT since that time.

Designated Global Terrorist ("SDGT") better known as Abu Mahdi al-Muhandis, confirmed that Hezbollah played an "essential role" in organizing and training "resistance cells" to attack Americans in Iraq.

4.     Muhandis had previously worked closely with Imad Mughniyah, Hezbollah's iconic terrorist "mastermind" since the early 1980s. And according to the U.S. Department of the Treasury, from 2004 – 2011 Muhandis also worked as "an advisor to Qasem Soleimani," commander of the IRGC-QF, which "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

5.     Defendants are Lebanese commercial banks that violated 18 U.S.C. § 2339B by knowingly providing extensive and sustained material support, including financial services, to Hezbollah and its companies, social welfare organizations, operatives, and facilitators. That support included providing vital access to the United States financial system through Defendants' respective correspondent interbank accounts in New York and helping Hezbollah covert massive sums of bulk cash in U.S. dollar banknotes that Hezbollah has deposited into Lebanese exchange houses into deposits at Defendant banks

6.     Defendants thereby violated § 2333(a) because their material support to Hezbollah involved acts dangerous to human life that violated U.S. criminal laws and that objectively appeared to be intended to intimidate or coerce a civilian population or influence the policy of a government by intimidation or coercion.

7.     Moreover, as set forth in detail below, each Defendant worked closely with, laundered money on behalf of, and provided terror financing for, Hezbollah's terrorism directorate known as the Islamic Jihad Organization ("IJO") or External Security Organization ("ESO"),

which, together with the IRGC, was responsible for committing the attacks in Iraq that injured Plaintiffs herein. By enabling Hezbollah and its IJO to launder vast quantities of U.S. banknotes, each Defendant also provided Hezbollah with access to the United States financial system and thereby facilitated the flow of U.S. dollar-denominated funds Hezbollah used to bankroll its operations in Iraq, recruit and pay its operatives and proxies, and acquire weapons, technology and material needed to conduct its terrorist attacks in Iraq and elsewhere.

8.     In fact, at least five Defendants (FRANSABANK, BYBLOS BANK, LEBANON AND GULF BANK, JAMMAL TRUST BANK and BANQUE LIBANO-FRANÇAISE) even held accounts for the Islamic Resistance Support Organization ("IRSO"), Hezbollah's infamous public fundraising arm for its terrorist operations. As detailed below, the IRSO explicitly raises funds to purchase weapons and to subsidize its fighters.

9.     Defendants conduct also violated § 2333(d) because each Defendant aided and abetted Hezbollah by knowingly providing substantial assistance to the terrorist organization. They did so by agreeing to help Hezbollah and its IJO launder vast sums of bulk cash that Hezbollah's social welfare organizations, companies and operatives collected in U.S. dollar-denominated banknotes from narcotics trafficking, diamond smuggling, arms dealing and other illicit activities.

10.     As set forth in detail below, each Defendant was aware of its role (and the role of the Lebanese banking sector as a whole) in facilitating Hezbollah's illicit schemes through which the terrorist organization funded its IJO and committed attacks on American service members in Iraq.

11.     Defendants also violated § 2333(d) by (each) conspiring with Hezbollah by agreeing to participate in a criminal enterprise sometimes known in Lebanon as "The System" through which Lebanese-organized crime families, working with Hezbollah and the IRGC, *first*,

launder billions of U.S. dollars annually; *second*, provide Hezbollah with financial services and resources, including, but not limited to, access to the U.S. financial system through their respective correspondent bank accounts in New York (while Defendants intentionally concealed this information from U.S. correspondent banks and U.S. regulatory, law enforcement, and intelligence agencies); and *third*, help to further facilitate Hezbollah's terrorist activities by enabling the IJO's operational funding, including its operations in Iraq from 2003 to 2011.

12.     Defendants all knowingly agreed to participate in The System and the criminal conspiracy it entails, including money laundering (encompassing both cross-border electronic funds transfers and physical bulk-transfers of banknotes), sanctions evasion, arms export violations, drug trafficking, kidnapping for ransom, and direct terrorist financing.

## II.     <u>HISTORICAL BACKGROUND</u>

13.     Most of what is publicly known about Hezbollah, its exploitation of the U.S. financial system, and its collaboration with Lebanese banks comes from four principal sources: (a) U.S. Department of the Treasury designations of Hezbollah leaders, operatives and commercial enterprises; (b) publicly available information concerning what became known as Project Cassandra, which originated in the Drug Enforcement Administration's ("DEA") investigation of Hezbollah's development into an international crime syndicate that collected funds worth as much as $1 billion U.S. dollars a year from narcotics and weapons trafficking, money laundering, and other criminal activities across Europe, Africa, and the Americas; (c) publicly disclosed materials relating to U.N. and European investigations of diamond smugglers and money launderers; and (d) published reports by prominent non-governmental organizations like Global Witness, Sentinel TMS, Bellingcat, C4ADS, the Washington Institute for Near East Policy and others.

14.     Hezbollah is a Lebanon-based terrorist organization, founded circa 1982 with the support and assistance of Iran's IRGC. It is widely regarded as the most dangerous terrorist

organization in the world, responsible for some of the most dramatic terrorist attacks in the last three decades, that have cost thousands of lives. These attacks include the hundreds of attacks it directed against U.S. forces in Iraq.

15.     Even in its early years, Hezbollah developed a social welfare infrastructure (with Iranian support and financing) to support its operatives and their families and to cultivate the large, generally poor Shi'a communities of Lebanon and expand its political base of support. This network – which includes the IRSO, the Martyrs Foundation - Lebanon and other institutions described in detail below – forms the backbone of Hezbollah's political support and is essential to its ability to recruit terror operatives and sustain public support in Shi'a communities.

16.     For more than two decades, Hezbollah has also participated directly in the fragmented Lebanese political system.

17.     While it does not *formally* control Lebanon's government or judicial system, it wields enormous political influence and maintains its own private militia which not only rivals but is militarily superior to the Lebanese army.

18.     Operating a terrorist organization of Hezbollah's size, ambition, reach and sophistication requires vast amounts of money annually. And despite Hezbollah's virulent hatred of the United States, because Lebanon is a dollarized economy (as discussed below), the terrorist organization is also highly dependent on access to the U.S. financial system – via Defendants.

19.     For many years, American intelligence and law enforcement agencies were aware of Hezbollah's growing capabilities and its increasing reliance on illicit activities to fund its operations.

20.     According to published reports, Project Cassandra Taskforce members in particular came to learn that Hezbollah, working closely with Iran's intelligence services and its IRGC, had

carefully cultivated illicit networks among Lebanese expatriate communities around the world to create a web of businesses that acted as front companies for Hezbollah's and the IRGC's black-market trading and money laundering activities.

21.     According to these published reports, Project Cassandra Taskforce members tracked Hezbollah's flow of weapons, drugs, Conflict Diamonds,[3] ammunition, explosives, military-grade spare parts (including parts for Iran's illicit nuclear and ballistic missile programs), and U.S. dollar-denominated funds along the same Hezbollah corporate routes that carried shipments of ostensibly legal goods, such as frozen chicken, raw materials, precious metals, used cars, cigarettes, and consumer electronics.

22.     Following Hezbollah's July 2006 conflict with Israel (which devastated parts of southern Lebanon and Hezbollah-controlled neighborhoods south of Beirut), Hezbollah further intensified its efforts to raise funds (mostly denominated in U.S. dollars) in order to fund its post-conflict rebuilding efforts in the Shi'a-dominated areas of Lebanon while simultaneously funding its terror operations in Iraq (including the targeting of Plaintiffs herein).

23.     Hezbollah's urgent need for larger amounts of cash led the transnational terrorist organization to greatly expand its role in the global cocaine trade to an unprecedented level.

24.     As Project Cassandra Taskforce members would learn, Hezbollah ran these networks through its Business Affairs Component ("BAC"), i.e., its "commercial apparatus," a special financial and business unit established by the late Imad Mughniyah, then Hezbollah's most senior terrorist commander, and overseen by two deputies, Adham Hussein Tabaja, a prominent

---

[3]     "Conflict Diamonds" (a/k/a "Blood Diamonds") as used herein refers to the illegal trade in diamonds with African countries where violent conflicts have taken place between armed militias and African government forces. Almost two decades ago, the United Nations Security Council initiated international embargos regarding trading in diamonds with countries like Liberia, Sierra Leone and Angola. Beginning in 1999, the European Union ("EU") adopted regulations regarding banning the direct or indirect import into the EU of rough diamonds from Liberia, Sierra Leone and Angola.

Hezbollah financier and real estate developer in Lebanon, and Abdallah Ali Safieddine (a/k/a "Safi al-Din"), the brother of Hashem Safieddine, one of Hezbollah's most senior leaders who is reportedly the designated successor to Hezbollah's supreme leader and U.S.-designated terrorist Hassan Nasrallah.

25.    Both Adham Tabaja and Abdallah Safieddine have been designated SDGTs by the U.S. Department of the Treasury.

26.    As discussed in detail below, the BAC oversees Hezbollah's vast network of world-wide criminal and commercial enterprises which it uses to finance its terrorist operations.

27.    In addition to funding Hezbollah's terrorist infrastructure, the BAC provides the terrorist organization with numerous illicit revenue streams for criminal syndicates operating among the Lebanese diaspora communities of West Africa, South America and the Persian Gulf. Hezbollah views these revenue streams as part of its Islamic resistance activity—even when conducted with criminal organizations that share no ideological affinity with Hezbollah. As a U.S. National Defense University report on Combating Crime-Terror Pipelines stated:

> Ideology is not an obstacle: when it comes to money, Hizballah will do business with anyone. Violent Extremists may justify their involvement in drug trafficking in many creative ways, including as a weapon against infidel consumers.[4]

28.    After Mr. Mughniyah was killed in 2008, leadership of Hezbollah's BAC was assumed by both Adham Tabaja and Abdallah Safieddine.

29.    The U.S. government ultimately concluded that Abdallah Safieddine was one of the key connections between Hezbollah's BAC and Iran's IRGC and the IRGC-QF.

---

[4]    Final Report, "Trans-Atlantic Dialogue on Combating Crime-Terror Pipelines Dismantling Converging Threat Networks to Strengthen Global Security," National Defense University (June 25-26, 2012).

30.     As Project Cassandra proceeded, multiple narcotics investigations also linked Mr. Safieddine to international drug smuggling and money laundering networks, and especially to a Colombian national named Ayman Joumaa, a major international drug-trafficker, who served as the key contact between Hezbollah and Mexico's murderous Los Zetas cartel and Colombia's La Oficina de Envigado cartel.

31.     Mr. Joumaa was subsequently designated by the U.S. Department of the Treasury as a Specially Designated Narcotics Trafficker Kingpin ("SDNTK").[5]

32.     The Project Cassandra Taskforce  investigations of Mr. Safieddine and Mr. Joumaa eventually intersected with a separate effort by U.S. Special Operations Command ("SOCOM") that was tracking the source of funds used by Iranian proxies that were deploying sophisticated weapons against U.S. armored vehicles in Iraq, including, among other weapons, IRGC-supplied (and Hezbollah-designed) EFPs (discussed in detail below).

33.     When phone numbers connected to the IRGC network supplying EFPs to Iranian and Hezbollah proxies in Iraq matched phone numbers intercepted during the Project Cassandra Taskforce's Colombia investigation of Mr. Joumaa's network, Project Cassandra and SOCOM investigative teams were able to tie Mr. Safieddine's EFP network in Iran to Hezbollah's narcotics trafficking and money laundering network operating in Colombia and the Tri-Border Area ("TBA") (covering the joint borders between Paraguay, Brazil, and Argentina).

34.     Ultimately, the U.S. Intelligence Community and Department of Justice's analysis of thousands of hours of intercepted Arabic phone conversations from Colombia, among other

---

[5]     See *Treasury Targets Major Money Laundering Network Linked to Drug Trafficker Ayman Joumaa and a Key Hizballah Supporter in South America* (U.S. Department of the Treasury, June 27, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1624.aspx. Mr. Joumaa was indicted in November 2011 for narcotics trafficking and money laundering. *See U.S. Charges Alleged Lebanese Drug Kingpin with Laundering Drug Proceeds for Mexican and Colombian Drug Cartels* (U.S. Department of Justice, December 13, 2011), *available at* https://www.justice.gov/archive/usao/vae/news/2011/12/20111213joumaanr.html.

locations, painted a picture of Abdallah Safieddine as a central figure in Hezbollah's (and the IRGC's) global financial network and in the provision of U.S. dollars emanating from the Lebanese banking system into Iraq to fuel attacks against U.S. service members, among others.

35.    According to then-DEA Acting Deputy Administrator Jack Riley, "[t]hese drug trafficking and money laundering schemes utilized by the Business Affairs Component provide a revenue and weapons stream for an international terrorist organization responsible for devastating terror attacks around the world."

36.    Armed with a better understanding of Hezbollah's BAC network, the Project Cassandra team soon targeted Lebanese Canadian Bank SAL ("LCB") by gathering evidence showing how Ayman Joumaa's narcotics network was laundering an estimated $200 million a month in U.S. dollar-denominated funds through LCB directly and through various Lebanese money exchange houses, including New Line Exchange Trust Company SAL ("New Line Exchange"), Elissa Exchange Company SARL ("Elissa Exchange"), Hassan Ayash Exchange Company SAL ("Hassan Ayash Exchange"), Halawi Exchange Company SAL ("Halawi Exchange"), and Mecattaf SAL that held accounts with LCB and several Defendants herein.[6]

37.    These exchange houses (and the banks that maintained their accounts) were also a vital conduit for BAC narcotics proceeds transited to Iraq to help Hezbollah underwrite its terrorist proxies, including so-called Special Groups (discussed below) that targeted Plaintiffs herein and hundreds of other Americans.

---

[6]    *See Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network* (U.S. Department of the Treasury, January 26, 2011), *available at* https://www.treasury.gov/press-center/press-releases/Pages/ tg1035.aspx. The U.S. Department of the Treasury later designated Kassem Rmeiti and Company for Exchange SAL ("Rmeiti Exchange"), Halawi Exchange and, more recently, Chams Exchange Company SAL ("Chams Exchange") for laundering money through The System on behalf of Mr. Joumaa, among others.

38.    After the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Mr. Joumaa, *The New York Times* published the following chart showing the intricate money laundering system LCB used to "divert money to the Shiite militant group Hezbollah":[7]



39.    As Hezbollah's money laundering activities came into focus it became clear that the terrorist organization was not simply involved in isolated fundraising activities or random criminal conduct.

40.    Instead, Hezbollah's finances were closely tied to a larger, highly sophisticated, criminal enterprise that involved much of Lebanon's banking sector (including Defendants herein), many of the country's pre-existing organized crime families, and a significant portion of its political class (comprising members of all major religious groups in Lebanon, i.e. Sunni, Shi'a, Maronite, Druze, etc.).

---

[7]    *Money Laundering at Lebanese Bank* (*The New York Times*, December 13, 2011), *available at* https://archive.nytimes.com/www.nytimes.com/interactive/2011/12/13/world/middleeast/lebanese-money-laundering.html.

41.     As noted above, this arrangement is sometimes referred to by Hezbollah and others in Lebanon as "The System."

42.     The System predates Hezbollah's central involvement in it over the course of the past two decades. However, in the 21st century, The System reflects Hezbollah's integration of several different criminal networks ranging from Conflict Diamond dealers, counterfeiters, narcotics traffickers, weapons traffickers, and trade-based money launderers.

43.     The System is modeled on Lebanon's "confessional system" of political power sharing, in which political representation is divided amongst Lebanon's various religious and ethnic groups.

44.     In the wake of the assassination of Lebanese Prime Minister Rafic Hariri on February 14, 2005, Hezbollah took over the central role of managing The System.

45.     The System churns proceeds from all these illicit activities through Lebanon's banks and exchange houses; secondarily, it pours significant sums of money into Lebanon's real estate sector.

46.     Although the most important players in The System are Hezbollah's operatives, numerous Shi'a, Sunni, Maronite and other participants play prominent roles – both to shield The System's operations from being overtly associated outside of Lebanon with Hezbollah and to co-opt Hezbollah's political rivals by dividing the spoils and ensuring that all Lebanese factions are invested in The System's continuation and success.[8]

---

[8]     In this Complaint, the nominal religious affiliations of certain individuals are mentioned solely for two reasons: First, because Lebanon's political and social system is confessional in nature (i.e. individuals' religious affiliation is noted on official documents and is integral to their positions in Lebanese society and commerce). Second, because although Hezbollah is a political and religious movement closely associated with Iran's current form of Shi'a Islam, the terrorist organization and its operatives deliberately work with individuals associated with all of Lebanon's religious and ethnic sects.

47.     Many of the participants in The System, including Defendants, actively and knowingly further Hezbollah's illicit activities (including terrorism) because their own financial and political interests are dependent on Hezbollah's continued participation in The System.

III.    **THE STRUCTURE OF LEBANON'S ECONOMY IS DEPENDENT ON HEZBOLLAH'S INFLOWS OF U.S. DOLLARS, AND DEFENDANTS' PROFITABILITY IS DEPENDENT ON U.S. CORRESPONDENT BANK ACCOUNTS AND U.S. DOLLAR CLEARING ON HEZBOLLAH'S BEHALF**

48.     Lebanon is a predominantly importing country characterized by large trade deficits, generally offset by capital account inflows, domestic income earnings, and a large volume of cross-border remittances.

49.     As the International Monetary Fund ("IMF") noted in its July 2, 2009 Statement on Lebanon, the country has long suffered from large fiscal deficits which have left public debt at over 150 percent of Gross Domestic Product ("GDP"). That public debt has historically been primarily purchased by Lebanese commercial banks whose balance sheets are heavily weighted toward sovereign debt.

50.     According to the Central Bank of Lebanon (a/k/a Banque du Liban), Lebanon's banking system is well-regulated, exhibits good financial sector soundness indicators, and has good ratings relative to peers. It is an attractive destination for domestic and expatriate deposits because bank failures have never caused depositors to lose money (the Central Bank of Lebanon has chosen to deal with troubled monetary institutions largely through mergers).

51.     In reality, Lebanon is in many respects a failed state, dominated if not wholly controlled by Hezbollah, the world's most powerful terrorist organization, which plays a decisive role in its political and security arrangements and a significant role in its economy.

52.     At the same time, Lebanon has long suffered from a significant balance of payments problem: It receives far less capital investment and foreign tourism dollars than its citizens spend and invest abroad.

53.     In 2006, almost 75 percent of Lebanese bank deposits (approximately $45 billion U.S. dollars) were denominated in U.S. dollars.

54.     In 2018, approximately 67 percent of Lebanese bank deposits (approximately $120 billion U.S. dollars) were denominated in U.S. dollars.

55.     The U.S. Department of the Treasury characterized the dynamics of the Lebanese banking system as follows:

> [A] steady flow of diaspora deposits in recent years have helped the Lebanese banking system to maintain relatively robust lending, improve asset quality, and maintain adequate liquidity and capitalization positions. However, banks remain highly exposed to the heavily indebted sovereign, carry significant currency risk on their balance sheets, and operate in a volatile political security environment…. *Of particular relevance is the possibility that a portion of the substantial flow of remittances from the Lebanese diaspora, estimated at $7 billion—21% of GDP—in 2009, according to the World Bank, could be associated with underground finance and Trade-Based Money Laundering ("TBML") activities. Laundered criminal proceeds come primarily from Lebanese criminal activity and organized crime*. (Emphasis added.)

56.     To service its debt with minimal exportable production of its own, the Lebanese government runs on debt on a scale that places it as the third most indebted economy in the world.

57.     For example, Lebanon's trade balance recorded deficits of approximately $7.9 billion U.S. dollars in 2007, $11.1 billion U.S. dollars in 2008, $11.2 billion U.S. dollars in 2009, $12.3 billion U.S. dollars in 2010, and $12.8 billion U.S. dollars in 2011.

58.     In 2010, for example, Moody's rated Lebanon's government debt on the same level as Senegal and Vietnam. Standard and Poor's and Fitch ranked Vietnam higher.

59.    In 2011, Lebanon's government debt service represented approximately 42.9 percent of total expenditures and 34.3 percent of total revenues.

60.    Compared to other countries, Lebanon has a high net outstanding public debt to GDP ratio, reaching 119 percent by the end of 2011.

61.    To finance its massive debt, Lebanon chose to link its economy to the U.S. dollar, running a massive proportion of its economy through correspondent accounts[9] with U.S. financial institutions, largely in New York.

62.    Specifically, the Lebanese economy is dependent on the following inter-related policies:

63.    For two decades the Lebanese pound has been pegged to the U.S. dollar at a fixed rate sometimes called a "currency peg."

64.    To keep the public sector afloat, two thirds of the Lebanese banking sector's balance sheets consist of loans to the Lebanese Central Bank and the Lebanese government.

65.    The Lebanese Central Bank maintains high interest rates that keep money flowing into banks.

66.    With economic growth slowing and traditional sources of foreign exchange, such as tourism, real estate and foreign investment having proven insufficient, Lebanon heavily relies on the billions of U.S. dollars that expatriate Lebanese deposit into Lebanon's banks.

67.    With its currency tied to the U.S. dollar and its dependence on infusions of U.S. dollars in hard currency from expatriate Lebanese, the entire structure of the Lebanese financial

---

[9]    Correspondent banking is an essential component of the global financial system, especially for cross-border electronic funds transfers. Banks establish and maintain correspondent banking relationships to access financial services in different jurisdictions and provide international payment services for their customers. However, correspondent banking is also a major vehicle for financial crime, including, money laundering and terror financing.

system is dependent on Lebanese commercial banks maintaining access to U.S. dollar-clearing capabilities through the maintenance of correspondent accounts with U.S. financial institutions.

68. Therefore, the Lebanese banks have chosen to maintain correspondent banking relationships with U.S. financial institutions in New York.

69. The fact that Lebanon has voluntarily waived its sovereign immunity defense as to any disputes relating to the government notes it issues, accepts New York law as the governing law, and submits to jurisdiction in U.S. courts, highlights that the entire Lebanese banking sector is dependent on access to U.S. dollars through networks of correspondent accounts.

70. The willingness of Lebanon's banks, including Defendants, to finance the government is to a large degree explained by the fact that over half of these banks' assets are invested in Lebanon's sovereign debt (issued by either the Ministry of Finance or the Central Bank of Lebanon).

71. The circularity and mutual dependence of this level of investment and re-investment in the sovereign creates a high-risk strategy for the Central Bank of Lebanon and the commercial banks because it relies on an ever-increasing level of domestic and expatriate deposits, mostly in U.S. dollars.

72. Ultimately, the ability of Lebanon's banks to continue financing the Lebanese government's public debt (and to profit significantly from doing so) rests on the steady growth of each of the banks' respective hard currency deposit bases, fueled by U.S. dollar-denominated remittances and transfers from the Lebanese diaspora in general, and Hezbollah in particular.

73.     For instance, as stated above, Lebanon's substantial influx of remittances from expatriates has been estimated by the World Bank at approximately $7.6 billion U.S. dollars annually over the last four years.[10]

74.     This includes enormous amounts of U.S. dollars that flow from drug-trafficking, the Conflict Diamond trade, arms dealing, contracts obtained by Hezbollah operatives from friendly African governments and even ordinary (i.e., otherwise legal) trade conducted by Hezbollah's world-wide enterprises.

75.     It also includes massive amounts of Iranian financial support (most of it in U.S. dollars, the currency in which Iranian crude oil was priced and upon which Lebanon was and is dependent) that is laundered through Hezbollah and Iranian organizations based in Lebanon, Hezbollah's commercial networks, and Iran's global sanctions evasions networks that is then routed through Lebanese entities and banks.

76.     Not only are Defendants herein aware of this, they depend on these U.S. dollar deposits from Hezbollah flowing from South America, Africa and elsewhere through the United States and onto their balance sheets, which in turn underwrites the Lebanese government's enormous and otherwise unsustainable debt structure.

77.     Thus, deposit accounts in Lebanese banks that receive U.S. dollars from Hezbollah are primarily U.S. dollar-denominated (Eurodollar)[11] accounts.

---

[10]     According to the U.S. Department of the Treasury, "Lebanon's banking sector continues to rely on significant capital inflows from the Lebanese diaspora community, which has been a large contributor to banking sector liquidity and capitalization, estimated by the World Bank at $7.6 billion—18% of GDP—in 2011." *See*, https://www.fincen.gov/sites/default/files/special_measure/311--ExchHouse-R-NoticeofFinding-Final.pdf.

[11]     Eurodollar refers to a multinational bank's unsecured time-deposit liability (chose in action), denominated in the U.S. dollar unit of account and maintained by credit and debit book-entries, but not directly subject to U.S. banking regulations. Clearing of Eurodollar electronic funds transfers occurs primarily through a bank-owned clearinghouse in New York, based on payment orders issued by correspondent banks and transmitted cross-border through a bank-

78.     Lebanon is formally a member of the Middle East and North Africa Financial Action Task Force, an intergovernmental regional body similar to the global Financial Action Task Force.

79.     Lebanon's Financial Intelligence Unit ("FIU") is the Special Investigation Commission ("SIC–Beirut"), a nominally independent legal entity empowered to investigate suspicious financial transactions and freeze assets.

80.     Despite these ostensible anti-money laundering tools, according to the U.S. State Department's Bureau for International Narcotics and Law Enforcement Affairs, Lebanon faces significant money laundering and terrorism financing challenges by Hezbollah, the IRGC-QF, and other malign actors.

81.     This is inevitable due to Hezbollah's preeminent role in the Lebanese government and its complementary position as an armed faction with capabilities far superior to the hapless Lebanese army (which it also dominates).

82.     For two decades this economic structure has kept Lebanon's economy afloat, provided Lebanese diaspora communities (and most importantly, Hezbollah) repatriated "fresh" hard currency (primarily denominated in U.S. dollars) that offset some of the balance of payment gap and made its way to Lebanon's Central Bank to help sustain the country's currency peg to the U.S. dollar.

83.     This marriage of convenience between Lebanon's commercial banks, Hezbollah and the country's criminal organizations provided each participant in The System with what it needed. The criminal organizations benefited from Hezbollah's global reach and sophisticated

---

owned secure messaging service. The settlement of Eurodollar electronic funds transfers occurs *only* in New York, across the balance sheet of the Federal Reserve Bank of New York ("FRB–New York"), acting in its role as the U.S. Central Bank and "lender of last resort" for all Eurodollar deposits globally. For purposes of this Complaint, Eurodollar transactions and accounts are referred to as "U.S. Dollar-denominated."

logistics networks to expand their operations and gain political protection in Lebanon. The banks gained steady streams of U.S. bank notes that helped to maintain the structural Ponzi scheme that sustains Lebanon's sovereign debt and has until recently provided them with steady returns on the sovereign debt they have heavily invested in. Hezbollah was afforded opportunities to develop new revenue streams for itself, new channels to launder money and material for the IRGC, and seamless channels to access the U.S. financial system that in turn provided Hezbollah with a competitive advantage in its narcotics trafficking, arms-trading, and money laundering business lines.

84.     In sum, The System offered (and offers) something significant for every Lebanese faction. For the less scrupulous members of the country's political class, it has purchased delay and pushed off reforms and austerity measures necessitated by runaway government spending (subsidized by the purchase of that debt by Lebanon's commercial banks).

85.     The System has also enriched select politicians across the Lebanese political spectrum who have either been invited to join as investors in various projects or had their close family members serve as board members of companies that benefit from The System.

86.     For Hezbollah, The System ensures that Lebanon's institutions and preferred members of its ruling class are all heavily invested (literally and figuratively) in its financial success and continued ability to acquire, invest and launder billions of U.S. dollars.

## IV.     THE LEBANESE CANADIAN BANK INVESTIGATION REVEALED THE MECHANICS OF THE SYSTEM

87.     As noted above, a large portion of Hezbollah's illicit proceeds in bulk cash were deposited in cash in Lebanese exchange houses, then deposited by the exchange houses into Lebanese banks.

88.     For example, in less than two years in the mid-2000s, Hezbollah laundered illicit funds worth more than $300 million U.S. dollars through Halawi Exchange and $150 million U.S. dollars through Hassan Ayash Exchange alone.

89.     As the LCB investigation revealed, Hezbollah's laundered U.S. dollar-denominated narcotics proceeds, among other sources of revenue, migrated through Lebanese exchange houses to LCB and Defendants BLOM BANK and MEAB BANK and were then, among other things, transferred to used-car dealerships in the United States to buy and ship thousands of vehicles to West Africa, where Hezbollah's BAC network operated hundreds of businesses.

90.     In February 2011, however, the U.S. Department of the Treasury, pursuant to 31 U.S.C. § 5318A ("Section 311" of the USA Patriot Act), identified LCB as "a financial institution of primary money laundering concern."

91.     This immediately threatened to cut LCB off from its U.S. correspondent banks – a result that would have drastically reduced LCB's capacity to operate as an international bank.

92.     More importantly, the announcement threatened to expose The System and jeopardize *other* Lebanese banks' access to U.S. correspondent banking. Therefore, Lebanese officials rushed to Washington to contain the damage and only *three weeks* after LCB was named a financial institution of primary money laundering concern a public announcement was made that Defendant SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL ("SGBL") was going to purchase LCB.

93.     In December 2011, the work of the Project Cassandra team resulted in the U.S. Department of Justice ("DOJ") filing a $483 million civil action against LCB.

94.     In August 2012, the U.S. government filed a civil forfeiture action pursuant to 18 U.S.C. § 981(k) to seize $150 million U.S. dollars held by Defendant BANQUE LIBANO-

FRANÇAISE SAL that U.S. law enforcement officials believed constituted criminal proceeds belonging to Hezbollah.[12]

95.     As part of the Lebanese effort to contain the crisis caused by the civil action against LCB, it was important to Defendant SGBL to dispel any impression that it was simply taking over LCB's role as Hezbollah's most favored bankers.[13]

96.     To assure its U.S. correspondent banks as well as U.S. and international bank regulators that this was not the case, Defendant SGBL retained the local offices of a prominent international accounting firm to audit LCB's accounts and brought in the Ashcroft firm (founded by former U.S. Attorney General John Ashcroft) to further oversee the process of allegedly purging Hezbollah accounts at LCB prior to LCB's complete absorption into SGBL.

97.     According to a December 2011 report in *The New York Times*, "auditors brought in to scrub the books discovered nearly 200 accounts that were suspicious for their links to Hezbollah and their classic signs of money laundering."[14] The process was described as follows:

> Initially, the auditors looked only at records for the past year. As they began combing through thousands of accounts, they looked for customers with known links to Hezbollah. They also looked for telltale patterns: repeated deposits of vast amounts of cash, huge wire transfers broken into smaller transactions and transfers between companies in such wildly incongruous lines of business that they made sense only as fronts to camouflage the true origin of the funds.

---

[12]     In June 2013, the DOJ settled with LCB and Defendant SGBL, with the U.S. government retaining $102 million of the $150 million U.S. dollars seized from the "Escrow Account" at Defendant BANQUE LIBANO-FRANÇAISE SAL.

[13]     As noted below, Israeli officials had previously warned the U.S. Department of the Treasury that SGBL was involved in facilitating Hezbollah's financial activities. While Defendant SGBL did close many (but not all) of LCB's Hezbollah accounts and temporarily froze several of the accounts belonging to the Joumaa Network, there is no publicly available information to indicate that Defendant SGBL terminated LCB's business with Iran's Central Bank, shuttered LCB's Prime Bank Gambia operations on Hezbollah's behalf, or closed the accounts of the Hezbollah organizations it failed to list as part of its post-acquisition audits.

[14]     Jo Becker, *Beirut Bank Seen as a Hub of Hezbollah's Financing* (*The New York Times*, December 13, 2011), *available* at https://www.nytimes.com/2011/12/14/world/middleeast/beirut-bank-seen-as-a-hub-of-hezbollahs-financing.html.

Each type of red flag was assigned a point value. An account with 1 or 2 points on a scale to 10 was likely to survive. One with 8 or 9 cried out for further scrutiny. Ultimately, the auditors were left with nearly 200 accounts that appeared to add up to a giant money-laundering operation, with Hezbollah smack in the middle, according to American officials. Complex webs of transactions featured the same companies over and over again, most of them owned by Shiite businessmen, many known Hezbollah supporters. Some have since been identified as Hezbollah fronts.

98.    As the *Times* report noted:

In all, hundreds of millions of dollars a year sloshed through the accounts, held mainly by Shiite Muslim businessmen in the drug-smuggling nations of West Africa, many of them known Hezbollah supporters, trading in everything from rough-cut diamonds to cosmetics and frozen chicken, according to people with knowledge of the matter in the United States and Europe. The companies appeared to be serving as fronts for Hezbollah to move all sorts of dubious funds, on its own behalf or for others. The system allowed Hezbollah to hide not only the sources of its wealth, but also its involvement in a range of business enterprises.

99.    The *Times* report, though detailed and accurate, understated the matter.

100.    To begin with, there were in fact more than 200 customer accounts associated with Hezbollah and the IRGC; only a subset of those accounts was formally identified by the Lebanese authorities.

101.    Moreover, although the article paraphrased lawyers for Mr. Ashcroft's firm as claiming that "all the problematic accounts had been excised," that proved not to be the case.

102.    Mr. Ashcroft was quoted in the *Times* report as saying that "[a]s current and potential problems have been uncovered, [his client] has not hesitated to act." However, according to the Lebanese government's own internal investigation, several accounts identified among the "accounts that appeared to add up to a giant money-laundering operation with Hezbollah smack in the middle" migrated to SGBL after the merger (including the suspended accounts for Ayman Joumaa and his brothers Anwar and Akram Joumaa – the individuals at the center of the narcotics trafficking activity that sparked the LCB investigation).

103.    Finally, the *Times* report concluded "as Treasury officials acknowledge … most of the accounts were simply transferred to several other Lebanese banks."

104.    In fact, many of the more than 200 Hezbollah accounts simply moved to the other Defendant banks *in this action* (as detailed below) with the full knowledge of the Lebanese government, whose own investigation and findings were widely circulated.

105.    For example, according to the Lebanese government, the following key (Hezbollah / BAC) accounts migrated to Defendants in 2011-2012 once LCB was forced to close the accounts:

| Defendant | Former LCB Account Holder |
| --- | --- |
| SGBL | <ul><li>Nazem Ahmad;</li><li>Anwar Joumaa;</li><li>Muhammad Issam Abu Darwish;</li><li>Ziyad Muhammad Youssef (SDNTK);</li><li>Ayman Joumaa (SDNTK).</li></ul> |
| FRANSABANK | <ul><li>Saleh Ali Assi;</li><li>Inter Aliment SAL Offshore;</li><li>Muhammad Bazzi (SDGT);</li><li>Global Trading Group (SDGT);</li><li>Euro African Group Ltd. (SDGT);</li><li>Muhammad Issam Abu Darwish;</li><li>Mustafa Faysal Ahmad;</li><li>Mercury Development Offshore SAL;</li><li>Millennium Diamond Offshore SAL;</li><li>Phoenicia Shipping Offshore SAL (SDNTK).[15]</li></ul> |
| MEAB BANK | <ul><li>Saleh Ali Assi;</li><li>Inter Aliment SAL Offshore;</li><li>Muhammad Issam Abu Darwish;</li><li>Said Hassan Fuani;</li><li>Mustafa Faysal Ahmad;</li><li>Safi Yahya Darwish;</li><li>Ali Muhammad Kharrubi (SDNTK);</li><li>Elissa Exchange Co. SARL (SDNTK).</li></ul> |
| BLOM BANK | <ul><li>Nazem Ahmad;</li><li>Youssef Tajideen;</li></ul> |

---

[15]    The U.S. Department of the Treasury uses the spelling "Phenicia Shipping Offshore SARL."

| | |
|---|---|
| | • Millennium Diamond Offshore SAL;<br>• SOGEAC SPRL;<br>• Mustafa Faysal Ahmad;<br>• Akram Joumaa. |
| **BYBLOS BANK** | • Afrimex (Offshore) SAL;<br>• Ali Hussein Darwish;<br>• Muhammad Hussein Darwish;<br>• Safi Yahya Darwish;<br>• Khodr Hussein Darwish;<br>• Ali Musa Nachar;<br>• Tarek Khalil Musa;<br>• Said Hassan Fuani;<br>• Ibrahim Muhammad Faqih. |
| **BANK AUDI** | • Ibrahim Issawi;<br>• Nazem Ahmad;<br>• Youssef Tajideen;<br>• Ali Charara (SDGT);<br>• Muhammad Issam Abu Darwish;<br>• Congo Diam SPRL;<br>• Fawzi Muhammad Malek;<br>• Ali Hussein Darwish;<br>• Muhammad Hussein Darwish;<br>• Khalil Nazem Ibrahim;<br>• Phoenicia Shipping Offshore SAL (SDNTK). |
| **BANK OF BEIRUT** | • Galaxy Flame Trading SAL Offshore;<br>• Samir Muhammad Hijazi;<br>• Youssef Tajideen. |
| **LEBANON AND GULF BANK** | • Adham Tabaja (SDGT);<br>• Fantasy World SARL;<br>• Ovlas Trading SA (SDGT);<br>• Leaders of Supply & Products (Offshore) SAL;<br>• Youssef Tajideen;<br>• Fayed Exchange;<br>• Elissa Exchange SARL (SDNTK). |
| **BANQUE LIBANO-FRANÇAISE** | • Ibrahim Issawi;<br>• Socimex;<br>• Saleh Ali Assi;<br>• Inter Aliment SAL Offshore;<br>• Nabila Wazni;<br>• SOGEAC SPRL;<br>• Hussein Ibrahim Bdeir;<br>• Ras Beirut 1442 SAL;<br>• S.I.M. SAL Offshore; |

| | |
|---|---|
| | • Muhammad Issam Abu Darwish;<br>• Ideal Development I.D. SAL;<br>• Wa'el Ahmad Issawi. |
| **BANK OF BEIRUT AND THE ARAB COUNTRIES** | • Teltac Worldwide Incorporated (Offshore) SAL;<br>• Fayed Exchange. |
| **FENICIA BANK** | • Elissa Exchange Co. SARL (SDNTK);<br>• Phoenicia Shipping Offshore SAL (SDNTK);<br>• Hussein Ahmad Issawi;<br>• Fun World Company SAL;<br>• Samir Muhammad Hijazi;<br>• Ali Ahmad Choueib;<br>• Golden Eye Trading Ithalat Ihracat Ltd.;<br>• Said Jamil Muhammad;<br>• Al-Jiyeh for Tourism & Construction SAL;<br>• New Land SARL. |

106.    In short, SGBL and the Lebanese government specifically identified more than 200 Hezbollah-related accounts at LCB, but these individuals and companies – many of whom are among the most prominent BAC leaders and companies – were not forced out of the Lebanese banking system.[16]

107.    On the contrary, their accounts simply moved to other banks (including the other Defendants). As *The New York Times* reported, "most of the accounts were simply transferred to several other Lebanese banks."

108.    Moreover, as detailed below, many of Hezbollah's and the Iranian governmental entities' accounts at LCB were omitted from the Lebanese reports inventorying suspect accounts at LCB, and there is no indication that these (unlisted) accounts were ever closed by Defendant SGBL.

---

[16]    For future reference in this Complaint, Hezbollah-related LCB accounts identified and listed by the Lebanese government are denoted with the * symbol.

109.     On the contrary, several of these illicit accounts, including accounts for U.S.-designated entities such as Elissa Holding SAL (SDNTK) and Yousser Company for Finance and Investment (a/k/a "Yousser") (SDGT) were retained by Defendant SGBL.

110.     The court filings from DOJ's civil action and the U.S. Department of the Treasury's regulatory action did not reveal the full extent of Defendants' complicity in Hezbollah's financial operations, but they did expose several key facts beyond the criminal wrongdoing of LCB and its management, including, among others:

> (a) The vast amounts of U.S. dollar-denominated funds from Hezbollah secretly flowing into the Lebanese banking system through LCB's willful participation;
>
> (b) The close ties and financial connections between Hezbollah's BAC and its social welfare institutions;
>
> (c) The vast amounts of cash imported by those Hezbollah social welfare institutions;
>
> (d) Hezbollah's (and the IRGC's) dependence on Lebanese commercial banks to provide it access to the U.S. financial system to launder drug money (in USD) and clear U.S. dollar-denominated electronic funds transfers; and
>
> (e) The intersection between Hezbollah's BAC network, narcotics trafficking, and terrorist operations, including terrorist attacks carried out against Americans in Iraq.

111.     In recent years, the LCB action was followed by a marked increase in U.S. Department of the Treasury designations of Hezbollah leaders, senior BAC operatives (for example, designating Messrs. Safieddine, Tabaja, Bazzi and Joumaa) and key components of the BAC network.

112.     In 2015, the U.S. Congress enacted The Hizballah International Financing Prevention Act of 2015, Pub. L. No. 114-102 to further confront the threat to U.S. national security posed by Hezbollah and address the terrorist organization's use of foreign financial institutions

and their correspondent bank accounts to finance terrorism. Section 102 of the statute states in part:

> The President shall prohibit or impose strict conditions on the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that knowingly:
>
> - facilitates a transaction or transactions for Hizballah;
> - facilitates a significant transaction or transactions of a person on specified lists of specially designated nationals and blocked persons, property, and property interests for acting on behalf of or at the direction of, or being owned or controlled by, Hizballah;
> - engages in money laundering to carry out such an activity; or
> - facilitates a significant transaction or provides significant financial services to carry out such an activity.

113. Subsequent congressional enactments, including the Hizballah International Financing Prevention Amendments Act of 2018, specifically targeted foreign persons who knowingly provide significant financial, material, or technological support for or to Hezbollah's social welfare network, including the IRSO and Hezbollah's IJO (External Security Organization).

114. Finally, 18 U.S.C. § 2333(a) of the ATA (incorporating 18 U.S.C. § 23339B) separately empowers Plaintiffs herein to identify and highlight integral parts of the BAC network and to hold legally accountable Hezbollah's "financial angels." These "financial angels" – including Defendants - have provided financial and material support to the IRSO and other designated components of Hezbollah's social welfare network as well as to the operatives and corporate assets of Hezbollah's IJO.

115. In doing so, Defendants have knowingly and actively laundered the proceeds of Hezbollah's illicit revenue streams that have midwifed this terrorist organization's birth into a truly global financial empire.

116. That "System," actively perpetuated with Defendants' vital assistance as well as the assistance of Lebanese currency exchange houses, in turn, sustains Hezbollah's global terrorist

operations, including the FTO's training camps, intelligence operations, procurement supply-chains, and research and development of various weapons systems that allowed it to play a central role in Iran's (largely successful) efforts to maim and murder vast numbers of Americans in Iraq and drive the United States from that country.

## V.     <u>JURISDICTION AND VENUE</u>

117.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338 as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism, and/or their estates, survivors, or heirs.

118.    Venue is proper in this District pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(b) and (d).

119.    Defendants are each subject to personal jurisdiction in New York pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2).

120.    As set forth below, Defendants have purposefully and deliberately used their correspondent accounts with U.S. financial institutions in New York (and elsewhere in the United States) over a long period of time to provide financial services to Hezbollah on a recurring basis, including facilitating the transfer of at least hundreds of millions of U.S. dollars through the United States on Hezbollah's behalf and for Hezbollah's benefit.

## VI.     <u>THE DEFENDANTS</u>

### A.     SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL ("SGBL")

121.    Defendant SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL is a private joint stock company with limited liability (*société anonyme libanaise*), incorporated in 1953. SGBL was registered under number "3696" with the Commercial Registry of Beirut and under number "19" on the list of banks licensed by Banque du Liban, the Central Bank of Lebanon.

122. Defendant SGBL's headquarters is located at Saloumeh Square, Sin El Fil, Beirut, Lebanon.

123. According to Defendant SGBL's 2017 annual report, the bank ended the year with assets valued at over $21 billion U.S. dollars; operated 70 branches across Lebanon; and employed 2,161 people in Lebanon, Jordan, and Cyprus.

124. Antoun N. Sehnaoui is Defendant SGBL's Chairman and its majority shareholder (owning 51.65 percent of the bank's common shares).

125. Defendant SGBL participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

126. Defendant SGBL is the Lebanese subsidiary of SOCIÉTÉ GÉNÉRALE SA ("SOCGEN"), one of the largest bank-holding companies in France.

127. According to SOCGEN's 2017 annual report, the company owns 16.78 percent of Defendant SGBL's common shares.

128. SOCGEN maintains a branch in New York, New York ("SOCGEN–New York"). SOCGEN–New York's primary business activity is correspondent banking (including, among other things, processing Eurodollar transactions through the U.S. financial system and managing U.S. dollar-denominated correspondent accounts).

129. SOCGEN is a founding member of the Wolfsberg Group, an association of thirteen global banks, formed in 2000, that develops "frameworks and guidance for the management of financial crime risks, particularly with respect to Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing policies."

130. Defendant SGBL's Board of Directors includes an Anti-Money

Laundering/Counter-Financing of Terrorism ("AML/CFT") Committee that purports to assist Defendant SGBL's Board with carrying out its "supervisory role with respect to fighting money laundering and terrorist financing and understanding the related risks."

131.    In coordination with SOCGEN, Defendant SGBL purports to utilize the following technical capabilities for complying with various AML/CFT requirements from, among others, the Central Bank of Lebanon, European Union ("EU"), United Nations ("UN"), Financial Action Task Force ("FATF"), and OFAC:

> Accuity's "Fircosoft" sanctions watchlist filtering software;
> Thomson Reuters's "World-Check" financial crime risk-screening database; and
> FICO TONBELLER's "Siron AML" money-laundering detection and analytics software.

132.    Defendant SGBL maintained a U.S. dollar-denominated correspondent account— used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> The Bank of New York Mellon ("BNY–New York"), account number 8033216603;
>
> JP Morgan Chase Bank NA ("JPM–New York"), account number 00155161;
>
> SOCGEN–New York, account number 00150347; and
>
> **From 2004 to 2008:**
> American Express Bank Ltd. ("AMEX–New York").[17]

133.    Defendant SGBL's Eurodollar clearing account at CHIPS–New York is identified

---

[17]    AMERICAN EXPRESS BANK LTD. was acquired by STANDARD CHARTERED BANK in 2008.

by Universal Identifier ("UID") number "001079."

134.    According to the Society for Worldwide Interbank Financial Telecommunications SCRL ("SWIFT–Belgium"),[18] Defendant SGBL's secure financial messaging account on SWIFT–Belgium's network ("SWIFT–Net")[19] is identified by Bank Identifier Code ("BIC") routing address "SGLILBBX."

135.    Defendant SGBL settles its foreign exchange transactions through, among others, settlement member SOCGEN's account at CLS Bank International in New York ("CLS–New York").[20]

136.    As noted above, in February 2011, the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a notice concluding that LCB was a "financial institution of primary money laundering concern"; and further issued a Notice of Proposed Rule Making giving notice of FinCEN's proposal to issue a rule prohibiting, among other things, all U.S. financial institutions from establishing, maintaining, administering, or managing a correspondent or payable-through account in the United States for, or on behalf of, LCB.

137.    Four months later, after receiving approval from the Central Bank of Lebanon, LCB entered into a $580 million U.S. dollar Sale and Purchase Agreement ("Purchase Agreement")

---

[18]    SWIFT–Belgium, founded in 1973, is a limited-purpose financial institution organized under Belgian law as a limited-liability cooperative society (*société coopérative à responsabilité limitée*). Member commercial banks own and control SWIFT–Belgium. An oversight committee comprising representatives from the Group of Ten ("G–10") central banks oversees SWIFT–Belgium, including representatives from, among others, the Federal Reserve Board of Governors ("FRB–DC"), Federal Reserve Bank of New York ("FRB–NY"), and National Bank of Belgium ("NBB–Brussels") (lead central-bank overseer).

[19]    SWIFT–Net, launched in 1977, replaced international Telex and telegraph systems by providing customers with improved financial messaging services for correspondent banking activities, securities market infrastructures, U.S. Department of the Treasury operations, trade finance, precious metals trading, large-value payment systems, and foreign exchange transactions.

[20]    CLS–New York is a limited-purpose Edge Act banking corporation organized under U.S. federal law, owned and controlled by its member banks, and regulated by FRB–DC. CLS–Bank began operations in September 2002, using payment-versus-payment settlement to reduce the risk involved in settling obligations related to foreign exchange transactions.

with Defendant SGBL.

138.    Pursuant to paragraphs 2.1 and 2.3 of the Purchase Agreement, attached as **Exhibit 1**, Defendant SGBL assumed all of LCB's liabilities, defined as follows:

> The Assumed Liabilities consist *inter alia* of any and all of the Seller's liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the Seller's Business, all as at the Completion Date. (Emphasis in original.)

139.    Furthermore, by assuming all of LCB's liabilities, Defendant SGBL also assumed LCB's liability for the banking and financial services that LCB knowingly performed for Hezbollah, the material support LCB knowingly provided to Hezbollah, and the conduct of LCB's managers, officers and directors who knowingly conspired with and/or aided and abetted Hezbollah in its money-laundering and drug trafficking operations, several of whom became senior employees of Defendant SGBL after its acquisition of LCB.

140.    In September 2011, the Central Bank of Lebanon's Central Council granted final approval of Defendant SGBL's acquisition of all of LCB's assets and liabilities.

141.    Two years later, LCB, SGBL and the DOJ reached an agreement whereby LCB paid $102 million U.S. dollars to settle the claims for money-laundering and International Emergency Economic Powers Act ("IEEPA") violations raised by the U.S. government in its 2011 civil complaint against LCB.

142.    At all relevant times, both Defendant SGBL and LCB purposefully and deliberately used their New York correspondent banks to "clear" U.S. dollar-denominated transactions on

Hezbollah's behalf on an ongoing and recurring basis.[21]

143.    LCB conspired with Hezbollah and knowingly facilitated billions of U.S. dollar-denominated funds transfers through New York on Hezbollah's behalf, including for Hezbollah's Conflict Diamond Money Laundering Network, Hezbollah narcotics traffickers, and arms dealers (discussed *infra*).

144.    Defendant SGBL, independent of its role as successor-in-interest to LCB, also purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

**B.    FRANSABANK SAL**

145.    Defendant FRANSABANK SAL was established in 1921 and incorporated in its present form in 1984 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. Defendant FRANSABANK was registered under number "25699" with the Commercial Registry of Beirut and registered under number "1" on the list of banks licensed by the Central Bank of Lebanon.

146.    Defendant FRANSABANK is controlled by the Kassar family. In October 2004,

---

[21]    Defendants all participate in the Eurodollar payment system, which includes a set of instruments, procedures, and rules for transferring funds between or among financial institution participants. Within that payment system, dollar "clearing" is the process of transmitting, reconciling, and, in some cases, confirming dollar-denominated electronic funds transfer transactions prior to settlement. "Settlement" in this context refers to the funds transfer process where the paying institution's debt obligation (denominated in U.S. dollars) is discharged and the receiving institution obtains irrevocable access to the transferred funds. The "clearing" of U.S. dollar-denominated payment orders occurs primarily at CHIPS–New York, and settlement only occurs across the balance sheet of the Federal Reserve Bank of New York.

Adnan Kassar was appointed Lebanon's Minister of Economy and Trade. Later, Mr. Kassar served as the Minister of State from November 2009 to 2011.

147.     Defendant FRANSABANK's head office address is Fransabank Center, Hamra Street, PO Box 11-0393, Riad El Solh, Beirut, 1107 2803, Lebanon.

148.     According to Defendant FRANSABANK's 2017 annual report, the bank ended the year with assets valued at over $22.1 billion U.S. dollars, denominated in, among others, the following units of account: U.S. dollars (47.2 percent), Lebanese pounds (45.8 percent), and EU euros (4.9 percent); its customers' deposits funded 80.5 percent of the bank's assets; the bank operated 75 branches across Lebanon; and it employed 1,735 people in Lebanon.

149.     Defendant FRANSABANK participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

150.     According to Defendant FRANSABANK's 2003 Anti-Money Laundering Guidelines, part of its Know Your Customer ("KYC") due diligence involves "Checking on client credibility & morality":

> The Bank verifies correctness of client address and phone numbers supplied and checks on the veracity of the information provided through specialized agencies (local or foreign) or through other banks. Account will become operational only in case of positive feedback.

151.     According to a questionnaire completed in 2006 by Defendant FRANSABANK's Vice President of Correspondent Banking, Khalil Zeidan, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

152.     In a September 14, 2006 memorandum to all branches, Defendant FRANSABANK

warned that "Culture, production or illicit trading of the narcotics and illicit traffic of weapons" constitute illicit funds.

153.    That same memorandum listed various money laundering techniques, including, among others:

- Exchange of an important number of small denominations of banknotes against high denominations, of the same currency or different one;
- Important or repetitive exchange transactions against banknotes, which total amount is exceeding USD 10.000 (or c/v);
- Deposit of a big amount or repetitive deposits, whose total could reach an important amount, not justified by the customer's economic activity;
- Using an account for mainly issuing transfers abroad of important amounts or for receiving same from abroad, when the customer's professional activity does not justify it;
- Operation linked to an activity abroad (Offshore), especially if this operation appears not having economic justification or of a lawful object, and mainly in case of a disproportion between the amount and the customer's professional activity;
- Cash deposit transactions and / or incoming transfers received in favor of the customer, followed immediately by successive withdrawals;
- Deposits transactions exceeding USD 10.000 (or c/v) or portioned out in smaller amounts, credited to a specific account or several accounts belonging to the same person; and
- Incoming transfers received from abroad mainly for amounts exceeding USD 10.000 (or c/v) executed at the counter instead through account.

154.    Defendant FRANSABANK describes its AML/CFT compliance program as implementing the following objectives:

Promoting a Know Your Customer (KYC) standard as a cornerstone principle for Fransabank Group business ethics and practices:

- Prior to any transaction of any type, Fransabank Group's entities gather and document the relevant customer identification data, along with the background information, the purpose and the intended nature of the business.

- Fransabank Group's entities retain and document any additional customer information relevant to the assessment of the money laundering risk, by adopting a risk-based approach which triggers the proper enhanced due diligence for the relevant customers.

Enforcing the following additional due diligence measures while establishing and maintaining correspondent relations:

- Gathering sufficient documentary evidence on a respondent institution, to avoid any relationships with 'shell banks';

- Enquiring about the good reputation of a respondent institution from public sources of information, including whether it has been subject to a money laundering or terrorist financing investigation or other regulatory action;

- Verifying, on a periodic basis, that the respondent institution is implementing sufficient and effective procedures to fight money laundering and terrorist financing.

Monitoring and reporting suspicious transactions/activity:

- Fransabank Group's entities apply due diligence measures whenever they detect any unusual or suspicious transaction or activity, taking into account the legal framework of the concerned institution.

- All suspicious transactions or activities complying with the laws and regulations of the corresponding jurisdiction are reported.

- The Group's compliance department is notified of all suspicious transactions or activities when doubts arise.

Developing an effective internal control structure where no activity with a customer is carried out without obtaining in advance all the required information relating to the customer.

155.    Defendant FRANSABANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

**From 2003 to 2011:**
BNY–New York,
account number 8900018224;

**From 2003 to 2005:**
HSBC Bank USA NA ("HSBC–New York");

> **From 2005 to 2008:**
> AMEX–New York; and
>
> **From 2005 to 2011:**
> JPM–New York,
> account number 544728788.

156.    Defendant FRANSABANK's Eurodollar clearing account at CHIPS–New York is identified by UID number "002233."

157.    According to SWIFT–Belgium, Defendant FRANSABANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "FSABLBBX."

158.    Defendant FRANSABANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

159.    At all relevant times, Defendant FRANSABANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein),  and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

### C.    MEAB BANK SAL

160.    Defendant MEAB BANK SAL[22] was incorporated in its present form in 1991 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years.

161.    Defendant MEAB BANK was registered under number "58153" with the

---

[22]    During the relevant period, MEAB BANK SAL was also known as Middle East and Africa Bank SAL.

Commercial Registry of Beirut and registered under number "110" on the list of banks licensed by The Central Bank of Lebanon.

162.    Defendant MEAB BANK's head office address is MEAB Building, Adnan al-Hakim Avenue, Beirut, 1105 2080, Lebanon.

163.    Defendant MEAB BANK describes itself as a family-owned commercial bank in Lebanon whose creation was propelled by the tremendous success of its founding Hejeij brothers in business ventures developing underserved regions of Africa.

164.    Defendant MEAB BANK claims to be a full-service bank with 11 branches throughout Lebanon, with a reputation for high-quality financial services and a strong record of modernization and growth.

165.    According to Defendant MEAB BANK's 2016 annual report, the bank had total assets of over $1.8 billion U.S. dollars and employed 335 people in Lebanon.

166.    Defendant MEAB BANK claims to be the 15th largest bank in Lebanon by deposits. The bank was named the "Fastest Growing Bank in Lebanon" by Banker Middle East Industry Awards in 2011 and was named "Best Private Bank in Lebanon" by the World Finance Banking Awards in 2012.

167.    Kassem Hejeij co-founded Defendant MEAB BANK and served as the bank's Chairman until June 2015 when he was forced to step down as a result of being designated an SDGT for his direct links to Hezbollah.

168.    During the relevant period, Defendant MEAB BANK participated in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

169.     Defendant MEAB BANK's November 2002 Money Laundering Procedures set forth two general rules as most important in the protection against money laundering:

- **Know Your Customer**
- **Know Your Customer's Business**.

170.     Defendant MEAB BANK's November 2002 Money Laundering Procedures stated that the bank had a "list of exemptions regarding some well-known clients to permit their daily cash deposit without filling CTS [cash transaction slips], prepared by the branch compliance unit officer and approved by the branch manager."

171.     It also recognized the warning signs indicated by "an operation effected in unusually complicated conditions, including deposit of funds followed by quick and frequent withdrawals."

172.     Defendant MEAB BANK's November 2002 Money Laundering Procedures further identified as a "Warning Sign" circumstances "[w]hen the account is basically used for a [sic] big amounts to be transferred to, or received from, foreign countries, if it appears to the bank officer carrying out the operations that the activities of the person or corporation in question do not justify such funds movements."

173.     Defendant MEAB BANK describes its AML/CFT compliance program as follows:

> The bank's Anti-Money Laundering/Counter Terrorist Financing (AML/CFT) programs meet or exceed the requirements of both the Banque du Liban and the international standards of the Financial Action Task Force (FATF).
>
> In addition to screening customers and transactions against the requirements of the Banque du Liban, MEAB also screens its banking activity against the U.S. Office of Foreign Assets Control (OFAC) Specifically Designated National (SDN) list, the U.S. sanction lists, among others, using EastNet's state-of-the-art SafeWatch system.

174.     Defendant MEAB BANK maintained a U.S. dollar-denominated correspondent

account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2004:**
> Union Bank of California ("UBOCI") – New York;
>
> **From 2004 to 2007:**
> Standard Chartered Bank ("SCB") – New York;
>
> **In 2006:**
> Wachovia Bank ("WB") – New York; and
>
> **From 2008 to 2011:**
> Dresdner Bank – Frankfurt (via Dresdner Bank branch in New York).[23]

175.   During the relevant period, Defendant MEAB BANK also maintained a correspondent account (# 0005297836325) and cleared U.S. dollars through Branch Banking & Trust Company (BB&T) in Guilford-Greensboro, NC.

176.   According to SWIFT–Belgium, Defendant MEAB BANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "MEABLBBE."

177.   Defendant MEAB BANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

178.   At all relevant times, Defendant MEAB BANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein),  and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United

---

[23]   DRESDNER BANK AG was later acquired by COMMEZBANK AG, Frankfurt, Germany.

States for the benefit of Hezbollah and its IJO.

179. This specifically included clearing transactions worth almost $2 million on behalf of Lebanese exchange houses such as Elissa Exchange and Ayash Exchange, that have been designated for their money laundering activities on Hezbollah's behalf.

**D.** **BLOM BANK SAL ("BLOM")**

180. Defendant BLOM BANK SAL was established in 1951 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BLOM was registered under number "2464" with the Commercial Registry of Beirut and registered under number "14" on the list of banks licensed by the Central Bank of Lebanon.

181. Defendant BLOM BANK's head office address is BLOM Bank Building, Rashid Karameh Street, Beirut, Lebanon.

182. The bank's shares are listed on the Beirut Stock Exchange and the Luxembourg Stock Exchange.

183. Mr. Sa'd Azhari serves as the bank's Chairman and General Manager, and Dr. Numan al-Azhari serves as the Chairman of BLOM Group (BLOM's ultimate parent).

184. In June 2017, Defendant BLOM BANK acquired 100 percent of the assets and liabilities of HSBC Bank Middle East Limited, Lebanon Branch, for a total consideration of $146 million U.S. dollars.

185. According to Defendant BLOM BANK's 2017 annual report, the bank ended the year with assets valued at over $32.5 billion U.S. dollars, denominated in, among others, the following units of account: U.S. dollars (47.1 percent), Lebanese pounds (31.8 percent), and EU euros (7.3 percent); its customers' deposits funded 81.9 percent of the bank's assets; and the bank operated 77 branches across Lebanon and employed 4,357 people.

186.    Defendant BLOM BANK participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

187.    Defendant BLOM BANK's Board of Directors includes a Compliance Committee that purportedly assists the Board with carrying out its functions and supervisory role with respect to "proper implementation and effectiveness of AML/CFT procedures and regulations."

188.    According to Defendant BLOM BANK's February 24, 2004 Anti-Money Laundering Policy, the bank's policy objectives were:

- To prevent use of Bank's products or services for money laundering.
- To prevent damage to the Bank's name and reputation by association with money launderers.
- To ensure that the Bank complies with money laundering legislation/regulations wherever it does business.

189.    To achieve those stated objectives, Defendant BLOM BANK stated in its AML Policy manual that:

- Procedures were put in place to monitor customers' transactions. The Compliance Unit at the Head Office generates daily and quarterly reports to achieve this task.

- Any transaction which does not fit within a customer's transaction profile should be reviewed by the Anti Money Laundering Compliance Officer at the branch and the branch manager, to determine whether the circumstances give rise to any suspicion of money laundering.

190.    According to a questionnaire completed in 2007 by Defendant BLOM BANK's Head of AML, Malek Costa, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

191.    Defendant BLOM BANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following

correspondent banks in New York:

> **From 2003 to 2011:**
> BNY–New York;
>
> **From 2005 to 2011:**
> JPM–New York;
>
> **From 2005 to 2008:**
> AMEX–New York;
> UBOCI–New York;
>
> **From 2008 to 2011:**
> Deutsche Bank Trust Company Americas ("DBTCA–New York"); and
> WB–New York.

192.    Defendant BLOM BANK's Eurodollar clearing account at CHIPS–New York is identified by UID number "001871."

193.    According to SWIFT–Belgium, Defendant BLOM BANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BLOMLBBX."

194.    Defendant BLOM BANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

195.    At all relevant times, Defendant BLOM BANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

196.    This specifically included clearing transactions worth more than $27 million on

behalf of Lebanese exchange houses such as Elissa Exchange and Ayash Exchange, that have been designated for their money laundering activities on behalf of Hezbollah.

### E. BYBLOS BANK SAL ("BYBLOS")

197. Defendant BYBLOS BANK SAL was established in 1950 and incorporated in its present form in 1961 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BYBLOS was registered under number "14150" with the Commercial Registry of Beirut and registered under number "39" on the list of banks licensed by the Central Bank of Lebanon.

198. Defendant BYBLOS BANK's head office address is Elias Sarkis Street, Ashrafieh, Beirut, Lebanon.

199. According to Defendant BYBLOS BANK's 2017 annual report, the bank ended the year with total assets of over $22.7 billion U.S. dollars and employed 2,485 people in Lebanon.

200. Defendant BYBLOS BANK participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

201. Defendant BYBLOS BANK's December 1, 2003 "Know Your Customer" Memorandum noted that "All Byblos branches should be aware of any unusual transaction or activity that is disproportionate to the customer's known business, for which a proper reason should be explained through the normal course of the relationship." It also noted various suspicious activities that might signal illicit activity such as when the customer "makes frequent deposits or withdrawals of large amounts of currency for no apparent business reason, or for a business that generally does not involve large amounts of cash" or when the customer initiates "[i]nternational

transfers for accounts with no history of such transfers or where the stated business of the customer does not warrant such activity."

202.    Defendant BYBLOS BANK describes its corporate governance program—including AML/CFT compliance—as implementing the following objectives:

> Byblos Bank's governance model is based on recommendations from the Basel Committee on Banking Supervision, guidelines published by the Financial Action Task Force, all relevant national regulations, and the constantly evolving body of international best practice. In keeping with this by-the-book approach, the Bank has developed a world-class toolbox of compliance policies, procedures, and systems, all helping us to meet our obligations to help identify and block money laundering, terrorism financing, sanctions violations, and other illicit activities.

203.    According to a questionnaire completed in 2006 by Defendant BYBLOS BANK's Head of Compliance, Antoine Dagher, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

204.    Defendant BYBLOS BANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011**:
> BNY–New York,
> account number 8033218622;
>
> Citibank NA ("CITI–New York"),
> account number 10948284;
>
> Wells Fargo Bank ("WFB–New York"),
> account number 2000191103571;
>
> SCB–New York,
> account number 3582049770001; and

> **Prior to 2009**:
> AMEX–New York,
> account number 00716613.

205.     Defendant BYBLOS BANK's Eurodollar clearing account at CHIPS–New York is identified by UID number "037179."

206.     According to SWIFT–Belgium, Defendant BYBLOS BANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BYBALBBX."

207.     Defendant BYBLOS BANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

208.     At all relevant times, Defendant BYBLOS BANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

### F.     BANK AUDI SAL

209.     Defendant BANK AUDI SAL was founded in 1830 and incorporated in its present form in 1962 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. Defendant BANK AUDI was registered under number "11347" with the Commercial Registry of Beirut and registered under number "56" on the list of banks licensed by the Central Bank of Lebanon.

210.     Defendant BANK AUDI's head office address is Bank Audi Plaza, Omar Daouk Street, Bab Idriss, Beirut, 2021 8102, Lebanon.

211.    As of 2014, Deutsche Bank Trust Company Americas owns 29 percent of Defendant BANK AUDI.

212.    According to **Defendant** BANK AUDI's 2017 annual report, the bank has total assets of over $43.8 billion U.S. dollars and employs 6,541 people in Lebanon and ten other countries.

213.    **Defendant** BANK AUDI participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

214.    **Defendant** BANK AUDI's Board of Directors includes a "Compliance/AML/CFT Committee" that purports to assist the Board with carrying out its functions and supervisory role with respect to "fighting money laundering and terrorist financing," "protecting the Bank from other compliance-related risks," and "overseeing the Bank's compliance with applicable laws, policies and regulations."

215.    **According to Defendant** BANK AUDI's Anti-Money Laundering & Combatting the Financing of Terrorism Policy (2010):

> Knowledge is what the entire money laundering compliance program is built upon. A sound program should include the following 9 elements:
>
> - Definition and acceptance of customers.
> - Full identification of customers, source of funds and wealth.
> - Development of transaction and activity profiles of each customer's anticipated activity.
> - Assessment and grading of risks presented by the customer or the account.
> - Account and transaction monitoring based on the risks presented.
> - Investigation and examination of unusual customer or account activity.
> - Documentation of findings.
> - Appropriate internal and external reporting.
> - Staff training about the importance of KYC.

216.    Defendant BANK AUDI's Anti-Money Laundering & Combatting the Financing of Terrorism Policy (2010) further states that the bank "has adopted a proactive Risk-Based Approach (RBA) to fighting money laundering and terrorist financing. By doing so, the Bank is able to ensure that measures to prevent or mitigate money laundering and terrorist financing are commensurate to the risks identified."

217.    The policy further states that "[a] risk analysis must be performed to determine where the money laundering and terrorist financing risks are the greatest. The objective is to identify higher risk customers, products and services, including delivery channels, and geographical locations."

218.    It also noted that "considering geographic locations that pose a higher risk of violations than others is essential to the Bank AML/CFT program" and identified certain indicia of high-risk jurisdictions which included:

- Countries identified by credible sources as having tight banking secrecy laws.
- Countries subject to sanctions or embargoes (e.g. OFAC sanctions list, state sponsors of terrorism).
- Countries identified by credible sources as having significant levels of criminal activities (e.g. drug trafficking).
- Countries identified by credible sources as having significant levels of corruption.

219.    Defendant BANK AUDI maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

**From 2003 to 2011:**
BNY–New York,
account number 8900111712;

JPM–New York,
account number 544729027;

**From 2003 to 2005:**
BANK AUDI (USA);

**From 2005 to 2008:**
AMEX–New York;
Interaudi Bank, New York;

**From 2008 to 2011:**
SCB–New York,
account number 3582023406001;

HSBC–New York,
account number 0000301159;

WFB–New York,
account number 2000191102776; and
CITI–New York.

220.     **Defendant** BANK AUDI's Eurodollar clearing account at CHIPS–New York is identified by UID number "000980."

221.     According to SWIFT–Belgium, BANK AUDI's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "AUDBLBBX."

222.     **Defendant** BANK AUDI primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

223.     At all relevant times, Defendant BANK AUDI purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

## G.     BANK OF BEIRUT SAL

224.     Defendant BANK OF BEIRUT SAL was incorporated in 1963 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. Defendant BANK OF BEIRUT was registered under number "13187" with the Commercial Registry of Beirut and registered under number "75" on the list of banks licensed by the Central Bank of Lebanon.

225.     Defendant BANK OF BEIRUT's head office address is Bank of Beirut Building, Foch Street, Beirut, Lebanon.

226.     According to Defendant BANK OF BEIRUT's 2016 annual report, the bank has total assets of over $17.2 billion U.S. dollars and employs 1,491 people in Lebanon.

227.     Defendant BANK OF BEIRUT participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

228.     Defendant BANK OF BEIRUT's internal manual on anti-money laundering policies and procedures identified several indicators of money laundering, including:

- Large cash exchange transactions;
- Requests of wire transfers or bankers checks in exchange for Bank Notes;
- Large cash deposits and withdrawals that are not consistent with the normal course of transactions on the account and/or the business activities of the client;
- High volume of deposits and transfers, where the nature of the account holder's business does not justify such volume of cash;
- High volume or repeated operations related to foreign jurisdiction & OFF-Shore operations, where the nature of the account holder's [business] does not justify these operations.

229.     Defendant BANK OF BEIRUT claims to maintain an "AML Compliance Program" that includes the following functions:

AML Procedures designed to implement the Bank's Customer Identification Program;

The designation of an Anti-Money Laundering Compliance Officer responsible for coordinating and monitoring day-to-day compliance with the Anti-Money Laundering Policy and applicable laws, rules and regulations;

Recordkeeping and reporting practices in accordance with the Anti-Money Laundering Policy and applicable laws, rules and regulations;

Appropriate methods of monitoring transactions and account relationships to identify potential suspicious activities;

Reporting suspicious activities to competent authorities in accordance with the Anti-Money Laundering Policy and applicable laws, rules and regulations;

On-going training of appropriate personnel with regard to anti-money laundering and counter financing of terrorism issues and their responsibilities for compliance; and

Independent testing to ensure that the Anti-Money Laundering Compliance Program has been implemented and continues to be appropriately maintained.

230.    According to a questionnaire completed in 2007 by Defendant BANK OF BEIRUT's Head of AML Compliance, Robert Zouein, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

231.    Defendant BANK OF BEIRUT maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> BNY–New York,
> account number 8900097906;

JPM–New York,
account number 400228661;

**From 2003 to 2008:**
AMEX–New York,
account number 28134;

**From 2008 to 2011:**
HSBC–New York;

CITI–New York,
account number 10952793;

SCB–New York,
account number 3582036868001; and
WB–New York.

232.    Defendant BANK OF BEIRUT's Eurodollar clearing account at CHIPS–New York is identified by UID number "030264."

233.    According to SWIFT–Belgium, Defendant BANK OF BEIRUT's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BABELBBE."

234.    Defendant BANK OF BEIRUT primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

235.    At all relevant times, Defendant BANK OF BEIRUT purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

## H.    LEBANON AND GULF BANK SAL ("LGB")

236.    Defendant LEBANON AND GULF BANK SAL was established in 1963 as Banque de Crédit Agricole and incorporated in its present form in 1980 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. Defendant LEBANON AND GULF BANK was registered under number "43171" with the Commercial Registry of Beirut and registered under number "94" on the list of banks licensed by the Central Bank of Lebanon.

237.    Defendant LEBANON AND GULF BANK's head office address is located in Allenby Street, Beirut, Lebanon.

238.    According to Defendant LEBANON AND GULF BANK's website, in 2017 the bank had total assets of over $4.7 billion U.S. dollars and employed 420 people in Lebanon.

239.    Defendant LEBANON AND GULF BANK participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

240.    Defendant LEBANON AND GULF BANK describes its AML/CFT compliance program as follows:

> LGB Bank has implemented a set of rules that apply to all Bank's activities to ensure compliance with Lebanese AML/CFT laws and regulations as well as international standards. The Bank has in place policies and procedures for the better knowledge of the customers' activities and their expected use of Bank's products and services.

241.    Its Manual of Anti Money Laundering (December 2002) states:

> Two general rules are regarded as the most important in the protection against money laundering:
>
> - **Know Your Customer**
> - **Know Your Customer's Business**

Not only because of any possible legal obligation, but also for the above-mentioned reasons it is advisable to extend verification of identity of the (eventual) beneficiary of an account as far as possible in all cases.

242.    Defendant LEBANON AND GULF BANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

**From 2003 to 2011:**
JPM–New York,
account number 544729422;

**From 2005 to 2008:**
BNY–New York,
account number 8900256141;

SCB–New York,
account number 3582023247001;

DBTCA–New York,
account number 04449171;

WB–New York,
account number 2000191104101;

UBOCI–New York,
account number 91267070112/NY; and
AMEX–New York.

243.    LEBANON AND GULF BANK's Eurodollar clearing account at CHIPS–New York is identified by UID number "160871."

244.    According to SWIFT–Belgium, LEBANON AND GULF BANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "LGBALBBX."

245.    LEBANON AND GULF BANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

246.    At all relevant times, LEBANON AND GULF BANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

### I.    BANQUE LIBANO-FRANÇAISE SAL ("BLF")

247.    Defendant BANQUE LIBANO-FRANÇAISE SAL was established in 1930 as a branch of the French Bank Compagnie Algérienne de Crédit et de Banque and incorporated in its present form in 1967 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. BANQUE LIBANO-FRANÇAISE was registered under number "19618" with the Commercial Registry of Beirut and registered under number "10" on the list of banks licensed by the Central Bank of Lebanon.

248.    Defendant BANQUE LIBANO-FRANÇAISE's head office address is Beirut Liberty Plaza, 5 Rome Street, Hamra, Beirut, 1107 2060, Lebanon.

249.    According to Defendant BANQUE LIBANO-FRANÇAISE's website, in 2017 the bank had total assets of over $13.6 billion U.S. dollars and employed 1,546 people in Lebanon.

250.    Defendant BANQUE LIBANO-FRANÇAISE participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

251.    Defendant BANQUE LIBANO-FRANÇAISE's Board of Directors purportedly includes a Compliance Committee that assists the Board with carrying out its functions and

supervisory role with respect to "proper implementation and effectiveness of AML/CFT procedures and regulations."

252.    In 2007, Farid Raphael, President and Director General, and Walid Raphael, Deputy General Manager, of Defendant BANQUE LIBANO-FRANÇAISE, represented to the United States government that their bank had no dealings with Hezbollah and that the bank ran the names of its customers against OFAC's SDN list and the Lebanese Central Bank Special Investigation Committee (SIC) list daily.

253.    According to a questionnaire completed in 2007 by Defendant BANQUE LIBANO-FRANÇAISE's Head of Risk Management and Compliance Unit, Mrs. Nada Awad Rizkalla, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

254.    According to Ms. Josephine Chahine, Head of Risk Management & Compliance and Mr. Wadih Soueidy of Defendant BANQUE LIBANO-FRANÇAISE's Compliance Unit, the bank "takes the matter of the prevention and combating of money laundering activities very seriously. It has established policies and procedures that arc constantly reviewed, updated and implemented throughout the bank. These policies and procedures apply to the Bank's head office and branches in Lebanon as well as its subsidiaries or offices in Lebanon and abroad."

255.    Furthermore, according to the bank's senior compliance staff, the "bank has implemented an automated process to monitor transactions, including all payments, transfers and other fund movements."

256.    Defendant BANQUE LIBANO-FRANÇAISE maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer

transactions—at each of the following correspondent banks in New York:

> **From 2003 to 2011:**
> BNY–New York, account number 8033222085;
>
> **From 2005 to 2011:**
> CITI–New York, account number 36154781;
>
> **From 2008 to 2011:**
> JPM–New York;
> SCB–New York, account number 3582023510001;
> DBTCA–New York, account number 04089495; and
> AMEX–New York (prior to 2009).

257.    BANQUE LIBANO-FRANÇAISE's Eurodollar clearing account at CHIPS–New York is identified by UID number "002902".

258.    According to SWIFT–Belgium, BANQUE LIBANO-FRANÇAISE's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BLFSLBBX".

259.    BANQUE LIBANO-FRANÇAISE primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

260.    At all relevant times, BANQUE LIBANO-FRANÇAISE purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network *(see, e.g.* ¶868 herein),    and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

**J.    BANK OF BEIRUT AND THE ARAB COUNTRIES SAL ("BBAC")**

261.    Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES SAL was founded

56

in 1956 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years. Defendant BBAC was registered under number "6196" with the Commercial Registry of Beirut and registered under number "28" on the list of banks licensed by the Central Bank of Lebanon.

262.    The bank was founded by Tawfiq Assaf, whose son, Ghassan, replaced him as chairman and general manager after Tawfiq's death in 1996.

263.    In 2000, the bank changed its name in a rebranding push, to become BBAC.

264.    Defendant BBAC's head office is located at BBAC Building, 250 Clemenceau Street, Beirut, Lebanon.

265.    According to Defendant BBAC's 2016 annual report, the bank had total assets of over $6.4 billion U.S. dollars and employed 833 people in Lebanon.

266.    Defendant BBAC participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

267.    Defendant BBAC claims that the role of its "AML/CFT and Sanctions section is to ensure that the Bank is operating in compliance with the applicable laws related to fighting money laundering and terrorism financing."

268.    According to a questionnaire completed in 2007 by Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES's Compliance Unit Manager, Mr. Talal Abou Zeki, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

269.    Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES's 2002 circular

on its monitoring system for anti-money laundering identified various indicia of money laundering, including:

- Deposits of large amounts of money or repeated deposits of amounts that total a certain limit or a huge volume unjustified compared to the client's evident activities.
- Operating an account mainly to transfer large amount of money to foreign countries or to receive large transfers from the same, at a time when it appears to the employee connected to these transactions that the client's activity does not justify such transactions.
- Large or repeated transactions connected to an Offshore foreign company, considered by the bank or the financial establishment as disproportional with this activity's volume.
- Exchanging monetary amounts by demands of electronic/wire transfers or bank checks.

270.     Defendant BBAC maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at each of the following correspondent banks in New York:

**From 2003 to 2011:**
BNY–New York, account number 8033216271;
JPM–New York, account number 544729289;
CITI–New York, account number 36070254; and

**From 2005 to 2008:**
AMEX–New York, account number 00716738.

271.     Defendant BBAC–Beirut's Eurodollar clearing account at CHIPS–New York is identified by UID number "000724".

272.     According to SWIFT–Belgium, Defendant BBAC's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BBACLBBX".

273.     Defendant BBAC primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

274.     At all relevant times, Defendant BBAC purposefully and deliberately used its New

York correspondent banks to "clear" U.S. dollar-denominated transactions on behalf of Hezbollah on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶1105 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

### K.    JAMMAL TRUST BANK SAL

275.    Defendant JAMMAL TRUST BANK SAL was founded in 1963 as a private joint stock company with limited liability (*société anonyme libanaise*) with a duration of 99 years.

276.    Defendant JAMMAL TRUST BANK was registered under number "13578" with the Commercial Registry of Beirut and registered under number "80" on the list of banks licensed by the Central Bank of Lebanon.

277.    Defendant JAMMAL TRUST BANK's head office is located at JTB Tower, Tahweeta Highway, Elias al-Harawi Street, Beirut, Lebanon.

278.    Defendant JAMMAL TRUST BANK maintains dozens of branches in Lebanon and internationally, including branches in Egypt, Nigeria, Ivory Coast, and the United Kingdom.

279.    According to Defendant JAMMAL TRUST BANK's 2016 annual report, the bank had total assets of over $997 million U.S. dollars and employed over 541 people in Lebanon.

280.    Defendant JAMMAL TRUST BANK participates in various domestic and international payment, clearing, and settlement systems (including, but not limited to, electronic funds transfer, check clearinghouse, credit-card, and automated teller machine networks).

281.    Defendant JAMMAL TRUST BANK claims that the bank is "in full and accurate compliance with all the laws, regulations and circulars related to Anti-Money Laundering and

Countering the Financing of Terrorism of which most notably those issued by the Financial Action Task Force (FATF/GAFI)."

282.    Defendant JAMMAL TRUST BANK's Chairman and General Manager, Anwar Jammal, represented to the United States government in 2007 that his bank has no dealings with Hezbollah, that the Bank runs the names of its customers against OFAC's Specially Designated Nationals and Blocked Persons List ("SDN") and the Lebanese Central Bank Special Investigation Committee (SIC) list daily and that the bank's compliance officers check not only names but civil registration numbers and customers' mothers' maiden names.

283.    According to a questionnaire completed in 2007 by Defendant JAMMAL TRUST BANK's Assistant General Manager, Mr. Adnan Youssef, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

284.    Defendant JAMMAL TRUST BANK's 2003 Money Laundering Abatement Procedures Guide noted various indicia of money laundering, including:

- large and repeated Cambia (currency exchange) transactions starting from cash amounts;
- depositing big amounts or big deposits whose aggregate amounts form a certain, huge and unjustifiable amounts with respect to the client's apparent activities;
- operating the account mainly to transfer huge amounts into foreign countries to receive transfers in the same whereas the employee in charge of such transactions believes that the client's business doesn't justify such transactions;
- clients who receive regular large payments whose sources are countries that usually participate in producing, processing and trafficking drugs, or from countries which permit the activities of terrorist organizations or from countries which are considered to be 'tax havens';
- repeated transfers into a country which is reputed for drugs manufacturing and production.

285.    Defendant JAMMAL TRUST BANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at the following correspondent banks in New York:

**From 2003 to 2005:**
HSBC–New York;

**From 2003 to 2008:**
AMEX–New York,
account number 000197640;

BNY–New York,
account number 8033219009;

**From 2005 to 2008:**
SCB–New York,
account number 3582023316001;

UBOCI–New York,
account number 91291740112; and

**From 2007 to 2008:**
WB–New York,
account number 2000193002162.

286.    Defendant JAMMAL TRUST BANK's Eurodollar clearing account at CHIPS–New York is identified by UID number "025502."

287.    According to SWIFT–Belgium, Defendant JAMMAL TRUST BANK's secure financial messaging account on the SWIFT–Network is identified by BIC routing address "JTBKLBBE."

288.    Defendant JAMMAL TRUST BANK primarily settles its foreign exchange transactions through the accounts of settlement members at CLS–New York.

289.    At all relevant times, Defendant JAMMAL TRUST BANK purposefully and

deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein) and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

L.    **FENICIA BANK**[24]

290.    Defendant FENICIA BANK was incorporated in Lebanon in 1962 and registered with the Lebanese Commercial Register under Corporate Registration number 11923 as the Bank of Kuwait and the Arab World.

291.    The Achour Group took over management of the bank in 1992 and exercises a controlling stake in the institution.

292.    The Bank of Kuwait and the Arab World changed its name to FENICIA BANK on December 20, 2010.

293.    Defendant FENICIA BANK's head office is located at Fenicia Bank Building, Foch street, Beirut Central District, Majidiyeh sector, Beirut, Lebanon.

294.    Abd al-Razak Achour (a/k/a Ashur) has served as Chairman and Director General of Defendant FENICIA BANK since 1994.

295.    His father, Mahmud Muhammad Achour, previously served as a municipal mayor on behalf of Amal,[25] and remains a major shareholder of the bank.

---

[24]    Because FENICIA BANK was only included in the Amended Complaint, the claims against this Defendant are limited to those Plaintiffs whose claims are predicated on terrorist attacks that occurred on or after August 2, 2009 and Plaintiff service members who were not discharged from their military service prior to August 2, 2009.

[25]    Amal was a political movement and militia established in the mid-1970s by Musa al-Sadr, a leading Shi'a cleric who emigrated to Lebanon. After Sadr's disappearance (and presumed death) in Libya, Hezbollah broke away from Amal in the early 1980s. The two groups have remained competitors, but also actively cooperate in many spheres.

296.     Youssef Abbas Merhi and Abd al-Ilah Mahmud Achour are board members of the bank.

297.     In June 2012, Ibrahim Chebli, manager of the Abbassieh branch of Defendant FENICIA BANK in Lebanon, was designated an SDNTK by the U.S. Department of the Treasury for facilitating the movement of millions of dollars for (among others) Ayman Joumaa's Hezbollah narcotics trafficking network.

298.     According to a questionnaire completed in 2007 by Defendant FENICIA BANK's assistant General Manager, Dr. Asa'ad A. Koshiesh and its Compliance Officer, Mr. Sami Neheme, the bank had "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" and took steps "to understand the normal and expected transactions of its customers based on its risk assessment of its customers."

299.     According to Defendant FENICIA BANK, its secure financial messaging account on the SWIFT–Network is identified by BIC routing address "BKAWLBBE."

300.     Defendant FENICIA BANK maintained a U.S. dollar-denominated correspondent account—used for its Eurodollar electronic funds transfer transactions—at the following correspondent banks in New York:

**From 2004 to 2007:**
American Express Bank Ltd. - P.O. Box 740, New York, NY 10008;
Bank of New York - 1 Wall Street, New York, NY 10286;
HSBC - 452 Fifth Avenue, NY 10018 - 2706, New York;

**From 2008 to 2009:**
Standard Chartered Bank (which acquired American Express Bank);
Bank of New York - 1 Wall Street, New York, NY 10286;
HSBC - 452 Fifth Avenue, NY 10018 - 2706, New York;

**From 2010 to 2011:**
The Bank of New York Mellon; and
Standard Chartered Bank.

301.    At all relevant times, Defendant FENICIA BANK purposefully and deliberately used its New York correspondent banks to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf on an ongoing and recurring basis, including on behalf of Hezbollah's Conflict Diamond Money Laundering Network (*see, e.g.* ¶868 herein), and knowingly aided and abetted Hezbollah and its Islamic Jihad Organization, provided them with substantial assistance and agreed to participate in The System and to help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO.

## VII.    ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC)

302.    On May 5, 1979, Ayatollah Ruhollah Khomeini, the first Supreme Leader of the Islamic Republic of Iran, promulgated a decree establishing the *Pasdaran e-Enqelab* (literally the "Guardians of the Revolution," also referred to in English as the Revolutionary Guard and later as the "Islamic Revolutionary Guard Corps") three months after the fall of the Shah and his government.

303.    Initially composed of a disparate group of militias that emerged after the revolution, the newly-formed IRGC was established to ensure that there would be no backsliding in implementing Ayatollah Khomeini's vision for an Islamic theocratic government in Iran based on his concept of an Islamic state ruled by a *velayat-e faqih* (guardianship of the jurist).

304.    The IRGC and (later) its subordinate directorate, the IRGC-QF, were established as entities under the direction, control and authority of the Supreme Leader of Iran, and they report directly to him.

305.    In September 1980, when Iraq invaded Iran, the Iranian armed forces suffered numerous setbacks on the battlefield. The newly formed IRGC and an affiliated militia known as the Basij helped the Iranian army halt the Iraqi invasion and drive the Iraqi army back to roughly the original border between the two countries.

306.   For eight years, until the war ended in 1988, Iran responded to Iraq's superior military matériel by deploying highly motivated infantry formations populated by the IRGC and Basij.

307.   In 1982, despite being heavily engaged in combat with Iraqi forces, the Iranian government sent IRGC members to assist the Lebanese Shi'a community build a political movement and military capable of pushing the Israeli army out of southern Lebanon (following the Israeli army's 1982 incursion known as "Operation Peace for Galilee" to evict the Palestine Liberation Organization from Lebanon).

308.   Initially, the IRGC supported Amal, which garnered support from southern Lebanon's Shi'a community. But the IRGC also provided critical assistance to newly emerging Hezbollah, which swore an oath of fealty to Iran, thereby tying it to decisions made by the theocratic Supreme Leader of Iran, Ayatollah Khomeini.

309.   Hezbollah's fealty to the IRGC and Iran's Supreme Leader ensured that Iran would provide funding, military equipment, advisors and training for Hezbollah at a level not enjoyed by Amal. That support and coordination continues to this day and is reciprocal: Iran bankrolls, arms and trains Hezbollah, and Hezbollah supports Iranian strategy and interests in Lebanon, Syria, Iraq and elsewhere.

310.   From Hezbollah's inception, the IRGC funded, armed, and supported it and provided it with the ability to attack Israeli forces in southern Lebanon.

311.   The October 23, 1983 bombing of the U.S. Marine Corps barracks in Beirut, Lebanon (resulting in the death of 220 Marines, 18 Sailors, and 3 Soldiers), was a coordinated attack sponsored and planned by the IRGC and carried out by Hezbollah operatives under the command of Imad Mughniyah and his successor, Mustafa Badr al-Din.

312.     The IRGC-QF was later created as a special IRGC directorate tasked with exporting Iran's terrorism and terrorist tactics internationally.

313.     The IRGC-QF was, and remains, separate from (and hierarchically superior to) Iran's regular military and is accountable directly to Iran's second, and current, Supreme Leader, Ayatollah Sayyid Ali Hosseini Khamenei.

314.     In many cases, young officers and leaders of the IRGC's new formations during the Iran-Iraq War are now senior members of the IRGC's leadership, including its IRGC-QF, such as Major General Qasem Soleimani, who assumed his position as IRGC-QF leader in 1998.

315.     Major General Soleimani was designated by the United States on October 25, 2007 under Executive Order 13382, based on his "relationship to the IRGC"; in May 2011, under Executive Order 13572, which focuses on human rights abuses in Syria, for his role as IRGC-QF commander; and again, on October 11, 2011, as an SDGT.

316.     In an April 1990 interview, Major General Mohsen Rezai, then-IRGC Commander, explained the reasoning behind the IRGC-QF's establishment and the scope of its responsibilities:

> [T]he Qods Force, which is for assisting Muslims, Islamic states or Islamic governments, should they ask for help in training or advice. That is now a global custom. If an Islamic state, government or people need to be put through some training, well the corps will go there and give them training; it will take measures to provide training support for world Muslims or Islamic states. There was a need for a force to perform this task, and the Eminent Leader commanded the corps to set it up.

317.     On October 25, 2007, the U.S. Department of the Treasury designated the IRGC-QF an SDGT for supporting terrorism as it: "…provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

318.     The IRGC-QF trains, advises and logistically supports terrorist organizations, and

performs related clandestine and covert special operations activities, on behalf of the Iranian government. According to a U.S. Department of Defense assessment:

> The Iranian regime uses the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to clandestinely exert military, political, and economic power to advance Iranian national interests abroad. IRGC–QF global activities include: gathering tactical intelligence; conducting covert diplomacy; providing training, arms, and financial support to surrogate groups and terrorist organizations; and facilitating some of Iran's provision of humanitarian and economic support to Islamic causes.

## VIII. <u>HEZBOLLAH</u>

### A. HEZBOLLAH'S INITIAL TERRORIST OPERATIONS AND ORGANIZATIONAL STRUCTURE

319. Hezbollah was established in Lebanon circa 1982 by Sheikh Subhi al-Tufayli and Abbas al-Musawi with the support and assistance of Iran's IRGC.

320. Mr. al-Tufayli was Hezbollah's first Secretary General, from 1989 until 1991.

321. Sheikh Muhammad Hussein Fadlallah served as the group's "Spiritual Leader," providing Hezbollah its intellectual basis for both pursuing *jihad* and departing from the more apolitical and passive theological trend in Shi'a Islam.

322. In 1995, the U.S. Department of the Treasury designated Sheikh Fadlallah a Specially Designated Terrorist ("SDT").

323. At all times relevant hereto, Hezbollah is and was a radical Islamic terrorist organization that views the United States and other Western countries as its enemies.

324. Since its founding, Hezbollah has committed numerous acts of international terrorism, including, but not limited to, the following:

- July 19, 1982: The kidnapping of American University president David S. Dodge in Beirut.

- April 18, 1983: A car bomb attack on the United States Embassy in Beirut, in which sixty-three people were killed.

- October 23, 1983: A truck bomb attack on the U.S. Marine barracks where American military personnel stationed in Beirut were serving as part of a peace-keeping force in which 241 American military personnel were killed; a separate attack against the French military compound in Beirut killed 58 people.

- December 12, 1983: Bombings against U.S. and French embassies in Kuwait, in which 5 people were killed.

- September 20, 1984: A car bomb attack on the U.S. Embassy annex in Beirut, in which two Americans and twenty-two others were killed.

325. From its founding through the present, Hezbollah has carried out hundreds of terrorist attacks against American targets that have killed hundreds of U.S. citizens and wounded hundreds more.

326. Hezbollah's policy and practice of carrying out terrorist attacks against United States targets was well known to Defendants, because Hezbollah has openly, publicly and repeatedly acknowledged having such a policy and carrying out such attacks.

327. Hezbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, *Al-Manar*, on its official radio station, *Al-Nour*, and in numerous press conferences and news media interviews conducted by senior Hezbollah officials.

328. As a result of its mission, conduct, and terrorist activities, on January 23, 1995, Hezbollah was designated an SDT by the United States. It has retained this designation since that time.

329. On October 8, 1997, Hezbollah was designated an FTO by the United States. It has retained this designation since that time.

330. On October 31, 2001, Hezbollah was designated an SDGT by the United States. It has retained this designation since that time.

331. The IRGC has funded, trained and supplied Hezbollah, and facilitated its attacks

against the Israel Defense Forces ("IDF") from at least as early as 1983.

332. Hezbollah had developed advanced tactical capabilities through the battlefield experience of attacking the IDF in southern Lebanon, including the use of roadside bombs featuring remote detonators and passive infrared ("PIR") switch systems.

333. By the late 1990s, Hezbollah effectively deployed EFPs (described further below) against IDF armor and had developed sophisticated tools to defeat IDF countermeasures.

334. Over time, Hezbollah became increasingly adept at inflicting casualties on the Israeli military, and it eventually forced the IDF to withdraw into what Israel called a "Security Zone" in southern Lebanon.

335. The Security Zone added depth to Israel's security along its northern border. The IDF and its proxy militia, the South Lebanese Army ("SLA"), occupied strong points within the zone, conducted patrols, and occasionally used its bases to launch raids on Hezbollah targets deeper in Lebanon.

336. For 15 years, the IDF maintained this buffer zone until increasing IDF casualties precipitated an Israeli withdrawal in 2000 to its current border with Lebanon.

337. During that 15-year period, southern Lebanon served as a laboratory for Hezbollah to hone its tactical war fighting skills and weapons development.

338. Attacks on the IDF's Security Zone allowed Hezbollah to study and improve its insurgent tactics, including: *first*, effectively ambushing Israeli patrols; *second*, deploying Improvised Explosive Devices ("IEDs"); *third*, kidnapping Israeli soldiers; and, *fourth*, developing and deploying EFPs in the late 1990s against Israeli armored vehicles.

339. The accumulated experience Hezbollah gained through its decades-long campaign against the IDF also included developing precision use of indirect fire weapons and employing

Iranian-provided 107mm and 122mm rockets to launch indirect fire attacks on Israeli fortified outposts and on Israel itself.

340.     Hezbollah's tactics evolved and improved over time. Examples included:

- Beginning in August 1991, Hezbollah began regularly detonating bombs by remote radio control, precluding the need for command wire. The IDF attempted to counter the remote-control detonations by sweeping a wide spectrum of radio frequencies from its listening bases on the mountain peak of Mount Hermon to explode the bombs prematurely.

- In response, Hezbollah resumed using command-wire, victim-initiated pressure plates and mat detonations for a while, before introducing a new coded remote-control system in mid-1993. The bombs were fitted with two receivers and scramblers, initially defeating Israeli attempts to reproduce the detonating signals. Hezbollah engineers then refined the bombs' switches further by incorporating small jammers and turning the weapons on using computerized multi-frequency transmissions.

- By 1995, Hezbollah was equipping its IEDs with cellular phone receivers to trigger firing switches. In turn, Israel jammed cell phone frequencies from aircraft flying high above southern Lebanon. As the technology improved and grew smaller, the IDF fitted cell phone jammers into armored personnel carriers and vehicles. Eventually foot soldiers could carry the equipment in a backpack.

- In a major step change in capability, Hezbollah began using passive infrared receivers in 1997 with the IED detonating when the target, human or vehicular, crossed the beam, thereby negating the effectiveness of IDF jamming devices.

341.     The relatively rapid evolution of Hezbollah's Tactics, Techniques & Procedures ("TTP") was a product of at least three related factors. First, Hezbollah's operatives were highly motivated and willing to risk heavy losses in their confrontations with Israel. Second, Hezbollah benefited enormously from Iranian financial support and IRGC training and technology transfers. Finally, Hezbollah took advantage of the first two factors and perfected its TTP through trial and error against the SLA and IDF. These combined factors allowed Hezbollah to inflict significant (but not decisive) casualty levels on the IDF.

342.     The status quo began to change, however, with the first reported use of an EFP by Hezbollah in southern Lebanon on October 5, 1998, when an Israeli High Mobility Multipurpose Wheeled Vehicle ("HMMWV") was struck, killing two Israeli soldiers and wounding six more.

343.     EFPs introduced into the Israeli Security Zone in southern Lebanon quickly began to significantly increase Israeli casualties because they were highly effective against Israeli armor and therefore diminished the IDF's ability to protect its patrols and supply lines, forcing the IDF to resupply their now isolated and beleaguered outposts by helicopter, thereby avoiding the use of armored convoys whenever possible.

344.     By the late 1990s, Hezbollah effectively deployed EFPs against IDF armor and had developed sophisticated tools to defeat IDF counter-IED measures.

345.     As noted above, in 2000, the Israelis withdrew their forces to the current border with Lebanon rather than suffer further personnel losses that were becoming politically unsustainable.

346.     In 2003, Hezbollah began to successfully export its TTP to Iraq – particularly its experience deploying EFPs against HMMWVs, including hiding EFPs inside fiberglass 'rocks' painted to match the limestone geology of South Lebanon.

347.     This included TTP for ambushes, kidnappings, indirect fire on stationary bases and particularly its experience deploying EFPs against HMMWVs.

348.     Hezbollah's transfer of weapons, technology and tactics was critical to the effectiveness and lethality of its proxies in Iraq that would go on to kill and maim more than a thousand Americans between 2004 and 2011.

349.     Another early warning sign of Hezbollah's threat to American personnel in Iraq occurred in May 2003 when Israeli naval commandos seized a small fishing boat off the country's

northern coast and captured a Hezbollah explosives expert who had bomb detonators and computer disks containing, among other things, bomb making instructions stowed on board.

350.    For example, the computer disks contained detailed instructions on how to manufacture and assemble EFPs:

> Anti-armor devices -
>
> Like with anti-personnel devices, one of the most important factors in increasing the effectiveness of anti-armor devices is:
>
> 1. The speed of the explosive substance: the faster the explosive substance is and the more powerful it is, the more effective the device is.
> 2. The weight of the explosive substance: the greater the weight of the explosive substance, the more effective the device is.
> 3. The case: the thicker the case is, the more effective the device is. The container is normally between 5 mm and 2½ cm in thickness.
>
> Anti-armor devices come in two types: plate devices and hollow devices.
>
> 1. Plate devices: these are devices designed to be used against light armor, such as: Land Hummer and the M113 armored personnel carrier.
>
> To penetrate armor, these devices depend on a formed projectile moving at a speed 2,000 to 3,000 meters per second.
>
> This is a concave projectile

351.    As set forth below, the IRGC-QF and Hezbollah jointly played a pivotal role in fomenting sectarian violence in Iraq between 2004 and 2011, and they orchestrated numerous attacks against U.S. service members in Iraq, including nearly all attacks involving EFPs, Improvised Rocket Assisted Munitions ("IRAMs") and other specified weapons.

## B.    HEZBOLLAH'S KEY LEADERS AND CURRENT ORGANIZATIONAL STRUCTURE

352.    After its founding, Hezbollah evolved into a multifaceted, sophisticated, highly organized, politically powerful, and well-financed terrorist organization.

353.     Hezbollah now resembles a multinational corporate or governmental entity, with departments, agencies, branches, in-house banking, insurance, and other financial services, and media outreach. Its estimated enterprise value is worth billions of U.S. dollars.

354.     Hezbollah's network consists of a multitude of departments that assist its leadership in carrying out its mission, and includes, but is not limited to, entities that are tasked with: *first*, terrorist and paramilitary activities; *second*, social services and "charitable" activities; *third*, general fundraising; *fourth*, construction and infrastructure; *fifth*, financial and insurance services; and, *sixth*, media services. Notwithstanding Hezbollah's multifaceted nature, it is a single, unified entity dedicated to religiously inspired terrorism.

## 1.     HEZBOLLAH'S EMBRACE OF TERRORISM IS OPEN AND PUBLIC

355.     Hassan Nasrallah (discussed below) has been Hezbollah's Secretary General and supreme leader for decades.

356.     Mr. Nasrallah's public pronouncements leave no doubt about Hezbollah's embrace of terrorism. For example:

- "... put a knife in your shirt, then get close to an Israeli occupier and stab him." *(Nightline*, October 19, 2000)

- "Suicide attacks shake the enemy from within, they plunge him into an existential crisis, and thus prepare the ground for victory; these acts are completely legitimate, since there are no innocent civilians in Israel; rather they all are occupiers and accomplices to crime and massacre." (Statement broadcast on *Al-Manar* TV, September 14, 2001)

- "Martyrdom operations - suicide bombings - should be exported outside Palestine. I encourage Palestinians to take suicide bombings worldwide. Don't be shy about it." *(Washington Times,* December 6, 2002)

- "…This American administration is an enemy. Our motto, which we are not afraid to repeat year after year, is: 'Death to America.'" (Statement broadcast on *Al-Manar* TV, February 18-19, 2005)

- "The Lebanese resistance today inspires all the resistance in the world, all the free persons, all the noble people and all who refuse to surrender to American humiliation in the world. This is our victory, and this too is the result of our battle." (Speech after the July 2006 War "Divine Victory Rally," September 22, 2006)

- "There is no doubt that American terrorism is the source of all terrorism in the world. The Bush administration has turned the U.S. into a danger—threatening the whole world, on all levels." (Statement broadcast, November 2009).

## 2. SHURA COUNCIL (MAJLIS AL-SHURA)

357. Hezbollah's Shura Council (a/k/a Majlis al-Shura) is the decision-making body within the terrorist organization, composed of Hezbollah's highest in command—its Secretary-General, the heads of the other Councils (see below) and advisors to Hezbollah leader Hassan Nasrallah.

358. All Councils in Hezbollah are subordinate to and overseen by the Shura Council.

359. Mr. Nasrallah presides over the Shura Council and functions as the group's leader under the authority of the "jurist theologian" Ayatollah Ali Khamenei, Iran's Supreme Leader.

360. Hezbollah's Shura Council comprises the following members:

- **Hassan Nasrallah**. In 1992, after Mr. al-Musawi's death, Hassan Nasrallah became Hezbollah's leader and Secretary General. At all relevant times, he has remained in that position. He was designated an SDT on January 24, 1995, and an SDGT on May 16, 2018.

- **Naim Qassem**. Sheikh Naim Qassem is Hezbollah's Deputy Secretary General. He was designated an SDGT on May 16, 2018.

- **Hashem Safieddine**. In 1995, Hashem Safieddine was promoted to the Majlis al-Shura. He is the Head of the Executive Council, Hezbollah's largest council. He was designated an SDGT on May 19, 2017.

- **Muhammad Yazbek**. Muhammad Yazbek is the Head of Hezbollah's Judicial Council. He was designated an SDGT on May 16, 2018. He is considered the personal representative of the Supreme Leader of the Islamic Revolution, Ali Khamenei, in Lebanon. Moreover, Mr. Yazbek manages many of Hezbollah's bank accounts.

- **Ibrahim Amin al-Sayyed**. Ibrahim Amin al-Sayyed is the Head of Hezbollah's Political Council. He was Hezbollah's first official spokesperson and was involved in Hezbollah's formation in the 1980's. He was designated an SDGT on May 16, 2018.

- **Hussein Khalil**. Hussein Khalil is Mr. Nasrallah's top political advisor. He was designated an SDGT on May 16, 2018.

- **Hussein al-Shami**. Mr. Al-Shami was formerly the head of the Islamic Resistance Support Organization and Bayt al-Mal, fundraising institutions that help finance Hezbollah. Due to Mr. Al-Shami's significant role in this effort, he was appointed to be a member of Hezbollah's Governing Council. Prior to that time, Mr. Al-Shami headed Hezbollah's Social Services Unit. He was designated an SDGT on September 7, 2006.

### 3. EXECUTIVE COUNCIL

361.　Hezbollah's executive council (*Majlis al-Tanfizi*) ensures the execution of the Shura Council's policies and runs the day-to-day operations of Hezbollah and its educational networks, youth movements, hospitals and health associations, women's association, labor unions, professional associations and other "charitable" and social organizations.

362.　 The executive council is headed by Shura Council member, Hashem Safieddine (SDGT).

### 4. PARLIAMENTARY COUNCIL

363.　Hezbollah's Parliamentary Council is subordinate to the Shura Council and is composed of Hezbollah's members of Lebanon's parliament and ministers, both current and past. This council supervises the actions of Hezbollah's bloc in Lebanon's parliament, known as "the Loyalty to the Resistance." In the latest Lebanese general elections, held on May 6, 2018, Hezbollah's bloc won thirteen seats in the parliament.

### 5. JIHAD COUNCIL

364.　The Jihad Council is the functional council underneath the Shura Council,

responsible for Hezbollah's paramilitary and terrorist activities. The Jihad Council overseas the organization's "Resistance" operations, including oversight, recruitment, training, equipment and internal security. This includes Hezbollah's terror apparatus, the Islamic Jihad Organization a/k/a External Security Organization.

365. The Jihad Council is officially headed by Mr. Nasrallah. Below are (or were) the most prominent figures in the IJO.

### a. **Imad Mughniyah**

366. Imad Mughniyah was one of the founders of Hezbollah in the 1980s and, until his death in 2008, headed the organization's IJO (under the supervision of the Jihad Council).

367. Mr. Mughniyah was known as Hezbollah's "Chief of Staff" and, as such, oversaw Hezbollah's military, intelligence, and security apparatuses.

368. Mr. Mughniyah began his career in terrorism with the Palestinian Fatah movement and rose through the organization's ranks.

369. He helped found and organize the unit that would eventually turn into Yasser Arafat's Force 17, a commando and special operations unit of Fatah in Beirut. After the PLO fled from Lebanon, Mr. Mughniyah joined Amal, and through it he was introduced to the IRGC in Baalbek, Lebanon.

370. Later, he joined Hezbollah and formed the organization's IJO with his brother-in-law, cousin, and successor Mustafa Badr al-Din.

371. Mr. Mughniyah was identified by both Israeli and American officials as personally involved in planning and directing many of Hezbollah's suicide bombings, terrorist attacks, murders, kidnappings and assassinations throughout the 1980s and 1990s against the United States and other Western countries, and against Israel and Jewish targets around the world.

372.     Below is a partial list of Hezbollah's terrorist operations that Mr. Mughniyah planned, directed, and/or executed:

| Date | Hezbollah Terrorist Attack Description | Location | Innocent Deaths |
|---|---|---|---|
| April 18, 1983 | Suicide Vehicle Borne Improvised Explosive Device ("SVBIED") terrorist attack against the U.S. Embassy–Lebanon. | Beirut, Lebanon | 63 |
| October 23, 1983 | Two separate SVBIED terrorist attacks against the Multi-National Peacekeeping Force (U.S. and French barracks). | Beirut, Lebanon | 305 |
| November 4, 1983 | SVBIED terrorist attack against the IDF regional headquarters building. | Tyre, Lebanon | 60 |
| December 12, 1983 | SVBIED terrorist attack against the U.S. Embassy–Kuwait. | Kuwait City, Kuwait | 5 |
| March 16, 1984 | Kidnapping, torture, and murder (June 3, 1985) of CIA Officer and Chief of Station, William F. Buckley. | Beirut, Lebanon | 1 |
| September 20, 1984 | SVBIED terrorist attack against the U.S. Embassy Annex–Lebanon. | Beirut, Lebanon | 24 |
| December 4, 1984 | Hijacking of Kuwait Airways Flight 221, including murder of two American passengers. | Tehran, Iran | 2 |
| March 10, 1985 | SVBIED terrorist attack against an IDF convoy of military vehicles and Israeli soldiers. | Southern Lebanon | 12 |
| June 14, 1985 | Hijacking of TWA Flight 847, including the murder of U.S. Navy diver Robert D. Stethem. | Beirut, Lebanon | 1 |
| September 30, 1985 | Kidnapping of four Soviet diplomats from the Soviet Embassy–Lebanon, including the murder of Consul Attaché Arkady Katov. | Beirut, Lebanon | 1 |
| February 17, 1988 | Kidnapping, torture, and murder (declared dead July 6, 1990) of U.S. Marine Corps Colonel William Higgins. | Beirut, Lebanon | 1 |
| April 5, 1988 | Hijacking of Kuwait Airways Flight 422, including the murder of two Kuwaiti passengers. | Larnaca, Cyprus | 2 |

| Date | Hezbollah Terrorist Attack Description | Location | Innocent Deaths |
|---|---|---|---|
| October 19, 1988 | SVBIED terrorist attack against an IDF convoy of military vehicles and Israeli soldiers. | Southern Lebanon | 8 |
| March 17, 1992 | SVBIED terrorist attack against the Israeli Embassy–Argentina. | Buenos Aires, Argentina | 29 |
| July 18, 1994 | SVBIED terrorist attack against the Argentine Israelite Mutual Association ("AMIA") building. | Buenos Aires, Argentina | 85 |
| June 25, 1996 | Vehicle Borne Improvised Explosive Device ("VBIED") terrorist attack against the U.S. Air Force's Khobar Towers housing complex. | Khobar, Saudi Arabia | 20 |
| October 4, 2000 | Kidnapping of IDF Colonel Elhanan Tannenbaum. | Dubai, UAE | - |
| October 7, 2000 | Kidnapping and murder of three IDF soldiers. | Northern Israel | 3 |
| March 12, 2002 | Small Arms Fire terrorist attack against Israeli civilian vehicles traveling on the Shlomi-Matzuva road. | Matzuva, Israel | 6 |
| February 14, 2005 | VBIED assassination of Rafic Hariri, former Prime Minister of Lebanon. | Beirut, Lebanon | 21 |
| April 4, 2005 | Kidnapping and torture of two Israeli citizens. | Northern Israel | - |
| July 12, 2006 | Complex terrorist attack against an IDF military convoy, including the kidnapping and murder of two IDF soldiers. | Northern Israel | 5 |

373.    Mr. Mughniyah also helped construct Hezbollah's military terrorist infrastructure in Lebanon, which was used against the IDF in 2006. As noted in detail below, Mr. Mughniyah was a key figure in establishing, training and directing the Shi'a terrorist cells that caused Plaintiffs' injuries.

### b.  Mustafa Badr al-Din

374.    Mustafa Badr al-Din was a Hezbollah military leader and both the cousin and

brother-in-law of Mr. Mughniyah (Mughniyah was married to Mustafa Badr al-Din's sister Sa'ada).[26]

375.    Like Mr. Mughniyah, Mr. Badr al-Din served in Fatah's Force 17 in Beirut (before 1982) and joined Hezbollah with him.

376.    Mr. Badr al-Din later became an expert bomb maker.

377.    He headed Hezbollah's security apparatus and was a member of the Shura Council as well as Head of the IJO unit responsible for overseas operations. He was a key participant in the bombing of the U.S. Marine Corps barracks in Lebanon in 1983, killing 241 Marines.

378.    Soon after that bombing, Mr. Badr al-Din was dispatched to Kuwait to work with a joint Iraqi Da'wa Party–Hezbollah operation to attack Western targets at the IRGC's behest.

379.    At the beginning of his terrorist career, Mr. Badr al-Din commanded the IRGC's operation to assassinate the Emir of Kuwait. The attempt failed, and he ultimately spent five years in a Kuwaiti jail. (He was also charged with the bombing of the American and French embassies in Kuwait City.)

380.    The Kuwaiti authorities sentenced him to death, but he fled from prison during the Iraqi invasion of Kuwait in August 1990.

381.    Hezbollah had previously tried to gain his release, along with other Hezbollah operatives held in Kuwait, by hijacking airplanes as bargaining chips, including hijacking a TWA flight in 1985 and Kuwaiti aircraft in 1984 and 1988.

382.    In June 2011, the prosecutor of the Special Tribunal for Lebanon charged Mr. Badr al-Din with involvement in the February 14, 2005 bombing that killed former Lebanese Prime

---

[26]    Mustafa Badr al-Din had a brother named Muhammad Amin Badr al-Din who is discussed *infra*.

Minister Rafic Hariri and 21 others.[27]

383.     The U.S. Department of the Treasury designated Mr. Badr al-Din an SDGT in September 2012 "for providing support to Hizballah's terrorist activities in the Middle East and around the world." Saudi Arabia also designated Mr. Badr al-Din as a global terrorist linked to Hezbollah, and as an activist in the Syrian war.

### c.   Muhammad Kawtharani

384.     Since 2003, Muhammad Kawtharani has been responsible for Hezbollah's Iraq portfolio, overseeing all of the terrorist organization's Iraqi operations. He has also assisted in coordinating the movement of Hezbollah fighters to support pro-regime forces in Syria.

385.     As the individual in charge of Hezbollah's Iraq activities, Mr. Kawtharani worked on behalf of Hezbollah's leadership to promote the terrorist group's interests in Iraq, including Hezbollah's efforts to provide training, funding, political, and logistical support to Iranian-backed terror cells in Iraq.

386.     As a member of Hezbollah's Political Council, Mr. Kawtharani also helped secure the release from Iraqi custody of senior Hezbollah commander Ali Mussa Daqduq. The latter was designated an SDGT by the U.S. Department of the Treasury in November 2012 and was responsible for numerous attacks against the Coalition Forces in Iraq, including the January 20, 2007 attack on a compound in Karbala that claimed the lives of five American soldiers and injured many others.

387.     On August 22, 2013, Mr. Kawtharani was designated an SDGT by the U.S. Department of the Treasury for, among other things, his supervisory role in Iraq where he "worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah

---

[27]     *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (U.S. Department of the Treasury, November 19, 2012), online at https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx.

efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups."[28]

### 6. THE JIHAD COUNCIL'S ISLAMIC JIHAD ORGANIZATION ("IJO") OR EXTERNAL SECURITY ORGANIZATION ("ESO")

388. The Jihad Council's Islamic Jihad Organization was established in 1983, after Hezbollah's attack on the U.S. military personnel conducting peace-keeping operations in Beirut.

389. The IJO is a sub-directorate of the Jihad Council, working alongside, but distinct from, Hezbollah's formal militia activity in Lebanon.

390. The IJO is a discrete branch within Hezbollah, responsible for procurement, intelligence, counterintelligence, surveillance, planning, coordination, and execution of terrorist attacks against Hezbollah's and Iran's enemies outside of Lebanon.

391. The IJO is responsible for numerous significant attacks against targets outside of Lebanon, including the following terrorist operations:

- On July 18, 2012, a bomb exploded on an Israeli tourist bus at Sarafovo Airport in Burgas, Bulgaria, killing five Israelis and their Bulgarian bus driver. The Bulgarian authorities have charged two individuals in connection with the attack; they state the individuals were IJO members.

- On July 18, 1994, a van carrying explosives was detonated outside the Argentinian-Israeli Mutual Association in Buenos Aires, Argentina, killing 85 people and injuring more than 300 others. In 1999, Argentinian authorities issued an arrest warrant for IJO leader Imad Mughniyah for his alleged involvement. No group claimed responsibility for the attack, and Hezbollah has repeatedly denied accusations that it perpetrated it. However, Argentinian authorities concluded that the IJO was responsible.

- On March 17, 1992, a truck laden with explosives was used to destroy the Israeli Embassy in Buenos Aires, killing 29 people and injuring 242 others. Although Hezbollah denied involvement, responsibility for the attack was claimed in the name of the IJO. Argentinian authorities

---

[28] *Treasury Sanctions Hizballah Leadership* (U.S. Department of the Treasury, August 22, 2013), online at https://www.treasury.gov/press-center/press-releases/Pages/jl2147.aspx.

eventually issued an arrest warrant for IJO leader Imad Mughniyah for organizing the attack.

### a. **Talal Hamiyah**

392.     The IJO's current Commander is Talal Hamiyah, previously a deputy of Mr. Mughniyah's. Mr. Hamiyah was implicated in the 1992 and 1994 attacks in Argentina (listed above). The U.S. Department of the Treasury designated Mr. Hamiyah an SDGT on September 13, 2012. The U.S. State Department is offering a reward of up to $7 million U.S. dollars for information that leads to Mr. Hamiyah's location, arrest, or conviction in any country.

### b. **Wafiq Safa**

393.     Wafiq Safa is a senior Hezbollah commander who has chaired the terrorist organization's liaison and central coordination committee (formerly its "security committee"). Although his role within Hezbollah does not formally fall under the Jihad Council's remit, operationally he is a senior Hezbollah liaison to the IJO, responsible for, among other things, facilitating and directing activities related to the IJO's Business Affairs Component, discussed below, particularly the BAC's access to Beirut's international airport and many ports.

394.     When the U.S. Department of the Treasury designated Wafiq Safa on July 9, 2019, it noted that he "serves as a Hizballah interlocutor to the Lebanese security forces. As the head of Hizballah's security apparatus, which is directly linked to Secretary General Hassan Nasrallah, Safa has exploited Lebanon's ports and border crossings to smuggle contraband and facilitate travel on behalf of Hizballah…. For example, Hizballah leveraged Safa to facilitate the passage of items, including illegal drugs and weapons, into the port of Beirut, Lebanon. Hizballah specifically routed certain shipments through Safa to avoid scrutiny. Additionally, as of 2018, Hizballah facilitated favors at the Beirut airport. Safa also facilitated travel for Hizballah associates through a border crossing."

## C.     HEZBOLLAH'S "SOCIAL WELFARE" SECTOR – THE *DA'WA*

395.     Since its emergence in the 1980s, Hezbollah has developed a network of social welfare institutions or *da'wa* that it uses as an instrument of its political, psychological and military strategy.

396.     For example, Hezbollah provides welfare benefits to the families of its "martyrs" (*shahid*, or *shuhadaa*, plural), particularly their children.

397.     The children of Hezbollah's *shuhadaa* are privileged because they are educated in Hezbollah-subsidized schools and receive free health care in a country where, for many years, Lebanese citizens spent an estimated 40 percent of their income on medical expenses.

398.     Hezbollah's social welfare institutions are not only operated by senior Hezbollah operatives, but these institutions and their leaders are also actively involved in Hezbollah's network of commercial enterprises which, in turn, provide services to these social welfare institutions.

399.     For example, the Martyrs Foundation–Lebanon (SDGT) operates hospitals and health clinics. Companies belonging to another Hezbollah institution, Jihad al-Bina (SDGT), receive the construction contracts for those projects, and still other Hezbollah companies arrange the financing, acquire the real estate, and provide the architectural and engineering services for the projects.

### 1.     IRSO – THE ISLAMIC RESISTANCE SUPPORT ORGANIZATION

400.     The Islamic Resistance Support Organization ("IRSO"), officially known in Arabic as *Hay'at Da'am al-Muqawama al-Islamiya Fi Lubnan*, is an umbrella organization that Hezbollah uses to solicit, collect and disperse donations in support of its terrorist activities.

401.    In 2016, Mr. Nasrallah said that IRSO's mission is to provide Hezbollah with a "kind of financial and material support" as well as moral and political support.[29]

402.    The IRSO was established in 1989 to professionalize Hezbollah's fund-raising campaigns. The money IRSO collects is earmarked primarily for the purchase of weapons for Hezbollah terrorist-operations and support for its cadres.

403.    The IRSO collects considerable sums of money in Lebanon from both private and public entities, including businesses, mosques, educational institutions, gas stations, shopping centers and roadblocks.

404.    The IRSO maintains branches across Lebanon as well as a women's division and an international division.

405.    Funds are raised in Lebanon and Muslim communities–especially Shi'a communities–around the world, mainly in the Gulf States and Western countries.

406.    A pamphlet recovered by Israeli forces in Lebanon in 2006 states: "The resistance collection box is small and placed inside the house so that all members of the family will sense the importance of participating in supporting the resistance by contributing."

407.    The IRSO also maintains the website www.moqawama.org, one of Hezbollah's official media organs.

408.    The IRSO is currently headed by Sayeed Qassem Tawil.

409.    Previously, the IRSO was headed by Hussein al-Shami (a designated SDGT).

---

[29]    Interestingly, at an IRSO event in 2013, Mr. Nasrallah gave a speech denying Hezbollah's involvement in any commercial activities, stating:

> I would like to reiterate that we do not have economic or investing projects in Lebanon or abroad. Well yes, we have service projects. However, we do not have projects that bring in profits and money. I will even make use of this occasion to tell the Lebanese that if anyone tells you that I have a commercial project in which he invested a capital and ask you to share with him or partake with him claiming that its returns are for the party or the party has a share in it, be sure that he is a liar.

410. Al-Shami is a senior Hezbollah official in several Hezbollah controlled-organizations, such as Bayt al-Mal and al-Qard al-Hassan, which also help Hezbollah fund its activities. He was also the director of Hezbollah's social services division and helped establish the Martyrs Foundation - Lebanon.

411. Mr. Al-Shami was designated an SDGT by the U.S. Department of the Treasury on September 7, 2006.

412. As mentioned above, Mr. Al-Shami is a Shura Council member due to his prominent position in Hezbollah's fundraising institutions.

413. The IRSO was designated an SDGT by the U.S. Department of the Treasury on August 29, 2006.

414. According to the U.S. Department of the Treasury, the IRSO solicited donations through Hezbollah's *al-Manar* satellite television in Lebanon.

415. In its 2006 press release, the U.S. Department of the Treasury noted that: "[s]olicitation materials distributed by IRSO inform prospective donors that funds will be used to purchase sophisticated weapons and conduct operations. Indeed, donors can choose from a series of projects to contribute to, including, supporting and equipping fighters and purchasing rockets and ammunition."

416. Furthermore, the U.S. Department of the Treasury provided a copy of the IRSO's donation form (allowing a donor to specify the Hezbollah program that the donation should be directed toward).

417. The IRSO openly offered prospective donors the opportunity to earmark funds toward different types of terrorist activities, including the acquisition of missiles and ammunition,

and payments to terrorists. Both English and Arabic copies of the IRSO's donation program form are appended hereto as **<u>Exhibit 2</u>**.

418.    Stuart Levey, then-U.S. Department of the Treasury Under Secretary for Terrorism and Financial Intelligence, noted in testimony before Congress that the IRSO does not attempt to conceal its purpose:

> While some terrorist-supporting charities try to obscure their support for violence, *IRSO makes no attempt to hide its true colors*. IRSO's fundraising materials present donors with the option of sending funds to equip Hezbollah fighters *or to purchase missiles that Hezbollah uses to target civilian populations. IRSO works to inflict suffering rather than alleviate it*. (Emphasis added.)

419.    In fact, prior to the IRSO's 2006 designation, Hezbollah used its television station, *Al-Manar*, to raise money through the IRSO in support of Hezbollah's terror campaign by running commercials requesting wire transfers be sent to four Lebanese commercial banks (specifying the account numbers for donations, including an account at Defendant BYBLOS BANK[30]).

420.    The IRSO owned the following bank accounts for the express purpose of supporting and funding Hezbollah's violent "resistance" operations:

- FRANSABANK, Al-Shiyah Branch,
  account number: 252010/692830.21;

- FRANSABANK, Al-Shiyah Branch,
  account number: 78.02.251.133553.0.8;

- BYBLOS BANK, Hreik Neighborhood Branch,
  account number: 78-2-252-133521-1-5;

- BANQUE LIBANO-FRANÇAISE SAL, Hreik Neighborhood Branch,
  account numbers: 657409.17 and 657469.171;

- LEBANON AND GULF BANK, Mazra'a Branch,
  account number: 202-336254;

---

[30]    Beirut Riyadh Bank was explicitly mentioned.

- LEBANON AND GULF BANK, Mazra'a Branch, account number: 202-329665; and

- JAMMAL TRUST BANK, Ghobeiry Branch, account number: 140-028355.28/0/5 (published in Al-Ahed Newspaper on February 21, 1986).

421.  A July 25, 2006 report that aired on *MSNBC* demonstrated that: *first*, Hezbollah used U.S. currency to support its activities; and *second*, often did so openly, including its appeals for donations. During the *MSNBC* broadcast, an NBC reporter contacted a number advertised on *Al-Manar*, the Hezbollah-owned-and-controlled Lebanese television network, posing as a prospective Hezbollah donor:

NBC Reporter: I want to donate money to the Mujahedeen [Hezbollah resistance], is this the right number?

Hezbollah Facilitator: You have to send to The Lebanese-French Bank [Defendant BANQUE LIBANO-FRANÇAISE SAL].

NBC Reporter: Do you have the number?

Hezbollah Facilitator: There is an account number. You deposit the money and wire it to the Lebanese French Bank.

NBC Reporter: How can I know that this is accurate? I'm so worried to deposit the money, can you tell me and confirm that this money will be sent to the Mujahideen?

Hezbollah Facilitator: Yes, sure.

NBC Reporter: And where are you from? Are you from the bank or no?

Hezbollah Facilitator: No. I'm from the resistance.

NBC Reporter: How would we know? I'm so worried when I deposit the money it will reach Mujahideen.

Hezbollah Facilitator: You go to the bank and deposit the money, and they will wire it to the Lebanese French Bank. You have to go [sic] the bank. Where are you calling from?

NBC Reporter: I am from America.

Hezbollah Facilitator: You have to go to the bank—any bank.

NBC Reporter: That for sure will reach the Mujahedeen?

Hezbollah Facilitator: For sure. Do not mention resistance or anything like that. If you do, they won't wire them.

NBC Reporter: Thank you—God be with you. Bye bye.

Hezbollah Facilitator: You are welcome. God be with you.[31]

### 2.    JIHAD AL-BINA

422.    Jihad al-Bina (a/k/a Jihad al-Binaa, a/k/a Jihad al-Bina'a, a/k/a Construction Jihad) was established in September 1988 and registered in Lebanon as a charitable organization.

423.    It is supervised and overseen by Hezbollah's Shura Council, which is responsible for Jihad al-Bina's operation.

424.    Sultan Khalifa As'ad was its founder and first general manager. He serves as Deputy Chairman of Hezbollah's Executive Council for Municipal Affairs and formerly headed Hezbollah's Finance Unit.

425.    Muhammad Said Khansa, one of Hezbollah's "Founding Fathers," serves as Director of Agricultural and Environmental Affairs at Jihad al-Bina. Since 1998, he has been elected three times as the mayor of Ghobeiry (a Hezbollah-dominated suburb of Beirut) as Hezbollah's candidate. He has also served as the President of the Union of the Dahiya municipalities.

426.    Qassem Aliq, who was designated an SDGT by the U.S. Department of the Treasury on July 24, 2007, served as the Director of Jihad al-Bina.

427.    Ibrahim Abdallah Ismail, another prominent Hezbollah leader, also served as

---

[31]    Adam Ciralsky and Lisa Myers, *Hezbollah Banks Under Attack in Lebanon* (NBC News, July 25, 2006), archived at https://web.archive.org/web/20060809013901/http://www.msnbc.msn.com:80/id/14015377/page/2/.

Director General of Jihad al-Bina.

428. In 2006, Walid Ali Jaber was named the Beirut director for Jihad al-Bina and was given responsibility for rebuilding and reconstructing the Dahiya area – a collection of suburbs predominantly populated by Shi'a and situated in south Beirut.

429. Mr. Jaber was also Hezbollah's candidate in the Burj al-Barajneh's (municipality located in the southern suburbs of Beirut between Rafic Hariri International Airport and Haret Hreik neighborhood) municipal elections.

430. Ali Tajideen, a key Hezbollah financier and Hezbollah's commander in Hanouay, Tyre, Lebanon (who, as described below, was designated an SDGT on December 9, 2010) was described by the U.S. Department of the Treasury as "a major player in Jihad Al-Bina."

431. Jihad Al-Bina was modeled on its Iranian counterpart, the Construction Jihad Movement—an Iranian charity working to support the holy war Hezbollah waged against Israel and Iran's other external enemies.

432. Jihad al-Bina rehabilitates and builds schools in remote villages and towns, subsidizes education in poor Shi'a areas, and is responsible for numerous infrastructure projects that help solidify Hezbollah's hold on the Shi'a populace in Lebanon.

433. In exchange for improving their quality of life, Jihad al-Bina expects its Shi'a beneficiaries to pledge their allegiance to Hezbollah.

434. According to the U.S. Department of the Treasury's February 20, 2007 designation of Jihad al-Bina as an SDGT, Hezbollah operates the organization for its own construction needs as well as to attract popular support in Lebanon by sponsoring civilian construction projects.

435. The U.S. Department of the Treasury described the organization as "a Lebanon-based construction company formed and operated by Hizballah. Jihad al-Bina receives direct

funding from Iran, is run by Hizballah members, and is overseen by Hizballah's Shura Council, at the head of which sits Hezbollah's Secretary General Hassan Nasrallah."

436.    The U.S. Department of the Treasury further noted that "[i]n cases when intended solicitation targets were thought to object to the group's relationship with Hezbollah and the Iranian government, the organization employed deceptive practices, applying in the name of proxies not publicly linked to Hezbollah."

437.    Jihad al-Bina, as part of its efforts to continue its large-scale operations in Lebanon after it was designated by the United States, diversified into several private construction companies, principally to protect its bankers and major suppliers from any negative repercussions from openly doing business with Hezbollah's construction arm.

438.    Jihad al-Bina and its commercial entities are inextricable from the Iranian Committee for the Reconstruction of Lebanon ("ICRL"), the IRGC-QF's strategic construction arm in Lebanon.

439.    Jointly Jihad al-Bina and ICRL have sponsored projects to build infrastructure in southern Lebanon, the Bekaa valley and the municipalities in Dahiya. Along with these projects serving as public works that bolster Hezbollah's support, particularly in the country's predominantly Shi'a population areas, the two organizations provide the backbone for Hezbollah and Iran's strategic engineering plans in furtherance of Hezbollah and the IRGC-QF's jihad against Israel. Accordingly, Jihad al-Bina and ICRL's road, bridge and tunnel building serve military / terrorist objectives as well as political ones.

440.    The companies that Jihad al-Bina established and controls include the following entities:

### a.  Meamar Company for Engineering and Development SARL

441.    Since its founding in 1988, Meamar Company for Engineering and Development SARL has been involved with more than 150 projects, including constructing and building sporting facilities, Shi'a religious institutions, schools and hospitals.

442.    For these projects, Meamar's clients are almost exclusively organizations linked to Hezbollah, including the Islamic Health Society, the ICRL, the Mehdi Scouts, the Shahid Association, the Islamic Religious Education Association ("IREA") and municipalities controlled by Hezbollah Mayors (such as Ghobeiry in Beirut and Bint Jbeil in South Lebanon).

443.    Among its founders are SDGT Qassem Aliq and Sultan Khalifa As'ad, who was the director of Jihad al-Bina itself. The construction company is currently headed by Hussein Muhammad Kheir al-Din and Burhan Hussein Qataya. Its attorney is Osama Abbas Ramal.

444.    According to Joseph Daher's monograph: *Hezbollah – The Political Economy of Lebanon's Party of God*:

> At the celebration of the company's 25th anniversary, many Hezbollah members were present including Muhammad Raad, head of the Hezbollah Deputy bloc in parliament, Muhammad Fneich, Minister of Administrative Development, and the two Deputies Ali Fayyad and Ali Mekdad. The event was prominently covered on Hezbollah's Al-Manar TV (2014) ….

### b.  Seasons Corporation for Agricultural Projects and Services SARL

445.    As its name suggests, the company provides agricultural services and establishes projects in the field of agriculture. According to Hezbollah's *Al-Manar*, it reportedly started its operations in the northern Bekaa valley town of al-Nabi Othman. According to an agreement made between Jihad al-Bina and the Lebanese University's School of Agriculture, Seasons is obligated to provide courses for the school's students. As in the case of Meamar, SDGT Qassem Aliq is one of its founders.

446.    The following individuals were involved with the company:

- **Ibrahim Abdallah Ismail** was listed as an authorized signatory, co-founder and shareholder (holding 1,220 shares) of the company;

- **Muhammad Ni'mah al-Hajj** was listed as an authorized signatory and shareholder (holding 260 shares) of the company;

- **Qassem Aliq** (SDGT) was listed as a co-founder of the company;

- **Abbas Muhammad Raslan** was listed as a co-founder of the company;

- **Fawzat Abdallah Ibrahim al-Hajj** was listed as a co-founder of the company;

- **Adel Mahmud Salim** was listed as a shareholder (holding 260 shares) of the company;

- **Tareq Muhammad al-Musawi** was listed as a shareholder (holding 260 shares) of the company; and

- **Osama Abbas Ramal** was listed as the company's attorney.

### c.  Arch Consulting SARL

447.    Arch Consulting SARL is one of Hezbollah's main construction partners. The company has built hospitals, schools and religious institutions in the Hezbollah-controlled areas in Beirut, South Lebanon and the Bekaa Valley.

448.    Arch Consulting SARL maintained an account at Defendant BLOM BANK.

449.    Arch Consulting SARL is also involved in tourism, infrastructure, and hydraulic projects.

450.    In international markets, the company built the Abidjan Islamic Cultural Center in the Ivory Coast, a Shi'a religious association established by a supporter of Hezbollah.

451.    Before registering in early 2005, Arch Consulting SARL operated under the name of Research Institute of Jihad al-Bina.

452.    Arch Consulting SARL cooperates with more than 30 municipalities in South

Lebanon and Beqaa, for which they consult and draw up engineering researches.[32]

453.     Together with Adham Tabaja's Al-Inmaa Engineering and Contracting SARL (SDGT) and Meamar Company for Engineering and Development SARL, Arch Consulting SARL was involved in the construction of Al-Mahdi Secondary School and a "Martyr's Hall" in the village of Hadath.

454.     Hezbollah leader Hashem Safieddine attended the opening ceremony for the school together with Tabaja and Walid Ali Jaber, the former director of Jihad al-Bina, who serves as the general manager of Arch Consulting SARL and owns 40 percent of it.

455.     Jaafar Musa Musa, another founder of Arch Consulting SARL, owns 30 percent of it. In 2016, he was a candidate in the municipal elections in his hometown of Houmine al-Faouqa and won a seat. Musa is also listed as a 25 percent shareholder in National Crushers Company SARL, a company co-founded by Muhammad Issam Abu Darwish and his brother Sami Issam Abu Darwish, with Osama Abbas Ramal registered as the company's attorney.

456.     Muhammad Haidar Qansu is another founder of Arch Consulting SARL and owns 30 percent of it. In 2016, Qansu was a Hezbollah candidate in the municipal elections in the Lebanese town Doueir. Additionally, he was named a member in a municipal committee later that year.

457.     Aside from Arch Consulting SARL, Mr. Qansu worked with IRGC-QF commander, Hassan Shateri, in National Crushers Company SAL and Cleany & Company SARL.

458.     Arch Consulting SARL's attorney was listed as Osama Abbas Ramal.

459.     Arch Consulting SARL is also closely tied with another prominent Hezbollah

---

[32]     According to Joseph Daher's monograph: *Hezbollah – The Political Economy of Lebanon's Party of God*, Arch Consulting SARL "was previously part of Jihad al-Bina (Hezbollah's construction organization) but became an independent company in 2005."

entity, the U.S.-designated Martyrs Foundation–Lebanon (SDGT).

460.    Arch Consulting SARL has undertaken at least two major projects for Atlas Holding SAL, the commercial arm and a corporate alter-ego (discussed below) of the Martyrs-Foundation - Lebanon.

461.    Arch Consulting SARL's website proudly notes projects the company has worked on for Atlas Holding SAL:



### d.   Al-Raed SARL

462.    Al-Raed SARL was established in 1994 by Sultan Khalifa As'ad's deputy, Karim Ibrahim Fadlallah who is, among other things, deputy administrator for Hezbollah's Central Municipal Labor Committee.

463.    Al-Raed SARL purports to provide general contracting services.

464.    The company's attorney is also Osama Abbas Ramal.

465.    The company maintained one or more accounts at Defendant BLOM BANK.

466.    Once again, as Joseph Daher wrote in *Hezbollah – The Political Economy of Lebanon's Party of God,* describing the collection of Jihad al-Bina corporate entities:

    These companies offer important insights into the nature of the Hezbollah's

economic activities. Each of them is privately owned and operated, and thus help to enrich a narrow layer of the Shi'a community who control them. At the same time, they are very closely linked to the party itself; all four companies are headed by Hezbollah members and supporters, including electoral candidates for the party. Their projects are largely based in the Hezbollah-controlled areas with clients mostly drawn from Hezbollah's educational, media and schooling institutions. Hezbollah officials frequently praise these institutions in publicly organized celebrations. Indeed, the close links between the Hezbollah and these companies have led to public concerns being expressed around clientelism and patronage stemming from the party's position in the state apparatus. The explicit and open nature of their relationship with the party is one further indication of the network of private sector institutions that have arisen around construction and real estate activities in Shi'a-populated areas, and points to the emergence of a bourgeoisie linked to the Hezbollah.

### 3. THE MARTYRS FOUNDATION–LEBANON

467. The Martyrs Foundation–Lebanon (a/k/a *Shahid* Foundation, a/k/a *Mua'assasat al-Shahid*) is a branch of the Iranian Martyrs Foundation. It was established after the Israeli incursion into Lebanon in 1982, with the goal of supporting the families of Hezbollah fighters who died as a result of their attacks on the IDF.

468. Martyrs Foundation–Lebanon is controlled and operated by Hezbollah and is one of the most open and notorious Hezbollah institutions in Lebanon.

469. One of the Martyrs Foundation–Lebanon's associated organizations is the U.S.-based Goodwill Charitable Organization ("GCO").

470. GCO was founded by the Martyrs Foundation–Lebanon as a fundraising office in Dearborn, Michigan.

471. GCO was designated an SDGT on July 24, 2007 by the U.S. Department of the Treasury as a "front organization that reports directly to the leadership of the Martyrs Foundation in Lebanon."

472. According to the U.S. Department of the Treasury, Hezbollah's leaders in Lebanon instructed Hezbollah operatives in the United States to send their contributions to GCO and to

contact GCO for the purpose of contributing to the Martyrs Foundation–Lebanon.

473.　Since its founding, GCO has sent a significant amount of money to the Martyrs Foundation in Lebanon.

474.　The Martyrs Foundation–Lebanon glorifies death in *jihad* by cultivating Hezbollah's 'cult of the martyr.'

475.　The foundation's purpose since its inception has been to help Hezbollah wage *jihad* against the perceived enemies of Shi'a Islam.

476.　The Director of the Foundation is a Hezbollah operative named Shawki Nur al-Din and its former chairman was Hussein al-Shami, an SDGT (former head of the IRSO; discussed above).

477.　The Martyrs Foundation–Lebanon is made up of five institutes: The Culture Institute promotes Hezbollah's ideology of the *shahid* (or martyr); the Check and Balance Institute monitors and provides aid to the families of Hezbollah's martyrs; the Health Institute overseas Hezbollah's hospitals and clinics for the families of the martyrs; the Social Institute is responsible for martyrs' children's education; and the most important of the five institutes is the Takaful Institute, whose director for much of the relevant period was Hussein al-Shami (also the director of the Foundation at the time).

478.　The Takaful Institute is essentially the fundraising arm of the foundation, responsible for identifying *kafils* (benefactors) who will sponsor families of the martyrs.

479.　The Takaful Institute used Hezbollah media to recruit these *kafils,* printing photographs of the children of recently deceased martyrs in its *Al Safir* publication.

480.　The Takaful Institute also targets the Lebanese Shi'a expat communities living in the Persian Gulf and in Africa.

481.    The Culture Institute aims at preserving the legacy of individual Hezbollah "martyrs" by transforming artifacts and their personal effects into icons. To this end, the Institute has established several local "museums," converting apartments located in Hezbollah quarters or villages and redesigning them as a kind of shrine in the hometown of the martyr.

482.    The shrines often include pieces of bloodied clothes the martyr wore when he was killed as well as photographs of the decedent in Hezbollah gear placed with family photos of the fallen, posing with his children or wife, or if unmarried, featured with his parents.

483.    The Culture Institute shrines often feature the Koran the martyrs allegedly used, opened to the page of *fatiha* (first sura of the Koran) and prayers said for the souls of the dead.

484.    As of November 2009, there were approximately 800 employees and volunteers working in the foundation.

485.    The Martyrs Foundation–Lebanon claims to take care of approximately 5,000 people, including the families of Hezbollah's "martyrs" who died during the 2006 conflict with Israel.

486.    According to the Martyrs Foundation–Lebanon's spokesman, Muhammad al-Husseini, the foundation assists only people who are affiliated with Hezbollah.

487.    The Martyrs Foundation–Lebanon has established a large hospital in Hezbollah's stronghold in Beirut—the Dahiya (or southern suburbs of Beirut).

488.    There are several branches all over Lebanon. The main branches are located in Beirut, Baalbek (the western Beqaa), Tripoli, and Tyre.

489.    The Martyrs Foundation–Lebanon was designated an SDGT by the U.S. Department of the Treasury on July 24, 2007.

490.    According to the U.S. Department of the Treasury, "Martyrs Foundation branches

in Lebanon has also provided financial support to the families of killed or imprisoned Hizballah [sic]… In addition to fundraising responsibilities, senior Martyrs Foundation officials were directly involved in Hizballah operations against Israel during the July-August 2006 conflict."

491.    The U.S. Department of the Treasury also found that:

> [T]he Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hezbollah, Hamas, and the Palestinian Islamic Jihad (PIJ). To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. Martyrs Foundation branches in Lebanon has also provided financial support to the families of killed or imprisoned Hezbollah and PIJ members, including suicide bombers in the Palestinian territories.

492.    The Martyrs Foundation–Lebanon does not conduct itself like any recognizable charity in the United States. The Martyrs Foundation–Lebanon imports and distributes cash (usually in U.S. dollars) at volumes that are unthinkable for a legitimate and ordinary charitable institution.

493.    As detailed below, during the relevant period, LCB exempted the Martyrs Foundation–Lebanon from signing cash transaction slips disclosing the source of funds for transactions up to $100,000 per day at its Airport Road branch in Beirut.[33]

494.    The Martyrs Foundation–Lebanon owns and operates, among other facilities:

---

[33]    The Financial Action Task Force (FATF), an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction, issued a guide in 2015 titled *Combating The Abuse of Non-Profit Organisations*. It provides:

> There may be circumstances in which cash may be the only means possible for the NPO to operate, for example, to provide assistance to a particularly remote region where financial services are not available. While cash is inherently more risky to terrorist abuse, when cash is used, *it should be used appropriately in line with international and national laws and regulations, including cash declaration and/or cash disclosure requirements to promote greater transparency and accountability of the funds*." (Emphasis added.)

### a. Al-Rasul al-Azam Hospital and Other Hezbollah-controlled Hospitals

495.     The Martyrs Foundation–Lebanon receives funding from the Imam Khomeini Relief Foundation (an SDGT discussed later in the Complaint), which pays all medical expenses for Hezbollah's wounded operatives and an estimated 70 percent of the cost of caring for civilians injured in "resistance"-related fighting.

496.     Al-Rasul al-Azam Hospital is located in one of Beirut's southern suburbs, Burj al-Barajneh, which is effectively controlled and governed by Hezbollah.

497.     Al-Rasul al-Azam Hospital and the new Hezbollah hospitals recently built in the South and in Baalbek employ large staffs and maintain substantial pools of medical professionals whose livelihood depends on Hezbollah.

498.     The Lebanese Syndicate of Hospitals lists the Martyrs Foundation as having established the Al-Rasul al-Azam Hospital and opened its doors in 1988.

499.     Dr. Muhammad Ali Bashir serves as the hospital's CEO, and Shawki Nur al-Din serves as the hospital's chairman.

500.     Al-Rasul al-Azam Hospital has a list of 1,800 Hezbollah martyrs' family members who receive preferential treatment, including priority appointments, superior rooms and nurses dedicated to their treatment.

501.     This happens even though Al-Rasul al-Azam claims to be committed to treating all Lebanese citizens; it is common knowledge that Hezbollah fighters and their families receive top priority.

502.     For example, a May 2013 article in *The New York Times* quotes a nurse from the hospital who stated that the facility was closed to civilian patients because it was "full of Hezbollah fighters." The article continues: "A Hezbollah militiaman stood guard with a walkie-talkie, near a

large poster of a fighter who died recently and was commemorated as a martyr."

503. In honor of the hospital's 25th anniversary, Hezbollah leader Hassan Nasrallah delivered a speech at the hospital. He acknowledged the role of the Martyrs Foundation–Lebanon in establishing the hospital and went on to describe the hospital as part of the *jihad*, of the resistance.

504. In July 2015, several sources published reports that an Iranian military delegation recovered the bodies of eight IRGC personnel after they were identified in, and transferred from, Al-Rasul al-Azam Hospital.

505. In November 2015, ISIS claimed responsibility for twin suicide attacks near the hospital that left 43 dead. ISIS has declared such attacks are an attempt to exact revenge on Hezbollah for its involvement in Syria.

506. As a result of the ISIS attacks on the hospital, Hezbollah has erected walls and iron and concrete barriers in the vicinity of the hospital.

507. Before the 2018 elections in Lebanon, the Hezbollah-affiliated publication *Al-Ahed* published an article calling Lebanese voters to support Hezbollah because of the services provided by Al-Rasul al-Azam Hospital.

508. The article publicly noted that the hospital received over $1 million U.S. dollars per month from the Imam Khomeini Foundation that subsidized costs to patients and urged voters to cast ballots for those who protect the country with "blood and medicine."

509. The Martyrs Foundation–Lebanon also controls several other major hospitals in Lebanon including Baalbek Hospital, Bahman Hospital, West Bekaa Hospital and Saint George Hospital.

510. Several such installations are reported to serve a secondary function as Hezbollah

command-and-control facilities, effectively shielded from Israeli airstrikes by their proximity to the hospitals they are situated in.

### b.  **Atlas Holding SAL**

511.    The Martyrs Foundation–Lebanon also owns a holding company, Atlas Holding SAL, which it formally established in 2006 but operated in other forms previously.

512.    Atlas Holding SAL is effectively the investment arm of the Martyrs Foundation–Lebanon.

513.    Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendants SGBL and BANK AUDI maintained an account for and provided financial services to Atlas Holding SAL.

514.    Atlas Holding SAL was co-founded by Hezbollah operative and Al-Rasul al-Azam Hospital CEO, Muhammad Ali Bashir; is managed by Hezbollah operative Qassem Muhammad Ali Bazzi; and was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

515.    Atlas Holding SAL makes no effort to conceal the fact that it is owned by the Martyrs Foundation–Lebanon and the latter publicly advertises the affiliation.

516.    Atlas Holding SAL has a sister company (located at the same address) called Atlas for Trade and Industry Ltd.

517.    Atlas for Trade and Industry Ltd. was co-founded by Qassem Aliq, who, as noted above, was designated an SDGT on July 24, 2007, as "a Hizballah official who was previously the director for the Martyrs Foundation branch in Lebanon. In addition to overseeing Martyrs Foundation's operation, Aliq worked closely with senior Hizballah officials. Aliq currently serves as the director of Jihad al-Bina, a Lebanon-based construction company formed and operated by

Hizballah and previously designated by the U.S. Department of the Treasury."

518.    Another founder of this company is Adnan Muhammad Ali Qassir, who served as the Hezbollah mayor of Dir Qanoun al-Nahr.

519.    As with Atlas Holding SAL, Atlas for Trade and Industry Ltd. lists one of Hezbollah's lawyers, Ali Hassan Berro, as the company's attorney.

520.    Atlas Holding SAL owns or controls several commercial enterprises. These include:

- **Shahed Pharm Drugstore SARL** (2,700 of 3,000 shares);
- **Al-Amana SARL** (39,200 of 40,000 shares);
- **Amana Plus Co.** (9,997 of 10,000 shares);
- **Amana Sanitary and Paints Company LLC ASPCO** (98 of 100 shares);
- **Société Orientale Libanaise d'Investissement et Développement SAL "SOLID"** (co-founder, no shares);
- **Medical Equipments and Drugs International Corporation SAL "MEDIC"** (28,000 of 30,000 shares);
- **Al-Kawthar** (98 of 100 shares);
- **City Pharma SARL** (co-founder, no shares); and
- **Global Touristic Services SAL "GTS"** (9,997 of 10,000 shares).

521.    The Martyrs Foundation – Lebanon / Atlas Holding family of companies had the following Lebanese banking relationships (detailed below):

| Atlas Holding Companies (Martyrs Foundation - Lebanon) | Defendant Bank |
|---|---|
| Atlas Holding SAL | <ul><li>SGBL</li><li>BANK AUDI</li></ul> |
| Shahed Pharm Drugstore SARL | <ul><li>LEBANON AND GULF BANK</li></ul> |
| Al-Amana SARL | <ul><li>BYBLOS BANK</li><li>LEBANON AND GULF BANK</li></ul> |
| Amana Plus Company SAL | <ul><li>LEBANON AND GULF BANK</li></ul> |
| Société Orientale Libanaise d'Investissement et Développement SAL | <ul><li>BYBLOS BANK</li></ul> |
| Medical Equipments and Drugs International Corporation SAL | <ul><li>BYBLOS BANK</li><li>BANK AUDI</li><li>BANK OF BEIRUT</li><li>JAMMAL TRUST BANK</li></ul> |

| City Pharma SARL | • LEBANON AND GULF BANK |
| Global Touristic Services SAL | • BYBLOS BANK |

### i. Shahed Pharm Drugstore SARL

522.    Shahed Pharm Drugstore SARL was co-founded and co-owned by Martyrs Foundation–Lebanon / Atlas Holding SAL sub-company (holds 2,700 shares), by Hezbollah operative and Al-Rasul al-Azam Hospital CEO Muhammad Ali Bashir, and by Martyrs Foundation–Lebanon Director Shawki Nur al-Din; is managed by Hezbollah operative Qassem Muhammad Ali Bazzi; and was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

523.    Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendant LEBANON AND GULF BANK maintained an account for and provided financial services to this Atlas Holding SAL sub-company, Shahed Pharm Drugstore SARL.

### ii. Al-Amana SARL

524.    Al-Amana SARL is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL, which holds 98 percent of Al-Amana SARL.

525.    Hezbollah operative Qassim Muhammad Ali Bazzi is the general manager and owns 1 percent, and the remaining one per cent is held by Osama Muhammad Aliq. Muhammad Ali Bashir is listed as founder of Al-Amana SARL. Al-Amana SARL was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

526.    Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendants LEBANON AND GULF BANK and BYBLOS BANK each maintained an account for and provided financial services to this Atlas Holding SAL sub-company, Al-Amana SARL.

### iii. Amana Plus Company SAL

527. Amana Plus Company SAL was co-founded by Hezbollah operative and Al-Rasul al-Azam Hospital CEO, Muhammad Ali Bashir, Martyrs Foundation–Lebanon Director, Shawki Nur al-Din, and Qassem Muhammad Ali Bazzi. It is also managed by Hezbollah operative Qassem Muhammad Ali Bazzi, and was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro.

528. Amana Plus operates gas stations in Lebanon. An example below demonstrates that this is an open, commercial enterprise:



529. Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendant LEBANON AND GULF BANK (main branch) maintained an account for and provided financial services to this Atlas Holding SAL sub-company, Amana Plus Company SAL.

### iv. Société Orientale Libanaise d'Investissement et Développement SAL

530. Atlas Holding SAL is listed as a founder of the company, but 50 percent of the registered shares were listed as belonging to Hassan Ali Tajideen, executive manager of Tajco (SDGT), shareholder in Tajco SAE and son of Ali Muhammad Tajideen—the U.S.-designated SDGT and Hezbollah financier.

531. The following individuals were involved with the company:

- **Hassan Ali Tajideen** was listed as the chairman, majority shareholder (holding 50 percent of the shares), co-founder and authorized signatory of the company;

- **Nur al-Ain Muhammad Ali Atwi** (Hassan's mother and wife of Ali Muhammad Tajideen) was listed as a shareholder (holding 35 percent of the shares), co-founder and member of the board of directors of the company;

- **Jihad Muhammad Qansu** (SDGT) was listed as the company's auditor; he serves as statutory auditor of numerous companies associated with Hezbollah (see dedicated section below);

- **Ibrahim Mahmoud Youssef** was listed as a partner and board member of the company; and

- **Ali Hassan Berro** was listed as the company's attorney.

532. Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendant BYBLOS BANK maintained an account for and provided financial services to this Hezbollah-controlled company in the BAC network, Société Orientale Libanaise d'Investissement et Développement SAL.

### v. Medical Equipments and Drugs International Corporation SAL

533. Medical Equipments and Drugs International Corporation SAL was established in 2013—*six years* after the U.S. designation of the Martyrs Foundation–Lebanon. It warehouses pharmaceutical products and medical equipment.

534. Hezbollah operative Qassem Muhammad Ali Bazzi is the company's manager.

535. Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendants BYBLOS BANK SAL, JAMMAL TRUST BANK SAL, BANK AUDI SAL and BANK OF BEIRUT SAL each maintained an account for and provided financial services to this Atlas Holding

SAL sub-company, Medical Equipments and Drugs International Corporation SAL.

### vi. Al-Kawthar

536.    Al-Kawthar is a clothing store chain in Lebanon. The company is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL, but 2 percent of the shares are owned by Hezbollah operative and Al-Rasul al-Azam Hospital CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director Shawki Nur al-Din (1 percent each). One of Hezbollah's lawyers, Ali Hassan Berro, is listed as the company's attorney.

### vii. City Pharma SARL

537.    City Pharma SARL is a Hezbollah-controlled pharmaceutical distributor also involved in counterfeit drug smuggling. The company is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL, but 2 percent of the shares are owned by Hezbollah operative and Al-Rasul al-Azam Hospital CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director Shawki Nur al-Din (1 percent each).

538.    Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendant LEBANON AND GULF BANK maintained an account for and provided financial services to this Atlas Holding SAL sub-company, City Pharma SARL.

### viii. Global Touristic Services SAL

539.    Global Touristic Services SAL is owned by the Martyrs Foundation–Lebanon through Atlas Holding SAL. It was founded in 2008, after the Martyrs Foundation–Lebanon was designated as an SDGT. The company claims to invest in tourism and hotel projects, hotels, restaurants, motels, furnished apartments, and restaurants in Lebanon and abroad. It also claims to invest in restaurants, cafes, snack bars, coffee and tea lounges of all grades as well as zoos,

amusement parks and games, art museums, craft festivals and tourism festivals.

540. Al-Rasul al-Azam Hospital's CEO Muhammad Ali Bashir and Martyrs Foundation–Lebanon Director (until 2009) Shawki Nur al-Din were co-founders of the company along with Hezbollah operative Qassem Muhammad Ali Bazzi.

541. Jihad Muhammad Qansu, a U.S.-designated SDGT associated with Adham Tabaja, was listed as the company's auditor, and one of Hezbollah's lawyers, Ali Hassan Berro, is listed as the company's attorney.

542. Notwithstanding Atlas Holding SAL being owned and controlled by the Martyrs Foundation–Lebanon and that organization's designation in 2006 as an SDGT, Defendant BYBLOS BANK maintained an account for and provided financial services to this Atlas Holding SAL sub-company, Global Touristic Services SAL.

### 4. AL-MABARRAT CHARITABLE SOCIETY

543. Al-Mabarrat Charitable Society (a/k/a Benevolent Charity Society) was established in 1978 and was founded by Hezbollah's spiritual leader, Sheikh Muhammad Hussein Fadlallah, who, as noted above, was designated an SDT in 1995.

544. Al-Mabarrat operates a chain of schools, orphanages, clinics, educational and vocational centers, mosques and hospitals, including the Al-Hadi Institute.

545. Just as Sheikh Fadlallah provided "spiritual guidance" and Islamic legal justifications for Hezbollah's terrorist activities but denied being a formal member of the organization, Al-Mabarrat has long maintained the pretense that it is sympathetic to, but not part of, Hezbollah.

546. Sheikh Fadlallah's brother, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, serves as the organization's general manager.

547.     Sheikh Fadlallah's son, Ali al-Sayyid Muhammad Hussein Fadlallah, serves as the organization's president.

548.     During the relevant period, the Al-Mabarrat Society maintained one or more accounts at LCB and was exempted from signing CTSs for cash transactions up to $55,000 per day at the Airport Road branch.

549.     Al-Mabarrat established a satellite organization in the United States known as "Al-Mabarrat Society," which was established in 1991 in Dearborn, Michigan.

550.     According to its English website, the charity's aim is to educate orphans and to secure sponsors and donations for fifteen schools and nine orphanages in Lebanon and Iraq.

551.     Talal Khalil Chahine (a/k/a Talal Shahin), the former owner of the La Shish restaurant chain, was prominently linked to the U.S. organization (as a Hezbollah fundraiser) prior to his indictment on federal tax evasion charges for allegedly concealing more than $20 million U.S. dollars in restaurant profits and funneling some of those funds to Lebanon.

552.     In 2002, Chahine, whom federal prosecutors asserted had "connections at the highest levels of ... Hezbollah," attended an Al-Mabarrat fundraiser in Lebanon at which he and Sheikh Fadlallah (SDT) served as the keynote speakers.

553.     Chahine is a relative and business partner of Muhammad Bazzi, a senior member of the BAC and an SDGT.

554.     Chahine maintained U.S. dollar-denominated accounts (in 2001) at Defendant BYBLOS BANK and Defendant FRANSABANK and transferred more than $2 million U.S. dollars through the United States using those accounts.

555.     On July 24, 2007, FBI agents raided Al-Mabarrat's office in Dearborn, and seized files, paperwork and financial records, but the organization was never indicted or closed.

556.    LCB and Defendants SGBL and BLOM BANK maintained accounts for and provided financial services to the Al-Mabarrat Society.

557.    In addition to funds it has raised in the United States through the Al-Mabarrat Society, the parent organization owns and operates several commercial enterprises in Lebanon and around the world. These include the following entities:

### a. Arab Lebanese Trading & Contracting Company

558.    Arab Lebanese Trading & Contracting Company was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro. The company is co-owned by Al-Mabarrat's general manager, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, its president, Ali al-Sayyid Muhammad Hussein Fadlallah, and Hamzah Safieddine, the brother of two of Hezbollah's most powerful leaders, Hashem and Abdallah Safieddine.

559.    Hamzah Safieddine's (nominal) ownership stake highlights Al-Mabarrat's role as a key institution in Hezbollah's network of social services organizations.

### b. Assaha International Group (Offshore) SAL

560.    Assaha International Group (Offshore) SAL was incorporated by one of Hezbollah's lawyers, Ali Hassan Berro (who also owns shares in the company). The company is co-owned by Al-Mabarrat's general manager, Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah, and an architect named Jamal Makke, who is involved in several companies associated with Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah. Hassan Hamd Surur was listed as the company's auditor.

### c. Assaha Travel and Tourism SARL

561.    Assaha Travel and Tourism SARL was also incorporated by one of Hezbollah's lawyers, Ali Hassan Berro, but is owned by Al-Mabarrat directly (which holds 90 percent of the

company's shares).

562.     Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah and Jamal Makke co-founded the company and are partners in it, each holding 5 percent of the shares.

563.     The company operates Assaha Village, a historically themed restaurant and event space in the heart of the Hezbollah-controlled southern outskirts of Beirut.

### d.   Al-Aytam Company for General Trading and Fuels

564.     Al-Aytam Company for General Trading and Fuels (a/k/a Aytam Petroleum), is a company which deals with trade, import and export, especially in the field of hydrocarbons trade and other petroleum derivatives. It operates a network of gas stations in the greater Beirut area.

565.     Hamzah Safieddine was listed as a co-founder and partner of the company, and Hassan Hamd Surur was listed as its director (he was also listed as the auditor of Assaha International Group Offshore SAL).

566.     Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah was listed as a partner and authorized signatory; Ahmad Muhammad Hussein Fadlallah (Sheikh Fadlallah's son) was listed as a partner and co-founder; Abdallah Ismail al-Zayn was listed as a partner and co-founder; Ali al-Sayyid Muhammad Hussein Fadlallah (Sheikh Fadlallah's son) was listed as a partner and authorized signatory; and Muhammad Ali al-Sayyid Abd al-Ra'uf Fadlallah (Sheikh Fadlallah's brother) was listed as a partner and co-founder of the company. Al-Mabarrat itself is listed as a partner and co-founder of the company.

567.     Both Hamzah Safieddine's role as partner co-founder and Sheikh Fadlallah's brother and son's roles serving as founders and partners in the company highlight the close connection between Al-Mabarrat, Al-Aytam and Hezbollah.

568.     Al-Aytam was incorporated and co-founded by one of Hezbollah's lawyers, Ali

Hassan Berro's sister—Zeinab Hassan Berro.

569.     During the relevant period, the Al-Aytam Company maintained one or more accounts at LCB and was exempted from signing CTSs for cash transactions up to $50,000 per day at the Airport Road branch.

### e.  The Lebanese-Arab Company for Touristic Services SARL

570.     The Lebanese-Arab Company for Touristic Services SARL is a tourism company owned by and co-founded by Al-Mabarrat.

571.     The following individuals were involved with the company:

- **Hamzah Safieddine** (brother of Hashem and Abdallah Safieddine, both SDGTs) was listed as a co-owner, co-founder and authorized signatory of the company;

- **Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah** was listed as a co-founder and authorized signatory of the company;

- **Jamal Ali Makke** was listed as a co-owner, co-founder and authorized signatory of the company;

- **Ali al-Sayyid Muhammad Hussein Fadlallah** was listed as a co-owner, authorized signatory and co-founder of the company;

- **Ra'fat Yunas Sa'id** was listed as an authorized signatory of the company; and

- **Ali Hassan Berro** was listed as the attorney for the company.

572.     During the relevant period, the Lebanese-Arab Company for Touristic Services SARL maintained one or more accounts at LCB and was exempted from signing CTSs for cash transactions up to $22,000 per day at the Airport Road branch.

### f.  Rayan Foods SAL

573.     The Lebanese-Arab Company for Touristic Services SARL is the major shareholder (63 percent) of Rayan Foods, nominally an import and export company that focuses

on renting, manufacturing, buying and selling various kinds of machinery and equipment, building materials, artificial stones, sanitary ware, electricals, paints, fuel, wood, metals, plastic, fertilizers, agricultural medicines, material and non-material movables, labor and brokering, abroad and in Lebanon. It also purports to be involved in management, investment, construction and rental of restaurants, amusement parks, cafes, cinemas, hotels, furnished apartments, and the use of all tourism businesses.

574. Another major shareholder of Rayan Foods is Ali Radwan Aidibi (31.81 percent). Ali Muhammad Hussein Fadlallah holds thirty shares and is the chairman; Jihad Muhammad Qansu (SDGT) is its auditor; Jamal Ali Makke is a board member and authorized signatory; and Muhammad Baqir al-Sayyid Abd al-Ra'uf Fadlallah is a board member, managing member and authorized signatory. It was also incorporated by Hezbollah's attorney, Ali Hassan Berro.

## 5.    IMAM KHOMEINI RELIEF COMMITTEE – LEBANON ("IKRC")

575. The Imam Khomeini Relief Committee (a/k/a Islamic Charitable Emdad Committee, Emdad Assistance Foundation) was formed in 1979 by the Iranian government as a charitable organization, officially to help poor families and allow them to regain financial stability. It operates throughout the Middle East and has branches all over the region. As a key instrument of soft power used to promote Iran's ideological and political goals, the IKRC is a humanitarian aid organization that also organizes anti-American protests, promotes Shi'a Islam, and has been known to work closely with the IRGC–QF.

576. The Imam Khomeini Relief Committee–Lebanon is the Lebanese branch of the IKRC ("IKRC-Lebanon"). It was reportedly established in Lebanon in 1987 and became a public welfare association by Lebanese presidential decree in 1994.

577. The IKRC–Lebanon defined itself in 1997 as "a charitable NGO started by Hizballah to alleviate social hardship in that part of the Lebanese population most affected by the

Israeli occupation of the south of the country." The IKRC–Lebanon maintains branches throughout Shi'a populated areas of Lebanon.

578.    Hezbollah controls and sets the policy for the IKRC–Lebanon and determines the allocation of its budget.

579.    The IKRC–Lebanon was designated an SDGT by the U.S. Department of the Treasury on August 3, 2010 together with its director, Ali Hassan Zreik.

580.    According to the U.S. Department of the Treasury, the IKRC–Lebanon "is a Hizballah social service organization that was created by the Government of Iran in the 1980s and is directed and run by Hizballah members or cadre. Iran has provided millions of dollars to the Hizballah-run branch in Lebanon since 2007. The IKRC has helped fund and operate Hizballah youth training camps, which have been used to recruit future Hizballah members and operatives. Hizballah Secretary General Hassan Nasrallah has acknowledged the IKRC branch in Lebanon as one of Hizballah's openly-functioning institutions linked to and funded by Iran."

581.    The IKRC-Lebanon held account no. 39144* at LCB in the names of four individuals jointly: "Mohamad Rahme, Sobhi Sakr, Mohamad Al Makhour and Ali Zreik." It was closed in October 2010, two months after the U.S. designation of the organization and director, Ali Hassan Zreik.

582.    Muhammad al-Maqhur (a/k/a Mohamad Al Makhour) also worked for the organization and served as a local Hezbollah official in the Hermel municipality.

583.    Subhi Ali Saqr (a/k/a Sobhi Sakr) serves as the Hezbollah mayor of Hermel.

584.    During the relevant period, Defendant MEAB BANK maintained accounts (including a U.S. dollar-denominated account) and provided financial services to the IKRC-Lebanon.

## 6. WOUNDED ASSOCIATION

585.   The Wounded Association (a/k/a *Muassasat Al-Jarha* / Al-Jarha Association) was registered in Lebanon on October 31, 1992. The organization's stated focus is caring for people wounded in the "Resistance."

586.   The Wounded Association belongs to and is controlled by Hezbollah and serves as a key "safety net" for the families of Hezbollah operatives, providing financial benefits to wounded Jihadists and their familes.

587.   During the relevant period, Defendant FRANSABANK maintained account number 805458023 and provided financial services to the Wounded Association.

588.   The Association's long-standing public affiliation with Hezbollah is well known. For example, the Lebanon-based *Daily Star* published a feature story in 2002 about the Wehbe family that received financial assistance from the Association:

> The purchase of the apartment and all its perks come with compliments from the Al-Jarha (Wounded) Association, which caters to the war-wounded and disabled and is one of the social services provided by Hizbullah.
>
> Established in 1989, the association, located in Beirut's southern suburbs, cares for over 3,000 men, women and children. Eighty percent of the men the association assists were resistance fighters.

589.   The Association was also mentioned in Hezbollah leader Naim Qassem's book, *Hizbullah: The Story from Within.*

## D.   HEZBOLLAH MEDIA

### 1.   LEBANESE COMMUNICATION GROUP

590.   The Lebanese Communication Group was designated an SDGT by the U.S. Department of the Treasury on March 23, 2006. This media holding company is the parent company of Hezbollah's satellite television station *Al-Manar* and its radio station *Al-Nour*. Ali

Muhammad Dahir is the company's director, and Osama Abbas Rahal is listed as the company's attorney.

591.    The following individuals were previously identified as shareholders of the company:

- **Adham Hussein Tabaja** (SDGT);
- **Amin Muhammad Cherri** (SDGT) (brother-in-law of Ahmad Safa, former LCB manager);
- **Sultan Khalifa As'ad**;
- **Muhammad Hassan Raad** (head of Hezbollah's parliamentary bloc);
- **Ali Muhammad Dahir** (listed as director);
- **Kamal Elias Haddad** (listed as director);
- **Ahmed Hadi Mustapha Mazboudi** (listed as director); and
- **Youssef Ismail Zein** (listed as director).

   a. *__Al-Manar__*

592.    *Al-Manar* started broadcasting in 1991 and began satellite broadcasts in 2000.

593.    *Al-Manar* raised funds for Hezbollah through advertisements broadcast on the network and an accompanying website that requested donations for the terrorist organization.

594.    As recently as late 2005, Hezbollah-affiliated charities aired commercials on *Al-Manar*, providing contact information and bank account numbers for donations. Moreover, Hezbollah Secretary General Nasrallah publicized an invitation for all Lebanese citizens to volunteer for Hezbollah military training on *Al-Manar* and *Al-Nour* (discussed below).

595.    The U.S. Department of State added *Al-Manar* to the Terrorism Exclusion List ("TEL") in December 2004.

596.    *Al-Manar* was designated an SDGT by the U.S. Department of the Treasury on March 23, 2006.

### b. *Al-Nour*

597.    *Al-Nour* is Hezbollah's primary radio station. The station started broadcasting on May 9, 1988 and is supported by the IRGC. The station had several names, including: Voice of Islam (*Sawt al-Islam*), Voice of Faith (*Sawt al-Iman*), and Voice of the Oppressed (*Sawt al-Mustadafin*). The station chiefly broadcasts news, but also airs programs with religious content and programs about the lives of terrorists who were killed or captured.

598.    *Al-Nour* was designated as SDGT by the U.S. Department of the Treasury on March 23, 2006.

### 2.    HEZBOLLAH'S *BAQIYAT ALLAH* MAGAZINE

599.    *Baqiyat Allah* Magazine was founded in 1991 as a cultural magazine to be distributed to Hezbollah operatives and commanders.

600.    It is printed by Hezbollah's Dbouk International for Printing and General Trading, which was registered by leading Hezbollah-affiliated attorney Ali Hassan Berro.

601.    Defendant SGBL maintained an account for, and provided financial services to, Dbouk International for Printing and General Trading.

602.    The magazine is supervised by Al-Ma'aref Islamic Cultural Society.

603.    A 2015 issue of the magazine (No. 119) describes Hezbollah's various charitable institutions as part of the "society in resistance."

604.    Among the institutions described in the article are the Islamic Resistance Support Organization, The Martyrs Foundation–Lebanon, The Wounded Association, the Imam Khomenei Relief Foundation, and Jihad al-Bina. The articles emphasize how these institutions are all integral parts of the "Resistance."

### 3.     LEBANESE ARTS COUNCIL

605.    The Lebanese Arts Foundation (a/k/a Risalat) was established in 2006, as a Hezbollah-run cultural institution. It is subordinate to Hezbollah's "Technical Activities" unit (part of the Executive Council, under Hashem Safieddine). Risalat operates exhibitions and offers art courses, lectures and workshops. It is headed by Muhammad Kamal al-Din Kawtharani.

606.    Mleeta Museum (a/k/a "The Tourist Landmark of the Resistance," a/k/a "Museum for Resistance Tourism") is a "war" museum operated by Hezbollah's Executive Council.

607.    The museum was established on May 25, 2010 and aims to "circulate the culture of the resistance and work on building a resisting society; give attention to the ideological, artistic and cultural activities of relevance to the resistance; deepen the concept of martyrdom and explain its role in making life and preserving homeland, territory and sanctities."

608.    The site offers its visitors a chance to see its "spoils of war" exhibitions "gained by the resistance fighters since the beginning of the conflict with the enemy. In addition, information about the Zionist enemy and its different military formations are exhibited."

609.    Other sections of the museum include "The Pathway" – "a trail where thousands of Mujahedeen had positioned during the years of occupation… [and] launched to execute military operations against the opposing enemy outposts, reaching the occupied buffer zone." Another exhibit is titled "The Cave," which the museum states was "built by the resistance fighters for shelter … dug in rotation by more than 1,000 freedom fighters over a span of 3 years."

### E.     HEZBOLLAH'S BUSINESS AFFAIRS COMPONENT (BAC)

610.    The BAC is an international apparatus orchestrating Hezbollah's network of businesses and enterprises across the world, tasked with raising funds for Hezbollah through illicit activities, such as money laundering and drug trafficking, as well as ordinary business

enterprises.[34]

611.　These proceeds are later used for purchasing weaponry and funding the organization's activities in Lebanon, Iraq and Syria.

612.　BAC's apparatus within Hezbollah was founded by Imad Mughniyah but is now headed by Abdallah Safieddine and Adham Tabaja.

613.　According to the DEA, Hezbollah's BAC has developed extensive operational and financial linkages with various drug cartels and money laundering networks across South America:

> Members of the Hizballah BAC have established business relationships with South American drug cartels, such as La Oficina de Envigado, responsible for supplying large quantities of cocaine to the European and United States drug markets. Further, the Hizballah BAC continues to launder significant drug proceeds as part of a trade-based money laundering scheme known as the Black-Market Peso Exchange.

614.　As set forth in granular detail in this Complaint, Hezbollah is a complex organization with many components, but it is ultimately a single, unified entity that serves its central purpose, to wage *jihad* according to its theological principles.

615.　Hezbollah's political leadership works collaboratively with its terrorism directorates, which are – in turn – part and parcel of its network of social welfare institutions and commercial enterprises that are ubiquitous in much of Lebanon and *openly* identify with the terrorist organization.

616.　While the work of the IJO's terror cells is conducted clandestinely, Hezbollah's political, social and commercial activity in Lebanon is conducted *openly* and is well understood by the Defendants, which service the organization's financial and logistical needs.

---

[34]　BAC also aided Hezbollah in other areas such as intelligence-gathering and weapons shipments.

### 1. HEZBOLLAH BAC LEADERSHIP

#### a. <u>Abdallah Ali Safieddine</u>

617.    Abdallah Safieddine is the co-head of Hezbollah's BAC.

618.    Mr. Safieddine is also Hezbollah's longtime Tehran-based envoy to the IRGC and oversees Hezbollah's international drug trafficking networks and operations.

619.    Mr. Safieddine was involved in Iranian officials' access to LCB and key LCB managers, who provide Iran and Hezbollah with banking services (including Eurodollar bank accounts and access to the U.S. financial system). He is also the brother of senior Hezbollah leader Hashem Safieddine, and of Hamzah Safieddine, who represents his brothers' and Hezbollah's interests on the boards of several companies and businesses.

620.    Abdallah Safieddine was designated an SDGT by the U.S. Department of the Treasury on May 17, 2018. He was described by the U.S. Department of the Treasury as "Hizballah's representative to Iran."

621.    He is also closely connected to another senior BAC operative named Muhammad Bazzi, who was designated an SDGT on the same date.

#### b. <u>Adham Hussein Tabaja</u>

622.    Adham Hussein Tabaja is a prominent Hezbollah leader and one of its most important financiers. Alongside Abdallah Safieddine, Mr. Tabaja presides over the BAC and operates an enormous network of well-known companies and businesses, whose proceeds support Hezbollah's terrorist endeavors.

623.    In Lebanon, Mr. Tabaja has been a public figure for decades and is widely known as a leading Hezbollah operative and real estate mogul, standing at the forefront of Hezbollah's leading projects from building hospitals and schools to public works projects to a series of

amusement parks and entertainment projects.

624. For these reasons, Mr. Tabaja himself, his company, Al-Inmaa Group for Tourism Works, and its subsidiaries Al-Inmaa Engineering and Contracting SARL and Al-Inmaa for Entertainment and Leisure Projects, were all designated SDGTs by the U.S. Department of the Treasury on June 10, 2015.

625. Al-Inmaa Group's subsidiary Al-Inmaa Engineering and Contracting SARL is one of the largest and most successful real estate companies in Lebanon. It has been used by Hezbollah as an "investment mechanism" and has provided Hezbollah with financial and organizational infrastructure for its real estate investment, construction, and money laundering requirements.

626. According to the U.S. Department of the Treasury, "Tabaja maintains direct ties to senior Hizballah organizational elements, including the terrorist group's operational component, the Islamic Jihad, and holds properties in Lebanon on behalf of the group."[35]

627. As a prominent Hezbollah leader, Adham Tabaja was the elected mayor of Kfar Tibnit (located in the Nabatiyeh district in South Lebanon) until his recent resignation in 2017 as a result of his designation as an SDGT.

628. Mr. Tabaja's successor as mayor is also a Hezbollah operative.

629. Adham Tabaja is an investor and holds key positions in a wide variety of Hezbollah commercial enterprises, which together form the "Tabaja Network." These entities also share common shareholders and officers, many of whom are U.S.-designated terrorist entities or individuals.

630. Mr. Tabaja first became an LCB customer in 1998.

---

[35] In 2009, Adham Tabaja bought a $27 million U.S. dollars plot of land in Lebanon. The deal was negotiated in meetings that took place at LCB's offices. According to a 2017 official report issued by the Lebanese General Directorate of Land Registry & Cadastre, Adham Tabaja is also linked to Defendant MEAB regarding the following properties in Lebanon: Ras Beirut 3361 Section 27 Block A and Nabatieh al-Tahta 688.

631.     Mr. Tabaja and his uncle Ahmad Ali Tabaja and other members of the "Tabaja Network" have owned dozens of properties across Lebanon that they have used as collateral to borrow large sums of money from Defendants to finance their operations.

632.     For example, on December 1, 2007, Adham Hussein Tabaja and Ahmad Ali Tabaja took a $1.3 million mortgage on a property they jointly owned (No. 177 J6, al-Hadath) from Defendant LEBANON AND GULF BANK.

633.     Defendant MEAB BANK has lent Mr. Tabaja and the "Tabaja Network" more than $10 million to finance their projects.

634.     On April 23, 2019 the U.S. government's "Rewards for Justice" Program announced a reward of up to $10 million "for information leading to the disruption of the financial mechanisms of Lebanese Hizballah."

635.     The announcement described Mr. Tabaja as a "Hizballah member who maintains direct ties to senior Hizballah organizational elements, including the terrorist group's operational component, Islamic Jihad. Tabaja also holds properties in Lebanon on behalf of the group."

636.     Adham Tabaja controls a vast network of companies in Lebanon (and Iraq) on Hezbollah's behalf that encompasses everything from real estate development to engineering to large entertainment projects to insurance.

637.     Mr. Tabaja's corporate holdings in Iraq provided Hezbollah with commercial cover for the movement of both money and personnel in and out of Iraq.

638.     For example, Mr. Tabaja is affiliated with Trust Compass Insurance SAL (previously Compass Insurance Company SAL).

639.     The chairman of Trust Compass Insurance is Ahmad Ali Tabaja, Adham's uncle.

640.     Adham's aunt also sits on the company's board.

641. The company insures, among other things, various hospitals and clinics owned by Hezbollah and its Martyrs Foundation (SDGT).

642. Trust Compass Insurance also owns a significant stake in Adham Tabaja's company – Fun World Company SAL.

643. Trust Compass Insurance was also a significant investor in LCB before the bank's legal difficulties precipitated its sale to SGBL.

644. Trust Compass Insurance maintained accounts at Defendants SGBL (Chtaura Branch), MEAB BANK (Main Branch) and BANK OF BEIRUT.

645. Adham Tabaja, his uncle Ahmad Tabaja, and Trust Compass Insurance, were also involved together in Nest Contracting Company SAL (discussed below).

646. Mr. Tabaja and his Al-Inmaa group of companies (discussed below) are widely known and acknowledged to be affiliated with Hezbollah. For example, at the 2012 opening of a newly-constructed "Hall of the Martyr Sayyid Muhammad Baqir al-Sadr," one of Hezbollah's most senior leaders, Hashem Safieddine (brother of Abdallah Safieddine), honored and publicly thanked Al-Inmaa Engineering and Contracting SARL, Meamar Company for Engineering and Development SARL, and Arch Consulting SARL for their contributions to the project.

647. Mr. Tabaja controls the following companies within the Hezbollah BAC network in Lebanon:

- **Al-Inmaa Group for Tourism Works** (SDGT) (and its subsidiaries). This company, founded in May 2006, provides travel and tourism services and operates amusement parks. The following individuals were involved with the company:

  o Adham Hussein Tabaja (SDGT) was listed as a co-founder, partner and authorized signatory of the company;
  o Issam Ahmad Saad (SDGT) was listed as an authorized signatory,

co-founder, and partner of the company;[36]

- o Imad Ramez Wazani (a/k/a Wazne) was listed as an authorized signatory, co-founder, and partner of the company; he was listed as a co-founder of at least six other Tabaja companies;
- o Muhammad Taha Jumaa was listed as an authorized signatory, co-founder, and partner of the company;
- o Ibrahim Waked Issa was listed as a co-founder and partner of the company;
- o Nabil Mahmoud Assaf (SDGT) was listed as a co-founder and partner of the company;
- o Hassan Muhammad Attiya was listed as a co-founder and partner of the company;
- o Attallah Jamil Shaito was listed as a co-founder and partner of the company;[37] and
- o Ali Hussein al-Ashi was listed as the attorney for the company.

Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES maintained an account for and provided financial services to Al-Inmaa Group for Tourism Works.

- **Al-Inmaa Engineering and Contracting SARL** (SDGT). This company is a subsidiary of Al-Inmaa Group for Tourism Works and provides construction services. It was established in Lebanon in 1991 but later operated in Iraq on Hezbollah's behalf. The following individuals were involved with the company:

- o Adham Hussein Tabaja (SDGT) was listed as manager, partner, co-founder and authorized signatory of the company;
- o Issam Ahmad Saad (SDGT) was listed as an authorized signatory, co-founder, and partner of the company;
- o Ibrahim Waked Issa was listed as co-founder, partner and authorized signatory of the company;
- o Muhammad Taha Jumaa was listed as an authorized signatory, co-founder and partner of the company;
- o Imad Ramez Wazani was listed as a co-founder and partner of the company;
- o Attallah Jamil Shaito was listed as a co-founder and partner of the company;
- o Nabil Mahmoud Assaf (SDGT) was listed as a co-founder and partner of the company;

---

[36]    Mr. Tabaja and his business partners took out a $3 million mortgage with Defendant FENICIA BANK on a property (3086 No. 7 Ras Beirut) owned by Issam Ahmad Saad.

[37]    Attallah Jamil Shaito (a/k/a Shai'tu or Cheaito) is a prominent member of the Tabaja Network and holds various positions in companies directly owned by Adham Tabaja. Additionally, he is a politician from South Lebanon, and has run for a seat in a Hezbollah-supported list in the Lebanese elections of 2004. In 2010, he was elected president of Bint Jbeil District's Municipalities' Federation.

- o Hassan Muhammad Attiya was listed as a co-founder and partner of the company;
- o Jihad Muhammad Qansu (SDGT) was listed as the financial manager of the company;
- o Abdul Latif Saad (SDGT) was listed as manager of the Baghdad branch of the company;
- o Ali Hussein al-Ashi was listed as the attorney for the company;
- o Muhammad al-Mukhtar Fallah Kallas (SDGT) was listed as an accountant of the company; and
- o Muhammad Badr al-Din (SDGT, brother of Mustafa Badr al-Din) was listed as manager of the Basra branch.

Defendants SGBL, FENICIA BANK, MIDDLE EAST AFRICA BANK, LEBANON AND GULF BANK SAL, BANQUE LIBANO-FRANÇAISE and BANK OF BEIRUT AND THE ARAB COUNTRIES maintained accounts for and provided financial services to Al-Inmaa Engineering and Contracting SARL.

- **Al-Inmaa for Entertainment and Leisure Projects** (SDGT), a subsidiary of Al-Inmaa Group for Tourism Works.

- **Family Park SARL**, an amusement park, which is a subsidiary of Al-Inmaa for Entertainment and Leisure Projects (SDGT). The following individuals were involved with the company:

  - o Issam Ahmad Saad (SDGT) was listed as a partner and authorized signatory of the company;
  - o Raed Hashem al-Amin was listed as a partner of the company;
  - o Ali Rauf Shaito was listed as a partner of the company;
  - o Rauf Ali Shaito was listed as a partner and authorized signatory of the company; and
  - o Attallah Jamil Shaito was listed as a partner and authorized signatory of the company.

LCB maintained account no. 110544* and provided financial services to Family Park SARL.

- **Car Care Center** (SDGT), which trades in new and used cars, and is a subsidiary of Al-Inmaa Group for Tourism Works. The company was designated by the U.S. Department of the Treasury on June 2015 for its ties with Hezbollah. Former manager of Car Care Center, Hussein Ali Faour (SDGT), worked with Adham Hussein Tabaja to manage Al-Inmaa's projects in Iraq. Car Care Center is one of the most important companies Hezbollah established. The company was located in a compound Hezbollah owned in south Beirut and was secured by Hezbollah personnel. According to the U.S. Department of the

Treasury, Car Care Center is "a front company based in Lebanon that supports Hizballah's transportation needs." The following individuals were involved with the company:

- o Hussein Ali Faour (SDGT) was listed as a co-founder, partner and authorized signatory of the company;
- o Ali Saleh Shuaib was listed as a co-founder of the company;
- o Batoul Hussein Faour was listed as a co-founder and partner of the company;
- o Abdallah Hassan Romani was listed as a partner of the company; and
- o Faruq Muhammad Raef Hammoud was listed as the attorney for the company.

Defendant BLOM BANK maintained an account for and provided financial services to Car Care Center.

- **Nest Contracting Company SAL**. This construction and real estate company was established in 1996 and its initial capitalization was deposited at Defendant MEAB BANK. It appears to have wound down in 2016. The following individuals and companies were involved in the ownership and management of the company:

  - o Adham Hussein Tabaja (SDGT) was listed as owning 49% of the company's shares and serving as a director of the company;
  - o Ahmad Tabaja was listed as owning nominal shares in the company but serving as its chairman and general manager; and
  - o Trust Compass Insurance SAL was listed as the owner of 50% of the company's shares.

Defendant MEAB BANK maintained an account for, provided financial services to, and served as main banker of Nest Contracting Company SAL.

- **Cooperative Al-Wafaa SARL**. The company owned and operated minimarts, selling food, beverages and tobacco products. The following individuals and companies were involved in the ownership and management of the company:

  - o Adham Hussein Tabaja (SDGT) was listed as a shareholder in the company and as one of its co-founders;
  - o Raouf Ali Shaito was listed as a shareholder in the company and as one of its co-founders and a managing partner;
  - o Ghassan Muhammad Shaito was listed as a shareholder in the company and as one of its managing partners; and
  - o Ahmad Tabaja was listed as a shareholder in the company.

Defendant BLOM BANK maintained an account for, provided financial services to, and served as main banker of Cooperative Al-Wafaa SARL.

- **Golden Hall**. The company owns and operates a bowling alley and billiards / gaming center. The following individuals were involved with the company:

  o Adham Hussein Tabaja (SDGT) was listed as a co-founder, partner and authorized signatory of the company;
  o Imad Ramez Wazani was listed as a co-founder, partner and authorized signatory of the company;
  o Attiya Muhammad Abbas (Adham Tabaja's wife) was listed as a co-founder and partner of the company;
  o Rita Hassam Abu Samra was listed as a co-founder and partner of the company; and
  o Ahmad Saad was the company's manager until 2011.

- **Trading Development Company SARL**. The following individuals were involved with the company:

  o Adham Hussein Tabaja (SDGT) was listed as a co-founder of the company;
  o Imad Ramez Wazani was listed as a co-founder of the company;
  o Attallah Jamil Shaito was listed as a co-founder of the company;
  o Muhammad al-Mukhtar Fallah Kallas (SDGT) was listed as the director, partner and authorized signatory of the company;
  o Yasser Ibrahim Issa was listed as co-founder, partner and authorized signatory of the company; and
  o Naji Tawfiq al-Mazzawi was listed as a partner of the company.

- **Family House SARL**. The company operates an amusement center, health club, and restaurants. When it was established in 2007, the company's initial capital was deposited at Defendant LEBANON AND GULF BANK. The following individuals were involved with the company:

  o Adham Hussein Tabaja (SDGT) was listed as a managing partner, director, co-founder and authorized signatory of the company;
  o Hassan Muhammad Attiya was listed as a 30 percent partner and co-founder of the company;
  o Imad Ramez Wazani was listed as a managing partner, co-founder, director and authorized signatory of the company;
  o Zaher Ismail al-Zayek (a/k/a Lezayk) was listed as a partner, majority shareholder and co-founder of the company;
  o Ahmad Saad was listed as the general manager of the company; and

- Ali Hussein al-Ashi was listed as the attorney for the company.

Defendant FENICIA BANK maintained an account for and provided financial services to Family House SARL.

- **Fun World Company** (a/k/a Aalam al-Marah Co SAL). The company operates a well-known amusement park in Beirut. The following entities and individuals were involved with the company:

  - Adham Hussein Tabaja (SDGT) was listed as a co-founder of the company;
  - Abbas Musallam Wahbah was listed as a shareholder and board member of the company;
  - Issam Ahmad Saad (SDGT) was listed as a co-founder of the company;
  - Muhammad Taha Jumaa was listed as a co-founder of the company;
  - Imad Ramez Wazani was listed as a co-founder of the company;
  - Ali Hussein al-Ashi is the attorney for the company;
  - Fadi Ali Hawi was listed as the chairman, majority shareholder and authorized signatory of the company;
  - Ali Muhammad Qubaysi is the statutory auditor of the company;
  - Hassan Mussa Awada was listed as a co-founder, board member and shareholder of the company; and
  - Trust Compass Insurance was listed as a shareholder of the company.

Prior to its closure in 2011 as part of Defendant SGBL's acquisition, LCB maintained account no. 110553* and provided financial services to Fun World. When the account was forced to close, the account balance migrated to an account at Defendant FENICIA BANK.

- **Farah Travels Company SARL (a/k/a Farah Company for Tourism)**. The company was established in August 2001. The following individuals were involved with the company:

  - Adham Hussein Tabaja (SDGT) was listed as the director, partner and authorized signatory of the company;
  - Abbas Ahmad Fahas was listed as a partner of the company;
  - Issam Ahmad Saad (SDGT) was listed as a partner of the company;
  - Ali Hussein Tabaja (brother of Adham Tabaja) was listed as a partner of the company; and
  - Nada Hassan Hijazi was listed as a partner of the company.

LCB maintained an account for Farah Travels Company SARL and extended it credit knowing that it was a subsidiary of Yousser Company for Finance and Investment (SDGT), a Hezbollah finance company.

- **City Park SARL**. The following individuals were involved with the company:

  - Adham Hussein Tabaja (SDGT) was listed as a co-founder and partner of the company;
  - Abbas Ahmad Fahs was listed as a co-founder, managing director, partner and authorized signatory of the company;
  - Nada Hassan Hijazi was listed as a co-founder and partner of the company;
  - Issam Ahmad Saad (SDGT) was listed as a co-founder and partner of the company;
  - Romel Hussein Tabaja (brother of Adham Tabaja) was listed as a co-founder and partner of the company; and
  - Butrus Michel Ghanimah was listed as the attorney for the company.

  Defendant FENICIA BANK maintained an account for and provided financial services to City Park SARL.

- **Fantasy World SARL**. This company which appears to have been established in 1999 owns and operates an amusement park and restaurant in Dahiya. It is widely known as a Hezbollah project and meeting place. The following individuals were involved with the company:

  - Adham Hussein Tabaja (SDGT) was listed as the director, co-founder, board member, authorized signatory and partner of the company;
  - Romel Hussein Tabaja was listed as a co-founder of the company;
  - Amin Muhammad Cherri (SDGT) was listed as a co-founder of the company;
  - Raouf Ali Shaito was listed as a co-founder of the company;
  - Muhammad Amin Badr al-Din (SDGT) was listed as a co-founder of the company;
  - Imad Muhammad Cherri was listed as a co-founder and partner of the company;
  - Ali Adham Tabaja was listed as a partner of the company;
  - Muhammad Adham Tabaja (Adham Tabaja's son) was listed as a partner of the company; and
  - Ali Hussein al-Ashi was listed as the attorney for the company.

When the U.S. Department of the Treasury recently designated Amin Muhammad Cherri (a/k/a Sherri), it noted that: "Sherri has maintained a close relationship with Adham Tabaja, a Hizballah financier, whom OFAC designated as an SDGT in June 2015 for providing support and services to Hizballah. Sherri and Tabaja have continued to do business

together despite the latter's designation. Sherri and Tabaja, among others, founded and were involved in a Lebanon-based company. Sherri also facilitated Tabaja's access to Lebanese banks and was directed by Hizballah Secretary General Nasrallah to settle issues related to his designation."[38]

LCB held account no. 70167* for Fantasy World SARL. Three individuals were authorized to borrow funds from LCB on behalf of the company: Raouf Ali Shaito, Adham Tabaja and Amine Cherri. The company's account was closed in September 2011. According to the Lebanese government, the account migrated to Defendant LEBANON AND GULF BANK and another bank.

In addition, Defendants SGBL, MEAB BANK and FENICIA BANK each maintained an account for and provided financial services to Fantasy World SARL. Defendant SGBL served as its main banker.

- **Technoplast Industrial & Trading Company SARL**. The company was established in 1994 and manufactured rubber and plastic products. The following individuals were involved in the ownership of the company:

  o Adham Hussein Tabaja (SDGT) held a 20 percent stake and was a co-founder of the company;
  o Amin Muhammad Cherri (SDGT) held a 20 percent stake and was a co-founder of the company;
  o Muhammad Amin Badr al-Din (SDGT) held a 20 percent stake, was a co-founder and served as managing partner of the company; and
  o Khalil Abdel Hussein Cherri held a 10 percent stake, was a co-founder and served as managing partner of the company.

- **Madan Tourism Projects Company SAL** (a/k/a "Green City"; Moudon SAL). The company was established in Maaroub, Lebanon in 1993. The following individuals were involved with the company:

  o Adham Hussein Tabaja (SDGT) was listed as a co-founder and member of the Board of Directors of the company;
  o Salah Abd al-Rauf Izz al-Din was listed as a board member of the company;
  o Hassan Mussa Awada was listed as a board member of the company (as well as a co-founder of Fun World);

---

[38]    *Treasury Targets Iranian-Backed Hizballah Officials for Exploiting Lebanon's Political and Financial System* (U.S. Department of the Treasury, July 9, 2019), online at https://home.treasury.gov/news/press-releases/sm724.

- o Hassan Abd al-Muttalib Fneish (brother of Hezbollah operative Muhammad Fneish) was listed as a co-founder and board member of the company;
- o Youssef Muhammad Hussein Faour was listed as the director, chairman, co-founder and authorized signatory of the company; and
- o Ali Hussein al-Ashi was listed as the attorney for the company.

- **Global Cleaners SARL** (SDGT). The company operated in Iraq in the waste management business and provided Hezbollah with an operational base in Baghdad. The following individuals were involved with the company:

  - o Adham Hussein Tabaja (SDGT) was listed as owner and manager of the company;
  - o Issam Ahmad Saad (SDGT) was listed as a partner and authorized signatory of the company;
  - o Maitham Muhsin Ubayd al-Zaydi was listed as a co-founder, partner and authorized signatory of the company;
  - o Shibl Muhsin Ubayd al-Zaydi (SDGT) was listed as a partner and co-founder of the company;
  - o Muhammad Adham Tabaja was listed as a partner of the company;
  - o Adnan Hussein Kawtharani (SDGT) was listed as a partner of the company;
  - o Hassan Muhammad Faour was listed as the attorney for the company;
  - o Ahmad Jawad Shalash al-Fartusi was listed as a co-founder of the company; and
  - o Raed Hamid Taher Abu Eini was listed as a co-founder of the company.

- **United Company for Insurance Services SARL**. The company provides insurance and pension funding. The following individuals were involved with the company:

  - o Muhammad Taha Jumaa was listed as a co-founder of the company;
  - o Adham Hussein Tabaja (SDGT) was listed as a co-founder and managing director of the company; and
  - o Taleb Muhammad Ali Abou-Zeinab was listed as a co-founder and managing director of the company.

  Defendant BANQUE LIBANO-FRANÇAISE maintained an account for and provided financial services to United Company for Insurance Services SARL.

648.    In addition to the companies listed above, the Tabaja Network consists of many

more companies affiliated with Adham Tabaja, his family, and/or his companies, but that are not directly headed by him, including the following entities:

- **Al-Yaqout Restaurant** is an affiliated company of City Park SARL and Fantasy World SARL along with Farah Travels Company SARL, Fun World Company, Medical Cooperation Co SAL, Development Group for Touristic Projects SARL, Family House SARL, and Al-Inmaa for Engineering and Contracting SARL.

- **Medical Cooperation Co SAL** (a/k/a Al Taaoun Medical SAL; Al-Khiam Hospital SAL; Al Khiyam Hospital) is part of the Tabaja network. The following individuals were involved with the company:

  o Adham Hussein Tabaja (SDGT) was listed as owning 515 shares and serving as a director of the company;
  o Issam Ahmad Saad (SDGT) was listed as owning 480 shares and serving as a director of the company;
  o Imad Ramez Wazani was listed as a director of the company; and
  o Ali Abdel Reda Hassan was listed as owning 995 shares and serving as the chairman and general manager of the company.

  Defendant FENICIA BANK maintained an account for and provided financial services to Medical Cooperation Co SAL.

- **New Land SARL**. The company appears to have been established in 2008. The following individuals were involved with the company:

  o Imad Ramez Wazani was listed as the director, co-founder, partner and authorized signatory of the company;
  o Tareq Ali Hawi was listed as a co-founder and partner of the company;
  o Nabil Mahmoud Assaf (SDGT) was listed as a co-founder and partner of the company;
  o Ahmad Saad was listed as human resources manager of the company; and
  o Ali Hussein al-Ashi was listed as the attorney for the company.

  Prior to its closure in 2011 as part of Defendant SGBL's acquisition, LCB maintained account no. 28681* and provided financial services to New Land SARL. According to the Lebanese government, New Land SARL's account balance migrated to accounts at Defendants FENICIA BANK and MEAB BANK.

- **Gresco for Contracting and Trading Company SARL**. The following individuals were involved with the company:

- o Muhammad Taha Jumaa was listed as a co-founder, partner and authorized signatory of the company;
- o Ibrahim Waked Issa was listed as a co-founder, partner and authorized signatory of the company;
- o Attallah Jamil Shaito was listed as a co-founder, partner and authorized signatory of the company;
- o Abd al-Karim Ahmad Saad was listed as a co-founder and partner of the company; and
- o Ali Hussein al-Ashi was listed as the attorney for the company.

- **Sanabel for Urban Studies and Architectural Design SAL**. The following individuals were involved with the company:

  - o Jihad Muhammad Qansu (SDGT) was listed as the chairman and statutory auditor of the company;
  - o Ali Hussein al-Haj was listed as a shareholder, co-founder and authorized signatory of the company;
  - o Adnan Abd al-Halim Mahdi was listed as a shareholder, co-founder and board member of the company;
  - o Rafat Said Yunis was listed as a shareholder, co-founder and board member of the company;
  - o Fadi Dawud al-Nimr was listed as a shareholder, co-founder and board member of the company; and
  - o Ali Hassan Berro was listed as the attorney for the company.

- **Al-Inmaa General Contractors SARL**. The following individuals were involved with the company:

  - o Ibrahim Waked Issa was listed as a co-founder, authorized signatory and partner of the company;
  - o Attallah Jamil Shaito was listed as a co-founder, authorized signatory and partner of the company;
  - o Haidar Saadallah Zgheib was listed as a co-founder, authorized signatory and partner of the company; and
  - o Ali Hussein al-Ashi was listed as the attorney for the company.

- **King Company for Manufacturing Trading Building Materials SARL**. The following individuals were involved with the company:

  - o Ibrahim Waked Issa was listed as an authorized signatory, co-founder and partner of the company;
  - o Ali Muhammad Qansu (SDGT) was listed as an authorized signatory of the company;
  - o Mahdi Ali Awada was listed as an authorized signatory, co-founder and partner of the company;

- Muhammad Ahmad Farhat was listed as an authorized signatory of the company;
- Muhammad Fayyad Jafal was listed as a co-founder of the company; and
- Ali Adham Tabaja was listed as a partner of the company.

- **Development Studies SARL**. The following individuals were involved with the company:

  - Nabil Mahmoud Assaf (SDGT) was listed as the director, co-founder, partner and authorized signatory of the company;
  - Issam Ahmad Saad (SDGT) was listed as a co-founder and partner of the company;
  - Hassan Muhammad Attiya was listed as the director, co-founder, partner and authorized signatory of the company;
  - Ahmad Izzat Khalil Muhammad was listed as the director, co-founder, partner and authorized signatory of the company;
  - Zinab Muhammad Saraeb was listed as a co-founder and partner of the company; and
  - Ali Hussein al-Ashi was listed as the attorney for the company.

- **Alia Company SAE**. The following individuals were involved with the company:

  - Nabil Mahmoud Assaf (SDGT) was listed as an authorized signatory, co-founder and partner of the company;
  - Zaher Hassan Dabuq was listed as an authorized signatory and co-founder of the company;
  - Yasser Hassan Dabuq was listed as an authorized signatory and co-founder of the company;
  - Muhammad Adham Tabaja was listed as an authorized signatory, co-founder and partner of the company;
  - City Food Company SARL was listed as a partner of the company; and
  - Ali Hussein al-Ashi was listed as the attorney for the company.

- **Farah Tyre Company**. The following individuals were involved with the company:

  - Hassan Muhammad Attiya was listed as an authorized signatory, co-founder and partner of the company;
  - Ali Hussein Tabaja was listed as an authorized signatory, co-founder and partner of the company;[39]
  - Abbas Musallam Wahbah was listed as a co-founder and partner of

---

[39] Defendant MEAB took over Mr. Tabaja's shares in the company.

the company; and
- o Ali Hussein al-Ashi was listed as the attorney for the company.

- **Cheaito Group SARL**. The following individuals were involved with the company:

  - o Attallah Jamil Shaito was listed as an authorized signatory and partner of the company;
  - o Ahmad Muhammad Shaito was listed as an authorized signatory and co-founder of the company;
  - o Fairuz Khalil Shaito was listed as a co-founder and partner of the company;
  - o Attallah Khalil Shaito was listed as a co-founder of the company;
  - o Najah Khalil Shaito was listed as a co-founder and partner of the company;
  - o Zainab Khalil Shaito was listed as a co-founder and partner of the company; and
  - o Hisham Ali Faqih was listed as the attorney for the company.

- **Lebanese Bread & Confectionery Company SAL**. The following individuals were involved with the company:

  - o Hassan Muhammad Attiya was listed as general director, chairman, shareholder, co-founder and authorized signatory of the company;
  - o Bassam Muhammad Tabaja was listed as vice-chairman, board member, co-founder, shareholder and authorized signatory of the company;
  - o Jihad Muhammad Qansu (SDGT) was listed as statutory auditor of the company;
  - o Ahmad Mustafa Mahmoud Hammoud was listed as a shareholder, co-founder and board member of the company; and
  - o Ali Hussein al-Ashi was listed as the attorney for the company.

- **African Fish Company (Offshore) SAL**. The following individuals were involved with the company:

  - o Jihad Muhammad Qansu (SDGT) was listed as a co-founder of the company;
  - o Ali Muhammad Qansu (SDGT) was listed as statutory auditor of the company;
  - o Muhammad Abdallah al-Amin (SDGT) was listed as a co-founder of the company;
  - o Ahmad Muhammad Makke was listed as general director, chairman, shareholder, and authorized signatory of the company;
  - o Khalil Hassan Faqih was listed as a shareholder, co-founder and board member of the company;

- o Muhammad Khadir Mattar was listed as a shareholder and board member of the company; and
- o Faruq Muhammad Raef Hammoud was listed as the attorney for the company.

- **Africa Invest Company (Offshore) SAL**. The following individuals were involved with the company:

  - o Jihad Muhammad Qansu (SDGT) was listed as a co-founder of the company;
  - o Muhammad Abdallah al-Amin (SDGT) was listed as the chairman, shareholder, co-founder and authorized signatory of the company;
  - o Roland Amin Madi was listed as statutory auditor of the company;
  - o Khalil Hassan Faqih was listed as a shareholder and board member of the company;
  - o Ali Khalil Faqih was listed as a shareholder and board member of the company;
  - o Hassan Said Farran was listed as a co-founder of the company; and
  - o Malik Jamil al-Sayyed was listed as the attorney for the company.

- **Farah Trading Company for Iron & Building Materials SAE**. The following individuals were involved with the company:

  - o Ali Hussein Tabaja was listed as an authorized signatory and partner for the company;
  - o Muhammad Ali Hawi was listed as an authorized signatory and partner for the company;
  - o Ibrahim Waked Issa was listed as an authorized signatory and partner for the company;
  - o Batul Adham Tabaja (Adham Tabaja's daughter) was listed as a partner of the company;
  - o Fatima al-Zahra Adham Tabaja (Adham Tabaja's daughter) was listed as a partner of the company; and
  - o Wala Tabaja (Adham Tabaja's daughter) was listed as a partner of the company.

- **King Charcoal SARL**. The following individuals were involved with the company:

  - o Ali Hussein Tabaja was listed as an authorized signatory and partner of the company;
  - o Muhammad Adham Tabaja (son of Adham Tabaja) was listed as an authorized signatory and partner of the company; and
  - o Hussein Abd al-Rida Tabaja was listed as an authorized signatory and partner of the company.

- **Béton Plus SAL**. The company was established in 2007 and purportedly was engaged in construction. The following individuals were involved with the company:

  o Salah Abd al-Rauf Izz al-Din (SDGT), a business associate of Adham Tabaja, was listed as the founder of the company; and
  o Osama Abbas Ramal was listed as the attorney of the company.

  Defendant BLOM BANK maintained an account for and provided financial services to Béton Plus SAL.

649. The following individuals were designated as SDGTs by OFAC as a result of their connections with Adham Hussein Tabaja:

- **Hussein Ali Faour** worked with Adham Tabaja to secure Al-Inmaa Engineering and Contracting SARL (SDGT) projects in Iraq. Mr. Faour is a member of Hezbollah's Islamic Jihad Organization and was listed as the co-founder, partner and authorized signatory for Hezbollah's Car Care Center (SDGT).

- **Muhammad al-Mukhtar Kallas** provided financial services to Adham Tabaja through his work as an accountant for SDGT Al-Inmaa Engineering and Contracting SARL.

- **Shibl Muhsin Ubayd al-Zaydi** facilitated money transfers from Iraq to Lebanon on behalf of Adham Tabaja. Mr. al-Zaydi was listed as a partner and co-founder of SDGT Global Cleaners SARL. He had longstanding operational ties to Abu Mahdi al-Muhandis (discussed below) and in 2014 became Secretary General of Kata'ib al-Imam Ali, an Iranian proxy militia in Iraq.

- **Muhammad Abdallah al-Amin** assisted Adham Tabaja in concealing funds and circumventing the impact of sanctions.[40]

- **Muhammad Noureddine** used his company Trade Point International SARL (SDGT) in order to provide financial services to Adham Tabaja and his company Al-Inmaa Engineering and Contracting SARL (SDGT).

- **Hamdi Zaher El Dine**, an employee of SDGT Trade Point International SARL, transferred funds to Adham Tabaja and to employees of Al-Inmaa Engineering and Contracting SARL (SDGT).

---

[40] Muhammad Abdallah al-Amin was listed as the chairman of Aya SAL Offshore, S.I.M. SAL Offshore and was affiliated with more than a dozen companies. He held account no. 170881* at LCB until August 2011.

- **Youssef Hashim** oversaw Hezbollah operations in Iraq and arranged for the security and protection of Adham Tabaja inside Iraq.

- **Jihad Muhammad Qansu** provided financial services to Adham Tabaja through his work as a financial manager for Al-Inmaa Engineering and Contracting SARL (SDGT). Mr. Qansu assisted Adham Tabaja in accounting matters.

- **Ali Muhammad Qansu** maintained millions of dollars in bonds for Adham Tabaja.

- **Issam Ahmad Saad** was listed as co-founder, partner and authorized signatory for Al-Inmaa Engineering and Contracting SARL (SDGT).

- **Nabil Mahmoud Assaf** was listed as a co-founder and partner in Al-Inmaa Engineering and Contracting SARL (SDGT).

- **Abdul Latif Saad** was listed as the manager of Al-Inmaa Engineering and Contracting SARL – Baghdad Branch (SDGT), and as such coordinated with Car Care Center (SDGT) and Global Cleaners SARL (SDGT) – both companies were affiliated with Adham Tabaja's Al-Inmaa Group for Tourism Works (SDGT).

- **Muhammad Badr al-Din** was the manager of Al-Inmaa Engineering and Contracting SARL – Basra Branch (SDGT) in Iraq.

- **Muhammad Ibrahim Bazzi** provided funds to Adham Tabaja and held a joint line of credit together with Mr. Tabaja.

- **Ali Youssef Charara** (SDGT) worked together with Adham Tabaja on oil ventures in Iraq.

650.     Adham Hussein Tabaja also held a personal account at LCB (no. 70306) which was closed in June 2012.

651.     According to the Lebanese government, Mr. Tabaja's personal account migrated to Defendant LEBANON AND GULF BANK.

652.     Below is a partial list of Tabaja Network individuals and companies and the Defendants that maintained accounts for them and provided them with financial services:

| Adham Tabaja Corporate Network | Bank |
|---|---|
| **Trust Compass Insurance SAL** | <ul><li>SGBL</li><li>MEAB BANK</li><li>BANK OF BEIRUT</li></ul> |
| **Al-Inmaa Group for Tourism Works** | <ul><li>BANK OF BEIRUT AND THE ARAB COUNTRIES</li></ul> |
| **Al-Inmaa Engineering and Contracting** | <ul><li>SGBL</li><li>MEAB BANK</li><li>LEBANON AND GULF BANK</li><li>BANQUE LIBANO-FRANÇAISE</li><li>BANK OF BEIRUT AND THE ARAB COUNTRIES</li><li>FENICIA BANK</li></ul> |
| **Family Park SARL** | <ul><li>LCB</li></ul> |
| **Car Care Center** | <ul><li>BLOM BANK</li></ul> |
| **Nest Contracting Company SAL** | <ul><li>MEAB BANK</li></ul> |
| **Cooperative al-Wafaa SARL** | <ul><li>BLOM BANK</li></ul> |
| **Family House SARL** | <ul><li>LEBANON AND GULF BANK</li><li>FENICIA BANK</li></ul> |
| **Fun World Company SAL** | <ul><li>LCB</li><li>FENICIA BANK</li></ul> |
| **City Park SARL** | <ul><li>FENICIA BANK</li></ul> |
| **Farah Company for Tourism (Farah Travels Company SARL)** | <ul><li>LCB</li></ul> |
| **Fantasy World SARL** | <ul><li>LCB</li><li>SGBL</li><li>LEBANON AND GULF BANK</li><li>MEAB BANK</li><li>FENICIA BANK</li></ul> |
| **Medical Cooperation Co SAL** | <ul><li>FENICIA BANK</li></ul> |
| **New Land SARL** | <ul><li>LCB</li><li>MEAB BANK</li><li>FENICIA BANK</li></ul> |
| **Béton Plus SAL** | <ul><li>BLOM BANK</li></ul> |
| **United Company for Insurance Services SARL** | <ul><li>BANQUE LIBANO-FRANÇAISE</li></ul> |
| **Adham Hussein Tabaja** | <ul><li>LCB</li><li>LEBANON AND GULF BANK</li><li>MEAB BANK (mortgage lender)</li></ul> |
| **Muhammad Abdallah al-Amin** | <ul><li>LCB</li></ul> |

### c. **Sultan Khalifa As'ad**

653.     Sultan Khalifa As'ad is a prominent and longstanding Hezbollah leader and financier who serves as Deputy Chairman of the Executive Council for Municipal Affairs for Hezbollah and formerly headed Hezbollah's Finance Unit.

654.     He was the founder of Hezbollah's construction arm, Jihad al-Bina, and one of its main front companies, the Meamar Company for Engineering and Development SARL.

655.     Both are closely tied to and effectively agents of the IRGC-QF.

656.     Sultan Khalifa As'ad wrote a chapter in a book dedicated to the memory of IRGC-QF General Hassan Shateri, who was killed in Syria (discussed below).

657.     Mr. As'ad was also a co-founder and partner of Hezbollah's think tank, the Consultative Center for Studies and Documentation.

658.     Mr. As'ad was also a founder and early shareholder in the Lebanese Communication Group (SDGT), the parent company of Hezbollah's satellite television station and SDGT, *Al-Manar*.

659.     Mr. As'ad owns several properties associated with Hezbollah, including the building that houses the Lebanese Arts Association – Risalat, one of Hezbollah's leading cultural institutions.

660.     Mr. As'ad is also the largest shareholder (together with Sobhi Mohamed Saqr) in Compu House SARL, a Hezbollah-controlled company serving as a wholesale and retail seller of computers and software.

661.     LCB and Defendants FRANSABANK and BANK OF BEIRUT maintained accounts for and provided financial services to Compu House SARL.

662.     In addition to his shareholdings in Compu House SARL, Sobhi Mohamed Saqr is

also a co-owner of Gas Transport and Storage SARL, which was co-founded by Mustafa Badr al-Din's brother, Muhammad Amin Badr al-Din (SDGT), a close associate of Adham Tabaja.

663.    Mr. Saqr is also a co-founder of Al Huda Agriculture Company, a company closely associated with Jihad al-Bina (SDGT).

### d.  Ali Youssef Charara

664.    Ali Youssef Charara (a/k/a Ali Sharara) is a Hezbollah operative and financier who owns and operates several companies with his brother, Muhammad Youssef Charara.

665.    Ali Youssef Charara was listed as the chairman, majority shareholder and authorized signatory for Spectrum Investment Group Holding SAL, a Lebanon-based telecommunications company that provides integrated telecommunications services in the Middle East, Africa, and Europe. On January 7, 2016, both Ali Youssef Charara and Spectrum Investment Group Holding SAL were designated SDGTs by the U.S. Department of the Treasury.

666.    According to the U.S. Department of the Treasury, Hezbollah invests millions of U.S. dollars with Mr. Charara on projects that financially support the organization.

667.    Ali Youssef Charara (SDGT) also worked with Hezbollah supporter Kassem Hejeij (SDGT) of Defendant MEAB BANK and Adham Hussein Tabaja (SDGT) on oil ventures in Iraq.

668.    Mr. Charara is involved in several Hezbollah-related companies, including:

- **Spectrum Investment Group Holding SAL** (SDGT), which is a Lebanon-based telecommunications services company, established in 2003. The following individuals were involved with the company:

  o  Ali Youssef Charara (SDGT) was listed as the chairman, co-founder, authorized signatory and the main shareholder (holding 750 shares) of the company;
  o  Abd al-Halim al-Shaykh Musa Charara was listed as the statutory auditor of the company;
  o  Youssef Abd al-Amir Charara was listed as a shareholder (holding 20 shares) and a member of the board of directors of the company;
  o  Muhammad Youssef Charara was listed as a shareholder (holding

230 shares), co-founder and a member of the board of directors of the company;
  o Ali Ibrahim Charara was listed as a co-founder of the company; and
  o Muhammad Farid Mattar was listed as the company's attorney.

Defendants LEBANON AND GULF BANK SAL, BLOM BANK and JAMMAL TRUST BANK maintained accounts for and provided financial services to Spectrum Investment Group Holding SAL.

- **Spectrum International Investment Holding SAL** (SDGT),[41] which is a Lebanon-based telecommunications services company established on December 9, 2007. It has affiliates in The Gambia and the British Virgin Islands. The following individuals were involved with the company:

  o Ali Youssef Charara (SDGT) was listed as the chairman of the board of directors, a partner (holding 1,760 shares), co-founder and authorized signatory of the company;
  o Muhammad Youssef Charara was listed as a partner (holding 200 shares), co-founder and member of the board of directors of the company;
  o Edmond Youssef Saadeh served as statutory auditor of the company; and
  o Muhammad Farid Mattar was listed as the attorney, as well as a partner (holding 40 shares) co-founder and a member of the board of directors of the company.

Defendants LEBANON AND GULF BANK, BANK AUDI and JAMMAL TRUST BANK maintained accounts for and provided financial services to Spectrum International Investment Holding SAL.

- **Spectrum (Offshore) SAL**. The following individuals were involved with the company:

  o Ali Youssef Charara (SDGT) was listed as the chairman, authorized signatory, co-founder and a shareholder of the company;
  o Edmond Youssef Saadeh served as statutory auditor of the company;
  o Muhammad Youssef Charara was listed as a co-founder, shareholder and board member of the company;
  o Youssef al-Shaykh Abd al-Amir Charara was listed as a shareholder, co-founder and board member of the company; and
  o Muhammad Farid Mattar was listed as the attorney for the company

---

[41] Spectrum International Investment Holding SAL was designated as an a/k/a of Spectrum Investment Group Holding SAL on January 7, 2016. *See*, https://www.federalregister.gov/documents/2016/02/02/2016-01828/sanctions-actions-pursuant-to-executive-orders-13224.

(served as attorney for many Hezbollah-controlled companies).

- **B.I. Group Holding SAL**. The following individuals were involved with the company:

  o Ali Youssef Charara (SDGT) was listed as the chairman, co-founder and a majority shareholder of the company;
  o Muhammad Youssef Charara was listed as the director general, co-founder, board member and shareholder of the company; and
  o Mohammad Farid Mattar was listed as the attorney, co-founder, board member and shareholder of the company.

- **Signum International Holding SAL**. The following individuals were involved with the company:

  o Ali Youssef Charara (SDGT) was listed as the chairman, co-founder and a major shareholder of the company;
  o Carla Saba was listed as a co-founder, board member and a major shareholder of the company; and
  o Muhammad Farid Mattar was listed as the attorney, co-founder, board member and minor shareholder of the company.

  Defendant FRANSABANK maintained an account for and provided financial services to Signum International Holding SAL.

- **Car Escort Services (Offshore) SAL** (a/k/a Car Escort Services SAL Offshore), which was listed as an import/export company established in 2007 and based in Lebanon, was designated an SDGT by the U.S. Department of the Treasury on May 17, 2018. The following individuals were involved with the company:

  o Fuad Haidar Najm was listed as the liquidator of the company;
  o Ali Muhammad Kharrubi (SDNTK) was listed as the chairman, general manager, co-founder, authorized signatory and co-equal shareholder of the company;
  o Ali Youssef Charara (SDGT) was listed as a co-founder, board member, and co-equal shareholder of the company;
  o Muhammad Ibrahim Bazzi (SDGT) was listed as a co-founder, board member, and co-equal shareholder of the company;
  o Edmond Youssef Saadeh served as statutory auditor for the company; and
  o Muhammad Farid Mattar was listed as the attorney for the company.

  Defendant JAMMAL TRUST BANK maintained an account for and provided financial services to Car Escort Services (Offshore) SAL.

- **Hoda for Touristic Services & Management Holding SAL** appears to act as a holding company. The following individuals were involved with the company:

  o Abbas Abd al-Latif Fawaz was listed as the chairman, co-founder, shareholder (holding 17,500 shares), and authorized signatory of the company;
  o Ali Ahmad Ismail was listed as a co-founder and shareholder (holding 7,500 shares) of the company;
  o Ali Youssef Charara (SDGT) was listed as a co-founder, shareholder (holding 5,000 shares) and member of the board of directors of the company;
  o Jalal Muhammad Rashed Bitar was listed as a co-founder and shareholder (holding 2,000 shares) of the company;
  o Fadl Abbas Fawaz was listed as a shareholder (holding 2,500 shares), co-founder and member of the board of directors of the company;
  o Sadeq Abbas Fawaz was listed as a shareholder (holding 2,500 shares), co-founder and member of the board of directors of the company;
  o Ziyad Ali Ismail was listed as a shareholder (holding 2,500 shares), co-founder and member of the board of directors of the company;
  o Ahmad Ali Ismail was listed as a shareholder (holding 2,500 shares), co-founder, authorized signatory and member of the board of directors of the company;
  o Wa'el Jalal Bitar was listed as a shareholder (holding 1,500 shares) and co-founder of the company;
  o Nasser Jalal Bitar was listed as a shareholder (holding 1,500 shares), co-founder and member of the board of directors of the company;
  o Fadi Fawzi Fawaz was listed as a co-founder of the company;
  o Abd al-Reda Abdallah Khorshid was listed as a shareholder (holding 5,000 shares) of the company;
  o Price-Waterhouse-Coopers was listed as the audit firm for the company; and
  o Muhammad Farid Mattar was listed as the attorney for the company.

Defendants SGBL and BANQUE LIBANO-FRANÇAISE maintained accounts for and provided financial services to Hoda for Touristic Services & Management Holding SAL.

- **One Globe Operator SAL Holding**. The following individuals were involved with the company:

  o E.B.D. Group Holding SAL was listed as a shareholder (holding 818 shares) and member of the board of directors of the company;
  o Ali Youssef Charara (SDGT) was listed as a co-founder of the

company;

- o Samir Subhi Abu-Hassan was listed as an authorized signatory and a shareholder (holding one share) of the company;
- o Raghid Wasif Charara was listed as an authorized signatory, a shareholder (holding 100 shares), and member of the board of directors of the company;
- o Ihab Awsaf Ghurayb was listed as an authorized signatory, a shareholder (holding 80 shares), and member of the board of directors of the company;
- o Ali Ibrahim Charara was listed as a co-founder of the company;
- o Abd al-Ghani Ra'if Qassem was listed as a co-founder of the company;
- o Wajih Masoun Maliki was listed as a shareholder (holding one share), chairman and authorized signatory of the company;
- o Abd al-Halim al-Shaykh Musa Charara served as the statutory auditor for the company; and
- o Muhammad Farid Mattar was listed as the attorney for the company.

- **International Group Holding SAL**. The following individuals and entities were involved with the company:

  - o Abbas Abd al-Latif Fawaz was listed as the director general, chairman, majority shareholder (holding 23,950 shares), co-founder, and authorized signatory of the company;
  - o Ali Ahmad Ismail was listed as vice president, a shareholder (holding 3,750 shares), co-founder, authorized signatory and member of the board of directors of the company;
  - o Ziyad Ali Ismail was listed as a shareholder (holding 3,750 shares), co-founder, and member of the board of directors of the company;
  - o Nasrin Ali Ismail was listed as a shareholder (holding 3,750 shares) and co-founder of the company of the company;
  - o Ahmad Ali Ismail was listed as a shareholder (holding 3,750 shares), co-founder and member of the board of directors of the company;
  - o Fadl Abbas Fawaz was listed as a shareholder (holding 5,000 shares), co-founder and member of the board of directors of the company;
  - o Sadeq Abbas Fawaz was listed as a shareholder (holding 3,000 shares), co-founder and member of the board of directors of the company;
  - o Farah Abbas Fawaz was listed as a shareholder (holding 3,000 shares) and a co-founder of the company;
  - o Ali Youssef Charara (SDGT) was listed as a co-founder of the company;
  - o Abd al-Reda Abdallah Khorshid was listed as a co-founder of the company;
  - o Hoda for Touristic Services & Management Holding SAL was listed

as a minor shareholder in the company;

- o Wassim Hatem Shahin served as statutory auditor for the company; and
- o Muhammad Farid Mattar was listed as the attorney for the company.

- **Medical Aid (Offshore) SAL** (MEDAID) was founded on December 12, 2002. The following individuals were involved with the company:

  - o Ali Youssef Charara (SDGT) was listed as a co-founder and member of the board of directors of the company;
  - o Abd al-Halim al-Sheikh Musa Charara was listed as the auditor of the company; and
  - o Mohammad Samir Ali Ahmad was listed as a co-founder, board member, shareholder and authorized signatory of the company.

- **EBD Teltac (Offshore) SAL**, founded in 2003, operates in Iran as well as Lebanon. The following individuals were involved with the company:

  - o Ali Youssef Charara (SDGT) was listed as the general manager, co-founder, and authorized signatory of the company;
  - o Ali Ibrahim Charara was listed as a co-founder, board member and shareholder of the company;
  - o Abd al-Ghani Ra'if Qassem was listed as the chairman and authorized signatory of the company;
  - o Muhammad Farid Mattar was listed as a co-founder and attorney for the company;
  - o Wajih Masoun al-Maliki was listed as an authorized signatory of the company;
  - o Abd al-Halim al-Sheikh Musa Charara was listed as the auditor of the company;
  - o One Globe Operator SAL Holding was listed as a shareholder (holding 900 shares) of the company;
  - o Spectrum Investment Group Holding SAL (SDGT) was listed as a shareholder (holding 73 shares) and had a seat on the board of directors of the company; and
  - o EBD Group (Holding) SAL was listed as a shareholder (holding 25 shares) and had a seat on the board of directors of the company.

Defendant LEBANON AND GULF BANK maintained an account for and provided financial services to EBD Teltac (Offshore) SAL.

669.     Below is a partial list of Charara Network entities and individuals and the Lebanese banks that maintained accounts for them and provided them with financial services:

| Charara Corporate Network | Bank |
|---|---|
| Ali Youssef Charara (SDGT) | • BLOM BANK<br>• MEAB BANK<br>• LCB<br>• BANK AUDI |
| Spectrum Investment Group Holding SAL (SDGT) | • LEBANON AND GULF BANK SAL<br>• BLOM BANK<br>• JAMMAL TRUST BANK |
| Spectrum International Investment Holding SAL (SDGT) | • LEBANON AND GULF BANK<br>• BANK AUDI<br>• JAMMAL TRUST BANK |
| Signum International Holding SAL | • FRANSABANK |
| Car Escort Services (Offshore) SAL | • JAMMAL TRUST BANK |
| Hoda for Touristic Services & Management Holding SAL | • SGBL<br>• BANQUE LIBANO-FRANÇAISE |
| EBD Teltac (Offshore) SAL | • LEBANON AND GULF BANK |
| Teltac Worldwide Inc. (Offshore) SAL | • LCB<br>• BLOM BANK<br>• BANK OF BEIRUT AND THE ARAB COUNTRIES<br>• BANK AUDI |

### e.  The Tajideen Family

670.     The Tajideen (a/k/a "Taj al-Din") family owns many businesses in Lebanon and several other countries, including the Democratic Republic of Congo, The Gambia, Sierra Leone, Ghana, Mozambique, Angola, Belgium and the United Arab Emirates.

671.     There were originally eleven siblings, at least nine of whom are or were active in the Tajideen Network in some fashion:

- Kassim Muhammad Tajideen;
- Mahmoud Muhammad Tajideen;
- Hassan Muhammad Tajideen (deceased);
- Ali Muhammad Tajideen;
- Hussein Muhammad Tajideen;

- Fatimah Muhammad Tajideen;
- Youssef Muhammad Tajideen;
- Ibrahim Muhammad Tajideen;
- Ahmad Muhammad Tajideen;
- Jaffar Muhammad Tajideen; and
- Mariam Muhammad Tajideen.

672.     The Tajideen brothers Kassim Tajideen, Ali Tajideen and Hussein Tajideen are Lebanese businessmen who have been designated SDGTs for their role as Hezbollah fundraisers, money launderers, and financial contributors. Further, the other Tajideen family members listed above, though not (yet) designated SDGTs, play important supporting roles in the Tajideen Network.

673.     Together, the Tajideen family controls a vast network of interlocking companies spanning the globe.

674.     The Tajideen family network is a vast commercial and criminal enterprise operated in the service of Hezbollah's BAC, built on a foundation of sizeable bribes to top officials in cooperative jurisdictions.

675.     By bribing officials across Africa for decades, Tajideen companies were able to evade import and export tariffs, undercut local competitors' prices, gain monopolies and government contracts, and secure discrete access to airports, landing strips and ports across central and western Africa.

676.     Although likely known to Western intelligence long before the turn of the century, the Tajideens and their business associates first came to the attention of European law enforcement after the September 11, 2001 attacks when these law enforcement agencies were collecting intelligence on radical Islamists and the Belgian Federal Police placed one particular individual under surveillance.

677.     This individual had taken a low-level administrative job at a trading company in

Antwerp known as Soafrimex which conducted extensive trade with Africa.

678.     Soafrimex was a company registered in Antwerp in 1989 by Kassim Tajideen (listed as residing in Sierra Leone) and Salim Reda (listed as a resident of the Ivory Coast).

679.     Through the investigation of Soafrimex, police investigators began to better understand The System (as described herein).

680.     Soafrimex would (on paper) purchase commodities from companies all over Africa (*e.g.* food, clothing, wood) that belonged to its own network of companies and would transport the goods using its own transport network, principally in Africa.

681.     These commodities would then be re-sold (through affiliated companies) and the proceeds (in local currency) would be used to purchase Conflict Diamonds for further sale and /or money laundering or deposited in "cooperative" banks in Lebanon and then reinvested.

### i.     Kassim Tajideen

682.     The eldest brother, Kassim Tajideen (a/k/a Kassem or Qassem a/k/a Taj al-Din), has built a global network of food-trading companies and real-estate holdings in Lebanon and Africa.

683.     Kassim Tajideen first emigrated from Lebanon to Africa in 1976.

684.     Initially, he settled in Sierra Leone before setting up shop in Cote d'Ivoire, Angola, and the Democratic Republic of Congo over the next two decades.

685.     In May 2003, as the result of the Soafrimex investigation, Kassim Tajideen and his wife Huda were arrested in Belgium in connection with fraud, money laundering, and diamond smuggling.

686.     Belgian police had discovered more than a dozen affiliated diamond companies that operated in Africa and received funds transfers through the same money laundering network.

687.     Nevertheless, a Belgian judge determined that the Tajideens were not a flight risk and released them on bail.

688.     They immediately fled to Beirut, and Kassim Tajideen restructured Soafrimex, folding it into a newly acquired corporate vehicle called Ovlas Trading SA (SDGT, discussed below).

689.     On May 27, 2009, Kassim Tajideen was designated an SDGT by the U.S. Department of the Treasury, which identified him as "an important financial contributor to Hizballah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hizballah and has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hizballah in Africa."

690.     Kassim Tajideen was arrested in Morocco in 2017 and extradited to the United States. In December 2018, he pleaded guilty to various OFAC violations and was sentenced to five years in prison.

691.     Kassim Tajideen owns or controls several companies designated as SDGTs, including the following entities:

- **Tajco Company** (Ltd.; SARL; LLC). On December 9, 2010, Tajco was designated an SDGT. Tajco is a multinational company involved with real estate, international trade, and merchandising based in The Gambia. It manages a series of grocery stores in The Gambia called "Kairaba Shopping Centre" (SDGT), as well as other organizations throughout Lebanon, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands. In 2013, it was reported that the company's name was changed to "Senesco Banjul." The following individuals were involved with the company:

  o Kassim Tajideen was listed as a co-owner and founder of the company;
  o Ali Tajideen was listed as a co-owner and director general of the company;

- o Hassan Ali Tajideen was listed as executive director of the company; and
- o Hussein Tajideen was listed as a co-owner and managing director in the company.

- **Kairaba Supermarket** (a/k/a Kairaba Shopping Center). Kairaba Supermarket is a subsidiary business of SDGT Tajco Ltd. Both companies named Hussein Tajideen as the same point of contact and manager, and both use the same primary business address.[42]

- **Ovlas Trading SA**. Ovlas Trading SA is the parent company of Ovlas Trading SAL (Offshore) and Béton Liban SARL (a/k/a BL SARL). The company deals with general trading and food manufacturing. Ovlas Trading SA was designated an SDGT by the U.S. Department of the Treasury on December 9, 2010. Ovlas Trading SA opened a branch in the British Virgin Islands in 2005, shortly after being founded in Lebanon. The following individuals were involved with the company:

  - o Kassim Tajideen was listed as the owner of the company, according to the U.S. Department of the Treasury;
  - o Hassan Muhammad Tajideen was listed as managing director, authorized signatory and a shareholder U.S. Department of the Treasury;
  - o Najmah Hassan Jabir (Hassan's widow) was listed as a shareholder of the company; and
  - o Nadin Hassan Tajideen (Hassan's and Najmah's daughter) was listed as a shareholder of the company.

LCB maintained account no. 174123* for Ovlas Trading SA until the account was closed in December 2010 and the account balance migrated to the company's account at Defendant LEBANON AND GULF BANK.

Defendants BLOM BANK, BANK AUDI, BANQUE LIBANO-FRANÇAISE SAL, BANK OF BEIRUT AND THE ARAB COUNTRIES SAL, and LEBANON AND GULF BANK maintained accounts for and provided financial services to Ovlas Trading SA.

- **Ovlas Trading SAL (Offshore)**. The following individuals were involved with the company:

  - o Ahmad Hassan Tajideen was listed as the chairman, majority shareholder (holding 3,000 shares), and authorized signatory of the

---

[42]    A December 17, 2013 OFAC enforcement action demonstrates the way the Tajideen Network conducts its operations between Africa and Lebanon via U.S. dollar-clearing in the U.S. *See e.g.* https://www.U.S. Department of the Treasury.gov/resource-center/sanctions/CivPen/Documents/20131217_hsbc.pdf.

company;

- o Najmah Hassan Jaber (Ahmad's mother) was listed as a shareholder (holding 1,250 shares), co-founder, and member of the board of directors of the company;
- o Anwar Hussein Sa'ad was listed as a shareholder (holding 750 shares), co-founder, and member of the board of directors of the company;
- o Hassan Muhammad Abd al-Hassan Tajideen was listed as a co-founder of the company (his wife remained on the board of directors after he died in a 2010 plane crash);
- o Shawqi Ra'if Abu Khalil was listed as the auditor for the company; and
- o Amer Afif Abu Khalil was listed as the attorney for the company.

Defendants BANK AUDI and LEBANON AND GULF BANK maintained accounts for and provided financial services to Ovlas Trading SAL (Offshore).

- **Golfrate Holdings (Angola) LDA**. Purchased by Kassim Tajideen in 2005, Golfrate is a wholly owned subsidiary of Ovlas Trading SA (SDGT), with part of its main operations located in Angola. It was, until designated an SDGT in 2010, one of the most prominent importers of U.S. and international brands in Angola and served as the exclusive representatives for several global brands. Together with its various subsidiaries, Golfrate employed more than a thousand people in Angola.

- **Afri Belg Commercio E Industria LDA**. Afri Belg Commercio E Industria LDA, is a subsidiary of Ovlas Trading SA (SDGT) and was presided over by Kassim Tajideen. It is believed to have operated more than 25 supermarkets in Angola.

- **Grupo Arosfran Empreendimentos E Participacoes SARL** (Grupo Arosfran). Kassim Tajideen founded Grupo Arosfran in Luanda, Angola, in November 1991. He has been the primary decision-maker and leader of Grupo Arosfran, and a member of the board of directors. Grupo Arosfran is listed as either a branch or a subsidiary of Ovlas Trading SA (SDGT) on multiple international business websites.

- **Congo Futur SPRL** was established in the Democratic Republic of Congo in 1997 as a subsidiary of Soaframex BV. Officially, the company is controlled by Ahmad Tajideen, but Kassim Tajideen controls the company and the entire network of subsidiaries and sister companies related to it.

692. Kassim's brothers, Ali and Hussein Tajideen, were designated SDGTs by the U.S.

Department of the Treasury. Ali Tajideen and Hussein Tajideen were business partners of Kassim Tajideen.

### ii. Ali Muhammad Tajideen

693. Ali Muhammad Tajideen was a Hezbollah commander in southern Lebanon, providing cash to Hezbollah in tranches as large as $1 million U.S. dollars each.

694. Ali Muhammad Tajideen is also a major player in Jihad al-Bina, the Lebanon-based construction company which was designated an SDGT by the U.S. Department of the Treasury in February 2007 and which was formed and operated by Hezbollah (described above) under the IRGC-QF's direction.

695. As of December 2010, and since at least December 2007, Ali Muhammad Tajideen used Tajco SARL, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on Hezbollah's behalf.

696. Under the name of Tajco Company LLC, Ali Muhammad Tajideen developed the properties, established mortgage loans, and acquired mortgage-life insurance to cover the mortgage borrowers.

697. Ali Muhammad Tajideen's real estate empire is of strategic importance to Hezbollah because the Tajideen clan is from southern Lebanon and Ali Muhammad Tajideen's acquisitions have often been situated in militarily strategic locations south of the Litani river where U.N. peacekeeping forces have nominally been responsible for preventing Hezbollah from entrenching along the border with Israel.

698. As the recent discovery of networks of Hezbollah tunnels burrowed under Israeli territory attest, U.N. peacekeeping forces have – at best – been ineffectual in their stated purpose.

699. On the other hand, Ali Muhammad Tajideen, Jihad al-Bina, the IRGC-QF and

Hezbollah's BAC have been highly effective in rebuilding Hezbollah's military / terror infrastructure south of the Litani river.

700.    Ali Muhammad Tajideen was designated an SDGT by the U.S. Department of the Treasury on December 9, 2010.

701.    Ali Muhammad Tajideen controlled the following companies in Lebanon:

- **Al-Omran SARL**, which deals mainly with the buying and selling of ready-made concrete. The following individuals were involved with the company:

  o Hassan Muhammad Abd al-Hassan Tajideen was the authorized signatory of the company before his death;
  o Ali Muhammad Tajideen (SDGT) was listed as a partner (holding 100 shares) of the company;
  o Hassan Ali Tajideen was listed as a partner (holding 100 shares) of the company; and
  o Muhammad Ni'mah Shams al-Din was listed as a partner (holding 100 shares) of the company.

- **Al-Ataa Company – Hassan Bazoun & Partners**, which was established in 1994 and purportedly deals with import and export of real estate-related materials and products. The following individuals were involved with the company:

  o Ali Muhammad Tajideen (SDGT) was listed as a partner (holding 3,729 shares) of the company;
  o Ali Ibrahim Tajideen (Ali Tajideen's nephew, Ibrahim Muhammad Tajideen's son) was listed as a partner (holding 648 shares) of the company;
  o Majida Zayna Ahmad Awada was nominally the chairwoman of the company;
  o Ali Balhis (Majida Zayna Ahmad Awada's husband; Hezbollah mayor of the town of Siddikine in southern Lebanon) was listed as a shareholder (holding 2,989 shares) of the company;
  o Reda Ali Atawi was listed as a partner in the company and also in New Roads Company SARL (discussed below; affiliated with Jihad al-Bina); and
  o Ibrahim Muhammad Rakin was listed as the auditor of the company.[43]

---

[43]    Mr. Rakin also served as auditor for General Medical Provider (Offshore) SAL (a/k/a GMP Offshore SAL) – a company belonging to the Qauq family. Nabil Qauq is one of Hashem Safieddine's deputies.

- **Advanced Sports Center SAL** (ASC), which runs a sports center located in Beirut. The following individuals were involved with the company:

    o Youssef Muhammad Tajideen was listed as a co-founder of the company; and
    o Ali Muhammad Tajideen (SDGT) was listed as a co-founder of the company.

- **Ad-Diyar Trading and Contracting SARL**, which deals with general trading, contracting, and real estate. The following individuals were involved with the company:

    o Ali Muhammad Tajideen (SDGT) was listed as a partner, owning 33 percent of the shares, and authorized signatory of the company;
    o Hassan Ali Suwaydan was listed as a partner, owning 33 percent of the shares of the company; and
    o Ibrahim Mahmoud Youssef was listed as a partner, owning 33 percent of the shares of the company.[44]

- **Al-Izdihar for Contracting SARL**, which deals with real estate and construction. The following individuals were involved with the company:

    o Ali Muhammad Tajideen (SDGT) was the founder of the company;
    o Hassan Ali Abbas was listed as a co-founder and a partner (holding 100 shares) of the company;[45]
    o Hassan Ali Suwaydan was listed as a partner of the company; and
    o Amer Afif Abu Khalil was listed as the company's attorney.

- **Company for Development and Prosperity**, which deals mainly with the establishment, construction, and investment in parks, hotels, restaurants, and swimming pools. The following individuals were involved with the company:

    o Youssef Muhammad Tajideen was listed as owning 17 percent (holding 5,000 shares) of the company;
    o Samiha Ibrahim Tajideen (Youssef's wife) was listed as owning 17 percent, and a member of the board of directors of the company;
    o Ali Muhammad Tajideen (SDGT) was listed as the chairman, authorized signatory, and a shareholder (holding 10,000 shares) of

---

[44] Mr. Youssef is another prominent member of the Tajideen Network, as partner and board member in BMC SAL and Société Orientale Libanaise d'Investissement et Développement SAL.

[45] Mr. Abbas was also listed as a partner in the Tajideen company Atwi and Abbas Trading Company, alongside Hassan Ali Tajideen and Amir Afif Abu Khalil.

the company;

- o Shawqi Ra'if Abu Khalil was listed as the auditor, shareholder, and member of the board of directors of the company; and
- o Amer Afif Abu Khalil was listed as the company's attorney.

- **Hyram Maritime SAL**, which was involved in transportation and logistics. Established in 2000, according to its auditor, the company was closed down and has not been operational since 2013. The following individuals were involved with the company:

  - o Ali Muhammad Tajideen (SDGT) was listed as the co-founder of the company;
  - o Youssef Tajideen was listed as the co-founder of the company;
  - o Ali Hussein Saad was listed as the shareholder (holding 4,000 shares), authorized signatory and chairman of the company;
  - o Khadijah Amin Mahmoud was listed as the vice-president, shareholder (holding 4,000 shares), and board member of the company;
  - o Elissar Hussein Sayegh (Fatimah Tajideen's daughter, Ali Tajideen's niece) was listed as a shareholder (holding 2,000 shares) and board member of the company;
  - o Shawqi Ra'if Abu Khalil was auditor and shareholder (holding 4,000 shares) of the company; and
  - o Amer Afif Abu Khalil was the company's attorney.

Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES maintained an account for and provided financial services to Hyram Maritime SAL.

- **Tajco Company SAE**. Tajco Company SAE is the Lebanese sister company of Tajco. Tajco Company SAE has been used for many years as Hezbollah's conduit for purchasing land in Lebanon to expand its areas of control and to acquire strategic parcels for political and strategic purposes. The following individuals were involved with the company:

  - o Kassim Muhammad Tajideen (SDGT) was listed as the co-founder of the company;
  - o Ali Muhammad Tajideen (SDGT) was listed as the partner (owning 20% of the shares), co-founder and authorized signatory of the company;
  - o Nur al-Ain Muhammad Ali Atwi (Ali Tajideen's wife) was listed as one of the partners (owning 20% of the shares) in the company;
  - o Hussein Muhammad Tajideen (SDGT) was listed as one of the partners (owning 20% of the shares) in the company;
  - o Hassan Ali Tajideen was listed as the CEO of the company after his father's death and likely inherited his father's shares;

- o Mahmoud Muhammad Tajideen was listed as one of the partners (owning 20% of the shares) in the company;
- o Ibrahim Muhammad Tajideen was listed as the co-founder of the company;
- o Youssef Muhammad Tajideen was listed as the co-founder of the company; and
- o Amer Afif Abu Khalil was listed as the company's attorney.

- **Tajideen Building and Construction Enterprise** (a/k/a Tajideen Establishment for Building & Construction), which was established in 2004. Ali Tajideen was listed as a trader and authorized signatory.

702. Ali Tajideen, through Tajco, also controlled a network of companies in The Gambia, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands.

703. One of those Tajco-affiliated companies was Matrix (Offshore) SAL, owned by Qassem Muhammad Ajami and his uncle, Muhammad Ali Izz-al-Din, and established in 2003.

704. Previously, Mr. Izz-al-Din had moved to Nigeria in 1987 and established a company called Babylon Enterprises Nigeria Ltd. which was involved in the construction business. The company conducted business with LCB and secured letters of credit from the bank.

705. Mr. Ajami joined his uncle in Nigeria in the mid-1990s. He held multiple accounts at LCB.

706. Muhammad Ali Izz-al-Din also held a personal account at LCB.

707. LCB also maintained a banking relationship with Matrix (Offshore) SAL.

### iii. Hussein Muhammad Tajideen

708. Both Ali and Hussein Tajideen are among Hezbollah's top financiers in Africa. Hussein Tajideen is a primary Hezbollah fundraiser and prominent Hezbollah supporter in The Gambia.

709. As of December 2010, and since at least March 2006, Hussein Tajideen owned 50 percent of Tajco Ltd., in Banjul, The Gambia, and served as the managing director of the company.

710.     Hussein Tajideen was designated an SDGT by the U.S. Department of the Treasury on December 9, 2010 together with his brother, Ali.

711.     Tajideen resided in The Gambia for 15 years until he was expelled on June 7, 2013.

### iv.     Ahmad Muhammad Tajideen

712.     Ahmad Muhammad Tajideen manages the family's businesses and money laundering operations in the Democratic Republic of Congo.[46]

713.     His company Congo Futur is a Tajideen Network / Hezbollah conglomerate that has been designated an SDGT by the U.S. Department of the Treasury. Its operations include mining, real estate, construction, and trade companies.

714.     In December 2010, the U.S. Department of the Treasury sanctioned the company as part of "the network of businesses" that the three Tajideen brothers—Ali, Hussein and Kassim—"owned or controlled."

715.     One of Congo Futur's subsidiary companies in Kinshasa is Trans-M,[47] which won lucrative contracts from the Congolese government for forestry rights, contracts that netted Mr. Ahmad Tajideen hundreds of millions of U.S. dollars in revenue and profits.[48]

716.     Another of its subsidiary companies, Congolese Company of Modern Construction

---

[46]     Ahmad Muhammad Tajideen and his brother Ibrahim Muhammad Tajideen also owned a company in the Democratic Republic of the Congo called Panikin SPRL.

[47]     Trans-M changed its name to Cotrefor in 2012 after Congo Futur was sanctioned, but it maintains the same address as Trans-M, inside the Congo Futur tower. According to a 2017 report by Global Witness:

> After the change of name, Cotrefor continued to work in the same logging concessions using the same permits and contracts that were issued to Trans-M by the Congolese government. The company has remained in the same offices that were occupied by Trans-M — on the third floor of the Congo Futur building on the Boulevard 30 Juin in Kinshasa. Cotrefor has continued to use the same company registration number as that used by Trans-M. In this light, there are compelling grounds to believe that Congo Futur, to all intents and purposes, continues to control Cotrefor just as it did Trans-M before it.

[48]     As of 2009, Ahmad Tajideen was listed as the largest shareholder in Trans-M SPRL.

(SCCM in French), has received several contracts from the Congolese Ministry of Finance totaling more than $12 million to do work on buildings in the Congolese capital of Kinshasa.

717.    Congo Futur's success has been tied to its links with senior government officials in Congo.

718.    A 2013 report by the Congolese Ministry of Trade alleged that "Congo Futur and other companies belonging to the Lebanese group Ovlas Trading SA (SDGT) controlled a significant proportion of Congo's foodstuffs market through a set of offshore companies in Lebanon – a setup that held significant fiscal advantages."

719.    An audit report conducted in 2013 on behalf of the Congolese Ministry of Trade found that Atlantic Trading, a reported subsidiary of Congo Futur that operates out of the same Kinshasa address, has extensive linkages with several Ovlas Trading SA (SDGT) subsidiaries.

720.    According to the 173-page audit:

> [W]e confirmed the existence of horizontal links with the suppliers of ATCOM (CONGO FUTUR Group) in Lebanon where three companies supply 85% of the Group's supplies: Leaders of Supply & Products, Global & Infinite Traders, Galaxy Flame Trading. These three companies, registered in the Lebanese commercial register under the offshore companies, belong to the same group (Ovlas) ... These companies mainly supply the Congo-Futur group through its subsidiary Atlantic Trade Company (ATCOM).

721.    Leaders of Supply & Products (Offshore) SAL and Galaxy Flame Trading SAL Offshore are two companies that are controlled by the Tajideen family. Both were identified by the Lebanese government as belonging to the Tajideen Network and maintaining accounts at LCB.

722.    According to the Lebanese government's assessment, Leaders of Supply & Products (Offshore) SAL maintained account no. 40022* at LCB until September 2011 – when it moved to Defendant LEBANON & GULF BANK.

723.    Leaders of Supply & Products (Offshore) SAL also maintained accounts with Defendants BANK AUDI and BANK OF BEIRUT.

724.    LCB maintained account no. 43286* for Galaxy Flame Trading SAL Offshore.

725.    According to the Lebanese government's assessment, the balance in that account migrated to Defendant BANK OF BEIRUT when LCB closed the account in August 2011.

726.    As noted above, Congo Futur is ultimately controlled by Kassim Tajideen and as discussed below, both Kassim Tajideen and Congo Futur have utilized companies nominally controlled by Saleh Ali Assi as intermediaries once Kassim Tajideen and Congo Futur were designated SDGTs by the United States.

727.    Ahmad Tajideen controls or is affiliated with the following companies in Lebanon:

- **Al-Massar Real Estate SAL**. Although not (yet) designated as an SDGT, Al-Massar Real Estate SAL is clearly controlled by the Tajideen family. The following individuals were involved with the company:

  o Ahmad Muhammad Tajideen was listed as a member of the board of directors and a shareholder of the company;
  o Jaffar Muhammad Tajideen was listed as a member of the board of directors and a shareholder of the company;
  o Youssef Muhammad Tajideen was listed as authorized signatory, chairman and a member of the board of directors of the company;
  o Qassem Hassan Tajideen (their nephew) was listed as a shareholder and board member of the company;
  o Shawqi Ra'if Abu Khalil was listed as the company's auditor;
  o Bassam Zafir Tamim was listed as the company's accountant; and
  o Amer Afif Abu Khalil was listed as the company's attorney.

- **Bream Star Line SAL Offshore**. The following individuals were involved with the company:

  o Ahmad Tajideen was listed as a shareholder, co-founder, general manager and authorized signatory of the company;
  o Bashir Qassem Jaffal was listed as a co-founder of the company;
  o Ibrahim Amin Salman was listed as a board member and shareholder of the company;
  o Shawqi Abu Khalil was listed as the company's auditor;
  o Amer Abu Khalil was listed as the company's attorney;

- o Ali Hussein Saad was listed as a co-founder, chairman, shareholder and signed commissioner of the company; and
- o Khadijah Amin Mahmoud was listed as deputy chairman, shareholder, co-founder and member of the board of directors of the company.

### v. Jaffar Muhammad Tajideen

728. Jaffar Muhammad Tajideen was listed as a member of the board of directors of Al-Massar Real Estate SAL (discussed above), together with his brothers Ahmad and Youssef Muhammad Tajideen.

### vi. Fatimah Muhammad Tajideen

729. Fatimah Tajideen was born in 1966. Fatimah Tajideen is the sister of the Tajideen brothers. Although not directly involved in the Tajideen Network, her husband, Hussein Tawfiq Sayegh, and their daughter, Elissar Hussein Sayegh, are shareholders in several Tajideen holdings:

- **Afrimex (Offshore) SAL**. Established in 2003, the company is part of the Tajideen Network in Africa and is also linked to Ayman Joumaa's narcotics trafficking and money laundering network. The company is owned and controlled by Fatimah Tajideen's family together with Hana Jawad (Fatimah Tajideen's sister-in-law, Ibrahim Muhammad Tajideen's wife). The following individuals were involved with the company:

  - o Hussein Tawfiq Sayegh was listed as a co-founder, vice president/vice chairman, member of the board of directors and shareholder of the company;
  - o Youssef Muhammad Tajideen was listed as a co-founder of the company;
  - o Elissar Hussein Sayegh was listed as chairwoman, an authorized signatory and a shareholder of the company;
  - o Hana Abd al-Karim Jawad was listed as a shareholder, co-founder and a member of the board of directors of the company;
  - o Amer Afif Abu Khalil served as the company's attorney; and
  - o Shawqi Ra'if Abu Khalil served as the company's statutory auditor.

  Until it was forced to close in February 2011, Afrimex (Offshore) SAL maintained account no. 40580* at LCB. According to the Lebanese government, that account migrated to Defendant BYBLOS BANK. At the same time, it maintained its account at LCB. Afrimex also

maintained at least one account at Defendant BANK AUDI in Tyre, Lebanon. That account was used to launder funds for Ayman Joumaa's network.

- **Union Real Estate Development Company SAL**. Deals with real estate, construction, and tourism. The company is owned wholly by members of the Tajideen family. The following individuals were involved with the company:

  o Hussein Tawfiq Sayegh was listed as the chairman, co-founder, signed commissioner, authorized signatory and a shareholder (holding 75 shares) of the company;
  o Mahmoud Muhammad Tajideen was listed as a majority shareholder (holding 750 shares), board member and co-founder of the company;
  o Youssef Muhammad Tajideen was listed as vice president, co-founder, shareholder (holding 100 shares) of the company;
  o Khadijah Hassan Mattar (Mahmoud Tajideen's wife, Youssef's sister in law) was listed as a board member, co-founder, and shareholder (holding 75 shares) of the company;
  o Shawqi Ra'if Abu Khalil was listed as the company's auditor; and
  o Amer Afif Abu Khalil was listed as the company's attorney.

- **Hyram Maritime SAL** (discussed above).

### vii.   Mahmoud Muhammad Tajideen

730.    Mahmoud Muhammad Tajideen is the brother of the aforementioned Tajideen brothers (SDGTs).

731.    Mahmoud Muhammad Tajideen is directly involved in the Tajideen Network through two Tajideen holdings:

- **Union Real Estate Development Company SAL** (discussed above); and

- **Tajco Company SAE** (discussed above).

### viii.   Youssef Muhammad Tajideen

732.    Youssef Muhammad Tajideen was born in 1967. He is the brother of the designated Tajideen brothers (SDGTs).

733.    Youssef Muhammad Tajideen maintained account no. 160549* at LCB until February 2011.

734.    When LCB was finally compelled to close his accounts, according to the Lebanese government, his accounts migrated to Defendants BANK OF BEIRUT, LEBANON & GULF BANK, BLOM BANK SAL and BANK AUDI.

735.    Youssef Muhammad Tajideen is directly involved in the Tajideen Network through more than a dozen Tajideen holdings, including the following Hezbollah entities:

- **Tajco Company SAE** (discussed above).

- **Hyram Maritime SAL** (discussed above).

- **Al-Massar Real Estate SAL** (discussed above).

- **Afrimex (Offshore) SAL** (discussed above).

- **Al-Dalhamiya Country Club Company** is a country club in the Chouf region controlled by the Tajideen family. The following individuals were listed in connection with the company:

  o Youssef Muhammad Tajideen was listed as the general manager, chairman of the board, authorized signatory and shareholder of the company;
  o Abdallah Youssef Tajideen (Youssef's son) was listed as the vice-chairman, board member, authorized signatory and a major shareholder of the company;
  o Ibrahim Muhammad Tajideen was listed as a principal shareholder and a board member of the company;
  o Najmah Hassan Jabir was listed as the principal shareholder and a board member of the company;
  o Wafa Muhammad Nussar Alamah was listed as a shareholder of the company;
  o Hussein Abd al-Muttalib Jawad was listed as a shareholder of the company;
  o Charles Antoun Kattanah was listed as a co-founder of the company;
  o Shawqi Ra'if Abu Khalil was listed as the company's auditor; and
  o Wissam Hussein Hammoud was listed as the company's attorney.

- **Rifieh Pour L'amélioration** (a/k/a Rural Real Estate Improvement SARL) is a Lebanese real estate company founded in 1975. The

company's offices are located in the Tajco building in Beirut. The company demonstrates the overlap between networks, in this case the Tajideen Network and the Ahmad Clan (discussed below). The following individuals were involved with the company:

- o Ibrahim Muhammad Tajideen was listed as the majority shareholder (owning 69 percent of the company's shares) of the company;
- o Youssef Muhammad Tajideen was listed as a partner, authorized signatory and shareholder of the company;
- o Abdallah Youssef Tajideen was listed as a partner and shareholder of the company;
- o Firas Nazim Ahmad (son of Nazim Ahmad, a senior Hezbollah BAC operative) was listed as a partner of the company;
- o Rami Kamil Ya'qub Baqir (brother-in-law of Nazim Ahmad) was listed as a partner of the company;
- o Hussein Abd al-Muttalib Jawad was listed as a partner of the company; and
- o Wissam Hussein Hammoud was listed as the company's lawyer.

- **Union Real Estate Development Company SAL** (discussed above).

- **Advanced Sports Center - ASC SAL** (discussed above).

- **Lebanese Real Estate Development & Investment Company SAL**, which deals with purchasing real estate and the rights to it, leasing, investments, construction and tourism. The following individuals were involved with the company:

  - o Youssef Muhammad Tajideen was listed as a member of the board of directors and owned 12.5 percent of the shares (holding 125 shares) of the company;
  - o Najmah Hassan Jabir (Youssef's sister-in-law) was listed as the co-founder, signed commissioner, head of board of directors, authorized signatory and a shareholder (holding 50 percent of the shares) of the company;
  - o Anwar Hussein Saad was listed as a shareholder, board member and co-founder of the company;
  - o Shawqi Ra'if Abu Khalil was listed as the company's auditor; and
  - o Amer Afif Abu Khalil was listed as the company's attorney.

- **Company for Development and Prosperity** (discussed above).

- **Distributions and Agencies Company SAL**, which deals with commercial activities such as selling, buying, exporting, importing, and renting. The following individuals were involved with the company:

- Youssef Muhammad Tajideen was listed as the vice-president, signed commissioner, member of the board of directors, authorized signatory and shareholder (holding 1,000 shares) of the company;
- Ahmad Hassan Tajideen was listed as head of the board of directors, signed commissioner, authorized signatory and shareholder (holding 26,500 shares) of the company;
- Hassan Ali Tajideen was listed as a shareholder (holding 2,000 shares) of the company;
- Ahmad Abd al-Karim Said Muhammad Jawad (Ibrahim Muhammad Tajideen's brother-in-law) was listed as a shareholder (holding 500 shares) and a member of the board of directors of the company;
- Shawqi Ra'if Abu Khalil was listed as the auditor; and
- Amer Afif Abu Khalil was listed as the attorney for the company.

### ix. Hassan Muhammad Tajideen

736. Hassan Muhammad Tajideen was born in 1960. He was the third oldest brother after Kassim and Mahmoud.

737. Hassan was on board Ethiopian Airlines Flight 409 when it crashed into the Mediterranean Sea shortly after take-off from Beirut, Lebanon, in January 2010.

738. Hassan Muhammad Tajideen was also heavily involved in the following Hezbollah-controlled companies:

- **Ovlas Trading SA** (SDGT, discussed above).

- **Al-Omran SARL** (discussed above).

### x. Ibrahim Muhammad Tajideen

739. Ibrahim is the younger brother of the aforementioned Tajideen brothers. Ibrahim, alongside his wife Hana Abd al-Karim Jawad and their two adult children, Duaa and Ali, is involved with prominent companies and business of the Tajideen Network, directly linked to Hezbollah.

740. Ibrahim Muhammad Tajideen is directly affiliated with the following Hezbollah-controlled companies:

- **Tajco Company SAE** (discussed above).

- **Enmaa Dalhamiya Company SAL** (a/k/a Deliku), which deals with real estate and construction. The following individuals were involved with the company:

  o Najmah Hassan Jabir was listed as the manager, a board member and partner (holding 785 shares) of the company;
  o Youssef Muhammad Tajideen was listed as chairman and partner (holding 829 shares) of the company;
  o Abdallah Youssef Tajideen was listed as vice-president, a board member and partner (holding 536 shares) of the company;
  o Ibrahim Muhammad Tajideen was listed as the majority shareholder (holding 13,510 shares) and a board member of the company;
  o Wafa Muhammad Nussar Alamah was listed as a shareholder of the company;
  o Hussein Abd al-Muttalib Jawad was listed as a shareholder of the company;
  o Charles Antoun Kattanah was listed as a co-founder of the company;
  o Shawqi Ra'if Abu Khalil was listed as the auditor for the company; and
  o Wissam Hussein Hammoud was listed as the attorney for the company.

  LCB maintained account no. 46467* for the company until July 2011 when it was forced to close.

- **Al-Dalhamiya Country Club Company** (discussed above).

- **Rifieh Pour L'amélioration** (discussed above).

741.    Ibrahim Muhammad Tajideen's son, Ali Ibrahim Tajideen, is a shareholder in Al-Ataa Company - Hassan Bazoun & Partners, a real estate company in southern Lebanon tied to both the Tajideen family's network (described above), Jihad al-Binna, and the IRGC.

742.    Below is a partial list of Tajideen Network individuals and companies and the Defendants that maintained accounts for them and provided them with financial services:

| Tajideen Corporate Network | Lebanese Bank |
|---|---|
| **Ovlas Trading SA** | • LCB<br>• BLOM BANK<br>• BANK AUDI<br>• LEBANON AND GULF BANK |

| | |
|---|---|
| | • BANQUE LIBANO-FRANÇAISE<br>• BANK OF BEIRUT AND THE ARAB COUNTRIES |
| **Ovlas Trading SAL (Offshore)** | • BANK AUDI<br>• LEBANON AND GULF BANK |
| **Hyram Maritime SAL** | • BANK OF BEIRUT AND THE ARAB COUNTRIES |
| **Matrix (Offshore) SAL** | • LCB |
| **Leaders of Supply & Products** | • LCB<br>• BANK AUDI<br>• LEBANON AND GULF BANK<br>• BANK OF BEIRUT |
| **Galaxy Flame Trading SAL Offshore** | • LCB<br>• BANK OF BEIRUT |
| **Amigo Travel and Transport SAL** | • BYBLOS BANK |
| **Afrimex (Offshore) SAL** | • LCB<br>• BYBLOS BANK<br>• BANK AUDI |
| **Enmaa Dalhamiya Company SAL** | • LCB |
| **ETCIMEX** | • BYBLOS BANK |
| **Société Orientale Libanaise d'Investissement et Développement SAL** | • BYBLOS BANK |
| **Youssef Muhammad Tajideen** | • LCB<br>• BANK OF BEIRUT<br>• LEBANON AND GULF BANK<br>• BLOM BANK<br>• BANK AUDI |

### f.  Muhammad Ibrahim Bazzi

743.    Born on August 10, 1964 in Bint Jbeil in southern Lebanon, Muhammad Ibrahim

Bazzi is a Hezbollah financier who has fundraised millions of dollars for Hezbollah through his

business activities in Belgium, Lebanon, Iraq, and West Africa.

744.    On May 17, 2018, Mr. Bazzi was designated an SDGT by the U.S. Department of

the Treasury.[49] Five companies he owned or controlled were also designated by the U.S. Department of the Treasury on the same date.

745.    Mr. Bazzi worked closely with former Gambian president Yahyah Jammeh to loot the country and open it up to Hezbollah for narcotics trafficking, money laundering and arms dealing.

746.    According to the Lebanese government, until 2012, Mr. Bazzi was the owner of U.S. dollar-denominated account no. 170037* at LCB.

747.    According to the Lebanese government, after Mr. Bazzi's LCB account was closed in 2012, the balance in his LCB account was moved to his account at Defendant FRANSABANK.

748.    Mr. Bazzi also held accounts at Defendants MEAB BANK and BLOM BANK.

749.    Mr. Bazzi runs several companies around the world, often with a business associate named Fadi George Mazegi, who is a Greek Orthodox Christian.

750.    In The Gambia, Mr. Bazzi installed Fadi George Mazegi as a "Non-Executive Director" of Prime Bank, a subsidiary of LCB (discussed *infra*). Although official documents reportedly show Mr. Bazzi as an owner of the bank, he has told *The Wall Street Journal* that "he had only helped procure a banking license for friends."

751.    Prime Bank (Gambia) became a key money laundering hub for Hezbollah and a favored channel for moving Hezbollah's money to LCB in Lebanon. It also moved hundreds of

---

[49]    A month after designating him for supporting Hezbollah's terrorist activities, the U.S. Department of the Treasury released a report on human rights that criticized the Gambian regime of Yahya Jammeh. The State Department also described The Gambia as "a source and destination country for women and children subjected to forced labor and sex trafficking." According to the State Department, "Gambian women are subjected to forced labor and sex trafficking in the Middle East, including Lebanon and Kuwait." Muhammad Bazzi has been linked to the Gambian human trafficking network, and a published report further linked him to "the process of using the Syrian girls who are collected from refugee camps and trading them for money to help Hezbollah."

millions of dollars for Iran at the behest of and in coordination with Muhammad Bazzi (SDGT) and Abdallah Safieddine.

752. Mr. Bazzi's son, Wa'el Muhammad Bazzi, owns shares in several of his father's corporate holdings and has assumed control of several of them following his father's SDGT designation (in order to facilitate sanctions evasion).[50]

753. Mr. Bazzi owned or controlled the following OFAC designated companies:

- **Global Trading Group NV** (SDGT), a global energy products and services company headquartered in Antwerp, Belgium that also has locations in Sierra Leone, The Gambia, Ivory Coast, and Benin.

  According to the Lebanese government, the company held U.S. dollar-denominated account no. 170782* at Lebanese Canadian Bank until it was closed in June 2012 and then moved its accounts to Defendant FRANSABANK.[51]

  On August 9, 2018, the company changed its name to Energy Engineers Procurement and Construction. One of its co-founders was Hisham Hussein Makki, a Lebanese national and resident of Sierra Leone who also serves as a board member of Ali Ibrahim Charara's Teltac Worldwide Incorporated (Offshore) SAL.

- **Euro African Group Ltd.** (SDGT), a major fuel supplier in The Gambia.

  According to the Lebanese government, the company held U.S. dollar-denominated account no. 42402* at LCB until it was closed in August 2012 and then moved its accounts to Defendant FRANSABANK.

  According to *Reuters*, Euro African Group Ltd. held exclusive rights to import fuel to The Gambia between 2008 and 2013 and a fuel supply deal to the state-run utility. Mr. Bazzi acknowledged to *Reuters* that the

---

[50] Wa'el Bazzi was designated an SDGT on April 24, 2019.

[51] Wa'el Bazzi (SDGT), Muhammad Ibrahim Bazzi's son, has replaced both Bazzi and Fadi George Mazegi as managing director and board member of Global Trading Group NV (SDGT) in Belgium as of June 10, 2018 (now Energy Engineers Procurement and Construction). The other new board member and managing director of the company is Voltra Transcor Energy BVBA in Belgium, a company also controlled by Wa'el Bazzi. On April 24, 2019 Voltra Transcor Energy BVBA was also designated as an SDGT. According to the U.S. Department of the Treasury, Wa'el Bazzi "likely established an account for Voltra Transcor Energy, in connection with Mohammad Bazzi's attempted use of an intermediary company to move money to [Global Trading Group NV] and circumvent OFAC sanctions."

company made three payments to the Jammeh Foundation for Peace totaling $1.3 million in 2013. Documents obtained by *Reuters* reflect five payments into the account in 2013 totaling $2.55 million – each referencing Euro African Group.

- **Africa Middle East Investment Holding SAL** (SDGT), held with Mr. Bazzi's wife.

- **Premier Investment Group SAL Offshore** (SDGT).
  Defendant BANK AUDI maintained an account for and provided financial services to Premier Investment Group SAL Offshore.

- **Car Escort Services (Offshore) SAL** (discussed above).
  Defendant JAMMAL TRUST BANK held an account for and provided financial services to the company.

754. The following (as-yet-undesignated) companies are owned or controlled by Mr. Bazzi:

- **Wanour Real Estate SAL**. The following individuals were involved with the company:[52]

  o Prior to his designation as an SDGT, Muhammad Bazzi held half the shares in, and was listed as the chairman of, the company; and
  o Wa'el Bazzi (SDGT) was listed as a minority shareholder of the company.

  Defendant FRANSABANK held an account for and provided financial services to Wanour Real Estate SAL.

- **Lebanese Printing Company (Dar al-Farabi) SAL**.

- **Global Electrical Group Holding SAL**. The following individuals were involved with the company:

  o Prior to his designation as an SDGT, Muhammad Bazzi held almost half the shares in, and was listed as the chairman of, the company;
  o Talal Khalil Chahine (fugitive from the United States discussed above) owned a slight majority of the shares of the company;
  o Fadi George Mazegi was listed as a member of the board of directors of the company;
  o Claire Elias Assaf Abu Rajili was listed as a co-founder of the

---

[52] Wa'el Bazzi (SDGT) also replaced his father as 40 percent shareholder and President of the Board of Wanour following his father's SDGT designation.

company;

- o Aline George Choucair Prince was listed as a co-founder of the company; and
- o Joseph George Zgheib was listed as a co-founder and attorney of the company.

According to the Lebanese government, the company held account no. 172658* at LCB until October 2012.

- **GAM Petroleum**.

- **Prime Bank** (The Gambia) (discussed below).

755. Muhammad Bazzi's family of companies had the following Lebanese banking relationships listed herein and detailed below:

| Muhammad Bazzi Corporate Network | Bank |
|---|---|
| Global Trading Group NV | • LCB<br>• FRANSABANK |
| Euro African Group Ltd. | • LCB<br>• FRANSABANK |
| Premier Investment Group SAL Offshore | • BANK AUDI |
| Car Escort Services (Offshore) SAL | • JAMMAL TRUST BANK |
| Wanour Real Estate SAL | • FRANSABANK |
| Global Electrical Group Holding SAL | • LCB |
| Ibrahim Muhammad Bazzi | • LCB |
| Ibrahim Muhammad Bazzi | • FRANSABANK |
| Ibrahim Muhammad Bazzi | • MEAB BANK |
| Ibrahim Muhammad Bazzi | • BLOM BANK |

756. Muhammad Bazzi is (or was prior to his SDGT designation) a director of the Gambia Milling Corporation along with Fadi George Mazegi. Bazzi's Premier Investment Group SAL Offshore (SDGT) appears to have owned 50 percent of the company.

757. Between 2009 and 2011, Mr. Bazzi had extensive business connections with Abdallah Safieddine, the co-head of Hezbollah's BAC and Hezbollah's representative to Iran.

758. In 2011, Mr. Bazzi and Mr. Safieddine worked to resolve a dispute and reestablish relations between Iran and The Gambia. According to the U.S. Department of the Treasury, Mr.

Bazzi was a "close associate" of Yahya Jammeh, the former president of The Gambia, who was sanctioned by the United States in December 2017 for his record of human rights abuses and money laundering.

759.     Mr. Bazzi maintains ties to other U.S.-designated individuals, including Hezbollah financiers Adham Hussein Tabaja and Ali Youssef Charara. He also had extensive links to Hezbollah's most senior narcotics traffickers, including the U.S.-designated SDNTK, Ayman Joumaa.

760.     On April 23, 2019, the U.S. government's "Rewards for Justice" Program announced a reward of up to $10 million "for information leading to the disruption of the financial mechanisms of Lebanese Hizballah."

761.     The announcement described Mr. Bazzi as a "key Hizballah financier, who has provided millions of dollars to Hizballah generated from his business activities" and noted that the reward offer was highlighting him and two other individuals "as examples of key Hizballah financiers and facilitators about whom it seeks information and whom the U.S. Department of the Treasury has designated as SDGTs."

### g.  Saleh Ali Assi

762.     Saleh Ali Assi was a leading money launderer on behalf of Hezbollah's BAC and was a significant business partner of Kassim Tajideen (SDGT), Muhammad Bazzi (SDGT), and the Ahmad clan (described below), among others.

763.     Mr. Assi is a Lebanese national, but in recent years has lived in Paris, France and the Democratic Republic of Congo.

764.     He is reportedly being sought by Interpol for questioning and faces possible arrest in Lebanon if he returns.

765.     During the relevant period, Mr. Assi opened and maintained U.S. dollar-denominated accounts at Defendants BANQUE LIBANO-FRANÇAISE, BANK AUDI and LCB.

766.     Mr. Assi controls a milling company in the Democratic Republic of Congo called Minocongo SPRL and a bakery chain called Bread Victory ("Pain Victoire"), both of which are part of the U.S.-designated Tajideen Network of companies under the rubric of Congo Futur.[53]

767.     In Mr. Assi's capacity as a vehicle for the Ahmad clan's money laundering enterprises in the Democratic Republic of Congo and Belgium, he received millions of dollars (through correspondent banks in New York) to his account at Defendant BANQUE LIBANO-FRANÇAISE in Lebanon and lesser sums to his account at Defendant BANK AUDI in Lebanon from companies controlled by Nazim Ahmad, including Rilton Traders and Primogems.

768.     Mr. Assi was also co-founder and partner in the company Lebanese Development & Investment Company LLC with Abd al-Karim Yusuf Ahmad, son-in-law of Ali Ahmad.

769.     Mr. Assi was also the co-founder of Global Supply and Consultancy SAL Offshore in 2009, a BAC-controlled company that maintained an account for and received financial services from Defendant FRANSABANK.

770.     The chairman of Global Supply and Consultancy SAL Offshore is Muhammad Arkan al-Seblani, a senior BAC operative and business associate of Muhammad Abdallah al-Amin (designated an SDGT in 2018 for "assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Adham Hussein Tabaja").

771.     According to the Lebanese government, when LCB was finally compelled to close Mr. Assi's personal and corporate accounts, Mr. Assi's personal accounts migrated to Defendants

---

[53]     Mr. Assi has lately faced some legal troubles in the Democratic Republic of Congo. His bakery chain has been accused of price gouging.

BANQUE LIBANO-FRANÇAISE, FRANSABANK, MEAB BANK, and SGBL.

772.    Mr. Assi served as chairman and general manager of Inter Aliment SAL Offshore, a BAC facilitating company he established in 2005. His sister and nephew served as board members and shareholders.

773.    Inter Aliment SAL Offshore shared the same accountant / auditor as many of the Ahmad clan's companies, and two of its co-founders were involved in companies connected to Kamel Muhammad Amhaz (SDGT) discussed below.

774.    According to the Lebanese government, Inter Aliment SAL Offshore maintained a U.S. dollar-denominated account at LCB which was closed in December 2011 and whose balance migrated to Defendants BANQUE LIBANO-FRANÇAISE, FRANSABANK and MEAB BANK.

775.    Separately, Defendants SGBL and BANK AUDI maintained accounts for and provided financial services to Inter Aliment SAL Offshore.

776.    During the relevant period, Inter Aliment SAL Offshore laundered an excess of $70 million through its Lebanese bank accounts.

777.    According to the Lebanese government assessment, Fayed Exchange Company in Beirut was also associated with Mr. Assi. The company's U.S. dollar-denominated account at LCB was closed in June 2011 and thereafter migrated to Defendants LEBANON & GULF BANK and BANK OF BEIRUT AND THE ARAB COUNTRIES.

778.    Mr. Assi was involved in the Bank Al Madina scandal (discussed in detail below) and was a business partner of Ms. Rana Koleilat (the Lebanese fugitive most closely associated with the 2003 collapse of Bank Al Madina.)

**h.  <u>Kamel Amhaz</u>**

779.    Kamel Muhammad Amhaz and his brother Issam Muhammad Amhaz were

designated SDGTs by the U.S. Department of the Treasury in July 2014 for aiding the procurement of sophisticated electronics for military equipment, including unmanned aerial vehicles ("UAVs") used in Hezbollah military operations in Syria and Israel.

780.    Kamel Amhaz is known in Lebanon as both a premier arms dealer and smuggler. He worked closely with Kassem Hejeij (SDGT), the head of Defendant MEAB.

781.    The brothers acquired these electronics using their Lebanon-based company, Stars Group Holding SAL, and its six subsidiaries, which are listed below and were included in the U.S. Department of the Treasury designation:

- **Stars Group Holding SAL**, which purportedly sells cell phones and tablets, was designated an SDGT in July 2014. It owns several consumer electronics businesses in Beirut and elsewhere. The following individuals were involved with the company:

  o Kamel Amhaz was listed as a board member and owned 40 percent of the company;
  o Issam Amhaz was listed as the chairman and owned 40 percent of the company; and
  o Hani Amhaz, the youngest brother, was listed as a board member and owned 20 percent of the company.

- **Unique Stars Mobile Phones LLC** (UAE) (Stars Group Holding SAL subsidiary) was designated an SDGT in July 2014. The following individuals were involved with the company:

  o The Amhaz brothers owned the company; and
  o Ayman Ahmad Ibrahim was listed as general manager; he was designated by the U.S. Department of the Treasury on July 10, 2014, along with the Amhaz brothers.

- **Stars International Ltd.** (Stars Group Holding SAL subsidiary) was designated an SDGT in July 2014. The following individuals were involved with the company:

  o The Amhaz brothers owned the company; and
  o Ali Zeaiter was listed as the general manager; he was designated by the U.S. Department of the Treasury on July 10, 2014, along with the Amhaz brothers.

- **Stars Communications Ltd.** (Stars Group Holding SAL subsidiary), which purportedly sells cell phones and other consumer electronics was designated an SDGT in July 2014. The following individuals were involved with the company:

  o Kamel Amhaz was listed as co-founder, director and signed commissioner of the company;
  o Ali Youssef Tarhini was listed as a director of the company;
  o Hussein Ahmad Amhaz was listed as co-founder and partner (owning 1 percent) of the company;
  o Abdallah Zuhayr al-Sahili was listed as majority shareholder (owning 98 percent) of the company; and
  o Samira Muhammad al-Sahili was listed as a partner (owning 1 percent) of the company.

- **Teleserve Plus SAL** (Stars Group Holding SAL subsidiary), which purportedly deals with communication and computers and was designated an SDGT on July 10, 2014. The following individuals were involved with the company:

  o Hani Amhaz was listed as the general manager, chairman and majority shareholder (owning 70 percent) of the company;
  o Michel Gabriel Ma'rawi was listed as a board member and partner (owning 25 percent) of the company;
  o Ahmad Hisham Amhaz was listed as a board member and partner (owning 5 percent) of the company;
  o Ibrahim Muhammad Rakin was listed as the auditor / accountant of the company; and
  o Ashraf Assem Safieddine was listed as the attorney and co-founder of the country.

- **Stars Communications (Offshore) SAL** (Stars Group Holding SAL subsidiary), which purportedly imports electronics into Lebanon was designated an SDGT in July 2014. The following individuals were involved with the company:

  o Kamel Amhaz was listed as the chairman and majority shareholder (owning 90 percent) of the company;
  o Fatima Ahmad Qubaysi was listed as a board member and shareholder (owning 5 percent) of the company;
  o Hani Amhaz was listed as a board member and shareholder (owning 5 percent) of the company; and
  o Ali Muhammad Amhaz was listed as general manager of the company.

- **Special Operations Group SAL**, which specialized in selling Czech

weapons, officially to the Lebanese Armed Forces. It was established in 2013 – after the relevant time period, but it is notable because it maintained an account with and received financial services from Defendant BANK AUDI despite Mr. Amhaz's controversial reputation. The following individuals were involved with the company:

o   Kamel Amhaz was listed as founder of the company;
o   Jihad Hussein al-Anan served as the company's attorney; and
o   Mr. Safieddine also served as the company's attorney.

782.    Another prominent member of the Amhaz brothers' network is Hanna Elias Khalifa (a/k/a Khalifeh) (SDGT), a Hezbollah operative and Lebanese businessman who worked directly with Stars Group Holding SAL network managers to facilitate procurement activities on Hezbollah's behalf.

### i.   <u>Hassan Shateri</u>

783.    Hassan Shateri (a/k/a Hussam Khoshnevis) was a senior commander in the IRGC–QF. After the 2006 conflict between Hezbollah and Israel, Mr. Shateri was sent to Lebanon under the alias of "Hussam Khoshnevis" and was put in charge of the Iranian Committee for the Reconstruction of Lebanon ("ICRL") together with another Iranian operative named Reza Dehnavi. Mr. Dehnavi was the manager of the ICRL southern branch.

784.    According to the *Fars New Agency,* Mr. Shateri served as an IRGC-QF officer in Kurdistan, Afghanistan, Iraq and Lebanon.

785.    As indicated by Mr. Shateri's rank, the ICRL was (and is) an organization controlled by the IRGC-QF.

786.    According to an *Asharq al-Awsat*'s report, Mr. Shateri received $200 million U.S. dollars a year in order to restore Hezbollah's military capabilities and its position within Lebanon.

787.    With these funds, he created a business empire including banks, shopping malls, hotels, transport companies, radio and television networks, newspapers, and travel agencies.

788.     Mr. Shateri was designated an SDGT by the U.S. Department of the Treasury in August 2010.

789.     According to the U.S. Department of the Treasury, Mr. Shateri also operated as then-Iranian President Mahmoud Ahmadinejad's personal representative in Lebanon.

790.     He was killed by Syrian rebels at the beginning of 2013.

791.     He was partner and founder of several companies linked to the Tajideen family and Jihad al-Bina (Hezbollah's SDGT construction arm), and of several companies under the umbrella of the Ansar Group run by his Iranian colleague, Reza Dehnavi, including the following entities:

- **New Roads SARL**, which deals with building materials, particularly cement. It is based in Nabatieh, South Lebanon. The following individuals were involved with the company:

  o  Hassan Shateri was listed as a partner of the company;
  o  Reda Ali Atawi of the Tajideen Network was listed as a partner of the company (through Al-Ataa Company Hassan Bazoun & Partners, described above);
  o  Muhammad Tarhini was listed as account manager of the company;
  o  Hussein Bahjat was listed as auditor of the company; and
  o  Muhammad Ali al-Seblani was listed as managing director, authorized signatory and a partner of the company.

- **National Crushers Company SAL**, which deals with cement production. The following individuals were involved with the company:

  o  Muhammad Ali al-Seblani was listed as chairman, a partner and authorized signatory of the company;
  o  Hassan Shateri was listed as the general director, partner and authorized signatory of the company;
  o  Muhammad Haidar Qansu was listed as a partner of the company;
  o  Kazem Abbas Darabi was listed as a board member and partner of the company; he is both a Hezbollah and IRGC operative and was previously responsible for planning the murderous attack on the Mykonos restaurant in Berlin in 1992; and
  o  Reza Dehnavi was listed as the manager of the company.

- **Cleany & Company SARL**, which deals mainly with maintenance and repairing of houses, offices, real estate and buildings. The following individuals were involved with the company:

- o Hassan Shateri was the founder and a partner (holding 100 shares) of the company;
- o Saad Habib Lahud was listed as a co-founder, authorized signatory, and majority shareholder (holding 4,800 shares) of the company;
- o Muhammad Haidar Qansu was listed as a co-founder and shareholder (holding 100 shares) of the company; and
- o Jihad George Lutfi was listed as the attorney for the company.

### j. **Imad Abdul Reda Bakri**

792.     Imad Bakri is a prolific "businessman" and BAC operative who was involved in companies from Lebanon to Europe to Africa to South America.

793.     According to a French news report, Mr. Bakri was involved trading meat, fish and flour, in Belgium, Romania, Lebanon, Algeria and Angola, through his company Metro Trading Company established in Belgium in 1989 and then incorporated in Lebanon as Metro Trading SARL and Metro Trading Company Offshore SAL (both) in 2008.

794.     During 2006-2007, Metro Trading laundered more than $15 million U.S. dollars through LCB on Hezbollah's behalf.

795.     Mr. Bakri personally laundered more than $3 million through his personal account at LCB during the same time period on Hezbollah's behalf.

796.     Metro Trading Company Offshore SAL has held accounts at Defendants SGBL and BANQUE LIBANO-FRANÇAISE.

797.     According to a United Nations report, Mr. Bakri has been the main weapons and military equipment supplier for the Angolan militia known as UNITA and has supplied the group via Kinshasa, Democratic Republic of Congo.

798.     Mr. Bakri has also been accused of orchestrating arms shipments through another company he controls in Romania called Romagro Cereal SRL, in Romania.

799. A July 2000 Belgian intelligence report identified specific Lebanese diamond traders and companies tied to Hezbollah, including Imad Abdul Reda Bakri, Ali Ahmad (discussed below), Afrostars Diamonds BVBA (controlled by Mr. Bakri), Triple A Diamonds NV (discussed below), and Ezzideen Diamonds BVBA.

800. According to the report, "there are indications that certain persons, the 'Lebanese connection' mentioned in the diamond smuggling file, also put in an appearance in files on money laundering, the drugs trade and the financing of Lebanese 'terrorist' organizations such as Amal and Hizballah."

801. In April 2003, the British NGO "Global Witness" described Mr. Bakri as having "close ties with President Mobutu in the former Zaire, working closely with Zairian generals to arm UNITA" and further observed that "[t]he BAKRI family is connected with Shi'ite organizations, in particular HIZBOLLAH." (emphasis in the original).

802. Mr. Bakri also reportedly orchestrated weapons trafficking logistics between UNITA and notorious Russian arms dealer Victor Bout.[54]

803. Mr. Bakri co-founded Metro Trading Company Offshore SAL with Iman Abd al-Saheb Dhiyab believed to be the wife of Imad Chukrallah Nasrallah, who was partners with Mr. Bakri in Romagro Cereal SRL.[55]

---

[54] *See*, for example, *International Arms Dealer Viktor Bout Convicted in New York of Terrorism Crimes Bout Convicted on All Four Counts, Including Conspiring to Kill Americans and Conspiring to Provide Material Support to Terrorists* (Drug Enforcement Administration, November 3, 2011), online at https://www.dea.gov/press-releases/2011/11/03/international-arms-dealer-viktor-bout-convicted-new-york-terrorism-crimes ("Bout was convicted today of conspiring to kill U.S. nationals; conspiring to kill U.S. officers and employees; conspiring to acquire and use anti-aircraft missiles; and conspiring to provide material support to a designated foreign terrorist organization.").

[55] Romagro Cereal SRL is also linked to other companies within the BAC network through Ali Ahmad Choueib (whose mother is a member of the Issawi family). Both Mr. Choueib's personal account at LCB and the account of his Turkish trading company, Golden Eye Trading Ithalat Ihracat Ltd., were identified by Lebanese authorities and closed as part of SGBL's acquisition of LCB. The account balances for both accounts migrated to Defendant FENICIA BANK.

804.     Imad Chukrallah Nasrallah was also a partner with Imad Bakri's brother, Walid Bakri, in another Lebanese company called Rimco which laundered more than $1 million U.S. dollars within a two-year period through LCB, on Hezbollah's behalf.

805.     Metro Trading Company SAL Offshore and Rimco worked together to launder funds on behalf of their principals and Hezbollah.

806.     In less than two years, Imad Chukrallah Nasrallah laundered more than $5 million U.S. dollars through his personal account at Lebanese Canadian Bank on Hezbollah's behalf.

## 2.     HEZBOLLAH'S CONFLICT DIAMOND AND MONEY LAUNDERING NETWORK

807.     As discussed above, the BAC's networks overlap considerably so that clear delineations between diamond smugglers, money launderers, drug traffickers or arms dealers do not exist.

808.     One of Hezbollah's early sources of revenue came from the Lebanese criminal networks active in sub-Saharan Africa.

809.     These networks included families long involved in dealing in Conflict Diamonds, particularly in West Africa.

810.     The families that control these networks have invested a substantial portion of their illicit proceeds in Lebanese real estate, often forming separate companies to deposit the millions of dollars they have laundered through black market sales and phony invoicing of Conflict Diamonds back into Lebanese exchange houses and ultimately, Defendants.

811.     These include the Nassour, Ahmad and Khanafer clans and individuals and companies that have facilitated their money laundering operations over the past two decades.

812.     In 2002, the United Nations Security Council ("UNSC") issued a report about Conflict Diamonds titled: *Final report of the Panel of Experts on the Illegal Exploitation of*

*Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo* ("the UNSC Report").

813.    The UNSC Report stated that the Nassour, Ahmad and Khanafer clans provided banknote counterfeiting, money laundering and diamond smuggling services to Hezbollah and other Hezbollah-related entities:

> The Panel has documents showing that three "clans" of Lebanese origin, who operate licensed diamond businesses in Antwerp, purchased diamonds from the Democratic Republic of the Congo worth $150 million in 2001, either directly through Kinshasa or through comptoirs in the Republic of the Congo. The three "clans" - Ahmad, Nassour and Khanafer - are distinct criminal organizations that operate internationally. Their activities, known to intelligence services and police organizations, include counterfeiting, money-laundering and diamond smuggling. Several credible sources have reported that the clans also have ties with Amal and Hezbollah. Some businesses associated with the clans are Sierra Gem Diamonds, Asa Diam, Triple A Diamonds and Echogem. A group linked to the clans' operations is providing counterfeit United States dollars to former generals from the time of President Mobutu, who are trying to overthrow the Government of the Democratic Republic of the Congo.

814.    In fact, all three clans and their Conflict Diamonds and Money Laundering Networks are tightly integrated into Hezbollah's BAC and The System, and a significant portion of the vast quantities of U.S. dollar-denominated banknotes they obtain and launder from South America, Africa and the Persian Gulf were deposited in and flowed through Lebanese exchange houses and Defendants herein.

815.    In 2011, the U.S. National Security Council ("NSC") released a report addressing the converging threats to U.S. national security from transnational organized crime—including Hezbollah.[56]

816.    For example, the NSC's report identified, among other threats, a growing nexus

---

[56]     *Strategy to Combat Transnational Organized Crime* (National Security Council, July 2011), online at https://obamawhitehouse.archives.gov/sites/default/files/microsites/2011-strategy-combat-transnational-organized-crime.pdf.

between crime, terrorism and insurgencies:

> Terrorists and insurgents increasingly are turning to [Transnational Organized Crime] to generate funding and acquire logistical support to carry out their violent acts. The Department of Justice reports that 29 of the 63 organizations on its FY 2010 Consolidated Priority Organization Targets list, which includes the most significant international drug trafficking organizations (DTOs) threatening the United States, were associated with terrorist groups. Involvement in the drug trade by the Taliban and the Revolutionary Armed Forces of Colombia (FARC) is critical to the ability of these groups to fund terrorist activity. We are concerned about *Hizballah's drug and criminal activities*, as well as indications of links between al-Qa'ida in the Lands of the Islamic Maghreb and the drug trade. (Emphasis added.)

817.    As these Conflict Diamond transnational criminal organizations grew in size, expanding in scope and reach over time, they became invaluable service providers to other BAC enterprises that were in need of, among other things, discreet access to ports and airfields in Africa, reliable bulk cash couriers, favorable government contracts and innovative ways to launder narcotics proceeds through trade-based money laundering techniques.

### a.   The Nassour Clan Network

818.    Ibrahim Khalil Nassour was a prominent Lebanese businessman who controlled a major diamond business in Antwerp. In 1984, Nassour established a company called Diamonds Forever with his sons Khalil Ibrahim Nassour, Muhammad Ibrahim Nassour and Aziz Ibrahim Nassour.

819.    LCB maintained account no. 172662* for Mr. Nassour until it was closed in July 2012.

820.    Ibrahim Khalil Nassour also owns and controls a Lebanese sister company to Diamonds Forever called Diamonds Forever SAL.

821.    For many years, Diamonds Forever was known as the key Nassour business before it entered into bankruptcy in 1999. One of its principal businesses was counterfeiting U.S. and Zaire banknotes.

822.    Ibrahim Nassour was also the director of Echogem, a diamond exporter based in Antwerp, Belgium and closely tied to the Democratic Republic of Congo.

823.    The UNSC Report, Annex III, listed Echogem as one of several companies found to have violated the Organization for Economic Cooperation and Development's ("OECD's") Guidelines for Multinational Enterprises.[57]

824.    According to a published report, Ibrahim Nassour is a "fanatic Shi'a Muslim, strong supporter of Hezbollah. Important sponsor figure in the Hezbollah structure and leadership."

825.    Ibrahim Khalil Nassour had eight children:

- Khalil Ibrahim Nassour;
- Muhammad Ibrahim Nassour;
- Aziz Ibrahim Nassour;
- Sahar Ibrahim Nassour;
- Diana Nassour;
- Abdul Menhem Ibrahim Nassour;
- Hassan Ibrahim Nassour; and
- Ali Ibrahim Nassour.

826.    Ibrahim Nassour's son Khalil Nassour was also affiliated with Diamonds Forever in Antwerp (where Khalil Nassour was a co-founder of the company), and he co-founded several Nassour family-controlled companies in Lebanon including La National SAL, Centrum Mark SAL, and Diamonds Forever SAL.

---

[57]    *OECD Guidelines for Multinational Enterprises* (Organization for Economic Cooperation and Development, 2011) online at http://www.oecd.org/daf/inv/mne/48004323.pdf.

827.    Khalil Nassour's wife, Batul Hassan Youssef Nassour, and two of the couple's sons are also affiliated with these same Lebanese companies as well as more than a dozen additional companies.

828.    In 2001, Khalil Nassour was implicated in a massive $90 million U.S. dollar diamond fraud at the ABN AMRO Bank in Amsterdam's diamond district.

829.    According to published reports, Khalil Nassour built the Sahara Hotel in South Sudan, which was managed by his brother-in-law, Nazim Adel Fayad (who was separately implicated, together with Aziz Nassour in a counterfeiting scheme in Lebanon in the 1990s).

830.    Ibrahim Nassour's son Muhammad Ibrahim Nassour was also affiliated with Diamonds Forever in Antwerp (where Muhammad Ibrahim Nassour was a co-founder of the company), and he also served as co-director of both Echogem and Sourans Diamonds in Antwerp (with his brother Aziz Nassour).

831.    Abdul Menhem Ibrahim Nassour and Ali Ibrahim Nassour were also involved in Nassour-controlled companies, including Diamonds Forever and Echogem.

832.    Ibrahim Nassour's son Aziz Nassour served as director of one of the family's diamond firms in Belgium known as ASA Diam NV, which it jointly controlled with the Ahmad clan (discussed below).[58]

833.    In the early 2000s, Aziz Nassour spent significant time in both Belgium and Lebanon.

834.    Aziz Nassour's sister, Diana Nassour, is married to Ali Sa'id Ahmad and is registered as a co-director of another key company in the network known as Sierra Gem Diamonds

---

[58]    Annex III of the UNSC Report also listed ASA Diam NV as one of several companies found to have violated OECD Guidelines for Multinational Enterprises. As noted above, the 2002 UNSC Report noted that the company provided "counterfeit United States dollars" and was associated with the Ahmad criminal organization.

NV that was registered in Antwerp, Belgium in 1980.

835.    From 1985 to 1986 Aziz Nassour reportedly operated a gold and diamond buying office in Liberia. Later he became very close to the then-dictator of the Democratic Republic of Congo – Mobutu Sese Seko – reportedly earning the nickname 'Aziz Mobutu.'

836.    Aziz Nassour reportedly left the Democratic Republic of Congo in 1994 and eventually used ASA Diam NV, a company controlled by his brother-in-law Ali Said Ahmad, to import the diamonds into Belgium. During 2000, for example, he reportedly imported diamonds worth approximately $14 million from the Democratic Republic of Congo, mostly from Kisangani.

837.    The Nassour and Ahmad clans – working together and separately – have long engaged in a variety of methods and schemes to smuggle Conflict Diamonds, secure trading rights in Africa and launder money, both on their own behalf and on Hezbollah's behalf.

838.    For example, according to Belgian authorities, Aziz Nassour "established a mechanism whereby rough diamonds, the so-called 'conflict or blood diamonds' were smuggled from the region of Kono (Sierra Leone) via Monrovia (Liberia) to the Antwerp diamond market." Nassour's right hand man and key figure acting for him in Africa was Samih Ossaily.

839.    Mr. Ossaily was introduced by Aziz Nassour to Ali Darwish,[59] who had a personal relationship with Ibrahim Bah, a leader of the Revolutionary United Front ("RUF"), a group that fought a vicious civil war in Sierra Leone until 2002.

840.    In late 2000, Mr. Ossaily worked with Mr. Bah to smuggle Conflict Diamonds from Sierra Leone to Belgium where they could be "laundered" through ASA Diam NV.

841.    A World Bank report estimated that diamond exports from Sierra Leone were worth $138 million U.S. dollars per year, of which only $1.2 million were legal.

---

[59]    Possibly, Ali Hussein Darwish, discussed below.

842.    From January 2000 through August 2001, according to a later financial audit under the auspices of Belgian authorities, ASA Diam NV moved $19 million U.S. dollars from Belgium to Lebanon, of which $16.5 million U.S. dollars was in cash withdrawals.

843.    Between January and May 2001, Mr. Nassour withdrew another $20 million U.S. dollars in cash from an account controlled by ASA Diam NV. Some of the money was transferred to Beirut after passing through the London offices of BYBLOS BANK Europe SA.[60]

844.    Defendant BYBLOS BANK owns over 99 percent of Byblos Bank Europe.

845.    Aziz Nassour later admitted that "certain sums, entered up for invoices from 'Bureau Aziz Nassour' were used to purchase real estate in Lebanon." Mr. Nassour appears to have maintained a personal account at a Lebanese bank not named in this Action.

846.    Mr. Nassour and ASA Diam NV were also linked to the RUF in Sierra Leone and both Al Qaeda and Iran.

847.    According to the Belgian police, ASA Diam NV phone records in Belgium indicated that from January to May 2001, a considerable number of telephone calls were made to Liberia and to RUF members in Sierra Leone. After May 2001, phone records show that calls were placed from ASA Diam NV's office to Afghanistan, Pakistan, Iran and Iraq.

848.    When interviewed, Mr. Nassour admitted to calling a Lebanese minister who was in Iran on personal business but could not explain the other calls, stating that anyone could have walked into the office and used the phone.

849.    Belgian police later concluded that Mr. Nassour "is the leader of an international

---

[60]    According to a U.N. investigation: "The company, represented by Ali Ahmad in its response to the Panel, confirms buying diamonds from a Mr. Aziz Nassour, but asserts that the consignments were imported into Belgium with official invoices having been declared at E.C. airports in a correct way. Asa Diam NV maintains that it was not its responsibility to search out whether Mr. Nassour was dealing in any incorrect way whatsoever." Left unstated is the familial relationship between Mr. Nassour and Mr. Ahmad.

criminal organization who delivers weapons to African war-territories in exchange for "blood" diamonds. The money is subsequently being laundered on the Antwerp Diamond Market."

850. Using interviews and phone records, Belgian police further linked Mr. Nassour via ASA Diam NV's offices in Antwerp to his brother-in-law Ali Said Ahmad and the phone calls from the company's offices to weapons purchases.

851. Mr. Nassour's phone records also linked certain weapons purchases to Sierra Gem Diamonds NV, Said Ali Ahmad and his sons Nazim and Hassan (discussed below).

852. Sierra Gem Diamonds NV was also linked to phone calls placed from its offices on September 10, 2001 to an individual named Zine Qayoum who was in direct contact with notorious arms dealer Victor Bout and unidentified Iranians.

853. Ibrahim Nassour's daughter, Diana Nassour, married Ali Said Ali Ahmad (discussed below). She was registered as a director of Sierra Gem Diamonds NV in Antwerp.

854. Primo-Gem SPRL in the Democratic Republic of Congo is reportedly controlled jointly by the Nassour and ahmad clans.

855. The company held an account at LCB that received at least $4.2 million U.S. dollars from the Ahmad-controlled Primogems in transactions that flowed through LCB's U.S. correspondent accounts.

### b. **The Ahmad Clan Network**

856. Ali Ahmad and his wife Zahra had five children who together built a sprawling criminal and commercial network through Africa and Europe that would feed The System's coffers in Lebanon.

857. Members of the Ahmad family often marry cousins within the various branches of the clan, benefiting the overall cohesion of their illicit business operations.

858. Together they form a vast criminal network that started in the diamond trade, but long ago expanded to numerous forms of illicit finance and money laundering, both for personal profit, and in the service of Hezbollah's BAC.

859. Ali Ahmad's children (born in the 1920s and 1930s) included Said Ali Ahmad, Youssef Ali Ahmad, Suleiman Ali Ahmad, Ahmad Ali Ahmad and Ali Ahmad.

860. They and their web of companies are used in furtherance of the BAC's global money laundering activities.

861. Said Ali Ahmad established several companies in Africa, Lebanon and Belgium. These companies were used as vehicles by which the Ahmad clan transported (or smuggled) diamonds (including Conflict Diamonds) and laundered enormous sums of money (primarily in U.S. dollars) – including substantial sums for Hezbollah.

862. Said Ali Ahmad's son, Nazim Ahmad, later emerged as a key Hezbollah BAC facilitator who controls a network of companies in Africa, Lebanon, Dubai and Belgium.

863. Nazim Ahmad's brothers, cousins and extended family play a significant role in his criminal network. The network was involved in smuggling Conflict Diamonds, money laundering (including narcotics proceeds) and weapons trafficking.

864. Until the period following the September 11, 2001 terrorist attacks, when law enforcement agencies around the world increased their scrutiny of suspected money launderers, the Ahmad clan smuggled diamonds and laundered money primarily by shipping diamonds from companies they controlled in the Democratic Republic of Congo to other companies they controlled in Antwerp, Belgium.

865. In addition to the added scrutiny brought about by the September 11, 2001 terrorist attacks, the Kimberley Process ("KP") established in 2003 created a Kimberley Process

Certification Scheme ("KPCS") under which states began to implement safeguards on shipments of rough diamonds and created a certification process to label diamonds as "conflict free."

866. Since the Ahmad clan operated its diamond companies primarily in conflict zones in Africa and the clan's business model was built on fueling corruption and exploiting war-torn areas of Africa, the Kimberley Process threatened unwanted scrutiny of their operations and led them to establish a number of parallel commercial entities in Dubai, United Arab Emirates, that could serve as an alternative route for shipping Conflict Diamonds and laundering bulk cash.

867. Until 2005, Nazim Ahmad often arranged for members of the Ahmad clan and trusted business partners to receive direct payments from diamond companies he controlled in Dubai, United Arab Emirates, Panama, Democratic Republic of Congo and elsewhere in Africa. These payments were typically processed through Belgium (through companies like Sierra Gem Diamonds NV and Blue Star Diamond Offshore SAL), then through the United States and then deposited into accounts in Lebanon belonging to individual members of the Ahmad clan and trusted business partners, usually involving transfers from companies controlled by Nazim Ahmad such as Rilton Traders in Dubai and Primogems in the Democratic Republic of Congo.[61]

868. The following individuals and companies were among the recipients of illicit funds in U.S. dollars directed by Nazim Ahmad's network via Rilton Traders in Dubai and Primogems to accounts at Defendant banks in Lebanon through their correspondent banks in the United States:

| Sender | Recipient | Bank | Minimum Funds Transferred via New York |
|---|---|---|---|
| **PRIMOGEMS** | PRIMOGEM SPRL | LCB | $4,200,000 |
| **PRIMOGEMS** | Elissa Company | MEAB BANK | $ 400,000 |
| **PRIMOGEMS** | Rim Reda Baqir / Rana Hachem | BANK AUDI | $ 150,000 |

---

[61] Primo-Gem SPRL (the Democratic Republic of Congo affiliate of Primogems) held an account at LCB that received over $4 million (in U.S. dollars) from its sister companies via electronic funds transfers that cleared through correspondent accounts in New York.

| | | | |
|---|---|---|---|
| **PRIMOGEMS** | Saleh Ali Assi | BANQUE LIBANO-FRANÇAISE | $2,200,000 |
| **Rilton Traders** | | | $1,700,000 |
| **Rilton Traders** | | FRANSABANK | $ 150,000 |
| **Rilton Traders** | Hussein Ahmad Issawi | LCB | $20,000,000 |
| **Rilton Traders** | Mahmoud Nayef Ahmad | BLOM BANK | $6,200,000 |
| **Rilton Traders** | Abd al-Ilah Mahmud Ashur | FENICIA BANK | $1,400,000 |
| **Rilton Traders** | Ali Hussein Darwish | SGBL | $ 300,000 |
| **Rilton Traders** | Fawzi or Johanna Malek | SGBL | $ 400,000 |
| **Rilton Traders** | Johanna Malek | BANQUE LIBANO-FRANÇAISE | $3,200,000 |
| **PRIMOGEMS** | Musa Muhammad Ahmad | JAMMAL TRUST BANK | $ 5,000 |
| **Rilton Traders** | | | $ 30,000 |
| **Rilton Traders** | Primo International SAL | BANQUE LIBANO-FRANÇAISE | $ 100,000 |
| | | BLOM BANK | $ 550,000 |
| **Rilton Traders** | Rami Kamil Ya'qub Baqir | BLOM BANK | $ 10,000 |
| **Rilton Traders** | Randa Muhammad Malek | FENICIA BANK | $ 95,000 |
| | | BLOM BANK | $ 200,000 |
| **PRIMOGEMS** | Rim Reda Baqir | BANK AUDI | $ 8,000 |
| **Rilton Traders** | | | $ 49,500 |
| **Rilton Traders** | Salman Ali Ahmad | BLOM BANK | $ 600,000 |
| | | LCB | $ 280,000 |
| **Rilton Traders** | Sleiman Ali Ahmad | BANQUE LIBANO-FRANÇAISE | $2,300,000 |
| **Rilton Traders** | Ramzi Muhammad Malek | FRANSABANK | $ 70,000 |
| **Rilton Traders** | Hussein Ali Atwi | BYBLOS BANK | $ 10,000 |
| **Rilton Traders** | Hijazi Trading Establishment | BANK OF BEIRUT | $ 50,000 |
| **Rilton Traders** | Samir Muhammad Hijazi | BLOM BANK | $ 950,000 |

869.    The above list reflects only a small subset of the family members and business associates that constituted Nazim Ahmad's diamond smuggling and money laundering network,

and it also reflects merely a small fraction of the U.S. dollars that flowed through that network via Dubai and Antwerp, through the United States and into accounts held by members of the network at Defendant banks.

870.    Following the U.N.'s 2002 investigation into Conflict Diamonds (which identified Ahmad clan companies) and a subsequent Belgian police investigation focused (at least initially) on possible weapons trafficking to Sierra Leone and other African conflict zones, Nazim Ahmad altered his approach and began using G & S Diamonds in Dubai, among other corporate entities, as his principal mechanism for depositing funds worth hundreds of millions of U.S. dollars in Lebanese banks rather than drawing further scrutiny to his family members and business associates.

871.    To that end, Nazim Ahmad began transferring hundreds of millions of dollars to G & S Diamonds' account(s) at LCB but also transferred a smaller volume of U.S. dollars (through correspondent accounts in New York) for deposit into G & S Diamonds' account at Defendant LEBANON AND GULF BANK.

872.    Below is a partial list and overview of individuals and companies affiliated with the Hezbollah's Ahmad Clan Network and the Defendants that maintained accounts for them and provided them with financial services:

| Ahmad Corporate Network | Bank |
|---|---|
| Nazim Said Ali Ahmad | <ul><li>LCB</li><li>BANK AUDI</li><li>BLOM BANK</li><li>SGBL</li></ul> |
| Primo International SAL Offshore | <ul><li>BLOM BANK</li><li>BANQUE LIBANO-FRANÇAISE</li></ul> |
| Blue Star Diamond Offshore SAL | <ul><li>LCB</li></ul> |
| G & S Diamonds | <ul><li>LCB</li><li>LEBANON AND GULF BANK</li></ul> |
| ASA Diam NV | <ul><li>BYBLOS BANK</li></ul> |

| | |
|---|---|
| **Primo-Gem SPRL** | • LCB |
| **Kohinoor SAL** | • LCB<br>• SGBL |
| **ACE Group SAL** | • FRANSABANK |
| **Blue City SAL** | • FRANSABANK |
| **Ali Ahmed Group – Holding SAL** | • FRANSABANK |
| **United Investment Group SAL** | • SGBL |
| **Golden Square SAL** | • FRANSABANK |
| **Spider Group SAL** | • FRANSABANK |
| **Paloma Group SAL** | • FRANSABANK |
| **Hassan Said Ahmad** | • LCB |
| **Issam Suleiman Ahmad** | • LCB |
| **Johanna Malek** | • SGBL<br>• BANQUE LIBANO-FRANÇAISE |
| **Musa Muhammad Ahmad** | • JAMMAL TRUST BANK |
| **Rami Kamil Ya'qub Baqir** | • LCB<br>• BLOM BANK |
| **Rim Reda Baqir** | • BANK AUDI<br>• LCB |
| **Fawzi Muhammad Malek** | • LCB<br>• SGBL<br>• BANK AUDI |
| **Ramzi Muhammad Malek** | • FRANSABANK |
| **Randa Muhammad Malek** | • BLOM BANK<br>• FENICIA BANK |
| **Seada Said Ali Ahmad** | • LCB |
| **Mahmoud Nayef Ahmad** | • BLOM BANK |
| **Ali Hussein Darwish** | • SGBL<br>• LCB<br>• BANK AUDI<br>• BYBLOS BANK |
| **Abd al-Ilah Mahmud Ashur** | • FENICIA BANK |
| **Saleh Ali Assi** | • BANQUE LIBANO-FRANÇAISE<br>• FRANSABANK<br>• LCB<br>• SGBL<br>• MEAB BANK |
| **Salman Ali Ahmad** | • BLOM BANK<br>• LCB |
| **Said Hassan Fuani** | • LCB<br>• FENICIA BANK<br>• BANK AUDI<br>• MEAB BANK |

| | BYBLOS BANK |
| | BANQUE LIBANO-FRANÇAISE |
|---|---|
| **Samir Muhammad Hijazi** | • BLOM BANK |
| | • LCB |
| | • FENICIA BANK |
| | • BANK OF BEIRUT |

i. **Said Ali Ahmad**

873. As noted above, while Nazim Ahmad is effectively the leader of the Ahmad clan's criminal network, Said Ali Ahmad (born in 1935) is the scion of the Ahmad clan – long known as both a prominent criminal organization in Africa and Hezbollah supporters and operatives.[62]

874. Said Ali Ahmad and his wife, Hind Abbas Ahmad, had eight children:

- Nazim Said Ali Ahmad (a/k/a Nazim Ahmad);
- Ali Said Ali Ahmad;
- Hassan Said Ali Ahmad;
- Muhammad Said Ali Ahmad;
- Hussein Said Ali Ahmad;
- Ibtisam Said Ali Ahmad;
- Seada Said Ali Ahmad; and
- Muna Said Ali Ahmad.

875. Companies affiliated with Said Ali Ahmad include the following entities:

- **Said Ali Ahmad (Company)**. The company's corporate registration indicates that Said Ali Ahmad established it in 1975.

- **Primo International NV / Primo International SAL Offshore**. The sister companies played a significant role in laundering money for the Ahmad clan's Conflict Diamonds business in Belgium. Nazim Ahmad also transferred (at least) hundreds of thousands of U.S. dollars from nominal diamond sales in Belgium through New York *en route* to accounts of the Beirut affiliate, Primo International SAL Offshore that owned U.S. dollar-denominated accounts at Defendants BLOM BANK and BANQUE LIBANO-FRANÇAISE. Primo International has served as an important money laundering conduit for Hezbollah's BAC.

- **Sierra Gem Diamonds NV**. The company appears in the UNSC Report Annex I (Companies on which the Panel recommends the placing of

---

[62]    Ahmad was also close to Nabih Berri, the Amal leader and current speaker of the Lebanese parliament.

financial restrictions). It is directly connected to Primo-Gem SPRL in Kinshasa, Democratic Republic of Congo and Primo in the Central African Republic. It has used a small Belgian bank that specializes exclusively in serving the diamond industry to transfer funds around the world. The following individuals were involved with the company:

- o Said Ahmad operated the company with his three sons and daughter-in-law; and
- o Nazim Ahmad controlled the company.

- **Beirut Diam SAL**. The company was registered in 2006. Nazim Ahmad used Beirut Diam SAL to launder significant sums of U.S. dollars through LCB. The following individuals were involved with the company:

  - o Nazim Ahmad was listed as the owner of most of the shares of the company;
  - o Rima Kamil Ya'qub Baqir (Nazim Ahmad's wife) was listed as owner of a minority stake of the company;
  - o Rami Kamil Ya'qub Baqir, was listed as owner of a minority stake of the company;
  - o Said Ali Ahmad was listed as a director of the company;
  - o Kamil Rashad Azar was listed as the company's attorney.

- **Terina Jewelry SARL**. The following individuals were involved with the company:

  - o Said Ali Ahmad was listed as owner and co-founder of the company;
  - o Nazim Ahmad was listed as co-founder of the company; and
  - o Naila Najib Hatem was listed as the company's attorney.

- **Pure Diam DMCC SAL Offshore**. The following individuals were involved with the company:

  - o Said Ali Ahmad was listed as a shareholder, co-founder and board member of the company;
  - o Imad Suleiman Ahmad was listed as the largest shareholder of the company; and
  - o Seada Said Ali Ahmad (Said's daughter and Imad's wife) was listed as a shareholder of the company.

- **Beirut Trade SAL**. The following individuals were involved with the company:

  - o Said Ali Ahmad was listed as a shareholder and board member of the company;

194

- o Nazim Ahmad was listed as shareholder, authorized signatory and chairman of the company;
- o Rima Kamil Ya'qub Baqir was listed as a shareholder and sat on the board of directors of the company;
- o Batul Hassan Youssef Nassour was listed as a shareholder of the company;
- o Muhsin Ali Ahmad (son of Ali Ahmad) was listed as a board member and a shareholder of the company; and
- o Kamil Rashad Azar was listed as the company's attorney.

- **Nour Holding SAL**. The following individuals were involved with the company:

  - o Said Ali Ahmad was listed as a shareholder, co-founder, authorized signatory and board member of the company;
  - o Nazim Ahmad was listed as the majority shareholder and chairman of the company;
  - o Rima Kamil Ya'qub Baqir was listed as a board member of the company; and
  - o Kamil Rashad Azar was listed as the company's attorney.

### ii. Nazim Said Ali Ahmad

876. Nazim Said Ali Ahmad (a/k/a Nazem Ahmad) is a senior BAC operative who has enjoyed a storied career as diamond dealer (including Conflict Diamonds), money launderer (and real estate mogul), weapons-trafficker and more recently, art collector.

877. Nazim Said Ali Ahmad has worked closely with other members of his extended family, the Nassour clan, the Tajideens, Adham Tabaja and other nodes of the BAC's criminal network.

878. Both he and his family are closely tied to Hezbollah, and he reportedly has close ties to the IRGC.

879. Nazim Ahmad effectively controls most, if not all, of the companies his father established and many others. They are all part of a closed network (that enlists family members and trusted business partners) that has laundered *billions* of U.S. dollars over the past two decades, much of it for Hezbollah.

880. Nazim Ahmad's wife, Rima Kamil Ya'qub Baqir (a/k/a Baker), and two children, Hind Nazim Ahmad and Firas Nazim Ahmad, are also involved in businesses he controls.[63]

881. Rima Baqir sits on the boards of 14 companies controlled by the family.

882. Rima's brother and Nazim Ahmad's brother-in-law – Rami Kamil Ya'qub Baqir (a/k/a Baker) – is also involved in the business and sits on the boards of nine companies controlled by the family.

883. Nazim Ahmad used Rilton Traders to launder at least $10,000 in U.S. dollar-denominated proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to Lebanon using his brother-in-law Rami's personal account at Defendant BLOM BANK on the family's (and Hezbollah's) behalf.

884. Rami Baqir (a/k/a Baker) also held personal account no. 172430* at LCB that was closed in September 2011.

885. Rami and his wife, Rim Reda Baqir (a/k/a Baker), held a joint account at LCB (account no. 172262*) before it was forced to close in 2011 as part of SGBL's acquisition of LCB.

886. Nazim Ahmad laundered more than $10 million U.S. dollars through that joint account at LCB.

887. Rim Reda Baqir also held multiple accounts at Defendant BANK AUDI through which Hezbollah's BAC laundered at least tens of thousands of U.S. dollars through New York that originated with, among others, Rilton Traders, Primo and Primogems.

888. Nazim Said Ali Ahmad's money laundering activities (including through several companies he controls) were at the center of the LCB terror financing scandal.

889. According to the U.S. Department of Justice:

---

[63] Firas Nazim Ahmad and his uncle Rami Kamil Ya'qub Baqir are partners and minority shareholders in Rifieh Pour L'amélioration SARL, a company controlled by Youssef and Ibrahim Tajideen.

LCB maintained a banking relationship with individuals and entities involved in the African diamond smuggling trade. For example, LCB maintained a banking relationship with Nazem Ibrahim Ahmad,[64] a Belgian of Lebanese origin trading in rough diamonds. On October 8, 2002 the United Nations Security Council's Panel of Experts on the Illegal Exportation of Natural Resources and Other Forms of Wealth of the Democratic Republic of Congo ("DRC") issued a report, S/2002/1146, addressing possible actions to help bring an end to the plundering of the natural resources of the DRC and the effect of those actions on the humanitarian and economic situation of the DRC.

The report described the Sierra Gem Diamonds Company, whose principals were Nazem Ahmad, Hassan Ahmad, and Said Ali Ahmad, as associated with one of three Lebanese clans that purchased $150 million in diamonds from the DRC in 2001. The report alleged that the three clans, including the Ahmad clan, had ties to Hizballah and also were involved in counterfeiting, money-laundering and diamond smuggling. In response to an LCB customer due diligence report on Ahmad and the UN report S/2002/1146, the LCB credit department stated that "we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon," and authorized an increase in credit limits for Ahmad.

890.    As noted above, Nazim Said Ali Ahmad transferred hundreds of millions of U.S. dollars on behalf of Hezbollah, his criminal associates and for his own personal gain, from accounts he and his extended family controlled at banks in Belgium, various locations in Africa and the United Arab Emirates; and he poured those funds into U.S. dollar-denominated accounts at LCB, Defendants BLOM BANK and BANK AUDI, and others via the U.S. banking system.

891.    Nazim Said Ali Ahmad's own personal account no. 172382* was used to move tens of millions of dollars through the United States to various accounts at LCB.

892.    The additional hundreds of millions of U.S. dollars Nazim Said Ali Ahmad directed through the United States to accounts at LCB were (often briefly) deposited in accounts owned by companies and individuals that were controlled by (a) Mr. Ahmad (e.g. Blue Star Diamond

---

[64]    The DOJ appears to have misstated Ahmad's middle name, but the description confirms that the person identified is in fact Nazim Said Ali Ahmad.

Offshore SAL, Beirut Diam SAL, Rami Kamil Ya'qub Baqir); (b) other branches of the Ahmad clan (*e.g.* Suleiman Ahmad, Fawzi Malik); (c) Ibrahim and Hussein Issawi (*e.g.* Socimex SPRL); (d) Muhammad and Ali Hussein Darwish; and (e) other parts of the BAC's African networks.[65]

893.　Nazim Ahmad was such an important client of LCB that he was granted a $15 million U.S. dollar privilege even though the bank was fully aware of the 2002 U.N. Security Council report, the travel ban imposed, and his association with money laundering.

894.　According to the Lebanese government, when LCB was finally compelled to close Nazim Said Ali Ahmad's account, the balance migrated to accounts owned by Mr. Ahmad and maintained by, respectively, Defendants BANK AUDI, BLOM BANK and SGBL.

895.　Companies controlled and/or affiliated with Nazim Said Ali Ahmad include the following entities:[66]

- **Sierra Gem Diamonds NV** (discussed above).

- **Primo International SAL Offshore** (discussed above).

- **G & S Diamonds (a/k/a G&S Diamond FZE)**. The company is nominally incorporated in the UAE and operated by Ali Rauf Osseiran, but the entity is under Nazim Ahmad's control and he used it to move *hundreds of millions* of U.S. dollars through the United States to various accounts that Mr. Ahmad beneficially owned at LCB, including account no. 172210* which was closed in July 2011. Along with Mr. Ahmad, G & S Diamonds was a focal point of LCB's August 13, 2007 Internal Audit Report that described, among other things, suspicious transactions during an 18 months period totaling $5 billion U.S. dollars with "[l]arge amounts … being withdrawn and paid cash to different parties" and accounts showing a "big volume of movement" but "very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s]."

---

[65]　　Said Hassan Fuani was another member of Nazim Ahmad's network. He owned account no. 170178* at LCB until November 2011. Mr. Fuani laundered more than $50 million for the Ahmad Network. According to the Lebanese government, when his account at LCB was closed the balance migrated to accounts owned by Mr. Fuani at Defendants FENICIA BANK, BANK AUDI, MEAB BANK, BYBLOS BANK and BANQUE LIBANO-FRANÇAISE.

[66]　　The Lebanese government also associated Nazim Ahmad with Enmaa Dalhamiya Company SAL (a/k/a Delhamieh Development), which is a Taj al-din family controlled real estate company. Ahmad likely served as a front for the Taj al-Dins' acquisition of a controversial property in the Chouf District for $220 million U.S. dollars.

G & S Diamond maintained one or more U.S. dollar-denominated accounts at Defendant LEBANON AND GULF BANK. It also transferred more than $4 million U.S. dollars through New York on behalf of the BAC that it deposited in its account(s) at Defendant LEBANON AND GULF BANK.

- **Blue Star Diamonds**. Nazim Said Ali Ahmad served as chairman of the company and its majority shareholder. During the relevant period, the company laundered approximately $100 million through LCB with the help of G & S Diamonds and Hussein Issawi. Along with Nazim Ahmad himself, Blue Star Diamonds was a focal point of LCB's August 13, 2007 Internal Audit Report (described above). LCB knew that Blue Star Diamonds, G & S Diamond, Hussein Ahmad Issawi, Ali Musa Nachar and Khalil Nassour were all moving funds between accounts with no legitimate business purpose, but Blue Star Diamonds' account at LCB (no. 172160*) was only closed in 2011.

- **Beirut Diam SAL** (discussed above).

- **Beirut Gem SAL**. The following individuals were involved with the company:

  o Nazim Ahmad was listed as shareholder and chairman of the company; and
  o Nazim Ahmad's wife and brother-in-law were listed as board members of the company.

- **Aramoun 1506 SAL**. The following individuals were involved with the company:

  o Nazim Ahmad was listed as shareholder and chairman of the company;
  o Nazim Ahmad's wife, brother-in-law and son were listed as board members of the company; and
  o Kamil Rashad Azar was listed as the company's attorney.

- **Debbiye 143 SAL**. The following individuals were involved with the company:

  o Nazim Ahmad was listed as shareholder and chairman of the company;
  o Nazim Ahmad's wife, brother-in-law and son were listed as board members of the company; and
  o Kamil Rashad Azar was listed as the company's attorney.

- **Noumayriye 1057 SAL**. The following individuals were involved with the company:

  o Nazim Ahmad was listed as shareholder and chairman of the company;
  o Nazim Ahmad's wife, brother-in-law and son were listed as board members of the company; and
  o Kamil Rashad Azar was listed as the company's attorney.

- **Gebaa 2480 SAL**. The following individuals were involved with the company:

  o Nazim Ahmad was listed as shareholder and chairman of the company;
  o Nazim Ahmad's wife, brother-in-law and son were listed as board members of the company; and
  o Kamil Rashad Azar was listed as the company's attorney.

- **Damour 850 SAL**. The following individuals were involved with the company:

  o Nazim Ahmad was listed as shareholder and chairman of the company;
  o Nazim Ahmad's wife, brother-in-law and son were listed as board members of the company; and
  o Kamil Rashad Azar was listed as the company's attorney.

- **Monte Carlo Beach Company SAL**. The following individuals were involved with the company:

  o Nazim Ahmad was listed as shareholder and chairman of the company;
  o Nazim Ahmad's wife was listed as a board member of the company; and
  o Kamil Rashad Azar was listed as the company's attorney.

- **Terina Jewelry SARL** (discussed above).

- **Nour Holding SAL** (discussed above).

- **Beirut Trade SAL** (discussed above).

### iii. Hassan Said Ali Ahmad

896. Hassan Ahmad (a/k/a Hassan Said Ahmad) is a naturalized Brazilian of Lebanese

descent, born in Sierra Leone and bearer of a Belgian passport. Hassan Ahmad owned individual account no. 174265* at LCB, prior to the account's forced closure in August 2011.

897.    According to a published Brazilian police synopsis of the evidence, Hassan Ahmad, along with the other large diamond exporters of the region, were believed to be running a large-scale operation for the illegal export of diamonds in the early 2000s.

898.    This included transferring Brazilian diamonds (often at inflated prices) to other Ahmad family-controlled companies in Belgium as well as SAM Diamonds in Dubai.

899.    Using dummy corporations, phony front men, and Brazilian illicit money changers (a/k/a *doleiros*), Hassan Ahmad and his associates were suspected of tax evasion, document forgery of Kimberley Certificates, money laundering and corruption of public officials.

900.    Hassan Ahmad was reportedly arrested by Brazilian authorities in 2006 but appears to have successfully fled Brazil thereafter.

901.    Companies controlled and/or affiliated with Hassan Ahmad include:

- **Sierra Gem Diamonds NV** (discussed above).

- **Triple A Diamonds NV**. The company was registered in Antwerp, Belgium in 1986 as a conduit for Conflict Diamonds shipped by Sierra Gem Diamonds NV. The company was named in the 2002 UNSC Report as part of the network of criminal organizations known to intelligence services and police organizations that engage in counterfeiting, money-laundering and diamond smuggling. The following individuals were involved with the company:

  o   Hassan Said Ali Ahmad was listed as a director of the company;
  o   Afif Ahmad Ahmad was listed as a director of the company;
  o   Musa Ahmad Ahmad was listed as a director of the company; and
  o   Ali Ahmad Ahmad was listed as a director of the company.

- **Primeira Gema Comercio Importacao e Exportacao Ltda**. This now-defunct Brazilian diamond export company was controlled by Hassan Ahmad and exported diamonds through Hassan's brother Ali and his company ASA Diam NV as well as Primogems.

- **African Star**. Hassan Ahmad was listed as the administrator and delegate administrator.

    iv.    **Ali Said Ali Ahmad**

902.    Ali Said Ali Ahmad is married to Diana Nassour and serves as an important link between the Nassour and Ahmad criminal organizations.

903.    He is associated with several key companies linked to Conflict Diamond smuggling and weapons trafficking, including the following entities:

- **Sierra Gem Diamonds NV** (discussed above).

- **Primo-Gem SPRL** (a/k/a Primogem), Kinshasa, Democratic Republic of Congo.

- **ASA Diam NV**.

- **ASA International**, incorporated in Antwerp, Belgium in 1992. Ali Said Ali Ahmad's sister, Ibtisam Said Ali Ahmad, was at least nominally involved in the company.

904.    Ali Said Ali Ahmad, his brothers Nazim Ahmad and Hassan Ahmad, and Ali's wife Diana were all listed as directors of Sierra Gem Diamonds NV located in Antwerp, Belgium (founded in 1980).

905.    According to Belgian police, surveillance of the company's phones linked Sierra Gem Diamonds NV to Iran and infamous international arms trafficker Victor Bout.

906.    Sierra Gem Diamonds NV's sister company in Kinshasa, Democratic Republic of Congo, known as Primo-Gem SPRL, was connected to Primo International NV. It also maintained an account at LCB and transferred significant U.S. dollar-denominated funds between the Democratic Republic of Congo and Lebanon through correspondent bank accounts at U.S. financial institutions.

### v.    Ibtisam Said Ali Ahmad

907.    Ibtisam Said Ali Ahmad is married to Adel Hassan Makki and they jointly operate Kohinoor SAL, a Lebanese jewelry manufacturer co-founded with Ali Ahmad Ahmad.

908.    Kohinoor SAL owned corporate Hezbollah-affiliated account no. 172945* at LCB until it was closed in August 2011. Defendant SGBL maintained an account and provided financial services to Kohinoor SAL.

909.    Adel Hassan Makki owned one of the Hezbollah-affiliated accounts at LCB (no. 75637*) that was forcibly closed in 2011.

### vi.    Seada Said Ali Ahmad

910.    Seada Said Ali Ahmad is married to her cousin, Imad Suleiman Ahmad, who is the director of Ahmad Diamond Corporation in Belgium together with their daughter Maya Ahmad.

911.    She is also a minority shareholder (together with her father) in a Lebanese diamond company called Pure Diam DMCC Offshore SAL which is owned and operated by her husband, Imad. The company shares the same accountant/auditor as MGM Construction SAL (which was founded by Muhammad Issam Abu Darwish).

912.    Imad Suleiman Ahmad is also a shareholder in Société Foncière Al Ghaba SAL, together with his cousin, Rasha Ali Ahmad, daughter of Ali Ahmad Ahmad.

913.    Seada Said Ali Ahmad held one of the Hezbollah-affiliated accounts at LCB (account no. 174335*) that was forcibly closed in October 2011.

### vii.    Youssef Ali Ahmad

914.    Youssef Ali Ahmad and his wife had seven children. His second-oldest son, Abdel Karim Youssef Ahmad, married his cousin, Nawal Ali Ahmad, the daughter of Ali Ali Ahmad.

915.    Abdel Karim Youssef Ahmad is the chairman of Imperial Heals SAL where

Diamonds Forever SAL (controlled by the Nassour clan) holds a significant interest and Ali Ali Ahmad's daughter sits on the board of directors.

916.     Abdel Karim Youssef Ahmad is also a partner with Saleh Ali Asi in the Lebanese Development & Investment Company LLC and with Ali Ahmad Ahmad and his family in ACE Group SAL (discussed below) and Blue City SAL (which holds an account with Defendant FRANSABANK, discussed below).

917.     His brother, Abd al-Aziz Youssef Ahmad, is partners with Defendant FENICIA BANK's attorney Waddah Hanna al-Sha'er.

### viii.     Suleiman Ali Ahmad

918.     Suleiman Ali Ahmad had seven children, five of whom are relevant here:

- Imad Suleiman Ahmad;
- Taysir Suleiman Ahmad;
- Issam Suleiman Ahmad;
- Najwa Suleiman Ahmad; and
- Maryam Suleiman Ahmad.

919.     Imad Suleiman Ahmad (discussed above) married Seada Said Ali Ahmad (his cousin).

920.     His brother Taysir Suleiman Ahmad is listed as a director of Ahmad Diamond Corporation in Belgium.

921.     Their brother Issam Suleiman Ahmad held account no. 110320* at LCB that was forcibly closed in October 2011.

922.     Suleiman Ali Ahmad's daughter, Najwa Suleiman Ahmad, married Afif Ahmad (discussed below).

923. Suleiman Ali Ahmad's daughter Maryam Suleiman Ahmad, married Muhammad Malek and had three children named Fawzi Muhammad Malek, Ramzi Muhammad Malek, and Randa Muhammad Malek.

924. Fawzi Muhammad Malek became a diamond trader in Mozambique. He married a woman named Johanna Malek.

925. Nazim Ahmad used Rilton Traders to launder more than $400,000 U.S. dollars in proceeds from the Ahmad family's criminal activities in Belgium to Fawzi and Johanna Malek. The funds were repatriated to Lebanon (using electronic funds transfers that were cleared and settled through correspondent bank accounts in New York) and deposited into Fawzi Muhammad Malek and Johanna Malek's jointly owned U.S. dollar-denominated account at Defendant SGBL.

926. Fawzi Muhammad Malek also owned individual account no. 172370* at LCB until he was forced to close it in 2011 as a result of Defendant SGBL's acquisition of LCB.

927. According to the Lebanese government, the balance in the account migrated to an account at Defendant BANK AUDI.

928. Nazim Ahmad also used Rilton Traders to launder more than $3 million U.S. dollars in proceeds from the Ahmad family's criminal activities in Belgium to Johanna Malek. The funds were repatriated to Lebanon (using electronic funds transfers that were cleared and settled through correspondent bank accounts in New York) and deposited into Johanna Malek's individually owned U.S. dollar-denominated account at Defendant BANQUE LIBANO-FRANÇAISE.

929. Nazim Ahmad also used Rilton Traders to launder at least $70,000 U.S. dollars in proceeds from the Ahmad family's criminal activities in Belgium to Ramzi Muhammad Malek. The funds were repatriated to Lebanon (using electronic funds transfers that were cleared and settled through correspondent bank accounts in New York) and deposited into Ramzi Muhammad

Malek's individually owned U.S. dollar-denominated account at Defendant FRANSABANK.

930.     Nazim Ahmad also used Rilton Traders to launder more than $200,000 U.S. dollars in proceeds from the Ahmad family's criminal activities in Belgium. The funds were repatriated to Lebanon (using electronic funds transfers that were cleared and settled through correspondent bank accounts in New York) and deposited into Randa Muhammad Malek's individually owned U.S. dollar-denominated account at Defendant BLOM BANK and more than $90,000 U.S. dollars to her individually owned U.S. dollar-denominated account at Defendant FENICIA BANK.

### ix.     Ahmad Ali Ahmad

931.     Born in 1929, Ahmad Ali Ahmad was Said Ali Ahmad's older brother. He died in 2012.

932.     Like his brother, he made his fortune as a local crime boss in Africa, establishing the Ahmad Ali Ahmad Company in Lebanon in 1975, co-founding Sierra Gem Diamonds NV with his brothers in Antwerp in 1980, and later co-founding Triple A International SPRL in the Democratic Republic of Congo and Triple A Team Ltd. in Lebanon in 1992. As noted above, the 2002 UNSC Report noted that the company provided "counterfeit United States dollars" and was associated with the Ahmad criminal organization.

933.     In 1996, he co-founded the following entity:

- **Ali Ahmed Group - Holding SAL**. The following individuals were involved with the company:

  o  Ahmad Ali Ahmad was listed as the co-founder and a shareholder of the company;
  o  Afif Ahmad was listed as the co-founder of the company;
  o  Nader Nasim Basma, a local Hezbollah official from Ain Baal, was listed as the shareholder (holding 1,475 shares), authorized signatory and chairman of the company;

- o Muhammad Abd Ali Rustam[67] was listed as the general manager, shareholder (holding 1,475 shares) and board member of the company;
- o Musa Ahmad Ahmad was listed as the co-founder, shareholder (holding 50 shares) and board member of the company; and
- o Fadi Adel Jamal al-Din was listed as the company's attorney.

Defendant FRANSABANK maintained an account for and provided financial services to Ali Ahmed Group - Holding SAL.

934.     He and his wife, Nayifah Suleiman, had seven children:

- Afif Ahmad;
- Musa Ahmad Ahmad;
- Ali Ahmad Ahmad;
- Nadia Ahmad Ahmad;
- Lina Ahmad Ahmad;
- Hassan Ahmad Ahmad; and
- Hismahan Ahmad Ahmad.

935.     Afif Ahmad married Najwa Suleiman Ahmad (his cousin) and has been involved in at least ten companies, including Triple A Team Ltd. with his father and brothers Musa, Ali and Hassan.

936.     He also co-founded United Investment Group SAL in 1994 with his brothers Musa, Ali and Hassan. Rami Kamil Ya'qub Baqir (Nazim Ahmad's brother-in-law) is the chairman of the company, and the company shareholders include Nazim Ahmad's wife, Rima, and daughter, Hind.

937.     United Investment Group SAL owned a corporate account at Defendant SGBL.

938.     Afif Ahmad also co-founded Golden Square SAL, which owned a corporate account at Defendant FRANSABANK.

---

[67]     Rustam was also listed as the general manager of DITREX Diamonds DMCC in Dubai, which was owned by Ali Rauf Osseiran (held account no. 172655* at LCB), a close business associate of Nazim Ahmad. LCB maintained account no. 61343 for DITREX until it was closed in July 2011.

939.	Musa Ahmad Ahmad was involved in more than fifteen companies in Belgium, Lebanon and the Democratic Republic of Congo including Triple A Diamonds NV[68] and Golden Square SAL.

940.	In 2002, the United Nations recommended imposing a travel ban on Musa Ahmad Ahmad for his role in smuggling Conflict Diamonds.

941.	In 1998, Musa Ahmad Ahmad co-founded the following entity:

- **ACE Group SAL**. The following individuals were involved with the company:

    o  Nadia Ahmad Ali Ahmad was listed as the shareholder, authorized signatory and chairman of the company;
    o  Ali Ahmad Ahmad was listed as the co-founder of the company;
    o  Musa Ahmad Ahmad was listed as the co-founder of the company;
    o  Youssef Ali Ahmad's son, Abd al-Karim Youssef Ahmad, was listed as the co-founder of the company; and
    o  Fadi Adel Jamal al-Din was listed as the company's attorney.

    Defendant FRANSABANK maintained an account for and provided financial services to ACE Group SAL.

942.	The following network of related companies are affiliated with Ahmad Ali Ahmad, his children and grandchildren as part of the larger Ahmad clan criminal network:

- **Blue City SAL**. The company was established in 1998. The following individuals were involved with the company:

    o  Ahmad Ali Ahmad was listed as a shareholder, board member and authorized signatory of the company;
    o  Ali Ahmad Ahmad was listed as a co-founder of the company;
    o  Muhammad Abd Ali Rustam was listed as one of the shareholders and board members of the company;
    o  Rasha Ali Ahmad (Ali Ahmad Ahmad's daughter) was listed as a shareholder and board member of the company;
    o  Youssef Ali Ahmad's son, Abd al-Karim Youssef Ahmad was listed as the co-founder of the company;
    o  Zuhayr Habib Saydani was listed as the company's auditor; and
    o  Fadi Adel Jamal al-Din was listed as the company's attorney.

---

[68]	He was also linked to Millenium Diamond SPRL in the Democratic Republic of Congo.

Defendant FRANSABANK maintained an account for and provided financial services to Blue City SAL.

- **Spider Group SAL**. The company was established in 1997. The following individuals were involved with the company:

  o Rasha Ali Ahmad was listed as chairman, director general, shareholder and authorized signatory of the company;
  o Musa Ahmad Ahmad was listed as a co-founder of the company;
  o Ali Ahmad Ahmad was listed as a co-founder of the company;
  o Muhammad Abd Ali Rustam was listed as one of the shareholders and board members of the company;
  o Lina Ahmad Ahmad was listed as a shareholder and board member of the company;
  o Al-Sirat Holding SAL was listed as a shareholder and board member of the company;
  o Zuhayr Habib Saydani was listed as the company's auditor; and
  o Fadi Adel Jamal al-Din was listed as the company's attorney.

- **Paloma Group SAL**. The company was established in 1997. The following individuals were involved with the company:

  o Nadia Ahmad Ahmad was listed as chairman, director general, shareholder and authorized signatory of the company;
  o Musa Ahmad Ahmad was listed as a co-founder of the company;
  o Ali Ahmad Ahmad was listed as a co-founder of the company;
  o Muhammad Abd Ali Rustam was listed as one of the co-founders of the company;
  o Al-Sirat Holding SAL was listed as a shareholder and board member of the company;
  o Lina Ahmad Ahmad was listed as a shareholder and board member of the company;
  o Zuhayr Habib Saydani was listed as the company's auditor; and
  o Fadi Adel Jamal al-Din was listed as the company's attorney.

Defendant FRANSABANK maintained an account for and provided financial services to Paloma Group SAL.

- **Al-Sirat Holding SAL**. The company was established in 2003. The following individuals were involved with the company:

  o Rasha Ali Ahmad (Ali Ahmad Ahmad's daughter) was listed as chairman, director general, shareholder and authorized signatory of the company;
  o Lina Ahmad Ahmad was listed as a shareholder and board member of the company;

- o Hismahan Ahmad Ahmad was listed as a shareholder and board member of the company;
- o Zuhayr Habib Saydani was listed as the company's auditor; and
- o Fadi Adel Jamal al-Din was listed as the company's attorney.

### c. The Issawi Family Network

#### i. Ibrahim Ahmad Issawi

943.    Ibrahim Issawi (a/k/a Issaoui) is a member of the BAC in central Africa who has laundered tens of millions of dollars on behalf of Hezbollah's African networks (particularly the Ahmad, Nassour and Khanafer clans) as part of his overall business of laundering *hundreds of millions of dollars* in partnership with Muhammad Bazzi (SDGT) using LCB, the Ayash Exchange and at least one other Lebanese bank.

944.    Mr. Issawi is also a prominent businessman in the Democratic Republic of Congo where he operates, among other things, a successful car dealership that also maintained an account at LCB until 2011.

945.    Mr. Issawi is the President of L'Union Libanaise Culturelle Mondiale (a/k/a World Lebanese Cultural Union "WLCU"), a business association in the Democratic Republic of Congo. Other prominent members include Issam Nabih Hamad, a partner in Société Financière de Banque SARL, and Saleh Ali Assi.

946.    He also operated a commodities business in Kinshasa known as Sky Star (which was the owner of account no. 172688* at LCB until July 2011).

947.    Nazim Said Ali Ahmad arranged, on behalf of Hezbollah, his criminal associates and for his own personal gain, for the transfer of large sums (denominated in U.S. dollars) from Rilton Traders to Sky Star's Lebanese bank accounts.

948.    Both Mr. Issawi and his brother were identified by LCB in minutes to a January 25, 2007 Anti-Money Laundering Special Committee meeting as directly connected to Ali Tajideen

(SDGT) and they were affirmatively exempted from declaring the source of funds for entities designated by the United States ("Case Exempted clients from declaring source of funds for entities appearing on OFAC list.").

949.    Mr. Safa was noted as responsible for this issue.

950.    According to the Lebanese government, when LCB was finally compelled to close Mr. Issawi's accounts at LCB in 2011,[69] the balance on his account no. 172333* migrated to accounts owned by Mr. Issawi at Defendants BANK AUDI, BANQUE LIBANO-FRANÇAISE SAL, and Byblos Bank Europe.

951.    Before his accounts were closed, Mr. Issawi had laundered (at least) hundreds of millions of U.S. dollars through LCB alone.

952.    At around the same time his other accounts were closed, a separate account he held together with his wife, Lama Hussein Bdeir Issawi, was liquidated in cash as was an account she separately held in her own name.

953.    Lama Hussein Bdeir Issawi's brother Ibrahim Hussein Bdeir and father Hussein Ibrahim Bdeir are active in business with Mr. Issawi.[70]

---

[69]    Mr. Issawi also jointly owned U.S. dollar-denominated account no. 174342* at LCB with his wife Lama Hussein Bdeir Issawi (closed in June 2012), and she held her own individual account no. 173840* at LCB which was closed in August 2011.

[70]    Lama Hussein Bdeir's brother owned account no. 28933* at LCB until it was closed in September 2011. His father, Hussein Ibrahim Bdeir, owned account no. 173842* at LCB until September 2011. According to the Lebanese government, the account balance migrated to Hussein Ibrahim Bdeir's accounts at Defendants MEAB BANK and BANQUE LIBANO-FRANÇAISE. Hussein Ibrahim Bdeir was also the chairman and majority shareholder of Al-Jiyeh for Tourism and Construction SAL, which owned account no. 22186* at LCB until September 2011. According to the Lebanese government, the account balance migrated to Defendants BANK AUDI and FENICIA BANK. Another Bdeir family hotel development company known as "Platinum Residence" owned account no. 145585* at LCB until August 2011. According to the Lebanese government, part of the account balance was converted to cash and the remainder migrated to the company's account at Defendant FRANSABANK. Ibrahim Hussein Bdeir was also the general manager and majority shareholder in La Voile Sur Mer SARL, a company involved in construction and tourism projects. It owned account no. 45320* at LCB until it was closed in July 2011. According to the Lebanese government, part of the account balance was transferred to an account owned by the company at Defendant FENICIA BANK.

954.    Ibrahim Hussein Bdeir held account no. 28933* at LCB until it was closed in September 2011.

955.    Mr. Issawi, his brothers Hussein, Ha'el, and Wa'el and their company, Socimex SPRL, were a focal point of LCB's August 13, 2007 Internal Audit Report that described, among other things, transactions during an 18 months period totaling $5 billion U.S. dollars with "[l]arge amounts … being withdrawn and paid cash to different parties" and accounts showing a "big volume of movement" but "very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s]."

956.    Socimex SPRL laundered more than $10 million U.S. dollars through LCB at Mr. Issawi's direction.

957.    According to the Lebanese government, when LCB was finally compelled to close Socimex's account no. 172687* in July 2011, the account migrated to Socimex's account at Defendant BANQUE LIBANO-FRANÇAISE.

958.    Companies controlled and/or affiliated with Ibrahim Issawi include the following entities:

- **Socimex SPRL**. Kinshasa-based company created in 1996 or 1998 "to supply the country [Congo] with healthy food products at competitive prices accessible to all social strata." The following individuals were involved with the company:

  o  Ibrahim Ahmad Issawi was listed as the managing partner and majority shareholder (64%) of the company; and
  o  Wa'el Ahmad Issawi, Ibrahim Issawi's son, was listed as owning 2,000 shares (8%) of the company.

- **Sea & Palm SARL**. This company was incorporated in 1992. The following individuals were involved with the company:

  o  Mr. Issawi was listed as manager and shareholder of the company;
  o  Tradium Holding SAL, Mr. Issawi's holding company, was listed as holding most of the shares of the company;

212

- o Wa'el Ibrahim Issawi was listed as holding the rest of the shares of the company; and
- o Joseph George Zgheib was listed as the company's attorney.

According to the Lebanese government, LCB maintained account no. 174032* for Sea & Palm SARL until it was finally compelled to close the account in July 2011.

- **Tradium Holding SAL**. The following individuals were involved with the company:

  - o Ibrahim Issawi was listed as chairman and the owner of most of the shares of the company;
  - o Ha'el Issawi was listed on the board of directors of the company;
  - o Lama Hussein Bdeir was listed on the board of directors of the company; and
  - o Joseph George Zgheib was listed as co-founder and attorney.

- **Investment Group for Construction and Development SAL**. The following individuals were involved with the company:

  - o Mr. Issawi was listed as the chairman, a shareholder and authorized signatory of the company;
  - o Lama Hussein Bdeir was listed as a board member and a shareholder of the company;
  - o Iqaruna Projects and Development Holding, controlled by Ibrahim Issawi, was listed as the majority shareholder of the company;
  - o Claire Elias Assaf was listed as co-founder of the company (she also co-founded Team 5 (Holding) SAL with Muhammad Issam Abu Darwish and Global Electrical Group Holding SAL with Muhammad Ibrahim Bazzi - SDGT); and
  - o Joseph George Zgheib was the company's attorney (he was also a founder of Team 5 (Holding) SAL and of Global Electrical Group Holding SAL, where he was listed as the attorney as well.)

According to the Lebanese government, Investment Group for Construction and Development SAL owned account no. 255790* at LCB until April 2010.

- **Mercury 3670 SARL**. The following individuals were involved with the company:

  - o Mr. Issawi was listed as the founder, authorized signatory, board member and largest shareholder of the company;
  - o Muhammad Issam Abu Darwish was listed as chairman, shareholder, co-founder, and authorized signatory of the company;

- o Sami Issam Abu Darwish was listed as a shareholder and board member of the company;
- o Mustafa Faysal Ahmad was listed as a co-founder of the company; and
- o Fadi Adel Jamal al-Din was listed as the company's attorney.

- **Central Motors SPRL**. The company sold cars in the Democratic Republic of Congo. The following individuals were involved with the company:

  - o Mr. Issawi was listed as owner of the company; and
  - o Issawi's mother, brother, sister (Hiba) and wife were listed as co-owners of the company.

  According to the Lebanese government, Central Motors SPRL owned an active account no. 29827* at LCB until it was closed in June 2011.

- **Iqaruna (Holding) SAL**. The following individuals were involved with the company:

  - o Ibrahim Issawi was listed as chairman and owner of most of the shares of the company;
  - o Ha'el Issawi was listed as a member of the board of directors of the company;
  - o Lama Hussein Bdeir was listed as a member of the board of directors of the company;
  - o Claire Elias Assaf was listed as a co-founder of the company; and
  - o Joseph George Zgheib was listed as the co-founder and attorney of the company.

### ii.     Hussein Ahmad Issawi

959.    Hussein Ahmad Issawi (Ibrahim's brother) is also a member of the BAC in central Africa who has laundered tens of millions of dollars on behalf of Hezbollah's African networks (particularly the Ahmad and Darwish clans) as part of the Issawi brothers' overall business of laundering hundreds of millions of dollars using LCB and at least three other Lebanese banks, including Defendant FENICIA BANK.

960.    Hussein Issawi is reported to be a business partner of Muhammad Bazzi (SDGT) and to have laundered funds for the Tajideen family's Ovlas Trading SA (SDGT) and for several

Ahmad clan individuals and companies through his account at LCB.

961. Hussein Issawi also used his LCB accounts to transfer funds for Nazim Ahmad's Blue Star Diamond and Beirut Diam SAL, and for Rami Kamil Ya'qub Baqir, all accountholders at LCB.

962. Mr. Issawi also laundered funds originating with Nazim Ahmad's network through LCB account no. 172781* owned by Soficom SPRL until it was closed in August 2011. Soficom SPRL was controlled by Muhammad Hussein Darwish (discussed below).

963. Soficom SPRL laundered more than $75 million U.S. dollar through LCB account no. 172781.

964. When LCB was finally compelled to close Hussein Ahmad Issawi's account no. 171035* in August 2011, according to the Lebanese government the balance migrated to Defendant FENICIA BANK and another financial institution.

### iii. Wa'el Ahmad Issawi

965. Wa'el Ahmad Issawi (Ibrahim's youngest brother) is also a member of the BAC in central Africa who worked with and for his brothers at Socimex SPRL in the Democratic Republic of Congo and maintained an account at LCB until 2011.

966. When LCB was finally compelled to close Wa'el Ahmad Issawi's account no. 172424* in 2011, according to the Lebanese government the account migrated to Defendant BANQUE LIBANO-FRANÇAISE.

### iv. Ha'el Ahmad Issawi

967. Ha'el Ahmad Issawi was listed as a board member of two companies controlled by his brother Ibrahim Issawi: Tradium Holding SAL and Iqaruna (Holding) SAL, and as a shareholder in at least three companies also controlled by his brother Ibrahim Issawi.

968.   He owned account no. 172208* at LCB that was closed in 2011, but it is not clear where the account migrated to thereafter.

### d.  The Abu Darwish Family Network

969.   The Abu Darwish family had connections to Lebanon's General Security Directorate in the 1980s.

970.   Issam Abu Darwish had four children:

- Muhammad Issam Abu Darwish;
- Sami Issam Abu Darwish;
- Rima Issam Abu Darwish; and
- Fatimah Issam Abu Darwish.

971.   Issam Abu Darwish maintained account no. 133754* at LCB until it was closed in September 2011 as part of SGBL's acquisition of LCB.

972.   According to the Lebanese government, Issam Abu Darwish's account was among the grouping of Hezbollah-affiliated accounts associated with his son Muhammad Issam Abu Darwish.

973.   When LCB finally closed the account, Issam Abu Darwish transferred the balance to his account at Defendant BANK AUDI.

974.   Issam Abu Darwish's son Sami is registered in ten or more companies jointly with his brother, Muhammad Issam Abu Darwish, and in more than 20 companies in Lebanon overall, but appears to be very much the junior partner in Muhammad Issam Abu Darwish's business empire.

975.   On September 16, 1997, Muhammad Issam Abu Darwish and his three siblings co-founded National Crushers Company SARL, but do not appear to have held an ownership stake or to have established a permanent address for the company.

976.   Instead, twenty-five percent of the company's shares were owned by Jaafar Musa

216

Musa, a Hezbollah official from Houmine al-Faouqa and founding partner of Arch Consulting SARL (discussed above), part of Jihad al-Bina's (SDGT) network of construction companies.

977. Another twenty-five percent of National Crushers Company SARL's shares were owned by Ali Muhammad Ghandur who worked at Jihad al-Bina's Meamar Company for Engineering and Development SARL.

978. The remaining fifty percent of the company's shares were held by Azam Abd-al-Aziz Kawtharani, manager of Meamar Company for Engineering and Development SARL.

979. Kawtharani has also served as executive manager for the projects of the Iranian Authority for the Rehabilitation of Lebanon, making him effectively an employee and agent of the IRGC-QF.

980. The lawyer for National Crushers Company SARL was Osama Abbas Ramal who also served as the lawyer for several Jihad al-Bina companies including, Seasons Corporation for Agricultural Projects and Services SARL, Meamar Company for Engineering and Development SARL, Arch Consulting SARL, Al-Raed SAL and Gas Transport and Storage SARL.

981. National Crushers Company SARL appears to have been a Jihad al-Bina affiliated forerunner of National Crushers Company SAL (discussed above), the IRGC-QF construction firm headed by General Shateri (SDGT).

982. Through his father's connections, Muhammad Issam Abu Darwish expanded his business relationships beyond Jihad al-Bina and made connections in Iraq that secured him certain government contracts with the Iraqi government under Saddam Hussein.

983. After the overthrow of Hussein's regime in 2003, Muhammad Issam Abu Darwish stayed in Iraq and teamed up with the controversial U.S. defense contractor known as Custer Battles.

984.    At the same time, Mr. Darwish maintained excellent relations with both Hezbollah and Amal in Lebanon and likely with Syrian intelligence services as well.

985.    From 1993 forward, Muhammad Issam Abu Darwish incorporated or joined more than 50 companies in Lebanon.

986.    Three of the companies – Ras Beirut 1442 SAL, Ideal Development I.D. SAL, and International Contractors and Developers SAL – maintained accounts at LCB before the bank was forced to close them and their account balances migrated to Defendant BANQUE LIBANO-FRANÇAISE.

987.    Ras Beirut 1442 SAL maintained account no. 173662* until it was closed in July 2011.

988.    Ideal Development I.D. SAL maintained account no. 40569* until it was closed in August 2011.

989.    International Contractors and Developers SAL maintained account no. 173306* until it was closed in July 2011.

990.    The Abu Darwish family holding company known as Team 5 (Holding) SAL owns part of Mercury Development Group (Holding) SAL (a company controlled by Mustafa Faysal Ahmad, another person the Lebanese government identified as part of the Hezbollah-affiliated client list at LCB) that, in turn, owns a property in Beirut mortgaged to Defendant JAMMAL TRUST BANK.[71]

991.    Muhammad Issam Abu Darwish is a shareholder in multiple companies with Mustafa Faysal Ahmad and at least one company with BAC facilitator and money launderer,

---

[71]    Mustafa Faysal Ahmad and his family also own Mercury Development Offshore SAL, which they established in 2005. The company held U.S. dollar-denominated account no. 172590* at LCB until June 2012. According to the Lebanese government, the balance in that account migrated to Defendant FRANSABANK. Mercury Development Offshore SAL also held accounts at Defendants BANK OF BEIRUT (Tyre) and SGBL (St. Charles Branch).

Ibrahim Issawi.

992.    Muhammad Issam Abu Darwish was also a co-founder and a shareholder of The New Millennium for Middle East and Africa SAL, an entity which owned account no. 172615* at LCB until the account was forced to close in August 2011.

993.    According to the Lebanese government, Muhammad Issam Abu Darwish owned at least one U.S. dollar-denominated account personally at LCB (account no. 172517*) and two other joint accounts, one with his wife, Carol Rogier Habib (account no. 172689*), and one with his business partner, Akram Ahmad al-Bast (account no. 173985*). All three accounts were flagged by SGBL's 2012 audit and Lebanese government investigation.

994.    According to the Lebanese government, when LCB was finally compelled to close Muhammad Issam Abu Darwish's accounts, the account balance he owned individually migrated to his account at Defendant BANQUE LIBANO-FRANÇAISE; the account balance he jointly owned with his wife migrated to their accounts at Defendants BANK AUDI, BANQUE LIBANO-FRANÇAISE and MEAB BANK; and the account Mr. Darwish owned jointly with one of his business partners (no. 173985*), Akram Ahmad al-Bast, migrated to Defendants FRANSABANK, BANQUE LIBANO-FRANÇAISE, SGBL, MEAB BANK and BANK AUDI.

995.    In addition to Ras Beirut 1442 SAL, which maintained an account at LCB before the bank was forced to close it and it migrated to Defendant BANQUE LIBANO-FRANÇAISE, and National Crushers Company SARL (discussed above), at least two of Sami Issam Abu Darwish's companies particularly underscore his role in the BAC network: S.I.M. SAL Offshore, which he co-founded and was majority shareholder in, and Atilla SAL (which had a U.S. dollar-denominated account at LCB until 2012).

996.    Sami Issam Abu Darwish was the majority shareholder of S.I.M. SAL Offshore,

but the company's chairman and co-founder was Muhammad Abdallah al-Amin (SDGT), a protégé of Adham Tabaja.

997. Sami Issam Abu Darwish also held approximately 12 percent of Atilla SAL's shares. Basel Nabih Berri, the son of Amal leader and speaker of the Lebanese parliament, held double that stake; and the aforementioned Mustafa Faysal Ahmad served as chairman and general manager of the company and as its largest shareholder.

998. Sami Issam Abu Darwish was also listed as a shareholder, authorized signatory and board member of Builders International SAL.

999. Builders International SAL maintained account no. 32740* at LCB until it was forced to close in August 2011.

1000. According to the Lebanese government, when LCB was finally compelled to close Builders International SAL's account, the account migrated to Defendant BANQUE LIBANO-FRANÇAISE.

### e. **The Darwish Family Network**

1001. The Darwish clan is based primarily in Lebanon and the Democratic Republic of Congo and is heavily involved in laundering money for Hezbollah's BAC.

1002. One or more of the Darwish brothers has also spent considerable time in Guinea and has been active in the diamond trade in that country.

1003. The Darwish brothers were known smugglers of diamonds and bulk cash on behalf of themselves, other businesses within the Lebanese diaspora, and Hezbollah.

1004. Muhammad Hussein Darwish was a board member and partner in Société Financière de Banque SARL (a/k/a Sofibanque), a financial institution based in the Democratic

Republic of Congo that was majority owned by LCB and used by Hezbollah to launder large sums of illicit funds.

1005.   Muhammad Hussein Darwish was the owner of four accounts at LCB until the bank closed them in 2011 as part of the bank's acquisition by Defendant SGBL.

1006.   Muhammad Hussein Darwish and his brother, Ali Hussein Darwish, were the joint owners of two accounts (no. 24247* closed in September 2011; and no. 172805* closed in May 2011) that were maintained by LCB. According to the Lebanese government, the account balance of one of those two LCB accounts migrated to the Darwish brothers' jointly owned accounts that were maintained by, respectively, Defendants SGBL, BANK AUDI and BYBLOS BANK.

1007.   Muhammad Hussein Darwish and his brother, Khodr Hussein Darwish, were joint owners of LCB account no. 172612*, which was cashed out when the account was closed in August 2011.

1008.   Soficom SPRL, one of the companies Muhammad Hussein Darwish controlled in the Democratic Republic of Congo, also owned LCB account no. 172781*, which was shuttered in 2011 as part of LCB's acquisition by Defendant SGBL.

1009.   Nabila Ya'qub Wazni was a partner in Soficom SPRL. According to the Lebanese government, she owned account no. 173614* at LCB individually and account no. 172823* jointly with her daughter. More than $15 million U.S. dollars flowed through the joint account alone. Both accounts were closed in 2011 and both migrated to Defendant BANQUE LIBANO-FRANÇAISE and another bank.

1010.   Another company part-owned by Muhammad Hussein Darwish called SOGEAC SPRL owned account no. 172683* at LCB, which was closed in August 2011.[72]

---

[72]     Isam Nabih Hamad, a partner in both SOGEAC and Sofibanque, also held a Hezbollah-affiliated account at LCB which was closed in August 2011.

1011.   According to the Lebanese government, the account balance migrated to SOGEAC's accounts at Defendants BLOM BANK and BANQUE LIBANO-FRANÇAISE.

1012.   In addition to sharing account no. 172612* owned jointly with his brother Muhammad Hussein Darwish, Khodr Hussein Darwish owned account no. 172613* individually at LCB until August 2011.

1013.   According to the Lebanese government, the account balance migrated to Defendant BYBLOS BANK and another bank.

1014.   Khodr Hussein Darwish co-owned a second account (no. 21930*) jointly with an individual named Kifah Sleiman which was closed in July 2011 and also migrated to Defendant BYBLOS BANK and another bank.

1015.   Khodr Hussein Darwish also owned two accounts at LCB with his cousin Safi Yehya Darwish which were closed in July (account no. 20300*) and August 2011 (account no. 174198*). According to the Lebanese government, the account balance in one of the accounts migrated to Defendants BYBLOS BANK, MEAB BANK and two other banks.[73]

1016.   Nazim Ahmad used Rilton Traders to launder proceeds worth at least hundreds of thousands of U.S. dollars from the Ahmad family's criminal activities in Belgium to Khodr Hussein Darwish. The funds were repatriated to Lebanon through correspondent bank accounts in New York using yet another U.S. dollar-denominated account at Defendant BANQUE LIBANO-FRANÇAISE SAL that was owned individually by Khodr Hussein Darwish.

1017.   Khodr Hussein Darwish was listed as the director general and chairman of Madina SAL Offshore in Lebanon. Safi Yehya Darwish served as a board member; Jihad Muhammad

---

[73]     Safi Yehya Darwish also held account no. 174199* at LCB individually. According to the Lebanese government, when the account was closed in August 2011, it migrated to Defendant MEAB BANK and another bank.

Qansu (SDGT) served as the firm's auditor; and Nabil Kamil al-Akhras served as the attorney.

1018. Khodr Hussein Darwish is also partners with Safi Yehya Darwish and Ali Musa Nachar in a company known as DARCO (a/k/a DARCO Safi Darwish and Partners) operating from offices owned by Khodr Hussein Darwish.

1019. Ali Musa Nachar owned three accounts at LCB until 2011.

1020. Ali Musa Nachar owned account no. 171151* individually until it was closed in August 2011. That account was used to launder more than $10 million U.S. dollars in less than two years.

1021. According to the Lebanese government, the account balance migrated to Ali Musa Nachar's account at Defendant BYBLOS BANK.

1022. The other two accounts were owned jointly with Ali Hussein Darwish (account no. 39000* closed in July 2011, and no. 172813* closed in January 2010).

1023. Mr. Nachar was listed as the chairman of a company in Angola named 5 Rosas Comércio e Indústria Limitada SAL Offshore whose auditor was listed as Ali Muhammad Qansu (SDGT), a member of Adham Tabaja's (SDGT) network.

1024. Nazim Ahmad used Rilton Traders to launder proceeds worth hundreds of thousands of U.S. dollars from the Ahmad family's criminal activities in Belgium. The funds were repatriated to Lebanon (through correspondent bank accounts in New York) using the U.S. dollar-denominated accounts owned individually by Ali Musa Nachar in Lebanon. Nazim Ahmad also used G & S Diamond FZE to launder even larger sums to Mr. Nachar's U.S. dollar denominated LCB accounts.

1025. Ibrahim Issawi also laundered significant sums (denominated in U.S. dollars) through Ali Musa Nachar's U.S. dollar-denominated accounts at LCB as well as the U.S. dollar-

denominated LCB accounts of Muhammad and Khodr Darwish.

1026.  As noted above, Ali Hussein Darwish owned two joint accounts with Ali Musa Nachar at LCB as well as two accounts owned jointly with Muhammad Hussein Darwish (discussed above).

1027.  Until June 22, 2012, Ali Hussein Darwish also owned a U.S. dollar-denominated account at LCB individually.

1028.  According to the Lebanese government, the account balance migrated to Defendants SGBL and BYBLOS BANK (and another bank).

1029.  Nazim Ahmad used Rilton Traders to launder hundreds of thousands of U.S. dollars in proceeds from the Ahmad family's criminal activities in Belgium to Ali Hussein Darwish. The funds were repatriated to Lebanon (using electronic funds transfers that were cleared and settled through correspondent bank accounts in New York) and deposited into Ali Hussein Darwish's individually owned U.S. dollar-denominated account at SGBL.

1030.  Ali Hussein Darwish and Muhammad Hussein Darwish's two sons, Hussein and Ibrahim, controlled an automotive part company in Ghobeiry called Interafrica Trading Company ITC SAL Offshore (a/k/a ITC). Jihad Muhammad Qansu (SDGT) served as the company's auditor, and Nabil Kamil al-Akhras served as the company's attorney.

1031.  Defendants FRANSABANK and BANK OF BEIRUT maintained accounts for and provided financial services to Interafrica Trading Company ITC SAL Offshore.

1032.  Khodr Darwish was also a shareholder in Darwish & Company in Nabatieh, together with several of his children and his business partner Safi Yahya Darwish.

1033.  The company's principal banker was Defendant SGBL (primarily through the bank's Hamra branch).

1034.   The company also owned account no. 174303* at LCB until it was forced to close in August 2012.

1035.   According to the Lebanese government, the account balance migrated to Defendant SGBL and another bank.

### f.   The Khalil Nazem Ibrahim Network

1036.   Khalil Nazem Ibrahim was identified by the Lebanese government as another diamond trader with accounts at LCB who was also affiliated with Hezbollah.

1037.   His company, Société Allure SARL, was founded in 2004 and engaged in large-scale, high-volume transactions of the kind described in LCB's August 13, 2007 Internal Audit Report.

1038.   Société Allure SARL owned account no. 172049* at LCB until it was closed in September 2011. More than $30 million U.S. dollars flowed through that account in less than two years.

1039.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES also maintained an account for and provided financial services to Société Allure SARL.

1040.   According to the Lebanese government, Khalil Nazem Ibrahim owned account no. 173309* at LCB until it was closed in September 2011 and the account balance migrated to Defendant BANK AUDI (and another bank).

1041.   Samir Muhammad Hijazi was identified by the Lebanese government as an individual within Khalil Nazem Ibrahim's network.

1042.   According to the Lebanese government, Mr. Hijazi maintained account no. 340568* at LCB until it was closed in September 2011 and the account balance migrated to Defendants FENICIA BANK and BANK OF BEIRUT.

1043.  Nazim Ahmad used Rilton Traders to launder more than $950,000 U.S. dollars in proceeds from the Ahmad family's criminal activities transferred from Belgium (through New York correspondent bank accounts) to the U.S. dollar-denominated accounts at Defendant BLOM BANK owned individually by Mr. Hijazi.

1044.  The Lebanese government also identified an individual named Amine Bzeih as part of Khalil Nazem Ibrahim's network.

1045.  According to the Lebanese government, Mr. Bzeih owned account no. 53416* at LCB until August 2011, when the balance on the account transferred to Mr. Bzeih's accounts at Defendants FRANSABANK, BANK AUDI and BANQUE LIBANO-FRANÇAISE SAL.

### 3.  NARCOTICS TRAFFICKING NETWORKS

1046.  Although Hezbollah's BAC has been involved in transnational narcotics trafficking for decades, its investment in this particular illicit line of business has gone through at least three significant evolutions.

1047.  The first major evolution occurred when Hezbollah transitioned from taxing criminal organizations moving drugs through Lebanon and became directly involved in the global drug trade itself.

1048.  The second major evolution occurred when the BAC began leveraging the synergies between its diamond smuggling and illicit trade networks in Africa and its direct involvement with various drug trafficking networks and cartels.

1049.  The third major evolution coincided with the conflict between Hezbollah and Israel during the summer of 2006 and the terrorist organization's desperate need for dramatically increased revenues to help rebuild after the cease-fire was implemented.

1050.  During this third evolution, Hezbollah's BAC expanded its capabilities from

running drug trafficking networks to becoming a global logistics enterprise. Specifically, BAC's operational platform evolved from transporting and selling cocaine to offering various supply-chain, financing and advisory services to other transnational criminal networks, such as La Oficina de Envigado and the Los Zetas cartel.

1051.    This growth and evolution was all approved and overseen by Imad Mughniyah, who cultivated the BAC's global drug trafficking and organized crime in order to fund the Islamic Jihad Organization's operations, including the terrorism strategy it coordinated with the IRGC-QF in Iraq to kill and maim thousands of U.S. service members.

### a.  Operation Titan

1052.    The U.S. government's Operation Titan, a joint U.S. and Colombian investigation, resulted in October 2008 in a significant blow to an international cocaine smuggling and money laundering ring used, in part, to finance Hezbollah.

1053.    The two-year investigation resulted in more than 130 arrests and the seizure of $23 million U.S. Dollars by Colombian and U.S. agents.

1054.    Operation Titan successfully used confidential sources to infiltrate a significant organized crime group in Medellin Colombia identified as the Oficina de Envigado.[74]

1055.    Among those arrested was a Hezbollah facilitator named Chekri Harb, known in the Colombian drug trade as "Taliban." He was designated an SDNT in 2009.

1056.    Mr. Harb laundered hundreds of millions of dollars each year, from Panama to Hong Kong, while forwarding a percentage of his profits to Hezbollah.

1057.    While under surveillance, Mr. Harb logged extensive travel to Egypt, Lebanon, and Syria, and was in phone contact with senior Hezbollah figures.

---

[74]    Many of those arrested belonged to the Florez Upegui Organization, a network of drug traffickers based in Colombia and Guatemala with close ties to Oficina de Envigado.

1058.  In part as a result of information gathered during Operation Titan, the DEA's Counter-Narco Terrorism Operations Center ("CNTOC") began to investigate multi-ton shipments of cocaine from Colombia to the Los Zetas Mexican cartel, which were also tied to a very sophisticated network in West Africa that was moving currency via couriers back to Lebanon.

1059.  According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008.

1060.  By 2012, it was estimated that as much as 300 metric tons of cocaine, worth approximately $13.5 billion, was trafficked through West Africa to Europe annually during those prior years.

1061.  The wholesale profits reaped by narco-traffickers during this period have been estimated to be approximately $3.5 billion per year.

1062.  Also, in 2008, German authorities at the Frankfurt airport arrested two Lebanese men carrying more than eight million euros raised by a Hezbollah cocaine smuggling ring. This and several subsequent arrests helped European law enforcement better understand Hezbollah's important role in drug trafficking.[75]

1063.  In 2009, Admiral James Stavridis, then commander of U.S. Southern Command, noted that narcotics traffickers "have expanded their presence in West Africa as a springboard to Europe, while also exploring new Middle Eastern and Asian markets."

1064.  According to a 2011 United Nations report, the European market for cocaine is growing rapidly:

> [T]he volume and value of the West and Central European cocaine market (US$33 billion) is approaching parity with that of the US (US$37 billion).

---

[75]  According to a U.N. report, 12 percent of individuals arrested in Germany for importing cocaine were Lebanese nationals.

> Two thirds of European cocaine users live in just three countries: The United Kingdom, Spain and Italy. With Germany and France, these countries represent 80% of European cocaine consumption.

1065. In February 2012, Yuri Fedotov, head of the UN Office on Drugs and Crime, informed the UN Security Council that "[t]he West African transit route feeds a European cocaine market which in recent years grew four fold… We estimate that cocaine trafficking in West and Central Africa generates some US $900 million annually."

1066. The rapid expansion of European demand for cocaine coincided with the maturation of the relationship and coordination between Hezbollah and the Colombian and Mexican drug cartels, with Hezbollah's West African logistics hubs serving as natural transit points for both cocaine and bulk cash.

### b. Ayman Joumaa Network

1067. Because Hezbollah maintained pre-existing criminal networks in West Africa and its IJO operatives were deeply entrenched there for decades, the significant growth in European demand for cocaine in the last fifteen years provided Hezbollah with a golden opportunity to put its sophisticated logistics capabilities to work on behalf of South and Central American drug cartels and generate vast new revenue streams.

1068. Ayman Joumaa, one of the most important Hezbollah operatives involved in the transnational drug trade, exemplifies the marriage between Hezbollah's logistics network, the drug cartels, and the growing European demand for cocaine.

1069. Mr. Joumaa has both been designated an SDNTK and indicted on November 23, 2011 (and charged with conspiracy to distribute narcotics and conspiracy to commit money laundering).

1070. Mr. Joumaa owned LCB account no. 221338* in his own name until it was

(temporarily) frozen and transferred to Defendant SGBL.

1071.   The indictment alleged that Mr. Joumaa and his co-conspirators coordinated the shipment of tens of thousands of kilograms of cocaine, including at least 85,000 kilograms of cocaine sold to Los Zetas, between in or around 2005 to in or around 2007.

1072.   The indictment also alleged that Mr. Joumaa laundered hundreds of millions of dollars in drug proceeds from West Africa, Europe, Mexico and the United States, largely for cocaine suppliers in Colombia and Venezuela, who paid Mr. Joumaa's organization a fee of between 8 and 14 percent of the laundered proceeds.

1073.   According to the U.S. government, Mr. Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million U.S. dollars per month, through various channels, including bulk cash smuggling operations and Lebanese exchange houses.

1074.   According to the U.S. government, Mr. Joumaa's organization pays fees to Hezbollah to facilitate the transportation and laundering of narcotics proceeds.

1075.   For example, Mr. Joumaa's organization has sent vast quantities of bulk cash shipments through the Beirut International Airport and regularly paid Hezbollah security to safeguard and transport the cash to its recipients, including LCB and various exchange houses discussed herein.[76]

1076.   On January 26, 2011 the U.S. Department of the Treasury designated Mr. Joumaa's drug and money laundering network. According to then-OFAC Director, Adam J. Szubin, Mr. Joumaa (SDNTK) ran "a complex money laundering scheme moving hundreds of millions of

---

[76]     A large amount of bulk cash (primarily in the form of banknotes that were denominated in U.S. dollars) was transported across the Togo and Ghana border on its way from Benin to the airport in Accra where the cash was then flown to Lebanon.

dollars of illicitly derived proceeds through businesses operated by him and his associates."

1077.   Mr. Joumaa's network used several money changers in Lebanon in order to launder the drug money, including among others, Hassan Ayash Exchange Company, Elissa Exchange Company, and New Line Exchange Trust Company, all designated SDNTKs on January 26, 2011.

1078.   The following chart diagramming the Joumaa Network was prepared by the U.S. Department of the Treasury:



1079.   On October 1, 2015, the U.S. Department of the Treasury designated four Lebanese nationals, two German nationals and eleven companies as Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act").

1080.   These individuals and entities provided support for narcotics trafficking and money laundering activities conducted by Lebanese-Colombian drug trafficker and money launderer Ayman Joumaa, key Joumaa associate Hassan Ayash, and the Joumaa criminal organization, which has ties to Hezbollah.

### c.   The Role of the Lebanese Exchange Houses

1081.   For at least two decades, money exchange businesses have played a key role as a waystation for Hezbollah BAC bulk cash to transition into the Lebanese banking system.

1082.   The exchange houses first became a major feature of Lebanon's financial sector during the Lebanese civil war and in 2001, the Lebanese Central Bank published a set of circulars expanding regulations for exchange houses operating in the country.

1083.   In 2011, the U.S. Department of the Treasury designated three of those exchange houses because of their significant roles in laundering money for the Joumaa Network: New Line Exchange Trust Company, the Elissa Exchange Company and the Hassan Ayash Exchange Company.

1084.   In 2013, the U.S. Department of the Treasury named Rmeiti Exchange and Halawi Exchange as foreign financial institutions of primary money laundering concern under Section 311 of the USA PATRIOT Act for essentially stepping in and taking over the roles played by Elissa Exchange Company and the Hassan Ayash Exchange Company in laundering money for Hezbollah and the Joumaa Network.

1085.   As noted above, "fresh" inflows of U.S. banknotes, transported to Lebanon in bulk cash shipments are a key stabilizing factor for Lebanon's precarious financial system.

1086.   From 2004 through 2011, Lebanese exchange houses were also a key transit point for Hezbollah funds flowing into Iraq to support Hezbollah's proxies and finance attacks on

American personnel, including Plaintiffs herein.

1087. Hezbollah's BAC set aside funds from its narcotics trafficking proceeds to send to Iraq via its preferred Lebanese exchange houses, invested some of the proceeds in Lebanese real estate and commercial ventures and laundered the rest using elaborate trade-based money laundering arrangements.

1088. A 2008 transaction involving New Line Exchange illustrates one of the ways U.S. banknotes originating from the Joumaa network transited through the Lebanese banking system to facilitate trade-based money laundering.

1089. Abdul Latif Fawaz worked as a courier for the Tajideen network that moved money from Ghana to Lebanon.

1090. In 2008, Mr. Fawaz made a cash deposit of $20,000 U.S. dollars at New Line Exchange's branch in Beirut, Lebanon.

1091. New Line Exchange then provided Mr. Fawaz with a receipt for his cash deposit (identified by Cash Transaction Slip reference number "36/2008," dated July 19, 2008).

1092. The Cash Transaction Slip identified the source of the funds as "business."

1093. Subsequently, New Line Exchange instructed LCB to debit New Line Exchange's U.S. dollar-denominated account no. 173902 and transfer $20,000 U.S. dollars to an individual with an account at Defendant SGBL (number "072004440591185013").

1094. Thus, a Hezbollah courier was able to convert U.S. banknotes into an electronic deposit in a U.S. dollar-denominated account at a Lebanese bank (LCB) in the name of a third party exchange house (New Line Exchange) that was then converted into another electronic funds transfer to a seemingly unrelated U.S. dollar-denominated account at a second Lebanese bank (SGBL) where it could be directed anywhere in the world using SGBL's correspondent bank

accounts in the United States.

1095.   Mr. Joumaa's movement of hundreds of millions of U.S. dollars into Lebanon each year provides desperately needed liquidity to the Lebanese banking system as do similar deliveries by other parallel drug trafficking networks approved by the BAC and overseen by Abdallah Safieddine.

1096.   At the same time, most Lebanese banks do not want to be seen as directly involved in processing vast sums of cash flown in primarily from West Africa. Nor do they wish to directly provide letters of credit to the Joumaa Network or other BAC procurement arms.

1097.   The Lebanese exchange houses therefore provide a valuable service both to the BAC and its drug trafficking networks as well as to Lebanon's commercial banks that prefer these intermediary financial institutions to handle the bulk cash deliveries and serve as the intermediaries for the trade-based money laundering that follows.

1098.   Lebanon's commercial banks, including Defendants, fully understand the role played by the exchange houses and fully understand their own roles in providing Hezbollah and its narcotics traffickers with access to the U.S. financial system both through the exchange houses' accounts at the banks and through the BAC corporate and individual accounts set forth above.

### i.   New Line Exchange Network

1099.   New Line Exchange Trust Company SAL ("New Line Exchange") was incorporated in May 2008 and operated by Ziyad Muhammad Youssef on behalf of Ayman Joumaa who effectively controlled the company.

1100.   Both New Line Exchange and Ziyad Muhammad Youssef were designated in January 2011 as SDNTKs for their direct involvement in Mr. Joumaa's narcotics money laundering activities.

1101.   Both New Line Exchange and Ziyad Muhammad Youssef owned accounts at LCB.

1102.   Mr. Youssef's U.S. dollar-denominated account no. 221418* was temporarily frozen by LCB with a balance of over $10 million U.S. dollars. According to the Lebanese government, the account balance was transferred to Defendant SGBL.

1103.   New Line Exchange LCB account no. 173902* was closed in June 2012, eighteen months after Mr. Joumaa's SDNTK designation.

1104.   New Line Exchange was also the owner of an account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES which Mr. Joumaa also used to launder narcotics proceeds through the international financial system.

1105.   New Line Exchange also conducted extensive business with the Mecattaf Exchange Network which served as a secondary banker or hawaladar to New Line Exchange.[77]

1106.   The transaction below provides an example of trade-based money laundering through the combination of bulk cash, New Line Exchange (SDNTK), a Lebanese bank (in this case Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES), U.S. correspondent bank accounts and ultimately the shipping and resale of commodities acquired through the multi-layered transaction:

---

[77]    A "hawaladar" is someone engaged in "hawala" – an alternative remittance channel that exists outside of traditional banking systems that enables individuals or companies to transfer funds through a system that records credit and debit transactions but does not involve the movement of funds either physically or through the exchange of commercial paper.

## Ayman Joumaa Network: Trade-based Money Laundering

$49,650 U.S. dollars via New Line Exchange and Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES on October 15, 2008



### ii. Elissa Exchange Network

1107.  Elissa Exchange Company SARL ("Elissa Exchange") was established in 1996 and designated by the U.S. Department of the Treasury as an SDNTK in January 2011 along with its principals, Jamal Muhammad Kharrubi and Ali Muhammad Kharrubi.

1108.  During the relevant period, Elissa Exchange and its network of Lebanese companies were a prime vehicle for Hezbollah's money laundering and drug trafficking operations.

1109.  These included Phoenicia Shipping Offshore SAL (SDNTK), Elissa Holding SAL,

Solmar Offshore SAL, SOL – MAR SARL, and several companies based in Africa.[78]

1110. LCB maintained U.S. dollar-denominated account no. 341276* for Elissa Exchange until it was frozen in June 2012.

1111. According to the Lebanese government, (despite Elissa Exchange's SDNTK designation in 2011) the company was able to move its U.S. dollar-denominated account balance at LCB to its accounts at Defendants FENICIA BANK, MEAB BANK, LEBANON AND GULF BANK and another Lebanese financial institution.

1112. In addition, after LCB's demise, Defendant BLOM BANK became Elissa Exchange's principal banker.

1113. Defendant BLOM BANK (together with Defendant MEAB BANK) used its U.S. correspondent bank accounts to facilitate Elissa Exchange's electronic funds transfers for the purpose of purchasing or shipping cars on behalf of the Joumaa Network.

1114. However, long before the U.S. designation of Elissa Exchange in 2011, it was obvious that the company was a money laundering enterprise. In fact, a 2006 LCB customer due diligence report noted that the Elissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including bulk cash smuggling on flights from Ghana to Beirut.

1115. The report further described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

1116. Between January 2007 and January 2011 Elissa Exchange transferred more than

---

[78]    These includes Elissa Group SA, which operated in Benin and was owned by Ali Muhammad Kharrubi (SDNTK) and Elissa Park Cotonou/Elissa Car Park, a subsidiary of Elissa Group SA in the port city of Cotonou, Benin.

$60 million U.S. dollars to bank accounts in the United States for the purpose of purchasing or shipping cars on behalf of the Joumaa Network.

1117.  LCB held U.S. dollar-denominated account no. 341277* for Phoenicia Shipping Offshore SAL (SDNTK) (Ali Muhammad Kharubbi was listed as chairman and largest shareholder) until the account was frozen in June 2012, eighteen months after the U.S. designation.

1118.  According to the Lebanese government, despite Phoenicia Shipping Offshore SAL's designation in 2011 (as part of the Elissa Exchange Network), the company was able to move its account balance to its accounts at Defendants FENICIA BANK, BANK AUDI and FRANSABANK.

1119.  Defendant MEAB BANK's Tyre branch served as Phoenicia Shipping Offshore SAL's principal banker.

1120.  LCB also held U.S. dollar-denominated account no. 341821* for Elissa Holding SAL (SDNTK) (Ali Muhammad Kharubbi was listed as chairman and largest shareholder) until the account was temporarily frozen in June 2012.

1121.  LCB also held U.S. dollar-denominated account no. 341629* for Solmar Offshore SAL, also owned and controlled by Ali Muhammad Kharubbi, until the account was temporarily frozen in June 2012, eighteen months after the U.S. designation.

1122.  LCB also owned U.S. dollar-denominated account no. 341628* for SOL – MAR SARL until the account was temporarily frozen in June 2012.

1123.  SOL – MAR SARL was owned by Ali Muhammad Kharubbi and his brother Jamal.

1124.  LCB also owned accounts no. 341275* and 172692* for Ali Muhammad Kharrubi. Account no. 172692 was closed in January 2012 and its account balance moved to Mr. Kharrubi's account at Defendant MEAB BANK.

1125.  Mr. Kharrubi's account no. 341275* was temporarily frozen in June 2012 but the account balance nevertheless moved to Mr. Kharrubi's account at Defendant MEAB BANK.

### iii.    Hassan Ayash Exchange Network

1126.  The Hassan Ayash Exchange Company SARL ("Hassan Ayash Exchange") is a money exchange based in Beirut, Lebanon.

1127.  The Hassan Ayash Exchange was owned and controlled by Hassan Muhammad Hasan Ayash.

1128.  The exchange's principal office is located adjacent to the Caesars Park Hotel in Beirut, which is owned by Ayman Joumaa's brother, Akram Said Joumaa (SDNTK).

1129.  The Hassan Ayash Exchange owned U.S. dollar-denominated account no. 340048* at LCB that was closed in June 2012.

1130.  In 2006, at Ahmad Safa's direction, the Hassan Ayash Exchange became LCB's primary source of foreign currencies, especially U.S. dollars.

1131.  Between 2007 and 2011, the Hassan Ayash Exchange Company transferred approximately $140 million U.S. dollars to bank accounts in the United States for the purpose of purchasing or shipping used cars for the Joumaa Network.

1132.  Defendants SGBL, BLOM BANK and MEAB BANK used their accounts at U.S. correspondent banks to facilitate the Hassan Ayash Exchange Company's funds transfers for the purpose of purchasing or shipping cars on behalf of the Joumaa Network.

1133.  Hassan Ayash Exchange Company was also used by Hezbollah to channel U.S. dollars into Iraq during the relevant period.

### iv.    Halawi Exchange Network

1134.  Halawi Exchange is owned and controlled by Mahmud Fuad Halawi and his family, including Ali Ahmad Halawi and Mahmud's sons, Wa'el Halawi, Fuad Halawi and Rawad Halawi.

1135. According to the U.S. Department of the Treasury, the Halawi family's entities leverage common office space and operational capabilities:

> Halawi Exchange, along with other related entities, is organized under a holding company known as Halawi Holding SAL, which also owns several other related companies in Lebanon. The Halawi companies are based in Beirut, Lebanon, share key corporate leadership, maintain offices at the same addresses, share common phone numbers and common email addresses, and frequently reference their close connection to one another.

1136. This network of companies (collectively, the "Halawi Network") includes the following entities:

- Halawi Holding SAL;
- Halawi Investment Trust SAL;
- Halawi Trading & Contracting Est;
- Halawi Real Estate SAL;
- General Investment Co SARL;
- L'ambiance de Rêve SARL;
- Info Trust SAL; and
- Info Trust SARL.

1137. Like the other Lebanese exchange houses discussed herein, the companies that form the Halawi Network furnish money laundering and bulk cash exchange services to Hezbollah's BAC and provide it with a means of converting banknotes into bank credit for setting off debts through the international banking system.

1138. Halawi Exchange owned an account at LCB through which it laundered hundreds of millions of U.S. dollars.

1139. On April 22, 2013, the Director of Financial Crimes Enforcement Network of the U.S. Department of the Treasury found that Halawi Exchange "is a financial institution operating outside the United States that is of primary money laundering concern."

1140. The U.S. Department of the Treasury further described Halawi Exchange's "extensive illicit financial activity on behalf of a variety of international narcotics trafficking and

money laundering networks," further noting its role in facilitating "transactions for a network of individuals and companies which launder money through the purchase and sale of used cars in the United States for export to West Africa."

1141.  Halawi Exchange was the owner of at least one account at Defendant BANK OF BEIRUT at its Clemenceau Street branch in Beirut, Lebanon and Defendant MEAB BANK at its branch in Tyre.

1142.  Halawi Holding SAL owned an account at Defendant MEAB BANK at its branch in Tyre.

1143.  Halawi Investment Trust SAL was the owner of accounts at Defendants SGBL, BLOM BANK and MEAB BANK.

1144.  Info Trust SAL was the owner of accounts at Defendants SGBL and BANK AUDI.

1145.  Info Trust SARL was the owner of at least one account at Defendant BANK AUDI.

**v.    Mecattaf Exchange Network**

1146.  Mecattaf SAL is part of a network of Lebanon-based money and precious metal exchange brokerage firms controlled by the Mecattaf family.

1147.  Unlike its competitors identified herein, Mecattaf has not (yet) been designated by the United States for its role in laundering money for Hezbollah's BAC and/or Ayman Joumaa's network.

1148.  However, Mecattaf play an important role in the BAC's and Mr. Joumaa's money laundering operations, with the assistance of Defendant LEBANON AND GULF BANK.

1149.   Mecattaf SAL owned corporate account no. 11110458 at Defendant LEBANON AND GULF BANK.

1150.  Below is an example of how Mecattaf and Defendant LEBANON AND GULF

BANK played important roles in facilitating Ayman Joumaa's movement of bulk cash from narcotics trafficking through Lebanon.

1151.   The transaction below illustrates how trade-based money laundering for the BAC works. While the cash originates with Joumaa's South American narcotics network, it was ultimately converted into a seemingly unrelated purchase of food products worth $115,050 U.S. dollars in Southeast Asia that wound up being supplied to Tajideen family companies in Africa. New Line Exchange processed the bulk cash deposit and then debited its account with Mecattaf Exchange. The latter then used its account at Defendant LEBANON AND GULF BANK to transfer U.S. dollars through Defendant LEBANON AND GULF BANK's U.S. correspondent bank account to effectuate a U.S. dollar-denominated transfer to the commodity food supplier in Singapore who shipped the commodity to the Tajideen Network in Africa which, in turn, would sell the commodity food products and convert those sales back into cash in Africa:



**Ayman Joumaa Network and Tajideen Network: Trade-based Money Laundering**
$115,050 U.S. dollars via New Line Exchange, Mecattaf Exchange and Defendant LEBANON AND GULF BANK on June 21, 2010

1152. Another transaction illustrates how the BAC uses couriers transporting bulk cash to effectuate its trade-based money laundering operations, this time using a trusted courier named Fawaz who deposited over $250,000 in U.S. banknotes with New Line Exchange (SDNTK). The funds were then debited from New Line Exchange's account at Mecattaf Exchange which, in turn, initiated an electronic wire transfer by its bank, Defendant LEBANON AND GULF BANK. The resulting transaction cleared U.S. dollars through Defendant LEBANON AND GULF BANK's U.S. correspondent bank and credited the account of a Vietnamese bank whose customer was a wholesale food supplier:

## Ayman Joumaa Network and Tajideen Network: Trade-based Money Laundering
### $269,678 U.S. dollars via New Line Exchange and Defendant LEBANON AND GULF BANK on August 5, 2009



### vi.    Kassem Rmeiti Network

1153.   Kassem Rmeiti & Company for Exchange ("Rmeiti Exchange") is a Lebanon-based money exchanger with branches and affiliates in Switzerland and Benin. Rmeiti Exchange, through its owner, Kassem Rmeiti, also owns companies including, but not limited to, the Rmeiti Group SAL Offshore in Lebanon and Société Rmeiti SARL (a/k/a STE Rmeiti) located in Benin (collectively, the "Rmeiti Network").

1154.   As with the other Lebanese exchange houses described herein, according to the U.S. Department of the Treasury, the Rmeiti Network "uses accounts held at foreign banks that

maintain correspondent relationships with U.S. financial institutions to gain access to the U.S. financial system."

1155.   Also, according to the U.S. Department of the Treasury, Rmeiti Exchange was involved in trade-based money laundering with drug cartels for Hezbollah's benefit:

> Rmeiti Exchange, its ownership, management, and associates are involved in illicit activity that includes the same trade based money laundering activities conducted by U.S.-designated narcotics kingpin Ali Mohamed Kharrubi and Elissa Exchange, facilitate money laundering by other Lebanese exchanges on behalf of drug traffickers, and provide financial services to Hizballah.

1156.   In addition, Ali Muhammad Qansu (SDGT), who is closely affiliated with Adham Hussein Tabaja and Muhammad al-Mukhtar Fallah Kallas, served as the auditor for Rmeiti Group SAL Offshore in Lebanon.

1157.   Rmeiti Group SAL Offshore owned an account at Defendant FENICIA BANK (Verdun branch).

### vii.   Fayed Exchange Network

1158.   Fayed Exchange Company was established in 1988 by Muhammad Abd al-Rahman Fayed and his brother Mahmud Fayed.

1159.   According to the company, its origins date back to the 1950s.

1160.   During the relevant period, Fayed Exchange Co. engaged in large-scale, high-volume transactions of the kind described in LCB's August 13, 2007, Internal Audit Report.

1161.   According to the Lebanese government, Fayed Exchange Co. fell within Saleh Ali Assi's network of companies for the BAC.

1162.   Fayed Exchange Co. was the owner of U.S. dollar-denominated account no. 170505* at LCB until it was closed on June 2011.

1163.   According to the Lebanese government, when LCB closed Fayed Exchange Co.'s

account, the balance migrated to accounts owned by Fayed Exchange at Defendants BANK OF BEIRUT AND THE ARAB COUNTRIES and LEBANON AND GULF BANK.

### 4. ARMS DEALING

1164. Hezbollah is actively involved in arms trafficking throughout the world. Its agents operate on six continents.

1165. Hezbollah procurement specialists and operatives acquire both kinetic weapons (*e.g.* rifles, grenades, missiles) and non-kinetic materials (*e.g.* night-vision equipment, scopes and fuses) for Hezbollah's own use as well as for profit and resale and to gain influence with governments and militia that they service.

### a. Weapons Trafficking in the United States

1166. In one leading example, Hezbollah's IJO sought to acquire approximately 1,200 Colt M4 Carbines (machine guns) from the United States.

1167. Hasan Antar Karaki, the brother of a senior Hezbollah operative who planned a major terrorist attack in Azerbaijan, worked closely with Hassan Hodroj, a Hezbollah spokesman and head of the organization's portfolio on "Palestinian issues," to acquire weapons from around the world.

1168. As with other Hezbollah efforts, the common denominator was criminality. Thus, Mr. Karaki and Mr. Hodroj were not only involved in procuring weapons for Hezbollah; they were also attempting to sell counterfeit U.S. currency and fake passports.

1169. On or before July 2008, Hassan Hodroj and his son-in-law, Dib Hani Harb (also a Hezbollah operative and close associate of Mr. Karaki), engaged in a multi-layered scheme to sell counterfeit currency and fake passports to undercover U.S. law enforcement agents and acquire weapons and technology on Hezbollah's behalf.

1170. In July 2008, an undercover U.S. law enforcement agent was advised that counterfeit money was available for purchase from Lebanon, and in September 2008, the agent was introduced to Dib Hani Harb, who was identified as someone involved in the sale of counterfeit money to support Hezbollah.

1171. Mr. Harb also advised the undercover U.S. law enforcement agent (and later established) that he was involved in cocaine trafficking.

1172. In April 2009, Mr. Karaki sent Mr. Harb to a meeting in southern Florida to meet with undercover law enforcement operatives. Terms were negotiated for the sale of stolen U.S. currency and multiple counterfeit currencies. Mr. Harb stated that $100 bills could be obtained for approximately 40 percent of face value and that the notes were manufactured in Iran specifically for Hezbollah's benefit.

1173. He also demanded a 3 percent commission on every deal between undercover U.S. law enforcement agents and Hezbollah.

1174. Mr. Harb specified that the counterfeit bills were printed in Baalbeck, Lebanon and that no one should fear criminal prosecution for this counterfeiting activity, indicating that "they" know everyone, even the judges.

1175. At the meeting, Mr. Harb also explained that Hezbollah produced not only counterfeit currency, but also false European travel documents as well.

1176. Mr. Harb explained that Mr. Karaki was a major figure in Hezbollah's forgery operations, and he offered several varieties of passports, including passports from Italy and the Czech Republic. (Fake British, American and French passports were also offered at a separate meeting.)

1177. A few months after the meetings in Florida, Mr. Harb and Mr. Karaki delivered

fraudulent British and Canadian passports to a law enforcement operative using the pictures and biographical information he had provided.

1178.   On or about May 12, 2009, Mr. Karaki directed that the payment for the passports should be made to Mr. Harb's account at Defendant BANK AUDI - Plaza Bid Idriss, Sofil Center, Beirut 2021 8102, Lebanon, account #813364.

1179.   Mr. Harb's stated profession was "physical therapist." He maintained a clinic in Dahiya which he acknowledged to an undercover U.S. law enforcement agent was "simply a cover for his activities on behalf of Hezbollah."

1180.   In June 2009, a U.S. undercover agent first discussed the possibility of Mr. Harb acquiring Colt M4 Carbines ("M4" machine gun) for Hezbollah.

1181.   Subsequently, Mr. Harb introduced the undercover U.S. law enforcement agent to his father-in-law Hassan Hodroj and Mr. Hodroj agreed to purchase approximately 1,200 M4s at a price of approximately $1,800 U.S. dollars per M4 and stated that he was involved in weapons and technology procurement for Hezbollah.

1182.   In November 2009, Mr. Harb, Mr. Hodroj and others were indicted for, among other things, conspiring to provide material support to Hezbollah.

1183.   That same month, U.S. law enforcement contacted BANK AUDI by serving a seizure warrant on its correspondent bank seeking to freeze Mr. Harb's account (which remained active). The warrant expressly stated that Mr. Harb had been charged with providing material support to an FTO under 18 U.S.C. § 2339B, but although the correspondent confirmed BANK AUDI's receipt of transmittal of the warrant, it did not comply.

### b. **Weapons Trafficking in Nigeria**

1184.   Hezbollah has strong connections to (among others) an arms-dealing network in Nigeria.

1185.   According to a report from the Combatting Terrorism Center at West Point:

> Iran's Quds Force and [Hezbollah]'s global operations have involved Nigeria for more than a decade, but their activities were exposed in October 2010. Nigerian customs officials in Lagos seized 13 containers of weapons from a ship operated by the same French-Lebanese businessman's company that in March 2011 saw a ship bound for Sinai, Egypt, via Syria to supply weapons to Hamas in Gaza intercepted by Israeli naval commandos. The containers in Lagos, which included 107mm Katyusha artillery rockets used by [Hezbollah] against Israel in 2006, were shipped on behalf of a Tehran-based Islamic Revolutionary Guard Corps (IRGC) "front company" and were picked up at Bandar Abbas in Iran, where the IRGC has a naval base. According to Nigeria's foreign minister, the weapons were destined for a warehouse in Abuja, but shippers altered documents to send them to Gambia (presumably for anti-Senegalese rebels in Casamance). Nigerian security officials arrested four individuals: a senior Quds Force officer; a Nigerian who formerly studied in Iran and worked at Radio Tehran's Hausa language service; and two Nigerian customs officials. A fifth Iranian suspect, Sayyed Akbar Tabatabaei, who was the Quds Force Africa Corps commander, took refuge in the Iranian Embassy, flew back to Tehran with Iran's foreign minister and was reportedly reassigned to Venezuela to run Quds Force operations in Latin America. One month after these arrests, $10 million worth of heroin hidden in auto engine parts suspected of being linked to the weapons shipment in October was seized in Lagos from a ship originating in Iran.

1186.   Muhammad Ibrahim Bazzi (SDGT) organized the above-referenced weapons shipment, using LCB's Prime Bank Gambia subsidiary to help finance the deal.

1187.   One of Hezbollah's most prominent arms dealers in Nigeria is Mustafa Reda Darwish Fawaz, who was designated by the U.S. Department of the Treasury as an SDGT on February 26, 2015, "for acting for or behalf of Hizbullah."

1188.   Mustafa Fawaz has been a significant donor to Hezbollah and a member of Hezbollah's Islamic Jihad Organization.

1189.    He is a Lebanese citizen who owns a chain of supermarkets in Abuja, Nigeria called Amigo Supermarket Ltd. (SDGT) as well as the Wonderland Amusement Park and Resort Ltd. (SDGT) in Abuja, Nigeria.

1190.    According to the U.S. Department of the Treasury, since the 1990s, Mustafa Fawaz has been involved in activities related to communications, surveillance, and reporting for Hezbollah. He communicated with Hezbollah in Lebanon by e-mail and reportedly received updates and newsletters regarding Hezbollah activities and distributed this information to other Hezbollah supporters in Abuja, Nigeria.

1191.    According to the U.S. Department of the Treasury, Mr. Fawaz used special surveillance cameras based at Amigo Supermarket (SDGT) to monitor the movements of foreigners, especially Israelis. He also provided Hezbollah with a report of his visit to the U.S. Embassy in Nigeria.

1192.    As of at least mid-September 2003, Mustafa Fawaz solicited donations in Abuja, Nigeria, and helped arrange the transmission of these funds to Hezbollah in Lebanon.

1193.    Mr. Fawaz maintained multiple accounts at Defendant BLOM BANK.

1194.    In mid-May 2013, the Nigerian State Security Service arrested Mustafa Fawaz and two other men after the discovery of an arms cache in a residence in the northern Nigerian city of Kano.

1195.    On May 30, 2013 Nigerian intelligence agents escorted journalists to a property in Kano and showed them a bunker where a massive haul of weapons had been stored.

1196.    A Nigerian official, Bassey Etang, described the room as a "Hezbollah armory."

1197.    Mustafa Fawaz reportedly confessed the details of Hezbollah activities in Nigeria and identified additional names of other Hezbollah IJO cell members in Nigeria, as well as a

specific property in Kano, Nigeria, that was used to support terrorism.

1198.   In November of 2013, Fawaz and one of the men arrested with him were acquitted of the charges against them because Hezbollah was not an illegal organization in Nigeria.

1199.   The third man was convicted of conspiring to import weapons illegally.

1200.   Fouzi Reda Darwish Fawaz, Mustafa Fawaz's brother, was also part of Hezbollah's Nigerian network.

1201.   He was designated an SDGT by the U.S. Department of the Treasury on February 26, 2015.

1202.   Fouzi Fawaz was a Hezbollah Foreign Relations Department ("FRD") official in Abuja, Nigeria. The FRD claims to be in charge of "community relations," but the primary goal of the FRD in Nigeria was to scout recruits for Hezbollah's military units, as well as to create and support Hezbollah's terrorist infrastructure in Africa and globally.

### c.   Weapons Trafficking and Dual-Use Technologies

1203.   Vatech SARL was established in 1997 in Beirut by Fadi Hussein Serhan. Both the company and Mr. Serhan were designated by the U.S. Department of the Treasury as SDGTs in November 2015. According to the U.S. government, Mr. Serhan ran procurement supply-chain operations for Hezbollah's UAV requirements:

> Serhan is a Hizballah procurement agent and General Manager of Beirut-based company Vatech SARL, which he has used to purchase sensitive technology and equipment for Hizballah. Serhan has purchased unmanned aerial vehicles (UAVs) and accessories, and various electronic equipment from companies in United States, Europe, Asia, and the Middle East.

1204.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES maintained an account for and provided financial services to Vatech SARL at its branch in the Mazraa district of Beirut, Lebanon.

### 5. ILLICIT INTERNATIONAL TRADE

1205.   At least hundreds of millions of dollars in U.S. currency are transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers.

1206.   These U.S. dollar-denominated funds include the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering proceeds, and other crimes. A significant portion of this money moves through courier and security networks controlled by Hezbollah or individuals affiliated with Hezbollah.

1207.   The proceeds of the car sales help to conceal and disguise the true source, nature, ownership, and control of the narcotics proceeds from U.S. customs and other law enforcement agencies.

1208.   For example, Elissa Group (SDNTK, discussed above)—headed by two Lebanese brothers Ali Muhammad Kharrubi (SDNTK) and Jamal Muhammad Kharrubi (SDNTK)—ran money exchange and used car selling companies in Lebanon and in Benin, Africa.

1209.   On the night of January 17, 2012, the Beninese Government arrested Ali Muhammad Kharrubi for narcotics-related money laundering. His permanent residency status was withdrawn, he was declared "persona non grata" by Beninese media, and he was extradited to the U.S. because of his ties to Hezbollah.

1210.   Similarly, according to the U.S. government, between 2003 and 2011, at least 34 individuals who transported bulk cash from Togo to Ghana also sought entry to the United States on non-immigrant visas. Most of them listed their employment as car buyers or car traders, and some identified as their points of contact U.S. car buyers who received wire transfers from LCB, the Hassan Ayash Exchange and the Elissa Exchange discussed herein.

1211.   Hezbollah also uses money couriers to transport millions of undeclared U.S. dollars in bulk cash shipments to Lebanon. As just one example, on December 9, 2010, three individuals connecting between airline flights through Paris on their way from Benin to Lebanon were arrested while carrying over $6.5 million U.S. dollars in undeclared U.S. currency. One of the individuals was also carrying a business card for Elissa Megastore, Elissa Exchange's car lot in Cotonou.

1212.   Hezbollah frequently blurs the lines between narcotics trafficking, illicit trade, counterfeiting and money laundering. For example, in 2007 and 2008 alone, a network of at least 44 couriers working for Hezbollah *declared* over $97 million in U.S. banknotes at the border crossing between Ghana and Togo in West Africa.

1213.   According to the U.S. government's civil complaint against LCB, Hezbollah maintained tight control over its money laundering networks:

> At least hundreds of millions of dollars in U.S. currency are transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers. These U.S. dollars include the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering proceeds, and other crimes. A significant portion of this money moves through courier and security networks controlled by Hizballah or individuals affiliated with Hizballah.

1214.   One of the individuals who transported money across the border between Ghana and Togo was Hassan Chokr, a Hezbollah weapons dealer.

1215.   In another example, in 2006, U.S. law enforcement officials became aware that various individuals were attempting to purchase large quantities of purportedly stolen cellular telephones for shipment overseas.

1216.   One of these men was Moussa Ali Hamdan, a Lebanese national living in New Jersey and later Brooklyn, who conducted a side-business in buying and selling stolen electronics.

1217.   In September 2008, Mr. Hamdan introduced an undercover U.S. agent to Dib Hani Harb (discussed above), who was involved in the sale of counterfeit money to support Hezbollah.

1218.   Over the course of approximately two years, undercover U.S. agents sold counterfeit consumer goods to Mr. Hamdan and worked with Mr. Hamdan and Mr. Harb on schemes to buy counterfeit currency.

1219.   Mr. Hamdan was a relatively low-level Hezbollah operative with close ties to more senior Hezbollah operatives in Lebanon and West Africa, but like many others, his criminal endeavors relied upon The System to facilitate his activities.

1220.   While Mr. Hamdan was buying approximately $150,000 U.S. dollars of what he believed to be counterfeit consumer goods from a U.S. undercover agent, he also operated a low-end car dealership in New Jersey called MAH Auto with his business partner.

1221.   From August 2006 through February 2008, MAH Auto received approximately 80 wire transfers from Lebanon to its his U.S.-based Commerce Bank account #7857579069.

1222.   In 2007 alone, Mr. Hamdan's MAH Auto account received $8.5 million U.S. dollars from bank accounts in Lebanon.

1223.   As part of the money laundering scheme, more than 15 wire transfers totaling more than $1 million U.S. dollars were sent by Hassan Ayash Exchange (designated an SDNTK in 2011), Halawi Exchange and Kassem Rmeiti and Co. For Exchange (designated as foreign financial institutions of primary money laundering concern under Section 311 of the USA PATRIOT Act in 2013) from accounts at LCB to MAH Auto.[79]

1224.   As part of the money laundering scheme, more than $500,000 U.S. dollars were wired to New Jersey from accounts at Defendant BANQUE LIBANO-FRANÇAIS.

---

[79]      Remiti Group SAL Offshore is a sister company of Kassem Rmeiti and Company for Exchange. Its auditor / accountant is Ali Muhammad Qansu, an SDGT who works on behalf of Adham Tabaja.

1225.   As part of the money laundering scheme, more than $250,000 U.S. dollars were wired to MAH Auto in New Jersey from accounts at Defendant BANK AUDI via JP Morgan Chase Bank in New York. One of the BANK AUDI accounts used to make the transfer was account no. 780554.

1226.   The funds were used in part to purchase used cars subsequently exported from the U.S. primarily to West Africa as part of Hezbollah's money laundering efforts to launder narcotics sales proceeds.

1227.   In November 2009, charges were filed in the Eastern District of Pennsylvania against Moussa Ali Hamdan (together with Mr. Harb and others) for providing material support to Hezbollah, and a host of other criminal offenses.

1228.   Before he could be arrested in New Jersey, Mr. Hamdan fled to Lebanon and later traveled to the Tri-Border Area, where he was subsequently arrested and extradited to the United States.

1229.   Mr. Hamdan is only one example of what the U.S. government has referred to as Hezbollah's "Used Car Trade-Based Money Laundering Scheme":





1230.  Mr. Hamdan's MAH Auto received wire transfers in New Jersey/New York that originated with LCB, Defendants BANQUE LIBANO-FRANÇAIS and BANK AUDI, often placed by exchange houses that themselves received massive inflows of drug money collected by Hezbollah.

1231.  MAH Auto then purchased used cars in the United States and shipped them to Africa where they would be re-sold, and the proceeds would be offset against narcotics proceeds to conceal the source of the latter.

1232.  Muhammad Noureddine, who was arrested in France in January 2016, presents another example of how The System mixes trade-based money laundering with narcotics trafficking and ultimately terrorism.

1233.  Mr. Noureddine used his company, Trade Point International SARL (SDGT), to provide financial services to Adham Tabaja, the co-head of Hezbollah's BAC and his company Al-Inmaa Engineering and Contracting SARL (SDGT).

1234. He and his associates in Europe collected cash provided by other Hezbollah operatives from Colombian drug cartels (particularly La Oficina de Envigado), used the money to buy luxury jewelry, watches and cars, and then resold these items in Lebanon or West Africa.

1235. Mr. Noureddine worked closely with a Hezbollah operative and drug trafficker named Ghassan Diab who was based in Lagos, Nigeria but operated in other central and west African countries.

1236. For example, law enforcement raids in Germany, France, Italy and Belgium resulted in the seizure of 500,000 Euros in bulk cash, property in the form of 70 watches valued at $9 million U.S. dollars, weapons and one luxury vehicle.

1237. The proceeds from the re-sale of watches, jewelry and other luxury items in Lebanon and West Africa were then deposited in currency exchange houses in Lebanon or money transfer bureaus in Africa, and a portion of that money was eventually transferred to the Colombians after sizeable commissions were deducted and – according to investigators – diverted to Hezbollah for purchasing weapons used by the organization in Syria. The rest of the funds were churned through Lebanese banks (including Defendants herein) for use by Hezbollah and its IJO.

1238. On January 28, 2016, both Mr. Noureddine and Trade Point International SARL were designated by the U.S. Department of the Treasury "for providing financial services to or in support of Hizballah."

1239. Trade Point International SARL has maintained an account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES to facilitate its conduct.

1240. The Treasury Department noted that Mr. Noureddine "maintained direct ties to Hizballah commercial and terrorist elements in both Lebanon and Iraq" and "transferred

substantial amounts of money in support of Hizballah's commercial investment activity in Lebanon and Iraq."

### 6. LEBANESE LAWYERS ASSOCIATED WITH BAC COMPANIES

1241. Hezbollah utilizes a small subset of Lebanese lawyers to help set up its network of companies. The association of one of these attorneys with an entity constitutes additional evidence that an entity or account is controlled by Hezbollah.

1242. Hezbollah's list of preferred attorneys includes the following individuals:

### a. __Ali Hassan Berro__

1243. Ali Hassan Berro is an attorney for many of the companies associated with Hezbollah's money laundering network. In 2017, he even ran on Hezbollah's behalf for the post of Head of Beirut's Bar Association. Mr. Berro is affiliated with the following Hezbollah-controlled companies:

- **The Lebanese Arab Company for Touristic Services SARL**;

- **Société Orientale Libanaise d'Investissement et Développement SAL** (discussed above, account at Defendant BYBLOS BANK);

- **Shahed Pharm Drugstore SARL** (discussed above, account at Defendant LEBANON AND GULF BANK);

- **Global Touristic Services SAL** (discussed above, account at Defendant BYBLOS BANK);

- **Atlas Holding SAL** (discussed above, accounts at Defendants SGBL and BANK AUDI);

- **Assaha Travel and Tourism SARL** (discussed above);

- **Amana Sanitary and Paints Company LLC (ASPCO)**;

- **Amana Plus Company SAL** (discussed above, account at Defendant LEBANON AND GULF BANK);

- **Sanabel for Urban Studies and Architectural Design SAL** (discussed above);

- **Al-Kawthar** (discussed above); and

- **Al-Amana SARL** (discussed above, accounts at Defendants LEBANON AND GULF BANK and BYBLOS BANK).

### b. Fadi Adel Jamal al-Din

1244. Fadi Adel Jamal al-Din is an attorney with numerous ties to Hezbollah related individuals and entities that are part of the BAC network.

1245. Mr. Jamal al-Din served as the attorney for numerous companies established by Rana Abd al-Rahim Koleilat during her tenure at Bank Al Madina (discussed *infra*), including:

- **Rana Travel Limited SARL**;

- **Rana K. Holding SAL** (discussed below);

- **R 2679 Real Estate SAL** (discussed below);

- **Sweet SARL I&R**;

- **Al Madina Flowers SARL**;

- **R and I Real Estate SAL** (discussed below);

- **V 46 Real Estate** (discussed below);

- **MD Group Cleaning SARL**; and

- **Intimo SARL**.

1246. Mr. Jamal al-Din served as attorney for at least four companies affiliated with senior BAC facilitator Saleh Ali Assi:

- **Al Mansouri Real Estate Company**;

- **Salasko Offshore SAL** (LCB account no. 172850*);

- **V69 Real Estate SAL**; and

- **Sol Blanc SAL**.

1247. Mr. Jamal al-Din served as attorney for the following companies controlled by the Nassour clan:

- **Centrum Mark SAL**;

- **Center Real Estate SAL**;

- **La National SAL** (co-founder and attorney); and

- **Serene Real Estate SAL** (co-founder and attorney).

1248. Mr. Jamal al-Din served as attorney for the following companies controlled by the Ahmad clan:

- **United Investment Group SAL** (discussed above, account at Defendant SGBL);

- **Paloma Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Spider Group SAL** (discussed above);

- **Triple A for Development SAL**;

- **Hariss 929 Real Estate SAL**;

- **Golden Square SAL** (account at Defendant FRANSABANK);

- **Triple A Team Ltd.**;

- **Ali Ahmed Group - Holding SAL** (discussed above, account at Defendant FRANSABANK);

- **ACE Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Diane Real Estate SAL**;

- **A&H Team SAL**; and

- **Al-Sirat Holding SAL** (discussed above).

### c. **Ali Hussein al-Ashi**

1249. Ali Hussein al-Ashi is the attorney for many companies associated with Hezbollah's network, specifically the Tabaja Network; most prominent among them are Adham Tabaja's designated companies:

- **Al-Inmaa Engineering and Contracting SARL** (SDGT, discussed above, accounts at Defendants SGBL, FENICIA BANK, LEBANON AND GULF BANK, MEAB BANK, BANK OF BEIRUT AND THE ARAB COUNTRIES, and BANQUE LIBANO-FRANÇAISE); and

- **Al-Inmaa Group for Tourism Works** (discussed above, account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES).

1250. He also serves as the attorney for companies within the Tabaja Network that are affiliated with Mr. Tabaja and other SDGTs such as Issam Ahmad Saad and Nabil Mahmoud Assaf:

- **New Land SARL** (discussed above, accounts at Defendants MEAB BANK and FENICIA BANK, and previously at LCB);

- **Fantasy World SARL** (discussed above, accounts at Defendants SGBL, MEAB BANK and FENICIA BANK, and previously at LCB);

- **Farah Tyre Company** (discussed above);

- **Fun World Company** (discussed above, account previously at LCB);

- **Madan Tourism Projects Company SAL "Green City"** (discussed above);

- **Alia Company SAE** (discussed above);

- **Lebanese Bread & Confectionery Company SAL** (discussed above); and

- **Development Studies SARL** (discussed above).

### d. **Amer Afif Abu Khalil**

1251. Amer Afif Abu Khalil is an attorney in Tyre who is closely associated with the

Tajideen Network. He is the attorney for the following Tajideen companies:

- **Afrimex (Offshore) SAL** (discussed above, accounts at Defendants BYBLOS BANK and BANK AUDI, and previously at LCB);

- **Distributions and Agencies Company SAL** (discussed above);

- **Galaxy Flame Trading SAL Offshore** (account at Defendant BANK OF BEIRUT, and previously at LCB);

- **Company for Development and Prosperity** (discussed above);

- **BMC SAL**;

- **Hyram Maritime SAL** (discussed above, account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES);

- **Al-Marjan Trading & Real Estate Development Company SAL**;

- **Lebanese Real Estate Development & Investment Company SAL** (discussed above);

- **Bream Star Line SAL Offshore** (discussed above);

- **Union Real Estate Development Company SAL** (discussed above);

- **Al Burhan Development and Development Company SAL**;

- **Al-Massar Real Estate SAL** (discussed above);

- **The General Company for Real Estate Development and Development (ALICE) SAL**;

- **Atwi and Abbas Trading Company**;

- **Trust & Safety RE. Investment SAL**;[80]

- **Al-Izdihar for Contracting SARL** (discussed above);

---

[80] The Chairman and majority shareholder is Ahmad Hassan Tajideen. Ali Muhammad Muhanna also owns shares in the company and sits on its board of directors together with Hassan Muhammad Abd al-Hassan Tajideen's wife, Najmah Hassan Jabir.

- **Tajco Company SAE** (discussed above); and

- **Ovlas Trading SAL (Offshore)** (discussed above, accounts at Defendants BANK AUDI and LEBANON AND GULF BANK).

1252. In addition, he is the attorney for several more Tajideen companies, which are part of Hezbollah.

### e. Ashraf Assem Safieddine

1253. Ashraf Assem Safieddine was a co-founder of Inter Aliment SAL Offshore, a company controlled by senior BAC facilitator, Saleh Ali Assi.

1254. The company owned an account at LCB where it laundered substantial sums of U.S.-denominated currency for the BAC.

1255. According to the Lebanese government, when LCB was finally compelled to close Inter Aliment SAL Offshore's account, the account balance migrated to the company's accounts at Defendants MEAB, FRANSABANK and BANQUE LIBANO-FRANÇAISE.

1256. Inter Aliment SAL Offshore was also the owner of accounts at Defendant BANK AUDI and SGBL.

1257. Mr. Safieddine is an attorney who was associated with several Amhaz Network companies. Among others, he was the attorney for:

- **Teleserve Plus SAL** (SDGT, discussed above);

- **Special Operations Group SAL** (discussed above, account at Defendant BANK AUDI); and

- **Liban Stars SARL**. The following individuals were involved with the company:

  o Kamel Amhaz founded the company and owned shares in the company;
  o Jihad Hussein al-Anan was listed as co-founder, partner and authorized signatory for the company; and

- Mr. Safieddine was listed as the company's attorney and a partner in the company.

**f. <u>Muhammad Hussein Dakrub</u>**

1258. Muhammad Hussein Dakrub is the brother of Dima Hussein Dakrub and is also an attorney. He is also the nephew of Muhammad Abd Ali Rustam, co-founder and in some cases the managing director of companies controlled by the Ahmad clan (see above).

1259. He has served as the attorney for several companies that are controlled by Muhammad Abdallah al-Amin (SDGT discussed *infra)*.

1260. These companies include:

- **M. Marine SAL Offshore** (SDGT). Mr. Dakrub was listed as a co-founder, board member, shareholder and the company's attorney;

- **Lama Food International SAL Offshore** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **Sierra Gas SAL Offshore** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **Lama Foods SARL** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **Thaingui SAL Offshore** (SDGT). Mr. Dakrub was listed as the company's attorney;

- **I. Prints Plus SARL**. Mr. Dakrub was listed as the company's attorney;

- **I. Prints SARL**. Mr. Dakrub was listed as the company's attorney;

- **Aya SAL Offshore**. Mr. Dakrub was listed as the company's attorney; and

- **S.I.M. SAL Offshore** (account at Defendant BANQUE LIBANO-FRANÇAISE, and previously at LCB). Mr. Dakrub was listed as the company's attorney.

### g. **Muhammad Farid Mattar**

1261.  Muhammad Farid Mattar is an attorney for several companies that are controlled by Hezbollah, including the following entities (several of which have been designated by the U.S. Department of the Treasury):

- **Car Escort Services (Offshore) SAL** (SDGT, discussed above, account at Defendant JAMMAL TRUST BANK);

- **Spectrum International Investment Holding SAL** (SDGT, discussed above, accounts at Defendants LEBANON AND GULF BANK, BANK AUDI and JAMMAL TRUST BANK);

- **Spectrum Investment Group Holding SAL** (SDGT, discussed above, accounts at Defendants BLOM BANK, LEBANON AND GULF BANK and JAMMAL TRUST BANK);

- **Hoda for Touristic Services & Management Holding SAL** (discussed above, accounts at Defendants SGBL and BANQUE LIBANO-FRANÇAISE);

- **Phoenicia Shipping Offshore SAL** (SDNTK, accounts at Defendants BANK AUDI, FRANSABANK, MEAB BANK, and previously at LCB);

- **International Group Holding SAL** (discussed above);

- **EBD Teltac (Offshore) SAL** (discussed above, account at Defendant LEBANON AND GULF BANK);

- **Solmar Offshore SAL** (account previously at LCB);

- **International Mining Company Holding SAL**, controlled by Muhammad Bazzi and Wa'el Muhammad Bazzi, both SDGTs;

- **One Globe Operator SAL Holding** (discussed above); and

- **B.I. Group Holding SAL** (discussed above).

### h. **Nabil Kamil al-Akhras**

1262.  Nabil Kamil al-Akhras is a lawyer and related to the following list of companies affiliated with Jihad Muhammad Qansu (SDGT):

- **Amigo Travel and Transport SAL** (account at Defendant BYBLOS BANK);

- **Al-Ansab Lebanese for International Trading (Offshore) SAL**;

- **United Company (Offshore) SAL**;

- **Golden Fish (Offshore) SAL** (SDGT);

- **Ifriqiya General Trading (Offshore) SAL**;

- **Al-Ghadaf Company for Trading & General Supplies (Offshore) SAL**;

- **Al-Twazon al-Handasy for General Contracting Company (Offshore) SAL**;

- **Mega Investment Group (Offshore) SAL**;

- **Interafrica Trading Company ITC SAL Offshore** (accounts at Defendants FRANSABANK and BANK OF BEIRUT);

- **Madina SAL Offshore**;

- **International Management & Finance Holding SAL**; and

- **Blue Sky Holding SAL**.

  i. <u>**Osama Abbas Ramal**</u>

1263.  Between 2001 and 2010, Osama Abbas Ramal was mayor of Adaisseh village on behalf of the Hezbollah and Amal joint list. Mr. Ramal serves as the attorney for the following list of Hezbollah-related companies in Lebanon:

- **Lebanese Communication Group** (SDGT, discussed above);

- **Seasons Corporation for Agricultural Projects and Services SARL** (discussed above);

- **Dar al-Manar for Artistic Production and Distribution**;

- **Meamar Company for Engineering and Development SARL** (discussed above);

266

- **Al-Raed SARL** (discussed above, account at Defendant BLOM BANK);

- **Béton Plus SAL** (discussed above, account at Defendant BLOM BANK);

- **Bekaa Company for Construction and Contracting BC SARL**, affiliated with the Iranian Authority for the Rehabilitation of Lebanon;

- **Media Publi Management SARL**; and

- **Arch Consulting SARL** (discussed above, account at Defendant BLOM BANK).

### j. Joseph George Zgheib

1264.  Joseph George Zgheib is the managing partner of Tyan & Zgheib.

1265.  He is registered as the attorney for three companies affiliated with Muhammad Ibrahim Bazzi (SDGT), at least one of which maintained an account at LCB (Global Electrical Group Holding SAL) before it was closed in 2012. Zgheib was also listed as a founder of this company as well as another company, Africa Middle East Investment Holding SAL (SDGT) owned and controlled by Bazzi.

1266.  Mr. Zgheib is registered as the attorney and co-founder for four companies affiliated with Ibrahim Issawi (and attorney for three more). At least three of the companies maintained accounts at LCB before those accounts were closed.

1267.  Mr. Zgheib is registered as the attorney and co-founder for four companies affiliated with Muhammad Issam Abu Darwish and his brother (and attorney for three more). Three of the companies – Ras Beirut 1442 SAL, Ideal Development I.D. SAL and Builders International SAL – maintained an account at LCB before the bank was forced to close it and it migrated to Defendant BANQUE LIBANO-FRANÇAISE.

### k. **Aline George Choucair Prince**

1268. Aline George Choucair Prince is an attorney for the law firm of Tyan & Zgheib.

1269. She is registered as co-founder for two companies affiliated with Muhammad Ibrahim Bazzi (SDGT), at least one of which maintained an account at LCB (Global Electrical Group Holding SAL) before it was closed in 2012. Ms. Prince was also listed as a founder of Africa Middle East Investment Holding SAL (SDGT) owned and controlled by Mr. Bazzi.

1270. Ms. Prince is listed as the co-founder of two companies controlled by Ibrahim Issawi and as co-founder of another company together with Wa'el Ahmad Issawi, who is a shareholder and a board member.

1271. She is registered as the co-founding attorney for three companies affiliated with Muhammad Issam Abu Darwish and his brother Sami. Two of the companies – Ras Beirut 1442 SAL and Builders International SAL – maintained an account at LCB before the bank was forced to close it and the account migrated to Defendant BANQUE LIBANO-FRANÇAISE.

### l. **Claire Elias Assaf Abu Rajili**

1272. Claire Elias Assaf Abu Rajili is an attorney for the law firm of Tyan & Zgheib.

1273. She was registered as a co-founder for Global Electrical Group Holding SAL, which is controlled by Muhammad Ibrahim Bazzi (SDGT) and which maintained an account at LCB before it was closed in 2012.

1274. Ms. Abu Rajili was listed as the co-founder of four companies controlled by Ibrahim Issawi and as attorney for another company controlled by Ibrahim Issawi. One of those companies, Investment Group for Construction and Development SAL, owned an account at LCB before the bank was forced to close it in 2010.

1275. She was registered as the co-founder for three companies and as attorney of one company controlled by Muhammad Issam Abu Darwish. One of the companies – Ras Beirut 1442 SAL – maintained an account at LCB before the bank was forced to close it and the account migrated to Defendant BANQUE LIBANO-FRANÇAISE.

1276. Ms. Abu Rajili was listed as the co-founder of Builders International SAL, where Sami Issam Abu Darwish was listed as a shareholder, authorized signatory and board member.

1277. Builders International SAL maintained account no. 32740* at LCB before the bank was forced to close it in August 2011.

## 7. LEBANESE ACCOUNTANTS / AUDITORS ASSOCIATED WITH BAC COMPANIES

1278. Hezbollah utilizes a small subset of Lebanese accountants and auditors to help maintain and "audit" its network of companies. The association of one of these accountants or auditors with an entity or account provides additional evidence that the entity or account is controlled by Hezbollah.

### a. Jihad Muhammad Qansu

1279. Jihad Muhammad Qansu serves as statutory auditor of numerous companies associated with Hezbollah.

1280. On February 2, 2018, Mr. Qansu was designated as an SDGT by the U.S. Department of the Treasury for his role as financial manager of Al-Inmaa Engineering and Contracting SARL (SDGT).

1281. Mr. Qansu is a business associate of Hezbollah operative and financier Adham Tabaja (SDGT), and assists Mr. Tabaja "in accounting matters, including resolving bank account issues."

1282. As part of his role in Al-Inmaa, Mr. Qansu worked on the company's operations

together with Muhammad Al-Mukhtar Kallas (SDGT). He is affiliated, as founder or shareholder,

with several companies that are part of the Tabaja and Tajideen networks.

1283.   Jihad Muhammad Qansu is statutory auditor of the following BAC companies:

- **Al-Inmaa Engineering and Contracting SARL** (SDGT, discussed above, accounts at Defendants SGBL, FENICIA BANK, LEBANON & GULF BANK, MEAB BANK, BANK OF BEIRUT AND THE ARAB COUNTRIES, and BANQUE LIBANO-FRANÇAISE);

- **Amigo Travel and Transport SAL** (account at Defendant BYBLOS BANK);

- **Global Touristic Services SAL (GTS)** (discussed above, account at Defendant BYBLOS BANK);

- **Golden Fish (Offshore) SAL** (SDGT). Mr. Qansu is also a shareholder (holding 495 shares), co-founder, and board member of the company;

- **Rayan Foods SAL** (discussed above);

- **Société Orientale Libanaise d'Investissement et Développement SAL**, (discussed above, account at Defendant BYBLOS BANK); and

- **Interafrica Trading Company ITC SAL Offshore** (accounts at Defendants FRANSABANK and BANK OF BEIRUT).

### b.  Mashhur Abd al-Nabi Hamqah

1284.   Mashhur Abd al-Nabi Hamqah serves as statutory auditor of the following

Hezbollah-controlled entities:

- **Atlas Holding SAL** (discussed above, account at Defendants SGBL and BANK AUDI);

- **Shahed Pharm Drugstore SARL** (discussed above, account at Defendant LEBANON AND GULF BANK); and

- **Amana Plus Company SAL** (discussed above, account at Defendant LEBANON AND GULF BANK).

### c.  Shawqi Ra'if Abu Khalil

1285.   Shawqi Ra'if Abu Khalil serves as statutory auditor of numerous companies

associated with the Tajideen Network, including the following list of Hezbollah-controlled entities:

- **Ovlas Trading SAL (Offshore)** (discussed above, accounts at Defendants BANK AUDI SAL and LEBANON AND GULF BANK);

- **Afrimex (Offshore) SAL** (discussed above, accounts Defendants BYBLOS BANK and BANK AUDI, and previously at LCB);

- **Hyram Maritime SAL** (discussed above, account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES);

- **Al-Dalhamiya Country Club Company** (discussed above);

- **Company for Development and Prosperity** (discussed above);

- **Distributions and Agencies Company SAL** (discussed above);

- **Al-Burhan Growth and Development Company SAL**;

- **Trust & Safety RE. Investment SAL**;

- **Leaders of Supply & Products** (Offshore) SAL (accounts at Defendants BANK OF BEIRUT, BANK AUDI and LEBANON AND GULF BANK, and previously at LCB); and

- **Galaxy Flame Trading SAL Offshore**, (account at Defendant BANK OF BEIRUT, and previously at LCB).

### d. Edmond Youssef Saadeh

1286. Edmond Youssef Saadeh serves as statutory auditor of the following Hezbollah-controlled entities:

- **Car Escort Services (Offshore) SAL** (SDGT, discussed above, account at Defendant JAMMAL TRUST BANK);

- **Spectrum International Investment Holding SAL** (SDGT, discussed above, accounts at Defendants LEBANON AND GULF BANK, JAMMAL TRUST BANK and BANK AUDI); and

- **Spectrum (Offshore) SAL** (discussed above).

### e. **Zuhayr Habib Saydani**

1287. Zuhayr Habib Saydani serves as statutory auditor of numerous companies associated with Hezbollah, including the following entities controlled by Nazim Ahmad, the Ali Ahmed Group, Faysal Mustafa Ahmad, Muhmmad Isa Abu Darwish and the Nassour clan:

- **Primo International SAL Offshore** (discussed above, accounts at Defendants BLOM BANK and BANQUE LIBANO-FRANÇAISE);

- **Blue City SAL** (discussed above, account at Defendant FRANSABANK);

- **Golden Square SAL** (account at Defendant FRANSABANK);

- **ACE Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Paloma Group SAL** (discussed above, account at Defendant FRANSABANK);

- **Beirut Diam SAL** (discussed above);

- **Enovation Digital SAL**;

- **Hariss 929 Real Estate SAL**;

- **Atilla SAL**;

- **Heliopolis SAL**;

- **Millennium Management SAL**;

- **Estonia SAL**;

- **Hart Gems SAL**;

- **Diane Real Estate SAL**;

- **KD SAL - Holding**;

- **Spider Group SAL** (discussed above); and

- **AD 730 SAL**.

IX.   **DEFENDANTS' MATERIAL SUPPORT TO HEZBOLLAH**

   A.   **BANK AL MADINA: THE BETA TEST FOR LEBANESE CANADIAN BANK**

1288.   Bank Al Madina, a Lebanese financial institution that collapsed in 2003, provides a prime example of how The System in Lebanon operates and how Hezbollah capitalizes on the institutional corruption of the Lebanese state.

1289.   The collapse of Bank Al Madina also served as a prelude to migration of Hezbollah BAC accounts from that institution to LCB and eventually to Defendants in this action.

1290.   Bank Al Madina was established by Saudi interests at the end of 1982 with a single branch in Hamra. It later acquired and maintained a sister bank, United Credit Bank (UCB), which was also involved in Bank Al Madina's massive fraud, money laundering and terror financing.

1291.   In 1984 a majority stake was acquired by the Abu-Ayash family, two Druze brothers with dual Lebanese-Saudi citizenship from the town of Baakline: Adnan Abu Ayash and Ibrahim Abu Ayash.

1292.   In the 1990s the bank acquired six additional branches purchased from Prosperity Bank.

1293.   During this time, Ibrahim Abu Ayash came to rely heavily on Abd al-Rahim Koleilat as a chief aide.

1294.   Koleilat worked closely with the head of Syrian Military Intelligence in Lebanon at that time, Major General Rustom Ghazali, and the bank served as a slush fund for Syrian generals and Lebanese politicians.[81]

1295.   Koleilat's daughter, Rana Koleilat, was used a key conduit in the kickback scheme

---

[81]      For example, according to a report prepared by Fortress Global Investigations, Koleilat facilitated a large payment to the then-Syrian Defense Minister's account at Defendant BLOM BANK.

that supplied Syrian and Lebanese politicians and security services with cash, real estate, cars, and jewelry in exchange for protecting and facilitating a multibillion-dollar money laundering operation that allowed Saddam Hussein and Russian gangsters to hide income and convert dirty money into legitimate bank accounts around the world.

1296.   It also provided a haven for Hezbollah's investments and a vehicle for Hezbollah's BAC money laundering network for West African Conflict Diamonds.[82]

1297.   When Al Madina collapsed in early 2003, it had been looted of about $1.65 billion. The Lebanese Special Investigation Commission to Combat Money Laundering Crimes issued a decision on October 7, 2003 accusing Rana Koleilat, the brothers Adnan and Ibrahim Abu Ayyash, and others of stealing hundreds of millions of U.S. dollars from Bank Al Madina and forging documents to cover this theft.[83]

1298.   The exploitation and collapse of Bank Al Madina foreshadowed several patterns that would recur with LCB and which are endemic to The System:

- The involvement (within the bank itself) of a Hezbollah operative;

- Use of commercial and residential real estate as a means of converting illicit proceeds into "respectable" investments;

- Distribution of corporate and real estate holdings to family members;

- Use of overlapping networks of lawyers and auditors tied to multiple BAC networks; and

- Use of U.S. correspondent accounts to clear U.S. dollar-denominated funds transfers.

---

[82]   According to the same Fortress Global Investigations report, several million U.S. dollars were also transferred to the Martyrs Foundation Lebanon.

[83]   Adnan Abu Ayash filed a lawsuit against Bank Al Madina, United Credit Bank, Rana Koleilat and others in the United States District Court for the Southern District of New York, in November 19, 2004. Rana Koleilat herself filed a complaint in Lebanon against the Abu Ayyash brothers and others for forgery, fraudulent use, fabrication of crimes and slander, intimidation and extortion of money.

1299.  The involvement of a Hezbollah operative *within* the bank was demonstrated in 2004 when U.S. prosecutors charged Naji Antoine Abi Khalil with attempting to purchase night vision goggles and other military equipment for Hezbollah.

1300.  Khalil's connections to Bank Al Madina came to light when he bragged to undercover agents that he travelled the world picking up cash to be deposited in the bank on behalf of Hezbollah (and the Russian mafia).

1301.  Khalil was not only an employee of Bank Al Madina, but he also played in a role in at least three related companies owned and controlled by Adnan Abu Ayash and Ibrahim Abu Ayash, the owners of Bank Al Madina:

- **Al Madina Shipping Company LLC**, Company Registration Number 74500;

- **Maritime City Company**, Company Registration Number 74502; and

- **Al Madina Travel & Swimming Company**, Company Registration Number 74501.

1302.  The use of commercial and residential real estate as a means of converting illicit proceeds into "respectable" investments is illustrated by a review of corporate assets held by Rana Koleilat which show a portfolio of companies, particularly in the real estate field. It also shows that her father, Abd al-Rahim Koleilat, and mother, Masarra Salah Sanadiki, held stakes in several of these companies, and that others were held together with Hezbollah facilitator, Saleh Ali Assi.

1303.  For example, the following is a partial list of real estate holding companies that were controlled by Rana Koleilat and one or both of her parents:

- **R 2679 Real Estate SAL**, Rana Koleilat's mother is listed as a shareholder, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **Rana K. Holding SAL**, both of Rana Koleilat's parents are listed as shareholders, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **R and I Real Estate SAL**, both of Rana Koleilat's parents are listed as shareholders, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **V 46 Real Estate**, both of Rana Koleilat's parents are listed as shareholders, and Fadi Adel Jamal al-Din is listed as the company's attorney;

- **V 58 Real Estate SAL**, both of Rana Koleilat's parents are listed as founders; and

- **V 55 Real Estate SAL**, Rana Koleilat's mother is listed as a shareholder.

1304. The following real estate holding companies were founded by Rana Koleilat but controlled by Hezbollah facilitator Saleh Ali Assi and his family:

- **V69 Real Estate SAL**; and

- **Al Mansouri Real Estate Company**.

1305. Fadi Adel Jamal al-Din is listed as the attorney for both companies, as well as a board member and minority shareholder.

1306. Rana Koleilat also allegedly worked closely with her boyfriend and fellow bank employee, Rene Moawad, to syphon millions of dollars for their private use.

1307. Evidence collected by investigators for the Abu Ayash brothers indicates that much of this money flowed through correspondent accounts in New York.[84]

1308. In the aftermath of Bank Al Madina's collapse, Rana Koleilat and the Abu Ayash

---

[84] For example, on January 28, 2003, $2 million U.S. dollars were deposited into Rene Moawad's account at Defendant BANK OF BEIRUT in Beirut. The deposit consisted of two checks in the amount of $1 million U.S. dollars each, check #014354 drawn on Bank Al Madina and Check #297006 drawn on United Credit Bank in Beirut. One day later, Moawad apparently transferred $1 million U.S. dollars from his account at United Credit Bank via Wachovia Bank in New York to an account held by Defendant BANK OF BEIRUT for the benefit and credit of "Rene Moawad."

brothers sued and countersued, and the Central Bank of Lebanon seized whatever assets it could to pay depositors, but even fifteen years later the results of the various Lebanese investigations remain sealed.

1309.   Rana Koleilat was eventually arrested in Brazil after fleeing Lebanon but did not face any serious legal jeopardy.

1310.   Similarly, the collapse of Bank Al Madina led to certain modifications but no major adverse impact on The System.

1311.   In fact, it appears that Bank Al Madina provided a template to Hezbollah on how to more fully integrate financial institutions into its narcoterrorism conspiracy and it further demonstrated how elements of the Lebanese political system and judiciary would cover for The System when a Lebanese financial institution's illicit activities was publicly exposed.

1312.   For example, shortly after Bank Al Madina's collapse, LCB acquired its branches in predominantly Shi'a municipalities.

1313.   Many of the accounts belonging to Hezbollah's BAC network for West African Conflict Diamonds and money laundering also migrated to LCB.

1314.   Likewise, the role played by Hezbollah operative Naji Antoine Abi Khalil at Bank Al Madina (discussed above) was undertaken by Ahmad Ibrahim Safa, Associate General Manager for Branches and Operations at LCB (and former Deputy General Manager of Defendant JAMMAL TRUST BANK), who actively worked to ensure that LCB granted Hezbollah institutions exceptions from the bank's policy of requiring cash transaction slips ("CTS") for cash transactions greater than $10,000.

1315.   Georges Zard Abou Jaoude is the former Chairman and General Manager of LCB. He formerly served as the Chair of LCB's Anti-Money Laundering Committee.

1316.   Muhammad Hamdoun is the former Deputy General Manager of LCB and served on LCB's Executive Board. He served as the Vice Chair of LCB's Anti-Money Laundering Committee.

1317.   Mr. Safa reported directly to Mr. Abou Jaoude and functioned as Mr. Hamdoun's deputy and was effectively Hezbollah's representative at the bank.[85]

1318.   Several additional members of LCB's management worked at Hezbollah's direction and facilitated its use of LCB as a vehicle for its BAC operations.

1319.   In sum, over time LCB became a significant Hezbollah asset.

1320.   LCB owned Prime Bank in The Gambia and Sofibanque in the Democratic Republic of Congo.

1321.   Prime Bank was controlled by Muhammad Bazzi (SDGT) and served as Hezbollah's BAC's preeminent money laundering vehicle in West Africa.

1322.   Mr. Ghassan W. Haikal (Deputy General Manager of LCB) and Mr. Ahmad Safa served on Prime Bank's board of directors together with Mr. Bazzi's business partner, Fadi George Mazegi.

1323.   At that time, CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon.

1324.   The LCB clients granted exceptions by Ahmad Safa included Hezbollah operatives and entities, like the Martyrs Foundation Lebanon.

1325.   Ahmad Ibrahim Safa is the brother-in-law of Amin Muhammad Cherri (SDGT), a Hezbollah member of parliament, shareholder in the Lebanese Communications Group (SDGT) and business partner of Adham Tabaja (SDGT), co-head of Hezbollah's BAC.

---

[85]     In 2010, Mr. Safa left LCB and assumed a new position at Lebanon's Banking Control Commission.

**B.   SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL**

      **1.   SGBL'S PREDECESSOR, LCB, CONSPIRED WITH AND AIDED AND ABETTED HEZBOLLAH**

1326.   LCB was a commercial bank based in Beirut, Lebanon that maintained a network of 35 branches in Lebanon and a representative office in Montreal, Canada.

1327.   In 2011, the bank was eighth largest among Lebanese banks in assets.

1328.   In the years before LCB's legal implosion, the bank served as a core Hezbollah asset within The System.

1329.   As described further below, LCB provided material support that aided and abetted Hezbollah in multiple ways: maintaining accounts for Hezbollah institutions and Hezbollah officials, actively participating in Hezbollah's trade based money laundering operations, disregarding minimal anti-money laundering rules on Hezbollah's behalf, and operating banks in The Gambia and the Democratic Republic of Congo that were controlled by Hezbollah's BAC and were used by it to launder billions of U.S. dollars for the BAC and Iran.

1330.   LCB's role as a Hezbollah asset began in large part with the collapse of Hezbollah's prior bank of choice, Bank Al Madina.

1331.   Shortly after Bank Al Madina's collapse, LCB acquired its branches in predominantly Shi'a municipalities.

1332.   Many of the accounts belonging to Hezbollah's BAC network for West African Conflict Diamonds and money laundering migrated from Bank Al Madina to LCB – as they would again a decade later from LCB to Defendants herein.

1333.   Likewise, the role played by Hezbollah operative Naji Antoine Abi Khalil at Bank Al Madina (discussed above) was undertaken by Ahmad Ibrahim Safa, Associate General Manager

for Branches and Operations at LCB (and former Deputy General Manager of Defendant JAMMAL TRUST BANK).[86]

1334. One of the key advantages for the BAC in having nearly unfettered access to a financial institution like LCB was its ability to launder vast quantities of narcotics proceeds and to use this access as a marketing tool to attract business from other transnational criminal organizations.

1335. At the same time, as Hezbollah's narcoterrorism footprint grew, U.S. law enforcement's investigation of it intensified.

1336. As a result, on January 26, 2011, the U.S. Department of the Treasury designated Mr. Joumaa under the Foreign Narcotics Kingpin Designation Act, together with the Hassan Ayash Exchange and the Elissa Exchange for their roles in his laundering of narcotics proceeds.

1337. This was quickly followed on February 10, 2011, by the U.S. Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN"), issuing a proposed rule and a finding that LCB "is a financial institution of primary money laundering concern."

1338. The proposed rule would have prohibited U.S. financial institutions from opening or maintaining correspondent or payable-through accounts for LCB.

1339. FinCEN's action was based on its determination that there was reason to believe that LCB (and certain Lebanese exchange houses) had been routinely used by Hezbollah-affiliated drug traffickers and money launderers operating in various countries in Central and South America, Europe, Africa, and the Middle East.

1340. FinCEN also determined that there was reason to believe that LCB managers were complicit in the network's money laundering activities:

---

[86]     In 2010, Mr. Safa left LCB and assumed a new position at Lebanon's Banking Control Commission.

LCB managers are linked to Hezbollah officials outside Lebanon. For example, Hezbollah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services.[87]

1341. In February 2011, after the public disclosures by the United States government revealed that LCB was a central actor in BAC's money laundering network for Hezbollah, the potential dangers posed to The System, including the entire Lebanese banking sector, became immediately apparent.

1342. Lebanon's Central Bank and largest commercial banks sought to treat LCB's conduct as aberrational and resolve all legal issues with the United States immediately. But as the Complaint sets forth in detail, even though the conduct of LCB and its subsidiaries in The Gambia and the Democratic Republic of Congo set it apart as Hezbollah's flagship bank, it was always only one (albeit important) financial transit point for The System.

1343. In June 2011 SGBL acquired LCB.

1344. In December 2011, the U.S. Department of Justice filed a civil complaint against LCB – which was by that time effectively owned and controlled by Defendant SGBL.

a. **LCB Participated in Hezbollah's Narcotics Money Laundering Operations and Transferred Over $250 Million for Hezbollah Through its New York Correspondent Bank Accounts**

1345. In coordination with Hezbollah-BAC commander Abdallah Safieddine, Ayman Joumaa, the previously discussed narcotics trafficker and money launderer, controlled an international network of drug traffickers that transported, distributed and sold multi-ton bulk

---

[87] Abdallah Safieddine, who was designated an SDGT on May 17, 2018, is Hezbollah's representative to Iran and acts as a conduit between Hezbollah and the IRGC. Mr. Safieddine was responsible in large part for obtaining the resources to fund the IRGC-QF-orchestrated effort to target American service members in Iraq, and a key source of his funding for the IJO derived from narcotics trafficking.

shipments of cocaine from South America, and laundered the proceeds—as much as $200 million U.S. dollars per month on Hezbollah's behalf.

1346.  In 2012, Mr. Joumaa's network was described by David S. Cohen, then-Under Secretary for Terrorism and Financial Intelligence, as "a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hezbollah."

1347.  The DOJ's November 23, 2011 Joumaa indictment alleged that he and his co-conspirators "coordinated the shipment of tens of thousands of kilograms of cocaine, including at least 85,000 kilograms of cocaine sold to Los Zetas, a Mexican drug cartel, between in or around 2005 to in or around 2007."

1348.  The DOJ's Joumaa indictment further alleged that he laundered hundreds of millions of dollars in drug proceeds from West Africa, Europe, Mexico and the United States, largely for cocaine suppliers in Colombia and Venezuela, who paid Mr. Joumaa's organization a fee of between 8 and 14 percent of the laundered proceeds.

1349.  According to DOJ, at least hundreds of millions of dollars in U.S. banknotes were transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers, often through Ghana.

1350.  These U.S. dollars included the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering, and other crimes.

1351.  A significant portion of this money moved through courier and security networks controlled by Hezbollah.

1352.  The bulk cash was often flown from Ghana directly to Beirut's airport where Wafiq Safa's Hezbollah personnel would oversee the deliveries and ensure that the funds made their way

to Hezbollah's preferred exchange houses.

1353.   The proceeds of the car sales helped to conceal and disguise the true source, nature, ownership, and control of Hezbollah's narcotics sales proceeds (primarily from cocaine sales in Europe) from U.S. correspondent banks and law enforcement agencies.

1354.   New Line Exchange, Elissa Exchange and Hassan Ayash Exchange were all used by Hezbollah and Ayman Joumaa's network to move bulk cash into Lebanon.

1355.   LCB then served as the favored destination for the funds.

1356.   Other Defendants, including BLOM BANK and MEAB BANK, were also used to facilitate U.S. dollar–denominated transfers through their U.S. correspondent accounts, in part, for Hezbollah's benefit.

1357.   According to the U.S. government, between January 2007 and January 2011, the Hassan Ayash Exchange participated in this money-laundering conspiracy by sending approximately $142 million U.S. dollars by wire transfer to the United States to purchase or ship used cars that were ultimately sold to mask the original origin of the narcotics proceeds from U.S. correspondent banks and law enforcement agencies.

1358.   In the same period, the Elissa Exchange participated in the money-laundering conspiracy by sending approximately $62 million U.S. dollars by wire transfer to the United States to purchase or ship used cars.

1359.   Of the approximately $204 million U.S. dollars wired by the exchanges to the United States, approximately 84 percent of the money originated from accounts owned at LCB, showing the extent of LCB's involvement in the money laundering scheme.

1360.   According to the U.S. Government, both the Hassan Ayash Exchange and LCB knew that these transactions were:

[T]he proceeds of illegal activities and that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds, and to promote those illegal activities; and that *this money laundering scheme benefitted Hezbollah*. (Emphasis added.)

1361.   FinCEN's February 10, 2011 report described how Mr. Joumaa instructed LCB to perform wire transfers in furtherance of two money laundering schemes:

> [S]ome of the funds move to LCB's U.S. correspondent accounts via suspiciously structured electronic wire transfers to multiple U.S.-based used car dealerships—some of which are operated by individuals who have been separately identified in drug-related investigations. The recipients use the funds to purchase vehicles in the United States, which are then shipped to West Africa and/or other overseas destinations, with the proceeds ultimately repatriated back to Lebanon. Other funds are sent through LCB's U.S. correspondent accounts to pay Asian suppliers of consumer goods, which are shipped to Latin America and sold, and the proceeds are laundered through a scheme known as the Black-Market Peso Exchange, in each case through other individuals referred to in this finding or via companies owned or controlled by them.

1362.   According to FinCEN, Hezbollah derived financial support from this narco-trafficking and money-laundering scheme, and LCB managers were complicit in the money laundering activities.

1363.   The U.S. Department of the Treasury also found that LCB was the favored bank for the Joumaa-Hezbollah illegal banking activity:

> With respect to the exchanges and companies related to Ayman Joumaa, numerous instances indicate that substantial amounts of illicit funds may have passed through LCB. Since January 2006, hundreds of records with a cumulative equivalent value of $66.4 million identified a Lebanese bank that originated the transfer; approximately half of those were originated by LCB, for a cumulative equivalent value of $66.2 million, or 94%, thus, indicating that LCB probably is the favored bank for these exchange houses, particularly in the context of illicit banking activity. Similarly, a review of all dollar-denominated wire transfers with the two primary exchange houses either as sender or receiver between January 2004 and December 2008 showed 72% originated by one of the exchange houses through LCB.

1364. The movement of money was also facilitated by Oussama Salhab, a Hezbollah operative born in the Bekaa Valley in Lebanon, a Hezbollah stronghold. Mr. Salhab, who is described further below, controlled a network of money couriers based primarily in West Africa.

1365. Proceeds from the drug sales were transported by the BAC to Beirut, deposited as bulk cash into the exchange houses, which in turn deposited the currency (primarily U.S. dollars) into their LCB accounts.

1366. Mr. Joumaa or the exchange houses he directed then instructed LCB to perform wire transfers in furtherance of at least two trade-based money laundering operations.

1367. In the first operation, Abou Jaoude, Mr. Hamdoun, and Mr. Safa oversaw LCB's transfers of large U.S.-dollar-denominated sums used to purchase used cars throughout the United States.

1368. The wire transfers passed through LCB's correspondent bank accounts at five New York banks: Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank.

1369. LCB made repeated, substantial use of the correspondent banking services of New York banks. Between 2007 and 2011, approximately 30 used-car purchasers received over 3,400 wire transfers totaling over $247 million U.S. dollars.

1370. Account holders other than the Hassan Ayash Exchange and Elissa Exchange initiated additional wire transfers of over $59 million U.S. dollars from accounts at LCB to bank accounts in the United States to purchase or ship used cars in furtherance of the money laundering conspiracy.

1371. Individuals linked to Hezbollah who sent wire transfers into the United States to purchase used cars as part of the money laundering scheme included Khodor Fakih, a Hezbollah

operative from Lebanon who worked in the car business in Cotonou, Muhammad Hassan Hammoud, a Hezbollah supporter from Lebanon who owned a shipping company in Cotonou, and Youssef Sobhi Nehme, a self-proclaimed Hezbollah supporter.

1372.    The car buyers in the United States used the money transferred from LCB via its New York correspondent banks to purchase used cars.

1373.    In the other money-laundering scheme, Abou Jaoude, Mr. Hamdoun, and Mr. Safa oversaw LCB's transfers of large amounts of U.S. dollar-denominated funds that Mr. Joumaa and other Hezbollah-affiliated drug traffickers used to buy consumer goods from Asian suppliers.

1374.    According to the U.S. government, Hezbollah derived financial support from these criminal activities, and LCB managers were complicit in the money laundering scheme.

1375.    The electronic funds transfers passed through LCB's correspondent bank accounts in the same five New York banks as in the other scheme: Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank.

1376.    The consumer goods purchased from Asia by Mr. Joumaa's network and other Hezbollah drug traffickers were often shipped to Central and South America and sold. The proceeds of the sales were then laundered through the Black-Market Peso Exchange.

1377.    Through these trade-based money laundering operations, LCB provided funds and services to or for the benefit of Hezbollah and participated in a channel for laundering proceeds of narcotics trafficking and other unlawful activities, to generate profits, fees and commissions to be paid to Hezbollah operatives and supporters who were involved in the money laundering scheme.

### b.  LCB Maintained Accounts for Various Hezbollah-Controlled Entities

1378.    As noted above, according to a December 2011 report in *The New York Times*, after Defendant SGBL acquired LCB in June 2011, "auditors brought in to scrub [LCB's] books

discovered nearly 200 accounts that were suspicious for their links to Hezbollah and their classic signs of money laundering."

1379.   This reporting significantly *underestimated* the number of accounts maintained by LCB for Hezbollah-affiliated individuals and entities and IRGC-controlled entities.

1380.   Although neither SGBL nor the Lebanese government publicly disclosed the audit trails or lists of identified Hezbollah individuals or entities, they did compile and circulate lists of more than 200 individuals and entities linked to Hezbollah that exhibited "classic signs of money laundering."

1381.   Those classic signs of money laundering were summarized in an August 13, 2007 LCB Internal Audit Report that described, among other things, a  total amount of transactions during an 18 month period totaling $5 billion with "[l]arge amounts … being withdrawn and paid cash to different parties" and accounts showing a "big volume of movement" but "very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s]."[88]

1382.   The 2007 Internal Audit Report largely tracked the same entities that SGBL and the Lebanese government would later flag in 2011-2012.

1383.   The list compiled by Defendant SGBL and the Lebanese government included several prominent, senior Hezbollah financiers who would later be designated SDGTs (e.g. Adham Hussein Tabaja, Muhammad Ibrahim Bazzi), as well as key currency exchange houses Hezbollah used to launder its black-market diamonds and narcotics trafficking proceeds and several of the key drug traffickers themselves (e.g. Ayman Joumaa and his brothers).

1384.   In addition, the SGBL and Lebanese government lists catalogued almost 200 other

---

[88]      *See, Nahl v. Abou Jaoude*, No. 15-cv-9755 (S.D.N.Y.).

individuals and companies that were, and are, part of Hezbollah's BAC, ranging from Conflict Diamond moguls based in West Africa to food suppliers and mineral exporters based in the Democratic Republic of Congo to diamond dealers and smugglers based in Dubai and Antwerp.

1385.  According to one of LCB's largest shareholders (Ghazi Abu Nahl), "on June 25, 2007, LCB's Internal Audit Division audited the compliance unit. The audit noted that a number of accounts at the Bank were unusually active, with large incoming and outgoing transfers. The audit also noted that many of these accounts had unusual movement of funds between accounts."[89]

1386.  As discussed herein, Hezbollah has long profited from its networks of Conflict Diamond traders and money launderers based in Africa, the Persian Gulf, Belgium and South America.

1387.  These networks, controlled by prominent BAC facilitators, were at the center of both the 2007 LCB Internal Audit and the later investigation by the Lebanese government.

1388.  At LCB, matters did not improve after 2007. According to Mr. Abu Nahl's lawsuit, a February 2010 Internal Audit Division review of the bank's Anti-Money Laundering compliance unit found "no evidence that proper and permanent control [was] being performed over some accounts witnessing frequent flow of large funds transfers" and that "the Compliance Unit does not generate on a daily basis [a] consolidated physical cash report that aggregates all cash deposits done by a single client, [on] the same day, and in multiple accounts totaling more than $10,000."

1389.  Considering that LCB maintained accounts for several exchange houses and many, if not most, of Hezbollah's leading narcotics traffickers and money launderers, the bank's policies—or rather, the absence thereof—make sense.

---

[89]     The Internal Audit report and other material facts are described in detail in *Nahl v. Abou Jaoude*, No. 15-cv-9755 (S.D.N.Y).

1390.   For instance, as described above, LCB maintained a banking relationship with the Hassan Ayash Exchange, Elissa Exchange, and New Line Exchange Trust Co. (all designated SDNTKs on January 26, 2011).

1391.   New Line Exchange Trust Co.'s principal, Ziyad Muhammad Youssef (also designated an SDNTK), maintained an account at LCB that had a balance of over $10 million when it was frozen and migrated to SGBL.

1392.   As noted throughout the Complaint, Defendant SGBL did not freeze at least tens of millions of dollars it held for more than 200 individuals and entities linked to Hezbollah that exhibited "classic signs of money laundering."

1393.   Instead, Defendant SGBL temporarily froze a handful of accounts and watched as Hezbollah's BAC moved hundreds of its LCB accounts laterally to other Lebanese banks including nearly all Defendants.

1394.   Of course, because Defendant SGBL was itself an active participant in The System (though not on the scale of LCB), neither money laundering conducted through these identified accounts nor the individuals and entities surprised Defendant SGBL or any of the banks that picked up the BAC business LCB lost.

1395.   Although Defendant SGBL undertook a review of Hezbollah's accounts at LCB and formulated the list described above, LCB previously maintained banking relationships with numerous other Hezbollah individuals and entities that never appeared on the list.

1396.   Moreover, there is no public indication that Defendant SGBL ever closed these "phantom accounts."

1397.   For example, LCB maintained accounts for Bayt al-Mal and Yousser Company for Finance and Investment, which are key parts of Hezbollah's financing operations.

1398.  On September 7, 2006, the U.S. Department of the Treasury designated Bayt al-Mal and Yousser as SDGTs, announcing that it was "target[ing] Hizballah's Bank."

1399.  The U.S. Department of the Treasury found that "Bayt al-Mal and Yousser Company function as Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist groups and mainstream banks."

1400.  The U.S. Department of the Treasury further found that "Bayt al-Mal is a Hezbollah-controlled organization that performs financial services for the terrorist organization. Bayt al-Mal operates under the direct supervision of Hezbollah Secretary General Hassan Nasrallah. As Hizballah's main financial body, Bayt al-Mal serves as a bank, creditor, and investment arm for Hezbollah."

1401.  According to the U.S. Department of the Treasury, "Bayt al-Mal utilizes the Yousser Company for Finance and Investment to secure loans and finance business deals for Hizballah companies."

1402.  The head of Bayt al-Mal, Hussein al-Shami, was also a director of Yousser.

1403.  The U.S. Department of the Treasury described Mr. Shami as "a senior Hezbollah leader who has served as a member of Hezbollah's Shura Council [i.e., the council that runs Hezbollah] and as the head of several Hezbollah-controlled organizations, including the Islamic Resistance Support Organization. Mr. Shami is also responsible for foreign donations to Hezbollah fundraising organizations."

1404.  LCB's banking relationships with Bayt al-Mal and Yousser were managed out of LCB's Airport Road branch.

1405.  Hezbollah also maintained bank accounts at various LCB branches in Lebanon for the Martyrs Foundation-Lebanon.

1406. As described above, the Martyrs Foundation–Lebanon is an integral part of Hezbollah and constitutes a key part of Hezbollah's social network.

1407. LCB also maintained a banking relationship with Lebanese Arab Company for Touristic Services SARL, which was managed out of the Airport Road branch. As discussed above, this company belonged to the Al-Mabarrat Charitable Society network of companies.

1408. LCB also maintained a banking relationship with Rayan (Offshore) LLC, which was owned by, *inter alia*, Nawaf Moussaoui (a Hezbollah public spokesperson and Member of the Lebanese Parliament), and Colonel Rida el-Moussaoui, (the brother-in-law of Muhammad Hamdoun, LCB Executive Board Member and Deputy General Manager).

1409. LCB also maintained a banking relationship with Matrix (Offshore) SAL, owned by Qassem Muhammad Ajami and Muhammad Ali Izz-al-Din.[90]

1410. These – and many other customer accounts – were never included in Defendant SGBL's 2011-2012 list of Hezbollah customers at LCB.

### c. LCB Disregarded Anti-Money Laundering Rules for Individuals and Entities Associated with Hezbollah

1411. During the relevant time period, LCB was required to complete cash transaction slips for all cash transactions greater than $10,000 U.S. dollars. CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon.

1412. LCB's policy requiring CTSs accorded with the "Regulations on the Control of Financial and Banking Operations for Fighting Money Laundering," Basic Decision No. 7818 of the Banque du Liban (the Lebanese Central Bank), issued on May 16, 2001 (the "Regulations").

1413. The Regulations contained "Know Your Customer" provisions whereby banks, including LCB, were required to "check the identity" of their clients.

---

[90] Messrs. Ajami and Izz-al-Din were business associates of Tajco SARL, which is described above.

1414.   The Regulations also contained provisions whereby banks, including LCB, were required in some circumstances to enquire about the source and destination of funds, the object of the operation, and the identities of both the beneficiary and the economic rightful owner of funds. Additionally, the Regulations required banks, including LCB, to give special attention to indicators of money laundering.

1415.   In or around September 2003, Mr. Safa granted exceptions to certain LCB clients from LCB's policy of requiring CTSs for cash transactions greater than $10,000 U.S. dollars.

1416.   The clients Mr. Safa granted exceptions to included individuals and entities belonging to Hezbollah:

- **Yousser Company for Finance and Investment** (SDGT) was exempted from signing CTSs for cash transactions up to $50,000 U.S. dollars per week at the Nabatieh branch and up to $60,000 U.S. dollars per day at the Airport Road branch.

- **Farah Company for Tourism** (Farah Travels Company SARL, owned by Adham Tabaja and Issam Saad (SDGTs) among others) was exempted from signing CTSs for cash transactions up to 50 million Lebanese pounds per week at the Nabatieh branch, roughly equivalent to $33,000 U.S. dollars in 2003 dollars.

- **Martyrs Foundation** was exempted from signing CTSs for cash transactions up to to $100,000 U.S. dollars *per day* at its Airport Road branch in Beirut.

- **Fantasy World**, controlled by Mr. Tabaja, was exempted from signing CTSs for cash transactions exceeding $10,000 per day.

- **Hussein al-Shami** (SDGT), using the name Hussein Ali Muhammad Chami, was exempted from signing CTSs for cash transactions up to $30,000 U.S. dollars per week at the Nabatieh branch.

- **Wahid Mahmoud Sbeity**, another owner of Yousser, was exempted from signing CTSs for cash transactions up to $30,000 U.S. dollars per week at the Nabatieh branch.

- **Al-Shami and two other directors of Yousser** were exempted from signing CTSs for cash transactions up to $200,000 U.S. dollars per day

and 200 million Lebanese pounds ($132,000 U.S. dollars in 2003 dollars) per day at the Airport Road branch.

- **Al-Mabarrat Charitable Society** was exempted from signing CTSs for cash transactions up to $55,000 U.S. dollars per day at the Airport Road branch.

- **Lebanese Arab Touristic Company**, owned by Al-Mabarrat Charitable Society, was exempted from signing CTSs for cash transactions up to $22,000 U.S. dollars per day at the Airport Road branch.

- **Al-Aytam Company for General Trading and Fuels** (founded by Al-Mabarrat Charitable Society) was exempted from signing CTSs for cash transactions up to $50,000 U.S. dollars per day at the Airport Road branch.

1417.   The exemptions discussed in the preceding paragraph essentially allowed Hezbollah to transfer tens of millions of U.S. dollars in untraceable bulk cash to Lebanon.

1418.   In addition to enabling Hezbollah operatives to make large cash deposits without documentation, Mr. Safa also disregarded internal LCB reports that raised concerns about lack of documentation relating to the Elissa Exchange.

1419.   A 2006 LCB customer due diligence report noted that the Elissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut.

1420.   The report further noted that LCB had limited "Know Your Customer" files for these clients and that another Lebanese commercial bank had closed its accounts with the Elissa Exchange. The report described large cash deposits into accounts held by the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

#### d. **LCB's Gambian Subsidiary, Prime Bank, Was Co-Owned by Muhammad Bazzi (SDGT)**

1421.   LCB was the majority shareholder (51%) of Prime Bank Limited, a private commercial bank in Serrekunda, The Gambia.

1422.   Prime Bank was officially opened as a subsidiary of LCB in May 2009.

1423.   Ghassan Wadi Haikal, Deputy General Manager of LCB, was listed as Chairman of Prime Bank, and Fadi Nasser was listed as Executive Director of the bank. Both men were instrumental in helping Hezbollah's BAC launder money through LCB.

1424.   Haikal went on to become Deputy General Manager of SGBL after it acquired LCB.

1425.   In 2012, Fadi Nasser's LinkedIn.com profile showed him as a "Senior Manager" at SGBL (having transitioned from LCB in September 2011).

1426.   Muhammad Ibrahim Bazzi (SDGT), senior BAC operative and Hezbollah financier, was the most important minority shareholder in Prime Bank. Mr. Bazzi controlled Prime Bank, which served as Hezbollah's BAC's preeminent money laundering vehicle in West Africa.

1427.   His long-time business partner, Fadi George Mazegi, was listed as a non-executive Director of the bank together with Mr. Safa.

1428.   As described above, the U.S. Department of the Treasury designated Mr. Bazzi an SDGT on May 17, 2018 for assisting in, sponsoring, or providing financial, technological or material support for—or financial or other services to or in support of—Hezbollah.

1429.   Mr. Bazzi was designated for being one of Hezbollah's top financiers, as well as for his links to drug dealers and money laundering to fund terrorism.

1430.  According to the U.S. government, Mr. Bazzi also has links to Ayman Joumaa's organization and – along with Abdallah Ali Safieddine – facilitated access to the Lebanese financial system for Iran's Central Bank between 2009 and 2010.[91]

1431.  In addition to providing millions of dollars to Hezbollah, Mr. Bazzi was a close associate of Yahya Jammeh, the then-President of The Gambia, who was identified on December 21, 2017, in the annex to EO 13818, which implemented the Global Magnitsky Human Rights Accountability Act (the "Magnitsky Act").[92] Mr. Jammeh appointed Mr. Bazzi as The Gambia's honorary Consul to Lebanon.

1432.  Mr. Bazzi derived significant amounts of money from Gambian oil contracts, which he won by providing Mr. Jammeh with illegal goods and services.

1433.  For example, Euro African Group Ltd. (SDGT), a company Mr. Bazzi controlled and in which he was the biggest shareholder, made payments in 2013 totaling $2.55 million U.S. dollars to a foundation Jammeh controlled.

1434.  Euro African Group Ltd. held exclusive rights to import fuel to The Gambia between 2008 and 2013 and held a fuel supply deal with the state-run utility. Euro African Group was designated an SDGT on May 17, 2018.[93]

1435.  Mr. Bazzi, who has been described as "Jammeh's business surrogate," was also involved in the sale of Iranian weapons to Hezbollah. He coordinated the exchange on behalf of Mr. Jammeh; the weapons were stored at Kanilai Farms in Jammeh's home village, and Mr. Bazzi allegedly used Prime Bank, LCB's subsidiary, for the financing.

---

[91]     *See, Treasury Targets Key Hizballah Financing Network and Iranian Conduit* (U.S. Department of the Treasury, May 17, 2018), *available at* https://home.treasury.gov/news/press-releases/sm0388.

[92]     The Magnitsky Act addresses human rights abuses on a global scale. It allows the U.S. government to sanction corrupt government officials implicated in abuses anywhere in the world.

[93]     It held accounts at both LCB and Defendant FRANSABANK.

1436.   Mr. Bazzi has also maintained close ties to Mr. Tabaja and Ali Youssef Charara, whom the U.S. Department of the Treasury designated SDGTs for providing material support to Hezbollah on June 10, 2015, and January 7, 2016, respectively. Both Messrs. Tabaja and Charara are described above.

1437.   According to the U.S. government, Mr. Bazzi provided funds to Mr. Tabaja, with whom he held a joint line of credit and worked closely with Abdallah Safieddine.

1438.   In sum, Mr. Bazzi coordinated his activities with the co-leaders of Hezbollah's BAC.

1439.   The following diagram, prepared by the U.S. Department of the Treasury, illustrates Mr. Bazzi's complicity in Ayman Joumaa's and Hezbollah's illicit financing networks:



### e.  LCB'S Subsidiary Société Financière de Banque SARL Was Used to Launder Money for Hezbollah

1440.  As discussed herein, Hezbollah's BAC network in the Democratic Republic of Congo is a significant revenue source for the organization.

1441.  As with Prime Bank in The Gambia, Société Financière de Banque SARL ("Sofibanque") was 51 percent owned by LCB and laundered substantial sums on Hezbollah's behalf from the Democratic Republic of Congo to Lebanon.

1442.  Ghassan Wadi Haikal, Deputy General Manager of LCB, was listed as a consultant to Sofibanque.

1443.  One of the bank's major shareholders, Muhammad Hussein Darwish, was identified both by SGBL and the Lebanese government as one of the Hezbollah-related accountholders whose accounts had to be closed at LCB as part of SGBL's acquisition of LCB.

1444.  Mr. Darwish appears to have owned four accounts at LCB until 2011.

1445.  One of the bank's other major shareholders, Isam Nabih Hamad, was also identified both by SGBL and the Lebanese government as one of the Hezbollah-related accountholders whose accounts had to be closed at LCB as part of SGBL's acquisition of LCB.

### 2.  SGBL ACQUIRED LCB'S LIABILITIES

1446.  On February 10, 2011, the U.S. Department of the Treasury announced the identification of LCB together with its subsidiaries as a financial institution of primary money laundering concern under Section 311 of the USA PATRIOT Act for the bank's role in facilitating the money laundering activities of an international narcotics trafficking and money laundering network.

1447.  Later that month, the head of LCB, Riad Salameh, held what was described as a "constructive" meeting with senior officials of the U.S. Department of the Treasury. At the same

time, *Reuters* reported that Mr. Salameh described LCB as "well managed" and stated that the bank "complied with international laws on money laundering."

1448.   On March 3, 2011 – *three weeks* after LCB was named a financial institution of primary money laundering concern – Mr. Salameh announced that SGBL was the winning bidder to acquire LCB.

1449.   Lebanon's *Daily Star* reported that SGBL "pledged to keep on all current employees of LCB."

1450.   Pursuant to an agreement dated June 22, 2011 (the "Sale and Purchase Agreement") between LCB and Defendant SGBL, SGBL as the "Purchaser" agreed to "receive and assume from the Seller [LCB], all of the Seller's Assets and Liabilities …." §2.1.

1451.   According to the Stipulation and Order of Settlement Regarding Lebanese Canadian Bank and Société Générale de Banque au Liban SAL ("DOJ-LCB Settlement"), LCB asserted that "LCB's Board of Directors, for commercial reasons, resolved to sell all of its assets, liabilities, rights and obligations to Société Générale de Banque au Liban S.A.L."

1452.   A copy of the portions of the Sale and Purchase Agreement disclosed on the public docket is attached hereto as **Exhibit 1**.

1453.   Section 2.3 of the Sale and Purchase Agreement stated:

> The Assumed Liabilities consist *inter alia* of any and all of the Seller's liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the Seller's Business, all as at the Completion Date.

1454.   On September 7, 2011, the Central Council of the Central Bank of Lebanon granted its final approval of SGBL's acquisition of LCB's assets and liabilities.

1455. LCB was immediately placed under liquidation, and it asked that its banking license be revoked, which was promptly consented to by the Central Bank of Lebanon.

1456. In August 2012, the U.S. government filed a civil forfeiture action pursuant to 18 U.S.C. § 981(k) to seize $150 million U.S. dollars held by Defendant BANQUE LIBANO-FRANÇAISE SAL.[94]

1457. According to the DOJ-LCB Settlement, "pursuant to an agreement dated September 8, 2011 (the "Escrow Agreement") between LCB, SGBL, and a Lebanese bank acting as escrow agent (the "Escrow Agent"), $150 million of the Purchase Price (the "Escrow Funds") was to be held in escrow by the Escrow Agent pending the satisfaction of certain conditions pursuant to the Sale and Purchase Agreement."

1458. Although the $150 million U.S. dollars were characterized as part of the "purchase price," documents on the public docket do not clearly delineate precisely whose funds were placed in the Escrow Funds or how the Department of Justice became aware of those funds.[95]

1459. According to the DOJ-LCB Settlement, "SGBL asserts it is an innocent purchaser of the assets and liabilities of LCB...."

1460. However, when the United States seized the Escrow Funds pursuant to 18 U.S.C. § 981(k), it was required to making a showing that it had reason to believe the seized funds constituted criminal proceeds related to financing terrorism.

1461. During this time, Defendant SGBL reviewed LCB's customers as described in *The New York Times* article referenced above, which detailed how "auditors brought in to scrub the

---

[94]     Section 981(k) permits the *in rem* forfeiture of funds held in U.S. correspondent bank accounts on behalf of foreign banks as a substitute for criminal funds held on deposit at the foreign bank. Federal prosecutors can now file an *in rem* forfeiture action against the equivalent amount of money that is held in a foreign bank's U.S. correspondent account, if the government can show that forfeitable funds were deposited into the account at the foreign bank. Being able to file this action enables the forfeiture of criminal assets that were previously beyond the government's reach.

[95]     Ghazi Abu Nahl's civil suit against LCB's former management team described the funds as "LCB's money."

books discovered nearly 200 accounts that were suspicious for their links to Hezbollah and their classic signs of money laundering."

1462.   As detailed throughout the Complaint, Defendant SGBL allowed most of those accounts to migrate to other Lebanese banks, including Defendants herein, but a subset of the accounts with "links to Hezbollah" that exhibited "classic signs of money laundering" migrated to Defendant SGBL and some of the most significant Hezbollah accounts (*e.g.* for the Martyrs Foundation – Lebanon) never made it on to the official list.

1463.   Ultimately Defendant SGBL paid a purchase price of $580 million U.S. dollars, subject to the final review by and approval of the Central Bank of Lebanon – which had every reason to quickly consummate this banking marriage.

1464.   In June of 2013, the U.S. Department of Justice settled with LCB and Defendant SGBL, with the U.S. government retaining $102 million of the $150 million U.S. dollars seized from the "Escrow Account" at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1465.   The result was a solid victory for all concerned parties. The Central Bank of Lebanon contained a crisis that threatened to implicate nearly the entire Lebanese banking system in Hezbollah's illicit financing; the Lebanese banking sector was freed to continue its highly lucrative financial services for Hezbollah and The System as a whole; and Hezbollah itself was freed to continue – and even more aggressively pursue its transnational crime spree with full access to the U.S. financial system, content in the belief that the United States government is, at most, prepared only to inconvenience it slightly.

1466.   In retrospect, none of this should have been surprising.

1467.   According to a U.S. Diplomatic Cable dated February 18, 2005, during a February 14, 2005 meeting with Stuart Levey, then-Head of the Office of Terrorism and Financial

Intelligence at the U.S. Department of the Treasury, and of a delegation that included Senior Adviser Adam Szubin and others, Israeli officials "provided information on a number of financial institutions and charities that they said provide funding to Hamas and Hizballah."

1468. An Israeli official "charged that at least two banks (the Lebanese Canadian Bank and the Société Générale de Banque au Liban SAL) are 'connected directly to the financial infrastructure of Hizballah.'"

1469. Six years and hundreds of millions of dollars to Hezbollah later, one of the banks "connected directly to the financial infrastructure of Hizballah" agreed to pay a fine and Defendant SGBL, the other bank that Israeli intelligence had identified as "connected directly to the financial infrastructure of Hizballah," had swallowed LCB without public objection from Washington.

### 3. SGBL AIDED AND ABETTED AND CONSPIRED WITH HEZBOLLAH IN ITS OWN CAPACITY BEFORE AND AFTER ITS PURCHASE OF LCB'S ASSETS AND LIABILITIES

1470. Even after Defendant SGBL undertook its own internal investigation of LCB's customers in 2011-2012, and the Lebanese government's subsequent audit, Defendant SGBL elected to maintain accounts for more than 20 of the Hezbollah-identified individuals and entities on the auditors' lists, including, *e.g.*, Muhammad Hussein Darwish and Ali Hussein Darwish, Muhammad Issam Abu Darwish, Mustafa Faysal Ahmad, and others.[96]

1471. Moreover, many of Hezbollah's and the Iranian governmental entities' accounts at LCB were omitted from the Lebanese reports inventorying suspect accounts at LCB and there is no indication that these (unlisted) accounts were ever closed by Defendant SGBL.

1472. These "phantom" accounts included, among others, those held for Yousser Company for Finance and Investment (SDGT), the Martyrs Foundation – Lebanon (SDGT),

---

[96] Mustafa Faysal Ahmad's mother's U.S. dollar-denominated account no. 172488 was never closed and remained at Defendant SGBL.

Hussein al-Shami (SDGT), Al-Mabarrat Charitable Society, Lebanese Arab Touristic Company and Al-Aytam Company for General Trading and Fuels.

1473.　While many of these accounts at LCB were not listed in the Lebanese government reports on LCB, at least two of the LCB accounts for U.S. designated entities such as Elissa Holding SAL (SDNTK) and Yousser Company for Finance and Investment (SDGT) were retained by Defendant SGBL who continued to provide them with banking services.

1474.　In addition to Defendant SGBL acquiring the liabilities of LCB, being the legal successor-in-interest to LCB and its criminal conduct,[97] and helping The System cover its tracks and contain the damage from the U.S. regulatory actions against LCB, SGBL has *itself* long provided material support to, and aided and abetted, Hezbollah.

1475.　For example, independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Hezbollah's Martyrs Foundation through Atlas Holding SAL, Martyrs Foundation's commercial arm (detailed above).

1476.　Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Hezbollah's Al-Mabarrat Charitable Society.

1477.　Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Al-Inmaa Engineering and Contracting SARL (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja (SDGT).

1478.　Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Al-Saad Establishment for Trading of Eggs, a company

---

[97]　Although Defendant SGBL froze certain accounts, particularly those connected to Ayman Joumaa's narcotics trafficking network, it closed, but did not freeze, the accounts of well-known senior BAC operatives such as Muhammad Bazzi, Ali Charara, Nazim Ahmad, Saleh Asi, Hussein Issawi, Youssef Tajideen and Muhammad Hussein Darwish.

owned and controlled by the IRGC–QF.

1479.  Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to the publisher of Hezbollah's *Baqiyat Allah* magazine, a Hezbollah-controlled company called Dbouk International for Printing and General Trading.

1480.  Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Hoda for Touristic Services & Management Holding SAL, a company controlled by two senior Hezbollah financiers, Abbas Abdel Latif Fawaz and Ali Youssef Charara (SDGT).

1481.  Independent of it acquiring the liabilities of LCB, Defendant SGBL knowingly held accounts and provided financial services to Fantasy World SARL, which operates the well-known Fantasy World amusement park in Hezbollah's stronghold of Dahiya in the southern suburbs of Beirut. Fantasy World was founded and operated by Adham Tabaja, co-chairman of Hezbollah's BAC. Fantasy World is an iconic flagship of Hezbollah's efforts to develop family-oriented and (religiously appropriate) entertainment options in Beirut's Shi'a-majority municipalities.

1482.  Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account for and provided financial services to Fawzi Muhammad Malek, through which Nazim Ahmad and his criminal network laundered more than $400,000 through the United States on Hezbollah's behalf.[98]

1483.  According to the Lebanese government, when Nazim Ahmad's own personal account at LCB (account no. 172382) was closed in October 2011, it migrated to among other Defendant banks, SGBL.

1484.  A similar scenario occurred with the account of Said Jamil Muhammad, who co-

---

[98]     Malek also held a separate account at LCB that was closed in October 2011.

founded Aya SAL Offshore with Muhammad Abdallah al-Amin (SDGT).

1485.   Independent of its acquiring the liabilities of LCB, Defendant SGBL maintained an account for and provided financial services to Inter Aliment SAL Offshore, a company controlled by Hezbollah facilitator Saleh Ali Assi that laundered large sums of money for Hezbollah and whose account at LCB was closed as part of Defendant SGBL's acquisition of LCB.

1486.   According to the Lebanese government, the funds in Mr. Assi's U.S. dollar-denominated account no. 172197 at LCB migrated to Defendants FRANSABANK, MEAB BANK and BANQUE LIBANO-FRANÇAISE as well as remaining at Defendant SGBL.

1487.   Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account and provided financial services to Halawi Investment Trust SAL and Info Trust SAL, sister companies within the Halawi Exchange network of companies responsible for churning bulk cash for Hezbollah's narcotics trafficking network.

1488.   As noted above, Halawi Exchange and other exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, be deposited into banks like Defendant SGBL (that exchange the cash for deposits by the Central Bank denominated in Lebanese pounds, at high interest rates).

1489.   Defendant SGBL also maintained an account and provided financial services to Hassan Ayash Exchange.

1490.   Within the parameters of The System, Halawi Exchange and Hassan Ayash Exchange received lucrative commissions, Defendant SGBL received high interest returns from financing Lebanese government debt and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1491.   Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account for and provided financial services to Metro Trading Company SAL Offshore, a company controlled by Hezbollah BAC operative Imad Abdul Reda Bakri that laundered large sums of money for Hezbollah.

1492.   Independent of it acquiring the liabilities of LCB, Defendant SGBL maintained an account at its Saint Charles branch and provided financial services to Mercury Development Offshore SAL. That company, controlled by Faysal Mustafa Ahmad, also maintained a U.S. dollar-denominated account at LCB that was marked for closure in 2012.

1493.   Long before it acquired LCB, Defendant SGBL fully understood its role in The System. And its own roster of customers, who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects Defendant SGBL's long-standing willingness to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

## C.   FRANSABANK SAL

1494.   Defendant FRANSABANK has knowingly maintained accounts for and provided financial services that aided and abetted several core Hezbollah-controlled organizations that are widely and publicly associated with the organization, including:

- **IRSO (SDGT)**, Chiyah Branch (a/k/a Al-Shiyah),
  Account numbers: 252010/692830.21 and 78.02.251.133553.0.8;

- **Martyrs Foundation–Lebanon** (SDGT),
  Account number: 21-10-0360062-73; and

- **Wounded Association** (*Muasassat al-Jarha*),
  Account number: 805458023.

1495.   The IRSO is the most explicit and notorious fundraising arm of Hezbollah's IJO.

1496.   The Martyrs Foundation–Lebanon is – and throughout the relevant period has always been (together with IRSO and Jihad al-Bina) – one of Hezbollah's flagship social organizations.

1497.   The Wounded Association belongs to and is controlled by Hezbollah and its stated purpose is to care for people wounded in the "Resistance."

1498.   Hezbollah also directly solicited funds to account no. 953113.30 at Defendant FRANSABANK's Tabaris branch in Beirut.

1499.   In August 2006, NBC News reported that the Israeli government had bombed FRANSABANK's offices in Beirut "which they claim help Hezbollah receive and move money around the world."

1500.   According to NBC News, "[t]he Fransabank General Manager tells NBC 'We have no relationship with Hezbollah or any other political party anywhere. We don't have any relation and we refuse to have one.'"[99]

1501.   Notwithstanding that denial, Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Compu House SARL, the Hezbollah-controlled technology importer, founded and majority owned by Sultan Khalifa As'ad, Deputy Chairman of the Executive Council for Municipal Affairs, former head of Hezbollah's Finance Unit, and former director of Jihad al-Bina.

1502.   Defendant FRANSABANK maintained an account for and provided financial services to Signum International Holding SAL, a company controlled by Ali Youssef Charara (SDGT).

1503.   Defendant FRANSABANK also maintained accounts for and provided financial

---

[99]      *See* Adam Ciralsky and Lisa Myers, *Hezbollah Banks Under Attack in Lebanon* (NBC News, July 25, 2006), archived at https://web.archive.org/web/20060810204050/http://www.msnbc.msn.com/id/14015377.

services that aided and abetted Hezbollah through companies belonging to the Ahmad clan. These included accounts for Ali Ahmed Group - Holding SAL, ACE Group SAL, Blue City SAL, Golden Square SAL, and Paloma Group SAL.

1504.   Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Interafrica Trading Company ITC SAL Offshore, co-founded by Ali Hussein Darwish and his family in conjunction with Jihad Muhmmad Qansu (SDGT).

1505.   Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Euro African Group Ltd., which was controlled by Muhmmad Bazzi and designated an SDGT on May 17, 2018.

1506.   Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Wanour Real Estate SAL, controlled by Mr. Bazzi.

1507.   Defendant FRANSABANK also maintained an account for and provided financial services that aided and abetted Hezbollah through Talal Khalil Chahine, including a transfer of $990,000 from his FRANSABANK account to another account belonging to Chahine.

1508.   Defendant FRANSABANK maintained an account for and provided financial services to Global Supply and Consultancy SAL Offshore, a Hezbollah / BAC entity co-founded by Saleh Assi.

1509.   Nazim Ahmad also used Rilton Traders to launder more than $150,000 from Belgium (through New York correspondent accounts) to Saleh Ali Assi's personal account at Defendant FRANSABANK.

1510.   Nazim Ahmad also used Rilton Traders to launder at least $70,000 from Belgium

(through New York correspondent accounts) to Ramzi Muhammad Malek's account at Defendant FRANSABANK.

1511.   Defendant FRANSABANK also maintained an account for and provided financial services to Kassem Hejeij (SDGT) knowing that he was a prominent and well-known Lebanese banker and money launderer deeply connected to Hezbollah.

1512.   After the demise of LCB in 2011, Defendant FRANSABANK took over a substantial portion of LCB's blacklisted accounts and business with Hezbollah's BAC.

1513.   According to the Lebanese government, this included taking on the U.S. dollar-denominated accounts of Muhammad Bazzi (SDGT) one of the BAC's most notorious and prolific financiers and facilitators.

1514.   According to the Lebanese government, this also included taking on the U.S. dollar-denominated accounts of leading BAC facilitator Saleh Ali Assi and the blacklisted account for his large money laundering operation – Inter Aliment SAL Offshore.

1515.   It also included taking over the blacklisted accounts of Phoenicia Shipping Offshore SAL (SDNTK), controlled by Ali Muhammad Kharrubi (SDNTK).

1516.   Similarly, according to the Lebanese government, Muhammad Bazzi's Euro African Group Ltd. (SDGT) account no. 42402* migrated to Defendant FRANSABANK as did his own personal U.S. dollar-denominated account no. 170037* at LCB.

1517.   After the demise of LCB in 2011, according to the Lebanese government Defendant FRANSABANK also took over the blacklisted account of Adel Hassan Makki, the son-in-law of Ali Said Ali Ahmad and brother-in-law of Nazim Ahmad.

1518.   According to the Lebanese government, Defendant FRANSABANK also took on the blacklisted LCB accounts of Muhammad Issam Abu Darwish's business partner, Akram

Ahmad al-Bast, as well as Muhammad Issam Abu Darwish's own blacklisted U.S. dollar-denominated account.

1519.  According to the Lebanese government, Defendant FRANSABANK also took on the blacklisted LCB accounts of Mustafa Faysal Ahmad, his company – Mercury Development Offshore SAL, Platinum Residence (Muhammad Bdeir and Co.), and others.

1520.  According to the Lebanese government, Defendant FRANSABANK also took on the account balance at LCB (account no. 173599*) of Millennium Diamond Offshore SAL.

1521.  Thus, there can be no doubt that Defendant FRANSABANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant FRANSABANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided FRANSABANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

## D.  BLOM BANK SAL

1522.  As set forth below, Defendant BLOM BANK maintained accounts and provided vital financial services to a wide spectrum of Hezbollah entities and operatives ranging from the well-known Al-Mabarrat Charitable Society–Lebanon, founded by Sheikh Fadlallah (SDT), to Hezbollah's money-laundering exchange houses and Conflict Diamond smugglers, to narcotics traffickers and arms dealers:

- **Al-Mabarrat Charitable Society–Lebanon**;
- **Cooperative Al-Wafaa SARL**;
- **Arch Consulting SARL**;
- **Elissa Exchange Company SARL** (SDNTK);
- **Ovlas Trading SA** (SDGT);
- **Spectrum Investment Group Holding SAL** (SDGT);

- **Mustafa Reda Darwish Fawaz** (SDGT);
- **Youssef Muhammad Tajideen**;
- **Car Care Center** (SDGT);
- **Teltac Worldwide Incorporated (Offshore) SAL**; and
- **Béton Plus SAL**.

1523. Taken as a whole, this roster of customers includes multiple designated Hezbollah persons or companies and entities, several additional persons and entities widely and openly known to be associated with and/or controlled by designated entities belonging to Hezbollah, and a rogue's gallery of companies and individuals that are part of Hezbollah's BAC's network.

1524. Defendant BLOM BANK's roster of Hezbollah-controlled customers reflects the bank's willingness to substantially assist Hezbollah's operations by providing it with financial services, including critical access to U.S. dollar-clearing.

1525. Defendant BLOM BANK maintained accounts for and provided financial services to Al-Mabarrat Charitable Society–Lebanon, aided and abetted Hezbollah knowing it was a prominent and well-known Hezbollah organization that was founded by Hezbollah's "spiritual leader" Sheikh Muhammad Hussein Fadlallah, who was designated a terrorist by the United States in 1995. Defendant BLOM BANK fully understood its own role in providing financial services to Al-Mabarrat Charitable Society–Lebanon.

1526. Defendant BLOM BANK maintained an account for and provided financial services to Cooperative Al-Wafaa SARL and provided material support that aided and abetted Hezbollah knowing that Cooperative Al-Wafaa SARL was owned and controlled by Adham Tabaja (SDGT) and fully understanding its own role in providing financial services to one of Hezbollah's most senior and well known financiers.

1527. Defendant BLOM BANK maintained an account for and provided financial services to Arch Consulting SARL and provided material support that aided and abetted Hezbollah

knowing that Arch Consulting SARL was a prominent and well-known Hezbollah organization and fully understanding its own role in providing financial services to this prominent and well-known corporate alter-ego for Hezbollah's construction arm, Jihad al-Bina (SDGT).

1528.   Defendant BLOM BANK maintained an account for and provided financial services to Ovlas Trading SA (SDGT) that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Tajideen Network of companies operated on behalf of Hezbollah's BAC.

1529.   Defendant BLOM BANK maintained an account for and provided financial services to Spectrum Investment Group Holding SAL (SDGT) that aided and abetted Hezbollah, knowing that it was providing financial services to this U.S.-designated, prominent and well-known part of the Charara Network of companies operated on behalf of Hezbollah's BAC.

1530.   Defendant BLOM BANK maintained an account for and provided financial services to Mustafa Reda Darwish Fawaz (SDGT) that aided and abetted Hezbollah, knowing that it was providing financial services to this U.S.-designated, prominent and well-known member of Hezbollah's IJO, who has supported the organization's communications, surveillance, and arms dealing activities in West Africa. Defendant BLOM BANK fully understood its own role in providing financial services to Mustafa Reda Darwish Fawaz.

1531.   Defendant BLOM BANK maintained an account for and provided financial services to Youssef Muhammad Tajideen that aided and abetted Hezbollah, knowing that he was a prominent and well-known member of Hezbollah's IJO, whose three brothers are designated SDGTs.

1532. Defendant BLOM BANK maintained an account for and provided financial services to Kassem Tajideen (SDGT), knowing that he was a prominent and well-known Hezbollah financier.

1533. Defendant BLOM BANK maintained an account for and provided financial services to Muhammad Bazzi (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1534. Defendant BLOM BANK maintained an account for and provided financial services to Ali Youssef Charara (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1535. Defendant BLOM BANK maintained an account for and provided financial services to Ali Muhammad Kharrubi (SDNTK), knowing that he was a prominent and well-known money launderer, narcotics trafficker and BAC operative.

1536. Defendant BLOM BANK maintained an account for and provided financial services to Nazem Ahmad, knowing that he was a prominent and well-known money launderer and Conflict Diamond trafficker.

1537. Defendant BLOM BANK maintained an account for and provided financial services to Kassem Hejeij (SDGT), knowing that he was a prominent and well-known Lebanese banker and money launderer deeply connected to Hezbollah.

1538. Defendant BLOM BANK maintained an account for and provided financial services to Car Care Center (SDGT), knowing it was controlled by the co-head of Hezbollah's BAC, Adham Tabaja, and managed by Hussein Ali Faour (SDGT), who the United States government has identified as "a member of Hizballah's Islamic Jihad, the unit responsible for

carrying out the group's overseas terrorist activities." Car Care Center has long operated as Hezbollah's motor pool, providing vehicles to the organization as needed.

1539.   Defendant BLOM BANK maintained an account for and provided financial services to Teltac Worldwide Incorporated (Offshore) SAL that aided and abetted Hezbollah, knowing it was providing these financial services to the Charara Network of companies operated on behalf of Hezbollah's BAC.

1540.   Defendant BLOM BANK maintained an account for and provided financial services to Béton Plus SAL that aided and abetted Hezbollah, knowing that it was providing those financial services to part of Hezbollah's BAC, co-founded by Salah Abd al-Rauf Azz al-Din, sometimes referred to as the Lebanese "Bernie Madoff," to whom the organization transferred the large sums it received from Iran in order to invest it in Europe and America.

1541.   Defendant BLOM BANK maintained an account for and provided financial services to Elissa Exchange Company SARL (SDNTK) that aided and abetted Hezbollah, knowing that it was providing financial services (directed through New York) to this major bulk cash money launderer for Hezbollah's narcotics trafficking network run by Ayman Joumaa, among others.[100]

1542.   Defendant BLOM BANK maintained an account for and provided financial services to Halawi Investment Trust SAL, knowing that the Halawi Network of companies were also major bulk cash money launderer for Hezbollah's narcotics trafficking network run by Ayman Joumaa, among others.

1543.   As noted above, these exchange houses deal in high-volume bulk cash transactions and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, be deposited into banks like Defendant BLOM BANK (which

---

[100]     BLOM Bank was identified by the U.S. government as one of four Lebanese banks whose New York correspondent banks were used by Lebanese exchange houses to launder money for Hezbollah.

exchange the cash for LBP deposits by the Central Bank at high interest rates).

1544.    Within the parameters of The System, Elissa Exchange Co. SARL (SDNTK) and the Halawi Network, Defendant BLOM BANK received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1545.    Nazim Ahmad used Rilton Traders to launder a minimum of $550,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Primo International SAL Offshore's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK.

1546.    Nazim Ahmad used Rilton Traders to launder a minimum of $10,000 U.S. dollars in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to his brother-in-law Rami Kamil Ya'qub Baqir's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK. According to the Lebanese government, two of his LCB accounts were closed in September 2011.

1547.    Nazim Ahmad used Rilton Traders to launder a minimum of $600,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Salman Ali Ahmad's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK.

1548.    Nazim Ahmad used Rilton Traders to launder a minimum of $6,200,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Mahmoud Nayef Ahmad's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK .

1549.    Nazim Ahmad used Rilton Traders to launder a minimum of $400,000 U.S. dollars in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to

Samir Muhammad Hijazi's U.S. dollar-denominated account in Lebanon at Defendant BLOM BANK.

1550.   According to the Lebanese government, Mr. Hijazi is associated with Khalil Nazem Ibrahim's Network.

1551.   Nazim Ahmad also used Rilton Traders to launder more than $200,000 from Belgium (through New York correspondent accounts) to Randa Muhammad Malek's account at Defendant BLOM BANK.

1552.   As set forth above, Defendant BLOM BANK fully understands its role in The System and its roster of customers who are either BAC operatives, BAC facilitators, Hezbollah/BAC-controlled bulk cash exchange house and Conflict Diamond smugglers, and money launderers, reflecting the bank's willingness to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1553.   Defendant BLOM BANK's agreement to participate in The System, to knowingly maintain accounts for BAC operatives and BAC-controlled entities and to launder U.S. dollar-denominated funds on their behalf is further supported by the fact that after the demise of LCB in 2011, several of LCB's blacklisted accounts identified as part of Hezbollah's financial operations migrated to Defendant BLOM BANK.

1554.   According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant BLOM BANK, included several accounts tied to the Ahmad Clan's diamond smuggling and money laundering networks in the Democratic Republic of Congo, such as LCB account no. 172854* and the personal account of Nazim Ahmad account no. 172382*.

1555. According to the Lebanese government, LCB accounts for Millennium Diamond Offshore SAL, Muhammad Hussein Darwish's SOGEAC SPRL, and Mustafa Faysal Ahmad also moved to Defendant BLOM BANK.

1556. Thus, there can be no doubt that Defendant BLOM BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BLOM BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided BLOM BANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

### E.    MEAB BANK

1557. Defendant MEAB BANK was co-founded and chaired—until June 2015—by Kassem Hejeij who stepped down as a result of being designated an SDGT by the U.S. Department of the Treasury for his direct links to Hezbollah.

1558. The bank was established to serve the needs of the Hejeij brothers, who owned a large construction business in Africa, including lucrative government contracts in Equatorial Guinea where Kassem Hejeij (SDGT) enjoys a highly profitable relationship with the country's long serving President, Teodoro Obiang.

1559. For many years, Kassem Hejeij (SDGT) has conducted his business, including on Hezbollah's behalf, from his offices and wood-paneled board room on the fourth floor of the Coral Beach Hotel, where he owns a stake through his daughter.

1560. At the Coral Beach, Hejeij's Executive Assistant, Zalfa Taher, manages his daily affairs and serves as a gatekeeper over his schedule and appointments.

1561. According to the U.S. Department of the Treasury:

Hejeij is a Lebanese businessman that maintains direct ties to Hizballah organizational elements. In addition to his support to Adham Tabaja and his affiliated companies in Iraq, Hejeij has helped open bank accounts for Hizballah in Lebanon and provided credit to Hizballah procurement companies. Hejeij has also invested in infrastructure that Hizballah uses in both Lebanon and Iraq.

1562. Hejeij's close aide and Defendant MEAB BANK manager, Adnan Yousef, has long assisted Hejeij's activities, often working with him at his private offices on the fourth floor of the Coral Beach Hotel.

1563. In 2006, Defendant MEAB BANK's offices were targeted by Israeli jets after a fundraising appeal that aired on Hezbollah's *Al Manar* television station asked that money for the Hezbollah resistance be sent to a specific account at the bank.

1564. Moreover, a public campaign to support Hezbollah was announced on June 16, 2007 asking donors to contribute the money into a Hezbollah-owned bank account at Defendant MEAB BANK, Account No. 10680.

1565. Apart from Mr. Hejeij's designation as an SDGT, MEAB BANK has long been regarded as one of Hezbollah's favored bankers.

1566. Defendant MEAB BANK has also knowingly held U.S. dollar-denominated accounts (including Account No. 004-002-036-100250-012) and provided financial services to the Imam Khomeini Relief Foundation–Lebanon (SDGT).

1567. Defendant MEAB BANK also maintained accounts and provided financial services to Al-Inmaa Engineering and Contracting SARL (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja (SDGT).

1568. Defendant MEAB BANK also maintained an account for and provided financial services to Nest Contracting Company SAL, another company controlled by Adham Tabaja and his uncle Ahmad Ali Tabaja.

1569.   Defendant MEAB BANK has also knowingly held accounts and provided financial services to Fantasy World SARL, which operates the well-known Fantasy World amusement park in Hezbollah's stronghold of Dahiya in the southern suburbs of Beirut that was founded and operated by Adham Tabaja, co-chairman of Hezbollah's BAC.[101]

1570.   Fantasy World serves as a favorite meeting point for Hezbollah operatives.

1571.   Defendant MEAB BANK has also held accounts and provided financial services to Trust Compass Insurance SAL, knowing that the company was controlled by Ahmad Ali Tabaja and was a BAC company used not only by the Tabaja family for its commercial purposes but also as a Hezbollah company used to insure, *e.g.*, the organization's hospitals and other assets.

1572.   In fact, for many years, Defendant MEAB BANK has provided extensive financing to Adham Tabaja and his companies, often using properties owned by Mr. Tabaja or co-owned by him jointly with his uncle Ahmad Ali Tabaja.

1573.   For example, Adham and Ahmad Tabaja jointly acquired properties 177 14 C, 15 E, 15 H, 18 E, F, H, 19 A, D and G in Hadath, Lebanon in 2001. Those apartments were used as collateral for a loan Defendant MEAB BANK extended to Fantasy World SARL, Adham Tabaja, and various Tabaja associates, including two of his children.

1574.   In fact, Defendant MEAB BANK's financial relationship with Adham Tabaja and his corporate holdings was so extensive that Mr. Tabaja's SDGT designation (which caused him and his companies a temporary liquidity problem) prompted MEAB BANK to seek short term assistance from the Central Bank of Lebanon to forestall its own liquidity problems.

1575.   Unsurprisingly, Defendant MEAB BANK was actively involved in Hezbollah's conspiracy to launder narcotics trafficking proceeds through the sale of used cars in Africa since

---

[101]      According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK, included another Tabaja controlled company, New Land SARL.

its roots are in West Africa where its (nominally) former chairman, Kassem Hejeij (SDGT) built his business empire with Hezbollah's assistance.

1576.   Between approximately January 2007 and early 2011, MEAB knowingly move tens of millions of dollars on Hezbollah's behalf (along with three other Lebanese banks), through its correspondent bank account(s) with U.S. financial institutions located in New York that were, *inter alia*, laundered through Lebanese exchange houses.

1577.   Specifically, Defendant MEAB BANK held account 135-051861-012 for Elissa Exchange in U.S. dollars and purposefully directed U.S. dollar-clearing on behalf of Elissa Exchange through correspondent accounts in New York knowing that it was a critical bulk cash conduit for laundering narcotics trafficking proceeds on behalf of Hezbollah's BAC.

1578.   Nazim Ahmad used Primogems to launder a minimum of $400,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Elissa Exchange's U.S. dollar-denominated account in Lebanon at Defendant MEAB BANK.

1579.   Defendant MEAB BANK also maintained an account for and provided vital financial services to Phoenicia Shipping Offshore SAL (SDNTK), a sister company of Elissa Exchange.

1580.   Defendant MEAB BANK also maintained accounts for and provided vital financial services to Halawi Exchange, Halawi Holding SAL and Halawi Investment Trust SAL, all companies within the Halawi Network, knowing that the Halawi Network was a critical bulk cash conduit for laundering narcotics trafficking proceeds on behalf of Hezbollah's BAC.

1581.   As noted above, the exchange houses Defendant MEAB BANK worked closely with deal in high-volume bulk cash transactions and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be

deposited into banks like Defendant MEAB BANK (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1582. Within the parameters of The System, Elissa Exchange Co. and the Halawi Exchange's network received lucrative commissions, Defendant MEAB BANK received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1583. Defendant MEAB BANK's agreement to participate in The System, to knowingly maintain accounts for BAC operatives and BAC-controlled entities, and to launder U.S. dollar-denominated funds on their behalf is further supported by the fact that after the demise of LCB in 2011, several of LCB's blacklisted accounts identified as part of Hezbollah's financial operations migrated to Defendant MEAB BANK.

1584. Defendant MEAB BANK maintained an account for and provided financial services to Muhammad Bazzi (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1585. Defendant MEAB BANK maintained an account for and provided financial services to Ali Youssef Charara (SDGT), knowing that he was a prominent and well-known Hezbollah facilitator and BAC operative.

1586. Defendant MEAB BANK also maintained an account for and provided financial services to Mr. Amine Cherri (SDGT) knowing that he was a prominent and well-known Hezbollah politician and financier deeply connected to Hezbollah, Adham Tabaja and the BAC.

1587. Defendant MEAB BANK also maintained an account for and provided financial services to Mr. Nazim Ahmad, knowing that he was a prominent and well-known money launderer

and Conflict Diamonds trafficker.

1588.    According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK, included the personal account at LCB of Ali Muhammad Kharrubi (SDNTK).

1589.    According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK, included several accounts tied to the Ahmad Clan's diamond smuggling and money laundering networks in the Democratic Republic of Congo, such as Said Hassan Fuani (account no. 170178*), Inter Aliment SAL Offshore (account no. 172851*) and the personal account of Saleh Ali Assi (account no. 172197*).

1590.    According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK included the personal account at LCB of Ibrahim Issawi's father-in-law, Hussein Ibrahim Bdeir.

1591.    According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK also included several related to Muhammad Issam Abu Darwish, including his joint accounts with his wife Carol and business partner Akram Ahmad al-Bast.

1592.    According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK also included the personal account of Muhammad Abdallah al-Amin's (SDGT) business partner, Said Jamil Muhammad.

1593.    According to the Lebanese government, the accounts closed by LCB that migrated in whole or in part to Defendant MEAB BANK included the personal account at LCB of Mustafa Faysal Ahmad.

1594.    According to the Lebanese government, the accounts closed by LCB that migrated

in whole or in part to Defendant MEAB BANK included the personal account at LCB of Safi Yahya Darwish and his joint account with Khodr Hussein Darwish.

1595.   Thus, there can be no doubt that Defendant MEAB BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations and that the U.S. government's legal actions against LCB did not discourage Defendant MEAB BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided MEAB BANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

F.      **BYBLOS BANK SAL**

1596.   As set forth below, Defendant BYBLOS BANK SAL maintains accounts for a wide spectrum of Hezbollah entities and operatives ranging from the core fundraising arm of Hezbollah's terror apparatus to a front for its U.S.-designated "social welfare" arm, to various nodes within Hezbollah's BAC:

- **Islamic Resistance Support Organization**;
- **Al-Amana SARL**;
- **Global Touristic Services SAL**;
- **Société Orientale Libanaise d'Investissement et Développement SAL**;
- **Afrimex (Offshore) SAL**;
- **Etcimex**;
- **Amigo Travel and Transport SAL**; and
- **Medical Equipments and Drugs International Corporation SAL**.

1597.   Taken as a whole, this roster of customers includes the most infamous designated Hezbollah organizations and many other key elements of its BAC.

1598.   Defendant BYBLOS BANK's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial

systems and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1599.  Defendant BYBLOS BANK maintained an account for the benefit of Islamic the IRSO, an SDGT that it knows to be widely and publicly associated with Hezbollah and its IJO.

1600.  Defendant BYBLOS BANK own AML policies noted that "non-profit and charitable organizations are also used by terrorist groups as a means of raising funds and / or cover for transferring funds in support of terrorist acts."

1601.  It AML policies also noted that some non-profit organizations can provide "support functions to the terrorist movement."

1602.  As noted above, the IRSO is the most explicit and notorious fundraising arm of Hezbollah's IJO.[102]

1603.  Defendant BYBLOS BANK maintained an account for and provided financial services to Al-Amana SARL, a company that owns gas stations in Lebanon (effectively owned and controlled by Atlas Holding SAL) on behalf of the U.S.-designated Martyrs Foundation–Lebanon.

1604.  At all relevant times, Defendant BYBLOS BANK knew (and knows) that Al-Amana SARL was (and is) a Hezbollah-controlled entity.

1605.  The company is owned by Atlas Holding SAL—the well-known "investment arm" of the U.S.-designated Martyrs Foundation–Lebanon.

1606.  Defendant BYBLOS BANK maintained an account for and provided financial services to Global Touristic Services SAL (a/k/a GTS), a company effectively owned and controlled by Atlas Holding SAL on behalf of the U.S.-designated Martyrs Foundation–Lebanon.

1607.  At all relevant times, Defendant BYBLOS BANK knew (and knows) that Global

---

[102]  BYBLOS's account for the "Resistance" at its Harel Hreik branch was broadcast openly on *Al-Manar*.

Touristic Services SAL (a/k/a GTS) was (and is) a Hezbollah-controlled entity.

1608.   The company is also owned by Atlas Holding SAL.

1609.   Defendant BYBLOS BANK maintained an account for and provided financial services to Société Orientale Libanaise d'Investissement et Développement SAL knowing the company was co-founded by the Atlas Holding SAL, the investment arm of the Martyrs Foundation – Lebanon (SDGT).

1610.   Defendant BYBLOS BANK also knew that the company's chairman was Hassan Ali Tajideen and that Ali Tajideen's (SDGT) wife was a board member and that the company's auditor, Jihad Qansu (SDGT) was also a Hezbollah operative.

1611.   Defendant BYBLOS BANK maintained an account for and provided financial services to Afrimex SAL Offshore, a company founded by Youssef Muhammad Tajideen (brother of two Tajideens who are designated SDGTs).

1612.   Afrimex (Offshore) SAL is part of the Tajideen family's network of trade-based money launderers and Hezbollah's BAC.

1613.   Defendant BYBLOS BANK maintained an account for and provided financial services to ETCIMEX, a Czech company founded by Kassem Tajideen that received significant flows of U.S. dollar-denominated transfers that cleared through New York.

1614.   The Tajideen family is widely known in Lebanon and particularly in banking and real estate circles.

1615.   Like the other defendants, BYBLOS BANK knew it was doing business with and facilitating the Tajideen's illicit activities, and it also understood that the Tajideens were (and are) – like the Tabaja family, the Safieddine family and others – synonymous with Hezbollah.

1616.   Defendant BYBLOS BANK maintained an account for and provided financial

services to Amigo Travel and Transport SAL, a company that is part of Adham Tabaja's network of companies and Hezbollah's BAC.

1617.   The company management includes Jihad Muhammad Qansu, a designated SDGT identified as part of the Tabaja Network, and was co-founded by Khadir Ali Abi Haidar, who is also a director of the U.S.-designated Car Care Center (a/k/a Mikalab SARL), which is also part of Adham Tabaja's network of companies and Hezbollah's BAC.

1618.   Defendant BYBLOS BANK maintained an account for and provided financial services to Société Orientale Libanaise d'Investissement et Développement SAL, a company that it knows is part of Hezbollah's BAC.

1619.   Defendant BYBLOS BANK knew that it was aiding Hezbollah by maintaining accounts for Société Orientale Libanaise d'Investissement et Développement SAL because the company was founded by Atlas Holding SAL—the well-known "investment arm" of the U.S. designated Martyrs Foundation–Lebanon.

1620.   Its management also includes prominent Hezbollah operatives, including Hassan Ali Tajideen, the son of Ali Tajideen, a U.S.-designated Hezbollah financier and Jihad Muhammad Qansu, an SDGT, who was listed as the company's auditor.

1621.   Defendant BYBLOS BANK maintained an account for and provided financial services to Medical Equipments and Drugs International Corporation SAL (a/k/a MEDIC), a Hezbollah-controlled company established in 2013 to sell pharmaceuticals and other medical products.

1622.   At all relevant times, Defendant BYBLOS BANK knew (and knows) that Medical Equipments and Drugs International Corporation SAL was (and is) a Hezbollah-controlled entity.

1623.   The company is owned by Atlas Holding SAL—the well-known "investment arm"

of the U.S.-designated Martyrs Foundation–Lebanon that was designated seven years before the company was established.

1624.    Defendant BYBLOS BANK's roster of Hezbollah-controlled customers reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1625.    It also demonstrates the interconnectedness of Hezbollah's BAC.

1626.    Defendant BYBLOS BANK's roster of Hezbollah-controlled customers includes companies with overlapping ownership and management structures that include representatives of the Martyrs Foundation–Lebanon, the Tajideen Network and the Tabaja Network – all working on behalf of the organization, with Defendant BYBLOS BANK providing its access to the banking sector and USD-clearing to ensure that the BAC can carry out its mission, generate revenue for the organization, and navigate American sanctions.

1627.    Defendant BYBLOS BANK maintained an account for and provided vital financial services to Talal Khalil Chahine, a close business associate of Muhammad Bazzi (SDGT), who was publicly associated with the Al-Mabarrat Charitable Society.

1628.    Apart from Mr. Chahine's clear association with Hezbollah and status as a fugitive from the United States, Defendant BYBLOS BANK would have known that he was involved in illicit activity by the abnormally large sums of U.S. dollars that moved through his account.

1629.    Nazim Ahmad used Rilton Traders to launder a minimum of $10,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Hussein Ali Atwi's U.S. dollar-denominated account in Lebanon at Defendant BYBLOS BANK

1630.    Moreover, like all other financial institutions in Lebanon, Defendant BYBLOS

BANK was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB. Nonetheless, it agreed to continue providing accounts and financial services to more than a dozen Hezbollah-related individuals and companies, including Ali Hussein Darwish, Muhammad Hussein Darwish, Safi Yahya Darwish, Khodr Hussein Darwish, Ali Musa Nachar, Tarek Khalil Musa,[103] and Said Hassan Fuani.

1631.   Thus, there can be no doubt that Defendant BYBLOS BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations and that the U.S. government's legal actions against LCB did not discourage Defendant BYBLOS BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided BYBLOS BANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

1632.   In sum, Defendant BYBLOS BANK fully understands its role in The System, and its conduct both before and after the LCB scandal demonstrates the bank's willingness to substantially assist Hezbollah's operations.

1633.   By helping the IRSO to collect funds which are explicitly and notoriously raised to underwrite violence and continuing to provide financial services to BAC operatives and facilitators even after the LCB scandal exposed various networks operating within The System, Defendant BYBLOS BANK has demonstrated a willingness to actively further Hezbollah's illicit and violent activities.

## G.   BANK AUDI SAL

1634.   As set forth below, Defendant BANK AUDI maintained accounts for a wide

---

[103]   According to the Lebanese government, Muhammad Bazzi's business associate in The Gambia, Tarek Khalil Musa, held LCB account no. 170239* until October 2011.

spectrum of Hezbollah entities ranging from various nodes within Hezbollah's BAC to sub-divisions of Hezbollah's "social welfare" arm:

- **Ovlas Trading SAL (Offshore)**;
- **Ovlas Trading SA (SDGT)**;
- **Afrimex SAL Offshore**;
- **Leaders of Supply & Products (Offshore) SAL**;
- **Atlas Holding SAL**;
- **Inter Aliment SAL Offshore**;
- **Fawzi Muhmmad Malek**;
- **Khalil Nazem Ibrahim**;
- **Dib Hani Harb**;
- **Rim Reda Baqir**;
- **Premier Investment Group SAL Offshore** (SDGT);
- **Spectrum International Investment Holding SAL** (SDGT);
- **Teltac Worldwide Incorporated (Offshore) SAL**;
- **Al-Hadi Institution**;
- **Medical Equipments and Drugs International Corporation SAL**;
- **Special Operations Group SAL**;
- **Info Trust SAL**; and
- **Info Trust SARL**.

1635.  Defendant BANK AUDI maintained an account for at least four major Tajideen family companies, including Ovlas Trading SAL (Offshore), which was designated by the U.S. Department of the Treasury on December 9, 2010.

1636.  Defendant BANK AUDI also maintained an account for Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1637.  Defendant BANK AUDI also maintained accounts for Afrimex SAL Offshore and Leaders of Supply & Products (Offshore) SAL, both Tajideen-controlled companies that actively used these accounts in trade-based money laundering on behalf of Hezbollah's BAC.

1638.  Defendant BANK AUDI maintained an account for Youssef Muhammad Tajideen and provided material support that aided and abetted Hezbollah, knowing that Mr. Tajideen and his brothers were prominent and well-known members of Hezbollah.

1639.  Defendant BANK AUDI was aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Youssef Muhammad Tajideen with financial services and access to U.S. dollar-clearing.

1640.  Defendant BANK AUDI maintained an account for Atlas Holding SAL, which was founded in 2006 by the Martyrs Foundation – Lebanon and is very publicly known as the commercial arm of the Martyrs Foundation, a core Hezbollah institution and SDGT.[104]

1641.  Defendant BANK AUDI maintained an account for Inter Aliment SAL Offshore, a company controlled by the prominent BAC facilitator and known money launderer, Saleh Ali Assi.

1642.  According to the Lebanese government, Defendant BANK AUDI maintained account no. 172370* at LCB for Fawzi Muhammad Malek until it was closed in October 2011 and the balance migrated to Mr. Malek's account at Defendant BANK AUDI. Mr. Malek is a member of the Ahmad clan and has laundered money on behalf of Nazim Ahmad and his criminal network.

1643.  Nazim Ahmad used Rilton Traders to launder at least $75,000 from Belgium in U.S. dollars to the BANK AUDI account of Yusuf Abbas Mer'i, a board member of Defendant FENICIA BANK.

1644.  Khalil Nazem Ibrahim held account no. 173309* at LCB until 2011.

1645.  According to the Lebanese government, when LCB was finally compelled to close the account for Khalil Nazem Ibrahim, the balance migrated to an account at Defendant BANK AUDI.

1646.  Defendant BANK AUDI maintained U.S. dollar-denominated account no. 813364 for Dib Hani Harb, a Hezbollah weapons procurement specialist and narcotics trafficker. The account was used to transfer funds from and through New York to Hezbollah in Lebanon. As

---

[104]     According to the Martyrs Foundation, it was founded in 1990.

detailed above, at a minimum Defendant BANK AUDI independently knew that Mr. Harb's was inconsistent with his stated occupation and was being used for illicit purposes, and it eventually received direct notice of his role in Hezbollah's IJO but continued to provide him and IJO with financial services.

1647.   Nazim Ahmad used Rilton Traders and Primogems to launder more than $200,000 U.S. dollars from Belgium through U.S. correspondent banks to the Defendant BANK AUDI accounts owned by Rim Reda Baqir.

1648.   Defendant BANK AUDI maintained an account for Premier Investment Group SAL Offshore (SDGT) and provided vital financial services to the company knowing that it was controlled by one of the most senior and prolific BAC operatives, Muhammad Ibrahim Bazzi (SDGT).

1649.   Defendant BANK AUDI maintained an account for Spectrum International Investment Holding SAL (SDGT) and provided financial services knowing that the company was a prominent and well-known part of the Charara network of companies operated on behalf of Hezbollah. Charara's Network has been described by the U.S. government as "a key Hizballah support network."

1650.   Defendant BANK AUDI maintained an account for Teltac Worldwide Incorporated (Offshore) SAL and provided financial services to it knowing that the company was a prominent and well-known part of the Charara network of companies operated on Hezbollah's behalf.

1651.   Ali Ibrahim Charara, who was listed as chairman, general manager and authorized signatory for Teltac Worldwide Incorporated (Offshore) SAL, was also a co-founder of Spectrum Investment Group Holding SAL (SDGT).

1652.   Defendant BANK AUDI maintained an account for Al-Hadi Institution, a

charitable institution for disabled children owned and operated by Al-Mabarrat.

1653. While the institution provides genuine services to disabled children, it does so as part of Hezbollah's successful effort to galvanize support for its core mission and political program, i.e. Hezbollah sees Al-Mabarrat, the Martyrs Foundation, and other outreach institutions as part of its wider efforts to proselytize and harden its domestic support for its terrorist program.

1654. Defendant BANK AUDI maintained an account for Medical Equipments and Drugs International Corporation SAL (MEDIC), a Hezbollah-controlled company established in 2013 to sell pharmaceuticals and other medical products.

1655. At all relevant time Defendant BANK AUDI knew (and knows) that Medical Equipments and Drugs International Corporation SAL (MEDIC) was (and is) a Hezbollah-controlled entity.

1656. The company is owned by Atlas Holding SAL—the well-known "investment arm" of the U.S.-designated Martyrs Foundation–Lebanon, which was designated seven years before the company was established.

1657. Its management includes Qassem Muhammad Ali Bazzi—just as the other Atlas Holding SAL portfolio companies do.

1658. Defendant BANK AUDI maintained an account for Special Operations Group SAL, an arms dealing company co-founded by Hezbollah's Kamel Amhaz (SDGT).

1659. Defendant BANK AUDI's roster of Hezbollah-controlled customers reflects the bank's commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1660. This is further supported by the fact that after the demise of LCB in 2011, BANK

AUDI allowed many of LCB's blacklisted accounts identified as part of Hezbollah's financial operations to migrate to Defendant BANK AUDI.

1661. According to the Lebanese government, blacklisted Hezbollah accounts at LCB that were closed but permitted to move their account balances into parallel accounts at Defendant BANK AUDI include:

- **Al-Jiyeh for Tourism and Construction SAL**;
- **Phoenicia Shipping Offshore SAL** (SDNTK);
- **Congo Diam SPRL**;
- **Nazim Ahmad**;
- **Carol Habib**;
- **Ibrahim Issawi**;
- **Youssef Muhammad Taj al-Din**;
- **Muhammad Issam Abu Darwish**;
- **Ali Hussein Darwish**;
- **Muhammad Hussein Darwish**;
- **Nazim Khalil Ibrahim**;
- **Akram Ahmad al-Bast**;
- **Amine Bzeih**; and
- **Said Hassan Fuani**.

1662. Like all other financial institutions in Lebanon, Defendant BANK AUDI was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing numerous customers with financial services and access to U.S. dollar-clearing after their accounts at LCB were targeted for closure.

1663. Thus, there can be no doubt that Defendant BANK AUDI has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations and that the U.S. government's legal actions against LCB did not discourage Defendant BANK AUDI from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided BANK AUDI with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

1664. Defendant BANK AUDI also held accounts for and provided banking services to

Info Trust SAL and Info Trust SARL, which are both owned and controlled by Halawi Exchange Network.

1665.  As noted above, Halawi Exchange and other exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant BANK AUDI (that can then exchange the cash for LBP deposits by the Central Bank at high interest rates).

1666.  Within the parameters of The System, Halawi Exchange received lucrative commissions, Defendant BANK AUDI received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1667.  In sum, Defendant BANK AUDI fully understands its role in The System, and its roster of customers who are either prominent Hezbollah institutions, BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies (including multiple recipients of Nazim Ahmad's long-standing money laundering operations) reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

## H.    LEBANON AND GULF BANK SAL

1668.  As set forth below, Defendant LEBANON AND GULF BANK maintained accounts for the benefit of a wide spectrum of Hezbollah entities ranging from the most infamous arm of Hezbollah's "social welfare" apparatus to various nodes within Hezbollah's BAC run by (a) the Martyrs Foundation (SDGT), (b) companies controlled by Adham Tabaja (SDGT), (c) the

Tajideen family, (d) the Charara Network, (e) the Ahmad Clan network, and (f) the Joumaa Network.

1669. Defendant LEBANON AND GULF BANK held accounts for and provided financial services to:

- **Islamic Resistance Support Organization**;
- **Al-Amana SARL**;
- **Amana Plus Company SAL**;
- **Shahed Pharm Drugstore SARL**;
- **City Pharma SARL**;
- **Adham Tabaja**;
- **Al-Inmaa Engineering and Contracting SARL** (SDGT);
- **Ovlas Trading SAL (Offshore)**;
- **Ovlas Trading SA** (SDGT);
- **Leaders of Supply & Products (Offshore) SAL**;
- **Spectrum Investment Group Holding SAL**;
- **G & S Diamonds**;
- **Elissa Exchange Co. SARL**; and
- **Mecattaf SAL**.

1670. Defendant LEBANON AND GULF BANK has maintained an account for and provided material support that aided and abetted the Hezbollah-controlled "charity" widely and publicly associated with the organization: the IRSO, bank account numbers: 202-336254 and 202-329665 (nominally held by the al-Ma'rifa Society and al-Bushra Society respectively—expressly and publicly soliciting donations for the benefit of the IRSO) knowing that the IRSO was the notorious fundraising arm of Hezbollah's IJO.

1671. Defendant LEBANON AND GULF BANK maintained an account for Al-Amana SARL and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1672. Al-Amana SARL operates 12 gas stations under the name of AL AMANA in Beirut, South Lebanon and the Bekaa Valley in Lebanon.

1673.    The company is owned by the Martyrs Foundation–Lebanon (SDGT) through Atlas Holding SAL.

1674.    Defendant LEBANON AND GULF BANK maintained an account for the related company (with the same founders and management), Amana Plus Company SAL, and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1675.    Defendant LEBANON AND GULF BANK maintained an account for Shahed Pharm Drugstore SARL (with largely the same Hezbollah founders and management as Al-Amana SARL and Amana Plus Company SAL) and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1676.    Defendant LEBANON AND GULF BANK maintained an account for City Pharma (with largely the same Hezbollah founders and management as Al-Amana SARL, Amana Plus Company SAL and Shahed Pharm Drugstore SARL) and has provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Martyrs Foundation–Lebanon network of companies operated on behalf of Hezbollah's BAC.

1677. City Pharma SARL was one of several Lebanese companies controlled by Hezbollah that was caught importing counterfeit medications from Southeast Asia and transferring them to factories in Europe where they were officially labeled as having been produced in Europe.

1678.    The licenses of the 15 pharmacies were temporarily revoked, but the counterfeit

medications had reached hospitals, clinics, and pharmacies in Lebanon, where they had already been prescribed to the public.

1679.   Defendant LEBANON AND GULF BANK maintained an account for and provided vital financial services to Adham Tabaja knowing – at a minimum – that he was a senior Hezbollah leader and prominent Hezbollah project developer in Lebanon. Notwithstanding that knowledge, Defendant LEBANON AND GULF BANK loaned Mr. Tabaja money and helped him finance his projects.

1680.   Defendant LEBANON AND GULF BANK also maintained an account for and provided vital financial services to Al-Inmaa Engineering and Contracting SARL (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja, again knowing that Mr. Tabaja was a senior Hezbollah leader and prominent Hezbollah project developer in Lebanon.

1681.   Defendant LEBANON AND GULF BANK maintained an account for Ovlas Trading SAL (Offshore) which was owned and controlled by the same Tajideen network that controlled Ovlas Trading SA – designated by the U.S. Department of the Treasury on December 9, 2010.

1682.   Defendant LEBANON AND GULF BANK knew that the company was controlled by the Tajideen family and knew that the Tajideens were a prominent Hezbollah family and that they were leading Hezbollah financiers and project developers in Lebanon.

1683.   Defendant LEBANON AND GULF BANK also maintained an account for Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010, again knowing that the Tajideen family were prominent representatives of Hezbollah within The System.

1684.   Defendant LEBANON AND GULF BANK also maintained an account for Youssef Muhammad Tajideen and provided material support that aided and abetted Hezbollah, knowing it was providing vital financial services to Hezbollah through a prominent player in The System.

1685.   Defendant LEBANON AND GULF BANK also maintained an account for Leaders of Supply & Products (Offshore) SAL and provided material support that aided and abetted Hezbollah, knowing it was providing vital financial services to Hezbollah through this Tajideen Network company.

1686.   Like all other financial institutions in Lebanon, Defendant LEBANON AND GULF BANK was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Youssef Muhammad Tajideen with financial services and access to U.S. dollar-clearing after his account at LCB was targeted for closure.

1687.   Thus, there can be no doubt that Defendant LEBANON AND GULF BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant LEBANON AND GULF BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided LEBANON AND GULF BANK with an opportunity – within Hezbollah's stake in The System – to gain additional market share with impunity.

1688.   Defendant LEBANON AND GULF BANK maintained an account for Spectrum International Investment Group Holding SAL (SDGT) and provided material support that aided and abetted Hezbollah, through its role in knowingly providing financial services to this U.S.-designated, prominent and well-known part of the Charara network of companies operated on behalf of Hezbollah's BAC.

1689.   Defendant LEBANON AND GULF BANK maintained an account for and provided financial services to EBD Teltac (Offshore) SAL. It thereby aided and abetted Hezbollah knowing that it was providing vital and substantial assistance to a company controlled by Mr. Charara (SDGT).

1690.   Mr. Charara's Network has been described by the U.S. government as "a key Hizballah support network."

1691.   Defendant LEBANON AND GULF BANK also maintained an account for G & S Diamonds, Nazim Ahmad's vehicle for laundering hundreds of millions of dollars for Hezbollah. By providing access to U.S. correspondent banking for G & S Diamonds, Defendant LEBANON AND GULF BANK provided vital assistance that aided and abetted Hezbollah, knowing it was providing vital financial services to one of the most significant players laundering money within The System.

1692.   Defendant LEBANON AND GULF BANK also maintained an account for Elissa Exchange Co. SARL (SDNTK) and Mecattaf SAL, two key companies within Ayman Joumaa's narcotics trafficking network, as well as the Fayed Exchange, identified by the Lebanese government as associated with Saleh Ali Assi.

1693.   As noted above, these exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function, allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant LEBANON AND GULF BANK (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1694.   Within the parameters of The System, Elissa Exchange Co. SARL (SDNTK), Mecattaf SAL and Fayed Exchange received lucrative commissions, Defendant LEBANON AND GULF BANK received high interest returns on the Lebanese public debt it financed, and

Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1695.    Defendant LEBANON AND GULF BANK fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the bank's extensive commitment to substantially assisting Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

I.    BANQUE LIBANO-FRANÇAISE SAL

1696.    Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained accounts for and provided vital financial services to the Hezbollah-controlled "charity" widely and publicly associated with the organization: the IRSO – Account numbers: 657409.17 and 657469.171.

1697.    Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to the Hezbollah-controlled "charity" widely and publicly associated with the organization: Martyrs Foundation – Lebanon – Account number 506936-80.

1698.    Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to Ovlas Trading SA, which was designated by the U.S. Department of the Treasury on December 9, 2010.

1699.    The company is controlled by the Tajideen family—part of Hezbollah's BAC.

1700.    Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to Hoda for Touristic Services & Management

Holding SAL, a company controlled by two senior Hezbollah financiers, Abbas Abdel Latif Fawaz and Ali Youssef Charara (SDGT).

1701.   Defendant BANQUE LIBANO-FRANÇAISE SAL maintained an account for and provided vital financial services to Al-Inmaa Engineering and Contracting (SDGT), the prominent Hezbollah construction and investment arm headed by Adham Tabaja (SDGT).

1702.   Defendant BANQUE LIBANO-FRANÇAISE SAL maintained an account for and provided vital financial services to United Company for Insurance Services SARL, an insurance company established by Adham Tabaja (SDGT) in 1995.

1703.   Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to REEM Pharmaceutical SAL, a designated SDGT since 2017, owned by Muhammad Abd-al-Amir Farhat (SDGT), a Hezbollah operative with close ties to the IRGC–QF.

1704.   Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained an account for and provided vital financial services to Nazim Ahmad's Primo International SAL Offshore and to various members of the Ahmad Conflict Diamond and Money Laundering Network, including Johanna Malek and Said Hassan Fuani.

1705.   Hezbollah facilitator Saleh Ali Assi's company, Inter Aliment SAL Offshore, held a U.S. dollar-denominated account at LCB prior to December 2011 and, according to the Lebanese government, the balance in its account migrated to Defendant BANQUE LIBANO-FRANÇAISE SAL (as well as two other Defendants) after the company's account at LCB was closed.

1706.   Saleh Ali Assi's personal U.S. dollar-denominated account at LCB was closed in June 2012.

1707.   According to the Lebanese government, the balance in his account migrated to

Defendant BANQUE LIBANO-FRANÇAISE SAL (as well as three other Defendants).

1708. Hezbollah facilitator Muhammad Issam Abu Darwish and his father and his wife held accounts at LCB.

1709. All of these accounts were flagged by SGBL's 2012 audit and Lebanese government investigation.

1710. According to the Lebanese government, when LCB was finally compelled to close Mr. Abu Darwish's accounts, the account Muhammad Issam Abu Darwish held individually (no. 172517*) migrated to Defendant BANQUE LIBANO-FRANÇAISE, the account balance he held with his wife Carol Habib (no. 172689*) also migrated to Defendant BANQUE LIBANO-FRANÇAISE (and two other defendants), and the account Mr. Abu Darwish held jointly with one of his business partners (no. 173985*), Akram Ahmad al-Bast, migrated to Defendant BANQUE LIBANO-FRANÇAISE (and four other Defendants).

1711. According to the Lebanese government, when LCB was finally compelled to close the account for Ideal Development I.D. SAL, a company Muhammad Issam Abu Darwish and his wife owned jointly, and the account for International Contractors and Developers SAL which Muhammad Issam Abu Darwish owned with Akram Ahmad al-Bast, the balances for both companies migrated to accounts at Defendant BANQUE LIBANO-FRANÇAISE.

1712. Muhammad Issam Abu Darwish and his wife also owned a company jointly with Muhammad's brother, Sami Issam Abu Darwish, called Ras Beirut 1442 SAL.

1713. Ras Beirut 1442 SAL held an account at LCB until July 2011.

1714. According to the Lebanese government, when LCB was finally compelled to close the account for Ras Beirut 1442 SAL, the balance migrated to an account at Defendant BANQUE LIBANO-FRANÇAISE.

1715. Sami Issam Abu Darwish was a significant shareholder and board member in Builders International SAL, which also held an account at LCB until 2011.

1716. According to the Lebanese government, when LCB was finally compelled to close the account for Builders International SAL, the balance migrated to an account at Defendant BANQUE LIBANO-FRANÇAISE.

1717. Sami Issam Abu Darwish was a majority shareholder in S.I.M. SAL Offshore, whose chairman was Muhammad Abdallah al-Amin (SDGT). The company held account no. 44000* at LCB until August 2011.

1718. According to the Lebanese government, when LCB was finally compelled to close the account for S.I.M. SAL Offshore, the balance migrated to an account at Defendant BANQUE LIBANO-FRANÇAISE.

1719. Nazim Ahmad used Rilton Traders to launder a minimum of $100,000 in proceeds from the Ahmad family's criminal activities from Belgium (through New York) to Primo International SAL Offshore's U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1720. Nazim Ahmad used Rilton Traders to launder more than $2.3 million in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to Sleiman Ali Ahmad's personal U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1721. Nazim Ahmad used Rilton Traders and Primogems to launder more than $4 million in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to Saleh Ali Assi's personal U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1722.   Nazim Ahmad used Rilton Traders to launder more than $3 million U.S. dollars in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (all or most of the funds through New York) to Johanna Malek's personal U.S. dollar-denominated account in Lebanon at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1723.   According to the Lebanese government, when Said Hassan Fuani's account at LCB was closed in 2011, this member of the Ahmad Clan Conflict Diamond and Money Laundering Network moved his accounts to, among others, Defendant BANQUE LIBANO-FRANÇAISE SAL.

1724.   Nazim Ahmad used Rilton Traders to launder hundreds of thousands of U.S. dollar-denominated proceeds from the Ahmad family's criminal activities from Belgium to Lebanon (through New York) using an account held individually by Khodr Hussein Darwish at Defendant BANQUE LIBANO-FRANÇAISE SAL.

1725.   Defendant BANQUE LIBANO-FRANÇAISE SAL knowingly maintained accounts for and provided vital financial services to Hezbollah facilitator Ibrahim Issawi and his father-in-law, Hussein Ibrahim Bdeir.

1726.   Both men held accounts at LCB until September 2011.

1727.   According to the Lebanese government, the balance in both men's personal accounts migrated to Defendant BANQUE LIBANO-FRANÇAISE SAL (as well as other Defendants).

1728.   Ibrahim Issawi's company, Socimex SPRL, held an account at LCB until July 2011.

1729.   According to the Lebanese government, when Socimex SPRL's account at LCB was closed, it migrated to Defendant BANQUE LIBANO-FRANÇAISE SAL.

1730.   According to the Lebanese government, Nabila Yaq'ub Wazni, who was a partner

in Soficom SPRL with Muhammad Hussein Darwish, held two accounts at LCB that migrated to BANQUE LIBANO-FRANÇAISE and another bank after LCB closed the accounts in August and September 2011.

1731. Defendant BANQUE LIBANO-FRANÇAISE knowingly maintained an account for and provided vital financial services to Metro Trading Company SAL Offshore, a company controlled by senior BAC operative Imad Bakri.

1732. According to the Lebanese government, Mr. Amine Bzeih belonged to Khalil Nazem Ibrahim's network, and when his account was closed in August 2011, it migrated to three Defendants, including BANQUE LIBANO-FRANÇAISE SAL.

1733. SOGEAC SPRL, a company part-owned by Muhammad Hussein Darwish, held an account at LCB which was shuttered in August 2011.

1734. According to the Lebanese government, the account balance migrated to SOGEAC's accounts at Defendants BLOM BANK and BANQUE LIBANO-FRANÇAISE.

1735. Mustafa Faysal Ahmad was identified by the Lebanese government as one of the individuals with accounts at LCB who were affiliated with Hezbollah.

1736. LCB closed Mustafa Faysal Ahmad's account no. 173642* at LCB in June 2012.

1737. Mustafa Faysal Ahmad also held U.S. dollar-denominated account no. 172488* jointly with his mother, May Kamel Darwish Fawaz.

1738. According to the Lebanese government, that account remained open at Defendant SGBL.

1739. Yet, despite all the controversy surrounding LCB's role in laundering money for Hezbollah, according to the Lebanese government the balance for this account migrated to BANQUE LIBANO-FRANÇAISE among other Defendants.

1740.   Defendant BANQUE LIBANO-FRANÇAISE's roster of Hezbollah-controlled customers reflects the Bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1741.   Moreover, subsequent to the U.S. government's filing of its civil lawsuit against LCB, U.S. investigators learned that LCB personnel moved assets to other banks in Lebanon to hide the assets from the United States government.

1742.   In August 2012, the Southern District of New York filed an 18 U.S.C. § 981K action against five correspondent banks in the United States that were doing business with Defendant BANQUE LIBANO-FRANÇAISE that had clandestinely received $150 million from LCB after commencement of the U.S. government action against LCB.

1743.   As a result of the 981K action, Defendant BANQUE LIBANO-FRANÇAISE transferred $150 million to the United States Marshals Service account in New York, and in June 2013, the U.S. Attorney's Office for the Southern District of New York settled the civil forfeiture action against LCB, requiring it to forfeit $102 million of the $150 million frozen to the United States.

1744.   As detailed above, Defendant BANQUE LIBANO-FRANÇAISE allowed Nazim Ahmad's network to launder millions of dollars through Defendant BANQUE LIBANO-FRANÇAISE's correspondent banks in New York, and Mr. Ahmad's money laundering activities were prominently noted in the U.S. government's civil complaint against LCB.

1745.   Like all other financial institutions in Lebanon, Defendant BANQUE LIBANO-FRANÇAISE was well aware of the LCB scandal and the forced closure of Hezbollah-related

accounts at LCB but nonetheless agreed to continue providing numerous customers with financial services and access to U.S. dollar-clearing after their accounts at LCB was targeted for closure.

1746.  Finally, according to U.S. government officials, Defendant BANQUE LIBANO-FRANÇAISE was one of several banks in Lebanon that worked with LCB personnel to hide LCB's assets from the United States government following the proceedings the U.S. initiated against that institution.

1747.  In sum, Defendant BANQUE LIBANO-FRANÇAISE fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1748.  Thus, there can be no doubt that Defendant BANQUE LIBANO-FRANÇAISE has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BANQUE LIBANO-FRANÇAISE from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant BANQUE LIBANO-FRANÇAISE with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

## J.  BANK OF BEIRUT SAL

1749.  Defendant BANK OF BEIRUT has maintained accounts for and provided material support that aided and abetted Hezbollah's BAC.

1750.  Defendant BANK OF BEIRUT maintained an account for Youssef Muhammad

346

Tajideen and provided material support that aided and abetted Hezbollah, knowing that the Tajideen family were prominent representatives of Hezbollah within The System.

1751.   Defendant BANK OF BEIRUT was aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Youssef Muhammad Tajideen with financial services and access to U.S. dollar-clearing.

1752.   The same is true for the Tajideen family's company, Galaxy Flame Trading SAL Offshore, which held account no. 43286* at LCB that was closed in August 2011 before migrating to Defendant BANK OF BEIRUT after the forced closure of Hezbollah-related accounts at LCB.

1753.   Leaders of Supply & Products (Offshore) SAL, another Tajideen family company, also held an account at LCB prior to 2011 and maintained accounts at Defendant BANK OF BEIRUT even after the company's account at LCB was closed.

1754.   Defendant BANK OF BEIRUT also maintained an account for Interafrica Trading Company ITC SAL Offshore, part of the group of companies controlled by the Darwish Network.

1755.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Mustafa Reda Darwish Fawaz (SDGT), a prominent and well-known member of Hezbollah's IJO who has supported the organization's communications, surveillance, and arms dealing activities in West Africa.

1756.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Compu House SARL, the Hezbollah-controlled technology importer, founded and majority owned by Sultan Khalifa As'ad, Deputy Chairman of the Executive Council for Municipal Affairs, former head of Hezbollah's Finance Unit and former director of Jihad al-Bina.

1757.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Trust Compass Insurance SAL, the Hezbollah-controlled insurance company

that insures various Hezbollah-controlled hospitals and owned a significant holding in Adham Tabaja's Fun World Company SAL and LCB.

1758.   Defendant BANK OF BEIRUT also maintained an account for and provided vital financial services to Mercury Development Offshore SAL which was controlled by Mustafa Faysal Ahmad and his family. The Lebanese government identified both Mustafa Faysal Ahmad and Mercury Development Offshore SAL's accounts at LCB as Hezbollah-related accounts.

1759.   Defendant BANK OF BEIRUT has also knowingly held accounts and provided vital financial services to Medical Equipments and Drugs International Corporation SAL MEDIC, another entity that is part of Hezbollah's network of pharmaceutical companies. Although the company was established after the period relevant to this action, because it is owned by Atlas Holding SAL – i.e. Martyrs Foundation–Lebanon – Defendant BANK OF BEIRUT's willingness to provide material support to one of Hezbollah's most prominent organizations in recent years confirms that BANK OF BEIRUT continues to provide material support to Hezbollah even when its customers' ties to Hezbollah are glaring.

1760.   Nazim Ahmad used Rilton Traders to launder more than $50,000 U.S. dollars from Belgium through U.S. correspondent banks to the Defendant BANK OF BEIRUT account owned by Hijazi Trading Establishment.

1761.   Defendant BANK OF BEIRUT maintained an account for Halawi Exchange Co., which the U.S. Department of the Treasury has identified as a "substantial threat to the U.S. and international financial systems, given its extensive illicit financial activity on behalf of a variety of international narcotics trafficking and money laundering networks."

1762.   In determining that Halawi Exchange Co. was a foreign financial institution of "primary money laundering concern," the U.S. Department of the Treasury further found that

"Halawi Exchange is known to have laundered profits from drug trafficking and cocaine-related money laundering networks for a leading Hizballah official and narcotics trafficker. Halawi Exchange has also been routinely used by other Hizballah associates as a means to transfer illicit funds."

1763.   Despite Halawi Exchange's blatantly high-risk profile, churning millions of dollars in cash from Africa and moving funds to conflict zones in the Middle East, Defendant BANK OF BEIRUT continued to facilitate its activities.

1764.   According to the Lebanese government, when LCB was forced to close Mr. Hijazi's account at LCB in 2011, the balance migrated to Defendants FENICIA BANK and BANK OF BEIRUT.

1765.   Like all other financial institutions in Lebanon, Defendant BANK OF BEIRUT was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing Mr. Samir Hijazi, Mercury Development Offshore SAL, Galaxy Flame Trading SAL Offshore, Leaders of Supply & Products (Offshore) SAL, and others, with financial services and access to U.S. dollar-clearing after their accounts at LCB were targeted for closure.

1766.   Defendant BANK OF BEIRUT also maintained an account for Halawi Exchange a key conduit for Ayman Joumaa's narcotics trafficking network.

1767.   As noted above, Halawi Exchange and other  exchange houses deal in high-volume bulk cash transactions, and they perform a vital gateway function allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant BANK OF BEIRUT (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1768. Within the parameters of The System, Halawi Exchange received lucrative commissions, Defendant BANK OF BEIRUT received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engage in trade-based money laundering on an unprecedented scale.

1769. Defendant BANK OF BEIRUT fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the Bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1770. Thus, there can be no doubt that Defendant BANK OF BEIRUT has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BANK OF BEIRUT from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant BANK OF BEIRUT with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

## K.     BANK OF BEIRUT AND THE ARAB COUNTRIES SAL

1771. Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES maintained accounts for and provided material support that aided and abetted Hezbollah's BAC.

1772. Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly maintained accounts (including U.S. dollar-denominated accounts) for and provided vital financial services to the Martyrs Foundation – Lebanon which is Hezbollah-controlled and publicly

affiliated with Hezbollah.

1773.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES has knowingly held accounts and provided vital financial services to Al-Inmaa Engineering and Contracting SARL and Al-Inmaa Group for Touristic Projects SARL, both designated SDGTs and controlled by Adham Tabaja, the co-head of Hezbollah's BAC.

1774.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES provided this assistance to Adham Tabaja's Network knowing – at a minimum – that he was a senior Hezbollah leader and prominent Hezbollah project developer in Lebanon.

1775.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES has held accounts and provided vital financial services to Ovlas Trading SA (SDGT), the Lebanese arm of the Tajideen family network of companies, knowing that the Tajideen family were prominent representatives of Hezbollah within The System.

1776.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held a U.S. dollar-denominated account at its Hamra branch for New Line Exchange Trust Company SAL, the currency exchange company established by Ayman Joumaa, the notorious narcotics trafficker and Hezbollah financier. New Line Exchange Trust Company SAL was designated by the U.S. Treasury Department on January 26, 2011 for its role in laundering narcotics proceeds for Mr. Joumaa's organization. That account has been used to clear U.S. dollars through New York on behalf of New Line Exchange and Ayman Joumaa.

1777.  Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES held an account for Fayed Exchange Co. – a Lebanese currency exchange house identified by the Lebanese government as belonging to Saleh Ali Assi's network of companies tied to Hezbollah.

1778.  According to the Lebanese government, when Fayed Exchange Co.'s account at

LCB was closed in June 2011, the account balance migrated to the company's existing account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES.

1779. As noted above, exchange houses like Fayed Exchange Co. deal in high-volume bulk cash transactions, and they perform a vital gateway function allowing massive infusions of Hezbollah cash (in U.S. dollars) to flow into Lebanon, and be deposited into banks like Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES (that exchange the cash for LBP deposits by the Central Bank at high interest rates).

1780. Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES understood its role and actively agreed to participate in providing Hezbollah a gateway to transit massive infusions of cash (primarily in U.S. dollars) that flow into and through Lebanon.

1781. Within the parameters of The System, New Line Exchange (SDNTK) and Fayed Exchange received lucrative commissions, Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES received high interest returns on the Lebanese public debt it financed and Hezbollah's BAC received access to the U.S. financial system that allowed it to engaged in trade-based money laundering on an unprecedented scale.

1782. Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Trade Point International SARL, a designated SDGT (2016) controlled by Hezbollah financier and arms dealer, Muhammad Mustafa Nur-al-Din (SDGT).

1783. Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Hyram Maritime SAL, part of the Tajideen family network of companies.

1784. Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held

accounts and provided vital financial services to Société Allure SARL, a company controlled by Khalil Nazem Ibrahim.

1785.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Vatech SARL, an SDGT controlled by Fadi Hussein Serhan (also an SDGT).

1786.   Mr. Serhan is a Hezbollah procurement agent who serves as the general manager of Vatech SARL, which was used to purchase sensitive technology and equipment for Hezbollah.

1787.   Mr. Serhan has purchased unmanned aerial vehicles (UAVs) and accessories, and various electronic equipment from companies in the United States, Europe, Asia, and the Middle East.

1788.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES knowingly held accounts and provided vital financial services to Teltac Worldwide Incorporated (Offshore) SAL, headed by Ali Ibrahim Charara, who serves as its chairman and CEO.

1789.   Ali Ibrahim Charara is also a co-founder of Spectrum Investment Group Holding SAL, the U.S.-designated company led by Hezbollah financier, Ali Youssef Charara (SDGT).

1790.   According to the Lebanese government, when Teltac Worldwide Incorporated (Offshore) SAL's account at LCB was closed in June 2012, the account balance migrated to the company's existing account at Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES.

1791.   Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the Bank's extensive commitment to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means

to evade U.S. efforts to confront Hezbollah's world-wide operations.

1792. Thus, there can be no doubt that Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations, and that the U.S. government's legal actions against LCB did not discourage Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant BANK OF BEIRUT AND THE ARAB COUNTRIES with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

## L. JAMMAL TRUST BANK SAL

1793. Defendant JAMMAL TRUST BANK has maintained an account for and provided vital financial services to the IRSO, an SDGT that it knows to be widely and publicly associated with Hezbollah and its IJO.

1794. The IRSO has openly advertised and solicited donations published with its JAMMAL TRUST BANK account 140/028355.28/0/5 at its branch in Ghobeiry (Hezbollah's stronghold in the southern suburbs of Beirut).

1795. As noted above, the IRSO is the most explicit and notorious fundraising arm of Hezbollah's IJO.

1796. Defendant JAMMAL TRUST BANK has knowingly held an account and provided vital financial services to Car Escort Services (Offshore) SAL, the prominent Hezbollah automotive company which is itself an SDGT and is owned by three prominent members of Hezbollah's BAC, Ali Muhammad Kharrubi, Ali Youssef Charara and Muhammad Ibrahim Bazzi – all designated SDGTs by the U.S. Department of the Treasury.

1797.  Defendant JAMMAL TRUST BANK has knowingly held accounts and provided vital financial services to Spectrum International Investment Holding SAL and Spectrum Investment Group Holding SAL—both designated SDGTs and both controlled by well-known Hezbollah financier and BAC leader, Ali Charara.

1798.  Defendant JAMMAL TRUST BANK has knowingly held accounts and provided vital financial services to New All Pharma SARL, part of Hezbollah's network of pharmaceutical companies.

1799.  Defendant JAMMAL TRUST BANK has also knowingly held accounts and provided vital financial services to Medical Equipments and Drugs International Corporation SAL MEDIC, another entity that is part of Hezbollah's network of pharmaceutical companies. Although the company was established after the period relevant to this action, because it is owned by Atlas Holding SAL – i.e. Martyrs Foundation–Lebanon – Defendant JAMMAL TRUST BANK's willingness to provide material support to one of Hezbollah's most prominent organizations in recent years confirms that Defendant JAMMAL TRUST BANK continues to provide material support to Hezbollah even when its customers' ties to it are glaring.

1800.  Defendant JAMMAL TRUST BANK also knowingly held accounts and provided vital financial services to Musa Muhammad Ahmad that received illicit funds in U.S. dollars directed by Nazim Ahmad's network via Rilton Traders in Dubai and Primogems through correspondent banks in the United States.

1801.  In sum, Defendant JAMMAL TRUST BANK fully understands its role in The System, and its roster of customers who are either notorious Hezbollah fundraising institutions or BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies reflects the bank's extensive commitment to substantially assist Hezbollah's operations (including – in the case of the

IRSO – explicitly its violent terrorist activities) by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

## M. FENICIA BANK

1802. Defendant FENICIA BANK agreed to participate in The System, maintained accounts for and provided material support that aided and abetted Hezbollah's BAC operatives and companies, and laundered millions of U.S. dollar-denominated funds on Hezbollah's behalf.

1803. For example, according to the U.S. Department of the Treasury, Defendant FENICIA BANK allowed its Abbassieh branch in Lebanon to facilitate the movement of more than a million dollars in narcotics sales proceeds for Ayman Joumaa and Abbas Hussein Harb.

1804. In June 2012, Ibrahim Chebli, manager of the Abbassieh branch of FENICIA BANK in Lebanon, was designated an SDNTK by the U.S. Department of the Treasury for facilitating the movement of millions of dollars for (among others) for Ayman Joumaa's narcotics trafficking network.

1805. According to FinCEN, Mr. Chebli regularly coordinated and executed financial transactions—including bulk cash transfers—that were processed through the Halawi Exchange.

1806. Nazim Ahmad used Rilton Traders to launder more than $1.4 million in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to the account of Abd al-Ilah Mahmud Ashur in Lebanon. Mr. Ashur is a major shareholder in Defendant FENICIA BANK, and the funds were also deposited in one of his accounts at Defendant FENICIA BANK.

1807.   Nazim Ahmad used Rilton Traders to launder more than $90,000 in proceeds from the Ahmad family's criminal activities, moving funds from Belgium in U.S. dollars (through New York) to the FENICIA BANK accounts of Randa Muhammad Malek in Lebanon.[105]

1808.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to the Elissa Exchange both before and after it was designated an SDNTK, even accepting deposits moved from LCB *after* that bank was forced to shutter its Hezbollah accounts and cease operations.

1809.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to the Phoenicia Shipping Offshore SAL (SDNTK) (owned by Elissa Holding and Ali Muhammad Kharrubi) both before and after it was designated an SDNTK, even accepting deposits moved from LCB *after* that bank was forced to shutter its Hezbollah accounts and cease operations.

1810.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to Rmeiti Group SAL Offshore knowing that the Rmeiti Network was a critical bulk cash conduit for laundering narcotics trafficking proceeds on behalf of Hezbollah's BAC.

1811.   Defendant FENICIA BANK also maintained accounts for several of Adham Tabaja's (SDGT) key BAC companies knowing – at a minimum – that Mr. Tabaja was a prominent Hezbollah leader involved in numerous widely-publicized development projects on Hezbollah's behalf, including:

- **Al-Inmaa Engineering and Contracting SARL** (SDGT);

- **City Park SARL**;

---

[105]     Rilton Traders also transferred funds through New York to Isam Abd al-Amir Izz al-Din's account at Defendant FENCIA BANK. LCB also maintained account no. 172782* for Isam Abd al-Amir Izz al-Din until it was closed in August 2012.

- **Fun World Company SAL**, whose account at LCB was forcibly closed in August 2011 and its balance split between FENICIA BANK and another non-Defendant bank;

- **Fantasy World SARL**;

- **Al-Taaoun Medical SAL**; and

- **New Land SARL**, whose account at LCB was forcibly closed in December 2011 and its balance split between FENICIA BANK and MIDDLE EAST AND AFRICAN BANK.

1812.  Defendant FENICIA BANK also provided financing to Mr. Tabaja and his network.

1813.  When LCB was forced to close the account for K.I. Group SAL Offshore in June 2011 because of its identification with Hezbollah, the balance in its account at LCB migrated to the company's accounts at Defendants FENICIA BANK, SGBL and another non-Defendant bank.

1814.  Likewise, when LCB was forced to close the accounts of Issawi network companies controlled by the Bdeir family such as Al-Jiyeh for Tourism and Construction SAL and La Voile Sur Mer SARL in September 2011 because of their identification with Hezbollah, the balance in their accounts at LCB migrated to the respective companies' accounts at Defendant FENICIA BANK.

1815.  The same thing happened yet again when LCB was forced to close the account for Hussein Issawi in August 2011 because of his role on Hezbollah's behalf: the Lebanese government concluded that Mr. Issawi's account migrated to FENICIA BANK and another non-Defendant bank.

1816.  According to the Lebanese government, when Said Hassan Fuani's account at LCB was closed in 2011, this member of the Ahmad Clan Conflict Diamond and Money Laundering Network moved his accounts to, among others, Defendant FENICIA BANK.

1817.   According to the Lebanese government, when Samir Hijazi's account at LCB was closed in 2011, this member of the Ahmad Clan Conflict Diamond and Money Laundering Network and Khalil Nazem Ibrahim Network, moved his account to Defendant FENICIA BANK.

1818.   Defendant FENICIA BANK maintained an account for and provided financial services to Kassem Tajideen (SDGT), knowing that he was a prominent and well-known Hezbollah financier.

1819.   Defendant FENICIA BANK also knowingly held an account for and provided vital financial services to Said Jamil Muhammad, who co-founded Aya SAL Offshore with Muhammad Abdallah al-Amin (SDGT).

1820.   According to the Lebanese government, when Said Jamil Muhammad's account at LCB was closed in 2012 (with a large negative balance), he moved his accounts to, among others, Defendant FENICIA BANK.

1821.   Both Ali Ahmad Choueib's (whose mother is a member of the Issawi family) personal account no. 170811* at LCB and the account (no. 174321*) of his Turkish trading company, Golden Eye Trading Ithalat Ihracat Ltd. were identified by Lebanese authorities as Hezbollah-related and closed as part of SGBL's acquisition of LCB. The account balances for both accounts (which are connected to Imad Abdul Reda Bakri's network) migrated to Defendant FENICIA BANK.

1822.   Like all other financial institutions in Lebanon, Defendant FENICIA BANK was well aware of the LCB scandal and the forced closure of Hezbollah-related accounts at LCB but nonetheless agreed to continue providing numerous customers with financial services and access to U.S. dollar-clearing after their accounts at LCB was targeted for closure.

1823.   Added to those facts, it is worth repeated that at least two FENICIA BANK board

members – Abd al-Ilah Mahmud Ashur  and  Yusuf Abbas Mer'i – received a total of more than $1.4 million from Nazim Ahmad via Rilton Traders, further manifesting the bank's participation in the System and its management's direct ties (and benefit) from the BAC money laundering pipeline.

1824.   In sum, Defendant FENICIA BANK fully understands its role in The System, and its roster of customers who are either BAC operatives, BAC facilitators or Hezbollah/BAC-controlled companies (including multiple recipients of Nazim Ahmad's long-standing money laundering operations) reflects the bank's willingness to substantially assist Hezbollah's operations by providing financial services, including critical access to U.S. dollar-clearing, the U.S., and international financial systems, and essential means to evade U.S. efforts to confront Hezbollah's world-wide operations.

1825.   Thus, there can be no doubt that Defendant FENICIA BANK has known for years that it plays a vital role in helping Hezbollah and its IJO collect, launder, invest and distribute funds needed to support Hezbollah's operations and that the U.S. government's legal actions against LCB did not discourage Defendant FENICIA BANK from continuing to engage in this conduct. On the contrary, the flight of Hezbollah accounts from LCB provided Defendant FENICIA BANK with an opportunity to gain additional market share in Hezbollah's financial operations with impunity.

## X.      THE IRGC DEPLOYED HEZBOLLAH'S SIGNATURE WEAPONS IN IRAQ

1826.   One of the first indications that Hezbollah operatives might be present in Iraq after the U.S.-led invasion came in an article in *The New York Time*s published in November 2003 that stated:

> Both American and Israeli intelligence have found evidence that Hezbollah operatives have established themselves in Iraq, according to current and former United States officials. Separately, Arabs in Lebanon and elsewhere

who are familiar with the organization say Hezbollah has sent what they describe as a security team of up to 90 members to Iraq. The organization has steered clear of attacks on Americans, the American officials and Arabs familiar with Hezbollah agree.

1827.    The reluctance to attack Americans was short-lived. During the next twelve months, Hezbollah would begin to gradually introduce both weapons and operational training into the Iraqi theatre that roughly corresponded to the U.S. military's effort to improve the armor protection of its vehicles.[106]

1828.    Beginning in late 2004 and into early 2005, the U.S. military began deploying up-armored HMMWVs equipped with one inch of rolled homogeneous armor ("RHA") on all doors and one-inch thick ballistic glass windows that were capable of absorbing and/or deflecting shrapnel from basic (non-technologically advanced) IEDs and small arms fire.

1829.    With the increasing ubiquity of the "up-armored" HMMWVs, improvised roadside bombs became a much less effective weapon against U.S. personnel because their blasts and shrapnel could not penetrate American vehicles' increased armor plating.

1830.    In response, the IRGC–QF directed Hezbollah to begin supplying their proxies with increasing numbers of EFPs that could defeat this newly-introduced American armor.

1831.    An EFP warhead is normally constructed with a 3- to 12-inch diameter steel pipe with one end sealed with a welded steel plate and a priming hole for the insertion of a detonator. The open end of the pipe is then packed with high-energy ("HE") explosive and closed with a copper plate.

1832.    After detonation, the explosion creates enormous pressure that accelerates the liner (copper plate) while simultaneously reshaping it into a molten slug.

---

[106]    When American troops first invaded Iraq in 2003 and occupied Baghdad, generally only the U.S. military police possessed armored vehicles.

1833.    The EFPs Hezbollah deployed in Iraq were generally made with precision manufactured concave copper disk liners and HE explosives, such as Iranian-manufactured C-4, packed behind the liner.

1834.    As with any explosive device, EFPs had to be first armed, then triggered.

1835.    "Arming" an EFP can best be described as transitioning the weapon from a passive or standby mode into an active, or ready mode. Once armed, an EFP is primed to detonate upon the occurrence of a given event.

1836.    That event is known as the "trigger."

1837.    In Iraq, EFPs were usually armed by remote frequency ("RF") or (insulated) command wire ("CW") capable of carrying a low-level electric charge with a maximum range of around 100 meters.

1838.    RF arming could be achieved using something as simple as a key-fob or as complex as a dual-tone multi-function reference board using the inside of a cell phone.

1839.    As noted above, a key signature of Hezbollah's TTP was the use of PIR devices in conjunction with EFPs.

1840.    Once remotely armed, by RF or command wire, an EFP would be triggered when the PIR would, for example, detect the heat signature of a passing vehicle and send an electrical current that set off the explosion within the EFP's casing.

1841.    In essence, passing American military vehicles would themselves trigger the EFPs.

1842.    To defeat Hezbollah's PIR triggers, Coalition Forces developed numerous counter-measures – just as the IDF had some years earlier.

1843.    For example, the American military developed a device named a "Rhino" that consisted of a flat piece of metal at the end of a boom that was attached to the front of the combat

vehicle. The metal was heated by the vehicle's engine, creating a heat signature that simulated the heat of the vehicle. When effective, the Rhino would cause an EFP's PIR trigger to mistake the Rhino for the vehicle itself, resulting in the device's premature detonation.

1844.   Hezbollah, however, had gained extensive experience countering the IDF's tactics and quickly directed its agents in Iraq to recalibrate the aim of their EFPs, angling them backward to account for the recent deployment of heat-generating decoys.

1845.   While such emplacing techniques might appear elemental, in hostile conditions they are far more complex, requiring a keen understanding of average U.S. convoy speeds, the extension lengths of the rhinos, the distance of the EFP from the target, and other battlefield variables.

1846.   To evaluate the problem set presented, make targeting adjustments, and communicate them across the battle space effectively, is enormously challenging, particularly since the Hezbollah-directed cells were subject to surveillance, arrest and targeting.

1847.   Yet, notwithstanding these complexities, with the help and direction of Hezbollah, its local Shi'a terror cells began successfully emplacing EFP arrays at precise angles that countered the Rhinos and resumed inflicting maximum damage to these moving, armored targets.

1848.   In addition to EFPs, the IRGC–QF provided their proxies in Iraq with a variety of other lethal weapons that Hezbollah had previously tested against the IDF in Lebanon.

1849.   During the 1980s and 1990s, Hezbollah frequently deployed 107 millimeter ("mm") and 122mm artillery rockets (frequently referred to as "Katyusha rockets") against IDF positions in southern Lebanon and against Israeli border towns in northern Israel.

1850.   IRGC–QF and Hezbollah proxies in Iraq trained and directed by Hezbollah used these same types of artillery rockets in their indirect fire attacks on U.S. and Coalition Forward

Operating Bases and MNF–I Headquarters in the Green Zone.

1851.   Throughout 2004-2011, Hezbollah continuously adapted and modified tactics to adjust to U.S. Military countermeasures and then instituted those adaptations through the Iraqi terror cells they directed.

## XI.   HEZBOLLAH'S CRITICAL ROLE IN TERRORIST ATTACKS IN IRAQ

1852.   Initially, the Hussein government sponsored the late Ayatollah Muhammad Sadiq al-Ṣadr, a leading Shi'a cleric in Iraq during much of Saddam Hussein's rule, as a relatively moderate counterbalance to the influence of more radical Shi'a religious leaders. The Hussein regime allowed Sadiq al-Sadr to appoint imams to lead mosques in hundreds of towns and cities.

1853.   Sadiq al-Sadr used this opportunity to develop a cohesive network under his guidance and control. He was particularly popular in the Shi'a slums of Baghdad and Basra and had established a network of mosques and social institutions that attempted to mirror Hezbollah's development in Lebanon.

1854.   Unlike many of his Shi'a clerical peers, Mr. Sadr was not particularly favorably disposed toward Iran, even after the Islamic revolution in 1979, remaining instead an Arab nationalist and supporting Arab control of the seminaries of Najaf, traditionally dominated by senior clerics who are either Iranian-born or of Iranian descent.

1855.   Nonetheless, the Hussein regime ultimately came to regard Sadr as a political threat and assassinated him and his two oldest sons, leaving his youngest son, Muqtada al-Sadr, as the de facto successor to what became known as the Sadrist Movement.

1856.   The Sadrist Movement commanded the loyalty of perhaps millions of Iraqi Shi'a, but under the Hussein regime's rule it had no military capacity; it was almost exclusively a social and political movement.

1857.   The 2003 U.S.-led invasion freed Muqtada al-Sadr and his followers from the

constraints placed on them by the Hussein regime, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community.

1858.   At the invitation of Iran's Supreme Leader, Ayatollah Khamenei, Mr. Sadr and his key deputies were formally received in Iran in June 2003, shortly after the U.S. invasion.

1859.   General Abdul Reza Shahlai—a deputy commander of the IRGC–QF—served as the "chief of protocol" for the visit and Qasem Soleimani, IRGC–QF Commander, served as host to the Sadr delegation.

1860.   Sadr also met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC–QF wanted to financially support the Sadrist movement.

1861.   Shortly thereafter, the IRGC dispatched two of Hezbollah's most senior terror operatives, Imad Mughniyah and Mustafa Badr al-Din, to help organize and birth the creation of the Sadrist Movement's armed faction.

1862.   On July 18, 2003, Sadr gave a sermon in the Great Mosque in Kufa in which he branded the newly-formed Iraqi government "nonbelievers" and announced the formation of a religious army to counter the government called "Jaysh al-Mahdi" or "JAM" – the Mahdi Army.

1863.   Hezbollah operatives were present on the ground in Iraq following the U.S. invasion in 2003 and were directly involved in providing training and support to JAM from its inception.

1864.   JAM featured several attractive assets for Iran and Hezbollah, including a strong base of support among the poorest and most disenfranchised Shi'a communities, a network of mosques and social institutions, and a vast supply of young, desperate men. However, it was an unruly and unprofessional organization ill-suited to confronting an advanced military in the way Hezbollah had successfully attacked the IDF.

1865.   Imad Mughniyah and Mustafa Badr al-Din worked closely both with Sadr and his associates and the Iranian-sponsored Badr Corps (made up of Iraqi Shi'a who opposed the Hussein regime during the 1980–1988 Iran-Iraq War), but Hezbollah remained cautious and did not encourage either Badr or JAM to immediately confront Coalition Forces.

1866.   As former Badr Corps leader and Special Group Kata'ib Hezbollah ("KH") (discussed below) founder Abu Mahdi al-Muhandis (discussed below) would later explain to the Hezbollah-affiliated channel *Al-Mayadeen*:

> **Al-Muhandis**: Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq.
>
> **Host**: Training Iraqis here, to fight the Americans?
>
> **Al-Muhandis**: Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003.
>
> **Host**: After 2003…
>
> **Al-Muhandis**: They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role.

1867.   The same al-Muhandis was the mastermind behind the 1983 Kuwait bombings, and later became the founder of KH in Iraq and an advisor to Qasem Soleimani, the commander of the IRGC–QF. Mustafa Badr al-Din, one of Hezbollah's leading bomb-makers at the time, was arrested by Kuwait after the attacks and convicted for his role in the bombings. He later became a leading figure in Hezbollah after his escape from a Kuwaiti prison.

1868.   As previously noted, in 2008, Imad Mughniyah was killed in Syria.

1869.   Ten years after his death, several of his former protégés gathered at an elaborate ceremony to pay tribute to him and extol his contributions to the terror campaign he helped launch in Iraq.

1870.   At an event commemorating the anniversary of his death, on February 23, 2018, several Iraqi Shi'a notables spoke, including Abu Mahdi al-Muhandis, who declared: "The martyr Mughniyah is still present in all fields of confrontation as [part of] a jihadist school that terrorized the enemies...."

1871.   Qais Khazali (discussed below), also in attendance, asserted that: "The pillars of the Islamic Resistance that took place in Iraq were the fruit of the martyr Mughniyah."

1872.   He went on to say:

> I got to know him in 2003 or 2004. At that time when I met him, I didn't know that he is Imad Mughniyeh. I only knew him as "Haj Radwan." Imad Mughniyah was the person behind the Iraqi Resistance against the American occupation of Iraq. The first generation of the commanders of the Resistance were the product of the Mughniyah's training.

1873.   Although Mughniyah was a key figure in Hezbollah's operational activities in Iraq, its political and diplomatic role in guiding Iraqi Shi'a factions was of equal, if not greater, importance.

1874.   For this purpose, Hezbollah tapped a senior member of its Political Council, Muhammad Kawtharani, to be responsible for the organization's Iraq portfolio. As the U.S. Department of the Treasury noted when it designated him an SDGT on August 22, 2013, Mr. Kawtharani was:

> [T]he individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.

1875.   Mr. Kawtharani was an inspired choice because he not only previously lived in Iraq

but had also been a pupil of Ayatollah Muhammad Sadiq al-Ṣadr.

1876.    Mr. Kawtharani wasted no time in contacting one of Sadr's most trusted deputies, Mustafa al-Yaqubi, soon after (and possibly before) the overthrow of the Saddam Hussein regime by Coalition Forces in 2003.

1877.    Mustafa al-Yaqubi had frequent contact with Mr. Kawtharani through the years and appears to have served as a primary channel for communications between Hezbollah and Sadr and his JAM militia.

1878.    From June 2003 through August 2004, at Iran's direction, Hezbollah's role was primarily to organize and train JAM gunmen and try to instill some discipline and professionalism into the organization so that it could effectively threaten U.S. and Coalition Forces across Iraq. Due to its conflict with Israel in Lebanon, Hezbollah possessed hard-earned specialized knowledge on how to deploy new tactical and technological countermeasures against a modern army.

1879.    Hezbollah was the obvious and natural choice for implementing the IRGC's policies in Iraq.

1880.    First, Hezbollah operatives were, like the Iraqi Sadrists, ethnically Arabs and spoke Arabic, whereas the Iranian IRGC members were ethnically Persian and spoke Farsi.

1881.    Second, there were many long-standing personal and intellectual connections between Hezbollah and the Sadrist Movement.

1882.    According to a 2007 Multi-National Forces – Iraq ("MNF–I") report, "members of the Sadr movement have deep respect for Lebanese Hezbollah…. Hezbollah sends trainers to Iran to train Iraqi fighters on EFPs."

1883.    For instance, Muqtada al-Sadr's father-in-law was Grand Ayatollah Muhammad Baqir al-Sadr, who was a contemporary of Hezbollah's spiritual leader, Muhammad Fadlallah.

1884. Hezbollah's leader, Hassan Nasrallah, received his religious education in Lebanon from a seminary that taught Baqir al-Sadr's teachings on Shi'ism.

1885. Despite the affinity between Hezbollah and the leaders of the Sadrist Movement, when Hezbollah slowly began to introduce EFPs into Iraq in small numbers at the IRGC's direction (during the late autumn of 2003 and into the first half of 2004), it did so through Iran's other, more established proxy, the Badr Corps.

1886. Unlike JAM, the Badr Corps had prior (and extensive) military training from, and its operatives had long-standing operational ties to, both the IRGC–QF and Hezbollah.[107]

1887. Most notable among the Badr Corps cells was the so-called "Sheibani Network" named after Hamid A'atabi al-Sheibani, also known as Abu Mustafa al-Sheibani.

1888. Accordingly, when Hezbollah introduced its most effective anti-armor weapon into Iraq, it began by training Badr Corp operatives on the emplacement of single EFPs with relatively primitive initiation systems—a process that allowed Hezbollah to test the weapons, assess the capabilities of its Iraqi proxies, and probe Coalition Forces' responses to the threat.

1889. According to the Chilcot Report released by the British Government, "[t]he first IED attack in Iraq using an Explosively Formed Projectile (EFP) took place against a UK Warrior vehicle in al-Amara in May 2004."

1890. By this method of slowly introducing the weapon system and directing its use against British forces, Hezbollah was able to assess the capabilities of the Badr Corp personnel, assess the effectiveness of its tactics, techniques, and procedures and adjust those TTPs based on how first British (and later American) forces responded.

---

[107] The Badr Corps had long established four geographic commands inside Iraq, all with experience conducting attacks against the Hussein regime. The Baghdad-based command was supervised from an IRGC base in nearby Bakhtaran, Iran by Abu Mustafa al-Sheibani, whose extensive smuggling routes were used both before and after the 2003 U.S.-led invasion for transporting weapons, men and money from Iran into Iraq.

1891.   A July 2004 UK Joint Intelligence Committee ("JIC") assessment noted: "We also judge that Lebanese Hizballah will retain an influence in Iraq (Hizballah members may have been linked to the group that attacked the Sheraton Hotel) and could supply Iraqi groups with terrorist expertise and munitions."

1892.   The concern was well-founded.

1893.   On August 3, 2004, the UK Defence Intelligence Staff ("DIS") accurately predicted the evolution of the IED threat in Iraq: "IED technology in use with other Middle Eastern groups [,] especially Lebanese Hizballah, can be expected to appear in Iraq. This would include multiple systems, such as RC (Radio-Controlled) switched PIRs [Passive Infrared]."

1894.   By the summer of 2004, British intelligence had detected the EFP's appearance in southern Iraq:

> On 26 July, the DIS reported that an EFP IED had been found on 15 July in Baghdad. The DIS noted that the EFP IED design had not previously been encountered in Iraq but was, as with the find in May 2004, of a type associated with Lebanese Hizballah. There were also indications of Iranian involvement in the construction of the devices.

1895.   On December 2, 2004, a British Defence Intelligence Report titled "The Evolution of the IED Threat in Iraq" stated:

> Improvement in IED technology has been most significant in Shia areas since May [20]04, where technical progress has been made that we assess could only have been achieved through focused external assistance. *We assess that this may be due to an influx of Lebanese Hezbollah IED technology under Iranian sponsorship.* (Emphasis added.)

1896.   Similarly, the United States Department of State Country Reports on Terrorism 2006 noted:

> Since at least 2004, Hizballah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hizballah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles.

1897.	At the same time, it was supplying the Badr Corp with the initial training and direction to launch EFP attacks against Coalition Forces, Hezbollah also provided training and logistical support to JAM, but did not initially furnish JAM operatives with EFPs.

1898.	A Sadrist uprising led by armed JAM forces in August 2004 in the Shi'a holy city of Najaf would soon change the direction of the conflict.

1899.	In Najaf in August, JAM forces launched an uprising and soon confronted U.S. Marines, other U.S. Army units, and their tactical air support.

1900.	As a result, JAM suffered significant casualties.

1901.	Over the course of approximately three weeks, the U.S. military lost nine soldiers and Marines.

1902.	By contrast, an estimated 1,500 JAM fighters were killed and an undetermined number, most likely in the thousands, were wounded.

1903.	IRGC–QF personnel were present during the bloodshed and carefully observed the fighting.

1904.	The lesson from the uprising was clear—JAM members were too disorganized and undisciplined to cause any serious harm to Coalition Forces. Thus, shortly after the uprising in Najaf was brought under control, Muqtada al-Sadr authorized his deputies to create what became known as the "Special Groups" to be supported and trained by Hezbollah and funded and controlled by the IRGC.

1905.	Mr. Sadr's key deputies wanted to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq while his "regular" JAM militia concentrated on ethnic cleansing and kidnapping Sunnis as well as its traditional criminal enterprises.

1906.   Initially, the Special Groups functioned essentially as regional commands under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais al-Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi).

1907.   As the U.S. military later noted:

> When Special Groups were formed, [Qais Khazali] and Akram al-Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with Special Groups, and in this position, they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

1908.   Predictably, the IRGC and Hezbollah saw these newly formed Special Groups (which they helped create and organize) as an opportunity to intensify Iran's control over JAM's terror apparatus.

1909.   From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC used Hezbollah to train and direct Special Groups cells to target Coalition Forces.

1910.   This was confirmed by Akram Kaabi himself during a January 1, 2019 interview on Al-Nujaba TV, a channel operated by Al-Nujaba, an Iranian-backed Shi'a group formed in 2013 as an outgrowth of Special Group Asa'ib Ahl al-Haq ("AAH") (discussed below) and designated (together with Kaabi) as an SDGT on March 5, 2019.

1911.   During the interview, Kaabi stated that:

> After [the 2004 Battle of Najaf], we realized that we needed a new method, especially since the brothers from Hezbollah and from the IRGC helped us in that battle in Najaf. Even in Sadr City, there were Iranian consultants. There was an IRGC officer called Abu Ali, who was originally from Ahwaz and spoke fluent Arabic. He was with us in Najaf, and he helped us with the battle management and provided much-needed basic and important advice.

1912.   He went on to say:

> Our chief engineer in Najaf, Dr. Jassem Al-Abadi, who was martyred, was among the first to be trained by that brother from Hizbullah and by the brothers from the IRGC. So, we realized that if we acquired more

capabilities, things would improve. Our morale was high. Our mujahideen were ready to make sacrifices. So, we decided to take this path and acquire a lot of expertise. So, we developed our relationship with the brothers in Hizbullah and the IRGC. Both Hizbullah and the IRGC were open with us about everything...

1913.   Kaabi was also explicit about the degree to which his exploits in Iraq were directed and coordinated with Hezbollah's senior leadership:

> After the battle of Najaf, I traveled by land to Syria and then to Lebanon, and I met Hassan Nasrallah for the first time. The brothers [in Hizbullah] did not keep any secrets from us. They were forthcoming with their years of experience. They summarized this experience and presented it to us in full detail and this, indeed, led to a significant change in our resistance on the ground.
>
> The late Imad Mughniyah participated in my meeting [with Nasrallah]. Nasrallah and Mughniyah asked me to debrief them about the battle of Najaf – the events, and the deployment of the forces and the vehicles. Mughniyah even asked me to present everything on a blackboard so that they would get a feel for what had happened on the ground. So, I reviewed all the details. Nasrallah was... Obviously, all this happened in the second meeting. The first meeting was an official introductory meeting. Then, since I was still in Lebanon, the second meeting was held. Both Nasrallah and Mughniyah sympathized with us. Both said that they had tried to contact us many times prior to the events in Najaf and that had they succeeded we would have been able to accomplish greater victories, and to change the balance of power significantly. But they said that this was the will of the Lord and that Hezbollah will not deny us anything. They said: 'All of our capabilities and expertise are at your disposal.'

1914.   Perhaps most notable, the interview specifically discussed the role of EFPs in targeting American forces in Iraq:

> At first, we used old anti-aircraft missiles to manufacture IEDs. They would cause a large explosion, with a loud noise and lots of smoke, but they had little effect on the heavily armored [American] vehicles. Penetrating this armor was no easy task.
>
> But later, our IEDs improved. We started using explosively formed penetrators. These charges would not cause a lot of smoke or a loud explosion, but they would penetrate the armor of the tanks through a certain hole. They would explode inside the tank, destroying it and killing everyone inside.

1915.   Kaabi's narrative broadly confirms the intelligence assessment publicly disclosed over the past few years. In sum, the IRGC–QF instructed Hezbollah to create "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist cells targeting MNF–I.

1916.   Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's behest.

1917.   Unit 3800 trained, advised and directed the JAM "Special Groups" and Badr Corps in Iraq as Kaabi described.

1918.   Hezbollah also trained Special Groups and Badr Corps operatives at training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations were critical to the IRGC's operations in Iraq between 2003 and 2011.

1919.   By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah operatives on terrorism charges.

1920.   On October 10, 2005, the British Broadcasting Company (BBC) reported that:

> An armour-piercing version of the bomb - blamed for the deaths of eight British soldiers this year - marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. (Emphasis added.)

1921.   The UK's *Belfast Telegraph* reported in 2007 that Muqtada al-Sadr publicly acknowledged his organization's coordination with Hezbollah:

> Speaking in Tufa in Iraq, Muqtada al-Sadr, the head of the Mehdi Army, admitted to 'formal links' with Hizbollah. 'We have formal links with Hizbollah, we do exchange ideas and discuss the situation facing Shiites in both countries,' he said. 'It is natural that we would want to improve ourselves by learning from each other. We copy Hizbollah in the way they fight and their tactics, we teach each other, and we are getting better through this.'

1922.   From September 2004 to late 2005, these newly-formed Special Groups conducted low-intensity operations against the British and U.S. militaries, launching increasing numbers of EFP attacks but mostly training in Iran and Lebanon with Hezbollah and the IRGC–QF, developing their TTPs and preparing for the next round of conflict.[108]

1923.   As Special Groups operatives detained by Coalition Forces later explained, only Hezbollah instructors taught Special Groups operatives the "Engineers Course" that focused on constructing and employing EFPs.

1924.   Not every Iraqi Special Group operative received this training. One detainee reported that "Engineers are special and have to be smart. If you are not smart no one will waste the time and expenses to send you to Iran to train to be an engineer because you will fail."

1925.   Hezbollah also trained these "Engineers" on how to incorporate EFPs into the tactical design of ambushing MNF–I convoys, principally to kidnap U.S. and Coalition soldiers. The tactics for a kidnapping-ambush using EFPs closely resembled the tactics Hezbollah developed in attempting to kidnap IDF soldiers in southern Lebanon.

1926.   One MNF–I interrogation of a Detainee revealed the extensive training he and other Iraqi operatives received from the IRGC–QF and Hezbollah for attacking MNF–I convoys with EFPs and other weapons:

> During one of [Detainee]'s training sessions, his group was instructed on techniques involving the attack of military convoys and abduction of POWs. Upon the arrival of a four-vehicle convoy, EFP's would be emplaced to disable the first three vehicles in a convoy. The attackers, who are hiding on one side of the road from an unidentified distance away, would successively fire upon the fourth vehicle with shoulder-fired missiles. Amidst the attack, two small groups of individuals would alternatively

---

[108]   EFPs were provided by the IRGC for the *exclusive* purpose of targeting Coalition Forces, and Hezbollah's advanced training was provided exclusively to assist Special Groups to improve their emplacement of EFPs against United States and British armored vehicles. On rare occasions certain elements defied this directive. For example, EFPs were used in the assassinations of two provincial governors and two provincial police chiefs in the latter half of 2006. The U.S. military assessed that these events were contrary to IRGC policy.

bound from the hidden area away from the road to the fourth vehicle while firing upon the fourth vehicle using small arms. The alternatively bounding small groups would advance to the vehicle, pull out any individual who is still living, and bring the individual back to an area where the attackers' own convoy of vehicles is waiting. In order to prevent a quick reaction force from arriving to aid the disabled convoys, a simultaneous mortar attack would be planned on a nearby military base. The simultaneous mortar attack would be followed through to keep the quick reaction force at the nearby base busy. Another way to prevent assistance from a quick reaction force would be to emplace more EFPs at a further distance down the same planned route as the military convoy.

1927.  An attack combining an EFP and other methods of attacking a convoy is called a "complex attack."

1928.  By 2007, MNF–I officials were reporting carefully planned, complex ambushes and retaliatory attacks on United States forces that included direct assaults on U.S. military outposts, ambushes in which American troops were captured, and complex attacks that used multiple weapons to strike more than one U.S. military target.

1929.  As Qais Khazali would later explain to his interrogators: "EFPs still come solely from Iran and there is currently nobody in Iraq manufacturing the components of an EFP."

1930.  Hezbollah and the IRGC–QF also introduced their proxies to the use of 107mm and 122mm artillery rockets (which Hezbollah had previously deployed in large numbers against the IDF in southern Lebanon and against Israeli border towns in northern Israel).

1931.  Both JAM and the Special Groups used these same types of rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF–I Headquarters in the Green Zone.

1932.  The IRGC also supplied JAM and JAM Special Groups with 240mm rockets (also known as the Fadjr-3) developed by the Shahid Bagheri Industries division of the Aerospace Industries Organization of Iran ("AIO").

1933.  Not only did the IRGC supply these weapons to both Hezbollah and (later) its Iraqi Shi'a proxies (including the Special Groups), but Hezbollah's TTP in the use of these weapons was also transferred to JAM and JAM Special Groups.

1934.  During a July 2, 2007 press briefing, U.S. Brigadier General Kevin J. Bergner noted that Special Groups were trained in Iran by Hezbollah instructors in a four-week long course that was titled "Artillery."

1935.  According to General Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets."

1936.  In May 2006, senior Hezbollah commander Ali Mussa Daqduq traveled to Tehran with Youssef Hashim, a fellow Hezbollah operative and senior supervisor of Hezbollah operations in Iraq.

1937.  There they met with the Commander and Deputy Commander of the IRGC–QF Special External Operations.

1938.  Mr. Daqduq was directed to return to Iraq and report on the training and operations of the Special Groups and provide assessments on their training in mortars and rockets, use of IEDs and kidnapping operations.

1939.  General Shahlai—the aforementioned deputy commander in the IRGC–QF who met with Messrs. Daqduq and Hashim—served as the case officer or supervisor of the Special Groups.

1940.  The United States later designated General Shahlai in September 2008 "for threatening the peace and stability of Iraq and the Government of Iraq." The U.S. Department of

the Treasury further found that General Shahlai supplied weapons and training to the Iraqi Special Groups:

> In late-August 2006, Shahlai provided material support to JAM Special Groups by supplying JAM Special Groups members with 122mm grad rockets, 240mm rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity of C-4.
>
> Shahlai also approved and coordinated the training of JAM Special Groups. As of May 2007, Shahlai served as the final approving and coordinating authority for all Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition Forces in Iraq. In late-August 2006, Shahlai instructed a senior Lebanese Hizballah official to coordinate anti-aircraft rocket training for JAM Special Groups.

1941.  The United States Department of State Country Reports on Terrorism 2006 noted that Iran provided guidance and training to Iraqi Special Groups for carrying out attacks against MNF–I and Coalition Forces:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks.  Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah.  The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces.  The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (Emphasis added.)

1942.  The Australian government reported in 2006 that Hezbollah, along with the IRGC-QF, was committing attacks in Iraq through insurgent groups it developed:

> Hizballah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings. The Hizballah units have been set up with the encouragement and resources of Iran's Revolutionary Guards al-Qods Brigades. Hizballah has also established a special training cell known as Unit 3800 (previously known as Unit 2800) specifically to train Shia fighters prior to action in Iraq.

1943.  In July 2007, General Bergner briefed the media on how the IRGC–QF used

Hezbollah operatives in Iraq: "Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups…. Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq."

1944.   Bergner further noted that: "The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the deadliest form of improvised explosive device -- and funding from Iran. They also have received planning help and orders from Iran."

1945.   In October 2007, the U.S. Department of the Treasury designated the IRGC–QF[109] an SDGT finding:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

1946.   The U.S. State Department's 2007 Country Reports on Terrorism stated that the IRGC–QF and Hezbollah provided Iraqi Special Groups with the tools necessary to carry out attacks against armored Coalition vehicles:

> The [IRGC–QF] continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed

---

[109]     In October 2017, the U.S. government designated the IRGC itself an SDGT "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC–QF."

thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devises (IEDs) and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

1947. The U.S. State Department's 2008 Country Reports on Terrorism noted that Iran and Hezbollah continued attacks on MNF–I and Coalition Forces through their Iraqi proxies by:

> Provid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was […] providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, *in concert with Lebanese Hezbollah,* provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. (Emphasis added.)

1948. Ali Mussa Daqduq conducted multiple visits to Iraq to undertake training needs assessments, survey the operational environment, and obtain feedback from Special Groups members in Iraq on their needs.

1949. This was intended to ensure that the training being designed and staffed by Hezbollah instructors would provide the greatest benefit to their students.

1950. In addition, Mr. Daqduq's assessments provided informed feedback to the IRGC–QF logisticians on the armaments the Special Groups fighters needed to meet their needs and improve their operational performance.

1951. Hezbollah's coordination with the IRGC–QF in support of Special Groups came into stark relief on January 20, 2007 when a team of approximately twelve AAH gunmen, disguised as U.S. soldiers, entered the Provincial Joint Coordination Center ("PJCC") in Karbala,

where U.S. soldiers were conducting a meeting with local officials.

1952.    Two months later, in March 2007, Coalition Special Forces captured Mr. Qais al-Khazali, his brother Mr. Layth al-Khazali, and Mr. Daqduq in Basra.

1953.    The documents, computers and media recovered from the target site as well as the subsequent interrogations of these men significantly supplemented the U.S. military's understanding of Hezbollah's operational role in Iraq and the IRGC–QF's central role in supporting and enabling the Special Groups.

1954.    Mr. Khazali later described Mr. Daqduq as the "designer of the Special Groups."[110]

1955.    MNF–I's exploitation of a computer that was captured during the 2007 raid revealed contents that confirmed the training and evaluation role that Mr. Daqduq performed. MNF–I described the contents as follows:

> Documents seized include: spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example; an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier.

1956.    According to U.S. intelligence estimates following Mr. Daqduq's 2007 arrest, the IRGC–QF provided Hezbollah and Mr. Daqduq up to $3 million in U.S. currency every *month* to run Special Groups in Iraq.

1957.    On January 9, 2008, the U.S. Department of the Treasury designated several individuals and entities "for threatening the peace and stability of Iraq and the Government of Iraq."

---

[110]    Ali Mussa Daqduq was held in U.S. detention until November 2011 with the goal to continue to hold him in U.S. custody. The Iraqi government denied the request, and he was transferred to Iraqi custody on December 18, 2011. The charges that the U.S. had brought against him were summarily rejected by an Iraqi Court in May 2012 as lacking evidence, and he was released from confinement, later returning to Lebanon.

1958.   These individuals included Ahmad Foruzandeh, a Brigadier General in the IRGC–QF.

1959.   According to the U.S. Department of the Treasury, Mr. Foruzandeh was directly involved in terrorist operations targeting MNF–I and Coalition Forces in Iraq:

> As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hizballah [KH], to increase their ability to combat Coalition Forces. The training includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

1960.   At the same time, the U.S. Department of the Treasury designated Abu Mustafa al-Sheibani for his role as the leader of the Sheibani Network, noting:

> The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

1961.   A 2010 Department of Defense report confirmed that weapons Iran delivered to its proxy militias in Iraq included EFPs (with radio-controlled, remote arming and passive infrared detonators), IEDs, anti-aircraft weapons, mortars, 107 and 122mm rockets, rocket-propelled grenades and launchers, explosives, and small arms.

1962.   The report also noted that "Lebanese Hizballah provides insurgents with the training, tactics and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs."

## XII.   HEZBOLLAH'S AND THE IRGC'S AGENTS & PROXIES IN IRAQ

### A.   THE BADR CORPS (a/k/a BADR ORGANIZATION)

1963.   The Badr Corps was established in 1982 as the military wing of the Supreme Council for Islamic Revolution in Iraq ("SCIRI"), which was founded by Muhammad Baqr Hakim in Iran in 1982 during the Iran-Iraq War.

1964.   From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

1965.   Like Hezbollah, the Badr Corps established clandestine offices in various businesses and social organizations in Iraq.

1966.   The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

1967.   Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF in conducting operations against Saddam Hussein's government.

1968.   The Badr Corps received training and weapons from the IRGC and Hezbollah.

1969.   Following the toppling of the Hussein regime in 2003, the IRGC saw an immediate opportunity to repatriate Muhammad Baqr Hakim into Iraq and carefully cultivate his party's growth within the new post-war political framework being developed by the Coalition Forces, while simultaneously slipping thousands of Badr Corp fighters back across the border.

1970.   After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr

Organization, and many of its operatives joined the newly formed Iraqi security forces.

1971. Published reports indicate that thousands of members of the Badr Organization remained on the IRGC–QF payroll after 2004.

1972. Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to IRGC proxies in Iraq from 2004 through 2011, including the previously-mentioned Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs and orchestrator of hundreds of attacks against Coalition Forces in Iraq, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hezbollah (discussed further below).

1973. The IRGC–QF's Ramazan Corps, led by General Abdul Reza Shahlai was in charge of supporting Hezbollah-trained terror cells in Iraq and remains the largest Qods Force command outside of Iran. It coordinated, armed and directed the Badr Organization.

1974. Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament through its political wing SCIRI, it also played a significant role in facilitating Special Groups operations in Iraq.

1975. Several senior Special Groups commanders such as Mr. al-Muhandis are, or were, Badr Organization personnel.

1976. After 2003, the Badr Organization inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Iraqi Ministry of Interior intelligence structure and key special forces and Iraqi Army units).

1977. This infiltration of Iraqi police, intelligence, and military units not only assisted in Badr Organization's efforts to murder former Hussein regime leaders and pursue ethnic cleansing of Sunni neighborhoods, but also made it possible for Badr Organization operatives to regularly

tip-off Special Groups' operatives of Coalition Forces' activities and provided Badr Organization's own terror cells with targeting guidance.

## B. ASA'IB AHL AL–HAQ ("AAH" OR THE "LEAGUE OF THE RIGHTEOUS")

1978.  The Asa'ib Ahl Al–Haq ("AAH" or the "League of the Righteous") terrorist organization was a Special Group that was advised, supported and directed by Hezbollah and funded and armed by the IRGC–QF.

1979.  It conducted numerous attacks on Iraqi Security Forces and Coalition Forces, particularly on American targets.

1980.  AAH was originally established by senior JAM commander and later MNF–I detainee, Qais al-Khazali.

1981.  Qais Khazali was a pupil of Muqtada al-Sadr's father and later one of Muqtada al-Sadr's senior deputies. But he also maintained an uneasy rivalry with the younger al-Sadr that occasionally devolved into open hostilities.

1982.  Mr. Khazali had accompanied Mr. Sadr to Tehran in 2003, and he maintained contact with senior IRGC–QF leadership when he assumed control of Special Groups cells after 2004.

1983.  According to a report by the U.S. military:

> In August 2006 MAS (Muqtada al-Sadr) asked [Qais al-Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM (Jaysh al-Mahdi (JAM) Militia subordinate to Muqtada al-Sadr). According to reporting, Ali Khamenei (Sayyid Ali Hosseini Khamenei was then and is still now the Supreme Leader of Iran) met with [Qais al-Khazali] and recruited him to lead a special group known as Asayb Al–Haq, or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais al-Khazali] agreed. Iran was interested in working with [Qais al-Khazali] because of his influence on MAS. Layth (al-Khazali's brother, captured with him on 20 March 2007 in Basra, served as the Operations Chief for Asayb Al–Haq) and as a liaison between the secret network formed by Qayis and the Iranians. In his position, Layth travelled

frequently between Iraq, Iran and Syria.

1984.  Mr. Qais al-Khazali and his brother Mr. Layth al–Khazali returned to Iraq, requisitioned the most experienced and capable fighters from Mr. Sadr's JAM terror cells and formed AAH.

1985.  At first, AAH appears to have remained within JAM's orbit.

1986.  At its inception, AAH was a Hezbollah-directed and IRGC-supplied cluster of terror cells that owed fealty to Mr. Sadr. Over time, it became a more cohesive entity that grew more independent of Mr. Sadr (even ceremonially). This evolution was the product of assessments made by senior Hezbollah commanders, including Mr. Daqduq, who had travelled to Iraq at the IRGC–QF's behest to evaluate the training, organization and effectiveness of the Special Groups.

1987.  Hezbollah identified Messrs. Qais Khazali and Akram Kaabi as among the more capable JAM commanders, cultivated them, and ultimately recruited them to serve as direct proxies of the IRGC–QF.

1988.  According to an April 2007 MNF–I report, Mr. Qais Khazali admitted that AAH received direct financing from the IRGC–QF.

1989.  Within months of Mr. Qais Khazali's formation of AAH, he blessed the Hezbollah-planned and orchestrated raid on the PJCC in Karbala on January 20, 2007.

1990.  As discussed more fully below, the kidnapping and murder of five American soldiers during the operation led to a concerted effort to locate the perpetrators, and it eventually resulted in the capture of both Khazali brothers in March 2007.

1991.  Thereafter, despite the capture and detention of the Khazali brothers, AAH continued to function as a full-fledged terrorist organization because of the significant funding,

training and supply of weapons it received from the IRGC, and from the training it received from, and close cooperation it maintained with, Hezbollah.

1992.   AAH was able to maintain a high-level offensive tempo from mid-2007 until the departure of United States forces from Iraq at the end of 2011, and Mr. Qais Khazali emerged from U.S. detention to become one of Iraq's most important political leaders.

1993.   In sum, from 2006 to 2011, AAH operated as the IRGC-QF's direct terror proxy targeting U.S. personnel at the direction of Hezbollah, working in concert with the IRGC–QF.

1994.   Iran harbored elements of its leadership (and their families), trained and supplied its operatives, and funded the AAH cells.

1995.   Iran used Hezbollah to train and direct AAH to commit attacks on Americans in Iraq.

1996.   AAH formally split from JAM in 2007 (though it continued to maintain significant ties with JAM cells even later).

1997.   Since that time, AAH has conducted countless attacks against U.S. and Iraqi forces, targeted kidnappings of Westerners and Iraqis, rocket and mortar attacks on the U.S. Embassy, murdered American and British soldiers; and assassinated Iraqi officials.

1998.   At his July 2, 2007 press briefing, Brigadier Gen. Bergner noted the extensive financial support the IRGC-QF provided in developing the Special Groups:

> The Qods Force also supplies the special groups with weapons and funding of 750,000 to 3 million U.S. dollars a month. Without this support, these special groups would be hard pressed to conduct their operations in Iraq […] The Qods Force goal was to develop the Iraqi special groups into a network similar to the Lebanese Hezbollah. Special groups would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons and other support. Like Ali Mussa Daqduq, Qais [Khazali's] main contact was [General Shahlai], the deputy commander for Qods Force Department of External Special Operations. Funding and training of the special groups started in 2004.

1999.   As MNF–I investigators would later learn, senior Lebanese Hezbollah commander Ali Mussa Daqduq not only provided training to AAH cells and advised them on terrorist operations, he also helped plan operations and had final approval over them.

2000.   Mr. Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Hezbollah's Muhammad Kawtharani and General Shahlai, the director of the IRGC–QF External Operations.

## C.    JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY") AND THE PROMISED DAY BRIGADES ("PDB")

2001.   As noted above, Jaysh al-Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003 with the help of Imad Mughniyah and Mustafa Badr al-Din, two of Hezbollah's most senior commanders.

2002.   JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population.

2003.   JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

2004.   After Hezbollah and the IRGC–QF began their complete takeover of the Special Groups in 2006-2007, JAM receded to a degree.

2005.   In the summer of 2007, Mr. Sadr declared a six-month ceasefire and a ban on attacking Coalition Forces. According to a 2007 MNF–I report, during this time, Mr. Sadr was receiving approximately $2 million U.S. dollars per month from Iran.

2006.   For much of 2007-2008, he was also embroiled in political disputes with rival Shi'a parties, and JAM engaged in violent clashes with the Badr Corps in Karbala during a religious festival.

2007.   In June 2008, Mr. Sadr announced his intention to disband JAM to focus his

organization on social, cultural and religious activities, but he soon further proclaimed that he would maintain an elite force, the Promised Day Brigades ("PDB"), to carry out attacks against Coalition Forces.

2008.   The PDB received funding and weapons from the IRGC and training and direction from both Hezbollah and the IRGC–QF and deployed many EFPs against American and Coalition Forces in Iraq after July 2008.

2009.   In August 2009 alone, MNF–I attributed 15 EFP attacks in Baghdad to the PDB.

2010.   MNF–I took significant and forceful measures against the PDB, but because of the financial, logistical and operational support it received from both Hezbollah and the IRGC–QF, PDB was able to survive and continued to menace American forces in Iraq through 2011.

2011.   For example, on June 28, 2011, the PDB issued a statement claiming responsibility for ten mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

### D.   KATA'IB HEZBOLLAH ("KH")

2012.   Kata'ib Hezbollah ("KH") (Hezbollah Brigades) was active in Iraq from 2007 to 2011.

2013.   KH was founded by Abu Mahdi al-Muhandis, a member of the Badr Corps and one of the IRGC–QF's senior operatives in Iraq.

2014.   In the 1980s, al-Muhandis was a member of the Iraqi Da'wa Party, in which capacity he worked closely with the IRGC–QF and Lebanese Hezbollah.

2015.   KH's overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Department of the Treasury as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." According to the U.S. government, "Ghanimi has organized KH military-related training in Iran from the IRGC–QF and Lebanese Hizballah. Ghanimi has sent

money provided by the IRGC–QF to KH leaders in Iraq."

2016.   KH functioned as Iran's premier terror proxy in Iraq, and like other Special Groups, its operatives received extensive training from the IRGC–QF and Hezbollah, including Hezbollah's TTP for the use of explosives, as well as weapons like the RPG–29, EFP, and the deployment of Katyusha rockets for indirect fire attacks on U.S. Forward Operating Bases.

2017.  According to MNF–I, IRGC–QF provided RPG–29 anti-armor weapons exclusively to KH.

2018.   The IRGC–QF also provided IRAMs almost exclusively to KH.

2019.   IRAMs are "flying IEDs"—explosive devices made from large metal canisters, such as propane gas tanks, filled with explosives, scrap metal and ball bearings, propelled into the air by rockets.

2020.   IRAMs first appeared in southern Iraq in November 2007.

2021.   Like other IEDs, IRAMs could be triggered remotely by radio control, or set to fire by way of a washing-machine timer. But, notwithstanding the fact that IRAMs were constructed from commonly-used "household" materials (such as, *e.g.*, propane tanks), proper assembly required a high-degree of technical sophistication that KH obtained from Hezbollah and the IRGC–QF.

2022.   IRAMs were "purpose-built" for one thing: being lobbed over walls and Hesco[111] barriers at short ranges, preventing interception by C-RAM defense systems[112] that were protecting Coalition Forces manning bases in Iraq.

---

[111]     Hesco barriers are a multi-cellular barrier system manufactured from welded zinc-aluminum coated steel wire mesh, joined with vertical, helical-coil joints, and lined with a heavy-duty non-woven polypropylene geotextile. Once filled with earth, sand, and dirt, the Hesco barriers provide protection against conventional fire attacks.

[112]     Counter Rocket, Artillery, and Mortar, abbreviated "C-RAM" or "Counter-RAM," is a set of systems used to detect and/or destroy incoming artillery, rockets and mortar rounds in the air before they hit their ground targets, or simply provide early warning.

2023.   The first known IRAM attack in Iraq occurred at Forward Operating Base Loyalty in Baghdad, which killed two American soldiers and wounded 16 others.

2024.   A second attack in the Sha'ab neighborhood of Baghdad resulted from an accidental explosion of IRAMs likely intended for Combat Outpost Callahan, approximately 800-yards away from where the truck carrying the IRAMs prematurely exploded, killing 18 civilians and wounding an additional 29 people.

2025.   IRAM attacks were particularly dangerous to U.S. troops, and had the potential to kill dozens in a single attack. Once launched, an incoming IRAM could not be stopped.

2026.   A soldier spotting the approach of a suspected IRAM-bearing vehicle could have as little as "two seconds to decide whether the person emerging from it ha[d] just set it for firing or [was] simply an innocent driver getting out to change a tire."[113]

2027.   IRAMs could be launched from either a frame resting on the ground or mounted on the bed of a truck and were designed to cause catastrophic damage and inflict mass casualties.

2028.   IRAMs became a signature weapon of KH.

2029.   KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout southeastern Iraq conducting, *first*, rocket-propelled grenade (RPG) attacks; *second*, 107mm and 240mm rocket attacks; *third*, IRAM attacks; and, *fourth*, EFP attacks on U.S. and Coalition Forces.

2030.   KH was also supplied by Iran with their production model of the RPG–29 anti-armor shoulder fired weapon that was first used against U.S. Forces during operations in Sadr City, Baghdad.

2031. On June 24, 2009, the United States designated KH a Foreign Terrorist Organization.

---

[113]     Robert Burns, *'Lob Bombs' Biggest Worry for U.S. in Baghdad* (Associated Press, July 12, 2008).

2032.   The State Department's notice of KH's FTO designation stated that:

> [KH] has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.

2033.   KH was also simultaneously designated an SDGT, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."

2034.   The U.S. Department of the Treasury also designated KH pursuant to EO 13438.

2035.   The U.S. Department of the Treasury 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

2036.   The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."

2037.   The U.S. Department of the Treasury press release also stated: "[f]urther, the IRGC–Qods Force provides lethal support to Kata ʹib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

2038.   The 2009 press release further reported that:

> Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG–29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

As of 2008, Kata'ib Hizballah was funded by the IRGC–Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran.

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons—including RPG–29s, IRAMs, and EFPs—against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

2039.   In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran and multiple terrorist attacks against Coalition Forces in Iraq—including KH's use of EFPs:

[A]lso known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators'— roadside bombs designed to pierce armor-hulled vehicles— and other weapons such as rocket-assisted mortars.

2040.   As noted above—and as stated by the U.S. Department of the Treasury in its July 2009 press release—throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket

and IED attacks against U.S. troops.

2041.   In this manner, Hezbollah helped publicize KH's activities and wage psychological warfare against the United States.

2042.   The U.S. Department of the Treasury designated KH's founder, Abu Mahdi al-Muhandis, an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation.

2043.   The U.S. Department of the Treasury's press release noted:

> As of early 2007, al-Muhandis formed a Shia militia *group employing instructors from Hizballah* to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)—from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapon smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks—containing mortars, Katyusha rockets, EFPs, and other explosive devices—from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft

missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination. (Emphasis added.)

2044. In a July 2010 press briefing, the then-MNF–I commander, U.S. Army General Ray Odierno, identified KH as the group behind increased threats to U.S. bases in Iraq.

2045. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq.

2046. General Odierno stated, "[T]hey are clearly connected to [the] Iranian IRGC [Iranian Revolutionary Guard Corps]."

## XIII.  THE PLAINTIFFS

### 1.  THE MAY 3, 2005 ATTACK – BAGHDAD

#### The Bartlett Family

2047. Plaintiff Robert Bartlett is a citizen of the United States and domiciled in the State of Virginia.

2048. On May 3, 2005, Robert Bartlett, then 31, was serving in the U.S. military in Iraq.

2049. He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2050. The weapon used to injure Mr. Bartlett was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2051. As a result of the attack, part of Mr. Bartlett's head was severed.

2052.   He also suffered third-degree burns on his neck, face and hands; internal bleeding; and a collapsed lung.

2053.   Mr. Bartlett has undergone multiple surgeries, including plastic surgery on his head and his bottom lip.

2054.   Mr. Bartlett nearly died on several occasions following the attack and was significantly physically impaired for several years following the attack.

2055.   Mr. Bartlett suffers from Post-Traumatic Stress Disorder ("PTSD") and has constant nightmares.

2056.   He has participated in group therapy to treat the emotional injuries he sustained as a result of the attack.

2057.   As a result of the attack, and the injuries he suffered, Plaintiff Robert Bartlett has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2058.   Plaintiff Terrel Charles Bartlett is a citizen of the United States and domiciled in the State of Arizona. He is the father of Robert Bartlett.

2059.   Plaintiff Linda Jones is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Robert Bartlett.

2060.   Plaintiff Shawn Bartlett is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Robert Bartlett.

2061.   As a result of the attack, and the injuries Robert Bartlett suffered, Plaintiffs Terrel Charles Bartlett, Linda Jones and Shawn Bartlett have experienced severe mental anguish and extreme emotional pain and suffering.

2062.   Plaintiff Robert Bartlett was discharged from the U.S. military on September 7, 2009.

## 2.    THE JANUARY 12, 2004 ATTACK – BAGHDAD

### The Crockett Family

2063.   Ricky Leon Crockett was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

2064.   On January 12, 2004, Ricky Leon Crockett, then 37, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near his vehicle.

2065.   Ricky Leon Crockett died from penetrating shrapnel injuries he sustained in the explosion.

2066.   The terror cell that emplaced the IED that killed Ricky Leon Crockett was trained by Hezbollah and funded and armed by the IRGC-QF.

2067.   Plaintiff Maxine E. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Ricky Leon Crockett.

2068.   Plaintiff Maxine E. Crockett brings an action individually and on behalf of the Estate of Ricky Leon Crockett, as its legal representative.

2069.   Plaintiff Marvise L. Crockett is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Ricky Leon Crockett.

2070.   As a result of the attack, and the death of Ricky Leon Crockett, Plaintiffs Maxine E. Crockett and Marvise L. Crockett have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 3.    THE APRIL 4, 2004 ATTACK – BAGHDAD

### The Arsiaga Family

2071.   Robert R. Arsiaga was a citizen of the United States and domiciled in the State of

Texas when he was killed in Iraq.

2072.   On April 4, 2004, Robert R. Arsiaga, aged 25, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2073.   Robert R. Arsiaga was killed in the attack.

2074.   The terror cell that emplaced the IED that killed Robert R. Arsiaga was trained by Hezbollah and funded and armed by the IRGC-QF.

2075.   Plaintiff Tracie Arsiaga is a citizen of the United States and domiciled in the State of Texas. She is the widow of Robert R. Arsiaga.

2076.   Plaintiff Tracie Arsiaga brings an action individually and on behalf of the Estate of Robert R. Arsiaga, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

2077.   Plaintiff Sylvia Macias is a citizen of the United States and domiciled in the State of Texas. She is the mother of Robert R. Arsiaga.

2078.   Plaintiff Gilbert Arsiaga, Jr. is a citizen of the United States and domiciled in the State of Texas. He is the brother of Robert R. Arsiaga.

2079.   Plaintiff George Arsiaga is a citizen of the United States and domiciled in the State of Texas. He is the brother of Robert R. Arsiaga.

2080.   Plaintiff Matthew Arsiaga is a citizen of the United States and domiciled in the State of Texas. He is the brother of Robert R. Arsiaga.

2081.   Plaintiff Angel Munoz is a citizen of the United States and domiciled in the State of Texas. She is the sister of Robert R. Arsiaga.

2082.   Plaintiff Robi Ann Galindo is a citizen of the United States and domiciled in the

State of Texas. She is the sister of Robert R. Arsiaga.

2083.   Jeremy Arsiaga was a citizen of the United States at the time of the death of Robert R. Arsiaga. He was the brother of Robert R. Arsiaga. Jeremy Arsiaga died on September 4, 2015.

2084.   Patricia Arsiaga is the surviving widow of Jeremy Arsiaga. Patricia Arsiaga brings an action on behalf of the Estate of Jeremy Arsiaga.

2085.   As a result of the attack, and the death of Robert R. Arsiaga, the late Jeremy Arsiaga experienced, and Plaintiffs Tracie Arsiaga, Sylvia Macias, Gilbert Arsiaga, Jr., George Arsiaga, Matthew Arsiaga, Angel Munoz and Robi Ann Galindo have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

**The Cason Family**

2086.   Ahmed A. Cason was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2087.   On April 4, 2004, Ahmed A. Cason, aged 24, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2088.   Ahmed A. Cason was killed in the attack.

2089.   The terror cell that emplaced the IED that killed Ahmed A. Cason was trained by Hezbollah and funded and armed by the IRGC-QF.

2090.   Plaintiff Cedric Hunt, Sr. is a citizen of the United States and domiciled in the State of Alabama. He is the stepfather of Ahmed A. Cason.

2091.   As a result of the attack, and the death of Ahmed A. Cason, Plaintiff Cedric Hunt, Sr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his

stepson's society, companionship, comfort, advice and counsel.

**The Greenwood Family**

2092.   Plaintiff Steven Greenwood is a citizen of the United States and domiciled in the State of Texas.

2093.   On April 4, 2004, Steven Greenwood, then 20, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2094.   The terror cell that emplaced the IED that injured Steven Greenwood was trained by Hezbollah and funded and armed by the IRGC-QF.

2095.   As a result of the attack, Mr. Greenwood suffered shrapnel wounds to his wrist which caused nerve damage.

2096.   He was initially treated in Iraq for his injuries, but the nerve damage could not be treated there. Approximately one week after the attack, he was sent to Landstuhl, Germany where he was further treated for his wounds.

2097.   He was then sent back to the U.S. where he had surgery to remove the shrapnel.

2098.   He also suffers from PTSD and depression.

2099.   He has sought treatment for his wounds, PTSD and depression.

2100.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Greenwood has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Hiller Family**

2101.   Stephen Dustin Hiller was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2102.   On April 4, 2004, Stephen Dustin Hiller, aged 25, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with members of JAM in Sadr City, Iraq.

2103.   Stephen Dustin Hiller was killed by JAM rocket-propelled grenade ("RPG") fire while engaged in the exchange of gunfire with members of JAM.

2104.   The terror cell that fired at Stephen Dustin Hiller was trained by Hezbollah and funded and armed by the IRGC-QF.

2105.   Plaintiff Stephen W. Hiller is a citizen of the United States and domiciled in the State of Alabama. He is the father of Stephen Dustin Hiller.

2106.   Plaintiff Stephen W. Hiller brings an action individually and on behalf of the Estate of Stephen Dustin Hiller, as its legal representative.

2107.   As a result of the attack, and the death of Stephen Dustin Hiller, Plaintiff Stephen W. Hiller has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## 4.   THE APRIL 9, 2004 ATTACK – BAGHDAD

**The Church Family**

2108.   Plaintiff Jeremy Church is a citizen of the United States and domiciled in the State of Missouri.

2109.   On April 9, 2004, Jeremy Church, then 26, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2110.   He was driving in a convoy when an IED and an RPG struck his vehicle.

2111.   The terror cell that executed the attack in which Jeremy Church was injured was trained by Hezbollah and funded and armed by the IRGC-QF.

2112. Mr. Church suffers from hearing issues as a result of the rocket fire and detonation of the IED. He continues to experience ringing in his ears.

2113. He has experienced severe headaches.

2114. Mr. Church has been diagnosed with PTSD.

2115. He has sought treatment, including counseling.

2116. He has been prescribed anti-anxiety medications, anti-depressants, and medication to address sleep-related issues.

2117. As a result of the attack, and the injuries he suffered, Plaintiff Jeremy Church has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2118. Plaintiff Sandra Hankins is a citizen of the United States and domiciled in the State of Texas. She is the mother of Jeremy Church.

2119. As a result of the attack, and the injuries Jeremy Church suffered, Plaintiff Sandra Hankins has experienced severe mental anguish and extreme emotional pain and suffering.

**The Fisher Family**

2120. Steven Scott Fisher was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2121. On April 9, 2004, Steven Scott Fisher, aged 43, was serving as a civilian contractor in Iraq when the convoy in which he was traveling was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2122. Steven Scott Fisher was killed in the attack.

2123. The terror cell that executed the attack in which Steven Scott Fisher was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

2124. Plaintiff Ingrid Fisher is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Steven Scott Fisher.

2125. Plaintiff Ingrid Fisher brings an action individually and on behalf of the Estate of Steven Scott Fisher, as its legal representative.

2126. Plaintiff Kristin Walker is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

2127. Plaintiff Steven T. Fisher is a citizen of the United States and domiciled in the State of Virginia. He is the son of Steven Scott Fisher.

2128. Plaintiff Kathleen Gramkowski is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Steven Scott Fisher.

2129. As a result of the attack, and the death of Steven Scott Fisher, Plaintiffs Ingrid Fisher, Kristin Walker, Steven T. Fisher, and Kathleen Gramkowski have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 5. THE JUNE 4, 2004 ATTACK – BAGHDAD

### The Carvill Family

2130. Frank T. Carvill was a citizen of the United States and domiciled in the State of New Jersey when he was killed in Iraq.

2131. On June 4, 2004, Frank T. Carvill, aged 51, was serving in the United States military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and IEDs in Baghdad.

2132. Frank T. Carvill was killed in the attack.

2133.   The terror cell that executed the attack in which Frank T. Carvill was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

2134.   Plaintiff Mary Carvill is a citizen of the United States and domiciled in the State of New Jersey. She is the mother of Frank T. Carvill.

2135.   Plaintiff Peggy Carvill-Liguori is a citizen of the United States and domiciled in the State of New Jersey. She is the sister of Frank T. Carvill.

2136.   Plaintiff Peggy Carvill-Liguori brings an action individually and on behalf of the Estate of Frank T. Carvill, as its legal representative.

2137.   Plaintiff Daniel Carvill is a citizen of the United States and domiciled in the State of New Jersey. He is the brother of Frank T. Carvill.

2138.   As a result of the attack, and the death of Frank T. Carvill, Plaintiffs Mary Carvill, Peggy Carvill-Liguori and Daniel Carvill have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 6.      THE JUNE 29, 2004 ATTACK – BAGHDAD

**The Adle Family**

2139.   Patrick Adle was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

2140.   On June 29, 2004, Patrick Adle, aged 21, was serving in the U.S. military in Iraq when a roadside bomb emplaced by JAM terror operatives detonated near the vehicle in which he was traveling in Baghdad.

2141.   Patrick Adle was killed in the attack.

2142.  The terror cell that emplaced the roadside bomb that killed Patrick Adle was trained by Hezbollah and funded and armed by the IRGC-QF.

2143.  Plaintiff Pamela Adle-Watts is a citizen of the United States and domiciled in the State of Maryland. She is the mother of Patrick Adle.

2144.  Plaintiff Pamela Adle-Watts brings an action individually and on behalf of the Estate of Patrick Adle, as its legal representative.

2145.  Plaintiff John Watts is a citizen of the United States and domiciled in the State of Maryland. He is the stepfather of Patrick Adle.

2146.  As a result of the attack, and the death of Patrick Adle, Plaintiffs Pamela Adle-Watts and John Watts have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**7.      THE JULY 27, 2004 ATTACK – BALAD RUZ**

**The Talbert Family**

2147.  DeForest L. Talbert was a citizen of the United States and domiciled in the State of West Virginia when he was killed in Iraq.

2148.  On July 27, 2004, DeForest L. Talbert, then 24, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

2149.  On July 27, 2004, DeForest L. Talbert was traveling in an M998 Humvee in the vicinity of Balad Ruz close to the Iranian border and IRGC-QF smuggling routes when his vehicle was struck with an IED.

2150.  DeForest L. Talbert was killed in the attack.

2151.  The terror cell that emplaced the IED that killed DeForest L. Talbert was trained by Hezbollah and funded by the IRGC-QF.

2152.   Plaintiff Gloria Nesbitt is a citizen of the United States and domiciled in the State of Virginia. She is the mother of DeForest L. Talbert.

2153.   Plaintiff Gloria Nesbitt brings an action individually and on behalf of the Estate of DeForest L. Talbert, as its legal representative.

2154.   Plaintiff D.J.H., a minor, represented by his legal guardian Frances Hamilett, is a citizen of the United States and domiciled in the State of West Virginia. He is the son of DeForest L. Talbert.

2155.   Plaintiff Chiquita Talbert is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

2156.   Plaintiff Tawanna Talbert Darring is a citizen of the United States and domiciled in the State of Maryland. She is the sister of DeForest L. Talbert.

2157.   Plaintiff Latasha Marble is a citizen of the United States and domiciled in the State of Virginia. She is the sister of DeForest L. Talbert.

2158.   Plaintiff James Talbert is a citizen of the United States and domiciled in the State of Virginia. He is the brother of DeForest L. Talbert.

2159.   As a result of the attack, and the death of DeForest L. Talbert, Plaintiffs Gloria Nesbitt, D.J.H., Chiquita Talbert, Tawanna Talbert Darring, Latasha Marble and James Talbert have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

**8.      THE AUGUST 5, 2004 ATTACK – NAJAF**

**The Rocha Family**

2160.   Moses Rocha was a citizen of the United States and domiciled in the State of New Mexico when he was killed in Iraq.

2161.   On August 5, 2004, Moses Rocha, aged 33, was serving in the U.S. military in Iraq when his unit was attacked by JAM terror operatives with rocket-propelled grenades and small-arms fire.

2162.   Moses Rocha was killed in the attack.

2163.   The terror cell that executed the attack in which Moses Rocha was killed was trained by Hezbollah and funded and armed by the IRGC-QF.

2164.   Plaintiff Miranda Pruitt is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Moses Rocha.

2165.   Plaintiff Velina Sanchez is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Moses Rocha.

2166.   Plaintiff Velina Sanchez brings an action individually and on behalf of the Estate of Moses Rocha, as its legal representative.

2167.   Plaintiff Aloysius Sanchez, Sr. is a citizen of the United States and domiciled in the State of New Mexico. He is the stepfather of Moses Rocha.

2168.   Plaintiff Rommel Rocha is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2169.   Plaintiff Phillip Sanchez is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2170.   Plaintiff Aloysius Sanchez, Jr. is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Moses Rocha.

2171.   As a result of the attack, and the death of Moses Rocha, Plaintiffs Miranda Pruitt, Velina Sanchez, Aloysius Sanchez, Sr., Rommel Rocha, Phillip Sanchez, and Aloysius Sanchez,

Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Reynoso Family**

2172.    Yadir G. Reynoso was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2173.    On August 5, 2004, Yadir G. Reynoso, aged 27, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

2174.    Yadir G. Reynoso was killed in the exchange of gunfire with JAM terror operatives.

2175.    The terror cell that fired at Yadir G. Reynoso was trained by Hezbollah and funded and armed by the IRGC-QF.

2176.    Plaintiff Gloria P. Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the mother of Yadir G. Reynoso.

2177.    Plaintiff Gloria P. Reynoso brings an action individually and on behalf of the Estate of Yadir G. Reynoso, as its legal representative.

2178.    Plaintiff Jasmin Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

2179.    Plaintiff Patricia Reynoso is a citizen of the United States and domiciled in the State of Washington. She is the sister of Yadir G. Reynoso.

2180.    Plaintiff Jose Reynoso is a citizen of the United States and domiciled in the State of Washington. He is the brother of Yadir G. Reynoso.

2181.    As a result of the attack, and the death of Yadir G. Reynoso, Plaintiffs Gloria P. Reynoso, Jasmin Reynoso, Patricia Reynoso, and Jose Reynoso have experienced severe mental

anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 9. THE AUGUST 6, 2004 ATTACK – NAJAF

**The Wells Family**

2182. Larry Lloyd Wells was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

2183. On August 6, 2004, Larry Lloyd Wells, aged 22, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in the Wadi al-Salam Cemetery in Najaf, Iraq.

2184. Larry Lloyd Wells was killed by sniper fire from JAM terror operatives.

2185. The terror cell that fired at Larry Lloyd Wells was trained by Hezbollah and funded and armed by the IRGC-QF.

2186. Plaintiff Ashley Wells Simpson is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2187. Plaintiff Ashley Wells Simpson brings an action individually and on behalf of the Estate of Larry Lloyd Wells, as its legal representative.

2188. Plaintiff Chad Wells is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of Larry Lloyd Wells.

2189. Plaintiff Crystal Stewart is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2190. Plaintiff Chasity Wells-George is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2191.   Plaintiff Candice Machella is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Larry Lloyd Wells.

2192.   Plaintiff Billy Doal Wells is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Larry Lloyd Wells.

2193.   As a result of the attack, and the death of Larry Lloyd Wells, Plaintiffs Ashley Wells Simpson, Chad Wells, Crystal Stewart, Chasity Wells-George, Candice Machella, and Billy Doal Wells have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## 10.   THE AUGUST 15, 2004 ATTACK – NAJAF

**The Sapp Family**

2194.   Brandon Robert Sapp was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2195.   On August 15, 2004, Brandon Robert Sapp, then 21, was serving in the U.S. military in Najaf, Iraq when the M2 Bradley Fighting Vehicle he was operating rolled over a 500-pound IED emplaced by JAM terror operatives that sent the Bradley and Brandon Robert Sapp airborne, killing him.

2196.   The terror cell that emplaced the IED that killed Brandon Robert Sapp was trained by Hezbollah and funded and armed by the IRGC-QF.

2197.   Plaintiff Hope Elizabeth Veverka is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Brandon Robert Sapp.

2198.   As a result of the attack, and the death of Brandon Robert Sapp, Plaintiff Hope Elizabeth Veverka has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 11.   THE AUGUST 16, 2004 ATTACK – SADR CITY

**The Heath Family**

2199.   David Michael Heath was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

2200.   On August 16, 2004, David Michael Heath, aged 30, was serving in the U.S. military in Iraq when an IED emplaced by JAM terror operatives detonated near his vehicle followed by smalls arms fire and a subsequent RPG attack in Sadr City.

2201.   David Michael Heath was killed in the attack by a gunshot wound to his head by JAM terror operatives.

2202.   The terror cell that fired at David Michael Heath was trained by Hezbollah and funded and armed by the IRGC-QF.

2203.   Plaintiff Donna Jean Heath is a citizen of the United States and domiciled in the State of Indiana. She is the widow of David Michael Heath.

2204.   Plaintiff Donna Jean Heath brings an action individually and on behalf of the Estate of David Michael Heath, as its legal representative.

2205.   Plaintiff Lola Jean Modjeska is a citizen of the United States and domiciled in the State of Indiana. She is the mother of David Michael Heath.

2206.   Plaintiff John David Heath is a citizen of the United States and domiciled in the State of Florida. He is the father of David Michael Heath.

2207.   As a result of the attack, and the death of David Michael Heath, Plaintiffs Donna Jean Heath, Lola Jean Modjeska, and John David Heath have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

## 12.    THE AUGUST 18, 2004 ATTACK – SADR CITY

**The Martir Family**

2208.    Jacob David Martir was a citizen of the United States and domiciled in the State of Connecticut when he was killed in Iraq.

2209.    On August 18, 2004, Jacob David Martir, aged 21, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Sadr City.

2210.    Jacob David Martir was shot and killed by JAM terror operatives while engaged in the exchange of gunfire.

2211.    The terror cell that fired at Jacob David Martir was trained by Hezbollah and funded and armed by the IRGC-QF.

2212.    Plaintiff Olga Lydia Gutierrez is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Jacob David Martir.

2213.    Plaintiff Olga Lydia Gutierrez brings an action individually and on behalf of the Estate of Jacob David Martir, as its legal representative.

2214.    Plaintiff Ismael Martir is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jacob David Martir.

2215.    As a result of the attack, and the death of Jacob David Martir, Plaintiffs Olga Lydia Gutierrez and Ismael Martir have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 13.    THE AUGUST 25, 2004 ATTACK – NAJAF

**The Arredondo Family**

2216.    Alexander Scott Arredondo was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

2217.   On August 25, 2004, Alexander Scott Arredondo, aged 20, was serving in the U.S. military in Iraq when his unit was engaged in small arms fire with JAM terror operatives in Najaf, Iraq.

2218.   Alexander Scott Arredondo was killed by sniper fire from JAM terror operatives.

2219.   The terror cell that fired at Alexander Scott Arredondo was trained by Hezbollah and funded and armed by the IRGC-QF.

2220.   Plaintiff Victoria M. Foley is a citizen of the United States and domiciled in the State of Massachusetts. She is the mother of Alexander Scott Arredondo.

2221.   Plaintiff Victoria M. Foley brings an action individually and on behalf of the Estate of Alexander Scott Arredondo, as its legal representative.

2222.   Plaintiff Nathaniel Foley is a citizen of the United States and domiciled in the State of Massachusetts. He is the brother of Alexander Scott Arredondo.

2223.   As a result of the attack, and the death of Alexander Scott Arredondo, Plaintiffs Victoria M. Foley and Nathaniel Foley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 14.     THE AUGUST 26, 2004 ATTACK – NAJAF

**The DeWilde Family**

2224.   Plaintiff Michael Scott DeWilde is a citizen of the United States and domiciled in the State of Texas.

2225.   On August 26, 2004, Michael Scott DeWilde, then 37, was serving in the U.S. military in Iraq.

2226.   On August 26, 2004, Michael Scott DeWilde was seriously injured when he came under fire from a rocket-propelled grenade fired by JAM terror operatives.

2227.   The terror cell that executed the attack in which Michael Scott DeWilde was injured was trained by Hezbollah and funded and armed by the IRGC-QF.

2228.   As a result of the attack, Michael Scott DeWilde sustained shrapnel injuries to his arm requiring him to be medevaced from the scene and treated at the nearest Forward Operating Base.

2229.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Scott DeWilde has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 15.   THE FEBRUARY 10, 2005 ATTACK

### The Morris Family

2230.   Plaintiff Steven Morris is a citizen of the United States and domiciled in the State of North Carolina.

2231.   Steven Morris served in the U.S. military in Iraq on multiple rotations from March 2003 through 2011 as a member of a Special Operations Unit.

2232.   On February 10, 2005, Mr. Morris sustained a traumatic brain injury ("TBI") as well as neck and shoulder injuries when he was knocked from his armored vehicle *en* route to an operation against JAM Special Forces north of the Sab' Abkar section of Baghdad.

2233.   On a separate occasion, he sustained an additional TBI from the blast wave of an Iranian 122mm rocket launched by JAM Special Groups.

2234.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Morris has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2235.    Plaintiff Danielle Dechaine-Morris is a citizen of the United States and domiciled in the State of North Carolina. She was the wife of Steven Morris.

2236.    Plaintiff Nicholas Morris is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

2237.    Plaintiff K.M., a minor represented by his legal guardian, Danielle Dechaine-Morris, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Steven Morris.

2238.    As a result of the attack, and the injuries Steven Morris suffered, Plaintiffs Danielle Dechaine-Morris, Nicholas Morris and K.M. have experienced severe mental anguish and extreme emotional pain and suffering.

2239.    Plaintiff Steven Morris was discharged from the U.S. military on October 31, 2013.

16.    **THE JUNE 8, 2005 ATTACK – BAGHDAD**

**The Arizola Family**

2240.    Roberto Arizola, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2241.    On June 8, 2005, Roberto Arizola, Jr., aged 31, was serving in the U.S. military near Rustimaya when an IED emplaced by JAM Special Groups terror operatives detonated near his vehicle.

2242.    Roberto Arizola, Jr. was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2243.    Plaintiff Monica Arizola is a citizen of the United States and domiciled in the State of Texas. She is the widow of Roberto Arizola, Jr.

2244.    Plaintiff Roberto Aaron Arizola is a citizen of the United States and domiciled in

the State of Texas. He is the son of Roberto Arizola, Jr.

2245. Plaintiff Roberto Arizola, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Roberto Arizola, Jr.

2246. Plaintiff Cecilia Arizola is a citizen of the United States and domiciled in the State of Texas. She is the mother of Roberto Arizola, Jr.

2247. Plaintiff Danny Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

2248. Plaintiff Ricardo Arizola is a citizen of the United States and domiciled in the State of Texas. He is the brother of Roberto Arizola, Jr.

2249. As a result of the attack, and the death of Roberto Arizola, Jr., Plaintiffs Monica Arizola, Roberto Aaron Arizola, Roberto Arizola, Sr., Cecilia Arizola, Danny Arizola and Ricardo Arizola have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's brother's society, companionship, comfort, advice and counsel.

## 17. THE JUNE 27, 2005 ATTACK – BAGHDAD

**The Klecker Family**

2250. Deborah Klecker was a citizen of the United States and domiciled in the State of Oregon when she was killed in Iraq.

2251. On June 27, 2005, Deborah Klecker, aged 51, was working as a civilian contractor providing mentoring and training to Iraqi police officers when she was killed by an IED planted and detonated near her vehicle by JAM Special Groups.

2252. Deborah Klecker was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2253.  Plaintiff Greg Klecker is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Deborah Klecker.

2254.  As a result of the attack, and the death of Deborah Klecker, Plaintiff Greg Klecker has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his sister's society, companionship, comfort, advice and counsel.

## 18.     THE JULY 3, 2005 ATTACK – BAGHDAD

**The Montgomery Family**

2255.  Ryan Montgomery was a citizen of the United States and domiciled in the State of Kentucky when he was killed in Iraq.

2256.  On July 3, 2005, Ryan Montgomery, aged 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

2257.  Ryan Montgomery was killed in the attack.

2258.  The weapon used to kill Ryan Montgomery was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2259.  Plaintiff Raymond Montgomery is a citizen of the United States and domiciled in the State of Kentucky. He is the father of Ryan Montgomery.

2260.  Plaintiff Patricia Montgomery is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of Ryan Montgomery.

2261.  Plaintiff Bryan Montgomery is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Ryan Montgomery.

2262.  As a result of the attack, and the death of Ryan Montgomery, Plaintiffs Raymond

Montgomery, Patricia Montgomery and Bryan Montgomery have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

19.   **THE JULY 27, 2005 ATTACK**

**The Wood Family**

2263.   Plaintiff Tony Wood is a citizen of the United States and domiciled in the State of Hawaii.

2264.   On July 27, 2005, Tony Wood, age 38, was serving in the U.S. military in Iraq.

2265.   Mr. Wood was returning to his base when his vehicle was struck by an EFP emplaced by Special Groups.

2266.   The weapon used to injure Mr. Wood was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2267.   As a result of the attack, he sustained significant injuries due to the impact of a large amount of shrapnel that pierced his body armor.

2268.   Mr. Wood received extensive medical treatment at various hospitals, where he spent a number of months.

2269.   He was also in a coma for over 40 days and developed numerous infections that required treatment.

2270.   The shrapnel affected numerous internal organs, and he underwent over 20 separate surgeries.

2271.   Mr. Wood continues to experience pain and limitations to his activities each day.

2272.   Mr. Wood suffers from PTSD and has experienced severe depression.

2273.   He has participated in treatment programs to address his emotional problems and has been on medication to address them.

2274.   As a result of the attack, and the injuries he suffered, Plaintiff Tony Wood has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2275.   Plaintiff Joedi Wood is a citizen of the United States and domiciled in the State of Hawaii. She is the wife of Tony Wood.

2276.   Plaintiff Adam Wood is a citizen of the United States and domiciled in the State of Hawaii. He is the son of Tony Wood.

2277.   Plaintiff Megan Wood is a citizen of the United States and domiciled in the State of Hawaii. She is the daughter of Tony Wood.

2278.   As a result of the attack, and the injuries suffered by Tony Wood, Plaintiffs Joedi Wood, Adam Wood and Megan Wood have experienced severe mental anguish, and extreme emotional pain and suffering.

2279.   Plaintiff Tony Wood was discharged from the U.S. military on August 22, 2016.

**20.    THE AUGUST 2, 2005 ATTACK – BASRA**

**The Vincent Family**

2280.   Steven Vincent was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2281.   On August 2, 2005, Steven Vincent, a 49-year old journalist, was reporting on the deteriorating security situation in Basra when he was kidnapped by JAM, taken hostage for several hours and then shot and killed by JAM operatives.

2282.   The JAM terrorist operatives that abducted and murdered Steven Vincent were trained by Hezbollah and funded and armed by the IRGC-QF and acted under their joint direction.

2283.   Plaintiff Lisa Ramaci is a citizen of the United States and domiciled in the State of New York. She is the widow of Steven Vincent.

2284.   Plaintiff Lisa Ramaci brings an action individually and on behalf of the Estate of Steven Vincent, as its legal representative.

2285.   Plaintiff Isabell Vincent is a citizen of the United States and domiciled in the State of California. She is the mother of Steven Vincent.

2286.   Plaintiff Isabell Vincent brings an action individually and on behalf of the Estate of her late husband, Charles Vincent, as its legal representative.

2287.   Charles Vincent was a citizen of the United States and was last domiciled in the State of California. He is the father of Steven Vincent.  As a result of Steven Vincent's murder, Mr. Vincent experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

2288.   As a result of the attack, and the death of Steven Vincent, Plaintiffs Lisa Ramaci and Isabell Vincent have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband/son's society, companionship, comfort, advice and counsel.

## 21.   THE AUGUST 7, 2005 ATTACK – BAGHDAD

### The Kalladeen Family

2289.   Anthony N. Kalladeen was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2290.   On August 7, 2005, Anthony N. Kalladeen, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2291.   Anthony N. Kalladeen died on August 8, 2005 as a result of the injuries he sustained in the attack.

2292.  The weapon used to kill Anthony N. Kalladeen was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2293.  Plaintiff Maria Vidal is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Anthony N. Kalladeen.

2294.  As a result of the attack, and the death of Anthony N. Kalladeen, Plaintiff Maria Vidal has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 22.  THE SEPTEMBER 2, 2005 ATTACK – BAGHDAD

**The Hassler Family**

2295.  Plaintiff Tamara Hassler is a citizen of the United States and domiciled in the State of North Carolina.

2296.  On September 2, 2005, Tamara Hassler, then 36, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which she was traveling in Baghdad.

2297.  The weapon used to injure Tamara Hassler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2298.  As a result of the attack, Ms. Hassler suffered bruising in her sacroiliac joint, soft tissue damage to her piriformis muscle, and injuries to her right hip.

2299.  Ms. Hassler also suffered from three bulging discs in her lower back as a result of the attack, as well as atrophied discs in her neck.

2300.  Ms. Hassler was also diagnosed with hearing loss, PTSD, and a TBI.

2301.   Ms. Hassler has been treated by numerous doctors and physical therapists for her injuries and has been prescribed medication to treat her symptoms.

2302.   As a result of the attack, and the injuries she suffered, Plaintiff Tamara Hassler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2303.   Plaintiff Richard E. Hassler is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Tamara Hassler.

2304.   Plaintiff Joanne Sue Hassler is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Tamara Hassler.

2305.   As a result of the attack, and the injuries Tamara Hassler has suffered, Plaintiffs Richard E. Hassler and Joanne Sue Hassler have experienced severe mental anguish and extreme emotional pain and suffering.

**The Huckfeldt Family**

2306.   Plaintiff Scott Huckfeldt is a citizen of the United States and domiciled in the State of Arizona.

2307.   On September 2, 2005, Scott Huckfeldt, then 37, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2308.   The weapon used to injure Scott Huckfeldt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2309.   As a result of the attack, Scott Huckfeldt suffered injuries to his left knee.

2310.   Mr. Huckfeldt was also diagnosed with PTSD.

2311. As a result of the attack, and the injuries he suffered, Plaintiff Scott Huckfeldt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2312. Plaintiff Kathryn Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Scott Huckfeldt.

2313. Plaintiff Alisha Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. She is the daughter of Scott Huckfeldt.

2314. Plaintiff Matthew Huckfeldt is a citizen of the United States and domiciled in the State of Arizona. He is the son of Scott Huckfeldt.

2315. As a result of the attack, and the injuries Scott Huckfeldt has suffered, Plaintiffs Kathryn Huckfeldt, Alisha Huckfeldt and Matthew Huckfeldt have experienced severe mental anguish and extreme emotional pain and suffering.

**The Newman Family**

2316. Plaintiff Timothy Newman is a citizen of the United States and domiciled in the State of South Carolina.

2317. On September 2, 2005, Timothy Newman, then 41, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

2318. The weapon used to injure Timothy Newman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2319. As a result of the attack, Mr. Newman's legs were injured, and his right leg had to be amputated above the knee.

2320. Mr. Newman's left hand was injured, and it had to be partially amputated at the wrist.

2321. Mr. Newman received a penetrating wound to his chest and abdomen and suffered a broken spine and various broken bones.

2322. Mr. Newman was also diagnosed with PTSD and a TBI.

2323. As a result of the attack, and the injuries he suffered, Plaintiff Timothy Newman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2324. Plaintiff Padraic J. Newman is a citizen of the United States and domiciled in the State of South Carolina. He is the son of Timothy Newman.

2325. As a result of the attack, and the injuries Timothy Newman has suffered, Plaintiff Padraic J. Newman has experienced severe mental anguish and extreme emotional pain and suffering.

## 23. THE SEPTEMBER 6, 2005 ATTACK – BAGHDAD

**The Jonaus Family**

2326. Jude Jonaus was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2327. On September 6, 2005, Jude Jonaus, aged 27, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

2328. Jude Jonaus was killed in the attack.

2329. The weapon used to kill Jude Jonaus was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2330.   Plaintiff Amenia Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the mother of Jude Jonaus.

2331.   Plaintiff Amenia Jonaus brings an action individually and on behalf of the Estate of Jude Jonaus, as its legal representative.

2332.   Plaintiff Gernessoit Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the father of Jude Jonaus.

2333.   Plaintiff Daphnie Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2334.   Plaintiff Ricky Jonaus is a citizen of the United States and domiciled in the State of South Carolina. He is the brother of Jude Jonaus.

2335.   Plaintiff Marckendy Jonaus is a citizen of the United States and domiciled in the State of Florida. He is the brother of Jude Jonaus.

2336.   Plaintiff Claire Jonaus is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2337.   Plaintiff Sharen Jonaus Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Jude Jonaus.

2338.   As a result of the attack, and the death of Jude Jonaus, Plaintiffs Amenia Jonaus, Gernessoit Jonaus, Daphnie Jonaus Martin, Ricky Jonaus, Marckendy Jonaus, Claire Jonaus and Sharen Jonaus Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 24. THE SEPTEMBER 26, 2005 ATTACK – BAGHDAD

**The Tuliau Family**

2339.   Tulsa T. Tuliau was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2340.   On September 26, 2005, Tulsa T. Tuliau, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2341.   Tulsa T. Tuliau was killed in the attack.

2342.   The weapon used to kill Tulsa T. Tuliau was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2343.   Plaintiff Masina Tuliau is a citizen of the United States and domiciled in the State of Washington. She is the mother of Tulsa T. Tuliau.

2344.   As a result of the attack, and the death of Tulsa T. Tuliau, Plaintiff Masina Tuliau has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 25. THE SEPTEMBER 28, 2005 ATTACK – UMM QASR

**The Morin Family**

2345.   Steve Morin, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2346.   On September 28, 2005, Steve Morin, Jr., aged 34, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2347.   Steve Morin, Jr. was killed in the attack.

2348.   The weapon used to kill Steve Morin, Jr. was a Hezbollah-designed and Iranian-

manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2349.   Plaintiff Gwendolyn Morin-Marentes is a citizen of the United States and domiciled in the State of Texas. She is the widow of Steve Morin, Jr.

2350.   Plaintiff Gwendolyn Morin-Marentes brings an action individually and on behalf of the Estate of Steve Morin, Jr., as its legal representative.

2351.   Plaintiff Esteban Morin is a citizen of the United States and domiciled in the State of Texas. He is the son of Steve Morin, Jr.

2352.   Plaintiff Audelia (Audrey) Morin is a citizen of the United States and domiciled in the State of Texas. She is the mother of Steve Morin, Jr.

2353.   Plaintiff Estavan (Steve) Morin, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Steve Morin, Jr.

2354.   Plaintiff Brianna Renee Navejas is a citizen of the United States and domiciled in the State of Texas. She is the stepdaughter of Steve Morin, Jr.

2355.   As a result of the attack, and the death of Steve Morin, Jr., Plaintiffs Gwendolyn Morin-Marentes, Esteban Morin, Audrey Morin, Steve Morin, Sr. and Brianna Renee Navejas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

**The Martinez Family**

2356.   Plaintiff Margarito A. Martinez, Jr. is a citizen of the United States and domiciled in the State of Texas.

2357.   On September 28, 2005, Margarito Martinez, then 36, was serving in the U.S. military in Iraq.

2358.    He was driving in a convoy when an EFP emplaced by Special Groups struck the lead vehicle.

2359.    The weapon used to injure Margarito Martinez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2360.    After the lead vehicle was stuck by the EFP, Mr. Martinez got out of his vehicle to check on the occupants of the vehicle that had been struck. He saw that Steve Morin had been hit in the back of the skull and appeared to be dead.

2361.    He then checked on Elizabeth Jacobson, who had been in Steve Morin's HMMWV and observed that she had been decapitated.

2362.    Finally, he checked on Andy Martinez, who was the gunner in the HMMWV. Andy was standing in the turret and couldn't hear or see anything. Mr. Martinez got on top of the vehicle and pulled Andy out. He cut off some of Andy's clothing to start an IV line for him.

2363.    As a result of the attack, Mr. Martinez suffers from PTSD.

2364.    As a result of the attack, and the injuries he suffered, Plaintiff Margarito Martinez, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2365.    Plaintiff Margarito Martinez was discharged from the U.S. military on April 4, 2011.

## 26.    THE OCTOBER 6, 2005 ATTACK – BAGHDAD

**The Robinson Family**

2366.    Jeremiah Robinson was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

2367.    On October 6, 2005, Jeremiah Robinson, aged 20, was serving in the U.S. military

in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2368.   Jeremiah Robinson was killed in the attack.

2369.   The weapon used to kill Jeremiah Robinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2370.   Plaintiff Amy Lynn Robinson is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Jeremiah Robinson.

2371.   Plaintiff Floyd Burton Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the father of Jeremiah Robinson.

2372.   Plaintiffs Amy Lynn Robinson and Floyd Burton Robinson bring an action individually and on behalf of the Estate of Jeremiah Robinson, as its legal representatives.

2373.   Plaintiff Jacob Michael Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Jeremiah Robinson.

2374.   Plaintiff Lucas William Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Jeremiah Robinson.

2375.   As a result of the attack, and the death of Jeremiah Robinson, Plaintiffs Amy Lynn Robinson, Floyd Burton Robinson, Jacob Michael Robinson and Lucas William Robinson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Burns Family**

2376.   Plaintiff Alvis Burns is a citizen of the United States and domiciled in the State of Arizona.

2377.    On October 6, 2005, Alvis Burns, then 41, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2378.    The weapon used to injure Alvis Burns was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2379.    As a result of the blast, Alvis Burns's skull was cracked, and shrapnel was lodged in his brain.

2380.    Mr. Burns experienced brain swelling, and he underwent brain surgery. He has been diagnosed with a TBI.

2381.    Shrapnel penetrated and became embedded in Mr. Burns' face and left arm. He also sustained hearing loss as a result of the blast.

2382.    Mr. Burns fell in and out of comas and was in a vegetative state for long periods of time. He was fed through a feeding tube.

2383.    As a result of the injuries sustained in the attack and following his many procedures, Mr. Burns has had to relearn how to swallow, eat, speak, and walk.

2384.    He experiences pain in his legs and feet and currently uses an electric wheelchair and at times, a walker.

2385.    As a result of the attack, and the injuries he suffered, Plaintiff Alvis Burns has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2386.    Plaintiff JoDee Johnson is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Alvis Burns.

2387.    Plaintiff James Higgins is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Alvis Burns.

2388. Plaintiff Wendy Coleman is a citizen of the United States and domiciled in the State of Washington. She is the sister of Alvis Burns.

2389. As a result of the attack, and the injuries Alvis Burns has suffered, Plaintiffs JoDee Johnson, James Higgins, and Wendy Coleman have experienced severe mental anguish, and extreme emotional pain and suffering.

**The Radke Family**

2390. Plaintiff Brian Radke is a citizen of the United States and domiciled in the State of Washington.

2391. On October 6, 2005, Brian Radke, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2392. The weapon used to injure Brian Radke was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2393. As a result of the attack, Brian Radke sustained shrapnel to his body, including a piece that clipped his carotid artery.

2394. He also sustained shrapnel in his right leg, and he has undergone reconstructive knee surgery.

2395. Mr. Radke's jaw was fractured in multiple locations, and he lost his right finger.

2396. His left arm was fractured in two locations, and his median nerve was severed.

2397. Mr. Radke has undergone numerous surgical procedures, including those to address the severed nerve and to emplace rods and to apply skin grafts in his left arm.

2398. He was in a coma, during which time he was fed by a feeding tube and breathed through a trach tube.

2399.  Mr. Radke still has pieces of shrapnel in his body, including some fragments lodged in his brain.

2400.  His injuries have required physical therapy and occupational therapy.

2401.  Mr. Radke has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

2402.  As a result of the attack, and the injuries he suffered, Plaintiff Brian Radke has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2403.  Plaintiff Nova Radke is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Brian Radke.

2404.  As a result of the attack, and the injuries Brian Radke has suffered, Plaintiff Nova Radke has experienced severe mental anguish, and extreme emotional pain and suffering.

2405.  Plaintiff Brian Radke was discharged from the U.S. military on August 27, 2009.

**The Vernier Family**

2406.  Plaintiff Steven Vernier, Jr. is a citizen of the United States and domiciled in the State of Tennessee.

2407.  On October 6, 2005, Steven Vernier, Jr., then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2408.  The weapon used to injure Steven Vernier, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2409.  As a result of the blast, Steven Vernier, Jr. sustained shrapnel to his face, neck, right shoulder, right wrist, and his thighs.

2410.   He also sustained first degree burns.

2411.   Mr. Vernier has experienced and continues to experience hearing loss in both ears.

2412.   He has undergone procedures to remove the shrapnel.

2413.   The injuries Mr. Vernier sustained resulted in a loss of range of motion in his right shoulder and right wrist.

2414.   He has been prescribed medication for pain. The pain continues to the present day.

2415.   Mr. Vernier has experienced flashbacks, nightmares, and extreme survivor's guilt.

2416.   He has been diagnosed with PTSD and has sought counseling.

2417.   As a result of the attack, and the injuries he suffered, Plaintiff Steven Vernier, Jr. has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 27.   THE DECEMBER 8, 2005 ATTACK – BAGHDAD

### The Smith Family

2418.   Kevin J. Smith was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2419.   On December 8, 2005, Kevin J. Smith, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2420.   Kevin J. Smith was killed in the attack.

2421.   The weapon used to kill Kevin J. Smith was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2422.   Plaintiff Clifford L. Smith, Jr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Kevin J. Smith.

2423.   Plaintiff Clifford L. Smith, Jr. brings an action individually and on behalf of the Estate of Kevin J. Smith, as its legal representative.

2424.   Plaintiff Georgianna Stephens-Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Kevin J. Smith.

2425.   Plaintiff Corena Martin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Kevin J. Smith.

2426.   As a result of the attack, and the death of Kevin J. Smith, Plaintiffs Clifford L. Smith, Jr., Georgianna Stephens-Smith, and Corena Martin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Mattis Family**

2427.   Plaintiff Adam Mattis is a citizen of the United States and domiciled in the State of Texas.

2428.   On December 8, 2005. Adam Mattis, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2429.   The weapon used to injure Adam Mattis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2430.   Mr. Mattis was driving a HMMWV, the second vehicle in a five-vehicle convoy, when his vehicle was hit by an EFP.

2431.   Mr. Mattis was hit by shrapnel in his right arm. The shrapnel hit his bicep and went into his shoulder. The shrapnel cut and cauterized an artery.

2432.   Following the attack, he was medevaced to a combat support hospital in Iraq for initial treatment. He was not allowed to leave Iraq for further treatment to his wounds until the end of his deployment in January 2006 which resulted in Methicillin-resistant Staphylococcus aureus (MRSA), a secondary infection.

2433.   After his deployment ended in January 2006, he initially sought treatment at a civilian hospital in Savannah, Georgia and then at Fort Stewart.

2434.   Mr. Mattis has also sought treatment at the VA.

2435.   He has been diagnosed with a TBI and PTSD.

2436.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Mattis has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Peterson Family**

2437.   Plaintiff Terrance Peterson, III is a citizen of the United States and domiciled in the State of Arizona.

2438.   On March 23, 2008, Terrance Peterson, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2439.   The weapon used to injure Terrance Peterson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2440.   Mr. Peterson was an occupant in the second vehicle traveling in a five-vehicle convoy, when his vehicle was hit by an EFP.

2441.   Mr. Peterson was hit by shrapnel in his right foot, both knees and his left arm. He had multiple fractures and tissue damage. The brachial artery in his right arm was severed.

2442. Following the attack, Mr. Peterson was taken to FOB Loyalty to stabilize him and was then taken to Balad for surgery to repair the brachial artery. From there he was transferred to Landstuhl, Germany and then to Walter Reed Army Medical Center where he spent the next 9 months. Ultimately, he was sent to Wynn Army Hospital at Fort Stewart where he concluded his military service.

2443. Mr. Peterson has undergone 33 surgeries as a result of the attack.

2444. As a result of the attack, and the injuries he suffered, Plaintiff Terrance Peterson, III has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2445. Plaintiff Petra Spialek is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Terrance Peterson, III.

2446. As a result of the attack, and the injuries Terrance Peterson, III has suffered, Plaintiff Petra Spialek has experienced severe mental anguish, and extreme emotional pain and suffering.

## 28. THE DECEMBER 25, 2005 ATTACK – BAGHDAD

**The Cardinal Family**

2447. Anthony Cardinal was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

2448. On December 25, 2005, Anthony Cardinal, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2449. Anthony Cardinal was killed in the attack.

2450. The weapon used to kill Anthony Cardinal was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2451.   Plaintiff David G. Cardinal, Jr. is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Anthony Cardinal.

2452.   Plaintiff David G. Cardinal, Jr. brings an action individually and on behalf of the Estate of Anthony Cardinal, as its legal representative.

2453.   As a result of the attack, and the death of Anthony Cardinal, Plaintiff David G. Cardinal, Jr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## 29.   THE JANUARY 5, 2006 ATTACK – NAJAF

**The Hecker Family**

2454.   William F. Hecker, III was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

2455.   On January 5, 2006, William F. Hecker, III, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2456.   William F. Hecker, III was killed in the attack.

2457.   The weapon used to kill William F. Hecker, III was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2458.   Plaintiff Richelle Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the widow of William F. Hecker, III.

2459.   Plaintiff Richelle Hecker brings an action individually and on behalf of the Estate of William F. Hecker, III, as its legal representative.

2460.   Plaintiff Victoria Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of William F. Hecker, III.

2461.   Plaintiff W.H., a minor represented by his legal guardian, Richelle Hecker, is a citizen of the United States and domiciled in the State of Colorado. He is the son of William F. Hecker, III.

2462.   Plaintiff C.H., a minor represented by her legal guardian, Richelle Hecker, is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of William F. Hecker, III.

2463.   Plaintiff William F. Hecker, Jr. is a citizen of the United States and domiciled in the State of Colorado. He is the father of William F. Hecker, III.

2464.   Plaintiff Nancy Hecker is a citizen of the United States and domiciled in the State of Colorado. She is the mother of William F. Hecker, III.

2465.   Plaintiff John D. Hecker is a citizen of the United States and domiciled in the State of New York. He is the brother of William F. Hecker, III.

2466.   As a result of the attack, and the death of William F. Hecker, III, Plaintiffs Richelle Hecker, Victoria Hecker, W.H., C.H., William F. Hecker, Jr., Nancy Hecker and John D. Hecker have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Mariano Family**

2467.   Robbie M. Mariano was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2468.   On January 5, 2006, Robbie M. Mariano, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2469.   Robbie M. Mariano was killed in the attack.

2470. The weapon used to kill Robbie M. Mariano was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2471. Plaintiff Robert F. Mariano is a citizen of the United States and domiciled in the State of California. He is the father of Robbie M. Mariano.

2472. Plaintiff Robert F. Mariano brings an action individually and on behalf of the Estate of Robbie M. Mariano, as its legal representative.

2473. Plaintiff Debra Mariano is a citizen of the United States and domiciled in the State of California. She is the mother of Robbie M. Mariano.

2474. Plaintiff Bobbie D. Mariano is a citizen of the United States and domiciled in the State of California. He is the brother of Robbie M. Mariano.

2475. As a result of the attack, and the death of Robbie M. Mariano, Plaintiffs Robert F. Mariano, Debra Mariano and Bobbie D. Mariano have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The White Family**

2476. Stephen J. White was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

2477. On January 5, 2006, Stephen J. White, aged 39, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2478. Stephen J. White was killed in the attack.

2479. The weapon used to kill Stephen J. White was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2480. Plaintiff Vickie Michay White is a citizen of the United States and domiciled in the State of Texas. She is the widow of Stephen J. White.

2481. Plaintiff Vickie Michay White brings an action individually and on behalf of the Estate of Stephen J. White, as its legal representative.

2482. As a result of the attack, and the death of Stephen J. White, Plaintiff Vickie Michay White has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 30. THE JANUARY 5, 2006 ATTACK – BAGHDAD

### The Lopez Reyes Family

2483. Jason Lopez Reyes was a citizen of the United States and domiciled in the Commonwealth of Puerto Rico when he was killed in Iraq.

2484. On January 5, 2006, Jason Lopez Reyes, then 29, was serving in the U.S. military in Iraq when a dual-array EFP emplaced by Special Groups detonated near his vehicle.

2485. Jason Lopez Reyes was killed in the attack.

2486. The weapon used to kill Jason Lopez Reyes was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2487. Plaintiff Gladys E. Reyes Centeno is a citizen of the United States and domiciled in Puerto Rico. She is the mother of Jason Lopez Reyes.

2488.   Plaintiff Veronica Lopez Reyes is a citizen of the United States and domiciled in Puerto Rico. She is the sister of Jason Lopez Reyes.

2489.   Plaintiff Veronica Lopez Reyes brings an action individually and on behalf of the Estate of Jason Lopez Reyes, as its legal representative.

2490.   Plaintiff Zoraima Lopez is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jason Lopez Reyes.

2491.   As a result of the attack, and the death of Jason Lopez Reyes, Plaintiffs Gladys E. Reyes Centeno, Veronica Lopez Reyes, and Zoraima Lopez have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 31.   THE JANUARY 18, 2006 ATTACK – BASRA

### The Hickman Family

2492.   Richard Thomas "Rick" Hickman was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

2493.   On January 18, 2006, Richard Hickman, aged 52, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2494.   Richard Hickman was killed in the attack.

2495.   The weapon used to kill Richard Hickman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2496.   Plaintiff Jennifer Link is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Richard Hickman.

2497.   Plaintiff Sharon Johnston is a citizen of the United States and domiciled in the State of Florida. She is the sister of Richard Hickman.

2498.   As a result of the attack, and the death of Richard Hickman, Plaintiffs Jennifer Link and Sharon Johnston have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice and counsel.

## 32.   THE FEBRUARY 14, 2006 ATTACK – BAGHDAD

**The Hutchinson Family**

2499.   Plaintiff Tara Hutchinson is a citizen of the United States and domiciled in the State of Texas.

2500.   On February 14, 2006, Plaintiff Tara Hutchinson, then 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated as her vehicle passed by it.

2501.   The weapon used to injure Tara Hutchinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2502.   As a result of the attack, Ms. Hutchinson's right leg was severed above the knee, she sustained 3rd degree burns to her left foot, and the main artery in her right leg was severed.

2503.   She has undergone more than 10 surgical procedures.

2504.   Ms. Hutchinson has also been diagnosed with a TBI, depression and PTSD.

2505.   As a result of the attack, and the injuries she suffered, Plaintiff Tara Hutchinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2506.   Plaintiff Tara Hutchinson was discharged from the U.S. military on January 26, 2010.

## 33.   THE FEBRUARY 17, 2006 ATTACK – BAGHDAD

**The Lee Family**

2507.   Plaintiff Kenny Lee is a citizen of the United States and domiciled in the State of Virginia.

2508.   On February 17, 2006, Kenny Lee, then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2509.   The weapon used to injure Kenny Lee was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2510.   As a result of the attack, Kenny Lee was stunned and incapacitated by the force of the concussive blast and shrapnel that entered his body in his buttocks region and partially exited from his back. Because the M1114 vehicle he was in remained operational after the detonation, Mr. Lee remained in shock and did not realize he had been hit with copper shrapnel from the EFP until he noticed that the back of his uniform was completely bloodstained.

2511.   A few days after the explosion, he discovered a concussive bruise approximately ten inches in diameter on his chest as a result of the explosion. Mr. Lee has lost flexibility due to the scarring from his injuries in addition to suffering back pain and sciatic pain.

2512.   As a result of the attack, and the injuries he suffered, Plaintiff Kenny Lee has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2513.   Plaintiff Tom B. Lee is a citizen of the United States and domiciled in the State of Connecticut. He is the father of Kenny Lee.

2514.   Plaintiff Ling P. Lee is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Kenny Lee.

2515.   As a result of the attack, and the injuries Kenny Lee suffered, Plaintiffs Tom B. Lee and Ling P. Lee have experienced severe mental anguish and extreme emotional pain and suffering.

### 34.    THE FEBRUARY 18, 2006 ATTACK – BAGHDAD

**The Matheny Family**

2516.   Charles E. Matheny, IV was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2517.   On February 18, 2006, Charles E. Matheny, IV, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2518.   Charles E. Matheny, IV was killed in the attack.

2519.   The weapon used to kill Charles E. Matheny, IV was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2520.   Plaintiff Deborah Noble is a citizen of the United States and domiciled in the State of Texas. She is the mother of Charles E. Matheny, IV.

2521.   Plaintiff Deborah Noble brings an action individually and on behalf of the Estate of Charles E. Matheny, IV, as its legal representative.

2522.   Plaintiff David Noble is a citizen of the United States and domiciled in the State of Texas. He is the stepfather of Charles E. Matheny, IV.

2523.   Plaintiff Charles E. Matheny, III is a citizen of the United States and domiciled in the State of Washington. He is the father of Charles E. Matheny, IV.

2524.   As a result of the attack, and the death of Charles E. Matheny, IV, Plaintiffs Deborah Noble, David Noble and Charles E. Matheny, III have experienced severe mental anguish,

extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 35. THE FEBRUARY 20, 2006 ATTACK –HINDIYAH

**The Collado Family**

2525.  Jay T. Collado was a citizen of the United States and domiciled in the State of South Carolina when he was killed in Iraq.

2526.  On February 20, 2006, Jay T. Collado, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2527.  Jay T. Collado was killed in the attack.

2528.  The weapon used to kill Jay T. Collado was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2529.  Plaintiff Judy Collado is a citizen of the United States and domiciled in the State of California. She is the widow of Jay T. Collado.

2530.  Plaintiff Kaiya Collado is a citizen of the United States and domiciled in the State of California. She is the daughter of Jay T. Collado.

2531.  As a result of the attack, and the death of Jay T. Collado, Plaintiffs Judy Collado and Kaiya Collado have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Waldeck Family**

2532.  Plaintiff Justin Waldeck is a citizen of the United States and domiciled in the State of Illinois.

2533.    On February 20, 2006, Justin Waldeck was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2534.    The weapon used to injure Justin Waldeck was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2535.    As a result of the attack, Mr. Waldeck sustained shrapnel injuries to his right knee and significant injuries to his left hand. The metacarpal bones in his left hand had to be fused, and he suffered nerve damage to his left pinky.

2536.    As a result of the attack, and the injuries he suffered, Plaintiff Justin Waldeck has experienced severe physical and mental anguish and extreme emotional pain and suffering.

36.    **THE FEBRUARY 20, 2006 ATTACK – BAGHDAD**

**The Kuhlmeier Family**

2537.    Daniel Kuhlmeier was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2538.    On February 20, 2006, Daniel Kuhlmeier, aged 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2539.    Daniel Kuhlmeier was killed in the attack.

2540.    The weapon used to kill Daniel Kuhlmeier was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2541.    Plaintiff Tanja Kuhlmeier is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Daniel Kuhlmeier.

2542.   Plaintiff Tanja Kuhlmeier brings an action individually and on behalf of the Estate of Daniel Kuhlmeier, as its legal representative.

2543.   Plaintiff K.K., a minor represented by her legal guardian, Tanja Kuhlmeier, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Daniel Kuhlmeier.

2544.   Plaintiff Robert J. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Daniel Kuhlmeier.

2545.   Plaintiff Theresa A. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Daniel Kuhlmeier.

2546.   Plaintiff Theresa Ann Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Daniel Kuhlmeier.

2547.   Plaintiff Edward Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2548.   Plaintiff Thomas Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2549.   Plaintiff John Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2550.   Plaintiff Robert W. Kuhlmeier is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Daniel Kuhlmeier.

2551.   As a result of the attack, and the death of Daniel Kuhlmeier, Plaintiffs Tanja Kuhlmeier, K.K., Robert J. Kuhlmeier, Theresa A. Kuhlmeier, Theresa Ann Kuhlmeier, Edward Kuhlmeier, Thomas Kuhlmeier, John Kuhlmeier, and Robert W. Kuhlmeier have experienced

severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

## 37.   THE FEBRUARY 26, 2006 ATTACK – BAGHDAD

### The Farr Family

2552.   Clay P. Farr was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2553.   On February 26, 2006, Clay P. Farr, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2554.   Clay P. Farr was killed in the attack.

2555.   The weapon used to kill Clay P. Farr was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2556.   Plaintiff Patrick Farr is a citizen of the United States and domiciled in the State of California. He is the father of Clay P. Farr.

2557.   Plaintiff Patrick Farr brings an action individually and on behalf of the Estate of Clay P. Farr, as its legal representative.

2558.   Plaintiff Silver Farr is a citizen of the United States and domiciled in the State of California. She is the stepmother of Clay P. Farr.

2559.   Plaintiff Carrol Alderete is a citizen of the United States and domiciled in the State of California. She is the mother of Clay P. Farr.

2560.   Plaintiff Anthony Alderete is a citizen of the United States and domiciled in the State of California. He is the stepfather of Clay P. Farr.

2561.   Plaintiff Chad Farr is a citizen of the United States and domiciled in the State of California. He is the brother of Clay P. Farr.

2562.   As a result of the attack, and the death of Clay P. Farr, Plaintiffs Patrick Farr, Silver Farr, Carrol Alderete, Anthony Alderete and Chad Farr have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Hunter Family**

2563.   Wesley Hunter was a citizen of the United States and domiciled in the State of New York when he was injured in Iraq.

2564.   On February 26, 2006, Wesley Hunter, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2565.   Wesley Hunter was injured in the attack, and he died on September 18, 2008 from the injuries he sustained in the attack.

2566.   The weapon used to kill Wesley Hunter was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2567.   Plaintiff Rayanne Hunter is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Wesley Hunter.

2568.   Plaintiff Rayanne Hunter brings an action individually and on behalf of the Estate of Wesley Hunter, as its legal representative.

2569.   Plaintiff W.H., a minor represented by his legal guardian Rayanne Hunter, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Wesley Hunter.

2570.   Plaintiff T.H., a minor represented by her legal guardian Rayanne Hunter, is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Wesley Hunter.

2571.   As a result of the attack, and the death of Wesley Hunter, Plaintiffs Rayanne Hunter, W.H. and T.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 38.   THE MARCH 13, 2006 ATTACK – RUSTAMIYAH

**The Lewis Family**

2572.   Bryan A. Lewis was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

2573.   On March 13, 2006, Bryan A. Lewis, aged 32, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2574.   Bryan A. Lewis was killed in the attack.

2575.   The weapon used to kill Bryan A. Lewis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2576.   Plaintiff Fabersha Flynt Lewis is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Bryan A. Lewis.

2577.   As a result of the attack, and the death of Bryan A. Lewis, Plaintiff Fabersha Flynt Lewis has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 39. THE MARCH 26, 2006 ATTACK – BAGHDAD

**The Bershefsky Family**

2578.   Plaintiff Christopher Anthony Bershefsky is a citizen of the United States and domiciled in the State of Pennsylvania.

2579.   On March 26, 2006, Christopher Anthony Bershefsky, then 32, was a private contractor with Erinys International, a British security company, in Iraq. He had been in Iraq for approximately three months during this assignment. He had also previously served in the United States Marine Corps for six years and was discharged in 1998.

2580.   Mr. Bershefsky was driving an armored Ford F350 vehicle en route to his base after completing a mission a few miles outside the international zone in Baghdad. He was approximately two miles from Gate 2 to enter the international zone when his vehicle was struck by an EFP emplaced by Special Groups. The force of the blast blew through Mr. Bershefsky's door.

2581.   The weapon used to injure Mr. Bershefsky was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2582.   As a result of the attack, Mr. Bershefsky sustained a fractured pelvis, damaged sciatic nerve, muscle tissue loss due to debridement in his left leg, damages to his left foot, which was rendered mostly inoperable, a torn urethra, and additional shrapnel injuries that have caused him to have a colostomy bag and suffer from urological deficits.

2583.   In addition to the physical injuries he sustained, Mr. Bershefsky also suffers from severe depression, anxiety, and PTSD.

2584.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Anthony Bershefsky has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 40.   THE APRIL 1, 2006 ATTACK – BAGHDAD

**The Devora-Garcia Family**

2585.   Israel Devora-Garcia was domiciled in the State of Texas when he was killed in Iraq. He became a citizen of the United States posthumously.

2586.   On April 1, 2006, Israel Devora-Garcia, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated while he was conducting a dismounted patrol.

2587.   Israel Devora-Garcia was killed in the attack.

2588.   The weapon used to kill Israel Devora-Garcia was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2589.   Plaintiff Lorenzo Sandoval, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the stepfather of Israel Devora-Garcia.

2590.   Plaintiff Lorenzo Sandoval, Sr. brings an action individually and on behalf of the Estate of Israel Devora-Garcia, as its legal representative.

2591.   Plaintiff Lorenzo Sandoval, Jr. is a citizen of the United States and domiciled in the State of Texas. He is the brother of Israel Devora-Garcia.

2592.   Plaintiff Adrian Sandoval is a citizen of the United States and domiciled in the State of Texas. He is the brother of Israel Devora-Garcia.

2593.    Plaintiff Rosa Esther Sandoval is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Israel Devora-Garcia.

2594.    As a result of the attack, and the death of Israel Devora-Garcia, Plaintiffs Lorenzo Sandoval, Sr., Lorenzo Sandoval, Jr., Adrian Sandoval and Rosa Esther Sandoval have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 41.    THE APRIL 12, 2006 ATTACK – MISIAB

**The Bandhold Family**

2595.    Scott Bandhold was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2596.    On April 12, 2006, Scott Bandhold, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2597.    Scott Bandhold was killed in the attack.

2598.    The weapon used to kill Scott Bandhold was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2599.    Plaintiff Henry J. Bandhold, Sr. is a citizen of the United States and domiciled in the State of Florida. He is the father of Scott Bandhold.

2600.    Plaintiff Henry J. Bandhold, Sr. brings an action individually and on behalf of the Estate of Scott Bandhold, as its legal representative.

2601.    Plaintiff Afonso Bandhold is a citizen of the United States and domiciled in Portugal. He is the son of Scott Bandhold.

2602.   Plaintiff Mariana Bandhold is a citizen of the United States and domiciled in the State of California. She is the daughter of Scott Bandhold.

2603.   Plaintiff H. Joseph Bandhold is a citizen of the United States and domiciled in the State of New York. He is the brother of Scott Bandhold.

2604.   Plaintiff Donald C. Bandhold is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Scott Bandhold.

2605.   As a result of the attack, and the death of Scott Bandhold, Plaintiffs Henry J. Bandhold, Sr., Afonso Bandhold, Mariana Bandhold, H. Joseph Bandhold and Donald C. Bandhold have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

## 42.     THE APRIL 16, 2006 ATTACK – BAWB ASH-SHAM

### The Stein Family

2606.   Plaintiff Joshua P. Stein is a citizen of the United States and domiciled in the State of Texas.

2607.   On April 16, 2006, Joshua P. Stein, then 22, was serving in the U.S. military in Iraq. He was traveling in a convoy from the Iraqi Police compound conducting route clearance when the vehicle he was driving, a Bradley Fighting Vehicle that was the second in the convoy, was hit with a dual-array EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

2608.   The weapon used to injure Joshua P. Stein was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2609.   As a result of the attack, Mr. Stein sustained double above-the-knee amputations, two broken forearms, elbow replacement in his left arm, fasciotomy on his right arm, nerve and muscle damage to both forearms causing him to lose feeling in both of his forearms, and a TBI.

2610.   He was in a coma for nearly a month following the attack and awoke from the coma in a military hospital in Texas after having been airlifted to Balad, Iraq, and Landstuhl, Germany.

2611.   Mr. Stein has received extensive medical treatment – including various surgeries and prosthetic fittings – at various hospitals, where he has spent years in treatment. He has been unable to utilize prosthetics because his right leg was not long enough after the amputation, so he is wheelchair-bound for ambulation.

2612.   As a result of the attack, and the injuries he suffered, Plaintiff Joshua P. Stein has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2613.   Plaintiff Nicole B. Stein is a citizen of the United States and domiciled in the State of Texas. She is the wife of Joshua P. Stein.

2614.   Plaintiff R.M.S., a minor, represented by her legal guardian Joshua P. Stein, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

2615.   Plaintiff J.S.S., a minor, represented by her legal guardian Joshua P. Stein, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Joshua P. Stein.

2616.   Plaintiff Jesse P. Stein is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Joshua P. Stein.

2617.   As a result of the attack, and the injuries Joshua P. Stein suffered, Plaintiffs Nicole B. Stein, R.M.S., and J.S.S. and Jesse P. Stein have experienced severe mental anguish and extreme emotional pain and suffering.

**The Shelswell Family**

2618.   Plaintiff Michael Paul Alan Shelswell is a citizen of the United States and domiciled in the State of Colorado.

2619.   On April 16, 2006, Michael Paul Alan Shelswell, then 23, was serving in the U.S. military in Iraq. He was sitting in the rear of a Bradley Fighting Vehicle traveling in a convoy from the Iraqi Police compound conducting route clearance when the Bradley was hit with a dual-array EFP emplaced by Special Groups on the left side of the vehicle on ASR Dover in the Bawb Ash-Sham village north of Baghdad.

2620.   The weapon used to injure Michael Paul Alan Shelswell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2621.   As a result of the attack, Michael Paul Alan Shelswell was hit with the concussive blast in his face causing a TBI.

2622.   In addition, he sustained chemical burns to his face and upper body as the Bradley caught on fire as a result of the EFP detonation. He continues to suffer from vision and hearing difficulties, sustained memory loss, and he suffered a stroke in 2009 related to his injuries.

2623.   Mr. Shelswell also suffers from severe PTSD that has caused him to suffer from suicidal ideation in the past and makes it impossible for him to be in confined spaces.

2624.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Paul Alan Shelswell has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2625.   Plaintiff Michael Paul Alan Shelswell was discharged from the U.S. military on September 1, 2010.

### 43.    THE APRIL 25, 2006 ATTACK – SADR CITY

**The Roberts Family**

2626.   Plaintiff Erik Roberts is a citizen of the United States and domiciled in the State of Pennsylvania.

2627.   On April 25, 2006, Erik Roberts, then 22, was serving in the U.S. military in Iraq.

2628.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2629.   The weapon used to injure Mr. Roberts was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2630.   Mr. Roberts' right femur was severed.

2631.   He had more than one dozen surgeries to treat his right femur and has suffered numerous infections.

2632.   As a result of the attack, and the injuries he suffered, Plaintiff Erik Roberts has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2633.   Plaintiff E.C.R., a minor, represented by her legal representative Erik Roberts, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of Erik Roberts.

2634.   Plaintiff Robin Roberts is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Erik Roberts.

2635.   Plaintiff James Craig Roberts is a citizen of the United States and domiciled in the State of Ohio. He is the father of Erik Roberts.

2636.   Plaintiff Cara Roberts is a citizen of the United States and domiciled in the State of Tennessee. She is the sister of Erik Roberts.

2637.   Plaintiff Colin Roberts is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Erik Roberts.

2638.   As a result of the attack, and the injuries Erik Roberts suffered, Plaintiffs E.C.R., Robin Roberts, James Craig Roberts, Cara Roberts and Colin Roberts have experienced severe mental anguish and extreme emotional pain and suffering.

**The Murphy Family**

2639.   Plaintiff Luke Murphy is a citizen of the United States and domiciled in the State of Florida.

2640.   On April 25, 2006, Luke Murphy, then 24, was serving in the U.S. military in Iraq.

2641.   He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2642.   The weapon used to injure Mr. Murphy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2643.   The explosive charge passed through Mr. Murphy's right leg, amputating it. Portions of his left leg muscles were destroyed, and he sustained a compound fracture of his left tibia and fibula, rendering his left leg useless.

2644.    Smoke began filling the inside of the vehicle. The vehicle ultimately crashed into a wall, and Mr. Murphy eventually found a way to exit the vehicle. He crawled on the ground, dragging the remaining stump of his right leg and injured left leg while he continued to experience significant blood loss.

2645.    Mr. Murphy has undergone over 30 procedures to address the injuries sustained in the attack, including those involving the additional shortening of the stump of his right leg and issues involving the problems that have developed with his left leg and foot.

2646.    Mr. Murphy has been prescribed anti-depressants and medication to assist with sleep issues.

2647.    As a result of the attack, and the injuries he suffered, Plaintiff Luke Murphy has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2648.    Plaintiff Willette Murphy is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luke Murphy.

2649.    As a result of the attack, and the injuries Luke Murphy suffered, Plaintiff Willette Murphy has experienced severe mental anguish and extreme emotional pain and suffering.

**The Irwin Family**

2650.    Plaintiff Shane Irwin is a citizen of the United States and domiciled in the State of Florida.

2651.    On April 25, 2006, Shane Irwin, then 23, was serving in the U.S. military in Iraq.

2652.    He was driving in a convoy when an EFP emplaced by Special Groups struck his vehicle.

2653. The weapon used to injure Mr. Irwin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2654. As a result of the attack, Mr. Irwin suffered lacerations, smoke inhalation and ruptured ear drums.

2655. He also suffers from a TBI and PTSD.

2656. As a result of the attack, and the injuries he suffered, Plaintiff Shane Irwin has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2657. Plaintiff T.R., a minor represented by her legal guardian, Shane Irwin, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Shane Irwin.

2658. Plaintiff Helen Marguerite Irwin is a citizen of the United States and domiciled in the State of Florida. She is the mother of Shane Irwin.

2659. Plaintiff Nicole Irwin is a citizen of the United States and domiciled in the State of Florida. She is the sister of Shane Irwin.

2660. As a result of the attack, and the injuries Shane Irwin suffered, Plaintiffs T.R., Helen Marguerite Irwin and Nicole Irwin have experienced severe mental anguish and extreme emotional pain and suffering.

2661. Plaintiff Shane Irwin was discharged from the U.S. military on April 25, 2014.

**44.      THE APRIL 28, 2006 ATTACK – BAGHDAD**

**The Gomez Family**

2662. Jose Gomez was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2663.   On April 28, 2006, Jose Gomez, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2664.   Jose Gomez was killed in the attack.

2665.   The weapon used to kill Jose Gomez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2666.   Plaintiff Maria Gomez is a citizen of the United States and domiciled in the State of New York. She is the mother of Jose Gomez.

2667.   Plaintiff Maria Gomez brings an action individually and on behalf of the Estate of Jose Gomez, as its legal representative.

2668.   As a result of the attack, and the death of Jose Gomez, Plaintiff Maria Gomez has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 45.   THE MAY 2, 2006 ATTACK – BAGHDAD

**The Greer Family**

2669.   Plaintiff John Dana Greer is a citizen of the United States and domiciled in the State of Texas.

2670.   On May 2, 2006, John Dana Greer, then 49, was a civilian contractor with Blackwater Security Consulting in Iraq.

2671.   Mr. Greer was driving a South African Mamba vehicle in a four-vehicle caravan en route to the Iraqi Ministry of Finance when the vehicle he was driving was struck by five EFPs emplaced by Special Groups.

461

2672. The weapon used to injure Mr. Greer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2673. As a result of the attack, Mr. Greer lost his right hand from above the wrist and sustained third-degree burns on his upper chest.

2674. He also suffered trauma to his back that necessitated a later L4 to S1 fusion.

2675. Mr. Greer sustained a TBI that has impacted his short- and long-term memory.

2676. He has also been diagnosed with PTSD.

2677. Mr. Greer received extensive medical treatment and has undergone various surgeries and prosthetic fittings.

2678. As a result of the attack, and the injuries he suffered, Plaintiff John Dana Greer has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2679. Plaintiff Stephanie C. Sander is a citizen of the United States and domiciled in the State of California. She is the daughter of John Dana Greer.

2680. Plaintiff Christopher D. Greer is a citizen of the United States and domiciled in the State of Georgia. He is the son of John Dana Greer.

2681. Plaintiff Joseph L. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John Dana Greer.

2682. Plaintiff Carl K. Greer is a citizen of the United States and domiciled in the State of Arizona. He is the brother of John Dana Greer.

2683. As a result of the attack, and the injuries John Dana Greer suffered, Plaintiffs Stephanie Sander, Christopher D. Greer, Joseph L. Greer, and Carl K. Greer have experienced severe mental anguish and extreme emotional pain and suffering.

**The Joyner Family**

2684.   Plaintiff Christopher Joyner is a citizen of the United States and domiciled in the State of North Carolina.

2685.   On May 2, 2006, Christopher Joyner, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

2686.   Mr. Joyner was the Vehicle Commander riding in the passenger seat of the South African Mamba that was the fourth vehicle in a four-vehicle caravan en route to the Iraqi Ministry of Finance when the vehicle he was riding in was struck by an EFP array emplaced by Special Groups.

2687.   The weapon used to injure Mr. Joyner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2688.   As a result of the attack, Mr. Joyner suffered multiple fragment wounds to his face and the globe of his right eye. He also sustained shrapnel wounds to his right upper extremity and left lower extremity.

2689.   The severity of the injuries to his right eye resulted in the loss of use of the eye, and the eye had to be surgically removed.

2690.   Mr. Joyner also sustained sinus fractures, loss of teeth, and a large wound to his right jaw.

2691.   He continues to have shrapnel lodged in his right forearm and his face.

2692.   Mr. Joyner has been diagnosed as having cognitive deficits as a result of the attack that impair his short-term memory and his ability to engage in abstract thinking and remaining on topic in conversation.

2693.   He has also received psychological treatment and counseling following the attack and was diagnosed with Acute Stress Disorder.

2694.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Joyner has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2695.   Plaintiff Anne P. "Poppy" Joyner is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of Christopher Joyner.

2696.   Plaintiff Necole Dunlow Smith is a citizen of the United States and domiciled in the State of North Carolina. She is the stepsister of Christopher Joyner.

2697.   As a result of the attack, and the injuries Christopher Joyner suffered, Plaintiffs Anne P. "Poppy" Joyner and Necole Dunlow Smith have experienced severe mental anguish and extreme emotional pain and suffering.

**The Mills Family**

2698.   Plaintiff Michael R. Mills is a citizen of the United States and domiciled in the State of West Virginia.

2699.   On May 2, 2006, Michael R. Mills, then 37, was a civilian contractor with Blackwater Security Consulting in Iraq.

2700.   Mr. Mills was one of two gunners riding in an armored vehicle that was struck by a multiple EFP array emplaced by Special Groups.

2701.   The weapon used to injure Mr. Mills was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2702.　As a result of the attack, Mr. Mills sustained blast and shrapnel injuries to his face, shoulder, and torso. It also caused a torn meniscus in his left knee.

2703.　Mr. Mills received extensive medical treatment and underwent various surgeries over a number of years.

2704.　As a result of the attack, and the injuries he suffered, Plaintiff Michael Mills has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2705.　Plaintiff M.R.M., a minor, represented by his legal guardian Michael Mills, is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

2706.　Plaintiff M.R.M., a minor, represented by his legal guardian Michael Mills, is a citizen of the United States and domiciled in the State of New Jersey. He is the son of Michael Mills.

2707.　As a result of the attack, and the injuries Michael Mills suffered, Plaintiffs M.R.M. and M.R.M. have experienced severe mental anguish and extreme emotional pain and suffering.

**46.**　**THE MAY 3, 2006 ATTACK – NASIRIYAH**

**The Palinsky Family**

2708.　Jerry A. Palinsky, Jr. was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2709.　On May 3, 2006, Jerry A. Palinsky, Jr., aged 42, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2710.　Jerry A. Palinsky, Jr. was killed in the attack.

2711.   The weapon used to kill Jerry A. Palinsky, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2712.   Plaintiff Eddie Jo Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the widow of Jerry A. Palinsky, Jr.

2713.   Plaintiff Eddie Jo Palinsky brings an action individually and on behalf of the Estate of Jerry A. Palinsky, Jr., as its legal representative.

2714.   Plaintiff Jerry A. Palinsky, II is a citizen of the United States and domiciled in the State of Oregon. He is the son of Jerry A. Palinsky, Jr.

2715.   Plaintiff Adina Palinsky is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Jerry A. Palinsky, Jr.

2716.   Plaintiff Jerry A. Palinsky, Sr. is a citizen of the United States and domiciled in the State of Washington. He is the father of Jerry A. Palinsky, Jr.

2717.   Plaintiff Kathleen Hoke is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Jerry A. Palinsky, Jr.

2718.   Plaintiff Joel Palinsky is a citizen of the United States and domiciled in the State of Washington. He is the brother of Jerry A. Palinsky, Jr.

2719.   Plaintiff Karaleen Herb is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Jerry A. Palinsky, Jr.

2720.   As a result of the attack, and the death of Jerry A. Palinsky, Jr., Plaintiffs Eddie Jo Palinsky, Jerry A. Palinsky, II, Adina Palinsky, Jerry A. Palinsky, Sr., Kathleen Hoke, Joel Palinsky and Karaleen Herb have experienced severe mental anguish, extreme emotional pain and

suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Stoneking Family**

2721.   Plaintiff Eric Brandon Stoneking is a citizen of the United States and domiciled in the State of Virginia.

2722.   On May 3, 2006, Eric Brandon Stoneking, then 26, was working as a civilian contractor with EODT in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2723.   The weapon used to injure Eric Brandon Stoneking was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2724.   As a result of the attack, Mr. Stoneking sustained a TBI, the loss of two tendons in his right arm, major facial trauma on the left side to his upper mandible and lower jaw, and shrapnel and burns to the face, left shoulder, and torso.

2725.   He has also suffered from PTSD.

2726.   Mr. Stoneking has received extensive medical treatment at various hospitals for the extensive injuries he sustained on May 3, 2006.

2727.   As a result of the attack, and the injuries he suffered, Plaintiff Eric Brandon Stoneking has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2728.   Plaintiff Carrie Sue Stoneking is a citizen of the United States and domiciled in Germany. She is the mother of Eric Brandon Stoneking.

2729.    Plaintiff Faith Renee Stoneking is a citizen of the United States and domiciled in Germany. She is the sister of Eric Brandon Stoneking.

2730.    As a result of the attack, and the injuries Eric Brandon Stoneking suffered, Plaintiffs Carrie Sue Stoneking and Faith Renee Stoneking have experienced severe mental anguish and extreme emotional pain and suffering.

## 47.    THE MAY 5, 2006 ATTACK – BAGHDAD

### The Saenz Family

2731.    Carlos N. Saenz was a citizen of the United States and domiciled in the State of Nevada when he was killed in Iraq.

2732.    On May 5, 2006, Carlos N. Saenz, aged 46, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2733.    Carlos N. Saenz was killed in the attack.

2734.    The weapon used to kill Carlos N. Saenz was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2735.    Plaintiff Nanette Saenz is a citizen of the United States and domiciled in the State of Nevada. She is the widow of Carlos N. Saenz.

2736.    Plaintiff Nanette Saenz brings an action individually and on behalf of the Estate of Carlos N. Saenz, as its legal representative.

2737.    Plaintiff Juan Saenz is a citizen of the United States and domiciled in the State of Nevada. He is the son of Carlos N. Saenz.

2738.    Plaintiff Joaqina Saenz Chorens is a citizen of the United States and domiciled in the State of Nevada. She is the mother of Carlos N. Saenz.

2739.   Plaintiff Luz Maria Estrada-Pulido is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2740.   Plaintiff Frances Catherine Castro is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2741.   Plaintiff Elva Espinoza is a citizen of the United States and domiciled in the State of Nevada. She is the sister of Carlos N. Saenz.

2742.   As a result of the attack, and the death of Carlos N. Saenz, Plaintiffs Nanette Saenz, Juan Saenz, Joaqina Saenz Chorens, Luz Maria Estrada-Pulido, Frances Catherine Castro and Elva Espinoza have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Vacho Family**

2743.   Nathan J. Vacho was a citizen of the United States and domiciled in the State of Wisconsin when he was killed in Iraq.

2744.   On May 5, 2006, Nathan J. Vacho, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2745.   Nathan J. Vacho was killed in the attack.

2746.   The weapon used to kill Nathan J. Vacho was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2747.   Amanda Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the legal guardian of Plaintiff E.V., a minor, and co-legal representative of the Estate of Nathan J. Vacho.

2748.   Amanda Vacho brings an action solely on behalf of Plaintiff E.V., a minor, and on behalf of the Estate of Nathan J. Vacho, as its co-legal representative.

2749.   Plaintiff E.V., a minor represented by her legal guardian Amanda Vacho, is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

2750.   Plaintiff Bayli Vacho is a citizen of the United States and domiciled in the State of Wisconsin. She is the daughter of Nathan J. Vacho.

2751.   Plaintiff Bayli Vacho brings an action individually and on behalf of the Estate of Nathan J. Vacho, as its co-legal representative.

2752.   Plaintiff John Vacho is a citizen of the United States and domiciled in the State of Wisconsin. He is the father of Nathan J. Vacho.

2753.   Carol Vacho was a citizen of the United States at the time of the death of Nathan J. Vacho. She was the mother of Nathan J. Vacho. She died on November 9, 2013.

2754.   Plaintiff John Vacho brings an action individually and on behalf of the Estate of Carol Vacho, as its legal representative.

2755.   Plaintiff Ashley Vacho Leslie is a citizen of the United States and domiciled in the State of Wisconsin. She is the sister of Nathan J. Vacho.

2756.   As a result of the attack, and the death of Nathan J. Vacho, the late Carol Vacho experienced, and Plaintiffs E.V., Bayli Vacho, John Vacho and Ashley Vacho Leslie have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/son's/brother's society, companionship, comfort, advice and counsel.

## 48.    THE MAY 6, 2006 ATTACK – DIWANIYAH

### The Veverka Family

2757.    David M. Veverka was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

2758.    On May 6, 2006, David M. Veverka, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2759.    David M. Veverka was killed in the attack.

2760.    The weapon used to kill David M. Veverka was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2761.    Plaintiff Ronald Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of David M. Veverka.

2762.    Plaintiff Carol Polley is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of David M. Veverka.

2763.    Plaintiff Keith Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

2764.    Plaintiff Douglas Veverka is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of David M. Veverka.

2765.    Plaintiff Sandra Soliday is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of David M. Veverka.

2766.    As a result of the attack, and the death of David M. Veverka, Plaintiffs Ronald Veverka, Carol Polley, Keith Veverka, Douglas Veverka and Sandra Soliday have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's

society, companionship, comfort, advice and counsel.

## 49.   THE MAY 14, 2006 ATTACK – BAGHDAD

### The West Family

2767.   Robert H. West was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

2768.   On May 14, 2006, Robert H. West, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2769.   Robert H. West was killed in the attack.

2770.   The weapon used to kill Robert H. West was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2771.   Plaintiff Jeanette West is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Robert H. West.

2772.   Plaintiff Jeanette West brings an action individually and on behalf of the Estate of Robert H. West, as its legal representative.

2773.   Plaintiff Shelby West is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of Robert H. West.

2774.   As a result of the attack, and the death of Robert H. West, Plaintiffs Jeanette West and Shelby West have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

### The Engeman Family

2775.   John W. Engeman was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

2776.   On May 14, 2006, John W. Engeman, aged 45, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2777.   John W. Engeman was killed in the attack.

2778.   The weapon used to kill John W. Engeman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2779.   Plaintiff Donna Engeman is a citizen of the United States and domiciled in the State of Texas. She is the widow of John W. Engeman.

2780.   Plaintiff Donna Engeman brings an action individually and on behalf of the Estate of John W. Engeman, as its legal representative.

2781.   As a result of the attack, and the death of John W. Engeman, Plaintiff Donna Engeman has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 50.   THE MAY 21, 2006 ATTACK – MOSUL

**The Shumate Family**

2782.   Plaintiff Shannon Shumate is a citizen of the United States and domiciled in the State of Missouri.

2783.   On May 21, 2006, Shannon Shumate, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2784.   The weapon used to injure Mr. Shumate was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2785.   As a result of the attack, Shannon Shumate sustained injuries to his head and back and suffered hearing loss. Mr. Shumate continues to experience pain in his back as well as ringing in his ears and hearing loss.

2786.   As a result of the attack, he also continues to suffer from PTSD, and he experiences flash backs when he drives at night.

2787.   As a result of the attack, and the injuries he suffered, Plaintiff Shannon Shumate has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2788.   Plaintiff Lauren Shumate is a citizen of the United States and domiciled in the State of Kansas. She is the daughter of Shannon Shumate.

2789.   Plaintiff L.S., a minor, represented by her legal guardian Shannon Shumate, is a citizen of the United States and domiciled in the State of Missouri. She is the daughter of Shannon Shumate.

2790.   Plaintiff L.S., a minor, represented by his legal guardian Shannon Shumate, is a citizen of the United States and domiciled in the State of Missouri. He is the son of Shannon Shumate.

2791.   As a result of the attack, and the injuries Shannon Shumate has suffered, Plaintiffs Lauren Shumate, L.S. and L.S. have experienced severe mental anguish and extreme emotional pain and suffering.

## 51.   THE MAY 25, 2006 ATTACK – BAGHDAD

### The DiCenzo Family

2792.   Douglas Andrew DiCenzo was a citizen of the United States and domiciled in the State of New Hampshire when he was killed in Iraq.

2793. On May 25, 2006, Douglas Andrew DiCenzo, then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2794. Douglas Andrew DiCenzo was killed in the attack.

2795. The weapon used to kill Douglas Andrew DiCenzo was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2796. Plaintiff Nicole DiCenzo is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Douglas Andrew DiCenzo.

2797. Plaintiff Nicole DiCenzo brings an action individually and on behalf of the Estate of Douglas Andrew DiCenzo, as its legal representative.

2798. Plaintiff D.D., a minor, represented by his legal guardian, Nicole DiCenzo, is a citizen of the United States and domiciled in the State of Georgia. He is the son of Douglas Andrew DiCenzo.

2799. Plaintiff Larry DiCenzo is a citizen of the United States and domiciled in the State of Florida. He is the father of Douglas Andrew DiCenzo.

2800. Plaintiff Kathy Crane is a citizen of the United States and domiciled in the State of New Hampshire. She is the mother of Douglas Andrew DiCenzo.

2801. As a result of the attack, and the death of Douglas Andrew DiCenzo, Plaintiffs Nicole DiCenzo, D.D., Larry DiCenzo, and Kathy Crane have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

**The Blair Family**

2802.   Robert Edward Blair was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

2803.   On May 25, 2006, Robert Edward Blair, then 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2804.   Robert Edward Blair was killed in the attack.

2805.   The weapon used to kill Robert Edward Blair was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2806.   Plaintiff Johnny Allen Blair is a citizen of the United States and domiciled in the State of Montana. He is the father of Robert Edward Blair.

2807.   Plaintiff Johnny Allen Blair brings an action individually and on behalf of the Estate of Robert Edward Blair, as its legal representative.

2808.   Plaintiff Charlee Blair Webb is a citizen of the United States and domiciled in the State of Florida. She is the sister of Robert Edward Blair.

2809.   As a result of the attack, and the death of Robert Edward Blair, Plaintiffs Johnny Allen Blair and Charlee Blair Webb have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 52.   THE JUNE 5, 2006 ATTACK – BAGHDAD

**The Lawson Family**

2810.   Isaac S. Lawson was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2811.   On June 5, 2006, Isaac S. Lawson, aged 35, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2812.   Isaac S. Lawson was killed in the attack.

2813.   The weapon used to kill Isaac S. Lawson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2814.   Plaintiff Suzzettee Lawson is a citizen of the United States and domiciled in the State of California. She is the widow of Isaac S. Lawson.

2815.   Plaintiff Suzzettee Lawson brings an action individually and on behalf of the Estate of Isaac S. Lawson, as its legal representative.

2816.   Plaintiff C.L., a minor represented by her legal guardian Suzzettee Lawson, is a citizen of the United States and domiciled in the State of California. She is the daughter of Isaac S. Lawson.

2817.   As a result of the attack, and the death of Isaac S. Lawson, Plaintiffs Suzzettee Lawson and C.L. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Eastlund Family**

2818.   Plaintiff Arne Eastlund is a citizen of the United States and domiciled in the State of California.

2819.   On June 5, 2006, Arne Eastlund, age 45, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

2820.   The weapon used to injure Mr. Eastlund was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2821.   Following the attack, pieces of one of the occupants of the vehicle, Isaac Lawson, landed on Mr. Eastlund's lap.

2822.   As a result of the attack, Mr. Eastlund sustained significant injuries to his back.

2823.   He also sustained burns to his body and has suffered hearing loss.

2824.   He has undergone multiple surgeries and procedures to address the injuries to his back. He continues to seek treatment for his back and neck.

2825.   Mr. Eastlund has been diagnosed with a TBI and PTSD.

2826.   As a result of the attack, and the injuries he suffered, Plaintiff Arne Eastlund has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2827.   Plaintiff Tina Eastlund is a citizen of the United States and domiciled in the State of California. She is the wife of Arne Eastlund.

2828.   Plaintiff Sven Eastlund is a citizen of the United States and domiciled in the State of California. He is the son of Arne Eastlund.

2829.   Plaintiff Taylor Eastlund is a citizen of the United States and domiciled in the State of California. She is the stepdaughter of Arne Eastlund.

2830.   Plaintiff Elizabeth Jo Eastlund is a citizen of the United States and domiciled in the State of California. She is the mother of Arne Eastlund.

2831.   As a result of the attack, and the injuries Arne Eastlund suffered, Plaintiffs Tina Eastlund, Sven Eastlund, Taylor Eastlund, and Elizabeth Jo Eastlund have experienced severe mental anguish and extreme emotional pain and suffering.

2832. Plaintiff Arne Eastlund was discharged from the U.S. military on July 21, 2015.

**The Adamson Family**

2833. Plaintiff Matthew Adamson is a citizen of the United States and domiciled in the State of Oklahoma.

2834. On June 5, 2006, Matthew Adamson, age 21, was serving in the U.S. military in Iraq. He was the gunner in a vehicle ("the Adamson vehicle") traveling in the same convoy as Arne Eastlund when Mr. Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2835. As a result of the explosion, Mr. Adamson was thrown back, injuring his head.

2836. The weapon used to injure Mr. Adamson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2837. Mr. Adamson has experienced frequent and severe headaches. He also experiences memory loss.

2838. Mr. Adamson has been diagnosed with a modified TBI.

2839. He has also been diagnosed with PTSD.

2840. Mr. Adamson has sought counseling and has been prescribed medication, including anti-depressants, to treat his condition.

2841. As a result of the attack, and the injuries he suffered, Plaintiff Matthew Adamson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2842. Plaintiff R.A., a minor represented by his legal guardian Matthew Adamson, is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Matthew Adamson.

2843.  Plaintiff Kathy Adamson is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Matthew Adamson.

2844.  Plaintiff Richard Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Matthew Adamson.

2845.  Plaintiff Christopher Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2846.  Plaintiff Jeffrey Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2847.  Plaintiff Justin Adamson is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Matthew Adamson.

2848.  As a result of the attack, and the injuries Matthew Adamson suffered, Plaintiffs R.A., Kathy Adamson, Richard Adamson, Christopher Adamson, Jeffrey Adamson, and Justin Adamson have experienced severe mental anguish and extreme emotional pain and suffering.

2849.  Plaintiff Matthew Adamson was discharged from the U.S. military on December 19, 2012.

**The Shepard Family**

2850.  Plaintiff James Shepard is a citizen of the United States and domiciled in the State of Oklahoma.

2851.  On June 5, 2006, James Shepard, age 32, was serving in the U.S. military in Iraq. He was the Truck Commander of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Mr. Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2852. The weapon used to injure Mr. Shepard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2853. Following the attack, the Adamson vehicle traveled toward the location where Mr. Eastlund's vehicle had stopped.

2854. After exiting his vehicle, Mr. Shepard went to the vehicle and opened the door. There, he saw Isaac Lawson moving, despite the fact that there were pieces of Lawson's face or neck visible in the interior of the vehicle.

2855. Mr. Shepard helped remove Isaac Lawson from the vehicle.

2856. Mr. Shepard continues to vividly recall the attack and his actions as well as what he witnessed following the attack.

2857. He has experienced extreme survivor's guilt.

2858. He has been diagnosed with PTSD and has sought counseling.

2859. As a result of the attack, and the injuries he suffered, Plaintiff James Shepard has experienced severe mental anguish and extreme emotional pain and suffering.

2860. Plaintiff James Shepard was discharged from the U.S. military on June 14, 2012.

**The Sklaney Family**

2861. Plaintiff John P. Sklaney, III is a citizen of the United States and domiciled in the State of Oklahoma.

2862. On June 5, 2006, John Sklaney, age 35, was serving in the U.S. military in Iraq. He was the driver of the Adamson vehicle, traveling in the same convoy as Arne Eastlund when Mr. Eastlund's vehicle was struck by an EFP emplaced by Special Groups.

2863. The weapon used to injure Mr. Sklaney was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2864. Following the attack, the Adamson vehicle traveled toward the location where Mr. Eastlund's vehicle had stopped.

2865. After exiting his vehicle, John P. Sklaney, III went to Mr. Eastlund's vehicle. He saw Isaac Lawson and that Mr. Lawson's leg had been severed.

2866. Together with James Shepard, John P. Sklaney, III removed Mr. Lawson from the vehicle. Mr. Sklaney helped to place Mr. Lawson on a stretcher.

2867. Mr. Sklaney has experienced survivor's guilt.

2868. He has experienced memory loss and has been diagnosed with PTSD.

2869. Mr. Sklaney has sought counseling and has been prescribed medication to treat depression.

2870. As a result of the attack, and the injuries he suffered, Plaintiff John P. Sklaney, III has experienced severe mental anguish and extreme emotional pain and suffering.

2871. Plaintiff John P. Sklaney, III was discharged from the U.S. military on July 25, 2019.

### 53. THE JUNE 8, 2006 ATTACK – AL KUT

**The Crabtree Family**

2872. Daniel Crabtree was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

2873. On June 8, 2006, Daniel Crabtree, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2874.    Daniel Crabtree was killed in the attack.

2875.    The weapon used to kill Daniel Crabtree was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2876.    Plaintiff Kathy Crabtree is a citizen of the United States and domiciled in the State of Ohio. She is the widow of Daniel Crabtree.

2877.    Plaintiff Kathy Crabtree brings an action individually and on behalf of the Estate of Daniel Crabtree, as its legal representative.

2878.    Plaintiff M.C., a minor represented by her legal guardian, Kathy Crabtree, is a citizen of the United States and domiciled in the State of Ohio. She is the daughter of Daniel Crabtree.

2879.    Plaintiff Judy Ann Crabtree is a citizen of the United States and domiciled in the State of Georgia. She is the mother of Daniel Crabtree.

2880.    Plaintiff Ronald Wayne Crabtree is a citizen of the United States and domiciled in the State of Ohio. He is the father of Daniel Crabtree.

2881.    Plaintiff Debra Wigbels is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Daniel Crabtree.

2882.    Plaintiff Ronald William Crabtree is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Daniel Crabtree.

2883.    As a result of the attack, and the death of Daniel Crabtree, Plaintiffs Kathy Crabtree, M.C., Judy Ann Crabtree, Ronald Wayne Crabtree, Debra Wigbels and Ronald William Crabtree have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

## 54.    THE JUNE 9, 2006 ATTACK – DIWANIYAH

**The Slaven Family**

2884.    Benjamin J. Slaven was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

2885.    On June 9, 2006, Benjamin J. Slaven aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2886.    Benjamin J. Slaven was killed in the attack.

2887.    The weapon used to kill Benjamin J. Slaven was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2888.    Plaintiff Judy Huenink is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Benjamin J. Slaven.

2889.    Plaintiff Judy Huenink brings an action individually and on behalf of the Estate of Benjamin J. Slaven, as its legal representative.

2890.    Plaintiff Sean Slaven is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of Benjamin J. Slaven.

2891.    Plaintiff Chastity Dawn Laflin is a citizen of the United States and domiciled in the State of Nebraska. She is the sister of Benjamin J. Slaven.

2892.    Plaintiff Nicole Landon is a citizen of the United States and domiciled in the State of Nebraska. She is the sister of Benjamin J. Slaven.

2893.    Plaintiff Misti Fisher is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Benjamin J. Slaven.

2894.    As a result of the attack, and the death of Benjamin J. Slaven, Plaintiffs Judy

Huenink, Sean Slaven, Chastity Dawn Laflin, Nicole Landon and Misti Fisher have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 55. THE JUNE 10, 2006 ATTACK – RUSTAMIYAH

**The Friedrich Family**

2895.   Plaintiff Steven J. Friedrich is a citizen of the United States and domiciled in the State of Florida.

2896.   On June 10, 2006, Steven J. Friedrich, then 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2897.   The weapon used to injure Mr. Friedrich was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2898.   As a result of the attack, Mr. Friedrich sustained bilateral eardrum perforations and shrapnel injuries to his left forehead, right shoulder, and right leg.

2899.   He has undergone multiple surgeries on his ears and suffers from tinnitus.

2900.   As a result of the attack, and the injuries he suffered, Plaintiff Steven J. Friedrich has experienced severe physical pain and mental anguish and extreme emotional pain and suffering.

2901.   Plaintiff A.F., a minor, represented by her legal guardian Steven J. Friedrich, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Steven J. Friedrich.

2902.   As a result of the attack, and the injuries Steven J. Friedrich suffered, Plaintiff A.F. has experienced severe mental anguish and extreme emotional pain and suffering.

2903.   Plaintiff Steven J. Friedrich was discharged from the U.S. military on August 20, 2014.

### 56.     THE JULY 11, 2006 ATTACK – KARBALA

**The Derise Family**

2904.   Plaintiff Philip Alan Derise is a citizen of the United States and domiciled in the State of Washington.

2905.   On July 11, 2006, Philip Alan Derise, then 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling outside of Karbala.

2906.   The weapon used to injure Philip Alan Derise was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2907.   As a result of the attack, Mr. Derise suffered a loss of hearing and eyesight.

2908.   Mr. Derise was also diagnosed with a concussion, a TBI, and PTSD.

2909.   As a result of the attack, and the injuries he suffered, Plaintiff Philip Alan Derise has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 57.     THE JULY 15, 2006 ATTACK – BAGHDAD

**The Contreras Family**

2910.   Andres J. Contreras was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2911.   On July 15, 2006, Andres J. Contreras, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2912.   Andres J. Contreras was killed in the attack.

2913.    The weapon used to kill Andres J. Contreras was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2914.    Plaintiff Norma Alicia Contreras is a citizen of the United States and domiciled in the State of California. She is the mother of Andres J. Contreras.

2915.    Plaintiff Jonathan Contreras, Sr. is a citizen of the United States and domiciled in the State of California. He is the father of Andres J. Contreras.

2916.    Plaintiff Carlos Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2917.    Plaintiff Cesar Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2918.    Plaintiff Hernan Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2919.    Plaintiff Noel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2920.    Plaintiff Dannyel Contreras is a citizen of the United States and domiciled in the State of California. He is the brother of Andres J. Contreras.

2921.    As a result of the attack, and the death of Andres J. Contreras, Plaintiffs Norma Alicia Contreras, Jonathan Contreras, Sr., Carlos Contreras, Cesar Contreras, Hernan Contreras, Noel Contreras and Dannyel Contreras have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**58.** **THE JULY 17, 2006 ATTACK – BAGHDAD**

**The Pugh Family**

2922.   Kenneth Irving Pugh was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

2923.   On July 17, 2006, Kenneth Irving Pugh, then 39, was serving in the U.S. military in Iraq when his checkpoint in southeast Baghdad came under sniper fire from JAM Special Groups.

2924.   Kenneth Irving Pugh was killed in the attack from a gunshot wound to his head.

2925.   The terror cell operatives that fired at Kenneth Irving Pugh were trained by Hezbollah and funded and armed by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF, as their proxy.

2926.   Plaintiff Sharon M. Pugh is a citizen of the United States and domiciled in the State of Kentucky. She is the widow of Kenneth Irving Pugh.

2927.   Plaintiff Sharon M. Pugh brings an action individually and on behalf of the Estate of Kenneth Irving Pugh, as its legal representative.

2928.   Plaintiff Britney E. Carter is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

2929.   Plaintiff Alicia Pearson is a citizen of the United States and domiciled in the State of Kentucky. She is the stepdaughter of Kenneth Irving Pugh.

2930.   As a result of the attack, and the death of Kenneth Irving Pugh, Plaintiffs Sharon M. Pugh, Britney E. Carter, and Alicia Pearson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

59.     **THE JULY 22, 2006 ATTACK – SADR CITY**

**The Evans Family**

2931.   Plaintiff Daniel J. Evans is a citizen of the United States and domiciled in the State of Texas.

2932.   On July 22, 2006, Daniel J. Evans, then 19, was serving in the U.S. military in Iraq. He was riding in the second vehicle of a four-vehicle convoy in the north-bound lane of Route Pluto en route to providing assistance to another unit involved in a previous IED attack in the vicinity of Sadr City when the M1114 vehicle in which he was riding in the rear passenger-side seat was hit by an EFP emplaced by Special Groups from the right side of the vehicle.

2933.   The weapon used to injure Daniel J. Evans was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2934.   As a result of the attack, Daniel J. Evans sustained a TBI having been rendered unconscious from the blast for approximately 16 hours. He also suffered from a collapsed left lung and injuries to his left shoulder.

2935.   He was also diagnosed with PTSD.

2936.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel J. Evans has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2937.   Plaintiff Justin Evans is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Daniel J. Evans.

2938.   As a result of the attack, and the injuries Daniel J. Evans suffered, Plaintiff Justin Evans has experienced severe mental anguish and extreme emotional pain and suffering.

2939.  Plaintiff Daniel J. Evans was discharged from the U.S. military on November 9, 2011.

### 60.    THE JULY 25, 2006 ATTACK – BAGHDAD

**The Graves Family**

2940.  Joseph A. Graves was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2941.  On July 25, 2006, Joseph A. Graves, aged 21, was serving in the U.S. military in Iraq when the convoy he was travelling in came under RPG and small arms fire from JAM Special Groups operatives.

2942.  Joseph A. Graves was killed in the attack.

2943.  The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2944.  Plaintiff Kevin Graves is a citizen of the United States and domiciled in the State of California. He is the father of Joseph A. Graves.

2945.  As a result of the attack, and the death of Joseph A. Graves, Plaintiff Kevin Graves has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

### 61.    THE AUGUST 26, 2006 ATTACK – JISR DIYALA

**The Zayas Family**

2946.  Edgardo Zayas was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

2947.   On August 26, 2006, Edgardo Zayas, aged 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Edgardo Zayas was in a five-vehicle convoy and was serving as the driver in the lead M1114 in the convoy.

2948.   Edgardo Zayas was killed in the attack.

2949.   The weapon used to kill Edgardo Zayas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2950.   Plaintiff Suheil Campbell is a citizen of the United States and domiciled in the State of Massachusetts. She is the widow of Edgardo Zayas.

2951.   Plaintiff Suheil Campbell brings an action individually and on behalf of the Estate of Edgardo Zayas, as its legal representative.

2952.   Plaintiff Alexander Zayas is a citizen of the United States and domiciled in the State of Massachusetts. He is the son of Edgardo Zayas.

2953.   Plaintiff A.Z.-C., a minor, represented by her legal guardian Suheil Campbell, is a citizen of the United States and domiciled in the State of Massachusetts. She is the daughter of Edgardo Zayas.

2954.   As a result of the attack, and the death of Edgardo Zayas, Plaintiffs Suheil Campbell, Alexander Zayas, and A.Z.-C. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 62. THE SEPTEMBER 3, 2006 ATTACK – BAGHDAD

**The Andino Family**

2955.   Edwin A. Andino, Jr. was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

2956.   On September 3, 2006, Edwin A. Andino, Jr., aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2957.   Edwin A. Andino, Jr. was killed in the attack.

2958.   The weapon used to kill Edwin A. Andino, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2959.   Plaintiff Cathy Andino is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Edwin A. Andino, Jr.

2960.   Plaintiff Cathy Andino brings an action individually and on behalf of the Estate of Edwin A. Andino, Jr., as its legal representative.

2961.   As a result of the attack, and the death of Edwin A. Andino, Jr., Plaintiff Cathy Andino has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 63. THE SEPTEMBER 20, 2006 ATTACK – BAGHDAD

**The Puertas Family**

2962.   Plaintiff Luis Junior Puertas is a citizen of the United States and domiciled in the State of Florida.

2963.   On September 20, 2006, Luis Junior Puertas, then 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. He was the

driver of the lead vehicle in a four-vehicle convoy traveling north on Route Gold adjacent to the Khansa neighborhood in the eastern portion of Baghdad when a multiple-array EFP planted inside the bottom of a newly constructed light pole detonated next to the vehicle.

2964.   The weapon used to injure Luis Junior Puertas was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2965.   As a result of the attack, Mr. Puertas lost his left foot as a result of an EFP entering the vehicle and sustained significant damage to his right leg as well. He underwent above-the-knee amputations on both legs as a result of the damages inflicted by the EFP. He also sustained a loss of equilibrium due to damage sustained to his ears.

2966.   Mr. Puertas has received extensive medical treatment – including various surgeries and prosthetic fittings – at several hospitals, where he has spent months in treatment.

2967.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Junior Puertas has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2968.   Plaintiff Lidia Sullivan is a citizen of the United States and domiciled in the State of Florida. She is the mother of Luis Junior Puertas.

2969.   Plaintiff Gabriela D. Puertas Vergara-Donoso is a citizen of the United States and domiciled in the State of Florida. She is the sister of Luis Junior Puertas.

2970.   As a result of the attack, and the injuries Luis Junior Puertas suffered, Plaintiffs Lidia Sullivan and Gabriela D. Puertas Vergara-Donoso have experienced severe mental anguish and extreme emotional pain and suffering.

## 64.  THE SEPTEMBER 30, 2006 ATTACK – BAGHDAD

**The Melendez Family**

2971.  Plaintiff Christopher Michael Melendez is a citizen of the United States and domiciled in the State of Florida.

2972.  On September 30, 2006, Christopher Michael Melendez, then 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Christopher Michael Melendez was a gunner in an M1114 vehicle on a routine patrol on Route Florida in the Mashtal neighborhood of Baghdad when his vehicle was disabled by a direct hit from an EFP on the driver's side of the vehicle.

2973.  The weapon used to injure Christopher Michael Melendez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2974.  As a result of the attack, Mr. Melendez's left leg was amputated above the knee, he sustained a TBI, an injury to his brachial plexus causing weakness in his dominant hand, tinnitus, jaw fractures, post-traumatic headaches, facial and hand nerve damage, disfiguring head and facial scarring, burns, and additional shrapnel injuries.

2975.  Mr. Melendez has received extensive medical treatment – including various surgeries and prosthetic fittings – at several hospitals, where he has spent months in treatment.

2976.  As a result of the attack, and the injuries he suffered, Plaintiff Christopher Michael Melendez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

2977.  Plaintiff Narciso Melendez is a citizen of the United States and domiciled in the State of New York. He is the father of Christopher Michael Melendez.

2978.  Plaintiff Christina Melendez is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Christopher Michael Melendez.

2979.  As a result of the attack, and the injuries Christopher Michael Melendez suffered, Plaintiffs Narciso Melendez and Christina Melendez have experienced severe mental anguish and extreme emotional pain and suffering.

## 65.    THE OCTOBER 4, 2006 ATTACK – BAGHDAD

**The Barattieri Family**

2980.  Guy Barattieri was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

2981.  On October 4, 2006, Guy Barattieri, aged 36, was serving as a civilian contractor with Falcon Security in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

2982.  Guy Barattieri was killed in the attack.

2983.  The weapon used to kill Guy Barattieri was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

2984.  Plaintiff Laurel Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the widow of Guy Barattieri.

2985.  Plaintiff Laurel Barattieri brings an action individually and on behalf of the Estate of Guy Barattieri, as its legal representative.

2986.  Plaintiff Patricia Wheatley is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Guy Barattieri.

2987.  Plaintiff Rebecca Barattieri is a citizen of the United States and domiciled in the State of Washington. She is the sister of Guy Barattieri.

2988.   Plaintiff Nicole Barattieri is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

2989.   Plaintiff Gina Tesnar is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of Guy Barattieri.

2990.   As a result of the attack, and the death of Guy Barattieri, Plaintiffs Laurel Barattieri, Patricia Wheatley, Rebecca Barattieri, Nicole Barattieri and Gina Tesnar have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 66.   THE OCTOBER 13, 2006 ATTACK – BAGHDAD

**The Stanton Family**

2991.   Kenny Frances Stanton, Jr. was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

2992.   On October 13, 2006, Kenny Frances Stanton, Jr., then 20, was serving in the U.S. military in Iraq when his unit was struck by an IED emplaced by JAM Special Groups terror operatives in the Sholeh neighborhood in northwest Baghdad.

2993.   Kenny Frances Stanton, Jr. was killed in the attack.

2994.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

2995.   Plaintiff Gloria L. Magana is a citizen of the United States and domiciled in the State of California. She is the mother of Kenny Frances Stanton, Jr.

2996.   Plaintiff Gloria L. Magana brings an action individually and on behalf of the Estate of Kenny Frances Stanton, Jr., as its legal representative.

2997. Plaintiff Mario Stanton is a citizen of the United States and domiciled in the State of California. He is the brother of Kenny Frances Stanton, Jr.

2998. Plaintiff Brandie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

2999. Plaintiff Terrymarie Stanton is a citizen of the United States and domiciled in the State of California. She is the sister of Kenny Frances Stanton, Jr.

3000. As a result of the attack, and the death of Kenny Frances Stanton, Jr., Plaintiffs Gloria L. Magana, Mario Stanton, Brandie Stanton, and Terrymarie Stanton have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 67. THE OCTOBER 17, 2006 ATTACK – BAQUBAH

### The Frigo Family

3001. Nathan J. Frigo was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

3002. On October 17, 2006, Nathan J. Frigo, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3003. Nathan J. Frigo was killed in the attack.

3004. The weapon used to kill Nathan J. Frigo was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3005. Plaintiff Fred Frigo is a citizen of the United States and domiciled in the State of Indiana. He is the father of Nathan J. Frigo.

3006. As a result of the attack, and the death of Nathan J. Frigo, Plaintiff Fred Frigo has

experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**The Haupt Family**

3007.  Ryan Haupt was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

3008.  On October 17, 2006, Ryan Haupt, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3009.  Ryan Haupt was killed in the attack.

3010.  The weapon used to kill Ryan Haupt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3011.  Plaintiff Nannette Bryne-Haupt is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Ryan Haupt.

3012.  Plaintiff Lynn Forehand is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Ryan Haupt.

3013.  Plaintiff Lynn Forehand brings an action individually and on behalf of the Estate of Ryan Haupt, as its legal representative, for his death and any suffering and/ or economic loss he/his Estate sustained as a result of the attack.

3014.  Plaintiff Lance Haupt is a citizen of the United States and domiciled in the State of Arizona. He is the father of Ryan Haupt.

3015.  Plaintiff Rhonda Haupt is a citizen of the United States and domiciled in the State of California. She is the sister of Ryan Haupt.

3016.  Plaintiff Tifany Thompson is a citizen of the United States and domiciled in the

State of California. She is the sister of Ryan Haupt.

3017.   Plaintiff Sabrina Cumbe is a citizen of the United States and domiciled in the State of California. She is the sister of Ryan Haupt.

3018.   As a result of the attack, and the death of Ryan Haupt, Plaintiffs Nannette Bryne-Haupt, Lynn Forehand, Lance Haupt, Rhonda Haupt, Tifany Thompson and Sabrina Cumbe have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 68.   THE OCTOBER 20, 2006 ATTACK – BAGHDAD

**The Witte Family**

3019.   Kevin M. Witte was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

3020.   On October 20, 2006, Kevin M. Witte, aged 27, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3021.   Kevin M. Witte was killed in the attack.

3022.   The weapon used to kill Kevin M. Witte was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3023.   Plaintiff William Witte is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Kevin M. Witte.

3024.   Plaintiff William Witte brings an action individually and on behalf of the Estate of Kevin M. Witte, as its legal representative.

3025.   As a result of the attack, and the death of Kevin M. Witte, Plaintiff William Witte has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

## 69.   THE OCTOBER 22, 2006 ATTACK – BAGHDAD

### The Mock Family

3026.   Willsun Mock was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

3027.   On October 22, 2006, Willsun Mock, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3028.   Willsun Mock was killed in the attack.

3029.   The weapon used to kill Willsun Mock was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3030.   Plaintiff Michael Mock is a citizen of the United States and domiciled in the State of Kansas. He is the father of Willsun Mock.

3031.   Plaintiff Tammy Dorsey is a citizen of the United States and domiciled in the State of Kansas. She is the sister of Willsun Mock.

3032.   Plaintiff Eric Phye is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Willsun Mock.

3033.   As a result of the attack, and the death of Willsun Mock, Plaintiffs Michael Mock, Tammy Dorsey and Eric Phye have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Gmachowski Family**

3034.  Plaintiff James Gmachowski is a citizen of the United States and domiciled in the State of California.

3035.  On October 22, 2006, James Gmachowski, then 19, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle.

3036.  The weapon used to injure James Gmachowski was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3037.  As a result of the blast, a golf-ball-sized piece of copper was lodged in James Gmachowski's back that required invasive surgery to remove. The wound took roughly five months to heal. Mr. Gmachowski was also diagnosed with a TBI and PTSD.

3038.  As a result of the attack, and the injuries he suffered, Plaintiff James Gmachowski has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3039.  Plaintiff James Gmachowski was discharged from the U.S. military on February 14, 2016.

## 70.  THE OCTOBER 22, 2006 ATTACK – BAGHDAD

**The Brian Family**

3040.  Brian Brian was a citizen of the United States and domiciled in the State of Arkansas when he was killed in Iraq.

3041.  On October 22, 2006, Brian Brian, then 58, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3042. The weapon used to kill Brian Brian was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3043. Plaintiff Constance Brian is a citizen of the United States and domiciled in the State of Arkansas. She is the widow of Brian Brian.

3044. Plaintiff Constance Brian brings an action individually and on behalf of the Estate of Brian Brian, as its legal representative.

3045. Plaintiff Amber Hensley is a citizen of the United States and domiciled in the State of North Dakota. She is the daughter of Brian Brian.

3046. As a result of the attack, and the death of Brian Brian, Plaintiffs Constance Brian and Amber Hensley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 71. THE OCTOBER 22, 2006 ATTACK – BAGHDAD

**The Haines Family**

3047. Plaintiff David W. Haines is a citizen of the United States and domiciled in the State of Kentucky.

3048. On October 22, 2006, David W. Haines, then 41, was serving in the U.S. military in Iraq.

3049. Mr. Haines was a member of a mounted patrol conducting a route reconnaissance to the military hospital in Baghdad when an EFP emplaced by Special Groups struck his vehicle.

3050. The weapon used to injure Mr. Haines was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

3051.   As a result of the attack, Mr. Haines sustained a fracture of his right femur that resulted in his right and left legs being different lengths; shrapnel injuries to his right hand, left arm, right leg, and buttocks; burns to his body; and nerve damage.

3052.   He has undergone multiple surgeries to repair the fracture to his femur and had multiple skin grafts.

3053.   As a result of the nerve damage that he incurred, Mr. Haines continues to experience limited mobility in his left arm and hand and sensation problems.

3054.   He has been diagnosed with PTSD and has sought counseling for emotional injuries resulting from the attack.

3055.   As a result of the attack, and the injuries he suffered, Plaintiff David W. Haines has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3056.   Plaintiff Dawn Haines is a citizen of the United States and domiciled in the State of Kentucky. She is the wife of David W. Haines.

3057.   Plaintiff Colin Haines is a citizen of the United States and domiciled in the State of Kentucky. He is the son of David W. Haines.

3058.   Plaintiff Mackenzie Haines is a citizen of the United States and domiciled in the State of Kentucky. She is the daughter of David W. Haines.

3059.   As a result of the attack, and the injuries suffered by David W. Haines, Plaintiffs Dawn Haines, Colin Haines and Mackenzie Haines have experienced severe mental anguish, and extreme emotional pain and suffering.

3060.   Plaintiff David W. Haines was discharged from the U.S. military on July 31, 2012.

**The Alabsawi Family**

3061.   Plaintiff Karar Alabsawi is a citizen of the United States and domiciled in the State of Pennsylvania.

3062.   On October 22, 2006, Karar Alabsawi was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3063.   The weapon used to injure Karar Alabsawi was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3064.   As a result of the attack, Mr. Alabsawi lost his left leg. He also suffered significant injuries to his left arm which he is unable to use, as well as shrapnel wounds and burns on his body.

3065.   As a result of the attack, and the injuries he suffered, Plaintiff Karar Alabsawi has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Taylor Family**

3066.   David G. Taylor, Jr. was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

3067.   On October 22, 2006, David G. Taylor, Jr., aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3068.   David G. Taylor, Jr. was killed in the attack.

3069.   The weapon used to kill David G. Taylor, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3070. Plaintiff Michelle Taylor is a citizen of the United States and domiciled in the State of Florida. She is the widow of David G. Taylor, Jr.

3071. Plaintiff Michelle Taylor brings an action individually and on behalf of the Estate of David G. Taylor, Jr. as its legal representative.

3072. Plaintiff J.T., a minor represented by his legal guardian, Michelle Taylor, is a citizen of the United States and domiciled in the State of Florida. He is the son of David G. Taylor, Jr.

3073. Plaintiff Phyllis Taylor is a citizen of the United States and domiciled in the State of Florida. She is the mother of David G. Taylor, Jr.

3074. Plaintiff John Taylor is a citizen of the United States. He is the brother of David G. Taylor, Jr.

3075. As a result of the attack, and the death of David G. Taylor, Jr., Plaintiffs Michelle Taylor, J.T., Phyllis Taylor and John Taylor have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Taylor Family**

3076. Plaintiff Brian G. Taylor is a citizen of the United States and domiciled in the State of Florida.

3077. On October 22, 2006, Brian G. Taylor was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3078. The weapon used to injure Brian G. Taylor was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3079. As a result of the attack, Mr. Taylor lost his right leg. He also suffered injuries to his right thigh, loss of muscle, skin and part of his femur, a dislocated knee, a damaged femoral artery, and compartment syndrome.

3080. As a result of the attack, and the injuries he suffered, Plaintiff Brian G. Taylor has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3081. Plaintiff Brian G. Taylor was discharged from the U.S. military on February 5, 2011.

**The Recendez Family**

3082. Plaintiff Judas Recendez is a citizen of the United States and domiciled in the State of California.

3083. On October 22, 2006, Judas Recendez was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3084. The weapon used to injure Mr. Recendez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3085. As a result of the attack, both of Mr. Recendez's legs were amputated below the knee. He also sustained shrapnel injuries to the lower part of his body from the waist down, hearing and vision damage, and nerve damage in his left hand.

3086. As a result of the attack, and the injuries he suffered, Plaintiff Judas Recendez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**72.** <u>**THE OCTOBER 22, 2006 ATTACK – SADR CITY**</u>

<u>**The Norager Family**</u>

3087.  Plaintiff Tyler Norager is a citizen of the United States and domiciled in the State of Utah.

3088.  On October 22, 2006, Tyler Norager was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3089.  The weapon used to injure Mr. Norager was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3090.  As a result of the attack, Mr. Norager sustained shrapnel wounds to the face, the right side of his body, and the top of his spine. His injuries have caused him long-term, permanent back pain.

3091.  As a result of the attack, and the injuries he suffered, Plaintiff Tyler Norager has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3092.  Plaintiff Shalee Norager is a citizen of the United States and domiciled in the State of Utah. She is the wife of Tyler Norager.

3093.  Plaintiff M.N., a minor represented by her legal guardian, Tyler Norager, is a citizen of the United States and domiciled in the State of Utah. She is the daughter of Tyler Norager.

3094.  As a result of the attack, and the injuries suffered by Tyler Norager, Plaintiffs Shalee Norager and M.N. have experienced severe mental anguish, and extreme emotional pain and suffering.

### 73.    THE OCTOBER 23, 2006 ATTACK – BAGHDAD

**The Bock Family**

3095.    Amos Bock was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

3096.    On October 23, 2006, Amos Bock, aged 24, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3097.    Amos Bock was killed in the attack.

3098.    The weapon used to kill Amos Bock was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3099.    Plaintiff Harry Riley Bock is a citizen of the United States and domiciled in the State of Missouri. He is the father of Amos Bock.

3100.    Plaintiff Jill Ann Bock is a citizen of the United States and domiciled in the State of Missouri. She is the mother of Amos Bock.

3101.    Plaintiff Mariah Simoneaux is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Amos Bock.

3102.    As a result of the attack, and the death of Amos Bock, Plaintiffs Harry Riley Bock, Jill Ann Bock, and Mariah Simoneaux have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 74. THE OCTOBER 2006 ATTACK – BAGHDAD

**The Al-Taie Family**

3103.   Ahmed Al-Taie was born in Iraq but left that country in 1980 with his family. Prior to 2004 he moved to the United States.

3104.   In 2004, Ahmed Al-Taie enlisted in the U.S. Army Reserves. He was deployed to Baghdad in 2005 as part of a Provincial Reconstruction Team, where he served as a translator.

3105.   On May 15, 2006, Ahmed Al-Taie was naturalized as a United States citizen.

3106.   In October 2006, Ahmed Al-Taie was visiting his wife in the Karrada neighborhood of Bagdad. While there, the AAH abducted Ahmed Al-Taie and held him captive.

3107.   In February 2007, an affiliate of the AAH posted a video of Ahmed Al-Taie in captivity.

3108.   Sometime prior to February 22, 2012, while the AAH held Ahmed Al-Taie prisoner, the AAH murdered him.

3109.   On February 22, 2012, the AAH released Ahmed Al-Taie's remains to the Iraqi government as part of a prisoner exchange.

3110.   Plaintiff Kousay Al-Taie is a citizen of the United States and domiciled in the State of Michigan. He is the father of Ahmed Al-Taie.

3111.   Plaintiff Kousay Al-Taie brings an action individually and on behalf of the Estate of Ahmed Al-Taie, as its legal representative.

3112.   Plaintiff Nawal Al-Taie is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Ahmed Al-Taie.

3113.   Plaintiff Bashar Al-Taie is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Ahmed Al-Taie.

3114.   Plaintiff Hathal K. Taie is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Ahmed Al-Taie.

3115.   As a result of the attack, and the death of Ahmed Al-Taie, Plaintiffs Kousay Al-Taie, Nawal Al-Taie, Bashar Al-Taie and Hathal K. Taie have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 75.   THE NOVEMBER 2, 2006 ATTACK – BAGHDAD

**The Kruger Family**

3116.   Eric Kruger was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3117.   On November 2, 2006, Eric Kruger, aged 44, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3118.   Eric Kruger was killed in the attack.

3119.   The weapon used to kill Eric Kruger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3120.   Plaintiff Lawrence Kruger is a citizen of the United States and domiciled in the State of Texas. He is the father of Eric Kruger.

3121.   Plaintiff Lawrence Kruger brings an action individually and on behalf of the Estate of Eric Kruger, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

3122.   Plaintiff Carol Kruger is a citizen of the United States and domiciled in the State of Missouri. She is the mother of Eric Kruger.

3123.   Plaintiff C.K., a minor represented by his conservator, Lawrence Kruger, is a citizen of the United States and domiciled in the State of Colorado. He is the son of Eric Kruger.

3124.   Plaintiff E.K., a minor represented by her conservator, Lawrence Kruger, is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of Eric Kruger.

3125.   Plaintiff Douglas Kruger is a citizen of the United States and domiciled in the State of Texas. He is the brother of Eric Kruger.

3126.   Plaintiff Kristy Kruger is a citizen of the United States and domiciled in the State of Texas. She is the sister of Eric Kruger.

3127.   As a result of the attack, and the death of Eric Kruger, Plaintiffs Lawrence Kruger, Carol Kruger, C.K., E.K., Douglas Kruger and Kristy Kruger have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

**The Finken Family**

3128.   Paul Finken was a citizen of the United States and domiciled in the State of Iowa when he was killed in Iraq.

3129.   On November 2, 2006, Paul Finken, aged 40, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3130.   Paul Finken was killed in the attack.

3131.   The weapon used to kill Paul Finken was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3132.   Plaintiff Jackie Farrar-Finken is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Paul Finken.

3133.   Plaintiff Jackie Farrar-Finken brings an action individually and on behalf of the Estate of Paul Finken, as its legal representative.

3134.   Plaintiff Emilie Finken is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3135.   Plaintiff C.F., a minor represented by her legal guardian, Jackie Farrar-Finken, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3136.   Plaintiff J.F., a minor represented by her legal guardian, Jackie Farrar-Finken, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Paul Finken.

3137.   Plaintiff Stephen Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3138.   Plaintiff Alan Finken is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Paul Finken.

3139.   Plaintiff Richard Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3140.   Plaintiff David Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3141.   Plaintiff Mark Finken is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Paul Finken.

3142. Plaintiff Peter Finken is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Paul Finken.

3143. Plaintiff Jean Pruitt is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

3144. Plaintiff Joan Henscheid is a citizen of the United States and domiciled in the State of Iowa. She is the sister of Paul Finken.

3145. As a result of the attack, and the death of Paul Finken, Plaintiffs Jackie Farrar-Finken, Emilie Finken, C.F., J.F., Stephen Finken, Alan Finken, Richard Finken, David Finken, Mark Finken, Peter Finken, Jean Pruitt and Joan Henscheid have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's society, companionship, comfort, advice and counsel.

**76.    THE NOVEMBER 9, 2006 ATTACK – BAGHDAD**

**The McCoy Family**

3146. Gregory McCoy was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3147. On November 2, 2006, Gregory McCoy, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3148. Gregory McCoy was killed in the attack.

3149. The weapon used to kill Gregory McCoy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3150. Plaintiff Lori Ann McCoy is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Gregory McCoy.

3151.   Plaintiff Lori Ann McCoy brings an action individually and on behalf of the Estate of Gregory McCoy, as its legal representative.

3152.   Plaintiff Logan McCoy is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

3153.   Plaintiff T.M., a minor represented by his legal guardian, Lori Ann McCoy, is a citizen of the United States and domiciled in the State of Colorado. He is the son of Gregory McCoy.

3154.   As a result of the attack, and the death of Gregory McCoy, Lori Ann McCoy, Logan McCoy and T.M. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Cox Family**

3155.   Plaintiff Glenn Michael Cox is a citizen of the United States and domiciled in the State of Florida.

3156.   On November 9, 2006, Glenn Michael Cox, then 45, was serving as a civilian contractor for DynCorp International in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3157.   The weapon used to injure Glenn Michael Cox was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3158.   As a result of the attack, Mr. Cox received multiple shrapnel injuries to his right side.

3159.   Mr. Cox's right ulna was shattered, as were most of the bones in his right hand. As a result, Mr. Cox has an artificial knuckle in his right hand. Shrapnel severed a nerve in his right forearm, and he still has a large amount of scarring on his arm and hand.

3160.   Mr. Cox also suffers from hearing loss as a result of the attack.

3161.   As a result of the attack, and the injuries he suffered, Plaintiff Glenn Michael Cox has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 77.   THE NOVEMBER 13, 2006 ATTACK – BAGHDAD

**The Kim Family**

3162.   Jang Ho Kim was domiciled in the State of California when he was killed in Iraq. He became a citizen of the United States posthumously.

3163.   On November 13, 2006, Jang Ho Kim, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3164.   Jang Ho Kim was killed in the attack.

3165.   The weapon used to kill Jang Ho Kim was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3166.   Plaintiff Sangsoon Kim is a citizen of the United States and domiciled in the State of California. She is the mother of Jang Ho Kim.

3167.   Plaintiff Seop (Steve) Kim is a citizen of the United States and domiciled in the State of California. He is the father of Jang Ho Kim.

3168.   Plaintiff Seop (Steve) Kim brings an action individually and on behalf of the Estate of Jang Ho Kim, as its legal representative.

3169.   Plaintiff Michelle Kim is a citizen of the United States and domiciled in the State of California. She is the sister of Jang Ho Kim.

3170.   As a result of the attack, and the death of Jang Ho Kim, Plaintiffs Sangsoon Kim, Seop (Steve) Kim and Michelle Kim have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Lamb Family**

3171.   Plaintiff Kurtiss Lamb is a citizen of the United States and domiciled in the State of Tennessee.

3172.   On November 13, 2006, Kurtiss Lamb, then 24, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3173.   The weapon used to injure Kurtiss Lamb was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3174.   As a result of the blast, Kurtiss Lamb suffered partial paralysis to his arm and bulging disks in his lumbar spine. Mr. Lamb was also diagnosed with a TBI.

3175.   As a result of the attack, and the injuries he suffered, Plaintiff Kurtiss Lamb has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 78.   THE NOVEMBER 16, 2006 ATTACK – BASRA

**The Coté Family**

3176.   Jonathon M. Coté was a citizen of the United States and domiciled in the State of New York when he was kidnapped and killed in Iraq.

3177. On November 16, 2006, Jonathon Coté was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3178. Mr. Coté's remains were mutilated after he was executed. On April 23, 2008, the FBI announced that it had identified the remains of Mr. Coté – which were recovered four days prior – and made arrangements to return Mr. Coté's remains to his family.

3179. Jonathon M. Coté was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3180. Plaintiff Francis L. Coté is a citizen of the United States and domiciled in the State of New York. He is the father of Jonathon Coté.

3181. Plaintiff Nancy Coté is a citizen of the United States and domiciled in the State of New York. She is the stepmother of Jonathon Coté.

3182. Plaintiff Christopher Coté is a citizen of the United States and domiciled in the State of New York. He is the brother of Jonathon Coté.

3183. Plaintiff Samantha Dunford is a citizen of the United States and domiciled in the State of New York. She is the stepsister of Jonathon Coté.

3184. Plaintiff Maximillian Shroyer is a citizen of the United States and domiciled in the State of Ohio. He is the stepbrother of Jonathon Coté.

3185. As a result of the November 16, 2006 attack, and the subsequent kidnapping and execution of Jonathon Coté, Plaintiffs Francis L. Coté, Nancy Coté, Christopher Coté, Samantha Dunford and Maxilillian Shroyer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Johnson-Reuben Family**

3186.    Paul Johnson-Reuben was a citizen of the United States and domiciled in the State of Minnesota when he was kidnapped and killed in Iraq.

3187.    On November 16, 2006, Paul Johnson-Reuben was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3188.    Mr. Johnson-Reuben's remains were mutilated after he was executed. In April 2008, Mr. Johnson-Reuben's remains were returned to his family.

3189.    Paul Johnson-Reuben was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3190.    Plaintiff Casey Reuben is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

3191.    Plaintiff Bree Reuben is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Paul Johnson-Reuben.

3192.    Plaintiff Patrick Reuben is a citizen of the United States and domiciled in the State of Wisconsin. He is the twin brother of Paul Johnson-Reuben.

3193.    As a result of the attack, and the death of Paul Johnson-Reuben, Plaintiffs Casey Reuben, Bree Reuben and Patrick Reuben have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's/brother's society, companionship, comfort, advice and counsel.

**The Munns Family**

3194.    Joshua Munns was a citizen of the United States and domiciled in the State of California when he was kidnapped and killed in Iraq.

3195.   On November 16, 2006, Joshua Munns was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3196.   Mr. Munn's remains were mutilated after he was executed. In April 2008, Mr. Munn's remains were returned to his family.

3197.   Joshua Munns was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3198.   Plaintiff Jackie Stewart is a citizen of the United States and domiciled in the State of California. She is the mother of Joshua Munns.

3199.   Plaintiff Mark Munns is a citizen of the United States and domiciled in the State of California. He is the father of Joshua Munns.

3200.   Plaintiff Crista Munns is a citizen of the United States and domiciled in the State of California. She is the stepmother of Joshua Munns.

3201.   As a result of the attack, and the death of Joshua Munns, Plaintiffs Jackie Stewart, Mark Munns and Crista Munns have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Young Family**

3202.   John Young was a citizen of the United States and domiciled in the State of Missouri when he was kidnapped and killed in Iraq.

3203.   On November 16, 2006, John Young, aged 44, was serving as a civilian contractor for Crescent Security near Basra, Iraq when he was kidnapped, held hostage, tortured, and ultimately murdered by JAM Special Groups.

3204. Mr. Young's remains were mutilated after he was executed. In March 2008, Mr. Young's remains were returned to his family.

3205. John Young was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3206. Plaintiff Sharon DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the mother of John Young.

3207. Plaintiff Dennis DeBrabander is a citizen of the United States and domiciled in the State of Arizona. He is the stepfather of John Young.

3208. Plaintiff Nicole DeBrabander is a citizen of the United States and domiciled in the State of Arizona. She is the sister of John Young.

3209. Plaintiff Joella Pratt is a citizen of the United States and domiciled in the State of Missouri. She is the sister of John Young.

3210. As a result of the attack, and the death of John Young, Plaintiffs Sharon DeBrabander, Dennis DeBrabander, Nicole DeBrabander and Joella Pratt have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 79. THE NOVEMBER 26, 2006 ATTACK – BAGHDAD

**The Fraser Family**

3211. David M. Fraser was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3212. On November 26, 2006, David M. Fraser, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3213. David M. Fraser was killed in the attack.

3214.   The weapon used to kill David M. Fraser was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3215.   Plaintiff Helen Fraser is a citizen of the United States and domiciled in the State of Texas. She is the mother of David M. Fraser.

3216.   Plaintiff Richard Fraser is a citizen of the United States and domiciled in the State of Texas. He is the father of David M. Fraser.

3217.   Plaintiff Richard Fraser brings an action individually and on behalf of the Estate of David M. Fraser, as its legal representative.

3218.   As a result of the attack, and the death of David M. Fraser, Plaintiffs Helen Fraser and Richard Fraser have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 80.   THE DECEMBER 3, 2006 ATTACK – BAGHDAD

**The English Family**

3219.   Shawn L. English was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

3220.   On December 3, 2006, Shawn L. English, aged 35, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3221.   Shawn L. English was killed in the attack.

3222.   The weapon used to kill Shawn L. English was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3223.   Plaintiff Tricia English is a citizen of the United States and domiciled in the State

of Ohio. She is the widow of Shawn L. English.

3224.    Plaintiff Nathan English is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

3225.    Plaintiff N.C.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

3226.    Plaintiff A.S.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

3227.    Todd Daily is a citizen of the United States and domiciled in the State of Ohio. He brings an action on behalf of the Estate of Shawn L. English, as its legal representative.

3228.    As a result of the attack, and the death of Shawn L. English, Plaintiffs Tricia English, Nathan English, N.C.E. and A.S.E. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Starkey Family**

3229.    Plaintiff Joshua Starkey is a citizen of the United States and domiciled in the State of Georgia.

3230.    On December 3, 2006, Joshua Starkey, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3231.    The weapon used to injure Joshua Starkey was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3232.    As a result of the attack, shrapnel impacted Joshua Starkey's body on his right shoulder and right side of his face. He also sustained burns to his face and shoulder.

3233. Joshua Starkey has been diagnosed with PTSD. He has sought counseling and has been prescribed medication to address related issues.

3234. As a result of the attack, and the injuries he suffered, Plaintiff Joshua Starkey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3235. Plaintiff Joshua Starkey was discharged from the U.S. military on January 1, 2019.

**81.** **THE DECEMBER 4, 2006 ATTACK – BAGHDAD**

**The Hinson Family**

3236. Plaintiff Brent Hinson is a citizen of the United States and domiciled in the State of Florida.

3237. On December 4, 2006, Brent Hinson, then 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3238. The weapon used to injure Brent Hinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3239. As a result of the attack, Brent Hinson suffered shrapnel injuries and was unable to walk for two weeks following the attack. He also required physical therapy.

3240. As a result of the attack, and the injuries he suffered, Plaintiff Brent Hinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3241. Plaintiff William Hinson is a citizen of the United States and domiciled in the State of Florida. He is the father of Brent Hinson.

3242. Plaintiff Fran Hinson is a citizen of the United States and domiciled in the State of Florida. She is the mother of Brent Hinson.

3243.   Plaintiff Hilary Westerberg is a citizen of the United States and domiciled in the State of New Hampshire. She is the sister of Brent Hinson.

3244.   As a result of the attack, and the injuries suffered by Brent Hinson, Plaintiffs William Hinson, Fran Hinson and Hilary Westerberg have experienced severe mental anguish, and extreme emotional pain and suffering.

## 82.   THE DECEMBER 10, 2006 ATTACK – BAGHDAD

**The Gibson Family**

3245.   Brennan C. Gibson was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

3246.   On December 10, 2006, Brennan C. Gibson aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3247.   Brennan C. Gibson was killed in the attack.

3248.   The weapon used to kill Brennan C. Gibson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3249.   Plaintiff Linda Gibson is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Brennan C. Gibson.

3250.   Plaintiff John Gibson is a citizen of the United States and domiciled in the State of Oregon. He is the stepfather of Brennan C. Gibson.

3251.   Plaintiff Stephanie Gibson Webster is a citizen of the United States and domiciled in the State of Oregon. She is the stepsister of Brennan C. Gibson.

3252.   Plaintiff Sean Elliott is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Brennan C. Gibson.

3253.   Plaintiff Travis Gibson is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Brennan C. Gibson.

3254.   As a result of the attack, and the death of Brennan C. Gibson, Plaintiffs Linda Gibson, John Gibson, Stephanie Gibson Webster, Sean Elliott and Travis Gibson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 83.   THE DECEMBER 20, 2006 ATTACK – BAGHDAD

**The Little Family**

3255.   Plaintiff William Ronald Little is a citizen of the United States and domiciled in the State of Florida.

3256.   On December 20, 2006, William Ronald Little, then 43, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3257.   Mr. Little was injured in the attack.

3258.   The weapon used to injure Mr. Little was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3259.   As a result of the attack, Mr. Little sustained shrapnel to his right eye socket necessitating the placement of a metal plate under his right eye. Shrapnel also impacted the right side of his face and his arm.

3260.   He lost a portion of muscle tissue in his back and shoulder area, and part of his right triceps muscle was detached. He no longer has full range of motion in his right arm.

3261.   He sustained nerve damage to his right cheek, sinus area, and his upper lip. He has undergone rhinoplasty and other procedures to address the injuries to these areas.

3262.   As a result of the attack, and the injuries he suffered, Plaintiff William Ronald Little has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3263.   Plaintiff Brenda Little is a citizen of the United States and domiciled in the State of Florida. She is the wife of William Ronald Little.

3264.   Plaintiff Kira Sikes is a citizen of the United States and domiciled in the State of Florida. She is the daughter of William Ronald Little and Brenda Little.

3265.   Plaintiff William Ronald Little, Jr. is a citizen of the United States and domiciled in the State of Florida. He is the son of William Ronald Little and Brenda Little.

3266.   Brenda Little brings an action individually and on behalf of William Ronald Little, Jr. as his power of attorney.

3267.   As a result of the attack, and the injuries William Ronald Little has suffered, Plaintiffs Brenda Little, Kira Sikes and William Ronald Little, Jr. have experienced severe mental anguish, and extreme emotional pain and suffering.

**The Denman Family**

3268.   Plaintiff Joshua Denman is a citizen of the United States and domiciled in the State of Florida.

3269.   On December 20, 2008, Joshua Denman, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3270.   Joshua Denman was injured in the attack.

3271.  The weapon used to injure Joshua Denman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3272.  As a result of the attack, Plaintiff Joshua Denman sustained shrapnel in his right arm and right hand. He has undergone surgery and procedures to address the removal of shrapnel and scar tissue.

3273.  As a result of the attack, and the injuries he suffered, Plaintiff Joshua Denman has experienced physical and mental anguish and extreme emotional pain and suffering.

3274.  Plaintiff Joshua Denman was discharged from the U.S. military on January 1, 2019.

**84.    THE DECEMBER 22, 2006 ATTACK – BAGHDAD**

**The Nantz Family**

3275.  Plaintiff Randolph Delbert Nantz is a citizen of the United States and domiciled in the State of Texas.

3276.  On December 22, 2006, Randolph Delbert Nantz, then 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3277.  The weapon used to injure Randolph Delbert Nantz was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3278.  As a result of the blast, Randolph Delbert Nantz suffered serious injuries, including nerve damage, burns on 23% of his body, and the amputation of his left leg below the knee.

3279.  As a result of the attack, and the injuries he suffered, Plaintiff Randolph Delbert Nantz has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3280.    Plaintiff Joshua Ryan Nantz is a citizen of the United States and domiciled in the State of Texas. He is the son of Randolph Delbert Nantz.

3281.    As a result of the attack, and the injuries suffered by Randolph Delbert Nantz, Plaintiff Joshua Ryan Nantz has experienced severe mental anguish, and extreme emotional pain and suffering.

3282.    Plaintiff Randolph Nantz was discharged from the U.S. military on November 4, 2012.

**85.    THE DECEMBER 27, 2006 ATTACK – BAGHDAD**

**The McCormick Family**

3283.    Clinton McCormick was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

3284.    On December 27, 2006, Clinton McCormick, aged 20, was serving in the United States military in Iraq when an IED emplaced by JAM Special Groups detonated near his vehicle.

3285.    Clinton McCormick was killed in the attack.

3286.    The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3287.    Plaintiff Lori Ann McCormick is a citizen of the United States and domiciled in the State of Florida. She is the mother of Clinton McCormick.

3288.    Plaintiff Lori Ann McCormick brings an action individually and on behalf of the Estate of Clinton McCormick, as its legal representative.

3289.    As a result of the attack, and the death of Clinton McCormick, Lori Ann McCormick has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 86. THE DECEMBER 30, 2006 ATTACK – BAGHDAD

**The Sullivan Family**

3290. John M. Sullivan was a citizen of the United States and domiciled in the State of Tennessee when he was killed in Iraq.

3291. On December 30, 2006, John M. Sullivan, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3292. John M. Sullivan was killed in the attack.

3293. The weapon used to kill John M. Sullivan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3294. Plaintiff Deborah Beavers is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of John M. Sullivan.

3295. As a result of the attack, and the death of John M. Sullivan, Plaintiff Deborah Beavers has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 87. THE DECEMBER 31, 2006 ATTACK – BAGHDAD

**The Blohm Family**

3296. Alan R. Blohm was a citizen of the United States and domiciled in the State of Alaska when he was killed in Iraq.

3297. On December 31, 2006, Alan R. Blohm, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3298. Alan R. Blohm was killed in the attack.

3299. The weapon used to kill Alan R. Blohm was a Hezbollah-designed and Iranian-

manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3300.    Plaintiff Denise Vennix is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Alan R. Blohm.

3301.    Plaintiff Denise Vennix brings an action individually and on behalf of the Estate of Alan R. Blohm, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

3302.    Chris Blohm was a citizen of the United States at the time of the death of Alan R. Blohm. He was the father of Alan R. Blohm. He died on May 4, 2017.

3303.    Plaintiff Jeremy Blohm is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Alan R. Blohm.

3304.    Plaintiff Jeremy Blohm brings an action individually and on behalf of the Estate of Chris Blohm, as its legal representative.

3305.    Plaintiff Kiana Blohm is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Alan R. Blohm.

3306.    As a result of the attack, and the death of Alan R. Blohm, the late Chris Blohm experienced, and Plaintiffs Denise Vennix, Jeremy Blohm and Kiana Blohm have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 88.    THE DECEMBER 31, 2006 ATTACK – BAQUBAH

**The Smith Family**

3307.    Richard Smith was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3308.   On December 31, 2006, Richard Smith, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3309.   Richard Smith was killed in the attack.

3310.   The weapon used to kill Richard Smith was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3311.   Plaintiff James Smith is a citizen of the United States and domiciled in the State of Texas. He is the father of Richard Smith.

3312.   Plaintiff Megan Mauk is a citizen of the United States and domiciled in the State of Texas. She is the sister of Richard Smith.

3313.   As a result of the attack, and the death of Richard Smith, Plaintiffs James Smith and Megan Mauk have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 89.   THE JANUARY 14, 2007 ATTACK – BAGHDAD

**The Vaccaro Family**

3314.   Plaintiff Robert Vaccaro is a citizen of the United States and domiciled in the State of Rhode Island.

3315.   On January 14, 2007, Robert Vaccaro, then 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3316.   The weapon used to injure Robert Vaccaro was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3317.   Mr. Vaccaro was in a coma for three weeks following the attack and endured several surgeries.

3318.   As a result of the attack, Mr. Vaccaro was diagnosed with a TBI, which caused him to suffer from seizures.

3319.   Mr. Vaccaro has had speech therapy, occupational therapy, and physical therapy to treat his injuries.

3320.   He has also been diagnosed with PTSD.

3321.   Mr. Vaccaro has been prescribed medication to treat his injuries.

3322.   As a result of the attack, and the injuries he suffered, Plaintiff Robert Vaccaro has experienced severe physical and mental anguish and extreme emotional pain and suffering.

90.   **THE JANUARY 18, 2007 ATTACK – BAGHDAD**

**The Rechenmacher Family**

3323.   William Joshua Rechenmacher was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

3324.   On January 18, 2007, William Joshua Rechenmacher, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3325.   William Joshua Rechenmacher was killed in the attack.

3326.   The weapon used to kill William Joshua Rechenmacher was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3327.   Plaintiff Joanne Gutcher is a citizen of the United States and domiciled in the State of Florida. She is the mother of William Joshua Rechenmacher.

3328.   As a result of the attack, and the death of William Joshua Rechenmacher, Plaintiff

Joanne Gutcher has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 91.   THE JANUARY 20, 2007 ATTACK – KARBALA

3329.   In the early evening of January 20, 2007, Iran launched a coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala, about thirty miles south of Baghdad.

3330.   The attack on the PJCC was largely planned by Hezbollah, under the direction of Ali Mussa Daqduq, and carried out by Hezbollah agents and AAH operatives led by Qais al-Khazali.

3331.   Just after nightfall, a five-car convoy of black GMC Suburban sport-utility vehicles ("SUVs") – the type frequently used by the U.S. government in Iraq – made its way through three checkpoints on the access road approaching the PJCC.

3332.   The vehicles contained at least a dozen AAH operatives dressed in U.S. military-style fatigues, carrying American-type weapons.

3333.   After they entered the PJCC compound, the five vehicles split up, with some parking in front, and others waiting at the Iraqi Police checkpoints along the southern approach to the PJCC compound.

3334.   After exiting their vehicles, the AAH terrorists greeted in fluent English the two U.S. soldiers guarding the PJCC's western entrance before launching a surprise attack.

3335.   The AAH operatives shot and wounded the two U.S. soldiers outside the PJCC's main building and opened fire on the PJCC compound with automatic rifles, while two small teams quickly moved inside the main building and assaulted the Communications Room with small arms fire.

3336.   One U.S. soldier, Johnathon M. Millican, fell on a grenade that was thrown into the Communications Room, while other soldiers prevented the attackers from overrunning their position.

3337.   Although Mr. Millican was killed, and several other U.S. soldiers injured, his selfless act provided his fellow soldiers in the PJCC's main building a few extra moments to recover and begin returning fire.

3338.   For his act of bravery, Johnathon M. Millican was posthumously awarded the Silver Star medal by the U.S. Army.

3339.   At the same time that AAH terrorists were attacking the PJCC's main building, other AAH operatives conducted a coordinated attack on the compound's barracks and back gate, before abducting four U.S. soldiers (the two wounded soldiers and two officers from inside the main building) and fleeing the compound.

3340.   Five of the AAH getaway vehicles drove east, crossing the Euphrates River and then turned north. Three others departed in the opposite direction to confuse any pursuing forces.

3341.   After over an hour of travel on the main roads, the five SUVs were stopped at a checkpoint in Mahawil, after U.S. forces put out a radio alert regarding the abducted soldiers.

3342.   The AAH terrorists then abandoned the main road for back roads, and the Iraqi Police and Iraqi Army forces at the Mahawil checkpoint gave chase.

3343.   Realizing the likelihood of escaping with their captives was low, and darkness making back road navigation all but impossible, the AAH operatives murdered the four Americans they had just kidnapped and abandoned their bodies and the vehicles near the town of Mahawil. Three of the four Americans died at the scene.

3344.   Only one of the four abducted U.S. soldiers, Brian S. Freeman, was still alive when

rescuers reached the scene. Two of the soldiers were found in the back of one of the SUVs, handcuffed together and shot dead. A third soldier was found dead on the ground, near the abandoned vehicles. Mr. Freeman had also been shot in the head and died on the way to the hospital.

3345. The terrorist group that planned and executed the PJCC attack, AAH, was trained and armed by Iran's IRGC with Hezbollah's assistance.

3346. On March 20, 2007, two months after the attack was perpetrated, Hezbollah operative Ali Mussa Daqduq and AAH leader Qais al-Khazali and his brother Laith al-Khazali were captured by Coalition Forces in southern Iraq.

3347. The United States government charged them with responsibility for the Karbala PJCC attack.

3348. Documents captured with Qais al-Khazali showed that the IRGC-QF had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers."

3349. A 22-page memorandum found with Daqduq "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," among others. Other documents discussed tactics to attack Iraqi and Coalition Forces.

3350. Daqduq also had a personal journal that noted his having met with Special Groups members who were targeting other Iraqis and Coalition Forces in the Diyala province using IEDs, as well as small-arms fire.

3351. According to U.S. military officials, both Daqduq and Qais al-Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the Karbala attack.

3352. It was later reported that U.S. spy satellites spotted a full-scale mockup of the

Karbala PJCC at the IRGC-QF Farj Garrison in the city of Ahwaz, Iran.

3353.  Analysis of the satellite imagery indicated that the IRGC had duplicated the PJCC's layout to specifically train the AAH operatives for the attack.

3354.  The terror attack on the PJCC was commanded by Azhar al-Dulaymi. He was trained by Hezbollah operatives, including Daqduq, near the city of Qom, Iran, where he and his AAH operatives trained to execute military-style, precision kidnappings.

3355.  Although al-Dulaymi commanded the attack, Daqduq, a longtime Hezbollah commander, masterminded it, authorized it and directed its execution down to the minor details.

3356.  Daqduq advised AAH commanders al-Dulaymi and Qais al-Khazali and served as a liaison between the IRGC-QF and Qais al-Khazali, who along with Laith al-Khazali oversaw the attack.

3357.  The U.S. Department of the Treasury's November 19, 2012 press release announcing Daqduq's designation as an SDGT stated, in part:

> Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) [sic] on January 20, 2007, which resulted in the deaths of five U.S. soldiers.

3358.  Daqduq is Lebanese-born and served in Hezbollah for twenty-four years prior to the attack on the Karbala PJCC.

3359.  Daqduq served as a bodyguard for Hezbollah leader Hassan Nasrallah and also led Hezbollah operations in large areas of Lebanon.

3360.  According to the U.S. government, Daqduq "was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups."

3361.  In 2005, Daqduq was directed by senior Lebanese Hezbollah leadership to go to Iran and work with the IRGC-QF to train Iran's proxies in Iraq.

536

3362. According to the U.S. government: "In May 2006, [Daqduq] traveled to Tehran with Yussef Hashim, a fellow Lebanese Hezbollah and head of their operations in Iraq. There they met with the commander and deputy commander of the Iranian Quds Force special external operations."

3363. Daqduq was ordered to go to Iraq to report on the training and operations of the Iraqi Special Groups.

3364. In the year prior to his capture in 2007, Daqduq made four trips to Iraq, where he monitored and reported on the training and arming of the Special Groups in mortars and rockets, manufacturing and employment of IEDs, and kidnapping operations.

3365. Most significantly, Daqduq was tasked with organizing the Special Groups in ways that mirrored the way Hezbollah was organized in Lebanon.

3366. Daqduq also helped the IRGC train Iraqis at multiple sites in Iran.

3367. Using training groups of approximately twenty to sixty Iraqis at a time, Daqduq instructed his trainees on how to use EFPs, mortars and rockets, as well as intelligence, sniper and kidnapping operations.

3368. The IRGC then provided operational, intelligence and logistical support to insert the terrorist trainees back into various Iraqi cities where they rejoined their respective Special Groups.

3369. The IRGC also supplied the Special Groups with weapons and a funding stream ranging from an estimated $750,000 to $3 million per month.

3370. On April 26, 2007, the Commander of the Multi-National Force – Iraq, Gen. David Petraeus, gave a briefing in which he stated:

> The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members -- the heads

of the Khazali network and some of the key members of that network that have been in detention now for a month or more. This is the head of the secret cell network, the extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction. When we captured these individuals -- the initial capture, and then there have been a number of others since then -- we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala. It also detailed -- there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

3371.    The Americans killed during the Karbala attack included Brian S. Freeman, Johnathan B. Chism, Shawn P. Falter, Johnathon M. Millican and Jacob Fritz. The Americans injured during the Karbala attack included Billy Wallace, Evan Kirby, Johnny Washburn and Marvin Thornsberry.

**The Freeman Family**

3372.    Brian S. Freeman was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3373.    Plaintiff Charlotte Freeman is a citizen of the United States and domiciled in the State of California. She is the widow of Brian S. Freeman.

3374.    Plaintiff Charlotte Freeman brings an action individually and on behalf of the Estate of Brian S. Freeman as its legal representative.

3375.    Plaintiff G.F., a minor represented by his legal guardian Charlotte Freeman, is a citizen of the United States and domiciled in the State of California. He is the son of Brian S. Freeman.

3376.    Plaintiff I.F., a minor represented by her legal guardian Charlotte Freeman, is a

citizen of the United States and domiciled in the State of California. She is the daughter of Brian S. Freeman.

3377.   Plaintiff Kathleen Snyder is a citizen of the United States and domiciled in the State of Utah. She is the mother of Brian S. Freeman.

3378.   Plaintiff Albert Snyder is a citizen of the United States and domiciled in the State of Utah. He is the stepfather of Brian S. Freeman.

3379.   Plaintiff Randolph Freeman is a citizen of the United States and domiciled in the State of California. He is the father of Brian S. Freeman.

3380.   Plaintiff Kathaleen Freeman is a citizen of the United States and domiciled in the State of California. She is the stepmother of Brian S. Freeman.

3381.   Plaintiff Richard Lee is a citizen of the United States and domiciled in the State of California. He is the stepbrother of Brian S. Freeman.

3382.   As a result of the attack, and the death of Brian S. Freeman, Plaintiffs Charlotte Freeman, G.F., I.F., Kathleen Snyder, Albert Snyder, Randolph Freeman, Kathaleen Freeman and Richard Lee have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/father's society, companionship, comfort, advice and counsel.

**The Chism Family**

3383.   Johnathan B. Chism was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

3384.   Plaintiff Danny Chism is a citizen of the United States and domiciled in the State of Louisiana. He is the father of Johnathan B. Chism.

3385.   Plaintiff Elizabeth Chism is a citizen of the United States and domiciled in the State of Louisiana. She is the mother of Johnathan B. Chism.

3386.   Plaintiff Elizabeth Chism brings an action individually and on behalf of the Estate of Johnathan B. Chism as its legal representative.

3387.   Plaintiff Vanessa Chism is a citizen of the United States and domiciled in the State of Louisiana. She is the stepmother of Johnathan B. Chism.

3388.   Plaintiff Julie Chism is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Johnathan B. Chism.

3389.   As a result of the attack, and the death of Johnathan B. Chism, Plaintiffs Danny Chism, Elizabeth Chism, Vanessa Chism, and Julie Chism have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Falter Family**

3390.   Shawn P. Falter was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

3391.   Plaintiff Russell J. Falter is a citizen of the United States and domiciled in the State of New York. He is the father of Shawn P. Falter.

3392.   Plaintiff Russell J. Falter brings an action individually and on behalf of the Estate of Shawn P. Falter, as its legal representative.

3393.   Plaintiff Linda Falter is a citizen of the United States and domiciled in the State of New York. She is the stepmother of Shawn P. Falter.

3394.   Plaintiff Marjorie Falter is a citizen of the United States and domiciled in the State of New York. She is the sister of Shawn P. Falter.

3395.   Plaintiff Russell C. Falter is a citizen of the United States and domiciled in the State of New York. He is the brother of Shawn P. Falter.

540

3396.   Plaintiff John Sackett is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Shawn P. Falter.

3397.   Plaintiff Jason Sackett is a citizen of the United States and domiciled in the State of New York. He is the brother of Shawn P. Falter.

3398.   Plaintiff Michael Lucas is a citizen of the United States and domiciled in the State of New York. He is the stepbrother of Shawn P. Falter.

3399.   Plaintiff Marsha Novak is a citizen of the United States and domiciled in the State of California. She is the stepsister of Shawn P. Falter.

3400.   Plaintiff David Lucas is a citizen of the United States and domiciled in the State of New York. He is the stepbrother of Shawn P. Falter.

3401.   Plaintiff Tim Lucas is a citizen of the United States and domiciled in the State of New York. He is the stepbrother of Shawn P. Falter.

3402.   Plaintiff Andrew Lucas is a citizen of the United States and domiciled in the State of Alaska. He is the stepbrother of Shawn P. Falter.

3403.   As a result of the attack, and the death of Shawn P. Falter, Plaintiffs Linda Falter, Russell J. Falter, Marjorie Falter, Russell C. Falter, John Sackett, Jason Sackett, Michael Lucas, Marsha Novak, David Lucas, Tim Lucas, and Andrew Lucas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Millican Family**

3404.   Johnathon M. Millican was a citizen of the United States and domiciled in the State of Alaska when he was killed in Iraq.

3405.   Plaintiff Shannon Millican is a citizen of the United States and domiciled in the State of Alabama. She is the widow of Johnathon M. Millican.

3406.   Plaintiff Shannon Millican brings an action individually and on behalf of the Estate of Johnathon M. Millican, as its legal representative.

3407.   Plaintiff Paul Mitchell Millican is a citizen of the United States and domiciled in the State of Alabama. He is the father of Johnathon M. Millican.

3408.   As a result of the attack, and the death of Johnathon M. Millican, Plaintiffs Shannon Millican and Paul Mitchell Millican have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

**The Fritz Family**

3409.   Jacob Fritz was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

3410.   Plaintiff Noala Fritz is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Jacob Fritz.

3411.   Lyle Fritz was a citizen of the United States at the time of the death of Jacob Fritz. He was the father of Jacob Fritz. Lyle Fritz died on June 11, 2011.

3412.   Plaintiff Noala Fritz brings an action individually and on behalf of the Estate of Lyle Fritz, as its legal representative.

3413.   Plaintiff Daniel Fritz is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of Jacob Fritz.

3414.   Plaintiff Ethan Fritz is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of Jacob Fritz.

3415.  As a result of the attack, and the death of Jacob Fritz, the late Lyle Fritz experienced, and Plaintiffs Noala Fritz, Daniel Fritz, and Ethan Fritz have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Wallace Family**

3416.  Plaintiff Billy Wallace is a citizen of the United States and domiciled in the State of Indiana.

3417.  Mr. Wallace was wounded while helping to defend the PJCC's main building.

3418.  He sustained serious shrapnel injuries when a grenade exploded in the doorway of the room that he was defending.

3419.  Mr. Wallace also suffered hearing loss and tinnitus.

3420.  He suffers from PTSD, for which he has received ongoing treatment.

3421.  As a result of the attack, and the injuries he suffered, Plaintiff Billy Wallace has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3422.  Plaintiff Stefanie Wallace is a citizen of the United States and domiciled in the State of Indiana. She is the wife of Billy Wallace.

3423.  Plaintiff Austin Wallace is a citizen of the United States and domiciled in the State of Florida. He is the son of Billy Wallace.

3424.  Plaintiff Devon Wallace is a citizen of the United States and domiciled in the State of Indiana. He is the son of Billy Wallace.

3425.  Plaintiff C.W., a minor represented by his legal guardians Billy Wallace and Stefanie Wallace, is a citizen of the United States and domiciled in the State of Indiana. He is the son of Billy Wallace.

3426.   As a result of the attack, and the injuries Billy Wallace suffered, Plaintiffs Stefanie Wallace, Austin Wallace, Devon Wallace and C.W. have experienced severe mental anguish and extreme emotional pain and suffering.

3427.   Plaintiff Billy Wallace was discharged from the U.S. military on July 31, 2014.

**The Kirby Family**

3428.   Plaintiff Evan Kirby is a citizen of the United States and domiciled in the State of Ohio.

3429.   Mr. Kirby was wounded during the attack on the PJCC's barracks.

3430.   As a result of an explosion that occurred during the attack, Mr. Kirby was thrown into the air and sustained injuries to his back and spine.

3431.   The aforementioned injuries have caused him great pain.

3432.   As a result of the attack, and the injuries he suffered, Plaintiff Evan Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3433.   Plaintiff Marcia Kirby is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Evan Kirby.

3434.   Plaintiff Steven Kirby is a citizen of the United States and domiciled in the State of Ohio. He is the father of Evan Kirby.

3435.   As a result of the attack and the injuries Evan Kirby suffered, Plaintiffs Marcia Kirby and Steven Kirby have experienced severe mental anguish and extreme emotional pain and suffering.

3436.   Plaintiff Evan Kirby was discharged from the U.S. military on October 7, 2011.

**The Washburn Family**

3437.   Plaintiff Johnny Washburn is a citizen of the United States and domiciled in the State of Wisconsin.

3438.   Mr. Washburn was wounded while helping to defend the PJCC's main building.

3439.   He was in the same room as Johnathon M. Millican when the grenade detonated that killed Mr. Millican.

3440.   In addition to witnessing Mr. Millican's murder, Mr. Washburn also observed other soldiers being killed and injured.

3441.   Mr. Washburn attempted to assist the aforementioned soldiers.

3442.   His clothing was covered in blood, causing him great distress, as he was initially unable to determine if the blood was his own or belonged to one of the surrounding soldiers.

3443.   These images and memories of what he witnessed throughout the attack have caused him great distress.

3444.   He has experienced sleep-related problems and headaches following the attack.

3445.   As a result of the attack, and the injuries he suffered, Plaintiff Johnny Washburn has experienced severe mental anguish and extreme emotional pain and suffering.

3446.   Plaintiff Johnny Washburn was discharged from the U.S. military on July 25, 2019.

**The Thornsberry Family**

3447.   Plaintiff Marvin Thornsberry is a citizen of the United States and domiciled in the State of Michigan.

3448.   Mr. Thornsberry was in the PJCC's adjacent building when the attack occurred.

3449.   He has experienced survivor's guilt following the attack.

3450. Mr. Thornsberry has been prescribed medication to address issues of depression and anxiety.

3451. As a result of the attack, and the injuries he suffered, Plaintiff Marvin Thornsberry has experienced severe mental anguish and extreme emotional pain and suffering.

3452. Plaintiff Cynthia Thornsberry is a citizen of the United States and domiciled in the State of Michigan. She is the wife of Marvin Thornsberry.

3453. Plaintiff A.B., a minor represented by his legal guardian Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Cynthia Thornsberry and the stepson of Marvin Thornsberry.

3454. Plaintiff M.T., a minor represented by her legal guardians Marvin Thornsberry and Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. She is the daughter of Marvin Thornsberry and Cynthia Thornsberry.

3455. Plaintiff N.T., a minor represented by his legal guardians, Marvin Thornsberry and Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Marvin Thornsberry and Cynthia Thornsberry.

3456. Plaintiff L.T., a minor represented by her legal guardians, Marvin Thornsberry and Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. She is the daughter of Marvin Thornsberry and Cynthia Thornsberry.

3457. As a result of the attack and the injuries Marvin Thornsberry suffered, Plaintiffs Cynthia Thornsberry, A.B., M.T., N.T., and L.T. have experienced severe mental anguish and extreme emotional pain and suffering.

3458. Plaintiff Marvin Thornsberry was discharged from the U.S. military on December 7, 2012.

## 92.   THE JANUARY 22, 2007 ATTACK – BAGHDAD

**The Stout Family**

3459.   Brandon L. Stout was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3460.   On January 22, 2007, Brandon L. Stout, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3461.   Brandon L. Stout was killed in the attack.

3462.   The weapon used to kill Brandon L. Stout was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3463.   Plaintiff Tracy Anderson is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Brandon L. Stout.

3464.   Plaintiff Jeffrey Anderson is a citizen of the United States and domiciled in the State of Michigan. He is the stepfather of Brandon L. Stout.

3465.   Plaintiff Adam G. Stout is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Brandon L. Stout.

3466.   Plaintiff Andrew Jeffrey Anderson is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Brandon L. Stout.

3467.   Plaintiff Elizabeth Lynn Islas is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Brandon L. Stout.

3468.   As a result of the attack, and the death of Brandon L. Stout, Plaintiffs Tracy Anderson, Jeffrey Anderson, Adam G. Stout, Andrew Jeffrey Anderson and Elizabeth Lynn Islas

have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

93.    THE JANUARY 25, 2007 ATTACK – BAGHDAD

**The Fuller Family**

3469.    Alexander H. Fuller was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

3470.    On January 25, 2007, Alexander H. Fuller, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3471.    Alexander H. Fuller was killed in the attack.

3472.    The weapon used to kill Alexander H. Fuller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3473.    Plaintiff Anastasia Fuller is a citizen of the United States and domiciled in the State of Massachusetts. She is the widow of Alexander H. Fuller.

3474.    Plaintiff Anastasia Fuller brings an action individually and on behalf of the Estate of Alexander H. Fuller, as its legal representative.

3475.    Plaintiff A.F., a minor represented by her legal guardian Anastasia Fuller, is a citizen of the United States and domiciled in the State of Massachusetts. She is the daughter of Alexander H. Fuller.

3476.    As a result of the attack, and the death of Alexander H. Fuller, Plaintiffs Anastasia Fuller and A.F. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Balsley Family**

3477.   Michael C. Balsley was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3478.   On January 25, 2007, Michael C. Balsley, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3479.   Michael C. Balsley was killed in the attack.

3480.   The weapon used to kill Michael C. Balsley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3481.   Plaintiff Samantha Balsley is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Michael C. Balsley.

3482.   Plaintiff Samantha Balsley brings an action individually and on behalf of the Estate of Michael C. Balsley, as its legal representative.

3483.   Plaintiff L.R.-W., a minor represented by his legal guardian Samantha Balsley, is a citizen of the United States and domiciled in the State of Virginia. He is the son of Michael C. Balsley.

3484.   As a result of the attack, and the death of Michael C. Balsley, Plaintiffs Samantha Balsley and L.R.-W. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 94.    THE JANUARY 27, 2007 ATTACK – BAGHDAD

**The Hobson Family**

3485.    Plaintiff Heath Damon Hobson is a citizen of the United States and domiciled in the State of Massachusetts.

3486.    On January 27, 2007, Heath Damon Hobson, then 34, was serving in the U.S. military in Iraq.

3487.    Heath Damon Hobson was in the motor pool at Camp Travis in the U.S. Embassy compound in Baghdad when multiple rockets were fired by Special Groups operatives at the compound and landed in his proximity.

3488.    Heath Damon Hobson was injured in the attack perpetrated by Hezbollah-trained Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3489.    As a result of the attack, Heath Damon Hobson sustained a shrapnel-induced open leg fracture and an arterial tear and significant blood loss. He was evacuated to a Combat Support Hospital where he underwent an arterial graft to salvage his leg and received external fixation to stabilize his leg. He was then flown to Balad, Iraq and then to Germany, finally arriving at Walter Reed Army Hospital in Washington, DC to be treated for his injuries. To this day, he has a loss of the use of his right foot and ankle, bone and soft-tissue loss, nerve damage, vascular damage, disfigurement, and PTSD.

3490.    Mr. Hobson has received extensive medical treatment at various hospitals to address the injuries he sustained in the attack.

3491.    As a result of the attack, and the injuries he suffered, Plaintiff Heath Damon Hobson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3492.    Plaintiff Jodi Michelle Hobson is a citizen of the United States and domiciled in the State of Massachusetts. She is the wife of Heath Damon Hobson.

3493.    Plaintiff M.D.H., a minor, represented by his legal guardian Heath Damon Hobson, is a citizen of the United States and domiciled in the State of Massachusetts. He is the son of Heath Damon Hobson.

3494.    As a result of the attack, and the injuries Heath Damon Hobson suffered, Plaintiffs Jodi Michelle Hobson and M.D.H. have experienced severe mental anguish and extreme emotional pain and suffering.

## 95.    THE JANUARY 27, 2007 ATTACK – TAJI

**The Garrigus Family**

3495.    Mickel D. Garrigus was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

3496.    On January 27, 2007, Mickel D. Garrigus, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3497.    Mickel D. Garrigus was killed in the attack.

3498.    The weapon used to kill Mickel D. Garrigus was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3499.    Plaintiff Deadra Garrigus is a citizen of the United States and domiciled in the State of Washington. She is the mother of Mickel D. Garrigus.

3500.    Plaintiff Deadra Garrigus brings an action individually and on behalf of the Estate of Mickel D. Garrigus, as its legal representative.

3501.   Plaintiff David Garrigus is a citizen of the United States and domiciled in the State of Washington. He is the stepfather of Mickel D. Garrigus.

3502.   Plaintiff Nichole Garrigus is a citizen of the United States and domiciled in the State of Washington. She is the sister of Mickel D. Garrigus.

3503.   Plaintiff Kyla Ostenson is a citizen of the United States and domiciled in the State of Washington. She is the sister of Mickel D. Garrigus.

3504.   Plaintiff Matthew Garrigus is a citizen of the United States and domiciled in the State of Washington. He is the brother of Mickel D. Garrigus.

3505.   As a result of the attack, and the death of Mickel D. Garrigus, Plaintiffs Deadra Garrigus, David Garrigus, Nichole Garrigus, Kyla Ostenson and Matthew Garrigus have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 96.    THE FEBRUARY 1, 2007 ATTACK – BAGHDAD

### The Ryan Family

3506.   Plaintiff Shawn Ryan is a citizen of the United States and domiciled in the State of Texas.

3507.   On February 1, 2007, Shawn Ryan was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3508.   The weapon used to injure Shawn Ryan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3509.   As a result of the attack, Mr. Ryan sustained shrapnel injuries that left him permanently disabled.

3510.   As a result of the attack, and the injuries he suffered, Plaintiff Shawn Ryan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3511.   Plaintiff Shawn Ryan was discharged from the U.S. military on June 27, 2012.

## 97.    THE FEBRUARY 2, 2007 ATTACK – MAHMUDIYAH

### The Dunn Family

3512.   Terrence Dunn was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

3513.   On February 2, 2007, Terrence Dunn, aged 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3514.   Terrence Dunn was killed in the attack.

3515.   The weapon used to kill Terrence Dunn was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3516.   Plaintiff Sharon Y. Dunn Smith is a citizen of the United States and domiciled in the State of Texas. She is the sister of Terrence Dunn.

3517.   Plaintiff Sharon Y. Dunn Smith brings an action individually and on behalf of the Estate of Terrence Dunn, as its legal representative.

3518.   Plaintiff Dennis Dunn is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Terrence Dunn.

3519.   As a result of the attack, and the death of Terrence Dunn, Plaintiffs Sharon Y. Dunn Smith and Dennis Dunn have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

**The Landeck Family**

3520.   Kevin C. Landeck was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3521.   On February 2, 2007, Kevin C. Landeck, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3522.   Kevin C. Landeck was killed in the attack.

3523.   The weapon used to kill Kevin C. Landeck was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3524.   Plaintiff Richard Landeck is a citizen of the United States and domiciled in the State of Illinois. He is the father of Kevin C. Landeck.

3525.   Plaintiff Victoria Landeck is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Kevin C. Landeck.

3526.   As a result of the attack, and the death of Kevin C. Landeck, Plaintiffs Richard Landeck and Victoria Landeck have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 98.      THE FEBRUARY 26, 2007 ATTACK – DIWANIYAH

**The Beardsley Family**

3527.   William J. Beardsley was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

3528.   On February 26, 2007, William J. Beardsley, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3529.   William J. Beardsley was killed in the attack.

3530. The weapon used to kill William J. Beardsley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3531. Plaintiff Lavonna Harper is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of William J. Beardsley.

3532. As a result of the attack, and the death of William J. Beardsley, Plaintiff Lavonna Harper has experienced the loss of her son's society, companionship, comfort, advice and counsel.

## 99.    THE MARCH 15, 2007 ATTACK – BAQUBAH

**The Harris Family**

3533. Blake Harris was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

3534. On March 15, 2007, Blake Harris, aged 27, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

3535. Blake Harris was killed in the attack.

3536. The weapon used to kill Blake Harris was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3537. Plaintiff Melba Anne F. Harris is a citizen of the United States and domiciled in the State of Georgia. She is the mother of Blake Harris.

3538. Plaintiff Paul D. Harris is a citizen of the United States and domiciled in the State of Georgia. He is the father of Blake Harris.

3539.   As a result of the attack, and the death of Blake Harris, Plaintiffs Melba Anne F. Harris and Paul D. Harris have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**100.   THE MARCH 20, 2007 ATTACK – BAGHDAD**

**The Glawson Family**

3540.   Curtis E. Glawson was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

3541.   On March 20, 2007, Curtis E. Glawson, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3542.   Curtis E. Glawson was killed in the attack.

3543.   The weapon used to kill Curtis E. Glawson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3544.   Plaintiff Hyunjung Glawson is domiciled in the State of Florida. She is the widow of Curtis E. Glawson.

3545.   Plaintiff Hyunjung Glawson brings an action individually and on behalf of the Estate of Curtis E. Glawson, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

3546.   Plaintiff Yolanda M. Brooks is a citizen of the United States and domiciled in the State of Alabama. She is the mother of Curtis E. Glawson.

3547.   Plaintiff Curtis Glawson, Sr. is a citizen of the United States and domiciled in the State of Georgia. He is the father of Curtis E. Glawson.

3548.   Plaintiff Kierra Glawson is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of Curtis E. Glawson.

3549.   Cortez Glawson was a citizen of the United States at the time of the death of Curtis E. Glawson. He was the brother of Curtis E. Glawson. Cortez Glawson died on January 24, 2018.

3550.   Sabrina Glawson is a citizen of the United States and domiciled in the State of Alabama. She brings an action on behalf of the Estate of Cortez Glawson, as its legal representative.

3551.   Plaintiff Jazmon Reyna is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Curtis E. Glawson.

3552.   As a result of the attack, and the death of Curtis E. Glawson, the late Cortez Glawson experienced, and Plaintiffs Hyunjung Glawson, Yolanda M. Brooks, Curtis Glawson, Sr., Kierra Glawson and Jazmon Reyna have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 101.   THE MARCH 23, 2007 ATTACK – NASIRIYAH

### The Sabinish Family

3553.   Plaintiff Ryan Sabinish is a citizen of the United States and domiciled in the State of Minnesota.

3554.   On March 23, 2007, Ryan Sabinish, then 25, was serving in the U.S. military in Iraq.

3555.   Mr. Sabinish, a gunner, was tasked with protecting his base from mortar and rocket attacks.

3556.    While he was conducting his operations, his vehicle was struck by an EFP emplaced by Special Groups.

3557.    The weapon used to injure Mr. Sabinish was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3558.    As a result of the attack, Mr. Sabinish experienced severe blood loss and sustained injuries to his back, hip, and lower extremities.

3559.    In addition, shrapnel penetrated and scarred his right arm.

3560.    Mr. Sabinish has been diagnosed with a TBI.

3561.    He also suffers from PTSD.

3562.    Mr. Sabinish has been hospitalized for his emotional injuries and has sought mental health treatment as an outpatient. He continues to seek treatment.

3563.    He has been prescribed medication to address his emotional health issues, and he continues to take medication to treat them.

3564.    As a result of the attack, and the injuries he suffered, Plaintiff Ryan Sabinish has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3565.    Plaintiff R.J.S., a minor represented by her legal guardian Ryan Sabinish, is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

3566.    Plaintiff S.J.S., a minor represented by her legal guardian Ryan Sabinish, is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

3567.    As a result of the attack, and the injuries suffered by Ryan Sabinish, Plaintiffs R.J.S. and S.J.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

## 102. THE MARCH 27, 2007 ATTACK – BAGHDAD

**The Thomas Family**

3568. Sean M. Thomas was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

3569. On March 27, 2007, Sean M. Thomas, aged 33, was serving in the U.S. military when he was killed in a 107mm rocket attack perpetrated by JAM Special Groups operatives.

3570. Sean M. Thomas was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3571. Plaintiff Carrie Thompson is a citizen of the United States and domiciled in the State of Pennsylvania. She is the widow of Sean M. Thomas.

3572. Plaintiff Carrie Thompson brings a claim individually and on behalf of the Estate of Sean M. Thomas, as its legal representative.

3573. Plaintiff A.T., a minor represented by her legal guardian, Carrie Thompson, is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Sean M. Thomas.

3574. Plaintiff Daniel Thomas, Sr. is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Sean M. Thomas.

3575. Plaintiff Diana Thomas is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Sean M. Thomas.

3576. Plaintiff Daniel Thomas, Jr. is a citizen of the United States and domiciled in the State of Pennsylvania. He is the brother of Sean M. Thomas.

3577. Plaintiff Kelly Gillis is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Sean M. Thomas.

3578.   Plaintiff Melinda Flick is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Sean M. Thomas.

3579.   As a result of the attack, and the death of Sean M. Thomas, Plaintiffs Carrie Thompson, A.T., Daniel Thomas Sr., Diana Thomas, Daniel Thomas Jr., Kelly Gillis and Melinda Flick have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

## 103.   THE MARCH 31, 2007 ATTACK – DIWANIYAH

**The Christopher Family**

3580.   Kwesi Christopher was a citizen of the United States and domiciled in Brooklyn, in the State of New York, when he was killed in Iraq.

3581.   On March 31, 2007, Kwesi Christopher, aged 25, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near him.

3582.   Kwesi Christopher was killed in the attack.

3583.   The weapon used to kill Kwesi Christopher was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3584.   Plaintiff Ann Christopher is a citizen of the United States and domiciled in the State of Florida. She is the mother of Kwesi Christopher.

3585.   Plaintiff Ann Christopher brings an action individually and on behalf of the Estate of Kwesi Christopher, as its legal representative.

3586.   As a result of the attack, and the death of Kwesi Christopher, Plaintiff Ann Christopher has experienced severe mental anguish, extreme emotional pain and suffering, and

loss of her son's society, companionship, comfort, advice and counsel.

### 104. THE APRIL 4, 2007 ATTACK – NASIRIYAH

**The Sabinish Family**

3587.   Plaintiff Ryan Sabinish is a citizen of the United States and domiciled in the State of Minnesota.

3588.   On April 4, 2007, Ryan Sabinish, then 25, was serving in the U.S. military in Iraq.

3589.   Mr. Sabinish was driving the third vehicle of a convoy when an EFP emplaced by Special Groups detonated near the first vehicle. During the attack, a secondary IED detonated, striking an Iraqi civilian vehicle.

3590.   The weapon used in the attack was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3591.   Mr. Sabinish dismounted his vehicle and would not allow the civilian vehicle to drive away from the scene. He witnessed a wounded child inside the vehicle die.

3592.   Mr. Sabinish was subsequently diagnosed with PTSD and has experienced suicidal ideation. He has been hospitalized for his emotional injuries and has sought mental health treatment as an outpatient.

3593.   Mr. Sabinish continues to seek treatment, including counseling, and has been prescribed anti-anxiety medications, anti-depressants, and medication to address sleep-related issues. He continues to take medication to treat his emotional injuries.

3594.   As a result of the attack, and the injuries he suffered, Ryan Sabinish has experienced severe mental anguish and extreme emotional pain and suffering.

3595.   Plaintiff R.J.S., a minor represented by her legal guardian Ryan Sabinish, is a

citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

3596.   Plaintiff S.J.S., a minor represented by her legal guardian Ryan Sabinish, is a citizen of the United States and domiciled in the State of Minnesota. She is the daughter of Ryan Sabinish.

3597.   As a result of the attack, and the injuries suffered by Ryan Sabinish, Plaintiffs R.J.S. and S.J.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

## 105.   THE APRIL 6, 2007 ATTACK – BAGHDAD

**The Fuentes Family**

3598.   Daniel A. Fuentes was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

3599.   On April 6, 2007, Daniel A. Fuentes, aged 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3600.   Daniel A. Fuentes was killed in the attack.

3601.   The weapon used to kill Daniel A. Fuentes was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3602.   Plaintiff Nancy Fuentes is a citizen of the United States and domiciled in the State of New York. She is the mother of Daniel A. Fuentes.

3603.   Plaintiff Nancy Fuentes brings an action individually and on behalf of the Estate of Daniel A. Fuentes.

3604.   Plaintiff Armando Fuentes is a citizen of the United States and domiciled in the State of New York. He is the father of Daniel A. Fuentes.

3605.   Plaintiff Julio Fuentes is a citizen of the United States and domiciled in the State of

New York. He is the brother of Daniel A. Fuentes.

3606.   Plaintiff Tatyana Fuentes is a citizen of the United States and domiciled in the State of New York. She is the sister of Daniel A. Fuentes.

3607.   Plaintiff Emma McGarry is a citizen of the United States and domiciled in the State of New York. She was the fiancée of Daniel A. Fuentes.

3608.   Plaintiff D.J.F., a minor represented by his legal guardian, Emma McGarry, is a citizen of the United States and domiciled in the State of New York. He is the son of Daniel A. Fuentes.

3609.   As a result of the attack, and the death of Daniel A. Fuentes, Plaintiffs Nancy Fuentes, Armando Fuentes, Julio Fuentes, Tatyana Fuentes, Emma McGarry and D.J.F. have experienced the loss of their son's/brother's/fiancée's/father's society, companionship, comfort, advice and counsel.

## 106.   THE APRIL 6, 2007 ATTACK – SADR CITY

### The Kirby Family

3610.   Plaintiff John Kirby is a citizen of the United States and domiciled in the State of Texas.

3611.   On April 6, 2007, John Kirby, then 31, was serving in the U.S. military in Iraq when both an EFP and an ambulance rigged with explosives detonated near his vehicle.

3612.   The weapon used to injure John Kirby was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3613.   As a result of the attack, Mr. Kirby suffered burns on his upper back. He also suffers from a TBI and PTSD.

3614.  As a result of the attack, and the injuries he suffered, Plaintiff John Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3615.  Plaintiff John Kirby was discharged from the U.S. military on August 25, 2009.

**107.  THE APRIL 7, 2007 ATTACK – BAGHDAD**

**The Murphy-Sweet Family**

3616.  Philip A. Murphy-Sweet was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

3617.  On April 7, 2007, Philip A. Murphy-Sweet, aged 42 was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3618.  Philip A. Murphy-Sweet was killed in the attack.

3619.  The weapon used to kill Philip A. Murphy-Sweet was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3620.  Plaintiff Michael Murphy-Sweet is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Philip A. Murphy-Sweet.

3621.  Plaintiff Elizabeth Murphy-Sweet is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Philip A. Murphy-Sweet.

3622.  Plaintiff Anona Gonelli is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Philip A. Murphy-Sweet.

3623.  As a result of the attack, and the death of Philip A. Murphy-Sweet, Plaintiffs Michael Murphy-Sweet, Elizabeth Murphy-Sweet and Anona Gonelli have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

108.   **THE APRIL 9, 2007 ATTACK – BAGHDAD**

**The Walton Family**

3624.   Brett A. Walton was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

3625.   On April 9, 2007, Brett A. Walton, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3626.   Brett A. Walton was killed in the attack.

3627.   The weapon used to kill Brett A. Walton was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3628.   Plaintiff Lindsay Young is a citizen of the United States and domiciled in the State of Oregon. She is the widow of Brett A. Walton.

3629.   Plaintiff Lindsay Young brings an action individually and on behalf of the Estate of Brett A. Walton, as its legal representative.

3630.   Plaintiff S.W., a minor represented by her legal guardian Lindsay Young, is a citizen of the United States and domiciled in the State of Oregon. She is the daughter of Brett A. Walton.

3631.   As a result of the attack, and the death of Brett A. Walton, Plaintiffs Lindsay Young and S.W. have experienced the loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Holden Family**

3632.   Brian L. Holden was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

3633.   On April 9, 2007, Brian L. Holden, aged 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

3634.   Brian L. Holden was killed in the attack.

3635.   The weapon used to kill Brian L. Holden was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3636.   Plaintiff Leasa Dollar is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Brian L. Holden.

3637.   Plaintiff Eugene DeLozier is a citizen of the United States and domiciled in the State of Washington. He is the stepfather of Brian L. Holden.

3638.   As a result of the attack, and the death of Brian L. Holden, Plaintiffs Leasa Dollar and Eugene DeLozier have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**109.   THE APRIL 13, 2007 ATTACK – BAGHDAD**

**The Bowman Family**

3639.   Larry R. Bowman was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

3640.   On April 13, 2007, Larry R. Bowman, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3641.   Larry R. Bowman was killed in the attack.

3642.   The weapon used to kill Larry R. Bowman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

3643.  Plaintiff Michelle Klemensberg is a citizen of the United States and domiciled in the State of California. She is the widow of Larry R. Bowman.

3644.  Plaintiff Michelle Klemensberg brings an action individually and on behalf of the Estate of Larry R. Bowman, as its legal representative.

3645.  As a result of the attack, and the death of Larry R. Bowman, Plaintiff Michelle Klemensberg has experienced the loss of her husband's society, companionship, comfort, advice and counsel.

## 110.  THE APRIL 15, 2007 ATTACK – BAGHDAD

### The Lilley Family

3646.  Plaintiff Scott Lilley is a citizen of the United States and domiciled in the State of New Mexico.

3647.  On April 15, 2007, Scott Lilley, then 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3648.  The weapon used to injure Mr. Lilley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3649.  As a result of the attack, shrapnel struck Mr. Lilley's head and entered his skull. He developed significant swelling of the brain.

3650.  Surgeons removed a portion of Mr. Lilley's skull to alleviate the swelling.

3651.  He remained in a coma for over 24 hours.

3652.  Mr. Lilley also underwent procedures in an attempt to prevent brain aneurisms.

3653.   The injury to his brain resulted in Mr. Lilley's inability to do simple and complex tasks that included walking, eating, and talking.

3654.   His received physical and occupational therapy so he could relearn these and other skills.

3655.   Mr. Lilley has developed short-term memory loss since the attack and has difficulty following up with tasks and recalling information. He has been diagnosed with ADHD and has been prescribed medication to address this condition.

3656.   As a result of the attack, and the injuries he suffered, Plaintiff Scott Lilley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3657.   Plaintiff Frank Lilley is a citizen of the United States and domiciled in the State of New Mexico. He is the father of Scott Lilley.

3658.   Plaintiff Jolene Lilley is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Scott Lilley.

3659.   Plaintiff Matthew Lilley is a citizen of the United States and domiciled in the State of Texas. He is the brother of Scott Lilley.

3660.   As a result of the attack, and the injuries Scott Lilley suffered, Plaintiffs Frank Lilley, Jolene Lilley, and Matthew Lilley have experienced severe mental anguish and extreme emotional pain and suffering.

3661.   Plaintiff Scott Lilley was discharged from the U.S. military on December 23, 2010.

**111.**   **THE APRIL 16, 2007 ATTACK – BAGHDAD**

**The Starcevich Family**

3662.   Lucas V. Starcevich was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3663.   On April 16, 2007, Lucas V. Starcevich, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3664.   Lucas V. Starcevich was killed in the attack.

3665.   The weapon used to kill Lucas V. Starcevich was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3666.   Plaintiff Ava Tomson is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Lucas V. Starcevich.

3667.   Plaintiff Ava Tomson brings an action individually and on behalf of the Estate of Lucas V. Starcevich, as its legal representative.

3668.   Plaintiff Richard Tomson is a citizen of the United States and domiciled in the State of Illinois. He is the stepfather of Lucas V. Starcevich.

3669.   Plaintiff Bradley Starcevich is a citizen of the United States and domiciled in the State of Illinois. He is the father of Lucas V. Starcevich.

3670.   Plaintiff Glenda Starcevich is a citizen of the United States and domiciled in the State of Illinois. She is the stepmother of Lucas V. Starcevich.

3671.   Plaintiff Ariana Starcevich is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Lucas V. Starcevich.

3672.   Plaintiff Trenton Starcevich is a citizen of the United States and domiciled in the State of California. He is the brother of Lucas V. Starcevich.

3673.   Plaintiff Samantha Tomson is a citizen of the United States and domiciled in the State of Illinois. She is the stepsister of Lucas V. Starcevich.

3674.   Plaintiff Andrew Tomson is a citizen of the United States and domiciled in the State

of Illinois. He is the stepbrother of Lucas V. Starcevich

3675.  As a result of the attack, and the death of Lucas V. Starcevich, Plaintiffs Ava Tomson, Richard Tomson, Bradley Starcevich, Glenda Starcevich, Ariana Starcevich, Trenton Starcevich, Samantha Tomson and Andrew Tomson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 112.  THE APRIL 28, 2007 ATTACK – BAGHDAD

### The Stevens Family

3676.  Plaintiff Jared S. Stevens is a citizen of the United States and domiciled in the State of Maryland.

3677.  On April 28, 2007, Jared S. Stevens was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups.

3678.  Jared S. Stevens was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3679.  As a result of the attack, Mr. Stevens was shot in the lip, lacerating it.

3680.  As a result of the attack, and the injuries he suffered, Plaintiff Jared S. Stevens has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3681.  Plaintiff Jared S. Stevens was discharged from the U.S. military on September 30, 2018.

## 113.  THE APRIL 28, 2007 ATTACK – SALMAN PAK

### The Hicks Family

3682.  Glenn Dale Hicks, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

570

3683.   On April 28, 2007, Glenn Dale Hicks, Jr., then 24, was serving in the U.S. military in Iraq when an IED emplaced by Special Groups detonated near his vehicle. His unit was on a routine patrol heading southwest on Route Kelp in the vicinity of Salman Pak, Iraq when the M1151 in which he was traveling was struck by an IED and subsequent small arms fire.

3684.   Glenn Dale Hicks, Jr. was killed in the attack from blast injuries.

3685.   The Special Groups terror cell operatives that emplaced the IED that killed Glenn Dale Hicks, Jr. were trained by Hezbollah and funded and supplied by the IRGC-QF and they launched the attack at the direction of both Hezbollah and the IRGC-QF, as their proxy.

3686.   Plaintiff Susan Maria Doskocil Hicks is a citizen of the United States and domiciled in the State of Texas. She is the mother of Glenn Dale Hicks, Jr.

3687.   Plaintiff Susan Maria Doskocil Hicks brings an action individually and on behalf of the Estate of Glenn Dale Hicks, Jr., as its legal representative.

3688.   Plaintiff Glenn Dale Hicks, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Glenn Dale Hicks, Jr.

3689.   Plaintiff David James Hicks is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

3690.   Plaintiff John Christopher Hicks is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

3691.   Plaintiff S.L.H., a minor, represented by his legal guardian Susan Maria Doskocil Hicks, is a citizen of the United States and domiciled in the State of Texas. He is the brother of Glenn Dale Hicks, Jr.

3692.   As a result of the attack, and the death of Glenn Dale Hicks, Jr., Plaintiffs Susan Maria Doskocil Hicks, Glenn Dale Hicks, Sr., David James Hicks, John Christopher Hicks, and

S.L.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

114.   **THE APRIL 29, 2007 ATTACK – BAGHDAD**

**The Funcheon Family**

3693.   Alexander J. Funcheon was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

3694.   On April 29, 2007, Alexander J. Funcheon, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his unit.

3695.   Alexander J. Funcheon was killed in the attack.

3696.   The weapon used to kill Alexander J. Funcheon was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3697.   Plaintiff Karen Funcheon is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Alexander J. Funcheon.

3698.   Plaintiff Karen Funcheon brings an action individually and on behalf of the Estate of Alexander J. Funcheon, as its legal representative.

3699.   Plaintiff Robert Funcheon is a citizen of the United States and domiciled in the State of Kansas. He is the father of Alexander J. Funcheon.

3700.   As a result of the attack, and the death of Alexander J. Funcheon, Plaintiffs Karen Funcheon and Robert Funcheon have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Martin Family**

3701.   Jay E. Martin was a citizen of the United States and domiciled in the State of Maryland when he was killed in Iraq.

3702.   On April 29, 2007, Jay E. Martin, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his unit.

3703.   Jay E. Martin was killed in the attack.

3704.   The weapon used to kill Jay E. Martin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3705.   Plaintiff Dwight Martin is a citizen of the United States and domiciled in the State of Maryland. He is the father of Jay E. Martin.

3706.   Plaintiff Dwight Martin brings an action individually and on behalf of the Estate of Jay E. Martin, as its legal representative.

3707.   Plaintiff Dove Deanna Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

3708.   Plaintiff Raven Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

3709.   Plaintiff Lark Adams is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Jay E. Martin.

3710.   As a result of the attack, and the death of Jay E. Martin, Plaintiffs Dwight Martin, Dove Deanna Adams, Raven Adams and Lark Adams have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 115.    THE MAY 3, 2007 ATTACK – BAGHDAD

**The Potter Family**

3711.    Jerome Potter was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

3712.    On May 3, 2007, Jerome Potter, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3713.    Jerome Potter was killed in the attack.

3714.    The weapon used to kill Jerome Potter was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3715.    Plaintiff Holly Burson is a citizen of the United States and domiciled in the State of Washington. She is the mother of Jerome Potter.

3716.    Plaintiff Holly Burson brings an action individually and on behalf of the Estate of Jerome Potter, as its legal representative.

3717.    As a result of the attack, and the death of Jerome Potter, Plaintiff Holly Burson has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 116.    THE MAY 3, 2007 ATTACK – MUSAYYIB

**The Umbrell Family**

3718.    Colby J. Umbrell was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

3719.    On May 3, 2007, Colby J. Umbrell aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3720.   Colby J. Umbrell was killed in the attack.

3721.   The weapon used to kill Colby J. Umbrell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3722.   Plaintiff Nancy Umbrell is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Colby J. Umbrell.

3723.   Plaintiff Nancy Umbrell brings an action individually and on behalf of the Estate of Colby J. Umbrell, as its legal representative.

3724.   Plaintiff Mark Umbrell is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Colby J. Umbrell.

3725.   Plaintiff Casey Boehmer is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Colby J. Umbrell.

3726.   As a result of the attack, and the death of Colby J. Umbrell, Plaintiffs Nancy Umbrell, Mark Umbrell and Casey Boehmer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 117.   THE MAY 5, 2007 ATTACK – KAMALIYAH

**The Smith Family**

3727.   Plaintiff Jeremy D. Smith is a citizen of the United States and domiciled in the State of North Carolina.

3728.   On May 5, 2007, Jeremy D. Smith was serving in the U.S. military in COP Bushmaster in Kamaliyah, Iraq when he was injured in a mortar attack perpetrated by JAM Special Groups operatives.

3729.   Jeremy D. Smith was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3730.   As a result of the attack, Jeremy D. Smith suffered shrapnel injuries to his right arm and right leg. He also suffered a damaged ligament in his right ankle.

3731.   As a result of the attack, and the injuries he suffered, Plaintiff Jeremy D. Smith has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3732.   Plaintiff Jeremy D. Smith remains on active duty with the U.S. military.

**118.   THE MAY 6, 2007 ATTACK – BAGHDAD**

**The Dixon Family**

3733.   Robert J. Dixon was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

3734.   On May 6, 2007, Robert J. Dixon aged 27, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3735.   Robert J. Dixon was killed in the attack.

3736.   The weapon used to kill Robert J. Dixon was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3737.   Ilene Dixon was a citizen of the United States at the time of the death of Robert J. Dixon. She was the mother of Robert J. Dixon. She died on November 18, 2014.

3738.   Plaintiff Daniel Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the father of Robert J. Dixon.

3739.   Plaintiff Daniel Dixon brings an action individually and on behalf of the Estate of Ilene Dixon as its legal representative.

3740.  Plaintiff Daniel Dixon also brings an action on behalf of the Estate of Robert J. Dixon, as its co-legal representative.

3741.  Jessica Hubbard is a citizen of the United States and domiciled in the State of Michigan. She is the ex-wife of Robert J. Dixon and is the legal guardian of Plaintiffs M.R., a minor, and L.R., a minor, and co-legal representative of the Estate of Robert J. Dixon.

3742.  Jessica Hubbard brings an action solely on behalf of Plaintiffs M.R. and L.R., minors, and on behalf of the Estate of Robert J. Dixon, as its co-legal representative.

3743.  Plaintiff M.R., a minor represented by his legal guardian, Jessica Hubbard, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Robert J. Dixon.

3744.  Plaintiff L.R., a minor represented by his legal guardian, Jessica Hubbard, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Robert J. Dixon.

3745.  Plaintiff David Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Robert J. Dixon.

3746.  Plaintiff Daniel Austin Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Robert J. Dixon.

3747.  Plaintiff Gretchen Lang is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Robert J. Dixon.

3748.  As a result of the attack, and the death of Robert J. Dixon, the late Ilene Dixon experienced, and Plaintiffs Daniel Dixon, M.R., L.R., David Dixon, Daniel Austin Dixon and Gretchen Lang have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

119. **THE MAY 6, 2007 ATTACK – BAGHDAD**

**The Martinez Family**

3749. Virgil C. Martinez was a citizen of the United States and domiciled in the State of Utah when he was killed in Iraq.

3750. On May 6, 2007, Virgil C. Martinez, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3751. Virgil C. Martinez was killed in the attack.

3752. The weapon used to kill Virgil C. Martinez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3753. Plaintiff Rebecca J. Oliver is a citizen of the United States and domiciled in the State of Utah. She is the mother of Virgil C. Martinez.

3754. Plaintiff Daniel C. Oliver is a citizen of the United States and domiciled in the State of Utah. He is the stepfather of Virgil C. Martinez.

3755. Plaintiff Kimberlee Austin-Oliver is a citizen of the United States and domiciled in the State of Utah. She is the sister of Virgil C. Martinez.

3756. As a result of the attack, and the death of Virgil C. Martinez, Plaintiffs Rebecca J. Oliver, Daniel C. Oliver and Kimberlee Austin-Oliver have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 120.    THE MAY 8, 2007 ATTACK – SALMAN PAK

**The Little Family**

3757.    Kyle A. Little was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

3758.    On May 8, 2007, Kyle A. Little, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3759.    Kyle A. Little was killed in the attack.

3760.    The weapon used to kill Kyle A. Little was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3761.    Plaintiff Tiffany M. Little is a citizen of the United States and domiciled in the State of Alabama. She is the widow of Kyle A. Little.

3762.    Plaintiff Tiffany M. Little brings an action individually and on behalf of the Estate of Kyle A. Little as its legal representative.

3763.    Plaintiff K.L., a minor represented by her legal guardian Tiffany M. Little, is a citizen of the United States and domiciled in the State of Alabama. She is the daughter of Kyle A. Little.

3764.    Plaintiff Shelley Ann Smith is a citizen of the United States and domiciled in the State of Massachusetts. She is the mother of Kyle A. Little.

3765.    Plaintiff Dakota Smith-Lizotte is a citizen of the United States and domiciled in the State of Massachusetts. He is the brother of Kyle A. Little.

3766.    Plaintiff Shyanne Smith-Lizotte is a citizen of the United States and domiciled in the State of Massachusetts. She is the sister of Kyle A. Little.

3767.   As a result of the attack, and the death of Kyle A. Little, Plaintiffs Tiffany M. Little, K.L., Shelley Ann Smith, Dakota Smith-Lizotte, and Shyanne Smith-Lizotte have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

## 121.   THE MAY 8, 2007 ATTACK – BAGHDAD

**The Stephens Family**

3768.   Blake Stephens was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

3769.   On May 8, 2007, Blake Stephens, aged 25, was serving in the United States military in Iraq when an EFP emplaced by JAM Special Groups detonated near his vehicle near Salman Pak, a town south of Baghdad.

3770.   Blake Stephens was killed in the attack.

3771.   The weapon used to kill Blake Stephens was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3772.   Plaintiff Erin Lee Dructor is a citizen of the United States and domiciled in the State of California. She is the widow of Blake Stephens.

3773.   Plaintiff Erin Lee Dructor brings an action individually and on behalf of the Estate of Blake Stephens, as its legal representative.

3774.   Plaintiff Trent Stephens is a citizen of the United States and domiciled in the State of Idaho. He is the father of Blake Stephens.

3775.   Plaintiff Kathleen Stephens is a citizen of the United States and domiciled in the State of Idaho. She is the mother of Blake Stephens.

3776. Plaintiff Derek Stephens is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Blake Stephens.

3777. Plaintiff Rhett Stephens is a citizen of the United States and domiciled in the State of California. He is the brother of Blake Stephens.

3778. Plaintiff Summer Stephens is a citizen of the United States and domiciled in the State of California. She is the sister of Blake Stephens.

3779. Plaintiff Brittani Hobson is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Blake Stephens.

3780. As a result of the attack, and the death of Blake Stephens, Plaintiffs Erin Lee Dructor, Trent Stephens, Kathleen Stephens, Derek Stephens, Rhett Stephens, Summer Stephens, and Brittani Hobson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 122. THE MAY 9, 2007 ATTACK – AL-HILLAH

### The Conner Family

3781. Bradly D. Conner was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

3782. On May 9, 2007, Bradly D. Conner, aged 41, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3783. Bradly D. Conner was killed in the attack.

3784. The weapon used to kill Bradly D. Conner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3785.   Plaintiff Cynthia Conner is a citizen of the United States and domiciled in the State of Alabama. She is the widow of Bradly D. Conner.

3786.   As a result of the attack, and the death of Bradly D. Conner, Plaintiff Cynthia Conner has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's companionship, comfort, advice and counsel.

### 123.   THE MAY 11, 2007 ATTACK – AL ISKANDARIYAH

**The Farrar Family**

3787.   William A. Farrar was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3788.   On May 11, 2007, William A. Farrar, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3789.   William A. Farrar was killed in the attack.

3790.   The weapon used to kill William A. Farrar was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3791.   Plaintiff William Farrar, Sr. is a citizen of the United States and domiciled in the State of California. He is the father of William A. Farrar.

3792.   Plaintiff William Farrar, Sr. brings an action individually and on behalf of the Estate of William A. Farrar, as its legal representative.

3793.   As a result of the attack, and the death of William A. Farrar, Plaintiff William Farrar, Sr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

124.  **THE MAY 14, 2007 ATTACK – BAGHDAD**

**The Brooks Family**

3794.  Plaintiff Joshua Brooks is a citizen of the United States and domiciled in the State of Tennessee.

3795.  On May 14, 2007, Joshua Brooks, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups hit the HMMWV in which he was traveling in Baghdad.

3796.  The weapon used to injure Joshua Brooks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3797.  The blast shattered Mr. Brooks' left fibula.

3798.  Mr. Brooks also suffered tissue loss in his left leg, nerve and tendon damage in his left foot and ankle and scarring on his left foot.

3799.  Mr. Brooks has undergone over twenty surgeries to treat his injuries. His injuries have also necessitated extensive physical therapy.

3800.  Mr. Brooks was diagnosed with PTSD and a TBI. He has been prescribed medication and has sought counseling to treat the emotional impact of the attack.

3801.  As a result of the attack, and the injuries he suffered, Plaintiff Joshua Brooks has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3802.  Plaintiff Joyce Brooks is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of Joshua Brooks.

3803.  Plaintiff Danny Brooks is a citizen of the United States and domiciled in the State of Kentucky.  He is the father of Joshua Brooks.

3804.   Plaintiff Daniel Tyler Brooks is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Joshua Brooks.

3805.   As a result of the attack, and the injuries Joshua Brooks has suffered, Plaintiffs Joyce Brooks, Danny Brooks and Daniel Tyler Brooks have experienced severe mental anguish and extreme emotional pain and suffering.

### 125.   THE MAY 18, 2007 ATTACK – BAGHDAD

**The Brown Family**

3806.   Scott J. Brown was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

3807.   On May 18, 2007, Scott J. Brown, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3808.   Scott J. Brown was killed in the attack.

3809.   The weapon used to kill Scott J. Brown was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3810.   Plaintiff Delilah Brown is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Scott J. Brown.

3811.   Plaintiff Delilah Brown brings an action individually and on behalf of the Estate of Scott J. Brown, as its legal representative.

3812.   As a result of the attack, and the death of Scott J. Brown, Plaintiff Delilah Brown has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

126. **THE MAY 29, 2007 ATTACK – SADR CITY**

**The Kirby Family**

3813.    Plaintiff John Kirby is a citizen of the United States and domiciled in the State of Texas.

3814.    On May 29, 2007, John Kirby, then 31, was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups.

3815.    John Kirby was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3816.    As a result of the attack, Mr. Kirby was shot in the arm breaking his humerus in three places and later requiring an implant.

3817.    As a result of the attack, and the injuries he suffered, Plaintiff John Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

127. **THE JUNE 2, 2007 ATTACK – BAGHDAD**

**The Dressler Family**

3818.    Shawn E. Dressler was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3819.    On June 2, 2007, Shawn E. Dressler, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3820.    Shawn E. Dressler was killed in the attack.

3821.    The weapon used to kill Shawn E. Dressler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3822.   Plaintiff Tonya K. Dressler is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Shawn E. Dressler.

3823.   Plaintiff Ardith Cecil Dressler is a citizen of the United States and domiciled in the State of Arizona. He is the father of Shawn E. Dressler.

3824.   Plaintiff Melissa Dressler is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Shawn E. Dressler.

3825.   Plaintiff Tanya Suzette Dressler is a citizen of the United States and domiciled in the State of Arkansas. She is the sister of Shawn E. Dressler.

3826.   Plaintiff Daniel Dressler is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Shawn E. Dressler.

3827.   Plaintiff James Dressler is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Shawn E. Dressler.

3828.   As a result of the attack, and the death of Shawn E. Dressler, Plaintiffs Tonya K. Dressler, Ardith Cecil Dressler, Melissa Dressler, Tanya Suzette Dressler, Daniel Dressler and James Dressler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Brown Family**

3829.   Joshua D. Brown was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3830.   On June 2, 2007, Joshua D. Brown, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3831.   Joshua D. Brown was killed in the attack.

3832.   The weapon used to kill Joshua D. Brown was a Hezbollah-designed and Iranian-

manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3833.   Plaintiff Elizabeth Masterson is a citizen of the United States and domiciled in the State of Michigan. She is the widow of Joshua D. Brown.

3834.   Plaintiff Elizabeth Masterson brings an action individually and on behalf of the Estate of Joshua D. Brown, as its legal representative.

3835.   Plaintiff Marian Brown is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Joshua D. Brown.

3836.   Plaintiff Wayne Brown is a citizen of the United States and domiciled in the State of Michigan. He is the father of Joshua D. Brown.

3837.   As a result of the attack, and the death of Joshua D. Brown, Plaintiffs Elizabeth Masterson, Marian Brown and Wayne Brown have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

### 128.   THE JUNE 5, 2007 ATTACK – KIRKUK

**The Balmer Family**

3838.   Ryan A. Balmer was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

3839.   On June 5, 2007, Ryan A. Balmer, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3840.   Ryan A. Balmer was killed in the attack.

3841.   The weapon used to kill Ryan A. Balmer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

3842.   Plaintiff Danielle Sweet is a citizen of the United States and domiciled in the State of Florida. She is the widow of Ryan A. Balmer.

3843.   Plaintiff Danielle Sweet brings an action individually and on behalf of the Estate of Ryan A. Balmer, as its legal representative.

3844.   Plaintiff A.B., a minor represented by his legal guardian Danielle Sweet, is a citizen of the United States and domiciled in the State of Florida. He is the son of Ryan A. Balmer.

3845.   Plaintiff G.B., a minor represented by her legal guardian Danielle Sweet, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Ryan A. Balmer.

3846.   As a result of the attack, and the death of Ryan A. Balmer, Plaintiffs Danielle Sweet, A.B. and G.B. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Kuglics Family**

3847.   Matthew J. Kuglics was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

3848.   On June 5, 2007, Matthew J. Kuglics, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3849.   Matthew J. Kuglics was killed in the attack.

3850.   The weapon used to kill Matthew J. Kuglics was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3851.   Plaintiff Donna Kuglics is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Matthew J. Kuglics.

3852.    Plaintiff Donna Kuglics brings an action individually and on behalf of the Estate of Matthew J. Kuglics, as its legal representative.

3853.    Plaintiff Les Kuglics is a citizen of the United States and domiciled in the State of Ohio. He is the father of Matthew J. Kuglics.

3854.    Plaintiff Emily Adams is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Matthew J. Kuglics.

3855.    As a result of the attack, and the death of Matthew J. Kuglics, Plaintiffs Donna Kuglics, Les Kuglics and Emily Adams have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 129.    THE JUNE 6, 2007 ATTACK – BAGHDAD

**The Gajdos Family**

3856.    Shawn D. Gajdos was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

3857.    On June 6, 2007, Shawn D. Gajdos, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3858.    Shawn D. Gajdos was killed in the attack.

3859.    The weapon used to kill Shawn D. Gajdos was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3860.    Plaintiff Derek Gajdos is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Shawn D. Gajdos.

3861.   Plaintiff Tammy DenBoer is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Shawn D. Gajdos.

3862.   As a result of the attack, and the death of Shawn D. Gajdos, Plaintiffs Derek Gajdos and Tammy DenBoer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## 130.   THE JUNE 8, 2007 ATTACK – BAGHDAD

### The Campbell Family

3863.   Plaintiff Brandeaux Campbell is a citizen of the United States and domiciled in the State of Texas.

3864.   On June 8, 2007, Brandeaux Campbell, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3865.   The weapon used to injure Mr. Campbell was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3866.   Brandeaux Campbell was severely wounded in the attack resulting in a concussion; his forehead, mouth, and tongue being sliced open; and shrapnel lodged in both his shoulder and leg.

3867.   As a result of the attack, and the injuries he suffered, Plaintiff Brandeaux Campbell has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### The Wilson Family

3868.   Plaintiff Ryan Wilson is a citizen of the United States and domiciled in the State of Florida.

3869.   On June 8, 2007, Ryan Wilson was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3870.   The weapon used to injure Mr. Wilson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3871.   Ryan Wilson was wounded in the attack resulting in shrapnel wounds to his right arm.

3872.   As a result of the attack, and the injuries he suffered, Plaintiff Ryan Wilson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3873.   Plaintiff Jami Lin Wilson is a citizen of the United States and domiciled in the State of Florida. She is the wife of Ryan Wilson.

3874.   As a result of the attack, and the injuries Ryan Wilson has suffered, Plaintiff Jami Lin Wilson has experienced severe mental anguish and extreme emotional pain and suffering.

**131.   THE JUNE 10, 2007 ATTACK – BAGHDAD**

**The Lammers Family**

3875.   Plaintiff Matthew Lammers is a citizen of the United States and domiciled in the State of North Carolina.

3876.   On June 10, 2007, Matthew Lammers, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3877.   Matthew Lammers was injured in the attack.

3878.   The weapon used to injure Matthew Lammers was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3879.  As a result of the attack, Matthew Lammers' left hand was completely severed. Both of his legs were nearly severed below his kneecaps.

3880.  His femoral arteries had been cut, and he lost a significant amount of blood.

3881.  After the attack, Mr. Lammers began to asphyxiate due to his lungs filling with bodily fluids. He remained conscious while this occurred.

3882.  Mr. Lammers' injuries necessitated that he undergo surgery to fully amputate both of his legs below the knees. He has been rendered a triple amputee.

3883.  He underwent multiple procedures and frequent wound cleanings. His treatment included debridement of muscle tissue.

3884.  Mr. Lammers has prosthetics to assist with the use of his left hand. He must use a wheelchair to ambulate.

3885.  He has experienced and continues to experience severe phantom limb pain and pain in his back.

3886.  Mr. Lammers has undergone extensive physical therapy.

3887.  He has been diagnosed with a TBI.

3888.  Mr. Lammers has also been diagnosed with PTSD and depression and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

3889.  Mr. Lammers continues to experience pain and emotional distress each day, and he receives continuing treatment for his injuries.

3890.  As a result of the attack, and the injuries he suffered, Plaintiff Matthew Lammers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3891.    Plaintiff Alicia Lammers is a citizen of the United States and domiciled in the state of North Carolina. She is the wife of Matthew Lammers.

3892.    Plaintiff Barbara Lammers is a citizen of the United States and domiciled in the state of Kansas. She is the mother of Matthew Lammers.

3893.    Plaintiff Gary Lammers is a citizen of the United States and domiciled in the state of Kansas. He is the father of Matthew Lammers.

3894.    Plaintiff Stacy Pate is a citizen of the United States and domiciled in the state of Kansas. She is the sister of Matthew Lammers.

3895.    As a result of the attack, and the injuries Matthew Lammers has suffered, Plaintiffs Alicia Lammers, Barbara Lammers, Gary Lammers and Stacy Pate have experienced severe mental anguish and extreme emotional pain and suffering.

**The Gomez Family**

3896.    Plaintiff Angel Gomez is a citizen of the United States and domiciled in the State of Texas.

3897.    On June 10, 2007, Angel Gomez, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3898.    The weapon used to injure Angel Gomez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3899.    The blast injured Mr. Gomez's right leg, necessitating its amputation below the knee.

3900. Mr. Gomez sustained shrapnel to his back, which resulted in complete muscle atrophy in his back.

3901. He was wearing Interceptor Body Armor ("IBA"), which included ballistic plates to protect his abdomen. The shrapnel hit the IBA plates, which slit Mr. Gomez's abdomen open and caused internal injuries.

3902. Mr. Gomez was also diagnosed with a concussion, a TBI, and PTSD.

3903. Mr. Gomez lived in a hospital for a year and a half while receiving treatment and undergoing numerous surgeries. He has been prescribed medication to treat his injuries.

3904. As a result of the attack, and the injuries he suffered, Plaintiff Angel Gomez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 132. <u>THE JUNE 11, 2007 ATTACK – BAGHDAD</u>

<u>The Payne Family</u>

3905. Cameron K. Payne was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3906. On June 11, 2007, Cameron K. Payne, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3907. Cameron K. Payne was killed in the attack.

3908. The weapon used to kill Cameron K. Payne was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3909. Plaintiff Denise Jackson is a citizen of the United States and domiciled in the State of California. She is the mother of Cameron K. Payne.

3910.   As a result of the attack, and the death of Cameron K. Payne, Plaintiff Denise Jackson has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 133.   THE JUNE 13, 2007 ATTACK - SCANIA

**The Parker Family**

3911.   Richard Parker was a citizen of the United States and domiciled in the State of Maine when he was killed in Iraq.

3912.   On June 13, 2007, Richard Parker, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3913.   Richard Parker died on June 14, 2007 as a result of injuries sustained in the attack.

3914.   The weapon used to kill Richard Parker was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3915.   Plaintiff Scott Hood is a citizen of the United States and domiciled in the State of Maine. He is the father of Richard Parker.

3916.   Plaintiff Flora Hood is a citizen of the United States and domiciled in the State of Maine. She is the stepmother of Richard Parker.

3917.   Plaintiff Dixie Flagg is a citizen of the United States and domiciled in the State of Maine. She is the mother of Richard Parker.

3918.   Plaintiff Stephanie Hood is a citizen of the United States and domiciled in the State of Maine. She is the sister of Richard Parker.

3919.   Plaintiff Cheyenne Flagg is a citizen of the United States and domiciled in the State of Maine. She is the sister of Richard Parker.

3920. Plaintiff William Parker is a citizen of the United States and domiciled in the State of Maine. He is the brother of Richard Parker.

3921. Plaintiff Meghan Parker-Crockett is a citizen of the United States and domiciled in the State of Maine. She is the sister of Richard Parker.

3922. As a result of the attack, and the death of Richard Parker, Plaintiffs Scott Hood, Flora Hood, Dixie Flagg, Stephanie Hood, Cheyenne Flagg, William Parker, and Meghan Parker-Crockett have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

134. **THE JUNE 14, 2007 ATTACK – SCANIA**

**The Moores Family**

3923. Plaintiff Andrew Moores is a citizen of the United States and domiciled in the State of Maine.

3924. On June 14, 2007, Andrew Moores, then 23, was serving in the United States military in Iraq. Mr. Moores was the truck commander in a gun truck that was part of a convoy tasked with escorting military vehicles between Kuwait and Iraq, when an EFP emplaced by Special Groups detonated near his vehicle.

3925. The weapon used to injure Andrew Moores was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3926. As a result of the attack, Andrew Moores sustained shrapnel in his left hand and suffered injury to his right shoulder, which necessitated surgery and physical therapy. He experiences limitations on his shoulder movement to this day.

3927. Mr. Moores also injured his neck as a result of the attack and takes medication for pain.

3928. Andrew Moores was diagnosed with PTSD, for which he sought counseling. He takes medication for his PTSD, as well as medication for the sleep issues he experiences stemming from the attack.

3929. As a result of the attack, and the injuries he suffered, Plaintiff Andrew Moores has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 135. THE JUNE 17, 2007 ATTACK – BAGHDAD

**The Tracy Family**

3930. Jacob Tracy was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

3931. On June 17, 2007, Jacob Tracy, aged 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3932. Jacob Tracy was injured in the attack and died on June 18, 2007 from the injuries he sustained in the attack.

3933. The weapon used to kill Jacob Tracy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3934. Plaintiff Sheila Tracy is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Jacob Tracy.

3935. Plaintiff Sheila Tracy brings an action individually and on behalf of the Estate of Jacob Tracy, as its legal representative.

3936.   Plaintiff Donald Tracy is a citizen of the United States and domiciled in the State of Illinois. He is the father of Jacob Tracy.

3937.   Plaintiff Nichole Sweeney is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Jacob Tracy.

3938.   Plaintiff Christina Sheridan is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Jacob Tracy.

3939.   As a result of the attack, and the death of Jacob Tracy, Plaintiffs Sheila Tracy, Donald Tracy, Nichole Sweeney, and Christina Sheridan have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Benson Family**

3940.   Plaintiff Matthew Benson is a citizen of the United States and domiciled in the State of Arizona.

3941.   On June 17, 2007, Matthew Benson, then 28, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3942.   The weapon used to injure Matthew Benson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3943.   As a result of the attack, Matthew Benson sustained a skull fracture.

3944.   Copper shavings were embedded in his body.

3945.   Mr. Benson also sustained burns and bruising on his back as well as lacerations to his hands, face, and head.

3946.  He has experienced severe headaches.

3947.  Mr. Benson has been diagnosed with PTSD.

3948.  As a result of the attack, and the injuries he suffered, Plaintiff Matthew Benson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

3949.  Plaintiff Melissa Benson is a citizen of the United States and domiciled in the State of Arizona. She is the wife of Matthew Benson.

3950.  Plaintiff C.B., a minor represented by his legal guardian, Matthew Benson, is a citizen of the United States and domiciled in the State of Arizona. He is the son of Matthew Benson.

3951.  Plaintiff B.B., a minor represented by his legal guardian, Matthew Benson, is a citizen of the United States and domiciled in the State of Arizona. He is the son of Matthew Benson.

3952.  Plaintiff Daniel P. Benson is a citizen of the United States and domiciled in the State of Kansas. He is the father of Matthew Benson.

3953.  Plaintiff Carol Benson is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Matthew Benson.

3954.  Plaintiff Daniel R. Benson is a citizen of the United States and domiciled in the State of Kansas. He is the brother of Matthew Benson.

3955.  As a result of the attack, and the injuries Matthew Benson has suffered, Plaintiffs Melissa Benson, C.B., B.B., Daniel P. Benson, Carol Benson and Daniel R. Benson have experienced severe mental anguish, and extreme emotional pain and suffering.

3956.  Plaintiff Matthew Benson was discharged from the U.S. military on January 1, 2019.

### 136. THE JUNE 20, 2007 ATTACK – BAGHDAD

**The Raymond Family**

3957. Plaintiff Andrew James Raymond is a citizen of the United States and domiciled in the State of New York.

3958. On June 20, 2007, Andrew James Raymond, then 48, was serving in the U.S. military in Iraq when his base came under attack from 107mm rockets.

3959. The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3960. Andrew James Raymond was injured in the attack when the rockets struck the building in which he was situated.

3961. As a result of the attack, Mr. Raymond suffered hearing loss and tinnitus.

3962. He was subsequently diagnosed with PTSD.

3963. As a result of the attack, and the injuries he suffered, Plaintiff Andrew James Raymond has experienced physical and mental anguish and extreme emotional pain and suffering.

3964. Plaintiff Andrew James Raymond was discharged from the U.S. military on June 1, 2013.

### 137. THE JUNE 21, 2007 ATTACK – BAGHDAD

**The Spencer Family**

3965. Raymond N. Spencer was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

3966. On June 21, 2007, Raymond N. Spencer, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3967. Raymond N. Spencer was killed in the attack.

3968. The weapon used to kill Raymond N. Spencer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3969. Plaintiff Raymond Nigel Spencer, Sr. is a citizen of the United States and domiciled in the State of Idaho. He is the father of Raymond N. Spencer.

3970. Plaintiff Sylvia Johnson Spencer is a citizen of the United States and domiciled in the State of Idaho. She is the stepmother of Raymond N. Spencer.

3971. As a result of the attack, and the death of Raymond N. Spencer, Plaintiffs Raymond Nigel Spencer, Sr. and Sylvia Johnson Spencer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 138.   THE JUNE 23, 2007 ATTACK – BAGHDAD

**The Moody Family**

3972. Michael Dean Moody, Jr. was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

3973. On June 23, 2007, Michael Dean Moody, Jr., aged 21, was serving in the U.S. military in Iraq when an IED emplaced by JAM Special Groups detonated near his vehicle while he was patrolling south of Sadr City. The IED strike was followed by small arms fire in the vicinity of the explosion.

3974. Michael Dean Moody, Jr. was killed in the attack.

3975. The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

3976. Plaintiff Michael Dean Moody, Sr. is a citizen of the United States and domiciled in the State of Virginia. He is the father of Michael Dean Moody, Jr.

3977. Plaintiff Michael Dean Moody, Sr. brings an action individually and on behalf of the Estate of Michael Dean Moody, Jr., as its legal representative.

3978. Plaintiff Connie Moody is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Michael Dean Moody, Jr.

3979. Plaintiff Kedrick Dante Moody is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Michael Dean Moody, Jr.

3980. As a result of the attack, and the death of Michael Dean Moody, Jr., Plaintiffs Michael Dean Moody, Sr., Connie Moody, and Kedrick Dante Moody have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 139. THE JUNE 25, 2007 ATTACK – BAGHDAD

### The Edwards Family

3981. Plaintiff Drew Edwards is a citizen of the United States and domiciled in the State of Missouri.

3982. On June 25, 2007, Drew Edwards, then 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

3983. The weapon used to injure Drew Edwards was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3984. As a result of the attack, Drew Edwards suffered an injury to his neck.

3985. Mr. Edwards has been diagnosed with a TBI.

3986. He was also diagnosed with PTSD. He has been prescribed medication to address the emotional impact of the attack.

3987. As a result of the attack, and the injuries he suffered, Plaintiff Drew Edwards has experienced physical injury, severe mental anguish and extreme emotional pain and suffering.

3988. Plaintiff Donielle Edwards is a citizen of the United States and domiciled in the State of Missouri. She is the wife of Drew Edwards.

3989. As a result of the attack, and the injuries Drew Edwards has suffered, Plaintiff Donielle Edwards has experienced severe mental anguish and extreme emotional pain and suffering.

**The Craig Family**

3990. Andre Craig, Jr. was a citizen of the United States and domiciled in the State of Connecticut when he was killed in Iraq.

3991. On June 25, 2007, Andre Craig, Jr., aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

3992. Andre Craig, Jr. was killed in the attack.

3993. The weapon used to kill Andre Craig, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

3994. Plaintiff Arifah Hardy is a citizen of the United States and domiciled in the State of Connecticut. She was the fiancée of Andre Craig, Jr.

3995.   Plaintiff T.C., a minor represented by her legal guardian, Arifah Hardy, is a citizen of the United States and domiciled in the State of Connecticut. She is the daughter of Andre Craig, Jr.

3996.   Plaintiff Aundra Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the father of Andre Craig, Jr.

3997.   Plaintiff Joyce Craig is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Andre Craig, Jr.

3998.   Plaintiff Debra Cook-Russell is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

3999.   Plaintiff Nashima Williams Craig is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

4000.   Plaintiff Matthew Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

4001.   Plaintiff Jonathan Craig is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

4002.   Plaintiff Andre Brown is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

4003.   Plaintiff Michael Cook is a citizen of the United States and domiciled in the State of Connecticut. He is the brother of Andre Craig, Jr.

4004.   Plaintiff Valencia Cook is a citizen of the United States and domiciled in the State of Connecticut. She is the sister of Andre Craig, Jr.

4005.   As a result of the attack, and the death of Andre Craig, Jr., Plaintiffs Aundra Craig, Joyce Craig, Debra Cook-Russell, Nashima Williams Craig, Matthew Craig, Jonathan Craig,

Andre Brown, Michael Cook and Valencia Cook have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their fiancée's/father's/son's/brother's society, companionship, comfort, advice and counsel.

### 140. <u>THE JUNE 28, 2007 ATTACK – BAGHDAD</u>

**<u>The Crow Family</u>**

4006.   William J. Crow was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

4007.   On June 28, 2007, William J. Crow, aged 28, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4008.   William J. Crow died on June 28, 2007 as a result of injuries sustained in the attack.

4009.   The weapon used to kill William J. Crow was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4010.   Plaintiff Katherine M. Crow is a citizen of the United States and domiciled in the State of Texas. She is the widow of William J. Crow.

4011.   Plaintiff Katherine M. Crow brings an action individually and on behalf of the Estate of William J. Crow, as its legal representative.

4012.   Plaintiff K.A.C., a minor represented by her legal guardian, Katherine M. Crow, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of William J. Crow.

4013.   Plaintiff K.E.C., a minor represented by her legal guardian, Katherine M. Crow, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of William J. Crow.

4014.   Plaintiff Candace Cathryn Hudson is a citizen of the United States and domiciled in the State of Florida. She is the sister of William J. Crow.

4015.   Kathryn Ann Mondini was a citizen of the United States at the time of the death of William J. Crow. She was the mother of William J. Crow. She died on April 18, 2014.

4016.   Plaintiff Candace Cathryn Hudson brings an action individually and on behalf of the Estate of Kathryn Ann Mondini, as its legal representative.

4017.   As a result of the attack, and the death of William J. Crow, the late Kathryn Ann Mondini experienced, and Plaintiffs Katherine M. Crow, K.A.C., K.E.C. and Candace Cathryn Hudson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/husband's/father's/brother's society, companionship, comfort, advice and counsel.

## 141.   THE JUNE 29, 2007 ATTACK – BAGHDAD

### The Adair Family

4018.   James L. Adair was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4019.   One June 29, 2007, James L. Adair, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4020.   James L. Adair was killed in the attack.

4021.   The weapon used to kill James L. Adair was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4022.   Plaintiff Amanda B. Adair is a citizen of the United States and domiciled in the State of Texas. She is the sister of James L. Adair.

4023.   As a result of the attack, and the death of James L. Adair, Plaintiff Amanda B. Adair

has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

142. **THE JUNE 30, 2007 ATTACK – BAGHDAD**

**The Tutwiler Family**

4024. Plaintiff Patrick Tutwiler is a citizen of the United States and domiciled in the State of Tennessee.

4025. On June 30, 2007, Patrick Tutwiler was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups terror operatives.

4026. As a result of the attack, Mr. Tutwiler was shot through the face and neck.

4027. Patrick Tutwiler was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4028. As a result of the attack, and the injuries he suffered, Plaintiff Patrick Tutwiler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4029. Plaintiff Crystal Tutwiler is a citizen of the United States and domiciled in the State of Tennessee. She is the wife Patrick Tutwiler.

4030. As a result of the attack, and the injuries suffered by Patrick Tutwiler, Plaintiff Crystal Tutwiler has experienced severe mental anguish, and extreme emotional pain and suffering.

143. **THE JULY 5, 2007 ATTACK – BAGHDAD**

**The Ring Family**

4031. Michelle R. Ring was a citizen of the United States and domiciled in the State of Oregon when she was killed in Iraq.

4032.   On July 5, 2007, Michelle R. Ring, aged 26, was serving in the U.S. military when she was killed in a mortar attack perpetrated by JAM Special Groups terror operatives.

4033.   Michelle R. Ring was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4034.   Plaintiff Shirley Stearns is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Michelle R. Ring.

4035.   Plaintiff John Stearns is a citizen of the United States and domiciled in the State of Oregon. He is the father of Michelle R. Ring.

4036.   Plaintiffs Shirley Stearns and John Stearns bring an action individually and on behalf of the Estate of Michelle R. Ring, as its legal representatives.

4037.   Plaintiff Karen Hall is a citizen of the United States and domiciled in the State of Alaska. She is the sister of Michelle R. Ring.

4038.   Plaintiff Marilyn Haybeck is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Michelle R. Ring.

4039.   Plaintiff Marc Stearns is a citizen of the United States and domiciled in the State of Oregon. He is the son of Michelle R. Ring.

4040.   James Cole is a citizen of the United States and domiciled in the State of Tennessee. He was the ex-husband of Michelle R. Ring and is the legal guardian of Plaintiff B.C., a minor. James Cole brings an action solely on behalf of Plaintiff B.C., a minor.

4041.   Plaintiff B.C., a minor represented by his legal guardian, James Cole, is a citizen of the United States and is domiciled in the State of Tennessee. He is the son of Michelle R. Ring.

4042.   As a result of the attack, and the death of Michelle R. Ring, Plaintiffs Shirley Stearns, John Stearns, Karen Hall, Marilyn Haybeck, Marc Stearns and B.C. have experienced

severe mental anguish, extreme emotional pain and suffering, and loss of their daughter's/sister's/mother's society, companionship, comfort, advice and counsel.

144. **THE JULY 6, 2007 ATTACK – BAGHDAD**

**The Lamie Family**

4043. Gene Lamie was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

4044. On July 6, 2007, Gene Lamie, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4045. Gene Lamie was killed in the attack.

4046. The weapon used to kill Gene Lamie was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4047. Plaintiff John D. Lamie is a citizen of the United States and domiciled in the State of Georgia. He is the brother of Gene Lamie.

4048. As a result of the attack, and the death of Gene Lamie, Plaintiff John D. Lamie has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

145. **THE JULY 6, 2007 ATTACK – BAGHDAD**

**The Lewis Family**

4049. Jason Dale Lewis was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

4050. On July 6, 2007, Jason Dale Lewis, aged 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4051.  Jason Dale Lewis was killed in the attack.

4052.  The weapon used to kill Jason Dale Lewis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4053.  Plaintiff Donna Lewis is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Jason Dale Lewis.

4054.  Plaintiff Donna Lewis brings an action individually and on behalf of the Estate of Jason Dale Lewis, as its legal representative.

4055.  Plaintiff J.L., a minor represented by his legal guardian Donna Lewis, is a citizen of the United States and domiciled in the State of Virginia. He is the son of Jason Dale Lewis.

4056.  Plaintiff J.L., a minor represented by his legal guardian Donna Lewis, is a citizen of the United States and domiciled in the State of Virginia. He is the son of Jason Dale Lewis.

4057.  Plaintiff G.L., a minor represented by her legal guardian Donna Lewis, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Jason Dale Lewis.

4058.  Plaintiff Jean Mariano is a citizen of the United States and domiciled in the State of Connecticut. She is the mother of Jason Dale Lewis.

4059.  As a result of the attack, and the death of Jason Dale Lewis, Plaintiffs Donna Lewis, J.L., J.L., G.L. and Jean Mariano have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

**The McRill Family**

4060.  Robert McRill was a citizen of the United States and domiciled in the State of

Virginia when he was killed in Iraq.

4061. On July 6, 2007, Robert McRill, aged 42, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4062. Robert McRill was killed in the attack.

4063. The weapon used to kill Robert McRill was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4064. Plaintiff Katherine McRill-Fellini is a citizen of the United States and domiciled in the State of Virginia. She is the widow of Robert McRill.

4065. Plaintiff Katherine McRill-Fellini brings an action individually and on behalf of the Estate of Robert McRill, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

4066. Plaintiff Brett Coke is a citizen of the United States and domiciled in the State of New York. He is the stepson of Robert McRill.

4067. Plaintiff Brian Coke is a citizen of the United States and domiciled in the State of Virginia. He is the stepson of Robert McRill.

4068. Plaintiff Ronald McRill is a citizen of the United States and domiciled in the State of California. He is the brother of Robert McRill.

4069. As a result of the attack, and the death of Robert McRill, Plaintiffs Katherine McRill-Fellini, Brett Coke, Brian Coke and Ronald McRill have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's society, companionship, comfort, advice and counsel.

146. **THE JULY 6, 2007 ATTACK – BAGHDAD**

**The Mergele Family**

4070.    Plaintiff Matthew L. Mergele is a citizen of the United States and domiciled in the State of Tennessee.

4071.    On July 6, 2007, Matthew L. Mergele was serving in the U.S. military in Iraq when an IED emplaced by JAM Special Groups terror operatives detonated while he was on a dismounted patrol near Rustimaya.

4072.    Matthew L. Mergele was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4073.    As a result of the attack, Mr. Mergele was blown back by the blast. He suffered difficulty hearing in his left ear, ringing in his ears and headaches.

4074.    As a result of the attack, and the injuries he suffered, Plaintiff Matthew L. Mergele has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4075.    Plaintiff Matthew L. Mergele was discharged from the U.S. military on January 1, 2019.

147. **THE JULY 7, 2007 ATTACK – BAGHDAD**

**The Miller Family**

4076.    Mikeal Miller was a citizen of the United States and domiciled in the State of Oregon when he was injured in Iraq.

4077.    On July 7, 2007, Mikeal Miller, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4078.    Mikeal Miller was severely injured in the attack when shrapnel went through his left eye and lodged in the back of his head.

4079.  Mr. Miller never regained consciousness after the attack.

4080.  He remained in a coma and died on January 27, 2008 as a result of the attack.

4081.  The weapon used to kill Mikeal Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4082.  Plaintiff Rene Pool is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Mikeal Miller.

4083.  As a result of the attack, and the death of Mikeal Miller, Plaintiff Rene Pool has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 148.  THE JULY 11, 2007 ATTACK – BAGHDAD

**The Hollcroft Family**

4084.  Plaintiff Derek Allen Hollcroft is a citizen of the United States and domiciled in the State of Florida.

4085.  On July 11, 2007, Derek Allen Hollcroft, then 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle

4086.  The weapon used to injure Derek Allen Hollcroft was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4087.  As a result of the attack, Derek Allen Hollcroft sustained a TBI and post-concussion syndrome that has caused frequent chronic headaches and migraines and affected his memory.

4088.  As a result of the attack, and the injuries he suffered, Derek Allen Hollcroft has experienced severe physical and mental anguish and extreme emotional pain and suffering.

149. <u>**THE JULY 17, 2007 ATTACK – BAGHDAD**</u>

<u>**The Bobb Family**</u>

4089.    Brandon K. Bobb was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

4090.    On July 17, 2007, Brandon K. Bobb, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4091.    Brandon K. Bobb was killed in the attack.

4092.    The weapon used to kill Brandon K. Bobb was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4093.    Plaintiff Paula C. Bobb-Miles is a citizen of the United States and domiciled in the State of Texas. She is the mother of Brandon K. Bobb.

4094.    Plaintiff Paula C. Bobb-Miles brings an action individually and on behalf of the Estate of Brandon K. Bobb, as its legal representative.

4095.    Plaintiff Johnny Javier Miles, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the stepfather of Brandon K. Bobb.

4096.    Plaintiff Johnny Javier Miles, Jr. is a citizen of the United States and domiciled in the State of Texas. He is the brother of Brandon K. Bobb.

4097.    Plaintiff Racquel Arnae Bobb Miles is a citizen of the United States and domiciled in the State of Texas. She is the sister of Brandon K. Bobb.

4098.    As a result of the attack, and the death of Brandon K. Bobb, Plaintiffs Paula C. Bobb-Miles, Johnny Javier Miles, Sr., Johnny Javier Miles, Jr. and Racquel Arnae Bobb Miles

have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Joshua Family**

4099.   Ron J. Joshua, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4100.   On July 17, 2007, Ron J. Joshua, Jr., aged 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4101.   Ron J. Joshua, Jr. was killed in the attack.

4102.   The weapon used to kill Ron J. Joshua, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4103.   Plaintiff Ursula Ann Joshua is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Ron J. Joshua, Jr.

4104.   Plaintiff Ursula Ann Joshua brings an action individually and on behalf of the Estate of Ron J. Joshua, Jr. as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

4105.   As a result of the attack, and the death of Ron J. Joshua, Jr., Plaintiff Ursula Ann Joshua has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

150.   **THE JULY 17, 2007 ATTACK – SADR CITY**

**The Harrelson Family**

4106.   James J. Harrelson was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

4107.  On July 17, 2007, James J. Harrelson, aged 19, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

4108.  James J. Harrelson was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4109.  Plaintiff Tammy Kinney is a citizen of the United States and domiciled in the State of Alabama. She is the mother of James J. Harrelson.

4110.  As a result of the attack, and the death of James J. Harrelson, Plaintiff Tammy Kinney has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

**The Price Family**

4111.  Plaintiff Daniel Price is a citizen of the United States and domiciled in the State of Illinois.

4112.  On July 17, 2007, Daniel Price, then 20, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

4113.  Daniel Price was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4114.  As a result of the attack, Mr. Price suffered shrapnel wounds to his face that cut his tear duct. He also suffered a fractured leg.

4115.  Mr. Price also suffers from a TBI and PTSD.

4116.  As a result of the attack, and the injuries he suffered, Plaintiff Daniel Price has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4117. Plaintiff Steven Price is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Daniel Price.

4118. As a result of the attack and the injuries Daniel Price suffered, Plaintiff Steven Price has experienced severe mental anguish and extreme emotional pain and suffering.

**The Aieti Family**

4119. Plaintiff Tausolo Aieti is a citizen of the United States and domiciled in the State of Nevada.

4120. On July 17, 2007, Tausolo Aieti, then 20, was serving in the United States military in Iraq when JAM-Special Groups detonated an IED near his vehicle in Sadr City, Baghdad.

4121. Tausolo Aieti was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4122. As a result of the attack, Mr. Aieti suffered a broken leg.

4123. Mr. Aieti also suffers from a TBI and PTSD.

4124. As a result of the attack, and the injuries he suffered, Plaintiff Tausolo Aieti has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4125. Plaintiff Imo Aieti is a citizen of the United States and domiciled in the State of Texas. He is the brother of Tausolo Aieti.

4126. Plaintiff Lisi Aieti is a citizen of the United States and domiciled in the State of Utah. She is the sister of Tausolo Aieti.

4127. Plaintiff Poloka Aieti is a citizen of the United States and domiciled in the State of Utah. He is the brother of Tausolo Aieti.

4128. As a result of the attack, and the injuries suffered by Tausolo Aieti, Plaintiffs Imo Aieti, Lisi Aieti and Poloka Aieti have experienced severe mental anguish, and extreme emotional pain and suffering.

4129. Plaintiff Tausolo Aieti was discharged from the U.S. military on April 28, 2012.

### 151. THE JULY 17, 2007 ATTACK – BAGHDAD

**The Bouten Family**

4130. Plaintiff Christopher Bouten is a citizen of the United States and domiciled in the State of Kentucky.

4131. On July 17, 2007, Christopher Bouten was serving in the United States military in Iraq when he was injured during a mortar attack launched by JAM Special Groups terror operatives in the Kamaliyah neighborhood in eastern Baghdad.

4132. Christopher Bouten was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4133. As a result of the attack, Mr. Bouten suffered shrapnel wounds to his back, neck and leg.

4134. As a result of the attack, and the injuries he suffered, Plaintiff Christopher Bouten has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4135. Plaintiff Erin Bouten is a citizen of the United States and domiciled in the State of Kentucky. She is the wife of Christopher Bouten.

4136. As a result of the attack and the injuries Christopher Bouten suffered, Plaintiff Erin Bouten has experienced severe mental anguish and extreme emotional pain and suffering.

4137. Plaintiff Christopher Bouten was discharged from the U.S. military on October 20, 2017.

152. **THE JULY 19, 2007 ATTACK – HUSSEINYAH**

**The Dudek Family**

4138. Plaintiff Daniel Dudek is a citizen of the United States and domiciled in the State of Washington.

4139. On July 19, 2007, Daniel Dudek was serving in the U.S. military in Iraq.

4140. Mr. Dudek was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4141. The weapon used to injure Mr. Dudek was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4142. As a result of the attack, Mr. Dudek suffers from limited paralysis in his hips and legs, and complete paralysis in both of his ankles and feet. He also has a Lumbar 3/4 cauda equina with no glute muscles and no ability to move the muscles in his calf/ankles/feet and has reduced feeling in his legs down to his ankles. He also has a deep shrapnel hole in his back and pieces of fragmentation all throughout his left arm, hips, and buttocks area.

4143. As a result of the attack, and the injuries he suffered, Plaintiff Daniel Dudek has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4144. Plaintiff Margaret Dudek is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Daniel Dudek.

4145. Plaintiff Katie Woodard is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Daniel Dudek.

4146. Plaintiff Sarah Dudek is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Daniel Dudek.

4147.   Plaintiff Andrew Dudek is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Daniel Dudek.

4148.   As a result of the attack, and the injuries suffered by Daniel Dudek, Plaintiffs Margaret Dudek, Katie Woodard, Sarah Dudek and Andrew Dudek have experienced severe mental anguish, and extreme emotional pain and suffering.

4149.   Plaintiff Daniel Dudek was discharged from the U.S. military on January 1, 2019.

### 153.   THE JULY 23, 2007 ATTACK – BAGHDAD

**The Florexil Family**

4150.   Camy Florexil was a citizen of the United States and domiciled in the State of Pennsylvania when he was injured in Iraq.

4151.   On July 23, 2007, Camy Florexil, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4152.   Camy Florexil was injured in the attack and died on July 24, 2007 from the injuries he sustained in the attack.

4153.   The weapon used to kill Camy Florexil was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4154.   Plaintiff Emanuela Florexil is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Camy Florexil.

4155.   Plaintiff Emanuela Florexil brings an action individually and on behalf of the Estate of Camy Florexil, as its legal representative.

4156.   As a result of the attack, and the death of Camy Florexil, Plaintiff Emanuela Florexil has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice and counsel.

### 154.   THE JULY 24, 2007 ATTACK – BAGHDAD

**The Miller Family**

4157.   Plaintiff Joseph T. Miller is a citizen of the Unites States and domiciled in the State of Ohio.

4158.   On July 24, 2007, Joseph T. Miller was serving in the U.S. military in Iraq.

4159.   Mr. Miller was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4160.   The weapon used to injure Mr. Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4161.   As a result of the attack, Mr. Miller suffered a ruptured left ear drum, a TBI and post-concussive syndrome.

4162.   As a result of the attack, and the injuries he suffered, Plaintiff Joseph T. Miller has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 155.   THE JULY 24, 2007 ATTACK – UMM QASR

**The Harrington Family**

4163.   Plaintiff Sean Harrington is a citizen of the United States and domiciled in the State of Pennsylvania.

4164.   On July 24, 2007, Sean Harrington, then 22, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling outside of Umm Qasr.

4165.   The weapon used to injure Sean Harrington was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4166.   Shrapnel from the EFP struck Sean Harrington's head and face, and copper from the EFP's liner remains fused to his face.

4167.   The impacting shrapnel has resulted in a partial loss of sight in his right eye and most of his hearing in his right ear.

4168.   Mr. Harrington has been diagnosed with a TBI. Medication has been prescribed to address this condition. He continues to endure migraines as a result of the attack.

4169.   Mr. Harrington was also diagnosed with PTSD a result of the attack, for which he has received treatment.

4170.   As a result of the attack, and the injuries he suffered, Plaintiff Sean Harrington has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 156.   THE JULY 31, 2007 ATTACK – BAGHDAD

**The Heinlein Family**

4171.   Charles T. Heinlein, Jr. was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

4172.   On July 31, 2007, Charles T. Heinlein, Jr., aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4173.   Charles T. Heinlein, Jr. was killed in the attack.

4174.   The weapon used to kill Charles T. Heinlein, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4175.   Plaintiff Jessica Heinlein is a citizen of the United States and domiciled in the State of Washington. She is the widow of Charles T. Heinlein, Jr.

4176.   Plaintiff Jessica Heinlein brings an action individually and on behalf of the Estate of Charles T. Heinlein, Jr., as its legal representative.

4177.   Plaintiff Charles Heinlein, Sr. is a citizen of the United States and domiciled in the State of Michigan. He is the father of Charles T. Heinlein, Jr.

4178.   Plaintiff Jody Lyn Heinlein is a citizen of the United States and domiciled in the State of Texas. She is the sister of Charles T. Heinlein, Jr.

4179.   As a result of the attack, and the death of Charles T. Heinlein, Jr., Plaintiffs Jessica Heinlein, Charles Heinlein, Sr. and Jody Lyn Heinlein have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

**The Jairala Family**

4180.   Alfred H. Jairala was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

4181.   On July 31, 2007, Alfred H. Jairala, aged 29, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

4182.   Alfred H. Jairala was killed in the attack.

4183.   The weapon used to kill Alfred H. Jairala was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4184.   Plaintiff Margarita Aristizabal is a citizen of the United States and domiciled in the State of Florida. She is the widow of Alfred H. Jairala.

4185.   Plaintiff Margarita Aristizabal brings an action individually and on behalf of the Estate of Alfred H. Jairala, as its legal representative.

4186.   Plaintiff J.J., a minor represented by her legal guardian, Margarita Aristizabal, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Alfred H. Jairala.

4187.   Plaintiff Sebastian Niuman is a citizen of the United States and domiciled in the State of Florida. He is the stepson of Alfred H. Jairala.

4188.   As a result of the attack, and the death of Alfred H. Jairala, Plaintiffs Margarita Aristizabal, J.J., and Sebastian Niuman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 157.   THE AUGUST 6, 2007 ATTACK – BAGHDAD

**The Neiberger Family**

4189.   Christopher Neiberger was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

4190.   On August 6, 2007, Christopher Neiberger, aged 22, was serving in the United States military in Iraq when an EFP emplaced by JAM Special Groups detonated near his vehicle in Baghdad.

4191.   Christopher Neiberger was killed in the attack.

4192.   The weapon used to kill Christopher Neiberger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4193.   Plaintiff Richard Neiberger is a citizen of the United States and domiciled in the State of Florida. He is the father of Christopher Neiberger.

4194.   Plaintiff Mary Neiberger is a citizen of the United States and domiciled in the State of Florida. She is the mother of Christopher Neiberger.

4195.   Plaintiff Ami Neiberger is a citizen of the United States and domiciled in the State of Virginia. She is the sister of Christopher Neiberger.

4196.   Plaintiff Robert Neiberger is a citizen of the United States and domiciled in Washington, D.C. He is the brother of Christopher Neiberger.

4197.   Plaintiff Eric Neiberger is a citizen of the United States and domiciled in Florida. He is the brother of Christopher Neiberger.

4198.   Plaintiff Eric Neiberger brings an action individually and on behalf of the Estate of Christopher Neiberger, as its legal representative.

4199.   As a result of the attack, and the death of Christopher Neiberger, Plaintiffs Richard Neiberger, Mary Neiberger, Ami Neiberger, Robert Neiberger, and Eric Neiberger have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**158.** **THE AUGUST 14, 2007 ATTACK – BAGHDAD**

**The Casey Family**

4200.   Plaintiff Brian J. Casey is a citizen of the United States and domiciled in the State of Montana.

4201.   On August 14, 2007, Brian J. Casey was serving in the U.S. military in Iraq when he came under sniper fire by JAM Special Groups terror operatives.

4202.   Brian J. Casey was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4203.   As a result of the attack, Mr. Casey suffered a collapsed lung and fractured ribs.

4204.   As a result of the attack, and the injuries he suffered, Plaintiff Brian J. Casey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4205.   Plaintiff Brittany Hogan is a citizen of the United States and domiciled in the State of Montana. She was the wife of Brian J. Casey.

4206.   Plaintiff Shelley Ann Casey is a citizen of the United States and domiciled in the State of North Carolina. She is mother of Brian J. Casey.

4207.   Plaintiff Richard Casey is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Brian J. Casey.

4208.   As a result of the attack, and the injuries suffered by Brian J. Casey, Plaintiffs Brittany Hogan, Shelley Ann Casey and Richard Casey have experienced severe mental anguish, and extreme emotional pain and suffering.

4209.   Plaintiff Brian J. Casey was discharged from the U.S. military on September 1, 2009.

159.    **THE AUGUST 17, 2007 ATTACK – BASRA**

**The Chand Family**

4210.    Michael Chand, Sr. was a citizen of the United States and domiciled in the State of California when he was kidnapped and killed in Iraq.

4211.    Michael Chand, Sr. worked in southeast Iraq as a civilian contractor who provided security relating to road construction projects.

4212.    On August 17, 2007, Mr. Chand's convoy was ambushed by roughly 300 JAM fighters near the JAM stronghold of Amarah, northwest of Basra. Mr. Chand suffered a gunshot wound in the ambush and was kidnapped by JAM.

4213.    He was held in captivity by JAM for several years afterward and was tortured in captivity. He was 52 years old at the time of his kidnapping.

4214.    On or about March 13, 2010, his body was returned to the U.S. government. The autopsy report revealed that Mr. Chand was killed by multiple gunshot wounds to the head and body, and his injuries were consistent with the conclusion that he had been tortured.

4215.    Initial reports of the August 17, 2007 attack suggested that Mr. Chand had been killed in the attack.

4216.    On August 24, 2007, the U.S. State Department officially informed Mr. Chand's wife, Sally Chand, that he was dead.

4217.    On October 31, 2007, the State Department reversed course and informed Ms. Chand, that, according to eyewitnesses, Mr. Chand was actually alive and being held in captivity. However, efforts to secure his release over the next several years failed, and, on or about March 13, 2010, the Chand family learned that JAM had tortured and executed Mr. Chand while he was being held in captivity.

4218.   The JAM terror cell that kidnapped and murdered Mr. Chand was trained by Hezbollah and funded and armed by the IRGC-QF.

4219.   Plaintiff Sally Chand is a citizen of the United States and domiciled in the State of California. She is the widow of Michael Chand, Sr.

4220.   Plaintiff Sally Chand brings an action individually and on behalf of the Estate of Michael Chand, Sr., as its legal representative.

4221.   Plaintiff Michael Chand, Jr. is a citizen of the United States and domiciled in the State of California. He is the son of Michael Chand, Sr.

4222.   Plaintiff Christina Mahon is a citizen of the United States and domiciled in the State of California. She is the daughter of Michael Chand, Sr.

4223.   Plaintiff Ryan Chand is a citizen of the United States and domiciled in the State of California. He is the son of Michael Chand, Sr.

4224.   Plaintiff Brenda Chand is a citizen of the United States and domiciled in the State of California. She is the daughter of Michael Chand, Sr.

4225.   As a result of the August 17, 2007 attack, and the subsequent kidnapping and execution of Michael Chand, Sr., Plaintiffs Sally Chand, Michael Chand, Jr., Christina Mahon, Ryan Chand and Brenda Chand have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 160.   THE AUGUST 23, 2007 ATTACK – BAGHDAD

### The Bowen Family

4226.   Plaintiff Mario Bowen is a citizen of the United States and domiciled in the State of Tennessee.

4227.   On August 23, 2007, Mario Bowen was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4228.   The weapon used to injure Mario Bowen was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4229.   As a result of the attack, Mr. Bowen was rendered unconscious. He suffers from a TBI, memory loss, headaches and speech issues.

4230.   As a result of the attack, and the injuries he suffered, Plaintiff Mario Bowen has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4231.   Plaintiff Mario Bowe was discharged from the U.S. military on January 1, 2019.

## 161.   THE AUGUST 23, 2007 ATTACK – AZIZIYAH

### The Hochstetler Family

4232.   Plaintiff James David Hochstetler is a citizen of the United States and domiciled in the State of Tennessee.

4233.   On August 23, 2007, James David Hochstetler, then 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4234.   The weapon used to injure James David Hochstetler was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4235.   As a result of the blast, James David Hochstetler suffered serious injuries, including severe injuries to his hand and face.

4236. As a result of the attack, and the injuries he suffered, Plaintiff James David Hochstetler has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4237. Plaintiff Leanne Lizabeth Hochstetler is a citizen of the United States and domiciled in the State of Tennessee. She is the wife of James David Hochstetler.

4238. Plaintiff J.H., a minor represented by his legal guardian, Leanne Lizabeth Hochstetler, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of James David Hochstetler.

4239. Plaintiff P.H., a minor represented by her legal guardian, Leanne Lizabeth Hochstetler, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of James David Hochstetler.

4240. Plaintiff Kyle Austin Marshall is a citizen of the United States and domiciled in the State of Tennessee. He is the son of James David Hochstetler.

4241. As a result of the attack, and the injuries suffered by James David Hochstetler, Plaintiffs Leanne Lizabeth Hochstetler, J.H., P.H. and Kyle Austin Marshall have experienced severe mental anguish, and extreme emotional pain and suffering.

4242. Plaintiff James David Hochstetler was discharged from the U.S. military on December 19, 2016.

**The Tully Family**

4243. Michael Tully was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

4244. On August 23, 2007, Michael Tully, aged 33, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4245.    Michael Tully was killed in the attack.

4246.    The weapon used to kill Michael Tully was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4247.    Plaintiff John Richard Tully is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Michael Tully.

4248.    Plaintiff John Richard Tully brings an action individually and on behalf of the Estate of Michael Tully, as its legal representative.

4249.    Plaintiff Marilyn Louise Tully is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Michael Tully.

4250.    Plaintiff Slade Victor Tully is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Michael Tully.

4251.    Plaintiff John Richard Tully II is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Michael Tully.

4252.    Plaintiff Heather Ann Farkas is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Michael Tully.

4253.    As a result of the attack, and the death of Michael Tully, Plaintiffs John Richard Tully, Marilyn Louise Tully, Slade Victor Tully, John Richard Tully II and Heather Ann Farkas have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

**The Hunt Family**

4254.    Plaintiff Robert James Hunt is a citizen of the United States and domiciled in the State of Washington.

4255. On August 23, 2007, Robert James Hunt, then 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4256. The weapon used to injure Robert James Hunt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4257. As a result of the blast, Robert James Hunt suffered lacerations to his neck and head. He also suffered shrapnel wounds to the left side of his head, upper torso, right arm and right hand.

4258. As a result of the attack, and the injuries he suffered, Plaintiff Robert James Hunt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4259. Plaintiff M.A.H., a minor represented by his legal guardian, Robert James Hunt, is a citizen of the United States and domiciled in the State of Washington. He is the son of Robert James Hunt.

4260. Plaintiff A.M.H., a minor represented by her legal guardian, Robert James Hunt, is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Robert James Hunt.

4261. Plaintiff Boonchob "Lynn" Prudhome is a citizen of the United States and domiciled in the State of Texas. She is the mother of Robert James Hunt.

4262. As a result of the attack, and the injuries suffered by Robert James Hunt, Plaintiffs M.A.H., A.M.H. and Boonchob "Lynn" Prudhome have experienced severe mental anguish, and extreme emotional pain and suffering.

4263. Plaintiff Robert James Hunt was discharged from the U.S. military on June 30, 2017.

162. __THE SEPTEMBER 2, 2007 ATTACK – BAGHDAD__

__The White Family__

4264.   Delmar White was a citizen of the United States and domiciled in the State of Kentucky when he was killed in Iraq.

4265.   On September 2, 2007, Delmar White, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4266.   Delmar White was killed in the attack.

4267.   The weapon used to kill Delmar White was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4268.   Plaintiff Michele White is a citizen of the United States and domiciled in the State of Kentucky. She is the widow of Delmar White.

4269.   Plaintiff Michele White brings an action individually and on behalf of the Estate of Delmar White, as its legal representative.

4270.   Plaintiff S.W., a minor represented by his legal guardian, Michele White, is a citizen of the United States and domiciled in the State of Kentucky. He is the son of Delmar White.

4271.   Plaintiff Shelby White is a citizen of the United States and domiciled in the State of Kentucky. She is the daughter of Delmar White.

4272.   Plaintiff Perry White is a citizen of the United States and domiciled in the State of Kentucky. He is the brother of Delmar White.

4273.   Plaintiff Robert White is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Delmar White.

4274. As a result of the attack, and the death of Delmar White, Plaintiffs Michele White, S.W., Shelby White, Perry White and Robert White have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's companionship, comfort, advice and counsel.

### 163. THE SEPTEMBER 2, 2007 – RUSTAMIYAH

**The Wold Family**

4275. Plaintiff Joshua P.G. Wold is a citizen of the United States and domiciled in the State of Oregon.

4276. On September 2, 2007, Joshua P.G. Wold was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. The convoy he was travelling in also came under small arms fire.

4277. The weapon used to injure Joshua P.G. Wold was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4278. As a result of the attack and the injuries sustained in the attack, Mr. Wold required partial amputation of his right foot.

4279. As a result of the attack, and the injuries he suffered, Plaintiff Joshua P.G. Wold has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4280. Plaintiff E.W., a minor represented by her legal guardian Joshua P.G. Wold, is a citizen of the United States and domiciled in the State of Oregon. She is the daughter of Joshua P.G. Wold.

4281. Plaintiff P.A., a minor represented by her legal guardian Joshua P.G. Wold, is a citizen of the United States and domiciled in the State of Oregon. She is the stepdaughter of Joshua P.G. Wold.

4282. Plaintiff Celeste Yantis is a citizen of the United States and domiciled in the State of Washington. She was the wife of Joshua P.G. Wold.

4283. As a result of the attack, and the injuries suffered by Joshua P.G. Wold, Plaintiffs E.W., P.A. and Celeste Yantis have experienced severe mental anguish, and extreme emotional pain and suffering.

## 164.  THE SEPTEMBER 4, 2007 ATTACK – BAGHDAD

### The Murray Family

4284. Joel L. Murray was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

4285. On September 4, 2007, Joel L. Murray, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4286. Joel L. Murray was killed in the attack.

4287. The weapon used to kill Joel L. Murray was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4288. Plaintiff Maricel Murray is a citizen of the United States and domiciled in the State of Kansas. She is the widow of Joel L. Murray.

4289. Plaintiff Maricel Murray brings an action individually and on behalf of the Estate of Joel L. Murray, as its legal representative.

4290.   Plaintiff J.M., a minor represented by his legal guardian, Maricel Murray, is a citizen of the United States and domiciled in the State of Kansas. He is the son of Joel L. Murray.

4291.   As a result of the attack, and the death of Joel L. Murray, Plaintiffs Maricel Murray and J.M. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Shelton Family**

4292.   Randol S. Shelton was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

4293.   On September 4, 2007, Randol S. Shelton, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4294.   Randol S. Shelton was killed in the attack.

4295.   The weapon used to kill Randol S. Shelton was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4296.   Plaintiff Bryan S. Shelton is a citizen of the United States and domiciled in the State of Illinois. He is the father of Randol S. Shelton.

4297.   Plaintiff Bryan S. Shelton brings an action individually and on behalf of the Estate of Randol S. Shelton, as its legal representative.

4298.   Plaintiff Darlene Shelton is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Randol S. Shelton

4299.   Plaintiff Amanda Shelton is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Randol S. Shelton.

4300.   Plaintiff Bryan T. Shelton is a citizen of the United States and domiciled in the State of Illinois. He is the brother of Randol S. Shelton.

4301.   As a result of the attack, and the death of Randol S. Shelton, Plaintiffs Bryan S. Shelton, Darlene Shelton, Amanda Shelton and Bryan T. Shelton have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 165.   THE SEPTEMBER 12, 2007 ATTACK – BAGHDAD

**The Laird Family**

4302.   Plaintiff Dan Laird is a citizen of the United States and domiciled in the State of Florida.

4303.   On September 12, 2007, Mr. Laird, then 32, was a civilian contractor with Blackwater Worldwide in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4304.   The weapon used to injure Dan Laird was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4305.   As a result of the blast, Dan Laird suffered a concussion and nerve damage in his right leg, and a level 5 AC separation that required him to undergo surgery on his right shoulder.

4306.   He also sustained emotional injuries, including panic attacks and anxiety, for which he has sought counseling.

4307.   As a result of the attack, and the injuries he suffered, Plaintiff Dan Laird has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4308.  Plaintiff Angela M. Laird is a citizen of the United States and domiciled in the State of Florida. She is the wife of Dan Laird.

4309.  Plaintiff Jordan M. Laird is a citizen of the United States and domiciled in the State of Florida. He is the son of Dan Laird.

4310.  Plaintiff Hunter L. Laird is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Dan Laird.

4311.  Plaintiff C.L., a minor represented by his legal guardian, Angela M. Laird, is a citizen of the United States and domiciled in the State of Florida. He is the son of Dan Laird.

4312.  As a result of the attack, and the injuries Dan Laird has suffered, Plaintiffs Angela M. Laird, Jordan M. Laird, Hunter L. Laird and C.L. have experienced severe mental anguish, and extreme emotional pain and suffering.

## 166.  THE SEPTEMBER 22, 2007 ATTACK – RUSTAMIYAH

**The Reeves Family**

4313.  Joshua H. Reeves was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

4314.  On September 22, 2007, Joshua H. Reeves, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by JAM Special Groups detonated near his vehicle.

4315.  Joshua H. Reeves lost consciousness from the pain and shock of the injuries he suffered, but initially survived the EFP detonation. He died from his injuries later that day – one day after his first child, a son, was born.

4316.  The weapon used to kill Joshua H. Reeves was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4317.   Plaintiff Leslie K. Reeves-Hardcastle is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Joshua H. Reeves.

4318.   Plaintiff Leslie K. Reeves-Hardcastle brings an action individually and on behalf of the Estate of Joshua Reeves, as its legal representative.

4319.   Plaintiff J.R., a minor represented by his legal guardian, Leslie K. Reeves-Hardcastle, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Joshua H. Reeves.

4320.   Plaintiff James L. Reeves is a citizen of the United States and domiciled in the State of Georgia. He is the father of Joshua H. Reeves.

4321.   Plaintiff W. Jean Reeves is a citizen of the United States and domiciled in the State of Georgia. She is the mother of Joshua H. Reeves.

4322.   Plaintiff Jared Reeves is a citizen of the United States and domiciled in the State of Georgia. He is the brother of Joshua H. Reeves.

4323.   Plaintiff Sherri C. Holiman is a citizen of the United States and domiciled in the State of Florida. She is the sister of Joshua H. Reeves.

4324.   Plaintiff Joni Ariel Reeves Little is a citizen of the United States and domiciled in the State of Florida. She is the sister of Joshua H. Reeves.

4325.   As a result of the September 22, 2007 attack, and the death of Joshua Reeves, Plaintiffs Leslie K. Reeves-Hardcastle, J.R., James L. Reeves, W. Jean Reeves, Jared Reeves, Sherri C. Holiman and Joni Ariel Reeves Little have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

167. **THE SEPTEMBER 26, 2007 ATTACK – BAGHDAD**

**The Lee Family**

4326.   Plaintiff William Lee is a citizen of the United States and domiciled in the State of Virginia.

4327.   On September 26, 2007, William Lee, then 44, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated as his vehicle passed by. William Lee was seated behind the driver in an up-armored M1151 vehicle traveling southwest on Route Raiders in the Saidiya neighborhood of Iraq when the vehicle in which he was traveling was struck by an EFP.

4328.   The weapon used to injure William Lee was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4329.   As a result of the attack, Mr. Lee sustained shrapnel injuries to his face including above his right eye and to various other parts of his body. One piece of shrapnel became lodged in his right medial sinus cavity while another piece of shrapnel impacted the subcutaneous nerve network in his right thigh which has caused intermittent shooting pain in his right leg that continues to a lesser degree even today. He has been informed that there is likely a piece of shrapnel from the EFP also lodged in his right anterior cruciate ligament.

4330.   Mr. Lee has also suffered from PTSD.

4331.   As a result of the attack, and the injuries he suffered, Plaintiff William Lee has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4332.   Plaintiff Alexandria L. Lee is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of William Lee.

4333.   Plaintiff William J. Lee is a citizen of the United States and domiciled in the State of Virginia. He is the son of William Lee.

4334.   Plaintiff Lillie Lai Lee is a citizen of the United States and domiciled in the State of Virginia. She is the ex-wife of William Lee. They were married at the time of the attack in which William Lee was injured and did not obtain a divorce until December 2018. The marital discord resulting in divorce was caused in significant part by the PTSD that William Lee has battled since he was injured in the EFP attack.

4335.   As a result of the attack, and the injuries William Lee suffered, Plaintiffs Alexandria L. Lee, William J. Lee, and Lillie Lai Lee have experienced severe mental anguish and extreme emotional pain and suffering.

**The Hunt Family**

4336.   Plaintiff Jennifer Lynn Hunt is a citizen of the United States and domiciled in the State of Maryland.

4337.   On September 26, 2007, Jennifer Lynn Hunt, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated as her vehicle passed by. Jennifer Lynn Hunt was the driver in an up-armored M1151 vehicle traveling southwest on Route Raiders in the Saidiya neighborhood of Iraq when the vehicle that she was driving was struck by an EFP.

4338.   The weapon used to injure Jennifer Lynn Hunt was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4339.   As a result of the attack, Jennifer Lynn Hunt sustained shrapnel wounds to her face and to both of her arms, nerve damage to her dominant hand, burn injuries to her back and scarring.

4340.   She also suffers from PTSD.

4341.   As a result of the attack, and the injuries she suffered, Plaintiff Jennifer Lynn Hunt has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**168.**   **THE SEPTEMBER 29, 2007 ATTACK – BAGHDAD**

**The Golembe Family**

4342.   Plaintiff Christopher Golembe is a citizen of the United States and domiciled in the State of West Virginia.

4343.   On September 29, 2007, Christopher Golembe, then 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

4344.   The weapon used to injure Christopher Golembe was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4345.   Mr. Golembe sustained a concussion as a result of the attack.

4346.   He has nightmares and has experienced survivor's guilt.

4347.   He has been diagnosed with PTSD and has sought counseling.

4348.   Mr. Golembe has suffered memory loss since the attack and has difficulty recalling information.

4349.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Golembe has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4350.   Plaintiff Kathryn Head is a citizen of the United States and domiciled in the State of Virginia. She is the of mother of Christopher Golembe.

4351.   As a result of the attack, and the injuries Christopher Golembe suffered, Plaintiff Kathryn Head has experienced severe mental anguish and extreme emotional pain and suffering.

642

4352.   Plaintiff Christopher Golembe was discharged from the U.S. military on October 18, 2012.

**The Watts Family**

4353.   Plaintiff Christopher Watts is a citizen of the United States and domiciled in the State of Texas.

4354.   On September 29, 2007, Christopher Watts, then 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

4355.   The weapon used to injure Christopher Watts was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4356.   Mr. Watts sustained a concussion as a result of the attack. He has been diagnosed with a TBI.

4357.   He experiences memory loss and at times his speech is slurred.

4358.   He has been prescribed anti-depressants and medication to address sleep-related issues.

4359.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Watts has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4360.   Plaintiff Christopher Watts was discharged from the U.S. military on October 12, 2013.

**169.**   **THE SEPTEMBER 30, 2007 ATTACK – BAGHDAD**

**The Olguin Family**

4361.   Randell Olguin was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4362.   On September 30, 2007, Randell Olguin, aged 24, was serving in the U.S. military in Iraq when his unit came under sniper fire by JAM Special Groups terror operatives.

4363.   Randell Olguin was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4364.   Plaintiff Janet L. Rios is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

4365.   Plaintiff Anita Baker is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

4366.   Plaintiff Jennie L. Morin is a citizen of the United States and domiciled in the State of Texas. She is the sister of Randell Olguin.

4367.   As a result of the attack, and the death of Randell Olguin, Plaintiffs Janet L. Rios, Anita Baker and Jennie L. Morin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

**170.   THE OCTOBER 18, 2007 ATTACK – BAGHDAD**

**The Geiger Family**

4368.   Wayne M. Geiger was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

4369.   On October 18, 2007, Wayne M. Geiger, aged 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Baghdad.

4370.   Wayne M. Geiger was killed in the attack.

4371.   The weapon used to kill Wayne M. Geiger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4372.   Plaintiff Randall Geiger is a citizen of the United States and domiciled in the State of California. He is the father of Wayne M. Geiger.

4373.   Plaintiff Randall Geiger brings an action individually and on behalf of the Estate of Wayne M. Geiger, as its legal representative.

4374.   Plaintiff Kimberly Geiger is a citizen of the United States and domiciled in the State of California. She is the mother of Wayne M. Geiger.

4375.   Plaintiff Jesseca Lyn Tsosie is a citizen of the United States and domiciled in the State of California. She is the sister of Wayne M. Geiger.

4376.   As a result of the attack, and the death of Wayne M. Geiger, Plaintiffs Randall Geiger, Kimberly Geiger and Jesseca Lyn Tsosie have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's companionship, comfort, advice and counsel.

## 171.   THE OCTOBER 21, 2007 ATTACK – ISKANDARIYAH

**The Donoho Family**

4377.   Plaintiff Eric Donoho is a citizen of the United States and domiciled in the State of Indiana.

4378.   On October 21, 2007, Eric Donoho, then 29, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Iskandariyah.

4379. The weapon used to injure Eric Donoho was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4380. Mr. Donoho suffered a concussion as a result of the blast.

4381. He was also diagnosed with a TBI and PTSD. He has been prescribed daily medication to address these conditions.

4382. Mr. Donoho continues to endure migraines as a result of the attack.

4383. As a result of the attack, and the injuries he suffered, Plaintiff Eric Donoho has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**172. THE OCTOBER 29, 2007 ATTACK – UMM QASR**

**The Ginavan Family**

4384. Plaintiff Tyler Ginavan is a citizen of the United States and domiciled in the State of Kansas.

4385. On October 29, 2007, Tyler Ginavan, then 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Umm Qasr.

4386. The weapon used to injure Mr. Ginavan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4387. As a result of the attack, copper from the EFP lodged in Mr. Ginavan's face, neck, knee, and calf. Copper from the EFP remains fused to Mr. Ginavan's jawline.

4388. Mr. Ginavan has been diagnosed with PTSD, and he has received treatment and counseling. He has been prescribed medication to address both the physical pain and emotional impact of the attack.

4389. As a result of the attack, and the injuries he suffered, Plaintiff Tyler Ginavan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 173. THE NOVEMBER 7, 2007 ATTACK – BAGHDAD

**The Tiffner Family**

4390. Benjamin David Tiffner was a citizen of the United States and domiciled in the State of West Virginia when he was killed in Iraq.

4391. On November 7, 2007, Benjamin David Tiffner, aged 31, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in Baghdad.

4392. Benjamin David Tiffner was killed in the attack.

4393. The weapon used to kill Benjamin David Tiffner was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4394. Plaintiff Timothy Tiffner is a citizen of the United States and domiciled in the State of Tennessee. He is the father of Benjamin David Tiffner.

4395. Plaintiff Timothy Tiffner brings a claim individually and on behalf of the Estate of Benjamin David Tiffner, as its legal representative.

4396. Plaintiff Judith Tiffner is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Benjamin David Tiffner.

4397. Plaintiff Joshua Tiffner is a citizen of the United States and domiciled in the State

of Utah. He is the brother of Benjamin David Tiffner.

4398.   Plaintiff Seth Tiffner is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Benjamin David Tiffner.

4399.   Plaintiff Sarah Crosby is a citizen of the United States and domiciled in the State of Alaska. She is the sister of Benjamin David Tiffner.

4400.   As a result of the attack, and the death of Benjamin David Tiffner, Plaintiffs Timothy Tiffner, Judith Tiffner, Joshua Tiffner, Seth Tiffner and Sarah Crosby have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 174.   THE NOVEMBER 14, 2007 ATTACK – BAGHDAD

**The Burks Family**

4401.   Peter Burks was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4402.   On November 14, 2007, Peter Burks, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in Baghdad.

4403.   Peter Burks was killed in the attack.

4404.   The weapon used to kill Peter Burks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4405.   Plaintiff Alan Burks is a citizen of the United States and domiciled in the State of Texas. He is the father of Peter Burkes.

4406.   Plaintiff Alan Burks brings a claim individually and on behalf of the Estate of Peter Burks, as its legal representative.

4407.   Plaintiff Jackie Merck Hlastan is a citizen of the United States and domiciled in the State of Texas. She is the mother of Peter Burks.

4408.   Plaintiff G.B., a minor represented by her legal guardian, Alan Burks, is a citizen of the United States and domiciled in the State of New Jersey. She is the sister of Peter Burks.

4409.   Plaintiff Alison Burks McRuiz is a citizen of the United States and domiciled in the State of Texas. She is the sister of Peter Burks.

4410.   Plaintiff Sarah Phillips is a citizen of the United States and domiciled in the State of Texas. She is the sister of Peter Burks.

4411.   Plaintiff Zachary Burks is a citizen of the United States and domiciled in the State of Alabama. He is the brother of Peter Burks.

4412.   As a result of the attack, and the death of Peter Burks, Plaintiffs Alan Burks, Jackie Merck Hlastan, G.B., Alison Burks McRuiz, Sarah Phillips and Zachary Burks have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 175.   THE NOVEMBER 26, 2007 ATTACK – AZIZIYAH

**Juneau Family**

4413.   William ("Bill") Juneau was a citizen of the Unites States and domiciled in the State of Minnesota when he was killed in Iraq.

4414.   On November 26, 2007, William Juneau, aged 36, was serving as a civilian contractor in southern Iraq when an IED emplaced by JAM Special Groups terror operatives detonated near his vehicle.

4415.   William Juneau was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4416.  Plaintiff Bridget Juneau is a citizen of the United States and domiciled in the State of Minnesota. She is the twin sister of William Juneau.

4417.  Plaintiff Bridget Juneau brings an action individually and on behalf of the Estate of William Juneau, as its legal representative.

4418.  Plaintiff Stephanie Juneau is a citizen of the United States and domiciled in the State of Montana. She is the sister of William Juneau.

4419.  As a result of the attack, and the death of William Juneau, Plaintiffs Bridget Juneau and Stephanie Juneau have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## 176.  THE DECEMBER 1, 2007 ATTACK – BAGHDAD

**The Reece Family**

4420.  Matthew K. Reece was a citizen of the United States and domiciled in the State of Arkansas when he was killed in Iraq.

4421.  On December 1, 2007, Matthew K. Reece, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4422.  Matthew K. Reece was killed in the attack.

4423.  The weapon used to kill Matthew K. Reece was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4424.  Plaintiff Tammy Vanderwaal is a citizen of the United States and domiciled in the State of Arkansas. She is the mother of Matthew K. Reece.

4425.   Plaintiff A.L.R., a minor represented by her legal guardian Tammy Vanderwaal, is a citizen of the United States and domiciled in the State of Arkansas. She is the daughter of Matthew K. Reece.

4426.   Plaintiff Preston Shane Reece is a citizen of the United States and domiciled in the State of Arkansas. He is the brother of Matthew K. Reece.

4427.   Plaintiff Shaylyn C. Reece is a citizen of the United States and domiciled in the State of Arkansas. She is the sister of Matthew K. Reece.

4428.   As a result of the attack, and the death of Matthew K. Reece, Plaintiffs Tammy Vanderwaal, A.L.R., Preston Shane Reece and Shaylyn C. Reece have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's/brother's society, companionship, comfort, advice and counsel.

## 177.   THE DECEMBER 9, 2007 ATTACK – AZ ZUBAYDIYAH

### The Shaw Family

4429.   Micah Shaw was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

4430.   On December 9, 2007, Micah Shaw, aged 32, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4431.   Micah Shaw was killed in the attack.

4432.   The weapon used to kill Micah Shaw was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4433.   Plaintiff Elena Shaw is a citizen of the United States and domiciled in the State of New Hampshire. She is the widow of Micah Shaw.

4434.   Plaintiff C.S., a minor represented by his legal guardian Elena Shaw, is a citizen of the United States and domiciled in the State of New Hampshire. He is the minor son of Micah Shaw.

4435.   Plaintiff L.S., a minor represented by her legal guardian Elena Shaw, is a citizen of the United States and domiciled in the State of New Hampshire. She is the minor daughter of Micah Shaw.

4436.   Plaintiff Emily Shaw is a citizen of the United States and domiciled in the State of Pennsylvania. She is the daughter of Micah Shaw.

4437.   As a result of the attack, and the death of Micah Shaw, Plaintiffs Elena Shaw, C.S., L.S. and Emily Shaw have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## The Doheny Family

4438.   Michael Doheny was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

4439.   On December 9, 2007, Michael Doheny, aged 30, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4440.   Michael Doheny was killed in the attack.

4441.   The weapon used to kill Michael Doheny was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4442.   Plaintiff Melissa Doheny is a citizen of the United States and domiciled in the State of Nebraska. She is the widow of Michael Doheny.

4443.   Plaintiff Melissa Doheny brings a claim individually and on behalf of the Estate of Michael Doheny, as its legal representative.

4444.   Plaintiff Kathy Kugler is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Michael Doheny.

4445.   Plaintiff Robert Kugler is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Michael Doheny.

4446.   As a result of the attack, and the death of Michael Doheny, Plaintiffs Melissa Doheny, Kathy Kugler and Robert Kugler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

**The Evrard Family**

4447.   Steven Evrard was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4448.   On December 9, 2007, Steven Evrard, aged 36, was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4449.   Steven Evrard was killed in the attack.

4450.   The weapon used to kill Steven Evrard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4451.   Plaintiff Tanya Evrard is a citizen of the United States and domiciled in the State of Texas. She is the widow of Steven Evrard.

4452.   As a result of the attack, and the death of Steven Evrard, Plaintiff Tanya Evrard has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

**The Johnson Family**

4453.   Plaintiff Billy Johnson is a citizen of the United States and domiciled in the State of Tennessee.

4454.   On December 9, 2007, Billy Johnson was serving as a civilian contractor in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4455.   The weapon used to injure Billy Johnson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4456.   As a result of the attack, Mr. Johnson's right leg was amputated below the knee. He also required multiple surgical implants in his left leg and left arm. In addition, Mr. Johnson suffered amputation of one finger on his left hand and partial amputation of a finger on his right hand.

4457.   Mr. Johnson has endured more than fifty surgical procedures including multiple skin grafts.

4458.   He also sustained a TBI and suffers from PTSD.

4459.   As a result of the attack, and the injuries he suffered, Plaintiff Billy Johnson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

178.  **THE JANUARY 6, 2008 ATTACK – BAGHDAD**

**The Gudridge Family**

4460.  James D. Gudridge was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

4461.  On January 6, 2008, James D. Gudridge, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4462.  James D. Gudridge was killed in the attack.

4463.  The weapon used to kill James D. Gudridge was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4464.  Plaintiff Judy Hoffman is a citizen of the United States and domiciled in the State of Florida. She is the mother of James D. Gudridge.

4465.  Plaintiff Ashley Gudridge Houppert is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of James D. Gudridge.

4466.  As a result of the attack, and the death of James D. Gudridge, Plaintiffs Judy Hoffman and Ashley Gudridge Houppert have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Schichtl Family**

4467.  Plaintiff Joshua Schichtl is a citizen of the United States and domiciled in the State of Florida.

4468.  On January 6, 2008, Joshua Schichtl, then 40, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4469.    The weapon used to injure Joshua Schichtl was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4470.    As a result of the attack, Joshua Schichtl sustained shrapnel to his body, impacting his left eye, face and bicep. He also lost the use of his right eye.

4471.    As a result of the blast, his cheekbone and roof of his mouth were shattered, and he lost several of his teeth. His lower jawbone was broken in 19 locations and he has had pins placed in the area to attempt to provide some stability. He is still unable to open his mouth as wide as necessary and chewing continues to be difficult.

4472.    Mr. Schichtl received medical treatment both as an in-patient and resident for approximately five years.

4473.    He has undergone multiple surgeries including bone and skin grafts, many of which have involved the reconstruction of his mouth.

4474.    Significant scarring is apparent on his face.

4475.    Mr. Schichtl has been diagnosed with a TBI and an anxiety disorder and has sought and continues to seek counseling.

4476.    He still experiences frequent pain.

4477.    As a result of the attack, and the injuries he suffered, Plaintiff Joshua Schichtl has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4478.    Plaintiff Mark Schichtl is a citizen of the United States and domiciled in the State of Arkansas. He is the father of Joshua Schichtl.

4479.    Plaintiff Katherine Prowse is a citizen of the United States and domiciled in the State of Arkansas. She is the sister of Joshua Schichtl.

4480.   Plaintiff Nicholas Prowse is a citizen of the United States and domiciled in the State of Arkansas. He is the brother of Joshua Schichtl.

4481.   Plaintiff H.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

4482.   Plaintiff S.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

4483.   Plaintiff C.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

4484.   Plaintiff A.S., a minor represented by his legal guardian, Joshua Schichtl, is a citizen of the United States and domiciled in the State of Florida. He is the son of Joshua Schichtl.

4485.   As a result of the attack, and the injuries Joshua Schichtl has suffered, Plaintiffs Mark Schichtl, Katherine Prowse, Nicholas Prowse, H.S., S.S., C.S. and A.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

4486.   Plaintiff Joshua Schichtl was discharged from the U.S. military on May 28, 2012.

**The Wadleigh Family**

4487.   Plaintiff Steve Wadleigh is a citizen of the United States and domiciled in the State of Washington.

4488.   On January 6, 2008, Steve Wadleigh, then 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4489.   The weapon used to injure Steve Wadleigh was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4490.   As a result of the attack, Steve Wadleigh sustained shrapnel to his face, neck, and

shoulder. Shrapnel was imbedded in his jawbone, necessitating both facial surgery and oral surgeries.

4491.   The impact of the blast caused his head to be thrown into the window of the vehicle. Mr. Wadleigh sustained a concussion and has been diagnosed with a TBI.

4492.   In addition, his ear drum was perforated, and his tooth was broken.

4493.   The vision in his left eye has been diminished and he continues to experience pain in his shoulder and hip.

4494.   Mr. Wadleigh has been diagnosed with PTSD, and he has sought counseling. He has experienced night terrors and has been prescribed medication to address them and other sleep-related issues.

4495.   The effects of the PTSD, along with the TBI, impact his daily living.

4496.   As a result of the attack, and the injuries he suffered, Plaintiff Steve Wadleigh has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4497.   Plaintiff Lea-Ann Wadleigh is a citizen of the United States and domiciled in the State of Washington. She is the wife of Steve Wadleigh.

4498.   As a result of the attack, and the injuries Steve Wadleigh has suffered, Plaintiff Lea-Ann Wadleigh has experienced severe mental anguish, and extreme emotional pain and suffering.

4499.   Plaintiff Steve Wadleigh was discharged from the U.S. military on January 1, 2019.

### 179.   THE JANUARY 30, 2008 ATTACK – BAGHDAD

### The Lukow Family

4500.   Plaintiff Michael Lukow is a citizen of the United States and domiciled in the State of Utah.

4501.   On January 30, 2008, Michael Lukow was serving in the U.S. military in Iraq.

4502.   Mr. Lukow was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4503.   The weapon used to injure Mr. Lukow was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4504.   As a result of the attack, Mr. Lukow's foot was amputated.

4505.   As a result of the attack, and the injuries he suffered, Plaintiff Michael Lukow has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4506.   Plaintiff Rikki Lukow is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Michael Lukow.

4507.   Plaintiff Bruce Lukow is a citizen of the United States and domiciled in the State of Colorado. He is the father of Michael Lukow.

4508.   Plaintiff Joseph Lukow is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Michael Lukow.

4509.   Plaintiff Andrew Lukow is a citizen of the United States and domiciled in the State of Wisconsin. He is the brother of Michael Lukow.

4510.   Plaintiff Kristen Kelley is a citizen of the United States and domiciled in the State of Colorado. She is the sister of Michael Lukow.

4511.   As a result of the attack and the injuries Michael Lukow suffered, Plaintiff Rikki Lukow, Bruce Lukow, Joseph Lukow, Andrew Lukow and Kristen Kelley have experienced severe mental anguish and extreme emotional pain and suffering.

4512.   Plaintiff Michael Lukow was discharged from the U.S. military on January 1, 2019.

180. **THE FEBRUARY 19, 2008 ATTACK – BAGHDAD**

**The Alvarez Family**

4513.   Conrad Alvarez was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4514.   On February 19, 2008, Conrad Alvarez, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4515.   Conrad Alvarez was injured in the attack and died on February 20, 2008 from the injuries he sustained in the attack.

4516.   The weapon used to kill Conrad Alvarez was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4517.   Plaintiff Maira Alvarez is a citizen of the United States and domiciled in the State of Texas. She is the widow of Conrad Alvarez.

4518.   Plaintiff Maira Alvarez brings a claim individually and on behalf of the Estate of Conrad Alvarez, as its legal representative.

4519.   Plaintiff K.A., a minor represented by his legal guardian, Maira Alvarez, is a citizen of the United States and domiciled in the State of Texas. He is the son of Conrad Alvarez.

4520.   Angela Alvarez is a citizen of the United States and domiciled in the State of California. She is the ex-wife of Conrad Alvarez and is the legal guardian of Plaintiffs A.A. and C.A. Angela Alvarez brings an action solely on behalf of Plaintiffs A.A. and C.A., both minors.

4521.   Plaintiff A.A., a minor represented by her legal guardian, Angela Alvarez, is a citizen of the United States and domiciled in the State of California. She is the daughter of Conrad Alvarez.

4522.   Plaintiff C.A., a minor represented by her legal guardian, Angela Alvarez, is a citizen of the United States and domiciled in the State of California. She is the daughter of Conrad Alvarez.

4523.   Plaintiff Belinda Garcia is a citizen of the United States and domiciled in the State of Texas. She is the mother of Conrad Alvarez.

4524.   As a result of the attack, and the death of Conrad Alvarez, Plaintiffs Maira Alvarez, K.A., A.A., C.A. and Belinda Garcia have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

**The Whitehorse Family**

4525.   Plaintiff Jason Whitehorse is a citizen of the United States and domiciled in the State of New Mexico.

4526.   On February 19, 2008, Jason Whitehorse, then 22, was serving in the U.S. military in Iraq.

4527.   Mr. Whitehorse was on a routine patrol in Baghdad when his vehicle was struck by an EFP emplaced by Special Groups.

4528.   The weapon used to injure Mr. Whitehorse was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4529.   As a result of the attack, he sustained injuries due to the impact of shrapnel impacting his body. This has resulted in scarring.

4530.   Apart from the shrapnel-related injuries, Mr. Whitehouse also sustained burns to his skin. This has also resulted in scarring.

4531. Mr. Whitehorse has been diagnosed with PTSD and major depression and has received treatment and counseling.

4532. Mr. Whitehorse continues to experience emotional distress, depression and survivor's guilt.

4533. As a result of the attack, and the injuries he suffered, Plaintiff Jason Whitehorse has experienced severe mental anguish and extreme emotional pain and suffering.

4534. Plaintiff Jason Whitehorse was discharged from the U.S. military on November 22, 2011.

## 181.    THE FEBRUARY 19, 2008 ATTACK – BAGHDAD

### The Mann Family

4535. Plaintiff Jeffrey C. Mann is a citizen of the United States and domiciled in the State of North Carolina.

4536. On February 19, 2008, Jeffrey C. Mann, then 25, was serving in the U.S. military in Iraq.

4537. Jeffrey C. Mann was inside a building at Forward Operating Base Rustamiyah in the southeast portion of Baghdad when the base was hit with a barrage of IRAMs fired from a dump truck in close proximity to the base.

4538. One of the rockets caused a fuel tank on the base to explode, which destroyed part of the building in which Jeffrey C. Mann was standing.

4539. KH operatives fired the IRAMs at the base. Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy.

4540.   The concussive blast of the explosion threw Jeffrey C. Mann backward, and he hit his head causing him to lose consciousness.

4541.   As a result of the attack, Jeffrey C. Mann suffered a TBI that has impeded his ability to concentrate or work. He also suffers from migraines and difficulty in completing tasks. The injuries he sustained have also caused him impaired vision and loss of feeling in part of his face in addition to tinnitus and hearing loss. He also suffered injuries to his back which now require him to walk with a cane when walking for any extended period of time while also suffering pain and numbness in his legs.

4542.   He also suffers from PTSD.

4543.   As a result of the attack, and the injuries he suffered, Jeffrey C. Mann has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4544.   Plaintiff Jeffrey C. Mann was discharged from the U.S. military on January 1, 2010.

## 182.   THE MARCH 11, 2008 ATTACK – BABIL PROVINCE

### The West Family

4545.   Laurent J. West was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

4546.   On March 11, 2008, Laurent J. West, aged 32, was serving in the U.S. military in Iraq when an IED (likely an EFP) was emplaced and detonated near his vehicle by JAM Special Groups.

4547.   Laurent J. West was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4548.   Plaintiff Michelle West is a citizen of the United States and domiciled in the State of New Mexico. She is the widow of Laurent J. West.

4549.   As a result of the attack, and the death of Laurent J. West, Plaintiff Michelle West has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

### 183.   THE MARCH 12, 2008 ATTACK – CAMP ADDER

**The Samten Family**

4550.   Tenzin Lobsang Samten was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

4551.   On March 12, 2008, Tenzin Lobsang Samten, aged 33, was serving in the U.S. military in Iraq near the city of An-Nasiriyah when his vehicle was struck by mortar fire launched by JAM Special Groups terror operatives.

4552.   Tenzin Lobsang Samten was killed in the attack.

4553.   The attack that killed Tenzin Lobsang Samten was carried out by JAM Special Groups operatives working at the behest of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing tactics taught to them by Hezbollah.

4554.   Plaintiff Rebecca L. Samten-Finch is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Tenzin Lobsang Samten.

4555.   Plaintiff Rebecca L. Samten-Finch brings an action individually and on behalf of the Estate of Tenzin Lobsang Samten, as its legal representative.

4556.   Plaintiff D.A.S., a minor, represented by her legal guardian, Rebecca L. Samten-Finch, is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Tenzin Lobsang Samten.

4557.   Plaintiff M.B.S., a minor, represented by his legal guardian, Rebecca L. Samten-Finch, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Tenzin Lobsang Samten.

4558.   As a result of the attack, and the death of Tenzin Lobsang Samten, Plaintiffs Rebecca L. Samten-Finch, D.A.S., and M.B.S. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Bradley Family**

4559.   Juantrea Tyrone Bradley was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

4560.   On March 12, 2008, Juantrea Tyrone Bradley, then 28, was serving in the U.S. military in Ira near the city of An-Nasiriyah when his vehicle was struck by mortar fire launched by JAM Special Groups terror operatives.

4561.   Juantrea Tyrone Bradley was killed in the attack.

4562.   The attack that killed Juantrea Tyrone Bradley was carried out by JAM Special Groups operatives working at the behest of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing tactics taught to them by Hezbollah.

4563.   Plaintiff Ava Lanette Bradley is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Juantrea Tyrone Bradley.

4564.   Plaintiff Ava Lanette Bradley brings an action individually and on behalf of the Estate of Juantrea Tyrone Bradley, as its legal representative.

4565.   Plaintiff A.D.B., a minor, represented by her legal guardian, Ava Lanette Bradley, is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Juantrea Tyrone Bradley.

4566.   Plaintiff T.T.B., a minor, represented by his legal guardian, Ava Lanette Bradley, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Juantrea Tyrone Bradley.

4567.   Plaintiff J.T.B., a minor, represented by his legal guardian, Ava Lanette Bradley, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Juantrea Tyrone Bradley.

4568.   Plaintiff Anthony Hudson is a citizen of the United States and domiciled in the State of North Carolina. He is the stepson of Juantrea Tyrone Bradley.

4569.   As a result of the attack, and the death of Juantrea Tyrone Bradley, Plaintiffs Ava Lanette Bradley, A.D.B., T.T.B., J.T.B., and Anthony Hudson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 184.   THE MARCH 14, 2008 ATTACK – MUSAYYIB

**The Bewley Family**

4570.   Plaintiff Austin Bewley is a citizen of the United States and domiciled in the State of Oregon.

4571.   On March 14, 2008, Austin Bewley, then 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling on the way to Baghdad.

4572.   The weapon used to injure Austin Bewley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4573.   Mr. Bewley suffered shrapnel wounds in his left leg, right hand, and face.

4574.   He was also diagnosed with PTSD.

4575.   Mr. Bewley was prescribed pain medication and medication to regrow the nerve in his leg. He was also prescribed medication to treat the symptoms of his PTSD.

4576.   As a result of the attack, and the injuries he suffered, Plaintiff Austin Bewley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4577.   Plaintiff Austin Bewley was discharged from the U.S. military on December 16, 2010.

### 185.   THE MARCH 17, 2008 ATTACK – BAGHDAD

**The Levi Family**

4578.   Plaintiff Christopher Levi is a citizen of the United States and domiciled in the State of New York.

4579.   On March 17, 2008, Christopher Levi, then 23, was serving in the U.S. military in Iraq.

4580.   Mr. Levi was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4581.   The weapon used to injure Mr. Levi was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4582.   As a result of the attack, Mr. Levi lost both of his legs.

4583.  He also sustained a fracture of his right ulna and loss of the second metacarpal in his right hand.

4584.  In addition to adjusting to life as a double amputee through the use of prosthetics and a wheelchair, Mr. Levi continues to experience numbness in his left arm.

4585.  He also suffers from a TBI.

4586.  As a result of the attack, and the injuries he suffered, Plaintiff Christopher Levi has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4587.  Plaintiff Eric Levi is a citizen of the United States and domiciled in the State of New York. He is the father of Christopher Levi.

4588.  Plaintiff Debra Levi is a citizen of the United States and domiciled in the State of New York. She is the mother of Christopher Levi.

4589.  Plaintiff Emily Levi is a citizen of the United States and domiciled in the State of New York. She is the sister of Christopher Levi.

4590.  Plaintiff Kimberly Vesey is a citizen of the United States and domiciled in the State of New York. She is the sister of Christopher Levi.

4591.  As a result of the attack, and the injuries suffered by Christopher Levi, Plaintiffs Eric Levi, Debra Levi, Emily Levi and Kimberly Vesey have experienced severe mental anguish, and extreme emotional pain and suffering.

4592.  Plaintiff Christopher Levi was discharged from the U.S. military on November 29, 2010.

## 186.  THE MARCH 17, 2008 ATTACK – BAGHDAD

### The Elledge Family

4593.  Michael D. Elledge was a citizen of the United States and domiciled in the State of

Indiana when he was killed in Iraq.

4594.  On March 17, 2008, Michael D. Elledge, aged 41, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

4595.  Michael D. Elledge was killed in the attack.

4596.  The weapon used to injure Mr. Elledge was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4597.  Plaintiff Marion Crimens is a citizen of the United States and domiciled in the State of Florida. She is the mother of Michael D. Elledge.

4598.  Plaintiff Timothy W. Elledge is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Michael D. Elledge.

4599.  As a result of the attack, and the death of Michael D. Elledge, Plaintiffs Marion Crimens and Timothy W. Elledge have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Simpson Family**

4600.  Christopher Simpson was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

4601.  On March 17, 2008, Christopher Simpson, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4602.  Christopher Simpson was killed in the attack.

4603. The weapon used to kill Christopher Simpson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4604. Plaintiff Mary Catherine McLaughlin is a citizen of the United States and domiciled in the State of New York. She is the mother of Christopher Simpson.

4605. As a result of the attack, and the death of Christopher Simpson, Plaintiff Mary Catherine McLaughlin has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

### 187. THE MARCH 23, 2008 ATTACK – BAGHDAD

**The Habsieger Family**

4606. Andrew J. Habsieger was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

4607. On March 23, 2008, Andrew J. Habsieger, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4608. Andrew J. Habsieger was killed in the attack.

4609. The weapon used to kill Andrew J. Habsieger was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4610. Plaintiff Brenda Habsieger is a citizen of the United States and domiciled in the State of Missouri. She is the mother of Andrew J. Habsieger.

4611. Plaintiff Brenda Habsieger brings an action individually and on behalf of the Estate of Andrew J. Habsieger, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

4612.   Plaintiff Michael Habsieger is a citizen of the United States and domiciled in the State of Missouri. He is the father of Andrew J. Habsieger.

4613.   Jacob Michael Habsieger was a citizen of the United States at the time of the death of Andrew J. Habsieger. He was the brother of Andrew J. Habsieger. Jacob Michael Habsieger died on March 5, 2018.

4614.   Amber Habsieger is a citizen of the United States and domiciled in the State of Missouri. She brings an action on behalf of the Estate of Jacob Michael Habsieger, as its legal representative.

4615.   As a result of the attack, and the death of Andrew J. Habsieger, the late Jacob Michael Habsieger experienced, and Plaintiffs Brenda Habsieger and Michael Habsieger have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Hake Family**

4616.   Christopher M. Hake was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

4617.   On March 23, 2008, Christopher M. Hake, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4618.   Christopher M. Hake was killed in the attack.

4619.   The weapon used to kill Christopher M. Hake was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4620.   Plaintiff Kelli D. Hake is a citizen of the United States and domiciled in the State of Oklahoma. She is the widow of Christopher M. Hake.

4621.   Plaintiff Kelli D. Hake brings an action individually and on behalf of the Estate of Christopher M. Hake, as its legal representative.

4622.   Plaintiff G.H., a minor represented by his legal guardian Kelli D. Hake, is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Christopher M. Hake.

4623.   Plaintiff Denice York is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Christopher M. Hake.

4624.   Plaintiff Russel York is a citizen of the United States and domiciled in the State of Oklahoma. He is the stepfather of Christopher M. Hake.

4625.   Plaintiff Peter Hake is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Christopher M. Hake.

4626.   Plaintiff Jill Hake is a citizen of the United States and domiciled in the State of Oklahoma. She is the stepmother of Christopher M. Hake.

4627.   Plaintiff Zachary Hake is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Christopher M. Hake.

4628.   Plaintiff Keri Hake is a citizen of the United States and domiciled in the State of Oklahoma. She is the sister of Christopher M. Hake.

4629.   Plaintiff Skylar Hake is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Christopher M. Hake.

4630.   Plaintiff Jennifer Renee York is a citizen of the United States and domiciled in the State of Oklahoma. She is the stepsister of Christopher M. Hake.

4631.   Plaintiff Jason York is a citizen of the United States and domiciled in the State of Oklahoma. He is the stepbrother of Christopher M. Hake.

4632.   As a result of the attack, and the death of Christopher M. Hake, Plaintiffs Kelli D.

Hake, G.H., Denice York, Russel York, Peter Hake, Jill Hake, Zachary Hake, Keri Hake, Skylar Hake, Jennifer Renee York and Jason York have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Delgado Family**

4633.   George Delgado was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

4634.   On March 23, 2008, George Delgado, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

4635.   George Delgado was killed in the attack.

4636.   The weapon used to kill George Delgado was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4637.   Plaintiff Maria E. Calle is a citizen of the United States and domiciled in the State of California. She is the mother of George Delgado.

4638.   Plaintiff Maria E. Calle brings an action individually and on behalf of the Estate of George Delgado, as its legal representative.

4639.   Plaintiff Cynthia Delgado is a citizen of the United States and domiciled in the State of California. She is the sister of George Delgado.

4640.   As a result of the attack, and the death of George Delgado, Plaintiffs Maria E. Calle and Cynthia Delgado have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The McCoy Family**

4641.   Steve A. McCoy was a citizen of the United States and domiciled in the State of Georgia when he was injured in Iraq.

4642.   On March 23, 2008, Steve A. McCoy, aged 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

4643.   The weapon used to kill Steve A. McCoy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4644.   As a result of the attack, Steve A. McCoy sustained third degree burns over 98% of his body. The explosion and resulting fire also caused the loss of some fingers, his ear, and his nose.

4645.   After initial treatment in Iraq and Germany, Steve A. McCoy received extensive treatment in the United States. During the course of his treatment he underwent a number of skin grafts.

4646.   He was heavily sedated for hours each day so that his bandages could be changed, and his wounds could be treated.

4647.   Occasionally, he was conscious and able to communicate through blinking and other methods. Following a tracheotomy procedure, he developed a limited ability to speak.

4648.   His condition also required respiratory therapy and dialysis treatment.

4649.   Steve A. McCoy died on June 10, 2008 as a result of the injuries he sustained in the attack.

4650.   Plaintiff Tabitha McCoy is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Steve A. McCoy.

4651. Plaintiff Tabitha McCoy brings an action individually and on behalf of the Estate of Steve A. McCoy, as its legal representative.

4652. Plaintiff L.M., a minor represented by his legal guardian Tabitha McCoy, is a citizen of the United States and domiciled in the State of Georgia. He is the son of Steve A. McCoy.

4653. Plaintiff R.M., a minor represented by her legal guardian Tabitha McCoy, is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Steve A. McCoy.

4654. As a result of the attack, and the death of Steve A. McCoy, Plaintiffs Tabitha McCoy, L.M. and R.M. have experienced severe mental anguish, extreme emotional pain and suffering and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Fieser Family**

4655. Plaintiff Matthew Fieser is a citizen of the United States and domiciled in the State of Washington.

4656. On March 23, 2008, Matthew Fieser, then 25, was serving in the U.S. military in Iraq.

4657. He was an occupant in a vehicle traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4658. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4659.   Following the blast, the lead vehicle began to burn, eventually burning uncontrollably.

4660.   Steve A. McCoy, the truck commander of the lead vehicle exited the vehicle, his body and clothes on fire. Nearly all his clothes had been burned off.

4661.   After the vehicle in which Mr. Fieser was traveling approached the disabled vehicle, he dismounted. While engulfed in flames, Mr. McCoy began running toward Mr. Fieser, screaming and crying out to him.

4662.   Although severely burned all over his body, Mr. McCoy remained conscious following the attack. After a period of time, Mr. Fieser helped to move Mr. McCoy onto a support to prepare him for transport.

4663.   Mr. Fieser traveled alongside Steve A. McCoy and continued to talk to him as he was transported to the hospital. Throughout this period, Steve A. McCoy continued to scream with pain and cough up a foamy substance.

4664.   After arriving at the hospital, Mr. Fieser learned that the other occupants of the lead vehicle had been severely burned, could not be extricated from their vehicle, and did not survive.

4665.   Mr. Fieser has been diagnosed with PTSD and has experienced nightmares.

4666.   Mr. Fieser has sought counseling and has been prescribed medication, including anti-depressants, to treat his condition.

4667.   As a result of the attack, and the injuries he suffered, Plaintiff Matthew Fieser has experienced severe mental anguish and extreme emotional pain and suffering.

4668.   Plaintiff Matthew Fieser was discharged from the U.S. military on October 23, 2012.

**The Carrington Family**

4669.    Plaintiff Benjamin Daniel Carrington is a citizen of the United States and domiciled in the State of Georgia.

4670.    On March 23, 2008, Benjamin Daniel Carrington, then 22, was serving in the U.S. military in Iraq.

4671.    Mr. Carrington was the driver of the vehicle in which Plaintiff Matthew Fieser was traveling when an EFP emplaced by Special Groups detonated near the lead vehicle in the convoy, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4672.    The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4673.    Mr. Carrington witnessed the attack scene and the aftermath, including Mr. McCoy, who was engulfed in flames.

4674.    He has been diagnosed with PTSD.

4675.    Mr. Carrington has sought counseling and has been prescribed medication to treat his condition.

4676.    As a result of the attack, and the injuries he suffered, Plaintiff Benjamin Daniel Carrington has experienced mental anguish and extreme emotional pain and suffering.

4677.    Plaintiff Benjamin David Carrington was discharged from the U.S. military on June 22, 2011.

## The Heslop Family

4678.   Plaintiff Jonathan Heslop is a citizen of the United States and domiciled in the State of Ohio.

4679.   On March 23, 2008, Jonathan Heslop, then 23, was serving in the U.S. military in Iraq.

4680.   Jonathan Heslop was the gunner of the vehicle that Benjamin Carrington was driving and was traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4681.   The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4682.   Mr. Heslop witnessed the attack scene and the aftermath, including seeing Mr. McCoy when he was engulfed in flames.

4683.   Jonathan Heslop has been diagnosed with PTSD.

4684.   Mr. Heslop has sought counseling to address the PTSD and the impact that the attack has had upon him. He has been prescribed medication to treat this condition.

4685.   As a result of the attack, and the injuries he suffered, Plaintiff Jonathan Heslop has experienced severe mental anguish and extreme emotional pain and suffering.

## The Mason Family

4686.   Plaintiff Russell Mason is a citizen of the United States and domiciled in the State of Maryland.

4687. On March 23, 2008, Russell Mason, then 23, was serving in the U.S. military in Iraq.

4688. Russell Mason was the commander of the convey and was an occupant in the vehicle being driven by Benjamin Carrington traveling in the same convoy when an EFP emplaced by Special Groups detonated near the lead vehicle, resulting in the deaths of four soldiers that day and the death of Steve A. McCoy, who subsequently died as a result of his injuries.

4689. The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4690. Following the blast, the lead vehicle began to burn, eventually burning uncontrollably.

4691. Steve A. McCoy, the truck commander of the lead vehicle exited the vehicle, his body and clothes on fire. Nearly all his clothes had been burned off.

4692. After the vehicle in which Mr. Mason was traveling approached the disabled vehicle, he dismounted. While engulfed in flames, Steve A. McCoy began running toward Mr. Fieser, screaming and crying out to him.

4693. While trying to help Steve A. McCoy, they came under fire from the ground floor and a second-floor window positions south of where the convey had been attacked.

4694. Mr. Mason suffers from PTSD and has experienced survivor's guilt. He has received treatment and counseling for these issues.

4695. As a result of the attack, and the injuries he suffered, Plaintiff Russell Mason has experienced severe mental anguish and extreme emotional pain and suffering.

4696.   Plaintiff Russell Mason was discharged from the U.S. military on August 15, 2012.

**The Pool Family**

4697.   Plaintiff Andy Pool is a citizen of the United States and domiciled in the State of Arkansas.

4698.   On March 23, 2008, Andy Pool, then 26, was serving in the U.S. military in Iraq.

4699.   Andy Pool was an occupant of the vehicle that Benjamin Carrington was driving when an EFP emplaced by Special Groups detonated near the lead vehicle in the convoy, resulting in the deaths of four soldiers that day and the subsequent death of Steve A. McCoy.

4700.   The weapon that caused the deaths of the soldiers who had been traveling in the lead vehicle was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4701.   Mr. Pool witnessed the attack scene and the aftermath, including seeing Steve A. McCoy when he was engulfed in flames. Although Mr. McCoy was essentially unrecognizable, Mr. Pool realized it was him solely from his tattoo that was somewhat visible.

4702.   Mr. Pool traveled alongside Mr. McCoy and continued to talk to him as he was transported to the hospital. Throughout this period, Mr. McCoy continued to scream with pain. While en route to the hospital, Mr. McCoy asked Mr. Pool to tell his wife and children that he loved them.

4703.   Mr. Pool endures extreme survivor's guilt. He has also experienced nightmares and sleep issues.

4704.   He has been diagnosed with PTSD.

4705.    Mr. Pool has sought counseling to address the PTSD and the impact that the attack has had upon him. He has been prescribed medication to treat this condition and the sleep issues that have developed since the attack.

4706.    As a result of the attack, and the injuries he suffered, Plaintiff Andy Pool has experienced severe mental anguish and extreme emotional pain and suffering.

4707.    Plaintiff Andy Pool was discharged from the U.S. military on June 14, 2019.

### 188.    THE MARCH 23, 2008 ATTACK – BAGHDAD

**The Converse Family**

4708.    Paul R. Converse was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

4709.    On March 23, 2008, Paul R. Converse, aged 56, was a civilian working as an auditor for the Special Inspector General for Iraq Reconstruction ("SIGIR") in Baghdad.

4710.    On March 23, 2008, a barrage of six 107mm rockets were fired by JAM Special Groups into the Green Zone in Baghdad where Paul R. Converse was working on Easter Sunday.

4711.    Paul R. Converse was mortally wounded in the rocket attack and succumbed to his wounds the following day.

4712.    The JAM Special Groups terror operatives that murdered Paul R. Converse were trained by Hezbollah and funded and armed by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF, as their proxy.

4713.    Plaintiff Frank L. Converse is a citizen of the United States and domiciled in the State of Washington. He is the brother of Paul R. Converse.

4714.    Plaintiff Frank L. Converse brings an action individually and on behalf of the Estate of Paul R. Converse, as its legal representative.

4715.    As a result of the attack, and the death of Paul R. Converse, Plaintiff Frank L. Converse has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

189.    **THE MARCH 27, 2008 ATTACK – SADR CITY**

**The Gerber Family**

4716.    Plaintiff Anthony M. Gerber is a citizen of the United States and domiciled in the State of Washington.

4717.    On March 27, 2008, Anthony M. Gerber was serving in the U.S. military in Iraq.

4718.    Mr. Gerber was in a convoy when an EFP emplaced by Special Groups struck the vehicle immediately in front of his.

4719.    The weapon used to injure Mr. Gerber was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4720.    Additionally, Mr. Gerber was also involved in additional attacks involving JAM during the Battle of Sadr City. He was involved in several counter-offensives against JAM terrorists. He was the target of regular ambushes by JAM that relied on the use of women and children as human shields and RPG and sniper attacks. Mr. Gerber was also part of: the fight surrounding the construction of the wall on Route Gold; the battle involving Chris Kyle depicted in *American Sniper*; and the fighting to interdict JAM attempts to resupply Sadr City and/or counter JAM attempts to overwhelm the Americans on the flanks of Sadr City during the Battle of Sadr City.

4721.    As a result of this attack and the additional combat Mr. Gerber was involved in, he suffered multiple concussions and suffers from PTSD, a TBI, chronic back pain and tinnitus.

4722.   As a result of the attack, and the injuries he suffered, Plaintiff Anthony M. Gerber has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4723.   Plaintiff Anthony M. Gerber was discharged from the U.S. military on November 15, 2009.

**The Gregston Family**

4724.   Plaintiff Charles B. Gregston is a citizen of the United States and domiciled in the State of California.

4725.   Charles B. Gregston served in Iraq as part of the 1-2 Stryker Calvary Regiment. During 2007 and 2008, he was deployed in and/or near Sadr City, Iraq for 15 months. For the entire Battle of Sadr City, Mr. Gregston was either directly in Sadr City or doing patrols on the outskirts of the area. Mr. Gregston's second and final deployment was from November 2009 to December 2010, when he was stationed on the outskirts of Baghdad.

4726.   During both deployments in Iraq, Mr. Gregston's unit confronted JAM Special Groups. He was an immediate responder during the JAM Special Groups sniper attack that killed Randell Olguin on September 30, 2007, and the JAM Special Groups' EFP attack that killed Joshua A. Molina and injured Plaintiff Anthony M. Gerber on March 27, 2008. Mr. Gregston was exposed to multiple roadside bombs while his unit patrolled JAM Special Groups' strongholds.

4727.   The weapon used to kill Joshua A. Molina was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4728.   The attacks described herein were perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

4729. Due to his multiple encounters with JAM, JAM Special Groups and exposure to multiple blasts from JAM and JAM Special Groups devices, Mr. Gregston sustained a number of injuries, including PTSD, TBIs, and tinnitus, resulting in, among other things, permanent hearing loss. Due to his injuries, he received a 100% disability rating from the VA.

4730. As a result of the JAM and JAM Special Groups attacks, Charles B. Gregston has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4731. Plaintiff Charles B. Gregston was discharged from the U.S. military on February 2, 2013.

### 190. THE MARCH 29, 2008 ATTACK – BAGHDAD

**The Miller Family**

4732. Patrick J. Miller was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

4733. On March 29, 2008, Patrick J. Miller aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4734. Patrick J. Miller was killed in the attack.

4735. The weapon used to kill Patrick J. Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4736. Plaintiff Kimberly Miller is a citizen of the United States and domiciled in the State of Florida. She is the mother of Patrick J. Miller.

4737. Plaintiff Michael J. Miller is a citizen of the United States and domiciled in the State of Florida. He is the brother of Patrick J. Miller.

4738. As a result of the attack, and the death of Patrick J. Miller, Plaintiffs Kimberly

Miller and Michael J. Miller have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**191.** **THE MARCH 29, 2008 ATTACK – BAGHDAD**

**The Reiher Family**

4739. Plaintiff Carl Reiher is a citizen of the United States and domiciled in the State of Arkansas.

4740. On March 29, 2008, Carl Reiher was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4741. The weapon used to injure Carl Reiher was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4742. As a result of the attack, Mr. Reiher's left arm was amputated. He also sustained multiple burn injuries.

4743. As a result of the attack, and the injuries he suffered, Plaintiff Carl Reiher has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4744. Plaintiff Carl Reiher was discharged from the U.S. military on November 11, 2009.

**192.** **THE MARCH 30, 2008 ATTACK – BAGHDAD**

**The Bailey Family**

4745. Plaintiff Walter Bailey is a citizen of the United States and domiciled in the State of Florida.

4746. On March 30, 2008, Walter Bailey, then 19, was serving in the U.S. military in Iraq.

4747. Mr. Bailey was returning to base when his vehicle was struck by an EFP emplaced by Special Groups.

4748.   The weapon used to injure Mr. Bailey was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4749.   As a result of the attack, Mr. Bailey sustained multiple pieces of shrapnel in his right arm and both legs. He was also struck by shrapnel in his face and arm.

4750.   As a result of the attack, Mr. Bailey lost consciousness.

4751.   He has been diagnosed with both a TBI and PTSD.

4752.   Mr. Bailey has also experienced memory loss.

4753.   He has sought and continues to avail himself of counseling for the emotional injuries caused by the attack.

4754.   As a result of the attack, and the injuries he suffered, Plaintiff Walter Bailey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4755.   Plaintiff Cassandra Bailey is a citizen of the United States and domiciled in the State of Florida. She is the wife of Walter Bailey.

4756.   As a result of the injuries suffered by Walter Bailey, Cassandra Bailey has sought counseling and been prescribed medication.

4757.   As a result of the attack, and the injuries Walter Bailey suffered, Plaintiff Cassandra Bailey has experienced severe mental anguish, and extreme emotional pain and suffering.

### 193.   THE MARCH 30, 2008 ATTACK – BAGHDAD

**The Gilmore Family**

4758.   Terrell W. Gilmore, Sr. was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

4759.   On March 30, 2008, Terrell W. Gilmore, Sr., aged 38, was serving in the U.S.

military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4760.   Terrell W. Gilmore, Sr. was killed in the attack.

4761.   The weapon used to kill Terrell W. Gilmore, Sr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4762.   The terrorist group that planned and executed the attack, the Mahdi Army/Special Groups, was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

4763.   Plaintiff Kacey Gilmore is a citizen of the United States and domiciled in the State of Louisiana. She is the daughter of Terrell W. Gilmore, Sr.

4764.   Plaintiff Terrell Gilmore, Jr. is a citizen of the United States and domiciled in the State of Louisiana. He is the son of Terrell W. Gilmore, Sr.

4765.   As a result of the attack, and the death of Terrell W. Gilmore, Sr., Plaintiffs Kacey Gilmore and Terrell Gilmore, Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

## 194.   THE MARCH 31, 2008 ATTACK – BAGHDAD

### The Dhanoolal Family

4766.   Dayne D. Dhanoolal was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

4767.   On March 31, 2008, Dayne D. Dhanoolal, aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4768.   Dayne D. Dhanoolal was killed in the attack.

4769.   The weapon used to kill Dayne D. Dhanoolal was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction,

using specialized training and components supplied by Hezbollah and the IRGC.

4770.   Plaintiff Kynesha Dhanoolal is a citizen of the United States and domiciled in the State of South Carolina. She is the widow of Dayne D. Dhanoolal.

4771.   Plaintiff Kynesha Dhanoolal brings an action individually and on behalf of the Estate of Dayne D. Dhanoolal, as its representative.

4772.   As a result of the attack, and the death of Dayne D. Dhanoolal, Plaintiff Kynesha Dhanoolal has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 195.   THE APRIL 3, 2008 ATTACK – SADR CITY

### The Robinson Family

4773.   Plaintiff Jason Robinson is a citizen of the United States and domiciled in the State of Virginia.

4774.   On April 3, 2008, Jason Robinson was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4775.   The weapon used to injure Jason Robinson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4776.   As a result of the attack, Jason Robinson sustained shrapnel wounds to his face, neck and shoulder. The blast also dislocated two lumbar disks and ruptured both of his eardrums.

4777.   As a result of the attack, and the injuries he suffered, Plaintiff Jason Robinson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4778.   Plaintiff Frances Robinson is a citizen of the United States and domiciled in the State of Virginia. She is the wife of Jason Robinson.

4779. Plaintiff E.R., a minor represented by her legal guardian, Frances Robinson, is a citizen of the United States and domiciled in the State of Virginia. She is the daughter of Jason Robinson.

4780. Plaintiff William Justin Weatherly is a citizen of the United States and domiciled in the State of Virginia. He is the stepson of Jason Robinson.

4781. Plaintiff Michael Weatherly is a citizen of the United States and domiciled in the State of Texas. He is the stepson of Jason Robinson.

4782. As a result of the attack, and the injuries suffered by Jason Robinson, Plaintiffs Frances Robinson, E.R., William Justin Weatherly and Michael Weatherly have experienced severe mental anguish, and extreme emotional pain and suffering.

4783. Plaintiff Jason Robinson was discharged from the U.S. military on January 4, 2016.

**196.** **THE APRIL 4, 2008 ATTACK – BAGHDAD**

**The von Letkemann Family**

4784. Plaintiff Grant von Letkemann is a citizen of the United States and domiciled in the State of Colorado.

4785. On April 4, 2008, Plaintiff Grant von Letkemann, then 35, was serving in the U.S. military in Iraq when his base came under attack from 107mm rockets.

4786. The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4787. Grant von Letkemann was injured in the attack when one of the rockets landed in his vicinity.

4788. As a result of the attack, Mr. von Letkmann sustained a TBI and a pulmonary blast injury, and he suffered from tinnitus and headaches.

4789.   He was also diagnosed with PTSD.

4790.   As a result of the attack, and the injuries he suffered, Plaintiff Grant von Letkemann has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4791.   Plaintiff Grant von Letkemann was discharged from the U.S. military on November 13, 2013.

### 197.   THE APRIL 6, 2008 ATTACK – BAGHDAD

**The Pickett Family**

4792.   Emanuel Pickett was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

4793.   On April 6, 2008, Emanuel Pickett, aged 34, was serving in the U.S. military when he was involved in a mortar and rocket attack, including 107mm rockets.

4794.   Emanuel Pickett was killed in the attack launched by JAM Special Groups terror operatives.

4795.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

4796.   Plaintiff Merlese Pickett is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Emanuel Pickett.

4797.   Plaintiff Merlese Pickett brings an action individually and on behalf of the Estate of Emanuel Pickett as its legal representative.

4798.   Plaintiff Harry Cromity is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Emanuel Pickett.

4799.   Plaintiff Marlen Pickett is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Emanuel Pickett.

4800.   Plaintiff Kemely Pickett is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Emanuel Pickett.

4801.   Plaintiff Vivian Pickett is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Emanuel Pickett.

4802.   Plaintiff Kyshia Sutton is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Emanuel Pickett.

4803.   As a result of the attack, and the death of Emanuel Pickett, Plaintiffs Merlese Pickett, Harry Cromity, Marlen Pickett, Kemely Pickett, Vivian Pickett and Kyshia Sutton have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 198.   THE APRIL 6, 2008 ATTACK – BAGHDAD

### The Scott Family

4804.   Stephen K. Scott was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

4805.   On April 6, 2008, Stephen K. Scott, aged 54, was serving in the United States military in Iraq when JAM Special Groups terror operatives attacked his unit.

4806.   Stephen K. Scott was killed in the attack.

4807.   The attack was perpetrated by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

4808.   Plaintiff Rachel M. Gillette is a citizen of the United States and domiciled in the State of Missouri. She is the daughter of Stephen K. Scott.

4809.   Plaintiff Rebekah Scott is a citizen of the United States and domiciled in the State

of Missouri. She is the daughter of Stephen K. Scott.

4810.   As a result of the attack, and the death of Stephen K. Scott, Plaintiffs Rachel M. Gillette and Rebekah Scott have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

## **The Wolfer Family**

4811.   Stuart Wolfer was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

4812.   On April 6, 2008, Stuart Wolfer, aged 36, was serving in the United States military in Iraq when JAM Special Groups terror operatives attacked his unit.

4813.   Stuart Wolfer was killed as a result of injuries sustained in the attack.

4814.   The attack was perpetrated by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

4815.   Plaintiff Lee Wolfer is a citizen of the United States and domiciled in the State of Iowa. She is the widow of Stuart Wolfer.

4816.   Plaintiff Lee Wolfer brings an action individually and on behalf of the Estate of Stuart Wolfer, as its legal representative.

4817.   Plaintiff L.W., a minor represented by her legal guardian, Lee Wolfer, is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Stuart Wolfer.

4818.   Plaintiff M.W., a minor represented by her legal guardian, Lee Wolfer, is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Stuart Wolfer.

4819.   Plaintiff I.W., a minor represented by her legal guardian, Lee Wolfer, is a citizen of the United States and domiciled in the State of Iowa. She is the daughter of Stuart Wolfer.

4820.   Plaintiff Beverly Wolfer is a citizen of the United States and domiciled in the State of New York. She is the sister of Stuart Wolfer.

4821.   As a result of the attack, and the death of Stuart Wolfer, Plaintiffs Lee Wolfer, L.W., M.W., I.W., and Beverly Wolfer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/brother's society, companionship, comfort, advice and counsel.

### 199.   THE APRIL 7, 2008 ATTACK – BAGHDAD

**The Smith Family**

4822.   Timothy Smith was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

4823.   On April 7, 2008, Timothy Smith, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4824.   Timothy Smith was killed in the attack.

4825.   The weapon used to kill Timothy Smith was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4826.   Plaintiff Patricia Smith is a citizen of the United States and domiciled in the State of California. She is the mother of Timothy Smith.

4827.   Plaintiff Michael Smith is a citizen of the United States and domiciled in the State of Florida. He is the father of Timothy Smith.

4828.   Plaintiff Jacqueline A. Smith is a citizen of the United States and domiciled in the State of California. She is the sister of Timothy Smith.

4829.    Plaintiff Thomas Smith is a citizen of the United States and domiciled in the State of California. He is the brother of Timothy Smith.

4830.    As a result of the attack, and the death of Timothy Smith, Plaintiffs Patricia Smith, Michael Smith, Jacqueline A. Smith and Thomas Smith have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 200.    THE APRIL 7, 2008 ATTACK – BAGHDAD

### The Vaughn Family

4831.    Richard A. Vaughn was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

4832.    On April 7, 2008, Richard A. Vaughn, aged 22, was serving in the U.S. military in Iraq when a vehicle in his unit was struck by an EFP emplaced by Special Groups and Richard A. Vaughn and his unit came under attack by RPGs and small arms fire.

4833.    Richard A. Vaughn was killed in the attack.

4834.    The weapon used in the attack that killed Richard A. Vaughn was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4835.    Plaintiff Rachelle Idol is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Richard A. Vaughn.

4836.    Plaintiff James Vaughn is a citizen of the United States and domiciled in the State of Arizona. He is the father of Richard A. Vaughn.

4837.    Plaintiff Jeannine Vaughn is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Richard A. Vaughn.

4838.   Plaintiff Clifford Vaughn is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Richard A. Vaughn.

4839.   As a result of the attack, and the death of Richard A. Vaughn, Plaintiffs Rachelle Idol, James Vaughn, Jeannine Vaughn and Clifford Vaughn have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 201.   THE APRIL 8, 2008 ATTACK – KHARGULIAH

**The Hartley Family**

4840.   Jeffery Hartley was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4841.   On April 8, 2008, Jeffery Hartley, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4842.   Jeffery Hartley was killed in the attack.

4843.   The weapon used to kill Jeffery Hartley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4844.   Plaintiff David Hartley is a citizen of the United States and domiciled in the State of Texas. He is the father of Jeffery Hartley.

4845.   Plaintiff David Hartley brings an action individually and on behalf of the Estate of Jeffery Hartley, as its legal representative.

4846.   Plaintiff David Wayne Hartley is a citizen of the United States and domiciled in the State of Texas. He is the brother of Jeffrey Hartley.

4847. Plaintiff Kaylie Hartley is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jeffery Hartley.

4848. Plaintiff Lisa Duncan is a citizen of the United States and domiciled in the State of Texas. She is the sister of Jeffery Hartley.

4849. As a result of the attack, and the death of Jeffery Hartley, Plaintiffs David Hartley David Wayne Hartley, Kaylie Hartley and Lisa Duncan have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 202. THE APRIL 9, 2008 ATTACK – SADR CITY

**The Ault Family**

4850. Jesse A. Ault was a citizen of the United States and domiciled in the State of Virginia when he was killed in Iraq.

4851. On April 9, 2008, Jesse A. Ault, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4852. Jesse A. Ault was killed in the attack.

4853. The weapon used to kill Jesse A. Ault was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4854. Plaintiff Virginia Billiter is a citizen of the United States and domiciled in the State of West Virginia. She is the mother of Jesse A. Ault.

4855. Plaintiff Eric Billiter is a citizen of the United States and domiciled in the State of West Virginia. He is the stepfather of Jesse A. Ault.

4856. Plaintiff Adrianne Kidd is a citizen of the United States and domiciled in the State of North Carolina. She is the stepsister of Jesse A. Ault.

4857. As a result of the attack, and the death of Jesse A. Ault, Plaintiffs Virginia Billiter, Eric Billiter and Adrianne Kidd have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 203. THE APRIL 12, 2008 ATTACK

**The Swinton Family**

4858. Plaintiff Allen Swinton is a citizen of the United States and domiciled in the State of Georgia.

4859. On April 12, 2008, Allen Swinton, then 33, was serving in the U.S. military in Iraq.

4860. Mr. Swinton's unit was providing escort duties when his vehicle was struck by an EFP emplaced by Special Groups.

4861. The weapon used to injure Mr. Swinton was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4862. As a result of the explosion, Mr. Swinton's artery was severed; he lost a great amount of blood; multiple pieces of shrapnel entered his lower extremities; and his right hand was injured.

4863. Mr. Swinton underwent surgery to tie his artery; he also underwent multiple surgeries to remove shrapnel from his body.

4864. He has also undergone physical therapy to treat the injuries he sustained to his legs and hand.

4865.   Mr. Swinton continues to experience pain in his lower extremities and will likely require additional treatment to address the remaining shrapnel in his body.

4866.   As a result of the attack, and the injuries he suffered, Plaintiff Allen Swinton has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4867.   Plaintiff Temika Swinton is a citizen of the United States and domiciled in the State of Georgia. She is the wife of Allen Swinton.

4868.   Plaintiff T.S., a minor represented by her legal guardian Temika Swinton, is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Allen Swinton and Temika Swinton.

4869.   Plaintiff T.S., a minor represented by her legal guardian Temika Swinton, is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Allen Swinton and Temika Swinton.

4870.   Plaintiff T.B., a minor represented by her legal guardian Temika Swinton, is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Temika Swinton and the stepdaughter of Allen Swinton.

4871.   Plaintiff Linda Pritchett is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Allen Swinton.

4872.   As a result of the attack, and the injuries Allen Swinton suffered, Plaintiffs Temika Swinton, T.S., T.S., T.B. and Linda Pritchett have experienced severe mental anguish and extreme emotional pain and suffering.

### 204. THE APRIL 12, 2008 ATTACK – BAGHDAD

**The Allmon Family**

4873. William E. Allmon was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

4874. On April 12, 2008, William E. Allmon, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4875. William E. Allmon was killed in the attack.

4876. The weapon used to kill William E. Allmon was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4877. Plaintiff William Allmon is a citizen of the United States and domiciled in the State of Georgia. He is the father of William E. Allmon.

4878. Plaintiff William Allmon brings an action individually and on behalf of the Estate of William E. Allmon, as its legal representative.

4879. As a result of the attack, and the death of William E. Allmon, Plaintiff William Allmon has experienced severe mental anguish, extreme emotional pain and suffering and loss of his son's society, companionship, comfort, advice and counsel.

### 205. THE APRIL 17, 2008 ATTACK – SADR CITY

**The Sloan Family**

4880. Plaintiff Ronald Sloan is a citizen of the United States and domiciled in the State of Tennessee.

4881. On April 17, 2008, Ronald Sloan, age 32, was serving in the U.S. military in Iraq.

4882.   Mr. Sloan was on patrol in Sadr City when the Abrams tank he was in was struck by an EFP emplaced by Special Groups.

4883.   The weapon used to injure Mr. Sloan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4884.   As a result of the attack, Mr. Sloan was struck by shrapnel on the right side of his face and neck.

4885.   He was medevaced to the 86th combat support hospital for treatment of his wounds. He was then sent to the Green Zone for further evaluation.

4886.   Mr. Sloan also suffers from PTSD as a result of the attack.

4887.   As a result of the attack, and the injuries he suffered, Plaintiff Ronald Sloan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4888.   Plaintiff Ronald Sloan was discharged from the U.S. military on May 31, 2015.

**206.   THE APRIL 21, 2008 ATTACK – BASRA**

**The Vandegrift Family**

4889.   Matthew R. Vandegrift was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

4890.   On April 21, 2008, Matthew R. Vandegrift, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

4891.   Matthew R. Vandegrift was killed in the attack.

4892.   The weapon used to kill Matthew R. Vandegrift was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

700

4893.   Plaintiff Mary Jane Vandegrift is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Matthew R. Vandegrift.

4894.   Plaintiff Mary Jane Vandegrift brings an action individually and on behalf of the Estate of Matthew R. Vandegrift, as its legal representative.

4895.   John Vandegrift was a citizen of the United States at the time of the death of Matthew R. Vandegrift. He was the father of Matthew R. Vandegrift. John Vandegrift died on September 23, 2016.

4896.   Plaintiff Mary Jane Vandegrift brings an action individually and on behalf of the Estate of John Vandegrift, as its legal representative.

4897.   As a result of the attack, and the death of Matthew R. Vandegrift, the late John Vandegrift experienced, and Plaintiff Mary Jane Vandegrift has experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 207.   THE APRIL 21, 2008 ATTACK – SADR CITY

**The Thomsen Family**

4898.   Plaintiff Mark E. Thomsen is a citizen of the Unites States and domiciled in the State of Arkansas.

4899.   On April 21, 2008, Mark E. Thomsen was serving in the U.S. military in Iraq when his unit was attacked with an IRAM.

4900.   The attack was perpetrated by Hezbollah-trained and IRGC-QF-supplied operatives of the JAM and KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

4901.   As a result of the attack, Mark E. Thomsen suffered a concussion.

4902.   He also suffers from a TBI and PTSD.

4903.   As a result of the attack, and the injuries he suffered, Plaintiff Mark E. Thomsen has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4904.   Plaintiff Ardell Thomsen is a citizen of the United States and domiciled in the State of Arkansas. She is the mother of Mark E. Thomsen.

4905.   Plaintiff Ralph Thomsen is a citizen of the United States and domiciled in the State of Arkansas. He is the father of Mark E. Thomsen.

4906.   As a result of the attack, and the injuries suffered by Mark E. Thomsen, Plaintiffs Ardell Thomsen and Ralph Thomsen have experienced severe mental anguish, and extreme emotional pain and suffering.

4907.   Plaintiff Mark E. Thomsen was discharged from the U.S. military on January 10, 2011.

## 208.   THE APRIL 21, 2008 ATTACK – BAGHDAD

**The Bogart Family**

4908.   Plaintiff Evan D. Bogart is a citizen of the Unites States and domiciled in the State of Arizona.

4909.   On April 21, 2008, Evan Bogart was serving in the U.S. military in Iraq.

4910.   Mr. Bogart was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4911.   The weapon used to injure Mr. Bogart was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4912.   As a result of the attack, Mr. Bogart sustained burns and blast injuries to his face as well as a shrapnel injury to his left shoulder.

4913.   He also suffers from PTSD and tinnitus.

4914.   As a result of the attack, and the injuries he suffered, Plaintiff Evan D. Bogart has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4915.   Plaintiff Lani D. Bogart is a citizen of the Unites States and domiciled in the State of Arizona. She is the mother of Evan D. Bogart.

4916.   Plaintiff Douglas R. Bogart is a citizen of the Unites States and domiciled in the State of Arizona. He is the brother of Evan D. Bogart.

4917.   Plaintiff Christopher Bogart is a citizen of the Unites States and domiciled in the State of Arizona. He is the brother of Evan D. Bogart.

4918.   Plaintiff Cana Hickman is a citizen of the Unites States and domiciled in the State of Texas. She is the sister of Evan D. Bogart.

4919.   As a result of the attack, and the injuries suffered by Evan D. Bogart, Plaintiffs Lani D. Bogart, Douglas R. Bogart, Christopher Bogart and Cana Hickman have experienced severe mental anguish, and extreme emotional pain and suffering.

4920.   Plaintiff Evan D. Bogart was discharged from the U.S. military on November 29, 2011.

### 209.   THE APRIL 21, 2008 ATTACK – SADR CITY

**The Rosa-Valentin Family**

4921.   Plaintiff Luis Rosa-Valentin is a citizen of the United States and domiciled in the State of Maryland.

4922.   On April 21, 2008, Luis Rosa-Valentin, then 24, was serving in the U.S. military in Iraq.

4923.   Mr. Rosa-Valentin was on foot patrol in the Al Amin neighborhood of Baghdad

when he was struck by an EFP emplaced by Special Groups.

4924.   The weapon used to injure Mr. Rosa-Valentin was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4925.   As a result of the attack, Mr. Rosa-Valentin lost both of his legs and his left arm. He also suffered blindness in one eye, lost his hearing, and broke every bone in his face.

4926.   He has also been diagnosed with a TBI and PTSD.

4927.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Rosa-Valentin has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4928.   Plaintiff M.R., a minor represented by her legal guardian Luis Rosa-Valentin, is a citizen of the United States and domiciled in the State of Maryland. She is the daughter of Luis Rosa-Valentin.

4929.   Plaintiff Iliana M. Rosa-Valentin is a citizen of the Unites States and domiciled in the State of Maryland. She is the sister of Luis Rosa Valentin.

4930.   As a result of the attack, and the injuries suffered by Luis Rosa-Valentin, Plaintiffs M.R. and Iliana M. Rosa-Valentin have experienced severe mental anguish, and extreme emotional pain and suffering.

4931.   Plaintiff Luis Rosa-Valentin was discharged from the U.S. military on May 28, 2010.

### 210.   THE APRIL 28, 2008 ATTACK – BAGHDAD

**The Marion Family**

4932.   Adam L. Marion was a citizen of the Unites States and domiciled in the State of North Carolina when he was killed in Iraq.

4933.  On April 28, 2008, Adam L. Marion, aged 26, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs by Hezbollah-trained and IRGC-QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

4934.  Adam L. Marion was killed in the attack.

4935.  Plaintiff Pam Marion is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Adam L. Marion.

4936.  Plaintiff Donnie Marion is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Adam L. Marion.

4937.  Plaintiff Adrian McCann is a citizen of the United States and domiciled in the State of North Carolina. She is the sister of Adam L. Marion.

4938.  As a result of the attack, and the death of Adam L. Marion, Plaintiffs Pam Marion, Donnie Marion and Adrian McCann have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Stone Family**

4939.  Mark Stone was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

4940.  On April 28, 2008, Mark Stone, aged 22, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs by Hezbollah-trained and IRGC-QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

4941.  Mark Stone was killed in the attack.

4942.  Plaintiff Don Jason Stone is a citizen of the United States and domiciled in the State of Texas. He is the brother of Mark Stone.

4943.   As a result of the attack, and the death of Mark Stone, Plaintiff Don Stone has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

**The Sloan Family**

4944.   Plaintiff Ronald Sloan is a citizen of the United States and domiciled in the State of Tennessee.

4945.   On April 28, 2008, Ronald Sloan, age 32, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs by Hezbollah-trained and IRGC-QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

4946.   As a result of the attack, Mr. Sloan was knocked unconscious. He also suffered ear pain and general discomfort.

4947.   Mr. Sloan has subsequently been diagnosed as suffering from a TBI and PTSD.

4948.   As a result of the attack, and the injuries he suffered, Plaintiff Ronald Sloan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4949.   Plaintiff Ronald Sloan was discharged from the U.S. military on May 31, 2015.

211.   **THE APRIL 28, 2008 ATTACK – SADR CITY**

**The Woodard Family**

4950.   Plaintiff David Woodard is a citizen of the United States and domiciled in the State of Georgia.

4951.   On April 28, 2008, David Woodard, then 34, was serving in the U.S. military in Iraq.

4952.   Mr. Woodard was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4953.    The weapon used to injure Mr. Woodard was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4954.    As a result of the attack, a large fragment from the EFP struck Mr. Woodard's right leg and blew out four inches of his leg bone. Two large shrapnel fragments entered his left calf, removing approximately 25% of the calf muscle, and another fragment entered near his Achilles tendon.

4955.    As a result of the attack, and the injuries he suffered, Plaintiff David Woodard has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4956.    Plaintiff D.M.W., a minor represented by his legal guardian David Woodard, is a citizen of the United States and domiciled in the State of Georgia. He is the son of David Woodard.

4957.    As a result of the attack, and the injuries suffered by David Woodard, Plaintiff D.M.W. has experienced severe mental anguish, and extreme emotional pain and suffering.

4958.    Plaintiff David Woodard was discharged from the U.S. military on December 9, 2010.

## 212.    THE APRIL 28, 2008 ATTACK – SADR CITY

### The Magers Family

4959.    Plaintiff Adam Magers is a citizen of the United States and domiciled in the State of Missouri.

4960.    On April 28, 2008, Adam Magers was serving in the U.S. military in Iraq and was at Joint Security Station Thawra in Sadr City when it was attacked with IRAMs by Hezbollah-trained and IRGC-QF-supplied operatives of the KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF.

4961.   As a result of the attack, Mr. Magers suffered lacerations on his left arm, hands, and right ear, and small cuts on the back of his neck. He also sustained injuries to his shoulder, which ultimately required surgery

4962.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Magers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 213.   THE APRIL 29, 2008 ATTACK – BAGHDAD

**The Kaplan Family**

4963.   Plaintiff Preston Charles Kaplan is a citizen of the United States and domiciled in the State of Texas.

4964.   On April 28, 2008, Preston Charles Kaplan, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated as his vehicle passed by. He was the turret gunner in an M1114 up-armored HMMWV that was hit with an EFP on the front passenger-side door while traveling in the Kadhimiya neighborhood of Baghdad.

4965.   The weapon used to injure Preston Charles Kaplan was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4966.   As a result of the attack, Mr. Kaplan sustained a penetrating wound to his right leg including blast injuries to his tibial shaft. Shrapnel lacerated his popliteal artery and injured his peroneal nerve.

4967.   He also sustained a TBI, bilateral hearing loss, tinnitus, scarring, sleep apnea, GERD, and PTSD.

4968.   After numerous attempts to save Mr. Kaplan's right leg below the knee, he underwent a below-the-knee amputation 19 months after the attack and suffered additional infections following the amputations that required significant additional surgeries.

4969.   Mr. Kaplan has received extensive medical treatment – including various surgeries and prosthetic fittings – at several hospitals, where he has spent years in treatment.

4970.   As a result of the attack, and the injuries he suffered, Preston Charles Kaplan has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4971.   Plaintiff Nicole A. Kaplan is a citizen of the United States and domiciled in the State of Texas. She is the wife of Preston Charles Kaplan.

4972.   Plaintiff Noni Kaplan is a citizen of the United States and domiciled in the State of California. She is the mother of Preston Charles Kaplan.

4973.   Plaintiff David Kaplan is a citizen of the United States and domiciled in the State of California. He is the father of Preston Charles Kaplan.

4974.   Plaintiff Jaime Zarcone is a citizen of the United States and domiciled in the State of California. She is the sister of Preston Charles Kaplan.

4975.   Plaintiff Jessalyn Holt is a citizen of the United States and domiciled in the State of California. She is the sister of Preston Charles Kaplan.

4976.   As a result of the attack, and the injuries Preston Charles Kaplan suffered, Plaintiffs Nicole A. Kaplan, Noni Kaplan, David Kaplan, Jaime Zarcone, and Jessalyn Holt have experienced severe mental anguish and extreme emotional pain and suffering.

4977.   Plaintiff Preston Charles Kaplan was discharged from the U.S. military on June 18, 2012.

214.    **THE APRIL 29, 2008 ATTACK – SADR CITY**

**The Garza Family**

4978.    Plaintiff Luis Garza is a citizen of the United States and domiciled in the State of Florida.

4979.    On April 29, 2008, Luis Garza, then 22, was serving in the U.S. military in Iraq.

4980.    Mr. Garza was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

4981.    The weapon used to injure Mr. Garza was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4982.    As a result of the attack, Mr. Garza suffered shrapnel injuries to his face. He also suffers from PTSD and sleep apnea. Eventually, part of his kidney had to be removed as a result of the wounds he suffered.

4983.    As a result of the attack, and the injuries he suffered, Plaintiff Luis Garza has experienced severe physical and mental anguish and extreme emotional pain and suffering.

4984.    Plaintiff Luis Garza was discharged from the U.S. military on April 25, 2010.

215.    **THE APRIL 30, 2008 ATTACK – BAGHDAD**

**The Tucker Family**

4985.    Ronald J. Tucker was a citizen of the Unites States and domiciled in the State of Colorado when he was killed in Iraq.

4986.    On April 30, 2008, Ronald J. Tucker, aged 21, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his HMMWV in Baghdad.

4987.   Ronald J. Tucker was killed in the attack.

4988.   The weapon used to kill Ronald J. Tucker was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

4989.   Plaintiff Susan Arnold is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Ronald J. Tucker.

4990.   Plaintiff Susan Arnold brings an action individually and on behalf of the Estate of Ronald J. Tucker, as its legal representative.

4991.   Plaintiff David Arnold is a citizen of the United States and domiciled in the State of Colorado. He is the stepfather of Ronald J. Tucker.

4992.   Plaintiff Samantha Tucker is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Ronald J. Tucker.

4993.   Plaintiff Brandon Arnold is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Ronald J. Tucker.

4994.   Plaintiff Daisy Tucker is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Ronald J. Tucker.

4995.   As a result of the attack, and the death of Ronald J. Tucker, Plaintiffs Susan Arnold, David Arnold, Samantha Tucker, Brandon Arnold and Daisy Tucker have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 216.   THE MAY 1, 2008 ATTACK – SADR CITY

**The Daggett Family**

4996.   John K. Daggett was a citizen of the United States and domiciled in the State of

Arizona when he was injured in Iraq.

4997.    On May 1, 2008, John K. Daggett, aged 21, was serving in the U.S. military in Iraq when a rocket propelled grenade fired by a JAM Special Groups terror operative hit the vehicle in which he was travelling.

4998.    John K. Daggett was injured in the attack, and he died on May 15, 2008 from the injuries he sustained in the attack.

4999.    John K. Daggett was killed in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5000.    Plaintiff John Daggett is a citizen of the United States and domiciled in the State of Arizona. He is the father of John K. Daggett.

5001.    Plaintiff Colleen Czaplicki is a citizen of the United States and domiciled in the State of Arizona. She is the mother of John K. Daggett.

5002.    As a result of the attack, and the death of John K. Daggett, Plaintiffs John Daggett and Colleen Czaplicki have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 217.    THE MAY 2, 2008 ATTACK – BAGHDAD

**The Hicks Family**

5003.    Corey L. Hicks was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

5004.    On May 2, 2008, Corey L. Hicks, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5005.    Corey L. Hicks was killed in the attack.

5006. The weapon used to kill Corey L. Hicks was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5007. Plaintiff Russel Hicks, Sr. is a citizen of the United States and domiciled in the State of Wyoming. He is the father of Corey L. Hicks.

5008. Plaintiff Russel Hicks, Jr. is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Corey L. Hicks.

5009. As a result of the attack, and the death of Corey L. Hicks, Plaintiffs Russel Hicks, Sr. and Russel Hicks, Jr. have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 218. THE MAY 9, 2008 ATTACK – BAGHDAD

**The Williamson Family**

5010. Plaintiff Wesley Williamson is a citizen of the United States and domiciled in the State of Texas.

5011. On May 9, 2008, Wesley Williamson, then 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5012. The weapon used to injure Mr. Williamson was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5013. As a result of the attack, Mr. Williamson's right ulna and radius were completely shattered, and his posterior interosseous nerve was severed.

5014. Shrapnel also penetrated his body.

5015.   Mr. Williamson received medical treatment in Iraq, Germany, Washington D.C., and Brooke Army Medical Center in San Antonio, Texas.

5016.   He has undergone multiple procedures to stabilize his condition and address his injuries.

5017.   In an attempt to regain functionality of his right arm and hand, Mr. Williamson underwent multiple surgeries.

5018.   These surgeries included the installation of plates and 16 screws in his right arm and tendon transfer surgery.

5019.   Mr. Williamson underwent occupational therapy for approximately 18 months. During that time, he was prescribed medications to manage the pain that he experienced.

5020.   The injury to his hand has resulted in a loss of dexterity to his fingers. This has forced Mr. Williamson to re-learn simple everyday tasks such as typing.

5021.   He experiences pain and limitations of movement daily.

5022.   Mr. Williamson has suffered memory loss since the attack and has difficulty recalling information.

5023.   He has been diagnosed with PTSD and a TBI and has sought counseling and been prescribed medication to treat those conditions.

5024.   As a result of the attack, and the injuries he suffered, Plaintiff Wesley Williamson has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5025.   Plaintiff Jesse Williamson is a citizen of the United States and domiciled in the State of New Mexico. He is the brother of Wesley Williamson.

5026.   As a result of the attack, and the injuries Wesley Williamson has suffered, Plaintiff Jesse Williamson has experienced severe mental anguish, and extreme emotional pain and suffering.

5027.   Plaintiff Wesley Williamson was discharged from the U.S. military on March 26, 2010.

### 219.   THE MAY 9, 2008 ATTACK – SADR CITY

**The Garza Family**

5028.   Plaintiff Luis Garza is a citizen of the United States and domiciled in the State of Florida.

5029.   On May 9, 2008, Luis Garza, then 22, was serving in the U.S. military in Iraq.

5030.   Mr. Garza was in a convoy when an EFP emplaced by Special Groups struck his vehicle.

5031.   The weapon used to injure Mr. Garza was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5032.   As a result of the attack, Mr. Garza suffered shrapnel injuries to his face.

5033.   He also suffers from PTSD and sleep apnea.

5034.   Eventually, part of Mr. Garza's kidney had to be removed as a result of the wounds he suffered.

5035.   As a result of the attack, and the injuries he suffered, Plaintiff Luis Garza has experienced severe physical and mental anguish and extreme emotional pain and suffering.

220. **THE MAY 9, 2008 ATTACK – SADR CITY**

**The Magers Family**

5036.   Plaintiff Adam Magers is a citizen of the United States and domiciled in the State of Missouri.

5037.   On May 9, 2008, Adam Magers was serving in the U.S. military in Iraq.

5038.   Mr. Magers was in a convoy when four separate EFPs emplaced by Special Groups struck the convoy in which he was traveling.

5039.   The weapon used to injure Mr. Magers was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5040.   As a result of the attack, Mr. Magers suffers from a TBI.

5041.   As a result of the attack, and the injuries he suffered, Plaintiff Adam Magers has experienced severe physical and mental anguish and extreme emotional pain and suffering.

221. **THE MAY 11, 2008 ATTACK – BAGHDAD**

**The O'Neill Family**

5042.   Plaintiff Patrick O'Neill is a citizen of the United States and domiciled in the State of Virginia.

5043.   On May 11, 2008, Patrick O'Neill, then 18, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5044.   Patrick O'Neill was injured in the attack.

5045.   The weapon used to injure Patrick O'Neill was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5046.   As a result of the attack, Mr. O'Neill was rendered unconscious.

5047.   He had sustained shrapnel in his back, buttock, and right shoulder and had also suffered injuries to his neck and face.

5048.   Mr. O'Neill's shoulder had been fractured and his right ear was severed in multiple places.

5049.   Shrapnel had also pierced through Mr. O'Neill's body, causing his right lung to collapse.

5050.   He continues to experience pain in his chest and shoulder.

5051.   Mr. O'Neill was diagnosed with PTSD and has sought counseling. He continues to have nightmares stemming from the attack.

5052.   As a result of the attack, and the injuries he suffered, Plaintiff Patrick O'Neill has experienced physical and mental anguish and extreme emotional pain and suffering.

5053.   Plaintiff John O'Neill is a citizen of the United States and domiciled in the State of Virginia. He is the father of Patrick O'Neill.

5054.   Plaintiff Dianne O'Neill is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Patrick O'Neill.

5055.   As a result of the attack, and the injuries Patrick O'Neill has suffered, Plaintiffs John O'Neill and Dianne O'Neill have experienced severe mental anguish, and extreme emotional pain and suffering.

5056.   Plaintiff Patrick O'Neill was discharged from the U.S. military on December 4, 2009.

### 222. THE MAY 11, 2008 ATTACK – BALAD

**The Luckett Family**

5057.   Plaintiff Daniel Luckett is a citizen of the United States and domiciled in the State of Kentucky.

5058.   On May 11, 2008, Daniel Luckett, then 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5059.   The weapon used to injure Daniel Luckett was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5060.   As a result of the attack, Daniel Luckett's left foot was sheared off above the ankle, and his right foot was cut off above the toes.

5061.   As a result of the attack, and the injuries he suffered, Plaintiff Daniel Luckett has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5062.   Plaintiff Daniel Luckett was discharged from the U.S. military on August 14, 2013.

### 223. THE MAY 25, 2008 ATTACK – AN-NAJAF

**The Gasper Family**

5063.   Frank J. Gasper was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

5064.   On May 25, 2008, Frank J. Gasper, aged 25, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling in Najaf.

5065.   Frank J. Gasper was killed in the attack.

5066.   The weapon used to kill Frank J. Gasper was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5067.   Plaintiff Breanna Lynn Gasper is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Frank J. Gasper.

5068.   Plaintiff Breanna Lynn Gasper brings an action individually and on behalf of the Estate of Frank J. Gasper, as its legal representative.

5069.   Plaintiff Jamie Barnes is a citizen of the United States and domiciled in the State of California. She is the sister of Frank J. Gasper.

5070.   As a result of the attack, and the death of Frank J. Gasper, Plaintiffs Breanna Lynn Gasper and Jamie Barnes have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/brother's society, companionship, comfort, advice and counsel.

### 224.   THE JUNE 7, 2008 ATTACK – BAGHDAD

**The Hurst Family**

5071.   David R. Hurst was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

5072.   On June 7, 2008, David R. Hurst, aged 31, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5073.   David R. Hurst was killed in the attack.

5074.   The weapon used to kill David R. Hurst was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5075.   Plaintiff Max W. Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the father of David R. Hurst.

5076.   Plaintiff Max W. Hurst brings an action individually and on behalf of the Estate of David R. Hurst, as its legal representative.

5077.   Plaintiff Lillian Hurst is a citizen of the United States and domiciled in the State of Louisiana. She is the stepmother of David R. Hurst.

5078.   Plaintiff Christopher Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of David R. Hurst.

5079.   Plaintiff Mark Hurst is a citizen of the United States and domiciled in the State of Louisiana. He is the brother of David R. Hurst.

5080.   As a result of the attack, and the death of David R. Hurst, Plaintiffs Max W. Hurst, Lillian Hurst, Christopher Hurst and Mark Hurst have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 225.   THE JUNE 24, 2008 ATTACK - BAGHDAD

**The Farley Family**

5081.   Steven L. Farley was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

5082.   Steven L. Farley worked in Iraq under the auspices of the U.S. Department of State as a member of a Provincial Reconstruction Team ("PRT") in eastern Baghdad in 2008.

5083.   On June 24, 2008, a JAM-Special Groups cell executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local

government officials who were not Sadr followers. The bomb killed eleven people, including Mr. Farley and three other Americans.

5084.   The attack was perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

5085.   Plaintiff Donna Farley is a citizen of the United States and domiciled in the State of Oklahoma. She is the widow of Steven Farley.

5086.   Plaintiff Noel J. Farley, Sr. is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Steven Farley.

5087.   Plaintiff Barbara Farley is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Steven Farley.

5088.   Plaintiff Brett Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

5089.   Plaintiff Cameron Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

5090.   Plaintiff Chris Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Steven Farley.

5091.   Plaintiff Vickie McHone is a citizen of the United States and domiciled in the State of Oklahoma. She is the sister of Steven Farley.

5092.   Plaintiff Noel S. Farley is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Steven Farley.

5093.   As a result of the June 24, 2008 attack, and the death of Steven Farley, Plaintiffs Donna Farley, Noel J. Farley, Sr., Barbara Farley, Brett Farley, Jessica Farley, Cameron Farley,

Chris Farley, Vickie McHone and Noel S. Farley have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Suveges Family**

5094.    Nicole Suveges was a citizen of the United States and domiciled in the State of Illinois when she was killed in Iraq.

5095.    Nicole Suveges was a political scientist who worked for BAE Systems in the Human Terrain System (HTS) program in eastern Bagdad in 2008. The HTS program was designed to promote cultural understanding between the U.S. military and Iraqis.

5096.    On June 24, 2008, a JAM-Special Groups cell executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not Sadr followers. The bomb killed eleven people, including Ms. Suveges and three other Americans.

5097.    The attack was perpetrated by JAM Special Groups operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

5098.    Plaintiff David C. Iverson is a citizen of the United States and domiciled in the State of Maryland. He is the widower of Nicole Suveges.

5099.    As a result of the attack, and the death of Nicole Suveges, Plaintiff David C. Iverson has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his wife's society, companionship, comfort, advice and counsel.

**226.** **THE AUGUST 4, 2008 ATTACK – BAGHDAD**

**The Menke Family**

5100.   Jonathan D. Menke was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

5101.   On August 4, 2008, Jonathan D. Menke, aged 22, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5102.   Jonathan D. Menke was killed in the attack.

5103.   The weapon used to kill Jonathan D. Menke was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5104.   Plaintiff Daniel Menke is a citizen of the United States and domiciled in the State of Indiana. He is the father of Jonathan D. Menke.

5105.   Plaintiff Daniel Menke brings an action individually and on behalf of the Estate of Jonathan D. Menke, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

5106.   Plaintiff Paula Menke is a citizen of the United States and domiciled in the State of Indiana. She is the stepmother of Jonathan D. Menke.

5107.   Plaintiff Matthew Menke is a citizen of the United States and domiciled in the State of Indiana. He is the stepbrother of Jonathan D. Menke.

5108.   Plaintiff Nichole Lohrig is a citizen of the United States and domiciled in the State of Indiana. She is the sister of Jonathan D. Menke.

5109.   As a result of the attack, and the death of Jonathan D. Menke, Plaintiffs Daniel Menke, Paula Menke, Matthew Menke and Nichole Lohrig have experienced severe mental

anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

227. <u>**THE AUGUST 13, 2008 ATTACK – BAGHDAD**</u>

<u>**The Hale Family**</u>

5110. James M. Hale was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

5111. On August 13, 2008, James M. Hale, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5112. James M. Hale was killed in the attack.

5113. The weapon used to kill James M. Hale was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5114. Plaintiff Jessica H. Williams is a citizen of the United States and domiciled in the State of Texas. She is the widow of James M. Hale.

5115. Plaintiff Jessica H. Williams brings an action individually and on behalf of the Estate of James M. Hale, as its legal representative.

5116. Plaintiff J.M.H., a minor represented by his legal guardian, Jessica H. Williams, is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

5117. Plaintiff J.J.H., a minor represented by his legal guardian, Jessica H. Williams, is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

5118. Plaintiff J.H., a minor represented by his legal guardian, Jessica H. Williams, is a citizen of the United States and domiciled in the State of Texas. He is the son of James M. Hale.

5119.   As a result of the attack, and the death of James M. Hale, Plaintiffs Jessica H. Williams, J.M.H., J.J.H. and J.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

228.   **THE AUGUST 26, 2008 ATTACK – SADR CITY**

**The Alfonso Family**

5120.   Carlo E. Alfonso was domiciled in the State of Washington when he was killed in Iraq.

5121.   On August 26, 2008, Carlo E. Alfonso, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5122.   Carlo E. Alfonso was killed in the attack.

5123.   The weapon used to kill Carlo E. Alfonso was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5124.   Plaintiff Rosemarie Alfonso is a citizen of the United States and domiciled in the State of Washington. She is the widow of Carlo E. Alfonso.

5125.   Plaintiff K.B., a minor represented by his legal guardian Rosemarie Alfonso, is a citizen of the United States and domiciled in the State of Washington. He is the son of Carlo E. Alfonso.

5126.   As a result of the attack, and the death of Carlo E. Alfonso, Plaintiffs Rosemarie Alfonso and K.B. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Latham Family**

5127.   Plaintiff Tyler Latham is a citizen of the United States and domiciled in the State of Michigan.

5128.   On August 26, 2008, Tyler Latham, age 22, was serving in the U.S. military in Iraq, when his vehicle was struck by an EFP emplaced by Special Groups.

5129.   The weapon used to injure Tyler Latham was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5130.   As a result of the attack, Mr. Latham sustained significant injuries to his left hand. This required complex surgery to reconnect tendons and ligaments in that hand.

5131.   The damage to his hand has necessitated extensive physical therapy.

5132.   He also sustained significant injuries due to the impact of multiple pieces of shrapnel lodging in his face, legs, and arm. This necessitated surgery and treatment.

5133.   Mr. Latham continues to experience limitations in strength and mobility of his left hand.

5134.   He suffers with chronic pain in his left hand and arm.

5135.   In addition, Mr. Latham has been diagnosed with a TBI.

5136.   As a result of the attack, and the injuries he suffered, Plaintiff Tyler Latham has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5137.   Plaintiff Tyler Latham was discharged from the U.S. military on December 15, 2009.

**The Koulchar Family**

5138.    Plaintiff Nicholas Gene Koulchar is a citizen of the United States and domiciled in the State of Michigan.

5139.    On August 26, 2008, Nicholas Gene Koulchar, then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle. Nicholas Gene Koulchar was the gunner in an RG-33 armored vehicle that was the lead vehicle in a convoy conducting route-clearing in the vicinity of Route Grizzlies and Route Gold in Sadr City. Nicholas Gene Koulchar's vehicle was struck by an EFP that had been mounted at a height of 86 inches in a shack near the side of the road.

5140.    The weapon used to injure Nicholas Gene Koulchar was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5141.    As a result of the attack, Mr. Koulchar sustained traumatic bilateral above-knee amputations, scarring on his lower body and back, genital trauma, facial scars, ulnar neuropathy and dysesthesia in his right hand, tinnitus, and PTSD.

5142.    He was transported to a Medical Aid Station in Sadr City and then to central Baghdad where he was stabilized following multiple surgeries and then airlifted to Landstuhl, Germany and then to Walter Reed Army Medical Center in Washington, DC.

5143.    Mr. Koulchar has received extensive medical treatment – including various surgeries and prosthetic fittings – at several hospitals, where he has spent years in treatment.

5144.    As a result of the attack, and the injuries he suffered, Nicholas Gene Koulchar has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5145.    Plaintiff Michael Koulchar is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Nicholas Gene Koulchar.

5146.    As a result of the attack, and the injuries Nicholas Gene Koulchar suffered, Plaintiff Michael Koulchar has experienced severe mental anguish and extreme emotional pain and suffering.

5147.    Plaintiff Nicholas Gene Koulchar was discharged from the U.S. military on October 27, 2010.

### 229.    THE SEPTEMBER 4, 2008 ATTACK – BAGHDAD

**The Mayne Family**

5148.    Kennith W. Mayne was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

5149.    On September 4, 2008, Kennith W. Mayne, aged 29, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5150.    Kennith W. Mayne was killed in the attack.

5151.    The weapon used to kill Kennith W. Mayne was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5152.    Plaintiff Michelle Benavidez is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Kennith W. Mayne.

5153.    Plaintiff Michelle Benavidez brings an action individually and on behalf of the Estate of Kennith W. Mayne, as its legal representative.

5154.    Plaintiff Daniel Benavidez is a citizen of the United States and domiciled in the State of Colorado. He is the stepfather of Kennith W. Mayne.

5155.   Plaintiff Christina Biederman is a citizen of the United States and domiciled in the State of Colorado. She is the sister of Kennith W. Mayne.

5156.   Plaintiff Daniel Benavidez, Jr. is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Kennith W. Mayne.

5157.   Plaintiff Jennifer Morman is a citizen of the United States and domiciled in the State of Colorado. She is the sister of Kennith W. Mayne.

5158.   As a result of the attack, and the death of Kennith W. Mayne, Plaintiffs Michelle Benavidez, Daniel Benavidez, Christina Biederman, Daniel Benavidez, Jr. and Jennifer Morman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Miller Family**

5159.   Plaintiff Christopher Miller is a citizen of the United States and domiciled in the State of Ohio.

5160.   On September 4, 2008, Christopher Miller, then 19, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5161.   The weapon used to injure Christopher Miller was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5162.   As a result of the attack, Mr. Miller lost part of his right leg, rendering him a below-the-knee amputee.

5163.   He also lost part of his left leg.

5164.   Mr. Miller developed gangrene in both his leg and foot, necessitating multiple medical procedures.

5165. During part of his treatment, he was placed in a medically induced coma.

5166. Mr. Miller has received physical therapy.

5167. He has also received counseling for his emotional injuries.

5168. As a result of the attack, and the injuries he suffered, Plaintiff Christopher Miller has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5169. Plaintiff Christopher Miller was discharged from the U.S. military on February 10, 2010.

### 230. THE OCTOBER 5, 2008 ATTACK – MUSAYYIB

**The Bearfield Family**

5170. Plaintiff Bryant Bearfield is a citizen of the United States and domiciled in the State of New York.

5171. On October 5, 2008, Bryant Bearfield, then 23, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near the vehicle in which he was traveling on Route Cleveland.

5172. The weapon used to injure Bryant Bearfield was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5173. As a result of the blast, Bryant Bearfield suffered shrapnel wounds to his head, and a concussion.

5174. Mr. Bearfield was also diagnosed with anxiety as a result of the attack.

5175. As a result of the attack, and the injuries he suffered, Plaintiff Bryant Bearfield has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5176.   Plaintiff Bryant Bearfield was discharged from the U.S. military on January 1, 2019.

231.   **THE OCTOBER 16, 2008 ATTACK – BAQUBAH**

**The Eggleston Family**

5177.   Cody J. Eggleston was a citizen of the United States and domiciled in the State of Oregon when he was injured in Diyala Province, Iraq and subsequently died as a result of those injuries.

5178.   On October 16, 2008, Cody J. Eggleston, aged 21, was serving in the U.S. military when he was involved in a 107mm rocket attack perpetrated by JAM Special Groups.

5179.   Cody J. Eggleston was fatally injured in the attack and died on October 24, 2008 from the injuries he sustained in the attack.

5180.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5181.   Plaintiff Angeline (Angie) Jackson is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Cody J. Eggleston.

5182.   Plaintiff Kaytrina Jackson is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Cody J. Eggleston.

5183.   Plaintiff Shilyn Jackson is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Cody J. Eggleston.

5184.   As a result of the attack, and the death of Cody J. Eggleston, Plaintiffs Angie Jackson, Kaytrina Jackson and Shilyn Jackson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 232.    THE DECEMBER 28, 2008 ATTACK – SADR CITY

**The Gonzales Family**

5185.    Tony J. Gonzales was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

5186.    On December 28, 2008, Tony J. Gonzales, aged 20, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5187.    Tony J. Gonzales was killed in the attack.

5188.    The weapon used to kill Tony J. Gonzales was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5189.    Plaintiff Tony Gonzales is a citizen of the United States and domiciled in the State of Texas. He is the father of Tony J. Gonzales.

5190.    Plaintiff Marlynn Gonzales is a citizen of the United States and domiciled in the State of Texas. She is the mother of Tony J. Gonzales.

5191.    Plaintiff Tamara Runzel is a citizen of the United States and domiciled in the State of California. She is the sister of Tony J. Gonzales.

5192.    Plaintiff Megan People is a citizen of the United States and domiciled in the State of California. She is the sister of Tony J. Gonzales.

5193.    Plaintiff Shaula Shaffer is a citizen of the United States and domiciled in the State of Texas. She is the sister of Tony J. Gonzales.

5194.    As a result of the attack, and the death of Tony J. Gonzales, Plaintiffs Tony Gonzales, Marlynn Gonzales, Tamara Runzel, Megan People, and Shaula Shaffer have

experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 233. THE DECEMBER 28, 2008 ATTACK – SADR CITY

**The Paul Family**

5195. Plaintiff Carllie Paul is a citizen of the United States and domiciled in the State of Florida.

5196. On December 28, 2008, Carllie Paul, then 22, was serving in the U.S. military in Iraq when his M1151 vehicle was attacked with grenades and small arms fire by JAM Special Groups terror operatives.

5197. Carllie Paul was injured in the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5198. As a result of the attack, Carllie Paul sustained burns to both of his arms resulting in lasting scars and injuries to his back. He was airlifted to Landstuhl, Germany where he stayed for approximately two weeks after which he was transferred to Fort Bliss, Texas.

5199. He also suffered from severe PTSD. He has difficulty sleeping, experiences nightmares, and suffers from depression, anxiety, and suicidal ideation.

5200. As a result of the attack, and the injuries he suffered, Carllie Paul has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5201. Plaintiff Carllie Paul was discharged from the U.S. military on April 14, 2015.

### 234. THE JANUARY 10, 2009 ATTACK – BAGHDAD

**The Bauer Family**

5202. Justin Bauer was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

5203. On January 10, 2009, Justin Bauer, aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5204. Justin Bauer was killed in the attack.

5205. The weapon used to kill Justin Bauer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5206. Plaintiff Kari Carosella is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Justin Bauer.

5207. Plaintiff Kari Carosella brings an action individually and on behalf of the Estate of Justin Bauer, as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

5208. Plaintiff Gregory Bauer is a citizen of the United States and domiciled in the State of New Mexico. He is the father of Justin Bauer.

5209. Plaintiff Connie Haddock is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Justin Bauer.

5210. Plaintiff Jacob Bauer is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Justin Bauer.

5211. Plaintiff Jeremy Bauer is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Justin Bauer.

5212. As a result of the attack, and the death of Justin Bauer, Plaintiffs Kari Carosella, Gregory Bauer, Connie Haddock, Jacob Bauer and Jeremy Bauer have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Bradley Family**

5213.   Plaintiff Andrew Bradley is a citizen of the United States and domiciled in the State of Texas.

5214.   On January 10, 2009, Andrew Bradley, then 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

5215.   The weapon used to injure Andrew Bradley was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5216.   As a result of the attack, Mr. Bradley lost part of his right leg, rendering him a below-the-knee amputee.

5217.   He also sustained burns on his left foot and has experienced nerve damage in that foot.

5218.   Apart from treatment in Iraq and Germany, Mr. Bradley received in-patient treatment at Brooke Army Medical Center for over one year.

5219.   Surgeons performed bone reconstruction to retain as much of his joint area as possible.

5220.   Mr. Bradley also underwent multiple procedures to address infections in his wounds.

5221.   He has received physical therapy and has been prescribed medications to address pain resulting from his injuries.

5222.   Mr. Bradley has also required treatment for medical conditions that developed from issues involving his prosthetics.

5223.  Mr. Bradley continues to experience pain and emotional distress each day, and he receives treatment for his injuries as necessary.

5224.  As a result of the attack, and the injuries he suffered, Plaintiff Andrew Bradley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5225.  Plaintiff Julie Salhus is a citizen of the United States and domiciled in the State of Texas. She is the mother of Andrew Bradley.

5226.  Plaintiff Kristen Galen is a citizen of the United States and domiciled in the State of Texas. She is the sister of Andrew Bradley.

5227.  As a result of the attack, and the injuries Andrew Bradley suffered, Plaintiffs Julie Salhus and Kristen Galen have experienced severe mental anguish and extreme emotional pain and suffering.

5228.  Plaintiff Andrew Bradley was discharged from the U.S. military on February 23, 2010.

**The Ward Family**

5229.  Plaintiff Patrick Ward is a citizen of the United States and domiciled in the State of Pennsylvania.

5230.  On January 10, 2009, Patrick Ward, then aged 36, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

5231.  Mr. Ward was an occupant in the third vehicle traveling in a four-vehicle convoy, when the lead vehicle was hit by an EFP.

5232.  The EFP used to injure Patrick Ward was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC

5233.   After the EFP impacted the lead vehicle, Mr. Ward got out of his vehicle and went to check on the occupants of the lead vehicle. He observed that the back of Justin Bauer's legs had been blown off and that he appeared to be dead. He assisted the medic in extricating Andrew Bradley, whose right leg had been severed, out of the HMMWV.

5234.   Following the explosion of the EFP, the convoy was attacked by a sniper on a nearby roof.

5235.   As a result of the attack, Mr. Ward was diagnosed with PTSD. He sought counseling once he came back to the U.S.

5236.   As a result of the attack, Plaintiff Patrick Ward has experienced severe mental anguish and extreme emotional pain and suffering.

5237.   Plaintiff Jarrett Ward is a citizen of the United States and domiciled in the State of Pennsylvania. He is the son of Patrick Ward.

5238.   As a result of the attack, and the injuries Patrick Ward suffered, Plaintiff Jarrett Ward has experienced severe mental anguish and extreme emotional pain and suffering.

5239.   Plaintiff Patrick Ward was discharged from the U.S. military on January 1, 2011.

**235.   THE JANUARY 18, 2009 ATTACK – BAGHDAD**

**The Andrade Family**

5240.   Roberto Andrade, Jr. was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

5241.   On January 18, 2009, Roberto Andrade, Jr., aged 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5242.   Roberto Andrade, Jr. was killed in the attack.

5243.   The weapon used to kill Roberto Andrade, Jr. was a Hezbollah-designed and

Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5244.   Plaintiff Roberto Andrade, Sr. is a citizen of the United States and domiciled in the State of Arizona. He is the father of Roberto Andrade, Jr.

5245.   Plaintiff Roberto Andrade, Sr. brings an action individually and on behalf of the Estate of Roberto Andrade, Jr., as its legal representative, for his death and any suffering and/or economic loss he/his Estate sustained as a result of the attack.

5246.   Plaintiff Veronica Pena Andrade is a citizen of the United States and domiciled in the State of Arizona. She is the stepmother of Roberto Andrade, Jr.

5247.   Plaintiff Sandra Valencia is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Roberto Andrade, Jr.

5248.   Plaintiff Angelica Andrade is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Roberto Andrade, Jr.

5249.   Plaintiff Veronica Denisse Andrade is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Roberto Andrade, Jr.

5250.   As a result of the attack, and the death of Roberto Andrade, Jr., Plaintiffs Roberto Andrade, Sr., Veronica Pena Andrade, Sandra Valencia, Angelica Andrade, and Veronica Denisse Andrade have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 236.   THE FEBRUARY 18, 2009 ATTACK – MAYSAN PROVINCE

**The Hedgecock Family**

5251.   Plaintiff Richard Hedgecock, II is a citizen of the United States and domiciled in the State of North Carolina.

5252.   On February 18, 2009, Richard Hedgecock, II then 30, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated when his vehicle passed by it.

5253.   The weapon used to injure Richard Hedgecock, II was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5254.   As a result of the attack, Mr. Hedgecock lost consciousness briefly and sustained a concussion.

5255.   He also sustained a broken nose, lacerations to his hand and leg, and he experienced blurry vision.

5256.   Mr. Hedgecock was also diagnosed with a TBI.

5257.   As a result of the attack, and the injuries he suffered, Plaintiff Richard Hedgecock, II has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5258.   Plaintiff Richard Hedgecock, II was discharged from the U.S. military on April 21, 2015.

### 237.   THE FEBRUARY 26, 2009 ATTACK – ADHAMIYAH

**The Connelly Family**

5259.   Brian Connelly was a citizen of the United States and domiciled in the State of New Jersey when he was killed in Iraq.

5260.   On February 26, 2009, Brian Connelly, aged 26, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle in the Adhamiyah District in eastern Baghdad.

5261.   Brian Connelly was killed in the attack.

5262.	The weapon used to kill Brian Connelly was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5263.	Plaintiff Kara Connelly is a citizen of the United States and domiciled in the State of New Jersey. She is the widow of Brian Connelly.

5264.	Plaintiff Jean Dammann is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Brian Connelly.

5265.	Plaintiff Mark Dammann is a citizen of the United States and domiciled in the State of Ohio. He is the father of Brian Connelly.

5266.	Plaintiff Kevin Connelly is a citizen of the United States and domiciled in the State of New Jersey. He is the brother of Brian Connelly.

5267.	As a result of the attack, and the death of Brian Connelly, Plaintiffs Kara Connelly, Jean Dammann, Mark Dammann and Kevin Connelly have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 238.	THE APRIL 13, 2009 ATTACK

**The Bowman Family**

5268.	Plaintiff Ryan Bowman[114] is a citizen of the United States and domiciled in the State of Pennsylvania.

---

[114]	Ryan Bowman, plaintiff in the related action *Bowman v. Société Générale de Banque au Liban*, No. 19-cv-02096-CBA-VMS (E.D.N.Y.) before this Court, joins this Amended Complaint to assert claims against Defendant FENICIA BANK only. He also intends to amend the *Bowman* complaint pursuant to Federal Rule of Civil Procedure 15(a) to include the same allegations relating to the remaining Defendants that are added herein and to move to consolidate these effectively identical actions.

5269.    On April 13, 2009, Ryan Bowman, then 23, was serving in the U.S. military in Iraq when the Chinook helicopter he was traveling in was attacked with an RPG-29 fired by Special Groups terror operatives.

5270.    Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy.

5271.    At the time of the attack, Mr. Bowman was not clipped into the Chinook helicopter. When the pilot of the Chinook helicopter took evasive actions to avoid the RPG-29, Mr. Bowman bounced around the helicopter, suffering a TBI and permanent injury to his back.

5272.    Mr. Bowman has received a 100% disability rating by the Veterans Administration.

5273.    As a result of the attack, and the injuries he suffered, Plaintiff Ryan Bowman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5274.    Plaintiff Ryan Bowman was discharged from the U.S. military on April 25, 2014.

**239.    THE APRIL 22, 2009 ATTACK – SALADIN PROVINCE**

**The Beatty Family**

5275.    Plaintiff Matthew C. Beatty is a citizen of the United States and domiciled in the State of Texas.

5276.    On April 22, 2009, Matthew C. Beatty, then 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated when his vehicle passed by it.

5277.    The weapon used to injure Matthew C. Beatty was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5278.  As a result of the attack, Mr. Beatty sustained a concussion and suffered from smoke inhalation.

5279.  As a result of the attack, and the injuries he suffered, Plaintiff Matthew C. Beatty has experienced physical and mental anguish and extreme emotional pain and suffering.

5280.  Plaintiff Matthew C. Beatty was discharged from the U.S. military on October 25, 2017.

**240.  THE APRIL 22, 2009 ATTACK – BAGHDAD**

**The Davis Family**

5281.  Brad A. Davis was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

5282.  On April 22, 2009, Brad A. Davis, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5283.  Brad A. Davis was killed in the attack.

5284.  The weapon used to kill Brad A. Davis was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5285.  Plaintiff Theresa Davis is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Brad A. Davis.

5286.  As a result of the attack, and the death of Brad A. Davis, Plaintiff Theresa Davis has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 241. THE MAY 16, 2009 ATTACK – BASRA

**The Schaefer Family**

5287.   David Schaefer was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

5288.   On May 16, 2009, David Schaefer, aged 27, was serving in the United States military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5289.   David Schaefer was killed in the attack.

5290.   The weapon used to kill David Schaefer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5291.   Plaintiff Rhonda Kemper is a citizen of the United States and domiciled in the State of Kentucky. She is the mother of David Schaefer.

5292.   As a result of the attack, and the death of David Schaefer, Plaintiff Rhonda Kemper has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 242. THE MAY 17, 2009 ATTACK – BAGHDAD

**The Canine Family**

5293.   Plaintiff Robert Canine is a citizen of the United States and domiciled in the State of Missouri.

5294.   On May 17, 2009, Robert Canine, age 29, was serving in the U.S. military in Iraq.

5295.   Mr. Canine was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP emplaced by Special Groups.

5296. The weapon used to injure Mr. Canine was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5297. As a result of the attack, he sustained significant injuries due to the impact of shrapnel and portions of the explosive device impacting his body.

5298. Mr. Canine's injuries included significant damage to his right leg and foot and the essential removal of the toes of his left foot as well as the loss of a great deal of blood.

5299. The injuries necessitated the amputation of his right leg and left foot.

5300. Apart from the injuries to his legs and feet, he also sustained a large laceration that ran from his buttocks to the back of his knee.

5301. Mr. Canine has suffered infections that have required treatment and assessment.

5302. Apart from medical treatment while in Iraq, Mr. Canine received treatment and rehabilitation at Walter Reed Army Medical Center for approximately 18 months.

5303. Mr. Canine has been diagnosed with PTSD and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

5304. Mr. Canine continues to experience pain and emotional distress each day, and he receives treatment for his injuries.

5305. As a result of the attack, and the injuries he suffered, Plaintiff Robert Canine has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5306. Plaintiff S.C., a minor, represented by his legal guardian Robert Canine, is a citizen of the United States and domiciled in the State of Missouri. He is the son of Robert Canine.

5307.   Plaintiff Janet Jones is a citizen of the United States and domiciled in the State of Missouri. She is the mother of Robert Canine.

5308.   Plaintiff Calvin Canine is a citizen of the United States and domiciled in the State of Missouri. He is the father of Robert Canine.

5309.   Plaintiff James Canine is a citizen of the United States and domiciled in the State of Missouri. He is the brother of Robert Canine.

5310.   Plaintiff Jennifer Roose is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Robert Canine.

5311.   As a result of the attack, and the injuries Robert Canine suffered, Plaintiffs S.C., Janet Jones, Calvin Canine, James Canine and Jennifer Roose have experienced severe mental anguish and extreme emotional pain and suffering.

5312.   Plaintiff Robert Canine was discharged from the U.S. military on November 24, 2010.

**The Murphy Family**

5313.   Plaintiff Rhett Murphy is a citizen of the United States and domiciled in the State of Minnesota.

5314.   On May 17, 2009, Rhett Murphy, then 30, was serving in the U.S. military in Iraq.

5315.   Mr. Murphy was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

5316.   The weapon used to injure Mr. Murphy was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5317.   As a result of the attack, he sustained significant injuries due to the impact of shrapnel striking his body. This has resulted in scarring.

5318.   Apart from the shrapnel-related injuries he also sustained injuries to the tendons in his left hand a fracture of his finger. These have necessitated various surgical procedures.

5319.   Mr. Murphy has been diagnosed with PTSD and major depression and has received treatment and counseling. He has been prescribed medication to address both the pain and emotional impact of the attack.

5320.   Mr. Murphy continues to experience emotional distress, and he receives treatment for his injuries.

5321.   As a result of the attack, and the injuries he suffered, Plaintiff Rhett Murphy has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5322.   Plaintiff Rhett Murphy was discharged from the U.S. military on September 27, 2010.

**The Landtiser Family**

5323.   Plaintiff Roady Landtiser is a citizen of the United States and domiciled in the State of Oklahoma.

5324.   On May 17, 2009, Roady Landtiser, then 21, was serving in the U.S. military in Iraq.

5325.   Mr. Landtiser was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

5326.   The weapon used to injure Mr. Landtiser was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5327.   As a result of the attack, he sustained a concussion and was rendered unconscious.

5328.   He developed tinnitus in his right ear, and this condition continues to the present day.

5329.   Mr. Landtiser has experienced flashbacks and night terrors.

5330.   He has been diagnosed with PTSD. He has received treatment, has been prescribed medication, and sought counseling for these issues.

5331.   As a result of the attack, and the injuries he suffered, Plaintiff Roady Landtiser has experienced physical injuries, severe mental anguish and extreme emotional pain and suffering.

5332.   Plaintiff Roady Landtiser was discharged from the U.S. military on December 20, 2009.

**The Richards Family**

5333.   Plaintiff Nathan Richards is a citizen of the United States and domiciled in the State of Florida.

5334.   On May 17, 2009, Nathan Richards, then 22, was serving in the U.S. military in Iraq.

5335.   Mr. Richards was on a routine patrol in northwest Baghdad when his vehicle was struck by an EFP.

5336.   The weapon used to injure Mr. Richards was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5337.   As a result of the attack, he sustained a concussion and was knocked unconscious. His eardrum was also ruptured as a result of the blast.

5338.   Mr. Richards has developed vertigo and has experienced migraines.

5339.   He has been diagnosed with a TBI and has dealt with long-term and short-term memory loss.

5340.   He has been diagnosed with PTSD and has had nightmares and flashbacks as well as experienced survivor's guilt. He has received treatment and counseling for these issues.

5341.   As a result of the attack, and the injuries he suffered, Plaintiff Nathan Richards has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5342.   Plaintiff Steven Richards is a citizen of the United States and domiciled in the State of Massachusetts. He is the father of Nathan Richards.

5343.   As a result of the attack, and the injuries suffered by Nathan Richards, Plaintiff Steven Richards has experienced severe mental anguish, and extreme emotional pain and suffering.

5344.   Plaintiff Nathan Richards was discharged from the U.S. military on November 26, 2009.

### 243.   THE JUNE 14, 2009 ATTACK – BALAD

**The Songer Family**

5345.   Plaintiff Christopher Songer is a citizen of the United States and domiciled in the State of Washington.

5346.   On June 14, 2009, Christopher Songer, then 36, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5347.   The weapon used to injure Christopher Songer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5348.   As a result of the attack, Christopher Songer suffered a broken middle finger, deep

lacerations on both hands requiring reconstructive surgery, shrapnel throughout his body, burns to hands, arms, face and legs, a large shoulder wound and multiple bone fractures. He also suffered from smoke inhalation which damaged lungs, nerve damage and hearing loss.

5349.   He also suffers from a TBI.

5350.   As a result of the attack, and the injuries he suffered, Plaintiff Christopher Songer has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5351.   Plaintiff Kimberly Songer is a citizen of the United States and domiciled in the State of Washington. She is the wife of Christopher Songer.

5352.   Plaintiff C.S., a minor represented by his legal guardian, Kimberly Songer, is a citizen of the United States and domiciled in the State of Washington. He is the son of Christopher Songer.

5353.   As a result of the attack, and the injuries suffered by Christopher Songer, Plaintiffs Kimberly Songer and C.S. have experienced severe mental anguish, and extreme emotional pain and suffering.

### 244.   THE JUNE 28, 2009 ATTACK – BAGHDAD

**The David Family**

5354.   Timothy A. David was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

5355.   On June 28, 2009, Timothy A. David, aged 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5356.   Timothy A. David was killed in the attack.

5357.   The weapon used to kill Timothy A. David was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using

specialized training and components supplied by Hezbollah and the IRGC.

5358.　Plaintiff Linda David is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Timothy A. David.

5359.　Plaintiff Linda David brings an action individually and on behalf of the Estate of Timothy A. David, as its legal representative.

5360.　Michael David was a citizen of the United States at the time of the death of Timothy A. David. He was the father of Timothy A. David. Michael David passed away on May 30, 2018.

5361.　Plaintiff Linda David brings an action individually and on behalf of the Estate of Michael David, as its legal representative.

5362.　Plaintiff Christopher David is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Timothy A. David.

5363.　As a result of the attack, and the death of Timothy A. David, the late Michael David experienced, and Plaintiffs Linda David and Christopher David have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 245.　THE JULY 16, 2009 ATTACK – BASRA

**The Drevnick Family**

5364.　Daniel P. Drevnick was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

5365.　On July 16, 2009, Daniel P. Drevnick, aged 22, was serving in the U.S. military when he was killed by a 107mm rocket launched by JAM Special Groups.

5366.　The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5367. Plaintiff Kenneth J. Drevnick is a citizen of the United States and domiciled in the State of Wisconsin. He is the father of Daniel P. Drevnick.

5368. As a result of the attack, and the death of Daniel P. Drevnick, Plaintiff Kenneth J. Drevnick has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## 246. THE AUGUST 21, 2009 ATTACK – BAGHDAD

### The Klingensmith Family

5369. Plaintiff Randall Klingensmith is a citizen of the United States and domiciled in the State of Georgia.

5370. On August 21, 2009, Randall Klingensmith, then 38, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated when his vehicle passed by it. The convoy he was travelling in subsequently came under small arms fire.

5371. The weapon used to injure Randall Klingensmith was a Hezbollah-designed and Iranian manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5372. The vehicle Mr. Klingensmith was in was split open by the EFP. He was evacuated from the scene of the attack and subsequently flown to Germany for treatment.

5373. As a result of the attack, Mr. Klingensmith was placed in a medically induced coma.

5374. He has undergone more than 40 surgical procedures.

5375. As a result of the attack, Mr. Klingensmith's left ear drum was ruptured, his lower back was fractured, he sustained shrapnel wounds to his right leg, and part of his left leg was blown off. Some of his teeth were broken and he also sustained a TBI.

5376.   In addition to the extensive physical injuries Mr. Klingensmith sustained, he also suffers from severe headaches, has difficulty sleeping and has nightmares. He also suffers from PTSD, depression and anxiety.

5377.   As a result of the attack, and the injuries he suffered, Plaintiff Randall Klingensmith has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**247.   THE SEPTEMBER 8, 2009 ATTACK – TIKRIT**

**The Myers Family**

5378.   Zachary T. Myers was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

5379.   On September 8, 2009, Zachary T. Myers, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5380.   Zachary T. Myers was killed in the attack.

5381.   The weapon used to kill Zachary T. Myers was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5382.   Plaintiff Megan Marie Sabatino is a citizen of the United States and domiciled in the State of Ohio. She is the widow of Zachary T. Myers.

5383.   Plaintiff Megan Marie Sabatino brings an action individually and on behalf of the Estate of Zachary T. Myers, as its legal representative.

5384.   Plaintiff R.N.S., a minor represented by her legal guardian Megan Marie Sabatino, is a citizen of the United States and domiciled in the State of Ohio. She is the daughter of Zachary T. Myers.

5385.   Plaintiff Tonya Freeman is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Zachary T. Myers.

5386.   Plaintiff Jerry L. Myers is a citizen of the United States and domiciled in the State of Ohio. He is the father of Zachary T. Myers.

5387.   Plaintiff Jeffrey D. Price is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Zachary T. Myers.

5388.   As a result of the attack, and the death of Zachary T. Myers, Plaintiffs Megan Marie Sabatino, R.N.S., Tonya Freeman, Jerry L. Myers and Jeffrey D. Price have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's/ brother's society, companionship, comfort, advice and counsel.

**The Smith Family**

5389.   Shannon M. Smith was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

5390.   On September 8, 2009, Shannon M. Smith was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5391.   Shannon M. Smith was killed in the attack.

5392.   The weapon used to kill Shannon M. Smith was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5393.   Plaintiff Cassie Collins is a citizen of the United States and domiciled in the State of Ohio. She is the widow of Shannon M. Smith.

5394.   Plaintiff Cassie Collins brings an action individually and on behalf of the Estate of Shannon M. Smith as its legal representative.

5395.    Plaintiff Deborah Smith is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Shannon M. Smith.

5396.    Plaintiff James Smith is a citizen of the United States and domiciled in the State of Ohio. He is the father of Shannon M. Smith.

5397.    Plaintiff Cory Smith is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Shannon M. Smith.

5398.    Plaintiff Christina Smith is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Shannon M. Smith.

5399.    As a result of the attack, and the death of Shannon M. Smith, Plaintiffs Cassie Collins, Deborah Smith, James Smith, Cory Smith and Christina Smith have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

## 248.    THE SEPTEMBER 8, 2009 ATTACK – BAGHDAD

### The Helton Family

5400.    Joseph D. Helton, Jr. was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

5401.    On September 8, 2009, Joseph D. Helton, Jr., aged 24, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5402.    Joseph D. Helton, Jr. was killed in the attack.

5403.    The weapon used to kill Joseph D. Helton, Jr. was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5404.    Plaintiff Joseph Helton, Sr. is a citizen of the United States and domiciled in the State of Washington. He is the father of Joseph D. Helton, Jr.

5405.    Plaintiff Joseph Helton, Sr. brings an action individually and on behalf of the Estate of Joseph D. Helton, Jr., as its legal representative.

5406.    Plaintiff Jessica Cabot is a citizen of the United States and domiciled in the State of California. She is the sister of Joseph D. Helton, Jr.

5407.    Plaintiff Jeanne Rhea McManus is a citizen of the United States and domiciled in the State of Pennsylvania. She is the sister of Joseph D. Helton, Jr.

5408.    As a result of the attack, and the death of Joseph D. Helton, Jr., Plaintiffs Joseph Helton, Sr., Jessica Cabot, and Jeanne Rhea McManus have experienced severe mental anguish, extreme emotional pain and suffering and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### **The Wise Family**

5409.    Plaintiff Victor Ray Wise, II is a citizen of the United States and domiciled in the State of Kentucky.

5410.    On September 8, 2009, Victor Ray Wise, II, then 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

5411.    The weapon used to injure Victor Ray Wise, II was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5412.    Mr. Wise was in the gunner's hatch when the EFP hit the vehicle he was in.

5413.    He was extricated from the vehicle and tourniquets were placed on his legs, and he was initially treated at Camp Falcon. He was then taken to a hospital up north for surgery.

5414. He was subsequently taken to Landstuhl, Germany and then Walter Reed Army Medical Center where he spent six months. He has undergone eleven surgeries. After six months at Walter Reed Army Medical Center, Mr. Wise was sent to Omaha Offutt Air Force Base, where he was treated at the base hospital.

5415. Because the EFP hit Mr. Wise sustained bilateral shrapnel wounds and burns to his thighs, traumatic loss of his left big toe and multiple skin graft surgeries on his right and left quads where he also sustained nerve damage.

5416. Mr. Wise was diagnosed with PTSD as a result of the attack.

5417. As a result of the attack, and the injuries he suffered, Plaintiff Victor Ray Wise, II has experienced severe physical and mental anguish and extreme emotional pain and suffering.

### 249. THE OCTOBER 12, 2009 ATTACK – AMARA

**The Evans Family**

5418. Plaintiff Stephen W. Evans is a citizen of the United States and domiciled in the State of California.

5419. On October 12, 2009, Plaintiff Stephen W. Evans, then 20, was serving in the U.S. Military in Iraq when an EFP emplaced by Special Groups detonated when his vehicle passed by it.

5420. The weapon used to injure Plaintiff Stephen W. Evans was a Hezbollah-designed and Iranian manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5421. Mr. Evans was struck by shrapnel and suffered both hard and soft tissue damage. Part of his left leg was severely damaged, he suffered burns to his body and face, and shrapnel peppered the left side of his body.

5422.   The force of the EFP blast caused his skull to fracture, broke his jaw and other bones in his face, and left him unconscious for several days after the attack.

5423.   He spent approximately 30 months hospitalized and underwent numerous surgeries.

5424.   Mr. Evans was also diagnosed with a TBI.

5425.   As a result of the attack, and the injuries he suffered, Plaintiff Stephen W. Evans has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 250.   THE JANUARY 18, 2010 ATTACK – BAGHDAD

**The Lester Family**

5426.   Plaintiff Theodore Lester is a citizen of the United States and domiciled in the State of Texas.

5427.   On January 18, 2010, Theodore Lester, then 32, and a former soldier in the U.S. military, was serving as a civilian contractor in Baghdad, Iraq when his camp was attacked with Katyusha rockets deployed by JAM Special Groups.

5428.   While running for cover from the Katyusha rockets, Mr. Lester was injured in the attack when he stepped into an existing mortar impact hole. Mr. Lester fell to the ground and was forced to crawl to cover.

5429.   The rocket attack was perpetrated by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

5430.   Mr. Lester was only able to obtain an X-ray of his foot a day later, which revealed that he had fractured three bones in his left foot. Mr. Lester still experiences pain in his left leg and foot from his injuries.

5431.   Mr. Lester was subsequently diagnosed with, and treated for, PTSD.

5432.   As a result of the attack, and the injuries he suffered, Plaintiff Theodore Lester has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 251.   THE APRIL 27, 2010 ATTACK – KHALIS

**The Coe Family**

5433.   Keith Coe was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

5434.   On April 27, 2010, Keith Coe, aged 30, was serving in the U.S. military in Iraq.

5435.   Mr. Coe was north of his base in Iraq when his vehicle was struck by an EFP emplaced by Special Groups.

5436.   The weapon used to kill Mr. Coe was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5437.   Plaintiff Katrina Coe is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Keith Coe.

5438.   Plaintiff Katrina Coe brings an action individually and on behalf of the Estate of Keith Coe, as its legal representative.

5439.   Plaintiff K.A.C., a minor represented by his legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Keith Coe.

5440.   Plaintiff K.A.C., a minor represented by his legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Keith Coe.

5441.   Plaintiff K.A.C., a minor represented by her legal guardian, Katrina Coe, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of Keith Coe.

5442.   Plaintiff Rhonda Smith is a citizen of the United States and domiciled in the State of Florida. She is the mother of Keith Coe.

5443.   Plaintiff Matthew Coe is a citizen of the United States and domiciled in the State of Florida. He is the brother of Keith Coe.

5444.   Plaintiff Sabrina Chapman is a citizen of the United States and domiciled in the State of Florida. She is the sister of Keith Coe.

5445.   As a result of the attack, and the death of Keith Coe, Plaintiffs Katrina Coe, K.A.C, K.A.C., K.A.C., Rhonda Smith, Matthew Coe and Sabrina Chapman have experienced severe physical and mental anguish and extreme emotional pain and suffering and loss of their husband's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Baumhoer Family**

5446.   Plaintiff Nicholas Baumhoer is a citizen of the United States and domiciled in the State of Indiana.

5447.   On April 27, 2010, Nicholas Baumhoer, age 20, was serving in the U.S. military in Iraq.

5448.   Mr. Baumhoer was north of his base in Iraq when his vehicle was struck by an EFP emplaced by Special Groups.

5449.   The weapon used to injure Mr. Baumhoer was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5450.   As a result of the attack, he sustained significant injuries due to the impact of shrapnel to his face and left arm. He also sustained a concussion.

5451. Mr. Baumhoer underwent surgery to address internal bleeding and the removal of shrapnel.

5452. As a result of the attack, and the injuries he suffered, Plaintiff Nicholas Baumhoer has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 252. THE SEPTEMBER 1, 2010 ATTACK – MAYSAN PROVINCE

### The Whiteside Family

5453. Plaintiff Matthew Whiteside is a citizen of the United States and domiciled in the State of South Carolina.

5454. On September 1, 2010, Matthew Whiteside, then 26, was serving in the U.S. military in Iraq when his base came under mortar attack from 107mm rockets.

5455. The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5456. Mr. Whiteside's bunker was struck by a 107 mm shell. As a result, he sustained a dislocated shoulder and was diagnosed with a TBI.

5457. As a result of the attack, and the injuries he suffered, Plaintiff Matthew Whiteside has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5458. Plaintiff Kandi Danielle Whiteside is a citizen of the United States and domiciled in the State of South Carolina. She is the wife of Matthew Whiteside.

5459. Plaintiff M.T.W., a minor represented by her legal guardians Matthew Whiteside and Kandi Danielle Whiteside, is a citizen of the United States and domiciled in the State of South Carolina. She is the daughter of Matthew Whiteside.

5460. Plaintiff Sharon Smithey Whiteside is a citizen of the United States and domiciled in the State of Mississippi. She is the mother of Matthew Whiteside.

5461.   Plaintiff Jackson Wiley Whiteside is a citizen of the United States and domiciled in the State of Mississippi. He is the brother of Matthew Whiteside.

5462.   Plaintiff Christopher Whiteside is a citizen of the United States and domiciled in the State of Mississippi. He is the brother of Matthew Whiteside.

5463.   As a result of the attack (as well as the July 3, 2011 attack discussed below), and the injuries Matthew Whiteside suffered, Plaintiffs Kandi Danielle Whiteside, M.T.W., Sharon Smithey Whiteside, Jackson Wiley Whiteside and Christopher Whiteside have experienced severe mental anguish and extreme emotional pain and suffering.

### 253.   <u>THE MARCH 10, 2011 ATTACK – BAGHDAD</u>

**<u>The Kinsey Family</u>**

5464.   Plaintiff James Kinsey is a citizen of the United States and domiciled in the State of Arkansas.

5465.   On March 10, 2011, James Kinsey, then 34, was serving in the U.S. military in Iraq when his base came under indirect fire by JAM Special Groups terror operatives working at the direction of Hezbollah and the IRGC-QF, using weapons supplied by the IRGC-QF and employing training provided by Hezbollah.

5466.   An Iranian-made 240mm rocket exploded within the base perimeter, approximately 50 meters from where Mr. Kinsey was standing.

5467.   The resulting blast threw Mr. Kinsey into a barrier wall, and he suffered a severe concussion.

5468.   Mr. Kinsey was later diagnosed with a TBI and PTSD from the attack.

5469.   As a result of the attack, and the injuries he suffered, Plaintiff James Kinsey has experienced severe mental anguish and extreme emotional pain and suffering.

**254.**    **THE APRIL 2, 2011 ATTACK – ISKANDARIYAH PROVINCE**

**The Garcia Family**

5470.    Christian Anthony Saracho Garcia was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

5471.    On April 2, 2011, Christian Anthony Saracho Garcia, aged 30, was serving in the U.S. military in Iraq when his base came under mortar attack perpetrated by JAM Special Groups terror operatives.

5472.    Christian Anthony Saracho Garcia died as a result of wounds sustained in the attack.

5473.    The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5474.    Plaintiff Angela M. Garcia is a citizen of the United States and domiciled in the State of Texas. She is the widow of Christian Anthony Saracho Garcia.

5475.    Plaintiff Angela M. Garcia brings an action individually and on behalf of the Estate of Christian Anthony Saracho Garcia as its legal representative.

5476.    Plaintiff K.M.G., a minor represented by her legal guardian Angela M. Garcia, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Christian Anthony Saracho Garcia.

5477.    Plaintiff K.R.G., a minor represented by her legal guardian Angela M. Garcia, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Christian Anthony Saracho Garcia.

5478.    Plaintiff Joel Hernandez is a citizen of the United State and domiciled in the State of Texas. He is the stepson of Christian Anthony Saracho Garcia.

5479.    Plaintiff Christopher Satterfield is a citizen of the United State and domiciled in the State of Texas. He is the stepson of Christian Anthony Saracho Garcia.

5480.    Plaintiff Victoria Hernandez is a citizen of the United State and domiciled in the State of Texas. She is the stepdaughter of Christian Anthony Saracho Garcia.

5481.    As a result of the attack, and the death of Christian Anthony Saracho Garcia, Plaintiffs Angela M. Garcia, K.M.G., K.R.G., Joel Hernandez, Christopher Satterfield and Victoria Hernandez have experienced severe mental anguish, extreme emotional pain and suffering and the loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 255.    THE APRIL 15, 2011 ATTACK – BAGHDAD

**The Pasco Family**

5482.    Plaintiff Michael Pasco is a citizen of the United States and domiciled in the State of Kentucky.

5483.    On April 15, 2011, Michael Pasco, then 28, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle slicing it in half.

5484.    The weapon used to injure Michael Pasco was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5485.    As a result of the attack, Mr. Pasco suffered a broken hand, numerous shrapnel wounds across his body, and was diagnosed with a TBI.

5486.    As a result of the attack, and the injuries he suffered, Plaintiff Michael Pasco has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 256.   THE APRIL 22, 2011 ATTACK – NUMANIYAH

### The Stiggins Family

5487.   Antonio Stiggins was a citizen of the United States and domiciled in the State of New Mexico when he was killed in Iraq.

5488.   On April 22, 2011, Antonio Stiggins, aged 25, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5489.   Antonio Stiggins was killed in the attack.

5490.   The weapon used to kill Antonio Stiggins was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5491.   Plaintiff Angel Mayes is a citizen of the United States and domiciled in the State of New Mexico. She is the mother of Antonio Stiggins.

5492.   Plaintiff Angel Mayes brings an action individually and on behalf of the Estate of Antonio Stiggins, as its legal representative.

5493.   Plaintiff Luke Stiggins is a citizen of the United States and domiciled in the State of New Mexico. He is the father of Antonio Stiggins.

5494.   Plaintiff Donald Mayes is a citizen of the United States and domiciled in the State of New Mexico. He is the stepfather of Antonio Stiggins.

5495.   As a result of the attack, and the death of Antonio Stiggins, Plaintiffs Angel Mayes, Luke Stiggins, and Donald Mayes have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

### 257.    THE MAY 22, 2011 ATTACK – BAGHDAD

**The Beattie Family**

5496.    Clifford Beattie was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

5497.    On May 22, 2011, Clifford Beattie, aged 37, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5498.    Clifford Beattie was killed in the attack.

5499.    The weapon used to kill Clifford Beattie was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5500.    Plaintiff Rhonda Beattie is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Clifford Beattie.

5501.    Plaintiff Rhonda Beattie brings an action individually and on behalf of the Estate of Clifford Beattie, as its legal representative.

5502.    Plaintiff Jaydean Hamilton is a citizen of the United States and domiciled in the State of Washington. She is the daughter of Clifford Beattie.

5503.    As a result of the attack, and the death of Clifford Beattie, Plaintiffs Rhonda Beattie and Jaydean Hamilton have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice and counsel.

### 258.    THE JUNE 6, 2011 ATTACK – BAGHDAD

**The Fishbeck Family**

5504.    Christopher Brook Fishbeck was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

5505.   On June 6, 2011, Christopher Brook Fishbeck, then 24 was serving in the U.S. military in Iraq when the base he was at, Forward Operating Base Loyalty in Baghdad, came under attack by IRAMs.

5506.   Christopher Brook Fishbeck was killed in the attack.

5507.   KH operatives fired the IRAMs at the base. Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy. Specifically, KH claimed responsibility for the attack that killed Christopher Brook Fishbeck.

5508.   Plaintiff Stephanie Kidder is a citizen of the United States and domiciled in the State of California. She is the wife of Christopher Brook Fishbeck.

5509.   Plaintiff Toni Attanasio is a citizen of the United States and domiciled in the State of California. She is the mother of Christopher Brook Fishbeck.

5510.   Plaintiff Toni Attanasio brings and action individually and on behalf of the Estate of Christopher Brook Fishbeck as its legal representative.

5511.   Plaintiff Gary Douglas Fishbeck is a citizen of the United States and domiciled in the State of California. He is the father of Christopher Brook Fishbeck.

5512.   Plaintiff Ana M. Gomez is a citizen of the United States and domiciled in the State of California, she is the stepmother of Christopher Brook Fishbeck.

5513.   Plaintiff Randi Jean Martz is a citizen of the United States and domiciled in the State of California. She is the sister of Christopher Brook Fishbeck.

5514.   Plaintiff Rene Gutel is a citizen of the United States and domiciled in the State of Virginia. She is the sister of Christopher Brook Fishbeck.

5515.   As a result of the attack, and the death of Christopher Brook Fishbeck, Plaintiffs Stephanie Kidder, Toni Attansio, Gary Douglas Fishbeck, Ana M. Gomez, Randi Jean Martz and Rene Gutel have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/brother's society, companionship, comfort, advice and counsel.

259.   **THE JUNE 18, 2011 ATTACK - AL-QADISIYAH**

**The Hall Family**

5516.   Plaintiff Mark A. Hall is a citizen of the United States and domiciled in the State of Montana.

5517.   On June 18, 2011, Mark A. Hall, then 41, was serving in the U.S. military in Iraq when his base came under attack from 107mm rockets.

5518.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5519.   A 107mm round hit within a few meters of Mr. Hall's position, and he was rendered unconscious and sustained a concussion.

5520.   He suffers from depression and was diagnosed with PTSD.

5521.   As a result of the attack, and the injuries he suffered, Plaintiff Mark A. Hall has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5522.   Plaintiff Athena Hall is a citizen of the United States and domiciled in the State of Montana. She is the wife of Mark A. Hall.

5523.   Plaintiff M.J.H., a minor represented by her legal guardian Mark Hall, is a citizen of the United States and domiciled in the State of Montana. She is the daughter of Mark A. Hall.

5524.   Plaintiff Kiersten Hall is a citizen of the United States and domiciled in the State of Montana. She is the daughter of Mark A. Hall.

5525.    Plaintiff Kaitlyn Adams is a citizen of the United States and domiciled in the State of Utah. She is the daughter of Mark A. Hall.

5526.    Plaintiff Mackenzie G. Hall is a citizen of the United States and domiciled in the State of Montana. She is the daughter of Mark A. Hall.

5527.    Plaintiff Abigail Hall is a citizen of the United States and domiciled in the State of Montana. She is the daughter of Mark A. Hall.

5528.    Plaintiff Andrew Hall is a citizen of the United States and domiciled in the State of Montana. He is the son of Mark A. Hall.

5529.    As a result of the attack and the injuries suffered by Mark A. Hall, Plaintiffs Athena Hall, M.J.H., Kiersten Hall, Kaitlyn Adams Mackenzie G. Hall, Abigail Hall and Andrew Hall have experienced severe mental anguish and extreme emotional pain and suffering.

## 260.    THE JUNE 29, 2011 ATTACK – WASIT PROVINCE

**The White Family**

5530.    Plaintiff George D. White is a citizen of the United States and domiciled in the State of Minnesota.

5531.    On June 29, 2011, George D. White, then 39, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs fired by KH Special Groups terror operatives.

5532.    Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy.

5533.    The rocket fire and one of the many explosions caused George D. White to be thrown toward the bunker.

5534.    Immediately following the attack, Mr. White suffered vision and hearing loss as

well as ringing in his ears. The vision loss – encompassing his night vision – and the ringing in his ears continue to the present.

5535.   He has been diagnosed with a TBI, and has experienced severe headaches, nightmares and difficulty sleeping – all conditions that he has received treatment for.

5536.   In addition, Mr. White suffers from PTSD and depression.

5537.   As a result of the attack, and the injuries he suffered, Plaintiff George D. White has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5538.   Plaintiff Natalia White is a citizen of the United States and domiciled in the State of Minnesota. She is the wife of George D. White.

5539.   Plaintiff Kristin White is a citizen of the United States and domiciled in the State of Texas. She is the daughter of George D. White.

5540.   Plaintiff George J. White is a citizen of the United States and domiciled in the State of Florida. He is the father of George D. White.

5541.   Plaintiff Edna Luz Burgos is a citizen of the United States and domiciled in Puerto Rico. She is the mother of George D. White.

5542.   As a result of the attack, and the injuries George D. White suffered, Plaintiffs Natalia White, Kristin White, George J. White and Edna Luz Burgos have experienced severe mental anguish and extreme emotional pain and suffering.

**The McCulley Family**

5543.   Plaintiff John McCulley is a citizen of the United States and domiciled in the State of Texas.

5544.   On June 29, 2011, John McCulley, then 32, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when he was attacked with IRAMs fired by KH Special Groups terror operatives.

5545.   Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy.

5546.   Two rockets landed near Mr. McCulley.

5547.   Mr. McCulley was struck by shrapnel.

5548.   His right arm was severed at the elbow, and his left leg was badly damaged.

5549.   Mr. McCulley was hospitalized on several occasions to treat his injuries, and he has had more than 20 surgeries.

5550.   Mr. McCulley has been diagnosed with a TBI, PTSD, and has been treated for depression.

5551.   As a result of the attack, and the injuries he suffered, Plaintiff John McCulley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5552.   Plaintiff Stephanie McCulley is a citizen of the United States and domiciled in the State of Texas. She is the wife of John McCulley.

5553.   Plaintiff T.M., a minor represented by his legal guardians John McCulley and Stephanie McCulley, is a citizen of the United States and domiciled in the State of Texas. He is the son of John McCulley.

5554.   Plaintiff R.M., a minor represented by his legal guardians John McCulley and Stephanie McCulley, is a citizen of the United States and domiciled in the State of Texas. He is the son of John McCulley.

5555.   As a result of the attack, and the injuries John McCulley suffered, Plaintiffs Stephanie McCulley, T.M., and R.M. have experienced severe mental anguish and extreme emotional pain and suffering.

**The Field Family**

5556.   Plaintiff Donald Field is a citizen of the United States and domiciled in the State of Texas.

5557.   On June 29, 2011, Donald Field, then 42, was serving in the U.S. military in Iraq when his unit was attacked with IRAMs fired by KH Special Groups terror operatives.

5558.   Those operatives were trained by Hezbollah and funded and supplied by the IRGC-QF, and they launched the attack at the direction of both Hezbollah and the IRGC-QF as their proxy.

5559.   One of the many explosions caused a concrete retaining wall to fall, portions of which landed on Donald Field, rendering him unconscious.

5560.   When he came to, he was able to extricate himself from the debris and noticed much of his clothing had been burned and torn.

5561.   Both lower lobes of Mr. Field's lungs had collapsed due to the force of the blast and the concrete wall having landed on him.

5562.   He sustained injuries to his back, primarily to his lower vertebrae, requiring surgery. He has limited motion.

5563.   He has been prescribed medication to address the pain he experiences on a daily basis.

5564.   As a result of the blast, Mr. Field also suffered first- and second-degree burns on his head, neck, and the back of his arms.

5565. Mr. Field also injured the right side of his head and right ear; he has undergone multiple surgeries to address those injuries. He has experienced and continues to deal with short-term cognitive and memory issues.

5566. Mr. Field has been diagnosed with a TBI.

5567. He has sought counseling and continues to seek treatment with a psychiatrist. He has been prescribed medication for anxiety and mood-related issues.

5568. As a result of the attack, and the injuries he suffered, Plaintiff Donald Field has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5569. Plaintiff Angelica Field is a citizen of the United States and domiciled in the State of Texas. She is the wife of Donald Field.

5570. Plaintiff Senovia Field is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Donald Field.

5571. Plaintiff Selicia Field is a citizen of the United States and domiciled in the State of Texas. She is the daughter of Donald Field.

5572. As a result of the attack, and the injuries Donald suffered, Plaintiffs Angelica Field, Senovia Field and Selicia Field have experienced severe mental anguish and extreme emotional pain and suffering.

261. **THE JULY 3, 2011 ATTACK – AMARA**

**The Whiteside Family**

5573. As noted above, Plaintiff Matthew Whiteside is a citizen of the United States and domiciled in the State of South Carolina.

5574.  On July 3, 2011, Matthew Whiteside, then 26, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle while he was *en* route from his Forward Operating Base in Amara, Iraq to the Adder Air Force Base outside of Nasara.

5575.  The weapon used to injure Matthew Whiteside was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5576.  As a result of the attack, Mr. Whiteside suffers from PTSD.

5577.  As a result of the attack, and the injuries he suffered, Plaintiff Matthew Whiteside has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 262.  THE JULY 7, 2011 ATTACK – BAGHDAD

### The Newby Family

5578.  Nicholas W. Newby was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

5579.  On July 7, 2011, Nicholas W. Newby, aged 20, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5580.  Nicholas W. Newby was killed in the attack.

5581.  The weapon used to kill Nicholas W. Newby was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5582.  Plaintiff Theresa Hart is a citizen of the United States and domiciled in the State of Idaho. She is the mother of Nicholas W. Newby.

5583.  Plaintiff Wayne Newby is a citizen of the United States and domiciled in the State of Idaho. He is the father of Nicholas W. Newby.

5584.   Plaintiff Nathan Newby is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Nicholas W. Newby.

5585.   As a result of the attack, and the death of Nicholas W. Newby, Plaintiffs Theresa Hart, Wayne Newby and Nathan Newby have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

### 263.   THE JULY 8, 2011 ATTACK – BAGHDAD

**The Ogden Family**

5586.   Plaintiff Tyler Nicholas Ogden is a citizen of the United States and domiciled in the State of Ohio.

5587.   On July 8, 2011, Tyler Nicholas Ogden, then age 29, was serving with the U.S. military in Iraq when his base came under attack from 107mm rockets.

5588.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5589.   A 107mm round landed approximately 30 feet from where Tyler Ogden was situated and knocked him to the ground.

5590.   When he stood up, he realized that had struck in the thigh by shrapnel.

5591.   As a result of that attack, Tyler Ogden's thigh muscle was damaged, and he developed problems with the use of his knee and ankle.

5592.   He also sustained hearing loss and developed asthma.

5593.   As a result of the attack, and the injuries he suffered, Plaintiff Tyler Nicholas Ogden has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5594.   Plaintiff Sheryl Ann Chen is a citizen of the United States domiciled in Ohio and is the mother of Tyler Nicholas Ogden.

5595.   Plaintiff Jerrin Matthew Ogden is a citizen of the United States domiciled in Ohio and is the brother of Tyler Nicholas Ogden.

5596.   As a result of the attack and the injuries sustained by Plaintiff Tyler Ogden, Plaintiffs Sheryl Ann Chen and Jerrin Ogden have experienced severe mental anguish and extreme emotional pain and suffering.

## 264.   THE JULY 10, 2011 ATTACK – MAYSAN PROVINCE

**The Niquette Family**

5597.   Plaintiff Sean M. Niquette is a citizen of the United States and domiciled in the State of New York.

5598.   On July 10, 2011, Sean M. Niquette, then 25, was serving in the U.S. military in Iraq when his Contingency Forward Operating Base came under attack from 107 mm rockets.

5599.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5600.   As Mr. Niquette was running for cover, a rocket landed about 15 yards from where he was located. Mr. Niquette sustained a concussion and was diagnosed with a TBI.

5601.   As a result of the attack, Mr. Niquette suffers from depression, anxiety, memory loss and migraines.

5602.   As a result of the attack, and the injuries he suffered, Plaintiff Sean Niquette has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5603.   Plaintiff Lauren Niquette is a citizen of the United States and domiciled in the State of New York. She is the wife of Sean M. Niquette.

5604.   Plaintiff Mary Niquette is a citizen of the United States and domiciled in the State of Florida. She is the mother of Sean M. Niquette.

5605.   Plaintiff Thomas Niquette is a citizen of the United States and domiciled in Florida. He is the father of Sean M. Niquette.

5606.   As a result of the attack and the injuries suffered by Sean M. Niquette, Plaintiffs Laruen Niquette, Mary Niquette and Thomas Niquette have experienced severe mental anguish and extreme emotional pain and suffering.

**The Kenney Family**

5607.   Plaintiff Daniel Kenney is a citizen of the United States and domiciled in the State of New York.

5608.   On July 10, 2011, Daniel Kenny, then 29, was serving in the U.S. military in Iraq when his Contingency Forward Operating Base came under attack from 107 mm rockets.

5609.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5610.   As Mr. Kenney was running for cover, a rocket landed within approximately 15 of his location, throwing him to the ground and concussing him.

5611.   As a result of the attack, Mr. Kenney suffers from depression, anxiety and PTSD.

5612.    As a result of the attack, and the injuries he suffered, Plaintiff Daniel Kenney has experienced mental anguish and extreme emotional pain and suffering.

5613.   Plaintiff Brooke Kenney is a citizen of the United States and domiciled in the State of New York. She is the wife of Daniel Kenney.

5614. Plaintiff J.K., a minor, represented by his legal guardians Daniel Kenney and Brooke Kenney, is a citizen of the United States and domiciled in the State of New York. He is the son of Daniel and Brooke Kenney.

5615. Plaintiff H.K., a minor, represented by her legal guardians Daniel Kenney and Brooke Kenney, is a citizen of the United States and domiciled in the State of New York. She is the daughter of Daniel and Brooke Kenney.

5616. As a result of the attack, and the injuries suffered by Daniel Kenney, Plaintiffs Brooke Kenney, J.K. and H.K. have each experienced severe mental anguish and extreme emotional pain and suffering.

### 265. THE JULY 15, 2011 ATTACK – BASRA

**The Elliott Family**

5617. Daniel L. Elliott was a citizen of the United States and domiciled in the state of North Carolina when he was killed in Iraq.

5618. On July 15, 2011, Daniel L. Elliott, aged 21, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5619. Daniel L. Elliott was killed in the attack.

5620. The weapon used to kill Daniel L. Elliott was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5621. Plaintiff Ed Elliott is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Daniel L. Elliott.

5622.   As a result of the attack, and the death of Daniel L. Elliott, Plaintiff Ed Elliott has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**266.   THE OCTOBER 12, 2011 ATTACK – AMARA**

**The Alldridge Family**

5623.   Plaintiff Brian Clark Alldridge is a citizen of the United States and domiciled in the State of Texas.

5624.   On October 12, 2011, Brian Clark Alldridge, then 35, was serving in the U.S military in Iraq when his Contingency Forward Operating Base came under a 107mm rocket attack perpetrated by JAM Special Groups terror operatives.

5625.   The attack was perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah.

5626.   As a result of the attack, Mr. Alldridge was hit by shrapnel and sustained blast injuries.

5627.   He suffered hearing loss, has tinnitus and requires a hearing aid.

5628.   Mr. Alldridge was diagnosed with a TBI. He was also diagnosed with PTSD and anxiety, for which he has sought counseling. He is able to sleep very little at night.

5629.   Mr. Alldridge has received a 100% disability rating by the Veteran's Administration.

5630.   As a result of the attack, and the injuries he suffered, Plaintiff Brian Clark Alldridge has experienced severe physical and mental anguish and extreme emotional pain and suffering.

5631.   Plaintiff Joann Alldridge is a citizen of the United States and domiciled in the State of Texas. She is the wife of Brian Clark Alldridge.

5632.   Plaintiff Andrew Charles Major is a citizen of the United States and domiciled in the State of Texas. He is the stepson of Brian Clark Alldridge.

5633.   Plaintiff Ashley Meikel Major is a citizen of the United States and domiciled in the State of Texas. She is the stepdaughter of Brian Clark Alldridge.

5634.   Plaintiff A.M.M., a minor represented by her legal guardian Joann Alldridge, is a citizen of the United States and domiciled in the State of Texas. She is the stepdaughter of Brian Clark Alldridge.

5635.   Plaintiff DiAnna Alldridge is a citizen of the United States and domiciled in the State of Washington. She is the mother of Brian Clark Alldridge.

5636.   Plaintiff Ronald Alldridge is a citizen of the United States and domiciled in the State of Washington. He is the father of Brian Clark Alldridge.

5637.   Plaintiff Todd Alldridge is a citizen of the United States and domiciled in the State of Indiana. He is the brother of Brian Clark Alldridge.

5638.   As a result of the attack, and the injuries suffered by Brian Clark Alldridge, Plaintiffs Joann Alldridge, Andrew Charles Major, Ashley Meikel Major, A.M.M., DiAnna Alldridge, Ronald Alldridge and Todd Alldridge have experienced severe mental anguish and extreme emotional pain and suffering.

## 267.    THE NOVEMBER 14, 2011 ATTACK – BAGHDAD

**The Hickman Family**

5639.   David Emanuel Hickman was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

5640.   On November 14, 2011, David Emanuel Hickman, aged 23, was serving in the U.S. military in Iraq when an EFP emplaced by Special Groups detonated near his vehicle.

5641.   David Emanuel Hickman was killed in the attack.

5642.   The weapon used to kill David Emanuel Hickman was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

5643.   Plaintiff Veronica Hickman is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of David Emanuel Hickman.

5644.   Plaintiff David Eugene Hickman is a citizen of the United States and domiciled in the State of North Carolina. He is the father of David Emanuel Hickman.

5645.   Plaintiff Devon Fletcher Hickman is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of David Emanuel Hickman.

5646.   As a result of the attack, and the death of David Emanuel Hickman, Plaintiffs Veronica Hickman, David Eugene Hickman and Devon Fletcher Hickman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

5647.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

5648.   During all relevant times, each Defendant knew that Hezbollah engaged in acts of international terrorism and each Defendant knew that Hezbollah had been designated an FTO.

5649. Each Defendant knowingly provided material support to Hezbollah during the period between 2003 through 2011 and by maintaining accounts for and transferring millions of dollars through the U.S. financial system for Hezbollah's benefit.

5650. Each Defendant's conduct *involved* acts dangerous to human life and constitute violations of 18 U.S.C. § 2339B.

5651. By knowingly providing material support to Hezbollah, each Defendant's conduct objectively appeared to be intended to intimidate or coerce a civilian population or influence the policy of a government by intimidation or coercion by substantially assisting Hezbollah in operating its global terror network.

5652. By knowingly providing material support to Hezbollah and providing a financial lifeline in the form of global access to critical U.S. dollars, each Defendant substantially and foreseeably contributed to Hezbollah's capacity to orchestrate, direct and commit terrorist attacks, including the terrorist attacks that injured Plaintiffs.

5653. Each Defendant's activities occurred primarily outside the United States.

5654. As the U.S. Department of the Treasury noted in 2016 (quoting Adam J. Szubin, then-Acting Under Secretary for Terrorism and Financial Intelligence), Hezbollah "relies upon accomplices in the business community to place, manage, and launder its terrorist funds."

5655. Defendants herein were the most central accomplices Hezbollah relied upon for facilitating its financial operations.

5656. Defendants' knowing provision of material support to FTO Hezbollah was a substantial reason that Hezbollah and the IRGC-QF were able to orchestrate the terrorist attacks at issue.

5657.   Defendants' knowing provision of material support to FTO Hezbollah increased its ability to plan, direct and commit deadly attacks that were a foreseeable consequence of facilitating the transfer of millions of U.S. dollars to persons and entities Hezbollah controlled.

## SECOND CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING HEZBOLLAH, A FOREIGN TERRORIST ORGANIZATION

5658.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

5659.   Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331.

5660.   Plaintiffs were all injured by acts of international terrorism committed, planned and authorized by FTO Hezbollah (and in some cases, also FTO Kata'ib Hezbollah).

5661.   Hezbollah had been designated an FTO (since 1997) as of the date of all the attacks alleged herein.

5662.   As set forth in detail above, the IRGC–QF tasked Hezbollah with directing their Iraqi agents to launch terrorist attacks on U.S. service members in Iraq.

5663.   Accordingly, Hezbollah trained, organized, advised and directed various terror cells that acted as its agents and proxies, launching attacks on U.S. and Coalition Forces at Hezbollah's behest and under its guidance.

5664.   Each Defendant aided and abetted Hezbollah in its commission of these acts of international terrorism, including the terrorist attacks that injured Plaintiffs, by providing substantial and vital assistance to Hezbollah and its IJO during the period between 2003 through 2011 and transferring hundreds of millions of dollars through the U.S. financial system for its benefit.

5665.   Defendants substantially assisted Hezbollah by, *inter alia*, laundering hundreds of millions of dollars for Hezbollah that it needed to sustain its operations and to commit acts of international terrorism.

5666.   As noted above, Abdallah Safieddine (SDGT) was the Hezbollah leader responsible for ensuring that proceeds from narcotics trafficking laundered through Defendants made their way to the IJO to fund Hezbollah's lethal operations in Iraq.

5667.   Each Defendant understood its role in helping fuel Hezbollah's illicit activities, was generally aware that by providing substantial assistance to Hezbollah it was aiding and abetting Hezbollah's terrorist and criminal activities and nonetheless continually assisted Hezbollah in its efforts.

5668.   The amount and extent of assistance each Defendant provided—illegal access to millions of U.S. dollars and the international financial system—was integral to Hezbollah's overall terrorist activities and the foreseeable acts of terrorism at issue.

5669.   Each Defendant knowingly provided this substantial assistance to Hezbollah for years.

5670.   Each Defendant knew that Hezbollah was not only an FTO, but among the most dangerous terrorist groups in the world, and that providing illegal access to the U.S. financial system would foreseeably aid Hezbollah in committing acts of international terrorism, including terrorism in Iraq.

5671.   As the U.S. Department of the Treasury noted in 2016 (quoting Adam J. Szubin, then-Acting Under Secretary for Terrorism and Financial Intelligence), Hezbollah "relies upon accomplices in the business community to place, manage, and launder its terrorist funds."

5672. Defendants herein were important accomplices relied upon by Hezbollah in collecting and distributing its operational funding, and they fully understood their role in Hezbollah's operations.

5673. Plaintiffs' injuries were proximately caused by Hezbollah's conduct, which each Defendant substantially assisted.

## THIRD CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) FOR DEFENDANTS' ROLE IN HEZBOLLAH'S CONSPIRACY TO MURDER AMERICANS IN IRAQ

5674. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

5675. During the relevant period, Hezbollah and the IRGC-QF formed a conspiracy whose objectives included launching terrorist attacks against U.S. and MNF-I personnel in Iraq. As part of that conspiracy, Hezbollah and the IRGC-QF agreed to finance these terrorist attacks primarily with U.S. dollar-denominated assets.

5676. Defendants joined that conspiracy by knowingly agreeing to provide Hezbollah with illegal material support in the form of financial services critical to Hezbollah's capacity to commit terrorist attacks in Iraq.

5677. Defendants agreed to join with Hezbollah and its agents (both natural persons and corporate entities and associations) to participate in unlawful acts (violations of U.S. criminal laws, including 18 U.S.C. § 2339B) and to provide substantial assistance to Hezbollah in furtherance of the common scheme by which Defendants served as vital conduits for Hezbollah's illicit financing network.

5678. Defendants knew the objective of the conspiracy was to provide material support for and increase Hezbollah's capacity to, *inter alia*, commit terrorist attacks.

5679. Defendants knew that by joining the conspiracy to provide material support to Hezbollah in the forms set forth herein they were contributing substantially to Hezbollah's capacity to commit terrorist attacks.

5680. The terrorist attacks at issue were foreseeably committed in furtherance of and as foreseeable consequences of the conspiracy.

5681. Plaintiffs' injuries were a foreseeable and proximate result of the conspiracy.

## FOURTH CLAIM FOR RELIEF

## SUCCESSOR LIABILITY OF SGBL

5682. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

5683. In addition to its own participation in The System and liability to Plaintiffs under the first three claims for relief set forth above, Defendant SGBL is liable for LCB's role in The System as its successor, including as to LCB's liabilities.

5684. Within three weeks of the February 10, 2011 announcement of the U.S. Department of the Treasury identifying Lebanese Canadian Bank together with its subsidiaries as a financial institution of primary money laundering concern under Section 311 of the USA PATRIOT Act, Defendant SGBL agreed to purchase LCB's assets and liabilities.

5685. This was memorialized in a Purchase Agreement dated June 22, 2011.

5686. As noted above, Section 2.3 of the Sale and Purchase Agreement stated:

> The Assumed Liabilities consist *inter alia* of any and all of the Seller's liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the Seller's Business, all as at the Completion Date.

5687.   According to an affidavit and verification signed and filed on behalf of Defendant

SGBL in *United States v. Lebanese Canadian Bank,* No. 11-cv-09186 (S.D.N.Y.):

> SGBL only finalized the purchase of certain assets and liabilities of LCB
> after a rigorous filtering process that eliminated any and all questionable
> accounts.

5688.   According to the Lebanese government, however, SGBL elected to maintain

accounts for more than 20 of the Hezbollah-identified individuals and entities on the auditors' lists,

including, *e.g.*, Muhammad Hussein Darwish, Ali Hussein Darwish, and Muhammad Issam Abu

Darwish.

5689.   Moreover, as noted above, many of Hezbollah's and the Iranian governmental

entities' accounts at LCB were omitted from the Lebanese reports inventorying suspect accounts

at LCB and there is no indication that these (unlisted) accounts were ever closed by Defendant

SGBL.

5690.   These "phantom" accounts included, among others, those held for Yousser

Company for Finance and Investment (SDGT), the Martyrs Foundation – Lebanon (SDGT),

Hussein al-Shami (SDGT), Al-Mabarrat Charitable Society, Lebanese Arab Touristic Company

and Al-Aytam Company for General Trading and Fuels.

5691.   As noted above, many of these accounts that were identified in the 2011 DOJ civil

action against LCB were later not listed in the Lebanese government reports on LCB.

5692.   At least two of the LCB accounts identified in the 2011 DOJ civil action – Elissa

Holding SAL (SDNTK) and Yousser Company for Finance and Investment (SDGT) – were

retained by Defendant SGBL who continued to provide them with banking services after the LCB

sale of assets and liabilities was completed.

5693.   In sum, Defendant SGBL did undertake a review of LCB's roster of customers and did require LCB to close *some* of Hezbollah's BAC accounts before LCB's customer accounts were taken over by SGBL, but the exercise was intended solely to protect Defendant SGBL's reputation in acquiring a pariah bank; not to cut Hezbollah off from SGBL or to end SGBL's role in The System.

5694.   For the foregoing reasons, Defendant SGBL is liable for the acts of LCB to the same extent that LCB would be found liable.

5695.   Defendant SGBL is liable for LCB's violation of 18 U.S.C. § 2333(a) (for violations of 18 U.S.C. § 2339B) and 18 U.S.C. § 2333(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against each Defendant and in favor of all Plaintiffs for compensatory damages (including for physical and emotional pain and suffering; loss of society, companionship, comfort, advice and counsel; and economic loss for all Plaintiffs) in amounts to be determined at trial;

(c)     Enter judgment against each Defendant and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

(d)     Enter judgment against each Defendant and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333; and

(e)     Grant such other and further relief as justice requires.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: August 2, 2019

By    /s/ Gary M. Osen
      **OSEN LLC**
      Gary M. Osen, Esq.
      Ari Ungar, Esq.
      Aaron Schlanger, Esq.
      2 University Plaza, Suite 402
      Hackensack, NJ 07601
      (201) 265-6400
      (201) 265-0303 Fax

      **TURNER & ASSOCIATES, P.A.**
      Tab Turner, Esq.
      (admitted pro hac vice)
      4705 Somers Avenue, Suite 100
      North Little Rock, AR 72116
      (501) 791-2277

      **MOTLEY RICE, LLC**
      Michael Elsner, Esq.
      28 Bridgeside Boulevard, P.O. Box 1792
      Mount Pleasant, SC 29465
      (843) 216-9000


      Attorneys for Plaintiffs