UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ROBERT BARTLETT, et al.,

                              Plaintiffs,

          -against-

SOCIETE GENERALE DE BANQUE AU LIBAN
SAL, et al.,

                              Defendants.

No. 19-cv-0007 (CBA) (VMS)

---

**MOVING DEFENDANTS' JOINT MEMORANDUM OF
LAW IN SUPPORT OF MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ........................................................................................... 3

I.    ANTI-TERRORISM ACT ..................................................................... 4

II.   PLAINTIFFS ........................................................................................ 5

III.  ALLEGATIONS .................................................................................. 6

ARGUMENT ............................................................................................... 11

I.    THIS COURT LACKS PERSONAL JURISDICTION OVER MOVING
DEFENDANTS ...................................................................................... 11

    A.    The Amended Complaint Fails to Allege Facts Sufficient to Establish that
Any Moving Defendant Is Subject To General Personal Jurisdiction ................. 12

    B.    The Amended Complaint Fails to Allege Facts Sufficient to Establish that
Any Moving Defendant Is Subject to Specific Personal Jurisdiction ................. 12

        1.    The Amended Complaint Fails to Allege Purposeful, Suit-Related
Conduct By Moving Defendants In The United States ........................... 13

        2.    The Amended Complaint Fails to Allege That Moving Defendants'
Conduct In The United States Gave Rise to Plaintiffs' Injuries ............. 17

II.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH
RELIEF MAY BE GRANTED ...................................................................... 19

    A.    The Amended Complaint Does Not State a Claim for Primary Liability ............ 20

        1.    The Amended Complaint Fails to Allege Facts Plausibly
Supporting an Inference of Proximate Causation .................................... 20

            a.    The Amended Complaint Does Not Link Moving
Defendants to the Attacks ........................................................... 23

            b.    The Amended Complaint Fails to Allege that Arms-Length
Banking Services Were a Substantial Factor in the Causal
Sequence .................................................................................... 26

            c.    The Amended Complaint Fails to Allege Facts Permitting a
Plausible Inference that Plaintiffs' Injuries Were a
Foreseeable Consequence of the Banks' Alleged Provision
of Arms-Length Banking Services to the Alleged Bank
Customers .................................................................................. 27

### TABLE OF CONTENTS
(continued)

Page

2. The Amended Complaint Fails to Allege Facts Supporting a Plausible Inference that Moving Defendants' Conduct Constituted Acts of International Terrorism .............................................................. 29

    a. Plaintiffs Have Not Alleged Facts Plausibly Showing that Moving Defendants Acted With Objective Terroristic Intent ....................................................................................... 30

    b. Plaintiffs Do Not Allege Facts Plausibly Showing that Moving Defendants Engaged in Acts Dangerous to Human Life ........................................................................................... 32

3. The Amended Complaint Fails to Allege Facts Supporting a Plausible Inference of the Elements of the Material Support Statute, 18 U.S.C. § 2339B ................................................... 32

B. The Amended Complaint Does Not State a JASTA Aiding-and-Abetting Claim ......................................................................................... 33

1. The Amended Complaint Fails to Meet the Threshold Statutory Requirements of JASTA ......................................................... 34

2. The Amended Complaint Fails to Plausibly Allege the *Halberstam* Elements of Aiding-and-Abetting ........................................... 37

    a. The Amended Complaint Fails to Allege Facts Permitting a Plausible Inference that Moving Defendants Knowingly Played a Role in Terrorist Activities ............................................ 38

    b. The Amended Complaint Fails to Allege Facts Supporting a Plausible Inference that Moving Defendants' Conduct Constituted Substantial Assistance ............................................. 41

C. The Amended Complaint Does Not State a JASTA Conspiracy Claim ............. 44

1. The Amended Complaint Does Not Properly Allege Any Illicit Agreement ............................................................................. 44

2. The Amended Complaint Does Not Properly Allege that Moving Defendants Conspired to Commit an Act of International Terrorism .............................................................................. 47

3. The Amended Complaint Does Not Properly Allege that Moving Defendants "Conspired" with Anyone Who Committed Acts of Terrorism .............................................................................. 48

CONCLUSION ................................................................................... 49

-ii-

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmad v. Christian Friends of Israeli Cmtys.*,
2014 WL 1796322 (S.D.N.Y. May 5, 2014) ....................................................23, 27

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006).................................................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................15, 19, 31, 35

*Atuahene v. City of Hartford*,
10 F. App'x. 33 (2d Cir. 2001) ..............................................................................10

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002)...................................................................................17

*Bank of Am. Corp. v. City of Miami*,
137 S. Ct. 1296 (2017)............................................................................................20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................19, 31

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007)...................................................................................12

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*,
137 S. Ct. 1773 (2017).......................................................................................12, 13

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)...........................................................................................13, 16

*Cain v. Twitter Inc.*,
2018 WL 4657275 (N.D. Cal. Sept. 24, 2018) .....................................................46

*Calder v. Jones*,
465 U.S. 783 (1984).................................................................................................12

*Charles Schwab Corp. v. Bank of Am.*,
883 F.3d 68 (2d Cir. 2018)......................................................................................18

*Chirag v. MT Marida Marguerite Schiffahrts*,
604 F. App'x 16 (2d Cir. 2015) ..............................................................................11

*Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*,
  2015 WL 4164763 (S.D.N.Y. July 10, 2015) ....................................................................16

*Consol. Rail Corp. v. Gottshall*,
  512 U.S. 532 (1994)..............................................................................................................20

*Crosby v. Twitter, Inc*,
  921 F.3d 617 (6th Cir. 2019) ..........................................................................35, 36, 37, 48

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)..............................................................................................................12

*In re del Valle Ruiz*,
  2019 WL 4924395 (2d Cir. Oct. 7, 2019)..........................................................................12

*Ehrenfeld v. Mahfouz*,
  489 F.3d 542 (2d Cir. 2007)................................................................................................11

*Fields v. Twitter, Inc.*,
  881 F.3d 739 (9th Cir. 2018) ............................................................................20,22,23, 25

*Freeman v. HSBC Holdings PLC*,
  2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ...........................................3, 6, 26, 27, 30, 31

*Goldberg v. UBS AG*,
  660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...............................................................................43

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011)..............................................................................................................17

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .................................................................................. *passim*

*Hau Yin To v. HSBC Holdings, PLC*,
  700 F. App'x 66 (2d Cir. 2017) ..........................................................................................17

*Hemi Grp., LLC v. City of N.Y.*,
  559 U.S. 1 (2010)..................................................................................................................20

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992)..............................................................................................................20

*Jazini v. Nissan Motor Co.*,
  148 F.3d 181 (2d Cir. 1998)..........................................................................................11, 16

*Kaplan v. Al Jazeera*,
  2011 WL 2314783 (S.D.N.Y. June 7, 2011) .....................................................................23

*Kaplan v. Lebanese Canadian Bank, SAL,*
  2019 WL 4869617 (S.D.N.Y. Sep. 20, 2019)..................................................... *passim*

*Keeton v. Hustler Magazine Inc.,*
  465 U.S. 770 (1984).........................................................................................12

*Kemper v. Deutsche Bank AG,*
  911 F.3d 383 (7th Cir. 2018) ....................................................................... *passim*

*Licci v. Lebanese Canadian Bank, SAL,*
  732 F.3d 161 (2d Cir. 2013).............................................................13, 14, 15, 17

*Linde v. Arab Bank PLC,*
  882 F.3d 314 (2d Cir. 2018)......................................................................... *passim*

*Mastafa v. Chevron Corp.,*
  770 F.3d 170 (2d Cir. 2014)..............................................................................19

*O'Sullivan v. Deutsche Bank AG,*
  2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ............................................... *passim*

*Ocasio v. United States,*
  136 S. Ct. 1423 (2016)......................................................................................47

*Ofisi v. BNP Paribas, S.A.,*
  2018 WL 396234 (D.D.C. Jan 11, 2018) ............................................................42

*Owens v. BNP Paribas,*
  897 F.3d 266 (D.C. Cir. 2018) ..........................................................................27

*Paroline v. United States,*
  572 U.S. 434 (2014)..........................................................................................20

*Penguin Grp. (USA) Inc. v. Am. Buddha,*
  609 F.3d 30 (2d Cir. 2010)................................................................................11

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.,*
  712 F.3d 705 (2d Cir. 2013)..............................................................................19

*Perrin v. United States,*
  444 U.S. 37 (1979)............................................................................................36

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013)......................................................................... *passim*

*Shaffer v. Deutsche Bank AG,*
  2017 WL 8786497 (S.D. Ill. Dec. 7, 2017)........................................................37

*Siegel v. HSBC Bank USA, N.A.*,
   2018 WL 3611967 (S.D.N.Y. July 27, 2018) .........................................................40

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019).........................................3, 34, 39, 40, 42, 44

*SPV OSUS, Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)..................................................11, 12, 17, 18

*Strauss v. Credit Lyonnais, S.A.*,
   379 F. Supp. 3d 148 (S.D.N.Y. 2019).....................................................38

*Stutts v. De Dietrich Grp.*,
   2006 WL 1867060 (E.D.N.Y June 30, 2006) .........................................23

*Taamneh v. Twitter, Inc.*,
   343 F. Supp. 3d 904 (N.D. Cal. 2018) .............................................43, 47

*In re Terrorist Attacks on Sept. 11, 2001*,
   349 F. Supp. 2d 765 (S.D.N.Y. 2005)......................................................10

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 118 (2d Cir. 2013)..............................20, 21, 23, 24, 25

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 659 (2d Cir. 2013)..................................................11, 16

*U.S. Bank N.A. v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019)..................................................12, 13

*United States v. Shabani*,
   513 U.S. 10 (1994)....................................................................45

*Walden v. Fiore*,
   571 U.S. 277 (2014)........................................................12, 13, 16

*Waldman v. PLO*,
   835 F.3d 317 (2d Cir. 2016)................................11, 12, 13, 14, 16, 17, 18

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014)...........................................................29, 33

*Weiss v. Nat'l Westminster Bank PLC*,
   381 F. Supp. 3d 223 (E.D.N.Y. 2019) .............................................32, 38

*Weshnak v. Bank of Am., N.A.*,
   451 F. App'x 61 (2d Cir. 2012) .......................................................43

*Zapata v. HSBC Holdings plc*,
    2019 WL 4918626 (E.D.N.Y. Sept. 30, 2019) ................................................................25, 31

**Statutes**

8 U.S.C. § 1189 ................................................................................................................10

18 U.S.C. § 2331 .......................................................................................................4, 29, 32

18 U.S.C. § 2333 ............................................................................................... *passim*

18 U.S.C. § 2335 ..................................................................................................................7

18 U.S.C. § 2336 ..................................................................................................................5

18 U.S.C. § 2339B ........................................................................................................10, 33

18 U.S.C. § 2339D ..............................................................................................................10

Public Law 112-239 (Jan. 2, 2013) .....................................................................................5

**Other Authorities**

31 C.F.R. part 594 ..............................................................................................................10

Fed. R. Civ. P. 8 ................................................................................................................19

Oxford English Dictionary ................................................................................................36

## PRELIMINARY STATEMENT

Plaintiffs are U.S. military personnel or contractors killed or injured in attacks committed by paramilitary groups in Iraq between 2004 and 2011, and their families. Starting in 2014, these and other similarly situated plaintiffs have filed numerous lawsuits seeking to recover money damages against a wide range of deep-pocketed entities, ranging from the government of Iran and Iranian banks to European banks, U.S. banks, and multinational pharmaceutical companies. While the theories of liability in these cases vary, all involve claims under the Anti-Terrorism Act ("ATA")—and most of those claims have been dismissed by the courts.

The defendants in this action are twelve Lebanese commercial banks that together account for roughly 80% of the assets in the Lebanese financial sector. The Amended Complaint makes sweeping and conclusory allegations that these banks maintained accounts for certain commercial entities and individuals that Plaintiffs allege have or had a connection to Hezbollah. Plaintiffs do not allege that Hezbollah carried out any of the attacks that injured them, but instead assert only that Hezbollah played some indirect role in those incidents. On this tenuous theory, Plaintiffs seek to hold virtually the entire Lebanese banking sector responsible for their injuries.[1]

The moving defendants here ("Moving Defendants" or the "Banks")[2] categorically abhor terrorism and all unjustified acts of violence. But they are not legally or factually responsible for Plaintiffs' battlefield injuries. The Amended Complaint does not identify a single banking transaction that any of the Banks processed for any of the alleged customers or for any other

---

[1] Plaintiffs initiated this action on January 1, 2019 (ECF Doc. 1 ("Initial Complaint")), the day before the January 2, 2019 expiration of a statute of limitations extension enacted by Congress in 2013, and filed an Amended Complaint seven months later. ECF Doc. 105 ("Amended Complaint").

[2] The Moving Defendants are (1) Société Générale de Banque au Liban S.A.L. ("SGBL"), (2) Fransabank S.A.L., (3) MEAB Bank s.a.l. ("MEAB Bank"), (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) Lebanon & Gulf Bank S.A.L., (9) Banque Libano Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank.

supposedly Hezbollah-related individual or entity, and does not even specify when Moving Defendants allegedly held accounts for these alleged customers (much less provide factual allegations plausibly demonstrating the existence of such accounts). Nor does the Amended Complaint tie Moving Defendants' alleged banking services in Lebanon to the violent incidents in Iraq, or offer a coherent explanation for how these banking services led to, supported, or otherwise had anything to do with their injuries.

Given these deficiencies, Counts I, II, and III of the Amended Complaint must be dismissed. *First*, the Amended Complaint contains no well-pleaded allegations supporting this Court's assertion of personal jurisdiction over these Lebanese banks. *Second*, it fails to plausibly allege that the routine banking services that the Banks are said to have provided to a wide range of commercial and charitable entities proximately caused Plaintiffs' injuries, let alone that the Banks themselves committed "acts of international terrorism." *Third*, it fails to plead the elements for an aiding-and-abetting claim under the ATA, and in particular falls far short of factual allegations permitting a plausible inference that defendants "knowingly and substantially" assisted the perpetrators of the attacks. *Fourth*, it fails to plead a conspiracy claim under the ATA because it does not plausibly allege that the Banks entered into an agreement to commit acts of international terrorism with the perpetrators of the attacks.

Since the time Plaintiffs filed this action in January, courts in this Circuit have consistently rejected ATA claims asserted against banks for allegedly committing, conspiring to commit, or assisting acts of international terrorism.

- In March 2019, Judge Swain dismissed primary and secondary liability ATA claims brought by U.S. military personnel against European banks that allegedly provided banking services to the Republic of Iran, which was alleged to have

financed the terror groups that injured plaintiffs. *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019).

- In August 2019, the Second Circuit affirmed Judge Cote's dismissal of secondary liability ATA claims brought by victims of a bombing in Jordan against a U.S. bank alleged to have supported al Qaeda in Iraq by providing services to a Saudi bank. *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019).

- In September 2019, Judge Chen dismissed with prejudice primary and secondary liability ATA claims brought by U.S. military personnel and others against European banks that provided banking services to the government of Iran and state-owned businesses in violation of Treasury Department sanctions, allegedly facilitating the financing of Hezbollah and other terror groups. *Freeman v. HSBC Holdings PLC*, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019).

- Most recently, also in September 2019, Judge Daniels dismissed with prejudice primary and secondary liability ATA claims against a Lebanese bank alleged to have provided banking services directly to Hezbollah fronts. *Kaplan v. Lebanese Canadian Bank, SAL*, 2019 WL 4869617 (S.D.N.Y. Sept. 20, 2019).

The law is clear, and Plaintiffs' claims here should likewise be dismissed.

## BACKGROUND

### I.  ANTI-TERRORISM ACT

Congress enacted the ATA in 1992 to hold terrorists accountable for their actions by providing a federal cause of action—a "primary liability" ATA claim—that requires proof that the defendant engaged in "international terrorism" and that the defendant's acts caused the plaintiff's injuries.  18 U.S.C. Section 2333(a) creates this civil cause of action for U.S. nationals

"injured . . . by reason of an act of international terrorism."  Acts of "international terrorism," as defined in 18 U.S.C. § 2331(1), include activities that:

> (A)  involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> (B)  appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> (C)  occur primarily outside the territorial jurisdiction of the United States.

To state a claim for *primary liability* pursuant to Section 2333(a), a plaintiff must allege facts plausibly showing that the defendant itself committed an act of international terrorism, *i.e.*, an act that satisfies each of Section 2331(1)'s definitional requirements.  *Linde v. Arab Bank PLC*, 882 F.3d 314, 318 (2d Cir. 2018).  A plaintiff also must allege that he or she was injured "by reason of" the defendant's act of international terrorism, 18 U.S.C. § 2333(a)—that the Second Circuit has held requires factual allegations permitting a plausible inference that the defendant's act proximately caused the plaintiff's injury, *see Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013).

The ATA did not include a secondary liability cause of action until 2016, when Congress enacted the Justice Against Sponsors of Terrorism Act ("JASTA") that, among other things, amended the ATA to create aiding-and-abetting and conspiracy liability, in certain narrow circumstances.  *Linde*, 882 F.3d at 318, 320; 18 U.S.C. § 2333(d).  JASTA is the exclusive source of secondary liability under the ATA. *Linde,* 882 F.3d at 319-20 (quoting *Rothstein*, 708 F.3d at 97).  It specifies two requirements for all ATA secondary liability: (1) the claimed injuries must be caused by terrorist acts "committed, planned, or authorized" by an officially designated foreign terrorist organization ("FTO"); and (2) liability attaches only to a "'person

-4-

who aids and abets, by knowingly providing substantial assistance [to], or who conspires with the person who committed such an act of international terrorism.'" *Linde*, 882 F.3d at 320 (quoting 18 U.S.C. § 2333(d)(2)).  As the Second Circuit has held, "aiding-and-abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.  Aiding-and-abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Id.* at 329 (emphasis in original).  To be liable under JASTA on a conspiracy theory, a  defendant must have conspired to commit an act of international terrorism with the person who committed that terrorist act. *O'Sullivan*, 2019 WL 1409446, at *9.

## II.    PLAINTIFFS

The United States invaded Iraq in 2003 as part of a multi-national effort to oust the government of Saddam Hussein; U.S. troops remained in Iraq for many years thereafter. Plaintiffs are U.S. military personnel or civilian contractors killed or injured in Iraq, and their families.  The Amended Complaint identifies approximately 265 incidents (together, in Plaintiffs' parlance, the "Attacks")[3] allegedly carried out by paramilitary "Special Groups" or unnamed "terror operatives" throughout Iraq between January 12, 2004, and November 14, 2011. Am. Compl. ¶¶ 2047-5646.[4]

This action was initiated on January 1, 2019, the day before the expiration of the ATA's statutorily-extended limitations period.[5]  This eleventh-hour lawsuit joins many other actions that

---

[3] Plaintiffs appear to repeat several Attacks where multiple Plaintiffs were involved.  *See*, *e.g.*, Am. Compl. ¶¶ 3026-39, 3040-46, 3047-86 (separately describing "The October 22, 2006 Attack – Baghdad").

[4] Because the United States was engaged in military combat operations against paramilitary forces operating in Iraq throughout the relevant time period, the claims in this case are statutorily barred under the "act of war" exclusion in 18 U.S.C. § 2336(a).  Moving Defendants expressly reserve the right to raise this defense, if necessary, at the appropriate time in these proceedings.

[5] Congress in 2013 extended the statute of limitations for claims under the ATA to ten years from the date of accrual. *See* National Defense Authorization Act For Fiscal Year 2013 ("NDAA"), Public Law 112-239 (Jan. 2,

already had been instituted against a host of defendants, all seeking money damages pursuant to

the ATA for some or all of the same Attacks.[6]  Of particular note is *Freeman v. HSBC Holdings*

*plc*, No. 14-cv-6601 (E.D.N.Y. Nov. 10, 2014) (PKC)(CLP), which was filed in 2014 by many of

the Plaintiffs in this case, represented by the same counsel, seeking to recover against another

group of banks for the same injuries claimed here.  On September 16, 2019, Judge Chen granted

the defendant banks' motions to dismiss the action in its entirety.  *Freeman*, 2019 WL 4452364.[7]

## III.   ALLEGATIONS

On July 15, 2019, all of the originally named defendants moved to dismiss the two counts

asserted against all defendants (primary liability and secondary aiding-and-abetting liability) for

lack of personal jurisdiction and failure to state a claim.  *See* ECF No. 100.  On the same date,

defendants SGBL and MEAB Bank served supplemental motions to dismiss the two counts

asserted only against those Banks (a conspiracy claim against both and a claim for successor

liability against SGBL) for failure to state a claim.  ECF Nos. 101, 102.  Rather than attempt to

defend the Initial Complaint, on August 2, 2019, Plaintiffs instead filed the Amended Complaint

---

2013).  It also created a special rule for acts of international terrorism that occurred from September 11, 2001, to January 1, 2009, extending the limitations period for claims based on those acts to six years from the enactment of the NDAA—until January 2, 2019.  Thus any ATA claim based on an attack that occurred before January 2, 2009 (*i.e.*, approximately 230 of the Attacks) was time-barred as of January 2, 2019.  Defendants expressly reserve the right to raise a statute of limitations defense, at the appropriate time in these proceedings, with regard to the approximately 35 Attacks that occurred on or after January 2, 2009.

[6] Those lawsuits include *Freeman v. HSBC Holdings plc*, No. 14-cv-6601 (E.D.N.Y. filed Nov. 10, 2014); *Fritz v. Islamic Rep. of Iran*, No. 15-cv-456 (D.D.C. filed Mar. 30, 2015); *Karcher v. Islamic Rep. of Iran*, No. 16-cv-232 (D.D.C. filed Feb. 12, 2016); *Burks v. Islamic Rep. of Iran*, No. 16-cv-1102 (D.D.C. filed June 13, 2016); *Martinez v. Deutsche Bank*, No. 17-cv-2474 (E.D.N.Y. filed Nov. 2, 2016); *Hake v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-114 (D.D.C. filed Jan. 17, 2017); *Brooks v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-737 (D.D.C. filed Apr. 20, 2017); *Field v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-2126 (D.D.C. filed Oct. 13, 2017); *Atchley v. AstraZeneca UK Ltd.*, No. 17-cv-2136 (D.D.C. filed Oct. 17, 2017); *Stearns v. Islamic Rep. of Iran*, No. 17-cv-131 (D.D.C. Jan. 19, 2017); *Freeman v. HSBC Holdings plc*, No. 18-cv-7359 (E.D.N.Y. filed Dec. 26, 2018); *Stephens v. HSBC Holdings plc*, No. 18-cv-7439 (E.D.N.Y. filed Dec. 28, 2018).

[7] On September 26, 2019, plaintiffs filed a motion for partial reconsideration of Judge Chen's order granting defendants' motions to dismiss the action.  *Freeman v. HSBC Holdings plc*, No. 14-cv-6601 (E.D.N.Y. Sept. 26, 2019) (ECF Doc. 239).  That motion was denied on October 28, 2019 and the judgment dismissing all claims against all defendants in *Freeman* is now final.  *Id.* (Oct. 28, 2019 Minute Order).

adding Fenicia Bank[8] and expanded their conspiracy claim to reach all defendants. ECF Doc. 105.

In addition, the Amended Complaint adds 52 new Plaintiffs. Five of the new Plaintiffs assert claims based upon Attacks, not included in the Initial Complaint, that occurred more than ten years before the filing of the Amended Complaint and hence are time barred.[9] Plaintiffs make no attempt to explain these untimely claims, and cannot argue that they "relate back" to the filing of the Initial Complaint under Federal Rule 15.[10] Also among the new Plaintiffs is Ryan Bowman, one of two plaintiffs in a related action pending before this Court that has not yet been served on any of the Moving Defendants. *See Bowman v. Société Générale de Banque au Liban SAL* (19-cv-2096) (E.D.N.Y.) ("*Bowman*"), filed April 10, 2019.

Despite the addition of over 200 pages, the Amended Complaint suffers from the same flaws as its predecessor. The Amended Complaint does not allege that Moving Defendants took part in any of the Attacks. Nor does it allege that any of the Moving Defendants had any dealings with the paramilitary groups or terrorists that allegedly perpetrated the Attacks. Instead, it merely asserts that Moving Defendants collectively provided unspecified "financial services" to several hundred individuals and entities that supposedly had some nebulous connection to Hezbollah, a State Department-designated FTO. Am. Compl. ¶¶ 5, 7, 9, 11.

---

[8] Plaintiffs' claims against Fenicia Bank are limited to those claims arising from Attacks that occurred after August 2, 2009. Am. Compl., n. 24. Only 22 of the approximately 265 Attacks identified in the Amended Complaint occurred after August 2, 2009.

[9] The five Plaintiffs are Tara Hutchinson (related Attack occurred on February 14, 2006), Andrew James Raymond (June 20, 2007), Grant Von Letkemann (April 4, 2008), Richard Hedgecock, II (February 18, 2009) and Matthew C. Beatty (April 22, 2009).

[10] The claims of these new plaintiffs should be dismissed even if the Court does not dismiss the Amended Complaint in its entirety. *See* 18 U.S.C. § 2335(a) ("a suit for recovery of damages under section 2333 of this title shall not be maintained unless commenced within 10 years after the date the cause of action accrued").

Hezbollah is not alleged to have actually carried out any of the Attacks.  Instead, the Amended Complaint asserts that Hezbollah, "in coordination with the United States-designated FTO Iran's Islamic Revolutionary Guard Corps (IRGC)," was somehow involved in each of the Attacks.  Am. Compl. ¶ 1.  While Hezbollah's alleged role in each Attack varies, the Amended Complaint most frequently alleges that Hezbollah, "in coordination with" the IRGC, had indirect involvement in each Attack—by designing or manufacturing the weapons used, training members of the groups that perpetrated the Attacks, or providing other resources for the Attacks—while alleging that each Attack actually was carried out by various unnamed operatives and paramilitary groups.  Am. Compl. ¶¶ 2047-5646.

The Amended Complaint does not allege that Moving Defendants provided banking services directly to Hezbollah, much less to the IRGC or to any perpetrators of an Attack.  Instead, the Amended Complaint alleges that persons with supposed *ties to* Hezbollah held accounts at unspecified times at the Banks.  Plaintiffs contend that those banking services somehow afforded Hezbollah "vital access to the United States financial system" that supposedly "facilitate[d] Hezbollah's illicit schemes."  *Id.* ¶¶ 5, 10.

The Amended Complaint purports to support its conclusory allegations with more than 950 paragraphs devoted to the alleged history, structure and global operations of Hezbollah.  Am. Compl. ¶¶ 319-1287.  It sets out a wide variety of illicit activities ascribed to Hezbollah, including narcotics trafficking, arms dealing, conflict diamond smuggling, and pharmaceutical counterfeiting that bear no conceivable relationship to the Attacks, much less to the Banks.  *E.g.*, Am. Compl. ¶¶ 827-855, 896-923, 1052-66.[11]

---

[11] This Court recognized as much in the context of the Initial Complaint, when it granted Achraf Safiedienne's motion to strike the allegations referencing him, noting that "the [Initial] Complaint does not contain any information suggesting that the Moving Defendants knew of or maintained any relationship with either Safieddine or any of the companies allegedly associated with him."  ECF Doc. 88 at 2 (citing Compl ¶¶ 869-1119).

The Amended Complaint identifies 205 entities that Plaintiffs contend were owned, controlled, associated with or otherwise connected with Hezbollah and supposedly had banking relationships with one or more of the Moving Defendants (the "Alleged Bank Customers"). Those so-called "intermediaries" include, *inter alia*, amusement parks, a printing company, technology wholesalers and retailers, travel and entertainment outfits, global communications companies, and pharmaceutical companies.[12]  Some of the Alleged Bank Customers are individuals and companies whose accounts allegedly "migrated" from non-defendant Lebanese Canadian Bank SAL ("LCB") to Moving Defendants in 2011 and 2012 (Am. Compl. ¶ 105), who supposedly received illicit funds in alleged accounts at the Banks from Hezbollah's network via Rilton Traders or Primogems (Am. Compl. ¶ 868), or who were allegedly associated with networks of individuals purportedly affiliated with Hezbollah (*see*, *e.g.*, Am. Compl. ¶¶ 652, 872).

One hundred and eighty-six of the Alleged Bank Customers—a large majority of the 205—are not alleged to have been designated by the United States as supporters of terrorism at the time of any of the Attacks.[13]  Of those 186, 169 never carried any designation at all and the 17 that did were designated only after the last Attack at issue in the Amended Complaint.[14]  And although the Amended Complaint identifies 19 Alleged Bank Customers[15] that were designated

---

[12] *See, e.g.*, Am. Compl. ¶ 1481 (Fantasy World SARL "the well-known Fantasy World amusement park in Hezbollah's stronghold"); *id.* ¶ 1479 (Dbouk International for Printing and General Trading); ¶ 1480 (Hoda for Touristic Services and Management Holding SAL); *id.* ¶¶ 660 and 1501 (Compu House SARL, "a wholesale and retail seller of computers and software"); ¶ 1596 (Medical Equipment and Drugs International Corporation SAL).

[13] *See, e.g.*, Am. Compl. ¶¶ 1307 n. 84, 1407-09, 1476-81, 1487, 1491, 1492, 1494, 1502-08, 1525-27, 1533, 1534, 1538-40, 1567-72, 1603, 1606, 1611, 1613, 1616, 1618, 1621,1637, 1638, 1641, 1646, 1651, 1652, 1654, 1664, 1671, 1674, 1675, 1676, 1685, 1689, 1700-04, 1731, 1750, 1751-60, 1762, 1774, 1777, 1782, 1783, 1788, 1810, 1811.

[14] *See, e.g.*, Am. Compl. ¶¶ 105, 624, 652, 665, 668, 669, 744, 753, 755, 1383, 1511, 1522, 1537, 1567, 1701, 1703, 1755, 1782, 1785, 1796, 1811.

[15] The Amended Complaint includes threadbare allegations that "Hezbollah" solicited funds to or owned accounts with two defendant Banks, but does not specify any banking transactions that were processed for Hezbollah or

as providing material support to Hezbollah at some point in time before the last Attack, it contains no allegations that any of them had a role in any of the Attacks.[16]

Moreover, not one of the Moving Defendants is alleged to have processed a specific transaction for any of those 19 Alleged Bank Customers at any time.  Indeed, the Amended Complaint is devoid of any allegation connecting any purported banking services (post-designation or otherwise) provided to any of the 19 Alleged Bank Customers to even one of the Attacks.[17]  That is fatal to Plaintiffs' claims.

The Amended Complaint asserts three claims against all Moving Defendants: Count I for primary liability pursuant to §2333(a); Count II for aiding-and-abetting under §2333(d); and Count III for conspiracy under § 2333(d).[18]  This motion addresses only those Counts and only

---

specify when the accounts were allegedly owned. Am. Compl. ¶¶ 1498, 1564. Moreover, the Amended Complaint, in its over 5,690 paragraphs, does not contain any additional factual allegations regarding these alleged accounts that would permit a plausible inference that they were owned by Hezbollah; that the Banks would have known that they were owned by Hezbollah; that there was any causal link between these alleged accounts and the Attacks at issue; or that the two defendant Banks were "aware" they were playing a "role" in terrorist activity by providing any routine banking service related to the alleged accounts.  For these reasons, the vague "Hezbollah" is not included in the Alleged Bank Customers figures.

[16] None of these 19 (or any of the other individuals or entities named in the Amended Complaint other than Hezbollah) was designated as an "FTO"—the State Department designation of a small number of organizations that present the greatest threat to the United States, *see* 8 U.S.C. § 1189, and that Congress has specifically required as a basis for liability in the ATA, 18 U.S.C. §§ 2339B, 2339D, and JASTA, 18 U.S.C. § 2333(d)(2).  *See* pp. 34-37, *infra*.  Rather, they were listed as Specially Designated Global Terrorists ("SDGTs"), a subset of thousands of Specially Designated Nationals ("SDNs") by the United States Treasury Department, whose assets must be blocked and whose financial activities curtailed. *See* 31 C.F.R. part 594.  Congress did not tie ATA or JASTA liability to SDGT or SDN designation.

[17] *See, e.g.*, Am. Compl. ¶¶ 1390, 1475, 1489,  1494, 1528, 1529, 1530, 1541, 1566, 1577, 1579, 1599, 1635, 1636, 1649, 1651, 1670, 1680, 1681, 1683, 1688, 1692, 1698, 1701, 1702, 1773, 1775, 1776, 1785, 1808, 1809.

[18] Many of the allegations in the Amended Complaint are directed at "Defendants" collectively.  *See, e.g.*, Am. Compl. ¶¶ 5, 9, 11, 114.  This practice of "group pleading" is impermissible.  *Atuahene v. City of Hartford*, 10 F. App'x. 33, 34 (2d Cir. 2001).  This is particularly so where the allegations involve participation in, and support of, international terrorism.  *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005) ("In light of 'the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of [a] Plaintiff's allegations as to any particular defendant . . . .'") (emphasis added).  Group-pleaded allegations in the Amended Complaint must be disregarded.

with respect to Moving Defendants.  Count IV, the only other claim, is addressed separately by SGBL in its supplemental brief.

## ARGUMENT

## I.     THIS COURT LACKS PERSONAL JURISDICTION OVER MOVING DEFENDANTS

The Amended Complaint should be dismissed as to all the Banks for lack of personal jurisdiction because the allegations do not make a *prima facie* showing of personal jurisdiction over any Bank.  "[T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010).  The Amended Complaint "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018).

This standard "requires non-conclusory fact-specific allegations."  *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015).  A court "will not draw argumentative inferences in the plaintiff's favor, nor must we accept as true a legal conclusion couched as a factual allegation."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (referred to herein as "*Asat Trust*") (internal citation and quotation marks omitted); *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184-85 (2d Cir. 1998) (rejecting jurisdictional allegations lacking "supporting facts" and "factual specificity").

The exercise of personal jurisdiction over any Moving Defendant must comport with principles of constitutional due process.  *See Waldman v. PLO*, 835 F.3d 317, 343 (2d Cir. 2016); *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007).  Each Moving Defendant must have "sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction," and the exercise of personal jurisdiction must "comport[] with 'traditional notions

of fair play and substantial justice' under the circumstances." *Waldman*, 835 F.3d at 331 -

(quoting *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014)).

The Amended Complaint fails to allege facts sufficient to establish that any Moving

Defendant is subject to either general or specific personal jurisdiction.

### A.   The Amended Complaint Fails to Allege Facts Sufficient to Establish that Any Moving Defendant Is Subject to General Personal Jurisdiction

The Amended Complaint does not allege that any Moving Defendant is incorporated or

maintains its principal place of business in New York or elsewhere in the United States or has

other "exceptional" affiliations with the United States that are so continuous and systematic as to

render the Moving Defendant "at home" here. *See Daimler AG*, 571 U.S. at 127.  There is thus

no general personal jurisdiction over any Moving Defendant.

### B.   The Amended Complaint Fails to Allege Facts Sufficient to Establish that Any Moving Defendant Is Subject to Specific Personal Jurisdiction

To exercise *specific* personal jurisdiction consistent with due process, the Court must

examine "the relationship among the defendant, the forum, and the litigation."  *Walden v. Fior*e,

571 U.S. 277, 283-84 (2014) (citations omitted); *In re del Valle Ruiz*, 2019 WL 4924395 (2d Cir.

Oct. 7, 2019) (same) (quoting *SPV Osus*, 882 F.3d at 344).  *First*, "the defendant must have

purposefully availed itself of the privilege of conducting activities within the forum State or have

purposefully directed its conduct into the forum State."  *U.S. Bank N.A. v. Bank of Am. N.A.*

("*U.S. Bank*"), 916 F.3d 143, 150 (2d Cir. 2019) (quoting *Bristol-Myers Squibb Co. v. Super. Ct.

of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1785 (2017)).  Under this "minimum contacts rubric,"

personal jurisdiction may be exercised only if the defendant either "continuously and deliberately

exploited the [forum's] market" or committed "intentional, and allegedly tortious, actions . . .

expressly aimed at [the forum]."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir.

2007) (citing *Keeton v. Hustler Magazine Inc.*, 465 U.S. 770, 781, 789-90 (1984), and *Calder v.*

*Jones*, 465 U.S. 783, 789-90 (1984)).  Contacts with the United States that are "[r]andom, fortuitous, or attenuated" and "the unilateral activity of another party or a third person" cannot support personal jurisdiction.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted).

*Second*, "the plaintiff's claim must arise out of or relate to the defendant's forum conduct."  *U.S. Bank*, 916 F.3d at 150 (*quoting Bristol-Myers Squibb*, 137 S. Ct. at 1786).  The allegations in the Amended Complaint must establish that Moving Defendants' "suit-related conduct"—*i.e.*, "conduct that could have subjected them to liability under the ATA"—created a "substantial connection" with the United States.  *Waldman*, 835 F.3d at 335 (quoting *Walden*, 571 U.S. at 284).  The Amended Complaint's allegations fall far short of this standard.

1.  The Amended Complaint Fails to Allege Purposeful, Suit-Related Conduct By Moving Defendants In the United States

The Amended Complaint's conclusory and generic allegations regarding the purported U.S. conduct of Moving Defendants are insufficient.  *See* Am. Compl. ¶¶ 121-301, 1494-1825. According to the Amended Complaint, Moving Defendants engaged in a single mode of U.S. contact: maintaining correspondent bank accounts in New York.  *See id.*  Yet the Amended Complaint does not allege any specific transactions through any Moving Defendant's U.S. correspondent account connected to the Attacks, and instead generically alleges use of those accounts.  The Second Circuit in *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013), rejected the proposition that "a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction."  Rather, to satisfy the New York long-arm statute and the U.S. Constitution, "the selection and repeated use of New York's banking system" must be "as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress."  *Id.* at

-13-

171; *see id.* at 168 (explaining that "both the frequency and deliberate nature" of the use of correspondent accounts were "determinative" in satisfying New York's long-arm statute); *see also Waldman*, 835 F.3d at 342 (deeming irrelevant to personal jurisdiction activities in the United States "that are not proscribed by the ATA and are not connected to the wrongs").

The Amended Complaint asserts that Moving Defendants should be subject to personal jurisdiction in the United States because they provided "critical access to U.S. dollar clearing." *E.g.*, Am. Compl. ¶¶ 1524, 1598, 1624, 1659; *see id.* ¶¶ 5, 11.  But the Amended Complaint also alleges that every bank account holder in Lebanon—including purported Hezbollah affiliates—has access to U.S. dollar clearing by virtue of the Central Bank of Lebanon's decades-long policy to link Lebanon's economy to the U.S. dollar and U.S. banking system.  *Id.* ¶¶ 62-67.  Such routine banking activity is insufficient; the Amended Complaint fails to connect the U.S. correspondent bank accounts to the alleged wrongs, much less demonstrate that Plaintiffs' claims "arise from" such banking activity.

The Amended Complaint also is devoid of factual allegations sufficient to establish, as required under *Licci*, that any Moving Defendant "select[ed] and repeated[ly] use[d]" its New York correspondent account as an "instrument" to facilitate Hezbollah money laundering in Lebanon to, in turn, enable third-party violence in Iraq.  732 F.3d at 171.  In *Licci*, the Second Circuit addressed allegations in the complaint that the defendant had made terrorism-related "wire transfers through AmEx [in New York] that numbered in the dozens and totaled several million dollars."  *Id.*  In contrast, the Amended Complaint here does not allege a single transaction through the Moving Defendants' U.S. correspondent accounts.  The Amended Complaint also fails to allege facts sufficient to establish that Moving Defendants knew of any links between an Alleged Bank Customer and the perpetrators of the attacks (or even Hezbollah),

-14-

much less that any Moving Defendant *chose* to use New York correspondent accounts as an "instrument" to facilitate any attacks by those paramilitary groups.  Indeed, the allegations that the Alleged Bank Customers were part of "a web of businesses that acted as front companies" (Am. Compl. ¶ 20) that dealt in legitimate goods (*id.* at ¶ 21 (frozen chicken, raw materials, used cars, cigarettes, and consumer electronics)) undermine any such speculative leap.

The Amended Complaint generically recites that each Moving Defendant "purposefully and deliberately used its New York correspondent banks to 'clear' U.S. dollar-denominated transactions on Hezbollah's behalf . . . including on behalf of Hezbollah's Conflict Diamond Money Laundering Network."  Am. Compl. ¶¶ 144, 159, 178, 195, 208, 223, 235, 246, 260, 274, 289.  It alleges that each Moving Defendant received "illicit funds in U.S. dollars . . . via Rilton Traders in Dubai and Primogems to accounts at Defendant banks in Lebanon through their correspondent banks in the United States."  *Id*. ¶ 868.  Such conclusory allegations fail to show that any Moving Defendant "select[ed] and repeated[ly] use[d]" its New York correspondent account as an "instrument" to facilitate Hezbollah money laundering in Lebanon to, in turn, enable third-party attacks in Iraq (*Licci*, 732 F.3d at 171), and should not be credited. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Courts should disregard "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "naked assertion[s] devoid of further factual enhancement.").

Even if these allegations were considered, however, they are not "suit related" because the Amended Complaint fails to connect these alleged transactions to the Attacks.  Moreover, these allegations do not implicate conduct expressly aimed at the forum by the Moving Defendants, but rather that of third party senders (*i.e.*, Rilton Traders and Primogems) whose alleged transmission of funds *to* Alleged Bank Customers in Lebanon was purportedly facilitated

by the Moving Defendants. *See Walden*, 571 U.S. at 283-84 (For specific jurisdiction, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State.") (quoting *Burger King Corp.*, 471 U.S. at 475) (emphasis in original); *Waldman*, 835 F.3d at 335 (same). These alleged transfers, directed through the U.S. by third parties, would represent only "the unilateral activity of another party or a third person," and thus would not permit the exercise of jurisdiction over the Moving Defendants. *Burger King Corp.*, 471 U.S. at 475; *see Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*, 2015 WL 4164763 (S.D.N.Y. July 10, 2015) (transfer through New York correspondent account was "'adventitious'" and "insufficient to demonstrate that the use of the account was 'purposeful'" where "use of the correspondent account was initiated by a party other than [defendant]").

Further, this Court should not credit the Amended Complaint's remaining conclusory allegations that Moving Defendants "provid[ed] financial services (directed through New York)" for an Alleged Bank Customer because they lack sufficient supporting facts, such as on whose behalf the money was allegedly sent or to whom.[19] *Asat Trust*, 714 F.3d at 673 ("[W]e will not draw argumentative inferences in the plaintiff's favor, nor must we accept as true a legal conclusion couched as a factual allegation.") (internal citation and quotation marks omitted); *Jazini*, 148 F.3d at 185 (rejecting "conclusory statements—without any supporting facts" that merely "restate[d]" legal factors).

---

[19] *See* Am. Compl. ¶¶ 196, 1541, 1577 (alleging that two Defendants maintained accounts for Elissa Exchange Company SARL and provided financial services directed through New York without identifying any specific transactions or pleading facts sufficient to support a plausible inference that either Bank was aware that these accounts were associated with Hezbollah's narcotics trafficking network, or that the accounts, or any transactions processed through the accounts, were causally connected to the Attacks at issue); Plaintiffs also assert that one Alleged Bank Customer transferred $1 million from his account at United Credit Bank via Wachovia Bank in New York to an account held by a Moving Defendant for the benefit and credit of the *same* Alleged Bank Customer (¶ 1307 n. 84), but according to the Amended Complaint itself, that amount was part of a larger sum that the Alleged Bank Customer and another individual had "siphoned . . . *for their private use*" (¶ 1306, emphasis added) —*i.e.*, not for a use connected to Hezbollah or the Attacks.

The Amended Complaint thus fails to make a *prima facie* showing of personal jurisdiction over any Moving Defendant based on that Moving Defendant's alleged use of correspondent accounts in the United States.

> 2.   The Amended Complaint Fails to Allege that Moving Defendants' Conduct In the United States Gave Rise to Plaintiffs' Injuries

Moving Defendants' alleged routine banking services cannot support the exercise of personal jurisdiction over any Moving Defendant for the independent reason that the allegations do not establish that those banking services caused the attacks at issue. "The exercise of specific jurisdiction depends on in-state activity that '*gave rise to the episode-in-suit*.'" *Waldman*, 835 F.3d at 331 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (emphasis in original)). As the Second Circuit has held, "[w]here the defendant has had only limited contacts with the [forum]," it is appropriate to require proximate causation—not merely "but-for" causation—for personal jurisdiction. *SPV OSUS*, 882 F.3d at 344; *see also Waldman*, 835 F.3d at 343 (explaining that personal jurisdiction over the defendant in *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002), was proper because the plaintiff hired the defendant "as a result of" defendant's in-forum activities).

*Licci* explained that the "use of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum *when that use is an integral part of the wrongful conduct*." *Licci*, 732 F.3d at 171-72 n.7 (emphasis added); *see also Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67-68 (2d Cir. 2017) (affirming dismissal of foreign banks for lack of personal jurisdiction absent factual allegations of "intentional and repeated use of [U.S.] correspondent accounts" that was an "integral part of" the defendants' money laundering scheme); *Siegel v. HSBC Holdings, PLC*, 2018 WL 501610, at *4 (S.D.N.Y. Jan. 19, 2018) (holding allegations that Saudi bank "aided terrorists by giving them an

-17-

entry into the American financial system" did "not sufficiently assert how this banking relationship relate[d] to" the relevant terrorist attacks).

The Amended Complaint includes no factual allegations permitting a plausible inference that financial transactions involving Moving Defendants proximately caused, and were integral to, the Attacks.  There is no allegation of: any transaction with any of the Iraqi Special Forces that allegedly perpetrated the Attacks; any transaction with the IRGC to fund the perpetrators; any transaction with Hezbollah to train the perpetrators; or any transaction with any Hezbollah affiliate where the funds were passed on to the perpetrators of an Attack.  *See SPV OSUS*, 882 F.3d at 344 (affirming dismissal for lack of personal jurisdiction where the complaint lacked allegations showing that "the injuries suffered by [plaintiff] were caused by [defendants]").  Nor does the Amended Complaint allege facts permitting a plausible inference that Moving Defendants' alleged conduct was necessary to allow Hezbollah to conduct its alleged activity related to any Attack.

The facts alleged do not establish the required "substantial connection" between any ATA-proscribed acts of any Moving Defendant and the United States.[20]  *See Waldman*, 835 F.3d at 335, 341 (holding that even defendants that otherwise would be liable under the ATA must be dismissed for lack of personal jurisdiction where their conduct did not create a "substantial connection" with the United States).  This Court, therefore, should dismiss the Amended Complaint for lack of personal jurisdiction over the Moving Defendants.

---

[20] The Plaintiffs cannot use the theory of "conspiracy jurisdiction" as a last resort to hale the Moving Defendants into this Court.  To do so, Plaintiffs would have to establish that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Charles Schwab Corp. v. Bank of Am.*, 883 F.3d 68, 87 (2d Cir. 2018) (citation omitted).  First, as set forth above, the Amended Complaint does not plausibly allege that *any* Moving Defendant had sufficient suit-related conduct to subject it to jurisdiction here.  Second, as discussed *infra* at § II(C), Plaintiffs have failed to plausibly allege any elements of a JASTA conspiracy claim.

## II.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plausibility standard requires more than a "sheer possibility." *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A court may consider only well-pleaded factual allegations, and must ignore "legal conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).  The Court must disregard "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement.'" *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

Determination of whether the inferences drawn from the specific alleged facts are actually "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Mastafa*, 770 F.3d at 177.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Pension Benefit Guar. Corp.*, 712 F.3d at 718 (quoting *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2))).

## A.   The Amended Complaint Does Not State a Claim for Primary Liability

### 1.   The Amended Complaint Fails to Allege Facts Plausibly Supporting an Inference of Proximate Causation

The ATA's requirement that a plaintiff allege facts permitting a plausible inference that he or she was injured "by reason of" the defendants' conduct (18 U.S.C. § 2333) necessitates a showing of proximate cause.  *Rothstein*, 708 F.3d at 95; *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013) (referred to herein as *"Al Rajhi Bank")*.  The proximate causation requirement serves the important function of preventing "infinite liability."  *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 546 (1994).  "Every event has many causes, . . . and only some of them are proximate, as the law uses that term."  *Paroline v. United States*, 572 U.S. 434, 444 (2014).

Proximate cause under the ATA requires three separate showings.  *First*, "the central question . . . is whether the alleged violation led *directly* to the plaintiff's injuries.'"  *Rothstein*, 708 F.3d at 91-92 (quoting *Anza v. Ideal Steel Supply Corp*., 547 U.S. 451, 461 (2006)) (emphasis added).  That requires "some direct relation between the injury asserted and the injurious conduct alleged."  *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).  *Second*, proximate cause also requires proof that the defendant's acts were a "*substantial factor in the sequence of responsible causation*."  *Rothstein*, 708 F.3d at 91-92 (emphasis in original); *see also O'Sullivan*, 2019 WL 1409446, at *5.  *Third*, the underlying harm must be foreseeable.  *Rothstein*, 708 F.3d at 91-92; *Fields v. Twitter, Inc.*, 881 F.3d 739, 746-47 (9th Cir. 2018); *see also Hemi Grp.,* 559 U.S. at 12.  But, as the Supreme Court has cautioned, "foreseeability alone is not sufficient to establish proximate cause."  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017).

*Rothstein* illustrates these principles.  There, the plaintiffs alleged that UBS transferred U.S. banknotes (*i.e.*, physical currency) directly to "Iranian Government Organs" in violation of U.S. law.  708 F.3d at 87.  The plaintiffs—victims of violence committed by Hezbollah or Hamas—sued UBS, asserting that these terrorist organizations received funding from Iran.  In particular, the plaintiffs alleged that U.S. banknotes, provided to terrorists by Iran, were a crucial factor in the terrorists' ability to fund their attacks.  While U.S. sanctions "made it difficult for Iran to obtain the large sums of cash dollars needed for the Hizbollah and Hamas operations," the plaintiffs contended that "UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash between 1996 and 2004."  *Id.*

The Second Circuit held that these claims were too indirect and attenuated to satisfy the proximate causation requirement.  *Id.* at 96-97; *see also Al Rajhi Bank*, 714 F.3d at 124-25 (affirming dismissal of ATA claims for lack of proximate causation where bank defendants allegedly "provid[ed] routine banking services to organizations and individuals said to be affiliated with al Qaeda").

Relying on *Rothstein*, Judge Daniels recently dismissed with prejudice primary liability ATA claims against LCB, which were based upon the same theory and many of the same alleged facts as in this case.  *Kaplan*, 2019 WL 4869617, at *1.[21]  In *Kaplan*, plaintiffs claimed that LCB should be held liable under the ATA for Hezbollah rocket attacks in Israel in 2006 based on LCB's provision of "banking services to Hizbollah through Hizbollah's affiliates."  *Id*. Specifically, plaintiffs alleged that LCB maintained bank accounts and provided wire transfer and other financial services to five customers—two Hezbollah leaders and three entities "created

---

[21] Although LCB is not named as a defendant in this action, Plaintiffs allege that SGBL bears "successor" liability for LCB's conduct and that dozens of Alleged Bank Customers migrated from LCB to Moving Defendants.  *See, e.g.*, Am. Compl. ¶¶ 87-116.

and wholly controlled by Hizbollah"—that plaintiffs alleged were Hezbollah proxies.  *Id.*[22] Judge Daniels held that plaintiffs failed to allege a proximate causal relationship between the funds transferred to the customers by LCB and the attacks at issue because there were no plausible allegations that (i) "Defendant provided money directly to Hizbollah to carry out the attacks," (ii) any funds provided by LCB were sent to Hezbollah and used to perpetrate the attacks, or (iii) "Hizbollah would not have been able to carry out the attacks absent those specific funds."  *Id.* at *4.

Similarly, Judge Swain recently dismissed primary liability ATA claims virtually identical to those asserted here.  The plaintiffs in that case sued a host of European financial institutions claiming that they had provided financial services to terrorist intermediaries (there, the government of Iran and Iranian entities) leading to attacks on U.S. military personnel in Iraq.  *O'Sullivan*, 2019 WL 1409446 at *1-2.  In dismissing the primary liability claim, the *O'Sullivan* court found that:

> The Complaint proffers no non-conclusory allegation that the funds processed by Defendants for various Iranian entities were in fact transferred to [various alleged terror groups], nor does it allege facts sufficient to support plausibly the inference that Iran and its Agents and Proxies would have been unable to assist [those terror groups] in carrying out the attacks without Defendants' assistance.

*Id.* at *5.

The Ninth Circuit applied the same principles to affirm dismissal of ATA claims brought against the social media company, Twitter.  In *Fields v. Twitter, Inc.*, the plaintiffs asserted that Twitter provided communication services *directly* to ISIS terrorists, but the court, following *Rothstein*, found the complaint insufficient because it did not allege that those services "had any

---

[22] The five customers are the "Shahid (Martyrs) Foundation," "Bayt al-Mal," "Husayn al-Shami," "Wahid Mahmoud Sbeity," and "Yousser Company for Finance and Investment."  *Kaplan v. Lebanese Canadian Bank, SAL*, No. 08-cv-7253 (S.D.N.Y. Dec. 5, 2018) (ECF No. 99 at ¶¶ 37-39) (Second Amended Complaint).  These entities are also Alleged Bank Customers in this case.  *See, e.g.,* Am. Compl. ¶ 1397, 1405, 1416.

direct relationship with the injuries that Plaintiffs–Appellants suffered." 881 F.3d at 749. The court explained that "facilitat[ing] the organization's growth and ability to plan and execute terrorist acts" was not sufficient to establish proximate cause in the absence of any "connection between [Defendant's] provision of this aid and [Plaintiffs'] injuries." *Id*. at 749-750.

Numerous other courts have similarly dismissed ATA cases for failure to plead proximate causation.[23]

### a.   The Amended Complaint Does Not Link Moving Defendants to the Attacks

Plaintiffs fail to plead a direct link between Moving Defendants and the Attacks, as required by *Rothstein* and its progeny. Rather, they offer only generalized allegations that Moving Defendants' "banking services" to the Alleged Bank Customers were somehow instrumental in allowing a different entity, Hezbollah, to grow and evolve into a "truly global financial empire" that, in turn, allowed Hezbollah to develop "training camps, intelligence operations, procurement supply-chains, and research and development of various weapons systems" that purportedly allowed Hezbollah to support Iran's efforts to drive the United States out of Iraq, and that, in turn, caused the Attacks. *See* Am. Compl. ¶¶ 115-16. Plaintiffs similarly proffer generalized allegations that Moving Defendants "agree[d] to participate in a criminal enterprise sometimes known in Lebanon as 'The System'" in all manner of illegal activity

---

[23] *See, e.g.*, *Al Rajhi Bank*, 714 F.3d at 124 ("We also are not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks or plaintiffs' injuries."); *Ahmad v. Christian Friends of Israeli Cmtys.*, 2014 WL 1796322, at *4 (S.D.N.Y. May 5, 2014) (dismissing ATA claims on causation grounds where the plaintiffs alleged only "that Defendants transferred funds to an unorganized group of approximately five hundred thousand people, and that some people in that group committed attacks against the American Plaintiffs"); *Kaplan v. Al Jazeera*, 2011 WL 2314783, at *7 (S.D.N.Y. June 7, 2011) (finding proximate cause not adequately alleged where plaintiffs did not allege "facts suggesting that Defendant's broadcasts were used by Hezbollah to better target their rockets"); *Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *3-4 (E.D.N.Y June 30, 2006) (concluding that it was not reasonably foreseeable that issuing letters of credit to Iraqi chemicals manufacturers would lead to the manufacture of chemical weapons).

committed by Hezbollah, "including money laundering (. . . both cross-border electronic funds transfers and physical bulk-transfers of banknotes), sanctions evasion, arms export violations, drug trafficking, kidnapping for ransom, and direct terrorist financing" without any alleged link to the Attacks. *Id*. ¶¶ 11, 12.  As for the Attacks, Plaintiffs simply assert, in conclusory fashion, that Moving Defendants'  "material support to Hezbollah involved acts dangerous to human life that violated U.S. criminal laws and that objectively appeared to be intended to intimidate or coerce a civilian population or influence the policy of a government by intimidation or coercion." *Id*. ¶ 6.

These allegations are insufficient to plausibly support the inference that the Moving Defendants proximately caused the Attacks.  The Amended Complaint alleges approximately 265 Attacks involving approximately 1,100 Plaintiffs.  *Id*. ¶¶ 2047-5646.  Nowhere in those 3,599 numbered paragraphs does the Amended Complaint plead facts permitting a plausible inference of a direct link between any of the banking services allegedly provided by Moving Defendants and any of the Attacks.  Indeed, the Amended Complaint does not identify a single transaction or banking service provided by any Moving Defendant that allegedly supported any Attack, or explain how the alleged banking relationships proximately caused the Attacks.  *See Al Rajhi Bank*, 714 F.3d at 124-25 (rejecting proposition that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda . . . proximately caused the September 11, 2001 attacks or plaintiffs' injuries," noting "no support . . . for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service"); *O'Sullivan*, 2019 WL 1409446, at *5 (dismissing ATA claims where complaint failed to show how banking relationships facilitated attacks on U.S. servicemen in Iraq).

And although the Amended Complaint attempts to indict the Lebanese banking sector for the very existence and growth of Hezbollah, it does not offer any legally sufficient connection between Moving Defendants and the Attacks by paramilitary groups in Iraq. This is precisely the type of vague and generalized causal link that courts have consistently found insufficient in the ATA context. *See, e.g.*, *Fields,* 881 F.3d at 750 (holding that allegations that defendants had "facilitated the [terrorist] organization's growth and ability to plan and execute terrorist acts" were insufficiently tied to attacks at issue, and must be dismissed).

Nor does the Amended Complaint plausibly allege direct support to Hezbollah. Rather than alleging that Moving Defendants offered financial services directly to Hezbollah, Plaintiffs offer conclusory allegations that Moving Defendants provided services to various "Hezbollah-controlled" entities, or entities with vague connections to Hezbollah.[24]

*Rothstein* and its progeny teach that such allegations of *indirect* support are not enough to plead proximate causation. *Al Rajhi Bank*, 714 F.3d at 124 ("Simply put, plaintiffs do not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks.") (citing *Rothstein*, 708 F.3d at 96-97); *Zapata v. HSBC Holdings PLC*, 2019 WL 4918626, at *10 (E.D.N.Y. Sept. 30, 2019) (dismissing ATA claims because, among other reasons, "[p]laintiffs do not allege . . . that the Cartels require **laundered** money to carry out any acts of violence in Mexico, let alone the specific atrocities inflicted upon Plaintiffs" (emphasis in original)); *Kaplan*, 2019 WL 4869617, at *4 ("Plaintiffs' complaint is devoid of any factual, non-conclusory allegations that

---

[24] *See*, *e.g.*, Am. Compl. ¶¶ 1493, 1494, 1524, 1598, 1659, 1695, 1740, 1769, 1791, 1801, 1824.

demonstrate . . . that Defendant provided money directly to Hizbollah to carry out the attacks [or] that any funds transferred through the LCB Accounts were, in fact, sent to Hizbollah and then used by Hizbollah to perpetrate the rocket attacks."); *Freeman*, 2019 WL 4452364, at *17 ("There are no allegations that Defendants directly provided funds or services to a terrorist group, no non-conclusory allegations that the specific funds processed by Defendants were destined for a terrorist organization rather than some more benign or legitimate purpose, and no plausible allegations that the attacks in Iraq were only possible due to Defendants' actions."); *O'Sullivan*, 2019 WL 1409446 at *6 ("Absent further factual allegations connecting Defendants' conduct to the terrorist organizations and attacks that injured Plaintiffs, the provision of financial services to Iran or various Iranian entities is insufficient on its own to support a plausible inference that the transferred funds were subsequently used to finance terrorism.").  Here, Plaintiffs do not even allege direct banking services to Hezbollah, let alone support to the perpetrators of the Attacks, who themselves are alleged to be distinct from Hezbollah.

> **b.      The Amended Complaint Fails to Allege that Arms-Length Banking Services Were a Substantial Factor in the Causal Sequence**

The banking services provided to the Alleged Bank Customers, themselves with only vague allegations of a connection to Hezbollah, can in no sense be said to be a "substantial factor" in causing the Attacks.  In fact, the Amended Complaint does not even allege that the Attacks were actually committed by Hezbollah, but rather that Hezbollah, "in coordination with" the IRGC, had some *indirect* involvement in each Attack, such as designing or manufacturing the weapons used, training members of the groups that perpetrated the Attacks, or providing other resources that supposedly were used in the Attacks.  *See, e.g.*, Am. Compl. ¶¶ 2050, 2066, 2133, 4553, 4900, 5532.  There, accordingly, are no factual allegations from which one could plausibly infer that Moving Defendants' banking services constituted a "substantial factor" in causing

-26-

Plaintiffs' injuries.  *See Kaplan*, 2019 WL 4869617, at *4 ("The causal link between Defendant's provision of financial services and Plaintiffs' injuries is too attenuated to support a finding of proximate cause."); *Freeman*, 2019 WL 4452364, at *18 ("[T]he provision of financial services to Iran or various Iranian entities is insufficient on its own to support a plausible inference that the transactions facilitated by Defendants proximately caused the IED explosions in Iraq that injured Plaintiffs."); *O'Sullivan*, 2019 WL 1409446, at *6 ("Iran's role as both an intermediary and a state sponsor of terrorism simply 'does not reduce the need for evidence of a substantial connection between the defendant and a terrorist act or organization.'") (quoting *Owens v. BNP Paribas*, 897 F.3d 266, 276 (D.C. Cir. 2018)).

        **c.**      **The Amended Complaint Fails to Allege Facts Permitting a Plausible Inference that Plaintiffs' Injuries Were a Foreseeable Consequence of the Banks' Alleged Provision of Arms-Length Banking Services to the Alleged Bank Customers**

In addition to alleging a direct and substantial link between Moving Defendants' conduct and the conduct that resulted in their injuries, Plaintiffs also must allege that their "injur[ies] w[ere] reasonably foreseeable or anticipated as a natural consequence" of the Moving Defendants' conduct in order to establish proximate cause.  *Rothstein*, 708 F.3d at 91; *accord O'Sullivan*, 2019 WL 1409446, at *5; *Ahmad*, 2014 WL 1796322, at *4.  The Amended Complaint does not satisfy this requirement.  Plaintiffs do not offer even a token allegation that it was foreseeable that the provision of routine banking services to the Alleged Bank Customers in Lebanon could lead to the Attacks against U.S. military personnel and contractors by paramilitary groups in Iraq, much less plead any facts that could support such an implausible claim.  *See* Am. Compl. ¶¶ 5652, 5657, 5668, 5670, 5680, 5681 (Amended Complaint's sole foreseeability allegations do not refer to any Alleged Bank Customer).

Indeed, the very nature of the Alleged Bank Customers refutes any inference of foreseeability.  The Amended Complaint alleges that Moving Defendants provided routine banking services to some 205 Alleged Bank Customers.  Many of the Alleged Bank Customers were commercial entities, including amusement parks, a printing company, technology wholesalers and retailers, travel and entertainment outfits, global communications companies, pharmaceutical companies, and an insurance company.[25]  Any purported links to Hezbollah allegedly were covert.  *See, e.g.*, Am. Compl. ¶¶ 20-21.  Critically, *none* of the Alleged Bank Customers is alleged to have been in the business of providing weapons or military training to the paramilitary groups that committed the Attacks in Iraq.  And *none* of the Alleged Bank Customers is alleged to have been in the business of financing those paramilitary groups.  It was in no way foreseeable that providing routine banking services to these Alleged Bank Customers in Lebanon might lead to the placement of explosive devices in Iraq.

At their core, the Amended Complaint's conclusory allegations of foreseeability contend only that it was foreseeable that Moving Defendants' services "contributed to" or "increased" Hezbollah's capacity to support paramilitary groups in Iraq.  Am. Compl. ¶¶ 5652, 5657.  But as the Second Circuit held in *Rothstein*, allegations that a defendant bank's banking services merely "made it more likely that the moneys would be used for terrorism" are not enough.  *Rothstein*, 708 F.3d at 96-97.  Count I of the Amended Complaint should be dismissed for failure to allege proximate causation.

---

[25] *See, e.g.*, Am. Compl. ¶ 1481 (Fantasy World SARL "the well-known Fantasy World amusement park in Hezbollah's stronghold"); *id*. ¶ 668, 1797 (Spectrum Investment Group and Spectrum International Investment Holding, which are "Lebanon-based telecommunications services" companies); *id*. ¶ 1479 (Dbouk International for Printing and General Trading, a "publisher"); ¶ 1480 (Hoda for Touristic Services and Management Holding SAL); *id.* ¶¶ 660 and 1501 (Compu House SARL, a "a wholesale and retail seller of computers and software"); ¶ 1621 (Medical Equipment and Drugs International Corporation SAL, which sells "pharmaceuticals and other medical products"); ¶ 1702 (United Company for Insurance Services SARL, "an insurance company"); ¶ 647 (Al-Inmaa Group for Tourism Works, which "provides travel and tourism services and operates amusement parks"); ¶ 647 (Family Park SARL, "an amusement park").

2.      The Amended Complaint Fails to Allege Facts Supporting a Plausible
        Inference that Moving Defendants' Conduct Constituted Acts of
        International Terrorism

The ATA imposes liability only for injuries incurred "by reason of *an act of international terrorism*." 18 U.S.C. § 2333(a) (emphasis added). Plaintiffs must allege that *each Moving Defendant* itself committed an "act of international terrorism." *Linde*, 882 F.3d at 320.

Section 2331 defines "international terrorism" to require, among other things, that Moving Defendant's acts "appear to be intended" to cause one of the enumerated illicit purposes of terrorism—intimidating or coercing a civilian population, influencing the policy of a government by intimidation or coercion, or affecting the conduct of a government by mass destruction, assassination, or kidnapping. 18 U.S.C. § 2331(1)(B). The test is objective: it "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014).

The Second Circuit recently held that a plaintiff asserting a claim under the ATA must allege and prove that the defendant's act "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government" in the manner required by the statute. *Linde*, 882 F.3d at 326. *Linde* specifically rejected the contention that proof of a predicate criminal act (there, as here, Section 2339B)[26] is by itself sufficient to demonstrate an act of "international terrorism" within the meaning of Section 2331. The Court reasoned that "the provision of material support to a terrorist organization does not invariably equate to an act of international terrorism," as defined by the ATA. *Id.* at 326. Rather, Plaintiffs must allege, and

---

[26] As explained below, 18 U.S.C. § 2331(1)(A) requires an ATA defendant's conduct to be "a violation of the criminal laws of the United States or of any State, or [an act] that would be a criminal violation if committed within the jurisdiction of the United States or of any State."

later prove, facts demonstrating that each defendant has manifested "the apparent intent to intimidate or influence" required by the statutory text.  *Id.*

Courts regularly dismiss complaints when plaintiffs have not plausibly alleged this element of the offense.  In *Kaplan*, defendant LCB was alleged to have facilitated wire transfers and provided other financial services to five bank customers allegedly affiliated with Hezbollah. *Kaplan*, 2019 WL 4869617, at *4.  Judge Daniels explained that "even assuming, *arguendo*, that Defendant was aware that it was providing such services to Hizbollah affiliates and that doing so violated economic sanctions imposed by the U.S. government," the plaintiffs had not plausibly alleged that this conduct "involve[d] violence or endanger[ed] human life' and [] 'appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government.'" *Id.* (quoting *Linde*, 882 F.3d at 326).

In *Freeman*, plaintiffs alleged that defendants provided material support to Iran by assisting Iranian banks, airlines, and shipping and oil companies in evading American sanctions, while knowing or being deliberately indifferent to the fact that Iran provides material support to terrorist organizations, including FTOs such as Hezbollah.  2019 WL 4452364, at *11.  Judge Chen dismissed their claims, holding that plaintiffs failed plausibly to allege that these banking services appeared to have been provided with terroristic intent.  *Id.* at *14, *15.  Rather, the court observed, the purpose appears to have been commercial in nature.  *Id.* at *15.

### a.  Plaintiffs Have Not Alleged Facts Plausibly Showing that Moving Defendants Acted With Objective Terroristic Intent

Plaintiffs here allege in conclusory fashion that Moving Defendants' conduct "appeared to be intended to intimidate or coerce a civilian population or influence the policy of a government by intimidation or coercion by substantially assisting Hezbollah in operating its global terror network."  Am. Compl. ¶ 5651.  But merely reciting the statutory standard is

insufficient under *Iqbal*.  *See* page 19 *supra*.  And Plaintiffs do not allege facts plausibly supporting that conclusion.

To begin with, the allegations regarding the provision of arms-length banking services to certain individuals and a wide range of commercial and charitable entities (*see* Am. Compl. ¶¶ 1288-1825) are insufficient.  *Kaplan*, 2019 WL 4869617, at *4 (holding that "the provision of financial services does not, in itself, equate to international terrorism"); *O'Sullivan*, 2019 WL 1409446, at *7 (finding implausible allegations that the provision of financial services to various Iranian banks and businesses with connections to terrorist organizations was dangerous to human life and intended to intimidate and coerce); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) ("While giving fungible dollars to a terrorist organization may be dangerous to human life, doing business with companies and countries that have significant legitimate operations is not necessarily so.") (internal quotation marks omitted).

That is because there is an "obvious alternative explanation" (*Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567)) for Moving Defendants' alleged provision of banking services—to generate revenue and profit for their respective banking businesses.  And terroristic intent cannot be presumed in the face of this clear commercial motivation.  *See Kemper*, 911 F.3d at 390 ("To the objective observer, [Deutsche Bank's] interactions with Iranian entities were motivated by economics, not by a desire to 'intimidate or coerce.'"); *see also Zapata*, 2019 WL 4918626, at *12 (finding that "to an objective observer, HSBC's conduct appeared to be motivated by economics, not by a desire to intimidate or coerce") (internal quotation marks omitted); *Freeman*, 2019 WL 4452364, at *15 (finding defendants appeared to be "purely motivated by the opportunity to make money," which further weakened any inference that they intended to intimidate civilians or influence a government by providing material support for

terrorism); *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 236 (E.D.N.Y. 2019) (holding that "merely provid[ing] banking services to [an alleged SDGT] for ostensibly charitable purposes . . . does not satisfy the intent required by § 2331(B) as established by the *Linde* Court.").

        **b.**        **Plaintiffs Do Not Allege Facts Plausibly Showing that Moving Defendants Engaged in Acts Dangerous to Human Life**

Plaintiffs contend that Moving Defendants' conduct "involved acts dangerous to human life [that] constitute violations of 18 U.S.C. § 2339B."  Am. Compl. ¶ 5650; *see also id.* ¶ 6.  But that conclusory allegation also must be disregarded under *Iqbal*.  Plaintiffs' factual allegations include nothing more than Moving Defendants' provision of banking services to entities allegedly affiliated with Hezbollah.  *Id.* ¶¶ 1288-1825.  There is no allegation of violent conduct – just banking services.  The Amended Complaint therefore fails to allege violent acts dangerous to human life.  As Judge Irizarry ruled in words that are equally applicable here:

> Plaintiffs' assertions address Defendant's indirect contribution, through banking services, to terrorist activities without establishing any nexus between the banking services and the terrorist activities. Plaintiffs offer no evidence that Defendant's banking services directly involved strong physical force, or intense force, or vehement or passionate threats.

*Weiss*, 381 F. Supp. 3d at 235.

        3.        <u>The Amended Complaint Fails to Allege Facts Supporting a Plausible Inference of the Elements of the Material Support Statute, 18 U.S.C. § 2339B</u>

The ATA's primary liability provision also requires Plaintiffs to plead and prove that Moving Defendants committed a criminal act.  18 U.S.C. § 2331(1)(A) (defendant's conduct must be "a violation of the criminal laws of the United States or of any State, or [an act] that would be a criminal violation if committed within the jurisdiction of the United States or of any

State"). That requires facts plausibly satisfying the *mens rea* element of the relevant criminal statute. *See Weiss*, 768 F.3d at 207-08.

Here, Plaintiffs allege violations of the material support statute, 18 U.S.C. § 2339B (Am. Compl. ¶ 5650), which provides that "[w]hoever *knowingly* provides material support or resources *to* a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned." 18 U.S.C. § 2339B(a)(1) (emphasis added). But the Amended Complaint does not satisfy the statute's requirements. No Alleged Bank Customer is alleged to have been designated as an FTO at any time. And Plaintiffs do not allege facts plausibly showing that Moving Defendants *knew* that, by providing routine banking services to the Alleged Bank Customers, they were materially supporting an FTO or terrorism. Rather, Plaintiffs identify Hezbollah as an FTO (*see* Am. Compl. ¶¶ 1, 329), allege that individuals somehow associated with Hezbollah either owned or controlled the Alleged Bank Customers (*id.* ¶¶ 1378-1825), and then allege in conclusory fashion that Moving Defendants therefore "knowingly provided material support to Hezbollah" (*id.* ¶ 5649).

These allegations are insufficient to establish that Moving Defendants *knew*—at the time they provided routine banking services to persons and entities other than Hezbollah—that their conduct was providing material support to Hezbollah. The failure to adequately allege that Moving Defendants violated Section 2339B independently requires dismissal of Plaintiffs' primary liability claim (Count I).

### B.    The Amended Complaint Does Not State a JASTA Aiding-and-Abetting Claim

Plaintiffs' aiding-and-abetting claim (Count II) likewise must be dismissed because the Amended Complaint fails to satisfy the statutory requirements of JASTA. As Judge Cote recently emphasized in dismissing JASTA claims against financial institutions, "it is particularly

important to focus with care in cases like this on each of the necessary elements to a finding that [JASTA] has been violated," and "[t]hose elements present a substantial hurdle when one financial institution is accused of having violated the ATA by providing assistance to terrorist organizations through engaging in common commercial banking practices." *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *5 (S.D.N.Y. July 27, 2018), *aff'd sub nom. Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019). At every step, the Amended Complaint falls short of JASTA's threshold statutory elements. It fails adequately to allege that Moving Defendants provided services to the perpetrators of the Attacks. It also fails adequately to allege facts that meet JASTA's requirement that Plaintiffs satisfy the *Halberstam* elements of civil aiding-and-abetting, because it does not adequately allege that Moving Defendants were "generally aware" that they were playing any role in the alleged terrorism or that Moving Defendants "knowingly and substantially assist[ed] the principal violation." *Linde*, 882 F.3d at 329 (quoting *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)). At most, it alleges that Moving Defendants somehow aided and abetted alleged aider-and-abettors, which is insufficient under JASTA. This claim must therefore be dismissed as well.

        1.      <u>The Amended Complaint Fails to Meet The Threshold Statutory Requirements of JASTA</u>

In enacting JASTA, Congress declined to create general secondary liability under the ATA, but instead limited such liability to cases where a plaintiff's injury arises from an act of international terrorism that is "committed, planned, or authorized" by an entity designated as an FTO as of the date of the attack. 18 U.S.C. § 2333(d)(2). Moreover, JASTA aiding-and-abetting is limited to cases in which the defendant "aids and abets, by knowingly providing substantial assistance [to] . . . the person who committed such an act of international terrorism.'" *Linde*, 882

F.3d at 320 (alteration in original) (quoting 18 U.S.C. § 2333(d)(2)).  Here, the Amended Complaint fails to meet either statutory pre-requisite.

First, the Amended Complaint does not plausibly allege that the Attacks were "committed, planned, or authorized" by an FTO.  Rather, Plaintiffs have simply inserted vague and conclusory references to Hezbollah into the description of each Attack.[27]  These allegations do not satisfy the pleading standard articulated by the Supreme Court, and must be disregarded. *Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement.").  Indeed, this pleading constitutes a blatant attempt to avoid Congress's express limitations on JASTA claims, and should be rejected.  *See Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019) (dismissing ATA claims for failure to satisfy threshold requirement of JASTA, stating "secondary liability requires that an act of international terrorism was 'committed, planned, or authorized' by a 'foreign terrorist organization'. . . .To get around this requirement, Plaintiffs rely on the same tenuous connection to argue that ISIS was responsible for the [attack]").

And even if credited, Plaintiffs' allegations do not suggest that Hezbollah "committed, planned or authorized" anything.  The Amended Complaint does not attempt to allege that Hezbollah actually "committed" any Attack and the alleged design of weapons or provision of some unspecified training—the most common allegations of Hezbollah involvement in the Amended Complaint—cannot be characterized as "planning" or "authorizing" a particular Attack

---

[27] *See, e.g.*, Am. Compl. ¶ 2050 ("The weapon . . . was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC"); ¶ 2066 ("trained by Hezbollah"); ¶ 2242 ("the attack perpetrated by Hezbollah-trained JAM Special Groups under the control and direction of the IRGC-QF and Hezbollah"); ¶ 3330 ("the attack . . . was largely planned by Hezbollah, under the direction of Ali Musa Daqduq, and carried out by Hezbollah agents and AAH [Asa'ib Ahl al-Haq] operatives"); ¶ 4900 ("the attack was perpetrated by Hezbollah-trained and IRGC-QF supplied operatives of the JAM and KH Special Groups acting as agents and proxies of Hezbollah and the IRGC-QF").

as those words are commonly used and understood.  *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").[28]  At most, Plaintiffs allege that Hezbollah generally supported the groups that committed the Attacks, not that it planned or authorized the particular Attacks that injured Plaintiffs, as required by JASTA.

Second, the Amended Complaint does not allege that Moving Defendants provided *anything* to the individuals or groups that *committed* the Attacks, as required by the plain text of JASTA.  The Sixth Circuit recently emphasized this requirement in upholding dismissal of the aiding-and-abetting claim in *Crosby*, 921 F.3d at 617.  There, victims of a mass shooting at a nightclub in Orlando committed by an individual claiming allegiance to the terror group ISIS asserted JASTA aiding-and-abetting claims against three social media companies, Twitter, Google, and Facebook.  *Id.* at 619.  Plaintiffs alleged that ISIS used these social media platforms to spread propaganda, recruit new members and solicit donations to fund its terrorist activities— and that the Orlando shooter had become radicalized through these means.  *Id*. at 620-21.

The Sixth Circuit held that dismissal of the aiding-and-abetting claim was required, regardless of whether the social media companies provided support to ISIS.  The *Crosby* court stated that the plaintiffs "must satisfy specific statutory requirements" of JASTA and "cannot meet these requirements where it was [the shooter]—and not ISIS—who committed the Pulse Night Club shooting."  *Id*. at 626.  The court explained that, under JASTA, the individual

---

[28] Dictionary definitions confirm this commonsense interpretation.  The Oxford English Dictionary defines the verb usage of "plan" as "to arrange in advance (an action or proposed proceeding); to devise, contrive, or formulate (a project or manner of proceeding); to lay out in a plan."  To the extent that the Amended Complaint uses the word "plan" in connection with any of the Attacks, it provides no detail concerning Hezbollah devising, contriving, formulating, or "arranging" anything in advance of those Attacks.  The mere incantation of the word "planned" is insufficient.  "Authorize" is defined as "to give official permission for or approval to (an undertaking or agent)."  *Id*. Designing weapons or providing generalized training or funds to paramilitary groups, even if alleged in sufficient detail, cannot be said to constitute "authorizing" the Attacks at issue here, consistent with the common definition and usage of that word.

-36-

shooter, Mateen, was "the person who 'committed' the shooting—not ISIS."  *Id.* at 626-27.

"Thus, *even if* Defendants somehow supported ISIS, and *even if* the shooting were an act of international terrorism, Plaintiffs' ATA claim for secondary liability still fail[ed] because [the shooter] 'committed' the terrorist act," and the plaintiffs had not adequately alleged that the defendants had supported him.  *Id.* at 627 (emphasis in original); *see also Shaffer v. Deutsche Bank AG*, 2017 WL 8786497 at *1 n.1 (S.D. Ill. Dec. 7, 2017), *aff'd sub nom. Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) (holding that conspiracy claims failed under JASTA because plaintiffs "allege a conspiracy with Iran, a State Sponsor of Terrorism (SST), not with an FTO").

The same is true here.  The Amended Complaint does not allege that Hezbollah committed any of the Attacks.  Nor does it allege that any Moving Defendant provided anything to the paramilitary groups that are alleged to have committed the Attacks, nor even that the Alleged Bank Customers provided anything to the paramilitary groups that allegedly committed the Attacks.  Plaintiffs' aiding-and-abetting claim does not satisfy the plain text of JASTA.

> 2.   The Amended Complaint Fails to Plausibly Allege the *Halberstam* Elements of Aiding-and-Abetting

Even if Plaintiffs could satisfy JASTA's threshold statutory requirements, the Amended Complaint fails to allege either the "*Halberstam* elements of civil aiding and abetting, or the factors relevant to the substantial assistance element," each of which is required under JASTA. *Linde*, 882 F.3d at 329.  JASTA requires that (i) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," , and (ii) "the defendant must knowingly and substantially assist the principal violation." *Id.* (quoting *Halberstam*, 705 F.2d at 487).  The Amended Complaint fails plausibly to plead either of these requirements.

a.     **The Amended Complaint Fails to Allege Facts Permitting a Plausible Inference that Moving Defendants Knowingly Played a Role in Terrorist Activities**

The Second Circuit has explained that aiding-and-abetting liability under JASTA "requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities."  *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477); *see* 18 U.S.C. § 2333(d)(2) (requiring that aider and abettor "knowingly provid[ed] substantial assistance" to the principal).  Although a defendant need not know of, or intend to bring about, the specific attacks at issue, the Amended Complaint must allege facts supporting a plausible inference that, in providing banking services, each Moving Defendant was "generally aware" that it was thereby playing a "role" in an FTO's violent or life-endangering activities.  *Id.*

Importantly, the mere provision of services to an FTO—even material support to an FTO—is not sufficient to satisfy JASTA's knowledge requirement.  *Linde*, 882 F.3d at 329-30 ("[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.") (emphasis in original); *see also Weiss*, 381 F. Supp. 3d at 239 ("evidence that [a] Defendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement"); *Strauss v. Credit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 164 (S.D.N.Y. 2019) (same).  Thus, even if the Amended Complaint had alleged facts permitting a plausible inference that a Moving Defendant processed transfers for Alleged Bank Customers after they were designated as "SDGTs" (*see* n. 13, *supra*) by the U.S. Treasury Department (only 19 of the 205 were so designated at the time of any of the Attacks)[29] that would not be sufficient to assert an aiding-

---

[29] The Amended Complaint alleges that one Bank maintained accounts for two Alleged Bank Customers both before and after they were designated by OFAC as Specially Designated Narcotics Trafficking Kingpin entities ("SDNTKs").  *See* Am. Compl. ¶¶ 1808-09.  However, the Amended Complaint does not specify when these accounts were held; does not identify any specific transactions that the bank allegedly processed for the accounts;

and-abetting claim for two reasons: An SDGT designation does not satisfy the statute's "FTO" requirement; and hypothetically, even if an FTO had an account at one of the Banks, provision of banking services, by itself, would not suffice.

As recent decisions make clear, Plaintiffs' failure to plausibly allege that the Moving Defendants knew of their supposed role in terrorist activities dooms the aiding-and-abetting claims. For instance, in *Kaplan*, Judge Daniels held allegations substantially similar to those here were insufficient to meet the "general awareness" element of aiding-and-abetting. *Kaplan*, 2019 WL 4869617, at *5-7. There, Plaintiffs alleged that LCB knew or should have known prior to the attacks about the connection between Hezbollah and five customers (the same five are also Alleged Bank Customers here) because these customers were "integral constituent parts" and leaders of Hezbollah. *Id*. at *6. The court rejected these general awareness allegations, finding that "[e]ven assuming, *arguendo*, that Defendant knew or should have known prior to the attacks about the Five Customers' relationships with Hizbollah, failure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities." *Id*.

Similarly, in *Siegel*, the Second Circuit recently affirmed dismissal of JASTA aiding-and-abetting claims against financial institutions based on allegations like those in the Amended Complaint. *Siegel*, 933 F.3d at 226. Plaintiffs in *Siegel* alleged that [1] "the defendant[] [banks] knew they were circumventing and violating banking regulations by providing [an intermediary] with correspondent banking services, . . . [2] that the defendants were aware of [the

_____

and does not allege facts permitting a plausible inference that such routine banking services were causally linked to the Attacks, or that the Bank, by virtue of allegedly holding these two accounts, was "generally aware" it was playing a "role" in Hezbollah's violent activities. This is particularly so because the Amended Complaint alleges that those two Alleged Bank Customers were designated not as terrorists, but as SDNTKs, and that those designations occurred in January 2011, after all but 15 of the approximately 265 alleged Attacks.

intermediary's] own connections generally with terrorist organizations," and [3] that the defendants knew of "the risk that [the intermediary] itself would use U.S. dollars generated through those banking services to in turn provide banking services or even funding to terrorists." *Siegel*, 2018 WL 3611967 at *4.  In dismissing the action, Judge Cote held that these allegations were insufficient to plausibly suggest that the defendant "knowingly" supported terrorists.  *Id.* at *4-5.

The Second Circuit affirmed, holding, as to general awareness, that plaintiffs did not offer any non-conclusory allegations that the bank provided banking services for any transactions relating to a terrorist attack.  933 F.3d at 224.  The Second Circuit also held that the six factors identified in *Halberstam* weighed against a finding of substantial assistance because the bank was not plausibly alleged to have encouraged the attack, sent any funds to the terror group that perpetrated the attack, or had any direct relationship with the terror group.  *Id.* at 225.  As explained above, the Amended Complaint does not allege plausibly that any Moving Defendant provided banking services of any kind to Hezbollah, nor to the perpetrators of any of the Attacks.  And none of the Alleged Bank Customers that Plaintiffs claim were somehow connected to Hezbollah was ever itself an FTO.  In fact, the vast majority of the Alleged Bank Customers never had a terrorist designation of any kind, and the Amended Complaint contains no non-conclusory allegation that any Moving Defendant maintained an account or provided any banking services for any entity *after* it was designated and before the Attacks.  There are simply no allegations that would support the plausible inference that Moving Defendants *knew* that by providing arms-length banking services to commercial entities (which Plaintiffs allege to be part of "a web of businesses that acted as front companies for Hezbollah" (Am. Compl. ¶ 20)), they

were playing a "role" in Hezbollah's terrorist activities, much less in the activities of the paramilitary groups that perpetrated the Attacks.  *See Kaplan*, 2019 WL 4869617, at *6.

Plaintiffs' attenuated aiding-and-abetting theory would render all manner of Lebanese and non-Lebanese (including U.S.) individuals and entities liable under JASTA: (i) suppliers of goods and services to, or purchasers of goods and services from, the Alleged Bank Customers, including technology companies, or (ii) tourists who patronize the travel agencies, visit the amusement park, or purchase drugs from the pharmaceutical company, supposedly linked to Hezbollah.  This is, of course, not the law.  Plaintiffs' failure to allege facts that would establish that Moving Defendants *knew* that they were "assuming a role in terrorist activities" dooms their aiding-and-abetting claim.

> **b.** **The Amended Complaint Fails to Allege Facts Supporting a Plausible Inference that Moving Defendants' Conduct Constituted Substantial Assistance**

In deciding "whether a defendant's assistance is 'substantial enough' to constitute aiding-and-abetting," courts consider "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance."  *Linde*, 882 F.3d at 330 (citing *Halberstam*, 705 F.2d at 484-85).

These substantiality factors each favor dismissal: (1) the "nature of the act encouraged"—no allegation that Lebanese bank accounts particularly "matter" to carrying out roadside bombings by paramilitary groups in Iraq; (2) "the amount of assistance"—not a single non-conclusory allegation that Moving Defendants offered services of *any* kind directly to either Hezbollah, or to the paramilitary groups that committed the Attacks, much less that any such services were a "major part" of, or "integral" to, instigating the Attacks; (3) the defendant's "presen[ce] at the time" of the tort—no allegation that Moving Defendants were present in the

Attacks; (4) defendant's relation to the principal—no allegation of any relationship at all between the Moving Defendants and the paramilitary groups; (5) the defendant's "state of mind"—no factual allegations sufficient to plausibly infer that Moving Defendants knew that any of their alleged banking services were intended to facilitate the Attacks; and (6) the "duration of the assistance"—no allegations of any specific banking services provided at any particular time, much less before any of the Attacks. *Halberstam*, 705 F.2d at 483-84, 488.

Judge Daniels rejected substantially similar allegations in *Kaplan*, observing that "although Plaintiffs assert that Defendants processed millions of dollars' worth of wire transfers through the LCB Accounts, Plaintiffs do not plausibly allege that Hizbollah received any of those funds or that Defendant knew or intended that Hizbollah would receive the funds."  2019 WL 4869617, at *6; *see also Siegel*, 933 F.3d at 225 (affirming dismissal of JASTA aiding and abetting claims for failure to plead substantial assistance, because the plaintiffs had not "plausibly alleged that [defendant] encouraged the heinous November 9 Attacks or provided any funds to [the terrorist group]."); *Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *5 (D.D.C. Jan 11, 2018) (dismissing aiding-and-abetting claims under *Halberstam* where "plaintiffs failed to plausibly allege that BNPP directly funded any terrorist group, had knowledge of Sudan's use of BNPP-provided funds to sponsor terrorist activities, or knew that BNPP's conduct actually enabled the attacks").

Plaintiffs' failure to plead facts plausibly showing substantial assistance is further underscored by their inability to specify when in time the alleged banking services were provided in relation to when the Attacks occurred.  Indeed, Plaintiffs allege in conclusory fashion that Moving Defendants provided assistance to the Alleged Bank customers in the 8-year period between 2003 and 2011 (*see* Am. Compl. ¶ 5664) and that the Attacks occurred between 2004

and 2011.  However, the Amended Complaint fails to articulate when in this 8-year period Moving Defendants provided services to the Alleged Bank Customers identified in the Amended Complaint, or how any such services (none is specifically alleged) relate to the Attacks.  Such vague and generalized allegations, untethered from the Attacks that the Moving Defendants supposedly assisted, are inadequate.  *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018) (holding that "JASTA does not refer to assisting a foreign terrorist organization generally or such an organization's general course of conduct" and that rather, by tethering JASTA secondary liability to a particular *act* of international terrorism (not merely a terrorist organization), Congress "indicate[d] that the injury at issue must have arisen from '*an act* of international terrorism' and that the secondary tortfeasor assisted the principal tortfeasor in committing '*such an act* of international terrorism.'") (emphasis in original).

In sum, "[a] bank's provision of its usual banking services to a customer [] does not in and of itself rise to the level of substantial assistance."  *Weshnak v. Bank of Am., N.A.*, 451 F. App'x 61, 62 (2d Cir. 2012) (internal quotation marks omitted).  And, as this Court has held, even alleged knowledge of a customer's terrorist designation does not convert routine banking services (which the Amended Complaint has not adequately alleged) into substantial assistance for an act of terrorism.  *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425-26 (E.D.N.Y. 2009) (holding that where bank purportedly "had knowledge of the designation of its client [ ] as an SDGT," allegations that the bank "transferred funds to institutions that were part of Hamas's financial infrastructure," were insufficient to show "substantial" assistance to Hamas suicide bombers); see also *Kaplan*, 2019 WL 2869617, at *6.  The Amended Complaint here does not allege more, and the aiding-and-abetting claim therefore must be dismissed.

-43-

C.     **The Amended Complaint Does Not State a JASTA Conspiracy Claim**

The Amended Complaint added a claim that Moving Defendants conspired with Hezbollah and IRGC-QF "to provide Hezbollah with illegal material support in the form of financial services."  Am. Compl. ¶¶ 5675-76 (Count III).

Under JASTA, a defendant is liable if it "conspire[d] with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).  That text imposes three requirements on any conspiracy claim:  (1) the defendant must have affirmatively agreed to join a conspiracy, *id.*; (2) the goal of the conspiracy must have been to commit "an act of international terrorism, *id.*; *see also O'Sullivan*, 2019 WL 1409446, at *9; and (3) the defendant must have conspired with "the person who committed" the act of international terrorism, 18 U.S.C. § 2333(d)(2); *O'Sullivan*, 2018 WL 1409446, at *9.  The Amended Complaint does not clear any of these hurdles.[30]

1.     The Amended Complaint Does Not Properly Allege Any Illicit Agreement

The Amended Complaint fails at the very first step by not plausibly alleging the most basic requirement of a conspiracy:  an agreement.  As with aiding-and-abetting claims, the elements for conspiracy in JASTA are found in *Halberstam*.  *Siegel*, 933 F.3d at 223. Conspiracy requires (1) an agreement between the defendant and another, (2) "to participate in an unlawful act," (3) an "unlawful overt act performed by one of the parties to the agreement," and (4) "an injury caused" by the overt act.  *Halberstam*, 705 F.2d at 477.  The "crux" of any conspiracy claim is the agreement.  *Kemper*, 911 F.3d at 395.  It is the agreement that distinguishes conspiracy from aiding and abetting, and which serves as the *actus reus* of the

---

[30] In addition, as discussed *supra* at § II(B)(1) in the context of aiding-and-abetting, Plaintiffs' failure to plausibly allege that Hezbollah (or some other FTO) "committed, planned, or authorized" any Attack precludes any secondary liability under JASTA.  Plaintiffs' failure to plead this statutory pre-requisite dooms their conspiracy claim.

crime.  *Halberstam*, 705 F.2d at 478; *see United States v. Shabani*, 513 U.S. 10, 16 (1994).  And the need for an illicit agreement is "especially important in business dealings" because the defining feature of financial networks is that they are meant to "benefit both parties"—yet they do not for that reason alone "carry with them the excess baggage of conspiracy."  *Kemper,* 911 F.3d at 395 (internal quotation marks omitted).

The Amended Complaint does not allege that any of the Moving Defendants had any direct contact with the IRGC-QF or any of the Special Forces, much less that any Bank reached an "agreement" with any of them.  That fact alone is fatal to Plaintiffs' conspiracy claim.  At most, the Amended Complaint generically asserts that Moving Defendants "agreed to join with Hezbollah and its agents" and that it did so "by knowingly agreeing to provide Hezbollah with illegal material support in the form of financial services."  Am. Compl. ¶¶ 5676-77; *see also, e.g.*, *id.* ¶¶ 12, 144, 159, 178, 1493, 1533.  And even that contention is not based on any purported agreement with Hezbollah, but rather on allegations that Moving Defendants provided routine (and entirely legal) banking services to Alleged Bank Customers supposedly associated with Hezbollah.[31]  *E.g.*, Am. Compl. ¶¶ 1475, 1525, 1552.  Such allegations do not add up to a conspiracy with Hezbollah, much less with the IRGC-QF or with any of the Special Forces that committed the Attacks.  *See Kemper*, 911 F.3d at 395 ("The facts here suggest only that [Defendants] may have engaged in business dealings that incidentally assisted a separate terrorism-related conspiracy involving [Hezbollah]; they do not suggest that [Defendants] ever agreed to join that conspiracy.").

---

[31] The closest the Amended Complaint comes to alleging direct contact between a Bank and Hezbollah are the allegations that Hezbollah "directly solicited funds to account no. 953113.30" at one Bank's "Tabaris branch in Beirut and owned "account no. 10680" at another Bank.  Am. Compl. ¶¶ 1498, 1564.  But Plaintiffs do not even contend that Hezbollah opened or maintained the Tabaris account.  And in any case, the mere existence of these accounts is insufficient to establish the other elements of a conspiracy claim:  an agreement to commit an act of international terrorism with the person who committed the act.

Instead of identifying an actual agreement, the Amended Complaint contends that Moving Defendants' alleged participation in the so-called "System" may serve as circumstantial evidence of an agreement.  According to the Amended Complaint, "The System" is a sprawling network comprising most of Lebanon's banking sector, government, political class, and organized crime families.  *See* Am. Compl. ¶¶ 40-41, 83-84.

But the Amended Complaint's abstract allegations about "The System" cannot substitute for an actual "agreement" with Hezbollah, for they rely exclusively on insinuations about Moving Defendants' financial incentives.  *E.g.*, *id.* ¶¶ 12, 47, 84, 144.  As a matter of law, shared financial incentives alone are not enough to assert a conspiracy claim—an agreement is required. *See Kemper*, 911 F.3d at 395; *Halberstam*, 705 F.2d at 478; *Cain v. Twitter Inc.*, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018).[32]  And alleged participation in "The System" cannot substitute for the requisite agreement between Moving Defendants and the IRGC-QF or any Special Forces because those groups, based in Iraq, are not even alleged to participate in "The System."  *E.g.*, Am. Compl. ¶¶ 42-47, 83-84.

The Amended Complaint does not include any non-conclusory allegations that Moving Defendants made any kind of agreement with the IRGC-QF, any Special Forces, or Hezbollah. And without such an agreement, the most basic element of conspiracy is lacking.  For that reason alone, Plaintiffs' conspiracy claim must be dismissed.

---

[32] The same is true of any allegations that Moving Defendants' accounts with supposedly "blacklisted" former LCB accounts are evidence of a conspiracy with Hezbollah.  *E.g.*, Am. Compl. ¶¶ 1521, 1553-56.  The Amended Complaint itself alleges that these accounts "provided [Defendants] with an opportunity to gain additional market share," and thus at most are further evidence of aligned financial incentives, not an agreement to commit acts of terror.  *Id*. at ¶ 1521.

2.    The Amended Complaint Does Not Properly Allege that Moving Defendants Conspired to Commit an Act of International Terrorism

Even if the Amended Complaint adequately alleged an agreement (which it does not), it does not allege that it was an agreement to commit acts of international terrorism.

For their JASTA conspiracy claims to pass muster, Plaintiffs must plausibly plead that Moving Defendants conspired with an FTO "to commit an act of international terrorism." *O'Sullivan*, 2019 WL 1409446, at *9; *see also Cain*, 2018 WL 4657275, at *3 (dismissing JASTA conspiracy claim because "[n]othing in the [complaint] establishes an agreement, express or otherwise, between Twitter and ISIS *to commit terrorist attacks*" (emphasis added)). *Accord Taamneh*, 343 F. Supp. 3d at 916 (JASTA "indicates that the injury at issue must have arisen from '*an act* of international terrorism' and that the secondary tortfeasor assisted the principal tortfeasor in committing '*such an act* of international terrorism.' JASTA does not refer to assisting a foreign terrorist organization generally or such an organization's general course of conduct." (citation omitted) (emphasis in original)).

This is a basic principle of conspiracy law: "one cannot join a conspiracy through apathy." *Kemper*, 911 F.3d at 395. A contrary rule would impose conspiracy liability on any business that transacted with bad actors. *Id.* Thus "although a conspirator need not agree to commit or facilitate each and every part of the offense, she must reach an agreement with the *specific intent* that the conspiratorial goal be completed." *Id.* (quoting *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (alterations and internal quotation marks omitted) (emphasis in *Kemper*). For conspiracy claims under JASTA, the conspiratorial goal at the core of the requisite agreement is the commission of an act of international terrorism. 18 U.S.C. § 2333(d)(2); *see also O'Sullivan*, 2019 WL 1409446, at *9; *Cain*, 2018 WL 4657275 at *3.

The Amended Complaint's allegations that the Moving Defendants conspired to commit acts of terrorism are purely conclusory. *E.g.* Am. Compl. ¶¶ 12, 5675-78. If anything, the allegations point in the other direction: that by providing routine financial services to Alleged Bank Customers, Moving Defendants merely engaged in business dealings that only incidentally assisted Hezbollah. *See, e.g.*, *Kemper*, 911 F.3d at 395 ("The facts here suggest only that Deutsche Bank may have engaged in business dealings that incidentally assisted a separate terrorism-related conspiracy involving Iran; they do not suggest that Deutsche Bank ever agreed to join that conspiracy."); *O'Sullivan*, 2019 WL 1409446, at *9 ("The Complaint pleads no facts from which the Court can infer that Defendants knew that the financial services they provided to various Iranian entities would be directed towards FTOs like Hezbollah, AAI and KH for the purpose of committing violent or life-endangering acts."); *Cain*, 2018 WL 4657275, at *3 ("Plaintiffs point to Twitter's terms of service that every user is subject to, but while that clearly is an 'agreement,' it is hardly relevant to a terrorist conspiracy."). For this additional reason, the Amended Complaint's conspiracy claim must be dismissed.

3.  The Amended Complaint Does Not Properly Allege that Moving Defendants "Conspired" with Anyone Who Committed Acts of Terrorism

Finally, Plaintiffs' conspiracy claim fails because the Amended Complaint does not allege that Moving Defendants "conspire[d] with *the person* who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2) (emphasis added). As explained above, conspiracy liability under JASTA requires that defendants conspired with the same FTO that *actually* "committed, planned, or authorized" the act of international terrorism. *See supra* at p. 44; *see also Crosby*, 921 F.3d at 626-27 & n.6 ("Courts now routinely dismiss ATA claims when the plaintiffs fail to allege a direct link between the defendants and the individual perpetrator."). As with any conspiracy claim, the need for an agreement between a defendant and a perpetrator

-48-

becomes more important the more "wide-ranging" the alleged conspiracy grows.  *Kemper*, 911 F.3d at 395-96.  Yet the Amended Complaint has not pleaded any such allegations.

By and large, the Amended Complaint alleges that Moving Defendants provided routine banking services to entities that, at the very most, have some sort of affiliation with Hezbollah, including minimarts, gas stations, and hospitals.  *E.g.*, Am. Compl. ¶¶ 521, 528, 539, 1526.  *See also supra* at pp. 9-10.  None of those Alleged Bank Customers is an FTO (or even alleged to be one); none of those Alleged Bank Customers is alleged to have committed the terrorist attacks at issue; and none of these Alleged Bank Customers is even alleged to have had any direct contact with the perpetrators of terrorist attacks.  *Id.*  Nor does the Amended Complaint allege any facts establishing that Hezbollah committed, planned, or authorized the attacks outlined in the Complaint.  *See supra* at § II(B)(1).  Accordingly, the Amended Complaint fails to state a claim for conspiracy for the further reason that it does not adequately connect Moving Defendants to an FTO that planned, executed, or authorized these terrorist attacks at issue.

## CONCLUSION

For the foregoing reasons, the Amended Complaint fails to make a *prima facie* showing of personal jurisdiction, and the First, Second, and Third Causes of Action in the Amended Complaint fail to state a claim.  This Court therefore should grant the Moving Defendants' motion and dismiss those causes of action against them in their entirety, with prejudice.

Respectfully submitted,

Dated:  November 1, 2019

-49-

MAYER BROWN LLP

By: /s/ *Mark G. Hanchet*
    Mark G. Hanchet
    Robert W. Hamburg
    Mayer Brown LLP
    1221 Avenue of the Americas
    New York, NY 10020
    212-506-2500
    Email: mhanchet@mayerbrown.com
    Email: rhamburg@mayerbrown.com

    *Attorneys for Defendant Banque Libano Française SAL*

MAYER BROWN LLP

By: /s/ *Andrew J. Pincus*
    Andrew J. Pincus
    Mayer Brown LLP
    1999 K Street, NW
    Washington, DC 20006
    202-263-3220
    Email: apincus@mayerbrown.com

    Christopher J. Houpt
    Kevin C. Kelly
    Mayer Brown LLP
    1221 Avenue of the Americas
    New York, NY 10020
    212-506-2500
    Email: choupt@mayerbrown.com
    Email: kkelly@mayerbrown.com

    *Attorneys for Defendant Bank Audi SAL*

DLA PIPER LLP (US)

By: /s/ *Jonathan D. Siegfried*
    Jonathan D. Siegfried
    Douglas W. Mateyaschuk II
    DLA Piper LLP (US)
    1251 Avenue of The Americas
    New York, NY 10020
    212-335-4925
    Email: jonathan.siegfried@dlapiper.com
    Email: douglas.mateyaschuk@dlapiper.com

    *Attorneys for Defendants Byblos Bank SAL, Bank of Beirut and the Arab Countries SAL, and Lebanon and Gulf Bank SAL*

DECHERT LLP

By: /s/ *Linda C. Goldstein*
    Linda C. Goldstein
    Dechert LLP
    1095 Avenue Of The Americas
    Three Bryant Park
    New York, NY 10036
    212-698-3500
    Email: linda.goldstein@dechert.com

    Michael H. McGinley (*pro hac vice*)
    Dechert LLP
    Cira Centre
    2929 Arch Street
    Philadelphia, PA 19104
    215-994-4000
    Email: michael.mcginley@dechert.com

    *Attorneys for Defendants BLOM Bank SAL and Fransabank SAL*

SQUIRE PATTON BOGGS (US) LLP

By: /s/ *Gassan A. Baloul*
    Gassan A. Baloul
    Mitchell R. Berger
    Squire Patton Boggs (US) LLP
    2550 M Street, NW
    Washington, DC 20037
    202-457-6155
    Email: gassan.baloul@squirepb.com
    Email: mitchell.berger@squirepb.com

    *Attorneys for Defendants MEAB Bank s.a.l. and Fenicia Bank s.a.l.*

SHEARMAN & STERLING LLP

By: /s/ *Brian H. Polovoy*
    Brian H. Polovoy
    Henry Weisburg
    Shearman & Sterling LLP
    599 Lexington Avenue
    New York, NY 10022
    212-848-4000
    Email: bpolovoy@shearman.com
    Email: hweisburg@shearman.com

    *Attorneys for Defendant Bank of Beirut SAL*

ASHCROFT LAW FIRM, LLC

By: /s/ *Michael J. Sullivan*
    Michael J. Sullivan
    Brian J. Leske
    Ashcroft Law Firm, LLC
    200 State Street, 7th Floor
    Boston, MA 02109
    617-573-9400
    Email: msullivan@ashcroftlawfirm.com
    Email: bleske@ashcroftlawfirm.com

    *Attorneys for Defendant Société Générale de Banque au Liban S.A.L.*