UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ROBERT BARTLETT, et al.,

                                  Plaintiffs,

                -against-

SOCIETE GENERALE DE BANQUE AU LIBAN
SAL, et al.,

                                  Defendants.

No. 19-cv-0007 (CBA) (VMS)

---

**MOVING DEFENDANTS' JOINT REPLY
IN FURTHER SUPPORT OF MOTION TO DISMISS**

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ..................................................................................................... 3

I.     THIS COURT LACKS SPECIFIC PERSONAL JURISDICTION OVER MOVING DEFENDANTS BECAUSE THE AMENDED COMPLAINT DOES NOT ALLEGE THE NECESSARY SUIT-RELATED CONDUCT IN THE UNITED STATES ....................................................................................... 3

II.    PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED ..................................................................................................... 5

    A.    Plaintiffs Fail to State a Claim for Primary Liability ............................. 5

        1.    Plaintiffs Fail to Plausibly Allege Proximate Causation ............................ 5

        2.    Plaintiffs Fail to Plausibly Allege that the Moving Defendants Committed Acts of International Terrorism ............................... 8

            a.    Acts Dangerous to Human Life .................................... 9

            b.    Objective Terroristic Intent ......................................... 10

        3.    Plaintiffs Fail to Plausibly Allege a Violation of the Material Support Statute ............................................................. 11

    B.    Plaintiffs Fail to Plead a JASTA Aiding-and-Abetting Claim ............................. 11

        1.    Threshold Statutory Requirements of JASTA ......................... 11

        2.    *Halberstam* Elements of Aiding-and-Abetting ...................... 13

            a.    General Awareness of Role in Life-Endangering Activities ....... 13

            b.    Plaintiffs Fail to Plausibly Allege Defendants Knowingly and Substantially Assisted the Attacks ....................................... 16

    C.    Plaintiffs' Defense of their Conspiracy Claim Ignores the Statutory Elements of Conspiracy Liability under JASTA ................................. 19

        1.    Plaintiffs Fail to Allege Any Facts that Could Lead to a Plausible Inference of an Illicit Agreement ............................ 20

        2.    Plaintiffs Cannot Avoid the Obligation to Allege that Moving Defendants Conspired to Commit an Act of International Terrorism .......................................................... 22

        3.    Plaintiffs Have Not Alleged That Moving Defendants Conspired with the Persons Who Committed Acts of Terrorism .............................. 23

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................10

*Averbach v. Cairo Amman Bank*,
2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ................................................. *passim*

*Bldg. Indus. Fund v. Local Union No. 3*,
992 F. Supp. 162 (E.D.N.Y. 1996) ...................................................................20, 21

*Boim v. Holy Land Found. For Relief and Dev.*,
549 F.3d 685 (7th Cir. 2008) .................................................................................9

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
137 S. Ct. 1773 (2017) ...........................................................................................4

*Cain v. Twitter Inc.*,
2018 WL 4657275 (N.D. Cal. Sept. 24, 2018) .................................................21, 22

*Crosby v. Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) ...............................................................................13

*Digital Realty Tr., Inc. v. Somers*,
138 S. Ct. 767 (2018) ...........................................................................................24

*Freeman v. HSBC Holdings PLC*,
2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ............................................. *passim*

*Fritz v. Iran*,
320 F. Supp. 3d 48 (D.D.C. 2018) .......................................................................12

*Halberstam v. Welch*,
705 F.2d 472 (D.D.C. 1983) ............................................................................20, 21

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ..................................................................................................10

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992) ................................................................................................6

*Honickman v. BLOM Bank SAL*,
2020 WL 224552 (E.D.N.Y. Jan. 14, 2020) ................................................. *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
    405 F. Supp. 3d 525 (S.D.N.Y. 2019) ............................................................ *passim*

*Karcher v. Iran*,
    396 F. Supp. 3d 12 (D.D.C. 2019) ..................................................................... 12

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ........................................................... 10, 20, 21, 22

*Leon v. Shmukler*,
    992 F. Supp. 2d 179 (E.D.N.Y. 2014) ................................................................. 5

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ................................................................................ 3

*Licci v. Lebanese Canadian Bank, SAL*,
    984 N.E.2d 893 (N.Y. 2012) ........................................................................... 3, 4

*Linde v. Arab Bank, plc*,
    882 F.3d 314 (2d Cir. 2018) ...................................................................... *passim*

*Loughrin v. United States*,
    573 U.S. 351 (2014) .......................................................................................... 24

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ........................................... *passim*

*Ofisi v. BNP Paribas, S.A.*,
    2018 WL 396234 (D.D.C. Jan. 11, 2018) .......................................................... 19

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) .............................................................................. 5, 6

*Siegel v. HSBC Bank USA, N.A.*,
    2018 WL 3611967 (S.D.N.Y. July 27, 2018) .................................................... 16

*Siegel v. N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) ........................................................... 13, 15, 16, 18

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) ............................................................................... 3

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ............................................................................ 6, 7

*United States v. Maldonado-Rivera*,
    922 F.2d 934 (2d Cir. 1990) ......................................................................... 20, 21

*United States v. Shabani*,
  513 U.S. 10 (1994)..........................................................................................................20

*Weiss v. Nat'l Westminster Bank PLC*,
  381 F. Supp. 3d 223 (E.D.N.Y. 2019) ..............................................................................9, 10

*Wis. Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018).....................................................................................................22

*Zapata v. HSBC Holdings plc*,
  2019 WL 4918626 (E.D.N.Y. Sept. 30, 2019) ...........................................................2, 7, 11

**Statutes**

18 U.S.C. § 2331 ...............................................................................................................8, 10

18 U.S.C. § 2333 .......................................................................................................19, 22, 23, 24

18 U.S.C. § 2339B .................................................................................................................22

## PRELIMINARY STATEMENT

This case fails because Plaintiffs cannot plausibly connect the Moving Defendants to the activities of Hezbollah or the Iraqi paramilitary groups that caused their injuries in Iraq.[1] Plaintiffs point to no allegations plausibly linking the banking services allegedly provided by the Moving Defendants to those Attacks. They instead rely on tenuous allegations of banking services for individuals and entities they claim have some connection to their murkily constructed "Hezbollah" in Lebanon, and allegations of connections between different elements of that murky "Hezbollah" and the separate groups that committed the Attacks in Iraq. Plaintiffs' construct supports neither jurisdiction nor liability under the ATA.

Plaintiffs dedicate nearly half of their opposition ("Opposition" or "Opp." at 5–37) to reciting the Amended Complaint's allegations about (i) Hezbollah's global structure, including its supposed social welfare sector, business affairs component, and narcotics and weapons trafficking networks; (ii) Moving Defendants' alleged provision of banking services to individuals and entities with purported connections to Hezbollah; and (iii) Hezbollah's alleged role in designing weapons used by, or providing some manner of training or support to, the paramilitary groups in Iraq.

But the Amended Complaint does not allege any facts that support an inference that any Alleged Bank Customers, to which the Moving Defendants supposedly provided routine banking services, had anything to do with the Attacks.[2] These omissions are fatal to both personal jurisdiction and the legal viability of Counts I through III.

---

[1] Unless otherwise noted, capitalized terms have the meaning ascribed to them in the Moving Defendants' opening brief ("Joint Br.").

[2] For instance, Plaintiffs allege in altogether conclusory fashion that five Moving Defendants maintained accounts for the IRSO for the "express purpose of supporting and funding" Hezbollah's violent operations (Am. Compl. ¶¶ 8, 420), without making any factual allegation supporting this conclusion. Similarly, Plaintiffs allege generally that Martyrs Foundation "is one of the most open and notorious Hezbollah institutions in Lebanon." Am. Compl. ¶ 468.

The Amended Complaint shares this fundamental flaw with the many ATA cases against financial institutions that courts in this Circuit have dismissed in the last year: *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525 (S.D.N.Y. 2019), *Freeman v. HSBC Holdings PLC*, 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019), *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019), and *Zapata v. HSBC Holdings plc*, 2019 WL 4918626 (E.D.N.Y. Sept. 30, 2019). After this motion was filed, this Court dismissed another ATA case against one of the Moving Defendants, *Honickman v. BLOM Bank SAL*, 2020 WL 224552 (E.D.N.Y. Jan. 14, 2020). And in *Averbach v. Cairo Amman Bank*, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020), the Magistrate Judge recommended the complaint be dismissed.

The common thread is courts' refusal to allow allegations of arms-length banking services to replace what the law requires: allegations supporting a plausible inference that the bank defendants committed, or knowingly provided substantial assistance to, or conspired with perpetrators of, acts of international terrorism. Courts have consistently, and correctly, rejected attempts to rest ATA liability on allegations of banking services to third parties claimed, based on tenuous allegations, to have in turn provided support to a designated terrorist group, which in turn has some general link to terrorist attacks—the very tactic embraced by Plaintiffs here. As explained in the amicus submission of the European Banking Federation and Institute of International Bankers (ECF 123-1), expanding secondary liability under the ATA to the extent advocated by Plaintiffs would expose financial institutions around the world to unwarranted litigation risk and reputational harm, and drive some to refrain from providing vital banking services to legitimate customers in emerging markets, resulting in a substantial negative impact to the global financial system. This Court should dismiss the Amended Complaint.

As discussed in greater detail at pp. 13-16, below, these conclusory and vague allegations are insufficient to attribute knowledge of these organizations' activities to any Moving Defendant.

## ARGUMENT

**I.  THIS COURT LACKS SPECIFIC PERSONAL JURISDICTION OVER MOVING DEFENDANTS BECAUSE THE AMENDED COMPLAINT DOES NOT ALLEGE THE NECESSARY SUIT-RELATED CONDUCT IN THE UNITED STATES**

Plaintiffs have not alleged facts showing that any Moving Defendant "select[ed] and repeated[ly] use[d]" New York's banking system as an "instrument" to facilitate the Attacks at issue in this case. Joint Br. at 15 (quoting *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013)). Indeed, the Amended Complaint fails to allege any specific transactions through any Moving Defendant's correspondent account in New York connected to the Attacks. Joint Br. at 13.

And Plaintiffs certainly have not shown a *proximate causal relationship* between those contacts and the harm complained of, which is required to satisfy due process where a defendant has limited contacts with the forum. *See* Joint Br. at 17-18 (citing *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018)). Instead of connecting the Moving Defendants' correspondent accounts to their injuries, Plaintiffs insist that no connection is needed: "the proper question is whether the Complaint ties the transactions to Hezbollah, not to any specific attack." Opp. at 40. This argument fails.

First, Plaintiffs misstate *Licci* in an effort to broaden the "arises from" standard for specific jurisdiction and accommodate their argument that the Moving Defendants' in-forum contacts need not relate to the Attacks. But the situation in *Licci* was completely different from the allegations here: There, plaintiffs identified "dozens" of wire transfers through defendant LCB's correspondent account totaling "several million dollars" that "caused, enabled and facilitated *the terrorist rocket attacks that injured them and their families*." *Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 895 (N.Y. 2012) (emphasis added, internal quotation marks omitted). The New York Court of Appeals, on a question certified by the Second Circuit,

3

concluded that "[a]ccepting the complaint's allegations as true, LCB's use of its AmEx correspondent account to transfer money for Shahid provided money for Hizballah to carry out terrorist violence, *including the 2006 rocket attacks*" and that the claims therefore arose from the correspondent banking activity. *Id.* at 901.[3]

Plaintiffs cannot meet the *Licci* standard for specific jurisdiction here because there is no such connection between the jurisdictional allegations of correspondent banking activities and the Attacks. The Amended Complaint vaguely alleges that Moving Defendants' correspondent accounts in New York were used to clear various dollar-denominated transactions on behalf of Lebanese individuals and entities with alleged ties to Hezbollah, with no indication as to when those supposed transactions occurred. *See* Opp. at 40-43. And there is no allegation that any of those transactions provided money for Hezbollah to carry out the Attacks or even other terrorist violence. The Amended Complaint is thus facially insufficient to subject Moving Defendants to specific jurisdiction because they are "unmoored" from the Attacks in Iraq at the heart of this case. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783 (2017) (in products liability action, rejecting argument for specific jurisdiction based on in-forum drug distribution because nonresident plaintiffs could not show injury by the drugs distributed in the forum: "the nonresidents have adduced no evidence to show how or by whom the [medication] they took was distributed to the pharmacies that dispensed it to them.").

Second, even under Plaintiffs' erroneous standard, the Moving Defendants are not subject to jurisdiction because the Amended Complaint contains no well-pled allegation that any Moving

---

[3] The same was true in *Averbach*, in which Magistrate Judge Parker recommended a finding that the bank defendant was subject to specific jurisdiction (before further recommending dismissal for failure to state a JASTA claim). There, unlike here, the plaintiffs identified specific transfers through defendant's New York correspondent account to customers with alleged connection to an FTO, which "committed terrorist acts that caused Plaintiffs' injuries" that were "aid[ed] … , in part, via [those] money transfers". 2020 WL 486860, at *7.

Defendant's correspondent bank account was used to "knowingly 'clear' USD-denominated transactions on behalf of their Hezbollah customers (and co-conspirators)." *See* Opp. at 40. Rather, Plaintiffs recite conclusory and formulaic allegations of Hezbollah support (*e.g.*, Opp. at 42, "LCB conspired with Hezbollah and knowingly facilitated billions of USD-denominated funds transfers through New York on Hezbollah's behalf") or of transfers on behalf of individuals or commercial enterprises that Plaintiffs claim have some connection to Hezbollah (*id.*, alleging that transfer of "more than $500,000 to MAH Auto in New Jersey to purchase used cars subsequently exported from the U.S. primarily to West Africa" was "part of Hezbollah's money laundering efforts to launder narcotics sales proceeds."). Such allegations do not demonstrate that the Moving Defendants "select[ed] and repeated[ly] use[d]" their New York correspondent accounts as "instruments" to facilitate *any* acts of terrorism.[4] Joint Br. at 15.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

### A.   <u>Plaintiffs Fail to State a Claim for Primary Liability</u>

#### 1.   <u>Plaintiffs Fail to Plausibly Allege Proximate Causation</u>

To satisfy the proximate cause requirement for primary liability under the ATA, Plaintiffs must plausibly allege that (i) Moving Defendants' conduct led *directly* to Plaintiffs' injuries, (ii) Moving Defendants' conduct was a *substantial factor* in causing those injuries, and (iii) Plaintiffs' injuries were *foreseeable.* Joint Br. at 20 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013)). Rather than argue that their allegations satisfy the directness element,

---

[4] Plaintiffs half-heartedly argue that they are "entitled" to jurisdictional discovery to try to establish a *prima facie* case of personal jurisdiction. Opp. at 43. But in *Leon v. Shmukler*, 992 F. Supp. 2d 179 (E.D.N.Y. 2014), the court allowed jurisdictional discovery where the complaint, unlike here, detailed that the defendant and its non-resident president stole proprietary information from a software developer in New York, a theft that was the basis for plaintiff's claim. Nothing in *Leon* suggests that Plaintiffs here are "entitled" to jurisdictional discovery from the 12 Lebanese bank defendants, where Plaintiffs identify no *claim-related* activity in New York and have not explained how discovery would help.

Plaintiffs incorrectly argue that *Rothstein* and its progeny do not require a direct connection between the Moving Defendants' conduct and their injuries; they say it is enough to allege "that Defendants provided money directly to Hezbollah." Opp. at 62. Plaintiffs are wrong.

*First*, *Rothstein* affirmed dismissal of ATA claims against UBS AG; the court was "not persuaded that Congress intended to permit recovery under § 2333 on a showing of less than proximate cause or that the Complaint contains plausible allegations that UBS's transfers of U.S. currency to Iran proximately caused plaintiffs' injuries." 708 F.3d at 97; *see also id.* at 96 ("[T]he burden of showing that plaintiffs' injuries were proximately caused by UBS's transfers of U.S. currency to Iran is higher than the burden of showing that plaintiffs' injuries were fairly traceable to those transfers.") Thus the relevant causal connection in *Rothstein*—which the plaintiffs there failed to plausibly allege—was between UBS's banking activity, on one hand, and the plaintiffs' injuries from Hezbollah rocket attacks, on the other.

The Second Circuit reaffirmed its holding in *Linde v. Arab Bank*, stating that "[c]ausation focuses on the relationship between an alleged act of international terrorism and a plaintiff's injury." 882 F.3d 314, 330-31 (2d Cir. 2018) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)); *accord*, *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013) ("providing routine banking services to organizations and individuals said to be affiliated with al Qaeda" did not "proximately [cause] the September 11, 2001 attacks or plaintiffs' injuries").

*Rothstein* and its progeny make clear that the proximate cause standard requires Plaintiffs to do more than allege that the Moving Defendants provided banking services to persons with purported connections to Hezbollah. Rather, Plaintiffs must plausibly allege a direct causal relationship between the alleged banking services *and Plaintiffs' injuries*. *See Kaplan*, 405 F.

Supp. 3d at 533 (holding that complaint failed to allege proximate cause where plaintiffs offered no plausible allegations: that LCB provided money directly to Hezbollah to carry out the attacks; that any funds transferred through LCB's customers' accounts were, in fact, sent to Hezbollah and then used by Hezbollah to perpetrate the attacks; or that Hezbollah would not have been able to carry out the attacks absent those specific funds). To hold otherwise would eliminate the causation requirement altogether and impose civil liability on the basis of "material support" to Hezbollah—which, as *Linde* explained, is insufficient. Plaintiffs' primary liability claim fails.

Plaintiffs' allegations are insufficient for the independent reason that they fail even on Plaintiffs' erroneous view of the law: they do not even directly connect the Moving Defendants to Hezbollah. Plaintiffs allege only that Moving Defendants provided *indirect* support by affording routine banking services to individuals and entities with supposed links to Hezbollah, which in turn, allegedly supported, along with Iran, paramilitary groups in Iraq that committed the Attacks. Joint Br. at 25-26. This is insufficient. *See, e.g., Al Rajhi Bank*, 714 F.3d at 124; *Zapata*, 2019 WL 4918626, at *10; *Kaplan*, 405 F. Supp. 3d at 532-33; *Freeman*, 2019 WL 4452364, at *17; *O'Sullivan*, 2019 WL 1409446, at *6. Plaintiffs' conclusory allegations that the Alleged Bank Customers were "alter-egos" (Opp. at 4-5, 62-63) fail as well. *See O'Sullivan*, 2019 WL 1409446 at *6 (rejecting similar allegations that defendant banks "dealt directly" with "specific entities within the Iranian terrorist apparatus"). And Plaintiffs' allegations relating to supposed Hezbollah alter egos like IRSO are, as set forth below, so vague and conclusory that they cannot be credited by the Court.[5]

*Second*, Plaintiffs fail to allege that banking services supposedly for the benefit of Hezbollah were a "substantial factor" in causing their injuries, because they do not allege that

---

[5] The same is true of Plaintiffs' vague references (*e.g.*, Opp. at 22) to accounts supposedly held by Hezbollah itself. *See* Joint Br. at 45 n. 31.

Hezbollah committed the Attacks; they allege only that Hezbollah had some oblique involvement in each Attack. Joint Br. at 26-27.

*Third*, Plaintiffs fail to plausibly allege that their "injur[ies] w[ere] reasonably foreseeable or anticipated as a natural consequence" of the provision of banking services. Joint Br. at 27-28. Plaintiffs argue that the Alleged Bank Customers were so obviously linked with Hezbollah that the Attacks were a reasonably foreseeable consequence of those banking services, but admit that the Alleged Bank Customers held themselves out as legitimate businesses. *See* Opp. at 65.

Plaintiffs attempt to buttress their foreseeability argument by pointing to certain Alleged Bank Customers, arguing that "five of the Defendants are alleged to have maintained accounts for one of the few 'charitable' organizations controlled by an FTO that *explicitly* raises money for terrorism – the IRSO" (Opp. at 63) and that several Moving Defendants "held accounts" for SDGTs (Opp. at 65). Yet utterly absent is any indication of when these supposed accounts were open, when any particular transaction was processed through any of these supposed accounts, the nature of the transaction, or its size. *See, e.g.*, Am. Compl. ¶ 420. Without more, these allegations say nothing of how or why the Moving Defendants could have reasonably foreseen that their banking services could lead to paramilitary actions in Iraq.

> 2. <u>Plaintiffs Fail to Plausibly Allege that the Moving Defendants Committed Acts of International Terrorism</u>

Plaintiffs also do not plausibly allege a second essential element of primary liability—that the Moving Defendants themselves engaged in acts of international terrorism—because they do not allege that any Moving Defendant committed an act that was (1) "dangerous to human life" (18 U.S.C. § 2331(1)(B)) and that (2) "appear[ed] to be intended" to cause one of the enumerated illicit purposes of terrorism. Joint Br. at 29 (citing *Linde*, 882 F.3d at 326). Plaintiffs fail to plead facts satisfying either requirement.

### a.　Acts Dangerous to Human Life

Plaintiffs argue that each Moving Defendant engaged in acts dangerous to human life by allegedly dealing with supposedly Hezbollah-linked individuals and entities. Opp. at 66-68. They claim the Amended Complaint provides "granular detail" as to how Moving Defendants' financial services apparently furthered Hezbollah's illicit activities. *Id*. at 66. But no amount of detail converts allegations of arms-length banking services into "acts dangerous to human life." *See Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 234 (E.D.N.Y. 2019) ("that the 13 Charities were controlled by Hamas founders, without more, is insufficient to prove that Defendants' activities were violent or endangered human life.").

Plaintiffs argue that *Linde* left open the possibility that banking services could be considered "acts dangerous to human life." Opp. at 66-67. But the Second Circuit concluded that holding accounts, and processing funds transfers, for Hamas leaders and operatives during the relevant time period—facts far worse than alleged here—*did not* constitute acts dangerous to human life as a matter of law. 882 F.3d at 327.

Plaintiffs strain to distinguish the dismissal of analogous claims against international banks in *O'Sullivan v. Deutsche Bank AG*, arguing that the allegations here are more like those in *Boim v. Holy Land Found. For Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008), where donations to a Hamas charity were considered "acts dangerous to human life." Opp. at 67. The purported distinction fails because, as in *O'Sullivan*, there are no allegations that any Moving Defendant donated anything to anyone, much less gave money to a "Hezbollah charity." Plaintiffs allege only that the Moving Defendants provided arms-length banking services to the Alleged Bank Customers. *See* Joint Br. at 31-32. As Judge Swain explained in *O'Sullivan*, "[u]nlike the defendants in *Boim*, Defendants here did not make direct donations to [perpetrators of the attacks in Iraq]. Instead, Plaintiffs posit that Defendants provided financial services to various Iranian

banks, airlines, shipping and oil companies with connections to terrorist organizations such as . . . Hezbollah . . . and those terrorist organizations, in turn, provided funding and other assistance to [the perpetrators of the attacks]." 2019 WL 1409446, at *8.[6] *See id.* ("The Complaint does not allege plausibly that the provision of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life"); *accord Weiss*, 381 F. Supp. 3d at 234 (defendant bank's alleged transactions for 13 charities allegedly related to Hamas did not involve "violent acts or acts dangerous to human life"); *Kaplan*, 405 F. Supp. 3d at 532 ("even assuming, *arguendo*, that Defendant was aware that it was providing such services to Hizbollah affiliates . . . the provision of financial services does not, in itself, equate to international terrorism. Plaintiffs must plausibly allege that Defendant's *own* actions "*also* involve[d] violence or endanger[ed] human life") (emphases in original).

### b. Objective Terroristic Intent

Plaintiffs' allegations could not lead an objective observer to infer that the Moving Defendants harbored terroristic intent. Joint Br. at 31. Instead, a reasonable observer would embrace the "obvious alternative explanation," *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009), that the Moving Defendants intended to generate revenue for their respective banking businesses.

Plaintiffs argue that Moving Defendants "conflate[] scienter with the objective intent requirement. . . which does not depend on the actor's beliefs." Opp. at 68. To the contrary, Moving Defendants focus only on what an objective observer would conclude about the banking services alleged here. Joint Br. at 31-32. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) (quoting 18 U.S.C. § 2331(1)(B)(i)) ("To the objective observer, [Deutsche Bank's] interactions with Iranian entities were motivated by economics, not by a desire to

<hr/>

[6] Likewise, Plaintiffs' reliance (Opp. at 67) on *Holder v. Humanitarian Law Project* is misplaced because that case did not hold that the provision of financial services equated to acts dangerous to human life. 561 U.S. 1 (2010).

'intimidate or coerce.'"); *see also Zapata*, 2019 WL 4918626, at *12 (finding that "to an objective observer, HSBC's conduct appeared to be motivated by economics, not by a desire to intimidate or coerce") (internal quotation marks omitted). And while Plaintiffs note that *Linde* was decided on a full trial record, courts have repeatedly dismissed similar claims under Rule 12(b)(6) for failure properly to plead this element. *See, e.g.*, *Freeman*, 2019 WL 4452364, at *15; *Kaplan*, 405 F. Supp. 3d at 532; *O'Sullivan*, 2019 WL 1409446, at *7; *Zapata*, 2019 WL 4918626, at *12.

### 3. Plaintiffs Fail to Plausibly Allege a Violation of the Material Support Statute

Plaintiffs' primary liability claim should be dismissed on the independent ground that they have not plausibly alleged "knowing" material support to an FTO, as required under 18 U.S.C. § 2339B. Joint Br. at 32-33. Plaintiffs do not argue that the Alleged Bank Customers were themselves FTOs. And despite vague, generalized suggestions that Hezbollah "operates openly" in Lebanon (Opp. at 59), the Amended Complaint contains no allegation tying any Moving Defendant to any purported "laundering" of "bulk cash" on behalf of any Alleged Bank Customer, much less to Hezbollah. The Amended Complaint's broad-brush assertions of unspecified banking services for the Alleged Bank Customers are insufficient to allege that Moving Defendants *knew* they were providing material support to an FTO. Joint Br. at 32-33. Count I of the Amended Complaint should be dismissed.

### B. Plaintiffs Fail to Plead a JASTA Aiding-and-Abetting Claim

### 1. Threshold Statutory Requirements of JASTA

Plaintiffs' JASTA aiding and abetting claim should be dismissed for failure to plausibly allege that: (i) the Attacks were "committed, planned, or authorized" by an entity designated as an FTO as of the date of the Attack (Joint Br. at 35-36); and (ii) the Moving Defendants

"knowingly provid[ed] substantial assistance [to] . . . the person who committed such an act of international terrorism." *Linde*, 882 F.3d at 320.

Plaintiffs contend that the Amended Complaint "details Hezbollah's central role in the Attacks by (1) establishing and organizing its proxy groups in Iraq, (2) designing EFPs and other weapons deployed by those proxies, (3) training its Iraqi proxies in tactics, techniques, and procedures ("TTP"), and (4) overseeing, approving, and directing Special Groups['] attacks on U.S. service members and other American nationals." Opp. at 33-37. But Plaintiffs utterly fail to tie Hezbollah to the 267 Attacks at issue in this case. At most, they allege that Hezbollah generally supported the third party paramilitary groups that committed the Attacks.

As evidence of Hezbollah's supposed "central role," Plaintiffs point to just one of the 267 Attacks—the January 20, 2007 Attack in Karbala, Iraq—which they say was "committed, planned, and authorized by Hezbollah." Opp. at 33, 36-37. The Amended Complaint, however, alleges that this particular Attack was committed by "AAH" operatives or terrorists, not by Hezbollah. Am. Compl. ¶¶ 3332, 3334–35, 3339, 3342–43.[7] And Plaintiffs' contention that this one Attack was "planned" or "authorized" by Hezbollah does nothing to support their aiding and abetting claim with respect to the other 266 Attacks in the Amended Complaint.[8]

---

[7] Plaintiffs claim that "[c]ourts have devoted considerable attention to the role the IRGC-QF and Hezbollah played in perpetrating" this Attack, citing two cases: *Karcher v. Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019) and *Fritz v. Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018). Opp. at 36-37. Plaintiffs fail to mention that both *Karcher* and *Fritz* were default judgment cases (the first of which was "prosecuted" by Plaintiffs' counsel in this case). No defendant appeared in those cases to challenge the plaintiffs' account of the facts.

[8] Even if the 1/20/2007 Karbala Attack was "planned" or "authorized" by Hezbollah, the aiding-and-abetting claim of the Plaintiffs injured in that Attack would still fail because it was not "committed" by the persons Moving Defendants are alleged to have knowingly and substantially assisted, as well as for the reasons addressed in Section B.2, below. *See also infra.*, Section C.3 (explaining that the difference between "planned, authorized, or committed," and the omission of "planned" or "authorized" at the end of §2333(d)(2), must be considered purposeful).

Separately, the aiding-and-abetting claim fails because Plaintiffs have not plausibly alleged that Moving Defendants knowingly provided substantial assistance *to the paramilitary groups* who allegedly committed the Attacks, as the statute requires. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 626-27 (6th Cir. 2019).[9]

### 2. *Halberstam* Elements of Aiding-and-Abetting

#### a. General Awareness of Role in Life-Endangering Activities

Even if Plaintiffs could satisfy JASTA's statutory pre-requisites, their aiding-and-abetting claim fails because they have not plausibly alleged that the Moving Defendants were "generally aware" that by providing banking services to the Alleged Bank Customers, the banks were assuming a role in the life-endangering terrorist acts of the primary actors. Joint Br. at 38-41.[10]

Plaintiffs note that several Alleged Bank Customers were designated "SDGTs" by the U.S. Treasury Department, but they do not dispute that only 19 of the 205 Alleged Bank Customers were so designated at the time of any of the Attacks; nor do they dispute that they have failed to allege when the Moving Defendants supposedly held accounts for any Customer so designated—in particular whether any Moving Defendant held an account for any Alleged Bank Customer *after* the Customer was designated. Joint Br. at 38.[11] Those failures preclude

---

[9] In *Siegel*, the Second Circuit declined to address the issue of whether JASTA aiding-and-abetting applies only to the provision of direct support to the terrorist perpetrator of the relevant attack, 933 F.3d at 224—the standard adopted by the Sixth Circuit in *Crosby*—because, as here, the plaintiffs had clearly failed to plausibly allege that, by providing arms-length banking services, the defendant was "generally aware" of its role in "violent or life endangering activities" or "knowingly and substantially assist[ed]" in the attack at issue. *Id.* at 224-26.

[10] Plaintiffs seek to bolster their secondary liability claim by pointing to customer accounts that were allegedly migrated from LCB in 2011. Opp. at 18-19. These allegations do not help Plaintiffs. Even if these accounts could somehow be relevant to claims against *the Moving Defendants*, Judge Daniels has already dismissed primary liability ATA claims against LCB based on the same theory and many of the same alleged facts as in this case. *Kaplan*, 405 F. Supp. 3d at 528. That determination undermines Plaintiffs' attempt to imbue those accounts with some special significance.

[11] Unable to contest this point, Plaintiffs suggest that the designation of a customer implies its banker's "general awareness" of the customer's conduct before the designation: "U.S. designations are inherently retrospective, describing unlawful conduct that occurred prior to the date of designation." Opp. at 8 n. 6. Of course, Plaintiffs do not—and cannot—contend that a U.S. designation implies that a customer has engaged in violent or life-threatening activities. Rather, "SDGT" and "SDN" are designations made by the U.S. Treasury Department in order to block

Plaintiffs' contention that the Moving Defendants were "generally aware" of any connection between the Alleged Bank Customers and Hezbollah. *See Honickman*, 2020 WL 224885, at *8 (dismissing JASTA aiding and abetting claims, and rejecting argument that BLOM Bank was "generally aware" that customers were related to Hamas, even where specific transactions were alleged, noting that "during the period in question, none of the Three Customers was itself designated during the time BLOM processed transactions on its behalf."); *see also Averbach*, 2020 WL 486860, at *12 (recommending dismissal of JASTA aiding and abetting claims against bank where "none of the Account Holders were designated by the United States government to be terrorists or terrorist organizations at the time of the fund transfers identified in the Complaint, and there is nothing in the Complaint supporting an inference that CAB read or knew of any other designations.").

Plaintiffs next argue that awareness of "terrorist activities" may be satisfied by allegations of awareness of some "overall illegal or tortious activity" and that this standard was met by allegations that the Moving Defendants "were generally aware of their role in terrorist activities, from which terrorist attacks were a natural and foreseeable consequence." Opp. at 49. (internal quotation marks and alterations omitted). This precise argument was rejected last month by Judge Matsumoto:

> In light of this precedent, it is not enough for Plaintiffs to "plausibl[y] allege that BLOM was 'generally aware of [its] role' in 'terrorist activities,' from which terrorist *attacks* were a natural and foreseeable consequence." (ECF No. 37, Pls.' Opp. to Mot. to Dismiss ("Pls. Opp."), at 11.) Adopting this reading would, in effect, replace the scienter for aiding-and-abetting liability with the lower scienter required for material support, in direct contravention of *Linde's* holding that the bank must be aware that it is assuming

---

assets or curtail financial activities of individuals or entities due to some connection that they, or their affiliates, may have to terrorist financing. *See* Joint Br. at 10 n. 16. And importantly, a post hoc designation by itself cannot substitute for factual allegations showing a defendant's knowledge of the nature of a customer's activities at an earlier time. *See Honickman*, 2020 WL 224552, at *3.

> a role in the organization's "violent or life-endangering activities."
> *See Siegel,* 933 F.3d at 224 (citing *Linde,* 882 F.3d at 329).

*Honickman*, 2020 WL 224552, at *8; *see also Kaplan*, 405 F. Supp. 3d at 535 (plaintiffs "d[id] not offer any non-conclusory allegations that Defendant was aware that, by providing financial services to the [subordinate entities], it was playing a role in violent or life-threatening acts intended to intimidate or coerce civilians or affect a government.").

The same is true here. Allegations that Moving Defendants were generally aware of the Alleged Bank Customers' connection to Hezbollah are not sufficient to support a plausible inference that they were aware that they were playing a role in any "violent and life-endangering activities."

Plaintiffs' efforts to analogize the Moving Defendants to the live-in girlfriend found to have aided and abetted the burglar in *Halberstam* are fundamentally flawed. *See* Opp. at 50. Contrary to Plaintiffs' "*Halberstam* Chart," the "Illicit Scheme of which Defendant Must Be Generally Aware" is not "Money Laundering," or even indirectly providing funds to Hezbollah. *See Linde*, 882 F.3d at 329 ("[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.") (emphasis in original). Rather, Moving Defendants must be "aware" of their "role" in "Violent and Life-Endangering Activities,"[12] which Plaintiffs have not alleged.[13] Moreover, unlike the live-in girlfriend in *Halberstam*, who knew of and helped with her boyfriend's criminal activities, the

---

[12] In addition, unlike the live-in girlfriend in *Halberstam*, who worked directly with Mr. Welch in his burglary enterprise, Plaintiffs have not alleged that Moving Defendants provided banking services to the perpetrators of the Attacks, or even Hezbollah.

[13] Although Plaintiffs contend that one Moving Defendant maintained an account that was "used for" purchasing guns, the cited paragraphs in the Amended Complaint allege no such thing. *See* Opp. at 66 (citing Am. Compl. ¶¶ 1178–83). Plaintiffs' contention that another Moving Defendant "maintained accounts for" an arms trafficker is not supported by any factual allegation that the alleged accounts were used for arms transactions or that the bank knew of such use. *Id*. (citing Am. Compl. ¶¶ 1192-1201).

Moving Defendants are alleged only to have provided arms-length banking services to Alleged Bank Customers that engaged in legitimate business activities.

Similarly flawed are Plaintiffs' repeated arguments regarding the Moving Defendants' supposed awareness of their role in Hezbollah's "fundraising activities," which Plaintiffs say can be inferred from the supposed Hezbollah connections of the Alleged Bank Customers. Opp. at 51-52. Even if Plaintiffs' allegations were specific and non-conclusory, awareness of "fundraising activities" is not enough. *See Kaplan*, 405 F. Supp. 3d at 535 ("[F]ailure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities."); *Siegel*, 2018 WL 3611967 at *4 (allegations of banking services to customer with known ties to terror financing insufficient to plausibly suggest that the defendant was aware of role in terrorist activities).

Finally, Plaintiffs attempt to distance the allegations of "general awareness" in this case from those rejected in *Linde* and *Siegel*. Opp. at 49-53. But courts have applied both *Linde* and *Siegel* to reject allegations of general awareness substantively identical to those advanced here. *See Kaplan*, 405 F. Supp. 3d at 534-35; *Honickman*, 2020 WL 224552, at *7-10; *Averbach*, 2020 WL 486860, at *12-15. The same result is warranted here.

### b. Plaintiffs Fail to Plausibly Allege Defendants Knowingly and Substantially Assisted the Attacks

Each of *Halberstam*'s six substantiality factors favors dismissal. Joint Br. at 41. Plaintiffs argue that the first *Halberstam* factor—the nature of the act encouraged—refers not to the Attacks that injured Plaintiffs, but rather to the "overall illegal or tortious activity" of Hezbollah. Opp. at 54-55. Plaintiffs' position has been repeatedly rejected by courts. *See Siegel*, 933 F.3d at 225 ("The plaintiffs here have not plausibly alleged that HSBC encouraged *the heinous November 9 Attacks* or provided any funds to AQI.") (emphasis added); *Honickman*, 2020 WL

224552, at * 11 ("Plaintiffs' harm arises from violent acts conducted by Hamas, but Plaintiffs have not plausibly alleged that BLOM encouraged *the attacks which injured Plaintiffs* or knowingly provided any funds to Hamas for its violent activities.") (emphasis added); *Averbach*, 2020 WL 486860, at *16 ("There is no allegation that CAB encouraged *the Attacks* or any of Hamas's *terrorist activities*.") (emphasis added). Plaintiffs do not argue that any Moving Defendant encouraged any criminal activity, much less any violent or life endangering activity.

There is similarly no merit to Plaintiffs' argument that the second *Halberstam* factor—the amount of assistance—"is obviously satisfied" because they claim that several of the Alleged Bank Customers are so closely tied as to be the equivalent of Hezbollah. Opp. at 55. This is yet another example of Plaintiffs' efforts to invoke their amoeba-like definition of "Hezbollah" to conceal the lack of any connection between the alleged banking services and the Attacks. As noted, Plaintiffs' "alter ego" allegations are too vague and conclusory to be credited. But even if Plaintiffs had plausibly alleged that the Alleged Bank Customers are "alter-egos" of Hezbollah, Plaintiffs identify no banking services that the Moving Defendants actually provided to these Customers at any specific time, or explain how such unspecified services were a "major part" of, or "integral" to, the Attacks. *See Honickman*, 2020 WL 224552, at *11 ("Again, even assuming the Three Customers did work to drum up political support for Hamas, there are no non-conclusory allegations that BLOM's assistance to the Three Customers went towards Hamas' violent activities.").

Plaintiffs concede that the third *Halberstam* factor—defendants' presence or absence at the time of the tort—favors Moving Defendants. Opp. at 55.

As to the fourth *Halberstam* factor—defendant's relation to the principal—Plaintiffs argue that the Court should consider their vaguely-defined "Hezbollah" to be the principal, not

the groups that committed the Attacks Opp. at 55-56. Even if Plaintiffs had plausibly pleaded that Moving Defendants had a direct relationship to Hezbollah (they have not), the Second Circuit has held that this is the wrong relationship. *See Siegel*, 933 F.3d at 225 (in considering the fourth *Halberstam* factor, reviewing the relationship between defendant and the terrorist organization that *committed* the attack at issue).

Nor is there merit to Plaintiffs' argument that the fifth *Halberstam* factor—the defendant's state of mind—is satisfied by allegations of "a decade-long, deliberate plan to participate in Hezbollah's *fundraising and money laundering enterprise*." Opp. at 56 (emphasis added). Again, Plaintiffs' position is contradicted by prior decisions in this Circuit, which require knowing participation in *violent and life-endangering activities*. *Kaplan*, 405 F. Supp. 3d at 536 ("Here, Plaintiffs do not advance any factual, non-conclusory allegations that Defendant knowingly and intentionally supported Hizbollah *in perpetrating the rocket attacks*."); *Averbach*, 2020 WL 486860, at *16 ("Plaintiffs have failed to plead sufficient facts to establish a plausible inference that CAB knew that the services it was providing to the Account Holders would assist Hamas's *terrorist activities or the Attacks* that injured Plaintiffs or their relatives. Nor are there any allegations in the Complaint supporting an inference that CAB intended to assist Hamas in *the Attacks*.") (emphases added).[14]

As to the sixth *Halberstam* factor—the duration of assistance—Plaintiffs state that "*all* of the allegations of Defendants' substantial assistance to Hezbollah relate to the specific period between 2003 and 2011." Opp. at 56. Yet the Amended Complaint does not allege facts identifying any specific banking transaction involving any Moving Defendant at any specific

---

[14] Plaintiffs argue that *Kaplan* "wrongly" evaluated this factor, Opp. at 57. *Kaplan* is entirely consistent with other cases in this Circuit requiring a showing that defendants knowingly supported "violent or life-endangering activities." *Linde*, 882 F.3d at 329.

time during these eight years, or even attempt to connect any transaction to any Attack between 2004 and 2011. *Siegel*, 933 F.3d at 225 ("[P]laintiffs do not allege—even conclusorily—that most, or even many, of HSBC's services to ARB assisted terrorism"); *Honickman*, 2020 WL 224552, at *12 (plaintiffs "make no plausible allegation that any of the funds provided to the Three Customers during this period went to support Hamas' violent activities.").[15]

Finally, Plaintiffs ask this Court to disregard the many adverse cases we have cited. Per Plaintiffs, *Kaplan* is "wrong[]," *Siegel* "inapposite," and *Ofisi* mischaracterized. Opp. at 56-57.[16] Since their Opposition, two additional courts have rejected Plaintiffs' substantial assistance theory: *Honickman* and *Averbach*. As in those cases, Plaintiffs' failure to connect the alleged banking services to the Attacks dooms their aiding and abetting claim. Count II of the Amended Complaint should be dismissed.

## C. Plaintiffs' Defense of their Conspiracy Claim Ignores the Statutory Elements of Conspiracy Liability under JASTA

JASTA subjects a defendant to liability on a conspiracy theory for injuries caused by an act of international terrorism only if it "conspire[d] with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). That plain text imposes three requirements for any conspiracy claim: (1) an affirmative agreement (2) between the defendant and the

---

[15] Plaintiffs cite to three paragraphs in the Amended Complaint in which they identify "specific transactions." Paragraphs 867 and 868 allege that Alleged Bank Customers Rilton Traders and Primogems transferred funds to accounts maintained by Moving Defendants in Lebanon through New York "until 2005," but do not specify when any of the supposed transfers occurred and do not link any transfer to Hezbollah, the paramilitary groups, an Attack, or other violent activity. Paragraph 1106 alleges that one Moving Defendant transferred $49,650 to its U.S. correspondent account on behalf of Alleged Bank Customer New Line Exchange on October 15, 2008. Plaintiffs do not allege this transaction supported or funded Hezbollah or the paramilitary groups that committed the Attacks, nor do they tie it to an Attack. Further, New Line Exchange was not designated until January 2011, after most of the Attacks. Am. Compl. ¶ 1100.

[16] Contrary to Plaintiffs' assertions that *Ofisi* was a primary liability case rejecting the application of *Halberstam*'s framework (Opp. at 57-58), the court there relied on *Halberstam* for the relevant common law standards for aiding and abetting liability, "but ultimately concluded that plaintiffs had failed to plausibly allege those theories." 2018 WL 396234, at *5.

"person who committed" the act of international terrorism, (3) to commit the "act of international terrorism." *Id.*; *O'Sullivan*, 2019 WL 1409446, at \*9; *see also Freeman*, 2019 WL 4452364, at \*21 n.41 ("[T]he plain text of JASTA's *conspiracy* liability provision requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff."). Plaintiffs try to avoid these textual hurdles by drawing tortured analogies to the facts in *Halberstam* and by reciting the purposes of JASTA. But because the text of JASTA is clear, neither Plaintiffs' reliance on *Halberstam* nor their invocation of legislative purpose can save the Amended Complaint.

1.    <u>Plaintiffs Fail to Allege Any Facts that Could Lead to a Plausible<br>Inference of an Illicit Agreement</u>

It is axiomatic that conspiracy requires agreement. *See Halberstam*, 705 F.2d at 477; *United States v. Shabani*, 513 U.S. 10, 16 (1994). "The essence of a conspiracy is not simply a commonality of interest. It involves *an agreement* between two or more people to accomplish a specific illegal objective." *Bldg. Indus. Fund v. Local Union No. 3*, 992 F. Supp. 162, 186 (E.D.N.Y. 1996) (emphasis added); *see also Kemper*, 911 F.3d at 395; *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).[17]

Plaintiffs fail to point to anything in the Amended Complaint that plausibly supports the conclusion that Moving Defendants entered any illicit agreement with any paramilitary group in Iraq. Plaintiffs instead fall back on insufficient generalizations. They claim that Moving Defendants provided banking services to Alleged Bank Customers supposedly associated with Hezbollah; they say that Moving Defendants participate in "The System" (along with most of the

---

[17] Plaintiffs' attempt to distinguish *Kemper* on the ground that it addressed purported conspiracy liability under § 2333(a), rather than § 2333(d), is a distinction without a difference. Opp. at 48 n.34. The Second Circuit and the Seventh Circuit impose the same basic requirement on any conspiracy: an illicit agreement in which "each alleged member [must have] agreed to participate in what he knew to be a collective venture directed toward a common goal." *Maldonado-Rivera*, 922 F.2d at 963.

Lebanese economy); and they proclaim that those allegations are "more than sufficient" to satisfy JASTA. *See* Opp. at 45-46.

But even if those allegations were all true, they would *not* be enough to infer an illicit agreement. The provision of banking services is not a proper basis for inferring an agreement to commit a terrorist act. *See Kemper*, 911 F.3d at 395; *Maldonado-Rivera*, 922 F.2d at 963 (establishing a conspiracy requires "show[ing] that each alleged member agreed to participate in what he knew to be a *collective venture* directed toward a *common goal*" and an agreement on "the essential nature of the plan" (emphasis added)); *Cain v. Twitter Inc.*, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018); *Bldg. Indus. Fund*, 992 F. Supp. at 186.

Plaintiffs try to analogize this case to *Halberstam*, but the facts are not remotely similar. The *Halberstam* defendant *lived with* her co-conspirator for several years; she *shared* the income resulting from his crimes; she *personally witnessed* her co-conspirator engaged in acts that were *obviously criminal* while keeping records of their *plainly illicit* transactions; and her co-conspirator *himself* committed the murder at issue. *Halberstam*, 705 F.2d at 486-87. The *Halberstam* court held that "[f]actors like the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity" all pointed to an illicit agreement. *Id*. at 486. Those factors point in the opposite direction here.

Unlike the intimate relationship in *Halberstam*, Moving Defendants are financial institutions with thousands of customers. Am. Compl. ¶¶ 123, 148, 165, 185, 199, 212, 226, 238, 249, 265. Unlike the direct connection between the defendant in *Halberstam* and her live-in boyfriend, the Moving Defendants are alleged to have provided routine banking services in Lebanon to persons and businesses allegedly affiliated with Hezbollah; and Hezbollah supposedly worked with *other* entities in Iraq that committed the Attacks. *E.g.*, Am. Compl. ¶¶

84, 1475, 1533, 5676. And unlike the evidence showing defendant's knowledge of her boyfriend's illegal enterprise in *Halberstam*, the Amended Complaint does not identify a single illegal transaction processed by any of the Moving Defendants. The factual allegations here are a far cry from *Halberstam*. They do not support an inference of an illegal agreement.

        2.      <u>Plaintiffs Cannot Avoid the Obligation to Allege that Moving Defendants Conspired to Commit an Act of International Terrorism</u>

Even if the Amended Complaint adequately alleged facts from which one could infer *some* kind of agreement (which it does not), it plainly does not allege facts supporting a plausible inference that the Moving Defendants agreed to the commission of *an act of international terrorism*. JASTA imposes liability only where a defendant "conspires with the person who committed *such an act* of international terrorism." 18 U.S.C. § 2333(d)(2) (emphasis added); *Kemper*, 911 F.3d at 395 ("Here, Kemper has not alleged facts that give rise to a plausible inference that Deutsche Bank agreed to provide material support *for terrorism*) (emphasis in original); *O'Sullivan*, 2019 WL 1409446, at *9; *see also Cain*, 2018 WL 4657275, at *3.

By specifically requiring a conspiracy with "the person who committed *such an act* of international terrorism," § 2333(d)(2) contrasts with § 2339B(a)(1), which imposes criminal liability on anyone who "conspires to" "provide[] material support or resources to a foreign terrorist organization." JASTA therefore requires that the conspiratorial goal be the commission of an act of international terrorism. *Linde*, 882 F.3d at 329 ("[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.") (emphasis in original); *O'Sullivan*, 2019 WL 1409446, at *9 ("If Congress had intended for anybody who helps a terrorist organization to be held accountable, it could easily have used language similar to that in the ATA, § 2339B, but it did not do so.") (internal alteration omitted); *see also Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071-72

(2018) (courts must "presume differences in language like this convey differences in meaning," and especially so where both statutes are designed "to handle much the same task") (citation omitted).

Plaintiffs do not contend that the allegations meet this test, arguing instead that JASTA does not require this showing. Their arguments fail. First, this reading of § 2333(d)(2) follows directly from the phrase "conspires with the person who committed such an act of international terrorism." It is also the reading adopted by Judge Swain in *O'Sullivan*, 2019 WL 1409446, at *9.

Next, JASTA's supposed "purpose of bringing into court" defendants who "contribute material support" to "persons or organizations that pose a significant risk of committing acts of terrorism," Opp. at 47 (emphasis omitted), cannot override the absence of that broad standard from the statute enacted by Congress. Finally, Plaintiffs try to read the "conspiratorial goal" element out of JASTA by noting that in *Halberstam,* the shared conspiratorial goal was not "murder" but another crime, burglary. Opp. at 47. But JASTA requires that the defendant conspire with "the person who committed *such an act of international terrorism*," thereby precluding conspiracy liability based on other purported goals, such as money laundering, narcotics trafficking, or even material support for a terrorist organization.

> 3.    Plaintiffs Have Not Alleged That Moving Defendants Conspired with the Persons Who Committed Acts of Terrorism

"[T]he plain text of JASTA's *conspiracy* liability provision requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff." *Freeman*, 2019 WL 4452364 at *21 n.41 (emphasis in original). Thus, to allege a claim for conspiracy liability under JASTA, Plaintiffs must allege that the Moving

Defendants conspired with "the person who committed" each of the Attacks—*i.e.*, the Special Forces—which they have failed to do. 18 U.S.C. § 2333(d)(2).

Plaintiffs do not cite a single allegation that Moving Defendants had any contact, let alone an agreement, with any of the paramilitary groups that carried out the Attacks in Iraq and do not allege that any Alleged Bank Customer was involved in any Attack. To the contrary, Plaintiffs try to satisfy this requirement by insisting that "Hezbollah Committed the Attacks." Opp. at 43. But this dubious contention rests almost exclusively on allegations that Hezbollah "authorized" or "planned" the Attacks by providing training or support to the attackers. Opp. at 33–37. And § 2333(d)(2) does not impose liability on defendants who conspire with persons who "authorized" or "planned" an act of international terrorism, only those who "committed" them. Even if Plaintiffs' conclusory allegations that Hezbollah planned or authorized the Attacks could satisfy § 2333(d)(2)'s requirement of "an injury arising from an act of international terrorism committed, planned or authorized by" an FTO, they are not enough to satisfy JASTA's separate requirement of an agreement "with the person or entity that *committed* such an act of international terrorism." *See Freeman*, 2019 WL 4452364 at *21 n.41 (emphasis added). The omission of the words "planned" or "authorized" in the latter clause of JASTA, when they were included earlier in the same sentence, must be considered purposeful. *See Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777 (2018).) ("'When Congress includes particular language in one section of a statute but omits it in another, this Court presumes that Congress intended a difference in meaning.'") (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)) (alterations incorporated).[18] For this reason too, the Amended Complaint fails to state a claim for conspiracy under JASTA.

---

[18] Plaintiffs try to contend that Hezbollah "committed" the January 20, 2007 attack on the Provincial Joint Coordination Center in Karbala. Opp. at 36–37 (citing Am. Compl. ¶¶ 3357, 3370). But the Amended Complaint

## CONCLUSION

For the foregoing reasons, and those set forth in our opening brief, the Amended

Complaint fails to make a *prima facie* showing of personal jurisdiction, and the First, Second,

and Third Causes of Action in the Amended Complaint fail to state a claim. This Court therefore

should grant the Moving Defendants' motion and dismiss those causes of action against them in

their entirety, with prejudice.

Dated: January 31, 2020

Respectfully submitted,

MAYER BROWN LLP                               MAYER BROWN LLP


By: /s/ *Mark G. Hanchet*                      By: /s/ *Andrew J. Pincus*
    Mark G. Hanchet                              Andrew J. Pincus
    Robert W. Hamburg                            Mayer Brown LLP
    Mayer Brown LLP                              1999 K Street, NW
    1221 Avenue of the Americas                  Washington, DC 20006
    New York, NY 10020                           202-263-3220
    212-506-2500                                 Email: apincus@mayerbrown.com
    Email: mhanchet@mayerbrown.com
    Email: rhamburg@mayerbrown.com               Christopher J. Houpt
                                                 Kevin C. Kelly
    *Attorneys for Defendant Banque Libano*      Mayer Brown LLP
    *Française SAL*                              1221 Avenue of the Americas
                                                 New York, NY 10020
                                                 212-506-2500
                                                 Email: choupt@mayerbrown.com
                                                 Email: kkelly@mayerbrown.com

                                                 *Attorneys for Defendant Bank Audi SAL*

---

belies this contention, for it repeatedly asserts that this Attack was committed by "AAH operatives" or "AAH terrorists," not by Hezbollah. *See* Am. Compl. ¶¶ 3332, 3334–35, 3339, 3342–43. And even if Hezbollah did commit that one Attack, Plaintiffs' conspiracy claim would still fail for all the other reasons discussed above.

DLA PIPER LLP (US)

By:  /s/ *Jonathan D. Siegfried*
    Jonathan D. Siegfried
    Douglas W. Mateyaschuk II
    DLA Piper LLP (US)
    1251 Avenue of The Americas
    New York, NY 10020
    212-335-4925
    Email: jonathan.siegfried@dlapiper.com
    Email: douglas.mateyaschuk@dlapiper.com

    *Attorneys for Defendants Byblos Bank SAL, Bank of Beirut and the Arab Countries SAL, and Lebanon and Gulf Bank SAL*

DECHERT LLP

By:  /s/ *Linda C. Goldstein*
    Linda C. Goldstein
    Dechert LLP
    1095 Avenue Of The Americas
    Three Bryant Park
    New York, NY 10036
    212-698-3500
    Email: linda.goldstein@dechert.com

    Michael H. McGinley (*pro hac vice*)
    Dechert LLP
    Cira Centre
    2929 Arch Street
    Philadelphia, PA 19104
    215-994-4000
    Email: michael.mcginley@dechert.com

    *Attorneys for Defendants BLOM Bank SAL and Fransabank SAL*

SQUIRE PATTON BOGGS (US) LLP

By:  /s/ *Gassan A. Baloul*
    Gassan A. Baloul
    Mitchell R. Berger
    Squire Patton Boggs (US) LLP
    2550 M Street, NW
    Washington, DC 20037
    202-457-6155
    Email: gassan.baloul@squirepb.com
    Email: mitchell.berger@squirepb.com

    *Attorneys for Defendants MEAB Bank s.a.l. and Fenicia Bank s.a.l.*

SHEARMAN & STERLING LLP

By:  /s/ *Brian H. Polovoy*
    Brian H. Polovoy
    Henry Weisburg
    Shearman & Sterling LLP
    599 Lexington Avenue
    New York, NY 10022
    212-848-4000
    Email: bpolovoy@shearman.com
    Email: hweisburg@shearman.com

    *Attorneys for Defendant Bank of Beirut SAL*

ASHCROFT LAW FIRM, LLC


By:  /s/  *Michael J. Sullivan*
    Michael J. Sullivan
    Brian J. Leske
    Ashcroft Law Firm, LLC
    200 State Street, 7th Floor
    Boston, MA 02109
    617-573-9400
    Email: msullivan@ashcroftlawfirm.com
    Email: bleske@ashcroftlawfirm.com

    *Attorneys for Defendant Société Générale
    de Banque au Liban S.A.L.*