UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROBERT BARTLETT, *et al.*,

                    Plaintiffs,

          -against-

SOCIÉTÉ GÉNÉRALE DE BANQUE AU
LIBAN SAL, *et al.*,

                    Defendants.

19-CV-00007 (CBA) (VMS)

**BRIEF OF *AMICI CURIAE* THE EUROPEAN BANKING FEDERATION AND
THE INSTITUTE OF INTERNATIONAL BANKERS IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

Lisa J. Fried
Benjamin A. Fleming
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, New York 10017
(212) 918-3000
lisa.fried@hoganlovells.com
benjamin.fleming@hoganlovells.com

*Attorneys for Amici Curiae*
*The European Banking Federation and*
*The Institute of International Bankers*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................3

ARGUMENT .........................................................................................................................7

I.    THE FILING OF UNJUSTIFIED ATA CLAIMS HAS INCREASED
DRAMATICALLY IN RECENT YEARS. ...................................................................7

II.   IF PERMITTED TO PROCEED, THE ACTION WOULD EXPOSE
INTERNATIONAL BANKS TO MORE BASELESS LITIGATION,
EXTRAORDINARY EXPENSE, REPUTATIONAL HARM, AND ATA
LIABILITY FOR COMMON BANKING SERVICES. ..............................................12

A.    The Court Should Reject Plaintiffs' Overbroad Reading of the Secondary
Liability Provisions of the ATA as Amended by JASTA. ...................................12

B.    The Court Should Reject Plaintiffs' Disregard for and Misapplication of the
Limitations on Primary ATA Liability. .............................................................18

CONCLUSION.....................................................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................7, 18

*Cent. Bank of Denver v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) .......................................................................................4, 12, 13

*Crosby v. Twitter, Inc.,*
    921 F.3d 617 (6th Cir. 2019) ...................................................................................9

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,*
    135 F.3d 837 (2d Cir. 1998) ..................................................................................13

*DM Research, Inc. v. Coll. of Am. Pathologists,*
    170 F.3d 53 (1st Cir. 1999)......................................................................................7

*Exp.-Imp. Bank of U.S. v. Asia Pulp and Paper Co.,*
    609 F.3d 111 (2d Cir. 2010) ..................................................................................15

*Fields v. Twitter, Inc.,*
    881 F.3d 739 (9th Cir. 2018) ...........................................................................10, 20

*Force v. Facebook, Inc.,*
    934 F.3d 53 (2d Cir. 2019) ......................................................................................9

*Freeman v, HSBC Holdings, PLC,*
    No. 14 Civ. 6601 (PKC) (CLP), 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019) ....................8

*Gonzalez v. Google, Inc.,*
    335 F. Supp. 3d 1156 (N.D. Cal. 2018).................................................................9

*Jesner v. Arab Bank, PLC,*
    138 S. Ct. 1386 (2018) .................................................................. 2, 10, 11, 13

*Kaplan v. Lebanese Canadian Bank, SAL,*
    No. 08 Civ. 7253 (GBD), 2019 WL 4869617 (S.D.N.Y. Sept. 20, 2019) ........................8, 20

*Kemper v. Deutsche Bank,*
    911 F.3d 383 (7th Cir. 2018) ...................................................................................4

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) ...........................................................................10

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010) ..............................................................10

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ..........................................................2, 19

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
    23 N.Y.3d 129 (2014)..........................................................................15

*O'Sullivan v. Deutsche Bank AG*,
    No. 17 Civ. 8709 (LTS) (GWG), 2019 WL 1409446
    (S.D.N.Y. Mar. 28, 2019) ...................................................... 8, 14, 19, 20

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) .........................................................4, 8

*Peled v. Netanyahu*,
    No. 1:17-cv-00260-RBW (D.D.C. filed Feb. 9, 2017)...........................9

*Pennie v. Twitter, Inc.*,
    281 F. Supp. 3d 874 (N.D. Cal. 2017)..................................................9

*Pension Benefit Guarantee Corp. v. Morgan Stanley Inv. Mgmt.*,
    712 F.3d 705 (2d Cir. 2013) ................................................................7

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) ..............................................................10

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ........................................................*passim*

*Shaffer v. Deutsche Bank AG*,
    No. 16-CR-497-MJR-SCW, 2017 WL 8786497 (S.D. Ill. Dec. 7, 2017) ................................8

*Shipping Corp. of India v. Jaldhi Overseas Pte.*,
    585 F.3d 58 (2d Cir. 2009) .................................................................16

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) .......................................................*passim*

*Siegel v. HSBC Bank USA, N.A.*
    No. 17 Civ. 6593 (DLC), 2018 3611967 (S.D.N.Y. July 27, 2018) ......................17

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ...........................................................................10

*Strauss v. Crédit Lyonnais, S.A.*,
    379 F. Supp. 3d 148 (E.D.N.Y. 2019) ...................................................................8

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ........................................................................ 14, 20

*Weiss v. Nat'l Westminster Bank PLC*,
    381 F. Supp. 3d 223 (E.D.N.Y. 2019) ...................................................................8

**Statutes**

18 U.S.C. § 2331 .............................................................................................*passim*

18 U.S.C. §2333 ............................................................................................. *passim*

28 U.S.C. § 1350 .........................................................................................2, 10

iv

## INTEREST OF *AMICI CURIAE*

The European Banking Federation ("EBF") is the leading professional organization of European banks.[1] It provides a forum for European banks to discuss best practices and legislative proposals and to adopt common positions on matters affecting the European banking industry. The EBF also actively promotes the positions of the European financial services industry, and the banking industry in particular, in international fora. The EBF unites 32 national banking associations in Europe that together represent some 3,500 banks – large and small, wholesale and retail, local and international – employing about two million people.

The Institute of International Bankers ("IIB"), based in New York, is the only national association devoted exclusively to representing and advancing the interests of banking organizations headquartered outside the United States that operate in the United States. The IIB's membership consists of approximately 90 banking and financial institutions from over 35 countries; none is incorporated or headquartered in this country. In the aggregate, IIB members' U.S. operations have approximately $5 trillion in U.S. banking and non-banking assets, provide approximately 25 percent of all commercial and industrial bank loans made in this country and have over 20,000 full-time employees in the U.S. Collectively, the U.S. branches and other operations of IIB member institutions enhance the depth and liquidity of the U.S. financial markets and are an important source of liquidity in those markets, including for domestic borrowers.

---

[1] *Amici* affirm that no party or party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person other than *amici*, their members, or their counsel contributed any money to fund the brief's preparation or submission. *Cf.* Fed. R. App. P. 29(a)(4)(E). Defendants have consented to the filing of this *amicus* brief; Plaintiffs have stated that they would not oppose EBF and IIB's motion seeking leave to file this *amicus* brief.

The EBF and the IIB regularly appear before federal courts as *amici curiae* in cases that raise significant legal issues relating to international banking, including cases involving the appropriate scope of the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* (the "ATA"), such as *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), and *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019) ("*Siegel II*"), and those involving other federal statutes, such as *Jesner v. Arab Bank*, *PLC*, 138 S. Ct. 1386 (2018) (plurality op.) (primarily concerning the extraterritorial application of the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS")).

The EBF, the IIB and their members have a substantial interest in the matter now before the Court. Denial of the Moving Defendants' November 1, 2019 motion to dismiss the Amended Complaint[2] would: (1) encourage additional meritless claims against financial institutions that provide services (*e.g.*, maintain accounts, process wire transfers, provide trade finance) for legitimate businesses throughout the world, based only on a tenuous and unsupported allegation that some customers may somehow be connected to a problematic party that in turn may be connected to the terrorist actors and organization that may have caused the plaintiffs' injuries; (2) threaten to disrupt correspondent banking; and (3) expose banks with no alleged involvement in terrorist attacks to years of expensive and far-reaching discovery. This, in turn, would have a substantial negative impact on the EBF, the IIB and their members, as well as the viability of the services provided by the international banking community to all legitimate businesses and the global financial community.

---

[2] The "Moving Defendants" are (1) Société Générale de Banque au Liban S.A.L., (2) Fransabank S.A.L., (3) MEAB Bank s.a.l., (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) Lebanon & Gulf Bank S.A.L., (9) Banque Libano Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank.

The EBF and the IIB submit this brief to provide this Court with a broader perspective on ATA litigation and to highlight reasons of particular significance to the international banking community why this Court should grant the Moving Defendants' motion to dismiss the Amended Complaint. *Amici* are uniquely equipped to describe for the Court the risks this litigation provides to the global banking and financial community and to opine on the effect an adverse ruling would have. *Amici* are also able to explain the harm global economies and the international banking community suffer when US litigation is allowed to proceed based on tenuous theories of liability that do not meaningfully connect defendants' alleged conduct to the plaintiffs' injuries.

## PRELIMINARY STATEMENT

Plaintiffs or their family members, while serving in the U.S. military as part of the coalition forces in Iraq, were the victims of horrific attacks. The EBF and the IIB deplore all acts of terrorism and vigorously support efforts to combat terrorist financing.

As part of the United States' response to the rise of international terrorism, Congress enacted the ATA to impose civil and criminal liability on individuals, foreign governments, and other entities that played a role in committing such acts. Congress also included in the ATA important limitations on those private causes of action. This action is one of a series of cases in which plaintiffs seek to sidestep those clear limitations by relying on novel, expansive, and untenable legal theories. In such actions, plaintiffs attempt to pursue ATA claims against, and recover treble damages for, conduct that the ATA's plain statutory language and controlling precedent do not deem actionable.

Here, Plaintiffs seek to hold the Moving Defendants, eleven Lebanese banks, liable based on expansive theories[3] under which the banks could incur billions of dollars in liability for providing routine banking services to commercial entities with legitimate operations. Plaintiffs would impose ATA liability on a financial institution even though the institution did not (1) provide any services to the actors that committed the acts that injured the plaintiffs or (2) process any transactions for the actors that committed the acts that injured the plaintiffs.

This action also goes even further than many other recent ATA actions in at least three ways: *First*, some prior ATA suits allege that the non-US bank defendants concealed, from their US correspondent banks, the fact that sanctioned entities were parties to wire transfers to those correspondent banking accounts. Courts have generally dismissed such claims, since the mere involvement of sanctioned entities or non-transparent banking practices does not suggest that the banks are facilitating terrorism. Here, the alleged transactions by the Moving Defendants are both wholly unspecified and not alleged to have improperly concealed the customers involved. *Second*, some prior ATA suits have followed the resolution of criminal investigations against non-US banks. That, too, has not been a sufficient basis for an ATA claim to survive dismissal. *See, e.g.*, *Siegel II*, 933 F.3d at 225-26; *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275-276 (D.C. Cir. 2018). Here, by contrast, Plaintiffs do not allege that any Moving Defendant has been criminally prosecuted. *Third*, courts have held that alleging that a defendant engaged in transactions that violate U.S. sanctions laws is not sufficient to state an ATA claim,[4] but

---

[3] The Amended Complaint asserts three claims against all defendants: primary liability pursuant to 18 U.S.C. §2333(a) and aiding-and-abetting and conspiracy liability under 18 U.S.C. §2333(d). Plaintiffs must comply with the statutory requirements of the Justice Against Sponsors of Terrorism Act ("JASTA"), which amended the ATA to create aiding-and-abetting liability in certain narrow circumstances.

[4] *See Kemper v. Deutsche Bank*, 911 F.3d 383, 395 (7th Cir. 2018) (allegation that defendant joined a conspiracy to evade sanctions insufficient to support claim that it agreed to join terrorism-related conspiracy); *Siegel II*, 933 F.3d at 225-256 (same).

Plaintiffs here seek to impose liability on financial institutions that are not alleged even to have engaged in such transactions.

Plaintiffs allege that the Moving Defendants provided banking services not to Hezbollah but rather to customers which they allege are related in some manner to Hezbollah. There is no dispute that these customers carried on legitimate operations. At the time the Moving Defendants provided services to these customers—before the alleged attacks took place—they were not designated by OFAC. Plaintiffs' effort to nevertheless subject the Moving Defendants to liability, if successful, would open the door to an extremely expansive legal interpretation of liability for all financial institutions. In particular, if the Amended Complaint survives dismissal, it will encourage additional meritless ATA litigation against non-US banks, and will threaten to disrupt correspondent banking, to the detriment of the global financial system.

Such a result would be particularly unfortunate because ATA lawsuits are a powerful weapon: they threaten defendants with treble damages [5] and, by attempting to associate defendants with heinous acts of terror, can inflict enormous reputational harm. The Moving Defendants are subject to a robust anti-terrorism and AML regulatory regime in their home country and have undertaken numerous measures to ensure compliance with the AML laws and regulations of other nations. [6] As frequent counterparties to *amici*'s members, they are also heavily incentivized to comply with international AML and anti-terrorist financing laws.

---

[5] The ATA provides that a successful plaintiff "*shall* recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a) (emphasis added).

[6] *See, e.g.*, Remarks of Assistant Sec'y Glaser on "Protecting the Lebanese Fin. Sector from Illicit Finance" at the 2013 Annual Arab Banking Conference, Treas. JL-2219 (Nov. 15, 2013) ("In fact, many Lebanese banks seek to go beyond the minimum requirements of the law, in order to ensure that they are not unwittingly facilitating illicit finance."); "Lebanon – Banking Systems," Lebanon Country Commercial Guide, U.S. Dep't of Commerce, https://www.export.gov/article?id=Lebanon-Banking-Systems (last visited December 2, 2019) ("Lebanon has one of the most developed, well regulated, and sophisticated banking sectors in the region.").

Any expansion of ATA liability beyond what Congress has authorized is likely to generate a further wave of such suits. In addition to imposing unwarranted litigation risk, expense and reputational harm on financial institutions, extending civil secondary liability beyond the statutory limits would create such broad and uncertain liability that banks operating in the U.S. might refrain from providing important services to other financial institutions, including those in emerging markets, or even decline to conduct business in certain regions altogether. Providing banking services to customers engaging in legitimate transactions — the activities targeted by Plaintiffs' claims in this case — is especially vital to the functioning of the global financial system and international finance and trade.

By requiring plaintiffs to plead facts that plausibly satisfy all the elements of the civil ATA claims created by Congress, courts properly restrict the scope of liability to those defendants that have themselves committed an act of international terrorism or knowingly provided substantial assistance to the persons who actually committed the acts of terrorism. In contrast, under plaintiffs' boundless theory, *any* bank that provides any service (*e.g.*, maintaining an account, effecting a wire transfer, providing trade finance) to any customer could be held liable for almost any subsequent act of terrorism under the ATA, so long as that customer is later alleged to have ties to problematic parties.

The same theory of liability under the ATA, moreover, could be applied to any act of terrorism anywhere around the world, based on the provision of banking services to an entity *later* alleged to be related to a problematic party. If the mere allegation of such a relationship is sufficient to permit a suit to proceed, plaintiffs' attorneys will be able to inflict huge discovery costs on non-US banks and open the door to the possibility of a trial and huge liability. It would unfairly tip the scales, licensing plaintiffs' attorneys to practice "settlement extortion—using

discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of the suit." *Pension Benefit Guarantee Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 719 (2d Cir. 2013) (*quoting Am. Bank v. City of Menasha*, 627 F.3d 261, 266 (7th Cir. 2010), as amended (Dec. 8, 2010)); *see also DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999)).

Requiring plaintiffs to adequately allege all elements of the claims spelled out under the ATA and JASTA weeds out implausible claims against institutions that played no direct, knowing part in promoting acts of terror, and keeps defendants "free from the burdens of discovery," *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009), when discovery is unwarranted. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007). Those burdens are particularly likely to be onerous in ATA cases, as the claims necessarily center on matters that occurred in distant and often tumultuous corners of the world.

## ARGUMENT

## I.  THE FILING OF UNJUSTIFIED ATA CLAIMS HAS INCREASED DRAMATICALLY IN RECENT YEARS.

Private lawsuits under the ATA targeting international financial institutions have grown increasingly common. Although the ATA was enacted in 1992, there has been a dramatic increase in the number and types of filings against financial institutions and other non-terrorist defendants in recent years. Notably, many cases have been filed against multinational banks and financial services companies asserting claims similar to those advanced in this case—seeking to hold defendants liable for instances of terrorism based on transactions involving entities alleged to themselves have some connection with a terrorist organization. Numerous courts have dismissed such suits on several grounds, including (among others) lack of knowledge, the absence of plausible allegations of proximate causation, lack of terroristic intent, and failure to

allege a conspiracy under JASTA. *See, e.g., Siegel II*, 933 F.3d at 224-25 (affirming dismissal of secondary liability claims against banks involving transactions with Saudi bank and injury in Jordan); *Owens*, 897 F.3d at 276–77 (affirming dismissal of ATA claims for lack of proximate cause and because aiding and abetting liability is unavailable for attacks that occurred before JASTA's effective date); *Freeman v, HSBC Holdings, PLC*, No. 14 Civ. 6601 (PKC) (CLP), 2019 WL 4452364, at *13 (E.D.N.Y. Sept. 16, 2019) (dismissing primary and secondary liability claims against European banks alleged to have provided banking services to Iran's government and state-owned entities in violation of U.S. sanctions laws); *Kaplan v. Lebanese Canadian Bank, SAL*, No. 08 Civ. 7253 (GBD), 2019 WL 4869617, at *4 (S.D.N.Y. Sept. 20, 2019) (dismissing claims against Lebanese bank alleged to have provided services to Hezbollah-affiliated groups for insufficient allegations of proximate causation among other things), *appeal docketed sub. nom. Licci v. Am. Express Bank, Ltd.*, No. 19-3522 (docketed Oct. 21, 2019); *O'Sullivan v. Deutsche Bank AG*, No. 17 Civ. 8709 (LTS) (GWG), 2019 WL 1409446, at *5 (S.D.N.Y. Mar. 28, 2019) (dismissing for lack of causation where complaint failed to show how banking relationships facilitated attacks on U.S. servicemen in Iraq; involving many of the same plaintiffs as the instant action); *Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 161 (E.D.N.Y. 2019) (holding that bank lacked terroristic intent required for international terrorism under ATA where defendant "merely provided banking services . . . for ostensibly charitable purposes, which does not satisfy the intent required . . . ."), *appeal docketed*, No. 19-1285 (2d Cir. Apr. 26, 2019)[7]; *Shaffer v. Deutsche Bank AG*, No. 16-CR-497-MJR-SCW, 2017 WL 8786497, at *1 (S.D. Ill. Dec. 7, 2017) (dismissing claims "alleging that Deutsche Bank conspired with Iranian

---

[7] *See also Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 234-35 (E.D.N.Y. 2019) (same as *Strauss*), *appeal docketed sub nom. Applebaum v. Nat'l Westminster Bank, PLC*, No. 19-1159 (2d Cir. April 26, 2019).

financial institutions to transfer U.S. currency to Iranian banks in violation of U.S. economic sanctions, giving the Iranian government access to currency necessary to fund terrorist activities in Iraq"; dismissing ATA claims for lack of proximate causation and because plaintiffs had not pled a conspiracy with the person who "actually planned or orchestrated" the act of international terrorism, *id.* at *4), *aff'd sub nom. Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018); *Riley v. HSBC Bank PLC*, No. 8:18- CV-1212-T-23SPF (M.D. Fla. Sept. 7, 2018), R&R, ECF No. 17 (magistrate judge's report recommending dismissal of ATA claims for failure to plead any required elements), *adopted by* Order (M.D. Fla. Oct. 3, 2018), ECF No. 18.

Financial institutions are not alone. Plaintiffs' attorneys have targeted other types of entities with similarly attenuated claims, including suits against technology companies and media outlets,[8] pharmaceutical companies,[9] and charities.[10] Those cases have also foundered on the absence of any direct connection between the companies' alleged conduct and the plaintiffs'

---

[8] These suits—against firms such as Google, Facebook, and Twitter—allege that terrorists used these companies' social networking and communications platforms to recruit supporters, raise funds, and otherwise support their efforts. *See Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 877 (N.D. Cal. 2017) ("Plaintiffs allege that '[w]ithout Defendants Twitter, Facebook, and Google (YouTube), HAMAS' ability to radicalize and influence individuals to conduct terrorist operations outside the Middle East would not have been possible.'"), *appeal voluntarily dismissed*, No. 17-17536 (9th Cir. Oct. 19, 2018), ECF No. 29; *see also Force v. Facebook, Inc.*, 934 F.3d 53, 57 (2d Cir. 2019) (affirming dismissal of claims pursuant to Communications Decency Act § 230(c)(1)); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019) (dismissing ATA claims for failure to satisfy threshold requirement of JASTA, stating "secondary liability requires that an act of international terrorism was 'committed, planned, or authorized' by a 'foreign terrorist organization.'. . . To get around this requirement, Plaintiffs rely on the same tenuous connection to argue that ISIS was responsible for [the attack]"); *Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1176-79 (N.D. Cal. 2018) (dismissing complaint and finding no proximate cause).

[9] For example, plaintiffs sued five groups of companies, including Johnson & Johnson, Pfizer, Roche, GE, and AstraZeneca, alleging that they are liable for downstream acts of terrorism based on their doing business with the post-war, US-funded Iraqi ministry of health. *See* Compl., *Atchley v. AstraZeneca UK Ltd, Inc.*, No. 17 Civ. 2136 (RJL) (D.D.C. Oct. 17, 2017), ECF No. 1. Liability was premised on allegations that defendants' provision of life saving medicines and medical equipment to the Iraqi ministry of health yielded—through looting and black-market sales—cash that terrorists then used to help fund attacks on U.S. forces. *See* Mem. in Supp. of Defs.' Mot. to Dismiss at 11–14, *Atchley*, ECF No. 72-1 (Apr. 26, 2018). The plaintiffs advanced these claims even though the U.S. government actively encouraged pharmaceutical companies to engage with the Iraqi government. Am. Compl. ¶¶ 3, 116, 138, 198, 221, *Atchley*, ECF No. 67 (Mar. 12, 2018).

[10] In *Peled v. Netanyahu*, No. 17 Civ. 260 (RBW) (D.D.C. filed Feb. 9, 2017), the plaintiffs not only sued senior Israeli government officials, but also American charities that made donations to Israel, seeking to impose ATA liability upon them for Israel's purportedly terroristic "war crimes" in the Palestinian territories. Motions to dismiss are pending.

harms.  As the Ninth Circuit put it in affirming the dismissal on the pleadings of a case against

Twitter:

> Communication services and equipment are highly interconnected with modern economic and social life, such that the provision of these services and equipment to terrorists could be expected to cause ripples of harm to flow far beyond the defendant's misconduct.  Nothing in § 2333 indicates that Congress intended to provide a remedy to every person reached by these ripples; instead, Congress intentionally used the "by reason of" language to limit recovery.

*Fields v. Twitter, Inc.*, 881 F.3d 739, 749 (9th Cir. 2018) (following the Second Circuit's analysis

in *Rothstein*).

The increase in filings of ATA cases parallels the decline in litigation invoking the Alien

Tort Statute (the "ATS"), as a consequence of recent appellate decisions curtailing the ATS's

scope.  Beginning in the 1990s, plaintiffs' lawyers began to use the ATS as a tool for filing

massive damages actions against multinational corporations based on alleged human rights

abuses.  One analysis identified 150 such lawsuits "filed against companies in practically every

industry sector for business activities in over sixty countries."  U.S. Chamber Institute for Legal

Reform, *Federal Cases from Foreign Places* 23 (Oct. 2014), https://goo.gl/Bdg4wX.  But the

Supreme Court's rulings in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), and *Kiobel v. Royal

Dutch Petroleum Co.*, 569 U.S. 108 (2013), overturned lower court rulings that had interpreted

the ATS expansively,[11] and Second Circuit decisions also significantly narrowed the scope of

ATS claims in other ways.[12]

---

[11] *Sosa* held that courts could only recognize claims under the ATS analogous to the "historical paradigms familiar when § 1350 was enacted"—piracy, assaults on ambassadors, and violations of safe conduct. 542 U.S. at 732. *Kiobel* held that the ATS did not apply extraterritorially.  569 U.S. at 117.

[12] In *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009), the Second Circuit imposed a stringent criminal-law *mens rea* requirement on aiding and abetting claims under the ATS.  In *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *aff'd on other grounds*, 569 U.S. 108 (2013), the court (to a considerable extent anticipating *Jesner*) held that ATS claims could not be maintained against corporations.

ATS cases had provided a vehicle for labeling companies "human rights violators" or "international law violators" and—through expansive causation arguments or secondary liability claims, or both—for seeking to tie those companies to horrific events in foreign nations, such as genocide, apartheid, murders of civilians by government forces, or forced labor. But the tragic facts of those actions presented peculiar challenges for companies seeking to investigate and defend themselves. Among other things, the claimed injuries were outside the United States, typically in areas beset by civil strife, making discovery particularly difficult and extremely expensive. And the combination of vague international-law legal standards and the reputational damage of being associated with atrocities generated enormous settlement pressure.

Although the scope of the ATA differs from that of the ATS, ATA claims have many of the same characteristics: a corporate defendant is labeled a "terrorist" or at least a "supporter of terrorism"; the harm occurred outside the United States, almost always in a conflict zone; and, as with the ATS, plaintiffs' lawyers seeking to bring large damages actions against multinational corporations have had little difficulty finding creative ways to package similar types of claims as "terrorism," supposedly giving rise to an action under the ATA—as the cases discussed above demonstrate. Just last year, in *Jesner*, the Supreme Court further limited the scope of ATS liability, holding that the ATS does not extend to non-US corporations. If history is any guide, the further closing of the ATS avenue will divert more litigation traffic toward dubious theories of ATA liability. It is therefore of great importance that the ATA be properly interpreted in cases such as this one.

## II. IF PERMITTED TO PROCEED, THE ACTION WOULD EXPOSE INTERNATIONAL BANKS TO MORE BASELESS LITIGATION, EXTRAORDINARY EXPENSE, REPUTATIONAL HARM, AND ATA LIABILITY FOR COMMON BANKING SERVICES.

### A. The Court Should Reject Plaintiffs' Overbroad Reading of the Secondary Liability Provisions of the ATA as Amended by JASTA.

As discussed in the Moving Defendants' memorandum of law, the exclusive path to imposing secondary ATA liability was through the amendments made by JASTA, and JASTA added only a narrow cause of action. Yet Plaintiffs nevertheless seek to hold the Moving Defendants liable based on a far broader theory of secondary liability, which, unless rejected, would expose the EBF's and the IIB's members to potentially unbounded secondary liability. Indeed, if uncorrected, it would chill the exercise of normal banking business and economically beneficial transactions conducted in New York and elsewhere.

The plain language of the ATA, as amended by JASTA, imposes two independent threshold requirements on secondary liability, both of which plaintiffs must satisfy. *First*, Section 2333(d)(2) applies only to injuries arising from acts of international terrorism "committed, planned, or authorized" by an organization that had been officially designated as an FTO as of the date on which the act was "committed, planned, or authorized." *Second*, Section 2333(d)(2) by its terms applies only to "those who aid[] and abet[] . . . or 'who conspire[]with the person who committed such an act of international terrorism." *Id.* Plaintiffs nevertheless seek: (1) to maintain claims for acts of international terrorism *other* than those committed, planned, or authorized by a then-designated FTO and (2) to proceed against the Moving Defendants without alleging in anything other than the most conclusory way that they conspired with any persons who committed an act of international terrorism. (Indeed, Plaintiffs do not allege that the attacks were committed by the Moving Defendants' customers, or even by

12

Hezbollah, the FTO that allegedly had some connections to such customers; rather, plaintiffs allege that the attacks were committed by various militias that were not designated as FTOs.)

Plaintiffs' theory flies in the face of the Supreme Court's recent guidance in *Jesner*. There, plaintiffs sought to utilize the ATS to bring claims for injuries arising from alleged acts of terrorism, thereby creating an ATS end-run around the limits on such claims established by Congress in the ATA. In response, the Court expressly cautioned courts against upsetting the policy balance struck by Congress in the ATA. *See* 138 S. Ct. at 1405 (finding that "[t]he detailed regulatory structures prescribed by Congress [in the ATA] and the federal agencies charged with oversight of financial institutions reflect the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism" and adding that "it would be inappropriate for courts to displace this considered statutory and regulatory structure").

That logic applies in full to the balance JASTA struck on the scope of secondary liability, for "[t]he fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere." *Cent. Bank of Denver v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 184 (1994); *see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 843 (2d Cir. 1998) (holding that for Rule 10b-5 claims, "where the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which *other parties* have committed a primary violation").[13]

---

[13] *Accord Rothstein*, 708 F.3d at 98 (finding that although Congress did not "intend[ ] to authorize civil liability for aiding and abetting through its silence," "[i]t of course remains within the prerogative of Congress to create civil liability on an aiding-and-abetting basis and *to specify the elements*, such as *mens rea*, of such a cause of action") (emphasis added).

The practical consequences of an expansion of secondary ATA liability would be immense—an international financial institution could potentially be held liable under the ATA for engaging in transactions not with FTOs, but rather with *other foreign entities* that are alleged to have assisted or conspired with FTOs. The Second Circuit has already rejected precisely that result in the primary liability context, *Rothstein*, 708 F.3d at 98, for good reason: it would chill the provision of "routine banking services to organizations and individuals" for fear that they might be "said to be affiliated" with terrorists. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013). And in *Siegel II*, the Second Circuit confirmed that the same logic applies in the JASTA context because, among other reasons, doing business with a large foreign bank simply does not generate any of the inferences needed to plausibly allege an aiding-and-abetting claim:

> Here, the plaintiffs have failed to allege that HSBC was aware that by providing banking services to [the Saudi bank] ARB, it was supporting AQI, much less assuming a role in AQI's violent activities. At most, the allegations, even when viewed in the light most favorable to the plaintiffs, assert that HSBC was aware that ARB was believed by some to have links to AQI and other terrorist organizations. Without further allegations that would support a conclusion that HSBC knowingly played a role in the terrorist activities, the [ ] pleadings are insufficient to state a claim for aiding-and-abetting liability under JASTA. . . . Instead, the plaintiffs' allegations suggest that in providing banking services to ARB, HSBC had little reason to suspect that it was assuming a role in AQI's terrorist activities. The plaintiffs acknowledge that ARB is a large bank with vast operations. They do not allege that most, or even many, of ARB's banking activities are linked to terrorists.

*Siegel II*, 933 F.3d at 224 (internal citations and quotations omitted); *see also O'Sullivan,* 2019 WL 1409446, at *10 (dismissing aiding-and-abetting claim against banks where "the Complaint is devoid of any factual allegations from which the Court can properly infer that Defendants knew that the financial services they provided to the various Iranian entities were destined to aid the FTOs responsible for the attacks that injured Plaintiffs.").

14

The risk of chilling legitimate banking activity is particularly serious in cases like this, where Plaintiffs' descriptions of Moving Defendants' alleged misconduct – though fatally vague and wholly conclusory – suggest that those banks' US dollar clearing capabilities and correspondent banking relationships are somehow inherently suspect. *See, e.g.,* Am. Compl. ¶¶ 994, 1009, 1016, 1100, 4477. The EBF's and the IIB's members engage in thousands of transactions each day with international financial institutions, including with those in Lebanon. And as acknowledged in Second Circuit precedents construing the ATA, Congress made clear that it did not intend to expose international financial institutions to burdensome litigation and potentially ruinous liability for engaging in U.S. dollar clearing and trade finance services. *Infra* at Section II.B.

That is especially true given the ubiquity and systemic importance of the type of transactions seemingly at issue: clearing of international U.S. dollar-denominated payments by the domestic branches of foreign financial institutions. Virtually every international bank clears U.S. dollar-denominated payments through New York, and the clearing of foreign payments is a routine part of conducting dollar-denominated transactions. For example, the Clearing House Interbank Payments System, or "CHIPS," is an interbank system that transmits and settles orders in U.S. dollars for domestic and foreign banks such as *amici*'s members.[14] Almost "all wholesale international transactions involving the use of the dollar go through CHIPS." *Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129, 137 (2014) (internal quotations and citation omitted). On an average day, CHIPS settles over 440,000

---

[14] *See Exp.-Imp. Bank of U.S. v. Asia Pulp and Paper Co.*, 609 F.3d 111, 119 n.7 (2d Cir. 2010) (noting that CHIPS "is more frequently used for international transactions" than its competitor, Fedwire, owned and operated by the Federal Reserve).

"payment messages" worth an aggregate of $1.5 trillion.[15] "For these reasons, CHIPS has been widely regarded as a systemically important payment system." *See* CHIPS, Public Disclosure of Legal, Governance, Risk Management, and Operating Framework, June 2018, https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/chips-public-disclosure-2018.pdf (last visited December 2, 2019).

If Plaintiffs' theory is accepted, a broad swath of the trillions of dollars in foreign payments cleared through New York weekly—including the clearing of U.S. dollar transactions for *other foreign banks*—could expose banks to liability under the ATA, even if made in full compliance with relevant anti-money laundering and other regulations. Such a scheme would inevitably have the pernicious effect of deterring international financial institutions, including the EBF's and the IIB's members, from engaging in a standard line of business that lubricates the global economy and allows the U.S. dollar to remain the world's reserve currency. Such concerns weigh strongly against adopting Plaintiffs' atextual reading of the ATA. *See, e.g.*, *Shipping Corp. of India v. Jaldhi Overseas Pte.*, 585 F.3d 58, 62 (2d Cir. 2009) (overruling precedent allowing attachment of electronic fund transfers in New York because it "not only introduced uncertainty into the international funds transfer process, but also undermined the efficiency of New York's international funds transfer business," a result that "if left uncorrected, [could] discourage dollar-denominated transactions and damage New York's standing as an international financial center") (internal quotations and citations omitted).

Under Plaintiffs' expansive interpretation of JASTA, the clearing of U.S. dollar transactions could expose banks to significant civil liability under the ATA, even if: (i) they have no direct relationship with designated terrorist organizations, (ii) they have no connection with

---

[15] *See* https://www.theclearinghouse.org/-/media/tch/pay%20co/chips/reports%20and%20guides/chips%20volume%20through%20july%202017.pdf?la=en (last visited December 2, 2019).

terrorist acts; (iii) they lacked notice of their customers' attenuated downstream connections to terrorist organizations; and (iv) those entities were designated only *after* the bank transactions at issue. That would, in turn, deter financial institutions, including many of *amici*'s members, from engaging in the commercially beneficial activity described above.[16] Domestic and international authorities have voiced concern that excessive "de-risking" by banks may "disrupt financial services and cross-border flows, including trade finance and remittances, potentially undermining financial stability, inclusion, growth, and development goals."[17] There is no evidence that Congress intended the ATA or JASTA to cause such massive disruption to global financial markets.

And there is no reason to believe that Congress intended to unleash the negative consequences that Plaintiffs' atextual view would necessarily entail. This Court should adhere to the clear statutory limits set forth in the ATA. As Judge Cote explained in *Siegel*, "because money is fungible and because the international banking system depends on cooperation among financial institutions across borders, it is particularly important to focus with care in cases like this on each of the necessary elements to a finding that JASTA has been violated." *Siegel v. HSBC Bank USA, N.A.* No. 17 Civ. 6593 (DLC), 2018 3611967, at \*5 (S.D.N.Y. July 27, 2018), *aff'd by Siegel II.*

---

[16] This type of "de-risking" would not eliminate money laundering and terrorist financing; it would simply render episodes of each less transparent. *See, e.g.,* Financial Action Task Force, *Guidance on Correspondent Banking* (Oct. 21, 2016), http://www.fatf-gafi.org/publications/fatfrecommendations/documents/correspondent-banking-services.html ("FATF Guidance").

[17] International Monetary Fund, SDN/16/06, *The Withdrawal of Correspondent Banking Relationships: A Case for Policy Action*, at 5 (June 2016), https://www.imf.org/external/pubs/ft/sdn/2016/sdn1606.pdf. *See also* U.S. Dep't Treasury, *et al.*, *Joint Fact Sheet on Foreign Correspondent Banking: Approach to BSA/AML and OFAC Sanctions Supervision and Enforcement*, at 1 (Aug. 30, 2016), https://www.treasury.gov/press-center/press-releases/Documents/Foreign%20Correspondent%20Banking%20Fact%20Sheet.pdf (Treasury and four U.S. federal banking regulators, addressing de-risking efforts, stating that "[t]he global financial system, trade flows, and economic development rely on correspondent banking relationships").

Financial institutions have a particular interest in the federal courts' continued vigilance in this area. *Amici*'s member institutions often provide banking services in emerging markets, including some that are beset by violence, where the attacks and injuries underlying ATA actions may arise. By increasing expense and risk, exposure to baseless ATA actions—even if they are ultimately dismissed at summary judgment—could discourage banks from providing legitimate banking services in violence-plagued regions. Iraq provides an excellent example: for over a decade, the United States government has invested substantially in Iraq and encouraged financial institutions to provide services there.[18] If district courts cease playing their gatekeeper role under *Twombly* in ATA actions, such emerging markets may become toxic, and the efforts of our government to encourage their progress and economic growth will be substantially impeded.

**B.     The Court Should Reject Plaintiffs' Disregard for and Misapplication of the Limitations on Primary ATA Liability.**

For the reasons set out in the Moving Defendants' memorandum of law, Plaintiffs' theory of primary liability must also be rejected. Plaintiffs' theory undermines the limitations Congress carefully delineated on the scope of ATA liability, and if taken to its logical conclusion would subject *any* bank (or seemingly any other business) that bestows even an indirect benefit upon any entity alleged to have had any connection to an alleged terrorist organization to liability for nearly any subsequent act of international terrorism, regardless of whether that connection existed at the time or whether the bank was aware of it. Unless rejected, Plaintiffs' theory would invite more unwarranted litigation against banks that clear payments in U.S. dollars or provide trade finance services that happen to benefit persons and entities in various countries, even

---

[18] *See, e.g.*, Testimony of E. Anthony Wayne, Ass't Secretary for Economic and Business Affairs, Before the Senate Banking Subcommittee on International Trade and Finance, Feb. 11, 2004, https://2001-2009.state.gov/e/eeb/rls/rm/29288.htm; "The United States and Iraq Sign Loan Guarantee Agreement," U.S. Dep't of Treasury Press Center, Jan. 5, 2017, https://www.treasury.gov/press-center/press-releases/Pages/jl0697.aspx.

though plaintiffs fail to allege any plausible connection to an act of terrorism, much less that the banks actually committed such an act.

**_Committing an Act of International Terrorism._** The plain language of the ATA and Second Circuit precedent make clear that, to be subject to primary liability under the ATA, a defendant—and not merely some other third party—must have committed an "act of international terrorism" as defined in 18 U.S.C. § 2331(1). 18 U.S.C. § 2333(a); *see Linde*, 882 F.3d at 325–26, 332. This requires plausible allegations *both* that the defendant's acts were violent or "dangerous to human life" *and* that those acts "appear[ed] to be intended" "to intimidate or coerce a civilian population" or to influence or affect a government by intimidation or coercion, or by "mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1).

The requirement that Defendants *themselves* committed an act of international terrorism is a basic limitation on the scope of ATA liability. *Linde*, 882 F.3d at 325–26. But opening and servicing bank accounts and processing wire transfers simply are not "acts of international terrorism." The Court should not conclude otherwise. *See, e.g.*, *id.* ("[T]o qualify as international terrorism, a defendant's act must *also* involve violence or endanger human life" and "must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government"); *O'Sullivan*, 2019 WL 1409446, at *8 ("The Complaint does not allege plausibly that the provision of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life, particularly because the factual allegations delineating relationships between those services and the terrorist attacks at issue are so attenuated.").

**_Directly Causing Plaintiffs' Injury._** There likewise is no allegation that any of the plaintiffs have been injured "by reason of" an act by Defendants of international terrorism. 18

U.S.C. § 2333(a). The Second Circuit has made plain that plausible allegations of proximate causation are a *sine qua non* for primary ATA liability. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 123–24; *Rothstein*, 708 F.3d at 95; *see also Siegel*, 2018 WL 3611967, at \*3. Courts, including the Second Circuit, have made equally clear that "proximate causation" in this context means *direct* causation, and that mere foreseeability is not enough. *See Rothstein*, 708 F.3d at 91–92 ("[W]ith respect to 'proximate causation, the central question . . . is whether the alleged violation led directly to the plaintiff's injuries'") (citation omitted); *Fields*, 881 F.3d at 748 ("for purposes of the ATA, it is a direct relationship, rather than foreseeability, that is required"). Under this plain and well-established standard, an international bank's business with one particular entity, which in turn is alleged to support in a vague way yet another entity, is *not* a proximate cause of acts of terrorism committed by another party still. *See Kaplan*, 2019 WL 489617, at \*4; *O'Sullivan*, 2019 WL 1409446, at \*5-6. Yet that is Plaintiffs' theory here.

Plaintiffs' approach would expose international financial institutions to liability for terrorist acts absent any plausible allegations tethering those acts to any banking business. It would also introduce uncertainty about exactly what actions are permissible, flying in the face of the unambiguous rules legislated by Congress. The inevitable consequence of that approach— obscuring clear distinctions and creating uncertainty about what acts constitute violations of law—would be to prompt banks to simply circumscribe or terminate the provision of appropriate and lawful services to certain countries, regions or persons who otherwise have entirely legitimate needs for these services. [19] In contrast, strictly enforcing Congress' carefully considered restrictions on liability under the ATA encourages appropriate risk management, monitoring, and reporting.

_____

[19] *See* FATF Guidance.

## CONCLUSION

The EBF and the IIB deplore the awful events that led to this action.  But the question of whether and to what extent to provide victims of terrorist attacks with civil remedies has already been carefully considered and addressed by Congress:  in the ATA (as amended by JASTA), Congress struck a specific balance that must be respected and adhered to.  Unless the Moving Defendants' motion to dismiss is granted, this action risks exposing international financial institutions to liability far beyond what Congress prescribed.  It also threatens to encourage a further proliferation of meritless ATA actions, to deter financial institutions from engaging in legal and economically beneficial transactions, both in New York and across the globe, to the detriment of their customers and the international financial system, and to inject unwarranted uncertainty into the ATA and other areas of the law.  For the foregoing reasons, the Court should grant the Moving Defendants' motion to dismiss.

Dated:  New York, New York
       December 16, 2019

 

Respectfully submitted,

HOGAN LOVELLS US LLP

By:  /s/ Lisa J. Fried
    Lisa J. Fried
    Benjamin A. Fleming
390 Madison Avenue
New York, New York 10017
(212) 918-3000
lisa.fried@hoganlovells.com
benjamin.fleming@hoganlovells.com

*Attorneys for Amici Curiae*
*The European Banking Federation and*
*The Institute of International Bankers*