UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

ROBERT BARTLETT *et al.*,                             :
                                                      :
                    Plaintiffs,                       :     **Case No. 19-cv-7 (CBA)(VMS)**
                                                      :
          -against-                                   :
                                                      :
SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL               :
*et al.*,                                             :
                                                      :
                    Defendants.                       :

-----------------------------------------------------------------------x

 

 

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
<u>THE AMENDED COMPLAINT</u>**

**Table of Contents**

I.   Factual Allegations ................................................................................................ 5

   A.  Hezbollah's Structure ....................................................................................... 5

      1.   Hezbollah's "Social Welfare" Sector ........................................................ 6

      2.   Hezbollah's Business Affairs Component ("BAC") ................................... 8

         a.   Hezbollah's BAC Leadership ................................................................. 9

         b.   Hezbollah's BAC Acts as a Series of Interlocking Criminal Networks. .......... 14

         c.   Hezbollah's Conflict Diamonds Networks ............................................ 15

         d.   Hezbollah's Narcotics Trafficking Networks ........................................ 16

         e.   Hezbollah's Weapons Trafficking Networks ......................................... 17

   B.  Lebanese Canadian Bank's Sale and the Migration of Hezbollah's Accounts to
       Defendants ........................................................................................................ 18

   C.  Each Defendant Provided Substantial Assistance to Hezbollah. ..................... 19

      1.   SGBL ....................................................................................................... 19

      2.   Fransabank ............................................................................................... 21

      3.   MEAB Bank ............................................................................................. 22

      4.   Blom Bank ............................................................................................... 24

      5.   Byblos Bank ............................................................................................. 26

      6.   Bank Audi ................................................................................................ 26

      7.   Bank of Beirut .......................................................................................... 27

      8.   Lebanon and Gulf Bank ("L&G") ........................................................... 28

      9.   Banque Libano-Française ("BLF") ........................................................... 29

      10.  Bank of Beirut and the Arab Countries ("BBAC") .................................. 30

      11.  Jammal Trust Bank ("JTB") ..................................................................... 31

12. Fenicia Bank ........................................................................... 32

D. Hezbollah "Committed, Planned or Authorized" Each of the Alleged Attacks. ...... 33

1. Hezbollah and the IRGC-QF Established and Organized Proxy Groups in Iraq. ........................................................................... 33

2. Hezbollah Designed the EFPs Used to Target Americans in Iraq. ................... 34

3. The IRGC-QF and Hezbollah Controlled and Directed the Special Groups. ... 35

4. Hezbollah and the IRGC-QF Also Trained Their Proxies to Use Other Iranian-Manufactured Weapons ........................................................................... 36

5. Hezbollah Planned and Oversaw the January 20, 2007 Attack on the Provincial Joint Coordination Center ("PJCC") in Karbala. ................................. 36

II. This Court Has Personal Jurisdiction Over Each Defendant. ................................. 37

III. The Complaint Plausibly Alleges JASTA Liability ........................................... 43

A. Hezbollah Committed the Attacks. ........................................................... 43

B. JASTA Secondary Liability Is Governed by *Halberstam v. Welch*. ........................... 44

C. Each Defendant Conspired with Hezbollah. ................................................. 45

D. Each Defendant Aided & Abetted Hezbollah. ............................................... 48

1. Each Defendant was Generally Aware of Its Role in Hezbollah's Tortious Activities. ........................................................................... 48

2. Each Defendant Provided Substantial Assistance to Hezbollah. ...................... 54

IV. The Complaint Plausibly Alleges Primary Liability Predicated on Defendants' Violations of 18 U.S.C. §2339B. ........................................................... 58

A. Each Defendant Knowingly Provided Material Support to Hezbollah in Violation of §2339B. ........................................................................... 59

B. Each Defendant's Material Support to Hezbollah Proximately Caused Plaintiffs' Injuries. ........................................................................... 59

1. ATA Primary Liability Does Not Require Tracing Material Support to Specific Attacks. ........................................................................... 60

**2.   ATA Primary Liability Does Not Require That the Material Support Be Provided to a Foreign Terrorist Organization Under Its Own Name.** ............... **62**

**3.   Terrorist Attacks Are a Reasonably Foreseeable Consequence of Providing Hundreds of Millions of Dollars to a Foreign Terrorist Organization** ............... **64**

**C.  Each Defendant's Material Support to Hezbollah "Involved Acts Dangerous to Human Life."** ................................................................. **66**

**D.  Each Defendant Acted with Objective Terroristic Intent.** ......................... **68**

**V.   SGBL Has Provided No Basis for Dismissal of Plaintiffs' Claims Against It.** ............... **69**

**A.  Plaintiffs Have Plausibly Pleaded That SGBL Has Assumed LCB's Liabilities to Plaintiffs.** ............................................................... **69**

**B.  The ATA Does Not Exclude Successor Liability.** ........................................ **71**

**C.  By Expressly Assuming LCB's Relevant Liabilities, SGBL Inherited LCB's Personal Jurisdiction Status.** .................................................. **74**

**CONCLUSION** ....................................................................................... **75**

## Table of Authorities

**Cases**

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002)................................................................. 38

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002)................................................................. 48, 73

*Boim v. Holy Land Found. for Relief and Dev.*,
    549 F.3d 685 (7th Cir. 2008) ............................................................. *passim*

*Cain v. Twitter Inc.*,
    No. 17-cv-02506-JD, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018) ...................................... 48

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*,
    511 U.S. 164 (1994)................................................................. 72

*E.E.O.C. v. Vucitech*,
    842 F.2d 936 (7th Cir. 1988) ............................................................. 73

*Fields v. Twitter*,
    881 F.3d 739 (9th Cir. 2018) ............................................................. 60

*Freeman v. HSBC*,
    No. 14-cv-6601(PKC)(CLP), 2019 WL 4452364 (E.D.N.Y. Sept. 16, 2019).................... 43, 44

*Fritz v. Islamic Republic of Iran*,
    320 F. Supp. 3d 48 (D.D.C. 2018) ............................................................. 37

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011)................................................................. 37

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................. *passim*

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)................................................................. 67

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009)................................................................. 50

*In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*,
    714 F.3d 118 (2d Cir. 2013)................................................................. 61, 62

*In re Terrorist Attacks on Sept. 11, 2001,*
   349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................................. 59, 62

*Jesner v. Arab Bank, PLC,*
   138 S. Ct. 1386 (2018) ................................................................................................. 1

*Kaplan v. Lebanese Canadian Bank, SAL,*
   No. 08-cv-7253-GBD, 2019 WL 4869617 (S.D.N.Y. Sept. 20, 2019) ..................... 57

*Karcher v. Islamic Republic of Iran,*
   396 F. Supp. 3d 12 (D.D.C. 2019) ...................................................................... 36, 37

*Kemper v. Deutsche Bank AG,*
   911 F.3d 383 (7th Cir. 2018) .............................................................................. 48, 68

*Kingdomware Technologies, Inc. v. U.S.,*
   136 S. Ct. 1969 (2016) ............................................................................................. 47

*Lelchook v. Islamic Republic of Iran,*
   393 F. Supp. 3d 261 (E.D.N.Y. 2019) ..................................................................... 49

*Leon v. Shmukler,*
   992 F. Supp. 2d 179 (E.D.N.Y. 2014) ..................................................................... 43

*Lerner v. Fleet Bank, N.A.,*
   318 F.3d 113 (2d Cir. 2003) ..................................................................................... 60

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,*
   673 F.3d 50 (2d Cir. 2012) ....................................................................................... 37

*Licci v. Lebanese Canadian Bank,*
   20 N.Y.3d 327, 984 N.E.2d 893 (2012) ................................................................... 38

*Licci v. Lebanese Canadian Bank, SAL,*
   732 F.3d 161 (2d Cir. 2013) ............................................................. 37, 38, 39, 41

*Linde v. Arab Bank, PLC,*
   384 F. Supp. 2d 571 (E.D.N.Y. 2005) ..................................................................... 59

*Linde v. Arab Bank, PLC,*
   882 F.3d 314 (2d Cir. 2018) .......................................................................... *passim*

*Litle v. Arab Bank, PLC,*
   611 F. Supp. 2d 233 (E.D.N.Y. 2009) ..................................................................... 73

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) ............................................................. 49

*Nahl v. Jaoude*,
   354 F. Supp. 3d 489 (S.D.N.Y. 2018).......................................................... 71

*National Council of Resistance of Iran v. Dep't of State*,
   373 F.3d 152 (D.C. Cir. 2004) ...................................................................... 64

*New York v. Nat'l Serv. Indus., Inc.*,
   460 F.3d 201 (2d Cir. 2006)................................................................... 70, 72

*O'Sullivan v. Deutsche Bank AG*,
   No. 17-cv-8709 (LTS)(GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)...... 46, 62, 67, 68

*Ofisi v. BNP Paribas, S.A.*,
   278 F. Supp. 3d 84 (D.D.C. 2017) ................................................................ 58

*Ofisi v. BNP Paribas, S.A.*,
   No. 15-cv-2010-JDB, 2018 WL 396234 (D.D.C. Jan 11, 2018) ............................ 57

*Ofisi v. BNP Paribas, S.A.*,
   285 F. Supp. 3d 240 (D.D.C. 2018) .............................................................. 58

*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018) ...................................................................... 60

*Owens v. Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017) ...................................................................... 60

*Perry Drug Stores v. CSK Auto Corp.*,
   93 F. App'x 677 (6th Cir. 2003) ................................................................... 74

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)................................................................. 59, 60, 61, 72

*Semenetz v. Sherling & Walden, Inc.*,
   21 A.D.3d 1138, 801 N.Y.S.2d 78 (3d Dep't 2005) ............................................ 74

*Semenetz v. Sherling & Walden, Inc.*,
   7 N.Y.3d 194, 851 N.E.2d 1170 (2006).......................................................... 74

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019).............................................................. 53, 54, 55, 57

vi

*Societe Generale v. Fla. Health Scis. Ctr., Inc.*,
   No. 03-cv-5615 (MGC), 2003 WL 22852656 (S.D.N.Y. Dec. 1, 2003) ................................. 75

*State Farm Fire & Cas. Co. v. Main Bros. Oil Co.*,
   956 N.Y.S.2d 695 (3d Dep't 2012) ........................................................................ 70

*Taamneh v. Twitter, Inc.*,
   343 F. Supp. 3d 904 (N.D. Cal. 2018) ................................................................... 48

*Terio v. Johann*,
   No. 05-cv-5918 (RPP), 2007 WL 60411 (S.D.N.Y. Jan. 8, 2007) ......................... 71

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019) ................................................................................ 74, 75

*United States v. El-Mezain*,
   664 F.3d 467 (5th Cir. 2011) ............................................................................... 64

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990) ................................................................................ 48

*Waldman v. Palestine Lib. Org.*,
   835 F.3d 317 (2d Cir. 2016) ................................................................................ 40

*Weiss v. Nat'l Westminster Bank PLC*,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) .................................................................. 59

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) .......................................................................... 58, 68

**Statutes**

18 U.S.C. §2333(a) ............................................................................................. 1, 5, 58

18 U.S.C. §2333(d) ................................................................................................ *passim*

18 U.S.C. §2339B ............................................................................................. 5, 58, 63

18 U.S.C. §2331(1) .................................................................................................. 58

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222 (2016) ...................... 44, 46, 47

N.Y.C.P.L.R. §302(a) .............................................................................................. 37

Pub. L. No. 104-132, §301(a)(7) (1996) ................................................................... 63

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 70

The *Bartlett* Amended Complaint ("Complaint" or "AC") is brought on behalf of 1,278 Plaintiffs who are American citizens and/or U.S. service members injured as a result of 267 terrorist attacks ("Attacks") in Iraq between 2004 and 2011 or the families members of those killed or injured in them. Most of the Attacks were caused by Explosively Formed Penetrators ("EFPs"), particularly lethal, anti-armor weapons designed by Hezbollah and emplaced by Iraqi proxies trained and directed by Hezbollah.[1] AC ¶¶346-50, 1946-49. Plaintiffs bring suit under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§2333(a) and (d), against 12 Lebanese banks that they allege helped bankroll Hezbollah, a Foreign Terrorist Organization ("FTO") that jointly committed the Attacks with Iran's Islamic Revolutionary Guard Corps ("IRGC").

The Supreme Court recently underscored that banks can be subject to civil liability under the ATA:

> The Anti-Terrorism Act … is part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing. The detailed regulatory structures prescribed by Congress and the federal agencies charged with oversight of financial institutions reflect the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism.

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018).

In *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), this Circuit set forth the elements required (based on a full trial record) to establish primary liability under §2333(a) and secondary liability under §2333(d)(2). Because the *Bartlett* Complaint is the most comprehensive civil ATA complaint ever filed against any bank since the law's 1992 enactment and its allegations *exceed* those pleaded in *Linde* in both scope of alleged wrongdoing and scienter, Defendants' motions to dismiss should be denied in their entirety.

---

[1]     For stylistic convenience, regardless of how source material spells the terrorist organization's name, it is consistently spelled "Hezbollah" herein.

Recognizing this, Defendants' three briefs in support of their motions gloss over the Complaint's allegations and misstate §2333(d)(2) requirements under the controlling legal standard for secondary liability delineated in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See Linde*, 882 F.3d at 329 (*Halberstam* controls §2333(d) analysis). Instead, Defendants characterize thousands of detailed allegations (often sourced to U.S. government findings) as "sweeping and conclusory," merely relating to "accounts for certain commercial entities and individuals that Plaintiffs allege have or had a connection to Hezbollah." Ds. Joint Brief ("JB") at 1. The truth is self-evidently otherwise. Plaintiffs set forth in exacting detail how each Defendant worked directly with Hezbollah – particularly with the Business Affairs Component ("BAC") of Hezbollah's Islamic Jihad Organization ("IJO"), the FTO's terrorism directorate responsible for directing terrorist attacks against Americans in Iraq.

Defendants' refusal to address the substance of the Complaint is evident from their exclusion of Defendant Jammal Trust Bank ("JTB") from the "Moving Defendants" and their Joint Brief. Even JTB's separate brief never acknowledges the proverbial "elephant in the room" – namely that the U.S. Treasury Department ("Treasury") designated JTB as a Specially Designated Global Terrorist ("SDGT") less than four weeks after the Complaint was filed. Treasury specifically found:

> Jammal Trust knowingly facilitates the banking activities of U.S.-designated entities openly affiliated with Hezbollah, Al-Qard al-Hassan and the Martyrs Foundation, in addition to services it provides to Hezbollah's Executive Council. Hezbollah has used accounts at Jammal Trust to pay its operatives and their families, and Jammal Trust has actively attempted to conceal its banking relationship with numerous wholly owned Martyrs Foundation subsidiaries. When opening purportedly "personal accounts" at Jammal Trust, Al-Qard al-Hassan officials clearly identified themselves to Jammal Trust as senior members of the terrorist group. Jammal Trust then facilitated these accounts to be used to conduct business on Al-Qard al-Hassan's behalf. Such a scheme is representative of the deep coordination between Hezbollah and Jammal Trust, which dates back to at least the mid-2000s and which spans many of the bank's branches in Lebanon. Also, Hezbollah Member of

2

Parliament Amin Sherri coordinates Hezbollah's financial activity at Jammal Trust with the bank's management. OFAC designated Amin Sherri in July 2019 for acting for or on behalf of Hezbollah pursuant to E.O. 13224.

*See* Exhibit A to the Declaration of Aaron Schlanger ("Schlanger Decl.").

But Defendants' omissions are not limited to failing to acknowledge JTB's recent designation. Their briefs also fail to acknowledge, let alone grapple with, the key allegations in the Complaint. Instead, Defendants generically reference 205 "Alleged Bank Customers," JB at 9, described only as "either owned or controlled" by "individuals somehow associated with Hezbollah." JB at 33. But the Complaint does not ask the Court to speculate about how Defendants' customers are "somehow" related to Hezbollah. On the contrary, it relies primarily on U.S. and Lebanese government findings, corporate registration documents, and reports by the United Nations Security Council ("UNSC") to specify Hezbollah's relationship to these various bank customers.

For example, although never mentioned in any of Defendants' briefs, the Complaint alleges that *five* of the Defendants held accounts for, and provided financial services to, the Islamic Resistance Support Organization ("IRSO").[2] As its name suggests, the IRSO is Hezbollah's fundraising organization most directly associated with the FTO's terrorist activities. It collects funds explicitly earmarked "primarily for the purchase of weapons for Hezbollah terrorist-operations and support for its cadres." AC ¶402. In its 2006 press release accompanying IRSO's designation as an SDGT, Treasury noted that:

> Solicitation materials distributed by IRSO inform prospective donors that funds will be used to purchase sophisticated weapons and conduct operations. Indeed, donors can choose from a series of projects to contribute to, including, supporting and equipping fighters and purchasing rockets and ammunition.

---

[2]     Fransabank; Byblos Bank; Banque Libano-Française; Lebanon & Gulf Bank; and JTB. AC ¶¶8, 420.

3

AC ¶415. *See also* AC ¶417, Ex. 2. The IRSO is *not* a clandestine organization—as the U.S. government has noted, "the IRSO solicited donations through Hezbollah's *al-Manar* satellite television in Lebanon." AC ¶414. As a senior Treasury official testified before Congress:

> While some terrorist-supporting charities try to obscure their support for violence, IRSO makes no attempt to hide its true colors. IRSO's fundraising materials present donors with the option of sending funds to equip Hezbollah fighters or to purchase missiles that Hezbollah uses to target civilian populations. IRSO works to inflict suffering rather than alleviate it.

AC ¶418. In fact, one of the IRSO's television spots even specified an account at Defendant Byblos Bank for donations. AC ¶419. IRSO is *not* a "supposedly Hezbollah-related individual or entity." JB at 2. It *is* Hezbollah. It is also the fundraising arm of the IJO, Hezbollah's terrorism directorate.

Similarly, Defendants' briefs never mention, let alone address, the fact that the "Alleged Bank Customers" included Hezbollah's Martyrs Foundation (designated an SDGT in 2007, AC ¶489) or companies it openly owned and controlled, and that *six* of the Defendants held accounts for, and provided financial services to it. AC ¶¶521, 1405, 1416, 1494, 1697, 1772. As its name suggests, the Martyrs Foundation provides financial support to the families of Hezbollah operatives who have been killed or imprisoned. AC ¶491. Like IRSO, the Martyrs Foundation operates openly. AC ¶¶495-510. As noted in JTB's designation quoted above, Treasury has also described the Martyrs Foundation as "openly affiliated with Hezbollah." It also openly owns and operates a commercial investment arm called Atlas Holding, even advertising that fact in its publicity materials. AC ¶515. Atlas Holding, in turn, operates at least nine companies – all operated and controlled by Hezbollah and serviced by six of the Defendants. AC ¶¶520-21.

In sum, IRSO and the Martyrs Foundation are two leading examples of what Defendants describe as "Alleged Bank Customers" that are "supposedly Hezbollah-related." As set forth in detail below, the Complaint not only alleges that eight of the Defendants provided material support

and substantial assistance to these two SDGT Hezbollah alter-egos that openly and notoriously support Hezbollah's violent agenda, but also that *all 12* Defendants knowingly worked in concert with the IJO for more than a decade to launder hundreds of millions of dollars (primarily through the U.S.) in proceeds from narcotics, conflict diamonds and weapons trafficking.

As set forth below, these detailed allegations make a prime facie case for specific personal jurisdiction. Moreover, they clearly assert that each Defendant knowingly provided material support to Hezbollah in violation of 18 U.S.C. §2339B and that its conduct, if proven at trial, would easily satisfy the requirements of 18 U.S.C. §§2333(a) and 2333(d).

## I.    Factual Allegations

### A.    Hezbollah's Structure

Hezbollah is a Lebanese terrorist organization, founded in the 1980s with the active support and assistance of Iran's IRGC. It is widely regarded as the most dangerous terrorist organization in the world, responsible for some of the most dramatic terrorist attacks in the last three decades, costing *thousands* of lives. These include hundreds of attacks directed against U.S. forces in Iraq. AC ¶14. Hezbollah's Shura Council (a/k/a Majlis al-Shura), is presided over by Hezbollah leader Hassan Nasrallah and is the preeminent decision-making body within the terrorist organization. AC ¶¶357-60. Under the Shura Council, Hezbollah's Jihad Council oversees the organization's "Resistance" operations, including oversight, recruitment, training, equipment and internal security. This includes Hezbollah's terror apparatus, the IJO. AC ¶364, 388-91. Imad Mughniyah and Mustafa Badr al-Din (SDGT) founded the IJO and Mughniyah was identified by American officials as personally involved in planning and directing many of Hezbollah's terrorist attacks throughout the 1980s and 1990s. AC ¶366-72. In 2003, the IRGC dispatched Mughniyah and Badr al-Din to Iraq to help create and organize an armed faction that became known as "Jaysh al-Mahdi" or "JAM" – an IRGC and Hezbollah proxy that Iran used to target Americans in Iraq. AC ¶¶1858-

63, 2001. Mughniyah and Badr al-Din also worked closely with the Iranian-sponsored Badr Corps,[3] which was also used by the IRGC and Hezbollah to launch terror attacks on Americans in Iraq. AC ¶1865.

### 1.    Hezbollah's "Social Welfare" Sector

In addition to the IRSO and the Martyrs Foundation, Hezbollah operates several other "social welfare organizations" in Lebanon that both raise funds for the FTO and reinforce domestic solidarity for Hezbollah by, *e.g.*, caring for the families of deceased or wounded Jihadists, building hospitals to service Hezbollah strongholds, and funding public works projects that improve local infrastructure and construct clandestine facilities for Hezbollah's militia and terror apparatus. AC ¶439. These "social welfare organizations" include Jihad al-Bina (Hezbollah's construction arm); Al-Mabarrat Charitable Society (founded by Hezbollah's spiritual leader, Sheikh Muhammad Hussein Fadlallah, designated a Specially Designated Terrorist ("SDT") in 1995); the Imam Khomeini Relief Committee; and the Wounded Association.

Designated an SDGT in 2007, Jihad al-Bina was described by Treasury as "a Lebanon based construction company formed and operated by Hezbollah. Jihad al-Bina receives direct funding from Iran, is run by Hezbollah members, and is overseen by Hezbollah's Shura Council, at the head of which sits Hezbollah's Secretary General Hassan Nasrallah." AC ¶¶434-35. It was founded by Sultan Khalifa As'ad, a key Hezbollah financier with close ties to Iran. AC ¶424. Treasury described another major Hezbollah financier, Ali Tajideen, as "a major player in Jihad Al-Bina." AC ¶430. Like other Hezbollah "social welfare organizations" Jihad al-Bina also operates through commercial subsidiaries (in part to evade its SDGT designation), including

---

[3]    Before 2003, the Badr Corps served as Iran's most important surrogate in Iraq, acting as a de facto arm of the IRGC's external directorate, the Qods Force ("IRGC-QF"), in conducting operations against Saddam Hussein's government. After 2003, the Badr Corps formed an Iraqi political faction, but a part of the organization also played a significant role facilitating the operations of the Hezbollah-trained "Special Groups" in Iraq. AC ¶¶1963-77, 1887-88.

Meamar Company for Engineering and Development and Blom Bank customer Arch Consulting (known prior to 2005 as "Research Institute of Jihad al-Bina"). AC ¶451; ¶¶454-61.

More than Hezbollah's other "social welfare organizations," Al-Mabarrat Charitable Society[4] and its branch in the United States have outwardly distanced themselves from Hezbollah, notwithstanding the Society's strong identification with the late Sheikh Fadlallah, Hezbollah's spiritual leader, and his family. AC ¶¶543-47. Moreover, during the relevant period, Al-Mabarrat Society maintained one or more accounts at Lebanese Canadian Bank ("LCB") and secured an exemption from reporting cash transactions of up to $55,000 *per day* at the bank's Airport Road branch. AC ¶548. Legitimate charities do not need to absorb (nearly) that much unreported income in cash daily. Al-Mabarrat is also closely linked to a fugitive named Talal Khalil Chahine[5] who fled the United States prior to his indictment on federal tax evasion charges. AC ¶551. In 2002, Chahine, whom federal prosecutors asserted had "connections at the highest levels of ... Hezbollah," served as a keynote speaker with Sheikh Fadlallah at an Al-Mabarrat fundraiser in Lebanon. AC ¶552. Chahine is also a relative and business partner of Muhammad Bazzi (SDGT), AC ¶553, discussed *infra* at 11. Finally, like the Martyrs Foundation and Jihad al-Bina, Al-Mabarrat also owns and controls several companies (several with daily cash reporting exemptions). AC ¶¶569, 572. Tellingly, Hamzah Safieddine, the brother of two of Hezbollah's most powerful leaders, Hashem and Abdallah Safieddine, is a partner/general manager of three of these companies. AC ¶¶558-59; 564-65; 570-71.

---

[4]     LCB and Defendants SGBL and Blom Bank maintained accounts for, and provided financial services to, the Al-Mabarrat Society. AC ¶556.

[5]     Chahine maintained USD-denominated accounts (in 2001) at Defendants Byblos Bank and Fransabank and transferred more than $2 million through the United States using those accounts. AC ¶554.

According to the Treasury announcement designating it as an SDGT in 2010, the Lebanese branch of the Iranian Imam Khomeini Relief Committee ("IKRC") is:

> a Hezbollah social service organization that was created by the Government of Iran in the 1980s and is directed and run by Hezbollah members or cadre. Iran has provided millions of dollars to the Hezbollah-run branch in Lebanon since 2007. The IKRC has helped fund and operate Hezbollah youth training camps, which have been used to recruit future Hezbollah members and operatives…. Hassan Nasrallah has acknowledged the IKRC branch in Lebanon as one of Hezbollah's openly-functioning institutions linked to and funded by Iran.

AC ¶580.[6]

Despite its name and obvious close affiliation with Iran and Hezbollah, LCB held an account for the IKRC in the name of four members of its management, and MEAB Bank held an account in the name of the organization itself. AC ¶¶575-84. Finally, the Wounded Association, whose stated focus is caring for people wounded in the "Resistance," also has a long-standing *public* affiliation with Hezbollah. AC ¶¶585-89.

### 2.     Hezbollah's Business Affairs Component ("BAC")

Hezbollah's finances are managed by several overlapping directorates, but its IJO, which conducts most of the FTO's terrorist operations, has long maintained its own independent revenue streams. That financial network is known as the BAC. The Complaint alleges that the BAC is an international network of businesses and enterprises across the world, tasked with raising funds for the IJO through illicit activities, such as money laundering and drug trafficking, as well as ordinary business enterprises. AC ¶610. It also notes the Drug Enforcement Agency's findings that

---

[6]     Defendants argue that only 19 of their customers were designated "at some point in time before the last Attack," JB at 9-10, but U.S. designations are inherently retrospective, describing unlawful conduct that occurred prior to the date of designation. The Iranian Imam Khomeini Relief Committee, for example, was designated in 2010 but has been "directed and run by Hezbollah members" for many years beforehand. Similarly, Mustafa Badr al-Din was a senior (and notorious) Hezbollah operative since the early 1980s when he participated in the bombing of the U.S. Marine Corps barracks in Lebanon, AC ¶377, but he was first designated an SDGT in 2012. AC ¶383. Many of the U.S.-designated Hezbollah leaders and operatives described herein had high public profiles and were well known in Lebanon to belong to Hezbollah long before Treasury designated them.

members of the BAC have established business relationships with South American drug cartels responsible for supplying large quantities of cocaine to Europe and the United States. AC ¶613. Most importantly, the Complaint alleges that, under Abdallah Safieddine's leadership, the BAC directed proceeds it collected from this illicit activity to the IJO to purchase weaponry and fund its terror activities in Lebanon, Iraq and Syria. AC ¶610-11.

### a.     Hezbollah's BAC Leadership

Since Imad Mughniyah's death in 2008, the BAC's leadership has been nominally divided between Abdallah Safieddine and Adham Tabaja.[7] AC ¶612. Safieddine manages the IJO's financial coordination with the IRGC and oversees Hezbollah's international drug trafficking networks and operations. AC ¶618. Although his brother, Hashem Safieddine, is one of Hezbollah's most prominent political leaders and a member of its Shura Council, AC ¶¶362, 619, Abdallah Safieddine has spent considerable time in Iran actively coordinating the BAC's finances with the IRGC, AC ¶¶617-18. For example, in 2011, when Treasury's Financial Crimes Enforcement Network ("FinCEN") identified LCB as "a financial institution of primary money laundering concern," it specifically noted that "LCB managers are linked to Hezbollah officials outside Lebanon. For example, Hezbollah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services." AC ¶1340.

The BAC's other chairman, Adham Tabaja, is one of the most prominent Hezbollah leaders in the commercial sector. Under its "Rewards for Justice" Program, DOJ has offered (up to) a $10 million reward for information relating to Tabaja, AC ¶634, describing him as a "Hezbollah member who maintains direct ties to senior Hezbollah organizational elements, including the

---

[7]     Both men have been designated SDGTs: Safieddine on May 17, 2018 (AC ¶620) and Tabaja on June 10, 2015 (AC ¶624).

terrorist group's operational component, Islamic Jihad. Tabaja also holds properties in Lebanon on behalf of the group." AC ¶635. Tabaja has been a public figure for decades and is widely known as a prominent Hezbollah operative and real estate mogul, standing at the forefront of Hezbollah's leading projects, from building hospitals and schools to public works projects to a series of amusement parks and entertainment projects. AC ¶623. Because Hezbollah is the strongest player in Lebanon's political system, Tabaja and his companies do not hide their affiliation with it – they manipulate it to push through governmental approval of their projects.

*Eight of the 12* Defendants held accounts for, and provided financial services to, companies controlled by Tabaja, AC ¶652, and Defendant Lebanon and Gulf Bank ("L&G") held a personal account for him and maintained the relationship even after the Lebanese government's investigation of LCB identified his account as one of the "accounts that appeared to add up to a giant money laundering operation with Hezbollah smack in the middle." AC ¶102-05.[8] Tabaja has also had a long-standing relationship with MEAB Bank, which has financed many of his (Hezbollah) projects and has held mortgages on various real estate Tabaja owned or co-owned as collateral for its loans to him and his enterprises. AC ¶¶1571-74.

Tabaja's network of companies is only one part of what some Lebanese have termed "The System," through which Lebanese-organized crime families, working with Hezbollah and the IRGC, launder billions of U.S. dollars ("USD") annually (much of it originating in bulk cash) from various criminal activities. Much of that money moves through Lebanese exchange houses and Defendants (including through their respective correspondent bank accounts in New York) to fund

---

[8]      Six of the Tabaja companies are SDGTs, and the management of most are dominated by Hezbollah operatives, including Tabaja-connected SDGTs such as Issam Ahmad Saad, Nabil Mahmoud Assaf, Jihad Muhammad Qansu, Hussein Ali Faour, Muhammad al-Mukhtar Fallah Kallas, Amin Muhammad Cherri, Muhammad Amin Badr al-Din, Adnan Hussein Kawtharani, Shibl Muhsin Ubayd al-Zaydi, and Muhammad Abdallah al-Amin. AC ¶647.

the IJO's operations. *See, e.g.*, AC ¶¶11, 36, 41-47, 83-92, 98, 679-81, 1298-1301, 1346-77. The complicity of the banks that actively participated in "The System" is evident not only by the identity of their customers but also by glaring indicia of money laundering—e.g., "[l]arge amounts … being withdrawn and paid cash to different parties" and accounts showing a "big volume of movement" but "very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s]." AC ¶1381.

Several other prominent individuals play critical roles in the BAC's funding network and are themselves major players in "The System." One of them, Muhammad Bazzi,[9] has been particularly close to Abdallah Safieddine and has worked extensively with him and the IRGC. Bazzi maintains ties to other U.S.-designated individuals, including Hezbollah financiers Tabaja and Ali Charara. He also had extensive links to senior drug traffickers, including the Specially Designated Narcotic Trafficking Kingpin ("SDNTK") Ayman Joumaa. AC ¶¶757-59. Like Tabaja, Bazzi was the target of the "Rewards for Justice" Program, which identified him as a "key Hezbollah financier, who has provided millions of dollars to Hezbollah generated from his business activities" and as a "key Hezbollah financier[] and facilitator[]." AC ¶¶760-61.

Charara (SDGT in 2016) invests millions of dollars for Hezbollah and has worked closely with other senior BAC leaders. For example, Charara worked with Kassem Hejeij (at the time MEAB Bank's chairman and controlling shareholder) and Tabaja on oil ventures in Iraq. AC ¶667. He was partners with Bazzi and narcotics trafficker Ali Kharrubi (SDNTK) in a company (designated an SDGT in 2017) known as Car Escort Services. AC ¶668. He was also Bazzi's close business partner and the co-founder of three companies designated as SDGTs. *Id.*

The Tajideen family consists of at least nine siblings who run a business empire spanning

---

[9]       Bazzi maintained accounts in his own name at LCB, Fransabank, MEAB Bank and Blom Bank. Six companies controlled by Bazzi have held accounts at LCB, Fransabank, Bank Audi and JTB. AC ¶755.

much of the globe, but with a particularly strong presence in southern Lebanon and the Democratic Republic of Congo ("DRC"). AC ¶670-71. Three of the siblings, Kassim, Ali and Hussein Tajideen, were designated SDGTs for their roles as Hezbollah fundraisers, money launderers, and financial contributors, and other siblings and family members also play important supporting roles in the Tajideen family's BAC network. AC ¶671-72. In designating Kassim Tajideen an SDGT on May 27, 2009, Treasury identified him as "an important financial contributor to Hezbollah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hezbollah and has sent funds to Hezbollah through his brother, a Hezbollah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hezbollah in Africa." AC ¶689. His brother, Ali Tajideen (designated in 2010), was a Hezbollah commander in southern Lebanon who played a major role in Jihad al-Bina (SDGT). AC ¶430. Ali's real estate empire is strategically important to Hezbollah because the Tajideen clan is heavily invested in southern Lebanon where Ali's acquisitions have often been situated in militarily strategic locations south of the Litani river. AC ¶697.[10]

Sultan Khalifa As'ad is a prominent and longstanding Hezbollah leader and financier who serves as Deputy Chairman of the Executive Council for Municipal Affairs for Hezbollah and formerly headed Hezbollah's Finance Unit. He founded Jihad al-Bina, and one of its main front companies, the Meamar Company for Engineering and Development.[11] As'ad was also a founder and early shareholder in the Lebanese Communication Group (SDGT), the parent company of

---

[10]     Bank of Beirut and the Arab Countries held an account for Hyram Maritime, a logistics company co-founded by Ali Tajideen and his brother Youssef. AC ¶701. The company's lawyer was also listed as the attorney for more than a dozen Tajideen family companies, including several that have been designated as SDGTs. AC ¶1251.

[11]     As'ad is a public figure openly identified with Hezbollah. *See, e.g.*, AC ¶653-60. Meamar Company for Engineering and Development is similarly open about its affiliation with Hezbollah. AC ¶¶443-44.

Hezbollah's satellite television station, *Al-Manar* (SDGT),[12] and was the largest shareholder in Compu House, a Hezbollah-controlled company that sold computers and software. AC ¶¶653-60.

Saleh Ali Assi (SDGT) was a leading BAC money launderer and a significant business partner of Adham Tabaja, Kassim Tajideen, Bazzi, and Nazim Ahmad (SDGT, *see infra*). In his capacity as a vehicle for Ahmad's money laundering enterprises in the DRC and Belgium, Assi received millions of dollars (through correspondent banks in New York) to his account at BLF and lesser sums to his account at Bank Audi from companies controlled by Ahmad, described by Treasury as a "significant Hezbollah financier."[13]

Assi served as chairman and general manager of Inter Aliment (SDGT), a company he established in 2005 that served as a BAC facilitator. During the relevant period, Inter Aliment laundered more than $70 million through its Lebanese bank accounts.[14] AC ¶¶772-76. According to the Lebanese government, when Inter Aliment's USD-denominated account at LCB was closed in 2011 the account balance migrated to Banque Libano-Française, MEAB Bank and Fransabank. AC ¶774. Like Assi's business partners, the nature of his activities, the volume of his transactional activity, his involvement in companies in the DRC and his close association with prominent Hezbollah financiers all signified his role as a major BAC facilitator.

Imad Bakri is a prolific "businessman" and BAC operative with a public profile, known for trading in meat, fish and flour in Europe and Africa; a United Nations report identified him as a supplier of weapons and military equipment to various militia. AC ¶¶792-98. A July 2000 Belgian intelligence report identified a company controlled by Bakri as connected to "money

---

[12]      Unsurprisingly, the identified shareholders of *Al-Manar* are all prominent Hezbollah figures. AC ¶591.

[13]      Saleh Assi and Nazim Ahmad were designated as SDGTs along with several of their companies on December 13, 2019. The Complaint allegations pertaining to them closely track the recent Treasury designations, but because the designations themselves *post-date* the Complaint, they are attached here as Schlanger Decl. Exhibit B.

[14]      SGBL and Bank Audi maintained accounts for, and provided financial services to, Inter Aliment. AC ¶775.

laundering, the drugs trade and the financing of Lebanese 'terrorist' organizations such as Amal and Hezbollah." AC ¶800. Three years later, the British NGO "Global Witness" noted "[t]he BAKRI family is connected with Shi'ite organizations, in particular HEZBOLLAH." AC ¶801 (emphasis in the original). Bakri's company Metro Trading Company held accounts at BLF and SGBL and laundered more than $15 million USD through LCB *alone* on Hezbollah's behalf between 2006 and 2007. AC ¶¶794-96.

### b.  Hezbollah's BAC Acts as a Series of Interlocking Criminal Networks.

As the Complaint's detailed allegations make clear, the multitude of Hezbollah-affiliated customers for which Defendants laundered hundreds of millions of dollars were not random account holders who independently decided to open accounts at Defendants' branches. They were, instead, constituent parts of a series of interlocking criminal networks with companies often established by the same small group of Lebanese lawyers and audited by a similarly select group of accountants. AC ¶¶1243-87. For example, Muhammad Farid Mattar was listed as the attorney for Spectrum International Investment Holding (SDGT), Spectrum Investment Group Holding (SDGT), and Spectrum (Offshore), three companies associated with Ali Charara (SDGT); Phoenicia Shipping Offshore (SDNTK), which served as a prime vehicle for Hezbollah's money laundering and drug trafficking operations, AC ¶1108-09;[15] *and* JTB customer Car Escort Services (SDGT), controlled by Charara (SDGT), Bazzi (SDGT) and Hezbollah narcotics trafficker Ali Kharrubi (SDNTK). AC ¶1261. Three of these companies also share the same statutory auditor, Edmond Youssef Saadeh. AC ¶1286. Similarly, Jihad Muhammad Qansu, an SDGT associated

---

[15]    L&G, Bank Audi, and JTB held accounts for Spectrum International Investment Holding. AC ¶668. Blom Bank, L&G, and JTB held accounts for Spectrum Investment Group Holding. AC ¶668. LCB held USD-denominated account no. 341277* for Phoenicia Shipping. AC ¶1117. Fransabank, MEAB Bank, Bank Audi, and Fenicia Bank also held accounts for the company. AC ¶¶1514-15, 1579, 1661, 1809.

with Adham Tabaja, was also listed as the auditor of a company owned and controlled by the Martyrs Foundation, and as auditor of one of Al-Mabarrat's companies. AC ¶¶ 539, 541, 570-74.

### c.   Hezbollah's Conflict Diamonds Networks

One of Hezbollah's early sources of revenue came from the Lebanese criminal networks active in sub-Saharan Africa. These networks included extended families long involved in dealing in Conflict Diamonds, particularly in West Africa. The families that control these networks have invested a substantial portion of their illicit proceeds in Lebanese real estate, often forming separate companies to deposit the millions of dollars they have laundered through black market sales and phony invoicing of "Conflict Diamonds" back into accounts at Defendant banks. These include the Nassour, Ahmad and Khanafer clans and individuals and companies that have facilitated their money laundering operations over the past two decades. In 2002, the UNSC issued a report about Conflict Diamonds stating that these clans "are distinct criminal organizations that operate internationally" that are involved in counterfeiting, money laundering and diamond smuggling and have ties to Hezbollah. AC ¶¶807-14.

In over 200 paragraphs, the Complaint details the complex personal and commercial relationships that form the networks and the Defendants' integral roles in the networks. AC ¶¶818-1045. For instance, the most important figure within these Conflict Diamond networks is Nazim Ahmad (SDGT), who has maintained ties to other senior BAC leaders like Adham Tabaja (SDGT) and various members of the Tajideen clan and reportedly works closely with the IRGC. AC ¶¶876-78. Although rooted in the diamond trade, the Conflict Diamond networks have branched out over time into arms trafficking, trade-based money laundering, and narcotics trafficking. No one network is wholly separate from the BAC's other tentacles. To cite but one example, senior BAC leader Kassim Tajideen (SDGT) first emigrated from Lebanon to Africa in 1976 and was initially arrested in Belgium in 2003 in connection with fraud, money laundering, and diamond smuggling.

AC ¶¶683-87. By 2008, however, under his leadership, the Tajideens had expanded their operations in Africa to the point where Ayman Joumaa's narcotics trafficking network was using Tajideen network couriers to move cash proceeds from narcotics through Africa and Lebanon. AC ¶¶1087-95.

### d.       Hezbollah's Narcotics Trafficking Networks

Hezbollah's narcotics trafficking networks are amply detailed in the Complaint. AC ¶¶1046-63, 1205-14, 1232-40, 1334-37, 1345-77. Its pre-existing criminal networks in West Africa (its IJO operatives were deeply entrenched there for decades) provided it with the logistical capabilities necessary to serve the South and Central American drug cartels' operations supplying Europe's growing cocaine market. Joumaa, a key Hezbollah facilitator involved in the transnational drug trade, exemplifies the marriage between Hezbollah's logistics network, the drug cartels, and the growing European demand for cocaine.[16] His organization has sent vast quantities of bulk cash shipments through the Beirut International Airport and regularly paid Hezbollah security to safeguard and transport the banknotes to its favored recipients, including LCB and various exchange houses that were used to launder its narcotics sales proceeds, including the Hassan Ayash, Elissa, and New Line Exchanges, all designated SDNTKs on January 26, 2011. AC ¶¶1067-77. Two years later, Treasury named the Rmeiti and Halawi Exchanges financial institutions of primary money laundering concern under Section 311 of the USA PATRIOT Act ("§311 Action") for essentially taking over the roles played by the Elissa and Hassan Ayash Exchanges in laundering money for Hezbollah and Joumaa. AC ¶1084. *See also* AC ¶¶1099-1106, 1146-52, 1158-63 (describing the roles of other Lebanese exchange houses).

---

[16]       Joumaa was both designated an SDNTK and indicted on November 23, 2011 (and charged with conspiracy to distribute narcotics and conspiracy to commit money laundering). AC ¶1069.

Lebanese exchange houses provide a valuable service to the BAC, its drug trafficking networks and to Lebanon's commercial banks, which prefer these intermediary financial institutions to handle the initial bulk cash deliveries that are ultimately deposited with Defendants before the funds are converted to bank ledger entries and repurposed by the BAC for terror financing, investment or trade-based money laundering. AC ¶¶1096-98.

As the Complaint alleges, from 2004 through 2011, Lebanese exchange houses were also a key transit point for Hezbollah funds flowing into Iraq to support Hezbollah's proxies and finance attacks on American personnel, including Plaintiffs herein. Hezbollah's BAC set aside funds from its narcotics trafficking proceeds to send to Iraq via its preferred Lebanese exchange houses, invested some of the proceeds in Lebanese real estate and commercial ventures, and laundered the rest using elaborate trade-based money laundering arrangements. AC ¶¶1086-87.

### e. Hezbollah's Weapons Trafficking Networks

The Complaint allegations concerning Hezbollah's interlocking criminal networks also include allegations concerning weapons trafficking operations closely tied to its other illicit funding streams. A few examples illustrate the linkages between BAC criminal networks and weapons trafficking:

- The Nassour and Ahmad clans (AC ¶¶818-942), best known for Conflict Diamonds and counterfeiting currency, have also been tied to weapons trafficking. According to Belgian police, surveillance of Ali Said Ali Ahmad's (he is married to Diana Nassour) company's phones linked the company to Iran and infamous international arms trafficker Victor Bout. AC ¶¶902-05.

- Senior BAC facilitator Bazzi (SDGT) orchestrated weapons shipments (including 107mm rockets) to the IRGC that were financed through LCB's Gambian subsidiary, Prime Bank. AC ¶¶1184-86.

- Hassan Hodroj, a Hezbollah spokesman and head of the FTO's portfolio on "Palestinian issues," worked with his son-in-law, Dib Hani Harb (also a

Hezbollah operative), to acquire machine guns and technology on Hezbollah's behalf using an account at Bank Audi.[17] AC ¶¶1166-83.

- As noted above, according to a UN report, BAC facilitator Imad Bakri has been the main weapons and military equipment supplier for the Angolan militia known as UNITA and has also been accused of orchestrating arms shipments through Romania and working with Victor Bout. AC ¶¶797-802.

**B.** **Lebanese Canadian Bank's Sale and the Migration of Hezbollah's Accounts to Defendants**

In February 2011, the U.S. government announced a §311 Action against LCB, identifying it as "a financial institution of primary money laundering concern." AC ¶5684. The Lebanese government then quickly orchestrated the sale of LCB to Defendant SGBL. To assure its U.S. correspondent banks (as well as U.S. and foreign bank regulators) that SGBL was not going to continue LCB's criminal activities, SGBL retained a prominent international accounting firm to audit LCB's accounts and brought in the Ashcroft firm (founded by former U.S. Attorney General John Ashcroft) to further oversee the process of allegedly purging Hezbollah accounts at LCB prior to LCB's complete absorption into SGBL. AC ¶96.

According to a December 2011 report in *The New York Times*, "auditors brought in to scrub the books discovered nearly 200 accounts that were suspicious for their links to Hezbollah and their classic signs of money laundering." The process was described as follows:

> Initially, the auditors looked only at records for the past year. As they began combing through thousands of accounts, they looked for customers with known links to Hezbollah. They also looked for telltale patterns: repeated deposits of vast amounts of cash, huge wire transfers broken into smaller transactions and transfers between companies in such wildly incongruous lines of business that they made sense only as fronts to camouflage the true origin of the funds.

> Each type of red flag was assigned a point value. An account with 1 or 2 points on a scale to 10 was likely to survive. One with 8 or 9 cried out for further scrutiny.

---

[17]     U.S. law enforcement served a seizure warrant on Bank Audi's correspondent bank seeking to freeze Harb's (still active) account, expressly stating that Harb was charged with providing material support to an FTO under §2339B; even though the correspondent confirmed Bank Audi's receipt of transmittal of the warrant, it did not comply. AC ¶1183.

> Ultimately, the auditors were left with nearly 200 accounts that appeared to add up to a giant money-laundering operation, **with Hezbollah smack in the middle, according to American officials. Complex webs of transactions featured the same companies over and over again, most of them owned by Shiite businessmen, many known Hezbollah supporters.** Some have since been identified as Hezbollah fronts.

AC ¶97 (emphasis added). *The New York Times* further reported that the accounts – "many of them **known Hezbollah supporters**" – "sloshed" hundreds of millions of dollars annually through them. AC ¶98 (emphasis added). A Lebanese government investigation determined that more than 200 of these Hezbollah accounts simply moved to the other Lebanese banks, including 11 of 12 Defendants herein (all except for JTB), as detailed in the Complaint. AC ¶105. Defendants' willingness to continue doing business with these Hezbollah customers *after* LCB was identified as a primary money laundering concern and sold to SGBL and *after* the Lebanese government investigation and closure of those accounts at LCB is strong evidence of Defendants' state of mind, their willful determination to continue their relationships with Hezbollah, and their collective commitment to "The System."

## C.    Each Defendant Provided Substantial Assistance to Hezbollah.

The Complaint abounds in detailed allegations concerning each Defendant's substantial assistance to Hezbollah (and particularly to its IJO).

### 1.    SGBL

SGBL's liability for LCB's conduct is discussed *infra* in Section V. The Complaint notes, however, that as far back as 2005, in a meeting with senior Treasury officials, an Israeli official linked the two banks (then separately owned) charging that they were "'connected directly to the financial infrastructure of Hezbollah.'" AC ¶¶1467-68. Unsurprisingly, independent of SGBL's acquisition of LCB's liabilities, SGBL was *itself* involved in knowingly holding accounts and providing financial services to at least 15 BAC operatives and corporate investments. AC ¶144.

19

SGBL also retained accounts that were at the heart of LCB's documented criminal conduct, including Elissa Holding (SDNTK), Yousser Company for Finance and Investment (designated an SDGT in 2006), Ali Assi's Inter Aliment (SDGT), and Nazim Ahmad's personal account. AC ¶¶1473, 1483, 1485-86. SGBL also held an account for Atlas Holding, openly owned and controlled by the Martyrs Foundation (SDGT in 2007). AC ¶1475. It also held an account for Hezbollah's Al-Mabarrat Charitable Society.

Like other Defendants, SGBL worked with, and held accounts for, various BAC business enterprises operated by Adham Tabaja, including Al-Inmaa Engineering and Contracting (SDGT), and Fantasy World, the well-known amusement park in Hezbollah's stronghold of Dahiya co-founded and operated by Tabaja and Amin Sherri, the same Hezbollah Member of Parliament mentioned in the JTB designation who "coordinates Hezbollah's financial activity at Jammal Trust with the bank's management."[18] ¶¶1477, 1481, 647. SGBL also maintained accounts for, and provided financial services to, Al-Saad Establishment for Trading of Eggs, a company owned and controlled by the IRGC-QF, AC ¶1478; Metro Trading Company, one of the vehicles used by Imad Bakri to launder large sums of money for Hezbollah, AC ¶1491; and the Hassan Ayash and Halawi Exchanges (the latter via Halawi Investment Trust and Info Trust), AC ¶¶1487-90. SGBL's relationship with these designated Exchanges[19] is particularly significant because both Exchanges dealt in high-volume bulk cash transactions and allowed massive infusions of Hezbollah cash (in

---

[18]    When Treasury designated Amin Muhammad Cherri (a/k/a Sherri), it noted that: "Sherri has maintained a close relationship with Adham Tabaja, a Hezbollah financier, whom OFAC designated as an SDGT in June 2015 for providing support and services to Hezbollah. Sherri and Tabaja have continued to do business together despite the latter's designation. Sherri and Tabaja, among others, founded and were involved in a Lebanon-based company. Sherri also facilitated Tabaja's access to Lebanese banks and was directed by Hezbollah Secretary General Nasrallah to settle issues related to his designation." AC ¶647 n.38.

[19]    Treasury stated that Halawi Exchange was involved in "extensive illicit financial activity on behalf of a variety of international narcotics trafficking and money laundering networks," AC ¶1140, and the Hassan Ayash Exchange was designated a SDNTK in 2011 for its role in laundering money for the Joumaa network. AC ¶1077-78.

USD) to flow into Lebanon and be deposited into banks like SGBL. AC ¶1488.

As the legal successor-in-interest to LCB, SGBL is also liable for LCB's conduct during the relevant period. That conduct is extensively detailed in the Complaint, but it can be summarized as alleging that LCB was "first among equals" in working assiduously with Hezbollah to assist the organization launder money (primarily through the United States).[20] Like the other Lebanese banks that conspired with Hezbollah, LCB allowed a Hezbollah representative to work inside the bank's management and participate in its decision-making processes. *See, e.g.*, AC ¶¶1314, 1318. In fact, Hezbollah MP Amin Sherri, who "coordinate[d] Hezbollah's financial activity at Jammal Trust with the bank's management" is the brother-in-law of Ahmad Safa, the former LCB manager who worked for Hezbollah inside the bank. AC ¶1325. LCB's subsidiaries in Africa were also co-owned by senior Hezbollah operatives and managed by them, AC ¶¶1321, 1004-05, and LCB worked with a variety of Lebanese exchange houses to convert bulk cash deliveries of U.S. banknotes into bank deposits that could be used by Hezbollah for a variety of purposes including trade-based money laundering. *See, e.g.*, AC ¶¶1073-75, 1083-87, 1104-06.

### 2.   Fransabank

Fransabank's substantial assistance to Hezbollah included knowingly maintaining accounts for, and providing financial services to, several core Hezbollah-controlled organizations that are widely and publicly associated with Hezbollah, including the IRSO, the most explicit and notorious fundraising arm of Hezbollah's IJO; the Martyrs Foundation, (described by the Treasury as "openly affiliated with Hezbollah"); and the Wounded Association, whose stated purpose is to

---

[20]     The relevant paragraphs of the Complaint include, *e.g.*: AC ¶¶36-39, 89-111, 136-43, 493, 548, 569, 572, 581, 619, 630, 647, 650, 652, 661, 669, 691, 704-07, 721-22, 724-25, 729, 733-34, 740, 742, 746-47, 750-51, 753-55, 765, 771, 774, 777, 794-95, 803 n.55, 804, 819, 855, 867-68, 871-72, 875, 884-86, 889-96, 1326-1445.

care for people wounded in the "Resistance." AC ¶¶1494-97. Hezbollah also directly solicited funds to account no. 953113.30 at Fransabank. AC ¶1498.

Fransabank also knowingly held accounts for, and provided financial services to, the following Hezbollah institutions, corporate investments or operatives: Kassem Hejeij (SDGT), former chairman of MEAB Bank; Saleh Assi (SDGT); Global Supply and Consultancy, a BAC entity co-founded by Assi; Talal Chahine, the Hezbollah fundraiser and fugitive money launderer; Compu House (founded and majority owned by Sultan Khalifa As'ad, former head of Hezbollah's Finance Unit and founder of Jihad al-Bina); Euro African Group Ltd. (SDGT), controlled by Bazzi (SDGT); and Wanour Real Estate, also controlled by Bazzi. AC ¶¶1501-21.

In addition to providing banking services during the relevant period to these prominent Hezbollah operatives and entities and several others (detailed in AC ¶¶1494-1511), Fransabank took on or retained customers whose LCB accounts were closed. For example, according to the Lebanese government, when LCB closed Muhammad Bazzi's USD-denominated accounts, the account balance migrated to Fransabank. AC ¶¶1512-13. The same process occurred with the accounts closed at LCB for Inter Aliment (SDGT, Phoenicia Shipping (SDNTK), (SDNTK), and Bazzi's Euro African Group Ltd. (SDGT), among others. AC ¶¶1509-20.

### 3.   MEAB Bank

Defendant MEAB Bank was co-founded and chaired by Kassem Hejeij until he stepped down in June 2015 after Treasury designated him an SDGT for his direct links to Hezbollah. AC ¶1557. According to Treasury:

> Hejeij is a Lebanese businessman that maintains direct ties to Hezbollah organizational elements. In addition to his support to Adham Tabaja and his affiliated companies in Iraq, Hejeij has helped open bank accounts for Hezbollah in Lebanon and provided credit to Hezbollah procurement companies. Hejeij has also invested in infrastructure that Hezbollah uses in both Lebanon and Iraq.

AC ¶1561.

In 2006, MEAB Bank's offices were targeted by Israeli jets after a fundraising appeal that aired on Hezbollah's *Al Manar* television station asking that money for the Hezbollah "Resistance" be sent to a specific account at the bank. AC ¶1563. Moreover, a public campaign to support Hezbollah announced on June 16, 2007, asked donors to contribute the money into a Hezbollah-owned account at MEAB Bank (Account No. 10680). AC ¶¶1564. MEAB Bank also provided Adham Tabaja (SDGT), co-chairman of the BAC, with significant financing (as reflected by the properties Tabaja has used as collateral via mortgages held by MEAB Bank). AC ¶¶1571-74. The bank was also actively involved in Hezbollah's conspiracy to launder narcotics trafficking proceeds through the sale of used cars in Africa, knowingly moving tens of millions of dollars on Hezbollah's behalf through its correspondent bank account(s) with U.S. financial institutions in New York between approximately January 2007 and early 2011. AC ¶¶1575-76.

MEAB Bank knowingly held accounts for, and provided financial services to, multiple Hezbollah institutions, corporate investments or operatives, including: the IKRF–Lebanon (SDGT); and at least four BAC corporate entities controlled by Tabaja: Al-Inmaa Engineering and Contracting (SDGT), Nest Contracting Company, Fantasy World, and Trust Compass Insurance (which is controlled by the Tabaja family and used by Hezbollah to insure, *inter alia*, its hospitals and other assets). AC ¶¶1565-71. The bank also provided Tabaja with significant financing for his BAC projects. AC ¶¶1572-74. MEAB Bank also knowingly held accounts for, and provided financial services to, several of the BAC's senior leaders and facilitators, including Bazzi (SDGT), Charara (SDGT), Cherri (SDGT), and Nazim Ahmad (SDGT).

MEAB Bank's important role in "The System" is further exemplified by the accounts it held for Elissa Exchange (SDNTK),[21] and its affiliate, Phoenicia Shipping (SDNTK), and Halawi Exchange and Halawi Investment Trust. As set forth in detail in the Complaint, MEAB Bank knew that the Elissa and Halawi Exchanges were critical bulk cash conduits used to launder narcotics trafficking proceeds on behalf of the BAC, and MEAB Bank willingly played its part in laundering those funds through its correspondent accounts in New York. AC ¶¶1577-83.

Finally, in addition to providing banking services to these prominent Hezbollah operatives and entities during the relevant period, MEAB Bank also took on or retained customers whose LCB accounts were closed. For example, according to the Lebanese government, when Ali Kharrubi's (SDNTK) personal account at LCB was closed in October 2011, it migrated to MEAB Bank. AC ¶1588. The same thing happened with a half-dozen other similar accounts. AC ¶¶1589-94.

### 4.    Blom Bank

Blom Bank provided extensive and substantial assistance to Hezbollah, including knowingly maintaining accounts for, and providing financial services to, several core Hezbollah-controlled organizations that are widely and publicly associated with Hezbollah, including Al-Mabarrat Charitable Society and Arch Consulting, the commercial arm of Jihad al-Bina (SDGT). AC ¶¶422-40, 447-61, 1525, 1527. Blom Bank also knowingly held accounts for, and provided financial services to, several of the BAC's senior leaders and facilitators, including Bazzi (SDGT); Hejeij (SDGT); Kassem (SDGT) and Youssef Tajideen; Charara (SDGT); noted Hezbollah arms dealer, Mustafa Reda Darwish Fawaz (SDGT); and Nazem Ahmad (SDGT). AC ¶¶1530-37.

---

[21]    Its account 135-051861-012 at MEAB Bank was used to clear dollars through correspondent accounts in New York. MEAB received large bulk cash deposits which it then laundered for Elissa Exchange and Hezbollah to conceal their narcotics trafficking proceeds. AC ¶1577.

Blom Bank also knowingly held accounts for, and provided financial services to, other prominent BAC enterprises, including Ovlas Trading SA (SDGT), part of the Tajideen network of companies; Spectrum Investment Group Holding (SDGT), controlled by Charara (SDGT); Cooperative Al-Wafaa, owned and controlled by Tabaja (SDGT); and Car Care Center (SDGT), controlled by Tabaja and managed by Hussein Ali Faour (SDGT), identified as "a member of Hezbollah's Islamic Jihad, the unit responsible for carrying out the group's overseas terrorist activities." AC ¶¶1526, 1528-29, 1538.

Blom Bank's important role in "The System" is exemplified by the accounts it held for Elissa Exchange (SDNTK),[22] Ali Kharrubi (SDNTK), and Halawi Investment Trust (sister company of Halawi Exchange). AC ¶¶1535, 1541-44. Blom Bank knew that the Elissa Exchange and Halawi Exchange were critical bulk cash conduits used to launder narcotics trafficking proceeds on behalf of Hezbollah's BAC, and Blom Bank willingly played its part in laundering those funds through its correspondent accounts in New York. AC ¶¶1541-43.

In addition to providing banking services to these and other prominent Hezbollah operatives and entities during the relevant period, Blom Bank also took on or retained customers whose LCB accounts were closed. For example, according to the Lebanese government, when the LCB accounts belonging to the Ahmad clan's diamond smuggling and money laundering networks in the DRC were closed, they moved to Blom Bank – including the personal account of Nazim Ahmad (SDGT). AC ¶¶1553-54.

---

[22]    Its account 135-051861-012 at MEAB Bank was used to clear dollars through correspondent accounts in New York. MEAB received large bulk cash deposits which it then laundered for Elissa Exchange and Hezbollah to conceal their narcotics trafficking proceeds. ¶1577.

### 5.    Byblos Bank

Byblos Bank provided substantial assistance to Hezbollah, including knowingly maintaining accounts for, and providing financial services to, several core Hezbollah-controlled organizations that are widely and publicly associated with the groups, including the IRSO (which solicited funds on television using a Byblos Bank account), the most explicit and notorious fundraising arm of Hezbollah's IJO; and Al-Amana and Global Touristic Services, which are openly owned and controlled by Atlas Holding on behalf of the U.S.-designated Martyrs Foundation. AC ¶¶1603-09.[23] Byblos Bank also maintained an account for Société Orientale Libanaise d'Investissement et Développement, a company established by Atlas Holding but controlled by Ali Tajideen (SDGT) through his son and wife. AC ¶¶1609-10. Byblos Bank also held accounts for Afrimex (also controlled by the Tajideens); ETCIMEX, a Czech company founded by Kassem Tajideen (SDGT) and Amigo Travel and Transport, a company that is part of Tabaja's network of BAC companies. AC ¶¶1611-16. Like the other Defendants, Byblos also took on or retained customers whose LCB accounts were closed as part of the bank's liquidation and sale to SGBL. AC ¶1630.

### 6.    Bank Audi

In 26 numbered paragraphs, the Complaint sets forth the litany of Hezbollah and Hezbollah BAC institutions, corporate investments or operatives Bank Audi held accounts for, and provided financial services to, during the relevant period, as well as the accounts of 14 individuals and entities the Lebanese government identified as Hezbollah-affiliated whose accounts were closed at LCB and migrated to Bank Audi. AC ¶¶1634-61. The accounts held during the relevant period

---

[23]    Byblos Bank also maintained an account for another company owned by the Martyrs Foundation – Medical Equipments and Drugs International Corporation, which was established in 2013. Although this assistance occurred after Plaintiffs sustained their injuries, it is further evidence of the bank's willingness to work with openly Hezbollah-controlled entities even after the U.S. government action against LCB. AC ¶¶1619-23.

included companies belonging to the Halawi Exchange Network (§311 designation as a "financial institution[] of primary money laundering concern") responsible for high-volume bulk cash transactions laundered through Bank Audi on the BAC's behalf and on behalf of its narcotics trafficking networks. AC ¶¶1664-66. They also include Atlas Holding and several key companies belonging to the BAC, including Premier Investment Group (SDGT), controlled by Bazzi; Spectrum International Investment Holding (SDGT), controlled by Charara; Ovlas Trading and Ovlas Trading SA (both SDGTs) and Leaders of Supply & Products and Afrimex, all controlled by the Tajideen family; and Inter Aliment (SDGT), controlled by Assi. AC ¶1634. In addition, Bank Audi held an account nominally in the name of Dib Hani Harb, which was used to sell counterfeit currency and purchase weapons on behalf of Hezbollah. AC ¶¶1166-83. In sum, Bank Audi played an active role in "The System" and provided extensive and substantial assistance to Hezbollah and its BAC.

### 7.     Bank of Beirut

In 22 numbered paragraphs, the Complaint sets forth multiple Hezbollah and Hezbollah BAC institutions, corporate investments, or operatives the Bank of Beirut held accounts for, and provided financial services to, during the relevant period, as well as the accounts of four individuals and entities the Lebanese government identified as Hezbollah-affiliated whose accounts were closed at LCB and migrated to Bank of Beirut. AC ¶¶1749-70. These accounts held by Bank of Beirut during the relevant period included the Halawi Exchange (§311 Action designation as a "financial institution[] of primary money laundering concern" in 2013), responsible for high-volume bulk cash transactions laundered through Bank of Beirut and others on behalf of the BAC and its narcotics trafficking networks; Mustafa Reda Darwish Fawaz (SDGT), noted Hezbollah arms dealer; Compu House, the Hezbollah-controlled technology importer, founded and majority owned by Sultan Khalifa As'ad; and Trust Compass Insurance,

the Hezbollah-controlled Tabaja family insurance company. AC ¶¶1755-57, 1762. In sum, the Complaint's allegations make clear that Bank of Beirut played an active role in "The System" (particularly by laundering bulk cash for Hezbollah in concert with the Halawi Exchange) and provided extensive and substantial assistance to Hezbollah and its BAC.

### 8.    Lebanon and Gulf Bank ("L&G")

The Complaint alleges in detail Defendant L&G's substantial assistance to Hezbollah. L&G held accounts for, and provided financial services to, multiple Hezbollah and BAC institutions, corporate investments, or operatives during the relevant period. Hezbollah accounts closed at LCB also migrated to L&G, including the account of Youssef Muhammad Tajideen. AC ¶¶1668-95. L&G knowingly maintained accounts for, and provided vital financial services to the IRSO; companies openly owned and controlled by the Martyrs Foundation; and various nodes within the BAC run by (a) Tabaja, (b) the Tajideen network, (c) the Charara network, (d) the Ahmad clan network,[24] and (e) the Joumaa Network (including several exchange houses critical to Hezbollah's laundering of bulk cash). AC ¶1668. Working with the IRSO would alone satisfy the ATA's requirements, but, in this case, L&G worked directly with Tabaja and financed him. AC ¶1679.[25] It also worked with Elissa Exchange Co. (SDNTK) and the Mecattaf and Fayed Exchanges, key instruments of the BAC's (and Joumaa network) money laundering operations that (through L&G) laundered millions of dollars of narcotics sales proceeds, including through the United States. AC ¶¶1692-94.

---

[24]    L&G held an account for, among others, G & S Diamonds, one of Nazim Ahmad's primary corporate vehicles through which he laundered hundreds of millions of dollars for Hezbollah. ¶¶895, 1691.

[25]    On December 1, 2007, L&G provided Adham Tabaja and his uncle, Ahmad Ali Tabaja, $1.3 million in financing using a mortgage on a property they jointly owned as collateral. AC ¶632.

### 9.     Banque Libano-Française ("BLF")

In 53 numbered paragraphs, the Complaint sets forth a multitude of Hezbollah and Hezbollah BAC institutions, corporate investments or operatives BLF held accounts for, and provided financial services to, during the relevant period, as well as the accounts of more than 15 individuals and entities the Lebanese government identified as Hezbollah-affiliated whose accounts were closed at LCB and migrated to BLF. AC ¶¶1696-1748. The allegations include knowingly maintaining accounts for, and providing vital financial services to, the IRSO, Martyrs Foundation and a litany of companies belonging to the BAC. AC ¶¶1696-97. These include two companies controlled by Adham Tabaja, Al-Inmaa Engineering and Contracting (SDGT) and United Company for Insurance Services; the flagship Tajideen network company, Ovlas Trading (SDGT); Nazim Ahmad's Conflict Diamonds money laundering company, Primo International; Imad Bakri's Metro Trading Company; and Muhammad Abd-al-Amir Farhat (SDGT)'s REEM Pharmaceutical. AC ¶¶1698-99, 1701-04, 1731.

The Complaint alleges that BLF allowed Nazim Ahmad's network to launder millions of dollars through its correspondent banks in New York, including more than $4 million to Saleh Assi (SDGT). AC ¶1721. Nazim Ahmad's money laundering activities were noted in the U.S. government's civil complaint against LCB and most recently in his SDGT designation. AC ¶1744; Schlanger Decl. Exhibit B.

BLF was also a favored destination for Hezbollah operatives and BAC entities whose accounts were closed at LCB following its 2011 identification as a "primary money laundering concern," including Saleh Assi (SDGT), Inter Aliment (SDGT), as well as Hezbollah facilitators Muhammad Issam Abu Darwish and Ibrahim Issawi and the latter's companies. AC ¶¶1705-18. Moreover, according to U.S. officials, BLF was one of several banks in Lebanon that worked with LCB personnel to hide LCB's assets from the U.S. government following the proceedings the U.S.

29

initiated against LCB. AC ¶1746. In sum, BLF's roster of Hezbollah customers reflects the bank's extensive commitment to substantially assisting Hezbollah's operations by providing it financial services, including critical access to U.S. dollar-clearing.

### 10. Bank of Beirut and the Arab Countries ("BBAC")

In 22 numbered paragraphs, the Complaint sets forth several Hezbollah and Hezbollah BAC institutions, corporate investments, or operatives that BBAC held accounts for, and provided financial services to, during the relevant period as well as the accounts of at least two companies the Lebanese government identified as Hezbollah-affiliated whose accounts were closed at LCB and migrated to BBAC. AC ¶¶1771-92. These allegations include knowingly maintaining accounts (including USD-denominated accounts) for, and providing financial services to the Martyrs Foundation, companies controlled by senior BAC leaders such as Al-Inmaa Engineering and Contracting and Al-Inmaa Group for Touristic Projects (two SDGTs controlled by Tabaja), Ovlas Trading SA (SDGT), and Hyram Maritime (both part of the Tajideen family network of companies). AC ¶¶1772-75, 1783.

Significantly, BBAC also worked closely with New Line Exchange Trust Company, the currency exchange house designated for its role in laundering narcotics proceeds for Ayman Joumaa's organization. AC ¶1776.[26] It also held accounts for, and provided vital financial services to, Trade Point International (SDGT) controlled by Hezbollah operative Muhammad Noureddine (SDGT), who collected cash provided by other Hezbollah operatives from Colombian drug cartels and laundered the money for Hezbollah by purchasing luxury goods and reselling them in Lebanon or West Africa. AC ¶¶1232-39, 1782. In sum, even setting aside BBAC's financial services and

---

[26]     BBAC's account was used to clear USD through New York on behalf of New Line Exchange and Joumaa. AC ¶1776.

support to the Martyrs Foundation, the Complaint plausibly alleges that BBAC collaborated with, and helped launder narcotics proceeds on behalf of the BAC.

### 11.    Jammal Trust Bank ("JTB")

As noted *supra* at 2-3, a few weeks after the Complaint was amended, JTB was designated an SDGT for its knowing and substantial support to Hezbollah. Nowhere in its stand-alone brief does JTB mention, let alone attempt to address, the Treasury's findings of "deep coordination between Hezbollah and JTB, which dates back to at least the mid-2000s"; or the finding that the bank (i) "knowingly facilitates the banking activities of U.S.-designated entities openly affiliated with Hezbollah," (ii) provides services to Hezbollah's Executive Council, (iii) helps Hezbollah "to pay its operatives and their families," or (iv) "coordinates Hezbollah's financial activity with Amin Sherri" (an SDGT and Hezbollah parliamentarian). The bank instead argues that the Complaint "does not allege that JTB in fact held any account for a customer that was designated as a 'foreign terrorist organization.'" JTB Brief ("JTB Br.") at 6.

However, the U.S. government's recent findings support the Complaint's allegations, AC ¶¶1793-1801, that JTB knowingly provided material support and substantial assistance to Hezbollah. In addition to the grounds set forth in the bank's SDGT designation, the Complaint notes that JTB held an *openly advertised* account for the IRSO. AC ¶1794. The Complaint also alleges that JTB held an account for Car Escort Services, a prominent Hezbollah company and SDGT owned by three prominent BAC facilitators: Kharrubi (SDNTK), Charara (SDGT) and Bazzi (SDGT). AC ¶1796. Two other designated commercial entities controlled by Charara held accounts at the bank – Spectrum International Investment Holding and Spectrum Investment Group Holding. AC ¶1797. JTB also does not seriously challenge the sufficiency of the Complaint's allegations that it provided substantial assistance to Hezbollah, arguing instead that it

did not assist "Hezbollah's terrorism activities, let alone the paramilitaries' violence in Iraq that allegedly harmed Plaintiffs." JTB Br. at 7.

### 12.  Fenicia Bank

The Complaint alleges that Defendant Fenicia Bank was deeply involved in laundering narcotics proceeds on behalf of the BAC though a variety of recognized money laundering vehicles including Elissa Exchange (SDNTK), Phoenicia Shipping (SDNTK), and Rmeiti Group SAL (a "primary money laundering concern"), among others. AC ¶¶1805-10. In June 2012, Ibrahim Chebli, manager of the Abbassieh branch of Fenicia Bank in Lebanon, was designated an SDNTK for facilitating the movement of millions of dollars for (among others) Joumaa's narcotics trafficking network. According to the U.S. government, Chebli regularly coordinated and executed financial transactions—including bulk cash transfers—that were processed through the Halawi Exchange. Nazim Ahmad (SDGT) used one of his companies to launder more than $1.4 million in illicit proceeds (through New York) to the Fenicia Bank account of Abd al-Ilah Mahmud Ashur, one of the bank's major shareholders. AC ¶¶1804-06.

In 23 numbered paragraphs, the Complaint sets forth how Fenicia Bank held accounts for several Hezbollah and BAC institutions, corporate investments, and operatives during the relevant period, as well as the accounts of ten individuals and entities the Lebanese government identified as Hezbollah-affiliated whose accounts were closed at LCB and migrated to Fenicia Bank. AC ¶¶1802-25. Fenicia Bank's Hezbollah customers included at least six companies controlled by Tabaja, including Al-Inmaa Engineering and Contracting (SDGT). AC ¶1811. Like MEAB Bank, Fenicia Bank also provided financing to Tabaja for his Hezbollah projects. AC ¶¶647 n.36, 1812. It also maintained an account for, and provided financial services to, Kassem Tajideen (SDGT). AC ¶1818. These allegations make clear that Fenicia Bank played an active role in "The System" (particularly by laundering bulk cash for Hezbollah in concert with other acknowledged money

launderers like Halawi Exchange, Elissa Exchange, Phoenicia Shipping and Rmeiti Exchange) and provided extensive and substantial assistance to Hezbollah and its BAC.

**D.      Hezbollah "Committed, Planned or Authorized" Each of the Alleged Attacks.**

Far from merely alleging that "Hezbollah generally supported the groups that committed the Attacks" as Defendants claim, JB at 36, the Complaint sets forth how Hassan Nasrallah, Hezbollah's Supreme Leader, established a specific directorate at Iran's behest (Unit 3800) to train, advise and direct its JAM "Special Groups" and Badr Corps proxies in Iraq.[27] AC ¶¶1916-17, 1942. The Complaint details Hezbollah's central role in the Attacks by (1) establishing and organizing its proxy groups in Iraq; (2) designing EFPs and other weapons deployed by those proxies; (3) training its Iraqi proxies in tactics, techniques, and procedures ("TTP"); and (4) overseeing, approving, and directing Special Groups attacks on U.S. service members and other American nationals.

**1.      Hezbollah and the IRGC-QF Established and Organized Proxy Groups in Iraq.**

The Complaint details Hezbollah's role in establishing and organizing its proxy groups in Iraq. Hezbollah and the IRGC were instrumental in forming the first (post-2003 U.S. invasion) Iraqi Shi'a militia – "Jaysh al-Mahdi" or "JAM," that was responsible for many of Plaintiffs' injuries. AC ¶¶1852-62. In fact, Hezbollah's most senior IJO commanders, Imad Mughniyah and Mustafa Badr al-Din, were dispatched to Iraq following the 2003 invasion to directly train and support JAM and its leadership. AC ¶¶1863-65. The most senior leaders of the so-called Special Groups have publicly acknowledged that Mughniyah and Badr al-Din "had a major role in organizing the resistance cells against the Americans in Iraq," and that Mughniyah "was the person

---

[27]      The composition and history of the Special Groups (misnamed in Defendants' joint brief as "Special Forces") is set forth at ¶¶1963-2046 of the Complaint.

behind the Iraqi Resistance against the American occupation of Iraq." AC ¶¶1866, 1872. From June 2003 through August 2004, at Iran's direction, Hezbollah's role was primarily to organize and train JAM gunmen and instill discipline and professionalism into the organization so that it could effectively threaten U.S. and Coalition Forces across Iraq. AC ¶1878. Later, Hezbollah tapped a senior member of its Political Council, Muhammad Kawtharani, to be responsible for the FTO's Iraq portfolio. Kawtharani was designated an SDGT on August 22, 2013 as:

> [T]he individual in charge of Hezbollah's Iraq activities, Kawtharani has worked on behalf of Hezbollah's leadership to promote the group's interests in Iraq, including Hezbollah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent groups.

AC ¶1874.

## 2.   Hezbollah Designed the EFPs Used to Target Americans in Iraq.

In addition to helping establish the proxy groups Hezbollah's IJO used to launch attacks against Americans in Iraq, Hezbollah was central in designing EFPs and training its proxies in the proper TTP for deploying them. Hezbollah gradually introduced EFPs into Iraq with relatively primitive initiation systems—a process that allowed Hezbollah to test the weapons, assess the capabilities of its Iraqi proxies, and probe American responses to the threat. AC ¶1888. By summer 2004, a British intelligence report identified EFPs in southern Iraq as "of a type associated with Lebanese Hezbollah. There were also indications of Iranian involvement in the construction of the devices." AC ¶1894. In December 2004, a British Defence Intelligence Report reported on EFPs in Iraq: "We assess that this may be due to an influx of Lebanese Hezbollah IED technology under Iranian sponsorship." AC ¶1895.[28] Hezbollah trained Special Groups and Badr Corps operatives at training camps in Lebanon and Iran in the deployment of EFPs, kidnapping, communications,

---

[28]    A 2006 U.S. government report similarly concluded: "Since at least 2004, Hezbollah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of [EFPs] …." AC ¶1896.

and small-unit operations. AC ¶1918. The U.S. State Department *2006*, *2007* and *2008 Country Reports on Terrorism* noted that the IRGC-QF "in concert with Lebanese Hezbollah provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry."[29] AC ¶¶1941, 1946-47.

### 3. The IRGC-QF and Hezbollah Controlled and Directed the Special Groups.

The Complaint sets forth Hezbollah's role supervising and directing its proxy groups in Iraq to attack Americans. In late 2004, JAM agreed to establish the "Special Groups" dedicated to attacking American and Coalition Forces in Iraq. AC ¶1898-1907. From 2004 through much of 2006, the IRGC used Hezbollah to train and direct Special Groups cells to target Coalition Forces. AC ¶¶1908-09. Akram Kaabi, one of the Special Groups' senior leaders, has publicly acknowledged that, after the disastrous 2004 JAM uprising in Najaf (in which U.S. forces killed approximately 1,500 JAM operatives), he personally met in Lebanon with Hassan Nasrallah and Imad Mughniyah, who told him: "All of our capabilities and expertise are at your disposal." AC ¶1913. A 2006 Australian government report confirmed that "Hezbollah has established an insurgent capability in Iraq, engaging in assassinations, kidnappings and bombings." AC ¶1942. A year later, documents seized during the capture of senior Hezbollah commander Ali Mussa Daqduq in Basra, Iraq included:

> spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example; an ambush and IED attack on a [Coalition] convoy in Karbala resulting in 4 X [Coalition] KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier.

AC ¶1955.

---

[29]   Only Hezbollah instructors taught Special Groups operatives the "Engineers Course" that focused on constructing and employing EFPs. AC ¶1923.

As a result of Daqduq's capture, Coalition Forces learned that "senior Lebanese Hezbollah commander Ali Mussa Daqduq not only provided training to AAH [Special Groups] cells and advised them on terrorist operations, he also helped plan operations and had final approval over them." AC ¶1999.

### 4. Hezbollah and the IRGC-QF Also Trained Their Proxies to Use Other Iranian-Manufactured Weapons.

The Complaint details Hezbollah's and the IRGC's roles in providing and training their Iraqi proxy groups in the proper TTP to be employed in wielding various weapons other than EFPs. For example, Hezbollah and the IRGC–QF introduced their proxies to the use of 107mm and 122mm artillery rockets (which Hezbollah had previously deployed in large numbers against Israel). AC ¶1930. Special Groups were also trained in Iran by Hezbollah instructors in a four-week long course on the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets. AC ¶¶1934-35, 1940. In addition, Hezbollah and the IRGC-QF trained one of the Special Groups, Kata'ib Hezbollah, how to properly assemble and launch "IRAMs" against Coalition Forces' bases.[30] AC ¶2021. In sum, the Complaint more than plausibly alleges that Hezbollah established various proxy groups in Iraq, trained them, and directed them to attack American targets in Iraq; Hezbollah therefore committed, planned *and* authorized the Attacks.

### 5. Hezbollah Planned and Oversaw the January 20, 2007 Attack on the Provincial Joint Coordination Center ("PJCC") in Karbala.

Courts have devoted considerable attention to the role the IRGC-QF and Hezbollah played in perpetrating the January 20, 2007 attack on American soldiers in Karbala, Iraq. *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019); *Fritz v. Islamic Republic of Iran*, 320

---

[30]     IRAMs are explosive devices made from large metal canisters, such as propane gas tanks, filled with explosives, scrap metal and ball bearings, propelled into the air by rockets. AC ¶¶2019-28.

F. Supp. 3d 48 (D.D.C. 2018)). *Karcher* cited "evidence that the operation was planned by an experienced team under the direction of Hezbollah and the IRGC-QF," and expert testimony that "Iran's IRGC and Hezbollah planned and orchestrated the January 20, 2007 attack on the Karbala [PJCC] in Iraq." 396 F. Supp. 3d at 51-52. As the Complaint notes, when Treasury designated Ali Mussa Daqduq an SDGT, it found that he "is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala [PJCC] ... result[ing] in the deaths of five U.S. soldiers." AC ¶3357. In a 2007 briefing, General David Petraeus noted "a 22-page memorandum on [Daqduq's] computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala." AC ¶3370. In sum, the Complaint more than plausibly alleges that Hezbollah committed, planned and authorized the January 20, 2007 Attack on the PJCC.

## II.   This Court Has Personal Jurisdiction Over Each Defendant.

This court has specific jurisdiction over Defendants in this case, a determination which "'depends on an "affiliation between the forum and the underlying controversy," principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci I*"), 673 F.3d 50, 60 n.9 (2d Cir. 2012) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Federal courts may exercise specific personal jurisdiction where: (1) service was proper; (2) a statutory basis for jurisdiction exists under federal law or the forum state's principles; and (3) constitutional due process is satisfied. *Id.* at 59-60. Because Defendants do not dispute that service was proper, their only grounds to contest jurisdiction are that the allegations against each Defendant fail to satisfy N.Y.C.P.L.R. §302(a) and constitutional due process.

Defendants tacitly concede (as they must) that *Licci v. Lebanese Canadian Bank, SAL* ("*Licci III*"), 732 F.3d 161 (2d Cir. 2013), is controlling authority in this case. In *Licci*, the

plaintiffs alleged that LCB provided material support to Hezbollah by maintaining accounts and processing USD-denominated funds transfers for the Martyrs Foundation. Plaintiffs further alleged that they were injured by a series of rocket attacks Hezbollah launched at Israel. *Id.* at 165-66. The Second Circuit explained that the "'arising from' prong of section 302(a)(1) does not require a causal link between a defendant's New York business activity and a plaintiff's injury," only "'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.'" *Id.* at 168-69 (quoting *Licci v. Lebanese Canadian Bank* ("*Licci II*"), 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (2012)). Moreover, while that connection "depends upon 'the nature and elements of the particular causes of action pleaded,'" §302(a)(1) requires only that "at least one element arises from the New York contacts ...." *Id.* at 169 (quoting *Licci II*, 20 N.Y.3d at 341).

The Second Circuit found that LCB's conduct met due process requirements—unsurprisingly, as it also noted that although "personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare." Indeed, the Court could find "no such decisions in this Circuit." *Id.* at 170. The Second Circuit then reviewed the two prongs of due process: "minimum" contacts and reasonableness. Under the first prong, "[w]here the claim arises out of, or relates to, the defendant's contacts with the forum," minimum contacts "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)) (internal quotation marks omitted). The court held that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress," met that standard. *Id.* at 171.

As for reasonableness, the Court observed that where "a defendant has purposefully directed its activities at the forum state," it can only defeat jurisdiction on due process grounds by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 173 (internal citations omitted). The Court granted that the parties and most of the documents and witnesses were located abroad but noted that modern conveniences make litigating in New York reasonable. The court also noted "the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends." *Id.* at 174. Thus, the Court "conclude[d] that the exercise of personal jurisdiction over LCB would not offend principles of fair play and substantial justice." *Id.*

In a vain attempt to distinguish the facts of this case from *Licci III*, Defendants baldly assert that the Complaint "fails to connect the U.S. correspondent bank accounts to the alleged wrongs, much less demonstrate that Plaintiffs' claims 'arise from' such banking activity," and that the Complaint "does not allege a single transaction through the Moving Defendants' U.S. correspondent accounts." JB at 14. But to make these dubious assertions, Defendants have to engage in considerable misdirection, suggesting that the U.S. transactions have to be linked to "the perpetrators of the attacks" or that the funds must be traceable in such a way that they were used to facilitate them. JB at 14-15. But, of course, the *Licci* cases hold no such thing. The plaintiffs in those cases neither claimed that the Martyrs Foundation *itself* launched rockets at Israel nor did they allege that the specific wire transfers processed through New York were earmarked for terror attacks *per se*, let alone the specific attacks at issue. Put simply, Defendants' invented legal standard requiring the Complaint "to connect these alleged transactions to the Attacks" is without legal support. JB at 15.

Nor does Defendants' repeated citation to the decision in *Waldman v. Palestine Lib. Org.* advance their arguments. 835 F.3d 317 (2d Cir. 2016). The *Waldman* plaintiffs relied primarily on an "effects test" for jurisdiction, arguing that the defendant in that case was targeting Americans in terror attacks.[31] *Id.* at 337. The only in-forum conduct they identified was the defendants' "continuous presence" in the U.S. for "pressuring" the U.S. on regional policy, but the Court found that the attacks did not arise out of, or relate to, the alleged pressure. *Id.* at 341-42.

Here, the Complaint alleges that Defendants each maintained correspondent accounts in New York to knowingly "clear" USD-denominated transactions on behalf of their Hezbollah customers (and co-conspirators). Specifically, the Complaint sets forth how the Nazim Ahmad (SDGT) laundered hundreds of millions of dollars for Hezbollah through LCB and the Defendants herein during the relevant period. Plaintiffs itemized large payments directed by Ahmad to his various relatives and business associates *through New York* to accounts at 10 of the Defendants (all except L&G and BBAC). AC ¶¶867-68.[32] Notwithstanding the facts that the UNSC identified the Ahmad clan in 2002 as a "criminal organization" with ties to Hezbollah, AC ¶813, the U.S. identified Nazim Ahmad in 2011 as an individual involved "in the African diamond smuggling trade" (also noting the UNSC's findings), AC ¶889, and Treasury recently described Ahmad as "a prominent Lebanon-based money launderer and significant Hezbollah financier," Defendants brush aside these highly specific allegations as not "suit related" because the Complaint "fails to connect these alleged transactions to the *Attacks*." JB at 15 (emphasis added). Again, the proper question is whether the Complaint ties the transactions to Hezbollah, not to any specific attack.

---

[31]     The allegations that Hezbollah was specifically targeting Americans in Iraq for purposes of applying the effects test for personal jurisdiction are far more compelling here.

[32]     The Complaint identifies accounts held by members of Hezbollah's Conflicts Diamond network at every Defendant bank except BBAC. AC ¶872.

*Licci III*, 732 F.3d at 169. As a "significant Hezbollah financier," as Treasury described him, Ahmad's numerous USD-denominated transactions through New York to accounts at nearly all Defendants (including transfers to another SDGT and a SDNTK affiliated with Hezbollah), qualify as "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Id.* at 168-69.

Hezbollah and the Defendants both make use of Lebanon's dollarized economy to channel much of their financial traffic through correspondent accounts with U.S. financial institutions, largely in New York. AC ¶61. As the Complaint explains, Defendants have become dependent on inflows of U.S. banknotes from drug-trafficking, the Conflict Diamond trade, arms dealing and contracts obtained by Hezbollah operatives from friendly African governments, and even ordinary (i.e., otherwise legal) trade conducted by Hezbollah's worldwide enterprises. AC ¶¶74-77. A large portion of Hezbollah's illicit proceeds in bulk cash was deposited in cash in Lebanese exchange houses, then deposited by the exchange houses into the Defendant banks. AC ¶87.

For example, in less than two years in the mid-2000s, Hezbollah laundered illicit funds worth more than $300 million through Halawi Exchange and $150 million through Hassan Ayash Exchange. As the U.S. government's investigations revealed, Hezbollah laundered USD-denominated narcotics proceeds (among other sources of revenue) through Lebanese exchange houses to LCB, Blom Bank and MEAB Bank and then transferred those funds to used-car dealerships in the United States to buy and ship thousands of vehicles to West Africa, where the BAC network operated hundreds of businesses. AC ¶¶88-89, 1576-77.

Defendants' briefs fleetingly mention "The System" and characterize it as "generalized allegations," JB at 23-24, never mentioning, let alone addressing, the Complaint's additional jurisdictional allegations, including:

1. MEAB Bank and Blom Bank moved tens of millions of dollars on Hezbollah's behalf through their New York correspondent bank accounts that were laundered through Lebanese currency exchange houses. AC ¶¶89, 1132, 1356, 1541 n.100 ("BLOM Bank was identified by the U.S. government as one of four Lebanese banks whose New York correspondent banks were used by Lebanese exchange houses to launder money for Hezbollah."); AC ¶1576 ("Between approximately January 2007 and early 2011, MEAB knowingly move[d] tens of millions of dollars on Hezbollah's behalf … through … New York ….").

2. MEAB Bank laundered at least $400,000 in proceeds from the Ahmad family's criminal activities (through New York) to Elissa Exchange's (SDNTK) USD-denominated account with MEAB Bank in Lebanon. AC ¶1578.

3. BLF transferred more than $500,000 to MAH Auto in New Jersey to purchase used cars subsequently exported from the U.S. primarily to West Africa as part of Hezbollah's money laundering efforts to launder narcotics sales proceeds. AC ¶¶1224, 1229-31.

4. Bank Audi laundered more than $250,000 through its correspondent account at JP Morgan Chase Bank in New York for MAH Auto in New Jersey for similar purposes. AC ¶¶1225, 1229-31.

5. Harb, the Hezbollah weapons procurement specialist, transferred funds from the United States, through New York, to Hezbollah's account at Defendant Bank Audi. AC ¶¶1166-83, 1646.

6. Chahine, the relative and business partner of senior Hezbollah facilitator Bazzi (SDGT) and fundraiser for Sheikh Fadlallah's (SDT) Al-Mabarrat organization, transferred more than $2 million through the United States using Defendants Byblos Bank and Fransabank. AC ¶554.

7. BBAC transferred $49,650 on October 15, 2008 through its New York correspondent bank account on behalf of New Line Exchange, an SDNTK controlled by Hezbollah's premiere narcotics trafficker Joumaa (also an SDNTK). AC ¶1106.

8. L&G transferred $269,678 through its New York correspondent bank account on behalf of Mecattaf Exchange, via New Line Exchange, an SDNTK controlled by Joumma. AC ¶1152.

9. LCB conspired with Hezbollah and knowingly facilitated billions of USD-denominated funds transfers through New York on Hezbollah's behalf. AC ¶¶143, 1347-63, 871, 890, 895, 943.

In fact, Defendants' briefs only once mention Hezbollah's narcotics trafficking scheme that laundered hundreds of millions of dollars through U.S. correspondent banks by transferring funds to the U.S. for the purchase of used cars. JB at 15. Despite the fact that this elaborate scheme was

the focus of DEA, DOJ and Treasury investigations culminating in LCB's designation as "a financial institution of primary money laundering concern," Defendants describe this massive Hezbollah money laundering scheme as dealings "in legitimate goods" that undermine any "speculative leap" that Defendants knew their customers (e.g., currency exchange houses dealing in bulk cash) were acting illegally.

Even if, given all of these allegations, Plaintiffs had not made out a prima facie case for personal jurisdiction, they would still be entitled to jurisdictional discovery of transfers Defendants processed through their New York accounts. *See e.g.*, *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194-95 (E.D.N.Y. 2014) ("It is well settled" that discovery may be appropriate where the plaintiffs "articulate[d] a colorable basis," if not a prima facie case, for personal jurisdiction).

## III.  The Complaint Plausibly Alleges JASTA Liability.

### A.  Hezbollah Committed the Attacks.

Defendants assert that the Complaint fails to allege that Hezbollah "committed, planned, or authorized" the Attacks, pointing to what they characterize as "vague and conclusory references to Hezbollah into the description of each Attack." JB at 35. According to Defendants, "[a]t most, Plaintiffs allege that Hezbollah generally supported the groups that committed the Attacks, not that it planned or authorized the particular Attacks that injured Plaintiffs, as required by JASTA." JB at 36. But in *Freeman v. HSBC* (a case brought by many of the same Plaintiffs in this case), Judge Chen observed that "Plaintiffs' allegations … taken as a whole, describe Hezbollah as deeply involved in supporting and coordinating an extensive campaign of terrorist activity against American citizens in Iraq." No. 14-cv-6601(PKC)(CLP), 2019 WL 4452364, at *20 (E.D.N.Y. Sept. 16, 2019). The Court then held that "Given the most generous reading possible, the [complaint] alleges that FTOs Hezbollah and Kata'ib Hezbollah and the IRGC (an SGDT) [sic], acting through agents and proxies, are the entities responsible for *committing* the acts of

43

international terrorism that injured Plaintiffs." *Id.* at \*21 (emphasis added). As set forth in detail *supra* at 33-37, the conclusion reached in *Freeman* is entirely consistent both with the Complaint's detailed allegations and the U.S. government findings that they rely upon.

**B.    JASTA Secondary Liability Is Governed by *Halberstam v. Welch*.**

JASTA established that plaintiffs may assert statutory secondary liability for acts of international terrorism committed, planned, or authorized by an FTO against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. §2333(d)(2). JASTA was explicitly added to expand the relief already available to civil litigants under §2333(a):

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA, §2(b). *Accord Linde*, 882 F.3d at 328 (describing JASTA as an "expansion" of the ATA).

JASTA directs courts to interpret aiding and abetting liability pursuant to *Halberstam* (an appellate case reviewing a full trial record, not a motion to dismiss). *See also id.* at 329 (same). In *Halberstam*, the defendant, Linda Hamilton, was found civilly liable for aiding and abetting the murder of Michael Halberstam by her boyfriend, Bernard Welch, during a botched burglary. *See* 705 F.2d at 474 ("[Ms. Hamilton is] civilly liable, as a joint venturer ... for the killing of Michael Halberstam"). However, Hamilton, who assisted what she claimed was her boyfriend's antiques business, did not know about the murder—or even the burglary:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* at 488.

The *Halberstam* court set forth "the elements of traditional tort theory that permit holding a nonparticipant in a burglary that led to murder civilly responsible for the economic consequences of so terrible an injury." *Id.* at 489. They are: (1) the party the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Id.* at 477. Plaintiffs have plausibly alleged each of these elements.

A civil conspiracy in violation of 18 U.S.C. §2333(d) requires "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. 705 F.2d at 477.

## C.     Each Defendant Conspired with Hezbollah.

The Complaint sets forth in detail how Defendants each agreed to work with Hezbollah and its BAC to launder hundreds of millions of dollars that allowed Hezbollah to fund its terrorist operations in Iraq. In the face of detailed allegations (extensively sourced to U.S. government findings), Defendants argue that the Complaint does not plead any agreement between them and Hezbollah, only "allegations that Moving Defendants provided routine (and entirely legal) banking services to Alleged Bank Customers supposedly associated with Hezbollah." JB at 45. Defendants are free to argue *at trial* that depositing hundreds of millions of dollars *in cash* for individuals and entities either designated as SDGTs at the time or later designated as senior operatives or alter-egos of Hezbollah and then converting those cash deposits into real estate investments, used car purchases in the U.S. or other blatant money laundering schemes was "routine" and "entirely legal," but that alleged conduct is more than sufficient to satisfy the ATA's pleading requirements.

Unable to effectively deny that "The System" they participated in constitutes a conspiracy,

Defendants argue instead that Plaintiffs' conspiracy allegations also fail because neither the IRGC-QF nor any of the Iraqi Special Groups participated in "The System." JB at 46. But, of course, Hezbollah and its IJO *are* participants in The System and the "common scheme" in *Halberstam* was *not* murder; it was "a long-running burglary enterprise, heavily dependent on aid in transforming large quantities of stolen goods into 'legitimate' wealth." 705 F.2d at 488. Here, the criminal enterprise involved a long-standing scheme to launder money and fund Hezbollah's IJO. The court in *Halberstam* found it sufficient to impose liability where "Hamilton agreed to participate in an unlawful course of action and [] Welch's murder of Halberstam was a reasonably foreseeable consequence of the scheme," *id.* at 487; here, Hezbollah's attacks on Americans serving in Iraq were "a reasonably foreseeable consequence" of Defendants' agreement to participate in an unlawful course of action that funded the IJO. *See id.* at 481 (holding that every conspirator is "liable for injuries caused by acts pursuant to or in furtherance of the conspiracy," even if he did not "benefit from" or "know[] about the injurious action").

Defendants cite *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS)(GWG), 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019) for the holding that under JASTA, the conspiratorial goal at the core of the requisite agreement is the commission of an act of international terrorism. *O'Sullivan* held "that JASTA liability lies where 'the secondary tortfeasor [conspired with] the principal tortfeasor in committing "*such an act* of international terrorism."'" *Id.* at *9 (quoting *Taamneh v. Twitter, Inc.,* 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018)). However, as noted above, that reading does not conform with *Halberstam*, which the statute sets forth as the "proper legal framework" for §2333(d) liability. JASTA §2(a)(5); *Linde*, 882 F.3d at 329. It is also inconsistent with Congress' stated intention "to provide civil litigants with the broadest possible basis … to seek relief against … entities … wherever acting and wherever they may be found, that have

46

provided material support, directly or indirectly, *to foreign organizations or persons that engage in terrorist activities against the United States*." JASTA §2(b) (emphasis added).[33]

Requiring a defendant under §2333(d) to conspire with the specific intent to *commit* "such an act of international terrorism" as did the *O'Sullivan* court cannot be reconciled with JASTA's stated purpose of bringing into court "[p]ersons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, *to persons or organizations* that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States…." JASTA §2(a)(6) (emphasis added).

Finally, *O'Sullivan*'s gloss on §2333(d) requires it to *add words that do not appear in the statute*. Section 2333(d)(2) states:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires *with the person who* committed such an act of international terrorism.

(Emphasis added). *O'Sullivan* reads the plain language "conspires *with the person who* committed such an act of international terrorism" to mean "conspires *with the specific intent to* commit such an act of international terrorism." That reading conflicts with the plain text, as confirmed by the incorporation of *Halberstam*, where Hamilton did not *intend* to kill anyone. *See Kingdomware Technologies, Inc. v. U.S.,* 136 S. Ct. 1969, 1976 (2016) ("if the statutory language is unambiguous

---

[33]    *Linde* also held that after JASTA, plaintiffs could pursue liability on the theory that a defendant aided and abetted acts of terrorism *by others* and noted the defendant in that case could not dispute the sufficiency of the evidence that the Hamas terrorists caused plaintiffs' injuries. 882 F.3d at 331. This is consistent with the plain meaning of the statute.

and 'the statutory scheme is coherent and consistent'—as is the case here—"[t]he inquiry ceases.")

(citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)).

Furthermore, its misreading of the statute relies on, and cites approvingly to, *Taamneh v. Twitter, Inc.,* 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018), in which plaintiffs alleged three social media companies *aided and abetted* (not conspired) an ISIS attack on a nightclub in Turkey. *Taamneh*'s analysis of §2333(d)(2)'s language is incorrect, but it was also *dicta* as the court had unsurprisingly found that plaintiffs could not satisfy §2333(d)(1)'s *Halberstam* aiding and abetting requirements, even under the correct reading of the statute.[34] By contrast, *Cain v. Twitter Inc.*, No. 17-cv-02506-JD, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018) *does* address conspiracy under §2333(d), but found nothing in the complaint establishing an agreement between Twitter and ISIS (other than Twitter's standard terms of service), let alone an agreement to commit an unlawful or tortious act. Here, the Complaint plausibly alleges that Defendants all knowingly participated in The System, depended on it for inflows of U.S. banknotes and even took on Hezbollah accounts closed at LCB in order to continue contributing to the conspiracy.

### D.    Each Defendant Aided & Abetted Hezbollah.

#### 1.    Each Defendant was Generally Aware of Its Role in Hezbollah's Tortious Activities.

In *Halberstam*, Hamilton acted as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," and denied knowing of the criminal nature of his "evening forays." 705 F.2d at 486, 487. Notwithstanding that her actions were "neutral standing alone," the court found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 488. Thus, the court

---

[34]    Defendants also cite *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018), but that case expressly declined to consider conspiracy claims under §2333(d). *Kemper* also required that the defendant sued under §2333(a) "care" how Iran "spent the funds" it helped launder. *Id.* at 395. In the Second Circuit, however, "[t]he goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).

concluded that because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488. Because the killing was "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake," and because her services substantially assisted the burglary resulting in murder, she was liable as an aider and abettor of the murder. *Id.*

*Linde*, following *Halberstam*, held that in the terrorism context, a bank can be found liable for aiding and abetting a terrorist organization if it was generally aware of "a 'role' in terrorist activities" performed by that organization. 882 F.3d at 329. Plaintiffs need *not* show "specific intent," "'intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed,'" or that the bank "knew of the specific attacks at issue when it provided financial services for [the FTO]." *Id.* Two recent JASTA decisions apply *Linde*'s holdings: *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267 (E.D.N.Y. 2019) (finding Iranian Bank Saderat liable for aiding and abetting Iranian terror attacks) and *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 47 (E.D.N.Y. 2019) (denying motion to dismiss claims that Arab Bank aided and abetted terror attacks committed by several FTOs). As discussed further below, neither court required a pleading, as urged by Defendants here, that the specific funds provided be earmarked for terrorist attacks or directly traceable to such attacks.

"Terrorist activities" in *Linde* does not refer to terrorist *attacks*, just as the "overall illegal or tortious activity" in *Halberstam* was "personal property crimes at night," *not* murder. Thus, as in *Halberstam* and *Linde*, Plaintiffs must plausibly allege that Defendants were "generally aware of [their] role" in "terrorist activities," from which terrorist *attacks* were a natural and foreseeable consequence. An equivalent formulation of the general awareness requirement articulated in *Halberstam* in this case would be:

| Defendant (Secondary Tortfeasor) | Form of Substantial Assistance | Principal Tortfeasor | Illicit Scheme of Which Defendant Must Be Generally Aware | Foreseeable Resulting Tort |
|---|---|---|---|---|
| Ms. Hamilton | Banking, Bookkeeping | Welch | Property Crimes at Night | Murder |
| *Bartlett* Defendants | Financial Services | Hezbollah | Money Laundering and Terrorism Financing | Terror Attacks in Iraq |

To begin with, courts are expected to be "lenient in allowing scienter issues …. to survive motions to dismiss," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (internal quotation marks and citation omitted). Moreover, the allegations in the Complaint *exceed* the scienter allegations pleaded in *Linde*, and if proven, would exceed the evidentiary record established *at trial* in that case. As the Second Circuit noted in *Linde*, plaintiffs in that case adduced evidence at trial that Arab Bank executed wire transfers for several senior Hamas leaders, and bank employees admitted their awareness of some of these persons' affiliation with Hamas. 882 F.3d at 321. The trial evidence also showed that "in the same general period Arab Bank processed transfers totaling approximately $32,000,000 on behalf of purported charities known to funnel money to Hamas," that these organizations "used funds to disseminate Hamas propaganda; support Hamas-affiliated terrorists; and make payments to the families of Hamas suicide bombers, prisoners, and operatives" and that "some bank transfers were explicitly identified as payments for suicide bombings." *Id.*

Here, five Defendants held accounts for the IRSO – an entity expressly dedicated to supporting terrorist attacks – and six Defendants held accounts for the Martyrs Foundation, which explicitly supports Hezbollah terrorists and makes payments to the families of Hezbollah prisoners, suicide bombers and other deceased operatives. AC ¶¶8, 420, 521, 1405, 1416, 1494, 1697, 1772. Moreover, Arab Bank was never itself designated an SDGT, whereas JTB was recently designated for *knowingly* laundering money and facilitating the financing of Hezbollah. Schlanger Decl.

Exhibit A. And Arab Bank's chairman was never designated an SDGT, whereas MEAB Bank's chairman and largest shareholder was – for helping Hezbollah open bank accounts in Lebanon, providing credit to Hezbollah procurement companies, and investing in infrastructure Hezbollah uses in both Lebanon and Iraq. AC ¶1561.[35]

 As with certain Arab Bank accountholders in *Linde*, the Complaint describes Adham Tabaja and his Al-Inmaa group of companies as "widely known and acknowledged to be affiliated with Hezbollah," and cites as an example a 2012 ceremony during which one of Hezbollah's most senior leaders, Hashem Safieddine (brother of Abdallah Safieddine), honored and publicly thanked Al-Inmaa Engineering and Contracting, Meamar Company for Engineering and Development, and Arch Consulting for their contributions to the project. AC ¶646. Until his designation by Treasury, Tabaja also served openly for many years as the Hezbollah mayor of Kfar Tibnit in southern Lebanon. AC ¶627.

As in *Linde*, the Complaint here sets forth many specific allegations providing a strong inference of Defendants' awareness of their integral role in Hezbollah's fundraising activities, including the central fact that eight of them held one or more accounts for notorious Hezbollah-controlled institutions explicitly and publicly devoted to supporting Hezbollah's violence, AC ¶¶415-18 (IRSO)[36]; AC ¶¶474-75, 481-86, 491, 521 (Martyrs Foundation)[37]; AC ¶¶603-04 (Martyrs Foundation, Wounded Association, the IKRF, and Jihad al-Bina); and that those

---

[35]     Hejeij has asserted that that "his relationship with Adham Tabaja was solely through his role as MEAB chairman and that MEAB only provided Adham Tabaja and his companies banking facilities consistent with MEAB's internal procedures." Schlanger Decl. Exhibit C at 2. Treasury noted however, that Hejeij's "description of his relationship with Adham Tabaja as professional in nature does not diminish the fact that he was personally involved in facilitating a customer relationship with Adham Tabaja." *Id.*

[36]     The IRSO advertised its bank accounts at JTB (AC ¶1794) and Byblos Bank (AC ¶419).

[37]     The Martyrs Foundation publicly advertises its affiliation with, and ownership of, Atlas Holding and its subsidiaries. AC ¶515.

Hezbollah-controlled "charitable" institutions often deposited large sums in cash, AC ¶¶110, 492-93, 548.[38] As noted in the Complaint, even Byblos Bank's own anti-money laundering policies, for example, noted that "non-profit and charitable organizations are also used by terrorist groups as a means of raising funds and / or cover for transferring funds in support of terrorist acts." AC ¶1600. Those policies also noted that some non-profit organizations can provide "support functions to the terrorist movement." AC ¶1601. The fact that Byblos Bank's own customer, the IRSO, explicitly solicited donations for, among other things, "the cost of a rocket" and "the cost of bullets" confirms this assessment. AC Exhibit 2.

In contrast to the allegations pleaded in *Linde*, here Defendants' awareness of their role in Hezbollah's fundraising activities can also be reasonably inferred from the fact that many of their customers who received funds were designated contemporaneously for acting as operatives of, or entities controlled by, Hezbollah (*see, e.g.*, AC ¶413 (IRSO – August 2006); AC ¶489 (Martyrs Foundation – July 2007); AC ¶689 (Kassim Tajideen – May 2009); AC ¶579 (Imam Khomeini Relief Committee – August 2010); AC ¶691 (Ovals Trading SA – December 2010)). Moreover, when the Lebanese government investigated LCB and identified accounts belonging to Hezbollah and its operatives, Defendants continued to provide these customers with financial services (AC ¶105 (listing accounts)). Defendants also maintained accounts for the senior leadership of the IJO and their commercial networks[39] and companies publicly identified with Hezbollah and its IJO, AC ¶742. Lastly, Defendants laundered vast sums of bulk cash collected in USD-denominated banknotes from narcotics trafficking, diamond smuggling, arms dealing and other illicit activities

---

[38]   Analogous to some of the *Linde* allegations, prior to the IRSO's 2006 designation, Hezbollah used its television station, *Al-Manar*, to raise money through the IRSO in support of Hezbollah's terror campaign by running commercials requesting transfers be sent to Lebanese commercial banks, including Defendant Byblos Bank. AC ¶419.

[39]   Adham Tabaja, AC ¶652; Ali Charara, AC ¶669; Muhammad Bazzi, AC ¶755; and Nazim Ahmad, AC ¶872.

(AC ¶¶9, 12, 1075, 1088, 1090-94, 1152, 1212, 1349), that violated the Defendants' own (stated) compliance policies. *See, e.g.* AC ¶¶153, 170-71, 201, 228, 284.

Because the allegations here meet and exceed those found sufficient to go to a jury in *Linde*, Defendants rely instead on *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019). JB at 39-40. But the series of brackets they use in quoting the district court's decision obscures the nature of the allegations in that case. The *Siegel* plaintiffs alleged that HSBC was liable for attacks committed by al-Qaeda in Iraq ("AQI") on a hotel in Jordan, because it engaged in financial transactions with Al Rajhi Bank ("ARB"), which, in turn, had customers who allegedly provided material support to AQI. As the Second Circuit noted: "To be sure, the plaintiffs did allege that HSBC provided hundreds of millions of dollars to ARB, but they did not advance any non-conclusory allegation that AQI received any of those funds or that HSBC knew or intended that AQI would receive the funds." *Siegel*, 933 F.3d at 225. While the *Siegel* plaintiffs had alleged that HSBC knew that some of "ARB's banking activities are linked to terrorists," they failed to plausibly allege that HSBC was actually used by ARB (knowingly or unwittingly) to provide *any* funds to AQI. *Id.* at 224-25.

Defendants here are not accused of "circumventing and violating banking regulations" or providing correspondent banking services to a bank they suspect might have customers that provide support to a terrorist organization. On the contrary, each Defendant here is alleged to have knowingly provided substantial assistance directly to Hezbollah and its IJO and worked closely with Hezbollah to advance their complementary objectives, including employing Hezbollah representatives within the banks to improve their coordination. *See, e.g.*, AC ¶¶1298-99, 1314. Unlike the claims in *Siegel*, here *five* Defendants are accused of holding accounts for the IRSO, the fundraising arm of Hezbollah's terror apparatus. AC ¶¶8, 420. Likewise, unlike HSBC in

*Siegel*, the chairman and largest shareholder of MEAB Bank was himself designated an SDGT for, *inter alia*, helping Hezbollah open bank accounts in Lebanon, providing credit to Hezbollah procurement companies, and investing in infrastructure Hezbollah uses in both Lebanon and Iraq. AC ¶1561.[40] Finally, *Siegel* contained no allegations that a defendant provided material support directly to anyone equivalent to Adham Tabaja, target of the DOJ's "Rewards for Justice" Program. AC ¶¶634-35. HSBC's correspondent banking services for another bank it should have suspected of having customers who funded al-Qaeda is self-evidently a far cry from the allegations here which include not only directly maintaining accounts for senior Hezbollah leaders and operatives but, as in the case of MEAB Bank, L&G and Fenicia Bank, allegedly providing loans to Tabaja, the co-chairman of the BAC. AC ¶¶632, 652, 647 n.36, 1572-74.

As noted above, Defendants continued to provide the same assistance to these same types of customers even *after* Treasury identified LCB (together with its subsidiaries) as "a financial institution of primary money laundering concern" due to the bank's preeminent role in facilitating Hezbollah's narcotics trafficking and money laundering networks and *after* the Lebanese government identified more than 200 Hezbollah-affiliated accounts at LCB that simply migrated to the Defendants.

### 2. Each Defendant Provided Substantial Assistance to Hezbollah.

Defendants grossly distort the meaning of many of the *Halberstam* factors for determining whether a defendant's conduct constitutes "substantial assistance." JB at 41-42. Contrary to Defendants' assertion, the first *Halberstam* factor – "nature of the act encouraged" – does *not* mean whether Defendants' maintenance of bank accounts for Hezbollah "particularly matter" to carrying

---

[40]     As Treasury recently noted, although Hejeij resigned as chairman of MEAB in 2015, he "continued to use MEAB on behalf of Hezbollah" and "continues to oversee the day-to-day operations at MEAB; the management change was merely a change on paper designed to circumvent sanctions." Schlanger Decl. <u>Exhibit C</u> at 3.

out bombings in Iraq. JB at 41. It refers to the relationship between a defendant's assistance and the "overall illegal or tortious activity" from which the violence resulted. In *Halberstam*, that "act" was "a long-running burglary enterprise," not the murder. 705 F.2d at 488. Here, it is terror financing and money laundering, not the bombings. The burglary enterprise in *Halberstam* "heavily depended" on Hamilton's bookkeeping and banking, even though that assistance was "neutral standing alone," in transforming large quantities of stolen goods into "'legitimate' wealth." *Id.* Here, Hezbollah's long-running money laundering and terrorism financing enterprise was heavily dependent on Defendants' aid in transforming large quantities of illicit cash, much of it in U.S. banknotes, into seemingly "legitimate" investments and international trade.

The second *Halberstam* factor – "the amount of assistance" – is obviously satisfied here. Defendants assert that the Complaint does not allege that they "offered services of *any* kind directly to [] Hezbollah." JB at 41. But leaders like Tabaja, Bazzi, Kassim Tajideen and Amine Cherri *are* Hezbollah. The same is true of organizations like the IRSO and many others. The third *Halberstam* factor – a defendant's presence at the time of the tort — is the only factor that favors Defendants here, but of course, Hamilton was also not present at the murder in *Halberstam*.

Defendants also mischaracterize the fourth *Halberstam* factor – defendant's relation to the principal – suggesting that it requires allegations of a relationship between the Defendants and Hezbollah's Iraqi proxies that emplaced the EFPs or launched the rockets that injured Plaintiffs.[41] JB at 42. But here Hezbollah is the principal, and the Complaint contains hundreds of detailed, plausible allegations that Defendants (one an SDGT; another whose former chairman is an SDGT)

---

[41]     As the Second Circuit noted in *Siegel,* "the statute does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations, and Congress wrote that its purpose in enacting the statute was 'to provide civil litigants with the *broadest possible basis*' to seek relief against those who "have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." 933 F.3d at 223 n.5 (quoting 18 U.S.C. §2333 note) (emphases added).

worked hand-in-glove with Hezbollah for more than a decade. In any event, the *Halberstam* court accorded this factor "a low priority" in its calculus. *Id.* at 488.

Contrary to Defendants' claim that the fifth *Halberstam* factor – their "state of mind" – requires allegations that they "knew that any of their alleged banking services were intended to facilitate the Attacks," JB at 42, Hamilton did not know about the murder. The *Halberstam* court described instead "a deliberate long-term intention to participate in an ongoing illicit enterprise. Hamilton's continuous participation reflected her intent and desire to make the venture succeed; it was no passing fancy or impetuous act." 705 F.2d at 388. Here, the Complaint alleges a decade-long, deliberate plan to participate in Hezbollah's fundraising and money laundering enterprise.

With respect to *Halberstam*'s sixth factor – the "duration of the assistance" – Defendants argue that the Complaint lacks "allegations of any specific banking services provided at any particular time, much less before any of the Attacks." JB at 42. But apart from allegations relating to the 2011-2012 Lebanese investigation into Hezbollah accounts at LCB, *all* of the allegations of Defendants' substantial assistance to Hezbollah relate to the specific period between 2003 and 2011 (with certain specific transactions identified as having occurred before 2005, AC ¶¶867-68, or on a specific date, *e.g.*, AC ¶1106).

Finally, the Court may consider that "a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." *Halberstam*, 705 F.2d at 484 n.13. Here, "[t]he particularly offensive nature of an underlying offense" consists of hundreds of acts of terrorism that killed and maimed Plaintiffs and other Americans. *Id.*

Defendants cite three cases to argue that providing hundreds of millions of dollars to Hezbollah's IJO over more than a decade does not satisfy *Halberstam*'s "substantial assistance"

prong. JB at 42. The first case, *Kaplan v. Lebanese Canadian Bank, SAL*, involved claims that LCB knowingly held accounts for, and provided financial services to, at least five Hezbollah-controlled entities before Hezbollah launched a month-long series of rocket attacks on Israel that injured those plaintiffs. Defendants describe *Kaplan* as containing "many of the same alleged facts as in this case." JB at 21. While *Kaplan* involved a *small* subset of the allegations against LCB set forth here, it wrongly held that the plaintiffs were required to plead that LCB "knowingly and intentionally supported Hezbollah in perpetrating the rocket attacks." No. 08-cv-7253-GBD, 2019 WL 4869617, at *6 (S.D.N.Y. Sept. 20, 2019) (appeal filed). This is contrary to *Halberstam* and *Linde*, which held that plaintiffs need *not* show "specific intent," "intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed,'" or knowledge "of the specific attacks at issue" when it assisted the FTO. 882 F.3d at 329.

The second case, *Siegel v. HSBC* (discussed *supra*), is factually inapposite because while the plaintiffs in that case had alleged that HSBC knew that some of "ARB's banking activities are linked to terrorists," they failed to plausibly allege that HSBC was actually the conduit ARB used to provide *any* funds to the terrorist organization that injured the plaintiffs. 993 F.3d at 224-25. Here, Defendants are not alleged to have substantially assisted *other* banks that in turn did business with Hezbollah; they are alleged to have worked directly with Hezbollah for years.

Defendants characterize their third case, *Ofisi v. BNP Paribas, S.A.*, No. 15-cv-2010-JDB, 2018 WL 396234, at *5 (D.D.C. Jan 11, 2018), as "dismissing aiding-and-abetting claims under *Halberstam*," JB at 42, but *Ofisi* was a primary liability case *rejecting* the application of *Halberstam*'s civil conspiracy framework, "concluding that the version of the ATA applicable to plaintiffs' claims does not provide for secondary liability under § 2333," 2018 WL 396234 at *2. In *Ofisi*, plaintiffs were victims of the 1998 bombings of U.S. embassies in Africa perpetrated by

al Qaeda. They sued BNP Paribas, a French bank under §2333(a), not (d). In assessing plaintiffs'

proximate cause allegations, the court noted that "most of the facts alleged with respect to BNPP's

conduct post-date the embassy bombings. Critically … BNPP's violation of U.S. sanctions against

Sudan" occurred "between 2002—four years after the embassy bombings—and 2012." *Ofisi v.*

*BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 100 (D.D.C. 2017), *vac'd in part on other grounds*, 285

F. Supp. 3d 240 (D.D.C. 2018). The *Ofisi* court found that even accepting that the complaint's

"allegations establish that BNPP was illegally processing dollar transactions for Sudan prior to the

1998 terrorist attacks, they only establish BNPP's connection to Sudan and Sudanese banks

(including Al Shamal)," *not* "to al Qaeda or any other terrorist or terrorist activity prior to the

attacks—as required to show a violation of § 2339A." *Id.* Once again, the highly-detailed

allegations here establish each Defendant's substantial assistance to Hezbollah during the relevant

time period—not four-to-fourteen years after the last attack as in *Ofisi*.

## IV. The Complaint Plausibly Alleges Primary Liability Predicated on Defendants' Violations of 18 U.S.C. §2339B.

In *Weiss v. Nat'l Westminster Bank PLC*, the Second Circuit expressly held that "through

[a] complex series of statutory incorporation … a defendant may be liable for civil remedies under

§2333(a) for providing material support to an organization that solicits funds for an FTO." 768

F.3d 202, 209 (2d Cir. 2014). *See also Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d

685 (7th Cir. 2008) (*en banc*) ("*Boim III*"). To properly plead liability under §2333(a) for criminal

violations of 18 U.S.C. §2339B, plaintiffs must plausibly allege that a defendant (1) knowingly (2)

provided material support to an FTO that (3) proximately caused their injuries and that (4)

defendant's unlawful conduct satisfies the definitional requirements of 18 U.S.C. §2331(1).

A.    **Each Defendant Knowingly Provided Material Support to Hezbollah in Violation of §2339B.**

Although various courts have acknowledged that routine banking activities do not create liability when defendants act *without knowledge* that they are supporting an FTO (*see, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 832-33 (S.D.N.Y. 2005)), "[w]here 'the Bank knows that the groups to which it provides services are engaged in terrorist activities' even the 'provision of basic banking services may qualify as material support.'" *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 625 (E.D.N.Y. 2006) (quoting *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005)). In Lebanon, Hezbollah operates openly: it runs candidates in local and national elections and its political machine controls both individual municipalities and whole regions of the country. Defendants' relationships with Hezbollah leaders, facilitators and operatives were not impersonal or exclusively conducted through electronic means like bank-to-bank transfers. Opening those accounts, obtaining signature cards and identifications, and checking identifications during personalized account transactions are not mechanical or instantaneous activities. Moreover, where, as here, many of Defendants' customers openly belonged to Hezbollah and were involved in laundering vast sums of bulk cash in U.S. banknotes from narcotics trafficking, diamond smuggling, arms dealing and other illicit activities, the conduct may have been commonplace but certainly cannot be described as "routine banking."

B.    **Each Defendant's Material Support to Hezbollah Proximately Caused Plaintiffs' Injuries.**

In *Rothstein v. UBS AG*, plaintiffs argued that defendant's provision of currency to Iran violated U.S. criminal law, and thus they should be entitled to a finding of *per se* liability and proximate cause "should be presumed." 708 F.3d 82, 96 (2d Cir. 2013). The Second Circuit disagreed, instead affirming that a primary liability claim requires plausible allegations supporting the inference that a defendant's conduct proximately caused a plaintiff's injury. The Court noted:

Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence.

*Id.* at 91-92 (*citing Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 123 (2d Cir. 2003)).

Defendants make three arguments in support of their assertion that the Complaint fails to adequately meet these two legal requirements for ATA proximate cause under *Rothstein*. *First*, they argue that the Complaint does not allege any "direct link between any of the banking services allegedly provided by Moving Defendants and any of the Attacks." JB at 24. *Second*, Defendants argue that the Complaint does not allege they knowingly provided material support to Hezbollah, but only to Hezbollah-controlled entities or "entities with vague connections to Hezbollah." JB at 21. *Third*, Defendants assert that, as a matter of law, it could not have been foreseeable that what they characterize as "the provision of routine banking services" to Hezbollah "could lead to the Attacks" in Iraq. JB at 27. Each argument is unavailing for the reasons set forth below.

### 1. ATA Primary Liability Does Not Require Tracing Material Support to Specific Attacks.

Defendants assert that "Plaintiffs fail to offer any specific factual allegations that, if proven, would establish any direct link between Defendants and the Attacks, as required by *Rothstein* and its progeny." JB at 23-24. But *Rothstein* never required any "direct link between [] Defendants and the Attacks."[42] *Id.* at 23. Instead, it found that no nonconclusory allegation in the complaint plausibly showed that the moneys UBS AG "transferred to Iran were in fact sent to Hezbollah or

---

[42]      *Fields v. Twitter*, 881 F.3d 739 (9th Cir. 2018), cited by Defendants, rejected *Rothstein* in favor of a "higher" standard. *Id.* at 744. Twitter argued that the ATA causation standard is higher than the *Rothstein* standard because it requires plaintiffs to plead that defendants' acts "'led directly' to their injuries." *Id.* at 744. The panel agreed, concluding that the defendant "has the better of the argument," *id.,* but the Ninth Circuit obviously cannot overrule the *Rothstein* standard that controls in this Circuit. In contrast, the D.C. Circuit has expressly and verbatim adopted the *Rothstein* standard, and added that it already encompasses "sufficient directness." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 at 273 n.8. (D.C. Cir. 2018); *Accord Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017).

Hamas *or* that Iran would have been unable to fund the attacks by Hezbollah and Hamas without the cash provided by [defendant]." 708 F.3d at 97 (emphasis added).[43]

Defendants suggest that Plaintiffs are required to identify transactions or banking services provided by any Defendant "that allegedly supported any Attack"—but none of the trial evidence in *Linde* for the three Hamas attacks on appeal identified banking services that directly supported or were earmarked for those attacks. Yet, *Linde* was remanded for new jury instructions, not dismissed for failure to meet the evidentiary standard. 882 F.3d at 332-33. Similarly, the complaint in *Boim III* contained no allegations that defendants made donations traceable to the attack that killed the plaintiff or even to terrorist attacks more generally. In fact, Boim *III* expressly rejected the need to trace contributions to an FTO to any specific attack. 549 F.3d at 698.[44]

Defendants' reliance on *In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*, 714 F.3d 118 (2d Cir. 2013) is likewise misplaced. JB at 20-21. Those plaintiffs pleaded that ARB maintained accounts for certain "charities"[45] that it knew (or should have known) supported terrorism and terrorist organizations, including al-Qaeda, and that the charities sent material support to al-Qaeda.

---

[43]     *Rothstein* lists four independently sufficient causation allegations: "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs. It does not allege that UBS provided money to Hezbollah or Hamas. It does not allege that U.S. currency UBS transferred to Iran was given to Hezbollah or Hamas. And it does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." 708 F.3d at 97.

[44]     "[I]f you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's non-terrorist activities does not get you off the liability hook. The reasons are twofold. The first is the fungibility of money. If Hamas budgets $2 million for terrorism and $2 million for social services and receives a donation of $100,000 for those services, there is nothing to prevent its using that money for them while at the same time taking $100,000 out of its social services 'account' and depositing it in its terrorism 'account.' Second, Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect (they would lose the material benefits that Hamas provides them), and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren." *Boim III* at 698 (citations omitted).

[45]     Not all SDGTs have identical characteristics. Some, like Al Haramain in *Al Rajhi*, were designated for donating funds to multiple terrorist groups, without being controlled by or synonymous with any one group. Conversely, some SDGTs are organizations or individuals (often senior terrorist leaders) affiliated with one particular terrorist group, like the IRSO. Thus, whether providing an SDGT with material support violates 18 U.S.C. §2339B is a *fact* question that must be determined on a case-by-case basis.

61

But the Second Circuit held that the plaintiffs had failed to make non-conclusory allegations that the accounts defendant allegedly held for those charities were ever in fact used to transmit funds to al-Qaeda. Nor did the plaintiffs include non-conclusory allegations that funds provided by those charities were specifically transmitted to particular people or entities that constitute al-Qaeda. *See* 714 F.3d at 124. In fact, the concrete connections alleged in that case were transfers to Hamas, the wrong FTO.[46]

Defendants' quotation from *O'Sullivan* gives the game away. In the sentence immediately preceding the one cited in their joint brief, JB at 22, the court found that the complaint:

> does not even allege that Defendants provided money directly to the IRGC-QF, Hezbollah, or Al-Qaeda, but rather alleges that Defendants indirectly supported those organizations by providing financial services to Iranian banks, airlines, shipping and oil companies with relationships to those organizations.

2019 WL 1409446, at *5. Here, the Complaint *does* allege that Defendants provided money directly to Hezbollah.

## 2. ATA Primary Liability Does Not Require That the Material Support Be Provided to a Foreign Terrorist Organization Under Its Own Name.

FTOs rarely open or maintain accounts as "Hezbollah" or "al-Qaeda" or incorporate as corporations or register as limited liability companies. In *most* cases, they act through individuals and entities who are careful enough to avoid explicitly identifying the purpose of their funds transfers as "for suicide bombers" or "for terrorism."[47] Furthermore, they often raise their funds, legitimate their activities, and even recruit terrorists under the cloak of humanitarian or charitable activities, not by overtly asking for contributions to kill civilians (certain Hezbollah organizations

---

[46]   In a prior iteration of their complaint, the *Al Rajhi* plaintiffs had alleged that the bank had direct ties to Hamas but did not allege any connection between Hamas and Osama Bin Laden, al-Qaeda, or the 9/11 attacks. *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d at 831-35.

[47]   Ironically, as Defendants sheepishly concede in a footnote, the AC *does* allege that Hezbollah "directly solicited funds to account no. 953113.30" at Fransabank, JB at 45 n.31 (quoting AC ¶1498), and MEAB maintained "Account No. 10680," *id.*, to which (Defendants omit) Hezbollah "ask[ed] donors to contribute … money," AC ¶1564.

are notable exceptions). That is why Congress enacted 18 U.S.C. §2339B in 1996, prohibiting the knowing provision of material support to FTOs regardless of the stated purpose, because Congress found that FTOs "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub. L. No. 104-132, §301(a)(7) (1996). Even so, in this case, five of the Defendants are alleged to have maintained accounts for one of the few "charitable" organizations controlled by an FTO that *explicitly* raises money for terrorism – the IRSO. *See, e.g.*, AC Exhibit 2 (a sample donation form IRSO has used that allows donors to earmark their contributions to purchase rockets or bullets).

Moreover, there is nothing "vague" about the connections between the individuals and entities to which Defendants provided material support and Hezbollah. As detailed above, the majority of the Hezbollah operatives and entities identified in the Complaint have been either (1) designated by the U.S. government for its role in Hezbollah's unlawful activities; (2) identified as connected to Hezbollah by the U.S. government, Lebanese government or the UNSC; or (3) are owned or controlled by a person or persons so-designated by the U.S. government or identified as connected to Hezbollah by the governmental entities identified above.

Courts have not, with the arguable exception of *Kaplan v. Lebanese Canadian Bank*, required plaintiffs to allege that a defendant provided material support to an FTO directing that support to the organization by name, reasoning that Congress did not intend to protect an FTO from liability simply because it chose to operate under an alias or through affiliated organizations or persons that did not bear the specific FTO designation. As the court in *National Council of Resistance of Iran* noted:

> Just as it is silly to suppose "that Congress empowered the Secretary to designate a terrorist organization . . . only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated,". . . so too it is implausible to think that

> Congress permitted the Secretary to designate an FTO to cut off its support in and from the United States, but did not authorize the Secretary to prevent that FTO from marshaling all the same support via juridically separate agents subject to its control.

*National Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157-58 (D.C. Cir. 2004)

(citations omitted). The court went on to assert that such a "crabbed view of alias status" "is at war

not only with the antiterrorism objective of AEDPA, but common sense as well." *Id.* at 158. To

illustrate the point, the Fifth Circuit upheld the criminal convictions under 18 U.S.C. §2339B of

donors to so-called charities controlled by Hamas. *United States v. El-Mezain*, 664 F.3d 467, 489

(5th Cir. 2011) ("The evidence of Hamas control of the zakat committees was substantial.").[48]

### 3. Terrorist Attacks Are a Reasonably Foreseeable Consequence of Providing Hundreds of Millions of Dollars to a Foreign Terrorist Organization.

Finally, Defendants argue that "Plaintiffs do not offer even a token allegation that it was

foreseeable that the provision of routine banking services to the Alleged Bank Customers in

Lebanon could lead to the Attacks against U.S. military personnel and contractors by paramilitary

groups in Iraq," and that the "very nature of the Alleged Bank Customers refutes any inference of

foreseeability." JB at 27-28. One "token allegation" about the "very nature" of Defendants'

customers is that the U.S. government found the IRSO "makes no attempt to hide its true colors"

and "works to inflict suffering rather than alleviate it." AC ¶418. Another "token allegation" is

that many Defendants worked openly and directly with Adham Tabaja, finance co-chairman of the

IJO, Hezbollah's directorate for perpetrating terrorist attacks (including in Iraq). AC ¶¶622-52.

Defendants attempt to sanitize and mischaracterize their alleged conduct by describing

their customers as "commercial entities, including amusement parks, a printing company,

technology wholesalers and retailers, travel and entertainment outfits, global communications

---

[48] In *Linde*, the Second Circuit described trial evidence that showed that "Arab Bank processed transfers totaling approximately $32,000,000 on behalf of purported charities known to funnel money to Hamas…." 882 F.3d at 321.

companies, pharmaceutical companies, and an insurance company." JB at 28. What Defendants

fail to mention is that:

- BBAC held an account for the holding company for one of the referenced "amusement parks," Al-Inmaa Group for Tourism Works. The company is itself a designated SDGT and three of its co-founders are senior Hezbollah operatives and SDGTs. AC ¶647.

- SGBL held an account and provided financial services to "a printing company" – a Hezbollah-controlled company called Dbouk International for Printing and General Trading that publishes Hezbollah's *Baqiyat Allah* magazine. AC ¶1479.

- BBAC held an account for a "technology wholesaler and retailer" – Vatech, an SDGT controlled by SDGT Fadi Hussein Serhan, identified by the U.S. government as a Hezbollah procurement agent who purchased sensitive technology and equipment for Hezbollah. AC ¶¶1785-87.

- L&G, Blom Bank, Bank Audi and JTB held accounts for "global communications companies" like Spectrum Investment Group Holding and Spectrum International Investment Holding, both SDGTs controlled by Ali Charara(SDGT). AC ¶668.

- L&G held an account for one of the "pharmaceutical companies," City Pharma, a pharmaceutical distributor owned by the Martyrs Foundation (SDGT) involved in counterfeit drug smuggling. AC ¶¶537-38.

Finally, the "insurance company" referenced by Defendants is United Company for Insurance

Services, controlled by Adham Tabaja as discussed *supra* at 29.

Lastly, Defendants argue that "*none* of the Alleged Bank Customers is alleged to have been

in the business of providing weapons or military training to the paramilitary groups that committed

the Attacks in Iraq. And *none* of the Alleged Bank Customers is alleged to have been in the

business of financing those paramilitary groups." JB at 28. Although irrelevant, this is at best a

half-truth. The Complaint makes clear that the BAC is "a special financial and business unit

established by the late Imad Mughniyah, then Hezbollah's most senior terrorist commander, and

overseen by two deputies, Adham Hussein Tabaja, a prominent Hezbollah financier and real estate

developer in Lebanon, and Abdallah Ali Safieddine," and that the "U.S. government ultimately

concluded that Abdallah Safieddine was one of the key connections between Hezbollah's BAC and Iran's IRGC and the IRGC-QF." AC ¶¶24, 29. Critically, the Complaint notes:

> Ultimately, the U.S. Intelligence Community and Department of Justice's analysis of thousands of hours of intercepted Arabic phone conversations from Colombia, among other locations, painted a picture of Abdallah Safieddine as a central figure in Hezbollah's (and the IRGC's) global financial network ***and in the provision of U.S. dollars emanating from the Lebanese banking system into Iraq to fuel attacks against U.S. service members, among others.***

AC ¶34 (emphasis added.) In short, the Complaint plausibly alleges that Hezbollah's BAC provided revenue streams used to finance Hezbollah's terror attacks in Iraq.

### C.   Each Defendant's Material Support to Hezbollah "Involved Acts Dangerous to Human Life."

Defendants argue that the Complaint provides merely "conclusory allegation[s]" that Defendants' "conduct 'involved acts dangerous to human life [that] constitute violations of 18 U.S.C. § 2339B.'" JB at 32. But the Complaint sets forth in granular detail (1) how Defendants provided hundreds of millions of dollars not only to Hezbollah but specifically to its IJO directorate responsible for launching terrorist attacks; (2) how Defendants laundered vast sums of bulk cash from narcotics, weapons and conflict diamond trafficking;[49] (3) how many Defendants maintained accounts for, and provided financial services to, Hezbollah institutions expressly devoted to supporting violence and "martyrs"; (4) how Bank Audi maintained an account that was used by Hezbollah for, *inter alia*, purchasing more than a thousand M4 machine guns, AC ¶¶1178-83; and (5) how Blom Bank maintained accounts for noted Hezbollah arms trafficker Mustafa Fawaz. AC ¶¶1192-1201.

*Linde* held "*only* that providing routine financial services to members and associates of terrorist organizations" does not "*compel a finding* that as a matter of law" the services met the

---

[49]   Unsurprisingly, many of Hezbollah's narcotics and Conflict Diamond traffickers have also been implicated in arms dealing. *See, e.g.*, AC ¶¶850-51, 870, 876, 903.

definitional requirements of 18 U.S.C. §2331(1). 882 F.3d at 327 (emphasis added). Plaintiffs do not here argue that the support Defendants allegedly provided to Hezbollah *dispositively* satisfies §2331(1) as a matter of law. But as the Supreme Court has noted: "Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism *is an empirical question*." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29 (2010) (emphasis added). The Court then answered that question by citing Congress's finding that "*any contribution to such an organization* [an FTO] facilitates [its criminal] conduct," *id.* (emphasis in original), citing 18 U.S.C. §2339B note, as well as the government's evidence of how such support furthers terrorist activities. The Court singled out the government's conclusion:

> In the Executive's view: "Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." That evaluation of the facts by the Executive, like Congress's assessment, is entitled to deference.

*Id.* at 33 (internal citation omitted).

Consequently, Defendants feel compelled to cite *O'Sullivan*, 2019 WL 1409446, at *7, for the proposition that the alleged "provision of financial services to various Iranian banks and businesses with connections to terrorist organizations" did not plausibly plead conduct that involves acts dangerous to human life and intended to intimidate and coerce. JB at 31. But *O'Sullivan* did not reject *Boim III*'s analysis that a U.S. charity's direct donations to Hamas-controlled organizations in the Palestinian Territories were dangerous to human life because the donations were akin to "giving a loaded gun to a child," *id.* at *8 (*citing Boim III* at 690). Indeed, it approvingly cited *Boim III*'s statement that "donations could appear to be intended to intimidate or coerce a civilian population because a donor who 'knew the aims and activities' of Hamas would know that 'donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or

67

wound, or try to kill, or conspire to kill more people in Israel.'" *Id*. at \*7 (*quoting Boim III* at 693-94). Instead, it found the specific allegations in that complaint too attenuated. The Complaint here alleges extensive material support to Hezbollah comparable to the donations made to Hamas-controlled charities in the Palestinian Territories as alleged in *Boim III*. If anything, several of the Hezbollah-controlled "social welfare organizations" like the IRSO and the Martyrs Foundation were, based on their names alone, more obviously dedicated to supporting violence than the Hamas-controlled organizations described in *Boim III*.

Similarly, Defendants point to *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018), but that case demonstrates why Plaintiffs have easily satisfied their pleading obligations. *Kemper agrees* that "giving fungible dollars to a terrorist organization may be dangerous to human life," only distinguishing the allegations in that case which the court characterized as "doing business with companies and countries that have significant legitimate operations [a]s not necessarily so." JB at 31 (quoting *Kemper*, 911 F.3d at 390).

### D. Each Defendant Acted with Objective Terroristic Intent.

Because *Linde* makes clear that whether a defendant's material support satisfies the requirements of §2331(1) is usually a question to be resolved by a jury, Defendants argue that their conduct did not appear to be intended to intimidate a civilian population because their more plausible motivation was "to generate revenue and profit for their respective banking businesses." JB at 31. This argument conflates scienter with the objective intent requirement set forth in §2331(1). *Weiss*, 768 F.3d at 207 n.6 (apparent intent "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions"). Nonetheless, Defendants assert that "terroristic intent cannot be presumed in the face of this clear commercial motivation." JB at 31.

However, Plaintiffs are not asking this Court to "presume" apparent intent. The question is whether a jury could, on the facts alleged, find Defendants – which worked symbiotically with Hezbollah and its "charities," knowing that Hezbollah used such money to finance the killing of Americans – liable under §2333(a) for Hezbollah's attacks targeting Americans in Iraq. While material support of terrorism does not qualify in all circumstances as an act of international terrorism, *Boim III* analogized "[g]iving money to Hamas" to "giving a loaded gun to a child," explaining that, while neither transfer is a violent act, both are acts "dangerous to human life." 549 F.3d at 690. Further, *Boim III* observed that "donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill" more people in Israel. *Id.* at 694. And given such foreseeable consequences, those donations would "appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination, as required by section 2331(1) in order to distinguish terrorist acts from other violent crimes ...." *Id.* (internal quotation marks omitted).

As noted above, the Second Circuit in *Linde* did not disagree but held "providing routine financial services" to an FTO did not "compel a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." 882 F.3d at 327. Nothing in *Linde* suggests that a defendant can escape liability under §2333(a) by arguing that its knowing material support to a terrorist organization was *subjectively* motivated by greed rather than ideology.

## V.   SGBL Has Provided No Basis for Dismissal of Plaintiffs' Claims Against It.

### A.   Plaintiffs Have Plausibly Pleaded That SGBL Has Assumed LCB's Liabilities to Plaintiffs.

Under "[b]oth New York law and traditional common law," "a buyer of a corporation's assets will be liable as its successor if: (1) it expressly or impliedly assumed the predecessor's tort

liability…." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (internal quotation marks and citations omitted).[50] SGBL did just that—following FinCEN's designation of LCB as a "primary money laundering concern," AC ¶1446, SGBL entered into a $580 million Sale and Purchase Agreement ("SPA") with LCB, AC ¶137. Pursuant to the SPA, SGBL "receive[d] and assume[d] from [LCB], all of [LCB's] Assets and Liabilities …." AC Exhibit 1 at 3. The SPA defined these liabilities as follows:

> The Assumed Liabilities consist *inter alia* of any and all of the Seller's liabilities and/or obligations and/or debts of any kind, character or description, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, determined, determinable or otherwise, to the extent they relate to the Seller's Business, all as at the Completion Date.

AC ¶138 and Exhibit 1. The definition is unambiguous[51] and all-encompassing. SGBL does not refute the language's plain meaning or that it covers tort liability (despite calling that conclusion "rank speculation," SGBL Brief ("SB" at 22). Instead, SGBL describes Plaintiffs' quotation of the "single . . . paragraph" "out-of-context and misleading," SB at 3, but fails to provide any alternative "context" to the paragraph, or to SPA ¶2.1, which states that it assumed "*all* liabilities" from LCB.

Notwithstanding the fact that its motion is governed by Fed. R. Civ. P. 12(b)(6), SGBL *asserts* only that it did not purchase *all* of LCB's assets as it "declined to assume certain LCB's customers and accounts," SB at 3, "associated with money laundering," SB at 22. SGBL then suggests that because those accounts were likely linked to Plaintiffs' injuries, liability somehow attached to the particular *accounts* (presumably traveling with them "to other Lebanese banks" or

---

[50]     If another law (e.g., Lebanese) applies and produces a different result, SGBL has not raised it. *See* SB at 2.

[51]     But even a clause that "contains ambiguities that are subject to conflicting interpretations, render[s] dismissal … inappropriate," *State Farm Fire & Cas. Co. v. Main Bros. Oil Co.*, 956 N.Y.S.2d 695, 698 (3d Dep't 2012).

elsewhere, SB at 22), rather than to LCB for its conduct in connection with those accounts. *Id.*[52] But, of course, a bank's liabilities for its own tortious *conduct* are not owned by an account or a customer, but by the bank itself.[53] SGBL's decision not to continue a banking relationship with certain (but not all) of LCB's Hezbollah-controlled accounts or customers does not reduce SGBL's assumption of LCB's own liabilities for LCB's pre-sale conduct. Likewise, the closure of any of those accounts does not cancel liability for Plaintiffs' claims.

Finally, the U.S. government's decision not to bring any claims against SGBL "under a theory of successor liability" does not mean SGBL *has no* successor liability relating to LCB's wrongdoing, or that SGBL was somehow immunized from private suits as a matter of law. SB at 3-4. *See, e.g.*, *Terio v. Johann*, No. 05-cv-5918 (RPP), 2007 WL 60411, at *2 (S.D.N.Y. Jan. 8, 2007) ("Declining to prosecute a criminal case for welfare fraud does not mean welfare fraud could not be proven."). And because SGBL's assumption of liability in this case was express, the many pages of its brief devoted to strawman arguments concerning *inferred* successor liability on an asset purchaser (under the ATA or otherwise), SB at 18-24, are irrelevant.

### B.    The ATA Does Not Exclude Successor Liability.

SGBL argues that the ATA excludes successor liability because it does not mention it explicitly—a principle its cited case rejects: "CERCLA does not specifically provide that a successor corporation may be held liable for response costs. Nevertheless, we have held that

---

[52]    LCB's officers and majority owners argued the opposite in defending a derivative suit relating to LCB's forfeiture of $102 million to the United States for maintaining Hezbollah-linked accounts: "Defendants argue that, in selling substantially all of its assets to SGBL, LCB transferred its right to sue on its own behalf and, as a result, that there can be no derivative suit." *Nahl v. Jaoude*, 354 F. Supp. 3d 489, 506 (S.D.N.Y. 2018)). The court only disagreed because the seizure was "an injury incurred after its sale of 'all rights, titles, and interests ... *as at the Completion Date*' to SGBL. The right to sue for that injury was therefore not transferred." *Id.* (citation omitted).

[53]    In any event, "a subset of the accounts with 'links to Hezbollah' that exhibited 'classic signs of money laundering' migrated to Defendant SGBL and some of the most significant Hezbollah accounts (e.g. for the Martyrs Foundation – Lebanon) never made it on to the official list." AC ¶1462. SGBL *retained* LCB accounts "entities such as Elissa Holding (SDNTK) and Yousser Company for Finance and Investment (SDGT)." AC ¶1473.

71

CERCLA encompasses successor liability." *Nat'l Serv. Indus.*, 460 F.3d at 206. SGBL cites no authority for its proposition, but analogizes to the Second Circuit's holding that 18 U.S.C. §2333(a)'s silence "on the subject of secondary liabilities means there is none," *Rothstein*, 708 F.3d at 98 (quoting *Boim III*, 549 F.3d at 689). *Rothstein* and *Boim III*, relying on *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 182 (1994), held that Congress, having included several express provisions with respect to aiding and abetting in connection with the ATA's *criminal* provisions, must have intentionally omitted common law aiding and abetting from the ATA's *civil* provisions set forth in §2333(a). 708 F.3d at 97-98; *Boim III*, 549 F.3d at 689. According to SGBL, "[t]he same can be said here: just as Congress's silence meant that it did not authorize *secondary* liability under the ATA prior to JASTA, Congress's silence here means it has not authorized *successor* liability." SB at 13.

The analogy is inapt. The *Rothstein/Boim III* rule does not limit *who* is liable under the ATA, but what *types of causes of action* are available. *See Cent. Bank of Denver*, 511 U.S. at 173 (explaining that aiding and abetting conduct may be wrongful, but does not match the conduct required for a 10b-5 claim). Successor liability does not create a new cause of action or punish the succession of interest itself—it simply transfers the *consequence* of the *predecessor's conduct* onto the successor (just as the assignment of a claim transfers the benefit, not the injury). Here, the conduct at issue is *LCB*'s alleged violations of §2333(a) and (d).

For the same reason, SGBL's argument that the ATA's punitive nature should not apply to an otherwise "innocent successor,"[54] *see* SB at 15-19, is misguided—it is LCB's conduct,

---

[54]   SGBL's own conduct was far from innocent. *See* AC ¶¶1475-93 (describing Hezbollah accounts at SGBL independent of its acquisition of LCB's assets).

attributed to SGBL, that the ATA "punishes."[55] In an uncited quote (possibly to *Litle v. Arab Bank, PLC*, 611 F. Supp. 2d 233, 242 (E.D.N.Y. 2009)), SGBL argues the ATA thus does not "authorize additional remedies," SB at 17—but *Litle* was rejecting Arab Bank's claim for contribution against other purported tortfeasors as a remedy unavailable in the ATA, which only creates claims for terror victims. If a court were to adopt SGBL's reading that for a successor-in-interest to assume liability the successor would have to itself commit the tort or exhibit the requisite mental state, it would render the concept meaningless for *any* common law or statutory tort.[56]

Without any authority supporting its view, SGBL relies on a misleading quotation from an inapposite Coal Act case: "Where Congress wanted to provide for successor liability in the Coal Act, it did so explicitly." SB at 13 (quoting *Barnhart*, 534 U.S. at 452-53). The Coal Act sought to protect coal industry retirees' pensions when their former employers went out of business, by assigning liability for those payments to certain defined successors-in-interest. The Supreme Court held that because Congress explicitly created liability for one class of successors but not another, that distinction must be treated as intentional. 534 U.S. at 452-53. These successors in interest had *not* assumed their predecessor's liabilities *except* as set forth in the statute. Here, of course, SGBL *chose* to assume (all of) LCB's liabilities.

Finally, SGBL argues that finding it liable for a U.S. tort would "apply[] U.S. law to a foreign asset purchase transaction," violating the "presumption against extraterritoriality." SB at 13. SGBL concedes that the ATA has exterritorial application, but argues that "Congress has not, however, instructed U.S. law to apply beyond the (evil) conduct constituting 'acts of international

---

[55]     SGBL also incorrectly argues that the ATA requires "terrorist intent." *See Boim III*, 549 F.3d at 693 (primary liability requires recklessness), *Linde*, 882 F.3d at 329 (secondary liability requires "general awareness," not "specific intent."). In any event, it is LCB's mental state, not SGBL's in purchasing LCB, that is relevant to the ATA. *See, e.g.*, *E.E.O.C. v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988) (tort liability transferred where "expressly assumed").

[56]     The fact that SGBL is alleged to have separately committed the same torts and exhibited the same requisite mental state as LCB speaks to its own liability, not its liability from having expressly assumed LCB's liabilities.

terrorism' to reach matters of (business) conduct, such as a foreign asset purchase transaction or other corporate law matters between two foreign entities." SB at 14. SGBL's argument is nonsensical. Plaintiffs were not injured by the "foreign asset purchase transaction," nor do they contend that the SPA itself violated the ATA. The presumption against extraterritoriality does *not* mean courts cannot interpret foreign contracts under foreign law or are powerless to enforce the ATA (civilly or criminally) against foreign actors that change their corporate form.

### C.  By Expressly Assuming LCB's Relevant Liabilities, SGBL Inherited LCB's Personal Jurisdiction Status.

SGBL contends that this Court has no personal jurisdiction because *its* conduct did not involve this forum.[57] However, as SGBL appears to realize, SB at 9-10, "in certain circumstances the successor corporation may inherit its predecessor's jurisdictional status." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 157 (2d Cir. 2019) (internal quotation marks omitted, quoting *Semenetz v. Sherling & Walden, Inc.*, 21 A.D.3d 1138, 1140, 801 N.Y.S.2d 78, 81 (3d Dep't 2005), *aff'd*, 7 N.Y.3d 194, 851 N.E.2d 1170 (2006)). Those circumstances include where the successor "is subject to all the liabilities of the acquired companies," *id.* at 155-56, as SGBL is here, by express agreement. *See Perry Drug Stores v. CSK Auto Corp.*, 93 F. App'x 677, 681 (6th Cir. 2003) ("A court may impute the jurisdiction of a corporate predecessor to its successor where the successor *expressly assumed the liability* of the predecessor corporation.") (emphasis added).

SGBL points out that the *U.S. Bank* court (in dicta) distinguished a merger from "an asset or stock purchase-sale," but that was because, "absent special circumstances, the acquiring company is subject only to those liabilities it has agreed to assume." 916 F.3d at 156 (internal

---

[57]     SGBL argues that Plaintiffs' claims against it "arise from a SPA in Lebanon," whereas "the alleged tortious conduct is LCB's, not SGBL's." SB at 8. As explained above, Plaintiffs' claims do not arise out of, or relate to, the SPA—the SPA simply transfers liability to SGBL.

quotation marks and citation omitted).[58] Here, SGBL agreed to assume "*all* of [LCB's] liabilities," AC ¶138, and the court could "see no reason to doubt" that the successor to "all" liabilities "would be subject to jurisdiction" wherever the predecessor would be. *U.S. Bank*, 916 F.3d at 156. SGBL's other cited case on inherited jurisdiction is no different—*Societe Generale v. Fla. Health Scis. Ctr., Inc.* doubted whether a successor in interest inherits its predecessor's jurisdictional status where the former did *not* assume the latter's liabilities by merger or other means. No. 03-cv-5615 (MGC), 2003 WL 22852656, at *4 (S.D.N.Y. Dec. 1, 2003). SGBL mischaracterizes the case as *rejecting*, rather than approving, the "successor liability exceptions" as grounds for jurisdictional inheritance. SB at 10 n.10.

Further, as detailed above, SGBL *itself* had relevant in-forum conduct—as with the other Defendants, SGBL maintained New York correspondent accounts, *see* AC ¶¶132-35, which it used to process USD-denominated transactions on behalf of Hezbollah's BAC, *see, e.g.*, AC ¶1493.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' motions to dismiss.

Dated: December 16, 2019

Respectfully submitted,

By    /s/ Gary M. Osen
      **OSEN LLC**
      Gary M. Osen, Esq.
      Ari Ungar, Esq.
      2 University Plaza, Suite 402
      Hackensack, NJ 07601
      (201) 265-6400
      (201) 265-0303 Fax

---

[58]    SGBL also argues that *U.S. Bank* "suggest[s] that under New York law, successor liability 'do[es] not confer and cannot confer [personal] jurisdiction'"—quoting from the very point in Judge Chin's concurrence the majority rejected. SB at 10 (quoting *U.S. Bank*, 916 F.3d at 159 (Chin, J., concurring)). As the majority explained, "if the rule were as Judge Chin suggests, the rule would be subject to serious abuse: a corporation liable to suit in a state in which it does not wish to be sued could simply arrange a merger with a dummy corporation and thus avoid being subject to an undesired jurisdiction in the state where its actions incurred the liability." *U.S. Bank*, 916 F.3d at 156.

**TURNER & ASSOCIATES, P.A.**
Tab Turner, Esq.
(admitted pro hac vice)
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**MOTLEY RICE, LLC**
Michael Elsner, Esq.
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
(843) 216-9000

Attorneys for Plaintiffs