Clerk's Office
Filed Date: 11/25/2020
10:37 AM

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ROBERT BARTLETT, et al.,

                Plaintiffs,              NOT FOR PUBLICATION
                                 **MEMORANDUM & ORDER**

   -against-                       19-CV-00007 (CBA) (VMS)

SOCIÉTÉ GÉNÉRALE DE BANQUE AU
LIBAN SAL, et al.,

                Defendants.
--------------------------------------------------------x
**AMON, United States District Judge:**

      Plaintiffs, a group of 1,278 American citizens killed or injured by terrorist attacks abroad, and/or their families, filed this action against 12 banking institutions—Société Générale de Banque Au Liban SAL ("SGBL"), Fransabank SAL, MEAB Bank SAL, Blom Bank SAL, Byblos Bank SAL, Bank Audi SAL, Bank of Beirut SAL, Lebanon and Gulf Bank SAL, Banque Libano-Française SAL, Bank of Beirut and the Arab Countries SAL, Jammal Trust Bank SAL ("JTB"), and Fenicia Bank—as well as John Does 1–50, seeking damages pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333 as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), for lack of personal jurisdiction, and 12(b)(6), for failure to state a claim.

      Plaintiffs have called this "the most comprehensive civil ATA complaint ever filed against any bank since the law's 1992 enactment." (ECF Docket Entry ("D.E.") # 142 ("Opp'n") at 1.) Indeed, the Amended Complaint is mind-numbing in its length: reading largely like a treatise on Hezbollah and the Lebanese economic system, its 5,695 paragraphs span nearly 788 pages. It is

questionable whether this filing meets Federal Rule of Civil Procedure 8's requirement that a complaint include a "short and plain statement of the claim." Nonetheless, having spent considerable time parsing the complaint, I conclude that Plaintiffs' strongest allegations state a claim for aiding-and-abetting liability under JASTA. I will not dismiss it in its entirety. For the reasons stated below, the motions to dismiss are GRANTED in part and DENIED in part.

**Summary of Complaint**

The following facts are taken from Plaintiffs' amended complaint (D.E. # 105 ("Am. Compl." or the "Amended Complaint")), and are assumed true for purposes of this motion.

Plaintiffs or their family members were injured in a series of terror attacks (the "Attacks") perpetrated by Hezbollah in Iraq between 2004 and 2011. (Am. Compl. ¶ 1.) Defendants are Lebanese commercial banks that Plaintiffs allege provided financial services to Hezbollah and Hezbollah affiliates. (Id. ¶ 5.) Hezbollah is an entity dedicated to religiously inspired terrorism, and in 1997 was designated by the United States as a Foreign Terrorist Organization ("FTO"). (Id. ¶¶ 1 n.1, 354.) Plaintiffs allege that Defendants knowingly provided Hezbollah with financial services, including access to the U.S. financial system through correspondent bank accounts in New York, and facilitated Hezbollah's terrorist attacks by enabling the organization's operational funding. (Id. ¶¶ 11.)

I. **Hezbollah's Fundraising and Recruitment Operations**

Hezbollah operates a commercial apparatus known as the Business Affairs Component ("BAC"), which raises funds for Hezbollah via money laundering and drug trafficking, as well as via ordinary business enterprises. (Id. ¶ 610.) Much of the money that Hezbollah makes through such commercial activity comes from certain well-known crime networks or "clans" known to be affiliated with Hezbollah. (See, e.g., id. ¶¶ 856–868.) Those networks launder their funds through

Lebanese "exchange houses," which facilitate international transfers of large cash deposits through Defendants' accounts in New York while simultaneously funneling money to Hezbollah (including for Hezbollah's use abroad in Iraq). (Id. ¶¶ 1084, 1087, 1097–98.) Ovlas Trading SA, which deals in general trading and food manufacturing, was designated a Specially Designated Global Terrorist ("SDGT") by the U.S. Department of the Treasury on December 9, 2010. (Id. ¶ 691.) The company is owned by Kassim Tajideen—allegedly an important financial contributor to Hezbollah who was himself designated as an SDGT on May 27, 2009 and imprisoned by the United States in 2018 after pleading guilty to various U.S. Office of Foreign Assets Control violations. (Id. ¶¶ 689–691.)

Hezbollah also fundraises and recruits through umbrella organizations such as the Islamic Resistance Support Organization ("IRSO") and the Martyrs Foundation–Lebanon. (Id. ¶¶ 400, 467.) Hezbollah publicizes account numbers where members of the public can donate to support Hezbollah's terrorist activities, including from outside Lebanon. (E.g., id. ¶ 421.) IRSO was designated an SDGT by the U.S. Department of the Treasury on August 29, 2006, and it openly solicits, collects and disperses donations in support of Hezbollah's terrorist activities. (Id. ¶¶ 400–421.) The money IRSO collects is earmarked primarily for the purchase of weapons for Hezbollah terrorist-operations and support for its cadres. (Id. ¶ 402.) Donors to IRSO can earmark funds toward terrorist attacks, including for the acquisition of missiles and ammunition. (Id. ¶ 417; D.E. # 105-1, Exhibit 2.) The Martyrs Foundation–Lebanon was designated an SDGT on July 24, 2007 and channels financial support from Iran to several terrorist organizations in the Levant, including Hezbollah. (Id. ¶¶ 489–491.) The Martyrs Foundation-Lebanon also provides financial support to the families of killed or imprisoned Hezbollah members. (Id. ¶ 491.) The Imam Khomeini Relief Committee – Lebanon (the "IKRC") was designated an SDGT by the United States on

August 3, 2010.  (Id. ¶ 579.)  The IKRC funds and operates Hezbollah youth training camps, which are used to recruit future Hezbollah members and operatives.  (Id. ¶ 580.)

## II.     Defendants' Financial Services

Plaintiffs allege that each Defendant knowingly maintained accounts for and provided vital financial services to Hezbollah and Hezbollah-affiliated entities, enabling Hezbollah to access millions of dollars which ultimately enabled the Attacks that injured Plaintiffs.  Among other financial services, Defendant banks used New York correspondent accounts to "clear" U.S. dollar-denominated transactions on Hezbollah's behalf.  (E.g., id. ¶ 142.)  "Correspondent accounts" enable financial institutions to access financial services in different jurisdictions and provide international payment services for their customers. (Id. ¶ 61 n.9.)  "Clearing" is the process of transmitting, reconciling, and, in some cases, confirming dollar-denominated electronic funds transfer transactions prior to settlement.  (Id. ¶ 142 n.21.)  Each Defendant maintained at least three New York correspondent accounts, which the Amended Complaint identifies by specific account number.  (See id. ¶¶ 132, 155, 174, 191, 204, 219, 231, 242, 256, 270, 285, 300.)

The alleged link between Defendants and Hezbollah comes through certain Hezbollah-affiliated customers (the "Bank Customers").  (E.g., id. ¶¶ 8, 529, 532, 535.)  The Bank Customers include individuals and businesses involved in the BAC, as well as other Hezbollah entities such as IRSO.  (E.g., id. ¶¶ 8, 105.)  Each Defendant except for Bank of Beirut is alleged to have maintained accounts for and provided financial services to organizations designated during the relevant timespan as Hezbollah-affiliated SDGTs:

| Defendant Bank | SDGT Bank Customer(s) |
|---|---|
| SGBL | Martyrs Foundation – Lebanon (Id. ¶ 5690)<br>Yousser Company for Finance and Investment (Id. ¶ 5690)<br>Hussein al-Shami (Id. ¶ 5690) |

| | |
|---|---|
| Fransabank | IRSO (Id. ¶ 8)<br>Martyrs Foundation– Lebanon (Id. ¶ 1494) |
| MEAB Bank | IKRC (Id. ¶ 1566) |
| Blom Bank | Ovlas Trading SA (Id. ¶ 691) |
| Byblos Bank | IRSO (Id. ¶ 8) |
| Bank Audi | Ovlas Trading SA (Id. ¶ 691) |
| Lebanon and Gulf Bank | IRSO (Id. ¶ 8)<br>Ovlas Trading SA (Id. ¶ 691) |
| Banque Libano-Française | IRSO (Id. ¶ 8)<br>Martyrs Foundation – Lebanon (Id. ¶ 1697)<br>Ovlas Trading SA (Id. ¶ 691) |
| Bank of Beirut and the Arab Countries | Martyrs Foundation – Lebanon (Id. ¶ 1772)<br>Ovlas Trading SA (Id. ¶ 691) |
| Fenicia Bank | Kassem Tajideen (Id. ¶ 1818) |
| Jammal Trust Bank | IRSO (Id. ¶ 8) |

Defendants each maintained policies and programs during the relevant period to detect illegal account activity and account holders. For example, Fransabank's Vice President stated in 2006 that the bank had "a monitoring program for suspicious or unusual activity" and developed a "risk assessment of its customers." (Id. ¶ 151.) And MEAB Bank maintained a counter-financing of terrorism program which involved screening its banking activity using a state-of-the-art system. (Id. ¶ 173; see also id. ¶¶ 131, 151, 189, 203, 216, 230, 240, 252, 267, 282, 298.)

In addition to certain Bank Customers' SDGT designations, other reporting and events publicly connected the Bank Customers to Hezbollah. A 1986 newspaper advertised that an account at Defendant Jammal Trust Bank was owned by IRSO. (Id. ¶ 420.) The offices of Defendants Fransabank and MEAB Bank were targeted and bombed by Israeli jets in 2006 due to their known connection to Hezbollah. (Id. ¶¶ 1499, 1563.) A 2006 television news report showed that Hezbollah was publicly soliciting donations to an account at Banque Libano-Française. (Id.

¶ 421.) In 2009, Bank Audi was served by U.S. law enforcement with a seizure warrant on Bank Audi's correspondent account, seeking to freeze the account of a customer who had been indicted for providing material support to Hezbollah. (Id. ¶ 1183.)

Plaintiffs further allege that Defendant SGBL is liable for certain actions of Lebanese Canadian Bank ("LCB"). (Id. ¶¶ 1326–1486.) LCB allegedly maintained bank accounts for Hezbollah institutions and officials, participated in Hezbollah's trade-based money laundering operations, and disregarded anti-money laundering rules on Hezbollah's behalf. (Id. ¶ 1329.) In 2011 the U.S. Department of the Treasury found that LCB was a "financial institution of primary money laundering concern." (Id. ¶¶ 1337.) In June 2011, SGBL acquired LCB's assets and liabilities. (Id. ¶ 1450.) Certain LCB accounts held by individuals and entities associated with Hezbollah—including some that had been designated SDGTs—migrated to Defendant banks. (Id. ¶¶ 103–105.)

Plaintiffs also allege certain Hezbollah-connected activity which postdates the Attacks. The alleged co-founder of Defendant MEAB bank, Kassem Hejeij, was forced to step down from his role as Chairman in June 2015 when he was designated an SDGT. (Id. ¶ 167.) Certain Bank Customers were designated SDGTs after the Attacks. (E.g., id. ¶ 624.) Defendant JTB was itself designated as an SDGT in 2019 due to its "deep coordination" with Hezbollah "which dates back to at least the mid-2000s." (See Opp'n at 2–3; D.E. # 142-2.)[1]

### III. Hezbollah's Terror Attacks

The Amended Complaint details four mechanisms by which Hezbollah committed,

---

[1] The parties dispute whether this post-complaint material may be considered on a motion to dismiss. (See Oral Arg. Tr. at 36:11–38:10.) At oral argument, Plaintiffs' counsel conceded that Plaintiffs' case against JTB is no stronger than against any other defendant, even considering these Treasury statements. (See id. at 32:11–22 (stating that "the allegations are equal against all defendants.").) Given the volume of allegations and the relative insignificance of JTB's designation given its occurring years after the Attacks, my conclusions in this opinion would be the same whether or not this fact is considered.

planned, or authorized the Attacks: "(1) establishing and organizing its proxy groups in Iraq; (2) designing EFPs [Explosively Formed Penetrators, an anti-armor weapon] and other weapons deployed by those proxies; (3) training its Iraqi proxies in tactics, techniques, and procedures . . .; and (4) overseeing, approving, and directing Special Groups attacks on U.S. service members and other American nationals." (Opp'n at 33.)

More particularly, Hezbollah was directly involved in providing training and support to Jaysh al-Mahdi ("JAM"), an Iraqi militia, from its inception in 2003. (Am. Compl. ¶¶ 1862–1878.) Hezbollah also provided training programs to teach Iraqi militants to construct and use EFPs, enabling trainees to teach other militants what they had learned. (Id. ¶¶ 1941, 1946–1947.) Hezbollah provided training for other types of weaponry as well. (Id. ¶¶ 1930–1935, 1940, 2021.)

When JAM proved to be ineffective, Hezbollah helped create and train "Special Groups." (Id. ¶¶ 1904–1918.) Plaintiffs quote reports indicating high levels of Hezbollah oversight and involvement in those proxy groups' activities:

> Documents seized [during a raid on Hezbollah commander and so-called "designer of the Special Groups" Ali Mussa Daqduq] include: spreadsheets detailing weapons and targets, step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks, including, for example; an ambush and IED attack on a MNF convoy in Karbala resulting in 4 X MNF KIA; an IED attack on a British patrol which destroyed two Land Rovers and killed the occupants; and a sniper attack on a British patrol which killed a British soldier.

(Id. ¶¶ 1952–1955.)

Plaintiffs also detail the Hezbollah connections to the Attacks themselves. For example, "the weapon used to injure [one Plaintiff] was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC." (Id. ¶ 2050.) In another attack,

"the terror cell that emplaced the [weapon] . . . was trained by Hezbollah."  (Id. ¶¶ 2087–2089.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal of a complaint for "lack of personal jurisdiction[.]"  The plaintiff has the burden of demonstrating personal jurisdiction. Troma Entm't, Inc. v. Centennial Pictures Inc., 729 F.3d 215, 217 (2d Cir. 2013).  "[W]hen the issue is decided initially on the pleadings and without discovery, the plaintiff need show only a prima facie case" of personal jurisdiction.  Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984).  In deciding whether the plaintiff has made such a showing, the pleadings must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor.  See DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted[.]"  A complaint will be dismissed unless the plaintiff states a claim that is "plausible on its face" by alleging sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court must dismiss a claim if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ."  Iqbal, 556 U.S. at 679.  Although courts will not credit "conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," id. at 678, the court must accept as true all material factual allegations and draw all reasonable inferences in the plaintiff's favor.  Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013).

## DISCUSSION

### I.      Personal Jurisdiction

Defendants argue that the Court lacks personal jurisdiction over Defendants for all claims.

I first address personal jurisdiction with respect to Claims I-III. Personal jurisdiction for Claim IV is discussed infra, in Part IV.

## A. Standard

A court's exercise of personal jurisdiction must satisfy the long-arm statute of the forum state and constitutional requirements of due process. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013). New York's C.P.L.R. § 302(a)(1) confers personal jurisdiction when two requirements are met: "(1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006).

The Second Circuit addressed personal jurisdiction under the ATA in Licci, 732 F.3d at 161. The defendant in that case was "a Lebanese bank with no operations, branches, or employees in the United States." Id. at 165. The bank had allegedly "executed wire transfers using its correspondent account in New York, for an account held by . . . a 'financial arm' of Hizbollah. Id. at 166. The first prong of New York's statute—that the defendant transacted business in the state—was satisfied due to "the frequency and deliberate nature of [the defendant's] use of its correspondent account." Id. at 168. The second prong—that the claim arose from the New York business activity—was also satisfied. That is because the transactions demonstrated "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former.'" Id. at 168–69 (quoting Licci v. Lebanese Canadian Bank, SAL, 20 N.Y.3d 327, 339 (2012)). This "not completely unmoored" standard "does not require a causal link between the defendant's New York business activity and a plaintiff's injury." Id. at 168; Strauss v. Crédit Lyonnais, S.A., 175 F.Supp.3d 3, 24–25 (E.D.N.Y. 2016) ("There is no requirement under § 302(a)(1) that a plaintiff's claim must arise exclusively from New York conduct.") (emphasis in

original).

Exercising personal jurisdiction must also satisfy constitutional due process, under which "the defendant's suit-related conduct must create a substantial connection with the forum State." Walden v. Fiore, 571 U.S. 277, 284 (2014). In Licci, constitutional due process was satisfied by the bank's "repeated, intentional execution of U.S.-dollar-denominated wire transfers" in "a lawsuit seeking redress for the allegedly unlawful provision of banking services of which the wire transfers are a part." 732 F.3d at 171. Since Licci, there have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York, either through their New York branch or a correspondent account they maintained in their own name. See, e.g., Averbach v. Cairo Amman Bank, No. 19-cv-4, 2020 WL 486860, at *4–9 (S.D.N.Y. Jan. 21, 2020), report and recommendation adopted at 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020); Miller v. Arab Bank PLC, 372 F.Supp.3d 33, 43–44 (E.D.N.Y. 2019); Nike, Inc. v. Wu, 349 F. Supp. 3d 346 (S.D.N.Y. 2018); Weiss v. Nat'l Westminster Bank PLC, 176 F. Supp. 3d 264, 285–86 (E.D.N.Y. 2016), appeal docketed, No. 19-863 (2d Cir. argued May 14, 2020).

**B. Application**

1. State Law

The first requirement of New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), is that the defendant transacted business in the state. Plaintiffs have identified each Defendant's correspondent bank account numbers in New York and allege that Defendants transferred millions of dollars on Hezbollah's behalf through those accounts. (See, e.g., Am Compl. ¶¶ 120, 178). Although such allegations on their own are somewhat general, Plaintiffs have identified numerous specific transactions through the New York bank accounts involving multiple alleged Bank

Customers; these transactions number in the dozens[2] and total millions of dollars. (See id. ¶¶ 868, 1132, 1151, 1576–77.) Such a volume of transactions—both the number and aggregate dollar-value—are sufficient to show that Defendants deliberately availed themselves of New York through the use of these correspondent accounts. Licci, 732 F.3d at 165 (recognizing jurisdiction for "dozens" of transactions); Averbach, 2020 WL 486860 at *5 (same, for twenty-three transactions); Indosuez Int'l Fin. B.V. v. Nat'l Rsrv. Bank, 98 N.Y.2d 238, 246 (2002) (six transactions). For example, Plaintiffs have identified numerous transactions through the correspondent accounts by Nazim Ahmad's Rilton Traders and Primogems, and Lebanese exchange houses. (E.g., Am. Compl. ¶¶ 925, 1029, 1043, 1551, 1576–78.) Nazim Ahmad is allegedly a key Hezbollah BAC facilitator and member of the Ahmad clan, whose connection to Hezbollah was publicized in a 2002 United Nations report. (See Am. Compl. ¶¶ 812–816, 862, 868.). Those transactions were allegedly carried out on behalf of Hezbollah, with the funds going to support the terrorist attacks in Iraq that injured Plaintiffs. (E.g., id. ¶¶ 1087, 1576–77.) As in Licci, such repeated transfers that "totaled several million dollars" evidence "purposeful availment of the privilege of doing business in the New York forum." 732 F.3d at 168, 171 (internal quotation marks omitted).

Many of the allegations concern funds received by (rather than sent by) Defendant banks, and Defendants argue that the "transmission of funds to Alleged Bank Customers" cannot support personal jurisdiction because such transfers are only the "unilateral activity of another party." (D.E. # 139-1 ("Omnibus Supp.") at 15–16 (emphasis in original).) Although the Second Circuit

---

[2] Plaintiffs have identified dozens of specific transfers, although the number varies between individual defendants, with at least one for each Defendant (and many more for most Defendants). In any event, "[a] single transaction is sufficient to satisfy this requirement, provided the relevant claims arise from that transaction. Miller, 372 F. Supp. 3d at 42 (citing Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999)).

has suggested that the "mere maintenance" of a correspondent account would not create personal jurisdiction, it drew no distinction between transactions that originate with the defendant and those which originate elsewhere. Licci, 732 F.3d at 171. What matters is "the frequency and deliberate nature" of [the bank's] use of its correspondent account." Id. at 168. Defendants do not contend that they accepted these transfers "once or twice by mistake,"[3] see Licci, 732 F.3d at 168, or refused to accept such transfers at all, see Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank, 549 B.R. 56, 65 (S.D.N.Y. 2016). Defendants' distinction between transfers sent and transfers received finds no support in the case-law. See Averbach, 2020 WL 486860, at *7 ("When a foreign bank repeatedly approves deposits and the movement of funds through a correspondent account, it is transacting business; that the foreign bank did not initiate the transaction does not change the analysis.").

The second requirement under N.Y. C.P.L.R. § 302(a)(1) is that there be "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." Licci, 20 N.Y.3d at 341. There is no requirement, as Defendants contend, that the New York transactions were earmarked for the specific Attacks in which Plaintiffs were injured. In addition to the transactions already described, Defendant MEAB Bank is alleged to have moved millions of dollars through its correspondent bank accounts—"knowing that it was . . . laundering narcotics trafficking proceeds on behalf of Hezbollah's BAC." (Am Compl. ¶ 1576–77.) Given that Hezbollah is singularly "dedicated to religiously inspired terrorism," (id. ¶ 354), these averments "properly allege[] that the aid provided to [Hezbollah] came about, in part, via money transfers through [Defendants'] New York correspondent accounts." Averbach, 2020 WL 486860,

---

[3] Indeed, Plaintiffs have identified at least three New York correspondent accounts for each Defendant, belying the notion that their use of correspondent accounts was infrequent or accidental. (See Am. Compl. ¶¶ 132, 155, 174, 191, 204, 219, 242, 256, 270, 285, 231, 300.)

at *7.

In sum, the Amended Complaint plausibly alleges frequent and deliberate use of New York-based correspondent accounts to facilitate the Hezbollah financing which led to Plaintiffs' injuries. Accordingly, Plaintiffs have pleaded a prima facie case under N.Y. C.P.L.R. § 302(a)(1).

### 2. Constitutional Due Process

In concluding that due process was satisfied in Licci, the Second Circuit observed that it would be "rare" and "unusual" for a court to determine that the exercise of personal jurisdiction over a defendant was permitted by § 302(a)(1), but prohibited under principles of due process. 732 F.3d at 170. The Second Circuit was indeed aware of no such decisions within this Circuit. Id.

Plaintiffs have alleged that Defendants had minimum contacts with New York such that "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotation marks omitted). The Amended Complaint alleges that Defendants each maintained multiple correspondent accounts in New York, which they used to facilitate the transfer of millions of dollars for their Hezbollah-affiliated customers. The Second Circuit has held that such a "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress" permits personal jurisdiction "consistent with due process requirements." Licci, 732 F.3d at 171. Although Defendants could have maintained dollar-denominated correspondent accounts in many countries, they chose to do so in New York. See Tamam v. Fransabank SAL, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) (noting that foreign bank defendants can maintain U.S. dollar correspondent relationships with banks throughout Europe, Asia, and Africa).[4]

---

[4] While Defendants are correct that the Second Circuit in Waldman v. Palestine Liberation Organization required a "substantial connection" between the in-forum contacts and the claims to assert jurisdiction under the ATA,

In sum, this is not the rare (perhaps unprecedented) case in which New York's long-arm statute is satisfied but constitutional due process is not. Defendants' select and repeated use of the New York banking system as an instrument to effect the wrongs of which Plaintiffs complain permits personal jurisdiction here consistent with constitutional due process.

## II. Primary Liability Under 18 U.S.C. § 2333(a)

Plaintiffs' first cause of action is for primary liability under 18 U.S.C. § 2333(a). To plead primary liability under § 2333(a), Plaintiffs must plausibly allege "(1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation." O'Sullivan v. Deutsche Bank AG, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at *4 (S.D.N.Y. Mar. 28, 2019) (internal citations omitted).

### A. Injury to a U.S. National

Only U.S. nationals who have been injured and their "estate, survivors, or heirs" may recover under § 2333(a). Averbach, 2020 WL 486860, at *9. Plaintiffs are "American nationals who were injured, and [their] estates and families." (Am. Compl. ¶ 1.) Defendants do not dispute that this element of primary liability is alleged adequately.

### B. Acts of International Terrorism

"For an act to constitute international terrorism, it must satisfy four separate requirements: (1) it must involve violent acts or acts dangerous to human life; (2) it must qualify as a violation of the criminal laws of the United States or of any State if it were committed within a United States jurisdiction; (3) it must appear to be intended to intimidate a civilian population, influence

---

Plaintiffs have pleaded such a connection here. They allege that Defendants transferred hundreds of millions of dollars through their New York correspondent accounts, knowing that such funds were being sent on behalf of Hezbollah. (See, e.g., Am. Compl. ¶¶ 1576–77.) In Waldman there were no correspondent banking transactions as in this case or Licci. 835 F.3d at 342. Rather, Defendants' alleged U.S.-connections "revolve[d] around lobbying activities that are not proscribed by the ATA and are not connected to the wrongs for which the plaintiffs here seek redress." Id.

government policy, or affect the conduct of government by certain specified means; and (4) it must occur primarily outside the United States or transcend national boundaries." Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 68 (2d Cir. 2012) (internal quotation marks omitted). The alleged conduct occurred outside the United States, so only the first three elements are at issue.

1. Acts Dangerous to Human Life

Plaintiffs do not argue that Defendants' conduct was "violent," but rather that it was "dangerous to human life." (See Opp'n at 66–68.) Cases involving conduct alleged to be "dangerous to human life" can be arranged along a spectrum involving more or less dangerous behavior. On the more dangerous end of the spectrum is Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685 (7th Cir. 2008) (Posner, J.). There, the Seventh Circuit found that a defendant accused of directly donating funds to a foreign terrorist organization committed "an act dangerous to human life." Boim, 549 F.3d at 690 (noting that "[g]iving money to Hamas [is] like giving a loaded gun to a child").[5] On the other end of the spectrum lie cases where banks provided services to customers engaged in principally legitimate businesses but who may have a limited connection to terrorism. See, e.g., Freeman v. HSBC Holdings PLC, 413 F. Supp. 3d 67, 91 (E.D.N.Y. 2019) ("Given the many legitimate activities [of a commercial airline and maritime carrier], the mere act of providing financial services to them cannot be violent or dangerous."), appeal docketed, No. 19-3970 (2d Cir. Nov. 26, 2019); O'Sullivan, 2019 WL 1409446, at *8; Kemper, 911 F.3d at 390. Somewhere in the middle of this spectrum are cases such as this one, in which banks allegedly provided financial services to customers affiliated with a foreign terrorist organization. At least one court in this Circuit has held such services do not constitute acts dangerous to human life. See

_____

[5] Defense counsel at oral argument doubted the continuing vitality of Boim. (See Oral Arg. Tr. at 10:5–8.) But the subsequent cases have explicitly distinguished rather than departed from Boim. E.g., Kemper v. Deutsche Bank AG, 911 F.3d 383, 390 (7th Cir. 2018).

Kaplan v. Lebanese Canadian Bank, SAL, 405 F. Supp. 3d 525, 532 (S.D.N.Y. 2019), appeal docketed sub nom Licci v. American Express Bank Ltd., No. 19-3522 (2d Cir. argued Nov. 19, 2020).[6]

The allegations here closely parallel those in Kaplan.  In both cases, "[t]here is no dispute that Defendant did not itself perpetrate the rocket attacks that injured Plaintiffs.  Rather, Defendant's alleged misconduct was providing wire transfer and other financial services" to customers allegedly affiliated with Hezbollah.  Kaplan, 405 F. Supp. 3d at 532.  As the court concluded in Kaplan, alleging that defendants provided financial services is different than alleging "Defendant's own actions . . . involved violence or endangered human life" under 18 U.S.C. § 2333(a).  Id.; see also Linde v. Arab Bank, PLC, 882 F.3d 314, 327 (2d Cir. 2018) ("[P]roviding routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to . . . compel a finding that as a matter of law, the services were violent or life-endangering acts[.]"); see also Weiss v. Nat'l Westminster Bank PLC, 381 F. Supp. 3d 223, 235 (E.D.N.Y. 2019).  Plaintiffs' counsel acknowledged in oral argument that, unlike in Boim, Plaintiffs do not allege that Defendants donated funds or provided currency to Hezbollah or any Hezbollah affiliates.  (Oral Arg. Tr. at 19:9–12, 26:24–27:5.)  Although I conclude that the Amended Complaint sufficiently alleges that Defendants knowingly provided substantial assistance to Hezbollah, see infra, I agree with the Kaplan court's conclusion on the question of primary liability that providing financial services such as those alleged here is not an act which is "violent or dangerous to human life" as contemplated by the ATA.  Accordingly, Plaintiffs' primary liability claims are dismissed.

---

[6] Plaintiffs in Kaplan, who are represented by the same counsel as the Plaintiffs in this case, have appealed the dismissal of their secondary liability claims but not their claim for primary liability.  See Brief for Plaintiffs-Appellants, D.E. # 57, No. 19-3522 (2d Cir.).

### III.     Secondary Liability Under 18 U.S.C. § 2333(d)

Plaintiffs' second cause of action is for aiding-and-abetting liability under 18 U.S.C. § 2333(d).  (Am. Compl. ¶¶ 5658–5673.)  Pleading aiding-and-abetting under JASTA requires plausible allegations that Defendants "knowingly provid[ed] substantial assistance" to an "organization that had been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned, or authorized[.]"  18 U.S.C. § 2333(d)(2).  The proper framework for determining aiding-and-abetting liability under JASTA is the decision set forth in <u>Halberstam v. Welch</u>, 705 F.2d 472 (D.C. Cir. 1983).  <u>See</u> 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 5).  <u>Halberstam</u> identifies three elements of aiding-and-abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."  <u>Halberstam</u>, 705 F.2d at 477.

### A.  The Principal

Under 18 U.S.C. § 2333(d)(2), a JASTA plaintiff's injuries must arise from an act of international terrorism that was committed, planned, or authorized by a foreign terrorist organization "officially designated as such."  <u>Freeman</u>, 413 F. Supp. 3d at 96.  Hezbollah has been an officially designated FTO since 1997.  But Defendants argue that the Amended Complaint fails to plausibly allege that the Attacks were committed, planned, or authorized by Hezbollah; instead, Defendants say, they were allegedly committed by "third party paramilitary groups."  (D.E. # 140 ("Omnibus Reply") at 11.)

Analogizing this case to <u>Crosby v. Twitter, Inc.</u>, Defendants argue that Plaintiffs allege only a tenuous connection between Hezbollah and the actual perpetrators of the attacks.  (Omnibus

Supp. at 35 (citing 921 F.3d 617 (6th Cir. 2019).)  But in <u>Crosby</u>, the FTO's involvement in the attacks was much more tenuous than what Plaintiffs allege here.  In <u>Crosby</u>, plaintiffs sought relief for injuries inflicted by a "self-radicalized" individual who was "virtually recruited" and planned and committed an attack on his own without any assistance or contact with the FTO.  <u>Id.</u> at 626. Here, Plaintiffs allege that Hezbollah trained the Iraqi militias, (Am. Compl. ¶ 2066), controlled and directed those militias, (Am. Compl. ¶ 2943), planned the Attacks, (Am. Compl. ¶¶ 1952–1955), and designed and emplaced the weapons used in the Attacks, (Am. Compl. ¶ 3462).  (<u>See generally</u> Am. Compl. ¶¶ 1852–2046.); <u>Freeman</u>, 413 F. Supp. 3d at 96–97; <u>Miller</u>, 372 F. Supp. 3d at 48.

In sum, Plaintiffs have satisfied this first requirement by detailing Hezbollah's involvement in the Attacks, and how Plaintiffs' injuries resulted from those Attacks.  (Am. Compl. ¶¶ 2047–5646.)

**B.  General Awareness**

1.  <u>Standard</u>

The second element of aiding-and-abetting liability requires "the secondary actor to be aware that, by assisting the principal, it is itself assuming a role in terrorist activities."  <u>Linde</u>, 882 F.3d at 329 (internal quotation marks omitted) (citing <u>Halberstam</u>, 705 F.2d at 477).  The general-awareness threshold is lower than the "specific intent demanded for criminal aiding and abetting culpability" and does not require "proof that [defendant] knew of the specific attacks at issue when it provided financial services for [a foreign terrorist organization]."  <u>Id.</u>  Still, "aiding and abetting an <u>act</u> of international terrorism requires more than the provision of material support to a designated terrorist <u>organization</u>."  <u>Id.</u> (emphases in original); <u>Honickman for Estate of Goldstein v. BLOM Bank SAL</u>, 432 F. Supp. 3d 253, 264 (E.D.N.Y. 2020) (distinguishing aid to "terrorist

attacks" from aid to "'terrorist activities,' from which terrorist attacks were a natural and foreseeable consequence."), appeal docketed No. 20-575 (2d Cir. Feb. 13, 2020).

In Halberstam, the D.C. Circuit found Linda Hamilton civilly liable for aiding and abetting a murder committed during a burglary by her boyfriend, Bernard Welch. See id. at 474–76. Welch was a serial burglar who sold the goods he stole. Id. at 475. Hamilton had assisted Welch by typing sales letters, keeping inventories, and performing general secretarial work. Id. But she testified that "she knew absolutely nothing about Welch's wrongdoing." Id. at 486 (emphasis in original).

The district court rejected Hamilton's pleas of ignorance, entering a verdict against her which the D.C. Circuit affirmed on appeal. That court reasoned that it "defies credulity that Hamilton did not know that something illegal was afoot," due to "Welch's pattern of unaccompanied evening jaunts over five years, his boxes of booty, the smelting of gold and silver, the sudden influx of great wealth, [and] Hamilton's collusive and unsubstantiated treatment of income and deductions on her tax forms." Id. at 486. Moreover, it was not necessary for Hamilton to know "specifically that Welch was committing burglaries." Id. at 488. Rather, "it was enough that she knew he was involved in some type of personal property crime at night" because "violence and killing is a foreseeable risk in any of these enterprises." Id. at 488.

## 2. Application

The Amended Complaint alleges that each Defendant "knew" certain Bank Customers were Hezbollah affiliates and that Hezbollah was responsible for attacks such as those inflicted upon the Plaintiffs. (E.g., Am. Compl. ¶¶ 1604, 1646, 1679.) These assertions would, on their own, be conclusory. But Plaintiffs substantiate these assertions with specific factual averments supporting the inference that Defendants were generally aware of these customers' nefarious

activities and that, by providing them access to financial services, they had assumed a role in Hezbollah's terrorist attacks. Specifically, Plaintiffs assert general awareness based on certain Bank Customers' designation as SDGTs and Bank Customers' open and notorious affiliation with Hezbollah (including through public media reports).

Plaintiffs plausibly allege that the United States designated certain Bank Customers as SDGTs and that Defendants knew of these designations. The Amended Complaint details each Defendants' anti-money laundering and counter-financing of terrorism procedures, which would give the banks reason to know when a customer had been designated an SDGT. (E.g., Am. Compl. ¶ 173.) Where courts have discounted such designations, there was a temporal disconnect between the attacks and designations. Honickman, 432 F. Supp. 3d at 267 ("None of the [account holders] were designated by the United States prior to the rocket attacks at issue."); O'Sullivan, 2019 WL 1409446, at *9 (same). The timeline here is more favorable to Plaintiffs. Defendants concede that "the Amended Complaint identifies 19 Alleged Bank Customers that were designated as providing material support to Hezbollah at some point in time before the last Attack." (Omnibus Supp. at 9–10.) Each Defendant except Bank of Beirut SAL (which is discussed further infra) had at least one customer who was an SDGT during the relevant period. It seems plain that JASTA proscribes knowingly enabling an organization such as IRSO—which was publicly designated by the U.S. government as a key Hezbollah fundraiser for violent terrorist attacks. (See Am Compl. ¶ 418.) At least five Defendants are alleged to have had IRSO as a customer. (Id. ¶ 8.)[7]

Further supporting Plaintiffs' contentions are their allegations that certain Bank Customers

---

[7] Defendants raise the formalistic argument that assistance to SDGTs like IRSO and the Martyrs Foundation cannot create liability because they are not themselves designated FTOs. (Omnibus Supp. at 10 n.16.) But courts have recognized that FTOs can operate through affiliates and front groups, and that to aid such front groups is to aid the FTO. See United States v. El-Mezain, 664 F.3d 467, 489 (5th Cir. 2011) (affirming conviction under § 2339B for donating to non-FTO entities under the control of a designated-FTO); Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 434–35, 442 (E.D.N.Y. 2013) (concluding that "a reasonable jury could find that the [non-FTO charities] are operating as [designated-FTO] front groups").

openly and notoriously associated with Hezbollah.  Plaintiffs describe at length the widespread knowledge that certain Bank Customers were Hezbollah affiliates, including the publication of such information in contemporaneous mass media.  (See, e.g., Am Compl. ¶¶ 420 (1986 newspaper advertising Hezbollah-affiliated account at Defendant bank), 421 (2006 MSNBC report identifying Hezbollah-affiliated account at Defendant bank), 889 (2002 United Nations Report identifying alleged Customers as Hezbollah affiliates), 1499–1500 (2006 NBC report identifying Hezbollah-affiliated account at Defendant bank), 1563 (2006 television broadcast linking Defendant bank to Hezbollah).)  Even if Plaintiffs do not allege that Defendants saw the specific television reports or newspaper advertisements, those records bolster the inference—already made plausible by the timely SDGT designations—that Defendants knew their customers were using Defendants' financial services to weaponize their terrorist attacks.

Defendants urge the Court to reject Plaintiffs' reliance on public information to support the "general awareness" prong.  (See generally Omnibus Reply at 13–16.)  But it would be unrealistic to expect a plaintiff at the pleading stage to possess direct evidence of a bank's subjective awareness of its role in terrorist attacks—internal memoranda, e-mails, and the like.[8]  Nor is such a standard supported in the case-law.  Defendants rely on cases in which courts declined to infer general awareness based on publicly available information, but those cases are distinguishable.  In Kaplan, unlike here, the sources describing the alleged affiliations between customers and Hezbollah were "dated after . . . the rocket attacks at issue."  405 F. Supp. 3d at 535.  So too in Averbach, "none of the Account Holders were designated by the United States government to be terrorists or terrorist organizations at the time of the fund transfers identified in the Complaint."  2020 WL 486860, at

---

[8] Even accepting Defendants' proposed rule, Plaintiffs here have relied on subjective information by identifying each bank's compliance policies which would give them reason to know of their customers' SDGT designations.

*12.  In contrast to those cases, Plaintiffs here have identified information and designations publicized before the Attacks which would link the Bank Customers to Hezbollah and which Defendants would have reason to know.

Defendants' reliance on Siegel v. HSBC N. Am. Holdings, Inc., 933 F.3d 217, 225–26 (2d Cir. 2019) is similarly misplaced.  (Omnibus Supp. at 39–40.)  In Siegel, the defendant bank's customer was not the terrorist organization itself, but another bank—Al Rajhi Bank ("ARB")— which had allegedly dealt with a terrorist organization.  933 F.3d at 220.  The plaintiffs in Siegel conceded that ARB was "a large bank with vast operations" and did not allege that "most, or even many, of ARB's banking activities are linked to terrorists."  Id. at 224.  And "crucially," ten months before the relevant attacks the defendant bank "ceased doing business with ARB altogether."  Id. Here, the alleged Customers include Hezbollah itself (or its terroristic affiliates)—not an intermediary like ARB whose activities were mostly unrelated to terrorism.[9]  Further differentiating this case from Siegel, Defendants had not allegedly ceased doing business with the Bank Customers months before the Attacks.

A well-reasoned recent opinion provides a cogent explanation of why plaintiffs are entitled to rely on circumstantial evidence to support the general awareness prong of aiding-and-abetting liability.  See Henkin v. Kuveyt Turk Katilim Bankasi, A.S., ___ F. Supp. 3d ___, 2020 WL 6143654 (E.D.N.Y. Oct. 20, 2020).  In rejecting a defendant's motion to dismiss a JASTA claim, the Henkin court explained that at the pleading stage, "terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious

---

[9] That alone explains why Defendants' repeated invocation of the fact that "only 19 of the 205 Bank Customers were so designated [as SDGTs]" is misplaced.  (Omnibus Reply at 13.)  In Siegel, the number of mostly-terroristic bank customers was zero.  Here, even Defendants concede that there were nineteen.

activities." Id. at *9 (citing Phelps v. Kapnolas, 308 F.3d 180, 187 (2d Cir. 2002)). Recognizing that a plaintiff can rely on circumstantial evidence even "when facing a heightened pleading standard when alleging fraud under Rule 9(b)," the court concluded that "it must logically follow that a plaintiff asserting an ATA/JASTA claim may as well." Id. Where Plaintiffs have plausibly alleged widespread public knowledge linking bank customers to a terrorist organization, there is no need to allege that the defendant necessarily read the specific media reports.

Defendants also advance a doctrinal argument, but that fares no better. To find general awareness here, Defendants say, "would, in effect, replace the scienter for aiding-and-abetting liability with the lower scienter required for material support." (Omnibus Reply at 14–15 (citing Honickman, 432 F. Supp. 3d at 267).) The Second Circuit in Linde did distinguish the knowing provision of material support from knowingly assuming a role in terrorist attacks. 882 F.3d at 329–30. An example illustrates the difference. Consider a bank that knowingly provides a loan to a terrorist organization so that it can purchase a vehicle, aware that it will be used to chauffeur around the organization's leader. That may constitute material support to the organization without assuming a role in life-endangering attacks. But when that same bank provides a vehicle loan knowing that the vehicle will likely be armed with explosives and driven into a public square to commit a terrorist attack, the otherwise "routine" activity may create aiding-and-abetting liability under JASTA. See Linde, 882 F.3d at 330 (concluding that "a jury, properly instructed as to aiding and abetting, [could] infer the requisite awareness" from communications which "alerted the bank that the transfers being requested therein were payments for suicide bombings").

Here, Plaintiffs allege that Defendants knowingly provided Hezbollah with wide-ranging financial services—including maintenance of accounts, accepting donations from abroad, and processing wire transfers—that were integral to financing Hezbollah's terroristic attacks. That

conduct differs from the "mere" provision of material support. Plaintiffs have not alleged an isolated provision of financial services to Hezbollah. Rather, they allege a wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers. Plaintiffs allege that despite Hezbollah's purportedly multifaceted nature, it remains singularly dedicated to religiously inspired terrorist attacks, (Am. Compl. ¶ 354); any suggestion that Hezbollah's core bankers would be unaware of their role in those attacks by providing it banking services necessary to funding those attacks is highly dubious.

One Defendant, Bank of Beirut, is on somewhat different footing. Bank of Beirut is not alleged to have maintained an account or provided financial services for a customer designated as an SDGT before any Attacks. To be sure, JASTA liability does not turn on whether the defendant had a customer designated as an SDGT. But in the absence of such a designated customer, the question remains whether this bank would have had reason to know it was assisting terrorist attacks.[10] Although it is a closer case, I conclude that Plaintiffs sufficiently plead that Bank of Beirut would have had general awareness of assuming a role in Hezbollah's attacks. The bank allegedly provided services to members of and companies controlled by the prominent Tajideen family—knowing that the Tajideens are "synonymous with Hezbollah," with family members and businesses designated as SDGTs. (Id. ¶¶ 1614, 1750-52.) The bank also allegedly took over Hezbollah-affiliated accounts from LCB after those accounts were forcibly closed following LCB's Hezbollah-related audit; and the bank would have reason to know of concerns with LCB's accounts due to the scandal surrounding its forced closure. (Id. ¶¶ 97–110, 1751–1753, 1764–65.)

In sum, Plaintiffs' detailed factual allegations plausibly allege that Defendants were

---

[10] Defendants have not specifically argued that the claims against this bank are weaker than against the others; but I consider its case in the interest of fullness and given my conclusion's reliance on the other banks' having had SDGT-designated customers during the relevant period.

generally aware of having assumed a role in Hezbollah's Attacks.

## C. Substantial Assistance

### 1. Standard

The third prong of aiding and abetting liability under JASTA is that the defendant must have "substantially assist[ed] the principal violation"—here, the terrorist attacks. Halberstam, 705 F.2d at 477. Linde instructs courts to consider the six factors outlined in Halberstam: (1) nature of the act; (2) amount and kind of assistance; (3) presence at the time of the tort; (4) relation to the tortfeasor; (5) state of mind; and (6) duration of assistance. 882 F.3d at 329 (citing Halberstam, 705 F.2d at 483–84.) Although aiding and abetting often involves "direct encouragement by word or deed," a defendant's actions "may also be more distant in time and location and still be substantial enough to create liability." Halberstam, 705 F.2d at 482.

In Linde, the court allowed that a jury might find substantial assistance from a bank processing payments for suicide bombings and providing other financial services to Hamas. Linde, 882 F.3d at 318, 330. In Siegel, the court held that a bank's transferring millions of dollars to another bank was not substantial assistance, because the defendant bank did not know that those funds would ultimately be sent to a terrorist organization. 933 F.3d at 225. Implicit in Siegel's reasoning is the suggestion that knowingly processing millions of dollars in bank transfers for a terrorist organization (rather than its bank) would constitute substantial assistance.

### 2. Application

I begin by applying the factors set forth in Halberstam v. Welch:

(1) Nature of the act: This factor "dictates what aid might matter, i.e., be substantial." Halberstam, 705 F.2d at 484.[11] Here, the ultimate tortious act was the commission of violent and

---

[11] Halberstam also described this factor as "Nature of the act encouraged," and some courts have asked whether the defendant expressly "encouraged" the terrorist attacks. E.g., Averbach, 2020 WL 486860, at *16 ("There

deadly acts of terrorism. Hezbollah allegedly supported the paramilitary attackers, trained them, armed them with explosive weaponry, provided them with logistical support, and directed their Attacks—all of which required capital. The Amended Complaint alleges in detail how Defendants enabled Hezbollah to procure that capital for carrying out the Attacks. This is unlike cases in which the bank's customers also performed non-terrorist activities, meaning any assistance would potentially have supported legitimate purposes. Cf. Kemper, 911 F.3d at 390. Bank Customers such as IRSO allegedly have no legitimate activities, (Am. Compl. ¶¶ 400–418); and although Hezbollah is a multifaceted organization, it is singularly dedicated to terrorism, (id. ¶ 354).

While in the abstract there may be a gap between banking services and terrorist attacks, these allegations plausibly bridge that gap. First, Plaintiffs allege that Hezbollah dedicates itself always and ultimately to terrorism. (Id. ¶ 354.) Second, Plaintiffs allege that Defendants' customers such as IRSO, Martyrs Foundation, and IKRC fundraise and recruit for the kinds of terrorist attacks alleged here. (Id. ¶¶ 417, 491, 580.) Third, Plaintiffs allege that Defendants provide Hezbollah access to the Lebanese economy by helping to convert large dollarized cash deposits into Lebanese pounds, including through exchange houses known to be affiliated with Hezbollah. (Id. ¶ 1488.) Fourth, Plaintiffs allege that Defendants allowed "blacklisted" accounts to migrate to their own banks after those accounts were forcibly closed at LCB due to their association with Hezbollah. (E.g., id. ¶¶ 1512–1514.) Taken together, these allegations depict Defendants as essential financial enablers of Hezbollah's known front organizations. While Defendants are not alleged to be bombmakers, they are alleged to have knowingly enabled

---

is no allegation that CAB encouraged the Attacks or any of Hamas's terrorist activities.") Defendants urge a requirement of encouragement here. (See Omnibus Reply at 16–17.) But such an interpretation is at odds with Halberstam, which elsewhere called this factor "nature of the act assisted." 705 F.2d at 488 (emphasis added). The purpose of this factor is not to ask whether there was affirmative encouragement, but to understand whether the defendant's conduct was of a kind that might be substantial. See id. (applying this factor without asking whether there was encouragement).

Hezbollah to access the funds to purchase its weaponry. That conduct is certainly "integral" to the Attacks that were ultimately committed. As in Halberstam, a party can aid and abet an act even if its role is a purely bureaucratic one—financial machinations on which "the success of the tortious enterprise" rests. 702 F.2d at 488.

Defendants dispute that providing "routine banking services" can constitute substantial assistance. (Omnibus Supp. at 43.); see Honickman, 432 F. Supp. 3d at 264 ("[T]he mere provision of routine banking services to an FTO does not render a bank liable for civil aiding and abetting.") By "routine banking services" Defendants apparently mean that the services are the kind available to any customer—maintaining accounts, transferring funds, and the like. (See Omnibus Supp. at 24.) Defendants' argument has some superficial appeal, but it is ultimately unavailing. Although the defendant in Halberstam had "performed these services in an unusual way under unusual circumstances," the court did not equate "unusual" with "substantial." 705 F.2d at 487. The Second Circuit in Linde and Siegel thus indicated that processing wire transfers for terrorists could support a finding of substantial assistance. 882 F.3d at 330; 933 F.3d at 221. Yet wire transfers are a service available to any customer, not only terrorists.[12]

In sum, Defendants' alleged financial support to Hezbollah was "integral" to the Attacks, and this factor weighs in favor of finding substantial assistance.[13]

---

[12] One might define "routine banking services" to mean banking services which do not appear from the bank's vantage to be carried out for terrorists. That definition would support the statement of law that banks cannot be liable for providing routine banking services. But one would reach the conclusion under the "general awareness" prong, rather than the substantial assistance prong. See Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94–96 (5th Cir. 1975) ("If the alleged aider and abettor conducts what appears to be a transaction in the ordinary course of his business, more evidence of his complicity is essential.") (cited in Halberstam, 705 F.2d at 477). Using that subjective definition of "routine," it is not improper to insulate "routine banking services" from JASTA liability; but stretching the argument to place beyond JASTA's reach activities such as wire transfers would unduly hamstring the statute and contradict the Second Circuit's guidance in Linde and Siegel.

[13] The Amended Complaint also includes numerous allegations of less obviously nefarious conduct, such as providing services to non-designated businesses such as an amusement park which allegedly funneled money to Hezbollah. (See id. ¶ 647.) Regardless of whether such conduct would alone constitute substantial assistance,

(2) Amount and kind of assistance: The financial services provided by Defendants were not only of a substantial kind, they were also of a substantial amount. The Amended Complaint explains that the services provided to the alleged Bank Customers enabled access to millions of dollars. (See, e.g., Am. Compl. ¶ 120 (charging Defendants with "facilitating the transfer of at least hundreds of millions of U.S. dollars through the United States on Hezbollah's behalf and for Hezbollah's benefit.").) Although the Amended Complaint does not specify exactly how much money was received in the accounts held by the designated SDGTs, Plaintiffs do allege that such accounts had been publicly advertised since 1986, that Israeli jets targeted several Defendants' offices in the mid-2000s for being publicly associated with Hezbollah, and that there was a phone number that members of the public could call for assistance with making donations to Hezbollah. (See id. ¶¶ 420-421, 1499, 1563.) That those events occurred over a lengthy timespan creates the plausible inference that Hezbollah raised substantial sums through these accounts. This factor thus weighs in favor of a finding of substantial assistance.

(3) Presence at the time of the tort: Plaintiffs admit that Defendants were not present at the time of the Attacks. (Opp'n at 55.) But there is reason to afford this factor little weight here. Halberstam discounted this factor because the tortious enterprise there necessarily required certain activities away from where the tort was committed, and the defendant's "role in that side of the business was substantial." 705 F.2d at 488. The same is true here: the Attacks required substantial funding activities which can be expected to occur far earlier and away from the where the Attacks were committed.

(4) Relation to the tortfeasor: This factor recognizes that one's encouragement of a tort may be more effective or less effective depending on one's relationship to the person being

Defendants have moved to dismiss the entire Amended Complaint and I consider Plaintiffs' allegations in their entirety.

encouraged. For example, if someone maintains a "position of authority" over another, there will be "greater force to his power of suggestion." Id. at 484. The Halberstam court warned that this factor can be difficult to interpret and that "we must be cautious not to overemphasize the relationship." Id. at 488 (giving this factor "a low priority in our calculus").

The Amended Complaint does include a small number of allegations suggesting that certain Defendant banks maintained a close relationship to Hezbollah. The chair of MEAB Bank was designated an SDGT in 2015 due to his connection to Hezbollah; Defendant JTB was likewise designated in 2019. (Am. Compl. ¶ 1557; D.E. # 142-2.) But other allegations undercut the notion of a close relationship, such as the chairman of Defendant Fransabank's statement that "[w]e have no relationship with Hezbollah." (Am Compl. ¶ 1500.) Even Plaintiffs admit that the Hezbollah-affiliates' relationship to Defendants is that of "customers." (E.g., id. ¶ 1493.)

(5) State of mind: This factor asks whether the defendant "was one in spirit" with the tortfeasor, such that its conduct "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." Halberstam, 705 F.2d at 484, 488. The Second Circuit in Siegel indicated that this factor could favor a finding of substantial assistance if the defendant "knowingly or intentionally supported [the terrorist organization]." 933 F.3d at 225. As discussed with respect to the "general awareness" prong, Plaintiffs have plausibly alleged that Defendants knew they were enabling fundraising for Hezbollah.[14] This factor accordingly weighs in favor of substantial assistance. Cf. Siegel, 933 F.3d at 225.

---

[14] This factor appears to overlap to some extent with the "general awareness" prong. One distinction may be that this factor assesses the defendant's overall state of mind, whereas the "general awareness" prong seeks to confirm that the defendant knew the object of the scheme was improper; this prevents imposing liability where a defendant knowingly aided tortious activity but was not aware that the aided activity was illegal. See Halberstam, 705 F.2d at 485 n.14 ("[W]e have acknowledged that an 'awareness of wrong-doing requirement' for an aider-abettor is designed to avoid subjecting innocent, incidental participants to harsh penalties or damages.").

(6) Duration of assistance: This factor "affects the quality and extent of their relationship and probably influences the amount of aid provided as well . . . ." Halberstam, 705 F.2d at 484. Plaintiffs allege that Defendants provided banking services to the alleged Customers from at least 2004–2011. The Amended Complaint includes allegations concerning specific banking transactions that plausibly occurred within that time period. (E.g., Am. Compl. ¶¶ 1152.) The complaint also includes allegations of certain Defendants providing services to the alleged Bank Customers as far back as 1986. (Id. ¶ 420.) Moreover, the Amended Complaint alleges that Defendants continued to provide services to customers even after their accounts had been forcibly closed at LCB. (E.g., id. ¶¶ 1512–1514.) This factor "may afford evidence of the defendant's state of mind." Halberstam, 705 F.2d at 484. The continued provision of financial services to these blacklisted account-holders certainly evinces a culpable, or at least willfully blind state of mind.

In sum, four Halberstam factors in the main weigh in favor of substantial assistance.

Finding substantial assistance here would be consistent with the Second Circuit precedents. Linde taught that a jury could find substantial assistance where a defendant "knowingly provid[ed] financial services to Hamas [and] an entity that made payments to the families of Hamas suicide bombers." Id. at 318. Substitute Hezbollah for Hamas, and those are the exact allegations Plaintiffs make here. Likewise in Siegel, the Second Circuit indicated that knowingly processing millions of dollars in transfers for a terrorist organization would constitute substantial assistance. 933 F.3d at 225. That is what Plaintiffs here have plausibly alleged.

Recent district court cases rejecting JASTA claims against financial institutions are not to the contrary.[15] Many of the recent cases did not reach the question of substantial assistance, instead

---

[15] As an initial matter, most such cases are on appeal which makes their current precedential value tenuous. See Licci v. American Express Bank Ltd., No. 19-3522 (2d Cir.); Weiss v. National Westminster Bank PLC, No. 19-

for example deciding the case on the "general awareness" prong. E.g., O'Sullivan, 2019 WL 1409446, at *10; Weiss, 381 F. Supp. 3d at 238–39 (same); Freeman, 413 F. Supp. 3d at 97–98. Others involved bank customers whose designation as terrorists came only after the attacks at issue. E.g., Kaplan, 405 F. Supp. 3d at 536; Honickman, 432 F. Supp. 3d at 265. Likewise, the complaint in Averbach provided "no non-conclusory allegations from which the Court can infer that [the terrorist organization] actually received the funds transferred through the correspondent accounts." 2020 WL 486860, at *16. First of all, I would note that none of these cases are controlling authority. In any event, this case is distinguishable from all of those: the Bank Customers here were allegedly designated as SDGTs during the relevant period, which permits the inference that Defendants knew their financial services were going to support Hezbollah.

Defendants argue that the Amended Complaint lacks allegations concerning precisely when the particular services were provided. (See Omnibus Supp. at 1–2, 42–43.) That argument demands a level of specificity not required at the pleadings stage. The Amended Complaint is not devoid of dates. For example, the complaint references a 1986 newspaper advertisement stating that donations to Hezbollah could be made to an account at Defendant JTB. (Am. Compl. ¶ 420.) Israel allegedly bombed two Defendants' offices in 2006 due to their reported affiliation with Hezbollah. (Id. ¶¶ 1499, 1563.) And Defendants allegedly allowed blacklisted accounts which had been closed at LCB to migrate to their banks in 2011. (Id. ¶¶ 1512–1514.) The Amended Complaint also includes specific allegations tying the Bank Customers to Defendants, such as IRSO's and the Martyrs Foundation-Lebanon's account numbers at certain Defendant banks. (Id. ¶ 1494.) Given the specificity that is in the complaint, including temporal specificity, the paucity

---

863 (2d Cir.); Freeman v. HSBC Holdings PLC, No. 19-3970 (2d Cir.); Honickman v. Blom Bank, No. 20-575 (2d Cir.).

of specific allegations concerning when individual wire transfers occurred is a matter for discovery and, if appropriate, summary judgment.

In sum, the Amended Complaint plausibly alleges that Hezbollah committed the Attacks that injured Plaintiffs; that Defendants knowingly assumed a role in Hezbollah's Attacks; and that the assistance Defendants allegedly provided to Hezbollah was substantial. Plaintiffs have accordingly stated a claim for aiding-and-abetting liability under JASTA.[16]

## IV.     Successor Liability

Plaintiffs' fourth cause of action is for successor liability resulting from SGBL's assumption of LCB's assets and liabilities under 18 U.S.C. § 2333(a) and 18 U.S.C. § 2333(d). (Am. Compl. ¶¶ 5682–5695.) Although Plaintiffs established personal jurisdiction for Claims I–III, "[a] plaintiff must establish the court's jurisdiction with respect to each claim asserted." Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis omitted). Plaintiffs allege that SGBL is subject to personal jurisdiction for successor liability due to (i) its inheriting LCB's personal jurisdiction status with respect to these claims and (ii) SGBL's own contacts with New York. Although I found that Plaintiffs state a claim against SGBL for direct JASTA liability, they have failed to establish a prime facie case of personal jurisdiction as to the successor liability claim, which must accordingly be dismissed.

### A.  Successor Jurisdiction

Plaintiffs principally assert that the successor liability claim is properly before this Court because SGBL inherited LCB's personal jurisdiction status. (Opp'n at 74). "In certain circumstances the successor corporation may inherit its predecessor's jurisdictional status[.]" U.S.

---

[16] Having concluded that Plaintiffs' Second Claim for Relief states a claim under JASTA, 18 U.S.C. § 2333(d)(2), there is no need to evaluate their Third Claim for Relief, which also seeks relief under JASTA, 18 U.S.C. § 2333(d)(2), under an alternative conspiracy theory.

Bank Nat'l Ass'n v. Bank of Am. N.A., 916 F.3d 143, 157 (2d Cir. 2019) (internal quotation marks omitted).   Whether "liability as a successor in interest also entails being subject to personal jurisdiction . . .  depends on the basis of the successor liability."  Id. at 156.  Although successor liability "based on acquisition of a predecessor's assets" does not necessarily confer successor jurisdiction, "the rule is different where the successor liability of the defendant derives from a merger with the predecessor."  Id.; In re Nazi Era Cases Against German Defendants Litig., 153 F. App'x 819, 822 (3d Cir. 2005) (stating that under New York law, "[a] merger of corporations generally implicates successor jurisdiction, whereas a mere acquisition of assets does not."); Gronich & Co., Inc. v. Simon Property Grp., Inc., 119 N.Y.S.3d 456, 457 (N.Y. App. Div. 2020) ("It is where the 'successor' has merely acquired the assets of the predecessor company that the [jurisdictional] contacts are not imputed.").

Plaintiffs claim that because the LCB-SGBL Sale and Purchase Agreement conferred all of LCB's liabilities,[17] even if it was an asset acquisition rather than a merger, the distinction is moot and thus jurisdiction should transfer.  (Opp'n at 74–75) (arguing that in U.S. Bank "the court could 'see no reason to doubt' that the successor to 'all' liabilities 'would be subject to jurisdiction' wherever the predecessor would be").   Unscrambling Plaintiffs' U.S. Bank quotation reveals, however, that the Second Circuit explained (albeit in dicta) that it was only "[b]ecause a successor by merger is deemed by operation of law to be both the surviving corporation and the absorbed corporation" that the successor would incur the predecessor's jurisdictional status.  916 F.3d at 156.  Though liability transfer is one aspect of a merger, courts have held that "continuity of ownership is the essence of a merger," and "a de facto merger will not be found in the absence of

---

[17] The LCB-SGBL Sale and Purchase Agreement states that "[t]he Assumed Liabilities consist inter alia of any and all of the Seller's liabilities and/or obligations and/or debts . . . to the extent they relate to the Seller's Business."  (Am. Compl. ¶ 138; D.E. # 105-2 ¶ 2.3.)

this element." New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 211–12 (2d Cir. 2006); Time Warner Cable, Inc. v. Networks Grp., LLC, No. 9-cv-10059, 2010 WL 3563111, at *6 (S.D.N.Y. Sept. 9, 2010) (analyzing de facto merger "in a flexible manner" but nevertheless maintaining that "there must be continuity of ownership"). And continuity of ownership is essential even if the buyer assumed the seller's liabilities. See, e.g., In re New York City Asbestos Litig., 789 N.Y.S.2d 484, 487–89 (N.Y. App. Div. 2005) (Where "there is no continuity of ownership," it does "not avail plaintiff that the third factor (assumption of liabilities necessary for uninterrupted business operations) apparently is present.").

That mergers are essentially characterized by continuity of ownership explains why the dicta in U.S. Bank approved of successor jurisdiction following a merger: such a rule avoids defensive forum-shopping, because otherwise "a corporation liable to suit in a state in which it does not wish to be sued could simply arrange a merger with a dummy corporation and thus avoid being subject to an undesired jurisdiction in the state where its actions incurred the liability." 916 F.3d at 156. That specter of jurisdictional abuse is absent for asset purchases without continuity of ownership where the selling company continues to exist and can presumably be haled into court for the liabilities at issue.[18] Indeed, the U.S. Bank majority opinion rejected the concurring opinion's reliance on cases involving asset acquisition instead of "successor liability that results from a merger." Id. at 156–57 (summarizing Schenin v. Micro Copper Corp., 272 F. Supp. 523, 526 (S.D.N.Y. 1967) and concluding that "had the successor liability been based on merger (as opposed to successor liability based on purchase of assets), the successor would 'inherit' the

---

[18] Given that LCB apparently continues to exist, Plaintiffs appear free to attempt to sue LCB in New York for the torts they allege; or Plaintiffs may sue SGBL where it is subject to general jurisdiction. Although I am not unsympathetic to the difficulties of recovering from a liquidated entity such as LCB, the law does not permit me to exercise successor jurisdiction over an asset purchaser such as SGBL, absent continuity of ownership, for claims arising from LCB's tortious conduct.

predecessor's jurisdictional status."). Thus, courts have recognized successor jurisdictional status when the successor corporation absorbs the predecessor corporation as in a merger. E.g., Arabi v. Javaherian, No. 13-CV-00456-ERK-CLP, 2014 WL 3892098, at *8 (E.D.N.Y. May 1, 2014) (allowing successor jurisdiction where "the predecessor and successor [are] one and the same and [the] the predecessor continues to exist as part of the successor") (internal quotation marks omitted); Societe Generale v. Fla. Health Scis. Ctr., Inc., No. 03 CIV. 5615 (MGC), 2003 WL 22852656, at *4 (S.D.N.Y. Dec. 1, 2003) ("Courts have held that a successor may inherit its predecessor's jurisdictional status in several situations: for example, if there was a de facto merger or consolidation of the two entities or if the successor is a 'mere continuation' of the predecessor.").

SGBL's alleged purchase of LCB was an asset purchase rather than a merger or mere continuation of LCB. Plaintiffs do not allege continuity of ownership—i.e., that "the shareholders of the predecessor corporation bec[a]me direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets," Asbestos Litig., 789 N.Y.S.2d at 486–87 (citing Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 47 (2d Cir. 2003)). (See Am. Compl. ¶¶ 1448–1464; see generally Opp'n). The Amended Complaint specifically refers to the sale as an acquisition of assets and liabilities—not as a merger. (Am. Compl. ¶¶ 140, 5684). Even if SGBL obtained all of LCB's liabilities, that does not necessarily confer jurisdiction. See U.S. Bank, 916 F. 3d at 157; New York, 460 F.3d at 212. Indeed, LCB continues to exist as an entity and is litigating in the Kaplan case currently before the Second Circuit. See No. 19-3522 (2d Cir); cf. Douglas v. Stamco, 363 F. App'x 100, 102 (2d Cir. 2010) ("[T]he predecessor entity . . . survived the asset sale as a bankrupt entity, which renders the mere continuation exception unavailable." (citing Wensing v. Paris Indus.—N.Y., 558 N.Y.S.2d 692 (N.Y. App. Div. 1990)). Because SGBL purchased LCB's assets for cash as the result of a bidding

process and did not merge with or otherwise "merely continue" LCB's ownership, SGBL did not inherit LCB's jurisdictional status in this forum.  (Id. ¶¶ 1448, 1463.)

Accordingly, Plaintiffs fail to establish successor-inherited personal jurisdiction over SGBL with respect to Claim IV.

### B.  Jurisdiction Based on SGBL's New York Contacts

Plaintiffs also contend that SGBL is subject to personal jurisdiction for successor liability because "SGBL itself had relevant in-forum conduct."  (Opp'n at 75 (emphasis in original).)  Specifically, "SGBL maintained New York correspondent accounts, which it used to process USD-denominated transactions on behalf of Hezbollah's BAC."[19]  (Id. (citations omitted).)

Personal jurisdiction requires a "connection between the forum and the specific claims at issue."  Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1776 (2017).  Plaintiffs fail to allege any such connection between SGBL's New York contacts and LCB's liability.  In Licci, exercising personal jurisdiction in New York was appropriate because "the correspondent account at issue is alleged to have been used as an instrument to achieve the very wrong alleged."  732 F.3d at 171 (emphasis added).  Here, the wrongs alleged are "the acts of LCB."  (Am Compl. ¶ 5694.)  None of Plaintiffs' allegations explain how LCB's conduct "arose from" SGBL's New York contacts, as is required.  Licci, 732 F.3d at 171.  While the "arising from" inquiry is a permissive one, it requires at least some connection between the contacts and liability.  Id. 169.  But Plaintiffs fail to plausibly allege that LCB's tortious conduct arose from SGBL's New York contacts.  Accordingly, SGBL's own New York contacts do not confer personal jurisdiction over the successor liability claim.

---

[19] SGBL argues that the Sale and Purchase Agreement between SGBL and LCB in Lebanon fails to confer personal jurisdiction in New York.  Plaintiffs do not appear to dispute this point, other than to rely upon that Agreement to argue for successor-based jurisdiction.

*  *  *

Plaintiffs fail to allege a <u>prima facie</u> case of personal jurisdiction over SGBL for Claim IV, successor liability, either through successor-inherited jurisdiction or through SGBL's own New York contacts. Accordingly, Plaintiffs' claims regarding SGBL's assumption of LCB's liabilities are dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss the Amended Complaint are granted as to Plaintiffs' First and Fourth Claims for Relief. The motions are denied as to Plaintiffs' Second and Third Claims for Relief under 18 U.S.C. § 2333(d).

Lastly, I note that today's opinion discusses several ATA/JASTA cases whose appeals are currently pending before the Second Circuit. <u>See supra</u> n.15. The Second Circuit has heard oral argument in two of those appeals—<u>Weiss</u> and <u>Kaplan</u>—with <u>Honickman</u> and <u>Freeman</u> scheduled for argument in December and February, respectively. Mindful of these pending appeals, the district court in <u>Henkin</u> recently certified the following question for interlocutory appeal after denying the motion to dismiss in that case:

> Under the ATA/JASTA, what amount and type of media coverage, governmental pronouncements, and other publicly available information – if any – is sufficient circumstantial evidence for a plaintiff to plead a plausible claim that a financial institution was aware that, by providing financial services to a client, it was thereby playing a role in violent or life-endangering activities as an aider and abettor?

No. 19-cv-5394, D.E. # 36 (E.D.N.Y. Nov. 13, 2020). I recognize that the issues in this case are highly contested and that the Second Circuit's decisions in the pending appeals may largely resolve those issues. For these reasons, today's decision is without prejudice to any party filing an application to stay these proceedings for a limited period, in light of the possibility that the Second

Circuit's decisions in the pending appeals could resolve certain issues in this case. If such a motion is made, I will of course consider any opposition to it.

SO ORDERED.

Dated: November 25, 2020
      Brooklyn, New York

/s/ Carol Bagley Amon
_____
Carol Bagley Amon
United States District Judge