# Exhibit B

```
 1                    UNITED STATES COURT OF APPEALS
                              FOR THE
 2                          SECOND CIRCUIT

 3
       MICHAL HONICKMAN, Individually,
 4     and for the Estate of
       Howard Goldstein, et al.,
 5
                    Plaintiffs/Appellants,
 6

 7     V.

 8
       BLOM Bank, SAL,
 9
                    Defendant/Appellee.
10

11                           *   *   *

12
                    TRANSCRIPT OF RECORDED ORAL ARGUMENT
13                  HEARD ON THURSDAY, DECEMBER 10, 2020

14                           *   *   *
15

16

17

18

19

20

21

22

23

24

25
```

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-34130BBCBD5B

2

```
 1

 2                     ATTORNEY APPEARANCES

 3          Michael J. Radine, Attorney at Law
                         Osen, LLC
 4                    2 University Plaza
                         Suite 402
 5          Hackensack, New Jersey  07601
                        201.265.6400
 6          Counsel for Plaintiffs/Appellants

 7          Linda C. Goldstein, Attorney at Law
                        Dechert, LLP
 8                   Three Bryant Park
                1095 Avenue of the Americas
 9            New York, New York  10036
            Counsel for Defendant/Appellee
10

11
                        *   *   *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-341308BCBD5B
Case 1:19-cv-00007-CBA-VMS  Document 172-2  Filed 12/15/20  Page 4 of 27 PageID #: 8837

3

```
1              The following recorded Oral Argument was held on

2      Thursday, December 10, 2020, before The Honorable Rosemary

3      Pooler, The Honorable Richard Wesley, and The Honorable

4      Susan Carney, and was conducted pursuant to the Federal

5      Rules of Civil Procedure, and transcribed after the fact,

6      as follows:

7                               *   *   *

8              JUDGE POOLER:  Next on our calendar is

9      Honickman versus BLOM Bank.

10             MR. RADINE:  Good morning, and may it

11     please the Court.  This is Michael Radine of

12     Osen, LLC, on behalf of the plaintiffs/

13     appellants.

14             I'd like to begin this morning by focusing

15     on the district court's misstatement of the

16     general-awareness standard set forth in

17     Halberstam v. Welch, which applies to JASTA

18     claims.  The district court held that

19     plaintiffs must allege BLOM's awareness of a

20     role in terrorist attacks.  But the lower

21     court's decision, which relies substantially on

22     Kaplan v. LCB, which is currently before this

23     court as Licci v. LCB, is incorrect.

24             Under JASTA, a defendant must be generally

25     aware that it is playing a role in violent or
```

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-34130BBCBD5B

```
1        life-endangering activities -- it doesn't
2        necessarily have to be violent -- from which
3        acts of international terrorism are a
4        foreseeable risk.  The standard comes from
5        Halberstam, where the defendant assisted,
6        quote, overall illegal or tortious activity,
7        which there was a criminal enterprise in stolen
8        goods, from which, quote, violence and killing
9        is a foreseeable risk.  Under JASTA, then,
10       terrorist activities or life-endangering
11       activities, as the Court in Linde used those
12       phrases, means conduct relating to a terrorist
13       enterprise, not terrorist attacks.  Here, the
14       lower court disagreed with Halberstam's
15       foreseeability framework, holding that it is,
16       quote, not enough for plaintiffs to plausibly
17       allege that BLOM was generally aware of its
18       role in terrorist activities, from which
19       terrorist attacks were a natural and
20       foreseeable consequence.
21            JUDGE WESLEY:  Kind of an interesting --
22       an interesting idea that the district court
23       could disagree with Halberstam's analysis,
24       since Halberstam is specifically incorporated
25       into the -- into the JASTA framework, isn't it?
```

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-34130BBCBD5B

```
 1          MR. RADINE:  Yes.  I agree, Your Honor.
 2     And, indeed, on the next page of its decision,
 3     on footnote 8, the Court mentions the passage
 4     from Halberstam I quoted a moment before and
 5     rejects it as incompatible with Linde.  But
 6     Linde, of course, explicitly adopts Halberstam
 7     and does not require more from a pleading than
 8     allegations of knowingly funding a terrorist
 9     organization.  Indeed, it held that whether,
10     quote, providing routine financial services to
11     associates of terrorist organizations is itself
12     a violent, life-endangering act for the
13     purposes of primary liability, much less
14     playing a role in them for secondary liability,
15     is a jury question.  And that's Linde at 327.
16          So the result is, the lower court found it
17     dispositive that BLOM had no specific knowledge
18     that these nominal charities engaged in any
19     violent activities themselves, to quote the
20     lower court.  But BLOM more than plausibly knew
21     that they were engaged in life-endangering
22     activities and that they were Hamas fundraising
23     institutions.  You can't --
24          JUDGE POOLER:  Did they know that?  Did
25     they know that they were Hamas fundraising
```

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-341308BCBD5B

```
 1        institutions?  Did you allege that in your
 2        complaint, and did you have any evidence to
 3        support that?
 4             MR. RADINE:  Yes, Your Honor.  This is the
 5        district court's second error.  The -- the
 6        allegations we presented -- which this court is
 7        lenient as to the state of mind and takes
 8        allegations in their totality rather than in
 9        isolation -- shows that BLOM did know that.
10        Hamas operated openly in Lebanon and in the
11        Palestinian refugee camps.  Hamas created the
12        three customers, as they're called.  So, for
13        instance, Sanabil, which the FBI in 2001 said
14        was a, quote, known front or supporter for
15        Hamas, created by Hamas as its da'wah -- is the
16        term -- headquarters in Lebanon, led by Hamas
17        leadership.  And that means Hamas leadership at
18        the time, despite BLOM's suggestion otherwise.
19        That's in our complaint at 591.
20             JUDGE POOLER:  So is it -- is it your
21        argument that if BLOM didn't know, they were
22        willfully ignorant?  They made themselves
23        willfully ignorant of these facts that you
24        allege here?
25             MR. RADINE:  They would have had to have
```

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-341308BCBD5B

```
 1      been.  It would have to be a -- a decision at
 2      that point to not know what was clear, not only
 3      from Sanabil's status as a Hamas institution,
 4      but where the money was coming into Hamas.
 5      Millions of dollars are coming into Hamas from
 6      two organizations that were already designated
 7      by Israel, and then, of course, from HLF,
 8      designated by the United States in 2001, and
 9      all this money was being converted into cash.
10      So millions of dollars are coming in from
11      Hamas' fundraising network abroad and being
12      pulled out in untraceable cash.
13          JUDGE CARNEY:  Let me ask.  I mean, do the
14      allegations support -- I mean, the notion that
15      being aware of red flags is tantamount to
16      having an intention to further terrorist
17      activity, doesn't Linde suggest that we need to
18      have something more?  And Siegel says that less
19      than an intention to further that activity is
20      inadequate to support liability under 2333.
21          MR. RADINE:  No, Your Honor.  Linde nor
22      Siegel require intent, and Halberstam as well
23      does not require intent.  Nothing in JASTA --
24          JUDGE WESLEY:  And Halberstam only
25      requires general awareness and some degree of
```

```
 1          foreseeability.  General awareness that there's
 2          a role -- that by -- by participating, that
 3          somehow playing a role with regard to the
 4          terrorist organization in some particular way,
 5          and that it's foreseeable from that role that,
 6          indeed, terrorist activity might arise.  They
 7          don't have to have a specific purpose and/or
 8          awareness of that it -- that they're assisting
 9          terrorist activity itself, do they, under
10          Halberstam?
11              MR. RADINE:  No, they don't.  There's no
12          intent required, and it was not at issue there.
13          As Your Honor said, the question is the
14          awareness of the role in terrorist activities
15          from which violence is foreseeable.  As the
16          supreme court found in Holder v. Humanitarian
17          Law Project, support for terrorist
18          organizations results in violence.  The phrase
19          was, facilitates more terrorist attacks.
20              And that would be clear here, to BLOM
21          moving millions of dollars into the area, which
22          is then pulled out in cash.  Cash, which they
23          admit at Page 32 of their brief, they don't
24          have visibility on the use for that cash; they
25          just see it leaving the account in the
```

1    untraceable cash.

2        We know from the treasury designation,

3    though, that Sanabil was using that cash to,

4    quote, provide funding to Hamas, in addition to

5    its recruiting efforts in the camps and

6    elsewhere.

7        JUDGE WESLEY:  In Licci you have fairly

8    specific allegations with regard to some of the

9    customers and their specific activities as the

10   treasury of Hezbollah.  So the customers

11   themselves were identified.  And the -- and the

12   transactions, including the ever-increasing

13   daily cash-transaction limits, had some

14   coordination, at least as far as your -- as

15   your complaint was in that -- same law firm

16   here -- was concerned in identifying the fact

17   that it had an appreciation that it was going

18   beyond just being the banker for these folks.

19   Isn't that the case?  I mean, you -- you had

20   far more specific allegations in Licci than you

21   have here, don't you?

22       MR. RADINE:  Yeah.  There are more

23   specific allegations in Licci; there are

24   allegations that are here that are not in

25   Licci.  For instance, here, there is the Hamas

    1          fundraising network that was already designated

    2          abroad, where the money's coming in from.  That

    3          particular fact is not in Licci.  But here, as

    4          in there, Sanabil is designated as a

    5          fundraising organization for Hamas, as in -- as

    6          is Union of Good.  They're playing the same

    7          roles here.  And that certainly would have been

    8          enough for the bank to be generally aware of

    9          the role that it's in.

   10              They're all -- the defense is essentially

   11          the same, which is that these entities call

   12          themselves charities or commercial operations,

   13          but, of course, that can't be immunizing under

   14          the statute.  Providing that support to an FTO

   15          is enough, as a pleading matter, certainly, to

   16          meet JASTA.

   17              And I see I'm over my time here.

   18              JUDGE POOLER:  Okay.  Counselors --

   19          counselors, are you both aware of a case

   20          entitled Reuvane versus Lebanese Canadian Bank?

   21              MR. RADINE:  Yes, Your Honor.

   22              JUDGE POOLER:  You're aware of that,

   23          that --

   24              MR. RADINE:  Yes.

   25              JUDGE POOLER:  -- that was argued last

DocuSign Envelope ID: 837F52B4-44DB-4243-8A94-34120BBCBD5B

1      November?

2          MR. RADINE:  Yes.  Also -- also called

3      Licci, that Judge Wesley referred to a moment

4      ago.

5          JUDGE POOLER:  Thank you.

6          I'm sorry, Judge Carney.  Did you have a

7      question?

8          JUDGE CARNEY:  No.  No.

9          JUDGE POOLER:  Okay.

10         Thank you.  You've reserved two minutes

11     for rebuttal.

12         MR. RADINE:  Thank you.

13         JUDGE POOLER:  We'll turn to the counsel

14     for the bank.

15         MS. GOLDSTEIN:  May it please the Court.

16     Linda Goldstein for BLOM Bank.

17         The district court's decision is faithful

18     to this court's precedence in both Linde and

19     Siegel, and the arguments you have heard this

20     morning are largely an invitation to rewrite

21     those two opinions.

22         I will address the three main defects in

23     plaintiffs' argument:  First, the incorrect

24     legal standard for the general-awareness prong

25     of a JASTA claim; second, the insufficient

DocuSign Envelope ID: 837F52B4-44DB-4243-8A94-34130BBCBD5B

```
 1          factual allegations supporting the

 2          substantial-assistance prong in this case; and,

 3          third, the contention that the allegations in

 4          the complaint are enough to allow the case to

 5          go to discovery.

 6               First, both Linde and Siegel confirmed

 7          that the general-awareness prong of a JASTA

 8          claim requires that defendant be aware that by

 9          assisting the principal it is itself assuming a

10          role in terrorist activities, specifically,

11          activities that are violent or life

12          threatening.  Neither case held that it is

13          enough to allege that a defendant was generally

14          aware that it was assuming a role in financing

15          a foreign terrorist organization from which it

16          was foreseeable that terrorist activities would

17          later result.

18               JUDGE WESLEY:  Well, let me ask you a

19          question.  If there's a -- if a panel of this

20          court were to find that there's an

21          inconsistency between Halberstam and Linde,

22          which controls?

23               MS. GOLDSTEIN:  There is no inconsistency

24          between --

25               JUDGE WESLEY:  No.  Don't answer -- I
```

DocuSign Envelope ID: 837F52B4-44DB-4243-8A94-34120BBCBD5B

```
 1        asked you a question.  If the panel of -- if

 2        this panel were to find that there was an

 3        inconsistency between the two, which controls?

 4             MS. GOLDSTEIN:  Well, plainly, Your

 5        Honor --

 6             JUDGE WESLEY:  Halberstam controls, does

 7        it not?

 8             MS. GOLDSTEIN:  -- JASTA says that --

 9        that --

10             JUDGE WESLEY:  Does not -- excuse me.

11             MS. GOLDSTEIN:  -- Halberstam provides the

12        framework.  And so the question is, what is the

13        framework that Halberstam provides.  And my

14        position, Your Honor, is that Linde is fully

15        consistent with Halberstam.  And if you let me

16        explain --

17             JUDGE WESLEY:  Well, don't you -- doesn't

18        it trouble you the district court found that

19        Halberstam was wrong or that Linde was right?

20             MS. GOLDSTEIN:  Um, I -- number one, Your

21        Honor, I don't believe that that is what the

22        district court held.

23             JUDGE WESLEY:  Okay.

24             MS. GOLDSTEIN:  But if I could point out,

25        the very first paragraph of Halberstam's legal
```

DocuSign Envelope ID: 837F52B4-44D8-4243-8A94-34120BBCBD5B

1    analysis at page 476 of the D.C. Circuit's

2    opinion explains that the case addresses two

3    separate questions:  First, whether Halberstam

4    was subject to vicarious liability for her

5    partner's burglaries --

6         JUDGE WESLEY:  Right.

7         MS. GOLDSTEIN:  -- and, if so, whether the

8    scope of that liability included a murder

9    committed by her partner during the course of

10   one of those burglaries.

11        JUDGE WESLEY:  Uh-huh.

12        MS. GOLDSTEIN:  The opinion's reference to

13   foreseeability arises only in connection with

14   the second question and not the first.  In

15   other words, the foreseeability of the murder

16   played no role in the Court's analysis whether

17   Halber- -- Hamilton was subject to vicarious

18   liability for the burglary.  That first

19   question was answered purely with reference to

20   Hamilton's knowledge of Welch's property crimes

21   at night and her role in processing the

22   proceeds of those crimes.

23        By analogy, under JASTA, a defendant must

24   be found vicariously liable for one act of

25   international terrorism before the

```
1        foreseeability of other consequences can come

2        into play.  Judge Matsumoto clearly applied the

3        correct legal standard for general awareness when she

4        followed this court's decisions in both Linde and

5        Siegel.  It's not just one case; it's both.

6             If I might also point to the statute, Your

7        Honor, the statute creates aiding-and-abetting

8        liability for acts of international terrorism.

9        By statutory definition, that requires violence

10       or life-threatening activity.

11            Halberstam, by contrast, was a survey of

12       common-law, aiding-and-abetting, and conspiracy

13       liability.  And the Court was clear that the

14       analysis was meant to cover a broad range of

15       torts, not just torts resulting in physical

16       injury.  But the -- but the analysis

17       specifically refers in numerous points to

18       aiding-and-abetting liability for

19       securities-fraud claims, which, obviously,

20       would not involve violence or life-threatening

21       activity.

22            So what the Courts did in Linde and again

23       in Siegel was take that middle prong of

24       Halberstam, which refers to illicit or tort --

25       sorry -- illegal or tortious activity and
```

```
 1        replaced it with the words of JASTA, which is
 2        terrorist activity.  And the sine qua non of
 3        terrorist activity is violent or life-
 4        threatening acts.  And that is why Linde and
 5        Siegel both correctly applied the Halberstam
 6        framework, which is what the statute requires,
 7        to the particulars of a claim under JASTA for
 8        vicarious liability under the Anti-Terrorism
 9        Act.
10            If I might move on to substantial
11        assistance.  Substantial assistance in this
12        part -- case are particularly flimsy.  The only
13        allegations against BLOM are that it processed
14        deposits into the accounts of Sanabil and Subul
15        Al-Khair, and that it facilitated distribution
16        of small cash payments to Palestinian refugee
17        camps living in Lebanon, not in the West Bank
18        or Israel, which is where all of the attacks
19        are alleged to have occurred.  That is what the
20        complaint says.
21            There can be no speculation that the cash
22        somehow went somewhere else.  The complaint
23        says that the cash went to those refugees in
24        the camps in Lebanon, and there is no
25        allegation that either Sanabil or Subul
```

DocuSign Envelope ID: 837F52B4-44DB-4243-8A94-34130BBCBD5B

```
 1        Al-Khair were themselves involved in violent or
 2        life-threatening activities --
 3             JUDGE WESLEY:  Excuse me.
 4             MS. GOLDSTEIN:  -- there is no allegation
 5        that any of the people that got that money
 6        engaged in violent or life-threatening
 7        activity, and there is no allegation that any
 8        of the funds transmitted to Sanabil or Subul
 9        Al-Khair made their way to Hamas.
10             JUDGE WESLEY:  Excuse me.  Excuse me.  Is
11        there -- was Sanabil designated prior to --
12             MS. GOLDSTEIN:  No.  No.
13             JUDGE WESLEY:  -- as a customer by Israel?
14             MS. GOLDSTEIN:  No.  Sanabil -- Sanabil
15        was designated by Israel -- that was not
16        public.  The complaint does not allege that
17        that was publicly available.  And, in fact, I
18        tried very hard to find it.  My library staff
19        couldn't find it anywhere other than on -- on
20        plaintiffs' counsel's website.  Israel enacted
21        a law in 2005, four years after the last of the
22        attacks in this case, which for the first time
23        allowed those designations to be posted on a
24        website that banks could consult.  But before
25        2005, they were not generally available, so
```

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-24120BBCBD5B

1        there's no basis to surmise --

2            JUDGE WESLEY:  So you take --

3            MS. GOLDSTEIN:  -- that BLOM had any idea

4        that they were there.

5            JUDGE WESLEY:  You take umbrage with --

6        with your opponent's indication earlier, that

7        he -- he said there was a designation of

8        Sanabil prior, as early as 2001?

9            MS. GOLDSTEIN:  The U.S. Government did

10       not designate Sanabil until August 22nd --

11           JUDGE WESLEY:  I didn't say that.  I --

12           MS. GOLDSTEIN:  -- 2003.  That's just

13       incorrect, Your Honor.

14           JUDGE WESLEY:  Okay.  Very good.  Thank

15       you.

16           JUDGE POOLER:  -- to interrupt.  Wasn't

17       there --

18           MS. GOLDSTEIN:  The Israeli designation

19       was earlier, but that was not -- that was not

20       public.

21           JUDGE POOLER:  Wasn't there evidence that

22       some of the money from BLOM Bank was used to

23       pay survivors of -- of suicide bombings?

24           MS. GOLDSTEIN:  That's not the case, Your

25       Honor.  There's no allegation of that.  There's

1     no allegation that either Sanabil or Subul

2     Al-Khair, the only two customers alleged to

3     have received funds in the complaint, ever made

4     such payments.  And so that is one of the

5     reasons, Your Honor, that discovery of BLOM's

6     knowledge is really irrelevant, because there

7     isn't even an allegation that that's what

8     Sanabil and Subul Al-Khair did.

9          So when BLOM received a payment -- a

10    transfer to a Sanabil account that is expressly

11    designated 'help for orphan children' and what

12    Sanabil does is give money to orphan children,

13    there's no reason for BLOM to be at all

14    suspicious of that.

15         JUDGE CARNEY:  Wasn't there -- wasn't

16    there one incident where the Sanabil account

17    received extensive regular transfers from the

18    Holy Land Foundation until September 2001, and

19    the first terrorist attack occurred on

20    December 1, and the Holy Land Foundation was

21    then designated a -- an SDGT on December 3?

22    Now, putting those facts together, isn't it

23    reasonable to infer -- or that the bank was at

24    least put on notice that that's what was going

25    on in that account?

DocuSign Envelope ID: 837F52B4-44DB-4213-8A94-24120BBCBD5B

1          MS. GOLDSTEIN:  Well, number one, Your

2     Honor, the standard is not inquiry notice; the

3     standard is actual knowledge.  The statute

4     says --

5          JUDGE CARNEY:  General awareness, not --

6          MS. GOLDSTEIN:  Well, the statute requires

7     knowingly providing substantial assistance,

8     number one.  Number two, Your Honor, the last

9     transfer from HLF, as you indicated, was in

10     September of 2001, and the designation took

11     place in December of 2001.  And the complaint

12     does not allege nor am I aware that a bank has

13     any obligation to retrospectively

14     investigate -- not a customer, because HLF was

15     not a customer, Your Honor; HLF was a

16     transferor to a customer.  And there's no

17     allegation that that is standard banking

18     procedure for a bank to go back to its books

19     and look at all of the incoming transfers that

20     were made to all of its customers to determine

21     if one of those customers -- one of those

22     transferors was later designated.  So that's --

23     that's not a red flag.

24          The essential allegations in this case,

25     Your Honor, are substantially weaker than those

1      in Siegel, where this Court held that

2      substantial assistance was lacking where HSBC

3      was alleged to have provided millions of

4      dollars to its customer, Al-Rajhi Bank.  But

5      the complaint offered at least conclusory

6      allegations that Al-Qaeda in Iraq had received

7      those funds.

8           Here, there isn't even that, because there

9      is no allegation in the complaint that either

10     Sanabil or Subul Al-Khair sent any funds on to

11     Hamas.

12          JUDGE WESLEY:  Your --

13          MS. GOLDSTEIN:  And the entire argument

14     depends not even on alter-ego allegations,

15     because the word 'alter ego' does not appear in

16     the complaint and the word 'alias' does not

17     appear in the complaint.

18          JUDGE POOLER:  I'm sorry.  I believe Judge

19     Wesley has a question.

20          JUDGE WESLEY:  No.  That's all right.  I

21     don't -- I don't want to interfere with

22     counsel's argument.

23          Go ahead.

24          MS. GOLDSTEIN:  I'm sorry, Your Honor.

25          JUDGE WESLEY:  So am I.

DocuSign Envelope ID: 837F52B4-44DB-4243-8A94-34120BBCBD5B

```
 1              MS. GOLDSTEIN:  But my point is, the
 2       complaint merely conflates the two.  And if
 3       this Court -- if the district court were to
 4       make an alter-ego finding, it would have to
 5       meet the legal standard based on facts alleged
 6       in the complaint.  And that was not done here.
 7              The legal standard is quite clear.  Your
 8       Honor Judge Wesley recognized it in the -- in
 9       the Kirschenbaum case:  It has to be when one
10       entity so dominates and controls another that
11       they must be considered principal and agent,
12       and this is shown by proving significant and
13       repeated control over the alleged agent's
14       day-to-day operations.  And that was -- that
15       was not shown here.  That defect is critical,
16       because without that alter ego --
17              I'm sorry, Judge Pooler?
18              JUDGE POOLER:  I said your time has
19       expired.  Can you just wind up?
20              MS. GOLDSTEIN:  Yes.  Yeah.
21              Two points, if I may, Your Honor, just to
22       finish up on alter ego, that without that
23       alter-ego allegation, the only substantial
24       assistance that BLOM is alleged to have
25       provided here is facilitating the distribution
```

1          of funds by Sanabil and Subul Al-Khair to

2          refugees in camps in Lebanon, not in Israel or

3          the West Bank.  And there's no allegation that

4          any of those funds were used to fund

5          terrorists.

6               If I can quickly address -- address --

7          address the discovery issue, Your Honor.  They

8          say that they need to get discovery from BLOM

9          to cure their defective allegations; those

10         defects can't be cured by discovery from BLOM.

11         The alter-ego defects, information about the

12         relationship between Sanabil and -- or, Subul

13         Al-Khair and Hamas can't be cured by discovery

14         from BLOM.  Whether it was well known in

15         Lebanon that Sanabil and Subul Al-Khair were

16         associated with BLOM can't be determinant -- I

17         mean, with Hamas; pardon me -- can't be

18         determined by discovery from BLOM.

19              JUDGE POOLER:  Thank you.  Thank you,

20         counsel.

21              MS. GOLDSTEIN:  Thank you, Your Honor.

22              JUDGE POOLER:  Mr. Radine, you have two

23         minutes for rebuttal.

24              MR. RADINE:  Thank you, Your Honor.  Just

25         a few quick points.

DocuSign Envelope ID: 837F52B4-44D8-4243-8A94-34120BBCBD5B

1           First, as to the money going to refugees,

2       that's what Sanabil claims.  FTOs claim

3       charitable uses for their money; BLOM didn't

4       have visibility on that.  And, of course, it

5       was the finding of Treasury that what Sanabil

6       did was provide funding to Hamas.

7           Second of all, the reference to HLF.  The

8       argument that a bank shouldn't have to check

9       all of its customers' accounts doesn't hold up

10      when it's in terms of the customers who are

11      known Hamas institutions.  When an organization

12      was openly created by Hamas, that is an account

13      that a bank would be expected to check and see

14      the millions of dollars coming in from HLF, an

15      organization that was designated for, in part,

16      paying families of suicide bombers.

17          Finally, as to -- as to the Halberstam

18      standard, of course, it does not require

19      knowledge in the violence.  The line is:  "For

20      Hamilton's aiding and abetting the murder, it

21      was enough that she knew she was involved in

22      some type of property -- personal-property

23      crime at night -- whether as a fence, burglar,

24      or armed robber made no difference -- because

25      violence and killing is a foreseeable risk in

DocuSign Envelope ID: 837F52B4-44DB-4243-8A94-24120BBCBD5B

1          any of those enterprises.  The standard under

2          JASTA isn't different.  The phrase 'terrorist

3          activities' is not in JASTA; that was a phrase

4          from Linde that is referring to the overall

5          tortious or illegal enterprise in Halberstam,

6          from which violence is a foreseeable result.

7               Finally, I'd add that the Siegel case here

8          is particularly inapposite, where the

9          plaintiffs failed to allege that any transfers

10         for an FTO passed through HSBC at all.  HSBC

11         held no account for an FTO or an FTO front or

12         alter ego or what have you.

13              That's my time.  Thank you, Your Honor.

14              JUDGE POOLER:  Thank you both.  Thank you

15         both for lively argument.  We'll reserve

16         decision.

17              And I inform you that Reuvane versus

18         Lebanese Canadian Bank was argued in November,

19         and we may very well wind up holding this case

20         for the decision in that case.

21              Thank you.

22              MR. RADINE:  Thank you, Your Honor.

23              (RECORDED PROCEEDINGS CONCLUDE)

24                              *  *  *

25

1    STATE OF FLORIDA

2    COUNTY OF SARASOTA

3            I, JULIA M. BINGHAM, Court Reporter, Notary

4    Public in and for the State of Florida at Large, do

5    hereby certify that I was authorized to and did

6    stenographically transcribe the foregoing recorded

7    proceedings in the above-captioned case and that the

8    transcript is, to the best of my ability, an accurate

9    record of same.

10           I FURTHER CERTIFY that I am neither an attorney

11   nor counsel for the parties to this cause, nor a relative

12   or employee of any attorney or party connected with this

13   litigation, and that I have no financial interest in the

14   outcome of this action.

15           IN WITNESS WHEREOF, I have hereunto subscribed

16   my name and affixed my seal this date, December 13th,

17   2020, at Sarasota, Sarasota County, Florida.

18

19

20

21

22   _____
     Julia Bingham, Court Reporter
23   Notary Public - State at Large

24

25