## DECLARATION OF DR. MUHAMMAD BAASIRI

I, Muhammad Baasiri, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America:

1. I am currently serving as the Liquidator of Jammal Trust Bank ("JTB"). I was approved by the Central Bank's Governor to serve in this role, pursuant to Article 17 of Law 110 regarding the "Reform of the Banking Sector." A copy of Law 110, and a true and accurate English translation thereof, is attached hereto as Exhibit A.

2. Under paragraph two of Article 17, my activities as Liquidator are "done under the supervision and control of the Central Bank of Lebanon."

3. In my capacity as JTB's Liquidator, I have acquired personal knowledge of the facts surrounding the JTB liquidation, including facts related to its financial status, the reasons for its liquidation, and the likely outcome of the liquidation.

4. No member of my team, including myself, was involved with JTB as an insider before its liquidation began. Any wrongdoing by JTB (which JTB denies) therefore does not implicate me, my team, or anyone managing JTB's assets and liabilities at this time.

5. Prior to becoming JTB's Liquidator, I served as the Vice Governor of the Central Bank of Lebanon, as a member of the Higher Banking Commission and as Chairman of the National Committee for Coordinating Anti-Money Laundering Policies. As Vice Governor of the Central Bank of Lebanon, I oversaw several departments, including the legal department, financing unit and corporate governance unit. I previously chaired Lebanon's Banking Control Commission from 1990-2000 and was chosen to be the first Secretary of the Special Investigation Commission of Lebanon's Financial Intelligence Unit. In 2006, I founded and have previously chaired the U.S.-MENA (Middle East/North Africa) Private Sector Dialogue, which forges a professional partnership, bridges cultural differences, and enhances communication channels between the financial sectors of the Middle East/North Africa and the United States.

6. The liquidation team is paid from the assets of JTB.

7. I hold a bachelor's degree in business from the American University of Beirut, and an accounting degree from the State University of New York.

8. I am a member and co-founder of the Lebanese Association of CPAs and a member of the American Institute of CPAs.

9. I provide the following factual information based on my personal knowledge or upon documents and/or information that is publicly available.

**A.  JTB's Background**

10. JTB was a Lebanese bank that had no branches outside of Lebanon. Its only asset outside of Lebanon is a correspondent bank account at the Standard Chartered Bank of New York, which has a current balance of approximately $8 million.

11. JTB was founded in 1963 and was registered at the Beirut Commercial Register under number /13578/.

12. As of the start of liquidation in September 2019, JTB had 15 shareholders.

13. JTB was a retail-depositor bank. This means that, aside from the owners' equity, JTB was capitalized by deposits from numerous persons, including both individuals and business entities that maintained retail accounts at JTB.

14. Like most banks, JTB granted loans to the general public. Corporate loans and small business loans represented 70% of JTB's total loan portfolio, distributed mainly between real estate (construction) and commercial (trade) sectors.

15. As of the start of liquidation in September 2019, JTB had 46,053 depositors. These depositors included individuals and business entities, and deposits ranged from large to small amounts.

**B.  JTB's Failure**

16. In fall 2019, Lebanon began to experience a serious economic crisis, including in its banking sector.

17. As Lebanon's economic crisis worsened, foreign currency deposits, including U.S. dollars, declined precipitously, interest rates spiked, bank lending to the private sector declined and Lebanon's gross domestic product dropped substantially.

18. Because the Lebanese pound is pegged to the U.S. dollar, the shortfall of U.S. dollars led Lebanese banks, including JTB, to limit domestic depositors' ability to access foreign currency and to intermittently close since mid-October 2019.

19. To make matters worse for JTB, on August 29, 2019, the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC) designated JTB a Specially Designated Global Terrorist ("SGDT") under U.S. Executive Order 13224.

20. As a consequence of OFAC's designation, JTB's U.S. correspondent account at the Standard Chartered Bank of New York was blocked and it was unable to transfer money in U.S. dollars.

21. The inability to transfer money in U.S. dollars was the final blow to JTB, as 60% of its deposits were in U.S. dollars and a large portion of its trade activities and obligations were issued in U.S. dollars, such as acceptances and letters of guarantee.

22. As a result of the OFAC designation, the Central Bank of Lebanon froze JTB's deposits, and all correspondent banks terminated their agreements with JTB. Consequently, JTB faced an immediate liquidity crisis and failure.

23. Consequently, on September 24, 2019, JTB entered liquidation pursuant to Article 17 of Law 110 of Lebanon.

**C.    Liquidation Under Article 17 of Lebanese Law 110**

24. Article 17 of Law 110 of Lebanon ("Article 17") authorizes a voluntary liquidation. Law 110. Ex. A., art. 17.

25. Paragraph two of Article 17 states that once the Governor of the Central Bank of Lebanon approves the appointment of a liquidator, "the Central Council [of the Central Bank of Lebanon] will exceptionally have the right to own the assets, and accept the transfer of rights in whole or in part" of the bank undergoing liquidation. Ex. A, art. 17 ¶ 2.

26. Paragraph two of Article 17 also declares that the liquidator of the bank must conduct the liquidation "under the supervision and control of the Central Bank of Lebanon." Ex. A, art 17 ¶ 2.

27. Once liquidation begins, paragraph five of Article 17 states that the bank must stop accepting deposits, granting loans, making investments, or committing to new obligations, or increasing the volume of deposits, loans, investments or previous obligations. Ex. A, art. 17 ¶ 5.

28. Liquidation "automatically leads to the permanent deletion of the concerned bank from the list of banks operating in Lebanon." Ex. A, art. 17 ¶ 7.

29. Under Article 14 of Law 110, the National Institute for the Guarantee of Deposits ("NIGD") guarantees bank deposits up to five million Lebanese Pounds. Ex. A, art. 14 ¶ 1.

30. Under Article 17, the NIGD will pay the guarantee amount to the liquidator approved by the Central Bank, and the liquidator will disburse the guarantee amount to depositors. Ex. A, art. 17 ¶ 2.

31. To qualify for liquidation under Article 17, the bank must establish that "its assets and rights value is sufficient to pay all the bank's deposits and the rest of its obligations," but for this purpose, the bank may include "the guarantee amount of the National Institute for the Guarantee of Deposits." *Id.*

32. Under Article 17, after the bank's obligations are paid, Lebanese law prioritizes repayment of NIGD's guarantee. Ex. A, art. 17 ¶ 8.

33. After NIGD has been repaid, "the balance of th[e] surplus, if any, shall be returned to the Central Bank of Lebanon." *Id.*

34. Under no circumstance can the shareholders of a bank undergoing Article 17 liquidation receive any equity back. Thus, JTB's shareholders will lose all equity.

35. Non-depositors may submit claims to the liquidator but their claims will not be recognized if any of the following three conditions exist: (1) they are non-liquidated; (2) they are liquidated after the liquidation is completed; or (3) there is no surplus from which to pay them.

4

36. To liquidate a foreign court judgment, a non-depositor (such as plaintiffs in this lawsuit) must first go to a Lebanese court to obtain recognition of the judgment.

37. If a Lebanese court recognizes the foreign court judgment and thereby liquidates it, the claim may be paid by the liquidator, but only if both (1) the liquidation is still ongoing; and (2) there is a surplus available to pay it.

38. The assessment of a bank's assets and liabilities is made as of the time liquidation is initiated. Only claims liquidated as of that time are accounted for as payable in the liquidation.

39. Claims that are liquidated *after* initiation of liquidation are payable only if there is a surplus in the bank's funds at the end of the liquidation.

40. If a court judgment is not recognized in a Lebanese court prior to the end of the liquidation, it is not liquidated, and it cannot be paid by the liquidator.

41. Once the Article 17 liquidation concludes, there is no successor from whom any claims against the bank may be recovered.

42. The Central Bank of Lebanon, which controls the assets of a bank undergoing Article 17 liquidation, Ex. A, art. 17 ¶ 2, is a public entity and its assets are immune from seizure or attachment under Lebanese law.

43. I have been involved in several bank liquidations in Lebanon, including ones conducted under Article 17. Lebanese bank liquidations typically take two to five years to conclude.

**D.   JTB's Liquidation**

44. On September 27, 2019, the Central Bank of Lebanon approved JTB's liquidation under Article 17. A copy of the Central Bank's order, and a true and accurate English translation thereof, is attached as Exhibit B.

45. The Central Bank of Lebanon approved JTB's Article 17 liquidation contingent upon several conditions: (1) that JTB stops accepting deposits, issuing loans, and otherwise operating as a bank; (2) that it allows the Central Bank of Lebanon to acquire all of JTB's assets

5

and rights; and (3) that a liquidator allocate JTB's assets to cover its obligations. Ex. B ¶ "First."; Ex. A., art. 17 ¶¶ 2, 5.

46. The Central Bank of Lebanon approved my appointment as JTB's Liquidator and requires me to "conduct the liquidation proceedings under the supervision of the Central Bank of Lebanon." Ex. B ¶ "Second."; Ex. A, art. 17 ¶ 2.

47. The order also effectuated the permanent deletion of the Jammal Trust Bank S.A.L. name from the list of banks. Ex. B. ¶ "Third."; Ex. A., art. 17 ¶ 7.

48. JTB is therefore no longer operating as a bank; its corporate status survives only for the limited purpose of allowing the liquidator to wind up its liquidation consistent with Lebanese law.

49. JTB has already reimbursed approximately 90% of depositors. As of the date of this declaration, 21,499 JTB depositors remain unpaid, and their deposits represent approximately 10.15% of the total value of deposits.

50. The total amount paid by the NIGD to guaranty JTB's deposits equals 80 billion Lebanese Pounds.

51. In addition to paying JTB's depositors, as Liquidator I am required by Lebanese law to compensate JTB's employees, at a cost of nearly 60 million Lebanese Pounds. Moreover, pursuant to Lebanese law, JTB's assets will also fund the administrative expenses of the liquidation.

52. I am generally aware of the claims of the plaintiffs in this lawsuit. I am aware that they are brought under the U.S. Anti-Terrorism Act and seek monetary judgments.

53. Should plaintiffs succeed in this lawsuit, any monetary judgment in their favor would have to be recognized by a Lebanese court before they could be considered "liquidated" claims that I am authorized to pay as JTB's Liquidator.

54. Because any monetary judgment in plaintiffs' favor could be liquidated by a Lebanese bank only *after* JTB's liquidation began, Lebanese law permits such claims to be paid only if there is a surplus at the end of JTB's liquidation.

55. As of June 30, 2020, I estimate that JTB's total liabilities exceed its total assets by about 162 Billion Lebanese Pounds, after deducting the amount provided by the NIGD.

56. Because JTB's liabilities exceed its assets, there is no surplus to pay any judgment in plaintiffs' favor, even if they are ultimately liquidated by a Lebanese court prior to the close of JTB's liquidation.

57. Once JTB's liquidation is closed, there will be no possibility of recovery because there is no successor entity under Lebanese law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November __14__, 2020 in Washington, DC.

_____
Dr. Muhammad Baasiri