UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT BARTLETT, et al.,<br><br>         Plaintiffs,<br><br>   -against-<br><br>SOCIETE GENERALE DE BANQUE AU LIBAN SAL, et al.,<br><br>         Defendants | No. 19-cv-0007 (CBA) (TAM) |

**MEMORANDUM OF LAW IN SUPPORT OF BANK OF BEIRUT SAL'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

                                                                                       **Page**

TABLE OF AUTHORITIES ................................................................................................. ii

ARGUMENT ........................................................................................................................2

      I.      Plaintiffs Do Not Adequately Plead the Knowledge Component of
              *Halberstam*'s Third Element As Construed by *Kaplan* ............................................2

      II.     *Kaplan* Makes Clear that Plaintiffs Do Not Adequately Plead that the Bank of
              Beirut Provided Assistance that Was "Substantial" .................................................6

CONCLUSION .....................................................................................................................10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-00007, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ............................................................................... *passim*

*Generale Bank, New York Branch v. Wassel*, 779 F. Supp. 310 (S.D.N.Y. 1991) ........................ 3

*Glowczenski v. Taser Int'l Inc.*, No. CV04-4052(WDW), 2010 WL 1948249 (E.D.N.Y. May 13, 2010) .................................................................................................................... 4

*Graham v. Distasio*, No. 14-CV-6677 PKC, 2015 WL 336473 (E.D.N.Y. Jan. 23, 2015) ............. 5

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ............................................................ *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ............................... *passim*

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ............................................................. 7, 8

*Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019) ......................................... 7, 8

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ......................... 5

**Regulation**

31 C.F.R. 594.201(a)(4)(ii) ............................................................................................................ 6

**Other Authorities**

OFAC, *Specially Designated Nationals and Blocked Persons List*, https://www.treasury.gov/ofac/downloads/sdnlist.pdf (last updated July 22, 2021) ................ 6

*Treasury Targets Hizballah Financial Network*, U.S. Dep't of the Treasury (Dec. 9, 2010), https://www.treasury.gov/press-center/press-releases/pages/tg997.aspx ...................... 6

*Treasury Targets Hizballah Network in Africa*, U.S. Dep't of the Treasury (May 27, 2009), https://www.treasury.gov/press-center/press-releases/pages/tg149.aspx ...................... 6

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), as applied to the unique circumstances pleaded with respect to Bank of Beirut SAL ("Bank of Beirut" or "the Bank"), requires dismissal of Plaintiffs' JASTA aiding-and-abetting claims. This Court recognized that Bank of Beirut was unique among Defendants in having no customers deemed to be Hezbollah-affiliated "Specially Designated Global Terrorists ("SDGTs") during the period of the attacks.[1] Although that would not be dispositive *if* Plaintiffs otherwise asserted plausible factual allegations that satisfy their pleading burden under *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), *Kaplan* makes clear that Plaintiffs did *not*.

The Court determined that the core allegations against Bank of Beirut on which Plaintiffs rely to satisfy *Halberstam* are that the Bank opened accounts for five individuals and entities who previously had accounts at Lebanese Canadian Bank ("LCB") that were "forcibly closed" in 2011 and 2012, following LCB's Hezbollah-related audit, and the Bank "would have reason to know of concerns with LCB's accounts due to the scandal surrounding its forced closure." Order at *11.[2] According to the Court, the customers for these accounts were Youssef Muhammad Tajideen, Galaxy Flame Trading SAL Offshore, Leaders of Supply & Products (Offshore) SAL, Mercury Development Offshore SAL, and Samir Muhammad Hijazi (the "Alleged Migrated Customers" or "Customers"). *See* Order at *11; *see also* SAC ¶¶ 105, 1781-84, 1789, 1795-96. Plaintiffs do not provide any factual allegations indicating *when* each of these Customers' accounts was opened at the Bank of Beirut. Plaintiffs also do not state that the Bank performed any wire transfers, or other transactions, for these Customers.

Analysis of the SAC shows that the terrorist attacks from which Plaintiffs' injuries arise took place in two periods, from January 12, 2004 through September 1, 2010 (*see* SAC ¶¶ 2103,

---

[1] *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-00007, 2020 WL 7089448, at *2, *9, *11 (E.D.N.Y. Nov. 25, 2020) ("Order").

[2] Bank of Beirut joins in, and incorporates by reference, the motion to dismiss the Second Amended Complaint ("SAC") submitted today by all of the Moving Defendants ("Joint Brief").

5493, the "2004-2010 Attacks") and from March 10, 2011 through November 14, 2011 (*see* SAC ¶¶ 5504, 5679, the "2011 Attacks"). As to the 2004-2010 Attacks, Plaintiffs surely fail to plead aiding-and-abetting claims under *Kaplan*, because the accounts of the Alleged Migrated Customers had not allegedly migrated to the Bank until after their closure at LCB in 2011-2012, and Plaintiffs do not plead factual allegations that the Bank was knowingly providing substantial assistance to any other alleged Hezbollah-affiliated customers from 2004 until 2010. Thus, the claims of the 1,207 Plaintiffs whose alleged injuries arise from the 2004-2010 Attacks must be dismissed as against Bank of Beirut.

With respect to the 2011 Attacks, as to which the SAC alleges that there are 71 plaintiffs,[3] *Kaplan* makes clear that Plaintiffs' allegations regarding the Alleged Migrated Customers are deficient in two independent respects: Plaintiffs do not plead that (1) the Bank had "actual knowledge" it was providing "substantial assistance" to Hezbollah affiliates, ***or*** (2) the "assistance" provided by the Bank was "substantial." Thus, *Kaplan* also requires dismissal of the claims of the 71 Plaintiffs whose alleged injuries arise from the 2011 Attacks.

## ARGUMENT

**I.   Plaintiffs Do Not Adequately Plead the Knowledge Component of *Halberstam*'s Third Element As Construed by *Kaplan***

In *Kaplan*, the Second Circuit concluded that the district court's analysis "d[id] not properly reflect the *Halberstam* third element," which the Second Circuit held "concerns whether [the defendant] . . . ***knowingly*** provid[ed] assistance . . . ," in addition to "whether that assistance was substantial." 999 F.3d at 866 (emphasis added). The Second Circuit went on to explain that the knowledge component required "actual knowledge." *Id.* at 863-64. Under *Kaplan*, then, Plaintiffs must plead plausible, factual, non-conclusory allegations that Bank of Beirut had "actual

---

[3] The names of the Plaintiffs who allege they were injured as a result of the 2011 Attacks and the dates of those attacks are identified in the accompanying Declaration of Henry Weisburg. Certainly, the claims of all Plaintiffs not listed there must be dismissed as to Bank of Beirut.

2

knowledge" that it was providing assistance to customers who were intermediaries of Hezbollah, and was thereby indirectly assisting Shia militias in the commission of the terrorist acts that injured Plaintiffs.[4]

Plaintiffs do not meet their pleading burden under *Kaplan*. This Court summed up Plaintiffs' allegations directed at Bank of Beirut as follows: (1) the Bank provided "substantial assistance" to the Alleged Migrated Customers, *i.e.*, five individuals and entities who had accounts at LCB that were "forcibly closed," and who, sometime "after" that, reopened those accounts at Bank of Beirut, and (2) Bank of Beirut "would have reason to know of concerns with LCB's accounts due to the scandal surrounding its forced closure." Order at *11. These allegations plainly do not plead "actual knowledge" as to the 2004-2010 Attacks, because Plaintiffs do not assert that any Alleged Migrated Customers had their accounts at Bank of Beirut before February 2011 at the earliest.[5]

The aiding-and-abetting claims of Plaintiffs who were injured in connection with the ***2011 Attacks*** also must be dismissed. As noted, this Court summed up Plaintiffs' state-of-mind allegations as follows: Bank of Beirut "took over Hezbollah-affiliated accounts from LCB after those accounts were forcibly closed following LCB's Hezbollah-related audit; and the bank ***would have reason to know*** of concerns with LCB's account due to the scandal surrounding its forced closure." Order at *11 (emphasis added). These allegations do not plead "actual knowledge," because it is well-settled that a state-of-mind allegation, like Plaintiffs' here, that a defendant "had reason to know" of a fact, reflects a lesser standard than, and does not adequately plead, actual knowledge of that fact. *See, e.g.*, *Generale Bank, New York Branch v. Wassel*, 779 F. Supp. 310,

---

[4] For the same reasons that Plaintiffs do not adequately plead actual knowledge, *see infra*, they also do not adequately plead general awareness. *See* Joint Brief, Section II.B.

[5] *See* SAC ¶¶ 105 (as to Galaxy Flame Trading SAL Offshore, Samir Hijazi and Youssef Tajideen, "in 2011-2012"), 739 (as to Leaders of Supply & Products (Offshore) SAL, not before "September 2011"), 750 (as to Youssef Tajideen, not before "February 2011"), 1013 n.96 (as to Mercury Development (Offshore) SAL, not before "June 2012"), 1065 (as to Samir Hijazi, not before "September 2011"), 1783 (as to Galaxy Flame Trading SAL Offshore, not before "August 2011").

3

321 (S.D.N.Y. 1991) ("To carry his burden, [defendant] must prove that [plaintiff] had actual knowledge, and *not just* a 'reason to know'" (emphasis added)); *Glowczenski v. Taser Int'l Inc.*, No. CV04-4052(WDW), 2010 WL 1948249, at *4 (E.D.N.Y. May 13, 2010) (equating allegation that "defendant *has reason to know*" with "gross negligence" or "recklessness") (emphasis added).

Plaintiffs' failure to plead actual knowledge by itself warrants dismissal of the aiding-and-abetting claims of Plaintiffs who were injured in connection with the 2011 Attacks (and therefore, under *Kaplan*, the aiding-and-abetting claims against the Bank by all Plaintiffs must be dismissed). But there are further deficiencies in Plaintiffs' allegations of the knowledge component of *Halberstam*'s third element. For instance, as determined by this Court, Plaintiffs allege that Bank of Beirut "would have reason to know *of concerns with LCB's account*s." Order at *11 (emphasis added). But that allegation begs the question of whether, when the Alleged Migrated Customers approached the Bank to open new accounts, the Bank actually knew that they formerly had accounts at LCB that were "forcibly closed." *Id.* Under Plaintiffs' own theory, unless the Bank possessed *that* knowledge, the Bank would not "have reason" to be concerned about the Customers in particular, and therefore would have no reason to suspect that by providing "substantial assistance" specifically to them, the Bank would be aiding Hezbollah-affiliated persons. ***But the SAC does not plead such knowledge***. It hardly follows from Plaintiffs' conclusory allegation that the Bank was "aware of the LCB scandal," *see* SAC ¶ 1782, that the Bank somehow had actual knowledge of exactly which LCB customers were involved.

If anything, the SAC pleads that "in 2011-2012" suspicious accounts from LCB migrated to other banks "with the full knowledge ***of the Lebanese Government***." *See* SAC ¶¶ 104-05. And although the SAC asserts the Lebanese government's "own investigation and findings were widely circulated," *id.* ¶ 104, such findings could not have been circulated until 2012 or later after the accounts at issue had migrated—*i.e.*, after the 2011 Attacks. Plainly, then, the existence of the

4

Lebanese government report does not support an inference that the Bank had actual knowledge at the time the Customers' accounts at LCB were "forcibly closed." Order at *11. This too is a fatal pleading deficiency.

Finally, as noted by the Court, *see* Order at *11, Plaintiffs make the allegation that: "***[l]ike the other Defendants*, BYBLOS BANK** . . . understood that ***the Tajideens*** were (and are) . . . ***synonymous with Hezbollah***."[6] SAC ¶ 1643 (emphasis added). But Plaintiffs cannot use this allegation to plead that the Bank knew that ***Youssef*** Tajideen (who Plaintiffs do not allege was an SDGT) was nevertheless affiliated with Hezbollah. *First*, the allegation (which does not even mention Bank of Beirut) about what the Bank and the other Defendants "understood" is a flagrant example of impermissible group pleading. *See, e.g.*, *Graham v. Distasio*, No. 14-CV-6677 PKC, 2015 WL 336473, at *3 (E.D.N.Y. Jan. 23, 2015); *see also In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005) ("[I]n light of 'the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of Plaintiffs' allegations as to any particular defendant . . . .'"). *Second*, *Kaplan* specifies that with regard to the "knowledge" component of *Halberstam*'s third element, a plaintiff is "required" to plead "allegations of the facts or events," and those allegations must include at least some "details." *See* 999 F.3d at 864.

Illustrative is *Kaplan*'s discussion of certain public statements from which the plaintiffs in *Kaplan* asserted the defendant's knowledge could be inferred. The Second Circuit held that the plaintiffs' allegations about those statements, "although lacking in some details, were not insufficient" because the statements were alleged to have been made "in a particular time period . . . were specific as to the status of the speaker . . . the circumstances in which the statements were made . . . and the other specific media in which they were made." *Id.* Here, by contrast, Plaintiffs

---

[6] As noted, the only Tajideen family members and companies alleged in the SAC to have been customers of Bank of Beirut are one individual and two entities whose accounts at the Bank allegedly migrated from LCB, beginning no earlier than February 2011—Youssef Tajideen, Galaxy Flame Trading SAL Offshore, and Leaders of Supply & Products (Offshore) SAL. *See supra* at 1, 3; SAC ¶¶ 105, 739, 750, 1782-84.

5

offer no basis—beyond their conclusory say-so—for their assertion that Defendants knew the entire Tajideen family was "synonymous with Hezbollah." *See* SAC ¶ 1643. Plaintiffs do not provide a single factual detail about *when* the Tajideens supposedly become "synonymous with Hezbollah," *who* said they were synonymous, in what *circumstances* that was said, and by what means it was disseminated such that it could be inferred that Bank of Beirut had "actual knowledge" of it. *See id. Kaplan* makes clear that a plausible inference of the Bank's alleged knowledge cannot be made in the absence of such details.[7]

## II. *Kaplan* Makes Clear that Plaintiffs Do Not Adequately Plead that the Bank of Beirut Provided Assistance that Was "*Substantial*"

*Kaplan* emphasizes that to satisfy *Halberstam*, a plaintiff must plead that the defendant provided "assistance" that is "substantial," both "qualitatively" and "quantitatively." *Kaplan*, 999 F.3d at 866. Plaintiffs have not pleaded this as to Bank of Beirut. Although Plaintiffs make sweeping group pleading allegations about wire transfers involving unspecified customers, Plaintiffs do not plead any factual allegations that Bank of Beirut made any wire transfers or performed any other transactions for any of the Alleged Migrated Customers. All the SAC asserts, in conclusory fashion, is that the Bank agreed to open accounts for the Customers, thereby giving those Customers "access" to normal banking services, including "U.S. dollar-clearing." *See, e.g.*, SAC ¶ 1796. Plaintiffs do not allege any specific transactions that the Bank performed for the Alleged Migrated Customers (they only allege those Customers had "access" to services), much

---

[7] Plaintiffs plead that in 2009 and 2010, the U.S. government determined that three siblings (none of whom was Youssef) of the eleven Tajideen siblings met the statutory criteria for an SDGT. SAC ¶¶ 688-89; *see* 31 C.F.R. 594.201(a)(4)(ii) (SDGTs include persons associated with Hezbollah). In the succeeding decade, the U.S. government has not designated any other members of the family. *See Treasury Targets Hizballah Network in Africa*, U.S. DEP'T OF THE TREASURY (May 27, 2009), https://www.treasury.gov/press-center/press-releases/pages/tg149.aspx; *Treasury Targets Hizballah Financial Network*, U.S. DEP'T OF THE TREASURY (Dec. 9, 2010), https://www.treasury.gov/press-center/press-releases/pages/tg997.aspx; OFAC, *Specially Designated Nationals and Blocked Persons List*, https://www.treasury.gov/ofac/downloads/sdnlist.pdf (last updated July 22, 2021). To credit Plaintiffs' contention that Bank of Beirut had "actual knowledge" that Youssef Tajideen was Hezbollah-affiliated, this Court would have to accept that the U.S. government, despite having familiarized itself sufficiently with the Tajideens to classify as SDGTs three of the eleven Tajideen siblings, thereafter failed to designate other members of the Tajideen family, even though (according to Plaintiffs) the *entire* family is supposedly "synonymous with Hezbollah." SAC ¶ 1643. Plaintiffs offer no factual allegations in support of that conclusion.

6

less do Plaintiffs allege that the Bank provided a "substantial" quantity of services to these particular customers.

In any event, if opening accounts and providing access to banking services were sufficient to establish substantial assistance, *Kaplan* would have had no reason at all to emphasize—as it does repeatedly—that the defendant bank there (LCB) provided "special treatment" to its suspect customers. *See* 999 F.3d at 850, 858, 862, 866. *Kaplan* would only have needed to point to the plaintiffs' allegations there that the bank had opened accounts and made banking services available to the customers at issue. Indeed, *Kaplan* makes explicit—when the Second Circuit sums up its holding on "substantial assistance" on the penultimate page of the decision—that allegations of "special treatment" are what satisfied the "substantial assistance" aspect:

> *[G]iven that* LCB's **special treatment** of the Customers allowed them to deposit large sums . . . totaling more than $2.5 million dollars a week . . . without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity, **the SAC adequately pleaded** that LCB knowingly gave the Customers assistance that both aided Hezbollah **and was qualitatively and quantitatively substantial**.

*Id.* at 866 (emphasis added). Plaintiffs here do not make any such allegations.

Although Plaintiffs have suggested that *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018), and *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), can be read to indicate that they have adequately pleaded that the Bank provided substantial assistance in the form of wire transfers, *Kaplan* makes clear that neither *Linde* nor *Siegel* support Plaintiffs' position. *See* Order at *12-*13. As *Kaplan* emphasized, the Second Circuit in *Linde* "held that since no aiding and abetting claim under JASTA had been presented to the jury at trial, ***it was not the role of this Court . . . to determine the viability of such a claim***." *Kaplan*, 999 F.3d at 858 (quoting *Linde*, 882 F.3d at 330) (emphasis added). Indeed, *Linde* declined to indicate whether the alleged assistance at issue there was "substantial." 882 F.3d at 330 (merely noting "***even if*** a properly charged jury ***could*** conclude that [defendant's] financial services provided substantial

7

assistance . . . ." (emphasis added)). Finally, *Linde* involved wire transfers of ***$32 million***. *Id.* at 321. As for *Siegel*, discussed at length in *Kaplan*, the defendant bank there allegedly transferred "***hundreds of millions of dollars***."[8] *Siegel*, 933 F.3d at 225 (emphasis added). In glaring contrast, as noted, Plaintiffs here fail to allege that Bank of Beirut performed a single wire transfer for the Alleged Migrated Customers during the relevant period. In fact, as to *all* of the Bank's customers over the *entire* period at issue in this case (2004-2011), Plaintiffs specifically allege only a single $50,000 wire transfer performed by the Bank, on an unspecified date and in a transaction not stated to have anything to do with the acts of terror at issue in this case. SAC ¶¶ 888, 1791.

Finally, also instructive in *Kaplan* is the court's discussion of defendant LCB's contention that "LCB's provision of banking services to the Customers was 'routine.'" 999 F.3d at 858. Tellingly, the Second Circuit did not brush off this assertion by responding that even "routine" banking services could amount to substantial assistance. Instead, the court responded by referring again to the plaintiffs' allegations that LCB had provided its customers with "special exceptions." *Id.* The Second Circuit clearly regarded LCB's opening of accounts and providing routine banking services as ***not*** sufficient to establish LCB's "substantial" assistance. *See id.* at 858, 866.

In addition to focusing on the "qualitative" and "quantitative" dimensions of "substantial" assistance, *Kaplan* emphasizes the temporal aspect of "substantial," which further supports dismissal of Plaintiffs' claims. After noting that *Halberstam* identifies six factors used to determine whether alleged assistance is substantial, *Kaplan* emphasizes that at least four of these six factors have a temporal dimension. Quoting *Halberstam*, *Kaplan* observed that "[t]he ***length of time an alleged aider-abettor has been involved with a tortfeasor*** almost certainly affects ***the quality and extent of their relationship*** and probably influences ***the amount of aid provided*** as well; additionally, it may afford evidence of the ***defendant's state of mind***." *Id.* at 857 (emphasis

---

[8] Moreover, *Kaplan* distinguished *Seigel* on the grounds, among others, that the defendant bank in *Kaplan* had provided the customers at issue with "special treatment," which Plaintiffs here do not allege Bank of Beirut provided to the Alleged Migrated Customers. *See* 999 F.3d at 850, 862-63, 866.

8

added). With regard to "state of mind," *Kaplan* further noted, quoting *Halberstam*, that "[t]he ***duration of [defendant's] assistance*** 'strongly influenced' the court's 'sense of how [defendant] perceived her role and of the value of her assistance." *Id.*; *see also Halberstam*, 705 F.2d at 484, 488 ("state of mind" relates to whether a defendant had a "deliberate ***long-term*** intention to participate in an ongoing illicit enterprise" (emphasis added)).

Plaintiffs' allegations relating to these four *Halberstam* factors with a temporal dimension are glaringly deficient. As noted in connection with the actual knowledge component, *see supra* at 3, Plaintiffs do not allege how long the Alleged Migrated Customers' accounts were open during the period of the 2011 Attacks, and in fact, Plaintiffs even concede that one of the accounts was not closed at LCB until 2012. SAC ¶ 1013 n.96. And although the SAC alleges when the Alleged Migrated Customers' accounts at LCB were ***closed*** (four of them were closed in 2011, and the other in 2012, *id.* ¶¶ 739, 750, 1013 n.96, 1065, 1783), the SAC does not allege ***when*** those Customers ***opened*** their accounts at Bank of Beirut, other than alleging it was "after" the closure of the LCB accounts. *See id.* ¶¶ 1782-84, 1789, 1795-96; *see also* Order at *11. "After" could mean many weeks or months.[9] And even assuming the Customers' accounts were all opened in 2011, it would only have been several months before the final attack, and thus the Bank's assistance during the relevant period would have been of short duration (and certainly not reflective of any "long-term intention," *see supra*).

Even assuming, *arguendo*, that the SAC adequately pleaded factual allegations that the accounts of the Customers that closed at LCB in 2011 were transferred to the Bank within a matter of days or weeks, that would mean that those Customers became customers of the Bank only months before the last attack (on November 14, 2011). SAC ¶ 5679. Given this (at most) relatively

---

[9] The SAC admits that the Alleged Migrated Customers could have become Bank of Beirut customers ***after the relevant period***: Plaintiffs concede that, according to the Lebanese government report on which Plaintiffs heavily rely, the former LCB accounts "migrated to other Defendants [including Bank of Beirut] ***in 2011-2012***." SAC ¶ 105. Accounts that were opened at the Bank ***after November 14, 2011*** cannot be used to plead the Bank knowingly provided assistance to Hezbollah in committing attacks that ended on November 14, 2011.

9

brief duration of the Bank's relationship with those Customers, it is clear in light of *Kaplan*'s emphasis on the duration dimension of *Halberstam*'s six factors, that the duration-related "factors" weigh **against** Plaintiffs. On top of that, for all the further reasons shown above, *see supra* at 6-9, Plaintiffs fail to plead factual allegations regarding the "amount" of assistance, and the nature of that assistance (other than that accounts were open, and access was given to normal banking services) that Bank of Beirut allegedly provided to the Alleged Migrated Customers—*i.e.*, Plaintiffs fail to plead the Bank provided assistance that was "substantial" both "qualitatively" and "quantitatively." This bears on *Halberstam*'s "amount of assistance" factor, and other factors too.

In sum, evaluated under *Kaplan* and its construction of the six *Halberstam* factors used to assess whether assistance is "substantial," Plaintiffs' allegations fall short with regard to at least ***five*** of those six factors, and at least three of those factors ***overwhelmingly*** disfavor Plaintiffs: (1) the "amount of assistance" given by defendant, (2) the period of defendant's assistance, and (3) defendant's presence or absence at the time of the tort. *Kaplan*, 999 F.3d at 856-57.[10]

### **CONCLUSION**

Based on the foregoing, Bank of Beirut respectfully submits that the Court should dismiss all Plaintiffs' aiding-and-abetting claims against Bank of Beirut. In the alternative, the Court should dismiss the aiding-and-abetting claims against Bank of Beirut of all Plaintiffs whose claims arise from injuries that occurred between January 12, 2004 and September 1, 2010.[11]

---

[10] Apparently aware that the upcoming Second Circuit decisions, including *Kaplan*, would expose the deficiencies of Plaintiffs' allegations, Plaintiffs made the unusual decision to amend their First Amended Complaint even though this Court had denied Moving Defendants' motion to dismiss. As to Bank of Beirut, Plaintiffs sought to prop up their claim by adding an allegation that, in its entirety, says "Muhammad Abdullatif Abboud, a branch manager at [the Bank] served as a facilitator and coordinator for Hezbollah inside the bank." SAC ¶ 1800. This vacuous allegation has many deficiencies; it does not even say that Abboud was a branch manager during the relevant period. It also does not include allegations of what assistance Abboud provided or that such assistance was substantial.

[11] Plaintiffs' conspiracy claims against Bank of Beirut should also be dismissed for the reasons set forth in the prior joint briefing on this issue, ECF No. 139-40, and the further reasons—related to *Kaplan*—set forth in the Joint Brief. *See* Joint Brief, Section I.

Dated: July 27, 2021                     Respectfully submitted,

                                          SHEARMAN & STERLING LLP

                                        By: */s/ Henry Weisburg*
                                        Henry Weisburg
                                        George Anhang (not admitted in E.D.N.Y.)
                                        Susan Loeb (not admitted in E.D.N.Y.)
                                        Shearman & Sterling LLP
                                        599 Lexington Avenue
                                        New York, NY 10022
                                        212-848-4000
                                        Email:  hweisburg@shearman.com
                                                    george.anhang@shearman.com
                                                    susan.loeb@shearman.com

                                        *Attorneys for Defendant Bank of Beirut SAL*