```
             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#
ROBERT BARTLETT, ET AL.,      : 19-cv-00007(CBA)(TAM)
                              :
              Plaintiffs,     :
                              :
      - versus -             : U.S. Courthouse
                             : Brooklyn, New York
SOCIETE GENERALE DE BANQUE   :
AU LIBAN SAL, ET AL.,        :
                             : October 8, 2021
              Defendants      : 4:40 p.m.
------------------------------X
```

```
         TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE
                  STATUS CONFERENCE
         BEFORE THE HONORABLE TARYN A. MERKL
             UNITED STATES MAGISTRATE JUDGE
```

**A P P E A R A N C E S:**
**(VIA VIDEO/AUDIO)**

**For the Plaintiffs:**          **Gary M. Osen, Esq.**
                                 **Ari Ugar, Esq.**
                                 **Dina Gielchinsky, Esq.**
                                 **Michael J. Radine, Esq.**
                                 Osen LLC
                                 190 Moore Street, Suite 272
                                 Hackensack, NJ 07601


**For the Defendants:**          **Linda C. Goldstein, Esq.**
                                 **Michael H. McGinley, Esq.**
                                 **Tamar Mallat, Esq.**
                                 Dechert LLP
                                 1095 Avenue of the Americas
                                 New York, NY 10036

              (Appearances continue on next page)

**Transcription Service:**       **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

APPEARANCES CONTINUED:


<u>For the Defendants</u>:          **Gassan A. Baloul, Esq.**
                                 **Joseph S. Alonzo, Esq.**
                                 **Mitchell R. Berger, Esq.**
                                 Squire Patton Boggs (US) LLP
                                 1211 Avenue of the Americas
                                 New York, NY 10036

                                 **Robert W. Hamburg, Esq.**
                                 Mayer Brown LLP
                                 1221 Avenue of the Americas
                                 New York, NY 10020

                                 **Elizabeth Price Foley, Esq.**
                                 Baker & Hostetler LLP
                                 1050 Connecticut Ave., N.W.
                                 Suite 1100
                                 Washington, DC 20036

                                 **Alex C. Lakatos, Esq.**
                                 Mayer Brown LLP
                                 1999 K Street N.W.
                                 Washington, DC 20037

                                 **George E. Anhang, Esq.**
                                 Shearman & Sterling
                                 410 9th Street, NW, Suite 800
                                 Washington, DC 20004

3

                    Proceedings

1          THE COURT:  Good afternoon.  Ms. Chan, could

2    you please call the case?

3          THE CLERK:  This is Civil Cause for a Status

4    Conference, Docket 19-cv-7, *Bartlett et al. v. Societe*

5    *Generale de Banque au Liban SAL, et al.*

6          Before asking the parties to state their

7    appearance, I would like to note the following.  Persons

8    granted remote access to proceedings are reminded of the

9    general prohibition against photographing, recording, and

10   re-broadcasting of court proceedings.  Violation of these

11   prohibitions may result in sanctions including removal of

12   court-issued media credentials, restricted entry to

13   future hearings, denial of entry to future hearings, or

14   any other sanctions deemed necessary by the Court.

15         MR. OSEN:  Good afternoon, your Honor.  This is

16   Gary Osen from Osen LLC for the plaintiff.  I'm joined by

17   my colleagues Ari Ugar, Michael Radine, and Dina

18   Gielchinsky.

19         THE COURT:  Good afternoon to you all.  And

20   just to keep things orderly, I know we have a number of

21   parties on the line, so if you could try to identify

22   yourself and let me know who you're here on behalf of for

23   the defendants, I would appreciate it.

24         I note at the outset that we may be missing

25   counsel for Societe Generale and another one of the

4

Proceedings

1    banks, Lebanon Bank.  So if anybody is also representing

2    those parties for purposes of today or has discussed this

3    with their counsel for those entities, I'd like to know

4    that too.

5              So take it away starting I guess with

6    Fransabank if we don't have Societe Generale on the line.

7              MS. GOLDSTEIN:  Yes, your Honor.  This is Linda

8    Goldstein of Dechert.  I am counsel to both Fransabank

9    and BLOM Bank.  I'm joined on the line by my colleagues

10   Michael McGinley and Tamar Mallat.

11             And I have spoken with counsel from DLA and am

12   authorized to speak on their client's behalf as well.

13             THE COURT:  Thank you for that.  I appreciate

14   it.

15             MR. BERGER:  Good afternoon, your Honor, this

16   is Mitchell Berger from Squire Patton Boggs along with my

17   colleagues Gassan Baloul and Joe Alonzo.  We represent

18   MEAB Bank, Lebanon and Gulf Bank, and Fenicia Bank.

19             THE COURT:  Thank you.  Who else do we have?

20             MR. HAMBURG:  Good afternoon, your Honor.  This

21   is Robert Hamburg of Mayer Brown representing Banque

22   Libano-Francaise.

23             THE COURT:  Good afternoon.

24             MR. LAKATOS:  Good afternoon, your Honor.  This

25   is Alex Lakatos of Mayer Brown representing Bank Audi

5

Proceedings

1   SAL.

2              THE COURT:  I'm sorry, what was your last name,

3   sir?

4              MR. LAKATOS:  Oh, sure.  It's Lakatos.  It's

5   L-A-K-A-T-O-S.

6              THE COURT:  Okay.  Thank you.

7              MR. LAKATOS:  Sure.  Thank you, your Honor.

8              MR. ANHANG:  Good afternoon, your Honor.  This

9   is George Anhang with Sherman & Sterling, and we

10  represent Bank of Beirut SAL.

11             THE COURT:  Good afternoon.

12             MS. FOLEY:  Good afternoon, your Honor.  This

13  is Elizabeth Foley.  I'm here representing Jammal Trust

14  Bank and the Lebanese Central Bank Liquidator, Dr.

15  Muhammed Baasiri, and I'm with Baker Hostetler.

16             THE COURT:  Thank you.  Who else do we have?  I

17  know we have more parties on the line.  Anybody else?

18  All right.  Is that everybody?

19             Okay.  So we're here today because it sounds as

20  though the parties are unable to determine how to

21  interpret Judge Amon's list of the discovery stay in this

22  case pending additional motion practice.  So I'd like to

23  hear from plaintiffs about the type of discovery that

24  they are seeking to begin in this case, and then I'd like

25  to hear from the defendants about why it is their view

6

Proceedings

1   that that type of discovery should not be permitted and,

2   you know, may be too burdensome at this stage of the case

3   given the pending motions.

4            I know that Jammal Trust Bank, Ma. Foley's

5   client, may be differently situated than some of the

6   others, but if people are able to consolidate their

7   arguments, I don't know if you guys have discussed a lead

8   defense counsel arrangement at all, I would certainly be

9   grateful to hear from anybody who would like to take the

10  lead on certain arguments but will not preclude any party

11  from contributing if they have something they would like

12  to add.

13           So if you could start, Mr. Osen, with an

14  overview of what you would like to accomplish with regard

15  to discovery and where things stand in that regard, I

16  would appreciate it.  Thank you.

17           MR. OSEN:  Sure.  Thank you, your Honor.

18           So there are sort of essentially two requests

19  pending before the Court.

20           The first is our motion to compel the

21  defendants to participate in a Rule 26(f) conference

22  which as your Honor knows is sort of the general starting

23  point for discovery without which most discovery cannot

24  go forward except as directed by court order.  And so

25  that's sort of the first  step, and I'll come back in a

7

Proceedings

1   moment to the reasons why we think that's appropriate.

2            The second element of discovery sort of in lieu

3   of the first if we can't proceed in the ordinary course

4   with a Rule 26(f) conference is to proceed with what

5   would be initially limited third party discovery here in

6   New York of the correspondent banks who have

7   transactional records here in the United States that are

8   relevant to the litigation.

9            And so those are the two sort of broad

10  categories.  And I'm happy to go through our

11  understanding sort of background of how we got to this

12  point.

13           THE COURT:  That would be welcome.  Thank you.

14           MR. OSEN:  Okay.  So we brought our case

15  originally in January of 2019.  We amended the complaint

16  in August of that year.  And of course the defendants

17  moved to dismiss the complaint thereafter.  We had oral

18  argument on August 31st of 2020 and the next day Jammal

19  Trust Bank filed a pre-motion letter seeking substitution

20  and intervention by Mr. Baasiri in essentially a new

21  motion to dismiss.

22           The Court then on November 25th of last year

23  issued a memorandum and order in which she denied the

24  defendants' motion to dismiss as to our second and third

25  claims for relief which are essentially for shorthand

8

Proceedings

1   purposes the JASTA claims under Section 2333(d).

2            And then subsequent to that, the defendants

3   moved for an interrogatory appeal which was denied.  And

4   as part of that denial, the Court issued an order in

5   December, actually December 30th of last year, in which

6   the Court issued a stay of most discovery in the case

7   until the issuance of an opinion by the Second Circuit in

8   *Reuvane v. Lebanese Canadian Bank*, also more commonly

9   referenced as *Kaplan v. Lebanese Canadian Bank*.

10            And the one major exception I guess to the stay

11  was that the Court did permit plaintiff to issue

12  preservation subpoenas to New York and U.S. correspondent

13  banks.  And that's it.  I'm sorry, your Honor, was there

14  questions?

15            THE COURT:  Not from me.  I'm on mute.  I don't

16  know if anybody else may.

17            MR. OSEN:  Okay.  Sorry, your Honor.

18            So that stay, except for the preservation

19  subpoenas, was in place until the Second Circuit decision

20  in *Kaplan*.  And once that occurred, the defendants, as

21  they were directed to in the December 30th order, asked

22  for a continuance of the stay.  And in a June 25, 2021

23  order, the Court denied the application for a further

24  stay and then directed the defendants to let the Court

25  know whether they wanted to answer the complaint or move

9

Proceedings

1    to dismiss.

2          The defendants, as your Honor knows, then moved

3    to dismiss the case again notwithstanding the fact that

4    *Kaplan*, which they had relied upon in their motions to

5    dismiss, as they saw it as the controlling legal

6    standard, was in fact vacated by the Circuit in its

7    decision this summer.

8          So they proceeded with their motion to dismiss.

9    The Court denied the stay.  And then we contacted defense

10   counsel and sought the scheduling of the Rule 26(f)

11   conference which they declined to participate in.  And

12   then we filed in July, July 22nd, a motion to compel the

13   defendant to comply with Rule 26(f) and participate.

14         And subsequent to that of course, the briefing

15   was completed on September 9th of the motion to dismiss,

16   and then we moved in September, 20th, for third party

17   discovery essentially in the alternative to Rule 26(f)

18   proceedings.

19         THE COURT:  Thank you very much for that

20   overview and that procedural history.  It's very helpful.

21         So as you know, we are newer to the case.  The

22   case was reassigned to us at some point over the summer.

23   And at that juncture, it wasn't clear to me what role

24   Judge Amon was planning to play with regard to pretrial

25   supervision because we noted that she had already denied

10

Proceedings

1    the application to stay discovery and we thought

2    discovery would likely proceed.  It's now been clarified

3    that our usual arrangement in the eastern district is

4    going to be applicable in this case and we will be

5    managing the pretrial discovery and pretrial case

6    management in the matter.

7            So I'd like to hear from whoever is taking the

8    lead from the defendants as to why Judge Amon lift of the

9    stay doesn't mean what it says it means, lifting of the

10   stay, and also why the defendants cannot participate in a

11   Rule 26(f) conference and object to this third party

12   discovery at a minimum.

13           MS. GOLDSTEIN:  Yes, your Honor.  Linda

14   Goldstein, and I will start to address those issues.

15           The first point is that the stay that was

16   requested after the *Kaplan* case was decided was a stay

17   pending the Second Circuit's decision in another JASTA

18   case that was then pending, the *Honickman* case.  And the

19   stay that Judge Amon denied was a stay pending Second

20   Circuit's decision in the *Honickman* case.  And after that

21   particular stay was denied, the Court did grant our

22   request to file a motion to dismiss the second amended

23   complaint that had been filed by the plaintiff.  And the

24   Court set a rather expeditious briefing schedule and also

25   very streamlined briefs so that our briefs were ten pages

11

Proceedings

1    long and our replies were five pages long.

2              And then two days later after we filed a motion

3    to dismiss, the Second Circuit issued its decision in the

4    *Honickman* case.  And in *Honickman*, unlike in *Kaplan*, the

5    Court of Appeals affirmed the dismissal of an aiding and

6    abetting claim under JASTA against one of the defendants

7    in this case, BLOM Bank, and further articulated the

8    elements of pleading an aiding and abetting claim under

9    JASTA.

10             We then amended our motion to dismiss to deal

11   with the new issues raised in the Second Circuit's

12   *Honickman* decision, and the briefing on the motion to

13   dismiss was completed on September 9, almost a month ago.

14   And that briefing raises several critical arguments that

15   could dramatically affect the scope of discovery first

16   with respect to the conspiracy claim, one of the two

17   remaining claims.

18             Judge Amon's November 2020 decision did not in

19   fact address the substance of the conspiracy claim.  The

20   Court held that it did not have to address that given its

21   ruling on the aiding and abetting claim.

22             The *Kaplan* decision in fact, the logic of the

23   *Kaplan* decision, makes it quite clear that the conspiracy

24   claim pleaded in the *Bartlett* case does not state a cause

25   of action.  And certainly, if the conspiracy claim were

Proceedings

1    dismissed, that would have a material impact on the scope

2    of any discovery to be taken from the defendant banks.

3              The other issues raised in the motion to

4    dismiss all pertain to the aiding and abetting claim.

5    And to give a very short form overview of the allegations

6    in this case, as it currently stands, there are claims

7    against 13 banks arising from the provision of banking

8    services to over 200 different customers in Lebanon.

9    Judge Amon's decision, which denied the motion to dismiss

10   with respect to the aiding and abetting claim, although

11   it did grant the motion on the primary liability claim,

12   rested in large part on the fact that the complaint

13   alleges that the defendant banks provided services to a

14   number of customers, and a very small number of

15   customers, 19 all together, that had been designated as

16   specially designated global terrorists by the U.S.

17   Treasury Department.

18              And what is clear from both the *Kaplan* decision

19   and the *Honickman* decision is that the timing of that

20   designation, or those designations, vis-à-vis the

21   provision of banking services, is a crucial point.  And

22   we have argued in the pending motion to dismiss that the

23   complaint as it stands does not adequately plead that any

24   of the moving defendants, who are the 11 defendants that

25   submitted the motion, does not allege that any of those

Proceedings

1    banks provided services to any of those 19 customers

2    after the customer was designated as an SDGT and did not

3    contain other allegations that would suffice to meet the

4    general awareness element of a JASTA aiding and  abetting

5    claim.

6              So that is crucial because if, as we have

7    submitted to Judge Amon, those allegations, the lack of

8    timing is fatal, that would call for the dismissal of the

9    claims against at least ten of the current defendants.

10             Another issue that was raised in the motion to

11   dismiss arising from the *Kaplan* and the *Honickman* cases

12   is whether the complaint adequately pleads that any of

13   the 200 or more customers was closely intertwined with

14   the terrorist activities of Hezbollah.  And Judge Amon's

15   decision from November of 2020 already held that there

16   was really only a very small number of the customers that

17   had been alleged to be connected at all to Hezbollah's

18   terrorist activities.  Those were the Islamic Resistance

19   Support Organization, the IRSO, Martyr's Foundation, and

20   the Imam Khomeini Relief Committee, the IKRC.

21             So if none of the other customers were closely

22   intertwined with Hezbollah, then that would call for the

23   dismissal of at least six of the -- I'm sorry, at least

24   five of the moving defendants which would also

25   significantly narrow the case.

Proceedings

1           And then if that were to happen, the claims

2    against any of the remaining defendants would not involve

3    discovery of the accounts of 200 customers, it would

4    involve discovery only of the accounts of the handful of

5    customers that were closely intertwined.

6               So for all of those reasons, the resolution of

7    the motion, it doesn't dispose of the case entirely which

8    we think is a very real possibility.  There is a

9    likelihood that it will narrow the case significantly.

10   And the reason that this is particularly important in

11   this case, because certainly as in most cases defendants

12   would argue that the scope of discovery would change, in

13   this case we have the added complication of the Bank

14   Secrecy Act in Lebanon.  And so any discovery against the

15   defendant banks of information regarding customer

16   accounts is going to have to go through a commodity

17   analysis to determine the proper scope of that discovery.

18   And so that is why we believe that the better course

19   would certainly be to continue staying discovery against

20   the defendant banks.

21               As for the third party discovery, we believe

22   that the proper balance was struck when plaintiffs

23   sought, and we consented, to the service of preservation

24   subpoenas upon a number of correspondent banks.  And

25   should plaintiffs wish to further protect their interest

15

Proceedings

1  by serving additional preservation subpoenas, we'd

2  certainly have no objection to that.  But based on what

3  we've seen, there's no reason to think that the banks

4  that have been served with preservation subpoenas are not

5  honoring their obligations to preserve whatever documents

6  they had in their possession and certainly nothing that's

7  been presented to the Court thus far suggests that they

8  are disregarding the subpoenas.  So we think that the

9  plaintiff's interests are adequately protected by that.

10          THE COURT:  So I'd like to go back to one

11  argument that you made regarding the timing issue, and

12  your argument that the deficiencies in the pleadings as

13  to timing could be fatal with regard to the provisional

14  banking services to people who -- you know, depending on

15  when they were designated.

16          MS. GOLDSTEIN:  Yes.

17          THE COURT:  Wouldn't their banking records be

18  helpful or probative as to determination of when the

19  banking services were provided?

20          MS. GOLDSTEIN:  There's a threshold issue in

21  terms of pleading of whether they have properly alleged

22  knowledge.  And plaintiffs have copious records.  Mr.

23  Osen's firm has been litigating similar cases against

24  various entities for many years and has, in his

25  complaint, provided copious details of transactions.

16

Proceedings

1   None of them show the provision of services to an FDGT

2   after the designation, and telling me in response to our

3   motion, plaintiff's counsel did not say that discovery

4   would help to identify such evidence and did not say that

5   were misreading the complaint somehow.  But in fact he

6   conceded that there was no allegation in the complain

7   that there were such transactions.

8           THE COURT:  Okay.  Thank you.  Are there any

9   other defendants who would like to be heard on this first

10  question, the threshold question, that I just posed to

11  Ms. Goldstein?  All right.

12          MS. FOLEY:  Your Honor, this is Elizabeth

13  Foley.

14          THE COURT:  Okay, Ms. Foley.

15          MS. FOLEY:  Yes, hi.  Thank you.

16          I would just like to point out that JTB's

17  position, as you noted initially, is quite different from

18  the other defendants.  So I can be brief because this

19  will pertain I assume to a lot of the other questions

20  that your Honor may be having.

21          Our position of course is that as you know,

22  we're parties to an interlocutory appeal as of right

23  under the Collateral Order Doctrine.  And we cited

24  numerous cases in our letter motions showing that the

25  lower courts are pretty uniform on the fact that when you

17

Proceedings

1  take an interlocutory appeal on an immunity issue under

2  the Collateral Order Doctrine, the district court is the

3  divested of jurisdiction on all further proceedings as to

4  the appealing party.

5       So that is our position here both with regard

6  to the 26(f) conference as well as the third party

7  subpoenas.

8       THE COURT:  Okay.  Thank you for that.  I

9  certainly understand that you are somewhat differently

10  situated than the other defendants.

11       Is there anybody else who'd like to be heard on

12  the arguments that Ms. Goldstein just made in response to

13  my questions as to the defendants' arguments as to why

14  they should not be required to participate in discovery

15  and/or why the third party subpoenas are a problem?

16       All right.  So I think it's back to you, Mr.

17  Osen.  Would you like to be heard in response to Ms.

18  Goldstein?

19       MR. OSEN:  Sure, your Honor.  Thank you very

20  much.

21       So I'm going to set for the moment JTB to one

22  side since they're a somewhat unique situation and just

23  start with the procedural stuff and then I'm happy to

24  address very briefly some of the substantive points as

25  well.

Transcriptions Plus II, Inc.

18

Proceedings

1        So to begin with, I just want to clarify

2   because Ms. Goldstein referred to continuing the stay in

3   this case.  There is in fact no stay in place at the

4   moment.  And I think that's procedurally significant

5   because the Court's June 25th order denied a further stay

6   and the defendant has never sought an affirmative stay

7   thereafter.  They simply pocket vetoed the proper

8   procedure under Rule 26(f) by not cooperating and

9   participating in the conference.  And it is pretty much

10  black letter law that where there is no stay in place,

11  under Rule 1, the discovery proceedings are supposed to

12  go forward unless there is an explicit stay.  And I think

13  we cited a case from the EDNY, *City of New York v.*

14  *Beretta* on that very subject.  So there is no stay and

15  they have not sought any stay except in the argument you

16  just heard now.

17        Moreover, and this gets to the substantive

18  arguments that you heard, first of all, the Court set the

19  briefing schedule in the same order that it denied the

20  stay.  So it allowed the defendants to respond as to

21  whether they wanted to move to amend and when they said

22  they did, that was granted on July 6th.  So you know,

23  they didn't come back to the Court after *Honickman* was

24  issued at the end of July and say now we want to renew a

25  request for a stay of discovery.  They just simply failed

19

Proceedings

1  to comply with Rule 26(f).

2          Now that being said, just very briefly to

3  address Ms. Goldstein's various points, and I'm going to

4  really try to be brief, your Honor.

5          First of all, neither *Kaplan* nor *Honickman*

6  address conspiracy.  They're both aiding and abetting

7  cases.  So that's sort of just a non-starter.

8          Number two, as a practical matter, as anyone

9  who's looked at the case law on aiding and abetting and

10  conspiracy, they're essentially kissing cousins and it's

11  hard to articulate a basis on which discovery of one

12  would be different from the other.

13          Ms. Goldstein refers to the fact that they had

14  a quote small number of specially designated global

15  terrorist customers of which only 19 are identified in

16  the complaint during the relevant period.  There are

17  literally dozens more after the relevant period, that is

18  who were designated afterward, but who weren't during the

19  years in question.

20          Moreover, I think most people would agree that

21  19 designated terrorist customers is 19 too many both

22  practically and legally speaking.

23          But more importantly, in *Kaplan*, none of the

24  customers were designated during the relevant period.

25  They were only designated afterwards.  And the Court

20

Proceedings

1  nonetheless found that the dismissal was not warranted

2  because designations are one, potential data points for

3  general awareness, but that doesn't mean that because

4  someone is not designated, people don't know who they are

5  or that it's impossible to know that they are in fact

6  terrorists.  And that's true, by the way, your Honor, as

7  you can well imagine of literally thousands of terrorists

8  around the world.  Not all of them are designated,

9  otherwise the Treasury Department would have to add

10  another couple of wings to the building.  Instead,

11  designation is one way in which knowledge is obtained by

12  initial institutions.  Another one, for example, is when

13  the customer as we allege offload plane loads of cash and

14  deposits that into a bank account.  And in fact, *Kaplan*

15  gives another example of that with Nazem Ahmad a person

16  who the United Nations identified in a report in 2002 as

17  a Hezbollah connected money launderer and blood diamond

18  trafficker.  He wasn't designated by the United States

19  until 2020, but that doesn't mean he wasn't a known

20  Hezbollah operative in 2002 or 2005 or 2010.

21      Moreover, this idea that only a small number of

22  these customers are quote/unquote closely intertwined

23  with Hezbollah is patently contradicted in every respect

24  by pages and pages of the second amended complaint.  We

25  allege that Hezbollah, and we do feel based on U.S.

21

Proceedings

1  Government findings, that Hezbollah operates something
2  called the Business Affairs Component which is basically
3  their commercial wing for fund raising.  And not just for
4  Hezbollah, but for Hezbollah's Islamic jihad
5  organization, the part of Hezbollah that commits every
6  single attack that they are responsible for.
7          And so when Ms. Goldstein refers to 200
8  customers and only a couple of them are intertwined with
9  Hezbollah, setting aside the ones that the judge
10 specifically identified in her November 2020 decision,
11 and those include the Islamic Resistance Support
12 Organization, whose sole and dedicated purpose is funding
13 Hezbollah's terrorism, or the Martyr Foundation which was
14 the subject of the *Kaplan* appeal and which is dedicated
15 to supporting the quote/unquote martyrs of Hezbollah.
16         Setting all that to the side, and multiple
17 defendants have these entities as customers, if you put
18 that all to the side, the commercial enterprises and the
19 hundreds of customers we've identified are all part of
20 the business affairs component of Hezbollah, i.e., they
21 raise and launder money through these defendant banks for
22 the Islamic jihad organization of Hezbollah.  There is
23 nothing more closely intertwined with Hezbollah or its
24 violent activities than its Islamic jihad organization.
25         And so in our view, Ms. Goldstein

22

Proceedings

1  mischaracterizes the district court's opinion by

2  suggesting that it somehow clairvoyantly adopted a

3  closely intertwined standard that didn't exist or was not

4  articulated in those words in *Kaplan* before that decision

5  was issued this summer.

6         But the Court mentions and discusses our

7  allegations about the Business Affairs Component.  It

8  cites examples of the Martyrs Foundation and IRSO as

9  egregious examples of entities that are clearly involved

10  with Hezbollah openly affiliated with them, but in no way

11  suggests that the other 200 entities and customers are

12  somehow innocent or irrelevant to the allegations.

13         And finally, Ms. Goldstein references Lebanese

14  Bank secrecy and that's a perfect example of why

15  discovery should proceed and a Rule 26(f) conference

16  should be ordered because this is a marathon and not a

17  sprint.  The process just of doing all the things we have

18  to do in the ordinary course, negotiating a protective

19  order, talking about electronic discovery protocol, Rule

20  26 disclosures, all that takes time.  It's not something

21  that's done overnight.  And all of that leads to a

22  process after which the defendants are going to refuse to

23  produce documents that are requested in Rule 26 discovery

24  on the grounds that they can't produce records from

25  Lebanon.  And that whole process which we have been

23

Proceedings

1   through on at least five occasions takes anywhere from

2   two years to a decade to resolve.  And the sooner we get

3   started on the process and the sooner we get records that

4   are actually available to us that don't require years of

5   litigation to get to, the better off we are, our clients

6   are, and the interest of justice.

7          THE COURT:  Ms. Goldstein, would you like to

8   respond to Mr. Osen's arguments?

9          MS. GOLDSTEIN:  Yes, absolutely.  If I could

10  just go in order.

11         First, with respect to conspiracy, what the

12  *Kaplan* case made clear is that it was interpreting the

13  statutory language of JASTA and there are portions of the

14  statute that apply both to conspiracy and to aiding and

15  abetting.  And it is clear from the *Kaplan* decision that

16  a claim for conspiracy stands only when the defendant is

17  alleged to have conspired with the principle violator.

18  In this particular case, the principle violator is not

19  Hezbollah but the Iraqi militias which placed or launched

20  the bombs that entered the plaintiffs.  So *Kaplan* is

21  quite material to that.

22         And the dismissal of the conspiracy case would

23  certainly have an impact on the scope of discovery

24  because I assume that the plaintiffs would be seeking

25  communications that would be communications, for example,

24

Proceedings

1  among the banks that would not be pertinent to an aiding

2  and abetting claim but would be pertinent to a conspiracy

3  claim.

4          Second, in terms of the FDGT designations, we

5  started with that because Judge Amon's decision made it

6  clear that she considered those to be the strongest

7  allegations and that those allegations were I guess

8  pertinent only to the extent that she inferred or felt it

9  was permissible to infer that the banks provided services

10  to those customers after they had been designated as

11  FDGTs.  And our argument based on the *Honickman* case is

12  that that is not a permissible inference.  And to the

13  extent that the decision or Mr. Osen in his opposition

14  raised additional indicia of general awareness, we have

15  provided answers to those as well, and that's now pending

16  before Judge Amon.

17          What is clear, you know, however, is that if we

18  are right that the inference that services were provided

19  after the designation was not a proper inference to make,

20  then five of the defendants -- I'm sorry, then ten of the

21  defendants should be out of the case.

22          As for the closely intertwined argument, we

23  believe that characterization of the various customers is

24  squarely based on Judge Amon's decision.  And what can't,

25  although we might disagree with Mr. Osen on that, what we

25

Proceedings

1    cannot dispute is that there is a very material

2    difference between discovery involving three or let's say

3    a handful of customers and discovery involving over 200

4    customers.  Those are obviously very different

5    enterprises and scope.

6              And as for Lebanese bank secrecy, we agree that

7    it is a complex process and a sensitive process, and it

8    is our view that that process is best embarked upon when

9    we have the Court's final decision as to the scope of the

10   case so that when requests made are to the appropriate

11   authorities in Lebanon regarding disclosure, that those

12   are the actual requests that are needed for the case,

13   that they're not broader or excessive based on

14   allegations that are subsequently dismissed from the

15   case.

16             THE COURT:  So I may agree with you that

17   getting the records pursuant to the Lebanon Bank Secrecy

18   Act, you know, is a stage that should perhaps be done at

19   a time when it's more crystal clear of what claims remain

20   in the case.  But what do you make of Mr. Rosen's

21   arguments that even getting to that point will take some

22   time and that the burden rests on the defendants if they

23   seek a stay of discovery.  Particularly given the age of

24   this case, it seems to me that discovery is sort of

25   overdue for getting started which I understand to be part

26

Proceedings

1   of Judge Amon's determination not to continue the stay

2   when she issued her first opinion in the case.  Why can't

3   discovery start?  Why can't get their third party

4   subpoenas at a minimum?

5           MS. GOLDSTEIN:  Well, I suppose the point that

6   the third parties also have an interest if there are only

7   going to be a few banks at issue rather than 13 banks and

8   if there are only going to be a few customers at issue

9   rather more than 200 customers not producing documents

10  that are ultimately not part of the case.  And that's not

11  a matter of irrelevance to the defendant banks because

12  although I haven't seen all of the contracts between the

13  defendant banks and their correspondence, it's quite

14  typical in those cases to have indemnification clauses.

15  So those are expenses that would be passed through to the

16  defendant banks.

17          THE COURT:  Mr. Osen, do you have a sense of

18  the scope of the production that you would be requesting

19  vis-à-vis these third party subpoenas?

20          MR. OSEN:  Sure, your Honor.  Certainly

21  initially we're focused on this stage on transactional

22  records that involve identified Hezbollah operatives or

23  entities listed in the complaint.  Obviously, we don't

24  want to waive anything down the road if we get that far

25  three years from now to follow up with other third party

27

Proceedings

1  discovery either to other banks, or other entities, or

2  what have you.  But for what we're talking or

3  contemplating at the moment, we're talking about

4  transactional records.  These are all electronic records.

5  The banks routinely search for them but with name

6  searches.  And it's actually easier for them to do it

7  broadly than it is narrowly in our experience.

8          So you know, to just use an example, if we were

9  to take the Martyrs Foundation and assuming they had

10 responsive transactions, they generally produce, you

11 know, whatever they have that has some variation on that

12 name, and it's easier for them to just do that than to

13 try and spend manpower narrowing it, making sure that we

14 have the precise party, et cetera.  So in the past we've

15 gotten anything that has a variation on that spelling or

16 what have you will be produced and then obviously it's

17 under a protective order so we only ultimately can

18 utilize the materials that are relevant.

19         But each bank is different.  Each bank, some of

20 these will do it in house, some hire outside counsel to

21 deal with it.  We often have to negotiate with each one

22 of them individually on their burden, how far back their

23 records go, et cetera.  So that itself is a not

24 insignificant process but one which, you know, takes time

25 and they're pretty individualized because some are just

28

Proceedings

1   more responsive historically.  Others drag their feet

2   more and you know, that how it goes.

3           But in one sense Ms. Goldstein is correct.  We

4   would seek discovery as to every Hezbollah related entity

5   that we've identified.  And we can't imagine a universe

6   in which Hezbollah related entities, most of which are

7   either designated or related to designated entities, are

8   not relevant to the claims we've made.

9           THE COURT:  How many banks?

10          MR. OSEN:  That I don't know.  There are I

11  think roughly eight to ten that potentially have -- that

12  we think might have potentially responsive information,

13  but it might be fewer than that.  But generally there are

14  a couple of major clearing banks that do most of this

15  activity.

16          THE COURT:  And would I be correct, sir, that

17  in seeking this -- I don't even want to call it

18  permission because as you point out there is no current

19  stay of discovery and ordinarily parties do not require

20  permission to seek subpoenas physically from a third

21  party.  So I don't even want to call it permission.  But

22  this discussion we are having about your idea to subpoena

23  these bank records, I presume you are not asking me today

24  to rule in advance on any motions to quash that the

25  defendants could choose to make at a later date if there

Proceedings

1  was a specific objection or specific issue with regard to

2  a particular subpoena?

3          MR. OSEN:  Well, I don't know if it would be so

4  much for the defendants, although there may be

5  circumstances where they might as well, but usually it's

6  the bank that receives the subpoena that would come in --

7          THE COURT:  Oh, I've received motions to quash

8  from parties too for third party subpoenas.  So anybody

9  can try.

10          MR. OSEN:  Okay.  Anyone can try.  That is

11  true, your Honor.

12          The reason we framed it at as permission is

13  that the sort of normal process under Rule 26 is for us

14  to have a 26(f) conference, do all of that as a

15  preliminary before engaging in any discovery, even

16  document discovery requests, let alone third party

17  discovery.  So we have framed it in that way because the

18  sort of ordinary process of just sitting on a conference

19  call and working through things like language for the

20  protective order hasn't occurred here.

21          THE COURT:  Fair enough.  And thank you for

22  that.

23          So Ms. Goldstein, I have a feeling you know

24  what my thinking basically is on this.  And as I'm sure

25  you are well versed, the filing of a dispositive motion,

30

Proceedings

1  even one that suggests the district court doesn't have

2  jurisdiction, does not automatically warrant an issuance

3  of a stay under Rule 26.  And given the age of this case,

4  you know, I have concerns about the fact that discovery

5  has not even begun.  It sounds complex.  As the parties

6  may be aware, I myself have substantial experience

7  working through bank record subpoenas and things of that

8  nature from my litigating days and I hear Mr. Osen in

9  terms of the length of time that these things take.

10         I also hear the defendants said that it's

11  burdensome.  And I have gotten many a phone call from the

12  banks over the years saying do you really need every one

13  of these accounts?  Do you really need this guy?  Do you

14  really need this?  We can only go this far back.  So I

15  hear, you know, what Mr. Osen is saying.  I also hear

16  about the potential burden that this poses on the

17  defendant correspondent banks, the possibility that they

18  may seek recompense or indemnification from the

19  defendants named in this case.

20         But in the determination of whether a stay of

21  discovery is appropriate, I have to look at the various

22  factors under the law including whether you made a strong

23  showing that the plaintiff's claim is not meritorious,

24  the breadth of discovery, and the burden of responding to

25  it, and the risk of unfair prejudice to the plaintiff.

31

Proceedings

1   And I think you have made a very strong argument that

2   there may be aspects of this case that don't survive

3   after the motion to dismiss.  But exactly what the

4   contours of the case at this stage would look like, we

5   can't know.  And so although I do give that first factor,

6   whether you've made a strong showing that the plaintiffs'

7   claims are not meritorious with some weight, I do not

8   think that the breadth of discovery that the plaintiff is

9   seeking at this juncture is so burdensome that it creates

10  an undue burden for the defendants in the ordinary

11  practice that discovery is to commence and to be self-

12  executing.

13          And as to the third factor, I have concerns

14  about unfair prejudice to the plaintiff.  As we have

15  already made note of, this is a lengthy process to get

16  these records.  The case has already been pending for a

17  couple of years and I think that, you know, it's time to

18  get cracking on the discovery process so that the parties

19  could have a better sense of where the case is going.

20          So with all respect for the fact that there are

21  motions pending and that the parties have concerns about

22  commencing a discovery, I do want the parties to sit down

23  and have a meet and confer and discuss what discovery

24  would look like and what you could agree on and what you

25  can't agree on.  And if you truly cannot agree on scope

32

Proceedings

1   of discovery and everything else, I'm not saying you have

2   to turn over everything immediately, that's what the

3   initial Rule 26(f) conference is for, is for the parties

4   to sit and discuss and meet and confer.  I want that

5   conference to happen.  And I can give the parties my

6   normal case management worksheet, but it will be of no

7   use to you guys given the complexity of the case.  It

8   works very well for smaller cases but I think it won't be

9   very helpful to you and your experienced teams in this

10  case.

11          So I welcome a proposal from the parties about

12  what discovery should look like, how it could be phased,

13  and what the timing of that discovery would look like.

14          And I also think that the plaintiffs, you know,

15  should be permitted to start their process with regard to

16  getting bank subpoenas.  Those records, you know, from

17  the banks' perspective, yes, it can be burdensome to

18  produce than, but it's not crazy burdensome.  They have

19  computers, they have subpoena compliance departments,

20  they have entire groups of his banks dedicated for this

21  specific purpose and it is important information that the

22  plaintiffs need to work through their case.

23          Of course, the scope of discovery could change

24  as soon as Judge Amon rules on the motion to dismiss.

25  And I frankly suspect that given the complexities here

33

Proceedings

1   that the parties won't be very far along in the discovery

2   process when her opinion is issued.

3            So for that additional reason, I just don't

4   think that the defendants have met their burden to show

5   that a stay of discovery continues to be appropriate in

6   this case.

7            I will note that the JTB defendants are

8   differently situated and will excuse them from

9   participating in discovery for the time being.  And Ms.

10  Foley, do you have any sense from the Circuit about

11  whether your case is being set for oral argument?  The

12  briefing schedule, what the timing looks like?

13           MS. FOLEY:  Thank you, your Honor.  Our initial

14  opening brief is due on October 27th, so we're still

15  about three weeks away from that, and then the usual time

16  lines for their reply, the opposition reply.  So we're

17  just beginning the process in terms of formal papers

18  toward the end of this month.

19           THE COURT:  I see.  Okay.  So I do think that

20  that issue may be premature to require your client to

21  participate in this Rule 26(f) conference.  But given Ms.

22  Goldstein's very, very thorough and excellent

23  presentation here today, I think all of the banks'

24  interests will be protected if there's a Rule 26(f)

25  conference in terms of not over-committing too quickly to

34

                              Proceedings

 1   any particular production and that Ms. Goldstein and your

 2   co-counsel on the case, although not representing your

 3   client but counsel and the defense side, will represent

 4   all defendants' interests in terms of trying to come up

 5   with a reasonable plan here.

 6            So Ms. Goldstein, I understand this is

 7   complicated and I understand it's going to take the

 8   parties some time.  Do you have thoughts on when we

 9   should have another status conference to check in on the

10   parties as to how things are proceeding?

11            MS. GOLDSTEIN:  I would suggest 60 days.

12            THE COURT:  Mr. Osen, how does that sound to

13   you?

14            MR. OSEN:  I think it depends obviously on when

15   we do our initial Rule 26(f) conference.  I would think

16   we know probably a little sooner, maybe in 45 days,

17   whether we have a meaningful impasse.  We could always

18   join the request pushing out if we need more time, but I

19   would prefer to set it a little earlier.

20            THE COURT:  Well, that's a great question.  You

21   know, I know that this is scheduling -- even the

22   scheduling in this case is going to be complex in terms

23   of a meet and confer and having a Rule 26(f) conference.

24            So Ms. Goldstein, do you have an estimate of

25   when you think might be a realistic time frame before

35

Proceedings

1  which the parties could have that initial discussion and

2  styled as a Rule 26(f) conference?

3           MS. GOLDSTEIN:  Well, as you probably could

4  tell from the roster of the people attending this call,

5  which is a subset of the people who need to be involved

6  in the conference, because we don't have most of the

7  junior lawyers who are charged with the marshaling of

8  resources for discovery, (indiscernible).

9           THE COURT:  Ms. Goldstein, I missed part of

10  what you said.

11          MS. GOLDSTEIN:  Oh, I'm sorry.  I just said

12  that I thought it would take at least 30 days before we

13  could align everybody's calendars to have a conference.

14          THE COURT:  Okay.  Yes, my phone kind of cut in

15  and out there.  I don't know if it's on my end or on your

16  end.  But given the breadth of the number of people

17  involved alone, I think that expecting the parties to be

18  able to find a mutually agreeable time within 30 days is

19  not unreasonable.  And as a consequence, Mr. Rosen, I am

20  going to request that the parties either provide a status

21  report or we have a status conference at the 60 day mark.

22  Given the complexity of getting everybody freed up for a

23  status conference, do you have a strong view, Mr. Osen,

24  as to whether or not a 60 day out status report or 60 day

25  out status conference would be preferable?

Proceedings

1          MR. OSEN:  I think we should have a conference.

2     In my experience, your Honor, nothing focuses the mind of

3     counsel like having to answer to the Court.  And so I

4     would prefer a status conference.

5          I'd also add if it's amenable to the Court,

6     we'd like to at least begin the process of third party

7     discovery essentially as soon as we effectively can.

8          THE COURT:  Yes.  I thought I had made clear, I

9     thought that the third party subpoenas need to begin and

10    I note that those are without prejudice to any party to

11    make an appropriate motion in response to the specific

12    service and specific process that you ultimately seek to

13    issue.  I'm not inviting discovery disputes, but I just

14    want to make clear that this is -- I'm not giving you the

15    blessing to do whatever you want.  Obviously, everyone's

16    rights are preserved if there is an issue with the

17    subsequent process that you seek to serve on those banks.

18    So yes, the third party subpoenas are certainly free to

19    be issued when you're able to get that rolling.  I do

20    think the 30 days out for Rule 26(f) conference target

21    date for the parties would be great.

22          And Ms. Chan, do we have a date we could offer

23    to the parties in mid-December for a follow-up status

24    conference?

25          THE CLERK:  Sure, Judge.  Just give me one

37

Proceedings

1   second to take a look.  How is --

2          MS. GOLDSTEIN:  Your Honor --

3          THE CLERK:  -- December 13th at 10:15?

4          THE COURT:  I'm sorry?  Okay.  I don't know who

5   just spoke but everyone write down December 13th at

6   10:15.  And who just spoke?

7          MS. GOLDSTEIN:  This is Linda Goldstein.  I

8   just wanted to raise the point on third party discovery,

9   whether that was a two-way street and the defendants

10  could also serve third party subpoenas.

11         THE COURT:  Absolutely.

12         MS. FOLEY:  Your Honor, if I may?  This is

13  Elizabeth Foley.

14         THE COURT:  Yes.

15         MS. FOLEY:  Yes.  I heard that you excused us

16  from the 26(f) conference, but just a point of

17  clarification, this also I assume excludes us from

18  discovery as to third parties or other discovery pending

19  disposition of the Second Circuit appeal?

20         THE COURT:  I don't know how you would be able

21  to given the third party discovery process, but if that

22  arises, you can let me know.

23         MS. FOLEY:  Meaning that if a third party

24  discovery is attempted with regard to someone who has

25  records or information regarding JTB that we would then

38

                        Proceedings

1   object at that time even though we should be divested --

2           THE COURT:  I mean it's not clear to me that

3   you're immune from discovery, from other parties getting

4   discovery about you.  That's not clear to me on the

5   current record or the current cases that have been cited

6   in support of your argument as to why you yourself should

7   not be participating in discovery.  But I don't think

8   that you get also a security blanket in a bubble if other

9   banks have information about you.

10          MS. FOLEY:  Well, I would like to speak on that

11  if possible, your Honor.  I would like to be heard.  We

12  did actually cite a case from DBC on this specific issue

13  which held that in fact the bubble, as you referred to

14  it, the immunity, in order to protect the purpose of the

15  immunity, divestiture is complete and that includes

16  discovery as to third parties.  And the rationale of that

17  is that -- I guess think of it this way, if you were

18  claiming an immunity as a judge, some sort of absolute

19  judicial immunity, the district court had denied that,

20  and then the plaintiff wanted to proceed against you by

21  seeking third party discovery, maybe depositions of

22  coworkers or documents from the hands of your bank, or

23  something like that, that kind of discovery against third

24  parties is intrusive and the point of the divestiture and

25  the immunity itself is to make sure that the defendant

39

Proceedings

1  who claims the immunity enjoys the robustness of it and

2  the immunity from suit including all the burdens

3  attendant to it.

4          So I do think that there are instances in which

5  discovery against third parties would undermine the

6  entire purpose of the immunity.

7          THE COURT:  I hear you on that, and that's one

8  of the reasons that I suggested that you would let me

9  know if you think that some sort of process or attempt to

10 obtain information does in fact invade the sort of bubble

11 that you're afforded because I frankly don't know exactly

12 what the plaintiff's subpoenas will look like.  And I

13 appreciate the analogies close to home, but you know,

14 it's just sort of abstract.  You know, I just am not at

15 all certain what fact pattern would develop that would

16 result in concern that was properly grounded on the case

17 law that you cited.

18          And you know, for example, if the plaintiff's

19 subpoena was squarely like to a correspondent bank, like

20 any and all transactions involving this bank, that could

21 be -- you could then be in a position of saying this is

22 too far, this is appropriate for a motion to quash.  And

23 I get that you feel that you should not have to

24 participate in litigation at all because of the sovereign

25 immunity argument.  But I'm not going to prejudge a fact

40

Proceedings

1   pattern that's not before me.  I just can't do that.

2          So you know, I caution Mr. Osen to understand

3   that you have an interlocutory appeal pending that

4   provides sovereign immunity protection potentially and

5   that it would be best if he doesn't create litigation

6   issues with regard to that.  But until there's a specific

7   fact pattern touching upon the sovereign immunity issue

8   that may attend to your client, I just don't think we can

9   say definitively that there's no discovery that could

10  touch upon your client.  That just doesn't -- it's just

11  premature.  We don't have the facts relevant to make that

12  finding.

13         MS. FOLEY:  Okay.  Thank you, your Honor.

14  We'll keep that in mind and should the plaintiff seek

15  discovery that does burden JTB, then we would make the

16  appropriate motion to quash.  Thank you.

17         THE COURT:  Yes.  And I do hear you.  And I

18  hope, Mr. Osen, that you're hearing me.  Okay?  Are you

19  hearing me, sir?

20         MR. OSEN:  I certainly hear your Honor.  I

21  think it's safe to say the plaintiffs are looking for the

22  path of least resistence to get discovery where we can.

23  And I would also add that the likelihood of getting

24  discovery from JTB as a designated global terrorist is in

25  general pretty low.  So we certainly hear what your

41

Proceedings

1   Honor's saying.

2          THE COURT:  Thank you.  All right.  So with

3   that, we have the target date of the parties

4   participating in a Rule 26(f) conference within the next

5   30 days which puts us out to November 8th I guess.  Or

6   November 7th if you want to be really technical about it.

7   Let me look at the days of the week.  November 7th is a

8   Sunday.  So I'd like to ask the parties to participate in

9   the Rule 26(f) conference by December 8th.  And we will

10  have another status conference in the case December 13th

11  at 10:15 a.m.  Does that time work for you, Mr. Osen?

12          MR. OSEN:  Yes, your Honor, that's fine.

13          THE COURT:  Does that time work for you, Ms.

14  Goldstein?

15          MS. GOLDSTEIN:  It does.

16          THE COURT:  Is there anyone on the call who

17  cannot appear or have a designee appear on that date,

18  December 13th, at 10:15?  Please speak up and identify

19  yourself if you are in that situation.  All right.  So it

20  looks like we have a date and a time, and a little bit of

21  a plan forward.

22          I do caution you, Mr. Osen, to be mindful of

23  the various complexities here and, you know, if

24  necessary, tread lightly, and as you say, take the path

25  of least resistence, choose your battles.  All of those

42

Proceedings

1  things, all of those cheesy analogies.  I do want to help

2  get this discovery started but I am going to be very

3  mindful about the burden on the defendants given the

4  posture and the possibility of success on their motion to

5  dismiss at least in part.  So I want to do this in a

6  staged way and I'm happy to hear the parties' proposal as

7  to how they can do that in a way that seems fair and

8  reasonable but does start the process of moving the

9  discovery along.

10        And with that, Mr. Osen, is there anything

11  further that we should attempt to take up today?

12        MR. OSEN:  Not for the plaintiffs, your Honor.

13  Thank you.

14        THE COURT:  Ms. Goldstein, starting with you on

15  behalf of the defendants?

16        MS. GOLDSTEIN:  Nothing further to raise, your

17  Honor.  Thank you.

18        THE COURT:  Thank you.  Is there any other

19  defendant who would like to add any final comments,

20  remarks, thoughts, questions?  And if so, please identify

21  yourself and who you represent.

22        All right.  So it sounds like we have a little

23  bit of a plan forward and it's nice to meet you all.

24  Thank you both for your excellent presentations and

25  arguments.  I feel that I've learned a lot about the

43

Proceedings

1  procedural history, that it just feels more granular

2  hearing it in argument than just simply reviewing it from

3  the docket and reading Judge Amon's prior opinions.  So I

4  appreciate your time and efforts today and I look forward

5  to speaking with you all again in December.  Take care.

6          MULTIPLE SPEAKERS:  Thank you, your Honor.

7                  (Matter concluded)

8                    -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **14th** day of **October**, 2021.

*Mary Greco*

Transcriptions Plus II, Inc.