1                      UNITED STATES DISTRICT COURT

2                      EASTERN DISTRICT OF NEW YORK

3

4    ROBERT BARTLETT, et al.,          Docket No.
                                       19-CV-00007-CBA-TAM
5          Plaintiffs,

6            v.                        Brooklyn, New York
                                       Monday, December 13, 2021
7    SOCIETE GENERALE DE BANQUE        10:26 a.m.
     AU LIBAN SAL, et al.,
8
           Defendants.
9

10        *REVISED* TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
                  BEFORE THE HONORABLE TARYN A. MERKL
11                 UNITED STATES MAGISTRATE JUDGE

12

13   APPEARANCES:

14   For the Plaintiffs:          Osen, LLC
                                  GARY M. OSEN, ESQ.
15                                AARON SCHLANGER, ESQ.
                                  ARI UNGAR, ESQ.
16                                DINA GIELCHINSKY, ESQ.
                                  MICHAEL JACOB RADINE, ESQ.
17                                190 Moore Street
                                  Suite 272
18                                Hackensack, New Jersey  07601
                                  201-265-6400
19
                                  Turner and Associates
20                                CLYDE T. TURNER, ESQ.
                                  4705 Somers Avenue
21                                Suite 100
                                  North Little Rock, Arkansas  72116
22                                501-791-2277

23

24

25

1    APPEARANCES CONTINUED

2    For the Defendant Societe      Ashcroft Law Firm, LLC
     Generale de Banque au          MICHAEL J. SULLIVAN, ESQ.
3    Liban SAL:                     BRIAN LESKE, ESQ.
                                    200 State Street
4                                   7th Floor
                                    Boston, Massachusetts  02109
5                                   617-573-9400

6    For the Defendants             Dechert, LLP
     Fransabank SAL and BLOM        LINDA C. GOLDSTEIN, ESQ.
7    Bank SAL:                      1095 Avenue of the Americas
                                    New York, New York  10036
8                                   212-698-3500

9    For the Defendants             Dechert, LLP
     Fransabank SAL and BLOM        MICHAEL H. MCGINLEY, ESQ.
10   Bank SAL:                      Cira Centre
                                    2929 Arch Street
11                                  Philadelphia, Pennsylvania  19104
                                    215-994-4000
12
     For the Defendants             Dechert, LLP
13   Fransabank SAL and BLOM        TAMER MALLAT, ESQ.
     Bank SAL:                      3 Bryant Park
14                                  1095 Sixth Avenue
                                    New York, New York  10036
15                                  917-388-8304

16
     For the Defendants Middle      Squire Patton Boggs (US) LLP
17   East Africa Bank SAL,          MITCHELL RAND BERGER, ESQ.
     Fenicia, and Lebanon and       GASSAN ADNAN BALOUL, ESQ.
18   Gulf Bank SAL:                 DAVID J. LIZMI, ESQ.
                                    1211 Avenue of the Americas
19                                  Ste 26th Floor
                                    New York, New York  07601
20                                  212-872-9800

21

22

23

24

25

1   APPEARANCES CONTINUED

2   For the Defendants Middle        Squire Patton Boggs (US) LLP
    East Africa Bank SAL,            JOSEPH STEWART ALONZO, ESQ.
3   Fenicia, and Lebanon and         30 Rockefeller Plaza
    Gulf Bank SAL:                   New York, New York  10112
4                                    212-872-9831

5
    For the Defendant Bank of        Shearman & Sterling
6   Beirut SAL:                      GEORGE E. ANHANG, ESQ.
                                     410 9th Street, NW
7                                    Suite 800
                                     Washington, DC  20004
8                                    202-508-8044

9
    For the Defendant Bank of        Shearman & Sterling
10  Beirut SAL:                      SUSAN LOEB, ESQ.
                                     599 Lexington Avenue
11                                   New York, New York  10022
                                     212-848-5442
12
    For the Defendant Banque         Mayer Brown, LLP
13  Libano-Francaise SAL:            MARK G. HANCHET, ESQ.
                                     ROBERT WILLIAM HAMBURG, ESQ.
14                                   1211 Avenue of the Americas
                                     New York, New York  10020
15                                   212-506-2500

16
    For the Defendant Bank          Mayer Brown, LLP
17  Audi SAL:                        ALEX C. LAKATOS, ESQ.
                                     1999 K Street NW
18                                   Washington, DC  20037
                                     202-263-3312
19

20

21

22

23

24

25

APPEARANCES CONTINUED

For the Defendants Byblos     DLA Piper, LLP (US)
Bank SAL and Bank of          JONATHAN D. SIEGFRIED, ESQ.
Beirut:                       1251 Avenue of the Americas
                              New York, New York  10020
                              212-335-4925

Transcription Service:        Opti-Script, Inc.
                              P.O. Box 77
                              Winfield, PA 17889
                              800-494-7500

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<pre>
 1                    P R O C E E D I N G S
</pre>

 2          THE COURT:  Good morning.  Ms. Chen (ph.), could

 3    you call the case, please?

 4          THE CLERK:  This is civil cause for a status

 5    conference, docket 19-cv-7, Bartlett, et al. versus Societe

 6    Generale de Banque au Liban SAL, et al.

 7          Before asking the parties to state their

 8    appearance, I would like to note the following.  Persons

 9    granted remote access to proceedings are reminded of the

10    general prohibition against photographing, recording, and

11    rebroadcasting of court proceedings.  Violations of these

12    prohibitions may result in sanctions, including removal of

13    court-issued media credentials, restricted entry to future

14    hearings, denial of entry to future hearings, or any other

15    sanctions deemed necessary by the court.

16          Will the parties please state their appearances for

17    the record, starting with the Plaintiffs?

18          MR. OSEN:  Good morning, Your Honor.  This is Gary

19    Osen of Osen, LLC, on behalf of the Plaintiffs.  And I'm

20    joined this morning by my colleagues Tab Turner, Ari Ungar,

21    Michael Radine, Dina Gielchinsky, and Aaron Schlanger.

22          THE COURT:  Good morning to you all.

23          And on behalf of Societe Generale?

24          MR. SULLIVAN:  Yes.  Good morning, Your Honor.

25    Michael Sullivan and Brian Leske from the Ashcroft Firm.

```
 1                  THE COURT:  Okay.  Good morning.

 2                  And for Fransabank?

 3                  MS. GOLDSTEIN:  For Fransabank, Linda Goldstein,

 4        Michael McGinley, and Tamer Mallat of Dechert.

 5                  THE COURT:  Okay.  And do you represent anybody

 6        else, Ms. Goldstein?

 7                  MS. GOLDSTEIN:  Yes.  We also represent BLOM Bank.

 8                  THE COURT:  Okay.  Thank you.  And there's so many

 9        Defendants.  I'm not sure.  We'll go through the whole list.

10        So if you could please state -- when I call your first bank,

11        let me know who's here on behalf of that party and if you're

12        representing anybody else.  I'd appreciate that as well.

13                  Middle East Africa Bank?

14                  MR. BERGER:  Good morning, Your Honor.  It's

15        Mitchell Berger from Squire Patton Boggs.  Also here with my

16        colleagues Gassan Baloul, Joseph Alonzo, and David Lizmi.  We

17        also represent Defendants Fenicia Bank and Lebanon and Gulf

18        Bank.

19                  THE COURT:  Okay.  Thank you for that.  And I would

20        just as a housekeeping note advise Mr. Lizmi that your

21        address on ECF has been coming up as the U.S. Attorney's

22        Office.  So you should probably get that corrected when you

23        have a moment.

24                  All right.  So who is next.  Bank of Beirut?

25                  MR. ANHANG:  Good morning, Your Honor.  This is
```

1   George Anhang with the law firm of Shearman & Sterling.  And

2   I'm joined today by my colleague Susan Loeb.

3            THE COURT:  And are you representing anybody else,

4   sir?

5            MR. ANHANG:  No.  We are not.

6            THE COURT:  Okay.  Thank you.

7            And Banque Libano-Francaise?

8            MR. HANCHET:  Good morning, Your Honor.  This is

9   Mark Hanchet of Mayer Brown.  With me is Robert Hamburg.  And

10  that's the only bank that we represent.

11           THE COURT:  Thank you.

12           And then Bank Audi SAL?

13           MR. LAKATOS:  Good morning, Your Honor.  This is

14  Alex Lakatos with Mayer Brown.  And that's the only bank that

15  we are representing.

16           THE COURT:  Okay.  Thank you.

17           Is anybody here on behalf of Jammal Trust Bank?  I

18  know they're part of our operative discovery schedule, but we

19  did have a couple folks with us last time from that bank.  Is

20  there anybody here for Jammal Trust Bank?  Okay.

21           And I believe that would also be true, then, for

22  Dr. Muhammad Baasiri.

23           So is there anybody else who has not yet made their

24  appearance?

25           MR. SIEGFRIED:  Yes, Your Honor.  Jonathan

1    Siegfried on behalf of Byblos Bank and Bank of Beirut.

2             THE COURT:  What was the first bank, sir?

3             MR. SIEGFRIED:  Byblos Bank.

4             THE COURT:  Okay.  Could you spell your last name

5    for me, sir?  The docket is so large, I'm not finding you

6    quickly, unfortunately.

7             MR. SIEGFRIED:  Sure.  Sure.  S-I-E-G-F-R-I-E-D.

8             THE COURT:  Okay.  Thank you.  It's so hard on the

9    phone to hear all these names and find them quickly and make

10   sure we're squared away docket wise.  Okay.  All right.  I

11   see your bank.  I see you here.  So thank you for spelling

12   your last name, sir.

13            With that, anybody else who has not yet entered

14   their appearance?

15            All right.  So we're here today for a status

16   conference on the discovery schedule.  I appreciated the

17   parties' submission.  So thank you for that, Mr. Osen.

18            If you could give me an update, sir, on the

19   conferences that you guys have been having to try to discuss

20   how to move forward with at least the limited discovery that

21   was ordered at the last status and where the parties are in

22   these conversations and their plans.  I'd like to start with

23   you, Mr. Osen.

24            MR. OSEN:  Yes.  Good morning again, Your Honor.

25   Thank you.

1          So as our letter indicated, the parties did hold

2     their Rule 26(f) conference on November 5th.  And we

3     exchanged several proposals and had two subsequent

4     conferences to discuss the issues that we couldn't reach

5     agreement on.

6          With the Court's indulgence, I think it would

7     probably benefit the discussion if I provided a little bit of

8     background and context beyond the schedule itself since the

9     case itself and the legal issues presented are certainly not

10    run-of-the-mill in any sense.

11         So with the Court's indulgence, I'd just start by

12    sort of reiterating that the elements of a JASTA aiding and

13    abetting claim, which is the central claim here, requires the

14    Plaintiffs to prove that each Defendant was, quote, generally

15    aware of its role in an overall illegal activity from which

16    acts of international terrorism was a foreseeable risk.

17         And so in short, scienter, each Defendant's general

18    awareness of a role in an overall illegal activity, in this

19    case laundering money for Hezbollah, is likely to be the key

20    evidentiary issue in the case, as it is in most JASTA cases.

21         Now, as we discussed in the last call, Your Honor,

22    the central discovery issue sort of looming in this case is

23    Defendant's announced intention to object to discovery from

24    Lebanon on the basis of Lebanon's bank secrecy laws.  And

25    though Defendant has not yet specified the precise contours

1   of their objections, it's safe to assume that nearly all of

2   the most relevant records the Plaintiffs will seek in this

3   case from these banks, at least from Lebanon, will be covered

4   by those bank secrecy objections.

5       And these include, for example, account opening

6   records for alleged Hezbollah-affiliated customers, know your

7   customer due diligence files on those entities or

8   individuals, transactional records involving Hezbollah or

9   alleged Hezbollah-affiliated persons and entities, and, of

10  course, internal bank communications about those customers

11  and counterparties and so forth.

12      So this brings us to the question of how the Court

13  will ultimately address and resolve objections to discovery

14  based on foreign law.  And when courts do that, when they're

15  evaluating a motion to compel or protective order implicating

16  discovery of documents and testimony in the face of

17  objections based on foreign law, the sort of bedrock case

18  that applies here is a Supreme Court case called

19  Aerospatiale.  And that case from 1987 lays out sort of the

20  elements under the Restatement (Third) of Foreign Relations

21  Section 442.

22      And among the elements that the court is supposed

23  to consider are the importance to the litigation of the

24  documents or other information requested, the degree of

25  specificity of the request, whether the information

1   originated in the United States, and, importantly for our

2   discussion this morning, the availability of alternative

3   means of securing information apart from the discovery in a

4   foreign jurisdiction.  And lastly, for now, the sort of most

5   important element, of course, is the extent which

6   noncompliance with the request would undermine important U.S.

7   interests or compliance with the request would undermine the

8   foreign state's interests, which is basically an evaluation

9   of the balance of national interests in the dispute.

10          So that's sort of the context in which this whole

11  discovery issue is framed.  And if Your Honor permits, I'll

12  sort of just go through what the parties have agreed upon and

13  then go to the issues upon which they haven't agreed.

14          THE COURT:  I think that makes sense.  And I

15  appreciate the background information.  This certainly is

16  not, as you point, the average case.  So please continue.

17          MR. OSEN:  Thank you, Your Honor.  So the

18  Defendants obviously are unlikely to be producing any

19  meaningful records over the next 12 months or more.  And so

20  the parties have mutually agreed that there's no immediate

21  need to exchange Rule 26 disclosures at this time.  So that's

22  one point of agreement.

23          The parties also agree that the resolution of the

24  bank secrecy issue should begin by the Plaintiffs serving

25  initial requests for production which will help the

1    Defendants and ultimately the Court assess the restatement

2    442 factors, including, you know, how important the discovery

3    is, how narrow or necessary it is, et cetera.  So that we

4    agree upon.

5            And that leads to the question of what happens, you

6    know, once we've served a request for production and the

7    parties agree that that would be followed by objections and

8    briefing on the issue.  And then, depending on what the

9    Court's determination is, in other words, whether it orders a

10   document production order and overrules bank secrecy

11   objections, then the Defendant would be afforded an

12   opportunity to seek permission to comply with the Court's

13   order or orders from the Lebanese authorities through letters

14   rogatory.

15           So in sum, the parties, with the exception of JTB,

16   of course, agree as to the broad outlines of the process.

17   I'll just note that the process we just outlined and that's

18   set forth in our joint letter is the first of a two-step

19   process to the extent that the Court ultimately overrules

20   foreign bank secrecy objections and the Defendant

21   nevertheless refuses to produce documents and can't obtain

22   consent from Lebanon to do so.  At the end of the road

23   there's a second briefing process to determine what the

24   Plaintiff's remedy is for the noncompliance with discovery.

25   But that's far down the road.

1          So that just sort of frames the sort of overall

2    structure of the issue.  But I don't think we have to go

3    further on something that's certainly a year or more down the

4    road.  But I think it's important to recognize that it's a

5    long process.

6          So this brings me briefly to the three areas, from

7    our perspective, of disagreement.  And I'll list them briefly

8    and then can return to them substantively.

9          So the first is that the Defendants want the Court

10   to compel Plaintiffs to complete the service of third-party

11   discovery of New York correspondent banks in the next few

12   weeks.  And the Plaintiffs object to any sort of timing

13   limitation on when they must initiate third-party discovery

14   at the very infancy of discovery in this case from our point

15   of view.

16         The second is that in the event that the Court

17   overrules Lebanese bank secrecy objections and the Defendant

18   seeks permission to comply with the court orders from

19   Lebanese authorities through letters rogatory, Plaintiffs

20   really want to set an end date by which the Defendants have

21   to actually give a final position on whether they'll comply

22   with the Court's orders.  The Defendants want to set a date

23   to report on the progress of their letters rogatory but

24   haven't agreed to set any end date for taking a final

25   position on whether they'll comply with the Court's order.

1            And the third issue, which I think in some respects

2    is the least important, the parties are not greatly apart on

3    the bulk of the schedule, as you can see from the joint

4    letter.  But as we're happy to elaborate, some of the dates

5    Defendant proposes -- Defendants propose, I should

6    say -- simply interpose from our viewpoint unnecessary long

7    gaps in the schedule.

8            So those are the three, I think, main issues that

9    are still in dispute.  And I'm happy to take them up in more

10   detail.  But I'll pause here in case the Court has questions.

11           THE COURT:  No.  I think that's a very helpful

12   overview, and it certainly helps to supplement this chart

13   that I'm looking at in this December 12th letter.  So I

14   appreciate the backstory as to how this chart was generated

15   and the reasons for the structure that the parties have

16   proposed.

17           If you have nothing further to add about framing

18   the issues, I'd like to ask who's speaking on -- taking the

19   lead on behalf of the Defendants today.  Is that going to be

20   you --

21           MR. BERGER:  Good morning.

22           THE COURT:  -- again, Ms. Goldstein, or is it

23   somebody else?

24           MR. BERGER:  I think this morning, Your Honor, it's

25   going to be me, Mitchell Berger, from Squire Patton Boggs,

1   although Ms. Goldstein has got things that she can say as

2   well.  But in terms of where Mr. Osen started, perhaps it

3   makes sense for me to start.

4          THE COURT:  Okay.  Very good.  Thank you.  And

5   thank you for coordinating amongst yourselves on these

6   issues.  As you know, these can be very burdensome.  So I

7   appreciate the pre-coordination that you all did.

8          MR. BERGER:  Absolutely.  Thank you, Your Honor.

9   Let me start where I thought Mr. Osen might start, which is

10  while we all agree that bank secrecy objections are going to

11  play a role in discovery, we're not exactly writing on a

12  clean slate.  Both the Eastern District and the Second

13  Circuit have been through this process before in the case of

14  Linde v. Arab Bank where the Second Circuit decision can be

15  found at 706 F.3d 92, 2013.

16         And it is the Linde decision and the way that both

17  the Eastern District and the Second Circuit approached the

18  issue that drive the schedule that you have from our side on

19  behalf of the moving Defendants.  And it accounts for the

20  differences between Plaintiffs' proposed schedule and our

21  proposed schedule.  So let me just elaborate on that for a

22  bit, if I might, without meaning to accept some of the things

23  that Mr. Osen said earlier, such as his description of the

24  elements of a JASTA claim where we clearly do have

25  disagreements.

1          But here's what we knows.  And it explains both the

2   front end and the back end of our schedule, which is what we

3   know from Linde is that the international comity test that I

4   applied to bank secrecy requires several things, some of

5   which Mr. Osen touched on.  One is specificity.  So the first

6   thing from the moving Defendants' side is we said we need to

7   know much more generally than the sort of ticking off the

8   boxes that Mr. Osen did of account opening records, know your

9   customer, et cetera.  We need to know what your requests are.

10  So first order of business is to get requests out at a

11  reasonable time and account for the process that Defendants'

12  counsel have then applied to the requests.

13         One of the other things international comity test

14  looks at is alternative means for obtaining the information,

15  as Mr. Osen said.  So one of the reasons why we have frankly

16  insisted that the Plaintiffs do what Your Honor allowed them

17  to do two months ago, which is to get on with the show of

18  subpoenaing third-party correspondent banks of these moving

19  Defendants to see what they can get from those banks because

20  that's going to inform the element of alternative means for

21  obtaining the same information, which is also part of the

22  international comity test.

23         The third part of this is that inevitably we will,

24  after having objected to the request on bank secrecy, we will

25  also be objecting on other grounds, which is relevance,

1    proportionality, need, scope of discovery.  And that too is

2    part of the international comity test, all of which is

3    reviewed in Linde.

4           So what we have proposed -- and these are the areas

5    of similarity with the Plaintiffs -- requests, objections and

6    responses, meet and confer, discovery motions.  But where we

7    disagree is at the back end.  And I counted up three times

8    that Mr. Osen said if the Court overrules bank secrecy

9    objections.

10          Now, we know from Linde that that, in fact, is not

11   the right process to use.  What Linde tells us -- and I'm

12   happy to give Your Honor cites to some of the earlier

13   decisions out of the FRD in the Linde case, which probably

14   spilled more ink than most cases.  But the way it goes is

15   after the court considers motions to compel or motions for

16   protective order and has limited appropriately the scope of

17   the requests, determine what's important or not, it then

18   affords the defendants an opportunity to issue -- ask the

19   court to issue letters rogatory to the Lebanese authority

20   that ask for waiver of bank secrecy laws and permission to

21   disclose the documents that are responsive to plaintiff's

22   requests as narrowed by the court.

23          Now, I didn't make up that language.  You can find

24   it in the Linde decision at 229 F.R.D. 194, namely that

25   before the court considers overruling bank secrecy

1    objections, it affords that opportunity to seek a waiver.

2         Then, once the letters rogatory are responded to by

3    the Lebanese authorities, we come back to court.  We say,

4    okay, here's the upshot.  The Lebanese authorities did or did

5    not give permission or they granted it in part.  And then we

6    litigate the issue.  And then and only then does the Court

7    make the determination to quote/unquote overrule bank secrecy

8    objections if it believes that that is appropriate.

9         Again, I didn't make that up.  Your Honor can see

10   that in the Linde decision at 269 F.R.D. 193 where the

11   District Court notes that the plaintiffs asked the magistrate

12   judge "to overrule defendant's foreign bank secrecy

13   objections."  But what in fact happened was that the

14   defendants were allowed to issue letters rogatory.

15        So that accounts for the difference at the back end

16   of our schedule, which is once we issue letters rogatory

17   seeking permission from the Lebanese authorities to disclose

18   documents that are the subject of a court's order narrowing

19   Plaintiffs' requests, we will come back and advise the Court.

20        What Plaintiffs want to do is impose an artificial

21   and frankly premature deadline on when we have to put up or

22   shut up, to use a common term.  And we won't know that.  How

23   can we possibly know at this stage how long it will take for

24   the Lebanese authorities, given all that is going on in

25   Lebanon and the complexity of these issues.

1          Certainly we believe we have to keep the Court

2     informed.  Our schedule proposes giving the Lebanese

3     authorities 90 days before we come back to the Court and say

4     here's where things stand and here's what the Defendants

5     think makes sense.  Of course, the Plaintiffs will tell the

6     Court what they think makes sense.  But to impose in the

7     abstract and in advance a hard and fast deadline to say we're

8     going to produce or not produce really doesn't take account

9     of the importance of foreign bank secrecy laws, which, as the

10    Linde decision and the Aerospatiale decision that Mr. Osen

11    mentioned say it's important.  You have to give it weight.

12          Well, how are you going to give it weight if you

13    say artificially and in advance you've got 90 days to get

14    that process done?  So all we're suggesting at the back end

15    is that we come back to the Court after 90 days and say

16    here's where we stand.

17          Frankly, other than those differences, at the front

18    end where we say they ought to do what Your Honor told them

19    to do and issue their subpoenas and that bears on the

20    alternative means inquiry.  And at the back end, where we say

21    there should not be an artificial deadline for deciding that

22    there will be compliance or noncompliance, the schedules are

23    largely the same.

24          The timing differences are that Plaintiffs have

25    proposed issuing their requests for production on December

1    20th and giving us 65 days to respond.  Ours is entirely sort

2    of a real world response, which is to say the time between

3    December 20th and January 3rd is wasted time.  Not for the

4    lawyers.  We're always happy to work.  But it will be

5    difficult, if not impossible, to get the clients to give us

6    the feedback we need on what they have and don't have that is

7    responsive to the requests.  So we have simply suggested that

8    the RFP process start after the holidays and, importantly,

9    after the Plaintiffs get seriously underway with their

10   third-party subpoena discovery.

11           And when I say seriously underway -- and this is

12   the last point I'll make -- is that Your Honor authorized

13   them on October 8th to proceed with these third-party

14   subpoenas.  There were 13 preservation subpoenas they wanted

15   to convert into production subpoenas.  They have issued to

16   date four subpoenas.

17           We think if they meant what they said to Your Honor

18   on October 8th that this was important and they needed to get

19   underway, then, frankly, they should be subject to a

20   substantial completion deadline.  When we proposed that, they

21   rejected it.  We said, okay, alternatively, at least get to

22   the end of the beginning and get all of your subpoenas out by

23   January 10.  And then serve your requests on the parties on

24   January 17th.

25               I'll pause there.  If Your Honor has questions,

1    happy to answer them.

2         THE COURT:  No.  Thank you.  That's very helpful.

3         Is there any other party for the Defendants who

4    would like to add what Mr. Mitchell said before I go back to

5    Mr. Osen?

6         MS. GOLDSTEIN:  Your Honor, this is Linda

7    Goldstein.  I'm prepared to go into a little bit more detail

8    to give you background on the issue of third-party subpoenas

9    if that would be helpful.

10        THE COURT:  Sure.  That was what I was going to go

11   back to Mr. Osen about, to ask him the plans with regard to

12   the third-party subpoenas and what's happening.  But if you

13   have additional context, I'll be happy to hear.

14        MS. GOLDSTEIN:  Sure.

15        THE COURT:  Then I'll go back to Mr. Osen in a

16   moment.

17        MS. GOLDSTEIN:  Sure.  Sure.  Well, to build on

18   what Mr. Berger started with, there were actually, I believe,

19   15 preservation subpoenas that went out in early 2021.  And

20   these included four banks that I'll call the big four because

21   each of them is alleged to have been a correspondent to

22   multiple Defendants.  So these big four include Standard

23   Chartered Bank, which is alleged to have correspondent

24   accounts for 13 of the Defendants.  Bank of New York, which

25   is alleged to have had accounts for 12 Defendants.  JPMorgan,

1    nine Defendants.  And Wells Fargo, eight Defendants.

2          As the Court will recall, the last conference that

3    we had on October 8th was triggered by a letter that

4    Plaintiffs' counsel sent to the Court seeking leave to serve

5    production subpoenas on the 15 banks that had already

6    received preservation subpoenas as well as any other

7    similarly situated banks.

8          At the October 8th hearing, this Court held that

9    the third-party discovery on these banks could begin before

10   resolution of the motion to dismiss.  And a large part of the

11   Court's reasoning was that such discovery would impose little

12   burden on the Defendants.

13         Since then, as Mr. Berger noted, the Plaintiffs

14   have served a total of four production subpoenas, three on

15   some of the banks that received preservation subpoenas, but

16   served BNP Paribas, KBC, and Mashreq Bank, and one on a new

17   bank -- you know, Arab Bank.

18         Significantly, none of those subpoenas went to the

19   group I've called the big four.  In terms of our discussions

20   with Plaintiffs at the various meet and confers, we initially

21   sought to have this third-party discovery completed before

22   the commencement of party discovery.  That approach was

23   rejected.  We're now seeking, as Mr. Berger said, simply that

24   this discovery be put on track and not deferred indefinitely,

25   in part because of the significance of the availability of

1    other sources of information for the comity analysis involved

2    and the bank secrecy issue.  And then partly, frankly,

3    because production from those banks could result in more

4    targeted requests to the Defendants or could have an impact

5    on any scope disputes that the parties may have on motions to

6    compel.

7              So just to be clear, we're not seeking that

8    third-party discovery be completed by any particular date.

9    We're simply asking that the process, which was initiated

10   through preservation subpoenas, be put back on track so that

11   it's going on at least concomitantly with party discovery.

12             THE COURT:  All right.  Anybody else on behalf of

13   the Defendants?

14             All right.  Going back to you, Mr. Osen.  Could you

15   shed a little bit more light on this third-party discovery

16   issue?  I'd like to try to figure out a path forward there.

17   And then we can discuss the balance of the schedule.  So Mr.

18   Osen?

19             MR. OSEN:  Yes, Your Honor.  Thank you.  So first

20   of all, let's start by going back to why the Plaintiffs

21   sought third-party discovery in the first place, which is

22   that the Defendants arrogated to themselves a stay of

23   discovery after the Court rejected it in a minute order this

24   past summer.

25             We attempted to initiate a 26(f) conference, which

 1   the Defendants declined to participate in.  And so as an

 2   alternative to proceeding with discovery as we believed we

 3   were entitled to, we sought an alternative avenue of

 4   proceeding with third-party discovery which would not

 5   directly affect any burden on the Defendants.

 6           The description of what has transpired is true or

 7   accurate, I should say, in most regards, but it leaves out

 8   some of the context.  First of all, we served third-party

 9   subpoenas from our standpoint in a strategic way to not sort

10   of blast out a mass discovery effort that would likely result

11   in significant motion practice and potentially involve the

12   Court in motions to quash and so forth.  We tried to take an

13   incremental approach by starting with narrower discovery of

14   banks that were likely to have some but not necessarily

15   voluminous amounts of responsive materials so that we could

16   evaluate those productions and then proceed from there,

17   depending on what the volume was.

18           When we were talking about discovery of or

19   third-party subpoenas to use Ms. Goldstein's term the big

20   four banks, we were talking about either asking the

21   Defendants -- I'm sorry, the four banks or others to produce

22   records from -- their correspondent bank records for those

23   Defendant correspondent accounts or, in the alternative, for

24   a long list of Hezbollah-affiliated entities.  And of course,

25   there are numerous spelling variations when we're dealing

1    with Arabic names transliterated into English.

2           So that process invariably -- even now with one of

3    our subpoenas to BNP Paribas, they've raised objections to a

4    much smaller list because of the scope of it and their

5    perceived burden in searching for that amount of names.  That

6    would, of course, be increased considerably if we began with

7    the same kind of sweeping third-party subpoenas here.

8           But I think that's the thought process in terms of

9    our assessment and how we've proceeded.  But I think it's

10   also important to remember that there's nothing whatsoever

11   preventing the Defendants from asking their own correspondent

12   banks, which as Ms. Goldstein points out, covers 13 banks for

13   SCB, 12 for Bank of New York, et cetera.  There's nothing

14   preventing them from requesting New York correspondent banks

15   to give them copies of their own transactional records.

16          And there's nothing preventing the Defendants from

17   serving their own subpoenas on other New York correspondent

18   banks to give them copies of transactional records involving

19   the Defendants and transactions which will be identified in

20   the Plaintiffs' request for production.

21          That's not to say they have to do that.  But to the

22   extent that they want that information in order to improve or

23   bolster a future motion or briefing that they potentially

24   will file that we have not seen and the Court has not seen is

25   not a legitimate basis for setting a artificial and arbitrary

1    deadline on how we proceed with discovery.  In other words,

2    from our standpoint --

3                 THE COURT:  Listen, Mr. Osen, to be fair --

4                 MR. OSEN:  Yes.

5                 THE COURT:  -- I do not hear the Defendants

6    advocating for a strict deadline for these third-party

7    subpoenas.  I heard them asking me to try to get that process

8    going so that the parties have a sense of the scope of

9    discovery and will be able to make a determination at a later

10   date about the availability or potential availability of the

11   records to the extent it becomes relevant later in an

12   analysis regarding the letters rogatory.

13                So the deadline is a red herring.  Don't focus on

14   it.  I think my real question is what are your intentions

15   with regard to these third-party subpoenas, and can we get

16   that process on track?

17                MR. OSEN:  Well, Your Honor, first of all, the

18   Defendants, of course, do want to set a deadline for when we

19   serve third-party subpoenas.  So I think that's the real

20   essence of the dispute.  We have no dispute with the question

21   of pursuing third-party discovery.  We're doing so now.  In

22   fact, we anticipate this week receiving a reasonably sizeable

23   production from one of the third-party subpoena recipients,

24   which we in the ordinary course would evaluate, see what kind

25   of transaction records are being produced.  We'd continue our

1  discussions with BNP Paribas so we learn the sort of scope of

2  what the larger banks will and will not agree to and whether

3  there are workarounds and compromises that get us what we're

4  looking for.

5           And then by all means, from our standpoint, we of

6  course want to collect as much material as we can from each

7  of the banks and maybe even some that we didn't serve

8  preservation subpoenas to.

9           So it's not a standpoint for us that we don't want

10 to pursue the discovery.  It's simply that we want to do it

11 in a staged way in which we can do it evaluating the

12 materials we get, learning from our interactions with various

13 banks so that we do it in a way that we view as efficient and

14 which doesn't provoke motion practice to the court which is

15 unnecessary.

16           THE COURT:  I hear you in terms of how that would

17 be a nice process, but I do wonder how much time you're

18 anticipating this will all take.  The proposal that the

19 parties have given me is anticipating, you know, motion to

20 compel briefings in April and May.  And, you know, the staged

21 process that you're describing, given the length of time that

22 it takes banks to respond to even small subpoenas, much less

23 voluminous subpoenas, strikes me as not consistent with your

24 strategy of doing this in a staged manner.

25           So I think what I'm sort of struggling with is this

1   whole process of opening the sort of gates to do the

2   third-party subpoena work and start to sort of do discovery

3   in a manner that makes sense in light of the motion to

4   dismiss and the possibility that the claims in this case are

5   going to be significantly narrowed following the motion to

6   dismiss.

7          The struggle that I'm having is that this was all

8   started because of your claimed desire to issue these

9   third-party subpoenas.  And I get it that you don't want to

10  get 3 million documents back in a week.  I completely get

11  that.

12         But it leaves the Court sort of at a loss as to how

13  to schedule the discovery in a manner that is realistic and

14  also actually gets things moving and done, which was your

15  original request, sir.

16         MR. OSEN:  Right.  And we don't disagree with any

17  of that.  I think where we disagree with the Defendants, Your

18  Honor, is that we don't think there's any relevance

19  whatsoever to our third-party discovery as it relates to or

20  is in any way contingent to the briefing process for

21  objections and bank secrecy.  In other words, we will serve

22  requests for production which will have the full scope of the

23  entities and persons that we are interested in and think are

24  relevant to the claims and defenses in this case.  They'll

25  have that universe when we serve that RFP.

1         And then they will proceed to object, whether it's

2   on relevance, burden, or foreign bank secrecy.  And that

3   process goes ahead.  And if they want to raise an issue such

4   as availability of particular records, they're certainly

5   free, as I said, to initiate the production from third

6   parties if it thinks it will help their briefing.  But that's

7   not our job.  Our job is just to proceed with discovery on

8   our end.

9         And so it's the coupling of those two issues that

10  is, I think, the area where we completely disagree with the

11  Defendants.  Moreover, you know, I don't want to gloss over

12  the fact Mr. Berger said that there's a particular procedure

13  set forth in the Second Circuit's decision in Linde.  You

14  know, don't want this to come out the wrong way, but we were

15  counsel in that case and spent 10 years in litigation on the

16  bank secrecy issue in that case.  And his procedural summary

17  of it is not accurate.

18        That being said, in a case that went on for 10

19  years, I don't blame Mr. Berger for not knowing the ins and

20  outs of how that particular discovery dispute unfolded.

21  However --

22        THE COURT:  I believe it was Mr. Mitchell just for

23  clarity of the record.

24        MR. BERGER:  It's Mitchell Berger, Your Honor, so

25  I'm happy to go by either one.

1          THE COURT:  Oh, I apologize Mr. Berger.  I wrote

2     your name down incorrectly on my notes.  Okay.

3          MR. BERGER:  No.  Not that at all.  I'd rather have

4     Mr. Osen's apology for saying I misstated the record.  I

5     think I'm the only one who provided Your Honor with case

6     cites.  But I'll desist and let him finish.

7          THE COURT:  Go ahead, Mr. Osen.  Sorry about my

8     interruption for an incorrect correction.

9          MR. OSEN:  That's all right.

10         THE COURT:  Go ahead, Mr. Osen.

11         MR. OSEN:  I make many mistakes, so don't worry.

12    The point is that the schedule that we outlined contemplates

13    the Court both assessing the scope and issuing ultimately a

14    production order and reaching an assessment on foreign bank

15    secrecy, which is an initial assessment obviously subject to

16    what the Defendants are able to obtain if the Court agrees

17    with us on the issue initially from the Lebanese authorities.

18         The way that this can work is actually in a

19    multiple number of ways.  So in other cases in the EDNY, in

20    Strauss and Weiss, the court took a somewhat different

21    procedural approach.  The issue isn't the particulars of it.

22    It's the question of first identifying a reasonable amount of

23    discovery that is tailored to -- that it's important to the

24    location and has a degree of specificity the Court agrees

25    about and then proceeds from there to give the Defendant an

1    opportunity, even if the Court does not agree with the comity

2    assessment to nonetheless seek permission from the foreign

3    authorities to proceed and to waive the objection.

4         Now, this can be done, and we propose to the

5    Defendant as an alternative that they could just start with

6    20 names.  And we gave them a sample of 20 names in our

7    discussion where they could start with letters rogatory.  And

8    that's, in fact, what we have done in another case in the

9    EDNY that's pending at the moment in Miller v. Arab Bank.

10        So there's not one way in which to do this.  But

11   the Defendants want us to serve an RFP and for them to be

12   able to have the full scope of what our initial requests are

13   so that they can challenge the specificity and scope and so

14   forth.  And we're fine with that.  I want to be clear about

15   that.

16        But that has nothing to do with the question of

17   whether one of the arguments they may raise on bank secrecy

18   would be assisted by our third-party discovery.  As I said,

19   nothing prevents them from going to their own banks and

20   asking them for records if they want to show that there are

21   records available to them.  And I suspect, but I can't be

22   certain, that a request from a longstanding banking customer

23   may be viewed with less jaundiced eye than a third-party

24   subpoena from Plaintiffs' counsel.  I could be wrong about

25   that.

1          But of course we would prefer, in whatever form,

2     that the documents be produced.  We just don't want to be

3     driven to do that on any particular schedule that is likely

4     to result in motion practice.  It might come down to that

5     anyway, but we'd rather do it according to our own lights.

6     And we don't see that that's tied in any way to the briefing

7     schedule.

8          THE COURT:  So back to you, Mr. Berger.

9          MR. BERGER:  Yes.  Well, let me start with where we

10    all were on October 8th, which was we got this whole process

11    activated and consumed a fair amount of Your Honor's time

12    because Mr. Osen said these subpoenas were important.  Well,

13    they haven't exactly voted with their feet in making them

14    important in issuing only four.  But more importantly, it

15    does bear on the availability of alternative means under the

16    international comity analysis.

17         When Mr. Osen ticked off in the abstract four areas

18    of documents he would be requesting, one of his was

19    transactional records.  Well, what is he seeking from these

20    correspondent banks but transactional records?  So indeed,

21    where we stand on the subpoenas will bear directly on the

22    alternative means of obtaining information that he wants for

23    the international comity analysis.

24         And he is right.  We rejected the idea of in the

25    abstract taking a list of 20-odd names with nothing more and

1    just then going to the court and saying, Your Honor, will you

2    issue a letter rogatory that asks for goodness knows what

3    with respect to these 20 names.  Well, we said we've read the

4    international comity test, whether you read it from

5    Aerospatiale or whether you read it in Linde, and it says you

6    have to have specificity of the request.  So we said for good

7    order's sake and to comply with the international comity

8    test, we need specific requests, specific requests of what

9    kinds of documents you want, about whom you want the records,

10   what time period it covers, all the conventional things that

11   one would expect in a request for production of documents.

12           And it's not just because we like doing it that

13   way.  It's because there's no other way to apply the

14   international comity test that we're going to have to

15   confront.  So despite what Mr. Osen said about having raised

16   that at the beginning, he ultimately seems to have come

17   around to our point of view, as you can see from his letter

18   of Friday, where what we're all proposing is let's do it by

19   the numbers.  Requests, objections, meet and confer, motions.

20           The only difference in those schedules for all

21   practical purposes is timing and two wrinkles.  And so I'll

22   just touch on those two wrinkles again.  One is he says in

23   resolving motions, Your Honor can overrule bank secrecy

24   before we get on with letters rogatory.

25           My first response to that is it's premature.  Your

1    Honor hasn't even seen where we stand.  We don't need to

2    resolve that issue for today.  That certainly wasn't the

3    approach that I quoted to you from the early Linde decisions

4    that are the ones I mentioned earlier that you can find at

5    269 F.R.D.  So that's one, which is we don't think that the

6    Court needs to decide that it's overruling bank secrecy and

7    certainly doesn't need to decide today that that's what it

8    needs to do when it has motions to compel or motions for

9    protective order.

10           And the second point where we disagree -- and it's

11   the only point -- is do we have a drop-dead deadline by which

12   we must tell you whether we're producing documents.  And I

13   think it's a bit ironic that Mr. Osen has begun his argument

14   by saying we don't want to have an artificial constriction of

15   our rights to pursue discovery.  We don't want to live under

16   any kind of deadline for third-party discovery.  But when it

17   comes to Defendants, there ought to be some artificial a

18   priori deadline by which they tell the Court that they will

19   produce or not.

20           I'll borrow Mr. Osen's logic and say it's simply

21   too early to know where we will stand 90 days after a letter

22   rogatory gets issued.  And therefore, what we're proposing

23   is, rather than a drop-dead deadline, we will come back.  We

24   will advise the Court what's going on.  And we will follow

25   the Court's directions.

```
 1              THE COURT:  All right.  Thank you for that.

 2              MS. GOLDSTEIN:  And so I'd like to add one point.

 3              THE COURT:  Sorry.  I want to ask Mr. Berger a

 4    follow-up question.

 5              So the issue about, you know, coming back to the

 6    court, I completely agree with you, Mr. Berger.  I don't

 7    think it's realistic at this juncture for us to be setting,

 8    you know, deadlines by which you are going to be telling me

 9    about your interactions with the Lebanese authority.  I think

10    that that's going to need some time to play out.

11              But what I'm still struggling with is this question

12    of how to get this process underway.  Mr. Osen,

13    understandably, doesn't want there to be a hard and fast

14    deadline for all third-party correspondent bank subpoenas.

15    And I frankly did not understand either of you to be arguing

16    that.  In fact, I believe that Ms. Goldstein expressly said

17    she wasn't arguing that but she wanted to get this

18    substantial compliance or things on track.  I may be

19    comingling some of the language the two of you used, but that

20    was my impression of the overall position of the Defendants.

21              So Mr. Berger, can you comment on the sort of

22    kickoff process and the timing there?

23              MR. BERGER:  Yes, Your Honor.  And I think Ms.

24    Goldstein and I are saying the same things and much because

25    we took a page from Your Honor's book from October 8th, which
```

1    is our position is we understood loud and clear from your

2    order of October 8th and your follow-up minute order of

3    October 11th that what Your Honor expected was some amount of

4    both sequential and incremental discovery.

5            So what we have proposed is pick whatever dates you

6    want.  Let's at least get the third-party discovery underway

7    in a meaningful way before we then grapple with requests for

8    production.  Pick whatever dates you want.  In the multiple

9    schedules we exchanged, we had suggested later dates for them

10   to complete issuing subpoenas and therefore later dates for

11   us to -- for the parties to issue requests for production.

12           Our only point is in the sort of chicken-egg battle

13   of what should come first, we thought that however Your Honor

14   believes is appropriate they need to do something more than

15   they have done on the third-party discovery front since

16   October 8th.  I mean, it's December 13th, and they have four

17   subpoenas outstanding.  And given that it will be difficult

18   to get meaningful interaction with the client banks over the

19   holidays, what we're trying to do is make good use of that

20   time by saying, okay, use the next three weeks.  Get your

21   subpoenas out.

22           You know, if that's all you want to do for them,

23   then I suppose the moving Defendants can live with that, but

24   do that before you then propound discovery requests because,

25   indeed, we are going to be coming back in discovery motions

1    saying you want transactional records from us, you could have

2    or you did request transactional records from the

3    correspondent banks.  That's meaningful.  It should go first.

4    That's our position so far as I understand it.

5         THE COURT:  Well, what do you make of Mr. Osen's

6    argument that the Defendant banks in some ways are arguably,

7    according to him, better situated to determine the

8    availability of the records from the correspondent banks in

9    the context of making those comity arguments?

10        MR. BERGER:  My only response to that would be why

11   didn't I hear that on October 8th when he was here telling

12   Your Honor how vital it was for the Plaintiffs to issue

13   subpoenas?  And if what he means is it was only vital to

14   issue the four subpoenas he's issued so far, okay, that's not

15   what I've heard, either in the meet and confers or on this

16   call.  But yeah.  I mean, we have alternative means as well.

17        But we started this journey with them asking Your

18   Honor to lift the discovery stay or at least to initiate the

19   discovery process and to start with these subpoenas.  So we

20   took them at their word that it was important.

21        THE COURT:  Which I understand.

22        MS. GOLDSTEIN:  If I could add, Your Honor.

23        THE COURT:  Yes.  Go ahead, Ms. Goldstein.

24        MS. GOLDSTEIN:  I have not heard Mr. Osen say that

25   he does not want the transactional records from the

1  correspondent banks.  All I hear him saying is that he

2  doesn't want it now if getting it now is going to be helpful

3  to Defendants and eventual motions to compel.  And that

4  doesn't really seem to be the most efficient way of

5  proceeding.

6          THE COURT:  Okay.  Back to you, Mr. Osen.  Again, I

7  do hear you on your desire to sort of stage things.  But why

8  are -- can we please just sort of figure out a schedule for

9  some substantial compliance with this request to issue these

10  third-party correspondent subpoenas?

11          MR. OSEN:  Well, let's start, Your Honor, with the

12  fact that the reason we sought third-party subpoenas is

13  because the Defendants wouldn't engage in any discovery

14  directly or even schedule a Rule 26(f) conference.  So that's

15  the background to this.

16          Obviously, we always prefer to get the records

17  directly from the Defendant rather than have to go through

18  third parties for it.  So it's no answer to say that, yes,

19  they could get those records, but ha, ha, the Plaintiffs

20  asked for it in a different way.  We asked for it in a

21  different way because that was the only option and

22  opportunity we had to open discovery at all.

23          But more importantly, again, the issue is not

24  whether we want the records or even that we want to frustrate

25  the Defendants' ability to make an argument in their eventual

1    briefing.  As stated before, they could go to those

2    correspondent banks who they have contractual relationships

3    with and ask for those records.  And they could make the same

4    argument that they want to make now.  This is just a red

5    herring to distract from the fact that they want to delay as

6    much as possible the briefing of the central issue in this

7    case.

8         And we are not in parallel.  We are in the process

9    of engaging in discovery.  The Defendants' objection to

10   deadlines is about the withholding of discovery.  They are

11   not the same thing, and they are not equivalent in any way.

12        So from our standpoint, we could serve a discovery

13   request next week or sometime before Christmas.  They could

14   have the same amount of time that they want on their schedule

15   to respond.  And in fact, giving them extra time to consider

16   the particulars of our request.

17        We have certainly no reason to not independently

18   seek third-party discovery and intend to pursue it

19   vigorously.  But what we don't want to do -- unless Your

20   Honor directs us.  If Your Honor directs us and says, look,

21   just send out those subpoenas to all the banks and see what

22   happens, it's not a big burden on us from a standpoint of

23   drafting and serving the subpoenas.  The burden will come in

24   when we are weighed down in the inevitable disputes over

25   those subpoenas and motions to quash, et cetera.  That might

1    happen no matter what, but our view is that that is something

2    we should try to avoid where we can and we should proceed in

3    a manner that is incremental and strategic and tries to limit

4    the amount of sort of collateral disputes that are going to

5    be raised.

6           But if the Court says, hey, look, just for the

7    sake of moving things forward, send it out and proceed in

8    that way, we're certainly not going to stand in the way of

9    that.  It's not mechanically difficult for us.  But I don't

10   think it's going to move the ball any further.  It's

11   certainly unlikely that in the briefing schedule the

12   Defendants are going to have any more benefit from the fact

13   that we sent a subpoena out that is being contested when, of

14   course, again, it bears repeating, they can go straight to

15   the horse's mouth.  They could ask the banks for the records.

16   And that would be the most direct and efficient way for them

17   to make whatever argument they want to make.

18          I want to stress also, Your Honor, just so we're

19   clear that transactional records are very important to us

20   because they are the actus reus of the crime, if you will, of

21   money laundering for Hezbollah.  But the key and central

22   issue in almost every ATA case is the defendant's scienter,

23   what do they know, what's their level of awareness.  And that

24   is generally not determined by transactional records but by

25   the internal communication of the banks themselves.  Those

1    records are not in United States.  They're not held by the

2    correspondent banks.  Those are the key records.  And that's

3    unaffected by anything we do here when the Court ultimately

4    analyzes the competing interests.

5              THE COURT:  All right.  So is there anything you'd

6    like to say in response to that, Mr. Berger?

7              MR. BERGER:  Only this, Your Honor, and I'm sure

8    you're getting tired of hearing from us, so I'll keep it very

9    short.  Which is obviously one of the things Your Honor is

10   going to have to address in discovery motions is

11   proportionality.  And it's very difficult to know what's

12   proportional for party discovery -- put aside international

13   comity.  Alternative means is certainly important for that.

14   And it's additionally important on the issue of

15   proportionality.

16             And the fact that they are voluntarily disarming

17   and choose not to pursue records that they could pursue I

18   think is going to speak volumes at a later date on

19   proportionality.

20             Last point, I guess, you would never know from what

21   Mr. Osen said that we're, like, three weeks apart on most of

22   the key elements of this.  And the only reason we're three

23   weeks apart is we said we'd like you to serve these subpoenas

24   first and we'd like to make sure we use the time efficiently

25   given the holidays.

1          Mr. Osen just solved the second of those problems

2  by saying if I serve next week on the December 20 deadline I

3  propose, you can still have until the March 18 deadline in

4  yours.  If that's what he's proposing, then we've reached

5  agreement on that.

6          And then it's really a question of did they mean

7  what they said when they came to Your Honor on October 8th

8  and said this stuff's important.

9          THE COURT:  Well, I don't think that the timing is

10  a determinant of whether it's important.  And I think both

11  parties are placing a lot of emphasis on what happened in the

12  past.  And, you know, frankly, it's of some relevance, but as

13  we all know, litigation is complicated.  Investigations are

14  complicated.  And things change.  People's perspectives

15  change.  The number of documents you have to review, you

16  know, can impact whether you feel like subpoenaing another

17  million documents.

18          I would like both of you to please stop putting so

19  much emphasis on how we got here and try to figure out our

20  paths forward because that is ultimately what I am here to

21  do.  I am not here to, you know, berate any party for their

22  conduct absent truly, you know, bad conduct.  But I am here

23  to try to make this process expeditious and reasonably

24  efficient.  And I recognize in a case like this those terms

25  don't really mean much because it's not going to be efficient

1    and it's not going to be quick.

2            But I really would ask both sides -- because you've

3    both been doing it a lot to stop with the jabs about what

4    happened in the past.  Okay?

5            Ms. Goldstein, is there anything you'd like to add?

6            MS. GOLDSTEIN:  No, Your Honor.  Not at this point.

7            THE COURT:  Okay.  So, you know, having reviewed

8    the parties' proposal and, you know, thank you, all, for your

9    very thorough, you know, discussion today of the different

10   moving parts.  I do think, frankly, Mr. Osen, that it makes

11   sense for some of this work to be, you know, on track with

12   regard to these third-party subpoenas.

13           And the reason for that is not necessarily because

14   it relates to the comity analysis, although I do believe that

15   it does.  I take your point, Mr. Osen, that the Defendants

16   are able to do a comity evaluation and do their own

17   independent investigation with their correspondent banks as

18   to the comity analysis at the appropriate time, but it

19   doesn't change the fact that, you know, this is a process

20   that you requested.  We started it.  And I do think we need

21   to keep the case, you know, moving in the direction that you

22   requested it to be moving.

23           So with that, Mr. Osen, you know, realistically,

24   what is the timing that you think would be realistic for

25   serving subpoenas on we'll call it the big four to borrow Ms.

1   Goldstein's term?

2          MR. OSEN:  We'd have to check the calendar, Your

3   Honor, but I imagine we could certainly serve them by or

4   before the first week of January.  So I think it might be

5   sooner, but that's really just a question of other things

6   going on here.  So I think that's an outer date.

7          THE COURT:  Okay.  I would then like to ask you to

8   serve those subpoenas on the big four by the Defendant's

9   proposed date of January 10th.  I am not going to order that

10  that be the last day for the Plaintiffs to serve subpoenas on

11  the correspondent banks.  I do agree with Mr. Osen that doing

12  this in a staged way to some degree makes sense.  And there's

13  certainly, you know -- the big four subpoenas will be very

14  informative as to the scope of the documents that are out

15  there and the complexity of the responses.  And also, to Mr.

16  Osen's point, whether or not this is going to result in a

17  barrage of briefing to kick off the new year together.

18          So we'll set that date as January 10th.  And then,

19  Mr. Osen, in addition to that, when would you be able to

20  serve your RFPs to the Defendant?

21          MR. OSEN:  Well, I think our plan, Your Honor,

22  would be to serve them on our original proposed date of

23  December 20th.  But I think to Mr. Berger's point, we could

24  have sort of an outside date of January 17th, which is their

25  date, which means that we would probably serve earlier, but

1  their time to respond would be the same.

2          THE COURT:  Which date do you want, sir?

3          MR. OSEN:  So I think the latest date would be

4  January 17th.

5          THE COURT:  We'll style that as initial RFPs to be

6  served by the Defendants [sic] no later than 1/17/22.

7  Obviously you can serve it before then if you're ready to do

8  so.

9          And with that, we can pick up with the Defendant's

10  schedule and direct that the parties can serve objections and

11  responses to the initial RFPs two months thereafter.  So

12  that's March 18th.  And the parties will then have a month to

13  do their meet and confer to discuss any objections to those

14  RFPs by April 18th.

15          And then the parties --

16          MR. OSEN:  I'm sorry, Your Honor.  If I could just

17  be heard for a moment on that because I think --

18          THE COURT:  Just for clarity, is this --

19          MR. OSEN:  Yes.  I'm sorry.

20          THE COURT:  -- Mr. Berger?  Go ahead.

21          MR. OSEN:  No.  This is Mr. Osen.  I'm sorry, Your

22  Honor.

23          THE COURT:  Mr. Osen.  Okay.

24          MR. OSEN:  One of the things that we objected to in

25  our discussions is the sort of elongation of the schedule on

 1   meet and confer process.  They'll have had at least two

 2   months and probably longer to consider the RFPs we provide.

 3   And given that they're not going to be producing the records

 4   but merely raising their objections at this point, we think

 5   that two weeks is more than reasonable for the meet and

 6   confer process before filing the briefs.

 7        THE COURT:  I see.  So your concern is about the

 8   April 18th date?

 9        MR. OSEN:  Correct.

10        THE COURT:  Mr. Berger, do you have -- I mean, my

11   concern, Mr. Osen, is that there's 22 people on this call and

12   that conferring with any group of 22 people can take a

13   lengthy period of time.

14        Mr. Berger, what is your thoughts on the deadline

15   for the meet and confer?

16        MR. BERGER:  Your Honor stole my best point, which

17   is, look, we have tried.  We, the seven law firms

18   representing 11 Defendants here have tried our best to stay

19   coordinated and not to quintuplicate I say only because I

20   don't know what the number is for seven the amount of effort

21   for Mr. Osen.

22        But I mean, it takes us a while to coordinate and

23   come up with positions.  And the premise that not only can we

24   do this quickly because we're only going to object is also

25   wrong.  We have a due diligence obligation once we receive

1   these requests to go back and figure out what there is so

2   that we're not raising objections in the abstract.  It will

3   take 30 days.  It took over 30 days to get through the 26(f)

4   process and come back on these requests.  I don't think it's

5   unreasonable.  But any number Your Honor picks we will comply

6   with.

7              THE COURT:  So Mr. Osen, I hear you.  And I think

8   that being Plaintiffs in this case you're a little more

9   nimble than the Defendants.  No offense to any individual

10  defense attorneys, of course.  I'm sure you're all very

11  nimble in your lives.  But in this context, this is not a

12  nimble process for this group of Defendants.

13             So I do credit Mr. Berger's concern that he needs

14  more time than two weeks to confer with this large of a group

15  to both review the requests, sort of figure out what their

16  positions are, and then to communicate those positions to

17  you, meet and confer on it.  I do predict that period of time

18  is going to take some time.  And I'd rather build a schedule

19  that we can live with and to avoid the parties needing to

20  engage in 17 emails back-and-forth just simply to request a

21  two-week extension, which is of no use to anybody.  That's

22  just an unnecessary burden.

23             So I am going to go ahead with the Defendants'

24  proposal that that gap be a one-month gap.  The parties have

25  been --

1          MR. OSEN:  Your Honor.

2          THE COURT:  Yes?

3          MR. OSEN:  If I may for just one moment.  I'm not

4    going to reargue the April 18th date.  Just want to point out

5    that the period here is not for the Defendants to confer.

6    They'll have 60 or more days to do that internally.

7          THE COURT:  I understand.

8          MR. OSEN:  It's to schedule a single call with us.

9    And again, I am not rearguing the April 18th date.  But I

10   just want the Court to be mindful that in the course of this

11   process -- and again, Mr. Berger mentioned the Linde case.

12   We had 10 years of litigation relating to bank secrecy,

13   including a trip to the U.S. Supreme Court.  So we're very

14   mindful of the fact that our clients are the families of

15   fallen soldiers and also horrifically injured veterans who

16   are obviously eager to see the case as expedited as this

17   complex process allows.

18          So having said my piece, I recognize the April 18th

19   deadline and will act accordingly.

20          THE COURT:  And I do appreciate everything you're

21   saying, Mr. Osen.  And I certainly in no way would like to

22   think this schedule is any disservice to your clients.  My

23   issue simply is one of case management and trying to figure

24   out a schedule that is realistic based on the knowledge that

25   it takes time for banks to move.  And it takes time for

1    voluminous records to be reviewed.

2         I'd be surprised if each of these banks are even in

3    a position to confer with one another in less than 30 days

4    after receiving your RFPs.  And I don't think it's a one

5    phone call meet and confer here, sir.  I think it's going to

6    probably be more than that because the, you know, complexity

7    of the issues here is going to be significant.  And you are

8    also potentially going to be in the midst of processing

9    substantial records in response to your third-party

10   subpoenas.

11        So really, all I'm trying to do here is build a

12   case schedule that I think is realistic.  And I appreciate

13   your optimism that this -- you can hammer out your meet and

14   confer in one meeting.  I am less confident about that.  And,

15   you know, I do want to underscore that my individual rules,

16   which I'm not -- I will waive for the purposes of this

17   particular motion, you know, require -- because this is a

18   different order of discovery motion than most -- you know,

19   require the parties to meet and confer and narrow as much as

20   they possibly can prior to coming to the court, you know, on

21   these motions to compel and motions for protective orders.

22        And I really strongly encourage the parties to do

23   that here.  And it may take more than one call, Mr. Osen.

24   And so you should all be prepared to do that.

25        So moving along, the parties' next proposed date,

1   original schedule, Plaintiffs had suggested that the motions

2   to compel be filed in late March.  We're obviously past that

3   at this point.

4          So going back to the Defendants' proposal, the

5   motions to compel or for protective order, suggested

6   submission date is May 2nd.

7          And then the Defendants' schedule gives a month to

8   respond.  The Plaintiffs' schedule also gave a month to

9   respond followed by a couple of weeks.  It looks like three

10  weeks on each of the schedules following that.

11         So Mr. Osen, understanding everything you just said

12  and taking it to heart, I am going to respectfully direct the

13  rest of the Defendants' proposed schedule.  May 2nd for the

14  parties' motion to compel or for protective order.  And then

15  the oppositions to discovery motion to be due June 2nd.

16  Replies to be due June 23rd.

17         Okay.  And then with regard to this issue

18  around -- about the back part, the back half that Mr. Berger

19  explained in detail, I am not going to set a deadline for the

20  parties -- for the Defendants to tell us the exact position

21  they're going to be taking 90 days after any issuance of

22  letters rogatory.  I'm going to leave that question open.

23  And we'll get to the issues pertaining to the scheduling of

24  that when there is a ruling, if there is such a ruling.  You

25  know, permitting the letters rogatory and seeing what all of

1   that -- seeing where everything ends up.

2          So I'm going to not rule on the latter two

3   categories for now.  And I will just advise the parties that

4   my inclination would be to give the Defendants a deadline by

5   which to provide a status report or an update but not a

6   deadline as to exactly what's happening with the, you know,

7   foreign banks because I know that that's a complex process.

8   So we can revisit that question when and if there's, you

9   know, more clarity about what's happening with regard to all

10  of that.

11         So Mr. Osen, with that, is there anything further

12  that the Court can take up today?

13         MR. OSEN:  Yes.  Just one item, Your Honor, because

14  we talked about the sort of front end of the schedule and the

15  briefing.  One thing that we have found in multiple prior

16  cases, including the Linde case Mr. Berger cited is the

17  Defendants providing in advance -- and sometimes to the court

18  as well, sometimes just to the plaintiffs -- the particular

19  sections of the applicable law, in this case Lebanon, that

20  they think are implicated once they see the RFPs so that the

21  parties are sort of aware of the parameters of what is going

22  to be in dispute, if anything.

23         So for example, some jurisdictions permit

24  disclosure if there is a client waiver.  Others do not.  Some

25  have distinctions they draw between nationals of the country

```
 1    and accounts held by foreign nationals.  So there are
 2    distinctions which obviously would be unique to Lebanon.  And
 3    so we would ask -- I don't know that it needs to be so
 4    ordered, but we would like to know well in advance of our
 5    meet and confer in April what laws and the Lebanese code the
 6    Defendants are going to rely upon with respect to the RFPs
 7    once they've received them.
 8              THE COURT:  Mr. Berger, what are your thoughts on
 9    that reply?
10              MR. BERGER:  Yes, Your Honor.  Look, I think I
11    speak for every defense firm on this call, which is it's not
12    our approach to things to give Plaintiffs less information
13    than we would give the Court.  I'm sure Your Honor would
14    insist of that in litigating these issues we'd be as specific
15    as possible.
16              Having not seen his requests, we don't know what
17    laws will be implicated.  We will, of course, have to take
18    advice from Lebanese lawyers on that issue.  And even if we
19    get it right in our view, in our responses, that's not to say
20    that the Lebanese Central Bank or the Commission, Special
21    Investigative Commission of Lebanon won't have other
22    provisions that we haven't thought about.
23              So we'll do our very best to be specific about the
24    provisions of Lebanese law.  We don't think we would be
25    credible to Your Honor if we just say, you know, Lebanese law
```

1  in general prohibits us from producing.  We will have to be

2  as specific as we can be.

3        THE COURT:  See, what I think he's actually asking

4  is for there to be some sort of understanding or perhaps even

5  build it into the schedule that to the extent you're able to

6  provide the citations or the translated copies of the law or

7  whatever it is that he's seeking, that you'll be providing

8  that in advance of the meet and confer so that the meet and

9  confer can be productive.

10        Is that a fair summary of what you're asking for,

11  Mr. Osen?

12        MR. OSEN:  Yes, Your Honor.

13        THE COURT:  So I think that's really the question,

14  Mr. Berger.

15        MR. BERGER:  And that seems entirely fair, Your

16  Honor.  And of course, we're dependent on Lebanese lawyers to

17  give us that advice and those copies, et cetera.  But there's

18  no reason for us to want to evade that.  We want fulsome

19  objections if we have to make them and we want a productive

20  meet and confer.

21        THE COURT:  Very good.  So what I will do then in

22  the minute entry and order that I will enter today setting

23  these dates and deadlines is just a, you know, directive to

24  the Defendants that you're being respectfully directed to

25  provide the relevant citations and, to the extent available,

1    the Lebanese authority on which you plan to rely in support

2    of any objections in advance of the meet and confer.

3           And I'm not going to set a deadline for it.  You

4    guys can work that out on your own.  But I will respectfully

5    direct the Defendants to do that.  I think it's a good idea,

6    Mr. Osen, in terms of having the meet and confer be

7    productive so that you're all, you know, reasonably informed

8    about the lay of the land as you go into the conversation.

9           So with that, is there anything else?  Mr. Osen?

10          MR. OSEN:  Nothing further, Your Honor.

11          THE COURT:  Okay.  Mr. Berger, how about from you?

12          MR. BERGER:  Nothing further, Your Honor.

13          THE COURT:  Ms. Goldstein?

14          MS. GOLDSTEIN:  Nothing further, Your Honor.

15          THE COURT:  All right.  Is there any other

16   Defendant who would like to add anything or has any

17   questions, clarification?

18          Okay.  Well, again want to thank you all for

19   coordinating as much as you have in advance of this call.

20   Your prep is very clear to me.  And I also appreciate that

21   you did your best vis-a-vis one another in trying to resolve

22   and narrow these disputes.  And I appreciated the joint

23   submission summarizing the respective positions of both

24   parties.

25          I, you know, do understand the complexities here

1    and hope to help keep this case moving along at a reasonable

2    pace, although I recognize that the Linde case gives us some

3    sense of how long it could go on for.

4          So with that, I think we are adjourned.  I hope you

5    all have a nice holiday season to the extent you're able to

6    take any time off.  I hope you enjoy it, and I hope you all

7    stay safe.

8       (Proceedings adjourned at 11:43 am)

9

10                   TRANSCRIBER'S CERTIFICATE

11          I certify that the foregoing is a correct

12   transcript from the electronic sound recording of the

13   proceedings in the above-entitled matter.

14

15                                    December 17, 2021

16   *Carrie Clouse*

17   _____    _____

18   Carrie Clouse, CET-1207                              DATE

19   Legal Transcriber

20

21

22

23

24

25

Opti-Script, Inc. | 800-494-7500
P.O. Box 77, Winfield, PA 17889
production@opti-script.com