UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

ROBERT BARTLETT *et al*.,                                    :
                                                             :
                    Plaintiffs,                              :        **Case No. 19-cv-7 (CBA)(TAM)**
                                                             :
          -against-                                          :
                                                             :
SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL                      :
*et al.*,                                                    :
                                                             :
                    Defendants.                              :
-----------------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO OVERRULE DEFENDANTS' FOREIGN BANK SECRECY
AND SCOPE/BURDEN OBJECTIONS AND COMPEL DEFENDANTS TO PRODUCE
DOCUMENTS RESPONSIVE TO PLAINTIFFS' FIRST REQUEST FOR THE
<u>PRODUCTION OF DOCUMENTS</u>**

### TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................... 1

I.    PLAINTIFFS AND THEIR CLAIMS ................................................................................... 2

    A.    Hezbollah ........................................................................................................................ 2

        1.    Hezbollah's "Social Welfare" Sector – The Da'wa ............................................ 4

        2.    Hezbollah's Business Affairs Component .......................................................... 6

            a.    Hezbollah's BAC Leadership .................................................................. 7

            b.    Hezbollah's BAC Acts as a Series of Interlocking Criminal Networks ........ 12

            c.    Hezbollah's Narcotics Trafficking Networks ........................................ 15

            d.    Hezbollah's Weapons Trafficking Networks ......................................... 16

    B.    LCB's Sale and the Migration of Hezbollah's Accounts to Defendants ................. 17

II.    ELEMENTS OF JASTA LIABILITY ............................................................................... 18

    A.    Aiding and Abetting Liability ...................................................................................... 18

    B.    Conspiracy Liability ..................................................................................................... 19

III.    PLAINTIFFS' DOCUMENT DISCOVERY REQUEST ................................................ 21

ARGUMENT ............................................................................................................................... 25

I.    THE STANDARDS GOVERNING EFFORTS TO WITHHOLD DISCOVERY BASED UPON FOREIGN BANK SECRECY STATUTES ........................................................ 25

II.    THE *AÉROSPATIALE*/RESTATEMENT FACTORS HEAVILY FAVOR COMPELLING PRODUCTION OF THE REQUESTED DOCUMENTS .................. 27

    A.    The Critical U.S. Interests in Deterring Terrorism and Promoting the Fair Resolution of Disputes Significantly Outweigh the Private Confidentiality Interests of the Banks' Customers and Transferees .................................................. 27

        1.    The Compelling U.S. Interests in Preventing Terror Financing Overwhelmingly Weighs in Favor of Ordering the Banks to Provide the Requested Discovery ........................................................................................... 27

        2.    The Personal Privacy Interests that Animate Lebanese Bank Secrecy Pale in Importance to the U.S. Interests This Case Implicates ................................. 32

        3.    Lebanon Excludes Hezbollah from the Application of Its Terrorism Financing Laws .................................................................................................... 34

    4.    **Disclosure Is Consistent with Lebanon's Obligations Under International Law** ................................................................................................... 36

B.    **The Importance of the Requested Documents to This Litigation Heavily Favors Compelling Their Production** ........................................................ 39

C.    **The Specificity with Which Plaintiffs Have Identified the Requested Documents Fully Supports Compelling Their Production** ................................. 39

D.    **Plaintiffs' Inability to Secure the Requested Documents Through Reasonable Alternative Means Supports Compelling the Banks to Produce Them** ................. 41

    1.    **Customer Waiver Is Not a Viable Alternative Means** ........................................... 41

    2.    **Third-Party Subpoenas Are Not a Viable Alternative Means** ............................. 41

E.    **The Additional Factors the Second Circuit Has Considered in Assessing Objections Based on Foreign Law also Support Compelling the Production of the Requested Documents** ........................................................... 44

    1.    **Party vs. Non-Party Status** ................................................................................... 44

    2.    **Hardship.** ................................................................................................................ 45

    3.    **Good Faith.** ............................................................................................................ 47

III.  **DEFENDANTS' RELEVANCE, BURDEN, AND PROPORTIONALITY OBJECTIONS** ............................................................................................................ 49

A.    **The Parties' Meet and Confer Process** .................................................................. 49

B.    **Defendants' Formulaic Proportionality and Burden Objections Are Meritless** ..... 51

    1.    **Plaintiffs' RFP Is Proportional Given the Importance of the Litigation** ........... 51

    2.    **Defendants Have Failed to Articulate Any Undue Burden in Producing Responsive Records** ............................................................................................... 52

C.    **Defendants' Objections to the Scope of the RFP Are Meritless** ............................. 53

    1.    **The Scope of Relevance under Rule 26** ............................................................... 55

    2.    **The RFP Requests Documents for Hezbollah-Affiliated Individuals and Entities** ...................................................................................................................... 56

    3.    **Defendants' Temporal Objections to RFP Exhibit 2 Are Meritless** ................... 57

**CONCLUSION** ........................................................................................................................ 58

# **TABLE OF AUTHORITIES**

## **Cases**

*American Safety Equipment Corp. v. J. P. Maguire & Co.*,
  391 F.2d 821 (2d Cir. 1968) ............................................................................. 33

*Bartlett v. Société Générale De Banque Au Liban SAL*,
  No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ... 18, 21, 42, 44

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020) ............................................................... 42

*Favors v. Cuomo*,
  No. 11-cv-5632 (DLI)(RR)(GEL), 2013 WL 12358269 (E.D.N.Y. Aug. 27, 2013)................ 58

*Flores v. Stanford*,
  18 Civ. 02468 (VB)(JCM), 2022 WL 354719 (S.D.N.Y. Feb. 7, 2022) ..................... 55

*Freydl v. Meringolo*,
  No. 09-CV-07196 (BSJ), 2011 WL 2566087 (S.D.N.Y. June 16, 2011) .................... 47

*Gucci Am., Inc. v. Curveal Fashion*,
  No. 09-cv-8458 (RJS)(THK), 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010)................... 28

*Gucci Am., Inc. v. Weixing Li*,
  135 F. Supp. 3d 87 (S.D.N.Y. 2015) ................................................................. 45

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................................. 19, 20, 21

*In re Grand Jury Proceedings*,
  219 F.3d 175 (2d Cir. 2000)................................................................................ 49

*In re Grand Jury Subpoena dated August 9, 2000*,
  218 F. Supp. 2d 544 (S.D.N.Y. 2002) ........................................................... 45, 46

*In re Iraq Telecom Ltd.*,
  2020 WL 1047036 (S.D.N.Y. March 4, 2020)................................................. 32, 48

*In re Sealed Case*,
  932 F.3d 915 (D.C. Cir. 2015)............................................................................ 49

*In re Uranium Antitrust Litig.*,
  480 F. Supp. 1138 (N.D. Ill. 1979) .................................................................... 30

*In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-cv-5571-RJH-HBP,
    2006 WL 3378115 (S.D.N.Y. Nov. 16, 2006) ........................................................ 46

*In re Weatherford Int'l Sec. Litig.*,
    No. 11-CV-1646 (LAK) (JCF), 2013 WL 5788680 (S.D.N.Y. Oct. 28, 2013) ...................... 47

*Jacoby v. Hartford Life & Acc. Ins. Co.*,
    254 F.R.D. 477 (S.D.N.Y. 2009) ........................................................ 47

*Jesner v. Arab Bank, PLC*,
    138 S. Ct. 1386 (2018) ........................................................ 28

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ........................................................ 19, 25, 39

*Laydon v. Mizuho Bank, Ltd.*,
    183 F. Supp. 3d 409 (S.D.N.Y. 2016) ........................................................ *passim*

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327, 984 N.E.2d 893 (2012) ........................................................ 49

*Linde v. Arab Bank, PLC*,
    463 F. Supp. 2d 310 (E.D.N.Y. 2006) ........................................................ *passim*

*Linde v. Arab Bank, PLC*,
    706 F.3d 92 (2d Cir. 2013) ........................................................ *passim*

*Minpeco, S.A. v. Conticommodity Services, Inc.*,
    116 F.R.D. 517 (S.D.N.Y. 1987) ........................................................ 30, 31, 33, 45

*New Falls Corp. v. Soni*,
    No. 16-cv-6805 (ADS)(AKT), 2020 WL 2836787 (E.D.N.Y. May 29, 2020) .................. 55, 56

*Nike, Inc. v. Wu*,
    349 F. Supp. 3d 346 (S.D.N.Y. 2018) ........................................................ 28

*Oppenheimer Fund., Inc. v. Sanders*,
    437 U.S. 340 (1978) ........................................................ 24, 56

*Reino de Espana v. Am. Bur. of Ship.*,
    No. 03-cv-3573 (LTS)(RLE), 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005) ...................... 49

*S.E.C. v. Gibraltar Glob. Secs., Inc.*,
    No. 13-cv-2575 (GBD)(JCF), 2015 WL 1514746 (S.D.N.Y. Apr. 1, 2015) .................. 25, 27

*Sims v. Blot*,
    534 F.3d 117 (2d Cir. 2008) ........................................................ 49

*Societe Internationale Pour Participations v. Rogers,*
  357 U.S. 197 (1958)................................................................................ 31

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa,*
  482 U.S. 522 (1987)........................................................................... 26, 38

*State Farm Mut. Auto. Ins. Co. v. Fayda,*
  14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037 (S.D.N.Y. Dec. 3, 2015).............. 56

*State Farm Mut. Auto. Ins. Co. v. Fayda,*
  14cv9792, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016) ..................................... 56

*Strauss v. Crédit Lyonnais, S.A.,*
  242 F.R.D. 199 (E.D.N.Y. 2007)....................................................... 31, 33

*Strauss v. Crédit Lyonnais, S.A.,*
  249 F.R.D. 429 (E.D.N.Y. 2008)................................................... *passim*

*Tansey v. Cochlear Ltd.,*
  No. 13-cv-4628 (SJF) (SIL), 2014 WL 4676588 (E.D.N.Y. Sept. 18, 2014) .......... 27, 32

*United States v. First Nat'l City Bank,*
  396 F.2d 897 (2d Cir. 1968) ......................................... 32, 44, 45, 46

*United States v. Miller,*
  425 U.S. 435 (1976).......................................................................... 38

*Weiss v. Nat'l Westminster Bank PLC,*
  242 F.R.D. 33 (E.D.N.Y. 2007)............................................... *passim*

*Weiss v. Nat'l Westminster Bank PLC,*
  768 F.3d 202 (2d Cir. 2014) ......................................................... 30

*Wultz v. Bank of China Ltd.,*
  910 F. Supp. 2d 548 (S.D.N.Y. 2012) ..................................... *passim*

*Wultz v. Bank of China Ltd.,*
  942 F. Supp. 2d 452 (S.D.N.Y. 2013) ..................................... 38

**Statutes**

18 U.S.C. § 2333(a) ..................................................................... 2, 31, 52

18 U.S.C. § 2333(d) .............................................................................. 2

18 U.S.C. § 2334(d) ............................................................................ 51

18 U.S.C. § 2339B ............................................................................. 17

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016)............. *passim*

**Rules**

Fed. R. Civ. P. 26.................................................................................................. 1, 51, 55

Fed. R. Civ. P. 33(b)(4)..................................................................................................... 47

Fed. R. Civ. P. 34................................................................................................................. 1

Fed. R. Evid. 401 .............................................................................................................. 38

**Treatises**

Restatement (Fourth) of Foreign Relations Law § 426, cmt. (a) ................................ 26, 39, 40, 44

Restatement (Third) of Foreign Relations Law § 442 ........................................................ 26, 45

**Regulations**

Executive Order 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001) .. 29

Executive Order No. 12947, Prohibiting Transactions with Terrorists who Threaten to Disrupt the Middle East Peace Process, 60 Fed. Reg. 5,079 (Jan. 23, 1995)............................................... 29

Plaintiffs respectfully submit this Memorandum of Law in support of their motion, pursuant to Fed. Rs. Civ. P. 26 and 34, to compel the production of the documents that Defendants (also referred to herein as "Banks")[1] have refused to produce based upon (1) prohibitions imposed by Lebanese bank secrecy laws and (2) scope, burden, and proportionality objections that are all entirely meritless.

## PRELIMINARY STATEMENT

The Court should grant Plaintiffs' motion to compel and issue the Proposed Order attached to this motion because the relevant factors related to assessing foreign bank secrecy laws overwhelmingly militate in Plaintiffs' favor. Namely:

(1) the documents Plaintiffs request ("Requested Documents") are undeniably central to their claims;

(2) Plaintiffs have identified the vast majority of the individuals and entities for which they have sought discovery in their Second Amended Complaint ("Complaint" or "SAC") and offered to provide additional information for 95 individuals and entities that do not appear in the SAC;

(3) the individuals and entities for which they have sought discovery all directly relate to Hezbollah;

(4) the Requested Documents sought were identified as precisely as possible, given the Banks' refusal to disclose any information concerning their customers and transferees;

(5) no alternative means exist for Plaintiffs to obtain the Requested Documents, particularly the Defendants' own internal records and communications relating to Hezbollah and its network of operatives, companies, and institutions; and, most importantly,

(6) the U.S. interests in advancing the deterrence and punitive policies underlying the Anti-Terrorism Act ("ATA"), as amended and broadened by the Justice Against Sponsors of Terrorism Act ("JASTA"), and guaranteeing a fair procedure for resolving this important dispute overwhelm Lebanon's interest in protecting the (waivable, personal) financial privacy of the Banks' lengthy roster of terrorist customers and transferees.

---

[1]     In the context of this Memorandum of Law, "Defendants" and "Banks" refer to 11 of the 13 defendants delineated in the Second Amended Complaint – excepting Jammal Trust Bank ("JTB"), which the Court exempted from discovery during the pendency of its interlocutory appeal to the Second Circuit Court of Appeals (*see* October 8, 2021, Minute Order) and Lebanese Canadian Bank (which has defaulted).

At this stage of discovery, Plaintiffs request only that the Court order production of the documents most critical to their claims from the primary potential source of those materials in a matter that strongly implicates policy interests that Congress, the Executive Branch, and federal courts have recognized as among the most significant any civil litigation can address.

## I.    PLAINTIFFS AND THEIR CLAIMS

The Complaint is brought on behalf of 1,279 Plaintiffs who are American citizens and/or U.S. service members injured as a result of 267 terrorist attacks ("Attacks") in Iraq between 2004 and 2011 and the family members of those killed or injured in them. Most of the Attacks were caused by Explosively Formed Penetrators ("EFPs"), which are particularly lethal, anti-armor weapons Hezbollah designed and were emplaced by Iraqi proxies it trained and directed.

Plaintiffs bring suit under the ATA and JASTA, 18 U.S.C. §§ 2333(a) and (d), against 13 Lebanese banks that they allege helped bankroll Hezbollah, a Foreign Terrorist Organization ("FTO")[2] that jointly committed the Attacks with State Sponsor of Terrorism Iran's[3] Islamic Revolutionary Guard Corps ("IRGC").[4]

### A.    Hezbollah

Hezbollah is a Lebanese terrorist organization and Iranian terror proxy, founded in the 1980s with the IRGC's active tactical and strategic support and financial assistance. It is widely regarded as the most dangerous terrorist organization in the world, responsible for some of the most dramatic and deadly terrorist attacks in the last three decades, costing *thousands* of lives.

---

[2]    Hezbollah was designated an FTO in October 1997. The designation has remained in effect through the present.

[3]    Iran was designated a State Sponsor of Terrorism in January 1984. The designation has remained in effect through the present.

[4]    The IRGC was designated a Specially Designated Global Terrorist in October 2017 and an FTO in April 2019.

These include hundreds of attacks directed against U.S. forces in Iraq. SAC ¶14.

Hezbollah's Shura Council is the preeminent decision-making body within the terrorist organization and is presided over by Hezbollah supreme leader Hassan Nasrallah. *Id.* ¶¶363-66. Under the Shura Council, Hezbollah's Jihad Council oversees the organization's terror apparatus, including oversight, recruitment, training, equipment, and internal security. This includes Hezbollah's external terror apparatus, the Islamic Jihad Organization ("IJO"). *Id.* ¶¶370, 394-97. Both Hezbollah and the Lebanese government[5] refer to this terror apparatus as the "Resistance."

Imad Mughniyah and his brother-in-law, cousin, and successor Mustafa Badr al-Din (both designated as Specially Designated Global Terrorists ("SDGTs") by the U.S. Treasury Department and now deceased) founded the IJO. Mughniyah was identified by American officials as personally involved in planning and directing many of Hezbollah's suicide bombings, other terrorist attacks, murders, kidnappings, and assassinations throughout the 1980s and 1990s against the United States and other Western countries, and against Israeli and Jewish targets around the world. SAC ¶¶372-79. In 2003, the IRGC dispatched Mughniyah and Badr al-Din to Iraq to help create and organize an armed faction that became known as "Jaysh al-Mahdi" or "JAM" – an IRGC and Hezbollah proxy that Iran used as a proxy to target Americans in Iraq. SAC ¶¶1897-1902, 2040. Mughniyah and Badr al-Din also worked closely with the Iranian-sponsored Badr Corps,[6] which was also used by the IRGC and Hezbollah to launch terror attacks on Americans in Iraq. SAC ¶1904.

---

[5]      In addition to constituting a major, international terrorist organization, Hezbollah operates its own private army, controls significant parts of Lebanon, and exercises a de facto veto over Lebanon's government.

[6]      Before 2003, the Badr Corps served as Iran's most important surrogate in Iraq, acting as a de facto arm of the IRGC's external directorate, the Qods Force ("IRGC-QF"), in conducting operations against Saddam Hussein's government. After 2003, the Badr Corps formed an Iraqi political faction, but a part of the organization also played a significant role facilitating the operations of the Hezbollah-trained "Special Group" proxies in Iraq. SAC ¶¶1963-77, 1887-88.

### 1.     Hezbollah's "Social Welfare" Sector – The Da'wa

Hezbollah operates numerous civil institutions that help the organization extend its influence in Lebanon as well as foster in-group identification within Lebanon's Shi'a community. The Islamic Resistance Support Organization ("IRSO") serves as the primary "charitable" fundraising organization for Hezbollah's IJO.[7] The Martyrs Foundation serves as the IRSO's flagship social organization, focusing on providing financial support, medical and educational services, and ideological training to the families of Hezbollah supporters. The Martyrs Foundation raises funds through contributions and its ownership and control of a series of companies through Atlas Holding.[8]

In addition, Hezbollah operates several other "social welfare organizations" in Lebanon that both raise funds, and reinforce domestic solidarity, for the FTO by, *e.g.*, caring for the families of deceased or wounded jihadists, building hospitals to service Hezbollah strongholds in southern Beirut and southern Lebanon, and funding public works projects that improve local infrastructure and construct clandestine facilities for Hezbollah's militia and terror apparatus. SAC ¶445. These "social welfare organizations" include Jihad al-Bina (Hezbollah's construction arm); Al-Mabarrat Charitable Society (founded by Hezbollah's spiritual leader, Sheikh Muhammad Hussein Fadlallah, designated a Specially Designated Terrorist ("SDT") in 1995); Imam Khomeini Relief Committee; and the Wounded Association.

Designated an SDGT in 2007, Jihad al-Bina was described by Treasury as "a Lebanon based construction company formed and operated by Hezbollah. Jihad al-Bina receives direct

---

[7]     Five Defendants are alleged to have maintained accounts for, and provided financial services to, the IRSO.

[8]     The SAC identified five Defendants that maintained accounts for these Martyrs Foundation companies for years after the Foundation was designated an SDGT in 2007. SAC ¶536 (SGBL, Bank Audi, Lebanon & Gulf Bank, Byblos Bank, and Bank of Beirut). Atlas Holding and its subsidiaries were designated in February 2020. *See* SAC ¶525.

funding from Iran, is run by Hezbollah members, and is overseen by Hezbollah's Shura Council, at the head of which sits Hezbollah's Secretary General Hassan Nasrallah." SAC ¶¶440-41. It was founded by Sultan Khalifa As'ad, a key Hezbollah financier with close ties to Iran. SAC ¶430. Treasury described another major Hezbollah financier, Ali Tajideen, as "a major player in Jihad Al-Bina." SAC ¶436. Like other Hezbollah "social welfare organizations," Jihad al-Bina also controls commercial subsidiaries (in part to evade its SDGT designation), including Meamar Company for Engineering and Development, and BLOM Bank customer Arch Consulting (known prior to 2005 as "Research Institute of Jihad al-Bina"). SAC ¶¶461, 465-72, 670.

The Al-Mabarrat Charitable Society[9] is strongly identified with the late Sheikh Fadlallah, Hezbollah's spiritual leader, and his family. SAC ¶¶559-63. Moreover, during the relevant period, the Al-Mabarrat Society maintained one or more accounts at Defendant Lebanese Canadian Bank ("LCB") and secured an exemption from reporting cash transactions of up to $55,000 *per day* at the bank's Airport Road branch. SAC ¶564. Legitimate charities do not need to absorb (nearly) that much unreported income in cash daily. Al-Mabarrat is also closely linked to a fugitive named Talal Khalil Chahine,[10] who fled the United States prior to his indictment on federal tax evasion charges. In 2002, Chahine, whom federal prosecutors asserted had "connections at the highest levels of ... Hezbollah," served as a keynote speaker with Sheikh Fadlallah at an Al-Mabarrat fundraiser in Lebanon. Chahine is also a relative and business partner of Muhammad Bazzi, discussed *infra* at 9. Finally, like the Martyrs Foundation and Jihad al-Bina, Al-Mabarrat also owns and controls several companies (several that have received daily cash reporting exemptions). SAC

---

[9]    Defendants LCB, SGBL and BLOM Bank maintained accounts for, and provided financial services to, the Al-Mabarrat Society. SAC ¶572.

[10]    Chahine maintained USD-denominated accounts (in 2001) at Defendants Byblos Bank and Fransabank and transferred more than $2 million through the United States using those accounts. SAC ¶570.

¶¶585, 588. Tellingly, Hamzah Safieddine, the brother of two of Hezbollah's most powerful

leaders, Hashem and Abdallah Safieddine (both designated SDGTs), is a partner/general manager

of three of these companies. SAC ¶¶574-75, 580-81, 586-87.

According to the Treasury announcement designating it as an SDGT in 2010, the Lebanese

branch of the Iranian Imam Khomeini Relief Committee ("IKRC") is:

> a Hezbollah social service organization that was created by the Government of Iran
> in the 1980s and is directed and run by Hezbollah members or cadre. Iran has
> provided millions of dollars to the Hezbollah-run branch in Lebanon since 2007.
> The IKRC has helped fund and operate Hezbollah youth training camps, which
> have been used to recruit future Hezbollah members and operatives…. Hassan
> Nasrallah has acknowledged the IKRC branch in Lebanon as one of Hezbollah's
> openly-functioning institutions linked to and funded by Iran.

SAC ¶596. Despite the IKRC's name and obvious close affiliation with Iran and Hezbollah, LCB

held an account for it in the name of four members of its management, and MEAB Bank held an

account in the name of the organization itself. SAC ¶¶591-600.

Finally, Fransabank's customer, the Wounded Association, whose stated focus is caring

for people wounded in the "Resistance," also has a long-standing *public* affiliation with Hezbollah.

SAC ¶¶601-05.

### 2.    Hezbollah's Business Affairs Component

Hezbollah's finances are managed by several overlapping directorates, but its IJO, which

conducts most of the FTO's terrorist operations, has long maintained its own independent revenue

streams orchestrated by a financial network known as the Business Affairs Component ("BAC").

The Complaint alleges that the BAC is an international apparatus orchestrating Hezbollah's

network of businesses and enterprises across the world, tasked with raising funds for the IJO

through illicit activities, such as money laundering and drug trafficking, as well as ordinary

business enterprises. SAC ¶626. It also notes the Drug Enforcement Agency's findings that

members of the BAC have established business relationships with South American drug cartels

responsible for supplying large quantities of cocaine to Europe and the United States. SAC ¶629. Most importantly, the Complaint alleges that, under Abdallah Ali Safieddine's leadership, the BAC directed the proceeds it collected from this illicit activity to the IJO to purchase weaponry and fund its terror activities in Lebanon, Iraq, and Syria. SAC ¶¶626-28.

### a.    Hezbollah's BAC Leadership

Since Mughniyah's death in 2008, the BAC's leadership has been nominally divided between Abdallah Safieddine and Adham Tabaja.[11] SAC ¶628. Safieddine manages the IJO's financial coordination with the IRGC and oversees Hezbollah's international drug trafficking networks and operations. SAC ¶634. His brother, Hashem Safieddine, is one of Hezbollah's most prominent political leaders and a member of its Shura Council. Abdallah Safieddine has spent considerable time in Iran actively coordinating the BAC's finances with the IRGC. For example, in 2011, when Treasury's Financial Crimes Enforcement Network ("FinCEN") identified LCB as "a financial institution of primary money laundering concern," it specifically noted that "LCB managers are linked to Hezbollah officials outside Lebanon. For example, Hezbollah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services." SAC ¶1365.

By contrast, Tabaja is one of the most prominent Hezbollah leaders in the commercial sector in Lebanon. Under its "Rewards for Justice" Program, DOJ has offered (up to) a $10 million reward for information relating to Tabaja, describing him as a "Hezbollah member who maintains direct ties to senior Hezbollah organizational elements, including the terrorist group's operational component, Islamic Jihad. Tabaja also holds properties in Lebanon on behalf of the group." SAC ¶¶650-51. Tabaja has been a public figure for decades and is widely known as a prominent

---

[11]    Both men have been designated SDGTs: Safieddine on May 17, 2018 (SAC ¶636) and Tabaja on June 10, 2015 (SAC ¶640).

Hezbollah operative and real estate mogul, standing at the forefront of Hezbollah's leading projects, from building hospitals and schools to public works projects to a series of amusement parks and entertainment projects. SAC ¶639. Because Hezbollah is the strongest player in Lebanon's political system, Tabaja and his companies do not hide their affiliation with it – they manipulate the system and their connection to Hezbollah to push through the BAC's projects.

*Eight of the 11* Defendants held accounts for, and provided financial services to, companies controlled by Tabaja, SAC ¶668, and Defendant Lebanon and Gulf Bank ("L&G") held a personal account for him and maintained the relationship even after the Lebanese government's investigation of LCB identified his account as one of the "accounts that appeared to add up to a giant money laundering operation with Hezbollah smack in the middle." SAC ¶¶102-05.[12] Tabaja has also had a long-standing relationship with MEAB Bank, which has financed many of his Hezbollah projects and has held mortgages on various real estate properties Tabaja owned or co-owned as collateral for its loans to him and his enterprises. SAC ¶¶1598-1601.

Tabaja's network of companies is only one part of what is often termed "The System," through which Lebanese-organized crime families, working with Hezbollah and the IRGC, launder billions of U.S. dollars ("USD") annually (much of it originating in bulk cash) from various criminal activities through Lebanese exchange houses and Defendants (including through their respective correspondent bank accounts in New York) to fund the IJO's operations. *See, e.g.*, SAC ¶¶11, 36, 41-47, 83-92, 98, 679-81, 1297-1300, 1345-77. Defendants' complicity in "The System" is evident not only by the identity of their customers but also by glaring indicia of money

---

[12]     Six of the Tabaja companies are SDGTs, and the management of most are dominated by Hezbollah operatives, including Tabaja-connected SDGTs such as Issam Ahmad Saad, Nabil Mahmoud Assaf, Jihad Muhammad Qansu, Hussein Ali Faour, Muhammad al-Mukhtar Fallah Kallas, Amin Muhammad Cherri, Muhammad Amin Badr al-Din, Adnan Hussein Kawtharani, Shibl Muhsin Ubayd al-Zaydi, and Muhammad Abdallah al-Amin. SAC ¶663.

laundering—e.g., "[l]arge amounts … being withdrawn and paid cash to different parties" and accounts showing a "big volume of movement" but "very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s]." SAC ¶1406.

Several other prominent individuals (sometimes referred to by the U.S. government as "super-facilitators")[13] play critical roles in the BAC's funding network and are themselves major players in "The System." One of them, Muhammad Bazzi,[14] has been particularly close to Abdallah Safieddine and has worked extensively with him and the IRGC. Bazzi maintains ties to other U.S.-designated individuals, including Hezbollah financiers Tabaja and Ali Youssef Charara. He also had extensive links to Hezbollah's most senior drug traffickers, including the Specially Designated Narcotics Trafficking Kingpin ("SDNTK") Ayman Joumaa. SAC ¶¶774-76. Like Tabaja, Bazzi was the target of the "Rewards for Justice" Program, which identified him as a "key Hezbollah financier, who has provided millions of dollars to Hezbollah generated from his business activities" and as a "key Hezbollah financier[] and facilitator[]." SAC ¶¶777-78.

Charara (designated an SDGT in 2016) invests millions of dollars for Hezbollah and has worked closely with other senior BAC leaders. For example, Charara worked with Kassem Hejeij (at the time MEAB Bank's chairman and controlling shareholder) and Tabaja on oil ventures in Iraq. SAC ¶684. He was partners with Bazzi and narcotics trafficker Ali Kharrubi (SDNTK) in a company known as Car Escort Services (designated an SDGT in 2017). SAC ¶685. He was Bazzi's close business partner and the co-founder of three companies designated as SDGTs. *Id.*

---

[13]     *See, e.g.*, https://www.wsj.com/articles/u-s-intensifies-bid-to-defund-hezbollah-1450312498.

[14]     Bazzi maintained accounts in his own name at Defendants LCB, Fransabank, MEAB Bank and BLOM Bank. SAC ¶¶763-65. Six companies controlled by Bazzi have held accounts at LCB, Fransabank, Bank Audi and JTB. SAC ¶772.

The Tajideen family involves at least nine siblings who run a business empire spanning much of the globe, but with a particularly strong presence in southern Lebanon and the Democratic Republic of Congo ("DRC"). SAC ¶¶687-88. Three of the siblings, Kassim, Ali, and Hussein Tajideen, were designated SDGTs for their roles as Hezbollah fundraisers, money launderers, and financial contributors, and other siblings and family members also play important supporting roles in the Tajideen family's BAC network. SAC ¶¶688-89. In designating Kassim Tajideen an SDGT on May 27, 2009, Treasury identified him as "an important financial contributor to Hezbollah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hezbollah and has sent funds to Hezbollah through his brother, a Hezbollah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hezbollah in Africa." SAC ¶706. His brother, Ali Tajideen (designated in 2010), was a Hezbollah commander in southern Lebanon and a player in Jihad al-Bina. Ali's real estate empire is strategically important to Hezbollah because the Tajideen clan is heavily invested in southern Lebanon where Ali's acquisitions have often been situated in militarily strategic locations south of the Litani river.[15]

Sultan Khalifa As'ad is a prominent and longstanding Hezbollah leader and financier who serves as Deputy Chairman of the Executive Council for Municipal Affairs for Hezbollah and formerly headed Hezbollah's Finance Unit. He founded Jihad al-Bina, and one of its main front companies, the Meamar Company for Engineering and Development.[16] As'ad was also a founder and early shareholder in the Lebanese Communication Group (SDGT), the parent company of

---

[15]     Bank of Beirut and the Arab Countries ("BBAC") held an account for Hyram Maritime, a logistics company co-founded by Ali Tajideen and his brother Youssef. SAC ¶718. The company's lawyer was also listed as the attorney for more than a dozen Tajideen family companies, including several that have been designated as SDGTs.

[16]     As'ad is a public figure openly identified with Hezbollah. *See, e.g.*, SAC ¶¶669-77. Meamar Company for Engineering and Development is similarly open about its affiliation with Hezbollah. SAC ¶¶450-51.

Hezbollah's satellite television station, *Al-Manar* (SDGT),[17] and was the largest shareholder in Compu House, a Hezbollah-controlled company that sold computers and software. AC ¶¶669-77.

Saleh Ali Assi (SDGT) was a leading BAC money launderer and a significant business partner of Adham Tabaja, Kassim Tajideen, Bazzi, and the Ahmad clan (*see infra*). In his capacity as a vehicle for the Ahmad clan's money laundering enterprises in the DRC and Belgium, Assi received millions of dollars (through correspondent banks in New York) to his account at Defendant Banque Libano-Française ("BLF") and lesser sums to his account at Bank Audi from companies controlled by senior Hezbollah BAC operative Nazim Ahmad (SDGT), described by Treasury as a "significant Hezbollah financier." SAC ¶¶782-83; 897-99.

Assi served as chairman and general manager of Inter Aliment (SDGT), a company he established in 2005 that served as a BAC facilitator. During the relevant period, Inter Aliment laundered more than $70 million through its Lebanese bank accounts. SAC ¶796. According to the Lebanese government, when Inter Aliment's USD-denominated account at LCB was closed in 2011 the account balance migrated to BLF, MEAB Bank, and Fransabank. SAC ¶794. Like Assi's business partners, the nature of his activities, the volume of his transactional activity, his involvement in companies in the DRC, and his close association with prominent Hezbollah financiers all signified his role as a major BAC facilitator. This was confirmed after this case was filed when Treasury designated Assi as an SDGT on December 13, 2019. SAC ¶¶782-83 ("Revenue generated by Assi's schemes is delivered to Lebanon via bulk cash transfers or laundered through Nazim Ahmad's diamond businesses. Over the past decade, Assi has used schemes like these to funnel tens of millions of dollars to [Adham] Tabaja. Assi was also involved in a tax evasion scheme with several other U.S. designated Hezbollah financiers and associates,

---

[17]     Unsurprisingly, the identified shareholders of *Al-Manar* are all prominent Hezbollah figures. SAC ¶607.

including [Adham] Tabaja, Nazim Ahmad, Muhammad Bazzi, and Kassim Tajideen.").

Imad Bakri is a prolific "businessman" and BAC operative with a public profile; a United Nations report identified him as a supplier of weapons and military equipment to various militia. SAC ¶¶812-18. A July 2000 Belgian intelligence report identified specific Lebanese diamond traders and companies, including Afrostars Diamonds BVBA (controlled by Bakri), noting "there are indications that certain persons, the 'Lebanese connection' mentioned in the diamond smuggling file, also put in an appearance in files on money laundering, the drugs trade and the financing of Lebanese 'terrorist' organizations such as Amal and Hezbollah." SAC ¶820. Three years later, the British NGO "Global Witness" noted "[t]he BAKRI family is connected with Shi'ite organizations, in particular HEZBOLLAH." SAC ¶821. Bakri's company Metro Trading Company held accounts at BLF and Société Générale De Banque Au Liban SAL ("SGBL") and laundered more than $15 million USD through LCB *alone* on Hezbollah's behalf between 2006 and 2007. SAC ¶¶814-16.

### b.  Hezbollah's BAC Acts as a Series of Interlocking Criminal Networks

As the Complaint's detailed allegations make clear, the multitude of Hezbollah-affiliated customers for which Defendants laundered hundreds of millions of dollars were not random account holders who independently decided to open accounts at Defendants' branches. They were, instead, constituent parts of a series of interlocking criminal networks with companies often established by the same small group of Lebanese lawyers and audited by a similarly select group of accountants closely tied to the BAC. SAC ¶¶1266-1310. For example, Muhammad Farid Mattar was listed as the attorney for Spectrum International Investment Holding and Spectrum Investment Group Holding, two SDGTs associated with Charara (SDGT); Phoenicia Shipping Offshore (SDNTK), which served as a prime vehicle for Hezbollah's money laundering and drug trafficking

12

operations, SAC ¶¶1131-32;[18] *and* JTB customer Car Escort Services (SDGT), controlled by Charara (SDGT), Bazzi (SDGT) and Hezbollah narcotics trafficker Ali Kharrubi (SDNTK). SAC ¶1284. All three companies also share the same statutory auditor, Edmond Youssef Saadeh. SAC ¶1309. Similarly, Jihad Muhammad Qansu, an SDGT associated with Tabaja, was also listed as the auditor of a company owned and controlled by the Martyrs Foundation, SAC ¶556, and as auditor of one of Al-Mabarrat's companies. SAC ¶¶586-90.

Al-Inmaa Engineering and Contracting is another example of the interlocking and overlapping Hezbollah networks. The company (itself an SDGT) was managed and co-founded by Tabaja (SDGT) and his business partners, including Issam Ahmad Saad (SDGT) and Nabil Mahmoud Assaf (SDGT). SAC ¶663.[19] It was one of the largest and most successful real estate companies in Lebanon and an "investment mechanism" for Hezbollah's investment, construction, and money laundering needs. SAC ¶641. Muhammad Badr al-Din (SDGT) (brother of former IJO senior commander Mustafa Badr al-Din) was listed as the manager of the company's branch office in Basra, Iraq, and Jihad Muhammad Qansu (SDGT) was listed as the company's financial manager. Qansu also served as the auditor for Global Touristic Services, which is owned by the Martyrs Foundation through Atlas Holding. SAC ¶¶554, 556. At the same time, Muhammad Noureddine (SDGT) used his company Trade Point International (SDGT), SAC ¶1261, to provide financial services to Tabaja (SDGT) and Al-Inmaa Engineering and Contracting, SAC ¶1256, thus linking Hezbollah's BAC real estate and construction arm to the cash provided by other Hezbollah operatives (including Noureddine) from South American drug cartels. SAC ¶1257.

---

[18]    L&G, Bank Audi, and JTB held accounts for Spectrum International Investment Holding. SAC ¶685. Defendants BLOM Bank, L&G, and JTB held accounts for Spectrum Investment Group Holding. SAC ¶685. LCB held USD-denominated account no. 341277* for Phoenicia Shipping. SAC ¶1140. Fransabank, MEAB Bank, Bank Audi, and Fenicia Bank also held accounts for the company. SAC ¶¶1539-40, 1607, 1690, 1845.

[19]    Defendants SGBL, Fenicia Bank, MEAB Bank, L&G, BLF, and BBAC all maintained accounts for, and provided financial services to, Al-Inmaa Engineering and Contracting SARL. SAC ¶663.

One of Hezbollah's early sources of revenue came from the Lebanese criminal networks active in sub-Saharan Africa. These networks included extended Lebanese families long involved in dealing in Conflict Diamonds, particularly in West Africa. The families that control these networks have invested a substantial portion of their illicit proceeds in Lebanese real estate, often forming separate companies to deposit the millions of dollars they have laundered through black market sales and phony invoicing of Conflict Diamonds back into Lebanese exchange houses and, ultimately, Defendants. These include the Nassour, Ahmad, and Khanafer clans and individuals and companies that have facilitated their money laundering operations over the past two decades. In 2002, the UN Security Council issued a report about Conflict Diamonds, stating that these clans "are distinct criminal organizations that operate internationally" that are involved in counterfeiting, money laundering and diamond smuggling and have ties to Hezbollah. SAC ¶¶827-34.

In over 200 paragraphs, the Complaint details the complex personal and commercial relationships involved and Defendants' integral roles in the Conflict Diamond network. SAC ¶¶838-1068. For instance, the most important figure within these networks is Nazim Ahmad (SDGT), who has maintained ties with other senior BAC leaders like Tabaja (SDGT) and various members of the Tajideen clan and reportedly works closely with the IRGC. SAC ¶¶896, 900-01. Although rooted in the diamond trade, the Conflict Diamond networks have branched out over time into arms trafficking, trade-based money laundering, and narcotics trafficking. No one network is wholly separate from the BAC's other tentacles. To cite but one example, senior BAC leader Kassim Tajideen (SDGT) first emigrated from Lebanon to Africa in 1976 and was initially arrested in Belgium in 2003 in connection with fraud, money laundering, and diamond smuggling. SAC ¶¶700-04. By 2008, however, under his leadership, the Tajideens had expanded their operations in Africa to the point where Ayman Joumaa's narcotics trafficking network was using

Tajideen network couriers to move cash proceeds from narcotics through Africa and Lebanon.
SAC ¶¶1110-18.

### c.    Hezbollah's Narcotics Trafficking Networks

Hezbollah's narcotics trafficking networks are amply detailed in the Complaint. SAC
¶¶1069-86, 1228-37, 1255-63, 1358-61, 1370-1402. Its pre-existing criminal networks in West
Africa (its IJO operatives were deeply entrenched in that region for decades) provided it with the
logistical capabilities necessary to serve the South and Central American drug cartels' operations
supplying Europe's growing cocaine market. Joumaa, a key Hezbollah "super-facilitator" involved
in the transnational drug trade, exemplifies the marriage between Hezbollah's logistics network,
the drug cartels, and the growing European demand for cocaine.[20] His organization has sent vast
quantities of bulk cash shipments through the Beirut International Airport and regularly paid
Hezbollah security to safeguard and transport the banknotes to its favored recipients, including
LCB and various exchange houses discussed below. Joumaa's network used several Lebanese
exchange houses in order to launder its narcotics sales proceeds, including the Hassan Ayash,
Elissa, and New Line Exchanges, all designated SDNTKs on January 26, 2011. SAC ¶1099. Two
years later, Treasury named the Rmeiti and Halawi Exchanges "financial institutions of primary
money laundering concern" under Section 311 of the USA PATRIOT Act ("§ 311 Action") for
essentially taking over the roles played by the Elissa and Hassan Ayash Exchanges in laundering
money for Hezbollah and Joumaa. *See also* SAC ¶¶1169-75, 1181-86 (describing the roles of other
Lebanese exchange houses).

The exchange houses provide a valuable service to the BAC and its drug trafficking

---

[20]    He was both designated an SDNTK and indicted on November 23, 2011 (and charged with conspiracy to
distribute narcotics and conspiracy to commit money laundering).

networks and to Lebanon's commercial banks, including Defendants. The banks prefer that these exchanges handle the bulk cash deliveries and then deposit the banknotes with the banks before the funds are converted to bank ledger entries and repurposed by the BAC for terror financing, investment, or trade-based money laundering. This process provided Defendants with access to much-needed hard currency that was essential to maintaining The System's elaborate Ponzi scheme.[21]

As the Complaint alleges, from 2004 through 2011, Lebanese exchange houses were also a key transit point for Hezbollah funds flowing into Iraq to support Hezbollah's proxies and finance attacks on American personnel, including Plaintiffs herein. Hezbollah's BAC set aside funds from its narcotics trafficking proceeds to send to Iraq via its preferred Lebanese exchange houses, invested some of the proceeds in Lebanese real estate and commercial ventures, and laundered the rest using elaborate trade-based money laundering arrangements—processes all intimately involving Defendants.

### d.     Hezbollah's Weapons Trafficking Networks

The Complaint's allegations concerning Hezbollah's interlocking criminal networks also include allegations concerning weapons trafficking operations closely tied to its other illicit funding streams. A few examples illustrate the linkages between BAC criminal networks and weapons trafficking:

- The Nassour and Ahmad clans (SAC ¶¶838-965), best known for Conflict Diamonds and counterfeiting currency, have also been tied to weapons trafficking. According to Belgian police, surveillance of Ali Said Ali Ahmad's (husband of Diana Nassour of the Nassour clan) company's phones linked the company to Iran and infamous international arms trafficker Victor Bout. SAC ¶¶925-28.

---

[21]     The mechanics of the scheme are detailed in Exhibit A to the Declaration of Aaron Schlanger ("Schlanger Decl.") at 9-11.

- Senior BAC facilitator Bazzi (SDGT) orchestrated weapons shipments (including 107mm rockets) to the IRGC that were financed through LCB's Gambian subsidiary, Prime Bank. SAC ¶¶1207-09.

- Hassan Hodroj, a Hezbollah spokesman and head of the FTO's portfolio on "Palestinian issues," worked with his son-in-law, Dib Hani Harb (also a Hezbollah operative), to acquire machine guns and technology on Hezbollah's behalf using an account at Bank Audi.[22] SAC ¶¶1189-1206.

- As noted above, according to a UN report, BAC facilitator Imad Bakri has been the main weapons and military equipment supplier for the Angolan militia known as UNITA and has also been accused of orchestrating arms shipments through Romania and working with Bout. SAC ¶¶817-22.

**B.    LCB's Sale and the Migration of Hezbollah's Accounts to Defendants**

In February 2011, the U.S. government announced a § 311 Action against LCB, identifying it as "a financial institution of primary money laundering concern." SAC ¶5724. The Lebanese government then quickly orchestrated the sale of LCB to Defendant SGBL. To assure its U.S. correspondent banks and U.S. and foreign bank regulators that SGBL was not going to continue LCB's criminal activities, SGBL retained a prominent international accounting firm to audit LCB's accounts and brought in the Ashcroft Group (founded by former U.S. Attorney General John Ashcroft) to further oversee the process of allegedly purging Hezbollah accounts at LCB prior to LCB's complete absorption into SGBL. SAC ¶96.

According to a December 2011 report in *The New York Times*, "auditors brought in to scrub the books discovered nearly 200 accounts that were suspicious for their links to Hezbollah and their classic signs of money laundering." The process was described as follows:

> Initially, the auditors looked only at records for the past year. As they began combing through thousands of accounts, they looked for customers with known links to Hezbollah. They also looked for telltale patterns: repeated deposits of vast amounts of cash, huge wire transfers broken into smaller transactions and transfers between companies in such wildly incongruous lines of business that they made

---

[22]    U.S. law enforcement served a seizure warrant on Bank Audi's correspondent bank seeking to freeze Harb's (still active) account, expressly stating that Harb was charged with providing material support to an FTO under § 2339B; even though the correspondent confirmed Bank Audi's receipt of the warrant, it did not comply.

sense only as fronts to camouflage the true origin of the funds.

Each type of red flag was assigned a point value. An account with 1 or 2 points on a scale to 10 was likely to survive. One with 8 or 9 cried out for further scrutiny. Ultimately, the auditors were left with nearly 200 accounts that appeared to add up to **a giant money-laundering operation, with Hezbollah smack in the middle, according to American officials. Complex webs of transactions featured the same companies over and over again, most of them owned by Shiite businessmen, many known Hezbollah supporters.** Some have since been identified as Hezbollah fronts.

SAC ¶97 (emphasis added). *The New York Times* further reported that the accounts – "many of them ***known*** Hezbollah supporters" – "sloshed" hundreds of millions of dollars annually through them. SAC ¶98 (emphasis added). A Lebanese government investigation determined that more than 200 of these Hezbollah accounts simply moved to the other Lebanese banks, including Defendants herein, as detailed in the Complaint. SAC ¶105. Defendants' willingness to continue doing business and providing support to these Hezbollah customers *after* LCB was identified as a primary money laundering concern and sold to SGBL and *after* the Lebanese government investigation resulted in the closure of those accounts at LCB is strong evidence of Defendants' state of mind, their willful determination to continue their relationships with Hezbollah, and their collective commitment to "The System."

## II.    ELEMENTS OF JASTA LIABILITY

### A.    Aiding and Abetting Liability

The elements for aiding and abetting liability under JASTA (which broadened the ATA) are: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be "generally aware" of his or her role as part of an overall illegal or tortious activity at the time assistance is provided; and (3) the defendant must knowingly and substantially assist the principal violation. *See Bartlett v. Société Générale De Banque Au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) (citing *Halberstam*

*v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). A defendant need not be generally aware of its role in the specific acts of terrorism that caused the plaintiffs' injuries but must be generally aware of its role in an overall illegal activity from which the acts that caused the plaintiffs' injuries were a foreseeable risk. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (2d Cir. 2021).

To determine whether a defendant has "knowingly[23] and substantially assisted" the overall illegal or tortious activity, courts consider six factors (which are weighed in their totality): (1) the nature of the act encouraged; (2) the amount of assistance given by defendant; (3) defendant's presence or absence at the time of the tort; (4) defendant's relation to the principal; (5) defendant's state of mind; and (6) the period of defendant's assistance. *See Kaplan*, 999 F.3d at 856.

### B.    Conspiracy Liability

Civil conspiracy requires proving an agreement between two or more persons to participate in an unlawful act, or a lawful act in an unlawful manner, and an injury caused by an unlawful overt act performed by one of the parties to the agreement, which overt act was done pursuant to or in furtherance of the common scheme. *Halberstam*, 705 F.2d at 477.

The prime distinction between civil conspiracy and aiding and abetting is that conspiracy involves an agreement to participate in wrongful activity, whereas aiding and abetting focuses on whether a defendant knowingly gave substantial assistance to someone who performed wrongful conduct, not on whether a defendant agreed to join wrongful conduct.

Here, the SAC alleges that each Defendant agreed to participate in Hezbollah's massive money laundering enterprise integrating several different criminal networks ranging from Conflict Diamond dealers, counterfeiters, narcotics traffickers, weapons traffickers, and trade-based money

---

[23]    The knowledge component is satisfied for aiding and abetting liability if the defendant knowingly, and not innocently or inadvertently, gave assistance. *See Kaplan*, 999 F.3d at 864.

launderers. As referenced above, the conspiracy is sometimes referred to in Lebanon as The System. SAC ¶42.

As a result of the conspiracy they joined, Defendants gained access to steady streams of U.S. bank notes that helped to maintain the structural Ponzi scheme that, until recently, sustained Lebanon's sovereign debt and (until Lebanon's recent sovereign debt default) provided them with steady returns on the sovereign debt into which they previously invested.

In exchange, Hezbollah was afforded opportunities to develop new revenue streams for itself, new channels to launder money and material, and access to the U.S. financial system (through Defendants) that in turn provided it with a competitive advantage in its narcotics trafficking, arms-trading, and money laundering business lines. SAC ¶83.

Plaintiffs allege that the Attacks were a reasonably foreseeable consequence of the unlawful course of action Defendants agreed to join and that the money laundering they engaged in constituted acts in furtherance of the conspiracy pursuant to the scheme described above. *See Halberstam*, 705 F.2d at 488 ("findings that Hamilton agreed to participate in an unlawful course of action and that Welch's murder of Halberstam was a reasonably foreseeable consequence of the scheme are a sufficient basis for imposing tort liability on Hamilton according to the law on civil conspiracy.").

Evidence of Defendants' agreement to participate in the conspiracy includes allegations that Defendants maintained unofficial liaison officers tasked with coordinating Hezbollah's business activities at each bank, *id.*, ¶¶1325, 5717, and the SAC even names specific officers or employees at 10 of the banks. *See id.*, ¶¶167, 1588-89 (MEAB), 1546 (Fransabank), 1578 (BLOM), 1659 (Byblos), 1724 (L&G), 1777 (BLF), 1800 (Bank of Beirut), 1804 (BBAC), 1839, 1841 (Fenicia), 1448-50 (SGBL). The SAC also sets forth in detail how Defendants worked with

Hezbollah to convert massive sums of bulk cash in U.S. dollar banknotes into U.S. dollar-denominated deposits for the benefit of notorious (senior) Hezbollah operatives, companies, and institutions. This conduct was neither routine nor legal.

Crucially, whether proving Defendants' "general awareness" for aiding and abetting liability or Defendants' "agreement to participate in an unlawful act" for conspiracy liability, Plaintiffs require the same combination of records – both transactional records that demonstrate the "unlawful acts" assisted and internal bank documents (*e.g.*, e-mails, text messages, internal reports and memoranda) that illuminate each Defendant's state of mind.

## III.    PLAINTIFFS' DOCUMENT DISCOVERY REQUEST

As the District Court has noted, "Plaintiffs have not alleged an isolated provision of financial services to Hezbollah. Rather, they allege a wide-ranging, yearslong, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers." *Bartlett*, 2020 WL 7089448, at *11. Accordingly, Plaintiffs have requested the Banks' account records, transactional records, and internal communications (including "Know-Your-Customer" and other compliance materials) for 687 individuals and entities with close, documented ties to Hezbollah who were part of what the Court has described as the "wide-ranging, yearslong, knowing scheme" detailed in the Complaint.

These records are essential to proving the two key elements of Plaintiffs' aiding and abetting JASTA claims against each Defendant: general awareness and substantial assistance.[24]

---

[24]    As stated above, while the elements of aiding and abetting and conspiracy liability are not identical, the evidence needed to establish them is similar. Thus, while aiding and abetting does not require evidence of agreement, such evidence is highly probative of a defendant's "general awareness" as well. As the D.C. Circuit noted in *Halberstam*: "Courts and commentators have frequently blurred the distinction between the two theories of concerted liability. Most commonly, courts have relied on evidence of assistance to the main tortfeasor to infer an agreement, and then attached the label 'civil conspiracy' to the resultant amalgam. Sometimes, although not always, the inference has been factually justified; many tort defendants have both conspired with and substantially assisted each other." 705 F.2d at 478.

Internal communications, account opening records, "Know-Your-Customer," and other compliance materials are essential to proving each Bank's: (1) knowledge of who its customers and counterparties were and (2) awareness of its role in an illicit enterprise from which terrorist attacks were foreseeable.

Furthermore, internal bank communications are obviously both in Defendants' *sole possession* and not available from any other source. Thus, depriving Plaintiffs of this information would not only impede a full and fair adjudication of the matter because it would preclude core aspects of discovery; it would also effectively prevent Plaintiffs from proceeding with the litigation (absent a judicial remedy under Rule 37).

Bank account records, particularly transactional records, are also vital in proving both Defendants' state of mind and that each Bank provided substantial assistance to Hezbollah. Evidence that Defendants maintained accounts for, and provided assistance to, numerous persons or entities despite knowing of their affiliation with Hezbollah—whether because of U.S. designations or other information the Banks were aware of or obtained in the course of their KYC or monitoring for higher risk accounts—demonstrates their general awareness.

Even evidence of assistance provided after the last attack listed in the SAC is highly probative. First, it is axiomatic that documents relate to events or statements that occurred prior to their creation, which may bear on a Defendant's liability. It is entirely logical to believe that transactions, emails, and other materials created after 2011 could illuminate the Defendant's state of mind (and intent) during the prior period. Second, evidence of a Defendant's willingness to assist Hezbollah in a later period (for example, even after a customer or counterparty has been designated by the U.S.) is evidence that the Bank had the same willingness in the prior period.

For example, evidence of Defendants' awareness that LCB's Hezbollah-affiliated

customers were being purged from that bank after its 2011 designation as a financial institution of primary money laundering concern—combined with evidence that another Defendant either continued to provide financial service to such customers (knowing their accounts had been forcibly closed at LCB for their Hezbollah ties) or affirmatively chose to offer *new* financial services to such a customer—would strongly support the inference that the Defendant was generally aware of its role in an overall illegal activity during the earlier period because it continued its conduct knowing that it was assisting Hezbollah.

The volume and type of transactions are powerful evidence of each Defendant's awareness of its role in assisting Hezbollah's money laundering operations. For example, as noted above, Lebanese exchange houses provide a valuable service to Hezbollah's drug trafficking networks, handling the bulk cash deliveries, and then depositing the banknotes with Defendants. Documentary evidence of those massive cash deposits are an example of the kind of glaringly high-risk transactions that would alert a bank to its role in illicit activities. Such evidence is also solely in the possession of Defendants and not otherwise available to Plaintiffs.

Transactional records are critical to assessing whether a Defendant's assistance to Hezbollah was substantial. That includes both the amount of assistance given by each Defendant (volume of transactions and total dollar value of the assistance provided to Hezbollah) and the period of Defendant's assistance (the longer the duration of the assistance, the more culpability).

During the exchange of letters preceding the only meet-and-confer call Defendants were willing to undertake (on April 28, 2022),[25] Defendants objected to what they uniformly described

---

[25]    Because Defendants did not respond to Plaintiffs' letters for nearly a month and were unavailable to confer by phone/video conference until April 28 – the meet and confer process was necessarily truncated. As explained in Plaintiffs' April 29, 2022, letter to the Court, ECF No. 269, not one Defendant provided even an initial response prior to April 18, 2022 – the date set by the Court for the completion of the meet-and-confer process.

as "Plaintiffs' complete failure to tailor the Requests to the facts alleged against each defendant in this case…." *See, e.g.*, Schlanger Decl., Ex. B (Letter from SGBL to Plaintiffs dated April 22, 2022, at 1).[26] But it is black letter law that "discovery is not limited to issues raised by the pleadings," and that the purpose of discovery is "to help define and clarify the issues." *See Oppenheimer Fund., Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Plaintiffs cannot further tailor their requests because *they have not had the benefit of discovery*. Instead, their requests identify Hezbollah operatives and entities – primarily those identified with Hezbollah's Business Affairs Component.

As the SAC details, BAC accounts were frequently held in multiple accounts at multiple banks, and the BAC regularly moved funds between and through accounts to further launder its funds. The SAC's allegations regarding particular accounts at particular Defendants are *examples* of banking relationships Plaintiffs could ascertain based on their own pre-discovery research—it is not an exhaustive list of actual relationships. Plaintiffs cannot possibly "tailor" their requests *pre*-discovery to identify in advance every account at each Defendant that belongs to the BAC network. Nor is there any legal basis to expect Plaintiffs to do so. Nevertheless, at the parties' meet and confer discussion on April 28, Plaintiffs invited defense counsel to provide a list of any names listed in Plaintiffs' First Request for the Production of Documents ("RFP") for which Defendants are unclear as to their relevant connection to Hezbollah.

It is worth noting, however, that despite the number of defendants and the enormity of the BAC's money laundering network, the RFP seeks the production of records relating to 687 individuals and entities – a far smaller range of documents than the court ordered produced in

---

[26]    At no time during this process has any Defendant articulated a principled basis for narrowing the list of individuals or entities apart from asserting that production should be limited to specific bank customers identified in the Complaint.

*Linde*.[27] There, the Court ordered discovery on **15,545** distinct sets of records for recipients of terrorism-related payments. *See* Schlanger Decl., Ex. C (*Linde* May 7, 2007, Production Order) and Ex. D (Rule 1006 Trial Exhibit quantifying the number of individuals covered in paragraph 1 of the *Linde* court's May 7, 2007, Production Order). In addition to those 15,545 distinct sets of records, the court also ordered production of records for 107 additional individuals and entities. Of course, the scope of discovery will depend on the specific allegations unique to a particular case. The comparison to the *Linde* production order is relevant here because *Linde* involved one defendant, not 11. Otherwise, the cases make similar claims that banks provided material support to terrorist groups in a variety of ways and paid the families of (terrorist) prisoners and suicide bombers, most notably the Martyrs Foundation here, which the Second Circuit has noted, allegedly "provides financial support to wounded Hizbollah terrorists and to the families of Hizbollah terrorists killed in action." *Kaplan*, 999 F.3d at 849.

## ARGUMENT

## I.     THE STANDARDS GOVERNING EFFORTS TO WITHHOLD DISCOVERY BASED UPON FOREIGN BANK SECRECY STATUTES

The party invoking a foreign bank secrecy statute as the basis for withholding discovery must first bear "the burden of proving what that law is and demonstrating why it impedes production." *S.E.C. v. Gibraltar Glob. Secs., Inc*., No. 13-cv-2575 (GBD)(JCF), 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015). But even where the resisting party sustains its burden of demonstrating that a foreign bank secrecy statute would bar disclosure, the Supreme Court has emphasized that "[i]t is well settled that [foreign blocking] statutes do *not* deprive an American

---

[27]     Because Defendants apparently did not initially realize that the names listed on RFP Exhibits 1 and 2 overlap, their letters refer to, e.g., "over 900 names" (Bank Audi) or "approximately 956 names" (BLOM). The production order in *Linde* reflected a considerable *narrowing* of the lists of persons and entities propounded in plaintiffs' discovery requests in that case.

court of the power to order a party subject to its jurisdiction to produce evidence." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987) ("*Aérospatiale*"). Thus, where a party asserts that foreign bank secrecy blocks production, courts perform a comity analysis weighing the interests of the U.S. and the foreign state in permitting or denying the discovery. *See, e.g.*, *Linde v. Arab Bank, PLC*, 706 F.3d 92, 111-12 (2d Cir. 2013).

In *Aérospatiale*, the Supreme Court endorsed the five-factor balancing test for assessing objections to discovery based upon foreign law set forth in § 437 of the Draft Restatement (Third) of Foreign Relations Law of the United States. 482 U.S. at 543, 544 n.28. Section 442(1)(c) of the published Restatement (Third) adopted that test. Section 426, Comment (a), of the Restatement (Fourth) of Foreign Relations Law, which the American Law Institute published in 2018, adopts its predecessor's Section 442(1)(c) standard.

The Restatement provides that courts weighing bank secrecy objections should "take into account" the following five factors:

> [1] the importance to the investigation or litigation of the documents or other information requested; [2] the degree of specificity of the request; [3] whether the information originated in the United States; [4] the availability of alternative means of securing the information; and [5] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement (Fourth) § 426, cmt. (a).

"Courts in the Second Circuit also consider two additional factors: (6) the hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery." *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 420 (S.D.N.Y. 2016) (paragraph breaks omitted). In addition, courts weigh "whether the person resisting discovery is a

party to the litigation and, '[w]here the issue is the application of another country's privacy laws, … whether such privacy requirements are absolute.'" *Id.* (quoting *Tansey v. Cochlear Ltd.*, No. 13-cv-4628 (SJF) (SIL), 2014 WL 4676588, at *2 (E.D.N.Y. Sept. 18, 2014)).

## II. THE *AÉROSPATIALE*/RESTATEMENT FACTORS HEAVILY FAVOR COMPELLING PRODUCTION OF THE REQUESTED DOCUMENTS

### A. The Critical U.S. Interests in Deterring Terrorism and Promoting the Fair Resolution of Disputes Significantly Outweigh the Private Confidentiality Interests of the Banks' Customers and Transferees

#### 1. The Compelling U.S. Interests in Preventing Terror Financing Overwhelmingly Weighs in Favor of Ordering the Banks to Provide the Requested Discovery

The "'most important'" factor in the *Aérospatiale*/Restatement comity analysis weighs the U.S. interests implicated by the requested discovery against the foreign state interests that a foreign statute protects. *Laydon*, 183 F. Supp. 3d at 422 (quoting *Gibraltar Glob. Sec.*, 2015 WL 1514746, at *5); *Weiss v. Nat'l Westminster Bank PLC*, 242 F.R.D. 33, 45 (E.D.N.Y. 2007). Here, as the district court in *Linde* concluded, multiple compelling U.S. interests easily outweigh the waivable, personal privacy rights Lebanon's bank secrecy statutes protect.[28]

"Axiomatically, the United States has 'a substantial interest in fully and fairly adjudicating matters before its courts.'" *Weiss*, 242 F.R.D. at 46 (citation omitted). *Accord, e.g.*, *Linde,* 706 F.3d at 111 (recognizing "the United States' interests in the effective prosecution of civil claims under the ATA"); *Strauss*, 249 F.R.D. at 443. Even outside the terrorism context, that interest alone often

---

[28]    *Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006) (deferring to the foreign bank secrecy statutes would undermine "important interests of the United States" and make it "difficult if not impossible to vindicate" those interests). *See also Linde,* 706 F.3d at 115 (characterizing the district court's comity analysis as "in line with … precedent," including its conclusion that "the important U.S. and international interests in preventing the financial support of terrorist organizations weigh in favor of producing the material at issue"); *Strauss v. Crédit Lyonnais, S.A.*, 249 F.R.D. 429, 446 (E.D.N.Y. 2008) ("[G]ranting Credit Lyonnais a protective order would undermine the irrefutably vital interest of the United States in ensuring that plaintiffs who are victims of terrorist attacks receive the discovery they seek in prosecuting their civil claims.").

outweighs the personal privacy rights that bank secrecy statutes protect.[29]

Moreover, the Supreme Court has underscored the policies giving rise to civil liability under the ATA:

> The Anti-Terrorism Act … is part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing. The detailed regulatory structures prescribed by Congress and the federal agencies charged with oversight of financial institutions reflect the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism.

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018).

Thus, when "the U.S. interest 'in fully and fairly adjudicating matters before its courts' is combined with its interest in combating terrorism, the U.S. interest 'is elevated to nearly its highest point, and diminishes any competing interests of the foreign state.'" *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 559 (S.D.N.Y. 2012) (quoting *Strauss*, 249 F.R.D. at 443). *Accord, e.g., Weiss*, 242 F.R.D. at 46. Thus, in terrorism cases, courts ***uniformly*** reject bank secrecy objections because they impede the critical U.S. interests in deterring and punishing terrorist attacks upon American civilians.[30]

Those holdings find strong support in Executive Branch statements regarding the critical

---

[29]    *See, e.g.*, *Nike, Inc. v. Wu*, 349 F. Supp. 3d 346, 367-68 (S.D.N.Y. 2018) (rejecting Chinese bank secrecy objections of six non-party Chinese banks because, among other reasons, the U.S. interest in enforcing the policies underlying the Lanham Act outweighed China's interest in protecting account holders' privacy); *Gucci Am., Inc. v. Curveal Fashion*, No. 09-cv-8458 (RJS)(THK), 2010 WL 808639, at *7 (S.D.N.Y. Mar. 8, 2010) (rejecting non-party's Malaysian bank secrecy objections because, among other factors, "the United States interest in fully and fairly adjudicating matters before its courts … outweighs Malaysia's interest in protecting the confidentiality of its banking customers' records").

[30]    *See, e.g.*, *Linde*, 706 F.3d at 112 ("[t]he District Court here appropriately recognized the important U.S. interests at stake in arming private litigants with the 'weapons available in civil litigation' to deter and punish the support of terrorism"); *Wultz,* 910 F. Supp. 2d at 559 ("The interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty."); *Strauss*, 249 F.R.D. at 443 (U.S. interest in "fully and fairly adjudicating matters before its courts … combined with the United States's goals of combating terrorism … diminishes any competing interests of the foreign state") (citations omitted); *Weiss*, 242 F.R.D. at 46, 48 (rejecting U.K. bank secrecy objection because the U.S. has "profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks," and the defendant's "noncompliance with plaintiffs' discovery requests would undermine [these] important interests.

U.S. interests that the ATA and other anti-terrorism laws protect. For example, multiple Executive Orders have recognized the grave threat that FTOs and other terrorist organizations pose and their reliance upon banks to fund their operations.[31]

Congress has also emphasized that the ATA and JASTA advance critical U.S. policy interests in punishing and deterring terrorism. *See, e.g.*, *Weiss*, 242 F.R.D. at 45-50; *Strauss*, 249 F.R.D. at 443-46; JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) ("The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.").

Even before Congress passed JASTA, the Second Circuit confirmed in *Linde* that:

> [T]he ATA's legislative history reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement. One of the Act's sponsors noted that the Act would ensure that "justice [is] sought" against terrorists "even if not by [foreign governments or] the United States." 137 Cong. Rec. S. 1771 (daily ed. Feb. 7, 1991) (Senator Grassley commenting after enactment). Furthermore, he declared that the Act would **"empower[ ] victims with all the weapons available in civil litigation, including: [s]ubpoenas for financial records, [and] banking information [of alleged terrorists]."** *Id.* The District Court here appropriately recognized the important U.S. interests at stake in arming private litigants with the "weapons available in civil litigation" to deter and punish the support of terrorism. *Id.*

706 F.3d at 112 (emphasis added) (alterations in original).

In addition, Congress's decisions to make the ATA expressly extraterritorial and to target

---

[31]    *See Weiss*, 242 F.R.D. at 46-47 (citing Executive Order No. 12947, Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process, 60 Fed. Reg. 5,079 (Jan. 23, 1995) and Executive Order 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001)); *Strauss*, 249 F.R.D. at 445 (same).

the statute at financial institutions are also irreconcilable with permitting expansive foreign bank secrecy statutes to impede discovery.[32]

Since the filing of this action on January 1, 2019, the U.S. government's extensive targeting of Hezbollah's finances also underscores the significance of the U.S. interests at stake in combating Hezbollah's terror financing through the financial system.[33] Most notably, eight months after the initial complaint was filed, Treasury designated one of the defendants, Jammal Trust Bank, an SDGT for its role in "assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah. Jammal Trust has a longstanding relationship with a key Hizballah financial entity and provides financial services to Hizballah's Executive Council and the Iran-based Martyrs Foundation."[34]

It also designated a number of additional persons and entities that the Complaint identified as Hezbollah operatives and entities who received assistance from Defendants, including Nazim Ahmad, Saleh Assi, Atlas Holding and 10 related companies, and Arch Consulting SARL.[35] Those

---

[32]    *See Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014) ("Congress clearly expressed its intention for § 2333(a) to apply to extraterritorial activities when the statute's standards are met, regardless of the views and laws of other nations.").

[33]    *See, e.g.*, *Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987)  (strong American interests in litigation's subject matter was "demonstrated by the extensive investigations conducted by both the CFTC and more than one congressional committee" as well as the fact that the alleged misconduct "amount[ed] to massive violations of this nation's most fundamental economic regulatory statutes"); *In re Uranium Antitrust Litig.*, 480 F. Supp. 1138, 1154 (N.D. Ill. 1979) ("Congressional concern with the very practices at issue here … is evidenced by extensive subcommittee investigations" into the alleged practices).

[34]    U.S. Dep't of the Treasury, *Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global Terrorist* (Aug. 29, 2019), https://home.treasury.gov/news/press-releases/sm760.

[35]    Treasury's post-January 1, 2019, designations further implicate Defendants. Its December 13, 2019, designation of Hezbollah financier Nazim Ahmad described how "Hizballah utilizes Ahmad and his companies to launder substantial amounts of money bound for the terrorist group," and how Ahmad "maintains ties to several U.S.-designated Hezbollah financiers and associates, including Kassim Tajideen and Mohammad Bazzi … Adham Tabaja [and Hassan] Nasrallah and Hezbollah's representative to Iran, Abdallah Safi-al-Din." https://home.treasury.gov/news/press-releases/sm856. SAC ¶¶897-99. Four Defendants (SGBL, BLOM, Bank Audi, LCB) held accounts for Nazim Ahmad himself, and all Defendants provided account services to at least one person or entity in the Ahmad network. SAC ¶892. Numerous Ahmad network individuals and entities also migrated from

30

designations reference the "tens" and even "hundreds" of "millions of dollars" generated by the targets' schemes, attesting to how critical access to the U.S. financial system (through the Lebanese banking system) is to Hezbollah. It also demonstrates again how important dollar-based remittances from the Lebanese diaspora in the Americas (and elsewhere) have been to the Lebanese banking system. Declaration of Marshall Billingslea ("Billingslea Decl."), ¶ 82.

Given that U.S. government designations of Hezbollah's financial network over the past three years closely parallel and confirm many of the allegations in this case – including the designation of Jammal Trust Bank, "'it is difficult to imagine a private commercial lawsuit which could be more infused with the public interest'" than this one. *Strauss v. Crédit Lyonnais, S.A.*, 242 F.R.D. 199, 218 (E.D.N.Y. 2007) (quoting *Minpeco*, 116 F.R.D. at 523-24). Accordingly, the critical U.S. interests that the ATA, JASTA and this lawsuit implicate far outweigh the personal privacy interests of Hezbollah-controlled entities and operatives that Lebanon's bank secrecy laws protect.[36]

---

LCB to other Defendants in 2011-2012. SAC ¶105. In the same announcement also designating Saleh Assi, Treasury noted Assi's role in laundering bulk cash for Ahmad and Tabaja. SAC ¶¶782-83. Three Defendants (BLF , Bank Audi, LCB) held bank accounts for Assi. SAC ¶784. Likewise, when Treasury designated Atlas Holding, the Martyrs Foundation's corporate holding company, in February 2020, it found that "Atlas Holding … along with several of its subsidiaries banked freely at Jammal Trust Bank despite their open affiliation with previously designated Hizbollah entities. In fact, Jammal Trust Bank facilitated hundreds of millions of dollars in transactions through the Lebanese financial system on behalf of Atlas Holding and its subsidiaries." https://home.treasury.gov/news/press-releases/sm917. SAC ¶¶525-27. The SAC additionally alleges that SGBL and Bank Audi held accounts for Atlas Holding. SAC ¶526. Months later, in September 2020, Treasury designated Arch Consulting SARL, a well-known corporate alter-ego for Hezbollah's construction arm, Jihad al-Bina. https://home.treasury.gov/news/press-releases/sm1126. SAC ¶460. Arch Consulting is alleged to have held an account at BLOM during the relevant period. SAC ¶1553.

[36]     *See, e.g., Societe Internationale Pour Participations v. Rogers*, 357 U.S. 197, 206 (1958) (given the importance of the "policies underlying the Trading with the Enemy Act," district court properly ordered party to produce documents that Swiss authorities had found subject to criminal secrecy laws); *Wultz*, 910 F. Supp. 2d at 559 ("The interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty."); *Weiss*, 242 F.R.D. at 46 ("The legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and a task force, reveal this country's profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks.").

## 2.    The Personal Privacy Interests that Animate Lebanese Bank Secrecy Pale in Importance to the U.S. Interests This Case Implicates

In contrast to the substantial American interests that Plaintiffs' ability to obtain the Requested Documents implicates, the Lebanese bank secrecy statutes seek to protect personal privacy interests, and only in limited circumstances.[37] Lebanese laws contain exceptions, including account holders' ability to waive their "privacy" rights and banks' unilateral ability to dispose of the protections of Lebanon's secrecy statute in *any* bank-customer commercial dispute.[38] *See In re Iraq Telecom Ltd.*, No. 18 Misc. 458 (LGS) (OTW), 2020 WL 1047036 (S.D.N.Y. March 4, 2020) (citing translation of Article 2 of Lebanon's bank secrecy law permitting revocation of privacy requirement when "authorized in writing by the concerned client, his/her heirs or legatees, or in case the client is declared bankrupt, or there is a lawsuit involving banks and their clients over banking operations").

These exceptions demonstrate that the foreign statutes protect "confidentiality rights held by the customers of the bank" that are "waivable," *Linde*, 463 F. Supp. 2d at 313. Thus, Lebanon's

---

[37]    None of the Defendants have provided Plaintiffs with a meaningful exposition of the contours of Lebanese bank secrecy, instead referring Plaintiffs to a website containing links to English translations of various Lebanese laws. Again, without exposition, certain Defendants cite various Lebanese laws including (1) the Lebanese Law of September 3, 1956 on Banking Secrecy; (2) Articles 36, 44, 127, 148, 151, 155, 190 & 203 of the Lebanese Code of Money and Credit of August 1, 1963; (3) Articles 6 & 8 of Law No. 44 of November 24, 2015 on Fighting Money Laundering and Terrorist Financing; (4) Article 55 of Law No. 161 of August 17, 2011 on Financial Markets; (5) Article 12.6 of Basic Circular 83 of the Banque du Liban of May 18, 2001; and (6) Article 579 of the Lebanese Criminal Code. Despite their repeated requests, Plaintiffs will first learn the substance of Defendants' Lebanese law objections when Defendants presumably submit Rule 44.1 declarations in opposition to this motion. During the parties' video meet and confer on April 28, 2022, Plaintiffs' counsel attempted to obtain further clarity concerning Defendants' understanding of the contours of Lebanon's bank secrecy laws. Counsel for Bank Audi began by providing helpful responses, but counsel for Bank of Beirut interposed an objection to further questions on the grounds that the meet and confer was not intended for this purpose. No further discussion of Lebanese law took place thereafter.

[38]    *See, e.g.*, *Linde*, 706 F.3d at 109-110 (adopting district court's finding that the record did not support foreign bank's assertion that disclosures – even if violative of foreign bank secrecy law – would subject it to prosecution); *United States v. First Nat'l City Bank*, 396 F.2d 897, 903 (2d Cir. 1968) (noting that "it is surely of considerable significance that Germany considers bank secrecy simply a privilege that can be waived by the customer"); *Laydon*, 183 F. Supp. 3d at 420 ("[w]here the issue is the application of another country's privacy laws," the question "whether such privacy requirements are absolute" is relevant to the comity analysis) (citing *Tansey*, 2014 WL 4676588, at *2).

waivable bank secrecy laws, provide little counterbalance to the weighty U.S. interests supporting disclosure.[39] *Cf. Weiss*, 242 F.R.D. at 55 (Treasury's "designation of Interpal as a[n SDGT] and the Department's decision to freeze Interpal's American accounts, strongly militates against honoring Interpal's unasserted bank privacy interest"). Although the United States has a strong interest, as the forum state of the lawsuit, in adjudicating the case under its rules,[40] as set forth herein and in the Billingslea Declaration, the U.S. has an even stronger national interest in preventing terrorism financing, and Lebanon has formally expressed a common national interest with the U.S. in thwarting terrorist financing. By signing and joining the International Convention for the Suppression of the Financing of Terrorism and participating in the Middle East and North Africa Financial Action Task Force, which is bound by the Financial Action Task Force's ("FATF") Recommendations, Billingslea Decl., ¶¶ 4, 86-93,[41] Lebanon expresses its formal commitment to combating terror financing. And the ATA provides a mechanism for its citizens to act as private attorneys general to promote that interest.[42] Thus, the national interests of the respective states are

---

[39]    Plaintiffs do not dispute that Lebanon has an interest in maintaining its bank secrecy laws or that it has not itself benefited from those laws which have attracted substantial foreign deposits—although that is largely from Hezbollah and international narcotics cartels which rely on that secrecy.

[40]    Axiomatically, the United States has "a substantial interest in fully and fairly adjudicating matters before its courts." *Minpeco*, 116 F.R.D. at 523-524.

[41]    FAFT Recommendation 37 states that "countries should . . . [n]ot refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions to maintain secrecy or confidentiality." https://www.cfatf-gafic.org/home-test/english-documents/cfatf-resources/14728-fatf-recommendations-2012-updated-october-2020/file.

[42]    *See, e.g.*, *Strauss*, 242 F.R.D. at 217 (quoting Senator Grassley's statement that the ATA "sets an example to the world of how the United States legal system deals with terrorists. If terrorists have assets within our jurisdictional reach, American citizens will have the power to seize them .... This legislation reaffirms our commitment to the rule of law: the people of the United States will be able to bring terrorists to justice the 'American Way,'" 136 Cong. Rec. S4568-01). The legislative history and statutory language of the ATA demonstrate that the law was intended to provide plaintiffs with powerful tools to enhance governmental efforts to prevent terrorism. Even in the antitrust context, the Supreme Court has found that "[a] claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest." *American Safety Equipment Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968).

anything but in equipoise.

The roles the Banks' accountholders and transferees played in terrorist operations also support granting Plaintiffs' motion. The supposed privacy interests of criminal actors cannot justify withholding the Requested Documents. As Judge Scheindlin observed, a foreign state's "interest in building confidence in its banking industry does not encompass an interest in protecting the confidentiality of those who participate in the funding of international terrorism." *Wultz*, 910 F. Supp. 2d at 559.

### 3. Lebanon Excludes Hezbollah from the Application of Its Terrorism Financing Laws

The Court should afford Lebanon's interest in bank secrecy substantially less weight for another reason: its legitimization of Hezbollah and incorporation of it into the Lebanese political system is contrary to both longstanding U.S. policy and U.S. national security.[43] In October 2003, purportedly to more effectively combat money laundering and terrorist financing, Lebanon adopted Law 547 to expand upon Article One of Law 318 (2001), criminalizing any funds resulting from the financing or contribution to the financing of terrorism or terrorist acts or organizations. This appears to have been based on the definition of terrorism as it appears in the Lebanese penal code (which distinguishes between "terrorism" and "resistance"). *See* Billingslea Decl., ¶¶ 89, 98.

Given Hezbollah's central role in Lebanon (e.g., maintaining its own private army, controlling the Beirut International Airport and other border crossings, exercising an effective veto over Lebanese parliamentary government, and physically controlling significant parts of the country), Lebanon has exempted it (and other "resistance" organizations) from Lebanon's

---

[43]    For just one recent example*, see* Audrey McNamara, "Alleged Hezbollah Scout Scoped Out Attack Targets in American Cities: Feds; Alexei Saab allegedly surveyed Fenway Park, the Washington Monument, and the Statue of Liberty as potential targets," *The Daily Beast* (Sept. 19, 2019), *available at* https://www.thedailybeast.com/alexei-saab-alleged-hezbollah-scout-scoped-out-attack-targets-in-american-cities-feds?via=FB_Page&source=TDB.

counterterrorism laws, thereby *de facto* nullifying them.[44] *See* Billingslea Decl., ¶ 98.

In fact, on many occasions, senior Lebanese government officials have endorsed and embraced Hezbollah publicly. For example, in 2019, then Lebanese Foreign Minister Jebran Bassil publicly stated that "everyone in Lebanon is a partner of Hizbullah." Schlanger Decl., Ex. F. He added: "Our partnership with Hizbullah has been costly at the popular and diplomatic levels, but we have gained Lebanon's stability and unity, because Hizbullah is a part of a people and not an armed group." *Id.* Bassil went on to explain: "We can't accept the classification of Hizbullah as a terrorist organization, as designated by Washington …." *Id.*[45]

Although the U.S. government has continued to work with various Lebanese authorities, including its Central Bank and Special Investigation Commission to encourage efforts to curtail Hezbollah's access to the Lebanese banking system, it has long been clear that Lebanese efforts have lacked vital political support and that corruption remains endemic throughout Lebanon's banking system. *See* Billingslea Decl., ¶¶ 64-65. More importantly, with Lebanon's tacit consent, Hezbollah has retained largely unfettered access to Lebanon's banking system through a variety of means, and it has continued to launder narcotics trafficking proceeds through Lebanon without any serious governmental effort at curtailing those activities. *Id.*, ¶ 66.

The rule of law is collapsing in Lebanon, which includes the use of bank secrecy as a cover for illegal financing. *See* Exhibit H to the Schlanger Decl. ("Salameh, in his role as head of the SIC, repeatedly rebuffed the Public Prosecution's queries for information into transfers abroad, citing banking secrecy and deferring to internal reviews by the banks themselves"). According to the IMF,

---

[44]    Lebanon's position is not only contrary to U.S. policy and law, but also constitutes an outlier even in the Arab World. For example, even the Arab League declared Hezbollah a terrorist group in 2016 (with abstentions only by representatives of Iraq and Lebanon). Schlanger Decl., Ex. E.

[45]    For a collection of Bassil's statements while serving as Lebanon's foreign minister, *see* Schlanger Decl., Ex. G.

"Lebanon is facing an unprecedented crisis, which has led to a dramatic economic contraction" and has been "combined with severe accountability and transparency problems and lack of structural reforms." *See* Schlanger Decl., Ex. I at 1-2. Today, the Lebanese banking sector is technically bankrupt, holding around $20 billion dollars against deposits of $112.3 billion – or about 18 cents for every dollar on its ledgers.[46] As one analyst put it, "the entire country has been picked clean by terrorists, criminals, elites, and the political class. The central bank claims to have gross amounts of foreign exchange available, but the central bank is insolvent on a net basis once bad assets are written down against capital." *See* Schlanger Decl. Ex. A at 8.

The Lebanese judiciary is also in a state of crisis. According to a 2020 Freedom House report, "Lebanon's judiciary is not independent. Political leaders exercise significant influence over judicial appointments, jurisdiction, processes, and decisions, which are also affected by corruption and undue influence of other prominent people."[47] Since that time, the situation has only become more dire as the country's fragile infrastructure has collapsed. *See* Schlanger Decl., Ex. J at SPA-1 (January 7, 2022, Statement by the Judges Club of Lebanon stating, *inter alia*, that "[l]ogistically speaking, the courts and their registries do not have the minimum requirements to operate, as there is no electricity, heating, or stationery.").

### 4.     Disclosure Is Consistent with Lebanon's Obligations Under International Law

As the Second Circuit has noted, "Lebanon ha[s] expressed a strong interest in deterring the financial support of terrorism, and [] these interests have often outweighed the enforcement of bank secrecy laws…" *Linde*, 706 F.3d at 111 (noting that Lebanon has signed a Memorandum of

---

[46]     The data comes from a report published by Defendant Byblos Bank and is predicated on data from the end of November 2020.

[47]     Freedom in the World 2020, Lebanon, https://freedomhouse.org/country/lebanon/freedom-world/2020. The State Department has come to the same conclusion. *See* https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/lebanon/.

Understanding adopting FATF recommendations "which specifically renounce bank secrecy as a basis for refusing requests for mutual legal assistance in money laundering and terrorist financing investigations") (internal citations and quotation marks omitted). For a detailed discussion of Lebanon's obligations under international law and its efforts to comply with its obligations and international standards, *see* Billingslea Declaration, ¶¶ 12-13, 15-16, 85-117. The public commitments that Lebanon has made to combat money laundering, narcotics trafficking, and tax evasion – rejecting bank secrecy as a basis for withholding information from other countries concerning these matters – further support compelling production.[48] Those commitments include:

- Compliance with United Nations Security Council Res. 1373, which requires states to prohibit their nationals and entities "from making any funds, financial assets or economic resources or financial or other related services available, directly or indirectly," for the benefit of terrorists or fronts controlled, directly or indirectly, by terrorists (U.N.S.C. Res. 1373 at § l(d)).

- Compliance with United Nations Security Council Res. 2462 requiring states to "[a]fford one another the greatest measure of assistance in connection with criminal investigations or criminal proceedings relating to the financing or support of terrorist acts, including assistance in obtaining evidence in their possession necessary for the proceedings."[49]

- Compliance as a signatory to the United Nations Convention Against Transnational Organized Crime (the "Organized Crime Convention"), which mandates that "States Parties shall not decline to render mutual legal assistance pursuant to this article on the ground of bank secrecy."[50]

---

[48]      *See Weiss*, 242 F.R.D. at 48-49, 51, 53 (citing the shared participation of the U.S. and the U.K. in the United Nations' International Convention for the Suppression of the Financing of Terrorism and the Financial Action Task Force as evidence of the nations' shared interest in preventing terror financing and in the production of documents allegedly subject to U.K. secrecy protections); *Strauss*, 249 F.R.D. at 443 (the shared "interests of the United States and France in combating terrorist financing," as evidenced by their "participation in international treaties and task forces aimed at disrupting terrorist financing, outweigh the French interest in bank secrecy laws and its generally-asserted interest in 'sovereignty'").

[49]      *Id.*, § 2(f).

[50]      *See* Organized Crime Convention, G.A. Res. 25, Annex I, U.N. GAOR, 55th Sess., Supp. No. 49, at 44, Art. 18(8), A/RES/55/25 (2001), entered into force Sept. 29, 2003; *available at* http://www.unodc.org/pdf/crime/a_res_55/res5525e.pdf; https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-12&chapter=18&clang=_en.

- Compliance with FATF Recommendation 37 (updated in June 2021) which provides that "Countries should have an adequate legal basis for providing assistance and, where appropriate, should have in place treaties, arrangements or other mechanisms to enhance cooperation. In particular, countries should ... [n]ot refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions to maintain secrecy or confidentiality.[51]

These commitments and obligations under international law thus further support the conclusion that the Court should not provide the Banks' terrorist customers and counterparties with greater protection from disclosure than American accountholders possess.[52]

Finally, the Banks' objections disregard the contemplated Protective Order that will eventually be entered in this case governing the parties' use of confidential materials. Considering that such an Order will be entered before any documents are produced, unless the Requested Documents are admitted at trial, their production will minimally impact account holders' and transferees' privacy because only a small group of people obligated to maintain the documents' confidentiality will see them. *See, e.g.*, *Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 472 (S.D.N.Y. 2013). Moreover, because documents admitted at trial must bear upon whether the Banks provided material support to a terrorist organization, *see* Fed. R. Evid. 401, Lebanon possesses no legitimate interest in protecting the confidentiality of those materials since they will be limited to admissible evidence of terror financing which Lebanon is obligated by treaty to prevent.

---

[51]    https://www.cfatf-gafic.org/home-test/english-documents/cfatf-resources/14728-fatf-recommendations-2012-updated-october-2020/file.

[52]    *See, e.g.*, *United States v. Miller*, 425 U.S. 435, 442-43 (1976) (account holders possess "no legitimate 'expectation of privacy'" in banking records and "[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government"); *see also Aérospatiale*, 482 U.S. at 544 n.29 (foreign blocking statute cannot "provide the nationals of such a country with a preferred status in our courts").

**B.    The Importance of the Requested Documents to This Litigation Heavily Favors Compelling Their Production**

Because this litigation hinges, in significant part, upon whether the Banks were generally aware of their role in an illegal enterprise from which the Attacks were a foreseeable risk, *Kaplan*, 999 F.3d at 860, no credible question exists concerning "the importance to the … litigation of the documents" Plaintiffs request. Restatement (Fourth) § 426, cmt. (a).

**C.    The Specificity with Which Plaintiffs Have Identified the Requested Documents Fully Supports Compelling Their Production**

The vast majority of persons and entities listed in Plaintiffs' RFP are found in the SAC (592 out of 687, or more than 85%) – which provides painstaking details concerning Hezbollah's interconnected terror financing networks. Most of the remaining persons and entities listed in the RFP are either SDGTs designated for their respective roles in Hezbollah (44) or companies controlled by SDGTs that have not yet been designated (11). The remaining names in the RFP include immediate family members of Hezbollah operatives involved in companies controlled by the BAC,[53] or persons identified in U.S. criminal prosecutions of Hezbollah operatives. The full list is available at Schlanger Decl., Ex. K.

During the meet and confer, Plaintiffs' counsel specifically invited Defendants' counsel to identify any persons and entities listed in the RFP not discussed in the Complaint that they did not believe were related to Hezbollah (either in the SAC or the public record). Defendants did not accept that offer, but instead contend that the scope of relevance is limited to persons and entities Plaintiffs have already identified – *pre-discovery* – as each Bank's respective customers. *See, e.g.*, Schlanger Decl., Ex. L at 4 ("Subject to the Court's ruling on the pending motion to dismiss,

---

[53]    BAC operatives frequently use family members to front for them on companies they control and to access funds through their relatives' accounts. The Ahmad and Tajideen clans discussed above (and detailed in the SAC) provide examples of this phenomenon.

BLOM will search only the names of individuals or entities that have been identified as BLOM customers in the Second Amended Complaint as to whom BLOM could potentially be subject to liability under the claims and allegations asserted against BLOM"). But of course, the only way for Plaintiffs to (1) identify each Defendant's Hezbollah customers and counterparties; (2) ascertain the amount (*e.g.,* number and dollar value of transactions), type (*e.g.,* funds transfers, letters of credit, cash exemptions) and duration of assistance each Defendant provided to these customers and counterparties; and (3) determine each Defendant's awareness of its role in Hezbollah's terror financing enterprise, ***is for Defendants to comply with their Rule 26 discovery obligations***.

In short, the second Restatement factor—"the degree of specificity of the request"—fully supports ordering the Banks to produce the Requested Documents. *See* Restatement (Fourth) § 426, cmt. (a); *Linde*, 463 F. Supp. 2d at 315.[54] In fact, Defendants do not genuinely challenge the specificity of the Requested Documents, only their volume, and that volume is purely a function of the fact that Plaintiffs credibly allege that Defendants provided financial services for a vast, interconnected network of Hezbollah operatives and entities. Indeed, Plaintiffs seek the production of customer and transactional records for a far more limited list of individuals and entities than the court in *Linde* ultimately ordered production for – a universe of more than 15,000 individuals and entities. *See* Schlanger Decl., Ex. C.[55] In sum, the discovery sought relates *directly* to Plaintiffs'

---

[54]    *See also, e.g.*, *Strauss*, 249 F.R.D. at 441 (in case involving a French bank that allegedly supported Hamas by providing financial services to the Hamas-affiliated charity CBSP, the specificity of the plaintiffs' requests supported rejecting the defendant's bank secrecy objection where the plaintiffs sought "documentation of and testimony regarding the relationship between defendant and CBSP, the nature and extent of the services that defendant provided to CBSP, the collection or distribution of funds by [the defendant] that may have been used by CBSP and/or its associates to support terrorism, and [the defendant's] knowledge of CBSP's alleged terrorist connections"); *Weiss*, 242 F.R.D. at 44 (same findings with respect to British bank that allegedly supported Hamas by providing financial services for Hamas-affiliated charity Interpal).

[55]    *See Linde*, 706 F.3d at 115 (characterizing as "in line with … precedent" the district court's finding "that the importance of the documents" supported compelling their production); *Linde*, 463 F. Supp. 2d at 315 (the "discovery sought here is essential to the proof of the plaintiffs' case").

claims that Defendants engaged in a scheme to help Hezbollah and its Business Affairs Component launder (and access) hundreds of millions of dollars over nearly two decades.

### D.    Plaintiffs' Inability to Secure the Requested Documents Through Reasonable Alternative Means Supports Compelling the Banks to Produce Them

#### 1.    Customer Waiver Is Not a Viable Alternative Means

Nearly every name listed in the RFP is either directly controlled by Hezbollah or part of Hezbollah's BAC financing network. There is no realistic basis to believe that Plaintiffs could ever obtain waivers from these individuals and entities to allow disclosure of their financial records. In a similar circumstance, the district court in *Linde* squarely rejected Arab Bank's contention that discovery available from terrorists and their family members constitutes a viable alternative to obtaining the bank's documents. *See Linde*, 463 F. Supp. 2d at 315. As *Linde* recognized, terrorists, their financiers, and their sympathizers located in jurisdictions like Lebanon are exceedingly unlikely to produce their financial records voluntarily to American victims of terrorism. *Id.*

#### 2.    Third-Party Subpoenas Are Not a Viable Alternative Means

At the status conference on December 13, 2021, Defendants' counsel urged the Court to direct Plaintiffs to serve third-party subpoenas on certain U.S.-based correspondent banks on the theory that documents Plaintiffs obtained "from those banks" would "inform the element of alternative means for obtaining the same information, which is also part of the international comity test." Tr. at 16:13-22. Although none of the four financial institutions served with third-party subpoenas pursuant to the Court's December 13, 2021, order have yet to produce any responsive records,[56] Plaintiffs anticipate that at least some of them will produce some (currently unspecified)

---

[56]    The four major clearing banks have notified Plaintiffs' counsel that they will not produce records until a protective order is in place. Unfortunately, despite multiple efforts by Plaintiffs to finalize the language of the order, Defendants have been slow to respond, and a narrow set of issues remain open. Nevertheless, Plaintiffs received a further proposal from Defendants on May 1 (yesterday) and believe a proposed protective will be submitted to the Court before the end of the month.

materials.[57]

However, while transactional records from U.S. correspondent banks are relevant to Plaintiffs' claims (hence Plaintiffs' stated desire to issue third-party subpoenas), even a robust response from each bank issued a subpoena would not remotely qualify as a viable "alternative means of securing the information" as intended by the Restatement (Fourth).

To begin with, as one court in this district has noted, "[a]s a practical matter – absent discovery – terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities." *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 156 (E.D.N.Y. 2020).[58]

The Hezbollah individuals and entities listed in the RFP are alleged to be customers and counterparties of Defendants, <u>not</u> customers of the U.S. correspondent banks. Thus, while those U.S. banks may possess *some* documentation that constitute red flags concerning Defendants' customers, *see, e.g.*, Schlanger Decl., Ex. M (Exhibit B to Defendants' joint memorandum of law in support of their pending motions to dismiss (ECF No. 209-4)), which is a non-public U.S. law enforcement communication to one of Bank Audi's correspondent banks that discloses the name and account number of a Bank Audi customer who is a Hezbollah arms dealer and counterfeiter, the most direct, detailed, and critical evidence of each Defendant's "knowledge of various red flags that could have apprised them of their customer's nefarious activities" can only be found in

---

[57]    One other bank, KBC, has made an initial production, but Plaintiffs informed the bank that the information it provided had been depicted inaccurately. KBC has indicated that it intends to re-produce that information in the correct form in approximately two weeks.

[58]    As the Court has observed, "it would be unrealistic to expect a plaintiff at the pleading stage to possess direct evidence of a bank's subjective awareness of its role in terrorist attacks—internal memoranda, e-mails, and the like." *Bartlett*, 2020 WL 7089448, at *10.

Defendants' own files.

For example, financial institutions generate several types of due diligence records on their own customers that third party banks do not. In October 2001, the Basel Committee on Banking Supervision[59] issued its report on "Customer due diligence for banks," describing "essential elements" of KYC programs banks must implement, including ongoing monitoring of high-risk accounts "to determine those transactions that do not conform with the normal or expected transactions for that customer or type of account." *See* https://www.bis.org/publ/bcbs85.pdf, ¶19. As the report stated, "[t]here should be intensified monitoring for higher risk accounts," including monitoring "sources of third party information" and "[s]ignificant transactions." *Id*., ¶54.

Moreover, even banks that are not legally required to implement KYC rules and Anti-Money Laundering ("AML") Programs in their domestic jurisdictions, have often done so because they, like Defendants, maintained correspondent bank accounts in New York and other jurisdictions that require such measures. These KYC, AML, and combating the financing of terrorism ("CFT") policies typically require banks to collect information such as names, addresses, and identification (driver's licenses, certificate of incorporations) and, most relevant here, *to monitor the nature of both routine and unusual transactions conducted by their customers*. Transactions inconsistent with a customer's profile or, for example, a large funds transfer from overseas may be flagged for further review, particularly for high-risk customers. Thus, even the absence of such due diligence documentation in a bank's files provides circumstantial evidence of its state of mind, including its decisions to avoid knowledge about certain customers. The District Court has noted that "Defendants each maintained policies and programs during the relevant period to detect illegal account activity and account holders. For example, Fransabank's Vice President

---

[59]    The Basel Committee (which is related to the Bank for International Settlement, a consortium of central banks) issues the industry-standard and highly influential "Basel Accords" policy recommendations.

stated in 2006 that the bank had 'a monitoring program for suspicious or unusual activity' and developed a 'risk assessment of its customers.' And MEAB Bank maintained a counter-financing of terrorism program which involved screening its banking activity using a state-of-the-art system." *Bartlett*, 2020 WL 7089449 at *2 (citations to complaint omitted).

Thus, the fourth Restatement factor—"the availability of alternative means of securing the information"—also heavily favors ordering the Banks to produce the Requested Documents. *See* Restatement (Fourth) § 426, cmt. (a). *Accord, e.g., Linde*, 463 F. Supp. 2d at 315; *Strauss*, 249 F.R.D. at 442 (only defendant bank could provide plaintiffs with financial records of Hamas-affiliated charity); *Weiss*, 242 F.R.D. at 44 (same).

### E.    The Additional Factors the Second Circuit Has Considered in Assessing Objections Based on Foreign Law also Support Compelling the Production of the Requested Documents

The Banks also cannot justify withholding the Requested Documents by pointing to the subsidiary factors that Second Circuit decisions have considered in assessing discovery objections based upon foreign law.

### 1.    Party vs. Non-Party Status.

Parties to litigation must bear a significantly higher burden than non-parties when asserting objections based upon foreign law. *See, e.g.*, *Linde*, 706 F.3d at 109-110; *Strauss*, 249 F.R.D. at 454 ("If, however, the objecting litigant is a party to the action, courts accord that party's hardship less weight."); *Laydon*, 183 F. Supp. 3d at 420 ("whether the person resisting discovery is a party to the litigation" is relevant to the comity analysis). That burden is heightened further where, as here, Defendants' alleged wrongful conduct largely depends on their access to U.S. correspondent banks that clear and settle U.S. dollars for them. *First Nat'l City Bank*, 396 F.2d at 905; *Wultz*, 910 F. Supp. 2d at 553 (fact that discovery target was "a party doing business in the United States … makes the case for compelling production even stronger"); *Restatement (Third)* § 442, Reporter's

Notes, No. 8 at 363 ("United States courts have placed heavy burdens on banks having offices in both the United States and bank secrecy jurisdictions" that attempted to avoid discovery based upon blocking statutes). This factor therefore favors granting Plaintiffs' motion.

### 2. Hardship.

The supposed "hardship" the Defendants will theoretically suffer if they produce the Requested Documents also does not support sustaining their objections. In assessing this factor, courts consider the *actual* likelihood and consequences of "enforcement of foreign law" and disregard unsubstantiated assertions that disclosure will lead to punishment. *See Minpeco*, 116 F.R.D. at 522, 526.[60]

Defendants have not sustained their burden of establishing that any adverse consequences would accompany producing documents pursuant to a production order by this Court. Indeed, in response to Defendants' (boilerplate) Objections to the RFP, Plaintiffs invited Defendants to provide not only the Lebanese statutes they were relying on but any case law they believed supported their bank secrecy objections, but no Defendant cited *any* instance where a Lebanese bank was subjected to criminal prosecution for any purported violations of Lebanon's bank secrecy

---

[60]    *See also, e.g., Linde*, 706 F.3d at 114 (holding that courts must focus on the likely consequences of production because "foreign states would not necessarily prosecute the Bank or any of its employees for the disclosure of sensitive banking information to private civil litigants in the context of the current proceedings"); *First Nat'l City Bank*, 396 F. 2d at 900 (the absence of practical consequences of production supported affirming ruling sanctioning Citibank for failure to produce documents allegedly subject to German bank secrecy doctrine); *In re Grand Jury Subpoena*, 218 F. Supp. 2d 544, 563 (S.D.N.Y. 2002) (rejecting objections based upon foreign executive privilege although the company resisting production offered an opinion by the foreign state's Ministry of Justice because neither the corporation nor the Ministry "presented any evidence that the confidentiality asserted by the Republic is enforced by any active prosecution"); *Wultz*, 910 F. Supp. 2d at 559-60 (rejecting bank secrecy objections where the defendant "has produced no evidence that it has been meaningfully sanctioned by the Chinese government for complying with the two previous U.S. court orders to produce documents in contravention of China's bank secrecy law"); *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 103 (S.D.N.Y. 2015) ("speculative nature of [bank's] professed hardship" supported rejecting Chinese bank secrecy objections where bank failed to cite any instance in which a bank was sanctioned for complying with an American discovery order).

laws resulting from compelled disclosure in a litigation.[61]

Defendants' anticipated hardship arguments also ignore that they are authors of the purported dilemma they now face. By accepting the benefits of maintaining correspondent accounts in the world's banking center and choosing to hold their deposits substantially in U.S. dollars, Defendants purposefully subjected themselves to New York and U.S. law, including the prospect of participating in litigation concerning their substantial assistance to Hezbollah, a terrorist group with a long track record of murdering and maiming Americans. Neither precedent nor comity remotely suggests that Defendants are entitled to knowingly violate U.S. law by clearing transactions through U.S. correspondent banks for a designated FTO yet evade accountability by invoking foreign statutes to shield evidence of their role in those transactions from scrutiny. *See, e.g., First Nat'l*, 396 F.2d at 905 (when a bank elects to operate in the U.S. and abroad, it may "confront the choice … to 'surrender to one sovereign or the other the privileges received therefrom' or, alternatively … to accept the consequences"); *In re Grand Jury Subpoena*, 218 F. Supp. 2d at 563 ("businesses that 'serve two masters' assume the risk of conflicting legal imperatives").[62]

Moreover, any asserted hardship associated with violating the privacy rights of Defendants'

---

[61]     *See Laydon*, 183 F. Supp. 3d at 425 (hardship factor favored production where the resisting party could not "cite a single instance in which" a bank faced enforcement efforts for producing documents pursuant to a U.S. court order); *Wultz*, 910 F. Supp. 2d at 553-54 (failure "to indicate any sanctions that [the defendant bank] has in fact received as a result of its compliance with the two prior orders" compelling discovery negated claim that production would produce hardship); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-cv-5571-RJH-HBP, 2006 WL 3378115, at *3-4 (S.D.N.Y. Nov. 16, 2006) (finding no hardship where resisting party provided no evidence of past prosecutions even where that party "ha[d] been threatened with prosecution by two French agencies"); *Strauss*, 249 F.R.D. at 455 (hardship factor favored rejecting bank secrecy objections despite evidence that France prosecuted violations of the statute where defendant bank had previously made disclosures regarding relevant accounts without ramifications).

[62]     Because U.S. dollars are at the heart of the money laundering conspiracy which Hezbollah has operated through the Defendant banks, even transactions for Hezbollah's benefit that were not cleared through U.S. correspondent banks are inexorably intertwined with the funds that were routed through the U.S. because converting, repurposing, and "washing" Hezbollah's money (and the money belonging to the drug cartels that Hezbollah works with) is a core purpose of The System.

Hezbollah accountholders and transferees would be mitigated—if not eliminated—by the entry of a Protective Order, as discussed above.[63] Defendants cannot point to any way in which the contemplated order would fail to provide adequate protection to the customer confidentiality interests of the individuals and entities targeted by Plaintiffs' discovery demands, all of whom have a demonstrated tie to terrorism.

### 3. Good Faith.

Courts in the Second Circuit also consider whether the party resisting discovery acted in good faith both when deciding whether to impose sanctions after a production order is violated and also when deciding whether to order production. *See Strauss*, 249 F.R.D. at 455. The burden of demonstrating good faith rests with the withholding party. *See Societe Internationale*, 357 U.S. at 201.

In response to Plaintiffs' RFP, Defendants uniformly interposed objections that violate Rule 34, made frivolous objections to routine definitions, and even refused to produce records concerning Hezbollah that they sent to the United States. Defendants' vague and boilerplate objections do not satisfy their requirements to lodge specific objections under Rule 33(b)(4). *See Freydl v. Meringolo*, No. 09-CV-07196 (BSJ), 2011 WL 2566087, at *3 (S.D.N.Y. June 16, 2011) ("'[B]oilerplate objections that include unsubstantiated claims of undue burden, overbreadth and lack of relevancy' while producing 'no documents and answer[ing] no interrogatories ... are a paradigm of discovery abuse.'") (citing *Jacoby v. Hartford Life & Acc. Ins. Co.*, 254 F.R.D. 477, 478 (S.D.N.Y. 2009)); *In re Weatherford Int'l Sec. Litig.*, No. 11-cv-1646 (LAK) (JCF), 2013 WL 5788680, at *2-3 (S.D.N.Y. Oct. 28, 2013) (ordering defendant which had previously lodged

---

[63]    *See, e.g.*, *Weiss*, 242 F.R.D. at 56 (entry of a "confidentiality order in this case … further lessens NatWest's potential hardship" from producing documents subject to U.K. bank secrecy laws); *Laydon,* 183 F. Supp. 3d at 425 ("the UK's interest in protecting the privacy of its citizens is mitigated by the protective order in place in this case").

"boilerplate objections" to provide substantive responses to interrogatories). *See, e.g.*, Schlanger Decl., Ex. N (Bank of Beirut's Responses and Objections to Plaintiffs' First Set of Requests for Production of Documents). Insofar as Defendants have all made clear that they do not intend to substantially produce responsive records, their stated objections cannot be construed as having been made in the utmost good faith.

Ignoring a key deadline in a discovery schedule they urged this Court to adopt is also hardly a sign of a dedicated commitment to fulfilling Rule 26 obligations,[64] but Defendants' lack of good faith is more acutely illustrated by its use of Exhibit B to their joint memorandum of law in support of their pending motions to dismiss (ECF No. 209-4). *See* Schlanger Decl., Ex. M. That document is a non-public U.S. law enforcement communication to one of Bank Audi's correspondent banks that discloses that Bank Audi held an account for a Hezbollah arms dealer and counterfeiter during the relevant period and specifically identifies the arms dealer's account number.

The document is significant because it was affirmatively produced by Defendants in support of their pending motions to dismiss – despite disclosing a customer's name and account number at Bank Audi. At the same time, Bank Audi and the other Defendants refuse to produce any records in response to RFP No. 9 ("All Communications to or from the U.S. concerning the following matters: (a) Hezbollah or Agents of Hezbollah; (b) the persons and entities listed in Exhibit 1") – the very type of communication "from the U.S." that Defendants have voluntarily produced when they believed it served their interest to do so.[65] It is well settled that even when a party may assert a recognized privilege under common law (of which foreign bank secrecy is

---

[64]    See Plaintiffs' Letter to the Court dated April 29, 2022, ECF No. 269.

[65]    By their own stated provisions, Lebanon's bank secrecy laws do not apply to banks and documents based outside of Lebanon. *See In re Iraq Telecom Ltd.*, 2020 WL 1047036, at *2.

not), "'a party cannot partially disclose privileged communications or affirmatively rely on privileged communications *to support its claim or defense* and then shield the underlying communications from scrutiny by the opposing party.'" *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000)) (emphasis in original).[66]

In any event, even a showing of absolute good faith in seeking the production of documents subject to foreign bank secrecy does not immunize those materials from disclosure. *See, e.g.*, *Weiss*, 242 F.R.D. at 56 ("'notwithstanding [a litigant's] good faith, [the court is] not precluded from issuing a production order'") (quoting *Reino de Espana v. Am. Bur. of Ship.*, No. 03-cv-3573 (LTS)(RLE), 2005 WL 1813017, at *8 (S.D.N.Y. Aug. 1, 2005) (brackets in *Weiss*)).[67]

## III.    DEFENDANTS' RELEVANCE, BURDEN, AND PROPORTIONALITY OBJECTIONS

### A.    The Parties' Meet and Confer Process

On December 31, 2021, Plaintiffs served each Defendant with the RFP, listing a combined total of 687 individuals and entities affiliated with and/or controlled by Hezbollah. Consistent with the Court's December 13, 2021, Order, Defendants each filed separate objections to the RFP on March 18, 2022. Upon receipt of those individualized objections, Plaintiffs promptly wrote to each Defendant asking a series of follow-up questions, including requesting that Defendants provide copies of the specific Lebanese laws and regulations they were relying upon in asserting that

---

[66]    Had the District Court ordered jurisdictional discovery in this case (Defendants claimed the Court lacked personal jurisdiction over them) it would have compelled production of the *very same transactional and compliance related documents* that evince a nexus or substantial relationship between the claim and use of the correspondent account. *See Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 984 N.E.2d 893, 900 (2012).

[67]    In fact, the D.C. Circuit has noted that Restatement (Fourth) of Foreign Relations Law significantly diminishes the importance of "good faith." *In re Sealed Case*, 932 F.3d 915, 940 (D.C. Cir. 2015) ("The Restatement (Fourth) simply states that courts 'have *discretion* to excuse violations of law, or moderate the sanctions imposed for such violations, on the ground that the violations are compelled by another state's law' if 'the person in question appears likely to suffer severe sanctions for failing to comply with foreign law' and 'has acted in good faith to avoid the conflict.'") (emphasis added by the court).

Lebanese bank secrecy prohibits disclosure of the information. Defendants' counsel assured the Court that "there's no reason for us to want to evade [providing the citations or the translated copies of the Lebanese laws]. We want fulsome objections if we have to make them, and we want a productive meet and confer." December 11, 2021, Status Conference Tr. 53:17-20. The Court directed Defendants "to provide to Plaintiffs the relevant citations of the Lebanese legal authority that Defendants anticipate relying on in their objections to initial requests for production prior to the parties' meet and confer sessions" in its December 13, 2021, Order.

Despite promptly writing separate letters to each Defendant in late March and offering multiple dates to hold a telephonic conference once the Defendants responded to these letters, not one Defendant met the Court's April 18, 2022, meet and confer deadline—none even responded to Plaintiffs' letters by that date. Instead, four of the 11 Defendants served responsive letters on April 22 and April 23 and the remaining Defendants served their responses the following week, including one Defendant less than 90 minutes before the videoconference meet and confer Defendants eventually scheduled for April 28. In all cases, Defendants provided Plaintiffs' counsel with one week or less to review their responses before the filing date set by the Court – May 2, 2022. Then, on April 25, 2022, Defendants requested to postpone the briefing schedule by three weeks (without mentioning any specific intention to move separately for a protective order), which Plaintiffs declined.[68]

Of course, Plaintiffs' requests for more detailed citations to Lebanese law were necessary

---

[68]     When the Court agreed with Defendants' proposal to set April 18, 2022, as the meet-and-confer deadline, Plaintiffs' counsel unsuccessfully argued that Defendants simply wanted to delay the case and stated, "It's to schedule a single call with us. And again, I am not rearguing the April 18th date. But I just want the Court to be mindful that in the course of this process -- and again, Mr. Berger mentioned the *Linde* case. We had 10 years of litigation relating to bank secrecy, including a trip to the U.S. Supreme Court. So, we're very mindful of the fact that our clients are the families of fallen soldiers and also horrifically injured veterans who are obviously eager to see the case as expedited as this complex process allows. So having said my piece, I recognize the April 18th deadline and will act accordingly." December 13, 2021, Status Conference Tr. 48:8-19.

because, despite the Court's Order and defense counsel's verbal assurances and Plaintiffs' repeated requests, Defendants did not previously provide copies of the laws or regulations they would rely upon and have now done so in only the most generalized way, citing various statutes, and providing links to them, but failing to explain how they construe those laws or how those laws support their position.[69]

### B. Defendants' Formulaic Proportionality and Burden Objections Are Meritless

Moreover, although Defendants' objections reference objecting to the burden of producing "electronically stored information ('ESI') that is not stored on active systems" or claim that the RFP seeks "Account Opening Records that are not relevant to any party's claim or defense related to this Litigation and is not proportional to the needs of this Litigation," it is evident that these pro forma proportionality and burden objections are unsupportable.

### 1. Plaintiffs' RFP Is Proportional Given the Importance of the Litigation

In considering the proportionality of Plaintiffs' document requests, the Court must consider (1) the importance of the issues at stake in the litigation; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of discovery in resolving issues; and (6) whether the burden or expense of the discovery is outweighed by the benefit. Fed. R. Civ. P. 26(b).

Given that the litigation is brought under a uniquely privileged federal statute[70] whose purpose "is to provide civil litigants with the ***broadest possible basis***, consistent with the

---

[69]    The one exception is Bank Audi, whose counsel appeared prepared to engage on the subject during the meet and confer call on April 29, 2022.

[70]    The statute not only provides for treble damages but also contains a separate venue provision that forecloses forum non conveniens challenges except where the alternative forum "is significantly more convenient and appropriate" and "offers a remedy which is substantially the same as the one available in the courts of the United States." 18 U.S.C. § 2334(d).

Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States," JASTA §2(b) (emphasis added), the importance of the issues at stake in the litigation are at their zenith. Moreover, given the number of Plaintiffs and the severity of their injuries, the damages in this case are likely to be in the billions of dollars *before* statutory trebling, *see* 18 U.S.C. § 2333(a), so the amount in controversy clearly justifies the (unspecified) expense and burden of searching and producing responsive records (although Defendants will likely incur a negligible burden since they have made it clear that they have no intention of substantively producing responsive records).

The parties' relative access to relevant information is hardly in dispute given that account records and internal bank communications are uniquely in Defendants' possession;[71] nor is there any dispute about the parties' relative resources. Finally, the last two factors also weigh overwhelmingly in favor of production. As shown above, evidence of Defendants' assistance to Hezbollah is of central importance in resolving the key disputed issues in the case and – even should Defendants decide to substantively produce responsive documents – the burden and expense of the discovery would be greatly outweighed by the benefit.

### 2. Defendants Have Failed to Articulate Any Undue Burden in Producing Responsive Records

Some Defendants have made clear that they have not made any effort to locate responsive records because in their view:

> It is premature to conduct searches because, among other things, the parties have not yet reached an agreement on the appropriate scope of discovery and the Court

---

[71] Plaintiffs may be able to obtain some *transactional* records through Defendants' U.S. correspondent accounts, but it remains unclear to what extent correspondent banks in the U.S. have retained such records or how far back in time those records have been retained.

> has not yet resolved the disputes, if any, between the parties as to the appropriate scope of discovery.

*See, e.g.*, Schlanger Decl., Ex. L (BLOM Bank Letter, April 22, 2022) at 4. Other Defendants have taken a different approach. For example, Bank Audi has stated that it "has located account opening records of the type it would be prepared to produce, if it were able to do so in compliance with Lebanese law" and has provided concrete details as to the *types* of responsive documents it possesses and the form and systems upon which such data are stored. *See, e.g.*, Schlanger Decl., Ex. O at 9 (Bank Audi's April 22, 2022, Letter to Plaintiffs' counsel).

In an ordinary case, the parties might usefully conduct discussions about prioritizing particular data sets and attempt to compromise by weighing the need for disclosures against various technical or procedural burdens of searching for particular subsets of data. In this case, however, burden is not seriously at issue because as Bank Audi, for example, has conceded, "given the nature of Plaintiffs' request for production that focus on seeking customer-related information, and given the strictures of Lebanese law, it is possible that there will be few, if any, documents that can be produced before Bank Audi's objections pursuant to Lebanese law are resolved." *Id.* at 5.

## C.    Defendants' Objections to the Scope of the RFP Are Meritless

Apart from bank secrecy, the sole basis for Defendants' objections to the RFP is that, in their view, it contains too many names, and that they should only be ordered to produce records for individuals or entities that have been identified as their specific customers in the SAC. *See, e.g.*, Schlanger Decl., Ex. L (BLOM Bank Letter) at 4: "BLOM will search only the names of individuals or entities that have been identified as BLOM customers in the Second Amended Complaint as to whom BLOM could potentially be subject to liability under the claims and allegations asserted against BLOM." Of course, searching for names – even for a unilaterally

53

narrowed list – is hardly meaningful when a party has no intention of producing records for the persons or entities.

As noted above, 592 out of the 687 listed names are identified in the Complaint. The 95 remaining persons and entities listed in the RFP are equally relevant – as set forth in Exhibit K to the Schlanger Declaration.[72] To the extent that Defendants provided financial services to *any* of the persons or entities listed in the RFP, such evidence would be highly relevant to proving Plaintiffs' claims. As explained above, Plaintiffs cannot know in advance of discovery every bank account held by each Hezbollah operative or entities—the accounts listed in the SAC are just those that Plaintiffs were able to ascertain *before* discovery. If courts limited discovery to facts alleged in a complaint, they would negate one of the primary the purpose of discovery itself.

While the requesting party must explain the potential relevance of the information sought, it is not obligated to make an evidentiary showing that the producing party in fact possesses responsive documents for a specific person or entity or from a specific time period. Nor is the requesting party required to make a showing that the discovery sought will definitively prove elements of their claim. Thus, BLF's assertion has discovery exactly backward:

> Plaintiffs should be prepared to explain the basis for saying that each of the alleged customers was so closely intertwined with Hezbollah's violent terrorist activities that one can reasonably infer that the bank was generally aware while it was providing banking services to that customer that it was playing a role in unlawful activities from which the attacks were foreseeable.

*See* Schlanger Decl., Ex. P at 1. First comes disclosure, then comes summary judgment when the parties argue about what inferences can reasonably be drawn from those disclosures. Debating the "basis" for a legal conclusion now is simply putting the proverbial cart before the horse. If a

---

[72]     As noted above, Plaintiffs previously offered to identify any persons and entities listed in the RFP that Defendants did not believe were related to Hezbollah either in the SAC or the public record. No Defendant took up that invitation.

Defendant believes the evidence ultimately shows none of its customers or counterparties were closely intertwined with Hezbollah's violent terrorist activities, nothing prevents it from arguing so at summary judgment or even producing contrary evidence, but the point of discovery is to facilitate disclosures that tend to make a fact more or less probable than it would be without the evidence. It is worth noting that nearly all the individuals and entities listed in Plaintiffs' RFP are part of Hezbollah's BAC – the financial arm of its Islamic Jihad Organization – and hence, by definition, closely intertwined with Hezbollah's violent terrorist activities. But even if that were not the case, the degree to which a given individual or entity is closely intertwined with Hezbollah's violent terrorist activities is a question of fact to be developed through discovery. For example, a Hezbollah-affiliated business might outwardly appear to be unrelated to the Business Affairs Component, but transactions disclosed in discovery might show that the business is in fact deeply involved in the BAC. Finally, as shown below, discovery subjects do not have to be themselves "closely intertwined," they only have to make the fact that Defendants assisted persons or entities "closely intertwined" with Hezbollah's violent terrorist activities *more probable*.

### 1.     The Scope of Relevance under Rule 26

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that a party is entitled to discovery on "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "As a general matter, federal law encourages disclosure of relevant information in light of the broad scope of discovery and truth-seeking purpose of Rule 26(b)." *Flores v. Stanford*, No. 18-cv-02468 (VB)(JCM), 2022 WL 354719, at *6 (S.D.N.Y. Feb. 7, 2022). Discoverability is determined by the broad standard of relevance.

Rule 26(b) "is liberally construed and is necessarily broad in scope." *New Falls Corp. v. Soni*, No. 16-cv-6805 (ADS)(AKT), 2020 WL 2836787, at *1 (E.D.N.Y. May 29, 2020) (citation omitted). "Information is relevant if: (a) it has any tendency to make a fact more or less probable

than it would be without the evidence; and (b) the fact is of consequence in determining the action. Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial." *Id.* at *2 (citation omitted).

> As the Supreme Court stated in *Oppenheimer Fund*, 437 U.S. at 351:
>
> Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. . . . Nor is discovery limited to the merits of the case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits.

(citations omitted).[73]

Here, Plaintiffs RFP goes to the very heart of the merits of the case and Defendants' objections have not cited any case suggesting Rule 26 relevancy is limited to specific factual allegations in the operative complaint. On the contrary, relevance must be "'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on[,]' any party's claim or defense." *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14-cv-9792 (WHP) (JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016) (quoting *Oppenheimer Fund*, 437 U.S. at 351).

## 2.    The RFP Requests Documents for Hezbollah-Affiliated Individuals and Entities

As noted above, the RFP is undisputedly relevant to Plaintiffs' efforts to prove that each Defendant was generally aware of its role in an overall illegal or tortious activity at the time assistance was provided and knowingly and substantially assisted the principal violation.[74] As the

---

[73]    The 2015 amendment to Rule 26 has not altered this basic principle. *See e.g., Fossil Group v. Angel Seller LLC*, No. 20-cv-2441 (WFK)(TAM), 2021 WL 5181308 (E.D.N.Y. October 22, 2021) (Merkl, M.J.) (citing *Oppenheimer* and noting that relevance must be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on a party's claim or defense).

[74]    The same state of mind evidence may also support an inference of agreement to satisfy the elements of civil conspiracy.

SAC's detailed allegations make clear, the hundreds of Hezbollah-affiliated individuals and entities that laundered hundreds of millions of dollars through Lebanese banks were not isolated account holders acting in a vacuum. They were, instead constituent parts of a series of interlocking criminal networks with companies controlled by Hezbollah's BAC – often registered by the same small group of Lebanese lawyers and audited by a similarly select group of accountants, and banking at a variety of Lebanese banks. These individuals and corporate entities served as a vital source of funding for Hezbollah's IJO – its core terror apparatus.

### 3.    Defendants' Temporal Objections to RFP Exhibit 2 Are Meritless

Defendants categorically object to producing records for individuals and entities in RFP Exhibit 2 because it calls for production of responsive records after the date of the last attack in the SAC. *See, e.g.*, Schlanger Decl., Ex. Q (Bank Audi's Responses and Objections to Plaintiffs' First Set of Requests for Production of Documents) at 10 ("Transactions occurring after November 30, 2011, have no causal relationship to any of the injuries allegedly suffered by Plaintiffs, and therefore have no relevance to Plaintiffs' claims. Bank Audi will not produce Documents that post-date November 30, 2011.").

Plaintiffs acknowledge that the financial services Defendants provided to a menagerie of Hezbollah entities and operatives prior to November 30, 2011, are more relevant in proving their *substantial assistance* (what Defendants term the "causal relationship") than their conduct after the last attack. However, transactions facilitated on behalf of Hezbollah entities and operatives (including the maintenance of accounts) occurring after November 30, 2011 (as well as Defendants' internal communications about those customers, transactions, and accounts) are *highly relevant* to ultimately proving Defendants' culpable state of mind.

For example, Plaintiffs allege that Defendants allowed "blacklisted" accounts to migrate to their own banks after those accounts were forcibly closed at LCB due to their association with

Hezbollah. Evidence from 2012 or later relating to Defendants knowingly on-boarding Hezbollah accounts that migrated from LCB would illuminate Defendants' state of mind during the earlier period (for example, contextualizing Defendants' claims that they would never have knowingly assisted Hezbollah). Similarly, evidence of an ongoing course of illegal conduct is also evidence of that party's state of mind. See *Favors v. Cuomo*, No. 11-cv-5632 (DLI)(RR)(GEL), 2013 WL 12358269, at \*4 (E.D.N.Y. Aug. 27, 2013) (collecting cases) ("By its plain language, Rule 26 imposes no temporal limitation on discovery…. Accordingly, courts routinely hold that it is the relevance of the information contained in the requested documents -- not the timing of events in relation to their creation -- that determines discoverability.").

## CONCLUSION

For the reasons set forth above, the Court should overrule Defendants' foreign bank secrecy and scope/burden objections, grant Plaintiffs' motion, and issue an order directing Defendants to produce responsive records to Plaintiffs' RFP.


Dated: Hackensack, NJ
       May 2, 2022

                                   Respectfully submitted,

                           By:     /s/ Gary M. Osen
                                   **OSEN LLC**
                                   Gary M. Osen, Esq.
                                   Ari Ungar, Esq.
                                   Michael J. Radine, Esq.
                                   Aaron Schlanger, Esq.
                                   Dina Gielchinsky, Esq.
                                   190 Moore Street, Suite 272
                                   Hackensack, NJ 07601
                                   (201) 265-6400

**TURNER & ASSOCIATES, P.A.**
Tab Turner, Esq.
(admitted pro hac vice)
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**MOTLEY RICE, LLC**
Michael Elsner, Esq.
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
(843) 216-9000

Attorneys for Plaintiffs