# Exhibit H

Case 1:19-cv-00007-CBA-TAM   Document 270-10   Filed 05/02/22   Page 1 of 12 PageID #: 12261

# The multi-billion dollar question: Tracing Lebanon's growing offshore wealth amid financial collapse

today.lorientlejour.com/article/1298108/the-multi-billion-dollar-question-tracing-lebanons-growing-offshore-wealth-amid-financial-collapse.html

Albin Szakola                                                                                                           April 29, 2022



BEIRUT — It has been nearly 1,000 days since Lebanon's banks became zombified caricatures of functioning financial institutions. Politicians are still squabbling over capital control legislation, but the billions of US dollars in wealth already transferred abroad has been shrouded in secrecy.

On Oct. 17, 2019, the Lebanese people took to the streets in mass protests against political elites; the banks — many of them connected to the country's political oligarchs — closed, only to reopen weeks later with new restrictions on withdrawals and transfers. Ordinary depositors have received the short shrift in the absence of a uniform capital control law, which left to the discretion of banks the decision to allow rich and politically-connected clients to move their money.

"The banking restrictions are a destruction of people's plans and dreams, while on the other hand we know the bankers and their families live abroad, go to the best universities and own penthouses," said Fouad Debs, a lawyer and co-founder of the Depositors Union, an

advocacy group representing the interests of Lebanese depositors.

"A few [Lebanese elites] are living la vida loca abroad while the rest of the population drowns," he added.

But the scale of the wealth that fled abroad has not been fully quantified.

Authorities probing possibly illegal transfers abroad by Lebanese elites have only released the results of an initial Banking Control Commission of Lebanon (BCCL) survey. In February 2020 they said that $2.276 billion worth of deposits moved from Lebanese banks to Switzerland between Oct. 17, 2019 and the end of that year.

The results of another, broader survey by the BCCL on transfers offshore to all countries from July 1, 2019 and early 2020 has been hidden from public view. A board member of BCCL said he could not comment on this "sensitive" issue, and referred *L'Orient Today* to the Special Investigation Commission (SIC), a quasi-judicial financial intelligence unit chaired by central bank governor Riad Salameh, which did not respond to a request for comment.

In a bid to circumvent this secrecy and give a picture of how much wealth left Lebanon for foreign shores amid the financial crisis, *L'Orient Today* crunched numbers from the Bank for International Settlements (BIS) and Swiss National Bank (SNB), and spoke with academics investigating offshore financial flows as well as with Lebanese and Swiss bankers, lawyers and former officials.

While the BIS' numbers do not necessarily show how much was directly transferred out of Lebanon, *L'Orient Today*'s tabulations reveal a remarkable increase of deposits held by residents of Lebanon in offshore havens since 2019, with a historically-high spike in these deposits occurring during the tumultuous final three months of that year.



According to *L'Orient Today*'s analysis, between Switzerland, Luxembourg and the British Crown Dependencies — in banks serving as gateways to a world of multi-trillion dollar offshore wealth — deposits belonging to individuals and companies based in Lebanon have grown by $3.5 billion since the summer of 2019.

These offshore deposits, mostly held by individuals, totaled $10.8 billion as of Oct. 1, 2021.

In Switzerland, deposits held by Lebanon-based individuals and companies started rocketing upward in 2019. In March of that year, these assets stood at $5.9 billion, rising to over $9.6 billion in the fall of 2021, with a $1.2 billion spike in the three crucial months of October, November and December 2019.



The data includes fiduciary accounts managed by Swiss banks on behalf of clients in Lebanon. At the time when the results of the initial BCCL survey on transfers abroad were released, Lebanese central bank Governor Riad Salameh made the dubious claim that 60 percent of these transfers, repayments of fiduciary deposits to Swiss-based banks, were not worth investigating.

However, multiple bankers interviewed for this piece told *L'Orient Today* the beneficiaries of the fiduciary deposits repaid by Lebanese banks were largely ultra-wealthy Lebanese with accounts abroad, the very people likely to benefit from abuses of the financial system.

Beyond just these offshore havens, deposits held by Lebanon-based individuals at banks in all 31 countries reporting to the BIS rose from $7.6 billion March 2019 to $12.1 billion at the end of September 2021, with the largest spike coming at the end of 2019.

The total amount of offshore deposits of wealthy Lebanese is almost certainly higher than this already vast sum, as BIS data does not account for common schemes of the offshore world, such as the use of foreign shell companies to obscure holdings.

**Judicial probe without result**

In the absence of capital controls, banks were arguably violating laws by paradoxically both restricting and facilitating withdrawals and transfers. General restrictions, mostly felt by ordinary depositors, have been increasingly challenged in courts. Meanwhile, transfers abroad allegedly benefitting the influential have come under investigation, with no results so far.

"This is completely illegal. You cannot distinguish between depositors, you cannot place restrictions on deposits, except in the cases of criminal activity," said Debs, in reference to banks' restrictions on ordinary depositors.

At the end of 2019, Lebanon's top prosecutor, Ghassan Oueidat, launched an investigation into whether Lebanese political elites had conducted any recent transfers at the time out of the country that would constitute criminal activity. The Public Prosecution requested help from the SIC, and BDL's Banking Control Commission.

Salameh explained the scope of the probe in January 2020, saying that a "serious investigation" was underway into whether politically-connected persons "used their influence to pressure the banks into conducting" transfers abroad on their behalf, among other possible violations.

Karim Daher, a lawyer and president of the Lebanese Association for Taxpayers' Rights, said that such abuses of position by well-connected political figures would constitute a breach of Lebanon's 2015 anti-money laundering law, among other legislation.

Salameh, in his role as head of the SIC, repeatedly rebuffed the Public Prosecution's queries for information into transfers abroad, citing banking secrecy and deferring to internal reviews by the banks themselves, according to publicly available correspondence between the two reviewed by *L'Orient Today*.

Parallel to the local probe, Lebanon's Public Prosecution sent a request for mutual legal assistance to Switzerland at the end of 2019, citing retired economist Marwan Iskander's testimony to the prosecution, in which he said he had heard that politically-linked individuals transferred $2 billion to Switzerland after Oct. 17, 2019.

Switzerland, in February 2020, responded that it could not fulfill the request, as it was incomplete and should include more detailed data on facts, names and alleged wrongdoing, then-Justice Minister Marie-Claude Najm said.

During her time in office, which lasted until September 2021, the Public Prosecution did not send a new detailed request to Switzerland because BDL and the SIC did not provide the office with more detailed information, citing banking secrecy, Najm added.

*L'Orient Today* was unable to reach Oueidat, while a judge assigned to the investigation declined to comment due to its ongoing nature.

"As I was told, Switzerland offered cooperation several times if Lebanon would seriously ask for it, [but] there was nothing coming at all," said Fabian Molina, a Swiss MP trying to get to the bottom of dubious transfers from Lebanon.

The MP did not spare criticism of the Swiss financial system's role in accepting questionable wealth flooding in from the developing world, including from Lebanon. "Switzerland is one of the leading financial platforms to hide money from doubtful and shady sources," he said.

While Lebanon's probe into transfers abroad has faltered, European nations' investigations into alleged embezzlement by Salameh have gained steam. Even the US, which had previously backed Salameh publicly as a close and trusted partner, has reportedly begun to sour on the central bank chief, albeit with political conditions.

A US Treasury Department delegation to Lebanon last month "raised concerns about abuses within the banking system by members of the political and economic elite," while demanding "serious efforts to investigate those abuses, particularly by the Banque du Liban and the Special Investigation Commission."

Salameh had already promised in early 2020 that "we will get to the bottom" of such abuses. They never did.

**See no evil, hear no evil**

As authorities kicked off an investigation into transfers abroad, Salameh dismissed the relevance of probing a large chunk of the capital flight, fiduciary accounts, one of the cogs of offshore finance that experts say were used by wealthy Lebanese with accounts abroad to deposit money at banks in Lebanon.

In a Jan. 30, 2020, interview with France24, Salameh confirmed that the investigation into transfers abroad was looking into the "$1 billion that came out of resident accounts," adding that "we want to see who those people were," in reference to potentially politically- linked individuals moving wealth abroad.

As for the remaining transfers, the central bank chief brushed them aside, saying that "$1.6 billion were in fiduciary accounts from foreign banks, so the money had come from abroad originally." Salameh focused on the immediate owners of these fiduciary accounts, while skipping the key issue of their true owners.

"Fiduciary deposits were, by and large, deposits from ultra-high net worth Lebanese using an international bank as an intermediary," according to Adel Afiouni, a former senior investment banker and minister of state under Saad Hariri's government from January 2019 until January 2020 .

Fiduciary accounts are a mechanism by which a bank invests deposits on behalf of a client at another bank in a different jurisdiction. For example, Lebanese clients with bank accounts in Switzerland could have instructed their Swiss banks to deposit a portion of their assets in Lebanon, where banks offered more lucrative interest rates.

In this example, while the Lebanese clients would be the beneficial owners of these accounts, the deposits themselves would be claimed by the intermediary Swiss bank. The clients' names, possibly including those of politicians, would thus not be known to Lebanese banks, Daher said.

A Swiss banker with experience advising ultra-high net worth individuals told *L'Orient Today* on condition of anonymity that wealthy Lebanese perceived Swiss banks as more secure and confidential than ones in Lebanon.

"People talk in Lebanon, even with banking secrecy," the source said, adding that the wealthy individuals using Swiss banks and fiduciary accounts "don't want people to know about their wealth."

Jean Riachi, CEO of FFA Private Bank, said that it "is obvious the vast majority of those [fiduciary account] clients are Lebanese."

Days after Salameh's January 2020 interview, the BBCL issued the results of its first survey, noting that $1.36 billion in fiduciary deposits were transferred from Lebanon to Switzerland between Oct. 17, 2019 and the end of 2020. The judiciary has not asked the SIC for any data specific to fiduciary deposits, according to publicly available letters reviewed by *L'Orient Today*, while banking leaders defended paying them back.

**Did fiduciary deposits need to be paid back?**

While there has been little public accounting of the amount of fiduciary deposits that were paid back in the wake of the crisis, the head of Lebanon's banking lobby, Bank of Beirut Chairman Salim Sfeir, said the figure stood at $2.5 billion as of mid-2020 . SNB data reviewed by *L'Orient Today* shows that a lower number, just under $1.5 billion, was paid back to Swiss banks between 2019 and 2020.

"We paid our debts to foreign banks so that there would be no default [by Lebanese banks]," Sfeir told Lebanese newspaper Nida al-Watan on July 31, 2020, adding that among these debts were the fiduciary deposits paid to banks outside Lebanon . ABL declined to comment specifically on the issue of fiduciary deposits to *L'Orient Today.*

Sfeir's argument doesn't hold water for Afiouni or Riachi.

"The absence of a capital control law and the argument that we can delay payment to a Lebanese citizen and not delay payment to an international bank acting for an ultra-high net-worth Lebanese who assumed the risk of the fiduciary deposit is an unfair and questionable practice," Afiouni said.

For Riachi, who ran an unsuccessful campaign to replace Sfeir as head of the ABL, there was an "original sin" in pretending Lebanese banks were not bankrupt, which allowed for the prioritizing of foreign claimants over local depositors.

"Banks should have defaulted at the time, authorities should have acknowledged the default and worked to repay everyone according to a new restructuring law," he said, citing the example of Iceland's restructuring wherein the state took over failed banks, froze accounts and repaid domestic depositors ahead of foreign ones.

"If you are a big global bank, and want money from a Lebanese bank, it is not a big deal for them. They took the risk. The fiduciary depositors knew there were risks, otherwise they would have directed the fiduciary banks to deposit [in another country] at lower interest," Riachi added.

It is not clear from BCCL's survey results which Swiss banks were repaid fiduciary deposits placed in Lebanon, but the structure of its questionnaire accounted for the possibility of transfers to Swiss banks owned by Lebanese ones.

"It would be harder to justify such transfers if they [Lebanese banks] were transferring to a subsidiary," Daher argued, referring to ABL's insistence that foreign banks needed to be paid back.

Financial statements of Lebanese-owned banks in Switzerland reviewed by *L'Orient Today* hint at the possibility that they were paid back fiduciary deposits from Lebanon after the start of the financial crisis.

Between 2018 and the end of 2019, BankMed Suisse, Banque Audi Suisse and Banque Banorient Suisse's (formerly known as BLOM Switzerland) combined fiduciary investments deposited at "affiliated banks" nearly halved, from $1.575 billion to $791 million.

To put it another way, this shows that the banks were recouping deposits placed either at their Lebanese parent bank or a fellow subsidiary abroad. *L'Orient Today* could not determine from the disclosures how much of the Swiss subsidiaries' fiduciary investments

were placed in Lebanon, either with their parent bank or another Lebanese one. BankMed and Bank Audi declined to comment, while BLOM Bank did not respond to requests for comment.

Banque Audi Suisse's 2020 annual report acknowledges that some of its fiduciary investments had been placed with its Lebanese parent, noting that at the end of that year, $386 million were still with Bank Audi in Beirut.

*L'Orient Today* reviewed all available financial statements of Lebanese banks for references to fiduciary deposits made by foreign banks. Only a handful of banks offered this information, including Bank of Beirut, owned by Sfeir, who defended paying back these deposits.

His bank's disclosures indicate it paid back nearly all of the fiduciary deposits placed by foreign banks, with these deposits plummeting from $339 million in 2018 to $20 million at the end of the following year.

The Swiss banking source said Lebanese banks and their Swiss subsidiaries were main players marketing fiduciary deposits in Lebanon, adding that increased regulations in Switzerland would have hindered bankers at prominent Swiss-based financial institutions from promoting such risky investments.

The Public Prosecution's latest available query to the SIC, sent in June 2021, cited Swiss National Bank data on Lebanon residents' holdings at banks in the Alpine nation, but did not refer to available data on fiduciary deposits. With the prosecutions' use of statistics being biased at best: *L'Orient Today* delved into SNB and other datasets, consulting their curators for better understanding, in a bid to peer through the secrecy on Lebanon's growing offshore deposits.

**Lebanon's hidden offshore wealth?**

Recent studies probing capital flight in countries around the world ahead of IMF bailouts, elite capture of foreign aid and the diversion of petroleum revenues into hidden wealth offshore have all used banking statistics from the Bank for International Settlements (BIS), an institution servicing central banks worldwide.

Key to these studies and any attempt to dig into Lebanon's offshore wealth, the BIS provides data on the value of deposits held by "non-bank residents" based in one country at the banks of another — including households and companies.

"What these statistics tell you is the deposits owned by a resident of 'Country X,' but that doesn't mean the deposit came from 'Country X,'" said economist Matthew Collin, who authored a report on the limitations of BIS data .

Academics using SNB and BIS datasets acknowledge their limitations. One of the main pitfalls is that the data is based on immediate ownership of accounts, and not their true beneficiaries, which almost certainly leads to an undercount of Lebanon's offshore wealth.

For example, a wealthy Lebanese national could open a company in the British Virgin Islands (BVI) and then deposit funds at a Swiss bank, which under BIS would be registered as funds held by a non-bank resident of the BVI, and not Lebanon.

Leaked information curated by the International Consortium of Investigative Journalists (ICIJ) reveals over 1,500 offshore front firms in the BVI, Panama and beyond linked to Lebanon. The Pandora Papers leaks from October 2021 uncovered offshore firms owned by Prime Minister Najib Mikati, his predecessor Hassan Diab and Riad Salameh, among others.

"It's an old trick," said Jakob Miethe — a professor at Ludwig Maximilian University of Munich of Munich who co-authored a study on tax havens using BIS data — about the use of shell companies, adding that while increased financial regulations and compliance might make the method less appealing, academics "still see very large investments between havens, which shows shell companies are being used a lot."

Also, BIS data is based on residency, and not nationality, of account holders, with schemes such as "golden visas" — citizenship and residency by investment — allowing wealthy elites of one country to claim residency in another.

As Miethe explained, a wealthy Lebanese national could "try not to be a Lebanese investor by obtaining tax residence in a different country, a golden visa or another visa." Such individuals could get passports or residencies from Malta, Cyprus or a Caribbean nation, for example, and within the BIS data they would be counted as residents of those countries, he said.

"Even better yet is to get a passport in the place of your bank accounts," the academic said, adding that such holdings would not appear at all in the BIS statistics, which only capture cross-border financial positions.

These limitations are potentially reflected in ICIJ's "Swiss Leaks," a cache of bank account data from HSBC's Swiss branch. As of 2007, just shy of 3,000 Lebanon-related clients held approximately $4.8 billion at HSBC Suisse alone. The HSBC data "sees through" immediate ownership, with account information on beneficial owners. For the same year, BIS data says that Lebanon-based companies and individuals held $7.6 billion in all of Switzerland's banks.

Overshadowing these figures is a potentially far greater one: the stocks of wealth beyond deposits held offshore by Lebanese. In his 2015 book The Hidden Wealth of Nations, economist Gabriel Zucman estimated $7.6 trillion in worldwide offshore wealth, $1.5 trillion of which is held in deposits, while the rest is "invested in stocks, bonds, and mutual funds."

"Wealthy individuals do not use tax havens to let their money sleep in low-yield bank accounts; for the most part, they make financial investments," the economist wrote.

Collin noted that BIS statistics do not tabulate all these financial securities or other instruments, such as real estate and artwork, among others.

While wealthy Lebanese based abroad normally keep a diversified portfolio, including stocks and other instruments, their counterparts in Lebanon were more predisposed to put all their eggs in the basket of the high-interest rates offered by the local banks, according to the Swiss banking source.

"They thought wrongly that their personal connections to owners and executives of Lebanon's banks would give them advanced notice of the 2019 collapse," the source added.

The data presented here gives an idea of the amount of funds that fled Lebanon in the crisis. But the unanswered question remains today, who did benefit from such personal connections to move their money out of Lebanon?