UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
ROBERT BARTLETT *et al.*,                          :
                                                   :
          Plaintiffs,          :    **Case No. 19-cv-7 (CBA)(TAM)**
                                                   :
-against-                                          :
                                                   :
SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN                :
SAL *et al.*,                                      :
                                                   :
          Defendants.          :
------------------------------------------------------------------- x

## <u>EXPERT DECLARATION OF MARSHALL BILLINGSLEA</u>

I, Marshall Billingslea, declare under penalty of perjury that the foregoing is true and correct. The statements included in this Declaration are based on my own personal knowledge.

## I.    Scope of Opinion

1.    I have been asked by Plaintiffs' counsel to render my opinion on certain specific issues in this case. My expert opinion has been sought to assess the relative importance of the U.S. Government's interest in exposing terrorist financing, tracing terrorist assets, and obtaining financial records from other countries pertaining to terrorism and terrorist financing. I have also been asked to summarize international conventions, standards, and norms governing the obligations of states and financial institutions with respect to anti-money laundering ("AML") and combating the financing of terrorism ("CFT"); how international conventions, standards, and norms view assertions of bank secrecy in cases involving AML and CFT in connection with requests from foreign courts and legal authorities; and the approach of U.S. policymakers regarding the interpretation of such conventions, standards and norms. The narrative below is submitted to assist the Court as it considers the question of the degree of deference that a U.S. court should pay to the foreign bank secrecy laws of Lebanon.

## II.    Summary of my Conclusions

2.    Based on my experience in the area of U.S. and international conventions, standards and norms pertaining to legal assistance, AML and CFT, including my service in the U.S. Department of the Treasury ("Treasury") during which time I participated in the development and negotiation of international instruments in these and related areas, and my additional experience as outlined in detail below in the full text of this Declaration, I express the following opinions:

### A.    Terrorism is a major national security threat to the United States.

3.    When I served in the Treasury and, to the best of my knowledge, to this day, the U.S. Government has ranked terrorism as a top tier threat to our nation, and thus a primary, core focus for the U.S. intelligence and law enforcement communities, and our military, diplomatic, and national security establishment. The U.S. Government's interest in countering terrorism is central to its mission to provide for the common defense, as set forth in the preamble to the Constitution. Terrorism, and the means by which it is effectuated, including terrorist financing, is regarded by the Government of the United States as one of the central public security issues facing this country and the world. It has long been the policy of the United States to disrupt terrorist networks by targeting their financial apparatus, and to oppose all efforts to shield terrorists, their supporters, and anyone engaged in the facilitation of terrorism.

### B.    U.S. policy is to secure financial information relating to terrorism, and to require foreign countries to release such information even if it would otherwise be protected by bank secrecy.

4.    As the Assistant Secretary of the Treasury for Terrorist Financing and Financial Crimes, I both witnessed and participated in the systematic development by the United States of a policy to push back against foreign bank secrecy laws to enable the U.S. to obtain information pertaining to financial crimes involving terrorism, drug trafficking, fraud, and tax evasion. This concerted policy of the U.S. Government was expressly stated in the International Crime Strategy

issued in 1998, and reaffirmed by subsequent administrations on numerous occasions. This principle has been enacted into law by Congress in AML legislation, including within the USA-PATRIOT Act ("PATRIOT Act"), passed after the September 11, 2001, terrorist attacks, which required foreign banks to agree to provide bank records to the U.S. Government as a condition of doing business in the United States. The PATRIOT Act also granted authority to the U.S. Government to seize illicit assets through inter-bank accounts when foreign bank secrecy laws have prevented robust law enforcement cooperation. The PATRIOT Act further affords a powerful mechanism to the Treasury, under Section 311, to compel foreign jurisdictions and foreign financial institutions to cooperate with U.S. AML efforts or risk having their correspondent or payable-through bank accounts suspended with all U.S. financial institutions – a measure which, in practice, generally results in insolvency and liquidation of the foreign financial institution.

5.      The long-term U.S. policy of opposing the use of foreign bank secrecy laws to shield illicit activity has been implemented in international conventions and other mechanisms supported by the U.S. to ensure that financial records pertaining to financial crime, including terrorist financing, are not protected by bank secrecy and are available to courts, wherever located. In addition to the U.S., most countries around the world, including Lebanon, have become party to one or more of these conventions, and thus have agreed to waive bank secrecy in cases covered by the conventions. The U.S. has also undertaken separate international efforts to encourage countries to change their domestic laws so that they may waive bank secrecy in such cases, in order to avoid sanctions being brought against them by the U.S. and other like-minded states. During my tenure, the Treasury focused heavily on Lebanon as a priority country that should be forced to change its laws regarding bank secrecy. In response to pressure from the U.S. and like-minded states, Lebanon has gradually modified its bank secrecy laws to permit a greater degree of disclosure in cases involving financial crimes.

**C.      Disclosure of terrorist financing information across national borders is in the public interest.**

6.      Financial transactions that facilitate international terrorism often involve cross-border transfers. The sources of funding for terrorist organizations are frequently located in jurisdictions geographically distant from the organization's main region(s) of operation. Accordingly, the records of financial transactions implicating terrorism financing are also commonly located in more than one country. In my opinion, the ability of the U.S. to combat terrorism would be substantially impaired without the ability of our courts to ensure that documents regarding financial transactions linked to terrorism are not shielded by foreign bank secrecy laws.

**D.      All United Nations (UN) Member States have an obligation to identify and to freeze terrorist funds since the adoption of UN Security Council Resolution 1373 (and more recently Resolution 2462) and to help other Member States trace such funds, and to make evidence available for proceedings relating to such funds.**

7.      In the aftermath of the 9/11 terrorist attacks on the United States, the UN Security Council adopted UNSCR 1373, which obligates all Member States to deny safe haven to those who finance, plan, support, or commit terrorist acts; to prevent those who finance, plan, facilitate

2

or commit terrorist acts from using their territories for those purposes against other States or their citizens; to ensure that any person who participates in the financing, planning, preparation or perpetration of terrorist acts or in supporting terrorist acts is brought to justice; and to afford other countries the greatest measure of assistance in connection with criminal investigations or criminal proceedings relating to the financing or support of terrorist acts, including assistance in obtaining evidence in their possession necessary for the proceedings.

8.    The UN's Counter-Terrorism Committee monitors implementation of UNSCR 1373 and reports to the Security Council. While the CTC has generally found Lebanon to be compliant with UNSCR 1373, it is noteworthy that in 2004 the Chair of the CTC issued a report documenting the many challenges faced by the CTC in monitoring implementation, stating that the process does "not provide either the CTC, the Security Council or the United Nations with a clear picture of the States' real situation or efforts in their implementation of resolution 1373." The Chair further noted that "the main source of information for the CTC are the reports sent by member States answering to the CTC's previous letters to them." Because Lebanon has refused to include Hezbollah in its definition of terrorism, and because the UN remains heavily dependent upon self-reporting by countries such as Lebanon, during my tenure at the Treasury Department, we did not view UN pronouncements on compliance with UNSCR 1373 and other resolutions as definitive.[1]

9.    During my tenure as both Assistant Secretary of the Treasury and as President of the Financial Action Task Force ("FATF"),[2] the U.S. Government worked with the Government of France and other UN Security Council members to enact UNSCR 2462. We adopted 2462 noting concerns with the implementation of UNSCR 1373 and made the obligations of Member States concerning terrorism financing even more explicit, requiring all Member States to ensure that their laws and regulations make it possible to prosecute and penalize, as serious criminal offenses, the financing, planning, preparation, perpetration, or supporting of terrorist acts. UNSCR 2462 also reaffirmed "that all States shall afford one another the greatest measure of assistance in connection with criminal investigations or criminal proceedings relating to the financing or support of terrorist acts."

**E.    The U.S. Government has long had a strategy of using multiple mechanisms to combat terrorism and terrorist financing, which include not only government-to-government law enforcement and regulatory activities, but also public information campaigns to expose those persons and entities linked to terrorist activity, support for private sector anti-terrorist activities, and support for civil litigation against terrorists. The Anti-Terrorism Act is a critical element of this strategy.**

---

[1]    Report by the Chair of the Counter-Terrorism Committee on the problems encountered in the implementation of Security Council Resolution 1373 (2001), UN document: S/2004/70, *available at* https://www.un.org/en/ga/search/view_doc.asp?symbol=S/2004/70.

[2]    The FATF is an inter-governmental organization that sets global AML & CFT standards. The FATF has 39 members. The overwhelming majority of the nations that are not FATF members participate in "FATF-style regional bodies" and commit to effective implementation of FATF standards. Lebanon, for instance, is a member of the Middle East & North Africa Financial Action Task Force ("MENAFATF").

10.     The U.S. Government's support for civil litigation to combat terrorism and terrorist financing was expressed legislated through the enactment by Congress of the Anti-Terrorist Act ("ATA"), which was enacted with the express purpose of providing "a new civil legal cause of action for American victims of terrorism."[3] The ATA was enacted to "facilitate civil actions against [foreign] terrorists" through "the extension of civil jurisdiction to accommodate the reach of international terrorism - i.e., American civil law would be granted the same extra-territorial reach as American criminal law."[4] In so stating, Congress explicitly expressed its intention that the ATA be interpreted to provide for the same jurisdictional reach for private litigants overseas as would be available to the U.S. Government in a criminal context.

11.     Another important example of how the U.S. Government seeks to acquire detailed information in order to disrupt terrorist financial networks, regardless of whether that information is viewed as covered by foreign bank secrecy laws, is the Rewards for Justice ("RFJ") program, administered by the Department of State. During my time at the Treasury, I jointly announced with the Assistant Secretary of State for Diplomatic Security and the State Department's Counter-Terrorism Coordinator a program offering "a reward of up to $10 million for information leading to the disruption of the financial mechanisms of Hizballah."[5] As part of that announcement, we provided details on a number of Lebanese individuals who are Hezbollah financiers, including their dates and places of birth, citizenship, and national identification numbers. The State Department RFJ program provides multiple ways for foreign nationals to supply terrorist financing-related information to the U.S. Government confidentially, in exchange for financial compensation.

**F.      The U.S. Government has the legal right to obtain foreign bank records pertaining to terrorism financing, even when they are covered by foreign bank secrecy laws, under the UN International Convention for the Suppression of the Financing of Terrorism.**

12.     The U.S. Government is a party to bilateral and multilateral agreements that enable it to obtain foreign bank records from other countries in cases involving terrorism. These include the UN International Convention for the Suppression of the Financing of Terrorism ("Terrorist Finance Convention"), which requires all signatories to provide assistance to one another regarding criminal investigations involving terrorism or terrorist financing, including assistance in obtaining evidence in their possession necessary for the proceedings. Under Article 12 of the Terrorist Finance Convention, ratifying nations expressly agree not to refuse a request for mutual legal assistance on the grounds of bank secrecy.[6] The U.S. became a party to these obligations by ratifying the Convention effective June 26, 2002. As a party to the Terrorist Finance Convention, the U.S. has the right to obtain foreign bank records pertaining to terrorist cases, even when they are covered by foreign bank secrecy laws, from any country that has ratified the convention. In 2019, Lebanon acceded to the Terrorist Finance Convention. However, it submitted a reservation concerning the definition of terrorism to endorse the definition from the Arab Convention for the

---

[3]     18 U.S.C. §2331, added by Pub. L. 102-572, Title X, §1003(a)(3) (October 29, 1992), purposes specified in H.R. Rep. No. 102-1040 (1992) at 5.

[4]     *Id.* at 5.

[5]     https://rewardsforjustice.net/rewards/disruption-of-hizballah-financial-mechanisms/.

[6]     UN Document Number: AIRES/54/109, 25 February 2000.

Suppression of Terrorism of 1984, which excludes any acts taken against what is characterized as "foreign occupation."

13.     When it comes to combating the financing of terrorism, the United States and the other 38 members of the FATF – the global standard setting body for AML and CFT – explicitly reject any country's use of "foreign occupation" as a justification for not sharing financial information, including that covered by bank secrecy laws. As an example, during my tenure as FATF President, the body reimposed counter-measures on Iran for its deficiencies in AML and CFT, and warned that before Iran could be removed from the FATF "Blacklist," "Iran should fully address… adequately criminalizing terrorist financing, including by removing the exemption for designated groups 'attempting to end foreign occupation, colonialism and racism.'"[7] FATF standards for criminalization of terrorist financing, contained in FATF Recommendation 5, do not allow for such an exemption or exclusion. Lebanon, as a member of MENAFATF, is subject to these standards.

**G.     The U.S. Government has the legal right to obtain foreign bank records pertaining to terrorism financing, even when they are covered by foreign bank secrecy laws, under the UN Convention Against Transnational Organized Crime.**

14.     The U.S. is a party to the UN Convention Against Transnational Organized Crime ("Transnational Organized Crime Convention"), which requires all signatories to provide assistance to one another regarding criminal investigations involving any form of serious crime, defined as a crime punishable by four years or more of imprisonment. Under Article 18(8) of the Transnational Organized Crime Convention, ratifying nations expressly agree not to refuse a request for mutual legal assistance on the ground of bank secrecy. The U.S. became a party to these obligations by ratifying the Convention effective November 3, 2005. As a party, the U.S. has the right to obtain foreign bank records pertaining to organized crime cases (which include terrorism cases), even when they are covered by foreign bank secrecy laws, from any country that has ratified the convention.

**H.     In ratifying the Transnational Organized Crime Convention, Lebanon has agreed to waive bank secrecy in criminal cases, including those involving terrorist financing.**

15.     Lebanon is a party to the Transnational Organized Crime Convention and is therefore bound by the Convention's obligation to waive bank secrecy in serious criminal cases (including terrorism cases) brought by foreign governments by ratifying the Transnational Organized Crime Convention effective October 5, 2005.

**I.     Lebanon has the authority to lift bank secrecy in cases involving terrorist financing.**

16.     In 2003, Lebanon enacted Law 547, expanding Article One of Law 318, making it illegal to hold or transfer funds that finance or contribute to the financing of terrorism or terrorist

---

[7]     https://www.fatf-gafi.org/publications/high-risk-and-other-monitored-jurisdictions/documents/call-for-action-february-2020.html.

5

acts or organizations. Lebanese regulators have published statistics showing that bank secrecy was lifted 48 times in 2017, of which 6 were in response to foreign requests, 30 times in 2018, of which 6 were in response to foreign requests, 55 times in 2019, of which 7 were in response to foreign requests, and 29 times in 2020, of which 3 were in response to foreign requests.[8]

17.     On multiple occasions, as Assistant Secretary of the Treasury, I furnished to the Central Bank of Lebanon detailed information regarding entities, individuals, accounts and/or transactions that the U.S. Government identified as associated with terrorist groups or with state sponsors of terrorism, and requested additional details be furnished in return (or action be taken). In most cases, the Central Bank provided information in response to our requests.

## III.    Experience and Qualifications

18.     I am a retired senior U.S. Government official with experience across the Departments of Defense, State, and the Treasury, and in NATO.

19.     I began my career in 1995 serving as the Senior Professional Staff Member for National Security Affairs on the Senate Foreign Relations Committee. I was the senior advisor to the Chairman and members of the Committee on all proliferation, arms control, defense, intelligence, and counterterrorism issues within the Committee's purview. This included working closely with the State Department's Counter-Terrorism Coordinator, and the Bureaus of Intelligence and Research and Diplomatic Security – the three elements of the Department of State most heavily involved in counter-terrorism efforts.

20.     In 2001, I was appointed as the Deputy Assistant Secretary of Defense for Negotiations Policy, acting as the U.S. Secretary of Defense's chief negotiator for all major international agreements. I was the principal Department of Defense representative on numerous U.S. arms control delegations, and the U.S. Head of Delegation for Transparency and Verification negotiations with the Russian Federation in connection with the Moscow Treaty on Strategic Nuclear Reductions.

21.     In 2002, I was appointed as the Principal Deputy Assistant Secretary of Defense for Special Operations/Low-Intensity Conflict in the wake of the 9/11 terrorist attacks. In that capacity, I acted as the principal civilian advisor to the U.S. Secretary of Defense on Special Operations Forces and counter-terrorism efforts against al-Qaeda and other terrorist groups. I also served as Co-Chairman of the Board of Directors for U.S. Special Operations Command. In that capacity, I established the Department of Defense's first counter-terrorist finance cell, focused on identifying, tracking, and disrupting terrorist financiers. I also oversaw a significant expansion of U.S. Special Operations Command's capacity to conduct worldwide operations against al-Qaeda and other terrorist groups and co-authored the first global counter-al-Qaeda Execute Order ("EXORD").

22.     From 2003-2007, I served at NATO, as Assistant Secretary General for Defense Investment. While there, I established the "Defense Against Terrorism Program of Work" which brought together the militaries and Defense Ministries of all alliance members to collaborate on

---

[8]     Lebanon's Special Investigation Commission: Fighting Money Laundering, website, http://sic.gov.lb/downloads/English.pdf.

new technologies to combat terrorism. I also led the initiative which resulted in creation of NATO's first Special Operations Headquarters. As the Assistant Secretary General, I was the senior U.S. civilian within the Alliance structure, responsible for the Alliance's armaments cooperation policies and programs, its military common funding, and the NATO standards-setting processes for military equipment. I also served as Chairman of NATO's Conference of National Armaments Directors and as Chairman of the Board of Directors for NATO's Consultation, Command, and Control Organization.

23.     Following my time overseas, I returned to Washington, D.C. to serve in the Navy Department as Deputy Under Secretary of the Navy. In that capacity I oversaw the process of long-range budget development for both the United States Navy and the Marine Corps and served as the Department's "number two" in processes run by the Deputy Secretary of Defense. I also oversaw Navy and Marine Corps clandestine programs and activities.

24.     I then spent more than eight years in the private sector as a Managing Director with Deloitte Financial Advisory Services, running its Federal Business Intelligence Services ("BIS") group, where I provided due diligence services for a wide range of clients, including multiple U.S. intelligence agencies and the Department of Defense. I also served a number of Fortune 500 companies. I specialized in investigating beneficial ownership structures and advising businesses on the legal and regulatory risks associated with third party transactions. Under my leadership, BIS became one of the most profitable service lines within Deloitte's Federal practice.

25.     Because of my deep experience within the Department of Defense, I also served as external advisor to the Boards and CEOs of multiple Aerospace and Defense Companies, and as an independent Committee on Foreign Investment in the United States ("CFIUS") monitor for several companies. In the role of monitor, I provided advice to companies that had been acquired by foreign entities on how to comply with the mitigation agreements to which they had committed with the U.S. Government as a condition for approval of the sale. I also was obligated to communicate to the U.S. Department of the Treasury any significant breaches or violations of those agreements.

26.     In April 2017, I was nominated by President Trump to become the Assistant Secretary for Terrorist Financing and Financial Crimes at the U.S. Department of Treasury and was confirmed by the U.S. Senate into that position. This position was created by Congress after 9/11; it is established by law as the senior official "responsible for formulating and coordinating the counter terrorist financing and anti-money laundering efforts of the Department of the Treasury…"

27.     In that role, I built international coalitions and led U.S. efforts to counter illicit financial activities around the globe. I also strengthened U.S. domestic AML capabilities and reorganized the Office of Terrorist Financing and Financial Crimes to employ cutting edge data analytics against threat networks. In 2018, I was selected unanimously by the 37 member countries of the Financial Action Task Force — the global AML and CFT body — to serve as the President of that prestigious organization.

28.     On my initiative, nations adopted the first ever set of AML standards for crypto-currencies and virtual assets.

29.     As Assistant Secretary, I also co-chaired the global Counter-ISIS Finance Group ("CIFG"). On my watch, the CIFG expanded in global membership, and became a venue for sharing operational leads and vignettes between nations to assist one another in identifying the mechanisms by which ISIS financiers operated, particularly through Money Service Businesses.

30.     On April 10, 2020, I was appointed by President Trump as the Special Presidential Envoy for Arms Control. I led arms control talks on behalf of the U.S. Government with the Russian Federation and the People's Republic of China and worked with friends and allies in Europe and Asia on the development and deployment of defensive capabilities.

31.     I hold a Bachelor of Arts from Dartmouth College and a Master of Arts in Law and Diplomacy from Tufts University. I have been decorated with the Cross of Terra Mariana by the President of Estonia; the Knight's Cross by the President of Poland; and the Cross of the Order of Merit of the Czech Republic. I have been awarded the Defense Medal for Distinguished Public Service by the U.S. Secretary of Defense and decorated by the U.S. Secretary of the Navy with the Distinguished Public Service medal. For my work at the Treasury, I received the Treasury Medal.

32.     Now in the private sector, I run my own firm, providing risk and advisory services to a diverse set of clients, and am a Senior Fellow with the Hudson Institute. I was appointed this year as a commissioner on the bipartisan Congressional Commission on the Strategic Posture of the United States, which is tasked with reviewing the U.S. strategic posture and nuclear weapons policy and assessing threats facing the country.

## IV.    Preparation For This Declaration

33.     Prior to April 2022, I had not read any document created for this litigation and filed with this Court, nor have I been involved in the representation of any party to this litigation. To prepare this Declaration, I have reviewed:

- Plaintiffs' Second Amended Complaint; and
- Plaintiffs' First Request for the Production of Documents.

## V.    No Position Taken in This Declaration on the Liability of Any Party

34.     I offer no opinion in this Declaration as to the contents of Plaintiffs' allegations in the Second Amended Complaint concerning specific Defendants or their potential civil liability under the Anti-Terrorism Act.[9]

## VI.    The U.S. Interest in Preventing the Financing of Terrorism

35.     Countering the financing of terrorism both through anti-money laundering and counter-terrorist financing controls has been a U.S. Government priority, particularly following the September 11, 2001, attacks on the World Trade Center and Pentagon.

---

[9]     I have not testified as an expert witness at trial or by deposition in the past four years. I am being compensated for my work in this matter at the rate of $700.00 per hour.

36.     In the International Money Laundering Abatement and Financial Anti-Terrorist Financing Act, part of the PATRIOT Act of 2001,[10] Congress declared:

> [M]oney launderers subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the financing of crime and terrorism, and, by so doing, can threaten the safety of United States citizens and undermine the integrity of the United States financial institutions.

37.     This national priority has manifested itself in many ways, some of which I have mentioned above. Additionally, the U.S. Government prioritizes obtaining financial information related to financial crimes and terrorism both through overt collection, covert and clandestine intelligence gathering, and via the bilateral and multi-lateral exchange of information with foreign governments.

38.     In furtherance of this objective, the U.S. Government has also led an effort to formulate and promulgate global AML and CFT standards through the Financial Action Task Force. Among the most relevant of the FATF standards (called "recommendations") for this particular matter are the aforementioned "Recommendation 5" on criminalization of terrorist financing, "Recommendations 36-40," which pertain to international cooperation, and "Recommendation 29," which requires the establishment of national Financial Intelligence Units ("FIUs"), which for the U.S. is the Treasury's Financial Crimes Enforcement Network ("FinCEN"). Financial institutions around the globe have mirrored this practice. Indeed, a key element of this global effort has been to encourage both FIUs and financial institutions to share information about customers and transactions that may be linked to criminal activity, including money laundering and terrorism financing.

39.     A key aspect regarding FATF standards is that, while they are framed as "recommendations," governments around the globe hold one another to them as binding commitments. Compliance with FATF standards is measured through "Mutual Evaluations" that are conducted by teams of government officials from different countries, with the assistance of the international staff of the FATF secretariat, or the secretariat of the relevant FATF-style regional body. In essence, these are audits of a country's approach to AML and CFT, and the mutual evaluation reports are debated, agreed upon, and published as public documents. Countries that have significant deficiencies are placed into an "Enhanced Follow Up" process that requires further reporting and improvements, and countries with major problems are placed on the FATF's so-called "Grey List." Further, the FATF and its regional bodies have evolved from simply assessing whether a country has implemented (in law or regulation) all of the FATF standards to whether the country can demonstrate "effectiveness" of its AML/CFT regime. Unsurprisingly, many countries struggle to prove that they are actually implementing the laws, regulations, and procedures that they have "on paper."

40.     Because both countries and major financial institutions scrutinize the results of Mutual Evaluations, FATF actions can have real financial consequences for countries, their

---

[10]     Pub. L. No. 107-56, § 302(a)(3), 115 Stat. 296 (2001).

economies, and their banks. This is what makes the FATF a particularly useful tool for the U.S. in pursuing its counter-terrorist financing and AML objectives.

41.     While significant progress has been made over the past two decades, several key impediments remain. One is the continuing lack of development of AML/CFT infrastructure (including, legal, regulatory, and organizational) to effectively monitor financial activities in many jurisdictions. The other is domestic bank secrecy laws which both shield illicit financial activity and attract terrorist organizations and criminal actors to jurisdictions that offer this added level of opacity. As the World Bank's Reference Guide to Anti-Money Laundering and Combating the Financing of Terrorism notes:

> Laws against money laundering have emerged, in part, as a response to the obstacles that bank secrecy laws posed to supervisory and law enforcement efforts. In some jurisdictions, strong bank secrecy requirements have frequently defeated investigative efforts to obtain financial information required to detect crimes and regulatory breaches, or for tracing or confiscating assets. Such a result is contrary to the FATF recommended structure, which provides that financial institution privacy laws should not inhibit any of the FATF recommendations.[11]

42.     AML and CFT efforts have long been understood to be very much interrelated but the lines between politically motivated terrorism and financial crime have blurred even further over the past two decades as terrorist groups have increasingly pivoted to drug trafficking and other illicit activities as sources of revenue.

43.     According to the U.S. Drug Enforcement Administration ("DEA"), 19 of 49 (39%) of State Department-designated foreign terrorist organizations ("FTOs") had "confirmed links to the drug trade" as of November 2011.[12] In 2010, the Department of Justice reported that 29 of the top 63 international drug syndicates, identified as such on the consolidated priority organization target ("CPOT") list, were associated with terrorists.[13]

44.     This is especially true for Hezbollah which operates global criminal-financial networks, with hubs in Europe, Africa, and Latin America. Multiple examples abound. For instance, a 2016 DEA investigation implicated Hezbollah in a multimillion-dollar scheme involving the alleged transit of Latin American cocaine to the United States and Europe and the laundering of drug proceeds through exchanges in the Middle East and West Africa.[14] As another example, during my tenure at Treasury, we conducted a joint effort with DEA's Project Cassandra and sanctioned a Lebanese money launderer, who was moving funds both on behalf of Hezbollah and narcotics trafficking organizations such as La Oficina de Envigado. As the Treasury announcement notes: "The DEA has determined that the Chams Money Laundering Organization

---

[11]    https://documents1.worldbank.org/curated/ar/558401468134391014/pdf/350520Referenc1Money01OFFIC IAL0USE1.pdf.

[12]    Prepared testimony of U.S. Drug Enforcement Administration (DEA) Special Operations Division Special Agent in Charge Derek S. Maltz, in U.S. Congress, House Committee on Foreign Affairs, Subcommittee on Terrorism, Nonproliferation, and Trade, Narcoterrorism and the Long Reach of U.S. Law Enforcement, Part II, Serial No. 112-81, 112th Cong., 2nd sess., November 17, 2011 (Washington, D.C.: U.S. Government Printing Office, 2011).

[13]    Obama Administration, National Strategy to Combat Transnational Organized Crime, July 2011.

[14]    Congressional Research Service, Lebanese Hezbollah (Feb. 1, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF10703.

launders a large portion of drug proceeds through Lebanon, which also benefits Hizballah." We also expressed our frustration with the Central Bank of Lebanon by noting "The Chams Exchange operates under license and the supervision of the Central Bank of Lebanon (BdL) despite U.S. authorities long suspecting it of being a significant third party money laundering operation."[15]

45.     The United States plays a central role in AML and CFT efforts because much of the global economy is dependent on access to the U.S. financial system. Transactions ranging from oil sales and other raw materials to technology and industrial materials are often denominated in U.S. dollars and settled with a U.S. dollar-denominated funds transfer, even if a U.S. customer is not a party to the transaction.

46.     In addition, U.S. currency is used globally as either the primary or de facto secondary reserve currency or store of value. The U.S. dollar is by far the most commonly held reserve currency, making up at least 60% of global foreign exchange reserves.[16]

47.     In 2015, Treasury's Office of Terrorist Financing and Financial Crimes, in coordination with FinCEN, the Office of Foreign Assets Control ("OFAC"), the IRS, DOJ, the DEA, FBI, Department of Homeland Security, the State Department, and other U.S. government agencies, published, for the first time, the National Money Laundering Risk Assessment ("NMLRA")[17] and the National Terrorist Financing Risk Assessment ("NTFRA").[18]

48.     Characterizing the "fight against money laundering and terrorist financing" as a "**pillar of U.S. national security and a strong financial system,**" the Treasury Department described its "unprecedented review" of these risks based on an analysis of more than 5,000 law enforcement cases, financial reporting by U.S. financial institutions, and reports from across government and the private sector.[19]

49.     Treasury stressed that "the scope and reach of the U.S. financial system makes it vulnerable to TF [terror financing] abuse," and that terrorist groups pose a direct threat to the U.S. homeland as well as to U.S. national security interests abroad.[20] Accordingly, "the United States has a vested interest in disrupting their financial activity even if it never actually reaches the U.S. financial system."[21] To that end, the U.S. government sought to globalize its CFT efforts, including by "supporting the development of strong international AML/CFT standards and working towards robust implementation of them through the FATF and the United Nations (UN) as well other

---

[15]     https://home.treasury.gov/news/press-releases/sm650.
[16]     Board of Governors of the Federal Reserve System, FEDS Notes, The International Role of the U.S. Dollar (Oct. 6, 2021), *available at* https://www.federalreserve.gov/econres/notes/feds-notes/the-international-role-of-the-u-s-dollar-20211006.htm.
[17]     National Money Laundering Risk Assessment (2015), *available at* https://home.treasury.gov/system/files/246/National-Money-Laundering-Risk-Assessment-06-12-2015.pdf.
[18]     National Terrorist Financing Risk Assessment (2015), *available at* https://home.treasury.gov/system/files/246/National-Terrorist-Financing-Risk-Assessment-06-12-2015.pdf.
[19]     NTFRA, letter from Adam J. Szubin, then-Acting Under Secretary, Terrorism and Financial intelligence.
[20]     *Id.* at 23.
[21]     *Id.*

bodies"; in fact, "[t]he U.S. government considers strong international AML/CFT regimes critical in advancing its efforts to prevent TF from touching the U.S. financial system in the first place."[22]

50.    The subsequent 2020 National Strategy for Combating Terrorist and Other Illicit Financing,[23] which was prepared by my office within the Treasury, continued to identify significant vulnerabilities in the U.S., citing as an example previously identified the potential for terror financing via U.S. correspondent accounts for foreign banks.[24] Among our recommendations was the need for collaboration by U.S. law enforcement with its counterparts around the world "to share information and act against cross-border financial crime."[25]

## VII.    U.S. Government Efforts to Curtail the Financing of Hezbollah

51.    For the past two decades, U.S. Government designations and criminal prosecutions directed at Hezbollah's Lebanese fundraising and money laundering operations have attempted to carefully balance U.S. counter-terrorism concerns and law enforcement efforts against concerns for the financial and political stability of Lebanon and the desire to avoid the type of humanitarian crisis precipitated by the Syrian civil war and during the prior Lebanese civil war of the 1970s.

### A.    U.S. Government Designations

52.    The political and military situation in Lebanon over the past 30 years present significant policy challenges for U.S. policymakers. In particular, Hezbollah is the only Lebanese faction that has been allowed to retain its independent military capabilities since the end of the Lebanese civil war.

53.    The ability of Hezbollah to control its own territory inside Lebanon and its commensurate ability to threaten violence against any political faction that may oppose it has allowed Hezbollah to develop a "state within a state" while at the same time compromising the independence of Lebanon's governmental institutions.

54.    Hezbollah's ability to leverage political alliances (particularly with the Free Patriotic Movement), has allowed it not only to insert itself into the daily political discourse of Lebanon but also to establish a de facto veto of any government initiatives that would threaten its stranglehold on the country's political system.[26]

55.    This political dynamic, together with the explicit threat of violence, has allowed Hezbollah to engage in a wide range of illicit business activities in Lebanon, both inside and outside the financial sector. This includes Hezbollah's abuse of Lebanon's airport and seaports, which provide the organization with a free hand to engage in smuggling, including the movement of narcotics, weapons, gold and other luxury items, and U.S. and Euro bank notes.

---

[22]    *Id.*

[23]    Treasury, National Strategy for Combating Terrorist and Other Illicit Financing, *available at* https://home.treasury.gov/system/files/136/National-Strategy-to-Counter-Illicit-Financev2.pdf.

[24]    *Id.* at 21-22.

[25]    *Id.* at 46-47.

[26]    In early 2019, for example, Hezbollah won control of Lebanon's Health Ministry, which had the fourth-largest budget in the government.

56.     This unimpeded movement of cash through Lebanon's ports serves as a major entry point for terrorist finances generated from within the overseas Lebanese diaspora (principally operating in Africa and Latin America). Because Hezbollah controls the points-of-entry, its couriers are able to avoid leaving a paper trail by not filing cash declaration forms. Once they bring the physical bank notes into Lebanon, Hezbollah then uses "money mules" (a term applied to individuals who transfer illegal money on behalf of someone else) into Lebanese banks. This then enables the value to be moved within the global financial system (through Lebanese banks) and for transformation of illicit cash into other assets, such as real estate, jewelry, watches, art, yachts, and planes.

57.     The FATF has long recognized the role that "cash couriers" play in illicit finance, and has issued Recommendation 32 which states, in part, that "Countries should have measures in place to detect the physical cross-border transportation of currency and bearer negotiable instruments, including through a declaration system and/or disclosure system." Notably, in Lebanon's first Mutual Evaluation in 2009 (which, as stated above, only covered the existence of laws and regulations but which did not assess "effectiveness"), the assessors concluded: "There is no implementation of the disclosure or declaration system for the cross-border transportation of funds."[27] Lebanon enacted a law in 2015 (after the period most relevant to the Second Amended Complaint) to cover cross-border cash movements, but Hezbollah retains control over Lebanon's main ports of entry.

58.     Because Hezbollah is able to access the Lebanese financial system through this and other techniques, Treasury has, on occasion, taken action to curb its abuse of Lebanon's financial sector. It took actions against Lebanese Canadian Bank in 2011 under Section 311 of the PATRIOT Act,[28] and Jammal Trust Bank, designated under Executive Order 13224 in 2019.[29] However we have largely attempted to influence the Lebanese banking sector in more positive ways, calibrating measures in ways that would be less likely to destabilize the Lebanese banking system.

59.     It has also been longstanding practice of the Assistant Secretary for Terrorist Financing and Financial Crimes to make somewhat laudatory statements to the press regarding the willingness/ability of the Lebanese Central Bank (BdL) and private banks to combat Hezbollah's access to the financial system, both to encourage them to take more active measures and to avoid roiling the increasingly fragile banking sector by publicly expressing a lack of confidence in its efforts. Our private messaging, particularly to the Lebanese government, however, was blunt and uncompromising. The Central Bank was, and I surmise is still, under no illusions that if it fails to take action when Treasury furnishes or requests information, Treasury sanctions or 311 actions may follow. The fact that Treasury has been forced to act against so many Lebanese banks, money exchanges, financiers and commercial entities speaks for itself.

---

[27]     https://www.menafatf.org/sites/default/files/MutualEvaluationReportoftheLebaneseRepublic-English.pdf.
[28]     Notice, Financial Crimes Enforcement Network, "Finding That the Lebanese Canadian Bank SAL Is a Financial Institution of Primary Money Laundering Concern" (Feb. 17, 2011), *available at* https://www.federalregister.gov/documents/2011/02/17/2011-3346/finding-that-the-lebanese-canadian-bank-sal-is-a-financial-institution-of-primary-money-laundering.
[29]     Press Release, Treasury Department, "Treasury Labels Bank Providing Financial Services to Hizballah as Specially Designated Global Terrorist" (Aug. 29, 2019), *available at* https://home.treasury.gov/news/press-releases/sm760.

60.     In addition to actions against two banks, Treasury has also periodically targeted individuals working in the banking sector. In 2015, for example, it designated Kassem Hejeij, then chairman of Middle East and Africa Bank ("MEAB"), for helping open Hezbollah bank accounts and providing credit to Hezbollah procurement companies.[30] Earlier, in 2012, Treasury sanctioned Ibrahim Chibli, a branch manager for Lebanon's Fenicia Bank, for providing help to launder money through Fenicia Bank for the Ayman Joumaa money laundering network.[31]

61.     More intensively, Treasury has focused on one of the key elements of Hezbollah's money laundering system, which is use of exchange houses. Treasury has sanctioned six key Lebanese money exchange houses linked to Hezbollah and its narcotics trafficking. They are:

     i.     **Hassan Ayash Exchange** (designated under Executive Order 13224 on January 26, 2011);[32]

     ii.     **Ellissa Exchange Company** (designated under Executive Order 13224 on January 26, 2011);[33]

     iii.     **New Line Exchange Trust Co.** (designated under Executive Order 13224 on January 26, 2011);[34]

     iv.     **Kassem Rmeiti & Co. For Exchange** (designated as a foreign financial institution of primary money laundering concern under Section 311 of the PATRIOT Act on April 23, 2013);[35]

     v.     **Halawi Exchange (designated** as a foreign financial institution of primary money laundering concern under Section 311 of the PATRIOT Act on April 23, 2013);[36] and

     vi.     **Chams Exchange Company SAL and its owner, Kassem Chams** (designated under Executive Order 13224 on April 11, 2019).[37]

62.     Treasury has also worked to isolate key Hezbollah operatives from the Lebanese and global financial system. For example, in October 2018, Treasury designated Muhammad

---

[30]     Press Release, Treasury Department, "Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq" (June 10, 2015), *available at* https://home.treasury.gov/news/press-releases/jl0069.

[31]     Press Release, Treasury Department, "Treasury Targets Major Money Laundering Network Linked to Drug Trafficker Ayman Joumaa and a Key Hizballah Supporter in South America" (June 27, 2012), *available at* https://home.treasury.gov/news/press-releases/tg1624.

[32]     Press Release, Treasury Department, "Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network" (Jan. 26, 2011), *available at* https://home.treasury.gov/news/press-releases/tg1035.

[33]     *Id.*

[34]     *Id.*

[35]     Press Release, Treasury Department, "Treasury Identifies Kassem Rmeiti & Co. for Exchange and Halawi Exchange Co. as Financial Institutions of 'Primary Money Laundering Concern'" (Apr. 23, 2013), *available at* https://home.treasury.gov/news/press-releases/jl1908.

[36]     *Id.*

[37]     Press Release, Treasury Department, "Treasury Sanctions Lebanese Money Launderer Kassem Chams Who Moves Money on Behalf of Narcotics Trafficking Organizations and Hizballah" (Apr. 11, 2019), *available at* https://home.treasury.gov/news/press-releases/sm650.

Abdallah al-Amin for his role in supporting Adham Tabaja, the co-head of Hezbollah's business affairs component ("BAC") because of his role serving "as a liaison between Tabaja and banking officials,"[38] and in July 2019, it designated Amin Sherri, a member of Hezbollah's Loyalty and Resistance Bloc in Lebanon's parliament, because (among other things) he "facilitated Tabaja's access to Lebanese banks."[39]

63.     These relatively recent designations attempted in part to penalize and deter Hezbollah's efforts to pressure Lebanese banks into continuing to provide the organization with financial services.

64.     As a general matter, as I have stated earlier, during my time in government, Treasury also worked closely and shared information with the Lebanese Central Bank and its Governor Riad Salameh to reduce Hezbollah's access to Lebanon's banking system. But, given Hezbollah's central role in the Lebanese state and its maintenance of a private army and intelligence service, while the Central Bank and several Lebanese banks have taken informal measures to protect the Lebanese banking system from Hezbollah and have on several occasions privately cooperated with the U.S. to prevent Hezbollah from *fully* exploiting the country's financial system, the U.S. Government has always recognized the intrinsic limitations of this effort.

65.     Put another way, although the U.S. Government has continued to work with various Lebanese authorities, including its Central Bank and Special Investigation Commission, it has long been clear that Lebanese efforts have lacked vital political support and that corruption remains endemic throughout both the Lebanese political and banking systems.[40]

66.     Unfortunately, despite a significant number of Treasury designations, criminal prosecutions and ongoing coordination with those Lebanese authorities not controlled by Hezbollah, throughout most of the past two decades Hezbollah has nevertheless retained substantial access to Lebanon's banking system through a variety of means and it has continued to launder narcotic trafficking and other illicit proceeds through both Lebanese banks and exchange houses, without any concerted governmental effort to truly curtail those activities.

67.     For example, in December 2020, an anonymous hacking group called SpiderZ published financial records of al-Qard al-Hasan Association ("AQAH") – the financial arm of Hezbollah, which was designated by Treasury in 2007. The published files included account information for nearly 400,000 individuals and entities. In addition to average Lebanese citizens, the documents exposed expatriates, Hezbollah cadres and institutions, so-called "major depositors," Iranian entities, and, importantly, several Lebanese banks that serviced AQAH.

---

[38]     Press Release, Treasury Department, "Treasury Continues to Expose and Disrupt Hizballah's Financial Support Networks" (Oct. 4, 2018), *available at* https://home.treasury.gov/news/press-releases/sm501.

[39]     Press Release, Treasury Department, "Treasury Targets Iranian-Backed Hizballah Officials for Exploiting Lebanon's Political and Financial System" (July 9, 2019), *available at* https://home.treasury.gov/news/press-releases/sm724.

[40]     For example, U.S. foreign aid for FY2020 added new language to include a specific reference to countering Hezbollah as a stated purpose of assistance to Lebanon. This addition, which was carried over into the FY2021 act, states that aid to Lebanon aims to "professionalize the [Lebanese Army] to mitigate internal and external threats from non-state actors, including Hizballah." CRS Report No. R44759.

68.    On May 11, 2021, Treasury designated several Hezbollah officials for their roles in AQAH, noting that they "have all participated in evasive 'shadow' banking activity. Yazbeck, Gharib, Harb, Akar, and Othman maintain joint bank accounts in Lebanese banks that have allowed them to transfer more than $500 million within the formal financial system over the past decade, despite existing sanctions against AQAH."[41]

69.    Both the fact that AQAH's use of the banking system involved large sums of money for a decade and the fact that these well-known Hezbollah operatives continued to maintain joint bank accounts in multiple Lebanese banks demonstrate that despite both U.S. and (periodic) Lebanese governmental efforts, Hezbollah retains substantial access to Lebanon's banking system.

**B.    Congressional Action**

70.    The U.S. national interest in preventing the financing of terrorism has been encapsulated in two federal statutes that specifically target Hezbollah. First, Congress passed the Hizballah International Financing Prevention Act of 2015 ("HIFPA") which imposes sanctions on foreign financial institutions that facilitate transactions on behalf of Hezbollah or its agents.[42]

71.    The Act established penalties for any foreign financial institution that:

(A) knowingly facilitates a significant transaction or transactions for Hizballah; (B) knowingly facilitates a significant transaction or transactions of a person identified on the list of specially designated nationals and blocked persons . . . and the property and interests in property of which are blocked . . . for acting on behalf of or at the direction of, or being owned or controlled by, Hizballah; (C) knowingly engages in money laundering to carry out an activity described in subparagraph (A) or (B); or (D) knowingly facilitates a significant transaction or transactions or provides significant financial services to carry out an activity described in subparagraph (A), (B), or (C). [43]

72.    Subsequently the law was amended and strengthened in 2018 with the passage of the Hizballah International Financing Prevention Amendments Act which imposes mandatory sanctions on foreign persons who recruit and raise funds on behalf of Hezbollah.[44]

---

[41]    Press Release, Treasury Department, "Treasury Targets Hizballah Finance Official and Shadow Bankers in Lebanon" (May 11, 2021), *available at* https://home.treasury.gov/news/press-releases/jy0170.

[42]    H.R.2297 - Hizballah International Financing Prevention Act of 2015 (Public Law No. 114-102 (12/18/2015)), *available at* https://www.congress.gov/bill/114th-congress/house-bill/2297#:~:text=2)%20This%20bill%20states%20that,Hizballah's%20criminal%20activities%20in%20order.

[43]    H.R.2297 - Hizballah International Financing Prevention Act of 2015, 114th Congress (2015-2016), *available at* https://www.congress.gov/bill/114th-congress/house-bill/2297/text/pl. As the current House majority leader stated in 2014, the statute's purpose was to "strengthen our ability to go after Hezbollah where it hurts the most: financing and recruitment. By sanctioning banks that facilitate Hezbollah's funding and the television providers that broadcast its propaganda, this bipartisan legislation will help prevent Hezbollah from accessing funds and spreading its messages of hate." https://www.majorityleader.gov/content/hoyer-statement-hezbollah-international-financing-prevention.act.

[44]    S.1595 – Hizballah International Financing Prevention Amendments Act of 2018, 115th Congress (2017-2018), *available at* https://www.congress.gov/bill/115th-congress/senate-bill/1595/text.

73.     The statute specifically sanctions assistance to (1) Bayt al-Mal, Jihad al-Bina, the Islamic Resistance Support Association, the Foreign Relations Department of Hezbollah, the External Security Organization of Hezbollah, or any successor or affiliate thereof as designated by the President; (2) al-Manar TV, al Nour Radio, or the Lebanese Media Group, or any successor or affiliate thereof as designated by the President; (3) a foreign person determined by the President to be engaged in fundraising or recruitment activities for Hezbollah; or (4) a foreign person owned or controlled by a person described in paragraph (1), (2), or (3).

74.     Those sanctions include asset blocking, "with respect to any foreign person that the President determines knowingly provides significant financial, material, or technological support for or to" any of several, known Hezbollah-run entities listed above.

## C.     U.S. Government's Current Assessment of Risks Posed by Hezbollah

75.     The 2022 National Terrorist Financing Risk Assessment ("2022 NTFRA")[45] relies on the guidance of FATF,[46] analysis of criminal prosecutions, Treasury designations, financial institution reporting, and other information available to the U.S. Government.[47]

76.     Under Section 1, titled "Threats," the 2022 NTFRA cites recent Treasury designations and other U.S. Government actions against Hezbollah associates in concluding that Hezbollah "maintains an international financing and procurement network, with front companies around the world."[48]

77.     The 2022 NTFRA notes the "particular challenge" posed by Hezbollah "because of its regular use of the international banking system and its significant financial resources, primarily due to the hundreds of millions of dollars per year provided by Iran."[49]

78.     Furthermore, Hezbollah is "able to access foreign financial institutions through supporters or sympathizers that willingly execute transactions on behalf of Hizballah leaders, facilitators, or affiliated entities."[50]

79.     The 2022 NTFRA further warns that a challenge faced by American financial institutions is unknowingly moving funds affiliated with terrorism when they provide correspondent banking services to other foreign financial institutions, which can lead U.S. banks to unwittingly process "larger funds transfers sent on behalf of Hizballah or its financial supporters."[51]

---

[45]     https://home.treasury.gov/system/files/136/2022-National-Terrorist-Financing-Risk-Assessment.pdf.
[46]     Financial Action Task Force, Terrorist Financing Risk Assessment Guidance (TF Risk Assessment Guidance), (Jul. 2019), *available at* https:// www.fatf-gafi.org/media/fatf/documents/reports/Terrorist-Financing-Risk-Assessment-Guidance.pdf.
[47]     2022 NTFRA at 3.
[48]     *Id.* at 10.
[49]     *Id.* at 17.
[50]     *Id.*
[51]     *Id.* at 16.

D.     **U.S. Multilateral Counter-Terrorist Financing Efforts**

80.     As I have stated above, the United States successfully led efforts to have the Financial Action Task Force, an international, inter-governmental body that issues recommendations and evaluates member countries on their compliance with those recommendations, issue eight special recommendations on terrorist financing.[52]

81.     In total, FATF issued forty recommendations to its members on June 20, 2003, and has updated them periodically. Recommendation 37, updated in June 2021, provides:

> Countries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to money laundering, associated predicate offences and terrorist financing investigations, prosecutions, and related proceedings. Countries should have an adequate legal basis for providing assistance and, where appropriate, should have in place treaties, arrangements or other mechanisms to enhance cooperation. In particular, countries should . . . [n]ot refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions to maintain secrecy or confidentiality.[53]

E.     **The Specific Terror Financing Vulnerabilities of U.S. Correspondent Bank Accounts**

82.     Access to the U.S. financial system is essential to most financial institutions around the world. But it has long been fundamental to the Lebanese banking system because of Lebanon's dollarized economy, its near total dependence on U.S. dollar clearing, and the criticality of remittances from the Lebanese diaspora living in the U.S. (and elsewhere).

83.     Dollar clearing -- whether engaged in directly, or indirectly through another financial institution -- generally must flow through the United States and is subject to U.S. regulation.[54] As stated above, U.S. correspondent bank accounts have been identified as a vulnerability for their potential role in terror financing. The recently passed Anti-Money Laundering Act of 2020 ("AMLA"), signed into law on January 1, 2021, sought to address this vulnerability. Pursuant to Title III of the PATRIOT Act, Treasury and the DOJ had authority to subpoena "any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside the United States relating to the deposit of funds into the foreign bank."[55]

84.     AMLA expands that authority to include "any records relating to the correspondent account or any account at the foreign bank, including records maintained outside the United

---

[52]     *See* U.S. Dep't of Treasury, *Contributions by the Department of the Treasury to the Financial War on Terrorism: Fact Sheet* 13 (2002) (Contributions by the Department of the Treasury); *see also* Financial Action Task Force, *Anti-Money Laundering and Counter-Terrorist Financing Measures: United States Evaluation Report* (2016), http://bit.ly/2gKd50y.

[53]     https://www.cfatf-gafic.org/home-test/english-documents/cfatf-resources/14728-fatf-recommendations-2012-updated-october-2020/file.

[54]     *See, e.g.*, The Clearing House, CHIPS Rules and Administrative Procedures, Rule 6 & 19(a)(1) (2016), http://bit.ly/2ta2MJH.

[55]     31 CFR § 1010.670(b).

States," provided it is the subject of any one of several enumerated types of investigations or actions.[56] Such change generally empowers DOJ to request the aid of a federal district court to compel compliance, including by holding the foreign bank in contempt, and to pursue civil penalties enforceable via seizure of funds held in the foreign bank's correspondent account at any U.S. financial institution.

## VIII.   Lebanon's Policy Toward Hezbollah

### A.        Lebanese AML and CFT laws

85.    Lebanon does not have a comprehensive counterterrorism law, but several articles of Lebanon's criminal code are used to prosecute acts of terrorism (although Hezbollah's violence is exempted from those laws, as noted previously).

86.    Lebanon is a member of the Middle East & North Africa Financial Action Task Force ("MENAFATF"). In April 2001, it adopted Anti-Money Laundering Law (318/2001), which clarified the Central Bank of Lebanon's ("CBL") powers to require financial institutions to identify all clients, maintain records of customer identification information, request information about the beneficial owners of accounts, conduct internal audits, and exercise due diligence in conducting transactions for clients.[57]

87.    Law No. 318 also established an FIU called the Special Investigation Commission ("SIC") under the auspices of the CBL and headed by the CBL's Governor. The SIC is authorized to investigate money laundering and monitor the financial sector's compliance with the provisions of Law No. 318.

88.    The SIC is also the administrative body through which foreign requests for assistance are processed. The SIC circulates to all financial institutions the list of individuals and entities that have been included on the UNSCR 1267 Sanctions Committee's consolidated list. The SIC also circulates the list of individuals and entities that the U.S. Government and the European Union have designated under their relevant authorities. The SIC has signed a number of memoranda of understanding with other FIUs concerning international cooperation in AML and CFT. The SIC is also tasked with cooperating with U.S. authorities on exchanging records and information within the framework of Law No. 318.[58]

89.    In 2003, Lebanon also adopted Laws 547 and 553. Law 547 expands Article One of Law No. 318, criminalizing any funds resulting from the financing or contribution to the financing of terrorism or terrorist acts or organizations based on the definition of terrorism as it appears in the Lebanese Penal Code. However, the State Department's International Narcotics Control Strategy Report issued in 2010 noted that Lebanon's definition of terrorism does not apply

---

[56]    The William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, H.R. 6395 here, 6308(a)(1)(3)(A)(i).

[57]    Law No. 318, "Fighting Money Laundering" (April 20, 2001), *available at* https://www.vertic.org/media/National%20Legislation/Lebanon/LB_Law_Money_Laundering.pdf.

[58]    *Id.*

to Hezbollah, which is considered a legitimate "resistance" organization in Lebanon and a political party—represented by members of Parliament and two Cabinet ministers in the current Cabinet.[59]

90.    Lebanon's SIC is a member of the Egmont Group, an international organization that emphasizes sharing information among FIUs. The Group's goal is to provide a forum for FIUs to improve support to their respective governments in the fight against money laundering, terrorist financing, and other financial crimes. Egmont Group members share tactical, operational, and strategic information relating to money laundering and predicate crimes, such as narcotics trafficking, to assist respective law enforcement agencies. The United States plays an active role in the Egmont Group. The Egmont Group also participates in FATF Plenary meetings, and many FATF Heads of Delegation are heads of national FIUs.

91.    For many years, the U.S. has shared information with foreign FIUs through FinCEN, both through formal memoranda of understanding ("MOU") as well as on a more informal basis. Treasury's Office of Terrorist Financial and Financial Crimes ("TFFC"), which I led, also furnishes and receives information from a wide range of foreign government entities, including FIUs, Interior and Finance Ministries, and various intelligence services.

92.    Lebanon signed a Memorandum of Understanding Between the Governments of the Member States of the Middle East and North Africa Financial Action Task Force Against Money Laundering and Terrorist Financing, November 30, 2004, adopting FATF's Forty Recommendations on Money Laundering and the Special Recommendations on Terrorist Financing.[60]

93.    As noted above, among the Forty Recommendations are provisions which specifically renounce bank secrecy as a basis for refusing requests for mutual legal assistance in money laundering and terrorist financing investigations.

94.    On November 10, 2009, MENAFATF issued a Mutual Evaluation Report ("MER") on Lebanon,[61] which concluded that, notwithstanding the fact that the Lebanese AML system had positive aspects, its legal framework needed to be modified to comply with FATF recommendations. As a result, Lebanon was placed on "regular follow-up" review status. It is important to note that the 2009 evaluation, like all "first round" evaluations, was focused on documenting whether Lebanon had in place the necessary legal and regulatory framework associated with FATF standards. It expressly did not assess the "effectiveness" of Lebanon's AML/CFT regime.[62]

95.    Following the 2009 assessment, Lebanon responded by passing emergency legislation in November 2015, including an AML law covering trans-border cash movements,

---

[59]    Department of State, Bureau for International Narcotics and Law Enforcement Affairs (Volume II) (March 2010), at 154, *available at* https://2009-2017.state.gov/documents/organization/137429.pdf.

[60]    http://www.menafatf.org/images/uploadfiles/mou-eng.pdf.

[61]    www.menafatf.org/MER/MutualEvaluationReportoftheLebaneseRepublic-English.pdf.

[62]    Lebanon's second-round assessment, when issued, will likely document a number of strategic deficiencies which could lead it to being placed in either "enhanced follow up" or on the FATF "Grey List."

mandating cooperation to fight tax evasion, and implementing measures to cut off resources used for terrorism.[63]

96.    According to the U.S. Department of State's Country Reports on Terrorism in 2016, Lebanon still lacked a comprehensive counterterrorism law, forcing its government to rely on sections of its criminal code to prosecute terrorism; however, Lebanon's confessional system of government and Hezbollah's restriction of access to sites in areas under its control made the implementation of the criminal code difficult. The State Department noted that the Lebanese "cabinet did not consider legislative initiatives that could potentially threaten Hizballah's operations, as the presence of Hizballah and its political allies in the government make the requisite consensus on such actions impossible."[64]

97.    Finally, as of July 2014, financial institutions (including Lebanese banks, financial institutions, investment banks, private banks, brokerage banks and any other institutions providing banking or financial services) must comply with the US Foreign Account Tax Compliance Act (FATCA), requiring them to report to the U.S. government about their U.S. clients.[65]

**B.    Lebanon's Hezbollah Exemption**

98.    Given Hezbollah's central role in Lebanon (e.g., maintaining its own private army, controlling the Beirut International Airport and other border crossings, exercising an effective veto over the Lebanese parliamentary government, and physically controlling significant parts of the country), Lebanon has exempted it (and other "resistance" organizations) from Lebanon's counterterrorism laws, effectively limiting their application to a narrow band of terrorist groups opposed by Hezbollah.[66]

99.    It should be noted, however, that since the passage of the Hizballah International Financing Prevention Act of 2015 ("HIFPA"), the SIC has periodically supported the implementation of terrorism-related sanctions against Hezbollah members and financers, including the sanctioning of two Lebanese companies subordinate to Hezbollah's Executive Council.[67]

100.    Although the SIC's recent efforts have not significantly curtailed Hezbollah's access to the Lebanese financial system, these more recent efforts have impeded the organization by, at a minimum, forcing it to operate less openly.

---

[63]    Law No. 44 amending the Law on Fighting Money Laundering and the Financing of Terrorism; Law No. 42 Declaring the Cross-Border Transportation of Money; Law No. 43 on the Exchange of Tax Information; and Law No. 53 authorizing the Lebanese Government to accede to the International Convention for the Suppression of the Financing of Terrorism.

[64]    United States Department of State, Country Reports on Terrorism 2016 - Lebanon, 19 July 2017, *available at* https://www.refworld.org/docid/5981e42f13.html.

[65]    IRS, Foreign Account Tax Compliance Act, Document No. D 13134 (Rev. 08/2013) Catalog Number 65179U, *available at* https://www.irs.gov/pub/irs-utl/froug.pdf.

[66]    Lebanon is an outlier even in the region. For example, in 2018, six leading Arab states designated Hezbollah's Shura Council and several individuals and entities discussed in the Second Amended Complaint. *See* https://home.treasury.gov/news/press-releases/sm0387.

[67]    Country Reports on Terrorism 2020: Lebanon, State Department, *available at* https://www.state.gov/reports/country-reports-on-terrorism-2020/lebanon/.

101.     Moreover, the SIC's recent efforts are also a stark departure from the prior two decades when Lebanese authorities would rarely if ever publicly implement measures against Hezbollah operatives, NGOs and financiers.

## C.     UN Security Resolutions and International Law

### 1.     International Convention for the Suppression of the Financing of Terrorism

102.     In 1999, the United Nations' General Assembly adopted the International Convention for the Suppression of the Financing of Terrorism; the United States played a leading role in preparing this treaty and has been a party since 2002.[68]

103.     The Convention notes the ongoing concern about the "worldwide escalation of acts of terrorism in all its forms and manifestations" and sets forth requirements for the prevention of terrorist financing.

104.     Article 2 makes it an offense to "by any means, directly or indirectly, unlawfully and willfully, provide[] or collect[] funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out" an act such as terrorism.[69]

105.     Article 5 requires States to adopt measures holding entities liable through "criminal, civil, or administrative" means for violations of Article 2.[70]

106.     While the Convention does not require states to enact legislation to recognize common-law tort actions in the manner the ATA does, and it permits them to fulfill their obligations by adopting detailed regulatory regimes governing financial institutions, the Convention reflects the fact that the international community agrees that financing terrorism is unacceptable conduct and that such conduct violates the Convention when undertaken by corporations (including financial institutions).

107.     Article 12 provides:

1) States Parties shall afford one another the greatest measure of assistance in connection with criminal investigations or criminal or extradition proceedings in respect of the offenses set forth in article 2, including assistance in obtaining evidence in their possession necessary for the proceedings.

2) States Parties may not refuse a request for mutual legal assistance on the ground of bank secrecy.[71]

108.     Although Article 12 focuses on assistance and cooperation among and between in connection with criminal investigations and extradition proceedings, civil actions brought under

---

[68]     International Convention for the Suppression of the Financing of Terrorism, opened for signature Dec. 9, 1999, 2178 U.N.T.S. 197 (entered into force Apr. 10, 2002), *available at* https://www.un.org/law/cod/finterr.htm.
[69]     *Id.* art. 2.
[70]     *Id.* art. 5.
[71]     *Id.* art. 12.

the ATA and the Justice Against Sponsors of Terrorism Act ("JASTA") further American national security interests in the fight against global terrorism.

109.    That same interest is reflected in Article 18, which provides that States take measures "requiring financial institutions and other professions involved in financial transactions to utilize the most efficient measure available for the identification of their usual or occasional customers, as well as customers in whose interest accounts are opened, and to pay special attention to unusual or suspicious transactions and report transactions suspected of stemming from criminal activity."[72]

### 2.    Resolution 1373

110.    In September 2001, the United Nations Security Council adopted Resolution 1373, which mandated that all governments shall "[p]revent and suppress the financing of terrorist acts."[73]

111.    It directed all governments to immediately freeze "funds and other financial assets or economic resources of persons who commit, or attempt to commit, terrorist acts."[74]

112.    Resolution 1373 also ordered that governments prohibit their nationals from "making any funds, financial assets or economic resources … available, directly or indirectly, for the benefit of persons who commit or attempt to commit … terrorist acts."[75]

113.    Resolution 1373 further demanded that governments "[e]nsure that any person who participates in the financing … of terrorist acts … is brought to justice."[76]

114.    Pursuant to Resolution 1373, the Security Council requested that Member States report to the Counter-Terrorism Committee on the steps they took to implement the resolution. In 2001, Lebanon described its compliance with 10 international conventions on terrorism requiring cooperation and the exchange of information, and described "the country being anxious to implement all the provisions of these conventions in the field of cooperation in combating terrorist acts," *subject to* the "distinction, as made in United Nations General Assembly resolution 46/51 of 19 January 1991 and in the 1998 Arab Convention for the Suppression of Terrorism, between terrorism on the one hand and the legitimate right of peoples to resist foreign occupation on the other."[77]

---

[72]    *Id.* art. 18.
[73]    S.C. Res. 1373, § 1(a) (Sept. 28, 2001), *available at* https://www.unodc.org/pdf/crime/terrorism/res_1373_english.pdf.
[74]    *Id.*, § 1(c).
[75]    *Id.*, § 1(d).
[76]    *Id.*, § 1(e).
[77]    Letter dated 13 December 2001 from the Chairman of the Security Council Committee established pursuant to Resolution 1373 (2001) concerning counterterrorism addressed to the President of the Security Council at 2 and 7, *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/N01/696/80/PDF/N0169680.pdf?OpenElement.

### 3.  Resolution 2462

115.    On March 28, 2019, the Security Council adopted Resolution 2462 on countering terrorism financing, which reaffirmed the requirement that all Member States prevent and suppress the financing of terrorist acts and refrain from providing support to those involved in them.[77]

116.    Resolution 2462 strengthened Resolution 1373 by requiring Member States to ensure that their laws and regulations make it possible to prosecute and penalize, "as serious criminal offences," the provision or collection of funds, resources and services intended to be used for the benefit of terrorist organizations or individual terrorists.[78] Member States are also required to ensure that their counter-terrorism measures are in compliance with their obligations under international law, including international humanitarian law, international human rights law and international refugee law.[79] Further, Member States are required to "[a]fford one another the greatest measure of assistance in connection with criminal investigations or criminal proceedings relating to the financing or support of terrorist acts," including "seeking[ing] ways to address the challenges in obtaining evidence to secure terrorist financing convictions."[80]

### 4.  Multilateral Convention on Mutual Administrative Assistance in Tax Matters

117.    The United States and Lebanon are signatories to the Convention on Mutual Administrative Assistance in Tax Matters (the "Tax Convention"),[81] which was developed jointly by the Organization for Economic Co-operation and Development ("OECD"), an intergovernmental economic organization with 38 member countries, founded in 1961 to stimulate economic progress and world trade, and the Council of Europe in 1988 and amended in 2010. The Tax Convention is the most comprehensive multilateral instrument available for all forms of tax cooperation to tackle tax evasion and avoidance. This cooperation ranges from exchange of information, including automatic exchanges, to the recovery of foreign tax claims.

Date: May 2, 2022

Marshall Billingslea

---

[77]     S.C. Res 2462 (March 28, 2019), *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/N19/090/16/PDF/N1909016.pdf?OpenElement.

[78]     *Id.*, §§ 2 and 3.

[79]     *Id.*, § 5.

[80]     *Id.*, §§ 7, 29.

[81]     The Multilateral Convention on Mutual Administrative Assistance in Tax Matters Amended by the 2010 Protocol, *available at* https://read.oecd-ilibrary.org/taxation/the-multilateral-convention-on-mutual-administrative-assistance-in-tax-matters_9789264115606-en#page1.