UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ROBERT BARTLETT, et al.,

                        Plaintiffs,

          -against-

SOCIETE GENERALE DE BANQUE AU LIBAN
SAL, et al.,

                     Defendants.

No. 19-cv-0007 (CBA) (VMS)

---

**JOINT MEMORANDUM OF LAW IN SUPPORT OF MOVING DEFENDANTS'
MOTION FOR PROTECTIVE ORDER AND IN OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 4

    A.    PROCEDURAL HISTORY ................................................................. 4

    B.    THE MEET-AND-CONFER PROCESS ............................................ 6

ARGUMENT ......................................................................................................... 7

I.    THE SCOPE OF PLAINTIFFS' REQUESTS MUST BE NARROWED UNDER RULE 26 AND THE RESTATEMENT ................................................. 7

    A.    Rule 26: Relevance and Proportionality ..................................... 7

    B.    The Restatement: Importance and Specificity ............................ 8

        1.    On their face, Plaintiffs' sweeping and undifferentiated Requests violate the basic tenets of Rule 26 and the Restatement. ......................... 9

        2.    Under Rule 26 and the Restatement, Plaintiffs' Requests must be limited to evidence that could actually support liability under their claims. ............................................................. 13

    C.    Rule 26: Burden and Expense ................................................... 22

II.    THE COURT SHOULD DECLINE TO ORDER THE MOVING DEFENDANTS TO VIOLATE LEBANESE LAW ON THE RECORD BEFORE IT .......................... 30

    A.    It is Premature for the Court to Order the Moving Defendants to Produce Materials in Violation of Lebanese Law ................................ 33

        1.    Scope .................................................................................. 33

        2.    Letters Rogatory to Lebanese Authority ................................ 33

        3.    Waivers ............................................................................... 36

    B.    Application of the Restatement Factors ..................................... 37

        1.    Importance of the Discovery to the Case ............................... 38

        2.    Degree of Specificity of Plaintiffs' Requests ........................... 39

        3.    Whether the Information Originated in the United States ......... 40

        4.    Availability of Alternative Means for Securing Requested Information ......................................................................... 40

        5.    Balancing Sovereign Interests .............................................. 41

            a.    Lebanon's interest in enforcing its laws in a matter affecting nearly its entire banking sector. .................................. 41

            b.    The U.S. and Lebanon's shared interest in fighting terrorism. ........................................................................ 44

# TABLE OF CONTENTS
## (continued)

**Page**

6.     The Moving Defendants Would Suffer Significant Hardship if Forced to Produce Bank Records in Violation of Lebanese Law ............ 54

7.     The Moving Defendants Have Acted in Good Faith ............................... 54

CONCLUSION ...................................................................................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Immigr. & Customs Enf't Div. of U.S. Dep't of Homeland Sec.*,
    255 F.R.D. 350 (S.D.N.Y. 2008) ..............................................................24

*Allstate Ins. Co. v. All Cnty., LLC*,
    2020 WL 5668956 (E.D.N.Y. Sept. 22, 2020) ........................................12

*Barbara v. MarineMax, Inc.*,
    2013 WL 1952308 (E.D.N.Y. May 10, 2013) ........................................17

*In re Bard IVC Filters Prods. Liab. Litig.*,
    317 F.R.D. 562 (D. Ariz. 2016) ......................................................14, 16

*Black v. Buffalo Meat Serv., Inc.*,
    2016 WL 4363506 (W.D.N.Y. Aug. 16, 2016) ......................................22

*Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp.*,
    318 F.R.D. 9 (E.D.N.Y. 2016) ....................................................17, 24

*Doubleline Cap. LP v. Odebrecht Fin., Ltd.*,
    2021 WL 4596561 (S.D.N.Y. Oct. 6, 2021) ...........................38, 40, 53, 54

*Edebali v. Bankers Standard Ins. Co.*,
    2016 WL 4621077 (E.D.N.Y. Sept. 6, 2016) ........................................17

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
    297 F.R.D. 99 (S.D.N.Y. 2013)) ..........................................................24

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ....................................................15, 16

*Helena Agri-Enters., LLC v. Great Lakes Grain, LLC*,
    988 F.3d 260 (6th Cir. 2021) ..............................................................21

*Henry v. Morgan's Hotel Grp., Inc.*,
    2016 WL 303114 (S.D.N.Y. Jan. 25, 2016) ....................................14, 16

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................16

*Honickman v. BLOM Bank SAL*,
    6 F. 4th 487 (2d Cir. 2021) ....................................................... *passim*

-iii-

*Johnson v. Nyack Hosp.*,
169 F.R.D. 550 (S.D.N.Y. 1996) ...................................................................23, 25

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021)..............................................................5, 6, 10, 15

*Laydon v. Mizuho Bank, Ltd.*,
183 F. Supp. 3d 409 (S.D.N.Y. 2016).........................................................8, 37, 38

*Linde v. Arab Bank*,
2014 WL 2191224 (May 23, 2014) ...............................................................43, 49

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018).......................................................................... *passim*

*In re Maxwell Commc'n Corp.*,
93 F.3d 1036 (2d Cir. 1996)...............................................................................37

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
116 F.R.D. 517 (S.D.N.Y. 1987) .......................................................................38

*Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*,
2016 WL 3906712 (S.D.N.Y. July 14, 2016) ..........................................................7

*Nike, Inc. v. Wu*,
349 F. Supp. 3d 310 (S.D.N.Y. 2018).................................................................41

*Raza v. City of New York*,
998 F. Supp. 2d 70 (E.D.N.Y. 2013) ..................................................................25

*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) ...........................................................................38

*Robertson v. People Mag.*,
2015 WL 9077111 (S.D.N.Y. Dec. 16, 2015) ......................................14, 16, 21, 23

*Rotstain v. Trustmark Nat'l Bank*,
2015 WL 13031698 (N.D. Tex. Dec. 9, 2015) ......................................................54

*In re Rubber Chems. Antitrust Litig.*,
486 F. Supp. 2d 1078 (N.D. Cal. 2007) ..............................................................38

*S.E.C. v. Collins & Aikman Corp.*,
256 F.R.D. 403 (S.D.N.Y. 2009) .......................................................................23

*Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
357 U.S. 197 (1958)...........................................................................................9

*Société Nationale Industrielle Aérospatiale v. United States Dist. Court for S. Dist. Iowa*,
482 U.S. 522 (1987) .................................................................................8, 31

*Solarex Corp. v. Arco Solar, Inc.*,
121 F.R.D. 163 (E.D.N.Y. 1988), *aff'd*, 870 F.2d 642 (Fed. Cir. 1989) ...............................23

*Strauss v. Crédit Lyonnais*,
842 F. App'x 701 (2d Cir. 2021) ...........................................................................5

*In re Terrorist Attacks on September 11, 2001*,
2021 WL 5449825 .........................................................................................23, 25

*Tiffany (NJ) LLC v. Andrew*,
276 F.R.D. 143 (S.D.N.Y. 2011), *aff'd sub nom.*, 2011 WL 11562419
(S.D.N.Y. Nov. 14, 2011) ................................................................................8, 40

*Trilegiant Corp. v. Sitel Corp.*,
272 F.R.D. 360 (S.D.N.Y. 2010) ......................................................................23, 24

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
839 F.3d 242 (3d Cir. 2016)................................................................................22

*United States v. Portrait of Wally*,
663 F. Supp. 2d 232 (S.D.N.Y. 2009).....................................................................37

*Vaigasi v. Solow Mgmt. Corp.*,
2016 WL 616386 (S.D.N.Y. Feb. 16, 2016)..............................................................25

*In re Vitamins Antitrust Litig.*,
2001 WL 1049433 (D.D.C. June 20, 2001)..........................................................9, 10, 38

*Wang v. Wu*,
2016 WL 10957847 (C.D. Cal. Dec. 7, 2016) ...........................................................38

*Weiss v. Nat'l Westminster Bank, PLC*,
242 F.R.D. 33 (E.D.N.Y. 2007).............................................................................54

*Weiss v. Nat'l Westminster Bank, PLC*,
993 F.3d 144 (2d Cir. 2021)...................................................................................5

*In re Westinghouse Elec. Corp. Uranium Contracts Litig.*,
563 F.2d 992 (10th Cir. 1977) ...............................................................................38

*Wultz v. Bank of China Ltd.*,
910 F. Supp. 2d 548 (S.D.N.Y. 2012)..................................................................8, 40

*In re: Xarelto (Rivaroxaban) Prod. Liab. Litig*,
  2016 WL 3923873 (E.D. La. July 21, 2016) ...........................................................38

*Zubulake v. UBS Warburg LLC*,
  217 F.R.D. 309 (S.D.N.Y. 2003) ............................................................................24

**Statutes**

Lebanese Banking Secrecy Act ("BSA") ............................................................. *passim*

22 U.S.C.A. § 9803 ....................................................................................................49

**Rules**

Fed. R. Civ. P. 26 ................................................................................................ *passim*

**Treatises**

Restatement (Third) of Foreign Relations Law ................................................... *passim*

## PRELIMINARY STATEMENT

Plaintiffs move to compel each of eleven Lebanese bank defendants (the "Moving Defendants" or the "Banks")[1] to search for and produce Lebanese bank records for nearly 700 individuals and entities—the majority of which are not even alleged in Plaintiffs' Complaint to have had any banking relationship with *any* Moving Defendant, much less *each* Moving Defendant—and to do so in violation of Lebanese law.  *See* Plaintiffs' Motion to Compel, ECF 270 ("MTC").  Plaintiffs have made no effort to narrow their discovery requests ("Requests" or "RFPs") through the meet-and-confer process, to tether their Requests to their legal claims or to the specific allegations in their Complaint, or even to differentiate among the eleven Moving Defendants.  Rather, Plaintiffs ask this Court simply to endorse wholesale their broad, indiscriminate Requests and order these Banks, which collectively represent the majority of the entire Lebanese banking industry, in the midst of a banking crisis, to violate Lebanese law.

The Court should not issue such an order—which involves a complex and delicate balancing of sovereign interests and consideration of foreign relations—and certainly not at this stage in the litigation, before the Lebanese authorities have even been presented with the Requests.  Rather, the Court should approach discovery here like in any other complex commercial litigation—by outlining the contours of permissible discovery and requiring the parties to work cooperatively toward overcoming discovery obstacles, such as foreign law restrictions.

Given the enormous breadth of Plaintiffs' Requests, carefully applying the standards of Federal Rule 26 and the Restatement (Third) of Foreign Relations Law § 442 is a critical

---

[1] The Moving Defendants are (1) Société Générale de Banque au Liban S.A.L., (2) Fransabank S.A.L., (3) MEAB Bank s.a.l., (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) Lebanon & Gulf Bank S.A.L., (9) Banque Libano-Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank SAL.

threshold issue. Read together, those standards mandate that Plaintiffs' Requests for banking records in Lebanon—the exclusive subject of Plaintiffs' Requests and motion to compel—are proper only if they relate to non-privileged matters that are relevant to a party's claim or defense, are proportional to the needs of the case, and address discovery that is important, critical, or absolutely essential to the case.

Plaintiffs' blunderbuss Requests plainly violate these standards. They seek "all" account opening, transactional, and compliance records, for a time period spanning decades (January 1, 2003 through December 31, 2021 for some of the Requests),[2] that any Moving Defendant may have for any of nearly 700 individuals and entities, regardless of (1) whether there is *any* allegation in the Complaint that the individual or entity was a customer of the Bank from which the discovery is sought, (2) whether there is any allegation in the Complaint that *any* Moving Defendant had a banking relationship with the individual or entity at all, (3) whether there is any allegation of publicly available information tying the individual or entity to Hezbollah (such as a U.S. government designation), or (4) whether there is any allegation that any Moving Defendant provided any banking services to the individual or entity after such information became available. In other words, there are no principled or discernable limitations on the discovery that Plaintiffs seek. Accordingly, even attempting to comply with these Requests would impose a crippling burden on the Moving Defendants. For this reason alone, Plaintiffs' motion to compel must be denied.

But the need to rationalize the scope of discovery becomes even more apparent when, as here, Plaintiffs' Requests would require the Moving Defendants to violate the laws of their home

---

[2] For Requests 1-3, 7, and 9, Plaintiffs seek production of documents from January 1, 2003, through December 31, 2011. For Requests 4-6, Plaintiffs seek production of documents from January 1, 2012, through December 31, 2021. For Request 8, Plaintiffs seek production of documents from January 1, 2003, through December 31, 2018.

country.  Bringing the scope of discovery in line with the standards of Rule 26 and the

Restatement will facilitate efforts by the Moving Defendants to *avoid* any conflict with Lebanese

law, including through customer waivers and letters rogatory, will crystallize the scope of any

conflict with Lebanese law, and may even obviate the need for this Court to address Lebanese

law.  And any determination of whether the Moving Defendants must be compelled to violate

Lebanese law under this Circuit's multi-factor comity analysis should be based on a fully

developed factual record of the relevant factors, not the undeveloped record now before the

Court.

   As noted, Plaintiffs' Requests are not limited to "important" or "critical" matters, nor are

they specific to any particular Moving Defendant or tailored to Plaintiffs' claims and allegations

in this case—and all the discovery that Plaintiffs seek originated in and is located in Lebanon.

All of these factors weigh heavily against compelling discovery.  Furthermore, the Court does

not yet have enough information to determine whether there are alternative means of obtaining

the requested discovery because Plaintiffs have yet to receive productions in response to their

third-party subpoenas and Lebanese authorities have not yet been approached about potentially

lifting bank secrecy restrictions.  This is yet another factor weighing against compelling

discovery at this stage.

   And importantly, Lebanon has a compelling interest in having its laws applied and

enforced on its soil—laws which protect fundamental and constitutionally-recognized privacy

rights in the context of Lebanon's most important industry, banking.  That interest is particularly

acute right now, as Lebanon is attempting to emerge from an economic crisis.  On the other

hand, the U.S. has no interest in allowing Plaintiffs to pursue unfettered and intrusive discovery.

Although Plaintiffs purport to invoke the broader interest of the United States in combating

international terrorism, this action is a private, civil lawsuit seeking monetary damages.  Indeed, as the U.S. Solicitor General has stated explicitly in the context of another Anti-Terrorism Act lawsuit, forcing foreign banks to violate laws in countries like Lebanon actually *undercuts* the United States' interest in fighting terror abroad, as state-to-state cooperation with friendly sovereigns in the Middle East is crucially important to anti-terrorism efforts.

Plaintiffs' motion to compel compliance with their Requests should be denied, and the Moving Defendant's motion for protective order should be granted.  The Court should first rule on the proper scope of discovery, and then direct the parties to work toward overcoming Lebanese law obstacles as explained below.  Only then, on a fully developed record, should the Court adjudicate Plaintiffs' motion.

## **BACKGROUND**

### A.   **PROCEDURAL HISTORY**

On August 2, 2019, Plaintiffs filed their Amended Complaint in this action, alleging the Banks should be primarily and secondarily liable under the ATA and JASTA for injuries Plaintiffs and/or their families tragically suffered while serving in the U.S. armed forces during the Iraq War.  Those injuries resulted from attacks committed by Iraqi militias from January 12, 2004 to November 14, 2011.  In its Memorandum Opinion and Order, ECF 164 at 16 (Nov. 25, 2020), the Court dismissed Plaintiffs' claims for primary liability, and held that the Amended Complaint's "strongest allegations" stated a claim for aiding-and-abetting liability under JASTA, *id*. at 2.

Plaintiffs thereafter sought leave to file a Second Amended Complaint (the "SAC" or "Complaint").  The Court granted Plaintiffs' request in an order dated December 30, 2020, but in that order adjourned all other deadlines *sine die,* including deadlines to respond to the SAC once filed. Minute Entry and Order (Dec. 30, 2020). The order further provided that the stay of

4

proceedings would remain in effect pending the Second Circuit's decision in *Kaplan v. Lebanese Canadian Bank, SAL,* at which time the Court would consider requests for a further stay in light of pending appeals in other ATA cases then before the Second Circuit or a motion to dismiss "in light of new Second Circuit guidance." *Id.*

Following the Second Circuit's decision in *Kaplan* on June 9, 2021, the Court, on July 6, 2021, granted the Moving Defendants' requests to file motions to dismiss the SAC. *See* July 6, 2021 Minute Order. Pursuant to that order, the Moving Defendants filed their renewed motions to dismiss three weeks later, on July 27, 2021.  *See* ECF Nos. 206-09.  Thereafter, following the Second Circuit's decision in *Honickman v. BLOM Bank SAL,* 6 F. 4th 487 (2d Cir. 2021), which affirmed the dismissal of all JASTA claims in that case, the Court issued a further order amending the briefing schedule and requiring that all briefs be filed and the motions submitted by September 9, 2021.  *See* Aug. 2, 2021 Minute Order. The Moving Defendants' renewed motions to dismiss, based on recent Second Circuit guidance which resulted in that Court upholding on appeal the disposal of three of the four JASTA cases presented to it in 2021,[3] remain *sub judice.*

Following a status conference on December 13, 2021, the Court issued a scheduling order that, *inter alia,* directed Plaintiffs to serve their initial requests for production by January 17, 2022, and the Moving Defendants to serve their objections and responses by March 18, 2022. Minute Entry and Order (Dec. 13, 2021).  Significantly, in this order, the Court "directed [the parties] to make every effort in their meet and confer sessions to narrow the issues in dispute prior to filing any motions to compel or moving for a protective order."  *Id.*

---

[3] In addition to affirming the dismissal of JASTA claims in *Honickman,* the Second Circuit also affirmed the denial of leave to add JASTA claims on futility grounds in *Weiss v. National Westminster Bank, PLC,* 993 F.3d 144 (2d Cir. 2021) and *Strauss v. Crédit Lyonnais,* 842 F. App'x 701 (2d Cir. 2021).

B.     **THE MEET-AND-CONFER PROCESS**

Plaintiffs served their Requests on December 31, 2021 and the Moving Defendants timely served their Responses and Objections ("Objections") on March 18, 2022.[4]  As discussed herein, Plaintiffs served a single set of RFPs on all Moving Defendants with undifferentiated Requests for information regarding possible accounts and transactions with 686 individuals and entities, unaccompanied by any other identifying information.[5] The vast majority of those individuals and entities were not designated during (or even after) the relevant time period as Specially Designated Global Terrorists ("SDGTs").  Plaintiffs have offered no evidence that these other individuals and entities were identified in public source materials during the relevant time period as even being linked to Hezbollah, let alone closely intertwined with its terrorist activities, as required by the *Kaplan* and *Honickman* decisions.  And, significantly, only 156 of the individuals and entities are alleged to have been customers of *any* Moving Defendant, meaning that the vast majority of the names listed in the RFPs are not alleged in the SAC to be customers of *any* of the Moving Defendants.[6]  Nearly 100 of the names in the RFPs are not mentioned *anywhere* in the SAC.[7]

Notwithstanding an exchange of letters about the basis for the Moving Defendants' objections, in a meet-and-confer conference call held among the parties on April 28, 2022,

---

[4]  Plaintiffs' initial Requests and the Banks' Objections are attached as Exhibits 1 and 2-12 respectively to the Declaration of Mark G. Hanchet, dated June 16, 2022 (the "Hanchet Declaration").

[5] Exhibit 1 to the RFPs lists the names of 366 individuals and 305 distinct entities (eliminating one duplicate entry); Exhibit 2 adds an additional 15 distinct entities.

[6] A list of all 156 of the individuals and entities alleged to be customers of the Moving Defendants is attached as Exhibit 15 to the Hanchet Declaration.

[7] A list of the 89 individuals and entities appearing in the RFPs whose names are not in the SAC is attached as Exhibit 14 to the Hanchet Declaration.

Plaintiffs made clear that they would not narrow their Requests in any way, thereby necessitating this motion for a protective order. Minute Entry and Order (May 10, 2022).

Plaintiffs filed their motion to compel, with supporting papers, on May 2, 2022 (together, the "MTC"). ECF 270. In it, Plaintiffs request that the Court immediately "overrule" the Moving Defendants' objections based on scope and proportionality, along with their foreign law objections (MTC at 58), thus ordering the Moving Defendants to violate Lebanese law. Moving Defendants now oppose Plaintiffs' motion to compel and also seek a protective order. Moving Defendants submit that the Court must first determine the proper scope of discovery, then afford the parties an opportunity to avoid a conflict with Lebanese law, including through the issuance of letters rogatory and pursuit of waivers from individual customers. If Lebanese law remains an issue after these efforts, only then, on a full record, should the Court conduct a comity analysis and evaluate whether Plaintiffs' motion to compel should be granted.

## ARGUMENT

I.   **THE SCOPE OF PLAINTIFFS' DISCOVERY REQUESTS MUST BE NARROWED UNDER RULE 26 AND THE RESTATEMENT**

A.   **Rule 26: Relevance and Proportionality**

Plaintiffs' RFPs patently violate Rule 26 of the Federal Rules of Civil Procedure by seeking discovery that is not relevant to the claims and defenses in this litigation. Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is *relevant* to any party's claim or defense and *proportional* to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphases added). Plaintiffs bear the burden of establishing the relevance of their Requests. *See Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2016 WL 3906712, at *3 (S.D.N.Y. July 14, 2016).

### B.      The Restatement: Importance and Specificity

In addition to Rule 26's relevance and proportionality requirements, Plaintiffs' RFPs

must comply with the additional, and heightened, standards for discovery of information located

outside the U.S. and protected by foreign privacy laws.

As the Supreme Court has held, "American courts, in supervising pretrial proceedings,

should exercise special vigilance to protect foreign litigants from . . . unnecessary, or unduly

burdensome, discovery." *Société Nationale Industrielle Aérospatiale v. United States Dist.*

*Court for S. Dist. Iowa*, 482 U.S. 522, 546 (1987).  Further, "[w]hen it is necessary to seek

evidence abroad, . . . the district court must supervise pretrial proceedings particularly closely to

prevent discovery abuses."  *Id.*  Where, as here, a party seeks production of information from a

foreign jurisdiction, the production of which would violate the law of that jurisdiction, "'courts

perform a comity analysis to determine the weight to be given to the foreign jurisdiction's law.'"

*Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (quoting *Tiffany (NJ)*

*LLC v. Andrew*, 276 F.R.D. 143, 151 (S.D.N.Y. 2011) (Pitman, M.J.), *aff'd sub nom.*, 2011 WL

11562419 (S.D.N.Y. Nov. 14, 2011); *see also Aérospatiale*, 482 U.S. at 543-44 & n.27

("international comity . . . *requires* in this context a . . . particularized analysis of the respective

interests of the foreign nation and the requesting nation.") (emphasis added).

As discussed more fully in Section II(B) below, when required to perform this analysis,

courts in this Circuit consider factors drawn from the Restatement and *Aérospatiale*.  *See, e.g.*,

*Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2012); *Laydon*, 183 F.

Supp. 3d at 420.  These factors include, *inter alia*, "the importance to the . . . litigation of the

documents or other information requested" and "the degree of specificity of the request".

*Aérospatiale*, 482 U.S. at 544 n.28; *see also, e.g.*, *Laydon*, 183 F. Supp. 3d at 419-20.  In the

context of a comity analysis, requested documents or information are important if they "might

have a *vital* influence upon this litigation" and are "*crucial* in the outcome of this litigation,"
*Société Internationale Pour Participations Industrielles ET Commerciales, S.A. v. Rogers*, 357
U.S. 197, 201, 204–05 (1958) (emphases added); and where the "requested information is
*absolutely essential* to [Plaintiffs'] case," *In re Vitamins Antitrust Litig.*, 2001 WL 1049433, at
*9 (D.D.C. June 20, 2001) (emphasis added).

While, for the reasons set forth below, the comity issue is not yet ripe for the Court to
decide, Plaintiffs do not dispute that their RFPs call for the Banks to produce records that would
violate Lebanese law.  It is equally indisputable that Plaintiffs' blunderbuss RFPs do not meet the
Restatement's requirements that they request with "specificity" only those documents
"absolutely essential" to their claims, given that the RFPs (1) are directed to all the Banks, rather
than being tailored to Plaintiffs' allegations regarding each individual Defendant; (2) seek
virtually unlimited records that relate in any way to 686 individuals or entities, the large majority
of which are not alleged to have been publicly known to have been closely intertwined with
terrorist acts or to have ever been designated as SDGTs; (3) seek to have the Moving Defendants
examine all of their records for documents related to parties who are not even alleged to have
been a customer of *any* Moving Defendant during the Relevant Time Period; and (4) seek
records over a period of many years, including almost ten years *after* the last alleged attack.
Accordingly, this Court should first determine the proper scope of discovery pursuant to the
mandates of Rule 26 and the Restatement.

       1.      **On their face, Plaintiffs' sweeping and undifferentiated Requests
violate the basic tenets of Rule 26 and the Restatement.**

Judge Amon has previously noted that the Amended Complaint (which is shorter than the
SAC) is "mind-numbing in its length: reading largely like a treatise on Hezbollah and the
Lebanese economic system."  Memorandum Opinion and Order, ECF 164 at 1 (Nov. 25, 2020).

And the Court's opinion denying the Moving Defendants' motion to dismiss sustained the Complaint's allegations only with respect to Plaintiffs' "strongest allegations," which comprised only a very small portion of the prolix complaint. *Id*. at 2. Those allegations largely related to the alleged maintenance of accounts for "organizations designated during the relevant timespan as Hezbollah-affiliated SDGTs" and that were allegedly known to be closely intertwined with Hezbollah's terrorist activities. *Id*. at 4, 26.

The Moving Defendants' still-pending motion to dismiss the SAC submits that even those "strongest" allegations are insufficient to state a claim under the Second Circuit's recent decisions in *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) and *Honickman*, because, among other things, the SAC is conspicuously silent on whether any Moving Defendant provided financial services to any SDGT *after* its designation. *See* Am. Jt. Mem. of Law in Supp. of Moving Defendants Motion to Dismiss the Sec. Am. Cmplt., ECF 223 at 3-7 (Aug. 8, 2021). The Moving Defendants have also moved to dismiss the SAC on the ground that only three of the 156 alleged customers identified in the SAC are purported to have been "closely intertwined" with Hezbollah's acts of terrorism, another prerequisite for a valid aiding-and-abetting claim. *Id*. at 7.

Rather than tailor their Requests to the handful of SDGTs and certain other alleged customers identified in Judge Amon's opinion—or even to the broader set of 156 persons and entities to whom various of the Moving Defendants are alleged to have provided financial services in the SAC—Plaintiffs instead chose to serve on all Moving Defendants sweeping, undifferentiated Requests for various types of records, spanning multiple decades, for nearly 700 individuals and organizations (over 1,000 names including spelling variants). No Moving Defendant is alleged to have provided banking services to more than 38 of these individuals or

10

organizations, and the great majority of the nearly 700 listed names are not alleged to have had *any* banking relationship with *any* Moving Defendant.  Nor have Plaintiffs attempted to appropriately limit their Requests to documents that are tied to their claims, let alone documents that are "important" or "critical" to their claims.

Instead, they indiscriminately seek every scrap of paper related to each name—despite the fact that much of that paper (*e.g.*, a letter of credit with no connection to an SDGT or any of the attacks identified in the SAC) has no relevance to this case.  Rather than let stand their overbroad Requests, the Court should limit Plaintiffs' Requests for account records to include only those alleged customers who were publicly known at the Relevant Time Period to be closely intertwined with terrorist activities (*see Honickman*, 6 F.4th at 502)—and should do so on a Bank-specific basis.  That approach is dictated by Rule 26's relevance requirement; by the Restatement's heightened standards requiring that discovery be limited to what is "critical"; by binding Second Circuit precedents on the scope of liability under the Anti-Terrorism Act; and by Judge Amon's motion to dismiss ruling.

Under the Federal Rules and the Restatement, Plaintiffs cannot demand that Defendants search the entirety of their banking records for documents that are untethered to the allegations set forth in their operative Complaint.  On the contrary, it was Plaintiffs' obligation to serve discovery requests that were appropriately calibrated and *proportional* to target *relevant* evidence from each Defendant, and to seek only information "vital" or "crucial" to the litigation —which they have failed to do.  Instead, Plaintiffs have sought vast swaths of information from the Moving Defendants based on claims of a highly attenuated relationship between the Banks' role in the Lebanese economy and terrorist attacks perpetrated in another country by Iraqi militias.  It is plainly not enough for Plaintiffs to generically speculate that some unspecified

11

needle of evidence *might* turn-up in the massive haystack of records they have asked Moving Defendants to produce.

Plaintiffs have not remotely attempted to limit their RFPs to discoverable "matter that is relevant" to their claims or Moving Defendants' defenses, let alone information on which the litigation will "stand or fall," as required by the Restatement.  The SAC contains allegations regarding specific alleged customers, which the Moving Defendants are alleged to have "aided and abetted" by providing them with unspecified banking services in Lebanon, and attacks in Iraq that ended in 2011.  Moving Defendants are also alleged to have "conspired with" the persons who perpetrated those attacks.  Yet, rather than calibrate their Requests to documents relevant to *those* allegations about Moving Defendants' conduct, Plaintiffs have served all of the Moving Defendants with a single set of sweeping, undifferentiated Requests for multiple categories of records concerning hundreds of individuals and organizations who are not alleged to be customers of any of the Moving Defendants.

Under any measure of relevance, blanket requests for bank records that are untethered to any specific allegation in the complaint are out of bounds.  *See, e.g.*, *Allstate Ins. Co. v. All Cnty., LLC*, 2020 WL 5668956, at *1 (E.D.N.Y. Sept. 22, 2020) (quashing subpoenas that took a similar "blunderbuss approach" to bank records).  Indeed, Plaintiffs made no effort to tie the hundreds of individuals and entities listed in the exhibits to their RFPs with any specificity to any of the allegations against any of the various Moving Defendants.  Instead, they served the same overbroad request on all Moving Defendants—with no distinction based on any specific allegations that would differentiate among them.  That blanket approach only confirms that Plaintiffs have no specific basis for believing that there is relevant evidence that would result

from the massive and exceedingly burdensome searches they wish to impose on Moving

Defendants.

**2.**     **<u>Under Rule 26 and the Restatement, Plaintiffs' Requests must be limited to evidence that could actually support liability under their claims.</u>**

In addition to serving the same sweeping, undifferentiated, and unsupported Requests on

each of the Moving Defendants, the Requests seek large swaths of documents that are neither

material nor relevant to the claims in this case, as they do not relate to matters within the

boundaries of any potential liability under the ATA and JASTA.  At a minimum, Rule 26 and the

Restatement require the Court to limit Plaintiffs' Requests in order to comply with the contours

of the statutory framework and the Second Circuit's decisions.

*Plaintiffs' Requests for account and compliance records must be limited to documents for the specific customers that were publicly known to be "closely intertwined" with Hezbollah's terrorist activities during the Relevant Time Period.*  For starters, Judge Amon's motion-to-dismiss decision sustained Plaintiffs' JASTA aiding-and-abetting claim only with respect to Plaintiffs' "strongest allegations," *i.e.*, the provision of banking services to SDGTs that Plaintiffs alleged were publicly known to have been closely intertwined with Hezbollah's terrorist activities.  *See* ECF 164 at 26.  Judge Amon went on to identify only three such entities: the Islamic Resistance Support Organization ("IRSO"), Martyrs Foundation, and the Imam Khomeini Relief Committee – Lebanon ("IKRC").  *Id.*  The Requests should therefore be limited to account and compliance documents related to such alleged customers—and those Requests must be Bank-specific, since each claim against each Moving Defendant must stand or fall on its own.

Because liability under JASTA requires that a defendant have the requisite level of knowledge that it was aiding-and-abetting or conspiring to commit an act of international

13

terrorism, Plaintiffs' demand that Defendants produce "All" Compliance, Account, and Transactional Records in any way relating to hundreds of persons and entities who are not alleged to have been publicly known as having been "closely intertwined" with Hezbollah's terrorist activities during the Relevant Time Period violates both the relevance and burden limitations of Rule 26 and the importance, specificity, and other requirements of the Restatement.  *See* Hanchet Decl. Ex. 1.  And that problem is only compounded by Plaintiffs' decision to propound the exact same overbroad Requests on *all* Moving Defendants.  *Id.*

Plaintiffs' only attempt to explain their facially overbroad Requests is their generic assertion that Hezbollah consists of "a series of interlocking criminal networks."  MTC at 57. But that does not fill the gap between their allegations against Moving Defendants and their overbroad Requests.  It is black letter law that unspecified "speculation" is insufficient to justify a fishing expedition into the entirety of eleven Defendants' bank records over a nearly two-decade period.  *Henry v. Morgan's Hotel Grp., Inc.*, 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016); *see also Robertson v. People Mag.*, 2015 WL 9077111, at *2 (S.D.N.Y. Dec. 16, 2015) (rejecting request for "nearly unlimited access to" a defendant's files).

When faced with similar Requests that would require the wholesale searching of over a decade's worth of records and communications, courts have refused to compel discovery based on "a mere possibility of finding" information relevant to the plaintiff's claim.  *In re Bard IVC Filters Prods. Liab. Litig.*, 317 F.R.D. 562, 566 (D. Ariz. 2016).  Rather than complying with Rule 26's relevance requirement, Plaintiffs have relied on pure speculation and inappropriately requested information related to over 700 names (which amount to far more than 1,000 when including variants) of individuals and entities—the vast majority of whom are *not* alleged to even

be customers of any of the Moving Defendants. And their motion to compel completely fails to supply the specificity that the Rules and the Restatement require.

***At a minimum, Plaintiffs' Requests for transaction records must be limited to transactions that were plausibly related to terrorist activity.*** Plaintiffs make no effort to limit their Requests to transactions that could foreseeably be tied to terrorist activity—because one or more of the parties involved were publicly known to be closely intertwined with terrorist activity—as opposed to routine commercial banking transactions. But the Second Circuit has repeatedly held that JASTA liability "requires more than the provision of material support to a designated terrorist organization." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329-30 (2d Cir. 2018). In *Halberstam*, which provides the legal framework for JASTA, the Court was careful to distinguish between the normal supportive activities of a spouse versus what it referred to as the defendant's "collusive" conduct that evidenced her knowing assistance in her spouse's illegal activities, such as helping to "dispos[e] of the loot," falsifying tax returns, smelting gold and silver in the basement, and "launder[ing] the loot," because she "performed these services in an unusual way under unusual circumstances." *Halberstam v. Welch*, 705 F.2d 472, 486-87 (D.C. Cir. 1983).

Applying the *Halberstam* framework, the Second Circuit in *Kaplan* focused on evidence that the defendant bank had granted "special exceptions" to customers linked to Hezbollah that "permitted the laundering of money—nearly half a million dollars or dollar equivalents per day—in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks." 999 F.3d at 858, 862, 865. The Court distinguished these services from "routine banking services to the Five Customers in connection with non-violent social service activities" which would not give rise to liability. *Id.* at 858. And in *Honickman*, the Court

15

outright rejected the theory that banking transactions unrelated to terrorism establish aiding and

abetting liability, because such transfers make available other funds for terrorist attacks or support

an FTO's military operations by enhancing its reputation and attracting recruits. 6 F.4th at 499

("[W]e reject Plaintiffs' attempt to equate the *Halberstam* foreseeability standard with the

'fungibility' theory in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)").

Yet the Requests here make no effort to target transactions that might in some way be

related to terrorist activity, instead broadly requesting any and all transactions involving the

almost 700 individuals and entities Plaintiffs identify.  The vast majority of the massive

categories of transactional documents Plaintiffs seek are unrelated to any alleged terrorist activity

at all.  For example, Plaintiffs' Requests would capture large categories of patently innocent

transactions—such as school tuition payments and letters of credit for routine commercial

transactions.  As noted, speculation regarding the possibility that some responsive transactions

may exist is insufficient to justify blanket Requests for bank account records for 700 individuals

and entities spanning nearly two decades.  *Morgan's Hotel Grp.*, 2016 WL 303114, at *3;

*Robertson*, 2015 WL 9077111, at *2;  *In re Bard*, 317 F.R.D. at 566.

Rather than force the Court to do their job for them, Plaintiffs are obligated to narrow

their Requests to comply with the limitations of Rule 26 and the Restatement.  And Moving

Defendants have been and remain willing to engage in a meaningful meet-and-confer process to

reach a potential resolution.

***Plaintiffs' Requests must be limited to the time period encompassing the relevant***

***terrorist attacks.***  In addition to requesting documents related to hundreds of individuals and

organizations not alleged to have had any banking relationship with any Moving Defendant,

Plaintiffs have demanded broad categories of documents from not only the nine-year period

during which the attacks at issue took place, but also the decade *after* the last attack at issue.[8]
*See* Hanchet Decl. Ex. 1 at Request Nos. 4-6.

On their face, those generic and undifferentiated Requests obviously have not been
calibrated to target evidence relevant to Plaintiffs' claims against Moving Defendants—which
are based on specific attacks that all occurred *before* the end of 2011 and cannot rest on events or
designations that occurred *after* the relevant attacks. *See Honickman*, 6 F.4th at 502.  Indeed,
Plaintiffs' decision to separate the pre- and post-2011 Requests itself acknowledges the obvious
and dispositive difference between those time periods.  And, again, Plaintiffs' bald speculation
that some unspecified documents within the broad swaths they request *might* shed light on a
Moving Defendant's state of mind during the Relevant Time Period is hardly enough to justify
the fishing expedition they seek to conduct.

Not only is discovery concerning matters after the attacks irrelevant as a matter of law,
but Plaintiffs also fail to allege any facts supporting their pursuit of this discovery.  The Federal
Rules do not permit Plaintiffs to impose on Moving Defendants the excessive expense and
burden of searching a decade's worth of voluminous records based on no more than Plaintiffs'
sheer speculation.  *See., e.g.*, *Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp.*, 318
F.R.D. 9, 14–15 (E.D.N.Y. 2016) (requiring that "the party seeking discovery [] make a *prima
facie* showing that the discovery sought is more than merely a fishing expedition") (citing
*Edebali v. Bankers Standard Ins. Co.*, 2016 WL 4621077, at *1 (E.D.N.Y. Sept. 6, 2016) and
*Barbara v. MarineMax, Inc.*, 2013 WL 1952308, at *2 (E.D.N.Y. May 10, 2013)).

---

[8] In the Objections, Moving Defendants object to producing documents beyond a time period more closely tailored
to the allegations in the Complaint. *See, e.g.*, Hanchet Decl. Ex. 2 (limiting production to January 1, 2003 through
November 30, 2011, since the last of the attacks in which a Plaintiff was allegedly injured occurred on November
14, 2011 for certain Requests); Ex. 9 (limiting production to January 1, 2011 through November 30, 2011 because
the earliest attack as to which Bank of Beirut could potentially be subject to liability occurred on March 10, 2011,
and the last of the attacks in which a Plaintiff was allegedly injured occurred on November 14, 2011).

***Plaintiffs' Requests related to accounts that were allegedly "migrated" from Lebanese Canadian Bank are irrelevant to Moving Defendants.***  In Plaintiffs' list of persons and entities in Exhibit 1 of the RFPs, Plaintiffs seek bank records of persons or entities that allegedly held accounts at Lebanese Canadian Bank ("LCB") that later "migrated" to certain of the Moving Defendants "in 2011-2012 once Defendant LCB was forced to close the accounts." SAC ¶ 105. But Plaintiffs cannot shift LCB's alleged ATA liability to the Moving Defendants.

As a threshold matter, Plaintiffs have not alleged that any of the Moving Defendants provided financial services to any of the "migrated" accounts during the timeframe relevant to the litigation.  A "migrated" bank account is simply an asset—here, of LCB—that allegedly was transferred.  To support liability against the receiving bank, Plaintiffs must prove conduct by that bank (not LCB) that satisfies JASTA's requirements. *See, e.g.*, *Linde*, 882 at 327–28 (2d Cir. 2018) (provision of material support in the form of banking services to an entity linked to an FTO is, without more, insufficient to establish secondary liability); *Honickman*, 6 F.4th at 501 (for secondary liability, defendant must (a) as a "threshold" requirement be aware of a customer's connection to the FTO before the relevant attacks and (b) also be aware from information available prior to the attacks that its customer was "closely intertwined with [the FTO's] violent terrorist activities.").

But Plaintiffs have not even attempted to meet those requirements.  Plaintiffs do not provide any factual allegations specifying *when* any Moving Defendant opened a particular "migrated" customer account (as opposed to that account being closed by LCB) and *what* (if any) particular transaction any Moving Defendant may have performed for that customer, let alone that those banking services had any connection to the injuries in this litigation.  That alone

is a sufficient basis to deny discovery on the LCB-related persons and entities identified in Exhibits 1 (and 2) for all Moving Defendants.

Nor do Plaintiffs provide any factual allegations as to *how* any speculative, non-alleged or conclusory-pleaded banking services for those LCB customers could lead to any ATA liability on the part of any Moving Defendant. Plaintiffs' allegations fall short in two fundamental respects, again making any request for discovery irrelevant.

*First*, the SAC does not allege that the migration of LCB customer accounts to the Moving Defendants and the alleged provision of banking services to those new alleged customers (if any) took place *before* the last attack alleged by Plaintiffs. *See* SAC ¶ 5679 (last attack took place on November 14, 2011); SAC ¶¶ 1016, 1739 (alleging "accounts were flagged by Defendant SGBL's *2012* audit and Lebanese government investigation") (emphasis added); *see also* SAC ¶¶ 666, 764 794, 1013 n.96, 1147, 1736, 1766, 1823, 1856 (allegedly migrated customer accounts not closed at LCB until 2012). Plaintiffs' Requests therefore seek bank records for alleged customers outside the relevant timeframe of the litigation and thus exceed the permissible bounds of discovery.

*Second*, even assuming the migration of any particular LCB customer account may be inferred to have taken place earlier than 2012, the SAC alleges that LCB "ceased its banking activities" upon the execution of a purchase and sale agreement with SGBL on June 22, 2011, SAC ¶ 306, and that SGBL commenced an anti-money laundering and anti-terrorism financing compliance audit of LCB accounts at that time. SAC ¶ 97; SAC ¶ 1403. The SAC also alleges the Central Bank of Lebanon did not approve SGBL's purchase and sale of LCB's assets until September 2011, SAC ¶ 140.  According to the SAC, therefore, any alleged migration of LCB

customer accounts would have taken place—at the very earliest—only in the ten weeks before the last attack on November 14, 2011.

Plaintiffs have not offered any allegations to support LCB-transferee bank's liability within that short window. Plaintiffs' allegations are insufficient because, in addition to the lack of any factual allegations regarding each Moving Defendants' *conduct* (*i.e.*, the provision of any banking services to any former LCB bank customer) during this narrow timeframe, Plaintiffs fail to allege sufficient *knowledge* (*i.e.*, that any Moving Defendant knew about a migrated customer's connection with Hezbollah or that the customer was closely intertwined with violent terrorist activities). Instead, the SAC focuses on information that was not yet available and not distributed until 2012. *See* SAC ¶ 104 (LCB accounts migrated "with the full knowledge of the Lebanese government, whose own investigation and findings were widely circulated"); SAC ¶¶ 1495, 1016, 1739 (alleging Lebanese government's "subsequent" audit took place in 2012 after the alleged account migration).

For these reasons, the Court should limit Plaintiffs' RFPs to exclude Requests related to the alleged "migrated" LCB accounts. And, at the very least, this Court should narrow discovery to the timeframe beginning September 1, 2011 (the earliest date the SAC suggests LCB account migration could have taken place) and ending November 30, 2011 (the date of the last attack), and not any earlier.[9]

---

[9] As the purchaser of LCB's assets and liabilities, the analysis for SGBL differs slightly. *See* SAC, Part IX.B. For SGBL, the SAC distinguishes between two categories of potential ATA liability: ***successor liability*** based on its purchase of LCB's assets and liabilities, *see* SAC ¶¶ 1350-1494 (asserting LCB is SGBL's predecessor, and discussing LCB's alleged conduct and SGB's purchase and sale), ¶¶ 1495-1498 (basing SGBL liability on LCB customers), and ***independent liability***, SAC ¶ 1499 (transitioning from successor liability to independent liability, by alleging: "In addition to Defendant SGBL acquiring the liabilities of Defendant LCB, being the legal successor-in-interest to LCB and its criminal conduct, Defendant SGBL . . . .") (emphasis added), ¶¶ 1500-1517 (basing SGBL liability on its alleged conduct with customers independent of LCB, alleging: "independent of it acquiring the liabilities of Defendant LCB, Defendant SGBL . . . ."). This distinction between successor liability and independent liability (and between LCB customers and non-LCB customers) is reinforced by the allegations in SAC's Fourth Claim for Relief, which essentially repeats the earlier successor liability allegations. *Compare* SAC ¶¶ 5728, 5729,

\*     \*     \*

The 2015 Amendments to Rule 26 clarified the limits of discovery in order to prohibit precisely the sort of overbroad and speculative fishing expeditions that Plaintiffs advocate here. Before 2015, Rule 26 permitted document requests that were "reasonably calculated to lead to [the discovery of admissible] evidence." Fed. R. Civ. P. 26 Advisory Committee Notes (2000). The 2015 amendment, however, tightened the standard to permit discovery only into non-privileged evidence "that is *relevant* to any party's claim or defense and *proportional* to the needs of the case." Fed. R. Civ. P. 26(b)(1) (2015) (emphases added). In its notes on the amendment, the Advisory Committee explained that the "present amendment restores the proportionality factors to their original place in defining the scope of discovery" and stresses the "need for continuing and close judicial involvement" to ensure proportionality. Fed. R. Civ. R. 26 Advisory Committee Notes (2015). Accordingly, the federal courts have recognized that the 2015 amendment "serves to exhort judges to exercise their preexisting control over discovery more exactingly." *Robertson*, 2015 WL 9077111, at \*2 (citing 2015 Advisory Committee Notes).

Plaintiffs' motion to compel flouts that guidance by asking this Court to rubber stamp their excessive Requests on the bare, unsubstantiated suggestion that those Requests *might* lead to relevant evidence. But that is precisely the sort of speculative and abusive discovery conduct that the 2015 Amendments sought to rein in. *See, e.g.*, *Helena Agri-Enters., LLC v. Great Lakes Grain, LLC*, 988 F.3d 260 (6th Cir. 2021) (explaining that the 2015 Amendments were adopted "to improve a system of civil litigation that 'in many cases … has become too expensive, time-

---

5730, 5732, *with* ¶¶ 1495, 1496, 1497, 1498. Because the Court's earlier ruling in this case dismissed Plaintiffs' successor liability claim against SGBL, the *only* relevant alleged SGBL customers for the purposes of discovery are persons and entities that are alleged in ¶¶ 1500-1517 and *no* discovery of any LCB-related customers for any timeframe is relevant or vital to the claims against SGBL.

consuming, and contentious, inhibiting effective access to the courts.'" (quoting *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 258 (3d Cir. 2016)).

### C.    <u>Rule 26: Burden and Expense</u>

The relevance problems with Plaintiffs' Requests are only compounded by the wildly disproportionate nature of the burden they would impose on the Moving Defendants.  The heavy burden and expense that each of the Moving Defendants would have to undertake to even begin to comply with Plaintiffs' sweeping Requests would far outweigh Plaintiffs' unsupported speculation that they *might conceivably* lead to relevant evidence.  Indeed, the gross disproportionality of Plaintiffs' blunderbuss approach is exactly the sort of discovery abuse that Rule 26—and specifically the 2015 Amendments—were adopted to prevent.  Thus, to fall within the bounds of the Federal Rules, Plaintiffs must substantially narrow their Requests and tie them with specificity to their allegations against the Moving Defendants.

Rule 26(b)(1) allows discovery of nonprivileged information that is relevant and "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The Rule further sets out six factors to be used to determine proportionality, including "whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Id.*  In addition, even for electronically stored data, parties are not required to produce documents "from sources that the party identifies as not reasonably accessible because of undue burden or cost."  Fed. R. Civ. P. 26(b)(2)(B).  Accordingly, Rule 26(c) permits the Court to, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).

Since burden and expense are factors in determining proportionality under the 2015 amendments to Rule 26, the core question when evaluating burden "is whether the quantity of requests for relevant material is such that it is out of proportion to the scope of the case."  *Black*

*v. Buffalo Meat Serv., Inc.*, 2016 WL 4363506, at *6 (W.D.N.Y. Aug. 16, 2016); *see also*

*Robertson*, 2015 WL 9077111, at *2 (plaintiffs' requests "extend[ed] far beyond the scope of

Plaintiffs claims and would significantly burden Defendants"); *Trilegiant Corp. v. Sitel Corp.*,

272 F.R.D. 360, 366 (S.D.N.Y. 2010) (requests for the name, address, telephone number, and

date of alleged enrollment of over 100,000 customers are unreasonable, but requests for

documents related to particular groups within that cohort would be appropriate in scope).

     Burden and expense may be quantified in multiple ways, including "in terms of time,

expense, or even the adverse consequences of the disclosure of sensitive, albeit unprivileged

material." *S.E.C. v. Collins & Aikman Corp*., 256 F.R.D. 403, 414 (S.D.N.Y. 2009) (internal

quotation omitted).  For example, in *In re Terrorist Attacks on September 11, 2001*, the court

ordered the parties to meet and confer to narrow the requests when defendant presented evidence

that certain documents requested were located within over 114,000 boxes in a warehouse in

Saudi Arabia, the contents of the boxes were not indexed, many files were not digitally

searchable, and the estimated cost for reviewing even a subset of boxes could cost up to tens of

millions of dollars.  2021 WL 5449825, at *11 (S.D.N.Y. Nov. 22, 2021).  Additional interests,

such as privacy or confidentiality, can also create unwarranted burden.  *Johnson v. Nyack Hosp.*,

169 F.R.D. 550, 562 (S.D.N.Y. 1996) (partially granting motions to quash because the "burdens

imposed on the hospitals' privacy and other interests sufficiently outweigh[ed] the needs of the

parties"); *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 180 (E.D.N.Y. 1988),  *aff'd*, 870

F.2d 642 (Fed. Cir. 1989) ("balance of need against burden favor[ed] non-disclosure in this case"

because the party opposing the motion to compel had "shown hardships attendant upon

disclosure" of individual's identity which required the requesting party "to meet a higher

23

standard of relevance to overcome the . . . need for confidentiality").[10]  Indeed, as further

discussed *infra*, the Restatement requires courts to consider "the hardship of compliance on the

party or witness from whom discovery is sought" in considering whether to compel production.

    Discovery requests may also be burdensome if the documents requested are

"inaccessible."  *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003).

"Examples of inaccessible paper documents could include (a) documents in storage in a difficult

to reach place; (b) documents converted to microfiche and not easily readable; or (c) documents

kept haphazardly, with no indexing system, in quantities that make page-by-page searches

impracticable."  *Id*.  Electronically stored data may also be "inaccessible," depending on how it

is stored.  *Id*. at 318-20 (listing five categories of data and describing whether they are accessible

or inaccessible); *Aguilar v. Immigr. & Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, 255

F.R.D. 350, 360 (S.D.N.Y. 2008) (finding "that the process of restoring and reviewing the back-

up tapes generated by its decentralized email system would be extremely burdensome").

    The onus of showing undue burden or expense is on the party resisting discovery.

*Certain Underwriters at Lloyd's*, 2016 WL 2858815, at *3.  Accordingly, the party claiming

burden should provide an explanation for why a request is "overly broad, burdensome or

oppressive," by, for example, "submitting affidavits or offering evidence revealing the nature of

the burden."  *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 102

(S.D.N.Y. 2013) (finding that "defendants have substantiated their concerns that the plaintiffs'

proposed search terms go too far . . . requiring the defendants to sift through voluminous

irrelevant documents added to the search results and thus creating an unreasonable burden of

---

[10] At a minimum, Moving Defendants should not be compelled to undertake such extensive searches unless the cost is shifted to Plaintiffs.  *See Trilegiant Corp.*, 275 F.R.D. at 432 (S.D.N.Y. 2011); *Zubulake*, 217 F.R.D. at 318.

production") ; *cf. In re Terrorist Attacks on September 11, 2001*, 2021 WL 5449825, at *11
(presenting evidence of burden).

Ultimately, the court must determine whether the demonstrated burdens outweigh the
benefit to the requesting party. *See In re Terrorist Attacks on September 11, 2001*, 2021 WL
5449825, at *9 (finding that "[s]even years of discovery on 57 corporate entities and all their
associated employees and agents, along with separate discovery into 21 people is likely to
impose a substantial burden that [could not] be justified" in light of their lack of importance);
*Raza v. City of New York*, 998 F. Supp. 2d 70, 86 (E.D.N.Y. 2013) (balancing the "limited
probative value" of the requests against the fact that they were "impossibly burdensome," where
their "practical effect would be to require Defendants to review and analyze virtually all of its
records over a nine-year period to determine whether they should be produced").[11]  How the
burdens and benefits are weighed will "var[y] depending upon the foci of the various discovery
demands." *Johnson*, 169 F.R.D. at 562 (in racial discrimination case, defendants had substantial
interest in "information concerning malpractice claims, suspensions and adverse administrative
actions involving Dr. Johnson," but "[t]heir interest is not so great when it comes to less
conclusive events").

Here, the burden and expense of Plaintiffs' overbroad Requests clearly outweigh any
benefits.

As an initial matter, the first step to finding any relevant documents of the type sought by
Plaintiffs would be for each of the Moving Defendants to identify which of the names requested

---

[11] *Cf. Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *21 (S.D.N.Y. Feb. 16, 2016) (ordering sanctions where
"[t]he sheer number of plaintiff's document requests, his refusal to reconsider any of his requests and his own
inability to justify each of the items in his Second Document Request, in conjunction with the other conduct
discussed below, all point to the ineluctable conclusion that Plaintiff's Second Document Request was the product of
a conscious effort to draft the most burdensome document requests possible").

were in fact customers during the relevant period.  Plaintiffs have asked that the Moving

Defendants produce documents from two exhibits to their RFPs which together list nearly 700

names, ***not*** counting hundreds of alternative spellings.  The named individuals and entities are

not alleged to have a banking relationship with ***all*** of the individual Moving Defendants (some

are not alleged to have a banking relationship with ***any*** of the Moving Defendants), despite the

blanket requests to all Moving Defendants, and many are not even mentioned in the 5,735-

paragraph Complaint.[12]  The burden of searching for this many names without any allegations

tying them to each (or any) particular Moving Defendant on its own outweighs the potential

benefit to Plaintiffs.

     This search is further complicated because many of Moving Defendants' documents are

not maintained in Arabic, but Arabic names can be spelled multiple different ways in other

languages (*e.g.*, English, French).[13]  Because of these alternative spellings, Plaintiffs' already

overbroad Requests are multiplied many times over, making the true burden of their Requests a

search for ***thousands*** of accounts.[14]  In addition, while this search could initially be conducted

electronically, the results generated must be analyzed one-by-one to verify positive matches.[15]

     The overbreadth of Plaintiffs' list of names is compounded by the lengthy time period for

which they seek documents, which spans multiple decades.  Plaintiffs define a "Relevant Time

Period" of January 1, 2003 through December 31, 2011, but also seek production of certain

---

[12] *See supra* at 2.  Nearly 100 of the names Plaintiffs seek documents for are found nowhere in the Complaint.
Hanchet Decl. Ex. 14.

[13] *See, e.g.*, Bank of Beirut Declaration ¶ 17; BLF Declaration ¶ 24; BLOM Declaration ¶ 31; Byblos Declaration
¶ 21; Fenicia Declaration ¶ 14; Fransabank Declaration ¶¶ 9, 29; LGB Declaration ¶ 14; MEAB Declaration ¶ 14;
SGBL Declaration ¶ 23.

[14] As can be seen in the exhibits to Plaintiffs' RFPs, for each individual or entity it is not uncommon for there to be
three or more alternative spellings listed. *See* Hanchet Decl. Ex. 1.

[15] *See, e.g.*, Bank of Beirut Declaration ¶ 30; BLF Declaration ¶ 25; BLOM Declaration ¶¶ 13, 31; SGBL
Declaration ¶ 48; Fransabank Declaration ¶ 29.

documents from January 1, 2012 all the way through December 31, 2021.  Since Moving

Defendants each carry out millions of transactions every year, to comply with Plaintiffs'

Requests for individuals and entities on the list that are found to have held accounts, Moving

Defendants will need to sift through hundreds of millions of transactions.[16]  And beyond the

already heavy burden of searching for almost a decade of documents, the burden of searching for

another ten years of documents well after the last attack for which Moving Defendants could

theoretically be liable clearly outweighs any minimal benefit such marginally relevant

documents could have.

Further, Plaintiffs seek wide-ranging types of documents, which, given the broad

definitions in Plaintiffs' Requests, essentially seek every document related to a customer.[17]

These documents are complex to locate and identify, given the numerous different formats,

systems, and physical locations where they can be found, as described below.[18]

For each of the Moving Defendants, some documents are only available in hardcopy.[19]

Hardcopy documents for a customer are generally stored at the customer's relevant branch and

---

[16] *See, e.g.*, BLOM Declaration ¶ 5 (385 million transactions between January 1, 2003 and November 30, 2011);
Fransabank Declaration ¶ 5 (50 million transactions between January 1, 2003 and November 30, 2011); Bank Audi
Declaration ¶ 6 (8-10 million transactions per year); Bank of Beirut Declaration ¶ 16 (average of approximately 2.8
million transactions per year).

[17] *See* Hanchet Decl. Ex. 1 (definitions of "Account Opening Records," "Compliance Records," and "Transactional
Records").

[18] Since Plaintiffs' Requests date back to 2003, many of the Moving Defendants have changed document
management practices and systems since then, making searching for and locating documents even more difficult.
*See, e.g.*, Bank of Beirut Declaration ¶ 18; LGB Declaration ¶ 17.

[19] *See, e.g.*, Bank Audi Declaration ¶ 17; Bank of Beirut Declaration ¶¶ 18-20; BBAC Declaration ¶ 10; BLF
Declaration ¶¶ 16, 18, 19; BLOM Declaration ¶¶ 11, 21, 28; Byblos Declaration ¶¶ 9, 12; LGB Declaration ¶¶ 18-
22; SGBL Declaration ¶¶ 20-22; Fenicia Declaration ¶ 19; Fransabank Declaration ¶¶ 11, 20; MEAB Declaration ¶¶
18-19.

then, at some point, are archived.[20]  Moving Defendants each have numerous branches,[21] and

generally archive documents at one or more warehouses or similar facilities which each can hold

tens of thousands of boxes.[22]  Hardcopy records are not aggregated at a single location for each

customer for most Moving Defendants.[23]  Therefore, for each customer, a Moving Defendant

would need to go to numerous different locations to search for all of that customer's relevant

hardcopy documents (*e.g.*, branches, warehouses, or both), locate the specific location of the

desired records (*e.g.*, a specific box within the warehouse), and then look for the actual

documents (which will often be intermingled with documents for multiple different and unrelated

clients).[24]  Moreover, for many of the Moving Defendants hardcopy documents are not indexed

by customer, making finding the documents only possible if particular information can be

provided (such as the date of a transactions) or practically impossible without manually

searching enormous amounts of records.[25]

Moving Defendants' ability to efficiently locate and collect hardcopy documents is

hampered by various other circumstances, including: (a) the acute electricity supply emergency

---

[20] *See, e.g.*, Bank of Beirut Declaration ¶¶ 21, 24; BBAC Declaration ¶ 12; BLF Declaration ¶ 19; BLOM Declaration ¶¶ 12, 22; SGBL Declaration ¶¶ 30, 36-37; Fenicia Declaration ¶ 20; Fransabank Declaration ¶ 12; MEAB Declaration ¶¶ 20, 22.

[21] BLOM Declaration ¶ 3 (76 branches in Lebanon currently); Fransabank Declaration ¶ 3 (average of 55 branches between 2003 and 2011); BLF Declaration ¶ 8 (46 branches in Lebanon at the end of 2011).

[22] *See, e.g.*, Bank of Beirut Declaration ¶ 21 (four warehouses each generally holding between 10,000 and 35,000 boxes); BLOM Declaration ¶¶ 6 (eight warehouses cumulatively holding upwards of 89,800 boxes); Fransabank Declaration ¶ 6 (35,000 boxes at its principal archive warehouse); SGBL Declaration ¶ 57 (65,318 boxes across multiple locations).

[23] *See, e.g.*, Bank of Beirut Declaration ¶ 25; BLOM Declaration ¶¶ 22, 29;  Byblos Declaration ¶ 14; Fenicia Declaration ¶ 23; Fransabank Declaration ¶¶ 6, 21; MEAB Declaration ¶ 27; SGBL Declaration ¶ 41.

[24] *See, e.g.*, Fenicia Declaration ¶ 30; SGBL Declaration ¶ 38.

[25] *See, e.g.*, BLF Declaration ¶ 35 (transactions indexed by date and branch rather than customer); MEAB Declaration ¶ 27 (transactional records typically organized by date); LGB Declaration ¶ 26 (manual inspection of all daily journals at a customer's branch for relevant time period required to find transactions); Fransabank Declaration ¶¶ 12, 23 (account opening records organized by branch and only contain a summary of contents on the outside of each box); BLOM Declaration ¶¶ 12, 24, 20 (locating certain records would require a manual search of more than 89,800 boxes and millions of transactional documents).

currently facing Lebanon, limiting the ability of Moving Defendants' employees to search within their warehouses[26]; the devastating August 4, 2020 explosion at the Port of Beirut [27]; merging of files due to branch closures caused by the unprecedented financial crisis facing Lebanon[28]; destruction of records during airstrikes in the 2006 Lebanon war[29]; and small capacity limits in warehouses, preventing the expedition of the review stored materials.[30]

Even if records are accessible electronically, they may only be searchable against limited criteria.[31]  For example, many of the Moving Defendants' document management systems do not provide for the searching of non-customer counterparty names; however, Plaintiffs' Requests contemplate Moving Defendants searching for any transaction involving the names on their list regardless of whether they were a customer or not, meaning that a manual transaction-by-transaction review of all transactional records would be required to comply.[32] Additionally, for some types of documents Moving Defendants may only have some percentage of the total

---

[26] *See, e.g.*, Bank of Beirut Declaration ¶ 23; BLOM Declaration ¶ 33; Fransabank Declaration ¶ 31.

[27] *See, e.g.*, SGBL Declaration ¶ 52 (stating that the explosion caused substantial damages to the SGBL's headquarters and most branches in Beirut with "thousands of documents being either destroyed or scattered on the ground and mixed"); Fenicia Declaration ¶ 24.

[28] *See, e.g.*, SGBL Declaration ¶ 51.

[29] *See, e.g.*, Fenicia Declaration ¶ 24; MEAB Declaration ¶ 23.

[30] *See, e.g.*, BLOM Declaration ¶ 14.

[31] *See, e.g.*, Bank Audi Declaration ¶ 9 (electronically stored transactional records must be searched for by branch, date, and the employee who executed the transaction); BLOM Declaration ¶¶ 7, 19 (unable to search for beneficial owners of accounts opened by individuals or business entities, signatories for accounts opened by business entities, or ultimate sources or ultimate beneficiaries of certain transactions); Byblos Declaration ¶ 11 (some scanned documents not capable of being OCRed), ¶ 16 (document management system designed for searches to be run based on date); BLF Declaration ¶ 34 (transaction date and branch necessary to locate tape with electronic records); Fransabank Declaration ¶¶ 7, 19 (limited fields that can be searched for certain transactions).

[32] *See, e.g.*, LGB Declaration ¶¶ 31-32 (search for non-customer transactional records would require cross-referencing almost 8 million records and would be estimated to take 13,095 hours if searching for all names on Plaintiffs' list); Bank of Beirut Declaration ¶ 18.b (only possible to search for customer names, not non-customer counterparty names, on document management system); Fenicia Declaration ¶¶ 35-36; BLF Declaration ¶ 57; MEAB Declaration ¶¶ 32-33.

universe of potentially responsive documents locatable electronically,[33] or may only have a summary form of the information available electronically.[34]  Finally, some electronically stored data may only be available on back-up tapes or microfilm, which have limited accessibility.[35]

Given all of the above challenges, searching for the names and relevant records (if determined to be a customer) of each individual or entity pursuant to Plaintiffs' Requests is estimated to take from a few hours to a few weeks *per individual or entity*, to take *months and months* to collect all documents for Plaintiffs' full list of names, and to be extremely costly in terms of *money and manpower*.[36]  Since, as discussed, the vast majority of the nearly 700 names on Plaintiffs' list are not actually alleged to be customers of each respective Moving Defendant, or tangibly demonstrated to be relevant to the allegations against Moving Defendants in any way, the burden and expense of this requested discovery undoubtedly outweighs any benefit.

## II.    THE COURT SHOULD DECLINE TO ORDER THE MOVING DEFENDANTS TO VIOLATE LEBANESE LAW ON THE RECORD BEFORE IT

Plaintiffs argue that the Court must decide whether the Moving Defendants should be required to produce banking records in violation of Lebanese law.  MTC at 1-2.  Plaintiffs further maintain that this issue is ripe for decision right now.  Neither of these contentions is correct.  *Id.*

---

[33] *See, e.g.*, Bank of Beirut Declaration ¶ 18.a (40% to 50% of documents from January 1, 2003, through December 31, 2011, not locatable on current electronic document management system due to problems converting from prior system); LGB Declaration ¶ 17 (transactional data reflected in the current core banking system incomplete and unstructured with respect to certain transactions due to transition from prior system); Fransabank Declaration ¶ 11 n.1 (some, but not all, account opening records converted from hardcopy to electronic format); Byblos Declaration ¶ 13 (digitization of transaction records done differently across locations, with some only scanning slip sheets and others including supporting documentation); BBAC Declaration ¶ 17 (annexes and supporting documents for daily journals not consistently digitized).

[34] *See, e.g.*, BLF Declaration ¶ 19; Fenicia Declaration ¶ 17; MEAB Declaration ¶ 17.

[35] *See, e.g.*, BLF Declaration ¶ 13; Byblos Declaration ¶ 16; Fransabank Declaration ¶ 18.

[36] *See, e.g.*, Bank Audi Declaration ¶ 10; Bank of Beirut Declaration ¶ 33; BBAC Declaration ¶ 19; BLOM Declaration ¶¶ 13, 23; Byblos Declaration ¶ 18; Fransabank Declaration ¶¶ 12, 40; LGB Declaration ¶ 27; MEAB Declaration ¶¶ 31, 34; SGBL Declaration ¶¶ 53, 58.

*First*, it is entirely possible that the Court *never* will have to conduct that comity analysis, and, even if it does, that analysis will address a much narrower set of banking materials than what Plaintiffs currently seek.  In *Société Nationale Industrielle Aérospatiale v. United States Dist. Court for Southern Dist. Of Iowa*, 482 U.S. 522, 555 (1987), the Supreme Court made clear that a comity analysis is required only if there is a true and unavoidable conflict between U.S. and foreign law.  While an order from the Court today requiring the Moving Defendants to comply with Plaintiffs' Requests as drafted would call upon the Banks to violate Lebanese law, *see* Moghaizel Decl. at ¶ 38, the parties and the Court can work to reduce that conflict or avoid it altogether.

As discussed above, the Court should first decide the proper scope of discovery.  A reduction in the scope of permissible discovery not only would ensure that such discovery is relevant and proportionate to the needs of the case, but it would also reduce the set of materials subject to any future comity analysis and increase the likelihood that a conflict with Lebanese law can be resolved.  To that end, once the Court determines the proper scope of discovery, the parties can approach the Lebanese authorities to request that Lebanese bank secrecy law be lifted on a targeted basis. Moghaizel Decl. at ¶¶ 31-36. To the extent the Lebanese authorities agree to lift those restrictions, the Moving Defendants will be authorized to produce responsive banking materials.  In that scenario, the Court may never be required to conduct a comity analysis because the Lebanese bank secrecy issue may have been resolved.  Consequently, skipping to the comity analysis now, without first appropriately limiting the scope of discovery, would be premature.

If, as Plaintiffs apparently want the Court to assume, the Lebanese authorities decline to authorize the production of some or all of the requested banking materials, the parties still have

31

avenues to avoid a conflict with Lebanese law.  The Moving Defendants can request that any client or former client implicated by Plaintiffs' *properly tailored* discovery requests consent to the production of certain of their records, effectively waiving their bank secrecy right, as permitted under Lebanese law.  Moghaizel Decl. at ¶ 20.  Again, if the clients so consent, the Court need never conduct a comity analysis with respect to those materials.[37]

     *Second*, even if the Court ultimately were required to conduct a comity analysis with respect to certain of the requested banking materials, it should make its ruling on a full record.  That record has not yet been developed.  As explained below, the comity analysis requires an evaluation of a range of factors implicating information that is, as yet, unknown.  Among other things, until the letters rogatory process has been completed and the Lebanese government has been consulted on whether it will lift the bank secrecy restrictions that govern the conduct of the Moving Defendants, the record for conducting the comity analysis is inadequate.

     *Third*, in the interim, there may be material changes to the scope of Lebanese bank secrecy laws in the near future.  Earlier this year, as a condition to a critically-needed $3 billion loan, Lebanon reached a staff-level agreement with the International Monetary Fund ("IMF") which, if adopted by Lebanon's Parliament, would relax bank secrecy restrictions in certain circumstances.[38]  The exact scope of those changes to Lebanese bank secrecy are still being addressed in the Lebanese Parliament.  Once again, until this plays out, it makes little sense to rush prematurely to an order directing the Moving Defendants to violate current Lebanese law.

---

[37] Although Plaintiffs speculate that the prospects of obtaining waivers are unrealistic (MTC at 41), bank customers have granted similar requests in the past. *See, e.g.,* https://www.finews.com/news/english-news/24500-citi-kristine-braden-swiss-private-bank-waive-banking-secrecy (describing Citi's success when asking clients to waive Swiss bank secrecy).

[38]*See* https://www.imf.org/en/News/Articles/2022/04/07/pr22108-imf-reaches-agreement-on-economic-policies-with-lebanon-for-a-four-year-fund-facility.

As discussed more fully below, it is premature to engage in a comity analysis at this stage, and the Court should decline Plaintiffs' invitation to skip ahead and summarily order the violation of foreign law.

### A.   It is Premature for the Court to Order the Moving Defendants to Produce Materials in Violation of Lebanese Law

Before conducting a comity analysis and potentially ordering the Moving Defendants to violate the law of their home country, three issues must be resolved: (1) the proper scope of discovery, (2) whether, and to what extent, the Lebanese government will lift bank secrecy restrictions to accommodate properly tailored requests, and (3) whether any customers or former customers of the Moving Defendants implicated by properly tailored requests will consent to the production of their bank records.  We address each of these issues below.

#### 1.   Scope

As discussed above in Section I, Plaintiffs' exceptionally broad Requests must be narrowed to comport with the relevance and proportionality requirements of Rule 26.  And as discussed below, those Requests must also be narrowed under the more restrictive standards of the Restatement. Determining the proper scope of discovery, and tying that scope to well-pleaded allegations in the Complaint also is necessary to facilitate the Moving Defendants' efforts to seek a targeted lifting of bank secrecy restrictions in order to accommodate a production to Plaintiffs.

#### 2.   Letters Rogatory to Lebanese Authority

After determining the proper scope of discovery requests targeting bank materials in Lebanon, the next step should be directing letters rogatory to the appropriate Lebanese governmental authority. As described more fully herein, the Lebanese government has designated an agency, and a process, for receiving, evaluating, and fulfilling requests from

33

foreign authorities and the lifting of Lebanese bank secrecy restrictions in certain contexts.
Moghaizel Decl. at ¶ 22.  That agency is known as the Special Investigation Commission or
"SIC."  *Id.*

As a logistical matter, this process would involve the parties submitting, and this Court
issuing, a tailored and supported request for assistance to the Minister of Justice in Lebanon.
Moghaizel Decl. at ¶ 33.  The Minister of Justice would then pass the request to the Public
Prosecutor at the Court of Cassation, who would submit it to the Special Investigation
Commission. Moghaizel Decl. at ¶ 34. The Special Investigation Commission has been
specifically empowered to consider requests to lift bank secrecy restrictions.  As the SIC website
explains:

> The Special Investigation Commission . . . is a multi-function financial
> intelligence unit (FIU) with judicial status. It is the center piece of
> Lebanon's AML/CFT regime, a platform for international cooperation and
> plays a vital role in safeguarding concerned sectors from illicit proceeds. .
> .SIC's tasks include. . .conducting financial investigations [and] lifting
> banking secrecy. . .

*See* https://sic.gov.lb/en/about-us.

The power of the SIC to lift bank secrecy restrictions is not merely theoretical. Moghaizel
Decl. at ¶ 36.  According to its published annual report, the SIC received 463 cases from local
and foreign authorities for potential investigation in 2020, investigated 384 of those cases,
provided information (including information covered by bank secrecy restrictions) in 147 cases,
and ultimately lifted bank secrecy restrictions in 29 of those cases, including multiple requests
from foreign courts.[39]  The numbers were even higher in 2019, with 637 cases received, 552

---

[39] *See* SIC Annual report 2020 English_0.pdf.

34

investigated, information provided in 164 cases, and bank secrecy restrictions lifted in 55 cases (including foreign requests).[40]

The mechanism for the SIC to lift Lebanese bank secrecy restrictions generally applies in cases in which the request is made by a non-Lebanese government or court in criminal matters, and largely has been applied in that context.  Although a request issued by a foreign court in a civil lawsuit, as here, would not be typical, any suggestion that it would be futile is without basis.  As Plaintiffs themselves argue (MTC at 35-36), Lebanon is struggling to overcome an economic crisis. This suit, against twelve leading Lebanese banks, representing over 80% of the Lebanese banking sector, is an action of unprecedented breadth.  Predicting the outcome of a request to the SIC in these circumstances amounts to speculation, and there certainly is no factual basis for the Court to presume futility.  Indeed, as noted above, the Lebanese government has quite recently demonstrated a flexibility in discussions with foreign counterparts when it comes to bank secrecy, embracing an IMF request to pursue legislation modernizing and relaxing its bank secrecy restrictions (the enactment of such legislation is now an issue before the Lebanese Parliament).

The process for submitting letters rogatory and receiving a response from the Lebanese authorities will likely take approximately six months in total, and thus will not create substantial delays. Moghaizel Decl. at ¶ 35.

As the Moving Defendants have consistently maintained in this litigation, they welcome the opportunity to provide evidence in this case, and to refute the spurious allegations made by the Plaintiffs.  It is in the parties' collective interest to find a solution to the discovery challenges presented by Lebanese law.  It bears emphasis that violation of the Lebanese Banking Secrecy

---

[40] *See* SIC English 2019..pdf.

Act ("BSA") can lead to criminal liability for any Bank or Bank employee responsible for any unlawful disclosure, and it is punishable by imprisonment for a period between three and twelve months. Moghaizel Decl. at ¶ 24.  In addition to criminal sanctions, a party that violates the BSA may also be held liable in tort or contract for damages by customers whose confidential information was disclosed in breach of the BSA.  Moghaizel Decl. at ¶ 25.

### 3.   Waivers

In addition to directing letters rogatory to the Lebanese government, the Moving Defendants can, and should be allowed the opportunity to seek waivers from any bank customers whose records are determined to be the proper subject of discovery in this case.

Embedded in the BSA is an exception to bank secrecy for instances in which the bank customer, whose confidentiality the BSA protects, consents to the disclosure of his or her information.  Moghaizel Decl. at ¶ 20.  Bank customers can waive all aspects of their BSA protections, and therefore executing a waiver authorizing disclosure in this case would remove any Lebanese law obstacles to production for that customer's records.

While Plaintiffs argue that "[t]here is no realistic basis to believe that Plaintiffs could ever obtain waivers from these individuals and entities to allow disclosure of their financial records" (MTC at 41), this statement is based on circular and conclusory reasoning: that "terrorists, their financiers, and their sympathizers located in jurisdictions like Lebanon are exceedingly unlikely to produce their financial records voluntarily to American victims of terrorism" (*id.*).

In any event, Plaintiffs identify no prejudice in permitting the Moving Defendants, if necessary, to seek waivers from any individual or entity that is within the scope of permissible discovery in this case.

### B.     Application of the Restatement Factors

Even if the Court were inclined at this time to consider an order requiring the Moving Defendants to violate Lebanese law before determining the scope of discovery, before consulting the Lebanese authorities, and before allowing the Moving Defendants to pursue customer waivers, an evaluation of the comity factors (even on the very limited record before the Court) counsels against such an order.

Federal courts view foreign court orders, statutory, and regulatory enactments through the lens of comity. *See, e.g., United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 248-49 (S.D.N.Y. 2009).  Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1046 (2d Cir. 1996). Where foreign law conflicts with domestic law, the court must perform a comity analysis "to determine the weight to be given to the foreign jurisdiction's law." *Laydon*, 183 F. Supp. 3d at 413.

This comity analysis is a familiar one for federal courts, and is guided by the Restatement (Third) of Foreign Relations Law § 442(1)(c).  Courts in this Circuit consider the following factors when assessing conflicting foreign law:

1.     the importance to the investigation or litigation of the documents or other information requested;

2.     the degree of specificity of the request;

3.     whether the information originated in the United States;

4.     the availability of alternative means of securing the information;

5.      the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located; [. . .]

6.      the hardship of compliance on the party or witness from whom discovery is sought; and

7.      the good faith of the party resisting discovery.

*Laydon*, 183 F. Supp. 3d at 419-20; *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 4596561, at *9 (S.D.N.Y. Oct. 6, 2021).[41]

We address each of these factors, briefly, below.

### 1.    Importance of the Discovery to the Case

Discovery is "important" for the purposes of a comity analysis if the "records might have a *vital* influence upon this litigation" and are *"crucial* in the outcome of this litigation." *Rogers*, 357 U.S. at 201, 205 (emphases added). Courts consistently assess the Restatement's importance factor in this way, in this Circuit and beyond. *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 529-30 (S.D.N.Y. 1987); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474-75 (9th Cir. 1992); *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 999 (10th Cir. 1977) (reversing a contempt and sanctions finding after analyzing whether the litigation would "stand or fall on the present discovery order"); *In re Vitamins Antitrust Litig.*, 2001 WL 1049433, at *5 n.6 (assessing "importance" in terms of whether the "requested information is absolutely essential to [plaintiffs'] case"); *In re: Xarelto (Rivaroxaban) Prod. Liab. Litig.*, 2016 WL 3923873, at *14 (E.D. La. July 21, 2016) (surveying precedent and assessing "importance" in terms of whether the evidence is "critical or compelling").[42]

---

[41] The court may also consider "whether the person resisting discovery is a party to the litigation," and whether the requirements of another country's privacy laws are "absolute." *Laydon*, 183 F. Supp. 3d at 420 (citing *Tansey v. Cochlear Ltd.*, 2014 WL 4676588, at *2 (E.D.N.Y. Sept. 18, 2014)).

[42] *See also In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1082 (N.D. Cal. 2007) (denying Plaintiffs' motion to compel in part because the documents were not important and stating, "[C]ourts are less inclined to ignore a foreign state's concerns where the outcome of litigation does not stand or fall on the present discovery order, or

As discussed in Section I above, the Requests issued by Plaintiffs here do not meet the Rule 26 standard of relevance and proportionality, much less the more exacting standard imposed by the Restatement—that the discovery is *critical* and *absolutely essential* to Plaintiffs' case.  This factor weighs in favor of granting a protective order, and underscores the need to properly calibrate the scope of discovery in this case.

### 2.    Degree of Specificity of Plaintiffs' Requests

Plaintiffs' Requests are anything but specific.  Indeed, their sweeping and undifferentiated nature only compound their violation of Rule 26's relevance and proportionality requirements.  Plaintiffs make no attempt to distinguish among any of the eleven Moving Defendants, and they seek "all" "Account Opening," "Transactional," and "Compliance" records[43] concerning any of nearly 700 individuals and entities, the vast majority of which are

---

where the evidence sought is cumulative of existing evidence . . . Here, plaintiff has failed to persuade [the Court] of the importance of the [ ] documents.") (internal quotation marks omitted); *Wang v. Wu*, 2016 WL 10957847, at *3 (C.D. Cal. Dec. 7, 2016) (denying a motion to compel additional and explaining, "the Court is not inclined to order [defendant] to search for or produce materials that are potentially responsive to Plaintiff's disputed discovery requests.").

[43] Plaintiffs define these terms extremely broadly. According to Plaintiffs, "Account Opening Records" means (and includes) account opening applications and documentation, "Know your Customer" ("KYC") forms, KYC profiles created by a bank, all customer identification Documents, including passports, driver's licenses or other forms of photographic identification, address, telephone number, profession, name of employer, purpose of account, source of cash flow, references provided and in the case of business entities, company bylaws, identification Documents for owners and for all authorized signatories, copies of filings with the applicable commercial register, nature of business, financial data provided, chairman of the board and executives, purpose of the account, sources of cash flow, references, any powers of attorney for authorized signatories, and copies of the audited accounts or annual reports. Such Account Opening Records include accounts controlled by or for the benefit of a listed person or entity, regardless of whether that person or entity's name appears on the account. *See* Hanchet Decl. Ex. 1 at 1.

"Compliance Records" means Documents, including memoranda, internal reports, KYC documentation, enhanced due diligence and customer risk profiles and Communications concerning an identified person or entity, including memoranda, notes and other Communications generated by, or in the possession of, a Defendant's Compliance and/or Audit Department. *Id.* at 2.

"Transactional Records" includes any S.W.I.F.T. Messages, CHIPS Payment Messages, FedWire Payment Messages, Continuous Linked Settlement (CLS) Bank Messages, Telex Messages, and any internal payment system messages reflecting requests for or actual payments, payment orders, bills of exchange, checks including interbank checks, financial institution transfers, including banknote transfers, documentary credits and guarantees, bank guarantees, letters of credit, mortgages and mortgage-related documents and any other wholesale transfers of value, regardless of whether they are or were blocked by law or Your policies. *Id.* at 3.

not even alleged to have had any banking relationship with any Moving Defendant and span multiple decades.  *See* supra at §I(b)(1).  And Plaintiffs make no attempt to tie the individuals and entities identified in their Requests to specific allegations in their Complaint. *Id*.

Plaintiffs' Requests amount to a vast fishing expedition, apparently issued with the hope that some of the names in those requests appear somewhere in the records of one or more of the Moving Defendants.  But that gets the discovery process backwards.  This effort is detached from the actual claims and defenses in this lawsuit.  The "specificity" factor weighs heavily in favor of granting a protective order.

### 3. Whether the Information Originated in the United States

Plaintiffs' Requests target records that were created, and are located, in Lebanon—a fact that Plaintiffs do not, and cannot, dispute.  *See* MTC at 27-44.  As such, this factor weighs in favor of granting a protective order. *See Tiffany (NJ) LLC*, 276 F.R.D. at 152.

### 4. Availability of Alternative Means for Securing Requested Information

Courts engaging in a comity analysis also consider "whether there are 'alternative means of securing the [requested] information.'" *Doubleline Capital*, 2021 WL 4596561 at *13 (citing *Wultz*, 298 F.R.D. at 96).  Alternative means could include any of a number of discovery tools available to Plaintiffs either to limit the scope of their Requests or obtain the information they have requested.

Evaluation of this factor underscores how any comity analysis in this case would be premature.  For instance, Plaintiffs have served some (but not all) of the Moving Defendants' U.S. correspondent banks with subpoenas seeking transactional data regarding most of the same individuals and entities included in their Requests to the Moving Defendants.  *See* MTC at 41-42.  The production of such data by U.S. correspondent banks would not implicate Lebanese law.  Plaintiffs argue that such productions would be insufficient because they would include some,

but not all, of the records they are seeking. MTC at 42. Even accepting Plaintiffs' arguments, document productions by the correspondent banks could narrow the scope of Plaintiffs' Requests by identifying individuals and entities, if any, that actually transacted through the United States at any relevant time period.

Plaintiffs also could cooperate with the Moving Defendants' efforts to seek assistance from the Lebanese authorities, such as the SIC. *See supra* at §II(A). This is precisely why the Moving Defendants propose approaching the SIC with a Court-endorsed request for information once the proper scope of discovery is determined.

Particularly at this stage, this factor also favors granting a protective order.

### 5.   <u>Balancing Sovereign Interests</u>

The "most important factor" in the comity analysis is the balancing of sovereign interests. *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 338 (S.D.N.Y. 2018). That is because "it directly addresses the relations between sovereign nations"—the very essence of international comity. *Id*. To evaluate this factor, courts engage in a "particularized analysis of the respective interests of the foreign nation and the requesting nation." *Id*.

Again, an examination of this factor highlights the insufficiency of the record before this Court. The parties have not yet sought the cooperation of the Lebanese government or the SIC, and thus do not have a complete picture of Lebanon's views of the issues before the Court. But even at this stage, significant Lebanese interests are apparent.

#### a.   **Lebanon's interest in enforcing its laws in a matter affecting nearly its entire banking sector.**

Defendants in this case comprise the vast majority—representing approximately 80% of assets—of the Lebanese banking sector. They are alleged to have engaged in banking conduct entirely on Lebanese soil, and Plaintiffs target bank records created and stored in Lebanon.

41

Thus, Lebanon has a clear sovereign interest in this dispute, the discovery sought, and the Moving Defendants, each a Lebanese bank.

More specifically, Lebanon has an acute interest in having its bank secrecy laws respected. The BSA reflects the Lebanese government's firmly held policy of protecting the individual right to privacy, a right so embedded in Lebanese society that it is reflected in the country's constitution. Moghaizel Decl. at ¶ 12. And it underlies the most critical sector of the Lebanese economy—the banking sector. Moghaizel Decl. at ¶ 13. Indeed, Lebanon emerged as an international banking center for the Middle East in the 1950s, and has remained so since that time, providing a sophisticated, reliable, and stable banking system to support the region's flourishing petroleum industry. *Id*. The hallmark of Lebanon's banking system has long been the Banking Secrecy Act, modeled after the laws in Europe's own banking center, Switzerland. *Id*.

The BSA is rigorously enforced in Lebanon. Moghaizel Decl. at ¶¶ 24-30. Violations carry the threat of criminal prosecution both for the banking institution involved and personnel within the bank responsible for any unlawful disclosure of protected information—a serious risk for individual bank employees. *Id*. As such, violations of the BSA rarely occur. *Id*. Even relatively minor violations of the BSA, such as the unauthorized disclosure of a customer's identity to a notary for banking purposes or of a customer's mortgage documents can give rise to criminal prosecutions. *Id*. Moving Defendants are aware of no violation of the BSA on the scale Plaintiffs seek to compel in this case.

The United States government has itself recently emphasized the very points outlined above. The Advisory Committee for the Restatement has recommended that courts conducting a comity analysis solicit input from the "United States attorney or other appropriate official to

advise it of the interests of the United States government." RESTATEMENT (THIRD) OF FOREIGN

RELATIONS LAW § 442 cmt. c (Am. Law Inst. 1987).  That is exactly what happened in *Linde v.*

*Arab Bank*, where the Solicitor General submitted an amicus brief to the United States Supreme

Court, addressing issues on all fours with those before this Court: namely, the deference a district

court should afford to non-U.S. bank secrecy laws, including those of Lebanon, where plaintiffs

seek discovery concerning ATA claims.

The Solicitor General explained that the district court *erred* in conducting its comity

analysis by not giving appropriate weight to the interests of the foreign jurisdictions (including

Lebanon). Brief for the United States as Amicus Curiae, *Linde v. Arab Bank*, 2014 WL 2191224

(May 23, 2014) (attached as Ex. 13 to Hanchet Decl.).  The Solicitor General identified several

of those interests and also the errors (some of which Plaintiffs invite the Court to repeat here)

that the district court made in concluding that Arab Bank should be ordered to violate Lebanese

and Jordanian law or face crippling sanctions.

Notably, the Solicitor General specifically explained that the

> district court also gave *insufficient weight* to the interests of foreign
> governments in enforcing their own laws within their own territories . . .
> The lower courts identified no reason to conclude that those statutes were
> enacted to shield wrongdoers from foreign legal process, like the blocking
> statute at issue in *Aérospatiale*, or that they are anything other than laws of
> general applicability that reflect legitimate sovereign interests in
> protecting foreign citizens' privacy and confidence in the nations'
> financial institutions.

*Id*. at *16.  As the Solicitor General noted, the bank secrecy laws of Lebanon are consistent with

those of many European and other Middle Eastern jurisdictions. *Id*. at *16-17, n.6.  They are not

blocking statutes,[44] which are often disfavored by U.S. courts.  The Solicitor General's reasoning is every bit as compelling here.

> **b.**      **The U.S. and Lebanon's shared interest in fighting terrorism.**

The interests of the United States and Lebanon, which both share a common interest in fighting international terrorism, strongly weigh in favor of granting the Moving Defendants' motion for a protective order.

To begin, Plaintiffs correctly observe that the fight against terrorism is of the utmost importance to the United States.  MTC at 27.  But what Plaintiffs fundamentally misunderstand is that the approach they advocate—flouting Lebanese sovereignty, ordering virtually the entire Lebanese banking sector to violate Lebanese law, and simply ignoring the prospect of letters rogatory to the Lebanese authorities—is antithetical to, and would materially *undermine,* the U.S. interest in fighting terrorism.  This is true for three key reasons.

*First*, the United States recognizes that Lebanon is a critical partner in the war on terror.  As the State Department recently noted, "Lebanese security services collaborated with the United States on numerous instances to investigate individuals involved in terrorism" and "Lebanon [has] supported counterterrorism efforts in regional organizations and participated in counterterrorism finance programs."[45]  This is also reflected in the cooperation that Lebanon provides through the SIC, which, as discussed above, can and does lift Lebanese bank secrecy in response to inquiries from the United States and other nations investigating terrorism.  *Supra* at §II(A)(2).

---

[44] A "blocking statute" is a foreign government's law that prohibits disclosure and transfer of information to the United States for litigation. (*See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442 Reporter's Note 4 (1987).)

[45] U.S. Department of State, Country Reports on Terrorism 2020: Lebanon, https://www.state.gov/reports/country-reports-on-terrorism-2020/lebanon/.

Moreover, Lebanon is a partner in a region where such partners are few and far between, and much needed.  Such partnerships are vital to the war on terror.[46]  As the White House has explained, "[e]xperience has . . . highlighted the importance of strong partnerships in sustaining our counterterrorism efforts."[47]  Cultivating the relationships needed for such nation-to-nation collaboration on anti-terror initiatives to succeed requires trust, ongoing support, and mutual respect.[48]  Running roughshod over the sovereign interests of Lebanon, and pressuring nearly its entire banking industry to violate Lebanese laws, in the midst of a financial crisis no less, can only damage that relationship, harming the ability of the United States to continue to partner successfully with Lebanon in the war on terror.  In the words of the Solicitor General:

> While private actions under the ATA can be one important means of disrupting terrorism financing and compensating victims of terrorism, [] other important interests are at stake as well. . . The sanctions order [by a U.S. district court, penalizing a non-U.S. bank for failing to produce documents in violation of non-U.S. bank secrecy law] could undermine the United States' vital interest in maintaining close cooperative relationships with [a friendly country in the Middle East] and other key regional partners in the fight against terrorism. A primary means by which the United States government protects American citizens from international terrorism is by ensuring that foreign governments and entities continue to cooperate in United States-led counterterrorism efforts.

*Linde* Amicus Br. at *18-19.

---

[46] United Nations Office on Drugs and Crime, Strengthening International Cooperation in Criminal Matters, https://www.unodc.org/unodc/terrorism/news-and-events/strengthening-international-cooperation.html ("The transnational nature of terrorism makes it necessary to ensure effective and efficient international and regional cooperation in criminal matters related to terrorism").

[47] National Strategy for Counterterrorism of the United States of America October 2018 Report, https://www.dni.gov/files/NCTC/documents/news_documents/NSCT.pdf ("This means collaborating so that foreign governments"; "We will use diplomatic engagement with partner governments").

[48] Nazanin Azizian, Easier to Get into War Than to Get Out: The Case of Afghanistan, Harvard Kennedy School Belfer Center for Science and International Affairs, August 2021, https://www.belfercenter.org/publication/easier-get-war-get-out-case-afghanistan#toc-6-0-0 ("The U.S. should develop trust and a working relationship with the host nation to detect and understand emerging threats and allocate appropriate resources to suppress the threat. The U.S. should work closely with the host nations to identify and eliminate terrorist leaders.").

*Second*, as the United States recognizes, the Lebanese banking sector in particular is a key ally in U.S. efforts to thwart terrorism in the Middle East.[49]  So too is the Central Bank of Lebanon, which regulates the Lebanese banking sector.[50]  The Central Bank of Lebanon has instructed Lebanese banks to ensure that they comply, in their dealings with U.S. correspondent banks, with U.S. anti-terrorism measures and sanctions.[51]  Support from financial institutions is crucial to fighting terrorism.[52]  Indeed, Plaintiffs' expert, Mr. Billingslea, while at Treasury, "highlighted the close partnership that the U.S. government has with the Central Bank of Lebanon and Lebanese financial institutions."[53]  Moreover, the Moving Defendants enjoy close

---

[49] *See* U.S. Department of State, Integrated Country Strategy: Lebanon (Aug, 9, 2018), https://www.state.gov/wp-content/uploads/2019/01/ICS-Lebanon_UNCLASS_508.pdf ("the Lebanese economy is the banking sector . . . is endeavoring to meet international standards regarding sanctions, anti-money laundering and combating terrorist financing (AML/CTF)," and "The United States will also continue to work with Lebanese authorities and the banking sector to ensure it remains . . . compliant with international standards on sanctions, anti-money laundering and combating terrorist financing (AML/CTF).").

[50] Dr. Amal Mudallali, Permanent Representative of Lebanon to the United Nations, Statement to the United Nations at the Sixth Committee, Oct. 7, 2021, https://www.un.org/en/ga/sixth/76/pdfs/statements/int_terrorism/03mtg_lebanon.pdf. ("Recently, the *Special Investigation Commission – a Lebanese financial intelligence unit whose role is to fight money laundering and terrorism financing – issued a guidance document on the implementation of financial measures* connected with UN Security Council resolutions 1267 and 1373. *This guidance seeks to help banks, financial institutions and other reporting entities in the freezing requirements of individuals connected to terrorism.*").

[51] *See* Bank du Liban, Basic Circular No. 126, Addressed to Banks and Financial Institutions, Art. 1 (April 5, 2012), https://www.sic.gov.lb/sites/default/files/laws-regulations/bdl%20circular%20126%20En.pdf

[52] IMF Working Paper, R. Barry Johnston and Oana M. Nedelescu, "The Impact of Terrorism on Financial Markets," International Monetary Fund (Mar. 2005), https://www.imf.org/external/pubs/ft/wp/2005/wp0560.pdf ("fighting terrorist financing requires a multidisciplinary approach. More than in other cases of financial crime, countering terrorist financing has to rely extensively on intelligence sources and requires a very close cooperation between intelligence and law enforcement agencies and other stakeholders, *such as financial institutions and market supervisors*") (emphasis added); *id.* ("a *coordinated effort is required from the various stakeholders* (*financial industry*, regulators and supervisors, intelligence and prosecuting agencies, governments, international organizations, etc.) to achieve the common objective of safeguarding the soundness and the integrity of financial systems from terrorism.") (emphasis added); UN CTITF Working Group Report, "Tackling the Financing of Terrorism," (Oct. 2009), https://www.un.org/counterterrorism/ctitf/sites/www.un.org.counterterrorism.ctitf/files/ctitf_financing_eng_final.pdf ("Financial transactions *can yield valuable intelligence that may be unavailable from other sources* . . . including helping to *track terrorist funds movements to gather intelligence on the scope of the terrorist network.*") (emphasis added); *id.* ("*Properly trained financial intelligence experts are critical to making the regime effective.* This includes financial intelligence unit personnel, criminal investigators, prosecutors, judges, regulators, customs officers and *financial institution employees.*") (emphasis added).

[53] https://lb.usembassy.gov/assistant-secretary-treasury-terrorist-financing-marshall-billingslea-visits-lebanon/.

and longstanding relationships with leading U.S. correspondent banks, which in turn screen both

the Lebanese banks themselves, and the dollar-denominated transactions that the Lebanese banks

process through the United States, for compliance with U.S. anti-terrorism objectives and

sanctions.  The Lebanese banks are also in regular contact with U.S. authorities, such as

Treasury, on topics including the foregoing correspondent relationships.  Rather than advancing

the U.S. government's interest in combatting terrorism, Plaintiffs' effort to compel the violation

of Lebanese law in favor of their overbroad and unduly burdensome Requests in *civil litigation*

would actually undermine the very relationships that the U.S. is seeking to nurture to support the

war on terror.

Indeed, in the *Linde* case, the Solicitor General expressed precisely this concern,

explaining that:

> Although the United States government may seek to compel disclosure of
> foreign bank records in court when necessary, the United States also relies
> heavily on cooperative methods for obtaining documents. Government
> agencies often negotiate voluntary disclosures or agreements that allow
> examination of documents consistent with both United States and foreign
> law. . . That cooperation, by both foreign sovereigns and private entities
> under their auspices, directly advances the United States government's
> ability to investigate violations of United States law."

*Linde* Amicus Br. at *13-14.

As the comments to the Restatement explain, courts engaging in a comity analysis should

consider "the long-term interests of the United States generally in international cooperation in

law enforcement and judicial assistance," including by "giving effect to formal or informal

international agreements, and in orderly international relations." RESTATEMENT § 442 cmt. c.

Here, those concerns strongly militate in favor of restraint.  *See* Moghaizel Decl. at ¶ 42

(describing Lebanese banks' strict compliance with U.S. sanctions regimes, and categorically

47

refuting Plaintiffs' contention that Hezbollah as "unfettered access" to Lebanon's banking system).

*Third*, as Plaintiffs acknowledge, Lebanon is in a precarious situation, fraught with economic and political turmoil.  MTC at 27.  Ensuring the stability of Lebanon is a key facet of U.S. policy, and is essential to the U.S. fight against Middle Eastern terrorism.[54]  As lessons painfully learned in the Middle East and elsewhere make clear, failed or collapsed states (such as Iraq) are breeding grounds for terrorism.[55]  The State Department explains, "[f]ragility [overseas] provides fertile ground for violent extremists and criminal organizations that threaten the security of Americans and United States allies."[56] The way to avoid that result in Lebanon, the United States has made clear, is to support it, including support for its rule of law.[57] Indeed, the United

---

[54] Background Press Call on Broad Middle East Regional Year-End Discussion (Dec. 17, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/12/17/background-press-call-on-broad-middle-east-regional-year-end-discussion/ ("Lebanon: One thing we want to try to make sure is that we don't have any more failed states in the Middle East region.  Failed states open vacuums, and those vacuums are not filled by moderates, they're filled by extremist actors on all sides and become kind of proxy fights by regional powers.  Lebanon had all the signs of a potential failing — a potential failed state.  We worked quite hard . . . [at] maintaining stability and trying to get Lebanon out of the crisis that it's in.").

[55] Harry Borowski & Illan Fuchs, *Weak States and Terrorist Organizations: A Proposed Model of Intervention*, 21 Minn. J. Int'l L. 177, 181 (2012) ("Weak or absent government control over its territory leads to a power vacuum that invites internal and external predators."); Nauro F. Campos & Martin Gassebner, *International Terrorism, Domestic Political Instability, and the Escalation Effect*, 25 Econ. & Pol. 27 (Mar. 2013), file:///C:/Users/GK055099/Downloads/SSRN-id2213140.pdf ("Domestic political instability is a root cause of international terrorism: it has a first-order effect on the production of terrorist attacks (that is, domestic instability escalates into international terrorism)").

[56] U.S. Department of State, *United States Strategy to Prevent Conflict and Promote Stability* (Apr. 1, 2022), https://www.state.gov/united-states-strategy-to-prevent-conflict-and-promote-stability/.

[57] *See generally* U.S. Department of State, "United States Strategy to Prevent Conflict and Promote Stability," (Apr. 1, 2022), https://www.state.gov/united-states-strategy-to-prevent-conflict-and-promote-stability/ (""*The United States will upgrade its diplomatic capabilities to address risks of violent conflict, violence, and fragility.*  This effort includes engaging proactively with partner nations, regional leaders, and allies and partners") (emphasis added); *id.* ("For decades, the United States has helped partner countries – including those recovering from or at risk of conflict – *become more self-reliant and democratic.*  Many of those countries now rank among the most prosperous economies in the world and are important economic and security partners for the United States.  They are essential in helping to address shared challenges.") (emphasis added); Task Force on Extremism in Fragile States,  *Preventing Extremism in Fragile States: A New Approach, United States Institute of Peace* (February 2019), https://www.usip.org/sites/default/files/2019-02/preventing-extremism-in-fragile-states-a-new-approach.pdf ("The United States should adopt a shared framework for strategic prevention that recognizes that extremism is a political and ideological problem. The framework should also identify building partnerships with leaders, civil society, and private sector actors in fragile states who are committed to governing accountably as the best approach to preventing extremism.").

States specifically supports the rule of law in Lebanon by providing training to members of the Lebanese judiciary.[58]  Ordering leading Lebanese corporate citizens to flout Lebanese law, as Plaintiffs urge, is not called for by any U.S. policy, and is openly hostile to U.S. interests.[59]  As terrorism conventions to which both the United States and Lebanon are parties repeatedly emphasize, cooperation, especially on procedural matters, is essential to combatting terrorism.[60]

*Finally*, Plaintiffs urge the Court to ignore Lebanon's interests in respecting its own domestic laws, arguing that the country is beholden to Hezbollah.  MTC at 34-36.  Plaintiffs are doubly wrong.  To begin, Lebanon is not, as Plaintiffs glibly assert, controlled by Hezbollah.  *See* MTC at 3, n. 5 ("Hezbollah  . . . exercises a de facto veto over Lebanon's government").  In the most recent elections in Lebanon, Hezbollah and its allies lost their Parliamentary majority (a majority that, as a matter of Lebanese politics, it is not clear Hezbollah ever had), and a new

---

[58] Press Release, U.S. Embassy Beirut, *U.S. Embassy Trains Lebanese Judges and Prosecutors through the American Bar Association (ABA)* (Apr. 29, 2021), https://lb.usembassy.gov/us-trains-lebanese-judges-and-prosecutors-through-the-american-bar-association-aba/.

[59]  *Cf. Linde* Amicus Br. 2014 WL 2191224, at *20 ("The United States has a significant interest in the stability of Jordan's financial and political system. Petitioner is the single largest financial entity in Jordan."); U.S. Department of State, *United States Strategy to Prevent Conflict and Promote Stability* (Apr. 1, 2022), https://www.state.gov/united-states-strategy-to-prevent-conflict-and-promote-stability/ ("U.S. interventions to address fragility *will not be successful without the active engagement of critical local partners.* ") (emphasis added); *see* Global Fragility Act, 22 U.S.C.A. § 9803 (directing the Department of State to establish the interagency Global Fragility Initiative to stabilize certain conflict-affected areas, and to "establish a comprehensive, integrated, ten-year strategy, to be referred to as the 'Global Fragility Strategy', to contribute to the stabilization of conflict-affected areas, address global fragility, and strengthen the capacity of the United States to be an effective leader of international efforts to prevent extremism and violent conflict.").

[60] FATF's recommendations for "international co-operation," including that "[c]ountries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to . . . terrorist financing investigations, prosecutions, and related proceedings," "the countries concerned should cooperate with each other, in particular on procedural and evidentiary aspects."  FATF 40 Recommendations, No. 36, available at https://www.fatf-gafi.org/media/fatf/documents/FATF%20Standards%20-%2040%20Recommendations%20rc.pdf.  Similarly, the International Convention for the Suppression of the Financing of Terrorism that includes a recognition "of the urgent need to enhance international cooperation among States" in preventing terrorist financing. *International Convention for the Suppression of the Financing of Terrorism*, Preamble, Dec. 9, 1999, 39 ILM 270 (2000).

reformist bloc has emerged[61] on a platform of fighting corruption, reinforcing rule of law, and modernizing the government.[62]  Indeed, "[t]he U.S.- and Saudi-backed Lebanese Forces party surpassed the Hezbollah-aligned Free Patriotic Movement to become the largest Christian party in Parliament."[63]  Experts predict that Hezbollah may face further losses still.[64]  And, even before that, Hezbollah never had the two-thirds majority that would have been necessary to amend Lebanon's constitution or to push through other major initiatives.[65]  Contrary to Plaintiffs' suggestion, Hezbollah is not  immune from prosecution for acts of terrorism, and Lebanon has successfully prosecuted Hezbollah operatives for acts of terrorism.[66]  As Lebanon's Permanent Representative to the United Nations explains, "[o]ur country has always firmly condemned terrorist acts and has always firmly reiterated that it cannot be associated with any

---

[61] Layal Abou Rahal, *Lebanon vote weakens Hezbollah bloc as reformists book gains*, Agence France Presse, May 16, 2022; Ylenia Gostoli, *What next for Lebanon after Sunday's elections?*, TRT World (Turkey), 2022 WLNR 15520778.

[62] Ben Hubbard, *Hezbollah Loses Majority Bloc in Lebanon Election, Results Show* N.Y. Times. (May 17, 2022), https://www.nytimes.com/2022/05/17/world/middleeast/lebanon-election-hezbollah.html.

[63] Council on Foreign Relations, *What Lebanon's Election Results Mean for Ending Its Crisis* (May 19, 2022) https://www.cfr.org/in-brief/what-lebanons-election-results-mean-ending-its-crisis.

[64] Kali Robinson, "What is Hezbollah?," Council on Foreign Relations (May 25, 2022), https://www.cfr.org/backgrounder/what-hezbollah ("Some experts say Hezbollah is losing its hold on Lebanon given the anger spreading even in traditional strongholds. . . . Additionally, increased support for the Lebanese Forces party, which wants to disarm Hezbollah, might be an indication that many voters no longer see it as the country's protector").

[65] Congressional Research Service, *Lebanon* (Apr. 21, 2021) https://crsreports.congress.gov/product/pdf/R/R44759 ("In 2018, Lebanon held its first legislative elections in nine years in which parties allied with Hezbollah increased their share of seats from roughly 44% to 53%. The political coalition known as March 8 . . . which includes Hezbollah, Amal, the FPM, and allied parties, won 68 seats. This is enough to secure a simple majority (65 out of 128 seats) in Parliament, but falls short of the two-thirds majority needed to push through major initiatives such as a revision to the constitution.").

[66]  Dr. Amal Mudallali, Permanent Representative of Lebanon to the United Nations, Statement to the United Nations at the Sixth Committee, Oct. 8, 2020, https://www.un.org/en/ga/sixth/75/pdfs/statements/int_terrorism/03mtg_lebanon.pdf ("on 18 August 2020, the Trial Chamber of the Special Tribunal for Lebanon pronounced its judgment in the case of the terrorist attack that claimed the life of former Prime Minister Rafic Hariri and other innocent civilians, 15 years ago. It found the accused [Hezbollah operative] guilty of all the counts, including, conspiracy aimed at committing a terrorist act and committing a terrorist act by means of an explosive device."); U.S. Department of State, "Country Reports on Terrorism 2020: Lebanon," https://www.state.gov/reports/country-reports-on-terrorism-2020/lebanon/ ("several articles of Lebanon's criminal code are effectively used to prosecute acts of terrorism").

religion, nationality or ethnic group."[67]  Similarly, "Lebanon's central bank has shut down the accounts of Hezbollah members and affiliates."[68]  This is hardly the conduct of government in the thrall of Hezbollah.

But more importantly, Plaintiffs take precisely the wrong lesson from the fact that Hezbollah has a role in the Lebanese political system.  The lesson is not, as Plaintiffs cynically urge, to write off Lebanon's  interests in the rule of law and international cooperation in the war against terrorism.  Rather, at such delicate moments, it is of the utmost importance to support the legitimate institutions of the state, and to respect the rule of law.[69]  That is, as shown above, how the United States has chosen to craft its policy toward Lebanon.[70]

The Billingslea declaration conspicuously omits any suggestion that it currently is, or ever has been, U.S. policy to direct Lebanon's citizens to violate Lebanese bank secrecy laws.

---

[67] Dr. Amal Mudallali, Permanent Representative of Lebanon to the United Nations, Statement to the United Nations at the Sixth Committee, Oct. 8, 2020, https://www.un.org/en/ga/sixth/75/pdfs/statements/int_terrorism/03mtg_lebanon.pdf.

[68] *Attacking Hezbollah's Financial Network: Policy Options: Hearing Before the Committee on Foreign Affairs,* 115th Cong. (2017) (statement of Rep. Theodore Deutch). https://www.govinfo.gov/content/pkg/CHRG-115hhrg25730/html/CHRG-115hhrg25730.htm.

[69] As the Brookings Institute explains, "[i]nternational actors can play a significant role in bolstering the efforts of domestic pro-democracy actors. . . .  Maintaining strong relations across democratic states through economic, political, informational, and social ties has historically helped to generate and maintain democratic institutions." The-Democracy-Playbook_Preventing-and-Reversing-Democratic-Backsliding.pdf (brookings.edu) (Nov. 2019) ("These outside actors should aim to empower local actors not by managing them but by collaborating with them to incentivize democratic reforms, support organic democratic development, and empower an active pluralistic civil society.").

[70] U.S. Department of State, *U.S. Relations with Lebanon* (April 27, 2022), https://www.state.gov/u-s-relations-with-lebanon/ ("The United States seeks to help Lebanon preserve its independence, sovereignty, national unity, stability, and territorial integrity" and includes "U.S. security assistance . . . to extend rule of law throughout the country"); Background Press Call on Broad Middle East Regional Year-End Discussion (December 17, 2021) , https://www.whitehouse.gov/briefing-room/press-briefings/2021/12/17/background-press-call-on-broad-middle-east-regional-year-end-discussion/ ("Lebanon: One thing we want to try to make sure is that we don't have any more failed states in the Middle East region.  Failed states open vacuums, and those vacuums are not filled by moderates, they're filled by extremist actors on all sides and become kind of proxy fights by regional powers. Lebanon had all the signs of a potential failing — a potential failed state.  We worked quite hard, quite quietly, but Dorothy Shea, our ambassador in Beirut, and working with France and others, and to — plus putting sanctions on particularly corrupt individuals of Lebanon's political system, because we're making clear that the only people that can save Lebanon are the Lebanese and particularly the Lebanese political leaders who have to make hard choices to save their country.  So, a combination of carrots and sticks.").

Indeed, such a suggestion would defy credulity.  Rather, as the Billingslea declaration makes clear, the Unites States recognizes Lebanon's bank secrecy law as binding, and therefore "pressure[s]" Lebanon to "modif[y] its Bank secrecy laws." Billingslea Decl. ¶ 13.  The fact that the U.S. recognizes and respects the legitimacy of Lebanese bank secrecy as the law of the land in Lebanon—even though the U.S. may sometimes disagree with its application—is hardly surprising.  Such respect is integral to the U.S. efforts to prevent international terrorism.  As Mr. Billingslea explained in his role as Assistant Secretary for Terrorist Financing in the United States Department of the Treasury, the United States and other nations must "address fundamental issues that create environments conducive to terrorism and terrorist financing, such as . . . lack of respect for the rule of law."[71]  Accordingly, as the Brookings Institute explains, the United States routinely "avoids bypassing the central government [of a foreign nation] because it . . . avoids delegitimizing the state."[72]  This Court should do the same.

Plaintiffs argue that their interest in exploring whether their claims under the ATA are viable should be viewed by this Court as the embodiment—indeed, the end-all-and-be-all—of U.S. interests.  *See* MTC at 31 ("the critical U.S. interests that the ATA, JASTA and this lawsuit implicate far outweigh [Lebanon's interests].").  But even putting aside the fact that the evidence may not (and the Moving Defendants maintain, will not) support Plaintiffs' claims, Plaintiffs'

---

[71] https://www.un.org/press/en/2019/sc13754.doc.htm.

[72] *Want Global Stability? Modify the U.S. Approach to Dealing with Non-State Actors*, Brookings Institute, Jan. 15, 2021, https://www.brookings.edu/blog/order-from-chaos/2021/01/15/want-global-stability-modify-the-u-s-approach-to-dealing-with-nonstate-armed-actors/; *see also* A Framework for Maximizing the Effectiveness of U.S. Government Efforts to Stabilize Conflict-Affected Areas, Joint Report led by U.S. State Department, USAID et al., (2018), https://www.state.gov/wp-content/uploads/2019/06/SAR-Final.pdf (recommending working with local governments to increase stability because "[o]perating within and in cooperation with local communities allows increased local support and the ability to build legitimacy from the bottom up by strengthening local political and social systems."); *Pursuing Effective and Conflict-Aware Stabilization: Lessons from beyond the Beltway*, Center for Strategic and International Studies (Apr. 30, 2020), https://www.csis.org/analysis/pursuing-effective-and-conflict-aware-stabilization-lessons-beyond-beltway (explaining that in Lebanon, U.S. "programming focused on freedom of speech, human rights, and other issues has resulted in greater partner government accountability and legitimacy."

argument ignores the multiple U.S. interests at play that, as described above, include the U.S. interest in fighting terrorism through instruments of diplomacy, criminal prosecutions, and the U.S. national security apparatus.  Any role that private plaintiffs might hope to play through a private civil action pales in comparison to the U.S. government's interests in engendering cooperation with key sovereign allies in the fight against terrorism.  Once again, the Solicitor General, on behalf of the United States, made precisely this point, emphasizing how private ATA plaintiffs' lawyers—and the ham-fisted approach to discovery they sometimes advocate—can disrupt U.S. relationships and interests:

> The balance of relevant interests is materially different when a private party seeks documents located in foreign jurisdictions. Private requests may intrude more deeply on foreign sovereign interests because private parties often do not exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government."

*Linde* Amicus Br. at *14 (internal quotation marks omitted).

The Solicitor General's reasoning in *Linde* applies with equal force here.  Disregarding or diminishing Lebanon's interest in enforcing the BSA, as Plaintiffs urge, would undermine U.S. efforts to achieve cooperation in document exchanges (particularly in light of Plaintiffs' exceedingly broad Requests here), baselessly and xenophobically assign nefarious purpose to Lebanese banking laws, undercut U.S. relationships with critical partners in the fight against terrorism on the ground in Lebanon, and promote instability and mistrust in a region already facing a very delicate political and economic climate (*i.e.*, the type of climate in which anti-terrorism partnerships are the most important), by forcing the near-entirety of the Lebanese banking sector to violate the country's laws.

The balance of the national interests weighs in favor of granting a protective order—and in consulting Lebanese authorities as part of the discovery process in this case.

### 6.     The Moving Defendants Would Suffer Significant Hardship if Forced to Produce Bank Records in Violation of Lebanese Law

Courts evaluating the "hardship" factor consider the civil, commercial, and criminal consequences that a defendant may suffer if forced to violate local law. *See Doubleline Capital*, 2021 WL 4596561, at *13. Here, those consequences are substantial.

Moving Defendants, and their employees involved in the unauthorized disclosure of customer information, could face criminal prosecution for violation of the BSA. Moghaizel Decl. at ¶¶ 24-26. Conviction on such a claim may lead to imprisonment for a period between three months to one year. *Id.* They also face civil suits for damages to bank customers arising from the unlawful disclosure. *Id.* And critically, the Moving Defendants could be subject to the loss of licensure for willfully violating the BSA, which would shutter the Moving Defendants' operations in Lebanon. Moghaizel Decl. at ¶ 26.

As the Supreme Court has stated, "[i]t is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign." *Rogers*, 357 U.S. at 211; *see also Rotstain v. Trustmark Nat'l Bank*, 2015 WL 13031698, at *4 (N.D. Tex. Dec. 9, 2015) (declining to compel production of foreign documents because the defendant bank "may be subject to criminal, civil, and administrative penalties"). The hardship factor weighs strongly in favor of granting a protective order here.

### 7.     The Moving Defendants Have Acted in Good Faith

Finally, courts in the Second Circuit consider whether the parties resisting discovery have acted in good faith. *See Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 56 (E.D.N.Y. 2007). The limited record before the Court shows that the Moving Defendants have acted in good faith.

*First*, Plaintiffs do not dispute that the production of records in response to their Requests would violate Lebanese law.  *See* Moghaizel Decl. at ¶ 38.  The Moving Defendants did not interpose foreign law objections in bad faith, or for dilatory purposes.  *See, e.g.*, *Doubleline Capital*, 2021 WL 4596561, at *14 ("There can be no real dispute that defendants, who apprised this Court more than a year ago that RFP 5 sought production of documents in violation of Brazilian law . . ., have acted in good faith in withholding the production of the [disputed documents] on that ground.").  On the contrary, the Moving Defendants have consistently expressed a desire to produce as many relevant records as they lawfully can, with confidence that such records will confirm that the Moving Defendants were not complicit in financing any acts of international terrorism.  If anything, Plaintiffs' effort to jump ahead and force a decision on bank secrecy at this premature stage would distort the normal and orderly process of discovery under the Federal Rules.

*Second*, consistent with the above, the Moving Defendants have conferred with the Plaintiffs in an effort to resolve discovery differences, including rationalizing the scope of Plaintiffs' Requests to increase the likelihood of finding solutions that will not require violation of Lebanese law.  The coordination of such sessions are particularly difficult in this case, as Plaintiffs have sued twelve banks located in Lebanon.  The Moving Defendants alone are represented by seven sets of attorneys from six different law firms, representing banks for which English is not the primary language, with a seven hour time difference, and who are tasked with responding to discovery requests of inordinate breadth, in the midst of an unprecedented domestic economic crisis in Lebanon that has placed tremendous strains on all Lebanese institutions, especially the Moving Defendants.

The Moving Defendants promptly responded to Plaintiffs' wide-ranging, undifferentiated Requests with individualized responses and objections, and each individually responded in writing to Plaintiffs' follow-up queries regarding those objections. *See, e.g.*, Exs. L, O, and P to Declaration of Aaron Schlanger, ECF 270-2.

*Third*, as demonstrated in this submission, the Moving Defendants are willing and active participants in the discovery process, and have proposed a logical path forward to maximize the likelihood that the parties are able to overcome any Lebanese law obstacles—that is, the Court should first determine the appropriate scope of discovery, then issue letters rogatory to the Lebanese authorities with specific requests to lift bank secrecy restrictions and allow the Moving Defendants to pursue customer waivers for individuals and entities properly within scope. *See* supra.

There can be no genuine dispute as to the good faith of the Moving Defendants.  This factor also weighs in favor of a protective order.

* * * * *

In sum, it is premature for this Court to consider, much less issue, an order compelling the Moving Defendants to violate Lebanese law by producing Lebanese bank records in response to Plaintiffs' Requests.  Neither the Lebanese authorities, nor any impacted bank customers, have yet been contacted and both sets of stakeholders have the potential to resolve any Lebanese law obstacles to production.  Plaintiffs' contention that these options should be simply ignored as futile (*see, e.g.*, MTC at 41) is an affront to international comity.

As explained above, the Court should first decide upon the proper scope of discovery, after which the parties should prepare letters rogatory for issuance to the Lebanese authorities

and the Moving Defendants allowed time to seek voluntary customer waivers for any individuals or entities determined to be within the scope of permissible discovery.

Even if the Court were inclined to engage in a preliminary comity analysis, that analysis only confirms that issuing an order compelling the Moving Defendants to violate Lebanese law is inappropriate at this stage, as all factors weigh in favor of a protective order. [73]

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Moving Defendants' Motion for Protective Order and deny Plaintiffs' Motion to Compel.

Respectfully submitted,

Dated:  June 16, 2022

MAYER BROWN LLP

By:  /s/  *Andrew J. Pincus*
    Andrew J. Pincus
    Marc R. Cohen
    Alex C. Lakatos
    Mayer Brown LLP
    1999 K Street, NW
    Washington, DC 20006
    202-263-3220
    Email: apincus@mayerbrown.com
    Email: mcohen@mayerbrown.com
    Email: alakatos@mayerbrown.com

    *Attorneys for Defendant Bank Audi SAL*

MAYER BROWN LLP

By:  /s/  *Mark G. Hanchet*
    Mark G. Hanchet
    Robert W. Hamburg
    Mayer Brown LLP
    1221 Avenue of the Americas
    New York, NY 10020
    212-506-2500
    Email: mhanchet@mayerbrown.com
    Email: rhamburg@mayerbrown.com

    *Attorneys for Defendant Banque-Libano Française SAL*

---

[73] Plaintiffs argue that the Moving Defendants acted in bad faith because they "affirmatively produced" a document that supposedly "disclos[ed] a customer's name and account number at Bank Audi," which Plaintiffs contend illustrates that the Defendants violated Lebanese bank secrecy to serve their interests.  MTC at 55.  This argument is preposterous.  The document at issue is a letter from the U.S. Federal Bureau of Investigation (FBI) to Standard Chartered Bank in New York—it was never protected by Lebanese bank secrecy, and Defendants' sharing this letter with the Court (prompted by Plaintiffs mischaracterizing its content, ECF 209-1, at 9) is thus in no way inconsistent with Defendants' adherence to Lebanese bank secrecy laws.

DLA PIPER LLP (US)

By:  /s/  *Jonathan D. Siegfried*
    Jonathan D. Siegfried
    Jeffrey Rotenberg
    DLA Piper LLP (US)
    1251 Avenue of The Americas
    New York, NY 10020
    212-335-4925
    Email: jonathan.siegfried@dlapiper.com
    Email: jeffrey.rotenberg@dlapiper.com

    *Attorneys for Defendants Byblos Bank SAL and Bank of Beirut and the Arab Countries SAL*

DECHERT LLP

By:  /s/  *Linda C. Goldstein*
    Linda C. Goldstein
    Dechert LLP
    1095 Avenue Of The Americas
    Three Bryant Park
    New York, NY 10036
    212-698-3500
    Email: linda.goldstein@dechert.com

    Michael H. McGinley (*pro hac vice*)
    Dechert LLP
    Cira Centre
    2929 Arch Street
    Philadelphia, PA 19104
    215-994-4000
    Email: michael.mcginley@dechert.com

    *Attorneys for Defendants BLOM Bank SAL and Fransabank SAL*

SQUIRE PATTON BOGGS (US) LLP

By:  /s/  *Gassan A. Baloul*
    Gassan A. Baloul
    Mitchell R. Berger
    Squire Patton Boggs (US) LLP
    2550 M Street, NW
    Washington, DC 20037
    202-457-6155
    Email: gassan.baloul@squirepb.com
    Email: mitchell.berger@squirepb.com

    *Attorneys for Defendants MEAB Bank s.a.l., Fenicia Bank s.a.l., and Lebanon and Gulf Bank SAL*

SHEARMAN & STERLING LLP

By:  /s/  *Henry Weisburg*
    Henry Weisburg
    Susan Loeb
    Shearman & Sterling LLP
    599 Lexington Avenue
    New York, NY 10022
    212-848-4000
    Email: hweisburg@shearman.com
    Email: susan.loeb@shearman.com

    *Attorneys for Defendant Bank of Beirut SAL*

ASHCROFT LAW FIRM, LLC


By:  /s/  *Michael J. Sullivan*
         Michael J. Sullivan
         Brian J. Leske
         Ashcroft Law Firm, LLC
         200 State Street, 7th Floor
         Boston, MA 02109
         617-573-9400
         Email: msullivan@ashcroftlawfirm.com
         Email: bleske@ashcroftlawfirm.com

         *Attorneys for Defendant Société Générale*
         *de Banque au Liban S.A.L.*