UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ROBERT BARTLETT, et al.,

                    Plaintiffs,

-against-

SOCIETE GENERALE DE BANQUE AU LIBAN SAL, et al.,

                    Defendants.

No. 19-cv-0007 (CBA) (VMS)

---

## DECLARATION OF DR. FADI MOGHAIZEL

Dr. Fadi Moghaizel hereby declares as follows:

1. I submit this Declaration in support of the Moving Defendants'[1] motion for a protective order, and their opposition to the Plaintiffs' motion to compel, in the above-captioned action.

2. In this Declaration, I (1) describe the Lebanese Bank Secrecy Act, (2) identify the exceptions embedded in the Bank Secrecy Act, (3) address the penalties for violation of the Bank Secrecy Act, (4) discuss Lebanon's approach to requests for judicial assistance from the United States and other foreign countries, (5) offer an opinion regarding

---

[1] The Moving Defendants are (1) Société Générale de Banque au Liban S.A.L., (2) Fransabank S.A.L., (3) MEAB Bank SAL, (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) Lebanon & Gulf Bank S.A.L., (9) Banque Libano-Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank SAL.

the application of the Bank Secrecy Act in this case, and (6) respond to several statements made in the Plaintiffs' motion to compel regarding Lebanese law.

3.  As set forth more fully below, the Bank Secrecy Act prohibits the Moving Defendants from disclosing any and all information regarding their customers, their customers' assets and matters, which includes any identifying information or facts about their account applications, background or account activity, without the consent of those customers.

**Background and Qualifications**

4.  I am a Lebanese attorney, member of the Beirut Bar Association, and senior partner of Moghaizel Law Office, a firm of 21 attorneys founded in 1953 by my late parents who were both lawyers.

5.  My legal education includes a *License en droit* from the Faculty of Law of Saint Joseph University, Beirut, in 1985, an LLM from the University of London, in 1986, and a PhD from the University of London, in 1990. I was admitted to the Beirut Bar and started practicing in 1985. I was admitted to the Paris Bar in 1992.

6.  Since 1985, my main practice areas include litigation, arbitration, contracts law, and banking law. My relevant experience includes representing local and foreign clients before Lebanese courts (civil and commercial chambers), whether as plaintiffs, defendants, or intervening third parties in more than two thousand lawsuits, including more than eight hundred and fifty lawsuits covering banking and financial activities.

2

7. My litigation experience covers all stages of litigation, and comprises claims on the merits, attachments, injunctions, appeals to the Court of Appeal and Cassation Court, as well as enforcement of deeds and judgments. I have represented clients before all types and degrees of Lebanese courts. I have also been advising clients for more than thirty-five years in relation to issues of Lebanese contract law, banking law (including structuring, securing, and enforcing the settlement of banking facilities of all types), breach of contract, and validity of contracts. I have acted as counsel and arbitrator in institutional (ICSID, ICC, and several Arab arbitration centers) and *ad hoc* arbitration proceedings.

8. I have acted as an expert witness on various aspects of Lebanese law in foreign courts, including the High Court of Justice in London and courts in the United States of America, as well as in arbitral tribunals. My clients include individuals, legal entities, governmental entities, and foreign governments. I am fluent in Arabic and French (both bilingual proficiency) and English (full professional proficiency).

9. I have been engaged on multiple occasions in connection with foreign matters to serve as an expert on Lebanese law issues, including the recent following matters in the United States: (1) Joseph Daou and Karen Daou vs BLC Bank SAL, Crédit Libanais SAL, Al Mawarid Bank SAL and Banque du Liban (Southern District Court of New York; Civ. Action 1:20-cv-4438, expert appointed by the Central Bank); (2) Patricia Raad, Stephanie Raad, and David Raad vs Bank Audi SAL (Southern District Court of New York; Civ. No. 1:20-cv-11101-AJN); (3) Georges S. El Ghossain and Mona C. El Gossain vs Bank Audi SAL (Southern District Court of New York; Civ. No. 1:21-cv-2162-PGG-BCM); and (4) Chaar et al. (13 other plaintiffs) vs. Arab Bank PLC, Bank Audi SAL,

3

Byblos Bank SAL, Bank of Beirut SAL, BLOM Bank SAL, Credit Libanais SAL, and Fenicia Bank SAL (Supreme Court of the State of New York, County of New York; Index No. 651780/2022).

10. I have also been engaged in a large number of cases in the United Kingdom and France to act as Lebanese law expert, including, in the last couple of years, in the following matters: (1) Khalifeh vs BLOM Bank SAL (High Court of Justice in England, Queen' Bench Division; (2) Manoukian vs SGBL SAL and Bank Audi SAL (High Court of Justice in England, Queen' Bench Division); Bitar vs Bank of Beirut SAL (High Court of Justice in England, Queen' Bench Division); Midani vs Saradar Bank SAL (Court of Appeal in Paris, France); and Azzam vs BLOM Bank SAL (Tribunal Judicaire in Paris, France).

**Lebanese Bank Secrecy Act**

11. For decades, since the early fifties, Lebanon has been one of the leading banking centers in the Middle East region, recognized internationally for its sophisticated financial and banking sector. One of the pillars upholding Lebanon's status as a leading banking center was its well-developed banking laws and judiciary.

12. One of the key features of Lebanon's banking system is the Lebanese Bank Secrecy Act ('BSA'), enacted in 1956. The BSA imposes strict obligations on Lebanese financial institutions to maintain the confidentiality of customer data, and has been rigorously observed by the banking industry. It provides bank customers the critical assurance of privacy in their financial affairs. These principles are recognized by Lebanon's

4

Constitution referring to the adherence by Lebanon to the Universal Declaration of Human Rights and the United Nations Covenants which protect the right to privacy, and are embedded in Lebanon's culture and heritage, which place significant value on, and respect of, personal privacy.

13. The BSA was enacted on September 3, 1956 and has remained in effect ever since. I attach the Lebanese Central Bank's English translation of the BSA as Exhibit 1. The Lebanese legislature adopted the BSA on the basis of the Swiss model of bank secrecy. Like Switzerland, Lebanon has striven to become a leading international banking center and provide the surrounding region with a stable, sophisticated, and Westernized banking system. As noted, Lebanon has succeeded in that effort. Thus, the banking sector in Lebanon is the cornerstone of the Lebanese economy, even though it is presently facing the challenges of the ongoing economic crisis in the country.

14. Of particular significance to these proceedings is Article $2^2$ of the BSA, which provides as follows:

> The managers and employees of banks mentioned in Article 1, and any person who, owing to his/her capacity or position, has access by any means to the banks' books, operations, and correspondence, are absolutely bound by banking secrecy in the interest of the clients of the said banks. These persons may not disclose any information known to them about the clients' names, [assets]$^3$, or . . . matters$^4$ to any party, be it an individual or a public authority, whether administrative, military, or judicial, except when authorized in writing by the concerned client, his/her heirs or legatees, or in case

---

$^2$ The original text of the BSA is in Arabic.
$^3$ The Central Bank's translation of Article 2 uses the term 'funds', while a more appropriate translation would be 'assets'.
$^4$ The Central Bank's translation of Article 2 refers to the customers' 'personal matters', while the original Arabic text refers, more broadly, to the customers' 'matters', which include any matter related or provided to the bank by the customers, whether such matters are personal to the customer himself/herself or not.

5

    the client is declared bankrupt, or there is a lawsuit involving banks
    and their clients over banking operations.

  15.  It has always been said that there can be no broader or more comprehensive banking secrecy terminology[5], and that the bank's secrecy obligation is very broad indeed.[6] Banking secrecy applies *vis-à-vis* all third parties, whether private or governmental parties, including all judiciary and military forces and agencies, subject to the exceptions that will be outlined further below.

  16.  Put simply, the above BSA provision prohibits officers and employees of banks in Lebanon, as well as any person who might have access in the context of his/her professional or other capacities, to bank registers, operations or correspondence, such as auditors, lawyers, and notary publics[7], to disclose to any third parties the names of bank customers, information concerning their assets or transactions, or more generally any other information concerning the bank's customers which became known to the aforementioned persons from the bank's records. These prohibitions continue indefinitely, even after the closing of a bank account.

  17.  In 1971, the Lebanese State Council (which is a court deciding disputes between private parties and governmental parties) confirmed that the banking secrecy law

---

[5] Joseph Moghaizel. *Banking Secrecy*, Lecture given in March 1966 at the Arab Cultural Club to bank officers and employees.
[6] Charles Fabia, *L'institution du secret bancaire au Liban, Revue trimestrielle de droit commercial*, vol. x, 1957, pp.53 to 71.
[7] Cassation Court, Decision 101 of March 23, 2006, *Sader Cassation Court Reports*, 2006, pp. 780 to 784.

6

prohibits the disclosure of the bank customers' names, as well as their assets and affairs, and that such prohibition covered the clients' accounts <u>and any matter related to them.</u>[8]

18.     The BSA even applies to the disclosure of bank customer data to Lebanese tax authorities, and prevents such disclosure.

### Exceptions to the Bank Secrecy Act

19.     Lebanese law provides for limited exceptions to Article 2 of the BSA under certain circumstances. Such exceptions are found in Articles 2, 6, and 7 of the BSA, as well as in other more recent pieces of legislation.

20.     Under the BSA, banking secrecy is lifted in the following five situations:

(a)     If the bank's customer willingly and expressly agrees in writing to lift banking secrecy;

(b)     if the bank's customer is declared bankrupt by the court;

(c)     in case of a dispute between the bank and the customer[9] in which case banking secrecy is lifted exclusively in relation to the specific transaction that is the subject matter of a dispute (see paragraph 28 below);

---

[8] State Council, Decision 15 of March 24, 1971, *Al Adl*, 1971, vol. 3, p. 379. More recently, in 2006, the Mount Lebanon Court of Appeal has also ruled in that same direction (Decision no. 51/2006 of April 3, 2006, *Idrel* electronic court reports).

[9] Whether the matter is pending before a State court or an arbitral tribunal, even though the BSA does not expressly say so.

7

(d) in relation to the exchange of information between banks for the purpose of investment prudency, and only with respect to their customers' debtor accounts; and

(e) upon receipt of a request for information by judiciary authorities in relation to an illicit enrichment lawsuit under legislation dating back to 1953 and 1954, which have since then been replaced by more recent legislation cited in the next paragraph.

21. Exceptions to banking secrecy are also provided by several post-BSA specific enactments, of which I cite the following:

(a) Law no. 44 of November 24, 2015 on fighting money laundering and terrorism financing that replaced the earlier Law no. 318 dated April 20, 2001;

(b) Law no. 55 of October 27, 2016 on the exchange of information for tax purposes;

(c) Law no. 189 of October 16, 2020 on disclosure of assets of public servants and other persons holding public office (that replaced the 1953 illicit enrichment legislation cited in Article 7 of the BSA); and

(d) Law no. 200 of December 21, 2020 lifting banking secrecy for one year concerning the Central Bank, ministries, and other public agencies for audit purposes, and Law no. 279 of March 10, 2022 extending the validity of Law no. 200 until the audit is completed.

22. In the context of efforts to implement better governance, tax collection, and reforms in coordination with the International Monetary Fund, the Lebanese Council of Ministers has approved on April 14, 2022, a draft bill[10] to be submitted to Parliament, for the amendment of the BSA. Under the draft bill, Article 2 of the BSA remains the same, but is supplemented by additional exceptions to banking secrecy cited in the proposed new Article 7 of the BSA. While under the existing Article 7, the exception to banking secrecy refers only to illicit enrichment matters, and requests of information made in such context, under the new Article 7 banking information becomes, under specific conditions, directly accessible to (i) the courts and the Special Investigation Commission ('SIC') to enforce the provisions of Law no. 44 of November 24, 2015 on fighting money laundering and terrorism financing, (ii) the National Commission for the Fight against Corruption, (iii) the Banking Control Commission of Lebanon, (iv) the National Deposits Guarantee Institution, (v) the Lebanese Central Bank, and (vi) the tax authorities. So far, the only authority that may have access to banking information and lift banking secrecy is the SIC acting under the aforementioned 2015 law on fighting money laundering and terrorism financing.

23. As indicated in the preceding paragraph, the purpose of the proposed amendment to the BSA is to ensure better tax management, and a more efficient repression of corruption, fraud, terrorism funding and other unlawful activities, while at the same time maintaining banking secrecy *vis-à-vis* private parties and non-authorized governmental parties so that the Lebanese banking sector regains the attractiveness that it always had up to the November 2019 crisis. Banking secrecy continues to be one of the crucial elements

---

[10] https://www.nna-leb.gov.lb/uploads/files/ad80da1f3445fbcea83b985f350f7048.pdf.

9

for a successful reinstatement of the Lebanese banking industry. The Lebanese Economy Recovery Plan proposed by the Lebanese Government underlines Lebanon's need for '*a healthy and dynamic banking sector and a strong central bank to grow again*'[11], which implies having a comprehensive and balanced BSA.

**Penalties for Violations of the Bank Secrecy Act**

24. To ensure a strict implementation of the BSA, the violation of banking secrecy is characterized by the BSA as a criminal offence. The severe sanctions applicable to the reach of banking secrecy was seen as the guarantee for compliance.[12] The BSA sets out the penalties for violating banking secrecy in its Article 8, which provides that:

> Any person who intentionally violates the provisions of the Law shall be punishable by imprisonment for a period of three to twelve months. The same punishment shall apply to any attempt of violation.
>
> Public prosecution shall be only instituted through a complaint by the injured party.

25. In addition to the above criminal sanctions, the party that breaches its/his/her bank secrecy obligation may also be held liable in tort for damages by customers whose confidential information was disclosed in breach of the BSA. Such tortious liability is governed by Articles 122 *et seq.* of the Lebanese Code of Obligations and Contracts and involves full compensation of direct as well as indirect damages suffered by the customer whose information was disclosed in breach of the banking secrecy obligation. For the sake

---

[11] http://finance.gov.lb/en-us/EventPdfs/English/The%20Lebanese%20Goverment%20Financial%20Recovery%20Plan.pdf.
[12] Atef El Khoury, '*La présentation du secret bancaire au Liban*' in '*Le secret bancaire au Liban : sécurité et risques*', Paris Bar Association, June 2012, p. 2.

10

of completeness, I should say that the bank also can face liability to its customer on a contractual basis.

26. Moreover, under Article 127 of the Lebanese Code of Money and Credit, persons convicted of breach of the banking secrecy obligation provided by the BSA are prohibited from establishing, managing, or being employed by a bank.

27. Turning to the implementation of the BSA by Lebanese courts, as early as 1960, lawsuits were filed with Lebanese courts against banks and bank officers for alleged violations of banking secrecy. For instance, in his Decision no. 3603 dated October 26, 1960, the First Degree Criminal Judge in Beirut[13] held that the Chairman of the Board of the bank in question had violated banking secrecy by having disclosed to third parties information regarding the plaintiff's account before the filing of the lawsuit opposing the bank to the client. In commenting on this decision in 1961, renowned banking law specialist and author Maurice Nasr explained that since the enactment of the banking secrecy law, *'banks in Lebanon have been very serious in implementing the provisions of the law in a very strict fashion to avoid being exposed to liability vis-à-vis their clients, and in full loyalty, in order to gain the trust of clients and generate substantial profits.'*[14]

28. The ruling of the above 1960 decision made it clear that the simple occurrence of dispute between the bank and one of its clients does not authorize the bank to lift banking secrecy in a general manner; it has to be specific and limited to the conflict

---

[13] *Hatem Court Reports*, vol. 44, 1961, p. 31.
[14] Maurice Nasr, *Hatem Court Reports*, vol. 44, 1961, p. 33.

at hand. Banking secrecy remains applicable in an absolute manner. More specifically, even when a dispute arises at court between the bank and its client, it is only the court to whom the dispute is filed, or its designee, that may have access to the client's banking information. Moreover, the bank's right to disclose information is strictly limited to the transaction or account in dispute, and does not apply to all the transactions between the bank and the client or all the customer's account entries. The lifting of banking secrecy is only intended to allow the court to settle the dispute between the bank and its client.[15]

29.     The Lebanese Criminal Cassation Court, which is the highest court in Lebanon, held in 1973[16] that, to be guilty of the banking secrecy violation offence, there must be an intentional disclosure of banking secrecy, as opposed to non-intentional disclosure.[17] Such ruling was restated by the Criminal Cassation Court in its Decision no. 101 of March 23, 2006. In this decision, the Court held that '*banking secrecy, as inferred from the provisions of … the law of September 3, 1956, represents the obligation of the bank and concerned parties designated in Article 2 of the law, to preserve the financial transactions and economic conditions related to their clients and to refrain from disclosing them, and it also represents the client's right that third parties are not shown such transactions and conditions.*' The Court reasserted that the violation of banking secrecy is punishable only when it occurs intentionally.[18]

---

[15] Maurice Nasr, *Hatem Court Reports*, vol. 44, 1961, p. 33.
[16] Criminal Cassation Court, Decision no. 63 of February 22, 1973, *Al Adl*, 1973, vol. 2, pp. 258-259.
[17] Non-intentional disclosure can be a ground for civil liability.
[18] Criminal Cassation Court, Decision 101 of March 23, 2006, *Al Adl*, 2006, vol 3, pp. 1298-1301.

12

30. In a decision dated November 6, 2008, the Beirut Court of Appeal held that a party to a dispute may not ask for the joining of a third party to the lawsuit in order to force such third party to lift banking secrecy from its accounts, and may not ask the third party's bank to provide information related to its customer as long as the client has not willingly lifted banking secrecy.[19]

**Lebanon's Approach to Foreign Requests for Assistance in Discovery**

31. Requests by foreign judicial authorities for assistance in the conduct of discovery of materials and information located in Lebanon through use of letters rogatory is a practice that is well known and quite routine in Lebanon.

32. From the Lebanese perspective, when the matter involves lifting banking secrecy to have access to information from banks, the process can be outlined as follows:

33. When a foreign court requires assistance by the Lebanese authorities to have access to information protected by banking secrecy, the letter rogatory or letter of request is sent in a confidential sealed envelope showing the name of the foreign court and the subject matter of the request such as 'Request for Lifting of banking secrecy'. The letter is sent through diplomatic channels via the Lebanese Embassy in the foreign country concerned. The Lebanese Embassy then dispatches the request to the Lebanese Ministry of Foreign Affairs who then transfers it to the Lebanese Ministry of Justice.

---

[19] Beirut Court of Appeal, Decision no. 1427 of November 6, 2008, *Cassandre*, vol. 11, 2008, pp. 2091-2095.

34. Once the Ministry of Justice in Lebanon receives a letter rogatory asking for the disclosure of banking information, it sends it to the Public Prosecutor at the Cassation Court. The Public Prosecutor has the authority, at his/her discretion, either to submit the matter to the SIC[20] so that it reviews it and decide whether or not to lift banking secrecy, or to reject the request in which case the Public Prosecutor's negative response is sent back to the foreign court through the same route (Ministry of Justice, Ministry of Foreign Affairs, and Lebanese Embassy). If the Public Prosecutor decides to submit the letter to the SIC, the SIC is charged with evaluating the application and it decides whether to lift banking secrecy in favor of competent judicial authorities with respect to the subject matter set forth in the letter rogatory.

35. For a typical request to the SIC, the entire process outlined above normally takes approximately six months.

36. Including requests in the criminal and government-to-government contexts, in 2019, the SIC received 637 requests originating from foreign as well as local authorities, and it lifted banking secrecy in 55 of these cases[21], including 7 foreign cases. In 2020, the SIC received an overall number of 463 requests, and it lifted banking secrecy in 29 cases, including 3 foreign cases.[22]

---

[20] Assuming the matter is related to money laundering, terrorism financing or other activities under Law no. 44 of November 24, 2015 (see paragraph 21 above).
[21] https://www.sic.gov.lb/sites/default/files/publications/SIC%20English%202019..pdf.
[22] https://www.sic.gov.lb/sites/default/files/publications/SIC%20Annual%20report%202020%20English_0.pdf.

**Application of the Bank Secrecy Act in This Case**

37. I have reviewed the Plaintiffs' discovery requests that were served on the Moving Defendants. I understand that the Plaintiffs have requested that each Moving Defendant Lebanese bank produce in discovery: all 'Account Opening Records,' 'Transaction Records,' 'Compliance Records,' and all 'Communications' to or from the U.S., concerning a series of almost 700 individuals and entities.

38. It is my opinion that unless 'authorized in writing by the concerned client, his/her heirs or legatees', or unless authorized by the SIC to do so, any Lebanese bank that provided the materials described above would violate Article 2 of the BSA and be subject to sanctions under the BSA.

**Responses to Plaintiffs' Statements Regarding Lebanese Law**

39. I have reviewed the Memorandum of Law submitted by the Plaintiffs in support of their Motion to Compel. The Memorandum of Law contains numerous statements that are ill-informed and false. While it is not my role to address Plaintiffs' hyperbole or arguments, there are putative factual statements regarding Lebanese law that are untrue.

40. In particular, I do not agree with Plaintiffs' general statement that '*The rule of law is collapsing in Lebanon.*' (Memo at 35). I would like to underline here that the Preamble of the Lebanese Constitution provides that '*Lebanon is also a founding and active member of the United Nations Organization and abides by its covenants and by the*

15

*Universal Declaration of Human Rights. The State shall embody these principles in all fields and areas without exception*'. Article 1 of the Lebanese Code of Civil Procedure ('CCP') provides that '*The judiciary is a power independent from the other powers in the investigation and resolution of lawsuits, and such independence cannot be restricted by any limit which is not provided for in the Constitution*'. Article 7, paragraph 3 of the CCP underlines that each person or corporate body, whether Lebanese or foreign, is entitled to file claims and defenses before Lebanese courts without discrimination. Moreover, Lebanese courts have one of the oldest and richest legal traditions in the Middle East. Lebanese courts have been very active and continue making decisions in all areas of the law, including banking and financial law, benefitting also from the considerable legislative and regulatory work that has been undertaken by Parliament since 1992. New laws and regulations were enacted in almost every area of activity, in order to modernize Lebanese legislation whose evolution was halted due to the civil war. The financial sector was one of the fields where legislative and regulatory activity has been very intense over the last twenty-five years. As a general matter, Lebanese courts are operative in their regular course of business. Although the country's economic crisis has introduced some social and political challenges due to the strong devaluation of the Lebanese currency, the judiciary remained operative.

41. Similarly, I do not agree with the Plaintiffs' general statement that '*Hezbollah has retained largely unfettered access to Lebanon's banking system*' (Memo at 35). Based on my 35 years of practice, Lebanese banks and financial services companies apply a very strict compliance program and enforce all international, including U.S., sanctions, and constantly scrutinize foreign sanctions lists, in particular US sanctions lists,

16

in all of their transactions. To my knowledge, they equally monitor changes in such lists and whenever one of their clients is sanctioned, they freeze its/his/her accounts and engage into the process of closing such accounts and terminating the relationship between the banks and their clients. The survival of the Lebanese banking sectors depends on the very strict application of such process.

42. The Lebanese authorities, and in particular the SIC, cooperate closely with the international community in the fight against money laundering and terrorist financing. In particular, they extend broad follow up to reports received from governments, including the U.S. Department of Justice and the U.S. Treasury. Lebanon being basically a dollarized economy, the Lebanese authorities have always been keen on following the U.S. guidelines imposed in the scrutiny of international transactions.

43. Plaintiffs also state that '*Lebanese laws contain exceptions, including account holders' ability to waive their 'privacy' rights and banks' unilateral ability to dispose of the protections of Lebanon's secrecy statute in **any** bank-customer commercial dispute.*' (Memo at 32, emphasis in original). That is a mischaracterization of Lebanese law. While the BSA contains an exception in the case of a lawsuit between the bank and its customer, the exception is a narrow one. As explained in paragraph 28 above, it applies only with respect to a lawsuit regarding a particular transaction, and only authorizes disclosure of information regarding the particular transaction in dispute. It is absolutely not, as Plaintiffs state, an exception that applies to '***any** bank-customer commercial dispute*.'

17

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed:   June 16, 2022

            Beirut, Lebanon

                                            Dr. Fadi Moghaizel