UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

ROBERT BARTLETT *et al.*,                                        :
                                                                 :
                Plaintiffs,                               :   **Case No. 19-cv-7 (CBA)(TAM)**
                                                                 :
     -against-                                                :
                                                                 :
SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL :
*et al.*,                                                        :
                                                                 :
                Defendants.                               :

-----------------------------------------------------------------------x


**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO COMPEL DEFENDANTS TO PRODUCE DOCUMENTS AND TO
OVERRULE DEFENDANTS' LEBANESE BANK SECRECY OBJECTIONS AND IN
<u>OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR A PROTECTIVE ORDER</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 13

    A.    THE LAW OF THE CASE ............................................................................ 13

    B.    RELEVANT PROCEDURAL HISTORY AND THE MEET-AND-CONFER
         PROCESS.................................................................................................... 14

    C.    THE RECENT BYBLOS BANK DISCLOSURES ......................................... 17

    D.    THE SPIDER Z LEAK – AL-QARD AL-HASAN ....................................... 20

ARGUMENT ....................................................................................................................... 22

I.    THE COURT CAN AND SHOULD DECIDE NOW BOTH THE SCOPE OF INITIAL
    DISCOVERY AND THE VALIDITY OF DEFENDANTS' FOREIGN BANK SECRECY
    OBJECTIONS ............................................................................................... 22

    A.    Defendants Declined Plaintiffs' Invitation to Proceed with Letters Rogatory to Lebanese
         Authorities and Proposed the Very Process to Which They Now Object ..................... 22

    B.    Defendants Have Given No Indication They Have Sought Waivers from Any of the 156
         Customers Identified in the Second Amended Complaint 18 Months Ago and Such
         Requests for Waivers Are Highly Unlikely to Be Successful ....................................... 23

    C.    The Procedural History of Prior ATA Cases Involving Foreign Bank Secrecy Make
         Clear That Ruling on Foreign Law Objections Now Is Appropriate ............................ 24

         1.    *Linde v. Arab Bank, Plc* ............................................................................... 25

         2.    *Miller v. Arab Bank, Plc* .............................................................................. 28

    D.    Courts Do Not Routinely Require Plaintiffs to Proceed Under the Hague Convention,
         Let Alone When Documents Are Resident in a Jurisdiction That Is Not a Signatory to
         the Hague Convention ................................................................................................ 30

II.    THE SCOPE OF PLAINTIFFS' REQUESTS IS ENTIRELY CONSISTENT WITH
    RULE 26 AND THE RESTATEMENT ............................................................ 33

    A.    Plaintiffs' Document Requests Are Narrowly Tailored to Records for Persons and
         Entities Identified in the Complaint or in U.S. Government Designations as Part of
         Hezbollah and its Business Affairs Component ......................................................... 33

         1.    Defendants Cannot Articulate a Principled Basis as to Why Particular Persons or

Entities, or Types of Transactions, Should Be Excluded from the Court's Production Order ......................................................................................................... 33

2. Third-Party Discovery to Date Not Only Confirms Allegations in the Complaint but Also Demonstrates that Defendants Maintained Accounts for Hezbollah Business Affairs Component Persons and Entities Not Identified in the Complaint. ............. 36

3. Plaintiffs' Document Requests Should Not Be Temporally Limited Because Illegal Conduct Occurring After 2011 Constitutes Important Circumstantial Evidence of Defendants' State of Mind ......................................................................................... 37

B. Rule 26 Does Not Limit Discovery to the Contours of the Complaint ......................... 39

C. Plaintiffs' Requests Are Directly Relevant to Defendants' Liability ............................ 40

III.   DEFENDANTS VASTLY EXAGGERATE THE BURDEN OF IDENTIFYING THEIR HEZBOLLAH-AFFILIATED CUSTOMERS ................................................... 41

A. Limited Third-Party Discovery Confirms That SWIFT Messages Can Reliably Identify Accountholders and Account Numbers, and Most Defendants Have Confirmed That They Possess Searchable SWIFT Records .................................................................... 46

B. Plaintiffs' Proposed Document Production Order Takes into Account Defendants' Purported Burden .......................................................................................................... 47

IV.   THE COURT SHOULD DETERMINE WHETHER LEBANESE BANK SECRECY LAWS EXCUSE DEFENDANTS' OBLIGATIONS UNDER F.R.C.P. 26 ..................... 49

A. If Defendants Are Correct and the *Restatement* Factors Support Their Objections to Disclosure, Then They Would Be Excused from Their Obligations Under F.R.C.P. 26, but No Court Has So Held ........................................................................................... 49

B. Application of the *Restatement* Factors Overwhelmingly Favors Overruling Defendants' Bank Secrecy Objections ............................................................................................... 50

1. The Discovery Sought Is Important to the Case ...................................................... 51

2. Plaintiffs' Requests Are Narrowly Tailored and Specific ........................................ 54

3. Some of the Information Sought Originated in the United States ............................. 55

4. There Are No Alternative Means for Securing Requested Information .................... 56

a. Document productions by U.S. correspondent banks are useful, but are not a substitute for Rule 26 discovery. ....................................................................... 56

b. Letters Rogatory to the Lebanese authorities do not qualify as a meaningful alternative means of discovery ............................................................................ 57

5.    Balancing Sovereign Interests .................................................................... 59

   a.    The U.S. interest "is elevated to nearly its highest point." ................................... 59

   b.    Lebanon's interest in enforcing its laws does not encompass an interest in protecting the confidentiality of those who participate in the funding of international terrorism............................................................................................... 63

   c.    The U.S. and Lebanon have a shared interest in fighting terrorism. ................... 65

6.    Defendants Have Demonstrated No Significant Hardship if Forced to Produce Bank Records in Violation of Lebanese Law .................................................... 67

   a.    Defendants have not proffered evidence of recent prosecutions of banks............ 67

   b.    Under Defendants' reading of the scope of Lebanese bank secrecy, their prior public disclosure in this case of a customer account from Bank Audi violated Lebanese law........................................................................................................... 69

7.    The Moving Defendants Cannot Be Said to Have Acted in Good Faith.................. 71

CONCLUSION.................................................................................................................. 72

## **TABLE OF AUTHORITIES**

**Cases**

*Al – Attabi v. Bank Audi S.A.L.*,
  No. 22-524, 2022 WL 2116043 (2d Cir. May 9, 2022) ........................................................... 72

*Alfadda v. Fenn*,
  149 F.R.D. 28 (S.D.N.Y. 1993) ................................................................................................ 50

*Allstate Ins. Co. v. All Cnty., LLC*,
  No. 19-cv-7121 (WFK) (SJB), 2020 WL 5668956 (E.D.N.Y. Sept. 22, 2020) ................ 42, 43

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
  No. 19-CV-00007 (CBA)(VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ........... *passim*

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
  No. 19-CV-00007 (CBA)(VMS), 2021 WL 3706909 (E.D.N.Y. Aug. 6, 2021) .................... 60

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
  No. 19-CV-00007 (CBA)(VMS), Memorandum & Order, ECF 291
  (E.D.N.Y. June 17, 2022) ..................................................................................................... 8, 13

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*,
  No. 90-cv-2370 (JFK) (FM), 2000 WL 713057 (S.D.N.Y. June 2, 2000) .............................. 50

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020) ............................................................................... 13, 52

*Flores v. Stanford*,
  No. 18-cv-02468 (VB)(JCM), 2022 WL 354719 (S.D.N.Y. Feb. 7, 2022) ............................ 52

*Fossil Group v. Angel Seller LLC*,
  No. 20-cv-2441 (WFK)(TAM), 2021 WL 5181308 (E.D.N.Y. October 22, 2021) ............... 39

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ........................................................................................... 13, 53

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ....................................................................................... 36, 54, 55

*In re Al-Attabi*,
  No. 21-mc207 (VSB)(RWL), 2022 WL 229784 (S.D.N.Y. Jan. 26, 2022) ............................ 72

*In re Sealed Case*,
  932 F.3d 915 (D.C. Cir. 2019) .......................................................................................... 58, 59

*In re Terrorist Attacks on September 11, 2001*,
No. 03-md-1570 (GBD)(SN), 2021 WL 5449825 (S.D.N.Y. Nov. 22, 2021) ............ 42, 43, 44

*In re Vitamins Antitrust Litig.*,
No. 99-cv-197 (TFH), 2001 WL 1049433 (D.D.C. June 20, 2001) ......................................... 52

*Kaplan v Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ...................................................................... 8, 35, 55, 63

*Laydon v. Mizuho Bank, Ltd.*,
183 F. Supp. 3d 409 (S.D.N.Y. 2016) ......................................................... 32, 49, 69

*Linde v. Arab Bank plc*,
97 F. Supp. 3d 287 (E.D.N.Y. 2015) .......................................................... 45, 64

*Linde v. Arab Bank, PLC*,
269 F.R.D. 186 (E.D.N.Y 2010) ....................................................................... 27

*Linde v. Arab Bank, Plc*,
706 F.3d 92 (2d Cir. 2013) .......................................................... 6, 26, 45, 50

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) .......................................................................... 35

*Linde v. Arab Bank, PLC*,
No. CV–04–2799 (NG)(VVP), 2009 WL 8691096 (E.D.N.Y. June 1, 2009).............. 25, 26, 40

*Linde v. Arab Bank, Plc*,
463 F. Supp. 2d 310 (E.D.N.Y. 2006) ............................................. 25, 26, 27, 50

*Linde v. Arab Bank, PLC*,
No. 04CV2799 (NG) (VVP), 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007) ..................... 26, 27

*Minpeco, S.A. v. Conticommodity Services, Inc.*,
116 F.R.D. 517 (S.D.N.Y. 1987) ............................................................... 59

*New Falls Corp. v. Soni*,
No. 16-cv-6805 (ADS)(AKT), 2020 WL 2836787 (E.D.N.Y. May 29, 2020) ....................... 40

*Oppenheimer Fund v. Sanders*,
437 U.S. 340 (1978)............................................................................. 39, 55

*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) .............................................................. 50

*Societe Internationale pour Participations Industrielles Et Commerciales, S. A. v. Rogers*,
357 U.S. 197 (1958)............................................................................. 51, 71

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
    482 U.S. 522 (1987) ................................................................................. 30, 32, 59

*Strauss v. Credit Lyonnais, S.A.*,
    249 F.R.D. 429 (E.D.N.Y. 2008) .................................................................... *passim*

*Strauss v. Credit Lyonnais, S.A.*,
    242 F.R.D. 199 (E.D.N.Y. 2007) ............................................................................ 31

*Strauss v. Credit Lyonnais, S.A.*,242 F.R.D. 199 (E.D.N.Y. 2007) ........................................ 30, 68

*Tiffany (NJ) LLC v. Forbse*,
    No. 11-cv-4976 (NRB), 2012 WL 3686289 (S.D.N.Y. August 23, 2012) ............................. 72

*United States v. Chase Manhattan Bank, N.A.*,
    584 F. Supp. 1080 (S.D.N.Y. 1984) ...................................................................... 50

*Vaigasi v. Solow Mgmt. Corp.*,
    No. 11-cv-5088-RMB-HBP, 2016 WL 616386 (S.D.N.Y. Feb. 16, 2016) ............................. 39

*Weiss v. Nat'l Westminster Bank, PLC*,
    242 F.R.D. 33 (E.D.N.Y. 2007) .................................................................... 13, 50, 51

*Wultz v. Bank of China Ltd.*,
    910 F. Supp. 2d 548 (S.D.N.Y. 2012) ................................................................ *passim*

**Statutes**

18 U.S.C. § 2333(a) ................................................................................... 48, 62

50 U.S.C. § 1701 ............................................................................................ 61

Hizballah International Financing Prevention Act of 2015,
    Public Law No. 114-102 ..................................................................................... 61

Hizballah International Financing Prevention Amendments Act of 2018,
    Public Law No. 115-272, 132 Stat 4144 ............................................................... 61, 62

Justice Against Sponsors of Terrorism Act,
    Pub. L. 114-222, ................................................................................... 13, 47, 63

**Other Authorities**

Antiterrorism Act of 1990: Hearing on S.2465, Testimony before Senate Subcomm. on Courts
    and Admin. Practice of the Senate Comm. on the Judiciary, S. Hrg. 101-1198 (1990) ..... 62, 63

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters,
    Mar. 18, 1970, 23 U.S.T. 2555, TIAS No. 7444 ..................................................... 31

Walter W. Heiser, *Civil Litigation as a Means of Compensating Victims of International Terrorism*, 3 S. DIEGO INT'L L. J. 1,3 (2002).............................................................................. 59

**Rules**

Fed. R. Civ. P. 26 ................................................................................................................ 8, 47

**Treatises**

*Restatement (Fourth)* § 426 ................................................................................................. 5

> Sunlight is said to be the best of disinfectants, electric light the most efficient policeman.
>
> - Louis D. Brandeis
>   *Other People's Money: And How the Bankers Use It.*

***

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs move to compel each of eleven Lebanese bank defendants (the "Defendants" or the "Banks")[1] to search for and produce Lebanese bank records for 687 individuals and entities that have been identified in the Second Amended Complaint ("Complaint" or "SAC") or by the U.S. government (or both) as affiliated with Hezbollah, a U.S. designated Foreign Terrorist Organization since 1997. As the District Court has recognized, "Plaintiffs have not alleged an isolated provision of financial services to Hezbollah. Rather, they allege a wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers." 2020 WL 7089448, at *11 (E.D.N.Y. Nov. 25, 2020). The Court also acknowledged that the Complaint alleges that "Hezbollah operates a commercial apparatus known as the Business Affairs Component, which raises funds for Hezbollah via money laundering and drug trafficking, as well as via ordinary business enterprises. Much of the money that Hezbollah makes through such commercial activity comes from certain well-known crime networks or 'clans' known to be affiliated with Hezbollah." *Id.* at *2 (citations to SAC omitted).

Yet, Defendants' Memorandum[2] cannot bring itself to even mention Hezbollah's Business

---

[1]  The Moving Defendants are (1) Société Générale de Banque au Liban S.A.L., (2) Fransabank S.A.L., (3) MEAB Bank s.a.l., (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) Lebanon & Gulf Bank S.A.L., (9) Banque Libano-Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank SAL.

[2]  Joint Memorandum of Law in Support of Moving Defendants' Motion for Protective Order and In Opposition To Plaintiffs' Motion To Compel ("Defs. Mem.").

1

Affairs Component – the wellspring of the central allegations of this case. This is not an oversight. Neither Defendants' briefing on the motions to dismiss the first amended complaint nor their most recent efforts to dismiss the SAC even mention, let alone address, Hezbollah's Business Affairs Component. Thus, Defendants' motion for a protective order, like their motions to dismiss this case, is premised on opposing an invented set of allegations rather than confronting the "wide-ranging, years-long, knowing scheme" actually alleged here.[3]

As Plaintiffs' opening Memorandum of Law in Support of its Motion to Compel ("Plaintiffs' opening brief") noted at 28, in terrorism cases, courts **uniformly** reject bank secrecy objections because they impede the critical U.S. interests in deterring and punishing terrorist attacks upon American citizens. Defendants do not (and cannot) dispute this precedent and therefore focus their attentions elsewhere by opposing Plaintiffs' document requests and seeking a protective order on four alternative grounds:

(1) **Sequencing**: That addressing Defendants' bank secrecy objections now is premature;

(2) **Relevance and Overbreadth**: That the requests are overbroad and "indiscriminate;"

(3) **Undue Burden**: That the requests would impose a "crippling" burden on Defendants; and

(4) **_Restatement_ Balancing**: That _Restatement_ balancing factors, despite being "premature," favor granting a protective order.

None of these objections is meritorious.

**<u>Sequencing of Motion Practice</u>**: The procedural sequencing of Plaintiffs' motion to compel and Defendants' motion for a protective order, both originally scheduled as part of the

---

[3]     For example, the SAC lists multiple individual customers of specific Defendants involved in Hezbollah's weapons trafficking business, including, _inter alia_, Muhammad Bazzi, SAC, ¶¶ 762-65, 1209; Imad Bakri, _id._, ¶¶ 812-26; Hasan Antar Karaki and Dib Hani Harb, _id._, ¶¶ 1189-1206; Mustafa Reda Darwish Fawaz, _id._, ¶¶ 1210-25, and Muhammad Mustafa Nur-al-Din, _id._, ¶ 1815.

Court's December 13, 2021, Minute Order, and as modified on May 10, 2022, was structured *at Defendants' request* and according to *Defendants'* preferred timetable.

Although Defendants now insist the Court should proceed with the lengthy Letters Rogatory process *before* considering their bank secrecy objections, they rejected Plaintiffs' attempts to do so eight months ago. In November 2021, Defendants declined Plaintiffs' invitation to present a stipulated document request for 20 individuals and entities that would have been used as the basis for Letters Rogatory. At the same time, Plaintiffs also provided a provisional list of 678 persons and entities for whom they would be seeking discovery – thereby affording Defendants an opportunity both to evaluate and discuss the scope of Plaintiffs' proposed discovery and to seek customer waivers. Plaintiffs' letter and exhibits are attached to the accompanying Declaration of Dina Gielchinsky ("Gielchinsky Decl.") as <u>Ex. A.</u> Defendants contended that any Letters Rogatory "should await the Court's ruling on the discovery motions, as to both bank secrecy objections and equally important scope issues," Gielchinsky Decl., <u>Ex. B</u>, and submitted a proposed briefing schedule in which they would "submit Letters Rogatory or Requests for Judicial Assistance as to initial RFPs" *after* "ruling on objections raised by discovery motions including bank secrecy," ECF No. 263.

Seven months later, after declining to agree to ask this Court to issue Letters Rogatory and having failed to seek customer waivers from the list of accountholders Plaintiffs provided previously (or even for those 156 accountholders specifically identified in the Complaint), Defendants now argue that assessing their bank secrecy objections is "premature." But Defendants' position constitutes not simply an about-face – it is also nonsensical. Neither prior precedent nor common sense precludes this Court from simultaneously assessing the proper scope of initial discovery and the merits of Defendants' foreign bank secrecy objections – *as Defendants'*

*own proposed schedule requested.*[4]

Moreover, under the circumstances of this case, it is unclear how deciding bank secrecy could be premature. The parties do not dispute the fact that, absent customer waiver, Lebanese law prohibits disclosures of much of the information sought by Plaintiffs' requests. Because Lebanese law conflicts with Defendants' discovery obligations under U.S. law, delay is pointless because, **by definition**, *any* document production order issued by this Court will likely require the Defendants to produce materials in violation of Lebanese law. Neither the extremely remote prospect of *some* voluntary waivers from among the hundreds of Hezbollah-affiliated individuals and entities listed in the Complaint and Plaintiffs' requests (including more than 190 Specially Designated Global Terrorists ("SDGTs") and Specially Designated Narcotics Traffickers ("SDNT")), nor the equally remote prospect of Lebanese authorities permitting disclosure of the financial records of Hezbollah's extended network of operatives and companies belonging to its Islamic Jihad Organization is likely to "obviate the need for this Court to address Lebanese law." Defs. Mem. at 3.

By arguing that the Court must (1) separately consider the initial scope of discovery and (2) only perform its international comity analysis after Letters Rogatory are issued and the responses from the Lebanese authorities are received *and* the results of Defendants' attempts to procure waivers from their customers are known, Defendants ignore that the *Restatement*'s factors include scope and specificity of the discovery sought *as part of* the assessment of bank secrecy objections, not independent of it. Faced with objections to discovery based upon foreign law, the court's first step – at issue here – is to determine in accordance with the *Restatement* whether the

---

[4]     As discussed more fully below, courts in this District have taken various approaches to sequencing, depending in large measure on how the non-producing party responds to the initial discovery requests.

balance of interests weighs in favor of compelling or excusing discovery of evidence in the foreign jurisdiction.[5] Reviewing the specificity of Plaintiffs' requests is intrinsically part of that balancing test (as applied in this Circuit) at the initial stage to determine whether the interests of the foreign jurisdiction are sufficiently compelling to excuse the non-producing party from discovery. *See Restatement (Fourth)* § 426, cmt. (a) ("the degree of specificity of the request").

Far from premature, considering bank secrecy now could mean that, if the Court agrees with Defendants that the *Restatement* factors favor deferring to the interests of Lebanon, then they would be excused from producing financial records from Lebanon regardless of the "degree of specificity of the requests." But, presumably aware that (their arguments notwithstanding) the balance of interests weighs heavily in favor of compelling discovery, Defendants now urge the Court to divorce the "specificity of the requests" factor of the balancing test from the other *Restatement* factors, before considering bank secrecy at all.

After a discovery order rejecting bank secrecy objections is issued, courts will often (but not always) afford the producing party an opportunity to seek permission from foreign regulators, courts and/or customers (or an additional opportunity if the party has already unsuccessfully sought such permission at the outset with no discovery order to bolster its request) before undertaking the next step of determining an appropriate sanction and/or remedy for the non-producing party's refusal to comply with discovery. Then, *at the remedy stage*, a court undertakes a further international comity analysis, again taking into account the interests of the foreign jurisdiction and weighing them against the prejudice to the party or parties who have been deprived of discovery the court has found warranted.

---

[5]    *See Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2012) (listing the five *Restatement* factors adopted by the Supreme Court in *Aérospatiale* and the two additional factors considered by courts in the Second Circuit).

**Relevance and Overbreadth**: Defendants argue that Plaintiffs' requests present "no principled or discernable limitations on the discovery," but the requests are self-evidently limited to information concerning Hezbollah operatives and entities that are at the heart of this case. Moreover, Defendants do not seriously dispute the relevance of the types of records requested – transactional records, account opening records and compliance files, and internal communications about Hezbollah-affiliated customers – to a case about whether they knowingly provided substantial assistance to Hezbollah. Nor do Defendants even mention, let alone dispute, the fact that in *Linde v. Arab Bank, Plc*, the Court ordered discovery of more than **15,545** distinct sets of records for recipients of terrorism-related payments – an order the Second Circuit found "in line with [Second Circuit] precedent" including the "specificity of the discovery requests." *Linde*, 706 F.3d 92, 115 (2d Cir. 2013).

Instead, they insist that discovery should be limited to:

1. Three specific Hezbollah entities mentioned in the District Court's decision or at most, customer accounts identified in the Complaint.

2. Individuals and entities publicly known to have been closely intertwined with Hezbollah's terrorist acts.

3. Transactions that "relate" to terrorism or "terrorist activity" in some undefined way.

4. The time period ending with the last attack at issue (November 2011).

These proposed limitations simply ignore the actual scope of the case brought on behalf of over a thousand Americans crushingly harmed as a result of terrorist attacks and which – in the District Court's words – alleges "a wide-ranging, years-long, knowing scheme of coordination in which Defendants" were involved in commercial activities of Hezbollah's Business Affairs Component and "certain well-known crime networks or 'clans' known to be affiliated with Hezbollah." 2020 WL 7089448, at *1, *11.

Instead, Defendants ask the Court – without support – to put the proverbial cart before the horse, suggesting Plaintiffs first provide evidence that particular individuals and entities were bank customers *before* obtaining discovery of that evidence and arguing that discovery should be limited to specific accounts already alleged in the Complaint—that is, whatever Plaintiffs were able surmise before discovery.

They further assert that:

No Moving Defendant is alleged to have provided banking services to more than 38 of these individuals or organizations, and the great majority of the nearly 700 listed names are not alleged to have had any banking relationship with *any* Moving Defendant.

Defs. Mem. at 10-11 (emphasis in original). Separate and apart from the fact that Plaintiffs' proposed document production order ("Proposed Document Production Order") would further narrow Defendants' obligations to producing records for those individuals or organizations with whom they *did have* banking relationships, even Plaintiffs' requests largely focused on Defendants' customers; and when they sought "transactional records" for counterparties as well as customers, those records were the most likely to be maintained in a searchable electronic form, such as in Defendants' SWIFT databases.

Thus, Defendants' complaint about "nearly 700 listed names" largely boils down to an objection to *searching* for such accounts, which does not seem like a "crippling burden" – to use Defendant's hyperbole, Defs. Mem. at 2 – for a *bank* to perform. If anything, identifying customer accounts is a typical function that banks routinely perform for any number of reasons. And, as discussed below, while such searches may be time consuming, Defendants offer no plausible rationale for why third-party correspondent banks are able to (and indeed compelled to) conduct searches for *customer and non-customer transactions* for largely the same individuals and entities,

but it would violate Rule 26's proportionality principle for Defendants to search for the same types of records.

As discussed extensively below, even the limited third-party document production so far made in this case has yielded confirmation that Defendants maintained one or more accounts for at least 49 Hezbollah-affiliated persons and entities that were not previously identified in the SAC as linked to those specific Defendants; additionally, a recent public disclosure in Lebanon has revealed that Defendant Byblos Bank *alone* held an additional 27 previously unidentified accounts for Hezbollah-affiliated persons and entities.

Moreover, as Defendants well know, their assertion that only records for individuals and entities publicly known to have been closely intertwined with terrorist acts are relevant, Defs. Mem. at 9, is a complete inversion of the legal standard articulated by the Second Circuit in *Kaplan v Lebanese Canadian Bank, SAL*. There, the Court held that, for example, public statements by Hezbollah reported in the media identifying certain bank customers as belonging to the organization provided *a* plausible inference for *pleading* the bank's knowledge – but it also noted that the "extent to which there is evidence to support the allegations as to Hizbollah's statements and as to whether LCB knew or should have known of them ***is a matter more appropriate for discovery***." 999 F.3d 842, 865 (2d Cir. 2021) (emphasis added). Nor is a defendant's knowledge of a customer's affiliation limited to instances where the customer is designated an SDGT by the U.S. government. *Contra* Defs. Mem. at 9. As the District Court most recently affirmed, "it would defy common sense to hold that such knowledge" of the customers' affiliation with a terrorist organization "could be gained in no other way." ECF No. 291 at 4 (quoting *Kaplan*, 999 F.3d at 864).

This brings us to Defendants' final relevance objection, which is that Plaintiffs' requests

seek records after the last attack in the case (November 14, 2011). Defendants devote **three full**

**pages** to the purported irrelevance of evidence of the migration of Hezbollah-linked accounts at

LCB to Defendants, describing this as "Plaintiffs' bald speculation that some unspecified

documents within the broad swaths they request *might* shed light on a Moving Defendant's state

of mind during the Relevant Time Period [which] is hardly enough to justify the fishing expedition

they seek to conduct." Defs. Mem. at 17 (emphasis in original). But this simply ignores the District

Court's holding that Plaintiffs' allegations "that Defendants allowed 'blacklisted' accounts to

migrate to their own banks after those accounts were forcibly closed at LCB due to their

association with Hezbollah" constituted one of several factors, taken together, that "depict

Defendants as essential financial enablers of Hezbollah's known front organizations." 2020

WL 7089448, *12.

The District Court further held that:

> [T]he Amended Complaint alleges that Defendants continued to provide services
> to customers even after their accounts had been forcibly closed at LCB. This factor
> 'may afford evidence of the defendant's state of mind.' *Halberstam*, 705 F.2d at
> 484. **The continued provision of financial services to these blacklisted
> account-holders certainly evinces a culpable, or at least willfully blind state
> of mind**.

*Id.* at *14 (emphasis added; complaint citations omitted). The same reasoning applies with equal

force to accounts held for SDGTs.[6] Thus, the Court has made it clear that the "*continued* provision

of financial services" to Hezbollah-affiliated customers is highly relevant to each Defendant's

state of mind. Moreover, Plaintiffs' requests for documents post-2011 is narrowly tailored because

they are limited to (1) Hezbollah-affiliated customers who maintained accounts with Defendants

---

[6]      Defendants have argued that "the SAC is conspicuously silent on whether any Moving Defendant provided
financial services to any SDGT *after* its designation." Defs. Mem. at 10 (emphasis in original). Of course, the
appropriate method for determining whether a defendant provided financial services to any SDGT *after* its designation
is for that defendant to properly respond to document requests and interrogatories that seek that information.

even after their accounts had been forcibly closed at LCB and (2) Hezbollah-affiliated SDGTs.

**Undue Burden**: Defendants assert that "attempting to comply with these Requests would impose a crippling burden on the Moving Defendants.  For this reason alone, Plaintiffs' motion to compel must be denied." Defs. Mem. at 2. Yet, unless each Defendant maintained accounts for *hundreds* of Hezbollah-affiliated individuals and entities, Defendants' burden would not even be *substantial*, let alone "crippling." Moreover, Plaintiffs' Proposed Document Production Order (attached as Exhibit 1) would limit the Defendants' searches to their electronic records (aside from compliance records of those individuals and entities confirmed to have been customers of each respective bank). With few exceptions, Defendants have declined to even conduct initial electronic searches to determine whether they have responsive records. As described more fully below, the recent disclosures concerning Byblos Bank highlight the fact that many if not all Lebanese banks keep their own lists of their current and former Hezbollah-affiliated customers, perhaps as part of their efforts to forestall U.S. government regulatory actions and maintain their correspondent banking relationship in New York. *See, e.g.,* Expert Declaration of Marshall Billingslea ("Billingslea Decl."), ECF No. 270-20, at ¶¶ 59, 64.

But even if, like ***all*** other courts that have considered the issue, this Court were to find the balancing of interests here favors ordering disclosure, Defendants assert that the "burden of ***searching*** for this many names without any allegations tying them to each (or any) particular Moving Defendant on its own outweighs the potential benefit to Plaintiffs." Defs. Mem. at 26 (emphasis added).

In other words, Defendants believe that a lawsuit alleging their involvement in terror financing for Hezbollah and aiding and abetting and conspiring in the murders and maiming of over 300 American service members cannot justify the "burden" of even undertaking to *search* for

Hezbollah-affiliated customers. This blatant contempt for Plaintiffs and the harm caused to them is further highlighted by the fact that Defendants are more than content to shift the search burden to third-party correspondent banks and Plaintiffs.

Finally, foreign bank secrecy is not a mechanism for offloading a defendant's discovery obligations to third parties, inverting the expected burdens in discovery. Third parties generally are not in possession of Defendants' compliance records or internal communications and they may have destroyed transactional records Defendants retained. Defendants' urged rule of waiting on the production by their correspondent banks before conducting a comity analysis, Def. Mem. at 3, 40-41, is the equivalent of a doctor's office refusing to provide a list of patients or their medical records but suggesting that information could be gleaned from subpoenas to 20 health insurance companies who may have received reimbursement requests and retained some of that information.

All that said, Plaintiffs' Proposed Document Production Order nevertheless attempts to address Defendants' expressed concerns about searching for and producing information and documents contained in hard copy by focusing on electronic records and limiting the initial hard copy production solely to compliance records of those individuals and entities confirmed to have been customers of each respective bank. A detailed explanation of the Proposed Document Production Order is set forth below.

***Restatement* Balancing:** The Defendants argue that it is premature for the Court to determine whether to overrule their Lebanese bank secrecy objections because it does not yet know (1) "whether, and to what extent, the Lebanese government will lift bank secrecy restrictions to accommodate properly tailored requests;" (2) whether any of their customers or former customers will consent to the production of their bank records; and (3) whether they have "enough information to determine whether there are alternative means of obtaining the requested discovery

because Plaintiffs have yet to receive productions in response to their third-party subpoenas." Defs. Mem. at 33. Left unsaid is that Defendants *rejected* Plaintiffs' offer in November 2021 to work jointly to submit a sample of 20 individuals and entities through Letters Rogatory to first ascertain the willingness of the Lebanese government to lift bank secrecy restrictions. Also left unsaid is that Defendants have known the names of the 156 individuals and entities listed in the SAC as their customers for the past 18 months and have not indicated that they have attempted to obtain waivers even from this subset of Hezbollah-affiliated customers. (And one cannot seriously believe that a substantial number, if any, of these Hezbollah operatives and entities are going to give such consent, notwithstanding Defendants' pretense that customer waivers could "even obviate the need for this Court to address Lebanese law," *id.* at 3.) Defendants also elide the glaring fact that no alternative means exist for obtaining Defendants' account records, compliance files and internal communications – the very heart of Plaintiffs' case. Finally, Defendants neglect to cite any cases suggesting that either Letters Rogatory or attempted customer waivers are a prerequisite to performing the *Restatement*'s balancing test.

As for the actual *Restatement* analysis, apart from denigrating the U.S. interest in the fair adjudication of the claims in this case and arguing that transactional and compliance records for their hundreds of Hezbollah-affiliated customers are not important or lack specificity, Defendants primarily assert that Lebanon has a more compelling interest in preserving the privacy of those Hezbollah-affiliated customers by having its bank secrecy laws applied and enforced. But they never address, let alone distinguish, the finding that when "the U.S. interest 'in fully and fairly adjudicating matters before its courts' is combined with its interest in combating terrorism, the U.S. interest 'is elevated to nearly its highest point, and diminishes any competing interests of the foreign state.'" *Wultz*, 910 F. Supp. 2d at 559 (quoting *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D.

429, 443 (E.D.N.Y. 2008)). *Accord, e.g.*, *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 46 (E.D.N.Y. 2007). For the reasons set forth herein and in Plaintiffs' opening brief, the *Restatement* balancing test overwhelmingly supports the Court overruling Defendants' foreign bank secrecy objections.

## BACKGROUND

### A.    THE LAW OF THE CASE

Defendants claim without support that the "Court's opinion denying the Moving Defendants' motion to dismiss sustained the Complaint's allegations only with respect to Plaintiffs' 'strongest allegations.'" Defs. Mem. at 10. In fact, the Court rejected Defendants' motions to dismiss Plaintiffs' aiding and abetting and conspiracy claims *in their entirety* and then reaffirmed its decision, noting that recent Second Circuit decisions "both discuss the *Halberstam* elements, but both alter the law in Plaintiffs' favor." ECF No. 291 at 3. As Plaintiffs have consistently maintained, the proper framework for determining aiding-and-abetting liability under JASTA is set forth in the decision *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which identifies three elements of aiding-and-abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Id.* quoting *Halberstam*, 705 F.2d at 477.

The District Court's decisions largely speak for themselves and conclusively reject Defendants' arguments, but it is worth pointing out that the Court also specifically endorsed *Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144 (E.D.N.Y. 2020) ("*Henkin*") as "a well-reasoned recent opinion" that:

> provides a cogent explanation of why plaintiffs are entitled to rely on circumstantial
> evidence to support the general awareness prong of aiding-and-abetting liability. In
> rejecting a defendant's motion to dismiss a JASTA claim, the *Henkin* court
> explained that at the pleading stage, 'terrorist victims and their families
> understandably do not have conclusive evidence that bank officials or compliance
> staff had actual knowledge of various red flags that could have apprised them
> of their customer's nefarious activities.'

2020 WL 7089448, at *10. Obtaining "conclusive evidence that bank officials or compliance staff

had actual knowledge of various red flags" is a core aspect of the discovery Plaintiffs seek.

Moreover, while Plaintiffs' Complaint was able to identify 156 Hezbollah-affiliated accounts held

by Defendants (itself a staggering number), as set forth herein, there is no reason to be believe that

number is the outer limit and *every* reason to believe it is not – given that various public disclosures

and productions from third parties have identified more than 75 Hezbollah-affiliated accounts at

Defendant banks *separate* from the 156 previously identified in the SAC.

## B.   RELEVANT PROCEDURAL HISTORY AND THE MEET-AND-CONFER PROCESS

Following the status conference held with the Court on October 8, 2021, Plaintiffs

proffered to Defendants a draft discovery plan approximately two weeks before the parties held a

Rule 26(f) conference on November 5, 2021. Three days after the Rule 26(f) conference, Plaintiffs'

counsel wrote to Defendants based on that discussion providing Defendants with two lists that

Defendants requested: (a) a proposed subset of Defendants' alleged customers that Plaintiffs would

proffer for Letters Rogatory (Exhibit A thereto) and (b) a proposed initial Request for the

Production of Documents ("RFP") (Exhibit B thereto). *See* Gielchinsky Decl., Ex A. The letter

stated:

> **Under our proposal – with the parties' consent – the Court would issue Letters
> Rogatory to the applicable Lebanese authorities for a discrete subset of
> customers in order to establish, in an efficient manner, whether the Lebanese
> authorities will waive their objections to disclosures. As Exhibit A indicates,
> the subset of alleged customers includes commercial entities, non-
> governmental entities, and individuals, comprising alleged customers of all**

14

**Defendants, thereby providing a representative sample of what full discovery would look like. We believe <u>Exhibit A</u> could be converted into Letters Rogatory expeditiously** and that the Lebanese authorities could, depending on how quickly the Court issued the Letters Rogatory, be expected to respond by the end of February 2022.

In parallel, we propose to serve an initial RFP that is substantially reflected in <u>Exhibit B</u> and reflects a much wider scope of initial discovery. Defendants would then interpose any objections they have, including as to scope, relevance, etc., in addition to bank secrecy. Once Defendants either receive a response from the Lebanese authorities or an agreed upon time has elapsed without a response, Plaintiffs would file a motion to compel (subject to the response from the Lebanese authorities). Defendants could raise any objections to the RFP they deem appropriate, including Lebanese bank secrecy. Thereafter, the Court would adjudicate the dispute and issue a production order, if appropriate.

The advantage of proceeding on parallel tracks is that the parties can identify and narrow any objections, including as to scope and relevance, unrelated to bank secrecy, while the Letters Rogatory process proceeds. The briefing on a motion to compel and the Court's ultimate adjudication of those issues would also provide the parties with considerable guidance on the scope of discovery at a relatively early stage. If Defendants' bank secrecy objections are overruled, the production order (and the decision underlying it) would provide the Lebanese authorities with additional insights as to the import and nature of the judicial proceedings before the Court. Of course, if the Court ruled in Defendants' favor on Lebanese bank secrecy, that would also relieve Defendants' discovery burdens considerably.

*Id.* at 1-2 (emphasis added).

After a follow-up letter from Plaintiffs on November 16, 2021, Defendants' counsel replied on November 24, 2021. *See* Gielchinsky Decl., <u>Ex B</u>. After first stating Defendants' view that "party discovery, through Requests for Production of Documents ('RFP') or otherwise, should await substantial completion of the ongoing third-party discovery from Moving Defendants' U.S. correspondent banks," Defendants then stated that party discovery "should not be initially limited to a bellwether letter rogatory concerning the entities and individuals on Exhibit A to your November 8 letter. Rather, party discovery should proceed in the normal course with both sides issuing RFPs and other discovery requests concerning the full range of issues in the case." *Id.* at 2.

Defendants' letter then goes on to state:

> With regard to the Lebanese bank secrecy issue, Plaintiffs can issue an RFP with whatever document requests they consider appropriate as to the full range of allegedly relevant entities and individuals. Moving Defendants would thereafter respond raising all objections they consider appropriate, including objections under Lebanese bank secrecy laws, after which the parties would meet and confer in advance of any discovery motions. Consistent with Magistrate Judge Merkl's comments during the October 8, 2021 hearing, **letters rogatory to the Lebanese authorities should await the Court's ruling on the discovery motions, as to both bank secrecy objections and equally important scope issues.**

*Id.* Thus, Defendants rejected Plaintiffs' offer to proceed with targeted Letters Rogatory, arguing that Letters Rogatory should follow this Court's review of its forthcoming bank secrecy objections.

In response, Plaintiffs wrote on November 29, 2021, noting that in their view "nothing in Magistrate Judge Merkl's October 8, 2021, Order suggested or implied that discovery was, or is, contingent on the ongoing third-party discovery from Moving Defendants' U.S. correspondent banks." Gielchinsky Decl., Ex. C (emphasis in original). Plaintiffs then confirmed that "during our initial Rule 26(f) conference we offered you the alternative of commencing bellwether letters rogatory concerning the entities and individuals on Exhibit A to our November 8 letter, but we do not object to proceeding in the normal course with both sides issuing RFPs." *Id.*

On December 10, 2021, the parties submitted a joint letter, ECF No. 263, setting forth their competing proposed schedules for serving initial RFPs and briefing any objections to those RFPs, including those based on Lebanese bank secrecy. Notably, both sides set forth timetables for submission of Letters Rogatory or Requests for Judicial Assistance to Lebanon. Defendants proposed that they "submit Letters Rogatory or Requests for Judicial Assistance as to initial RFPs, if necessary following rulings on discovery motions **including foreign bank secrecy**" – "30 days after District Court ruling on objections raised by discovery motions including bank secrecy." *Id.* (emphasis added).

Defendants do not dispute Plaintiffs' description of Defendants' subsequent failure to respond to Plaintiffs' requests to meet and confer over their objections to Plaintiffs' RFP by April 18, 2022, as directed by the Court on December 13, 2021; nor do they dispute Plaintiffs' description of how they provided Plaintiffs with, in the case of some of the Defendants, only two or three business days to review their responses before the Plaintiffs' May 2, 2022, deadline for filing their motion to compel, and how they failed to provide detailed citations to Lebanese law on which they intended to rely. *See* Plaintiffs' opening brief at 50. In sum, the lead up to these motions has proceeded according to Defendants' preferences and schedule.

### C.    THE RECENT BYBLOS BANK DISCLOSURES

In June 2020, Antoine Dagher, a former senior compliance officer for Defendant Byblos Bank (and then current Byblos Bank employee), was brutally stabbed to death in a parking garage near his home. On June 4, 2022, a two-part investigative report on Lebanese television detailed the circumstances of the murder and the failure of the subsequent police investigation (despite CCTV cameras located in several locations in the area). Relevant here is that the Lebanese television report segments published internal Byblos Bank documents the victim reportedly possessed prior to his death, including Byblos Bank compliance files. The two news report segments (with subtitles provided) have been provided to the Court on a flash drive via FedEx. A copy of the one page of the key document disclosed in the report is attached as Gielchinsky Decl., Ex. D and transcribed below:

17

| Names | CIFs | Branch | | |
|---|---|---|---|---|
| Nayef Krayem & Ali Zein | 4053223 | Haret Hreik | CLOSED | |
| Lebanese Communication Group (LCG) Al Manar TV | 4053187 | Haret Hreik | CLOSED | |
| Lebanese Communication Group (LCG) Al Nour TV | 4053832 | Haret Hreik | CLOSED | |
| Al Imdad   Philanthropic Islamic | 3551524 | Ghobeiry | CLOSED | |
| Dar Al Manar | 4053142 | Haret Hreik | CLOSED | |
| Foundation IMH Fadlallah | 4051831 | Haret Hreik | CLOSED | |
| Brotherly Family | 4053971 | Haret Hreik | CLOSED | |
| Al Bachaer | 4051828 | Haret Hreik | CLOSED | |
| Star Media (NAEF Krayem) | 4050246 | Haret Hreik | ACTIVE | |

| | | | | |
|---|---|---|---|---|
| Al Shaheed Charitable Association | 3106962 | Ghobeiry | CLOSED | |
| Association Al Mabarrates | 3103847 | Ghobeiry | LG ONLY | |
| Lycee Al Khawthar | 3104166 | Ghobeiry | CLOSED | |
| Magazine Ahmad | 3104474 | Ghobeiry | CLOSED | |
| Dar Al Hadayek | 3100364 | Ghobeiry | CLOSED | |
| Al Rassoul Al Aazam Hospital | 3107280 | Ghobeiry | ACTIVE | |
| Al Rassoul Al Aazam Technical College | 3106393 | Ghobeiry | ACTIVE | |
| Tawbeh Mohamad  Hajj Jaafa Sadek | 3110601 | Ghobeiry | WAED | 25MIO |
| Abbas Ghorayeb / Mostafa Harb / Izzat Akar | 3110206 | Ghobeiry | KARD HAS | 10MIO |
| Ahmad Yazbek & Abbas Ghorayeb & Hassan Osman | 3113806 | Ghobeiry | KARD HAS | 6.8MIO |

| Group Tajeddine | | | | |
|---|---|---|---|---|
| AFFRIMEX S.A.L. | 3555731 | Verdun | | |
| LEADERS OF SUPPLY AND PRODUCTS S.A.L. | 4457660 | Verdun | | |
| G.A.LINE(UK)LIMITED | 4457680 | Verdun | | |
| OVLAS TRADING S.A.L. OFF-SHORE | 4457701 | Verdun | | |
| HYRAM MARITIME OFF SHORE S.A.L. | 4457710 | Verdun | | |
| TAJCO S.A.R.L. | 3550007 | Verdun | | |
| ATWI AND ABBAS TRADING S.A.R.L. | 4457729 | Verdun | | |
| TRUST AND SAFTEY RE. INVESTMENT S.A.L. | 4457353 | Verdun | | |
| GALAXY S.A.L. OFF-SHORE | 4457718 | Verdun | | |
| IMPEX INTERNATIONAL LTD | 2709745 | Verdun | | |
| BREAM STAR LINE B.S.L. OFFSHORE SAL | 2709752 | Verdun | Closed | |

This one page of what appears to be a multi-page document created in 2012 or 2013 lists the names of 30 Hezbollah-affiliated accounts at Byblos Bank. The document is particularly relevant here for four reasons.

First, only *three* of the 30 Hezbollah-affiliated persons or entities listed were identified in

18

the SAC as holding accounts at Byblos Bank, thereby demonstrating that limiting Defendants'
discovery obligations to accounts identified in the SAC is not only unduly restrictive as a matter
of law but would also foreclose disclosure of Hezbollah-affiliated accounts Defendants *already
know* they possess. Nor can it be an efficient use of judicial resources for Plaintiffs to continuously
return to the Court every time they discover additional Hezbollah-affiliated accounts, whether
through their own investigation or through third-party discovery.

Second, the list demonstrates how Defendants like Byblos Bank may at times formally
close certain accounts for U.S. designated SDGTs like the Martyrs Foundation ("Al Shaheed
Charitable Association") or Al-Qard al-Hassan ("AQAH") but continue to maintain accounts for
them through other account names (Al Rassoul Al Aazam Hospital, which belongs to the Martyrs
Foundation, and Ahmad Yazbek & Abbas Ghorayeb & Hassan Osman, fronts for AQAH).[7]

Third, the list demonstrates how Defendants like Byblos Bank maintain internal
compliance records that track their past and present Hezbollah-affiliated accounts.[8]

Finally, taken in the context of the news report and surrounding documents, the list appears
to have been created in 2012 or 2013 (*i.e.*, after November 2011) but is nevertheless highly relevant
to this lawsuit as evidence both of Byblos Bank's awareness of its role in maintaining accounts
and performing financial services for Hezbollah as well as its willingness to *continue* providing
assistance to undesignated Hezbollah-affiliated customers and to SDGTs operating under other
names. In sum, the documents disclosed in the news report are precisely the kind of internal records
Plaintiffs seek in this case and that cannot be obtained from third-party correspondent banks. They

---

[7]     The Spider Z leak discussed below indicates that the AQAH accounts were still active in late 2019.

[8]     Defendants claim it would be unduly burdensome to search, *inter alia*, for beneficial owners of accounts.
Defs. Mem. at 29, n.31. But the Byblos Bank documents indicate that it was already tracking accounts it knew
designated Hezbollah entities were holding under other names.

also clearly demonstrate that – far from conducting a "fishing expedition" – Plaintiffs' core allegations concerning Hezbollah's Business Affairs Component and its commercial activity through "certain well-known crime networks or 'clans' known to beaffiliated with Hezbollah" (like the infamous Tajideen clan whose Byblos Bank accounts are listed in the bank's compliance documents transcribed above) are rooted in the evidence and warrant appropriate discovery.

### D.      THE SPIDER Z LEAK – AL-QARD AL-HASAN

Prior to the disclosures concerning Byblos Bank in June of 2022, in late December of 2019, an anonymous hacking group calling itself "Spider Z" published an extensive series of records belonging to Hezbollah's AQAH. According to the U.S. Treasury Department's designation of AQAH-affiliated individuals shortly following the Spider Z leak, "AQAH, which was designated by OFAC in 2007, is used by Hizballah as a cover to manage the terrorist group's financial activities and gain access to the international financial system."[9] Hezbollah has essentially run AQAH as a bank with nearly 400,000 "accounts" for individuals and entities, including (but by no means limited to) major Hezbollah entities and operatives, replete with its own branches and ATM machines.

However, there are two limitations on AQAH's role as a bank. First, given the size of its operations (controlling hundreds of millions of dollars in assets) and the fact that it was designated an SDGT in 2007, it is too prominent and moves too much money on a regular basis for Lebanese banks to allow AQAH to hold accounts in its own name. Second, given its designation and obvious affiliation with Hezbollah it could not and cannot organize as a bank and secure its own correspondent accounts in the U.S. and elsewhere. Thus, as the U.S. Treasury Department has found, AQAH indirectly accesses the global financial system via a number of Lebanese banks by

---

[9]      Press Release, U.S. Dep't of the Treasury, "Treasury Targets Hizballah Finance Official and Shadow Bankers in Lebanon" (May 11, 2021), *available at*: https://home.treasury.gov/news/press-releases/jy0170.

maintaining accounts in the names of seven Hezbollah operatives (all designated on May 11, 2021). These individuals "used the cover of personal accounts at certain Lebanese banks, including U.S.-designated Jammal Trust Bank (JTB), to evade sanctions targeting AQAH and transfer approximately half a billion U.S. dollars on behalf of AQAH." *Id.*

Most relevant here, the Spider Z leak disclosed that five of the Defendants (Byblos Bank, Fenicia Bank, MEAB Bank, Lebanon & Gulf Bank and SGBL) all held accounts for Hezbollah operatives on behalf of AQAH. When, for example, Byblos Bank issued a statement disputing that it held accounts for AQAH, the Spider Z hackers published a cash withdrawal slip issued by Byblos Bank for Abbas Ghorayeb (a/k/a Abbas Hassan Gharib), one of the Hezbollah operatives designated as an SDGT for his role as "AQAH's informatics manager." Gielchinsky Decl., Ex E. Mr. Ghorayeb is the same individual listed in the leaked Byblos Bank document described in section C above listing Hezbollah-affiliated accounts at the bank.

The Spider Z documents are relevant here for **three** reasons.

First, none of the AQAH accounts held at the five Defendant banks were identified in the SAC, once again demonstrating that limiting Defendants' discovery obligations to accounts identified in the SAC would improperly foreclose the scope of discovery in this case.

Second, both the Spider Z leak and the subsequent U.S. Treasury Department designations highlight not only how pervasive Hezbollah's access to Defendants' banking services is, but also the degree to which Defendants' objections to searching for beneficial owners rings hollow.[10] Banks simply do not process a half-a-billion U.S. dollars for Hezbollah officials through their

---

[10]     In fact, after the AQAH data breach occurred, Defendants SGBL and Byblos Bank both issued public statements to Lebanese media denying they had accounts "in the name of al-Qard al-Hasan Association." *See* Gielchinsky Decl., Ex F. Of course, the question is not accounts *in the name of* AQAH but the fact that as the U.S. Treasury Department noted *infra*, individuals "used the cover of *personal accounts* at certain Lebanese banks … to evade sanctions targeting AQAH and transfer approximately half a billion U.S. dollars on behalf of AQAH" (emphasis added).

personal accounts without noticing. As the former Assistant Secretary for Terrorist Financing and

Financial Crimes at the U.S. Department of Treasury and former President of the Financial Action

Task Force states in his declaration in this case:

> Both the fact that AQAH's use of the banking system involved large sums of money
> for a decade and the fact that these well-known Hezbollah operatives continued to
> maintain joint bank accounts in multiple Lebanese banks demonstrate that despite
> both U.S. and (periodic) Lebanese governmental efforts, Hezbollah retains
> substantial access to Lebanon's banking system.

Billingslea Decl., ¶ 69.

<u>Finally</u>, Spider Z documents from 2019 are clearly relevant to demonstrate certain

Defendants' willingness to substantially assist Hezbollah SDGTs like AQAH that operate through

individuals to conceal their operations and obtain access to (among other things) U.S. dollar

correspondent accounts. Such "continued" provision of financial services to blacklisted

accountholders (if proven), in the Court's words, "certainly evinces a culpable, or at least willfully

blind state of mind." 2020 WL 7089448, at *14.

## ARGUMENT

## I.   THE COURT CAN AND SHOULD DECIDE NOW BOTH THE SCOPE OF INITIAL DISCOVERY AND THE VALIDITY OF DEFENDANTS' FOREIGN BANK SECRECY OBJECTIONS

### A.   Defendants Declined Plaintiffs' Invitation to Proceed with Letters Rogatory to Lebanese Authorities and Proposed the Very Process to Which They Now Object

Defendants' own proposal to the Court on December 10, 2021, (ECF No. 263) explicitly

contemplated submitting Letters Rogatory or Requests for Judicial Assistance "30 days after

District Court ruling on objections raised by discovery motions including bank secrecy." Adopting

Defendants' proposal, the Court directed the parties to "file any motions to compel or for protective

orders as to unresolved objections to initial RFPs, *including as to bank secrecy* by 5/2/2022."

December 13, 2021, Minute Order (emphasis added).

22

Now that process is characterized as "Plaintiffs' effort to jump ahead and force a decision on bank secrecy at this premature stage [that] would distort the normal and orderly process of discovery under the Federal Rules." Defs. Mem. at 55. It is important to recall that Plaintiffs offered to commence discovery with Letters Rogatory for 20 accounts, but Defendants stated in their November 24, 2021, letter that "letters rogatory to the Lebanese authorities should await the Court's ruling on the discovery motions, as to both bank secrecy objections and equally important scope issues." Gielchinsky Decl., Ex. B at 2. Since then, seven months have elapsed. In that time, Defendants have produced no documents of any kind and most Defendants have stated that they decline even to determine whether they have responsive records.

**B.      Defendants Have Given No Indication They Have Sought Waivers from Any of the 156 Customers Identified in the Second Amended Complaint 18 Months Ago and Such Requests for Waivers Are Highly Unlikely to Be Successful**

The District Court denied Defendants' motion to dismiss on November 11, 2020; Plaintiffs' Second Amended Complaint was filed on December 31, 2020 – more than 18 months ago. For all that time, Defendants knew, at a bare minimum, that the 156 Hezbollah-affiliated customers identified in the Complaint would obviously be the subject of discovery (indeed, the District Court rejected Defendants' attempt to reimpose a stay of discovery on June 25, 2021). Moreover, because they requested a tentative list of individuals and entities from Plaintiffs' counsel during the parties' Rule 26(f) conference on November 5, 2021, Defendants have known the basic scope of Plaintiffs' RFPs since November of last year. Yet, nothing in Defendants' objections and responses to Plaintiffs' requests or their Memorandum of Law suggest that they have sought *any* customer waivers since the commencement of the lawsuit more than 42 months ago or since the filing of the (post-motion to dismiss decision) Second Amended Complaint – or even since the time, more than

23

seven months ago, when they received an advance look at Plaintiffs' requests. Gielchinsky Decl.,
Ex. A.

Moreover, Defendants' invocation of customer waivers as an alternative means of securing
discovery demonstrates that their real objective is delay, not disclosure. Consider for example the
fact that Defendants are urging the Court to delay the case further so they can seek waivers from
individuals who are currently subject to rewards of upwards of "$10 million for information on
the activities, networks, and associates" from the U.S. government's "Rewards for Justice"
program. These include:

- Muhammad Kawtharani
- Ali Qasir
- Adham Tabaja
- Ali Youssef Charara
- Mohammad Ibrahim Bazzi[11]

The idea that these key Hezbollah operatives with bounties on their heads are going to give
consent to their bankers to disclose their financial records or the financial records of the companies
they control is highly implausible. That Defendants' attempt to analogize their request to a U.S.
bank's offer "to make a client's high-flying life easier" by waiving Swiss bank secrecy for client
service purposes (not litigation), Defs. Mem. at 32 n.37, illustrates their refusal to acknowledge
that this case is not about pleasing high-flyer bank customers, but a case about aiding and abetting
and conspiring with a terrorist organization.

### C. The Procedural History of Prior ATA Cases Involving Foreign Bank Secrecy Make Clear That Ruling on Foreign Law Objections Now Is Appropriate

Each case is of course different and presents its own unique issues, but because Defendants

---

[11]    https://rewardsforjustice.net/rewards/muhammad-kawtharani/;    https://rewardsforjustice.net/rewards/ali-
qasir/;   https://rewardsforjustice.net/rewards/adham-husayn-tabaja/;   ttps://rewardsforjustice.net/rewards/ali-youssef-
charara/; https://rewardsforjustice.net/rewards/mohammad-ibrahim-bazzi/.

previously raised *Linde v. Arab Bank, plc* as a precedent that, they incorrectly argue, compels courts to sequence bank secrecy disputes in the way preferred by Defendants, and because Defendants misstated the procedural history of that case (and implicitly the sequencing of other bank secrecy cases), a discussion of *Linde* and certain other relevant cases is warranted.

In both *Linde* and in *Miller v. Arab Bank, plc*, the parties first *agreed* to a Letters Rogatory process before the defendant made its bank secrecy objection—the same sort of arrangement Plaintiffs here offered, and Defendants rejected. In *Strauss v. Credit Lyonnais, S.A.*, which is addressed in Section D, below, the court ruled on (and rejected) bank secrecy objections without any Letters Rogatory first being initiated.

### 1.      *Linde v. Arab Bank, Plc*

After initially serving broad discovery requests, the plaintiffs in *Linde* submitted a Joint Modified Phase I Request seeking records for ten (reduced to nine) specific accounts identified as belonging to the families of Palestinian suicide bombers. 463 F. Supp. 2d 310, 312 (E.D.N.Y. 2006). A month later, by agreement of the parties, the court ordered that "[t]he parties shall commence steps immediately to obtain the necessary permission from foreign regulatory authorities" for the production of records pertaining to those nine bank accounts. *Linde*, No. 04-cv-2799 (NG) (VVP), ECF No. 81 at 3. The defendant in that case, Arab Bank, then made applications to a Jordanian court for one account (denied on appeal on October 9, 2005) and a Palestinian court for seven other accounts (denied on October 2, 2005). ECF Nos. 108 (at 5) and 113. On October 5, 2005, Arab Bank also sought permission directly from the Palestine Monetary Authority to authorize disclosure of the records for the seven accounts and that request was denied. 2009 WL 8691096, at *4 (E.D.N.Y. June 1, 2009). As a result of a separate Stipulated Production Order dated November 8, 2005, Arab Bank applied to the Lebanese Special Investigation

Commission ("SIC") for permission to disclose information relating to an account later determined to belong to Hamas leader Osama Hamdan. No. 04-cv-2799 (NG) (VVP), ECF No. 115. On January 25, 2006, the SIC granted Arab Bank's application (though at the time, Arab Bank did not disclose that account records were in the United States, having been provided without consent of the SIC, to the U.S. Office of the Comptroller of the Currency). 2009 WL 8691096, at *4; 706 F.3d at 98. Plaintiffs then moved to overrule defendant's foreign bank secrecy objections and for sanctions for defendant's refusal to produce. *Linde*, No. 04-cv-2799 (NG) (VVP), ECF No. 153.

On March 3, 2006, recognizing that Arab Bank's purported efforts to seek permission from certain foreign jurisdictions to produce records had failed and because Plaintiffs' broader document requests could potentially implicate the laws of more than the three jurisdictions implicated by its prior orders, the court issued a wide-ranging document production order but reserved judgment on Arab Bank's bank secrecy objections, first directing the bank to identify all jurisdictions whose bank secrecy laws would be implicated by the order by March 24, 2006. *See Linde*, No. 04-cv-2799 (NG) (VVP), ECF No. 160, ¶ 13. On November 25, 2006, the magistrate judge issued an order overruling defendant's bank secrecy objections as to three jurisdictions (Lebanon, Jordan and the Palestinian Territories), and deferred ruling on the plaintiffs' request for sanctions. 463 F. Supp. 2d at 317. The district judge subsequently rejected the defendant's Rule 72 objections to that ruling and urged the magistrate judge to set a prompt deadline by which the bank would determine whether it could secure permission to turn over the documents. 2007 WL 812918, *2 (E.D.N.Y. Mar. 14, 2007).

Thereafter, the magistrate judge issued what became the controlling document production order of May 7, 2007, calling for the production of **15,545** distinct sets of records for recipients of terrorism-related payments and production of records for **107** additional individuals and entities.

*See* Ex. C to the Schlanger Declaration attached to Plaintiffs' opening brief ("Schlanger Decl."), ECF No. 270-5 (Linde May 7, 2007, Production Order) and Ex. D, ECF No. 270-6 (*Linde* Rule 1006 Trial Exhibit quantifying the number of individuals covered in paragraph 1 of the Linde court's May 7, 2007, Production Order).[12] Prior to issuing the May 7, 2007, order, the magistrate judge urged the defendant to "make a good faith effort to secure permission from the foreign authorities to make the information available." *Linde*, 463 F. Supp. 2d at 316, *aff'd*, 2007 WL 812918.

It is worth noting that far from "running roughshod over the sovereign interests" of foreign jurisdictions, the *Linde* court hoped that its overruling of Arab Bank's foreign bank secrecy objections might spur those jurisdictions to be more cooperative given the clear signal that the defendant would not be excused from discovery. The court stated that "[n]ow that this court has ruled that the bank secrecy laws of those jurisdictions will not serve as a bar to discovery ordered here, the defendant may be in a position to pursue avenues for obtaining permission to disclose the information from pertinent governments and authorities through letters rogatory or other devices, and should be given a specified period of time to do so." *Id.* The court then signed Letters of Request to Palestinian and Jordanian banking authorities in June 2007 seeking waiver of foreign bank secrecy laws and permission to disclose documents responsive to plaintiffs' requests. *Linde*, 269 F.R.D. 186, 193-94 (E.D.N.Y 2010).

When those Letters of Request were denied and defendant declined to produce, plaintiffs moved again for sanctions pursuant to Rule 37. *See id.* at 194. The resulting sanctions imposed by the magistrate judge and affirmed by the district court were platformed off the defendant's refusal to comply with the *Linde* court's May 7, 2007, order. *Id.*

---

[12]     Unlike the Proposed Document Production Order here, the *Linde* order made no distinctions between electronically stored and paper records.

Here, Defendants could have agreed to commence discovery by submitting Letters Rogatory as was done in *Linde* and *Miller v. Arab Bank, plc* (discussed below) but they declined that invitation and submitted their proposal for a schedule that contemplated full scale requests for production and objections followed thereafter by a schedule to "submit Letters Rogatory or Requests for Judicial Assistance as to initial RFPs, if necessary following rulings on discovery motions **including foreign bank secrecy**" – "30 days after District Court ruling on objections raised by discovery motions including bank secrecy." ECF No. 263 (emphasis added).

Until the filing of the present motions, the parties *agreed* on the principle that this Court should rule on both the scope of Plaintiffs' discovery *and* the validity of Defendants' bank secrecy objections concurrently. The parties' sole disagreement concerned whether (in the event the Court overruled Defendants' bank secrecy objections) any time limit should be placed on the subsequent Letters Rogatory process. *See* 12/13/21 Tr. at 18:20-25 ("What Plaintiffs want to do is impose an artificial and frankly premature deadline on when we have to put up or shut up, to use a common term. And we won't know that. How can we possibly know at this stage how long it will take for the Lebanese authorities, given all that is going on in Lebanon and the complexity of these issues."). This Court agreed with Defendants and declined to impose any time frame on any future Letters Rogatory process at this juncture.

## 2.    *Miller v. Arab Bank, Plc*

In *Miller v. Arab Bank, plc*, the plaintiffs served their RFPs in July 2019 and the magistrate judge subsequently directed them to provide to the defendant "a short list of individuals and entities for whom Letters Rogatory should first be submitted." No. 18-cv-02192 (HG) (PK), Sept. 24, 2019, Minute Order. After the plaintiffs provided that agreed upon "short list" of putative customers, the defendant submitted Letters Rogatory which the court issued to Lebanon, Jordan,

28

and the Palestinian Authority. During that period between September 24, 2019, and January 29, 2020, the parties exchanged correspondence and met and conferred regarding the relevance of bank records concerning the 677 persons and entities the RFPs identified, and defendant then confirmed that it would, on a non-waiver basis, produce responsive records located in the U.S. "for all persons and entities listed in plaintiffs' RFPs…." – *i.e.*, **for all 677 persons and entities**. After more than a year passed, Lebanon, Jordan, and the Palestinian Authority each refused to authorize disclosure regarding even the "short list" of putative customers. Thereafter, the defendant advised plaintiffs that it would not produce records responsive to the RFPs from Lebanon, Jordan, or the Palestinian Authority. No. 18-cv-02192 (HG) (PK), Joint Pre-Motion to Compel Letter, ECF No. 77.

When the plaintiffs advised that they intended to file a motion to compel, the defendant responded that it would seek a protective order because plaintiffs' RFPs "are overly broad and lack proportionality" and that it should be afforded an opportunity to seek customer waivers before the court considered their bank secrecy objections. It also argued that the scope of the RFPs should be significantly curtailed because it "is unrealistic to believe that any customer will agree to have all of the transactions in their accounts over a multi-year period, no matter how unrelated to the claims at issue, produced to Plaintiffs. Nor should they." *Id.* The bank also asserted that in order to justify each name listed on its RFPs "Plaintiffs must establish that the alleged customers were 'closely intertwined with [the FTO's] violent and terrorist activities.'" *Id.* (citations omitted).

Having received the parties' joint pre-motion letter, Magistrate Judge Kuo held a telephonic status conference to determine how the issues presented should be briefed (including on Lebanese bank secrecy). The defendant's counsel argued that the proper scope of discovery should be decided first and then the bank should be given an opportunity to seek customer waivers

before the court returned to the bank secrecy issue. In response, Magistrate Judge Kuo stated:

> [T]he only issue that I think I need to decide today is the sequence, whether … they should be dealt with one after the other or whether they can be dealt with simultaneously. And based on what I'm hearing I think that the parties can deal with these two issues in the same brief. You can make the argument on one on the first half of the brief that talks about the scope, that it should be limited, so that I can consider it and under 26(C) and see if the scope should be limited. If it should be six years or one year or something of that nature. And then once I've made that decision move on to the assertion of bank secrecy as a reason that the defendant doesn't have to produce the documents that are otherwise producible.

No. 18-cv-02192 (HG) (PK), 1/20/22 Tr. at 33:16-34:5, ECF No. 81.

Magistrate Judge Kuo expressed no objection if the defendant wanted to try to get customer consents while the briefing of the motion was underway but noted: "I am doubtful that you will get 677 consents. **And so that's part of my concern about giving you time to get the consents because I don't think if you were to get a small number of consents that that would really affect the ruling or the need to rule on bank secrecy anyway.**" *Id.* at 34:19-24 (emphasis added). The same reasoning pertains with equal force here.

> ### D.   Courts Do Not Routinely Require Plaintiffs to Proceed Under the Hague Convention, Let Alone When Documents Are Resident in a Jurisdiction That Is Not a Signatory to the Hague Convention

Defendants tout the fact that Lebanon's Special Investigation Commission ("SIC") has the authority to lift Lebanese bank secrecy in certain contexts. *See* Defs. Mem. at 34. But Plaintiffs have never expressed an objection to Defendants submitting requests to the SIC (although past experience suggests that the process outlined by Mr. Moghaizel may be unduly burdensome) and even offered – more than seven months ago – to proceed with a sample list of 20 individuals and entities to submit to the Lebanese authorities. For a variety of reasons, Plaintiffs are highly skeptical that the SIC could or would ever lift bank secrecy for more than a fraction of the individuals and entities listed in Plaintiffs' requests, given Hezbollah's de facto control of Lebanon and the attendant risks of displeasing the terrorist group.

However, even in far more conventional circumstances involving jurisdictions that are signatories to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, TIAS No. 7444 (the "Hague Convention"), court have not required parties to resort to the Convention's mechanisms when it finds the U.S. interest outweighs the foreign interest in its privacy laws.

In *Strauss v. Credit Lyonnais, S.A.*, an Anti-Terrorism Act case against a French bank, the court granted plaintiffs' motions to compel discovery after weighing and balancing the relative interests of the parties and the national interests of the United States and France, holding that "the plaintiffs are entitled to Credit Lyonnais's responses" to plaintiffs' discovery demands (without first issuing any Letters Rogatory). 242 F.R.D. 199, 228 (E.D.N.Y. 2007). The defendant cross-moved for protective orders requesting that the court: (a) compel plaintiffs to seek discovery through the Hague Convention; and (b) excuse the bank from providing discovery protected under French bank secrecy laws. *Id.*, No. 06-cv-00702 (DLI) (RML), ECF No. 117. The defendant submitted a letter it received from the French Ministry of Justice stating France's position that the Hague Convention provides "the exclusive and mandatory" means of obtaining evidence in the territory of France, and further stating that discovery conducted outside the formal procedures of the Hague Convention would "clearly constitute a violation of the sovereignty of the French State." *Id.*, ECF No. 118 at 4.

Nevertheless, the court denied the defendant's motion, citing the Supreme Court's *Aerospatiale* decision which explained:

> An interpretation of the Hague Convention as the exclusive means for obtaining evidence located abroad would effectively subject every American court hearing a case involving a national of a [signatory] state to the internal laws of that state. Interrogatories and document requests are staples of international ... litigation, no less than of other suits, yet a rule of exclusivity would subordinate the court's supervision of even the most routine of these pretrial proceedings to the actions or,

equally, to the inactions of foreign judicial authorities.

249 F.R.D. at 442 (citing *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 539 (1987)).

As the *Strauss* court bluntly stated: "Defendant's argument that American courts must defer and be subject to internal French law contravenes American law." *Id.* at 443. Other courts have agreed. *See, e.g.*, *Wultz*, 910 F. Supp. 2d at 559 ("I take seriously the mutual interest of China and the United States in the bilateral resolution of cross-border legal enforcement issues. But the Chinese interest in building confidence in its banking industry does not encompass an interest in protecting the confidentiality of those who participate in the funding of international terrorism."); *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 423-25 (S.D.N.Y. 2016) (finding that U.S. national interests in a putative class action alleging commodity manipulation outweighed the UK's interests in its data privacy laws, and denying banks' motion for an order directing discovery of UK documents through the Hague Convention).

These cases, and others that agree with them referenced above, are "private, civil lawsuits" that Defendants assure this Court do not demonstrate the necessary U.S. interests to compel document production. Defs. Mem. at 3-4. And in all these cases, the foreign interests in enforcing their laws was found insufficient to outweigh the U.S. interests in proceeding with Rule 26 discovery, despite Defendants' argument that "forcing foreign banks to violate laws in countries like Lebanon actually *undercuts* the United States' interest in fighting terror abroad." *Id.* at 4.

In this case, Lebanon is not even a signatory to the Hague Convention and while *Plaintiffs* were the ones who proposed commencing discovery with submissions of Letters Rogatory to the Lebanese authorities and who proposed permitting Defendants to submit Letters Rogatory "if foreign bank secrecy objections are overruled and motion to compel is granted" (ECF No. 263), there is simply no reasoned basis for the Court in this case to abrogate its December 13, 2021

32

Minute Order directing the parties to "file any motions to compel or for protective orders as to unresolved objections to initial RFPs, *including as to bank secrecy* by 5/2/2022" (emphasis added). All this is notwithstanding, of course, Defendants argue that the process *they* proposed (and the Court adopted) is "premature."

## II.   THE SCOPE OF PLAINTIFFS' REQUESTS IS ENTIRELY CONSISTENT WITH RULE 26 AND THE RESTATEMENT

### A.   Plaintiffs' Document Requests Are Narrowly Tailored to Records for Persons and Entities Identified in the Complaint or in U.S. Government Designations as Part of Hezbollah and its Business Affairs Component

#### 1.   Defendants Cannot Articulate a Principled Basis as to Why Particular Persons or Entities, or Types of Transactions, Should Be Excluded from the Court's Production Order

Defendants complain about having to search for 687 potential customers — about 5% of the number of individuals and entities ordered in *Linde* — but do not suggest a principled basis for refusing to search for the names of any of these potential customers.[13] Instead, Defendants suggest that discovery in this case—a case alleging a "wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers," 2020 WL 7089448, at *11, on behalf of over 1,000 Plaintiffs, should be limited to *three* customers:

> For starters, Judge Amon's motion-to-dismiss decision sustained Plaintiffs' JASTA aiding-and-abetting claim only with respect to Plaintiffs' "strongest allegations," *i.e.*, the provision of banking services to SDGTs that Plaintiffs alleged were publicly known to have been closely intertwined with Hezbollah's terrorist activities. *See* ECF 164 at 26. Judge Amon went on to identify only three such entities: the Islamic Resistance Support Organization ("IRSO"), Martyrs Foundation, and the Imam Khomeini Relief Committee – Lebanon ("IKRC"). *Id.* The Requests should therefore be limited to account and compliance documents related to such alleged customers—and those Requests must be Bank-specific,

---

[13]      Conversely, Defendants point out that a court found unreasonable a request for client information for "over 100,000 customers." Defs. Mem. at 23 (quoting *Trieligant Corp. v. Sitel Corp.*, 272 F.R.D. 360, 366 (S.D.N.Y. 2010)). That court required the requesting party to narrow its request for information on 134,000 customers but permitted discovery "related to particular groups within the cohort of 134,000—such as customers who actually were lost from within that group or any customer within the group to complain or dispute a sale." *Id.* Not only are requests for documents for 687 individuals and entities not analogous to a request for *134,000*, but here the majority of the names requested here are identified in the SAC and all of them are directly relevant to Plaintiffs' claims.

since each claim against each Moving Defendant must stand or fall on its own.

Defs. Mem. at 13. Obviously, limited discovery to "customers identified in Judge Amon's opinion," *id.* at 10, would constitute a wholly arbitrary restriction to the handful of entities from the 803-page SAC the District Court happened to name in its 38-page opinion.

Presumably recognizing how implausible their positions is, Defendants next suggest the Court limit the entities to those "publicly known at the Relevant Time Period to be closely intertwined with terrorist activities," Defs. Mem. at 11 (although they do not explain why determining which individuals or entities were publicly known as Hezbollah-affiliated in Lebanon is now relevant when the *evidentiary* question is whether *Defendants* were generally aware of their role in an unlawful enterprise—presumably "public knowledge" could provide indirect evidence of generally awareness, but the *direct* evidence is in Defendants' files and the testimony of their employees and officers).

But the District Court's decisions do not even hint at the limitations Defendants urge. Likewise, Defendants also argue that their then-pending second motion to dismiss would show a requirement that "any Moving Defendant provided financial services to any SDGT *after* its designation," and their alleged customers each be "'closely intertwined' with Hezbollah's acts of terrorism." *Id.* at 10. These are (purported) pleading requirements, not an evidentiary burden Plaintiffs must meet *before* requesting discovery about a Hezbollah operative or entity; but since Defendants filed their brief, the District Court did decide their renewed motions to dismiss and rejected them soundly.

Defendants do not suggest the Hezbollah-affiliated individuals and entities listed in Plaintiffs' requests do not exist or did not maintain bank accounts in Lebanon and, by their own admission, they collectively "represent[] over 80% of the Lebanese banking sector." *Id.* at 35. It stands to reason that these individuals and entities held accounts with Defendants (a fact confirmed

even by the disclosures that have occurred since the filing of the SAC) — demonstrating that Defendants' real objection is not to the "burden" of searching their customer records but to Plaintiffs and the Court learning the full extent of their relationships with Hezbollah.

Defendants also attempt to limit the types of records Plaintiffs may seek "to transactions that could foreseeably be tied to terrorist activity," Defs. Mem. at 15, in some undefined way. Defendants argue this based on their reading of "liability under JASTA"—theories the District Court has now rejected twice. Principally, Defendants argue these exclude "routine commercial banking transactions" according to the Second Circuit's *Linde* opinion. *Id.* The Circuit has already rejected this *precise* argument, explaining *Linde*'s "statement--that 'the mere provision of "routine banking services to organizations and individuals said to be affiliated with" terrorists' is not sufficient to show that the defendant itself committed an act of terrorism--was made '*in the context of a challenge to proof of the causation element* of an ATA claim.'" *Kaplan*, 999 F.3d at 858 (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018)).[14]

Further, the Circuit explained that it noted in *Linde* "that whether a defendant bank's 'financial services to [an FTO or its affiliates should or] should not be viewed as routine' is a 'question[ ] of fact for a jury to decide.'" *Id.* (quoting *Linde*, 882 F.3d at 327). Whether Defendant's conduct was routine is for a jury to decide here, too, not a basis for limiting discovery. And although much of LCB's conduct was certainly not routine, *Kaplan* makes clear that aberrational conduct hardly constitutes some sort of minimum requirement for a JASTA claim.

Defendants claim *Honickman* came to the same conclusion; again, Defendants misstate the case law. Far from rejecting purportedly "routine" financial transfers alleged in that case as relevant to a JASTA claim, the Circuit explained that the "district court misunderstood the first

---

[14]     As in the *Kaplan* appeal, there is no primary liability ATA claim currently pending in this case.

factor" of "knowing and substantial assistance," explaining that the factor ("nature of the act assisted") "required assessing whether the alleged aid (facilitating the transfer of millions of dollars to the Three Customers) would be important to the nature of the injury-causing act (Hamas's terrorist attacks)." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021). In short, BLOM's alleged conduct in that case was far from clearly insufficient for JASTA liability purposes.

In any event, neither *Kaplan* nor *Honickman* even remotely suggests that JASTA discovery is limited to transactions that are "foreseeably be tied to terrorist activity" – whatever that phrase means.

> 2.  **Third-Party Discovery to Date Not Only Confirms Allegations in the Complaint but Also Demonstrates that Defendants Maintained Accounts for Hezbollah Business Affairs Component Persons and Entities Not Identified in the Complaint.**

Only one of the four main correspondent banks has thus far produced transactional records (and those have been limited to the 2003-2012 period). Yet that production and the productions by other correspondent banks have confirmed both the validity of Plaintiffs' allegations concerning Defendants' maintenance of bank accounts for Hezbollah-affiliated entities and individuals and the banks' use of New York correspondent banks to, in many cases, effectuate large volume and large value transactions on their behalf. A rough preliminary calculation suggests that, *exclusive* of transactions on behalf of Lebanese exchange houses affiliated with Hezbollah, Plaintiffs tabulate approximately 3,000 transactions totaling **$850 million** during that time period for just 47 of the 687 individuals and entities listed in Plaintiffs' request. Those numbers include 78 customer accounts held by 49 accountholders at Defendant banks that are not identified in the SAC. In other words, this is merely the tip of the proverbial iceberg. *Full* Rule 26 discovery *from the Defendants*

is essential to properly gauge the magnitude of the (criminal) assistance these Defendants provided to Hezbollah.

### 3. Plaintiffs' Document Requests Should Not Be Temporally Limited Because Illegal Conduct Occurring After 2011 Constitutes Important Circumstantial Evidence of Defendants' State of Mind

As the District Court recognized, transactional and compliance records dated after November 2011 are highly relevant in demonstrating each Defendant's state of mind. It is hardly "bald speculation" that evidence of Defendants' continuing criminal conduct provides circumstantial evidence of their awareness or a role in an ongoing criminal enterprise. Defs. Mem. at 17.

Plaintiffs' requests for records after 2011 are focused on two categories of individuals and entities: (1) Hezbollah-affiliated customers whose accounts migrated from Lebanese Canadian Bank after its collapse and (2) U.S. government-designated SDGTs affiliated with Hezbollah. For both categories, in its first decision, the District Court affirmed that "[t]he continued provision of financial services to these blacklisted account-holders certainly evinces a culpable, or at least willfully blind state of mind." 2020 WL 7089448, at *14. Defendants cannot plausibly argue that they first decided to provide financial services to Hezbollah only after November 14, 2011, and *subsequent* to the date the U.S. government sanctioned Lebanese Canadian Bank for engaging in that conduct.

For the first category, Defendants devoted three full pages to arguing that the migration was irrelevant, Defs. Mem. at 18-20—but the District Court already decided it was. 2020 WL 7089448, *12. Regarding the second category – U.S. government-designated SDGTs – even in their opening brief, Defendants argue that "the SAC is conspicuously silent on whether any Moving Defendant provided financial services to any SDGT *after* its designation." Defs. Mem. at

10 (emphasis in original).[15] Clearly, Defendants believe that the closure of accounts belonging to SDGTs or the absence of accounts for them is exculpatory and would welcome at least selective discovery into those facts.

But as both the recent Byblos Bank disclosures and the Spider Z leak concerning AQAH illustrate, obtaining records of financial services Defendants provided to "any SDGT after its designation" is highly relevant. For example, AQAH was designated an SDGT in 2007. After that point, it could no longer use accounts held in its own name to conduct U.S. dollar-denominated funds transfers through Defendant banks because the filtering software used by U.S. correspondent banks would have automatically blocked and frozen funds routed through the United States. Therefore, to continue its very substantial operations in Lebanon on behalf of Hezbollah, AQAH – in the words of the U.S. Treasury Department – "used the cover of personal accounts at certain Lebanese banks, including U.S.-designated Jammal Trust Bank (JTB), to evade sanctions targeting AQAH and transfer approximately half a billion U.S. dollars on behalf of AQAH."[16] Accordingly, evidence that certain Defendants actively assisted AQAH operatives to evade U.S. terrorism sanctions and transfer "half a billion U.S. dollars" after AQAH was designated in 2007 *and as recently as last year* is clearly relevant to proving a Defendant "was aware of its role (and the role of the Lebanese banking sector as a whole) in facilitating Hezbollah's illicit schemes through which the terrorist organization funded its [Islamic Jihad Organization]." SAC, ¶ 10.

---

[15]     Plaintiffs disputed that in their opposition to Defendants' motions to dismiss the SAC, but relevant here is that *Defendants* believe rendering financial services to any SDGT after its designation is particularly inculpatory.

[16]     Press Release, U.S. Dep't of the Treasury, "Treasury Targets Hizballah Finance Official and Shadow Bankers in Lebanon" (May 11, 2021), *available at*: https://home.treasury.gov/news/press-releases/jy0170.

### B.        Rule 26 Does Not Limit Discovery to the Contours of the Complaint

It goes without saying that discovery is not limited to the persons or entities listed in a complaint. Even leaving aside plaintiffs' limited knowledge before discovery, such a rule would turn complaints into directories—and, as Defendants pointed out, the SAC is long enough. *See* Defs. Mem. at 9. Indeed, discovery can reach entire *issues* not raised in a complaint. As the Supreme Court stated in *Oppenheimer Fund v. Sanders*:

> Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. ... Nor is discovery limited to the merits of the case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits.

437 U.S. 340, 351 (1978) (citations omitted).[17] Here, of course, Plaintiffs' document requests are limited to issues raised in the Complaint, and of course discovery is also not limited to particular persons or entities the District Court mentions in its decision denying motions to dismiss.

The recent public disclosure of 30 Hezbollah-affiliated accounts identified and monitored by the compliance department at Byblos Bank demonstrates Plaintiffs' need for discovery aimed at Hezbollah's "wide-ranging" network. Of the 30 Hezbollah-affiliated accounts listed on a single page of Byblos Bank's internal memorandum, only *three* of them were listed as the bank's customers in the SAC.

So too, the limited productions to date of transactional spreadsheets from three third-party correspondent banks, KBC Bank, Standard Chartered Bank and BNP Paribas have confirmed the accounts identified in the SAC at Defendant banks (and certain transactions) for several Hezbollah-

---

[17]        The 2015 amendment to Rule 26 has not altered this basic principle. *See e.g., Fossil Group v. Angel Seller LLC*, No. 20-cv-2441 (WFK)(TAM), 2021 WL 5181308, *4 (E.D.N.Y. October 22, 2021) (Merkl, M.J.) (citing *Oppenheimer* and noting that relevance must be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on a party's claim or defense). Notwithstanding Defendants' repeated insistence, "[t]he 2015 amendments, however, did not establish a new limit on discovery; rather they merely relocated the limitation from Rule 26(b)(2)(C)(iii) to Rule 26(b)(1)." *Vaigasi v. Solow Mgmt. Corp.*, No. 11-cv-5088-RMB-HBP, 2016 WL 616386, at *13 (S.D.N.Y. Feb. 16, 2016) (citing cases).

affiliated individuals and entities and disclosed that Defendants maintained one or more accounts

for at least 49 Hezbollah-affiliated persons and entities that were *not* previously identified in the

SAC as linked to those specific Defendants. As the *Linde* court observed: "It would require a

suspension of disbelief to conclude that the only financial services the Bank ever provided to those

alleged by the plaintiffs to be terrorists or their affiliates are reflected in the documents that have

been produced." 2009 WL 8691096, at *6. Furthermore, Rule 26(b) "is liberally construed and is

necessarily broad in scope." *New Falls Corp. v. Soni*, No. 16-cv-6805 (ADS)(AKT), 2020 WL

2836787, at *1 (E.D.N.Y. May 29, 2020) (citation omitted). There is simply no basis to arbitrarily

constrict the scope of the highly relevant discovery sought in this case.

### C.      Plaintiffs' Requests Are Directly Relevant to Defendants' Liability

As noted above, Defendants have consistently and deliberately avoided referring to one of

the Complaint's central allegations – their assistance to and facilitation of Hezbollah's fundraising

directorate, the Business Affairs Component of its Islamic Jihad Organization, which is in charge

of terror attacks overseas.[18] The Business Affairs Component oversees Hezbollah's commercial

funding and assists in its weapons procurement. In Defendants' reading of the District Court's

initial decision on their motions to dismiss, while they stand accused of maintaining some accounts

(156) for Hezbollah, *only three* of them are in any way connected to Hezbollah's violent activities

and therefore relevant to discovery (the Islamic Resistance Support Organization, Martyrs

Foundation, and the Imam Khomeini Relief Committee – Lebanon). *See* Defs. Mem. at 13. But

this is simply delusional. All nodes of the various interlocking networks that make up Hezbollah's

Business Affairs Component are part of the organization's Islamic Jihad Organization – its terror

apparatus.

---

[18]      Hezbollah's "Social Welfare" sector is discussed in Plaintiffs' opening brief at 4-6.

To cite but one example of what the District Court here summarized as money laundering and drug trafficking through commercial activity that "comes from certain well-known crime networks or 'clans' known to be affiliated with Hezbollah," 2020 WL 7089448, at *1, the Tajideen clan runs a business empire spanning much of the globe, but with a particularly strong presence in southern Lebanon, Angola, and the Democratic Republic of Congo. SAC, ¶¶ 687-88. Three of the siblings, Kassim, Ali, and Hussein Tajideen, were designated SDGTs for their roles as Hezbollah fundraisers, money launderers, and financial contributors, and other siblings and family members also play important supporting roles in the Tajideen family's Business Affairs Component network. *Id.*, ¶¶ 688-89. All three brothers who were designated SDGTs maintained accounts at one of the Defendant banks. Those account records – including internal bank communications, memoranda, and reports – are directly relevant to Plaintiffs aiding and abetting and conspiracy claims.

## III.   DEFENDANTS VASTLY EXAGGERATE THE BURDEN OF IDENTIFYING THEIR HEZBOLLAH-AFFILIATED CUSTOMERS

Defendants largely repeat the same mantras about the burdens of searching for and identifying their Hezbollah-affiliated customers. As noted above, and as illustrated by the example of Byblos Bank, the identities of Defendants' Hezbollah-affiliated customers are less mysterious than they protest. Of the 687 names, 307 of them are corporate entities[19] and while the names of individuals may be more difficult to search than corporate names (due to multiple spellings or common names), the process is far less onerous than Defendants present for a variety of reasons.

---

[19]      Even the limited productions from third-party correspondent banks so far strongly suggests that customer accounts for corporate entities are relatively easy to identify. Moreover, these banks were able to find responsive transactions from vastly larger data sets than those described by the Defendants. *See, e.g.*, Issa Decl., ECF No. 284, ¶ 9. To cite just one example, third party discovery to date suggests that a single entity controlled by one of the crime networks or "clans" known to be affiliated with Hezbollah moved more than $100 million through just *one* of the Defendants during the 2003 to 2011 period.

First, nearly all the individuals listed in the requests are part of extended networks often transacting *with each other* or the corporate entities on the list. For example, there are no doubt several individuals named "Muhammad Bazzi" and several spellings of that name, but only one individual by that name is likely to receive or send funds to companies and individuals associated with Muhammad Bazzi's criminal network, like Global Trading Group NV (SDGT).

Second, these individuals are often disproportionately involved in large transactions or high-volume transactions that are far from ordinary for the average bank customer.

Third, some Defendants complain that searches for individuals are difficult without any other information, such as the ID number, date of birth, and nationality, but the U.S. Treasury Department often provides at least some of that information for SDGTs. If the Court enters Plaintiffs' Proposed Document Production Order, Plaintiffs will provide whatever additional identifying information they may have about the names on the list – just as they have done for third-party banks who have requested assistance.

Lastly, as described above, Plaintiffs' Proposed Document Production Order addresses Defendants' expressed concerns about the burden of searching for and producing information and documents contained in hard copy by focusing mostly on electronic records.

Defendants' reliance on *Allstate Ins. Co. v. All Cnty., LLC*, No. 19-cv-7121 (WFK) (SJB), 2020 WL 5668956 (E.D.N.Y. Sept. 22, 2020) and *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570 (GBD) (SN), 2021 WL 5449825 (S.D.N.Y. Nov. 22, 2021), does not change the analysis. Plaintiffs' targeted requests for records for Hezbollah-affiliated individuals and entities are hardly "blanket requests for bank records that are untethered to any specific allegation in the complaint." Defs. Mem. at 12. Rather, they *all* relate to Hezbollah's "wide-ranging" networks, as set forth in the SAC and recognized in the District Court's decisions. Moreover, Defendants' cited

cases arise in very different procedural contexts.

In *Allstate*, an insurance company sought to claw back payments it had made to All County, LLC, claiming it had failed to comply with New York licensing requirements, and was therefore ineligible to seek no-fault insurance payments. Allstate served third-party subpoenas on All County's banks and accountant seeking not just "all of Defendants' financial information, including all books and records for the past decade" but also "all documents in any way related to [defendant]." *Id.* at *1, 3. It claimed the records were relevant to determining "the illegal ownership and operation of All County" and justified its sweeping third-party discovery as an effort to prove ownership through a "money trial." *Id.* at *2. Here, the records sought – customer account records, transactions and internal memoranda and communications concerning Hezbollah-affiliated persons and entities – are the most obvious means of proving the central elements of the claim: proving Defendants' state of mind and substantial assistance to Hezbollah. Furthermore, unlike in *Allstate*, the RFPs are made on Defendants, not third parties (none of whom have yet moved to quash the subpoenas they received).

Magistrate Judge Netburn's ruling in *In re Terrorist Attacks* cited by Defendants is no more analogous to the circumstances here than *Allstate*. In that instance, the court was assessing the scope of *jurisdictional* discovery requests and noted that it "must ... be 'limited to the essentials necessary to determining the preliminary question of jurisdiction'" and was further limited in scope "based on what was authorized in the Remand Order" from the Second Circuit. 2021 WL 5449825, at *2-3. Moreover, unlike the elements of aiding and abetting and conspiracy liability applicable here, the plaintiffs in that case sought to establish a narrow "effects test" basis for personal jurisdiction premised on the assertion that the defendant bank "provided financial services and donations to charities that it knew financially supported al Qaeda and provided financial services

to known extremist operatives ... with the *specific intent* to further al Qaeda's terrorism against the United States." *Id.* at *3 (emphasis added).

Defendants inappropriately cite to the seven-year period for discovery in *In re Terrorist Attacks* and the plaintiffs' request for hard copy searches for "57 corporate entities and all their associated employees and agents" and "114,000 boxes in a warehouse in Saudi Arabia" with contents that were not indexed or digitally searchable, as an analogous example of undue burden. Defs. Mem. at 23, 25. But even there, where the issue was jurisdictional discovery and the defendant faced the realistic prospect of tens of millions of dollars of costs, the court ordered the parties to meet and confer further, noting that "despite these costs, it cannot be a blanket objection to discovery that ARB's files are too difficult to review." *In re Terrorist Attacks*, 2021 WL 5449825, at *11.

The far more apt comparison to this case is *Linde* (which involved neither third-party discovery nor jurisdictional discovery), where the court ultimately ordered discovery on **15,545** distinct sets of records for recipients of terrorism-related payments records and for 107 additional individuals and entities. *See* Schlanger Decl., Ex. C, ECF No. 270-5 (*Linde* May 7, 2007, Production Order) and Ex. D, ECF No. 270-6 (*Linde* Rule 1006 Trial Exhibit quantifying the number of individuals covered in paragraph 1 of the *Linde* court's May 7, 2007, Production Order). The *Linde* order encompassed both electronic *and* paper records and included account opening records, including "all documents reflecting the identity of those having authority over, or holding any beneficial interest in, the account … and all other records concerning the account." ECF No. 270-5 at 4. As the Second Circuit later held:

> The District Court concluded, in line with this precedent, that the importance of the documents, the lack of available alternative means to obtain them, ***the specificity of the discovery requests***, and, finally, the important U.S. and international interests in preventing the financial support of terrorist organizations weigh in favor of

producing the material at issue. ***Records concerning accounts held at the Bank and documents related to the Saudi Committee are directly relevant to whether Arab Bank knowingly provided banking services in support of terrorist operations and are thus essential to plaintiffs' case. Arab Bank has unique access to the records and only Arab Bank can make a complete production***.

*Linde*, 706 F.3d at 115 (emphasis added). Because the Second Circuit's analysis demonstrates that the document production order in *Linde* was appropriate, Defendants can only point to language in a brief submitted by the Solicitor General's office to the U.S. Supreme Court in *Linde*. But the Solicitor General did *not* challenge the scope of the document production order in that case; nor did it criticize the Second Circuit's application of *Société Nationale*. Rather, it quibbled with the district court's analysis in imposing Rule 37 sanctions, but it concluded that the "interlocutory posture of the case also renders the effect of the sanctions difficult to assess" and therefore found the "court was within its discretion to decline to grant the extraordinary remedy of mandamus in the circumstances of this case." Hanchet Decl., Ex. 13, ECF No. 277-13 at 11-12.

The district court in that case later showed at length that the Solicitor General's analysis was flawed,[20] but the issue before *this* Court is limited to the threshold question of whether Lebanese bank secrecy should excuse Defendants from meaningful participation in discovery and, if not, what the proper scope of initial discovery should be. The scope of the document production order in *Linde* makes clear that Plaintiffs' requests here are specific and directly relevant to whether Defendants knowingly provided banking services to Hezbollah operatives and entities and that only Defendants possess the records necessary to make a complete production.

---

[20]     The Solicitor General's brief provides no basis for abandoning the Circuit's analysis or rejecting the reasoning of the many courts that have considered, and rejected, arguments indistinguishable from those the Defendants advance here. For a detailed (and persuasive) explanation of why the Solicitor General's analysis was flawed regarding the sanctions imposed, *see Linde v. Arab Bank plc*, 97 F. Supp. 3d 287, 318-19 (E.D.N.Y. 2015).

A. **Limited Third-Party Discovery Confirms That SWIFT Messages Can Reliably Identify Accountholders and Account Numbers, and Most Defendants Have Confirmed That They Possess Searchable SWIFT Records**

As noted above, Plaintiffs have so far received limited productions of transactional spreadsheets from three third-party correspondent banks. Nevertheless, even this relatively small subset of transactions serves to (1) confirm several of the core allegations about Defendants' customers and their transactions through the United States as set forth in the SAC; (2) demonstrate that Defendants maintained one or more accounts for at least 49 Hezbollah-affiliated persons and entities that were not previously identified in the SAC as linked to those specific Defendants;[21] and (3) confirm that customer accounts (and often account numbers) can be ascertained by reviewing SWIFT transactional data.[22]

While SWIFT transactions are by no means the only types of financial records sought or relevant to this case, as an electronic funds transfer system, SWIFT is an excellent *starting* point for identifying transactions, customers, account numbers and other relevant details.

Five Defendants (SGBL, Fransabank, BLOM Bank, Byblos Bank and BBAC) have acknowledged that their SWIFT funds transfer records are electronically stored and searchable. Several other defendants, including MEAB Bank, Lebanon and Gulf Bank, BLF, Bank of Beirut, and Fenicia Bank have some electronically stored transactional records, but absent further discovery, it is not clear what the precise contours of available (or restorable) electronic data would be. Unsurprisingly, more recent customer and transactional data is more easily accessible for many

---

[21]    *See* Gielchinsky Decl., Ex. G which is adopted from Exhibit 15 to Defendants' Hanchet Declaration, and adds the newly discovered accounts and accountholders indicated in red.

[22]    SWIFT-Brussels is a cooperative society under Belgian law owned by its member financial institutions. SWIFT-Brussels's global private network, SWIFT-NET, enables financial institutions to send and receive information about financial transactions in various international financial markets, in a standardized message format.

Defendants, highlighting yet another reason Plaintiffs' requests for more recent records pertaining to SDGTs and customers whose accounts migrated from LCB are not only highly relevant to establishing state of mind but are also the easier records to locate.

**B.    Plaintiffs' Proposed Document Production Order Takes into Account Defendants' Purported Burden**

The parties agree that, as part of the *Restatement* analysis, it was "Plaintiffs' obligation to serve discovery requests that were appropriately calibrated and proportional to target relevant evidence from each Defendant, and to seek only information 'vital' or 'crucial' to the litigation." Defs. Mem. at 11 (emphasis omitted). But Defendants never acknowledge the factors Courts must consider in assessing the proportionality of discovery requests: (1) the importance of the issues at stake in the litigation; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of discovery in resolving issues; and (6) whether the burden or expense of the discovery is outweighed by the benefit. Fed. R. Civ. P. 26(b).

Defendants neither mention nor address the fact that the litigation is brought under a uniquely privileged federal statute whose purpose "is to provide civil litigants with the ***broadest possible basis***, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA §2(b) (emphasis added).

And although Defendants raise proportionality over a dozen times, Defs. Mem. at 2, 7-8, 11, 21-22, 31, 33, 39, often italicizing it, they never state how Plaintiffs' first RFP could possibly be out of proportion with this massive case, whose importance is not only indicated by the nature of the allegations and the number of victims and the severity of their injuries (and commensurate damages) but is even noted in the Lebanese news report (provided to the Court by flash drive)

describing the murder of Byblos Bank's Head of Compliance (discussed *supra*).[23] Nor can they bring themselves to acknowledge the sheer number of Plaintiffs and the severity of their injuries and prospective damages (likely in the billions of dollars *before* statutory trebling, *see* 18 U.S.C. § 2333(a)), which so obviously warrants even the greatest expense and burden a civil case can justify. In short, the proportionality factors so heavily weigh in Plaintiffs' favor in this case that Defendants simply ignore them.

Even though most Defendants have not even deigned to conduct searches to confirm the accounts they have maintained for the Hezbollah-affiliated persons and entities identified in the SAC, Plaintiffs nevertheless are prepared to reduce Defendants' theoretical burden, should they ultimately decide to comply even minimally with their discovery obligations. To that end, Plaintiffs have attached a Proposed Document Production Order as Exhibit 1.

First, instead of ordering production of "[a]ll Account Opening Records," "[a]ll Transactional Records," "[a]ll Documents and Communications which refer or relate to payments made through and/or facilitated by a Defendant to the families or representatives of so-called 'Martyrs' as defined herein" and "[a]ll Communications during the time period between January 1, 2003, and December 31, 2018, concerning Hezbollah or Agents of Hezbollah" – which would encompass paper records as well as electronically maintained records, the Proposed Document Production Order would limit productions in each of these categories to *electronically maintained* records (except for the request for Communications concerning Hezbollah which would be further limited to electronically searchable records.)

---

[23]     The report states that "in New York, in 2019, Lebanese banks began facing a lawsuit filed by the families of American victims in Iraq who accused Lebanese banks of monetizing and laundering funds for Hezbollah. These were some of the challenges facing the Lebanese banking system before the major crisis which also included requests to freeze the accounts of Hezbollah parliamentarians and impose sanctions on accounts." 1:01-1:21.

Second, the Proposed Document Production Order would limit productions of Compliance Records to persons and entities that were or are customers of the Defendants and exclude production of account opening documents which most Defendants state have been maintained solely in paper form.

In submitting the Proposed Document Production Order, Plaintiffs reserve all of their rights to pursue additional discovery (including all discovery set forth in their initial RFP), depending on the progress of discovery and the scope and content of Defendants' document production. Although the importance of all requested records, the size of the case and amount in controversy all justify far greater burden and expense than Defendants even claim, the Proposed Document Production Order nevertheless reflects a compromise that addresses Defendants' stated concerns about retrieving and reviewing hard copy records and focuses predominantly on their Hezbollah-affiliated customers without imposing unreasonable limitations on the Defendants' searches for highly relevant and responsive records.

**IV.   THE COURT SHOULD DETERMINE WHETHER LEBANESE BANK SECRECY LAWS EXCUSE DEFENDANTS' OBLIGATIONS UNDER F.R.C.P. 26**

**A.   If Defendants Are Correct and the *Restatement* Factors Support Their Objections to Disclosure, Then They Would Be Excused from Their Obligations Under F.R.C.P. 26, but No Court Has So Held**

If a court finds that there is an actual conflict between the discovery request and foreign law, the court must then perform a comity analysis to decide "the weight to be given to the foreign jurisdiction's law," balancing this country's national interests against those of the foreign jurisdiction. *Laydon*, 183 F. Supp. 3d at 413. The parties in this case do not dispute that an actual conflict exists between Plaintiffs' discovery requests and Lebanon's bank secrecy laws with

respect to at least *some* of the documents and communications sought in Plaintiffs' requests.[24]

### B.     Application of the *Restatement* Factors Overwhelmingly Favors Overruling Defendants' Bank Secrecy Objections

Because the *Restatement* factors overwhelmingly favor overruling Defendants' Lebanese bank secrecy objections, the Defendants prefer to argue that it would be premature to decide the issue. Unsurprisingly, they therefore ignore the cases most directly on point – the Second Circuit's decision in *Linde* and multiple district court decisions from this District. Those cases all hold that the U.S. interest embodied in the civil provisions of the Anti-Terrorism Act outweigh foreign sovereign interests in shielding financial records and related matters from disclosure in federal court proceedings. *See Linde*, 706 F.3d at 112; *Linde*, 463 F. Supp. 2d at 315; *Wultz*, 910 F. Supp. 2d at 559; *Strauss*, 249 F.R.D. at 443; *Weiss*, 242 F.R.D. at 46, 48. But even outside the civil Anti-Terrorism Act context, court have often overruled foreign secrecy laws and compelled discovery. *See, e.g., Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474-78 (9th Cir. 1992) (affirming order of production notwithstanding Chinese secrecy laws); *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, No. 90-cv-2370 (JFK) (FM), 2000 WL 713057, *8-10 (S.D.N.Y. June 2, 2000) (declining to defer to Mexican bank secrecy law); *Alfadda v. Fenn*, 149 F.R.D. 28, 34-40 (S.D.N.Y. 1993) (denying protective order sought on the ground of Swiss bank secrecy); *United States v. Chase Manhattan Bank, N.A.*, 584 F. Supp. 1080, 1083-87 (S.D.N.Y. 1984) (refusing protective order sought on basis of Hong Kong bank secrecy law). In this case, "the U.S. interest 'in fully and fairly adjudicating matters before its courts' is combined with its interest in combating

---

[24]     It is far from clear that every communication by Defendants concerning Hezbollah implicates Lebanese bank secrecy. For example, communications about various U.S. designations or the passage of Congressional legislation or about revenues generated from Hezbollah generally would seem to fall outside Defendants' stated understanding of Lebanese law. Moreover, Defendants' Lebanese legal expert states that Lebanese law "prohibits the disclosure of the bank customers' names, as well as their assets and affairs, and that such prohibition covered the clients' accounts and any matter related to them." Moghaizel Decl., ¶ 17 (emphasis omitted). It is unclear from Dr. Moghaizel's declaration whether, in his view, financial data that redacts the bank customers' name or other identifying information runs afoul of the Lebanese Bank Secrecy Act.

terrorism, the U.S. interest 'is elevated to nearly its highest point, and diminishes any competing interests of the foreign state.'" *Wultz*, 910 F. Supp. 2d at 559 (quoting *Strauss*, 249 F.R.D. at 443). *Accord, e.g., Weiss*, 242 F.R.D. at 46.

### 1.   The Discovery Sought Is Important to the Case

As noted above, according to Defendants, "Plaintiffs here do not meet the Rule 26 standard of relevance and proportionality, much less the more exacting standard imposed by the *Restatement*—that the discovery is '*vital*,' '*critical*,' and '*absolutely essential*' to Plaintiffs' case." Defs. Mem. at 8-9, 39 (emphasis in original). In support, Defendants offer quotes from cases which do not reflect their holdings. The party contesting production in *Societe Internationale* did not even dispute the requested records' relevancy; rather, it denied that it controlled them. *See Societe Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 200 (1958). The Court described the lower court's conclusion that the records would have a "vital influence upon this litigation" in the context of holding that "United States courts should be free to require claimants of seized assets who face legal obstacles under the laws of their own countries to make all such efforts to the maximum of their ability where the requested records promise to bear out or dispel any doubt the Government may introduce as to true ownership of the assets." *Id.* at 205. The word "crucial" in the same case cited by Defendants was used to describe the lower court's order dismissing the complaint after finding that the plaintiff wrongfully refused to produce records which "might prove to be crucial in the outcome of this litigation." *Id.* at 201. (The lower court then suspended that order. *Id.* at 202.) The other quote comes from *In re Vitamins Antitrust Litig.*, which appropriately applied Rule 26's relevancy standard: "[T]he Court does not find it unreasonable to require these defendants to submit to the Federal Rules for purposes of discovery, as long as the discovery requests are relevant and not overly burdensome or unduly intrusive." No.

99-cv-197 (TFH), 2001 WL 1049433, at *5 n.7 (D.D.C. June 20, 2001). The court, however, requested that the plaintiffs determine whether a "small subset" of personal employee data requested (including home addresses and e-mail addresses), which was not unequivocally protected by the protective order in that case, was "absolutely essential to their case" before ordering it produced. *Id.* at *7-9.

Defendants' internal memoranda concerning Hezbollah-affiliated customers and their transactional records for these customers certainly meet "the broad scope of discovery and truth-seeking purpose of Rule 26(b)," as appropriately applied. *Flores v. Stanford*, No. 18-cv-02468 (VB)(JCM), 2022 WL 354719, at *6 (S.D.N.Y. Feb. 7, 2022). Internal correspondence, memoranda and due diligence reports are indisputably the most direct evidence of each Defendant's knowledge, and that information is self-evidently in Defendants' possession and not available from any other source. As the court in *Henkin* observed, "terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities." *Henkin*, 495 F. Supp. 3d at 156.

As the Complaint makes clear, Defendants all boast of their anti-money laundering ("AML") and counter-financing of terrorism ("CFT") efforts. For example, SGBL purports to have an Anti-Money Laundering/Counter-Financing of Terrorism ("AML/CFT") Committee that assists its board with carrying out its "supervisory role with respect to fighting money laundering and terrorist financing and understanding the related risks." SAC, ¶ 130. Similarly, Fransabank purports to have "a monitoring program for suspicious or unusual activity that covers funds transfers and monetary instruments" *id.*, ¶ 151, and MEAB Bank claims that the "bank's Anti-Money Laundering/Counter Terrorist Financing (AML/CFT) programs meet or exceed the

requirements of both the Banque du Liban and the international standards of the Financial Action Task Force (FATF)." *Id.*, ¶ 173. The records of these AML/CFT committees and the reports generated by transaction monitoring programs concerning Hezbollah-affiliated customers are the kinds of documents that are most likely to reveal the degree of awareness a bank has of the nature of its customers and their financial activities.

Transactional records (whether funds transfers, loans, mortgages, or letters of credit) for Hezbollah-affiliated customers are also obviously fundamental to ascertain how much assistance each Defendant provided to Hezbollah. Quoting *Halberstam*, the District Court noted that the *duration* of assistance "affects the quality and extent of their relationship and probably influences the amount of aid provided as well …." 2020 WL 7089448, at *14 (citing *Halberstam*, 705 F.2d at 484). It went on to state that:

> Plaintiffs allege that Defendants provided banking services to the alleged Customers from at least 2004–2011. The Amended Complaint includes allegations concerning specific banking transactions that plausibly occurred within that time period. (E.g., Am. Compl. ¶¶ 1152.) The complaint also includes allegations of certain Defendants providing services to the alleged Bank Customers as far back as 1986. (Id. ¶ 420.) Moreover, the Amended Complaint alleges that Defendants continued to provide services to customers even after their accounts had been forcibly closed at LCB. (E.g., id. ¶¶ 1512–1514.)

*Id.*

But even beyond addressing the substantial assistance element of aiding and abetting liability, transactional records also provide insights into the links between individuals and entities that form "a commercial apparatus known as the Business Affairs Component, which raises funds for Hezbollah via money laundering and drug trafficking, as well as via ordinary business enterprises." *Id.* at *1.

In sum, Plaintiffs' requests are targeted to the most fundamental evidence necessary to prove their case.

## 2.   Plaintiffs' Requests Are Narrowly Tailored and Specific

Defendants' assert that "Plaintiffs' Requests are anything but specific" and are "sweeping and undifferentiated," Defs. Mem. at 39, but the opposite is self-evidently true. Plaintiffs' requests are *narrowly limited* to Hezbollah-affiliated individuals and entities and the banks' internal records pertaining to Hezbollah.[25] Thus, by definition, records responsive to these specific requests will not sweep in irrelevant customers or irrelevant accounts. All the information sought is *directly* relevant to establishing the "wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers," 2020 WL 7089448, at *11, and the SAC's allegations that "Hezbollah operates a commercial apparatus known as the Business Affairs Component, which raises funds for Hezbollah via money laundering and drug trafficking, as well as via ordinary business enterprises." *Id*. at *1.

Because Plaintiffs' requests are all facially specific and relevant, Defendants have *invented* limitations on relevance, arguing that Plaintiffs are only entitled to discovery of individuals or entities that contemporaneous public source materials show are both linked to a terrorist organization and closely intertwined with its terrorist activities during the relevant time period. *See* Defs. Mem. at 6, 9, 11.

Although Defendants cite the Second Circuit's decision in *Honickman* for this requirement in passing, *see* Defs. Mem. at 11, that decision says nothing approximating Defendants' assertion. The language Defendants reference, 6 F.4th at 502, instead describes the insufficiency of certain

---

[25]     Defendants complain that Plaintiffs' requests implicate documents "with no connection to an SDGT or any of the attacks identified in the SAC," *id.* at 11, but two decisions by the District Court (the second citing the controlling Second Circuit precedent) make clear that SDGT designations are not prerequisites for liability, let alone prerequisites to justify discovery under the broad scope of Rule 26. The same is equally true of Defendants' invention of a required connection to "any of the attacks identified in the SAC." In *Honickman,* the Second Circuit made clear that a bank's customers "do not themselves need to be 'engaged in ... violent or terrorist acts'" for a bank to be liable for aiding and abetting acts of terrorism, let alone engaged in the *specific* attacks alleged to have caused harm to the plaintiffs. 6 F.4th at 499 n.15 (citation omitted). Of course, *all* of the persons and entities in Plaintiffs' requests have "connections" not just to various SDGTs, but to Hezbollah, a designated FTO.

scienter allegations in the complaint in that case. *At the pleading stage*, plaintiffs are required to include allegations of the facts or events they claim give rise to an inference of knowledge but as two decisions of the District Court in this case make plain, Plaintiffs have already met that burden here.

More to the point, Second Circuit observed in *Kaplan* that ["a] complaint is allowed to contain general allegations as to a defendant's knowledge because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" 999 F.3d at 864 (citations omitted). Of course, publicly available information may be relevant to establishing the Defendants' knowledge of, or reckless disregard for, their customers' ties to terrorism. But public source materials are just *one* way by which a plaintiff can support an inference of knowledge and, as *Kaplan* itself noted, the sufficiency of public source materials and other circumstantial evidence to support that inference "is a matter more appropriate for discovery." *Id*. at 865.[26] Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc.*, 437 U.S. at 351. Taking into account the needs of the case and the importance of the proposed discovery in its resolution, the document requests here more than reasonably bear on Plaintiffs' claims.

### 3.   Some of the Information Sought Originated in the United States

To be sure, many (if not most) of the documents covered by Plaintiffs' requests originated in Lebanon. These include, for example, records of Defendants' AML/CFT committees and the reports generated by the banks' transaction monitoring programs. They also include checks, mortgage documents and funds transfers in Lebanese Pounds. But Defendants' assertion that they "are alleged to have engaged in banking conduct entirely on Lebanese soil, and Plaintiffs target

---

[26]   The Second Circuit in *Honickman* also agreed that public sources such as media articles that plausibly suggest a defendant's knowledge "can be confirmed during discovery." 6 F.4th at 502 n.18.

bank records created and stored in Lebanon," Defs. Mem. at 41, is not accurate.

Defendants have objected to producing both communications *from the United States* and transactional records of U.S. dollar transfers routed through U.S. correspondent banks (which originated in the U.S.). For example, with respect to communications from the United States, Lebanon and Gulf Bank objected to Plaintiffs' Request No. 9 seeking "[a]ll Communications **to or from the U.S.** concerning the following matters: (a) Hezbollah or Agents of Hezbollah, (b) The persons and entities listed in Exhibit 1." Gielchinsky Decl., Ex. H (emphasis added). It asserted, *inter alia*, an "objection to this Request to the extent that it purports to require the disclosure of information that LGB is restricted from disclosing under Lebanon's Banking Secrecy Act." *Id.* The remaining Defendants interposed similar objections either in direct response to Request No. 9 or by incorporating their general objections which included Lebanese bank secrecy.

With respect to a large subset of transactional documents (international funds transfer records of payments effectuated in U.S. dollars), records of those transactions are physically maintained by Defendants (either in paper or electronic form) in Lebanon and may pertain to bank customers in Lebanon, but some of the pertinent SWIFT message data (for example) originate in and/or transit through the United States and reflect transactions that cleared and settled in New York (as evidenced, in part, by the third-party productions from Defendants' correspondent banks).

### 4. There Are No Alternative Means for Securing Requested Information

#### a. Document productions by U.S. correspondent banks are useful, but are not a substitute for Rule 26 discovery.

Defendants argue that "document productions by the correspondent banks could narrow the scope of Plaintiffs' Requests by identifying individuals and entities, if any, that actually transacted through the United States at any relevant time period." Defs. Mem. at 41. There are two obvious flaws in this statement. First, discovery in this case is not limited to transactions "through

the United States." Defendants are liable for *all* knowing substantial assistance to Hezbollah during the period 2003 to 2011 regardless of whether the assistance was provided through the U.S. Indeed, many Hezbollah-affiliated customers maintained accounts in multiple currencies and in the case of Adham Hussein Tabaja, co-head of Hezbollah's Business Affairs Component (and an SDGT), also obtained mortgages in Lebanon from Defendants. *See, e.g.,* SAC, ¶¶ 648, 663 n.51.

Second, as discussed above, productions by the correspondent banks certainly do confirm many of the Complaint's allegations and identify many Hezbollah-affiliated accounts not previously listed in the Complaint; however, the fact that some fraction of the wrongful conduct alleged is reflected in the records of correspondent banks does not mean that third-party discovery efforts constitute a viable alternative means for securing the information Plaintiffs are entitled to obtain.

Banks have different retention practices, particularly for non-customers. For example, third-party bank KBC has advised Plaintiffs that it was "unable to locate any relevant original messages, likely due to the age of the transactions." Nothing in the *Restatement* balancing test suggests that third party subpoenas could ever be a satisfactory alternative means of securing the information needed in this case.

> **b.     Letters Rogatory to the Lebanese authorities do not qualify as a meaningful alternative means of discovery.**

Defendants observe that "Plaintiffs also could cooperate with the Moving Defendants' efforts to seek assistance from the Lebanese authorities, such as the SIC. This is precisely why the Moving Defendants propose approaching the SIC with a Court-endorsed request for information once the proper scope of discovery is determined." Defs. Mem. at 41 (reference omitted). Setting aside the fact that Plaintiffs offered to cooperate with the submission of Letters Rogatory for an initial universe of 20 Hezbollah-affiliated individuals and entities *more than eight months* ago and

that Defendants declined that offer, both Defendants' and Plaintiffs' proposed schedules submitted in their December 10, 2021 joint letter (ECF No. 263) explicitly contemplated submission of Letters Rogatory to the Lebanese authorities *after* the Court resolves Defendants' bank secrecy objections. If the Defendants' proposed process – adopted by the Court – "is antithetical to, and would materially *undermine,* the U.S. interest in fighting terrorism" as they now baselessly assert, Defs. Mem. at 44, it is their own fault.

It is worth noting, however, that even where the U.S. government had the means to obtain discovery through a pre-existing Mutual Legal Assistance Agreement ("MLAA") of the kind Plaintiffs obviously do not have with Lebanon, the D.C. Circuit still rejected Chinese banks' arguments that "'[c]omity dictates that the Chinese government at least be given an opportunity to comply with an MLAA request before forcing a Chinese bank to violate Chinese law on Chinese soil.'" *In re Sealed Case*, 932 F.3d 915, 933 (D.C. Cir. 2019) (citation omitted).

In that case, China's Central Authority, the Ministry of Justice, expressed a willingness to cooperate with an MLAA request from the Department of Justice, including directly communicating with the district court multiple times to assure it that the Ministry "would timely review and handle the requests for assistance sought by the DOJ in accordance with the [MLAA] and applicable domestic laws," reminding the court that China has "provided effective assistance to the US in many cases" and that "[t]he avenue of the [MLAA] is the only legal means to obtain criminal evidence in China by foreign judicial agencies under Chinese laws." *Id.* at 937 (citations and quotation marks omitted).

The D.C. Circuit found no abuse of discretion in the district court's decision to enforce the subpoenas outside the MLAA process, citing the Supreme Court's guidance that "evidence-sharing arrangements set up by international agreements, although often valuable, can also prove 'unduly

time consuming and expensive, as well as less certain' than court-enforced subpoenas 'to produce needed evidence.'" *Id.* at 938 (quoting *Société Nationale*, 482 U.S. at 542).

### 5.   Balancing Sovereign Interests

#### a.   The U.S. interest "is elevated to nearly its highest point."

It is axiomatic that the United States has "a substantial interest in fully and fairly adjudicating matters before its courts." *Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517, 523-524 (S.D.N.Y. 1987). As the court observed in *Strauss*, 249 F.R.D. at 443: "When that interest is combined with the United States' goals of combating terrorism, it is elevated 'to nearly its highest point,' and diminishes any competing interests of the foreign state." *Accord Wultz*, 910 F. Supp. 2d at 559.

Contrary to Defendants' assertions, Plaintiffs do not claim that this private right of action is precisely equal to the U.S. government's interest in national security, whether expressed through criminal or civil litigation. What Plaintiffs *do* assert is that this case gives expression to the highest U.S. national interests that can be reflected in any private lawsuit.

<u>First</u>, the lawsuit is brought by wounded service members and the families of wounded and fallen service members who were specifically targeted by Hezbollah and the Islamic Revolutionary Guard Corps because they were Americans.[27]

<u>Second</u>, the lawsuit is directed at entities that aided and abetted Hezbollah, a U.S.-designated terrorist organization that is fueled by money laundering and narcotics, weapons, and conflict diamond trafficking around the world. As the court in *Strauss* observed, "[t]he American

---

[27]   *See* Walter W. Heiser, *Civil Litigation as a Means of Compensating Victims of International Terrorism*, 3 S. Diego Int'l L. J. 1,3 (2002) (""Private parties have successfully utilized civil litigation as a means of neutralizing domestic hate groups. The question now is whether they can achieve similar success with respect to international terrorists. Success in this context is measured by two basic goals: compensating victims of international terrorism, and deterring future wrongful acts on the part of international terrorist organizations and their state sponsors."), abstract available at https://digital.sandiego.edu/ilj/vol3/iss1/2/.

interest in disrupting terrorist networks with global assistance from American allies is unmistakable." 249 F.R.D. at 446. The 2022 National Terrorist Financing Risk Assessment has noted the "particular challenge" posed by Hezbollah "*because of its regular use of the international banking system and its significant financial resources*, primarily due to the hundreds of millions of dollars per year provided by Iran."[28] Furthermore, Hezbollah is "able to *access foreign financial institutions through supporters or sympathizers that willingly execute transactions on behalf of Hizballah leaders, facilitators, or affiliated entities*." Billingslea Decl., ¶¶ 77-8 (emphasis added).

The threat posed by the very conduct alleged in this case is so significant that the U.S. Treasury Department designated one of the Defendants in this case as an SDGT during the pendency of this action[29] and Congress has passed legislation twice in the last seven years to address it, first with the Hizballah International Financing Prevention Act of 2015 and then with Hizballah International Financing Prevention Amendments Act of 2018. *See* Billingslea Decl., ¶¶ 70-74.

The Hizballah International Financing Prevention Act of 2015 calls for sanctions for any foreign financial institution that:

> (A) knowingly facilitates a significant transaction or transactions for Hizballah; (B) knowingly facilitates a significant transaction or transactions of a person identified on the list of specially designated nationals and blocked persons ... and the property and interests in property of which are blocked ... for acting on behalf of or at the direction of, or being owned or controlled by, Hizballah; (C) knowingly engages in money laundering to carry out an activity described in subparagraph (A) or (B); or (D) knowingly facilitates a significant transaction or transactions or provides significant financial services to carry out an activity described in subparagraph (A), (B), or (C).

---

[28]   https://home.treasury.gov/system/files/136/2022-National-Terrorist-Financing-Risk-Assessment.pdf.

[29]   Defendant Jammal Trust Bank is not a party to the present dispute due to its pending appeal of the District Court's August 6, 2021, decision denying its motions to substitute its Lebanese liquidator and dismiss the claims against it on sovereign immunity grounds. *See Bartlett*, 2021 WL 3706909 (E.D.N.Y. Aug. 6, 2021).

*Id.*, ¶ 71 (citing H.R.2297 - Hizballah International Financing Prevention Act of 2015 (Public Law No. 114-102 (12/18/2015))). This Act reflects the United States' policy to "(1) prevent Hizballah's global logistics and financial network from operating in order to curtail funding of its domestic and international activities; and (2) utilize all available diplomatic, legislative, and executive avenues to combat the global criminal activities of Hizballah as a means to block that organization's ability to fund its global terrorist activities." Public Law No. 114-102, § 2.

The Hizballah International Financing Prevention Amendments Act of 2018 amended the 2015 Act and requires the President to block and prohibit all transactions in all property and interests in property of a foreign person determined by the President to meet one or more criteria in the Act. *See* Billingslea Decl., ¶¶ 72-74 (citing S.1595 – Hizballah International Financing Prevention Amendments Act of 2018, Public Law No. 115-272, 132 Stat 4144, codified at 50 U.S.C. § 1701).

Specifically, as relevant here, the statute directs that the President "shall impose" specific sanctions, including asset blocking,

> with respect to any foreign person that the President determines knowingly provides significant financial, material, or technological support for or to –
>
> (1) Bayt al-Mal, Jihad al-Bina, the Islamic Resistance Support Association, the Foreign Relations Department of Hizballah, the External Security Organization[30] of Hizballah, or any successor or affiliate thereof as designated by the President;
>
> (2) al-Manar TV, al Nour Radio, or the Lebanese Media Group, or any successor or affiliate thereof as designated by the President;
>
> (3) a foreign person determined by the President to be engaged in fundraising or recruitment activities for Hizballah; or

---

[30] Also known as Hezbollah's Islamic Jihad Organization.

> (4)     a foreign person owned or controlled by a person described in paragraph
>          (1), (2), or (3).

Public Law No. 115-272, §§ 101, 103. These are precisely the types of individuals and entities

identified in the Complaint and listed in Plaintiffs' RFP.

Third, as Mr. Billingslea – the former Assistant Secretary for Terrorist Financing and

Financial Crimes at the U.S. Department of Treasury and former President of the Financial Action

Task Force – states in his declaration in this case:

> The long-term U.S. policy of opposing the use of foreign bank secrecy laws to
> shield illicit activity has been implemented in international conventions and other
> mechanisms supported by the U.S. to ensure that financial records pertaining to
> financial crime, including terrorist financing, are not protected by bank secrecy and
> are available to courts, wherever located.

Billingslea Decl., ¶ 5.

Fourth, from its inception, the civil provisions of the Anti-Terrorism Act were intended as

a complementary element of U.S. counter-terrorism policy. The Deputy Legal Adviser at the

Department of State, Alan J. Kreczko, testified on behalf of the U.S. government before the Senate

Judiciary Committee more than 30 years ago that civil suits under § 2333(a) would further U.S.

government policy:

> The existence of such cause of action may deter terrorist groups [1] from
> maintaining assets in the United States, [2] from benefiting from investments in the
> United States, and [3] from soliciting funds from within the United States. In
> addition, [4] other countries may follow our lead and implement complementary
> national measures, thereby increasing obstacles to terrorist operations."

Antiterrorism Act of 1990: Hearing on S.2465, Testimony before Senate Subcomm. on Courts and

Admin. Practice of the Senate Comm. on the Judiciary, S. Hrg. 101-1198, at 12 (1990).

In his written statement to the Judiciary Committee accompanying this testimony, Mr.

Kreczko elaborated on these points, explaining that "the possibility of civil damages may well

serve as an economic disincentive to terrorism" and also added a fifth public-policy rationale in support of § 2333(a), depicting it as an alternative to the strict standards of criminal prosecution:

> Moreover, the bill may be useful in situations in which the rules of evidence or standards of proof preclude the U.S. government from effectively prosecuting a criminal case in U.S. courts. Because a different evidentiary standard is involved in a civil suit, the bill may provide another vehicle for ensuring that terrorists do not escape justice.

*Id.* at 18.

Finally, Congress amended the Anti-Terrorism Act in 2016 by enacting JASTA to strengthen the statute further. As the Second Circuit has confirmed, "Congress's stated purpose in enacting JASTA was 'to provide civil litigants with *the broadest possible basis*, consistent with the Constitution of the United States, to seek relief *against persons [and] entities ... that have provided material support* ... to foreign organizations or persons that engage in terrorist activities against the United States,' whether '*directly or indirectly*.'" *Kaplan*, 999 F.3d at 855 (quoting JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853 (emphases added by the Second Circuit)). The stated purpose of JASTA would be negated if Plaintiffs seeking relief under the statute were to be prevented from proceeding with discovery in the jurisdictions where the "foreign organizations or persons" actually receive the material support prohibited by U.S. criminal laws.

> ### b.   Lebanon's interest in enforcing its laws does not encompass an interest in protecting the confidentiality of those who participate in the funding of international terrorism.

Conducting an international comity analysis and balancing foreign interests against U.S. interests hardly constitutes "running roughshod over the sovereign interests of Lebanon" as Defendants hyperventilate, Defs. Mem. at 45. The schedule Defendants proposed (and the Court adopted) expressly contemplates that if the Court's comity analysis results in it overruling Defendants' Lebanese banks secrecy objections, Defendants will have an opportunity to submit

Letters Rogatory to the Lebanese authorities (including the SIC) seeking permission to disclose those records which the Court orders directed be produced.

Defendants maintain that "Lebanon has an acute interest in having its bank secrecy laws respected." Def. Mem. at 42. Although there is ample evidence that the "acute interest" is motivated by a desire to shield corruption, self-dealing and money laundering, *as a formal matter,* courts typically acknowledge a foreign sovereign's *stated* interest regardless of how that interest manifests in practice. However, as Judge Scheindlin observed, a foreign state's "interest in building confidence in its banking industry does not encompass an interest in protecting the confidentiality of those who participate in the funding of international terrorism." *Wultz*, 910 F. Supp. 2d at 559.

Plaintiffs' requests list over 190 SDGTs and SDNTs and every individual and entity listed is either alleged in the SAC or separately by the U.S. government to be affiliated with Hezbollah. Several of the individuals listed have been directly implicated in the mass murder of American citizens.

As Judge Cogan concluded:

> Vindicating the right of a convicted mass-murderer like [Abbas] Al–Sayyed to the privacy of his financial records over the right of his victims to compensation is not in the interest of any nation.

*Linde*, 97 F. Supp. 3d at 321.

Whatever the legitimate interests Lebanon may still have in its bank secrecy laws following the country's recent economic collapse, vindicating the privacy right of Hezbollah operatives (some of them mass murderers; others, narcotics traffickers and/or human traffickers) or the privacy of their financial records over the rights of their victims to compensation is not in the interest of any nation.

Moreover, the Complaint in this case seeks to vindicate the rights Congress has expressly

provided to Plaintiffs to seek redress from those who conspire with terrorist organizations and knowingly provided them with substantial assistance.

As the World Bank's Reference Guide to Anti-Money Laundering and Combating the Financing of Terrorism notes:

> In some jurisdictions, strong bank secrecy requirements have frequently defeated investigative efforts to obtain financial information required to detect crimes and regulatory breaches, or for tracing or confiscating assets. Such a result is contrary to the FATF recommended structure, which provides that financial institution privacy laws should not inhibit any of the FATF recommendations.

Billingslea Decl., ¶ 41. By seeking to expose Hezbollah's financing networks that destabilize Lebanon and fund its private army and cadre of terrorists, Plaintiffs' discovery affirmatively serves the long-term interests of Lebanon.

### c. The U.S. and Lebanon have a shared interest in fighting terrorism.

The unfortunate reality is that Lebanon is a failed state under the sway of a terrorist organization with its own private army. It is also the victim of a financial crisis authored by the corrupt warlords who divide a de facto spoils system and by Defendants in this case who profited from and helped engineer the Ponzi scheme that led to the country's financial collapse and did so under the protections of Lebanon's bank secrecy laws. Stating these facts is neither "baseless" nor "xenophobic," as Defendants claim. Defs. Mem. at 53.

Lebanon's debt default, its refusal to impose formal capital controls (to protect depositors from capital flight by its privileged elite), its rolling blackouts and collapsing health care system – *not* Plaintiffs' discovery requests – "promote instability and mistrust in a region already facing a very delicate political and economic climate." *Id.*

It would be absurd to wholly disregard "Hezbollah's central role in Lebanon (*e.g.*, maintaining its own private army, controlling the Beirut International Airport and other border

crossings, exercising an effective veto over the Lebanese parliamentary government, and physically controlling significant parts of the country)" or the fact that "Lebanon has exempted [Hezbollah] (and other 'resistance' organizations) from Lebanon's counterterrorism laws, effectively limiting their application to a narrow band of terrorist groups opposed by Hezbollah." Billingslea Decl., ¶ 98.

On the other hand, it *is* appropriate for the Court to acknowledge Lebanon's de jure commitment to countering terror financing. For example, Lebanon signed a Memorandum of Understanding Between the Governments of the Member States of the Middle East and North Africa Financial Action Task Force Against Money Laundering and Terrorist Financing, November 30, 2004, adopting FATF's Forty Recommendations on Money Laundering and the Special Recommendations on Terrorist Financing, which included a commitment to renounce bank secrecy as a basis for refusing requests for mutual legal assistance in money laundering and terrorist financing investigations. *See id.*, ¶¶ 92-93.

It is also proper to acknowledge Lebanon's binding obligation under United Nations Security Council Resolution 1373 to "[e]nsure that any person who participates in the financing … of terrorist acts … is brought to justice." *Id.*, ¶ 113.

Overruling Defendants' bank secrecy objections would signal this Court's assessment that the balance of interests weighs in favor of disclosing the documents requested (and ordered by the Court). The *subsequent* Letters Rogatory or other requests made to the Lebanese SIC or other governmental authorities would provide Lebanon with a golden opportunity to "lift Lebanese bank secrecy in response to inquiries from the United States and other nations investigating terrorism," Defs. Mem. at 44, and demonstrate its heretofore unnoticed commitment to countering the financing of Hezbollah.

At the same time, the parts of the Lebanese banking sector represented by the 11 Defendants *could* demonstrate that they are "a key ally in U.S. efforts to thwart terrorism in the Middle East," Defs. Mem. at 46, by (1) engaging directly with their various correspondent banks and collecting all records responsive to Plaintiffs' requests; (2) producing their communications and documents concerning Hezbollah that do not reference specific customers or, where they do reference specific customers, initially producing them with the names redacted; and (3) substantively respond to Plaintiffs' First Set of Interrogatories (Gielchinsky Decl., Ex. I) which do not necessitate any disclosures in violation of Lebanese law, without interposing improper objections.[31]

### 6. Defendants Have Demonstrated No Significant Hardship if Forced to Produce Bank Records in Violation of Lebanese Law

#### a. Defendants have not proffered evidence of recent prosecutions of banks.

Defendants aver that Lebanon's Banking Secrecy Act "is rigorously enforced," Defs. Mem. at 42 (citing Moghaizel Decl. at ¶¶ 24-30), but Defendants' expert declaration only cites a decision from 1960 – **62 years ago**. The letter (styled as an affidavit) submitted by Mr. Kabalan of the Lebanese Ministry of Justice similarly avers that Lebanon takes its bank secrecy laws seriously and that Defendants and their employees would be subject to serious criminal sanctions as a result of a violation of bank secrecy. ECF No. 294-1. But this is not vastly different from the letter the district court received from the French Ministry of Justice in *Strauss* which similarly cited French laws prohibiting disclosure of the records sought in that case and which also cited a recent decision by the French Court of Appeals finding the defendant in that case guilty of violating the French blocking statute. The French Ministry of Justice letter stated in part:

[A]ny search for evidence in the territory of France by foreign authorities that

---

[31]     Those interrogatory responses are due on August 10, 2022.

would be conducted outside a duly formalized request for judicial mutual aid would clearly constitute a violation of the sovereignty of the French State.

Moreover, French criminal law prevents the search and disclosure by any person of economic, commercial, industrial, financial or technical documents or information that are to constitute evidence for foreign judicial or administrative proceedings ... subject to criminal penalties of imprisonment and fine.

249 F.R.D. at 436.

That letter did little to avail the defendant in *Strauss*, as it did "not state that Credit Lyonnais will be prosecuted if it complies with this court's order to provide discovery. Rather, it states generally without specific reference to Credit Lyonnais that 'any person' who engages in searches or disclosures prohibited by the French blocking statute is 'subject to criminal penalties ...' and provides an example of the 'particularly broad' scope of the law." *Id.* at 449. Additionally, the court was unpersuaded by the decision cited by the defendant, finding its facts distinguishable on a number of grounds. *See id.* at 436, 450-51.

The single paragraph in Defendants' expert declaration listing a criminal decision from 1960 does not even give enough details to assess whether it has any precedential value. Also, the letter submitted by Mr. Kabalan similarly makes general statements that "banks and their employees would be subject to serious criminal sanctions as a result of a violation of banking secrecy," but does not state that the Defendants would be prosecuted. In fact, Mr. Billingslea described how "several Lebanese banks have taken informal measures to protect the Lebanese banking system from Hezbollah and have on several occasions privately cooperated with the U.S. to prevent Hezbollah from *fully* exploiting the country's financial system." Billingslea Decl. at ¶ 64. Defendants have offered no evidence that any Lebanese bank has been criminally or civilly sanctioned for providing "private cooperation" to the U.S. government.

Moreover, the *Strauss* court held that the protective order in that case "further lessens Credit Lyonnais's potential hardship," 242 F.R.D. at 226, a conclusion which courts continue to

reach. *See, e.g., Laydon*, 183 F. Supp. 3d at 425 ("Second, the UK's interest in protecting the privacy of its citizens is mitigated by the protective order in place in this case, which permits the Moving Defendants to designate disclosed materials as 'Highly Confidential.'"). So too here, the protective order shields confidential financial records and "lessens the potential hardship" faced by Defendants.

> **b.  Under Defendants' reading of the scope of Lebanese bank secrecy, their prior public disclosure in this case of a customer account from Bank Audi violated Lebanese law.**

As noted in Plaintiffs' opening brief, Defendants filed Exhibit B to their joint memorandum of law in support of their then-pending motions to dismiss (ECF No. 209-4). *See* Schlanger Decl., Ex. M, ECF No. 270-15. That document was a non-public U.S. law enforcement communication to one of Bank Audi's correspondent banks that discloses that Bank Audi held an account for a Hezbollah arms dealer and counterfeiter during the relevant period and specifically identifies the arms dealer's account number.

The document is significant because Defendants voluntarily produced it in support of their then-pending motions to dismiss – despite disclosing a customer's name and account number at Bank Audi. According to Defendants' Lebanese law expert, Mr. Moghaizel, Lebanese law "prohibits officers and employees of banks in Lebanon, as well as any person who might have access in the context of his/her professional or other capacities, to bank registers, operations or correspondence, such as auditors, *lawyers*, and notary publics, to disclose to any third parties the names of bank customers, information concerning their assets or transactions, or more generally any other information concerning the bank's customers which became known to the aforementioned persons from the bank's records. These prohibitions continue indefinitely, even after the closing of a bank account." Moghaizel Decl., ¶ 16 (emphasis added).

69

Defendants argue that "[t]he document at issue is a letter from the U.S. Federal Bureau of Investigation (FBI) to Standard Chartered Bank in New York—it was never protected by Lebanese bank secrecy…." Defs. Mem. at 57 n.73. Yet at the same time that Defendant freely disclosed and confirmed the existence of the Bank Audi account (and account number) of Dib Harb, Defendants refuse to produce any records in response to RFP Nos. 8[32] or 9[33] – the very type of communication "from the U.S." that Defendants have voluntarily produced when they believed it served their interest to do so.

Defendants find Plaintiffs' argument pointing this out "preposterous," as the document was sent by the FBI in Philadelphia to Standard Chartered Bank in New York. But key transactional information travels via SWIFT messages from originator's banks around the world, through SWIFT's servers in Europe and the U.S., to correspondent banks in New York, and from those correspondent banks (through SWIFT) to the beneficiary banks in Lebanon (this process of course also occurs in reverse); indeed, this is why the third-party correspondent banks have been able to produce to Plaintiffs transactional information involving Defendants. Thus, for any given international wire transfer, information from records created around the world might be sent "to Standard Chartered Bank in New York," Defs. Mem. at 57 n.73, much like the FBI letter in Defendants' Exhibit B, which then passes on that information to Defendants.

If there is some distinction under Lebanese law between disclosing a client's name and account number when they are contained in an FBI letter to a New York bank from that same information contained in a SWIFT message, e-mail or facsimile sent by a financial institution to a

---

[32]    "All Communications during the time period between January 1, 2003, and December 31, 2018, concerning Hezbollah or Agents of Hezbollah."

[33]    "All Communications to or from the U.S. concerning the following matters: (a) Hezbollah or Agents of Hezbollah; (b) the persons and entities listed in Exhibit 1."

New York bank, neither Defendants nor their Lebanese law expert has disclosed it; and even if such a distinction exists, Defendants have not explained why they have nevertheless interposed objections to the same types of communications as the FBI letter on, *inter alia*, bank secrecy grounds.

When, as here, non-producing parties make selective disclosures when it suits their strategic interests, their stated concerns about, *e.g.*, the criminal penalties they face in making disclosures in violation of foreign law, lose much of their credibility. *See, e.g., Wultz*, 910 F. Supp. 2d at 560 n.84 (citing a decision compelling production of documents, notwithstanding conflict with Chinese state secret law, where the foreign bank defendant's "actions reflect[ed] a conscious decision to selectively disclose information pertinent to the case … only as it suits [its] litigation interests").

### 7.    The Moving Defendants Cannot Be Said to Have Acted in Good Faith

As noted in Plaintiffs' opening brief, courts in the Second Circuit also consider whether the party resisting discovery acted in good faith both when deciding whether to impose sanctions after a production order is violated and also when deciding whether to order production in the first place. *See Strauss*, 249 F.R.D. at 455-56. The burden of demonstrating good faith rests with the withholding party. *See Societe Internationale*, 357 U.S. at 201.

Here, Defendants purport to "demonstrate" their good faith by stating that they have not "interpose[d] foreign law objections in bad faith, or for dilatory purposes." Defs. Mem. at 55. But if professions of good faith alone were sufficient for a non-producing party to meet its burden, no party would ever be found wanting.

Initially asking the Court, for example, for a schedule to "submit Letters Rogatory or Requests for Judicial Assistance as to initial RFPs, if necessary following rulings on discovery

motions … 30 days after District Court ruling on objections raised by discovery motions including bank secrecy," ECF No. 263, and then arguing that it would be premature for the Court to rule on their bank secrecy objections before Letters Rogatory or requests are issued may or may not, standing alone, constitute bad faith, but as previously discussed, Defendants' actions speak more forcefully.[34]

When it suited their purposes, Defendants filed the non-public U.S. law enforcement communication discussed above, which publicly discloses a customer's name and account number at Bank Audi in Lebanon. But now, when it does not suit their interests, Defendants object to producing the very same type of communications sent or received from the United States. *See Tiffany (NJ) LLC v. Forbse*, No. 11-cv-4976 (NRB), 2012 WL 3686289, at *20 (S.D.N.Y. August 23, 2012) ("BOC actually strengthens the inference that it has resisted the discovery request in bad faith. From our view, BOC's actions reflect a conscious decision to selectively disclose information pertinent to the case, and to the discovery dispute more specifically, only as it suits BOC's litigation interests. Such a course of action is precisely the type of conduct that the Court may consider in undertaking the applicable comity analysis.")

## CONCLUSION

The Court should adhere to the process and sequencing the parties have agreed to and that the Court itself ordered. In doing so, it should issue the Proposed Document Production Order attached herein as Exhibit 1 and overrule Defendants' bank secrecy objections for the same reasons

---

[34]     It should not be lost on this Court that in a recent case brought by one of the Defendants' accountholders trying to retrieve their funds, Defendant Bank Audi argued that Lebanese bank secrecy laws should bar discovery even from their U.S. correspondent banks. *See, e.g., In re Al-Attabi*, No. 21-mc207 (VSB)(RWL), 2022 WL 229784, at *9 (S.D.N.Y. Jan. 26, 2022), *appeal dismissed sub nom. Al – Attabi v. Bank Audi S.A.L.*, No. 22-524, 2022 WL 2116043 (2d Cir. May 9, 2022). While this argument was rejected, it demonstrates that Defendants wield Lebanese bank secrecy tactically to suit their needs as particular litigation dictates.

that every court that has considered foreign law objections in Anti-Terrorism Act cases has done

so.

Dated: Hackensack, NJ
July 14, 2022

Respectfully submitted,

By:   /s/ Gary M. Osen
**OSEN LLC**
Gary M. Osen, Esq.
Ari Ungar, Esq.
Michael J. Radine, Esq.
Aaron Schlanger, Esq.
Dina Gielchinsky, Esq.
190 Moore Street, Suite 272
Hackensack, NJ 07601
(201) 265-6400

**TURNER & ASSOCIATES, P.A.**
Tab Turner, Esq.
(admitted pro hac vice)
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**MOTLEY RICE, LLC**
Michael Elsner, Esq.
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
(843) 216-9000

Attorneys for Plaintiffs