UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ROBERT BARTLETT, *et al.*,

                                    Plaintiffs,

           -against-

SOCIETE GENERALE DE BANQUE AU LIBAN
SAL, *et al.*,

                                    Defendants.

No. 19-cv-0007 (CBA) (TAM)

---

## JOINT REPLY MEMORANDUM OF LAW IN SUPPORT OF MOVING DEFENDANTS' MOTION FOR PROTECTIVE ORDER

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 3

I.    THE SCOPE OF PERMISSIBLE DISCOVERY MUST BE DETERMINED AT
THE OUTSET ................................................................................................................. 3

    A.    The Parties Agree that the "Scope-First" Approach to Discovery is
Appropriate Here ............................................................................................... 7

    B.    Moving Defendants Have Consistently Urged The "Scope-First"
Approach to Discovery ....................................................................................... 8

    C.    Moving Defendants Will Seek Customer Waivers Once Scope is Decided ........ 10

    D.    Nothing in *Linde* or *Miller* Alters the Proper Approach to Discovery Here ....... 12

II.    THE SCOPE OF PLAINTIFFS' DISCOVERY REQUESTS MUST BE
NARROWED UNDER RULE 26 AND THE RESTATEMENT ................................... 14

    A.    The Concessions in Plaintiffs' Proposed Order Do Not Cure Moving
Defendants' Scope Objections ........................................................................... 14

        1.    The RFPs Continue to Seek Irrelevant Documents ................................. 15

    B.    The Concessions Made in Plaintiffs' Proposed Order Do Not Cure Moving
Defendants' Burden Objections .......................................................................... 19

    C.    Plaintiffs' Proposed Order Seeks Categories of Documents Not Sought in
Plaintiffs' Requests. .......................................................................................... 20

III.    AN APPLICATION OF THE RESTATEMENT FACTORS FAVORS THE
MOVING DEFENDANTS ............................................................................................. 21

    A.    Plaintiffs Fail to Rebut the Moving Defendants' Showing that Restatement
Factors Support Issuance of a Protective Order .................................................. 23

        1.    Importance of Discovery to the Case ..................................................... 23

        2.    Degree of Specificity of Plaintiffs' Requests .......................................... 24

        3.    Whether the Information Originated in the United States ....................... 24

        4.    Availability of Alternative Means of Securing the Information .............. 25

            a.    Discovery directed to U.S. correspondent banks ........................ 25

            b.    Letters Rogatory to Lebanon ...................................................... 25

        5.    Balancing of Sovereign Interests ........................................................... 27

            a.    The U.S.'s and Lebanon's shared interest in fighting
terrorism .................................................................................... 28

            b.    The U.S. interest in fighting terrorism ........................................ 29

# TABLE OF CONTENTS
(continued)

**Page**

c.     Lebanon's Interest in its Bank Secrecy Laws .............................. 31

6.     The Moving Defendants' Hardship ........................................ 32

7.     The Moving Defendants' Good Faith ...................................... 34

CONCLUSION ................................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bartlett v. Société Generale de Banque au Liban*,
    No. 19-0007, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................................................15

*CE Int'l Res. Holdings, LLC v. S.A. Mins. Ltd. P'ship*,
    No. 12-CV-08087 CM SN, 2013 WL 2661037 (S.D.N.Y. June 12, 2013) .......................24, 34

*Dolgow v. Anderson*,
    53 F.R.D. 661 (E.D.N.Y. 1971) ...........................................................................................4

*Doubleline Cap. LP v. Odebrecht Fin. Ltd.*,
    No. 17-CV-4576 (GHW) (BCM), 2021 WL 4596561 (S.D.N.Y. Oct. 6, 2021) ....................34

*EM Ltd. v. Republic of Argentina*,
    695 F.3d 201 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Cap., Ltd.*, 573
    U.S. 134 (2014) ......................................................................................................................4

*Flores v. Stanford*,
    No. 18-cv-02468 (VB)(JCM), 2022 WL 354719 (S.D.N.Y. Feb. 7, 2022) ...........................23

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..............................................................................................18

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ...................................................................................... *passim*

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    278 F.R.D. 51 (E.D.N.Y. 2010) ............................................................................................33

*In re Al-Attabi*,
    No. 21-mc207 (VSB)(RWL), 2022 WL 229784 (S.D.N.Y. Jan. 26, 2022), *appeal dismissed
    sub nom. Al – Attabi v. Bank Audi S.A.L.,* No. 22-524, 2022 WL 2116043 (2d Cir. May 9,
    2022) ......................................................................................................................................37

*In re Sealed Case*,
    932 F.3d 915 (D.C. Cir. 2019) ..............................................................................................26

*In re Vitamins Antitrust Litig.*,
    No. 99-197TFH, 2001 WL 1049433 (D.D.C. June 20, 2001) .........................................23, 30

*Intel Corp. v. Advanced Micro Devices, Inc*.,
    542 U.S. 241 (2004)...............................................................................................................37

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Kaplan v. Lebanese Canadian Bank, S.A.L.*,
   999 F.3d 842 (2d Cir. 2021)........................................................................15, 17, 18

*Linde v. Arab Bank*,
   463 F. Supp. 2d 310 (E.D.N.Y. 2006) ....................................................................27

*Linde v. Arab Bank*,
   706 F.3d 92 (2d Cir. 2013)............................................................................. *passim*

*Linde v. Arab Bank*,
   882 F.3d 314 (2d Cir. 2018)...........................................................................13, 17

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   116 F.R.D. 517 (S.D.N.Y. 1987) ...............................................................23, 24, 33

*Société Internationale Pour Participations Industriales et Commerciales, S.A. v. Rogers*,
   357 U.S. 197 (1958)................................................................................................17

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004)................................................................................................28

*Strauss v. Credit Lyonnais*,
   249 F.R.D. 429 (E.D.N.Y. 2008) ...............................................................27, 33, 34

*Tiffany (NJ) LLC v. Qi Andrew*,
   276 F.R.D. 143 (S.D.N.Y. 2011), *aff'd sub nom. Tiffany (NJ) LLC v. Andrew*, 2011 WL
   11562419 (S.D.N.Y. Nov. 14, 2011) ......................................................................35

*Weiss v. Nat'l Westminster Bank*,
   242 F.R.D. 33 (E.D.N.Y. 2007) ..............................................................................27

*Wultz v. Bank of China*,
   910 F. Supp. 2d 548 (S.D.N.Y. 2012)....................................................................27

**STATUTES**

18 U.S.C. § 2339B ...........................................................................................13, 35

28 U.S.C. § 1782 ...................................................................................................37

Lebanese Banking Secrecy Act ..................................................................... *passim*

Lebanese Law 44/2015 ..........................................................................................36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

31 CFR § 1010.520 ....................................................................................................29

31 CFR § 1020.320(e)(2) ..........................................................................................29

Douglas A. Kash, *The United States v. Adam Gadahn: A Case for Treason*, 37 Cap. U. L. Rev. 1,
1 (2008) ...............................................................................................................33

Fed. R. Civ. P. 26 ............................................................................................... *passim*

Fed. R. Civ. P. 34 .....................................................................................................20

MANUAL FOR COMPLEX LITIGATION (FOURTH) (4th ed.) (H.R. REP. No. 99, reprinted in 1986
U.S.C.A.N. 2835) .................................................................................................4

Paul T. Crane, *Did the Court Kill the Treason Charge?: Reassessing Cramer v. United States
and Its Significance*, 36 Fla. St. U. L. Rev. 635 (2009) ...........................................33

Restatement (Third) of Foreign Relations Law (Am. L. Ins. 1987) ....................................1, 26, 27

## PRELIMINARY STATEMENT

As the Moving Defendants have maintained since party discovery commenced in this case, the Court should first rule on the proper scope of discovery, applying the standards of Federal Rule 26 and the Restatement (Third) of Foreign Relations Law.  Then, with scope established, the parties should be given the opportunity to mitigate, or avoid altogether, any conflicts with Lebanese bank secrecy laws.  *See* Joint Memorandum in Support of Moving Defendants' Motion for Protective Order and in Opposition to Motion to Compel at 1, ECF 276 ("Moving Defendants' Initial Br.").[1]  This approach is sensible in light of the unprecedented breadth of this case—the Moving Defendants know of no other JASTA case against twelve banks comprising nearly the entirety of another nation's banking sector that has entered the discovery stage—and the parties' fundamental disagreements about the showing needed to prove liability and the proper scope of discovery.

The Court need not, and should not, simply direct the majority of Lebanon's banking sector to violate the country's laws by disclosing protected customer information without first considering what materials Plaintiffs actually are entitled to under the Federal Rules and the Restatement, and whether a conflict is avoidable.  On this point, the parties largely agree. Plaintiffs have submitted to the Court a proposed discovery order (Exhibit 1, ECF 295-1 ("Plaintiffs' Proposed Order")) that appears to limit the scope of Plaintiffs' exceptionally broad RFPs and, critically, contemplates the submission of letters rogatory to the Lebanese authorities only *after* the Court issues its scope ruling, the very sequencing the Moving Defendants have advocated all along.  Thus, on the question of sequencing, the parties appear aligned.

---

[1] Unless otherwise defined herein, the Moving Defendants adopt the defined terms set forth in the Moving Defendants' Initial Brief.

Still, Plaintiffs' Proposed Order remains overbroad and out of line with the standards of Rule 26 and the Restatement. It seeks records spanning nearly 20 years, and requires the Moving Defendants to search for hundreds of names not linked to them in the SAC. It also does not limit discovery to alleged bank customers of Moving Defendants that may be relevant to Plaintiffs' claims in this case—*i.e.*, those with a known connection to Hezbollah before the time of the banking services in question, and those "closely intertwined" with Hezbollah's violent terrorist activities. *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021). Nor does Plaintiffs' Proposed Order cure the fact that the names of many of the individuals on Plaintiffs' list are so common as to be difficult or impossible to identify conclusively. And although Plaintiffs purport to reserve the right to revisit the proper scope of discovery "in the future," such a goalpost-moving proposal would waste judicial resources and undermine the Moving Defendants' efforts to overcome Lebanese law obstacles to producing relevant records. Plaintiffs' Proposed Order therefore must be modified to account for these issues, and the Moving Defendants have proposed an alternative order for the Court's consideration. *See* Exhibit A (the "Moving Defendants' Proposed Order").

Finally, although Plaintiffs do not appear to urge the Court to engage in a full-fledged comity analysis at this time (and any such analysis would be premature given the parties' alignment on the appropriate sequencing of discovery), a review of the Restatement factors would favor the entry of a protective order. Of particular importance is the Lebanese government's statement of interest, submitted shortly after the Moving Defendants' filed their Initial Brief, through an affidavit from Judge Imad Kabalan, Cassation Attorney General/Judicial Council Attorney General, Republic of Lebanon, June 28, 2022, ECF 294-1 (the "Lebanese Government Statement of Interest"). This statement, with which Plaintiffs do not take issue,

provides a stark illustration of (1) the importance to the Lebanese government of the issues
before this Court; (2) Lebanon's compelling interest in having its laws respected and complied
with here; and (3) the country's commitment to international cooperation, particularly on issues
of anti-terrorism and anti-money laundering, and its receptivity to foreign requests for assistance
through proper channels.

In sum, despite Plaintiffs' specious aspersions of bad faith, the parties agree that the
scope of discovery should be determined at the outset. Plaintiffs' Proposed Order provides a
useful starting point, but should be modified as the Moving Defendants explain below and set
forth in the Moving Defendants' Proposed Order. Following the entry of that Order, the parties
should proceed with letters rogatory to the Lebanese authorities and pursue customer waivers,
with the goal of avoiding any conflict with Lebanese law.

## ARGUMENT

## I. THE SCOPE OF PERMISSIBLE DISCOVERY MUST BE DETERMINED AT THE OUTSET

As explained in the Moving Defendants' Initial Brief, the Court should not order any
bank to violate Lebanese law without first addressing the proper scope of discovery. *See* Moving
Defendants' Initial Br. at 30-36. This scope-first approach provides the parties the best
opportunity to avoid or mitigate any conflict with Lebanese law—the Moving Defendants'
primary goal from the start. And it relieves this Court from having to enter a blanket order, on
an incomplete record, directing nearly all of Lebanon's banking sector to violate its own
domestic law—as the parties *agree* such an order would require, *see* Plaintiffs' Memorandum of
Law in Support of Their Motion to Overrule Defendants' Foreign Bank Secrecy and
Scope/Burden Objections and Compel Defendants to Produce Documents Responsive to

Plaintiffs' First Request for the Production of Documents, ECF 270-1 ("Plaintiffs' Opening Br.")
at 49-50—without first carefully tailoring the discovery that is appropriate in this case.

It is well established that the Court has broad discretion to fashion the manner in which
discovery should proceed. *See, e.g.*, *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d
Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014) ("A
district court has broad latitude to determine the scope of discovery and to manage the discovery
process."). And district courts often exercise that discretion in complex, multi-defendant actions
by issuing an early ruling on the scope of appropriate discovery.[2] Such a ruling is particularly
important in this case because of its unprecedented breadth: the SAC comprises 800 pages and
nearly 6,000 paragraphs, with allegations directed variously at each of twelve separate bank
defendants (that, together, comprise approximately 80 percent of Lebanon's banking sector). *See*
SAC, ECF 189. Each of those twelve defendant banks is alleged to have provided banking
services to customers in Lebanon that Plaintiffs allege were associated somehow with Hezbollah,
and through that association contributed to 267 instances of violence hundreds of miles away in
Iraq, from 2004 to 2011. The parties agree that the production of Lebanese bank records in this
case, as things stand, would violate Lebanese law. *See, e.g.*, Plaintiffs' Opening Br. at 4. Proper
sequencing of discovery, however, may mitigate or even eliminate this outcome.

The parties disagree about the appropriate scope of discovery. Plaintiffs have maintained
that they are entitled to discovery from each Moving Defendant regarding hundreds of

---

[2] As the *Manual for Complex Litigation*, which Congress has highlighted as one of "the tools available to the court"
for the management of other complex litigations (H.R. REP. No. 99-253, 80, *reprinted in* 1986 U.S.C.C.A.N. 2835,
2862), explains, "[e]arly identification and clarification of issues [] is essential to discovery control." MANUAL FOR
COMPLEX LITIGATION (FOURTH) § 11.41 (4th ed.). Further, regardless of the "substantial discovery" plaintiffs may
allege is necessary, it is the judge that "must start the process of defining and structuring the issues, albeit
tentatively, to establish the appropriate sequence and limits for discovery." *Id*. § 11.31; *see also, e.g., Dolgow v.
Anderson*, 53 F.R.D. 661, 664 (E.D.N.Y. 1971) ("A trial court has a duty, of special significance in lengthy and
complex cases where the possibility of abuse is always present, to supervise and limit discovery to protect parties
and witnesses from annoyance and excessive expense.").

individuals and entities named in the SAC, even though only a very small subset of those named is alleged to have included customers of any particular Moving Defendant, and an even smaller subset was actually designated by the U.S. government or identified in public source materials during the relevant time frame as being associated with Hezbollah.  *See* Moving Defendants' Initial Br. at 6.  Plaintiffs further have maintained that they are entitled to discovery regarding a significant number of additional entities and individuals that are not even mentioned in the SAC. And the relevant timeframe, according to Plaintiffs, spans not just the period surrounding the underlying violent incidents (*i.e.*, from 2003 to 2011) but runs for another ten years, until *2022*. *See* Moving Defendants' Initial Br. at 16-17.  Plaintiffs' "omnibus" RFPs, directed to the Moving Defendants collectively, reflect these positions, and until Plaintiffs unveiled their Proposed Order on July 14, 2022, they intractably refused to narrow their discovery requests in any way.  *See id*. at 6-7.

As set forth more fully in the Moving Defendants' Initial Brief (at 7-22) and Section II below, the Moving Defendants have a different view of the appropriate scope of discovery, as guided by the standards of Federal Rule 26 and the Restatement (which applies to the scope of discovery here because—as the parties agree—the Moving Defendants' production of bank records would violate Lebanese law).  Plaintiffs' Proposed Order, while still overbroad, reflects a starting point for addressing the appropriate scope of discovery here, and the Moving Defendants used it as such in presenting the Court with a modified Proposed Order for consideration.  *See* Moving Defendants' Proposed Order.

Resolution of the threshold issue of scope, in addition to bringing the RFPs in line with applicable standards, will increase the likelihood that any conflict with Lebanese law can be mitigated, or avoided altogether, which the Moving Defendants submit should be the objective.

First, with a defined and court-sanctioned set of discovery requests, the Moving Defendants can proceed with a single, tailored request to the Lebanese authorities requesting that bank secrecy restrictions be lifted.  *See* Moving Defendants' Initial Br. at 33-36; Declaration of Dr. Fadi Moghaizel ¶¶ 32-34, ECF 290.  As reflected in the Lebanese Government Statement of Interest, "Lebanon has great experience in cooperating with the United States of America in carrying out judicial Requests for Assistance" and "its Special Investigations Commission [the "SIC"] . . . exclusively has the right to lift banking secrecy from accounts in the event there exists a suspicion of money-laundering or terror-financing."  Lebanese Gov't Stmt. of Interest at 1.

And second, addressing at the outset the permissible scope of discovery also will facilitate the Moving Defendants' efforts to obtain waivers from customers—an exercise that is more likely to succeed if the Court has already determined what potential customers, what documents, and what time frame, should be the subject of any such waiver request.

Finally, the Moving Defendants note that changes to the Lebanese Banking Secrecy Act are imminent, and have passed a vote in the Lebanese Parliament.[3]  Although the precise language of the amendments has not yet been broadly released, the changes may affect the Moving Defendants' ability to produce bank customer materials in this case.  These developments further counsel pursing a scope-first approach here, in order to allow for these legislative changes to take effect.

---

[3] As recently as last week, the Lebanese parliament voted to ratify amendments to the Lebanese Banking Secrecy Act.  *See* https://www.lorientlejour.com/article/1306885/secret-bancaire-lamenagement-de-la-loi-reamenage-par-les-deputes.html; *see also* https://www.annahar.com/arabic/%D8%A7%D8%AE%D8%A8%D8%A7%D8%B1-%D8%B9%D8%A7%D8%AC%D9%84%D9%87/26072022122535527?fbclid=IwAR0KuVjm3MaDjtE3-B5_cvtdAwcvfCSLnuZF2wif1mLCuA3W5oio-pPShnA&mibextid=dYiCQB&fs=e&s=cl (published news articles discussing Lebanese Parliament's vote on legislative changes to Banking Secrecy Act).

**A.    The Parties Agree that the "Scope-First" Approach to Discovery is Appropriate Here**

Plaintiffs' Reply Brief endorses the Moving Defendants' scope-first sequencing.  Indeed, Plaintiffs' Proposed Order limits the scope of the RFPs and invites the Moving Defendants to seek letters rogatory within 30 days of the entry of the Order.  *See* Plaintiffs' Proposed Order. This is the very sequencing that the Moving Defendants have consistently advocated: determine scope first, and submit letters rogatory to the Lebanese governmental authorities second.

The parameters of discovery that Plaintiffs now suggest in their Proposed Order, while certainly more sensible than that requested in their RFPs, remain overbroad, and the Moving Defendants request that the Court instead adopt the modifications to that proposal explained below and reflected in Moving Defendants' Proposed Order.  What is noteworthy, however, is that Plaintiffs acknowledge through their Proposed Order that the parties should make requests to the Lebanese governmental authorities only *after* the proper scope of discovery is determined.

Indeed, that is precisely how the Moving Defendants described their discovery sequencing proposal to this Court more than seven months ago on December 13, 2021.  *See* Dec. 13, 2021 Status Conference Tr. at 16-18, ECF 264 ("after the court considers motions to compel . . . and has limited appropriately the scope of the requests . . . it then affords the defendants an opportunity to issue . . . letters rogatory to the Lebanese authority that ask for waiver of bank secrecy laws.").  The Moving Defendants have consistently advocated resolving scope issues first, and Plaintiffs now appear to agree.[4]

---

[4] As noted above, Plaintiffs' Proposed Order would allow Plaintiffs to "renew[] their efforts to obtain other records [] in the future."  Plaintiffs' Proposed Order at 2.  Although the Moving Defendants do not object to any party seeking specific modification of the Court's discovery order *for good cause* (*see* Moving Defendants' Proposed Order at 2, proposing good cause standard), Plaintiffs' contemplated unfettered right to return to the Court to revisit the proper scope of discovery would waste both judicial and party resources.  Also, such an arrangement would undermine the Moving Defendants' efforts to pursue letters rogatory and bank customer waivers in Lebanon, if Plaintiffs could simply demand a broader set of materials "in the future."

B.     **Moving Defendants Have Consistently Urged The "Scope-First" Approach to Discovery**

Plaintiffs are wrong to suggest that Moving Defendants have performed an about-face on discovery sequencing, let alone that Moving Defendants have done so in bad faith, in order to delay discovery.  Plaintiffs' Reply Br. at 22-23, 28, 71-72, ECF 295.  This is false.

Plaintiffs identify a December 10, 2021, scheduling proposal that the Moving Defendants submitted to the Court that contemplated that the Moving Defendants would submit letters rogatory "30 days after District Court ruling on objections raised by discovery motions including bank secrecy." *Id.* at 16, 22, 28.  But that proposal is entirely consistent with the Moving Defendants' arguments in their Initial Brief, and reflects the very same position the Moving Defendants have taken since the outset of discovery in this case.  That is, the Court should determine the scope of permissible discovery as a threshold issue.

To do that, the Court must take account of the Moving Defendants' bank secrecy objections, and the fact that disclosure of the discovery materials Plaintiffs seek will violate foreign law (as all parties agree).  In those circumstances, unlike in typical domestic discovery disputes, the scope of permissible discovery is dictated not only by Federal Rule 26, but also by the specificity and importance factors of the Restatement, which apply where the production of discovery materials located abroad would violate foreign law.  At no time, and in no way, did the Moving Defendants ever take the position that the Court should issue a ruling as to whether the Moving Defendants should be forced to violate Lebanese law *before* the proper scope of discovery is determined or *before* approaching the Lebanese authorities.

Again, that is precisely how the Moving Defendants described their proposed sequencing of discovery to this Court on December 13, 2021, referring specifically to the December 10 letter that Plaintiffs mischaracterize now.  Counsel speaking for the Moving Defendants explained:

8

The third part of this is that inevitably we will, after having objected to the request on bank secrecy, we will also be objecting on other grounds, which is relevance, proportionality, need, scope of discovery. And that too is part of the international comity test [. . .] [A]fter the court considers motions to compel or motions for protective order and has limited appropriately the scope of the requests, determine what's important or not, it then affords the defendants an opportunity to issue -- ask the court to issue letters rogatory to the Lebanese authority that ask for waiver of bank secrecy laws and permission to disclose the documents that are responsive to plaintiff's requests as narrowed by the court.

[. . .]

Then, once the letters rogatory are responded to by the Lebanese authorities, we come back to court. We say, okay, here's the upshot. The Lebanese authorities did or did not give permission or they granted it in part. And then we litigate the issue. And then and only then does the Court make the determination to quote/unquote overrule bank secrecy objections if it believes that that is appropriate.

Dec. 13, 2021 Status Conference Tr. at 16-18.[5]

The Moving Defendants advocate now the very same approach they described to this Court last December, and the approach that is most likely to successfully result in the discovery of banking materials located in Lebanon in a manner consistent with Lebanese law—which is, and has been, the Moving Defendants' goal all along.[6]  *See* Moving Defendants' Proposed Order ¶¶ 1-4 (ordering proposed letters rogatory to be submitted after agreement or ruling on appropriate scope).

---

[5] *See also id*. at 33-34 ("The only difference in those schedules for all practical purposes is timing and two wrinkles. And so I'll just touch on those two wrinkles again.  One is he says in resolving motions, Your Honor can overrule bank secrecy before we get on with letters rogatory.  My first response to that is it's premature. Your Honor hasn't even seen where we stand.  We don't need to resolve that issue for today. That certainly wasn't the approach that I quoted to you from the early *Linde* decisions that are the ones I mentioned earlier . . . .").

[6] The Moving Defendants have some concern that Plaintiffs do not share this goal.  Instead of working to obtain relevant information in a manner that respects U.S. and Lebanese law, Plaintiffs' counsel may be more interested in getting to "no" and laying the groundwork for an unwarranted motion for outcome-determinative discovery sanctions, a strategy they have pursued elsewhere.  Given the stakes of this case and the sovereign interests implicated, the Court should decline to countenance such gamesmanship.

Plaintiffs likewise seek to undermine the Moving Defendants' position by repeating throughout their Reply Brief that they "offered to commence discovery with letters rogatory for 20 accounts" and the Moving Defendants declined that offer.  Plaintiffs' Reply Br. at 16, 23, 25, 30, 57.  It is true that the Moving Defendants rejected this approach, because Plaintiffs' offer to proceed with so-called "bellwether" letters rogatory for 20 individuals and entities (of Plaintiffs' choosing) *before* scope issues were decided runs exactly counter to the scope-first approach that the Moving Defendants have consistently advocated.  The Moving Defendants explained just that in November when declining Plaintiffs' bellwether offer:

> The international comity test governing Lebanese bank secrecy objections cannot be applied meaningfully absent, inter alia, the "specificity" of an RFP, to provide concrete context concerning the "importance" of the requested documents and the "availability of alternative means of securing the information" (including through discovery from Moving Defendants' U.S. correspondent banks authorized by Magistrate Judge Merkl), among other elements. *See, e.g., Linde v. Arab Bank*, 706 F.3d 92, 98-99 (2d Cir. 2013). The Lebanese authorities, as much as the Court, will require specificity as to the type, time-frame, and other features of the documents Plaintiffs seek.

Nov. 24, 2021 Letter from M. Berger to G. Osen at 2, ECF 295-4 (explaining reasons for opposing Plaintiffs' bellwether proposal).[7]

## C.   Moving Defendants Will Seek Customer Waivers Once Scope is Decided

Plaintiffs also wrongly accuse the Moving Defendants of dilatory conduct for invoking customer waivers as a potential mechanism to avoid or mitigate any conflict with Lebanese law. *See* Plaintiffs' Reply Br. at 24 ("Defendants' invocation of customer waivers as an alternative

---

[7] In addition to the fact Plaintiffs' bellwether proposal was contrary to the scope-first approach to discovery, the Moving Defendants also rejected this proposal because it was unlikely to be successful, and might even have undermined the ability of the parties to make successful letters rogatory requests after scope was decided, as it contemplated successive rounds of letters rogatory to the Lebanese authorities.  The Moving Defendants' Proposed Order solves that issue, by proposing that a single round of letters rogatory be issued to the Lebanese authorities, after scope is determined. *See* Moving Defendants' Proposed Order ¶ 5. Thus, far from illustrating Defendants' supposed "bad faith," the events actually demonstrate the Moving Defendants' good faith commitment to a successful process to address Lebanese bank secrecy.

means of securing discovery demonstrates that their real objective is delay, not disclosure.").
Plaintiffs' accusation is without merit.

As Moving Defendants explained in their Initial Brief, because the Lebanese Bank
Secrecy Act primarily protects the confidentiality interests of bank customers, those customers
can consent to waiving the BSA's protections.  *See* Moving Defendants' Initial Br. at 36 (citing
Declaration of Dr. Fadi Moghaizel ¶ 20).

But as explained above, without guidance from the Court, it is not clear which individuals
and entities are the proper subjects of discovery and thus should receive a waiver request, what
the request would ask those customers to waive, and for what period of time.  For instance, a
waiver request seeking the disclosure of a customers' entire suite of bank records from 2003 to
2022 is qualitatively and quantitatively different from a reasonably-tailored request seeking the
disclosure of a targeted subset of records for a circumscribed time period.  The latter request
would have a greater likelihood of success.  The Proposed Order submitted by the Moving
Defendants accomplishes this goal by confining the production to account statements for their
customers for the period of January 1, 2003 to November 30, 2011.[8]  *See* Moving Defendants'
Proposed Order ¶ 4.  In order to further optimize the likelihood of obtaining waivers from
individual and commercial bank customers who may be wary of producing personal information
not related to the Plaintiffs' claims, Moving Defendants also propose that the parties meet and
confer to identify categories of transactions that could be redacted from those statements.  *See id*.
¶ 6.  The Moving Defendants remain willing and ready to pursue targeted waivers from any
relevant customer after the permissible scope of discovery is established.

---

[8] The Moving Defendants' Proposed Order also contemplates the production of transactional documents to the
extent that account statements are not available for production.  *See* Moving Defendants' Proposed Order ¶ 4.

To the extent that Plaintiffs argue that the entire "waiver" strategy is futile, they offer nothing more than conjecture.  Their contention that "key Hezbollah operatives" are unlikely to consent to the disclosure of their banking records assumes their conclusion, and mischaracterizes the commercial nature of the account activity implicated by their broad document requests.  *See* Plaintiffs' Reply Br. at 24.

      **D.**    **Nothing in *Linde* or *Miller* Alters the Proper Approach to Discovery Here**

Plaintiffs next purport to recite the procedural histories of *Linde v. Arab Bank*, No. 04-cv-2799 (E.D.N.Y.), and *Miller v. Arab Bank*, No. 18-cv-2192 (E.D.N.Y.), and argue that the courts' approach to discovery in these cases undermines the Moving Defendants' sequencing approach here.  *See* Plaintiffs' Reply Br. at 24-30.

Both *Linde* and *Miller* are instructive in the sense that both involve discovery in Anti-Terrorism Act claims against a non-U.S. bank, and that the court in those cases grappled with the application of foreign bank confidentiality laws.  But Plaintiffs ignore a critical distinction between this case and those: both *Linde* and *Miller* involved claims against *one bank*, Arab Bank PLC.  *See Linde v. Arab Bank*, No. 04-cv-2799 (E.D.N.Y.); *Miller v. Arab Bank*, No. 18-cv-2192 (E.D.N.Y.).  By contrast, Plaintiffs in this case have sued *twelve* Lebanese banks, and have accused a major swath of commercial participants in the Lebanese economy of being affiliated with Hezbollah.  While the allegations of the SAC distinguish, at least in some respects, among the Moving Defendants (e.g., identifying certain Moving Defendants who allegedly held accounts for certain individuals and entities), Plaintiffs' blunderbuss discovery requests have not. In light of the sweeping breadth of the Complaint, and of Plaintiffs' views of permissible discovery as among the various defendants, the Court here should exercise its discretion to first determine the permissible scope.

Moreover, Plaintiffs' reliance on the scope of the requests in *Linde* is misplaced.  First, the District Court in that case did not rule on the proper scope of discovery in an action under JASTA, because JASTA had had not been enacted at the time.  Second, the broad scope of discovery rulings by the District Court were premised on what the Second Circuit in *Linde v. Arab Bank*, 882 F.3d 314, 326 (2d Cir. 2018) later found was an erroneous interpretation of the statutory requirement for primary liability under Section 2333(a) of the ATA, namely that the provision of *any* type of material support to a terrorist organization in violation of 18 U.S.C. § 2339B was sufficient to establish a bank's liability under the ATA.  As the Second Circuit subsequently held, only transactions processed by a bank that "involve violence or endanger human life" can give rise to primary liability.  *Id.*  Third, the discovery rulings in *Linde* predated by thirteen years the 2015 Amendments to Rule 26(b) which added proportionality, tied relevance to proportionality, and abolished the "reasonably calculated to lead to the discovery of admissible evidence" standard applied by the court at that time.  Under those no longer applicable standards, the District Court permitted plaintiffs to request information related to more than fifteen thousand accounts of recipients of payments from the Saudi Committee, although none of the recipients were alleged to have themselves engaged in terrorism, and almost all of the payments were, on their face, humanitarian payments for food assistance, housing and medical assistance, and clothing wholly unrelated to terrorism.

Likewise, in *Miller* (where plaintiffs did not even dare to repeat their request for the accounts of 15,545 recipients of Saudi Committee payments), there has been no court ruling to support Plaintiffs' discovery requests here.  To the contrary, Arab Bank has objected to the scope of plaintiffs' requests based on the current Rule 26 standard governing the scope of discovery, the Restatement factors, and post-*Linde* Second Circuit guidance on JASTA liability.

Even setting aside these critical distinctions, *Linde* and *Miller* support the Moving Defendants' proposed approach to sequencing—in both cases, letters rogatory were issued before resolving foreign bank confidentiality objections.[9]

## II.   THE SCOPE OF PLAINTIFFS' DISCOVERY REQUESTS MUST BE NARROWED UNDER RULE 26 AND THE RESTATEMENT

### A.   The Concessions in Plaintiffs' Proposed Order Do Not Cure Moving Defendants' Scope Objections

Plaintiffs' Proposed Order makes concessions that Plaintiffs had been unwilling to entertain during the parties' meet-and-confer session on April 28, 2022:

- Plaintiffs now want the Moving Defendants to search only electronic (not hard copy) Transactional Records for the names listed in RFP Exhibits 1 and 2 (ECF 277-1).  Plaintiffs' Proposed Order ¶ 1.

- Plaintiffs now want the Moving Defendants to search only electronic Communications and Account Opening Records for the persons listed in RFP Exhibits 1 and 2 who were the Defendant's customers.  *Id*. ¶¶ 2, 3.  (They no longer ask Moving Defendants to conduct manual searches through all of a Defendant's Communications and Account Opening Records to locate other accounts where those persons might have been mentioned.)

- Plaintiffs now want the Moving Defendants to search only Compliance Records for the persons listed in RFP Exhibits 1 and 2 who were the Defendant's customers.  *Id*. ¶¶ 4-5.  (They no longer are demanding that Moving Defendants

---

[9] Plaintiffs argue elsewhere that the Court could simply ignore the conflict with Lebanese law.  *See* Plaintiffs' Reply Br. at 30-33.  Such an approach would be an affront to the sovereignty of Lebanon, and in any event is not the approach set forth in Plaintiffs' Proposed Order.  *See* Plaintiffs' Proposed Order (contemplating the issuance of letters rogatory 30 days after a ruling from the Court on scope).

conduct manual searches to determine if those names appeared anywhere in a

Defendant's Compliance Records.)

These salutary modifications, now limiting the Requests to information about the Moving

Defendants' actual customers, serve to highlight the excessive scope of Plaintiffs' RFPs but fall

far short of resolving the Moving Defendants' concerns.

### 1.    The RFPs Continue to Seek Irrelevant Documents

Most critically, Plaintiffs' proposed modifications do not cure the fundamental objection

that the 686 names on RFP Exhibits 1 and 2 are not confined to alleged individuals or entities

with whom a banking relationship could give rise to aiding-and-abetting liability under JASTA.

As an initial matter, Plaintiffs' claims are predicated on the Moving Defendants' provision of

banking services, and the Moving Defendants provide banking services only to *customers*.  Thus

discovery is appropriately limited to the accounts of individuals or entities that were customers

of the Moving Defendants.  Also, the Second Circuit has explained that the "general awareness"

element of an aiding-and-abetting claim requires that the Moving Defendants be "aware of [their

customers'] connections with [the principal violator] before the relevant attacks" and that the

alleged customers be "so closely intertwined with [the principal violator's] violent terrorist

activities that one can reasonably infer [the defendant] was generally aware of its role in

unlawful activities from which the attacks were foreseeable while it was providing financial

services to [its customers]." *Honickman*, 6 F.4th at 501.[10]  The Second Circuit has also

---

[10] Judge Amon's opinion denying the Moving Defendants' motion to dismiss the First Amended Complaint was issued before the Second Circuit's decisions in *Kaplan v. Lebanese Canadian Bank, S.A.L.*, 999 F.3d 842 (2d Cir. 2021) and *Honickman*.  The opinion held that the "general awareness" element was met because Plaintiffs had alleged "certain Bank Customers' designation as SDGTs and Bank Customers' open and notorious affiliation with Hezbollah (including through public media reports)," but did not specifically address the additional requirement that the alleged customers be "closely intertwined" with terrorist activities. *Bartlett v. Société Generale de Banque au Liban*, No. 19-0007 (CBA), 2020 WL 7089448 at *9 (E.D.N.Y. Nov. 25, 2020).  Judge Amon's opinion denying the Moving Defendants' motion to dismiss the SAC did not address this requirement at all.  *See generally* June 17, 2022 Memorandum and Order, ECF 291.

explained that prior to discovery, such allegations must be supported through "public source" material.  *Id*. at 502 n.18.

RFP Exhibits 1 and 2 are not, however, limited to persons or entities that meet these standards—and Plaintiffs have failed to justify their overbreadth.

First, they include 89 individuals and entities never mentioned *at all* in the encyclopedic SAC.  *See* List of Persons and Entities Not Mentioned in the SAC But Included in Pls.' Request for Production, ECF 277-14.  Plaintiffs have made no effort, either in the meet-and-confer process or in their motion papers, to explain how performing financial services for these 89 individuals and entities is relevant to their claims—let alone how it could give rise to liability under JASTA.

As for the remaining individuals and entities that *are* mentioned in the SAC who were neither designated nor publicly affiliated in some manner with Hezbollah, Plaintiffs have failed to demonstrate how any of them could meet the standard for liability, as they must in light of the fact that the SAC has been sustained only with respect to its "strongest" allegations.  June 17, 2022 Memorandum and Order at 2, ECF 291.  For example, their Reply points to the undifferentiated "Tajideen clan."  Plaintiffs' Reply Br. at 41.[11]  This cryptic reference merely highlights the fact that many of the individuals in the SAC are not plausibly alleged to have any connection to Hezbollah other than familial relationships with designated persons.  Even for those in the referenced "Tajideen clan," Plaintiffs say nothing about what "public source" material plausibly establishes a connection between those persons and Hezbollah, or establishes that they were "closely intertwined" with Hezbollah's violent terrorist activities.

---

[11] For the majority of the 597 individuals and entities, Plaintiffs also do not specify which Moving Defendants are alleged to have provided them with financial services.

Plaintiffs' silence on this subject is deliberate, for their flawed theory of the case also incorrectly presumes that liability under JASTA can result merely from the provision of financial services for "Hezbollah-affiliated individuals and entities." *Id*. at 34.  Their insistence that a commercial entity's alleged association with Hezbollah's "Business Affairs Component," *id*. at 40, is sufficient without more to subject its banker to aiding-and-abetting liability for violent acts of terrorism relies upon the same "fungibility of money" argument that *Honickman* expressly rejected.

In *Honickman*, the Second Circuit rejected Plaintiffs' "fungibility of money" theory, which would give rise to aiding-and-abetting liability where material support is given to "civil, nonviolent activities" by an enterprise associated with an FTO, 6 F.4th at 498-99; and held that there was a "meaningful difference" between the alleged customers in *Honickman* (alleged to be part of Hamas's "social welfare program") and the alleged customers in *Kaplan* (alleged to have "provided subsidies to the families of Hizbollah suicide bombers"), *id*. at 503 n.21.  *Honickman* (citing *Linde v. Arab Bank, PLC* (882 F.3d 314 (2d Cir. 2018)), therefore makes clear that performing banking services for a customer affiliated with an FTO is not, without more, a sufficient basis for aiding-and-abetting liability under JASTA.  6 F.4th at 498-99.

In the absence of a showing that the performance of financial services for an individual or entity on RFP Exhibit 1 or 2 could subject a Moving Defendant to liability under JASTA, the documents requested cannot be considered "vital" or "crucial" to Plaintiffs' claims, as required by *Société Internationale Pour Participations Industriales et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958).  Plaintiffs quibble with the limitations to RFP Exhibits 1 and 2 that the Moving Defendants have suggested (Plaintiffs' Reply Br. at 33-36), but they propose no workable alternative of their own.  For this reason, Moving Defendants propose that another round of

meeting-and-conferring, to be followed by a more targeted submission to this Court to resolve the scope of the letters rogatory requests, would be appropriate.  *See* Moving Defendants' Proposed Order ¶¶ 2-3.[12]

Plaintiffs' Proposed Order also does not address the Moving Defendants' objections to producing documents for a period of more than 10 years after the last of the Attacks (and more than 17 years after the first Attacks).[13]  Again, both *Kaplan* and *Honickman* confirm that Plaintiffs must prove that a Moving Defendant had the requisite state of mind "at the time that" it provided financial services to its customer.  *See Kaplan*, 999 F.3d at 863 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *Honickman*, 6 F.4th at 501 (affirming dismissal of aiding-and-abetting claim because "the public sources cited in the complaint do not plausibly support the inference that BLOM Bank had the requisite general awareness at the time that it provided banking services to the Three Customers").  Plaintiffs' assertion that transactions occurring 10 to 20 years after the relevant time period *might* provide "circumstantial evidence" of a Moving Defendant's state of mind is far too speculative to meet their burden under

---

[12] Indeed, notwithstanding the Moving Defendants' concern that Lebanese authorities would be more considerate of letter rogatory requests that were specifically targeted to obtain transaction documents (or transactions referenced in account statements) that were foreseeably tied to terrorist activity, the Moving Defendants do not insist that the Court limit the scope of the Requests with regard to the type of transaction for the letters rogatory.  That is because the Moving Defendants are confident that if the Lebanese authorities grant such blanket requests permitting them to disclose all transactions they performed, those documents would show nothing more than routine commercial services.  A different issue is presented when seeking customer waivers, which Plaintiffs request the Moving Defendants undertake simultaneously with the issuance of the letters rogatory.  Understandably, any customer agreeing to a waiver may request reasonable limitations as to scope, such as transactions involving personal, confidential, medical or proprietary information.

[13] Plaintiffs claim their post-2011 requests are "narrowly tailored because they are limited to (1) Hezbollah-affiliated customers who maintained accounts with Defendants even after their accounts had been forcibly closed at LCB and (2) Hezbollah-affiliated SDGTs."  Plaintiffs' Reply Br. at 9-10. Neither their document request nor Plaintiffs' Proposed Order contains those limitations.

*Aerospatiale.* [14] [15]   Therefore, as described in Moving Defendants' Proposed Order, the Court

should limit the relevant time frame to January 1, 2003 through November 30, 2011. *See* Moving

Defendants' Proposed Order ¶ 4.

### B.     The Concessions Made in Plaintiffs' Proposed Order Do Not Cure Moving Defendants' Burden Objections

Notwithstanding the concessions made in Plaintiffs' Proposed Order, Plaintiffs' Requests

still impose a heavy logistical burden on Moving Defendants that outweighs any likely benefit

and is not proportional to the needs of this case.  Fed. R. Civ. P. 26(b)(1), (b)(2)(B).

First, despite the undeniable fact that Moving Defendants provide banking services only

to customers, Plaintiffs still seek "[a]ll" transactional records for individuals and entities listed in

RFP Exhibit 1 or 2, without limiting them to "persons and entities [that] were ever customers of

the Defendant," despite Moving Defendants' showing that many of their document management

systems are not capable of searching for non-customer counterparty names for transactions.

Plaintiffs' Proposed Order at 1; Moving Defendants' Initial Br. at 29 & n.32.[16]   The Moving

---

[14] Judge Amon's decision does not hold that such *post hoc* evidence can be relevant to establishing contemporaneous "general awareness," but only that the alleged provision of services after the closure of certain accounts at LCB could be relevant to "duration of assistance" for substantial assistance. November 25, 2020 Memorandum and Order at 30, ECF 164. The Court did not champion looking at extensive after-the-fact "state of mind" evidence wholesale.  *Id.*

[15] Plaintiffs' Reply Brief refers to unverified documents apparently illegally obtained and published in late 2019 by "an anonymous hacking group calling itself 'Spider Z'", which appear to suggest links between Al-Qard Al-Hassan, on the one hand, and Lebanese banks, including Jammal Trust Bank and certain of the Moving Defendants, on the other hand.  Plaintiffs' Reply Br. at 20-22.  Moving Defendants vehemently deny any and all allegations of wrongdoing contained in these hearsay materials.  Notably, while, as Plaintiffs note, the U.S. Government issued sanctions relating to Al-Qard Al-Hassan in 2021 (years after the alleged "Spider Z" hacking reports), and has designated Jammal Trust Bank, none of the Moving Defendants has ever been designated by the U.S. or any other government authority.

[16] Indeed, other than limiting their Proposed Order to "electronically maintained" records, Plaintiffs offer nothing to blunt or constrain the multiple categories of documents they seek for each name, which exponentially compound the intrinsic overbreadth of their excessive names list.  For example, for each name, Plaintiffs seek "transactional records," which Plaintiffs define to include dozens of categories of records, from SWIFT messages to letters of credit.  *See* Plaintiffs' Proposed Order at 1 n.2 ("For purposes of this Order, all capitalized terms have the definitions set forth in Plaintiffs' First Request for the Production of Documents."); Plaintiffs' First Request for Production of Documents at 3, ECF 277-1 (definition of "Transactional Records"); *see also* Plaintiffs' Reply Br. at 55 (noting that Plaintiffs seek "checks, mortgage documents and funds transfers in Lebanese Pounds").

Defendants' Proposed Order addresses this issue by providing that the Moving Defendants produce account statements for the persons and entities that were their customers, to be supplemented by electronically maintained and retrievable transactional records, to the extent that account statements are not available for production.  *See* Moving Defendants' Proposed Order ¶ 4.

Second, as Moving Defendants have explained, searching for potential individual accountholders is highly complex and will be unduly burdensome to conduct as currently requested.  Moving Defendants' Initial Br. at 25-26.  Plaintiffs acknowledge that the 379 names of individuals on RFP Exhibits 1 and 2 "may be more difficult to search than corporate names (due to multiple spellings or common names)."  Plaintiffs' Reply Br. at 41.  But their proposed solution—that the Moving Defendants should subjectively surmise whether the individual to whom they provided banking services is the same individual whose information Plaintiffs now request, *see id*. at 42, imposes a time-consuming, subjective analysis for each name searched (an exercise separate from and in addition to actually collecting records or determining relevance of those records).  It also conflicts with one of the most basic tenets of Fed. R. Civ. P. 34(b)(1)(A), which requires that a document request "must describe with reasonable particularity each item or category of items to be inspected."  To the extent that Plaintiffs have additional identifying information about the individuals on RFP Exhibits 1 and 2, such as ID number, register number, date of birth, and nationality, they should be required to provide it.  *See* Moving Defendants' Proposed Order ¶ 1.

### C.   Plaintiffs' Proposed Order Seeks Categories of Documents Not Sought in Plaintiffs' Requests.

Without providing any explanation in their Reply Brief, Plaintiffs' Proposed Order surreptitiously seeks to broaden their already expansive document requests by seeking a new

category of documents:  "All electronically searchable Communications concerning Hezbollah or its bloc in Lebanon's parliament known as 'the Loyalty to the Resistance.'"  Plaintiffs' Proposed Order ¶ 6.  If Plaintiffs wish to request such documents, they should serve a proper document request and give the Moving Defendants an opportunity to object to it, as required by the Federal Rules of Civil Procedure, rather than asserting it for the first time buried in a Proposed Order appended to a reply brief on a motion to compel.

## III.   AN APPLICATION OF THE RESTATEMENT FACTORS FAVORS THE MOVING DEFENDANTS

As noted in Section I above, the Court need not, and should not, issue any final ruling on the Moving Defendants' bank secrecy objections until the scope of discovery is determined and the parties are given the opportunity to pursue letters rogatory and customer waivers.  Still, if the Court were inclined to embark on an analysis of bank secrecy on the incomplete record before it, that analysis favors the Moving Defendants' request for a protective order.

As discussed below, the most important factor in the comity analysis is the balancing of the sovereign interests.  Crucial to that balancing—and also providing invaluable insight into other comity factors, such as the degree of hardship on the producing party—is the Lebanese Government Statement of Interest recently supplied for the benefit of this Court.  *See generally,* Lebanese Gov't Stmt. of Interest.  The Lebanese Government Statement of Interest provides this Court with the position of the government of Lebanon, especially on the sovereign interest factor—and it echoes the analysis of the appropriate balancing of those interests that the Moving Defendants set forth in their Initial Brief.  Among the Lebanese Government's key points are the following:

21

- **History and importance of Lebanese bank secrecy.**  Lebanese bank secrecy is rooted in the Lebanese right to personal privacy, which "has a long and important history in the culture and values of the Lebanese people and their laws";

- **Severe penalties for violations of Lebanese bank secrecy.**  "[B]anks and their employees would be subject to serious criminal sanctions as a result of a violation of banking secrecy";

- **Lebanese-U.S. partnership in fighting terrorism.**  Lebanon has "great experience" in cooperating with the United States in the war on terrorism, including assisting with requests for judicial assistance and extraditing criminals;

- **Plaintiffs' approach is antithetical to efforts to fight terrorism.**  "Any disclosure in violation of bank secrecy laws would undermine Lebanon's sovereign interests, and negatively affect the government's fight against terror-financing";

- **Availability of letters rogatory.** "Lebanon has procedures in place to balance [Lebanese bank secrecy] laws and policies against appropriate official requests . . . for evidence from the Lebanese banks."

*Id*. at 1.

Other than noting (parenthetically) that the Lebanese Government Statement of Interest is "styled as an affidavit" (Plaintiffs' Reply Br. at 67), Plaintiffs do not contest its substance, let alone demonstrate that any of the points contained therein are inaccurate.  All told, the Lebanese Government Statement of Interest, viewed through the lens of comity among nations, clearly and strongly supports sustaining Lebanese bank secrecy.

A.   **Plaintiffs Fail to Rebut the Moving Defendants' Showing that Restatement Factors Support Issuance of a Protective Order**

1.   **Importance of Discovery to the Case**

Plaintiffs err when they seek to water down the standard governing whether discovery is "important" under the first factor of the comity analysis. Contrary to Plaintiffs' assertion, discovery is not deemed "important" for Restatement purposes merely because the requests at issue happen to meet what Plaintiffs describe as "the broad scope of discovery and truth-seeking purpose of Rule 26(b)," (Plaintiffs' Reply Br. at 52)—a standard that, in any event, Plaintiffs' discovery does not satisfy (*supra* at Section II).

Rather, where the Restatement applies, the standard is higher. *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 522 (S.D.N.Y. 1987) (the "normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence . . . should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation"); Moving Defendants' Initial Br. at 38 (collecting cases).[17]

---

[17] The single case that Plaintiffs cite for the proposition that their discovery requests need not be "essential," "crucial," or "vital" to pass muster under the first Restatement factor—*Flores v. Stanford,* No. 18-cv-02468 (VB)(JCM), 2022 WL 354719, at *6 (S.D.N.Y. Feb. 7, 2022)—does not address the Restatement comity analysis at all; it addresses the deference to be afforded to "state privilege laws" in a federal question case where such state laws "do not govern," (*id*. at *5) an entirely different situation, in which the party resisting discovery was not being asked to violate *any* laws, let alone those of its home country. Plaintiffs incorrectly suggest that *In re Vitamins Antitrust Litig.* endorsed discovery in contravention of foreign law based on requests that merely satisfied "Rule 26's relevancy standard." Plaintiffs' Reply Br. at 51. But in fact, the *Vitamins* court first noted that "the discovery requests have been narrowed to make them as unburdensome as possible under the circumstances," and even then the court remained "hesitant to order these defendants to violate their country's laws without a better understanding of exactly . . . how *necessary* this *small subset* of information is to plaintiffs' claims in this case." *In re Vitamins Antitrust Litig.*, No. 99-197TFH, 2001 WL 1049433, at *5, *9 (D.D.C. June 20, 2001) (emphases added). Accordingly, the court directed the defendants to create a "privacy log," so that "Plaintiffs may then determine whether that requested information is *absolutely essential* to their case." *Id.* at *9 (emphasis added). The *Vitamins* court thus took pains to prevent exactly what Plaintiffs seek to do here: pursue vast, unbounded discovery, well in excess of what is *vital* to their case, in violation of foreign law.

Moreover, in this case, once scope is determined, the parties intend to seek the documents at issue through letters rogatory.  "Where parties have other means of obtaining the requested documents, courts consider the requested discovery to have a 'reduced degree of importance.'"  *CE Int'l Res. Holdings, LLC v. S.A. Mins. Ltd. P'ship*, No. 12-CV-08087 CM SN, 2013 WL 2661037, at *9 (S.D.N.Y. June 12, 2013) (citing *Minpeco*, 116 F.R.D. at 529) (denying motion to compel production of documents).

### 2.   Degree of Specificity of Plaintiffs' Requests

Plaintiffs summarily assert that their Requests are "narrowly tailored" and purportedly limited to "Hezbollah-affiliated entities and individuals."  Plaintiffs' Reply Br. at 54.  But Plaintiffs' list of alleged "Hezbollah-affiliated entities and individuals" contains hundreds of names that were never designated by OFAC as affiliated with Hezbollah.  And even if Plaintiffs were able to establish that their list includes only names linked to Hezbollah—which Plaintiffs have not done and apparently are unable to do[18]—a list of over 700 names, ranging from "Alpha-Beta (Belgium)" to "Stars International Ltd. (China)" to "Wonderland Amusement Park and Resort Ltd. (Nigeria)," does not reflect "narrow tailoring."

### 3.   Whether the Information Originated in the United States

Plaintiffs concede that "many (if not most) of the documents" at issue "originated in Lebanon."  Plaintiffs' Reply Br. at 55.

---

[18] On April 22, 2022, Bank Audi wrote to Plaintiffs to ask Plaintiffs (1) whether Plaintiffs could supply more information about the names on their list and (2) if Plaintiffs were unable to supply such information, then how Plaintiffs had concluded that the names on their list, especially common Arabic names, were relevant to this lawsuit, *i.e.*, how Plaintiffs had concluded that such names were linked to Hezbollah.  *See* Apr. 22, 2022 Defendant Bank Audi's Letter to Plaintiffs' Counsel at 4, ECF 270-17.  Plaintiffs never responded.

4.     **Availability of Alternative Means of Securing the Information**

a.     **Discovery directed to U.S. correspondent banks**

In attempting to minimize the importance of the correspondent banking records available in the United States, Plaintiffs effectively set aside their far-reaching theory that, if *any* "fraction of the [alleged] wrongful conduct" (*id*. at 57) is reflected in the U.S. correspondent bank records, then Plaintiffs will have established their claims, and will not need to establish what did, or did not, happen in Lebanon.  Plaintiffs cannot now amend their position solely for purposes of the comity analysis.[19]

b.     **Letters Rogatory to Lebanon**

Although Plaintiffs' brief includes a section titled "Letters Rogatory to the Lebanese authorities do not qualify as a meaningful alternative means of discovery" (Plaintiffs' Reply Br. at 57-59), Plaintiffs do not argue that letters rogatory are anything other than a lawful, appropriate and viable mechanism for procuring documents from Lebanon without requiring the Moving Defendants to violate Lebanese law.  Nor could they.  Moving Defendants' expert on Lebanese bank secrecy (Plaintiffs have not identified a Lebanese bank secrecy expert of their own) explained that the parties can approach the Lebanese authorities to request that Lebanese bank secrecy law be lifted on a targeted basis.  Declaration of Dr. Fadi Moghaizel ¶¶ 31-36.  The

---

[19] Plaintiffs argue that third party discovery from correspondent banks "confirms" allegations in the SAC and demonstrates that Moving Defendants held accounts for additional Hezbollah-related individuals and entities not mentioned in the SAC.  *See* Plaintiffs' Reply Br. at 36-37.  Conspicuously absent from Plaintiffs' argument is any suggestion that correspondent bank records show that any Moving Defendant provided banking services to any individual or entity that was designated by the U.S. government, or that was tied through public sources to Hezbollah, before the banking services were rendered.  *Id*.  Nor do Plaintiffs mention that, for the majority of transactions reflected in the correspondent bank records, the supposed Hezbollah-related individuals and entities are customers of *other banks*, not the Moving Defendants.  And although Plaintiffs now tout the importance of these records in "confirming" and, apparently, expanding their allegations, Plaintiffs have not even issued subpoenas to all correspondent banks used by the Moving Defendants, and have opposed Moving Defendants' suggestion that they pursue these subpoenas in the first instance.  *See id*. at 11, 16, 19.  In any event, Plaintiffs plainly take the position that the correspondent bank records are a mechanism to identify actual customers of the Moving Defendants (without violating Lebanese law), and accordingly, Plaintiffs should be directed to pursue this discovery on a priority basis as part of the parties' collective effort to avoid or mitigate any conflict with Lebanese law.

Lebanese Government Statement of Interest confirms that "Lebanon has procedures in place to balance [Lebanese bank secrecy] laws and policies against appropriate official requests to the Special Investigations Commission for evidence from Lebanese banks."  Lebanese Gov't Stmt. of Interest at 1.

Indeed, Plaintiffs direct the Court to the parties' proposed scheduling orders (Plaintiffs' Reply Br. at 57-58 (citing Dec. 10, 2021 Joint Letter to the Court, ECF 263)), in which both Plaintiffs and the Moving Defendants proposed that the parties would, as part of the overall effort to appropriately obtain discovery in a manner consistent with Lebanese bank secrecy, submit "Requests for Judicial Assistance" to Lebanon.  *See* Dec. 10, 2021 Joint Letter to the Court at 2.  Neither side would have agreed to the letters rogatory process were it anything other than—in the words of the Restatement—an "available alternative means of securing the information [at issue]." [20] Restatement (Third) of Foreign Relations Law § 442 (Am. L. Ins. 1987).

Finally, Plaintiffs point to a case in which a court did not require the U.S. government to seek discovery through a Mutual Legal Assistance Treaty with China, which the Department of Justice declined to attempt, having already been "[s]tymied by what it perceives as sluggish and typically fruitless cooperation from Chinese authorities in the past."  Plaintiffs' Reply Br. at 58 (citing *In re Sealed Case*, 932 F.3d 915, 920 (D.C. Cir. 2019)).  But that is not the judgment of the United States in this case.  *See* Moving Defendants' Initial Br. at 44.

---

[20]  Plaintiffs devote three pages of their brief to the unsolved murder of Antoine Dagher, a Byblos employee at the time of his murder, and to what Plaintiffs call a "key document" included in a Lebanese television report about his murder.  Plaintiffs' Reply Br. at 17-20.  Plaintiffs, without substantiation, refer to this document as an "internal compliance record[]" of Byblos tracking Hezbollah-affiliated accounts "that cannot be obtained from third-party correspondent banks."  *Id.* at 17, 19.  This unauthenticated document could not be obtained from Byblos either because it is not a Byblos Bank document and contains no marking as such.  In any event, Plaintiffs are free to include a request for this document in a proper letter rogatory.  Whether the request is granted or denied, the response of Byblos for the production of this document would be the same.

5. **Balancing of Sovereign Interests**

This Court should decline to credit Plaintiffs' views of the sovereign interests at stake in this matter over the views expressed by the governments of the United States and Lebanon, themselves. This case is unique compared to other ATA cases that undertook a comity analysis: here, prior to any judicial comity assessment, *both* the U.S. government (through the submission of the Solicitor General in *Linde v. Arab Bank,* another case involving Lebanese bank secrecy) *and* the Lebanese government (through its Statement of Interest directed to this litigation) have articulated their views on how to balance the sovereign interests at stake and both governments unequivocally favor respecting Lebanese bank secrecy in this context. Plaintiffs say next to nothing about either government's position of record, no doubt because both governments' statements leave little room for debate. And, although Plaintiffs blithely urge this Court to adopt their self-serving view that the sovereign interests weigh in their favor, that is not the approach the Restatement endorses. Instead, the Restatement instructs the Court to take its cues from the sovereigns themselves. *See* Restatement (Third) of Foreign Relations Law § 442 cmt. c.

Plaintiffs cite to inapposite ATA cases in which courts assessing sovereign interests lacked the direct sovereign guidance that this Court enjoys. *See* Plaintiffs' Reply Br. at 50 (citing *Linde v. Arab Bank*, 463 F. Supp. 2d 310 (E.D.N.Y. 2006); *Weiss v. Nat'l Westminster Bank*, 242 F.R.D. 33 (E.D.N.Y. 2007); *Strauss v. Credit Lyonnais*, 249 F.R.D. 429 (E.D.N.Y. 2008); *Wultz v. Bank of China*, 910 F. Supp. 2d 548 (S.D.N.Y. 2012)). Those courts, when striving to assess U.S. interests, were forced to auger meaning from Congressional tea leaves. *See, e.g.*, *Strauss*, 249 F.R.D. at 443 (assessing the U.S. interests by looking to the "legislative history of the ATA"); *Weiss*, 242 F.R.D. at 45 (same); *Wultz*, 910 F. Supp. 2d at 559 & nn. 69-71 (relying upon the analysis in *Strauss*); *Linde*, 463 F. Supp. 2d at 315 (assessing the U.S. interest based on Congressional enactment of criminal and civil statutes). Such an exercise is a poor

27

substitute for what this Court is well-positioned to do: rely on statements that not only originate with the executive branch, *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n. 21 (2004) ("federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"), but that provide a context-specific analysis squarely addressing the very issues before this Court.

a.      **The U.S.'s and Lebanon's shared interest in fighting terrorism**

Plaintiffs point to certain multilateral pacts and obligations to which the United States and/or Lebanon (as well as other countries) are parties as purported evidence that the Court should disregard Lebanon's sovereign interests.  Plaintiffs' Reply Br. at 66.  For example, Plaintiffs cite the Memorandum of Understanding Between the Governments of the Member States of the Middle East and North Africa Financial Action Task Force Against Money Laundering and Terrorist Financing (the "FATF 40 Memorandum"), which obligates its members to intergovernmental mutual legal assistance in terrorist financing investigations.  *Id.* What agreements like the FATF 40 Memorandum demonstrate—as Plaintiffs correctly note—is that their signatories share a common goal of thwarting terrorism and its financing.  *Id.*  But contrary to what Plaintiffs intone, such agreements do not mean that the sovereign interest factor favors disregarding Lebanese law in the context of civil litigation between private parties; these agreements show exactly the opposite.  They demonstrate the real-world critical primacy of successful and efficacious *government-to government* cooperation in *criminal* matters.  Such peer-to-peer cooperation among nation states is what the United States has underscored must be prioritized, and what the United States has said must not be jeopardized in favor of advancing private, civil litigation.  Moving Defendants' Initial Br. at 44-45.

Plaintiffs' suggestion that, because Lebanon shares information with the United States at the governmental level, information must also be produced in a private civil litigation, falls flat.

28

By Plaintiffs' logic, the fact that the United States shares intelligence with foreign intelligence agencies would require that private civil plaintiffs be afforded the same access, and the fact that the United States shares suspicious activity report ("SAR") information with foreign law enforcement would require that private civil plaintiffs be afforded the same access.  That is not how the law governing confidential materials operates.  *Compare* 31 CFR § 1010.520 (permitting sharing of SAR information with "a foreign law enforcement agency") with 31 CFR § 1020.320(e)(2) (prohibiting sharing SAR information with members of the public, including for use in a private legal proceeding).  Governments routinely share materials with one another, and their doing so says nothing about whether private citizens should be afforded access to such information in civil disputes with other private parties—which is an entirely different question, subject to different considerations and outcomes.

### b.    The U.S. interest in fighting terrorism

Plaintiffs' brief provides no response to Moving Defendants' showing that the approach Plaintiffs advocate—flouting Lebanese sovereignty, ordering virtually the entire Lebanese banking sector to violate Lebanese law, and simply ignoring the prospect of letters rogatory to the Lebanese authorities—is antithetical to, and would, *according to the U.S. Government*, materially undermine, the strong U.S. interest in fighting terrorism.  Moving Defendants' Initial Br. at 44-53.  As the United States has explained, "[a] primary means by which the United States government protects American citizens from international terrorism is by ensuring that foreign governments and entities continue to cooperate in United States-led counterterrorism efforts." *Id*. at 45 (citing *Linde* Amicus Br. at *18-19); *accord* Lebanese Gov't Stmt. of Interest at 1 ("[a]ny disclosure in violation of bank secrecy laws would . . . negatively affect the [Lebanese] government's fight against terror-financing").  In fact, Plaintiffs' approach directly jeopardizes

that objective by evidencing a general disrespect for Lebanese law—something antithetical to good-faith cooperation.

Plaintiffs also do not dispute that the United States considers Lebanon a critical partner in the war on terror (Moving Defendants' Initial Br. 44-45); that the United States recognizes that the Lebanese banking sector in particular is a key ally in U.S. efforts to thwart terrorism in the Middle East (*id*. 46-48); and that ensuring the stability of Lebanon is a key facet of U.S. policy, and is essential to the U.S. fight against Middle Eastern terrorism (*id*. at 48-49). Plaintiffs have no rejoinder to the U.S. government's statement that the approach Plaintiffs advocate, *i.e.*, overriding Lebanese bank secrecy, "could undermine the United States' vital interest in maintaining close cooperative relationships with . . . key regional partners [like Lebanon] in the fight against terrorism." *Id*. at 45 (citing *Linde* Amicus Br. at *18-19).

Instead, Plaintiffs argue that "this case gives expression to the highest U.S. national interests *that can be reflected in any private lawsuit*." Plaintiffs' Reply Br. at 59 (emphasis added). Assuming *arguendo* that Plaintiffs are correct,[21] their position says nothing about how important this particular lawsuit, or any civil lawsuit, is in the overall scheme of the U.S. war on terrorism, nor whether—whatever interest the United States may have in fighting terrorism through its authorization of private civil lawsuits—the existence of such lawsuits trumps other U.S. sovereign interests in fighting terrorism.

---

[21] Plaintiffs hypothetically could be correct that their suit might vindicate the U.S. national interest in remedying terrorism, but only if, in fact, their allegations ultimately prove to be true (which Moving Defendants submit will not happen). Plaintiffs engage in circular reasoning when they argue that their unproven allegations establish a U.S. interest justifying their need to obtain evidence to prove their allegations. By contrast, in *In re Vitamins Antitrust Litig.*, the court was able to assess the U.S. interests definitively, before deciding whether to defer to foreign privilege laws, because "[m]ost of these foreign defendants have pled guilty to criminal liability for these alleged antitrust violations" and so "if there was ever a case where the foreign defendants should be required to comply with our discovery rules, it would appear to be this one." 2001 WL 1049433, at *5.

### c.   Lebanon's Interest in its Bank Secrecy Laws

This Court should also decline Plaintiffs' invitation to substitute their own opinion that their approach to resolving the parties' dispute evinces no disrespect toward Lebanon's laws for Lebanon's contrary view.  *Compare* Plaintiffs' Reply Br. at 63 (arguing that ordering Lebanese banks to violate Lebanese bank secrecy is "hardly . . . running roughshod over the sovereign interests of Lebanon") *with* Lebanese Gov't Stmt. of Interest at 1 ("[a]ny disclosure in violation of bank secrecy laws would undermine Lebanon's sovereign interests").  So too should this Court reject Plaintiffs' unfounded assertion that Lebanese bank secrecy is a sham designed to protect criminals (Plaintiffs' Reply Br. at 64), and credit Lebanon's thoughtful explanation of the history and purpose of its bank secrecy laws.  Lebanese Gov't Stmt. of Interest at 1 ("Personal privacy, including the financial aspect thereof, has a long and important history in the culture and values of the Lebanese people and their laws.").  Nor does the argument that a privacy protection (*e.g.*, the Fourth Amendment of the U.S. Constitution) may at times shield wrongdoing undermine the legitimacy of such a law's intended purpose.

Plaintiffs' cynical suggestion that the rule of law in Lebanon is no longer entitled to respect due to political and economic turmoil (e.g., "[w]hatever the legitimate interests Lebanon may still have in its bank secrecy laws following the country's recent economic collapse," "Lebanon is a failed state under the sway of a terrorist organization," "[Hezbollah] exercis[es] an effective veto over the Lebanese parliamentary government," Plaintiffs' Reply Br. at 64-66), is wrong.

First, Plaintiffs say nothing to rebut the Moving Defendants' showing that the foregoing slanderous attacks on the Lebanese state are untrue.  *See, e.g.*, Moving Defendants' Initial Br. at 49 ("In the most recent elections in Lebanon, Hezbollah and its allies lost their Parliamentary majority").  Plaintiffs' brief simply recites the same, stale statements from the original

declaration of Marshall Billingslea (Plaintiffs' Reply Br. at 65-66), who has not held a government post since President Trump left office, and who tellingly has not updated his declaration in light of recent events on the ground in Lebanon.

Second, Plaintiffs say nothing to rebut the Moving Defendants' discussion demonstrating that the appropriate approach to supporting a fragile government—and the approach the U.S. has chosen with respect to Lebanon—is to support the legitimate institutions of the state, and to respect the rule of law.  *See* Moving Defendants' Initial Br. at 51.  Indeed, the Moving Defendants' motion for a protective order noted that the "Billingslea declaration conspicuously omits any suggestion that it currently is, or ever has been, U.S. policy to direct Lebanon's citizens to violate Lebanese bank secrecy laws" and further observed that Mr. Billingslea himself, while in office, was a vocal opponent of "lack of respect for the rule of law."  Moving Defendants' Initial Br. at 51-52.  Once again, Plaintiffs offer no rebuttal, and no update to Mr. Billingslea's declaration.

*  *  *  *  *

The bottom line is that U.S. and Lebanese interests in combatting terrorism are not a neutral factor on this motion; they undercut Plaintiffs' efforts to obtain discovery in Lebanon in violation of Lebanese law.

### 6.      The Moving Defendants' Hardship

Much as they do throughout their brief, Plaintiffs once again seek to substitute their own view that the Moving Defendants (and the Moving Defendants' employees) are not at risk of prosecution if they violate Lebanese bank secrecy, for the express position of the Lebanese government that the Moving Defendants face just such a risk if they do so.  Plaintiffs' Reply Br. at 67-68.  The Court should reject Plaintiffs' gambit in its entirety.  First, as noted above, the views of Lebanon, not those of Plaintiffs, are the best evidence of how Lebanese laws are

understood and enforced in Lebanon.[22]  Second, Plaintiffs' argument—that, because

prosecutions for Lebanese bank secrecy violations are infrequent, the law can be disregarded

with impunity—makes no sense.  Under that logic, U.S. treason laws should be seen as toothless,

given that the last successful prosecution was in 1952.[23]

Third, regardless of what may have occurred in the past, prosecutions are far more likely

to occur in high profile cases, and this matter is squarely within the attention of the Lebanese

government and public.[24]

In *Strauss*, on which Plaintiffs rely (Plaintiffs' Reply Br. at 68), the French government's

submission to the court did "not mention France's interest in its bank secrecy laws," 249 F.R.D.

at 449, which is the opposite of the situation here.  Rather, the French government's letter

mentioned only the French blocking statute, *id.*, a law which, unlike Lebanese bank secrecy law,

was designed to thwart foreign discovery and was "intended . . . to provide [French citizens] with

tactical weapons and bargaining chips in foreign courts," *In re Air Cargo Shipping Servs.*

*Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010).  Consequently, the French letter, unlike the

Lebanese Government Statement of Interest, did not set forth a valid domestic policy basis for

the French blocking statute.  *Compare Strauss v. Credit Lyonnais*, No. 1:06-cv-702, at 4-5, ECF

---

[22] Contrary to Plaintiffs' arguments, courts routinely accord significant weight to statements of governmental interest that originate from strict bank secrecy jurisdictions, like Switzerland and Lebanon.  *See, e.g., Minpeco,* 116 F.R.D. at 525.

[23] *See* Paul T. Crane, *Did the Court Kill the Treason Charge?: Reassessing Cramer v. United States and Its Significance*, 36 Fla. St. U. L. Rev. 635, 636, 696 (2009) (noting that, besides the more recent indictment of Adam Gadahn in 2006, the last time an American was indicted for treason was in 1954, and the last treason conviction to be upheld was in 1952); Douglas A. Kash, *The United States v. Adam Gadahn: A Case for Treason*, 37 Cap. U. L. Rev. 1, 1 (2008) (noting that the Gadahn indictment marked the first time since the World War II era that an American was charged with treason, and the United States has only brought charges of treason approximately thirty times since the birth of the nation).

[24] It is also important to note that Plaintiffs' ever-multiplying panoply of absurd positions cannot be reconciled, *e.g.*, (1) that Hezbollah supposedly controls Lebanon and its government, including by wielding a "private army," (2) that Lebanese bank secrecy laws supposedly are utilized to shield Hezbollah's misconduct, *and* (3) that Moving Defendants supposedly can ignore Lebanese bank secrecy without fear of official (or extrajudicial) repercussion—logically, at least one, if not all, of those propositions must be false.

118 (E.D.N.Y. Jan 25, 2008) ("*Strauss* French Letter") (providing no domestic policy basis for the French blocking statute) *with* Lebanese Gov't Stmt. of Interest at 1 (explaining that Lebanese bank secrecy is based on principles of personal privacy enshrined in Lebanese law and culture). Nor did the French letter offer any broader context, let alone suggest that deferring to the French blocking statute would further crucial, shared sovereign interests of both nations. *Compare Strauss* French Letter (setting forth no shared U.S. and French sovereign interests in respecting the French blocking statute) *with* Lebanese Gov't Stmt. of Interest at 1(explaining that violating Lebanese bank secrecy would have a detrimental effect on Lebanon's anti-terrorism efforts). Accordingly, the Court need not afford Plaintiffs' use of *Strauss* any weight in analyzing this factor.

### 7.   The Moving Defendants' Good Faith

Plaintiffs fail to rebut Moving Defendants' showing that they have acted in good faith. Plaintiff's Reply Br. at 71-72.  First, Plaintiffs do not contest that the Moving Defendants are bound by Lebanese bank secrecy and thus have no lawful choice but to assert objections (Moving Defendants' Initial Br. at 55), a fact that courts have held supports a finding of good faith.  *See, e.g., CE Int'l Res. Holdings, LLC v. S.A. Mins. Ltd. P'ship*, No. 12–CV–08087 (CM)(SN), 2013 WL 2661037, at *16 (S.D.N.Y. June 12, 2013) ("Given that there is no dispute that Singapore has adopted banking secrecy laws, the Court cannot find that Deutsche Bank's opposition to the subpoena has been in bad faith."); *Doubleline Cap. LP v. Odebrecht Fin. Ltd.*, No. 17-CV-4576 (GHW) (BCM), 2021 WL 4596561, at *14 (S.D.N.Y. Oct. 6, 2021) (similar). Second, Plaintiffs do not dispute that the Moving Defendants have conferred with them in an

effort to resolve discovery disputes.  Moving Defendants' Initial Br. at 55.[25]  Third, Plaintiffs do

not dispute that the Moving Defendants have worked to overcome Lebanese legal obstacles,

including by committing to drafting and pursuing letters rogatory to the Lebanese government.

*See Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 160 (S.D.N.Y. 2011) (banks acted in good

faith where they offered to help draft a Hague Convention request), *aff'd sub nom. Tiffany (NJ)*

*LLC v. Andrew*, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011).  Fourth, as discussed above,

Moving Defendants are amenable to pursuing targeted customer waivers, as Plaintiffs suggest

(Plaintiffs' Reply Br. at 3), or producing redacted documents (Plaintiffs' Reply Br. at 67) to the

extent they can do so consistent with Lebanese law, although Moving Defendants reasonably

need to understand the scope of their discovery obligations before they undertake such efforts.

      Rather than acknowledge these efforts, Plaintiffs ignore them.  And to distract from that

omission, Plaintiffs concoct a phony "example" of supposed bad faith.  By way of background,

the SAC alleges that an individual named "Dib Hani Harb" had an account at Bank Audi, and

that Bank Audi knew that Mr. Harb was affiliated with Hezbollah because (1) Bank Audi

received a copy of seizure warrant that was served on Bank Audi's U.S. correspondent bank

(Standard Chartered Bank) and (2) the seizure warrant supposedly informed Bank Audi that "Mr.

Harb had been charged with providing material support to an FTO under 18 U.S.C. § 2339B."

SAC ¶ 1206.  In the Moving Defendants' motion to dismiss, Moving Defendants explained that

this allegation was a fabrication.  Moving Defendants' Motion to Dismiss at 9, ECF 209

(explaining that "the warrant, which only was addressed to (and required compliance from) the

U.S. correspondent bank, was silent about the reason for the seizure.").  Moving Defendants

---

[25] Plaintiffs do claim (incorrectly) that Defendants' negotiating position evolved over time, but as explained above that is not correct, nor is it evidence of bad faith.

attached a copy of the seizure warrant demonstrating that it did not support Plaintiffs' allegation. *See* Moving Defendants' Motion to Dismiss at Exhibit B, ECF 209-4.  The warrant originated with the FBI, was sent to Standard Chartered Bank in New York, and noted the FBI's belief that an individual named "Dib Hani Harb," held a particular account at Bank Audi.  *Id.*

While providing the seizure warrant to the Court did debunk Plaintiffs' spurious allegations, it did not violate Lebanese bank secrecy, because the seizure warrant was never a Bank Audi document, was not information that a customer had confidentially provided to Bank Audi, and by supplying it to the Court, Bank Audi was neither confirming nor denying that either "Dib Hani Harb" or anyone else was (or was not) a Bank Audi customer.  This is hardly surprising; it is, in fact, how duties of confidentiality typically function.  If, for example, an attorney happened to be representing Mr. Harb, then the attorney would not violate any duty of attorney-client confidentiality by providing the seizure warrant to the Court.

Nor is the position (which should be uncontroversial) that the seizure warrant is not covered by Lebanese bank secrecy inconsistent with any Lebanese bank secrecy objections that Bank Audi (or the other Moving Defendants) have asserted.  To the contrary, Bank Audi has merely objected that it will comply with Lebanese bank secrecy laws.[26]

Plaintiffs protest that if the seizure warrant does not fall within the scope of Lebanese bank secrecy, then SWIFT messages must not, either.  But that is a false comparison.  Unlike a

---

[26] In response to Plaintiffs' RFP No. 8 ("All Communications during the time period between January 1, 2003, and December 31, 2018, concerning Hezbollah or Agents of Hezbollah"), and Plaintiffs RFP No. 9 ("All Communications to or from the U.S. concerning the following matters: (a) Hezbollah or Agents of Hezbollah, (b) The persons and entities listed in Exhibit 1"), Bank Audi objected in relevant part, "Bank Audi objects to Request No. 8 [and No. 9] to the extent that it purports to require Bank Audi to disclose Communications that Bank Audi is prohibited from disclosing by any law, including without limitation, Lebanon's Banking Secrecy Act and Articles 6 and 8 of Lebanese Law 44/2015. Bank Audi will produce Communications to the extent not prohibited by law, including Lebanon's Banking Secrecy Act." *See* Responses and Objections of Defendant Bank Audi SAL to Plaintiffs' First Set of Requests for Production, dated March 18, 2022, at 37-43, ECF 270-19.

seizure warrant, a SWIFT message contains information supplied by a customer to a bank, is a bank document, and contains data confirming that the sender or recipient is a bank customer (as opposed to merely reflecting a third-party's theory about who is, and is not, a customer). Accordingly, there is no basis to conclude that the Moving Defendants' invocation of privilege is inconsistent, let alone evidence of bad faith.[27]

## **CONCLUSION**

For the foregoing reasons, and those set forth in the Moving Defendants' Initial Brief, the Court should grant the Moving Defendants' Motion for Protective Order.

---

[27] Nor is Bank Audi's position in *In re Al-Attabi,* No. 21-mc207 (VSB)(RWL), 2022 WL 229784, (S.D.N.Y. Jan. 26, 2022), *appeal dismissed sub nom. Al – Attabi v. Bank Audi S.A.L.,* No. 22-524, 2022 WL 2116043 (2d Cir. May 9, 2022) at odds with its position in this litigation.  In that case, a bank depositor invoked 28 U.S.C. § 1782 to obtain discovery from Bank Audi's U.S. correspondent banks for use in a lawsuit against Bank Audi pending in Lebanon.  Bank Audi did not claim in that case (just as it has not claimed in this case) that Lebanon's Banking Secrecy Act would preclude production by any U.S. correspondent bank.  Rather, Bank Audi urged that production in *Al-Attabi* should be denied under the discretionary factors of *Intel Corp. v. Advanced Micro Devices, Inc*., 542 U.S. 241 (2004) because production would "put it at a disadvantage" in the Lebanese proceedings since "Bank Audi could not openly address the material [produced by the U.S. correspondents] without violating the Lebanese secrecy law."  *In re Al-Attabi*, 2022 WL 229784 at *9.

Respectfully submitted,

Dated:  August 4, 2022

MAYER BROWN LLP

By:  /s/   *Andrew J. Pincus*
     Andrew J. Pincus
     Marc R. Cohen
     Alex C. Lakatos
     Mayer Brown LLP
     1999 K Street, NW
     Washington, DC 20006
     202-263-3220
     Email: apincus@mayerbrown.com
     Email: mcohen@mayerbrown.com
     Email: alakatos@mayerbrown.com

     *Attorneys for Defendant Bank Audi SAL*

MAYER BROWN LLP

By:  /s/  *Mark G. Hanchet*
     Mark G. Hanchet
     Robert W. Hamburg
     Mayer Brown LLP
     1221 Avenue of the Americas
     New York, NY 10020
     212-506-2500
     Email: mhanchet@mayerbrown.com
     Email: rhamburg@mayerbrown.com

     *Attorneys for Defendant Banque-Libano Française SAL*

DLA PIPER LLP (US)

By: /s/ *Jonathan D. Siegfried*
 Jonathan D. Siegfried
 Jeffrey Rotenberg
 DLA Piper LLP (US)
 1251 Avenue of The Americas
 New York, NY 10020
 212-335-4925
 Email: jonathan.siegfried@dlapiper.com
 Email: jeffrey.rotenberg@dlapiper.com

 *Attorneys for Defendants Byblos Bank SAL*
 *and Bank of Beirut and the Arab Countries*
 *SAL*

DECHERT LLP

By: /s/ *Linda C. Goldstein*
 Linda C. Goldstein
 Dechert LLP
 1095 Avenue of The Americas
 Three Bryant Park
 New York, NY 10036
 212-698-3500
 Email: linda.goldstein@dechert.com

 Michael H. McGinley (*pro hac vice*)
 Dechert LLP
 Cira Centre
 2929 Arch Street
 Philadelphia, PA 19104
 215-994-4000
 Email: michael.mcginley@dechert.com

 *Attorneys for Defendants BLOM Bank SAL*
 *and Fransabank SAL*

SQUIRE PATTON BOGGS (US) LLP

By: /s/ *Gassan A. Baloul*
 Gassan A. Baloul
 Mitchell R. Berger
 Squire Patton Boggs (US) LLP
 2550 M Street, NW
 Washington, DC 20037
 202-457-6155
 Email: gassan.baloul@squirepb.com
 Email: mitchell.berger@squirepb.com

 *Attorneys for Defendants MEAB Bank*
 *s.a.l., Fenicia Bank s.a.l., and Lebanon*
 *and Gulf Bank s.a.l.*

SHEARMAN & STERLING LLP

By: /s/ *Henry Weisburg*
 Henry Weisburg
 Susan Loeb
 Shearman & Sterling LLP
 599 Lexington Avenue
 New York, NY 10022
 212-848-4000
 Email: hweisburg@shearman.com
 Email: susan.loeb@shearman.com

 *Attorneys for Defendant Bank of Beirut SAL*

ASHCROFT LAW FIRM, LLC


By:  /s/  Michael J. Sullivan
      Michael J. Sullivan
      Brian J. Leske
      Ashcroft Law Firm, LLC
      200 State Street, 7th Floor
      Boston, MA 02109
      617-573-9400
      Email: msullivan@ashcroftlawfirm.com
      Email: bleske@ashcroftlawfirm.com

      *Attorneys for Defendant Société Générale*
      *de Banque au Liban S.A.L.*