UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

ROBERT BARTLETT, et al.,

                 Plaintiffs,

        -against-

SOCIÉTÉ GÉNÉRALE DE BANQUE AU
LIBAN SAL et al.,

               Defendants.

---------------------------------------------------------X

**<u>MEMORANDUM & ORDER</u>**
19-CV-7 (CBA) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

       Plaintiffs are a group of 1,279 American nationals, or their surviving family members, who were injured or killed in terrorist attacks that they allege were perpetrated abroad by Hezbollah. (Second Amended Complaint ("SAC"), ECF No. 189; Pls.' Mem. of Law in Supp. of Mot. to Overrule Defs.' Objections and Compel Defs. ("Pls.' Mot."), ECF No. 270-1, at 2.) Plaintiffs' SAC alleges that thirteen banking institutions (Société Générale de Banque au Liban SAL ("SGBL"), Fransabank SAL, Middle East Africa Bank SAL, BLOM Bank SAL, Byblos Bank SAL, Bank Audi SAL, Bank of Beirut SAL, Lebanon and Gulf Bank SAL, Banque Libano-Française SAL, Bank of Beirut and the Arab Countries SAL, Jammal Trust Bank SAL, Fenicia Bank, and Lebanese Canadian Bank SAL ("LCB")) committed, *inter alia*, violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). (SAC, ECF No. 189.)[1]

---

[1] Defendant Lebanese Canadian Bank SAL ("LCB") has not appeared in this action; it was declared by the U.S. Department of the Treasury as "a financial institution of primary money laundering concern" in February of 2011 and was then acquired by Defendant Société

Currently before the Court are a motion to compel, by which Plaintiffs seek an order directing the production of documents and overruling Defendants' foreign bank secrecy objections, and a joint motion by Defendants for a protective order.[2] (*See* Pls.' Mot., ECF No. 270-1; Moving Defs.' Joint Mot. for a Protective Order ("Defs.' Mot."), ECF No. 275; Joint Mem. of Law in Supp. of Moving Defs.' Mot. for Protective Order and in Opp'n to Pls.' Mot. to Compel ("Defs.' Mem."), ECF No. 276). The Court grants Plaintiffs' motion to compel in part and denies Defendants' motion for a protective order in part for the reasons discussed below.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.  Factual Background[3]

Plaintiffs bring the instant action under the ATA and JASTA against Defendants, which are Lebanese commercial banks that Plaintiffs allege "knowingly provid[ed] extensive and sustained material support, including financial services, to Hezbollah and its companies, social welfare organizations, operatives, and facilitators." (SAC, ECF No. 189, ¶¶ 1, 5.) Hezbollah has been designated as a Foreign Terrorist Organization by the U.S. Department of State since 1997. (SAC, ECF No. 189, ¶ 1, n.1.)

---

Générale de Banque au Liban SAL ("SGBL"). (*See* Clerk's Entry of Default, ECF No. 203; SAC, ECF No. 189, ¶¶ 90–92.)

[2] The moving Defendants include 11 of the 13 Defendants, namely: (1) BLOM Bank SAL, (2) Bank Audi SAL, (3) Bank of Beirut SAL, (4) Bank of Beirut and the Arab Countries SAL, (5) Banque Libano-Française SAL, (6) Byblos Bank SAL, (7) Fenicia Bank, (8) Fransabank SAL, (9) Lebanon and Gulf Bank SAL, (10) Middle East Africa Bank SAL, and (11) SGBL. As to the remaining two Defendants, Jammal Trust Bank SAL has been temporarily exempted from discovery due to a pending interlocutory appeal regarding foreign sovereign immunity, and LCB is defunct and has defaulted, as set forth *supra* note 1. (*See* Oct. 8, 2021 ECF Minute Entry and Order (concerning Jammal Trust Bank).)

[3] This Memorandum and Order assumes familiarity with the underlying facts and procedural history of this case.

Plaintiffs' extensive Second Amended Complaint includes 837 pages and 5,735 numbered paragraphs, details information regarding 1,279 Plaintiffs, identifies numerous individuals or entities affiliated with Hezbollah, and discusses 267 Hezbollah-affiliated attacks between 2004 and 2011. (*See generally* SAC, ECF No. 189.) Plaintiffs describe their lawsuit as "the most comprehensive civil ATA complaint ever filed against any bank since the law's 1992 enactment." *Bartlett v. Société Générale De Banque Au Liban SAL* ("*Bartlett I*"), No. 19-CV-7 (CBA) (VMS), 2020 WL 7089448, at *1 (E.D.N.Y. Nov. 25, 2020) (quotation marks omitted) (filed at ECF No. 164). (*See also* Pls.' Mot., ECF No. 270-1, at 2 (describing allegations in SAC; noting 1,279 Plaintiffs).)

## II. Procedural History

### A. The Pleadings and Motions to Dismiss

Plaintiffs filed the complaint on January 1, 2019, and then filed an amended complaint on August 2, 2019. (Compl., ECF No. 1; First Am. Compl., ECF No. 105 ("FAC" or "Am. Compl.").) On January 31, 2020, Defendants filed three motions to dismiss, arguing lack of personal jurisdiction and failure to state a claim.[4] On November 25, 2020, the Honorable Carol Bagley Amon denied the motions in part, concluding that Plaintiffs had adequately pleaded two claims, namely, aiding-and-abetting and conspiracy under JASTA, 18 U.S.C. § 2333(d)(2). *See Bartlett I,* 2020 WL 7089448, at *1, 16, n.16, 18. In her ruling on the motions to dismiss, Judge Amon found that the first amended complaint included allegations regarding each Defendants' provision of "vital financial services to Hezbollah and Hezbollah-affiliated entities, enabling Hezbollah to

---

[4] *See* Jammal Trust Bank SAL's Mot. to Dismiss, ECF No. 134; SGBL's Mot. to Dismiss, ECF No. 136; BLOM Bank SAL, Bank Audi SAL, Bank of Beirut SAL, Bank of Beirut and the Arab Countries SAL, Banque Libano-Française SAL, Byblos Bank SAL, Fenicia Bank, Fransabank SAL, Lebanon and Gulf Bank SAL, Middle East Africa Bank SAL, and SGBL's Mot. to Dismiss, ECF No. 139.

access millions of dollars which ultimately enabled the Attacks that injured Plaintiffs."

*Id.* at *2.

> As Judge Amon observed:
>
> Here, Plaintiffs allege that Defendants knowingly provided Hezbollah with wide-ranging financial services — including maintenance of accounts, accepting donations from abroad, and processing wire transfers — that were integral to financing Hezbollah's terroristic attacks. That conduct differs from the "mere" provision of material support. Plaintiffs have not alleged an isolated provision of financial services to Hezbollah. Rather, they allege a wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers. Plaintiffs allege that despite Hezbollah's purportedly multifaceted nature, it remains singularly dedicated to religiously inspired terrorist attacks, (Am. Compl. ¶ 354); any suggestion that Hezbollah's core bankers would be unaware of their role in those attacks by providing it banking services necessary to funding those attacks is highly dubious.

*Id.* at *11.

As Judge Amon further detailed, the pleadings in this case describe, in some detail, Hezbollah's fundraising and recruitment efforts, including activities such as publicizing "account numbers where members of the public can donate to support Hezbollah's terrorist activities." *Id.* at *2. Plaintiffs also specifically allege the involvement of various bank customers involved in the Business Affairs Component ("BAC") of Hezbollah, which is alleged to be responsible for raising "funds for Hezbollah via money laundering and drug trafficking, as well as via ordinary business enterprises." *Id.* at *1. (*See also* SAC, ECF No. 189, ¶¶ 626–32.) In addition, Plaintiffs allege that (1) "[e]ach Defendant maintained at least three New York correspondent accounts, which the Amended Complaint identifies by specific account number," *Bartlett I*, 2020 WL 7089448, at *2 (citing FAC) (*see also* SAC, ECF No. 189, ¶¶ 132, 155, 174–75, 191, 204, 219, 231, 242, 256, 270, 285, 301); (2) "[e]ach Defendant except for Bank of Beirut is alleged to have maintained accounts for and provided financial services to organizations designated during the relevant timespan as Hezbollah-affiliated

[Specially Designated Global Terrorists ('SDGTs')]," *Bartlett I*, 2020 WL 7089448, at *2; (3) each Defendant "maintained policies and programs during the relevant period to detect illegal account activity and account holders," *id.*; and (4) "other reporting and events publicly connected the Bank Customers to Hezbollah," separate and apart from SDGT designations. *Id.* In addition, the pleadings detail dozens of transactions that involve multiple alleged bank customers associated with Hezbollah. *Id.* at *5; *see, e.g., id.* (discussing, as an example, Plaintiffs' allegations concerning Nazim Ahmad, a "key Hezbollah BAC facilitator," and numerous transactions involving Defendants' correspondent accounts and "Nazim Ahmad's Rilton Traders and Primogems").

Following Judge Amon's ruling on the initial motions to dismiss, Plaintiffs filed a second amended complaint on December 31, 2020. (SAC, ECF No. 189.) Defendants responded by filing additional motions to dismiss.[5] On June 17, 2022, Judge Amon issued a Memorandum and Order, discussing the recently decided Second Circuit cases addressing aiding-and-abetting liability under JASTA, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ("*Kaplan II*") and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). In the Memorandum and Order, Judge Amon reaffirmed her previous determination that Plaintiffs may proceed on two JASTA claims, brought under theories of aiding-and-abetting and conspiracy liability. (*See* June 17, 2022 Mem. and Order, ECF No. 291 (unpublished).)

---

[5] *See* Jammal Trust Bank SAL's Second Mot. to Dismiss, ECF No. 205; Bank of Beirut SAL's Second Mot. to Dismiss, ECF No. 206; BLOM Bank SAL, Bank Audi SAL, Bank of Beirut SAL, Bank of Beirut and the Arab Countries SAL, Banque Libano-Française SAL, Byblos Bank SAL, Fenicia Bank, Fransabank SAL, Lebanon and Gulf Bank SAL, Middle East Africa Bank SAL, and SGBL's Second Mot. to Dismiss, ECF No. 209; Muhammad Baasiri and Jammal Trust Bank SAL's Am. Mot. to Dismiss, ECF No. 245.

Like the FAC, the SAC reads "largely like a treatise on Hezbollah and the Lebanese economic system." *Bartlett I*, 2020 WL 7089448, at *1. It includes near-encyclopedic allegations regarding myriad individuals and entities involved in a wide array of illicit fundraising and money laundering to support Hezbollah, detailing the role of the BAC and others within a series of criminal networks engaged in dealing in conflict diamonds (*see* SAC, ECF No. 189, ¶¶ 838–965, 982–87, 1024–68); narcotics trafficking (*see id.* ¶¶ 1069–1186, 1228–37, 1255–63, 1358–64, 1370–1402); weapons trafficking (*see id.* ¶¶ 817–22, 925–28, 1187–1227); and money laundering (*see, e.g., id.* ¶¶ 7–13, 89, 102, 827–924, 941–53, 966–87, 1024–58, 1370–1402) for the purpose of supporting Hezbollah and facilitating its terrorist mission. The SAC also details specific claims regarding "The System," an alleged network of individuals, entities, and financial institutions through which, Plaintiffs claim, "Lebanese-organized crime families, working with Hezbollah and [Iran's Islamic Revolutionary Guard Corps ('IRGC')], launder billions of U.S. dollars ('USD') annually (much of it originating in bulk cash) from various criminal activities through Lebanese exchange houses and Defendants." (Pls.' Mot., ECF No. 270-1, at 8 (citing SAC, ECF No. 189, ¶¶ 11, 36, 41–47, 83–92, 98, 679–81, 1297–1300, 1345–77).)

The SAC also includes specific factual allegations concerning Lebanese Canadian Bank, which is now defunct. *See supra* note 1. As Judge Amon previously observed, Plaintiffs claim "that Defendant SGBL is liable for certain actions of Lebanese Canadian Bank." *Bartlett I*, 2020 WL 7089448, at *3. As outlined in the SAC, in 2011, the U.S. Department of Treasury determined that LCB was "a financial institution of primary money laundering concern" and it was subsequently acquired by Defendant SGBL. (SAC, ECF No. 189, ¶¶ 87–92, 5724.) A subsequent audit uncovered hundreds of accounts with links to Hezbollah; Plaintiffs allege that certain of these accounts

migrated to Defendants' banks. (*Id.* ¶¶ 95–110; *see id.* at ¶ 105 (listing, for each of the eleven Defendants, at least two former LCB account holders that migrated in 2011– 2012).) *See also Bartlett I*, 2020 WL 7089448, at *3.

### B. Discovery

Discovery in this case commenced in Fall 2021, following a motion by Plaintiffs to start discovery notwithstanding the fact that the parties were, at that time, awaiting a decision on the second round of motions to dismiss following the Second Circuit's rulings in *Kaplan II* and *Honickman*. (*See* Oct. 8, 2021 ECF Minute Entry and Order.) After a court-ordered Rule 26(f) conference, the parties submitted competing scheduling proposals and, following discussion with the Court regarding the proposals, the Court set a schedule for Plaintiffs to issue third-party subpoenas to the major correspondent banks that serviced Defendants, initial requests for production, and briefing on the anticipated motions to compel and protective orders. (*See* Dec. 13, 2021 ECF Minute Entry and Order; *see also* May 10, 2022 ECF Minute Entry and Order (adjusting the schedule for the motion to compel and protective order briefing).) The parties thereafter filed the currently pending motions.

### III. Plaintiffs' Motion to Compel and Defendants' Motion for a Protective Order

Plaintiffs' opening motion sought production of a significant number of bank records, including transactional records, account records, and internal communications (which include "Know-Your-Customer" and compliance documents) for 687 individuals and entities (with alternative spellings provided for many of them). (Pls.' Mot., ECF No. 270-1, at 21; *see also* Pls.' Proposed Document Production Order ("Pls.' Proposed Order"), ECF No. 295-1; Pls.' First Request for the Production of Documents to Defs. ("Pls.' First RFP"), ECF No. 277-1; List of 95 Names, ECF No. 270-13.) Not all of these 687 individuals and entities are named in the pleadings; Plaintiffs have provided a

document proffering information regarding 95 individuals and entities that are not included in the SAC. (Pls.' Mot., ECF No. 270-1 at 54; List of 95 Names, ECF No. 270-13.)

With their reply, Plaintiffs submitted a proposed order that seeks a somewhat narrowed list of discovery materials from the eleven Defendant banks, in accordance with the time periods outlined in Plaintiffs' first request for production of documents. (Pls.' Reply, ECF No. 295; Pls.' Proposed Order, ECF No. 295-1.) Specifically, Plaintiffs now seek (1) all electronically maintained transaction records for 687 persons and entities that are identified in Exhibits 1 and 2 to Plaintiffs' first request for production (referred to collectively as the "List of 687 Names");[6] and for persons or entities who were customers of a Defendant bank (2) all electronically maintained communications concerning the List of 687 Names; (3) all electronically maintained account opening records concerning the List of 687 Names; (4) all electronically maintained compliance records concerning the List of 687 Names; (5) all paper or hard copy compliance records, other than account opening documents; and (6) "[a]ll electronically searchable Communications concerning Hezbollah or its bloc in Lebanon's parliament known as 'the Loyalty to the Resistance.'"[7] (Pls.' Proposed Order, ECF No. 295-1, at 2–3.)

In support of the motion to compel, Plaintiffs also included a list of the 95 individuals and entities who were included in Plaintiffs' document request, but whose

---

[6] Defendants specifically object to this request for various reasons, including but not limited to the concern that many of Defendants' systems are not capable of searching for non-customer counterparty names. (Defs.' Reply, ECF No. 298, at 19–20.) Defendants propose to cure this issue by suggesting that Defendants could "produce account statements for the persons and entities that were their customers, to be supplemented by electronically maintained and retrievable transactional records, to the extent that account statements are not available for production." (*Id.* at 20 (citing Defs.' Proposed Order, ECF No. 298-1, ¶ 4).)

[7] Defendants assert that this request was never propounded in a document request and that Plaintiffs should be required to first request these documents of Defendants in the ordinary course of discovery, "rather than asserting it for the first time" in a proposed order. (Defs.' Reply, ECF No. 298, at 21.) The parties are directed to meet and confer regarding this issue in an effort to resolve it prior to submission of proposed letters rogatory.

names do not appear in the SAC. (List of 95 Names, ECF No. 270-13.) Plaintiffs posit that searching for records associated with these additional names is warranted due to the complexity of the claims and because, as Plaintiffs contend, the case involves individuals who sought to avoid scrutiny and who may have asked family members to open accounts or to complete transactions in their family members' or associates' names. (*See, e.g.*, Pls.' Mot., ECF No. 270-1, at 39 n.53.)

Defendants object to Plaintiffs' requested discovery production, citing Federal Rule of Civil Procedure 26 and Lebanon's banking secrecy statute. (Defs.' Mem., ECF No. 276.) Defendants argue that discovery should be limited to publicly known customers to whom banking services were provided during the relevant time period (which Defendants contend predates November 30, 2011, a short time after the final attack at issue in this case, which occurred on November 14, 2011). (*Id.* at 11, 17, n.8, 20) They also assert that discovery should be permitted only for transactions that are "closely intertwined" with terrorist activities, and that Plaintiffs be required to provide tailored requests directed at each bank. (*Id.* at 11, 13–17.) Defendants also suggest that discovery should be limited to the three Hezbollah-affiliated entities listed by Judge Amon in *Bartlett I*. (*Id.* at 13.)

 In addition, Defendants object to the temporal scope of Plaintiffs' requests, which, generally speaking, seek records for the time period from January 1, 2003, through December 31, 2011, including account opening records, transactional records, and compliance records for a list of persons and entities identified in Exhibit 1 of Plaintiffs' request. (Pls.' First RFP, ECF No. 277-1, at 4, ¶¶ 1–3, 12.) Plaintiffs' document requests also seek account opening records, transactional records, and compliance records from January 1, 2012 to December 31, 2021, for a narrower list of persons and entities identified in Exhibit 2 of Plaintiffs' request. (*Id.* at 4, ¶¶ 4–6.) Exhibits 1 and 2, in

turn, list 366 persons and 307 entities, and 126 persons and 157 entities, respectively. (*Id.* at ECF pages 8–60.) Plaintiffs explain that there is some overlap to these lists and that, in total, they are seeking records pertaining to 687 persons and entities, 592 of whom are specifically identified in the SAC. (Pls.' Mot., ECF No. 270-1, at 54.)[8]

Defendants also request that the Court not reach the merits of Plaintiffs' motion to compel and propose a different approach. (*See* Defs.' Mem, ECF No. 276, at 7, 30–33; Joint Reply Mem. of Law in Supp. of Moving Defs.' Mot. for Protective Order ("Defs.' Reply"), ECF No. 298, at 3–6.) Defendants ask that the Court first determine the proper scope of discovery, then provide Defendants time to seek customer waivers and send letters rogatory; Defendants also suggest that Plaintiffs should continue to seek discovery from U.S.-affiliate banks. (Defs.' Mem., ECF No. 276, at 30–33, 40–41.) And finally, after all other options have been exhausted (however many months or years that may take), Defendants would have the Court conduct a comity analysis in order to decide Plaintiffs' motion to compel. (*Id.* at 33; Defs.' Reply, ECF No. 298, at 3.)

In support of their position, Defendants have submitted an affidavit from the government of Lebanon that discusses Lebanon's bank secrecy law and sovereign interests. (*See* Statement of Suppl. Authority, ECF No. 294; Lebanese Gov't Statement of Interest, ECF No. 294-1.) In addition, together with their reply, Defendants filed a proposed document production order that would, among other things, (1) require Plaintiffs to provide "public source information published prior to November 30, 2011"

---

[8] As noted, with their Reply, Plaintiffs submitted a narrower proposed production order than that originally propounded. Plaintiffs initially requested all communications that refer to the families or representatives of "so called 'Martyrs'" as defined by the document requests, all communications to or from the United States concerning "Hezbollah or Agents of Hezbollah," as defined by the document requests, as well as all communications with persons and entities listed in Exhibit 1 of Plaintiffs' request, and all communications "during the time period between January 1, 2003, and December 31, 2018, concerning Hezbollah or Agents of Hezbollah." (Pls.' First RFP, ECF No. 277-1, at 5 ¶¶ 7–9.)

in support of their requests for records as to each individual and entity identified by Plaintiffs; (2) provide for a meet and confer regarding the proper scope of discovery based on the information provided by Plaintiffs; (3) permit a joint submission to the Court regarding areas of disagreement for a determination as to which "Requested Persons" shall be the topics of discovery; and (4) require that, within 30 days of the identification of a list of the "Requested Persons," Defendants submit proposed requests or letters rogatory to the Court. (Defs.' Proposed Order, ECF No. 298-1, ¶¶ 1–4.) As to what documents would be sought, Defendants propose a narrower list than Plaintiffs, all limited to documents from the period of January 1, 2003 to November 30, 2011. (*Id.* ¶ 4.)

For the reasons that follow, Plaintiffs' motion to compel is granted in part, and Defendants' bank secrecy act objections are overruled. Defendants' motion for a protective order is denied in part, but Defendants will be provided time to seek letters rogatory and may also seek customer waivers in an effort to comply with Lebanese law.

## DISCUSSION

Interpreting JASTA, the Second Circuit recently observed that:

> Congress was clear that its purpose in enacting JASTA was to[] 'provide civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.'

*Honickman*, 6 F.4th at 494 (emphasis added in *Honickman*) (quoting JASTA, Pub. L. No. 114-222, 130 Stat. 852, 853 (2016)). As set forth above, Judge Amon already found that Plaintiffs have adequately pleaded two JASTA claims, based on aiding-and-abetting

11

and conspiracy theories of liability.[9] *Bartlett I*, 2020 WL 7089448, at *16, n.16, 18. In her ruling, Judge Amon further observed that Plaintiffs have included in the pleadings "specific factual averments supporting the inference that Defendants were generally aware of these customers' nefarious activities and that, by providing them access to financial services, they had assumed a role in Hezbollah's terrorist attacks." *Id.* at *9.

Now that this case is in discovery, Plaintiffs seek bank records that they contend are necessary to establish their claims. Given the essential elements of the JASTA claims, the Court finds that meaningful discovery from Defendants is "crucial to the prosecution of the plaintiffs' claims." *Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 311 (E.D.N.Y. 2006), *aff'd*, No. 04-CV-2799 (NG) (VVP), 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007). The Court now turns to the specifics of Plaintiffs' discovery requests and Defendants' objections.

## I. Relevance and Proportionality of Plaintiffs' Document Requests

### A. Background Legal Principles

Federal Rule of Civil Procedure 26(b)(1) provides, in pertinent part, that: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). In deciding discovery matters, Courts must consider "the importance of the issues at

---

[9] In *Honickman*, the court held that "*Halberstam* . . . provides the proper legal framework for how [aiding and abetting] liability [under the ATA] should function." 6 F. 4th at 494 (quotation marks omitted; alterations in *Honickman*). Under *Halberstam*, the elements of aiding and abetting liability under JASTA are: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see also Bartlett I*, 2020 WL 7089448, at *8 (discussing *Halberstam*). For conspiracy liability under JASTA, a plaintiff must prove "(1) an agreement between two or more persons; (2) to participate in an unlawful act . . . ; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477.

stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* The Court has "broad discretion" in determining relevance for discovery purposes. *Michael Kors, L.L.C. v. Su Yan Ye*, No. 18-CV-2684 (KHP), 2019 WL 1517552, at *2 (S.D.N.Y. Apr. 8, 2019).

Rule 26(b) should be "liberally construed," since it is "necessarily broad" in scope. *New Falls Corp. v. Soni*, No. 16-CV-6805 (ADS) (AKT), 2020 WL 2836787, at *1–2 (E.D.N.Y. May 29, 2020) (quoting *MacCartney v. O'Dell*, No. 14-CV-3925 (NSR), 2018 WL 5023947 (S.D.N.Y. Oct. 17, 2018)). Information is considered relevant if "'(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial.'" *N. Shore-Long Island Jewish Health Sys. v. MultiPlan,* 325 F.R.D. 36, 47 (E.D.N.Y. 2018) (quoting *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088, 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016)). A party resisting discovery bears the burden of "showing 'specifically how, despite the broad and liberal construction afforded the federal discovery rules, each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive.'" *Id.* at 48 (quoting *Lindsey v. Butler*, No. 11-CV-9102 (ER), 2017 WL 4157362, at *3 (S.D.N.Y. Sept. 18, 2017)).

In addition, "it is beyond dispute that the Federal Rules of Civil Procedure provide the court with authority to issue discovery orders requiring the disclosure of information protected by foreign bank secrecy laws." *Linde*, 463 F. Supp. 2d at 314; *see also Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa* (*Aérospatiale*), 482 U.S. 522, 544 n.29 (1987).

**B. Discussion**

As set forth above, Plaintiffs have plausibly alleged wide-ranging JASTA claims. *See generally Bartlett I*, 2020 WL 7089448. Given that the central allegations in the case concern Defendants' provision of financial services to individuals and entities associated with Hezbollah, bank account records, transactional records, compliance records, and internal and external communications regarding persons and entities associated with Hezbollah are undoubtedly relevant, as would be documents that provide "direct evidence of a bank's subjective awareness of its role in terrorist attacks — internal memoranda, e-mails, and the like." *Id.* at *10. Concerning Plaintiffs' current requests, Plaintiffs' Reply includes a somewhat narrowed list that largely seeks electronically available records pertaining to 687 individuals and entities, 592 of which are identified in the SAC. (Pls.' Proposed Order, ECF No. 295-1; *see* Pls.' Mot., ECF No. 270-1, at 39.)

1. *Relevance*

Within the List of 687 Names, Plaintiffs have requested discovery regarding 95 individuals and entities that are not named in the SAC. It is Plaintiffs' contention that the names and entities in their List of 95 Names are (1) "SDGTs designated for their respective roles in Hezbollah (44)," (2) "companies controlled by SDGTs that have not yet been designated (11)," (3) "immediate family members of Hezbollah operatives involved in companies controlled by the BAC," or (4) "persons identified in U.S. criminal prosecutions of Hezbollah operatives." (Pls.' Mot., ECF No. 270-1, at 39; *see also* List of 95 Names, ECF No. 270-13.) Plaintiffs essentially seem to argue that discovery in this case should be broad enough to determine if Defendants provided banking services to anyone that Plaintiffs have identified as associated with Hezbollah. (*See* Pls.' Mot.,

14

ECF No. 270-1, at 54.)[10] Defendants counter by arguing that Plaintiffs should only be able to seek discovery for account records for alleged customers who were publicly known, during the relevant time period, to be "closely intertwined with terrorist activities," and for transactions "plausibly related" to terrorist activity.[11] (Defs.' Mem., ECF No. 276, at 11, 13, 15.)[12]

Given the breadth of Plaintiffs' allegations, as discussed above, which includes claims regarding "Hezbollah and its companies, social welfare organizations, operatives, and facilitators," the Court has little difficulty concluding that discovery related to the 592 names and entities listed in the SAC may yield relevant evidence. (SAC, ECF No. 189, ¶ 5.) However, with regard to the additional 95 names, some of Plaintiffs' requests go a step too far at this juncture.[13]

---

[10] In the motion to compel, Plaintiffs argue: "To the extent that Defendants provided financial services to *any* of the persons or entities listed in the RFP, such evidence would be highly relevant to proving Plaintiffs' claims. As explained above, Plaintiffs cannot know in advance of discovery every bank account held by each Hezbollah operative or entities . . . ." (Pls.' Mot., ECF No. 270-1, at 54.)

[11] In support of this argument, Defendants contend, *inter alia*, that "Judge Amon's motion-to-dismiss decision sustained Plaintiffs' JASTA aiding-and-abetting claim only with respect to Plaintiffs' 'strongest allegations,' *i.e.*, the provision of banking services to SDGTs that Plaintiffs alleged were publicly known to have been closely intertwined with Hezbollah's terrorist activities." (Defs.' Mem., ECF No. 276, at 13.) But citing Judge Amon's ruling did not limit discovery to transactions or individuals that are "closely intertwined with terrorist activities." *Bartlett I*, 2020 WL 7089448, at *12–13. Rather, Judge Amon observed that the pleadings allege provision of a wide range of banking services, including "routine banking services," and found that "Defendants' alleged financial support to Hezbollah was 'integral' to the Attacks." *Id.*

[12] In their reply brief, Defendants cite *Honickman* in support of the argument that discovery should not proceed in the absence of allegations of "public source" materials establishing that alleged banking customers are closely intertwined with a principal violator's terrorist activities. (Defs.' Reply, ECF No. 298, at 15–16 (citing *Honickman*, 6 F.4th at 502 n.18).) Defendants' argument appears to overread *Honickman*, which evaluated the sufficiency of the allegations in the complaint; the language cited by Defendants does not expressly address prerequisites for a relevancy finding during discovery on well-pleaded allegations.

[13] Having carefully reviewed the List of 687 Names, as well as the List of 95 Names, the Court finds that Plaintiffs have not established how the following names and entities included in the List of 95 Names are relevant to the actual JASTA allegations contained in the SAC: 1–4, 6,

On the other hand, Plaintiffs have shown that discovery regarding the accounts migrated from LCB to the other Defendants would be relevant. Defendants argue that these migrated LCB accounts are irrelevant because (1) Plaintiffs did not specifically allege that any Defendants provided financial services (or other affirmative conduct) to any migrated accounts; and (2) Plaintiffs did not allege that any banking services provided to the migrated accounts occurred before the last attack (on November 14, 2011).[14] (Defs.' Mem., ECF No. 276, at 18–20.) But if Defendants provided banking services to accounts migrated from LCB even after they knew or should have known that those accounts were associated with customers affiliated with terrorism or Hezbollah, the "continued provision of financial services to these blacklisted account holders certainly evidences a culpable, or at least willfully blind state of mind." *Bartlett I*, 2020 WL 7089448, at *15. Discovery regarding these accounts could yield highly relevant evidence regarding Defendants' state of mind and the duration of Defendants' provision of banking services, factors pertinent to analyzing "general awareness" and "substantial assistance" under JASTA. *See Halberstam v. Welch*, 705 F.2d 472, 477, 488 (D.C. Cir. 1983) (emphasis omitted).

On the question of the appropriate time period, Plaintiffs' requests are too broad. In general terms, the Court finds that the time frame of January 1, 2003, through

---

11, 12, 14, 15, 17, 22, 24–26, 31–33, 35, 37, 39–41, 43–46, 52–53, 58, 59, 74, 87, and 94. (List of 95 Names, ECF No. 270-13.) Given the Court's determination, however, that discovery from abroad will commence in stages, focused first on the bank customers identified in the SAC, this finding is without prejudice should Plaintiffs have additional information to proffer about the relevance of the above names and entities as discovery progresses.

[14] As to the timeline of events, Defendants cite the SAC's allegations that LCB ceased its banking activities on June 22, 2011, and that the Central Bank of Lebanon approved of the purchase and sale of LCB's assets in September 2011. "According to the SAC, therefore, any alleged migration of LCB customer accounts would have taken place — at the very earliest — only in the ten weeks before the last attack on November 14, 2011." (Defs.' Mem., ECF No. 276, at 19–20.)

December 31, 2011, for many categories of documents, as described above, is supported by the allegations in the SAC. (*See* Pls.' First RFP, ECF No. 277-1, at 4, ¶ 12.) As to the records sought from after 2011, pertaining to the individuals and entities identified in Exhibit 2, Plaintiffs claim that their requests "are focused on two categories of individuals and entities: (1) Hezbollah-affiliated customers whose accounts migrated from [LCB] after its collapse and (2) U.S. government-designated SDGTs affiliated with Hezbollah." (Pls.' Reply, ECF No. 295, at 37.) Notwithstanding this narrower scope, Plaintiffs' requests for account opening records, transactional records, and compliance records from January 1, 2012 through December 31, 2021, for the list of persons and entities identified in Exhibit 2, is too broad. (*See* Pls.' First RFP, ECF No. 277-1, at 4–5, ¶¶ 4–6.) Although some records following the alleged terrorist attacks, as well as records related to the 2011 closure of LCB and subsequent migration of some LCB accounts to Defendants, may be relevant to evaluating Defendants' state of mind around the time of the attacks specified in the pleadings, discovery regarding nine years of records *after* 2011 is not sufficiently relevant or proportional. Accordingly, the Court concludes, on the basis of the current record, that account opening records, transactional records, and compliance records for the list of persons identified in Exhibit 2 would be relevant and proportional only for the time period from January 1, 2012 through December 31, 2012. (*See id.*)

      2.  *Proportionality*

      Although many of Plaintiffs' requests might yield relevant evidence, because they are not differentiated with respect to each Defendant, the Court has scope and proportionality concerns, particularly in light of the comity analysis that the Court must undertake, as discussed below. Given the important interests at stake for both the United States and Lebanon, the Court concludes that discovery will proceed in stages.

As discussed *infra*, Plaintiffs will first be permitted to request discovery from Lebanon related to the bank customers and accounts identified in the SAC, broken down by bank, and letters rogatory may be submitted for issuance to Lebanon for narrower lists of customers and accounts. (*See, e.g.*, Pls.' Reply, ECF No. 295, at 3 (discussing 156 accountholders specifically identified in the Complaint).)[15]

In sum, the Court finds that Plaintiffs' revised document requests largely seek discovery that is relevant, with the exception of the specific parties listed above, *see supra* note 13, and with the addition of the temporal limit on the requests for the individuals and entities listed in Exhibit 2 to Plaintiffs' First RFP. Due to proportionality and comity concerns, discussed further below, the Court finds that Plaintiffs' requested order for documents is too broad at this juncture. At the same time, Defendants' proposal is too narrow. As set forth below, the parties are directed to meet and confer, and shall submit a proposed document production order consistent with the Court's findings on relevance, scope, and, as discussed in the next section, proposed requests for assistance or letters rogatory for submission to the Lebanese government.

The Court now turns to Defendants' foreign bank secrecy act objections.[16]

---

[15] As information comes to light during discovery that establishes relevance and proportionality, further efforts to seek documents and records from Lebanon can be conducted in stages, supervised by the Court, as anticipated by the Supreme Court in *Aérospatiale*, 482 U.S. at 546.

[16] Defendants argue that they should submit letters rogatory before the Court does a comity analysis and orders Defendants to provide records in violation of Lebanese law. (Defs.' Mem., ECF No. 276, at 30–31.) The order of procedure for discovery regarding the bank records has been something of a moving target for over a year. (*See generally* Pls.' Reply, ECF No. 295, at 14–17.) The Court notes that, in the parties' joint status report dated December 10, 2021, Defendants' proposed schedule envisioned the parties serving objections and responses to the initial requests for production (RFPs) in March 2022; the parties meeting-and-conferring over those objections in April; the parties filing motions to compel or for a protective order "as to unresolved objections to initial RFPs, including as to bank secrecy" in May; oppositions and replies in June; and "Defendants submit[ting] Letters Rogatory or Requests for Judicial Assistance as to initial RFPs, if necessary following rulings on discovery motions including

## II. Foreign Bank Secrecy Objections

### A. Lebanon's Banking Secrecy Law

The Lebanese Law of September 3, 1956 on Banking Secrecy provides that bank managers and employees "may not disclose any information known to them about the customers' names, funds, and personal matters to any party, be it an individual or a public authority, whether administrative, military or judicial, unless they are authorized in writing by the concerned customer." Banque du Liban, Laws and Circulars, *Lebanese Law of September 3, 1956 on Banking Secrecy*, available in English at https://www.bdl.gov.lb/laws/index/5/32/Laws.html (last visited Mar. 30, 2023). Intentional violation of the law (through disclosure of protected information) can be punished by imprisonment. *Id.*, Art. 8. (*See also* Lebanese Gov't Statement of Interest, ECF No. 294-1, at 1 (describing criminal penalties).) The law contains a carveout, providing that banks cannot invoke banking secrecy in response to a request from "competent judicial authority in lawsuits for corruption offenses and money-related offenses" under Lebanon's Penal Code and the Special Investigation Commission, related to the Law on Fighting Money Laundering and Terrorist Financing, among other exceptions. *Lebanese Law of September 3, 1956 on Banking Secrecy*, Art. 7.

---

foreign bank secrecy," scheduled for "30 days *after* [the] District Court ruling on objections raised by discovery motions including bank secrecy." (Dec. 10, 2021 Status Report, ECF No. 263 (emphasis added).) Plaintiffs have represented that they offered to do letters rogatory for 20 accounts, but Defendants declined the offer in a letter from November 2021. (*See* Nov. 24, 2021 Letter from Moving Defs., Ex. B to Pls.' Reply, ECF No. 295-4, at 2 (observing that "[c]onsistent with Magistrate Judge Merkl's comments during the October 8, 2021 hearing, letters rogatory to the Lebanese authorities should await the Court's ruling on the discovery motions, as to both bank secrecy objections and equally important scope issues").) The Court declines Defendants' invitation for further delay in ruling on their foreign bank secrecy objections.

B. **Comity Analysis**

In *Aérospatiale*, the Supreme Court established that, when evaluating a request for foreign discovery, courts should evaluate the six factors discussed in a (then) draft restatement on foreign relations:

> While we recognize that § 437 of the Restatement may not represent a consensus of international views on the scope of the district court's power to order foreign discovery in the face of objections by foreign states, these factors are relevant to any comity analysis: (1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

482 U.S. at 544 n.28 (quotation marks omitted) (discussing a tentative draft, which has since become section 442 of the Restatement (Third) of the Foreign Relations Law of the United States (1987) ("Restatement")). In addition, "[c]ourts in the Second Circuit also consider two additional factors: '(6) the hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery.'" *Laydon v. Mizuho Bank, Ltd*., 183 F. Supp. 3d 409, 420 (S.D.N.Y. 2016) (quoting *Wultz v. Bank of China*, 910 F. Supp. 2d 548, 553 (S.D.N.Y. 2012)) (paragraph structure modified). "Courts also often consider whether the person resisting discovery is a party to the litigation and, '[w]here the issue is the application of another country's privacy laws, . . . whether such privacy requirements are absolute.'" *Id.* (quoting *Tansey v. Cochlear*, No. 13-CV-4628 (SJF) (SIL), 2014 WL 4676588, at *2 (E.D.N.Y. Sept. 18, 2014)). As the Supreme Court has observed, discovery involving non-U.S. litigants requires careful consideration, and courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may

20

place them in a disadvantageous position" and "supervise pretrial proceedings particularly closely to prevent discovery abuses." *Aérospatiale*, 482 U.S. at 546.

The fifth Restatement factor, a consideration of the interests of the United States and the foreign state, is generally deemed to be the most important factor for consideration. *Laydon*, 183 F. Supp. 3d at 422; *see also SEC v. Gibraltar Glob. Sec., Inc.*, No. 13-CV-2575 (GBD) (JCF), 2015 WL 1514746, at *5 (S.D.N.Y. Apr. 1, 2015) ("The fifth factor — the balancing of national interests — is the most important, as it directly addresses the relations between sovereign nations." (quoting *Madanes v. Madanes,* 186 F.R.D. 279, 286 (S.D.N.Y. 1999))). The Court turns to this factor first.

    1.  *Important Interests of the United States and the Foreign State*

Both parties agree that the United States has important interests in fighting terrorism, but the parties do not concur on how an order to compel disclosure that may clash with Lebanon's banking secrecy law will affect the global war on terror.[17] Courts that have analyzed this question have generally heralded the United States' paramount interest in fighting terrorism. *See, e.g., Linde v. Arab Bank, PLC*, 706 F.3d 92, 115 (2d Cir. 2013) ("The District Court concluded, in line with this precedent, that . . . the important U.S. and international interests in preventing the financial support of terrorist organizations weigh in favor of producing the material at issue."); *Wultz,* 910 F. Supp.

---

[17] For example, Plaintiffs would have the Court prioritize the U.S. interest in fighting terrorism over the privacy interests underlying the Lebanese bank secrecy law and Lebanon's interests in upholding and enforcing its own laws. (Pls.' Mot., ECF No. 270-1, at 32–34.) Furthermore, Plaintiffs question if Lebanese law and Lebanon's legal system are positioned to adequately address Hezbollah (arguing that Hezbollah and its affiliates have been intertwined in Lebanon's government). (*Id.* at 34–36; *see generally* SAC, ECF No. 189, ¶¶ 16–17, 40, 44, 51, 72, 76, 81.) Defendants counter with a discussion regarding recent turmoil in Lebanon, the importance of Lebanon as a partner with the United States in the global war on terror, the importance of promoting the rule of law in Lebanon (rather than undermining it by ordering key players in the banking industry to violate the banking secrecy law), and the argument that failing to respect Lebanon's sovereignty would actually undermine U.S. interests. (Defs.' Mem., ECF No. 276, at 44–53; Defs.' Reply, ECF No. 298, at 31–32; *see also* Lebanese Gov't Statement of Interest, ECF No. 294-1, at 1.)

2d at 559 ("The interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty.") "When the U.S. interest 'in fully and fairly adjudicating matters before its courts' is combined with its interest in combating terrorism, the U.S. interest 'is elevated to nearly its highest point, and diminishes any competing interests of the foreign state.'" *Id.* (quoting *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 443 (E.D.N.Y. 2008)).

Lebanon's interests also deserve substantial consideration. As set forth in the Lebanese Government's Statement of Interest, bank secrecy is important to Lebanon and is rooted in the Lebanese right to personal privacy, which "has a long and important history in the culture and values of the Lebanese people and their laws." (Lebanese Gov't Statement of Interest, ECF No. 294-1, at 1.) In addition, Lebanon submits that "serious criminal sanctions" could flow from a violation of the banking secrecy law, that Lebanon has "great experience in cooperating with the United States," and that it "is active in countering terrorism." (*Id.*) The Statement of Interest also indicates that "[a]ny disclosure in violation of bank secrecy laws would undermine Lebanon's sovereign interests, and negatively affect the government's fight against terror-financing and government efforts to rehabilitate the Lebanese financial sector." (*Id.*) Finally, the Statement of Interest urges that "official requests under the Banking Secrecy Law" be used, and it represents that "Lebanon has procedures in place to balance [Lebanese banking secrecy] laws and policies against appropriate official requests to the Special Investigation Commission for evidence from the Lebanese banks." (*Id.*)

In balancing these competing interests, it is important to underscore that the terrorist financing at issue in this case is alleged to have been extensive and integral to Hezbollah's ability to conduct 276 terrorist attacks that killed or injured 1,279 Americans. In addition, as noted above, the Second Circuit recently observed that Congress's purpose in enacting JASTA was to provide U.S. nationals "'the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries" that have provided material support to terrorists. *Honickman*, 6 F.4th at 494 (quotation marks omitted). Moreover, as Judge Amon already found, the pleadings in this case allege that Defendants constituted "Hezbollah's core financial service-providers." *Bartlett I*, 2020 WL 7089448, at *11. Given the U.S. interests at stake in the litigation, on balance, this factor ultimately weighs in favor of Plaintiffs, with not-insignificant weight to be given to Lebanon's interests. Indeed, Lebanon's interests counsel in favor of submitting formal requests to Lebanon before ordering the production of documents from Defendants, as discussed in more detail below.

2. *The Remaining Factors Under the Restatement & Second Circuit Caselaw*

a. <u>*The Information's Importance to the Litigation*</u>

The first factor considers the importance of the documents or requested information to the litigation. Plaintiffs contend that the requested bank records are directly relevant to the key elements of Plaintiffs' JASTA claims and will contain key evidence concerning general awareness and substantial assistance. (Pls.' Mot., ECF No. 270-1, at 21–22.) As discussed above, Defendants' internal records are highly important to the litigation because they are likely to provide the best evidence of Defendants' knowledge of who its customers were, including those formally designated as terrorist-affiliated or those making suspicious transactions, and their adherence to proper compliance procedures. All of this goes to Defendants' state of mind and, to the extent

there are transaction records, whether Defendants provided substantial assistance and the duration of any assistance. *See generally Bartlett I*, 2020 WL 7089448, at *15. Just as in *Linde*, "[p]roof concerning the flow of money, if any . . . is essential to the plaintiffs' case." *Linde*, 463 F. Supp. 2d at 311. This factor strongly favors Plaintiffs.

      b.  <u>The Degree of Specificity of the Request</u>

The second Restatement factor, specificity, also weighs in favor of Plaintiffs somewhat, provided that discovery proceeds in stages. Plaintiffs' current production request, for the most part, calls for "electronically maintained" records,[18] with the exception of compliance records for people or entities that were customers of Defendants. (Pls.' Proposed Order, ECF No. 295-1.) Defendants' request that Plaintiffs be required to narrow or specify customers bank-by-bank as to discovery for the entire case is, however, unrealistic. Prior to taking discovery, Plaintiffs lack specific knowledge regarding which Hezbollah-associated entities and individuals have been customers (or counterparties to transactions) of each Defendant bank, and Defendants are the only ones with access to that information. *See, e.g., Bartlett I*, 2020 WL 7089448, at *15 (observing that "the paucity of specific allegations concerning when individual wire transfers occurred is a matter for discovery and, if appropriate, summary judgment"). Although, as discussed below, the Court concurs that Plaintiffs' requests should be more tailored for purposes of submitting the first set of letters rogatory to Lebanon, Plaintiffs have attempted to craft specific requests based on the information they have at this stage of the case. Accordingly, this factor supports Plaintiffs' argument overall.

---

[18] As noted *supra*, Plaintiffs' first request for production of documents was broader than what they now seek. (*See* Pls.' First RFP, ECF No. 277-1.)

c. _Whether the Information Originated in the United States_

There is no real dispute that many of the documents and records sought from Defendants originated in Lebanon. (_See_ Defs.' Mem., ECF No. 276, at 40; Pls.' Reply, ECF No. 295, at 55.) While this fact underscores the importance of a careful comity analysis, it is not fatal to Plaintiffs' motion. _See Linde_, 463 F. Supp. 2d at 315 (discussing that the only factor "that arguably favors recognition of the bank secrecy laws as a bar to discovery is the fact that the vast majority of the discovery sought here concerns information that originated outside of the United States," but nonetheless overruling foreign bank secrecy objections). This factor weighs in favor of Defendants.

d. _Availability of Alternative Means of Securing the Information_

As to whether alternative means to secure the information exist, Plaintiffs assert that "internal bank communications are obviously both in Defendants' _sole possession_ and not available from any other source." (Pls.' Mot., ECF No. 270-1, at 22; _see also id._ at 41–43.) In addition, as noted by Judge Amon in _Bartlett I_, "direct evidence of a bank's subjective awareness of its role in terrorist attacks — internal memoranda, e-mails, and the like," _Bartlett I_, 2020 WL 7089448, at *8, may be highly relevant to ascertaining Defendants' general awareness, and whether their provision of banking services aided and abetted terrorist acts. Defendants do not dispute that they may possess some of the requested records, but they would prefer to pursue alternative means to avoid conflict with Lebanese law, as discussed _infra_. In light of recent history in other, similar cases, the Court is skeptical that alternative means are likely to provide sufficient information. Accordingly, this factor squarely supports Plaintiffs, but the Court will direct alternative efforts prior to ordering Defendants to produce bank records.

25

e. _Hardship of Compliance_

The first hardship for Defendants is the risk of violating Lebanese law. Plaintiffs contend that, notwithstanding the existence of Lebanon's banking secrecy law, other than a case from 62 years ago, "no Defendant [has] cited _any_ instance where a Lebanese bank was subjected to criminal prosecution for any purported violations of Lebanon's bank secrecy laws resulting from compelled disclosure in a litigation." (Pls.' Mot., ECF No. 270-1, at 45–46; Pls.' Reply, ECF No. 295, at 67.) Defendants maintain that the risk is realistic. (Defs.' Mem., ECF No. 276, at 42; Lebanese Gov't Statement of Interest, ECF No. 294-1.) As the _Linde_ court observed, however, Lebanon is a member of the Middle East and North Africa Financial Action Task Force, the members of which have "expressly adopted a policy not to rely on bank secrecy laws as a basis for protecting information relating to money laundering and terrorist financing."[19] _Linde_, 463 F. Supp. 2d at 315–16. Defendants counter with the Statement of Interest from Lebanon, and contend that prosecution here is a possibility given the breadth, scope, and high-profile nature of this case. (Defs.' Reply, ECF No. 298, at 32–34.) Accordingly, this case is somewhat differently situated from _Linde_, where the court concluded that "there is nothing in the record indicating that defendant faces a real risk of prosecution; nor does

---

[19] The Court further notes, as did the _Linde_ court, that the memorandum of understanding between the member states to the Middle East and North Africa Financial Action Task Force adopted forty recommendations, including provisions "which specifically renounce bank secrecy as a basis for refusing requests for mutual legal assistance in money laundering and terrorist financing investigations." _Linde_, 463 F. Supp. 2d at 316 n.5. _See_ The Forty Recommendations, _available at_ https://www.fatf-gafi.org/en/publications/ Fatfrecommendations/The40recommendationspublishedoctober2004.html; _see id._ at 4 (providing, in Recommendation 4, that "[c]ountries should ensure that financial institution secrecy laws do not inhibit implementation of the FATF Recommendations"). While the Court recognizes that the type of mutual legal assistance contemplated by these recommendations is government to government, not necessarily assistance in private civil lawsuits, it provides some support for the proposition that Lebanon is committed to combatting terrorist financing. (_See generally_ Defs.' Reply, ECF No. 298, at 28.)

the record show that defendant or its employees have been prosecuted for the Bank's *voluntary* productions in other cases." *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 197 (E.D.N.Y. 2010). Regardless of the likelihood of prosecution for a violation of Lebanese law, the Court finds that an approach similar to that taken in *Linde* is appropriate and that issuance of an order overruling Defendants' bank secrecy objections may put Defendants "in a position to pursue avenues for obtaining permission to disclose the information from [the] pertinent government[] and authorities through letters rogatory or other devices." *Linde*, 463 F. Supp. 2d at 316.

As a second hardship, Defendants posit that compliance will present logistical difficulties given that many of their records are not electronic, and even if electronic, they are not easily searchable, or not searchable to the extent that Plaintiffs request (i.e., searching for counterparties in a transaction as opposed to only the bank's customer). (Defs.' Mem., ECF No. 276, at 26–30.) As set forth above, Plaintiffs have narrowed their requests to make them largely dependent upon searches of electronic databases. (*Compare* Pls.' First RFP, ECF No. 277-1, *with* Pls.' Proposed Order, ECF No. 295-1.) That there may be voluminous search requirements or a high number of responsive records does not excuse Defendants from providing discovery, particularly in light of the importance of the discovery at issue here and the indisputable fact that each Defendant is the singular source for their own internal records. Notably, Plaintiffs offer a protective order as a way to protect customer confidentiality interests. (Pls.' Mot., ECF No. 270-1, at 38, 47.) For all of these reasons, although the Court does recognize some hardship for Defendants, it is not sufficient to outweigh the other factors of the Restatement test.

f.   *Additional Factors*

As to the remaining factors — bad faith, party or non-party status, and whether the other country's privacy laws are absolute — the Court first notes that the record in this case does not evidence bath faith by Defendants at this juncture. Defendants' arguments, principally premised on Lebanon's bank secrecy law and their contentions regarding the lack of relevance and proportionality for the broad scope of discovery sought here, evince advocacy on behalf of their clients, who are tasked with navigating a complex discovery process and competing legal obligations. Accordingly, the bad faith factor is in equipoise.

However, because Defendants are parties to the litigation, they have a higher burden when asserting objections based on foreign law than non-parties would have. *See, e.g., Strauss*, 249 F.R.D. at 454; *Laydon*, 183 F. Supp. 3d at 420. Finally, on the question of whether Lebanon's secrecy laws are absolute, Defendants themselves note that it is possible for the Lebanese secrecy protections to be waived; thus, the law is not "absolute." (Defs.' Mem., ECF No. 276, at 34.) This final factor weighs in favor of Plaintiffs, but it is of little weight compared to other, more important factors.

\*   \*   \*   \*   \*

Balancing the many factors relevant under the Restatement and Second Circuit caselaw, the Court overrules Defendants' foreign bank secrecy act objections. The information and records that Plaintiffs seek from Defendants are of critical importance to a case alleging "that Defendants knowingly provided Hezbollah with wide-ranging financial services — including maintenance of accounts, accepting donations from abroad, and processing wire transfers — that were integral to financing Hezbollah's terroristic attacks." *Bartlett I*, 2020 WL 7089448, at \*11. Not only is the evidence sought by Plaintiffs of central importance to advancing the significant U.S. interest in

28

combatting global terror recognized by JASTA, the bank records they seek are not available through any other means. Additionally, the documents can be described with enough specificity, subject to the Court's directives and supervision, so as not to run afoul of the important principles of international comity recognized in the Restatement test. In addition, Plaintiffs largely seek electronically available records, which substantially mitigates concerns about Defendants' burden of production and potential hardship. On the other side of the scale, the factors that favor Defendants — including Lebanon's sovereign interests, legal risk to Defendants due to the Lebanese banking secrecy law, and the fact that most of the documents originated outside the United States — do not outweigh the factors that favor the conclusion that Defendants' foreign bank secrecy act objections should be overruled.

## III.  Alternative Means for Discovery

As noted above, Defendants request that the Court consider alternative means for discovery so as to navigate Lebanese law, if possible. The Court is skeptical, but hopeful, that Defendants' proposals will yield sufficient information in light of the voluminous discovery that is relevant and proportional to this case. However, the Court concludes that, in the interests of comity, Defendants will be permitted to pursue letters rogatory against the backdrop of the Court's decision to overrule Defendants' bank secrecy act objections. In addition to letters rogatory, Defendants suggest an opportunity to obtain individual customer waivers and discovery from U.S. correspondent banks. (Defs.' Mem., ECF No. 276, at 32, 40–41; Defs.' Reply, ECF No. 298, at 10–12.) Defendants are free to seek individual customer waivers, and Plaintiffs should certainly continue to seek discovery from relevant correspondent banks, but the Court declines to further delay the issuance of letters rogatory.

**A. Individual Customer Waivers**

As other courts have found, it is not realistic to believe that the named individuals or entities will provide waivers, much less that *all* would. *See, e.g., Linde*, 463 F. Supp. 2d at 315 ("Even if [customers and other participants in the transactions at issue] were known, it is unlikely that those persons would willingly disclose information to the plaintiffs for fear that any information verifying their connection to the perpetrators of violent acts would expose them to retaliation."). As noted above, Defendants may request individual customer waivers, but the Court will not delay other discovery steps for those efforts. Such efforts are likely to be very time consuming and ultimately unsuccessful, given the identities of some of the key accountholders and the nature of the records Plaintiffs seek.[20]

**B. Discovery from U.S. Correspondent Banks**

As noted above, Plaintiffs have sought some discovery through third-party subpoenas on U.S.-based correspondent banks. In their reply brief, Plaintiffs state that, based on bank records received from one correspondent bank, they have identified "approximately 3,000 transactions totaling $850 million during [2003 to 2012] for just 47 of the 687 individuals and entities listed in Plaintiffs' request." (Pls.' Reply, ECF No. 295, at 36.) This estimate includes information from "78 customer accounts held by 49 accountholders at Defendant banks" not identified in the SAC.[21] (*Id.*) Although Plaintiffs intimate that these accounts are somehow relevant, they do not provide factual

---

[20] As discuss in Plaintiffs' Reply, some of the individual accountholders are the subjects of rewards offered by the U.S. government for information about them. (Pls.' Reply, ECF No. 295, at 24.)

[21] The Court notes that Plaintiffs represent that they have identified "more than 75 Hezbollah-affiliated accounts" at Defendant banks separate from the 156 identified in the SAC based on transactional records from one of correspondent banks and public disclosures. (Pls.' Reply, ECF No. 295, at 14, 36.)

explication as to how the information gleaned from these records advances their arguments in support of the motion to compel, or whether the records illustrate a relationship between any of the alleged terrorist acts in the SAC and identifiable financial transactions or customers. (*See id.* at 36.)

It may be that the receipt of additional correspondent bank records will shed light on salient issues in the case — Plaintiffs should continue these efforts. However, transaction records are not likely to provide much information about each Defendants' knowledge of its customers or Defendants' general awareness of their customers' activities. Given the need for internal bank documents and records, as discussed above, even if the U.S.-based banks have some records, Defendants are really the only source for the vast bulk of the needed discovery. *See, e.g., Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 156 (E.D.N.Y. 2020).

## C. Letters Rogatory to Lebanese Authorities

As noted above, Defendants seek an opportunity to submit letters rogatory to the relevant Lebanese authorities in order to request that the banking secrecy law restrictions be lifted. (Defs.' Mem., ECF No. 276, at 31, 33–36; Defs.' Reply, ECF No. 298, at 6 (discussing Lebanese Gov't Statement of Interest, ECF No. 294-1).) As anticipated throughout discovery in this case, now that the Court has concluded that Defendants' foreign bank secrecy objections are overruled, in the interests of international comity, Defendants may seek letters rogatory.

In *Linde*, despite overruling the defendant's foreign bank secrecy objections, the court found that the defendant should have the opportunity to seek permission from the relevant authorities, consistent with the Restatement, as explained below:

> Specifically, with respect to an order requiring the disclosure of information located outside the United States which is prohibited by the law of a foreign state, "a court or agency in the United States may require

> the person to whom the order is directed to make a good faith effort to
> secure permission from the foreign authorities to make the information
> available." *Restatement* § 422(2)(a). It is appropriate to provide the
> defendant with that opportunity here.

*Linde*, 463 F. Supp. 2d at 316. The Court is skeptical that the Lebanese authorities will lift

bank secrecy for all of the relevant accountholders given the scope of this case, and the

outcome of the letters rogatory in *Linde* and *Miller*.[22] But the Court remains hopeful,

particularly in light of the Lebanese Government's Statement of Interest and against the

backdrop of Lebanon's commitment to combatting terrorism and money laundering,

that letters rogatory will yield some discovery. Accordingly, the Court concludes that it

is appropriate to provide Defendants the opportunity to submit letters rogatory before

providing a final deadline for responding to Plaintiffs' revised requests for production.

The first set of letters rogatory should be focused on documents and records related to

the 156 accountholders identified in the SAC, which Defendants estimate would yield

no more than 38 names per bank.[23] (Pls.' Reply, ECF No. 295, at 3; Defs.' Mem., ECF No.

---

[22] The discovery process in another foreign bank secrecy case, *Miller v. Arab Bank, PLC*, No. 18-CV-2192 (HG) (PK), is instructive. In *Miller*, a case where plaintiffs sought bank records with respect to 677 individuals and entities, Magistrate Judge Peggy Kuo determined that discovery for bank records from Jordan, the Palestinian Territories, and Lebanon should proceed in stages, and the parties were first directed to submit short lists, as well as proposed letters rogatory. *See, e.g.*, *Miller et al v. Arab Bank, PLC*, No. 18-CV-2192 (HG) (PK), Sept. 24, 2019 Minute Entry. Ultimately, the letters rogatory, which sought a small subset of the records, were denied by the governmental authorities. *See* Aug. 29, 2022 Ltr. to the Hon. Hector Gonzalez, No. 18-CV-2192 (HG) (PK), ECF No. 102 at 2.

[23] Cognizant of Plaintiff's concern that a "rule" tying the scope of discovery to the allegations in a complaint could run the risk of turning "complaints into directories," the Court notes that this ruling does not *limit* discovery to the accounts alleged in the SAC. (Pls.' Reply, ECF No. 295, at 39.) Rather, this ruling directs the parties to meet and confer, and to focus the first set of letters rogatory on the 156 accountholders identified in the SAC with the goal of devising manageable lists of accountholders *by bank*. The decision to take this approach is due to the extraordinary breadth of the allegations in the SAC, the challenges of taking international discovery, and the need for comity and specificity. Even if the SAC read like a "directory" of accounts, the Court would require discovery to proceed in stages, focused on a manageable number per bank for each set of requests.

276, at 10–11.) The parties are directed to meet and confer regarding the specifics of the documents sought, consistent with this opinion.

## CONCLUSION

For the reasons discussed herein, the Court overrules Defendants' Lebanese bank secrecy act objections and denies Defendants' motion for a protective order, in part. Plaintiffs' motion to compel is granted in part and denied in part.[24]

\*     \*     \*     \*     \*

Informed by the Court's concerns about proportionality, specificity, comity, and the appropriate scope of the letters rogatory that should be transmitted to Lebanon, Plaintiffs shall provide a revised document production request and shorter lists of proposed names, broken down by bank, to Defendants by **April 28, 2023**. By **May 30, 2023**, following a meaningful meet and confer, the parties shall file a joint letter (1) outlining any areas of dispute regarding Plaintiffs' revised document production request and lists; and (2) providing (a) a proposed schedule for the filing of requests for judicial assistance and/or letters rogatory for ultimate service on the Lebanese authorities, and (b) a proposed schedule for regular reporting on the progress being

---

[24] The Court does not adopt Defendants' proposed order, which would require Plaintiffs to provide "public source" materials to Defendants regarding the names and entities as to whom Plaintiffs seek to take discovery. (Defs.' Reply, ECF No. 298, at 15–16.) But the Court also does not endorse Plaintiffs' blunderbuss approach of seeking records pertaining to all 687 persons or entities from all eleven moving Defendants. More specificity is appropriate in light of Lebanon's important interests and the Supreme Court's directive that courts closely supervise discovery processes where there are competing foreign interests. *Aérospatiale*, 482 U.S. at 546.

made to serve the requests for judicial assistance and/or letters rogatory, receipt of any responses thereto, and a final deadline for the Lebanese authorities to respond. (*See, e.g.*, *Miller v. Arab Bank, PLC*, No. 18-CV-2192 (HG) (PK), July 8, 2019 Scheduling Order.)

     **SO ORDERED.**

Dated:  Brooklyn, New York
       March 31, 2023

                                    *Taryn A. Merkl*

                                  _____
                                  TARYN A. MERKL
                                  UNITED STATES MAGISTRATE JUDGE