
190 Moore Street, Suite 272, Hackensack, New Jersey 07601
T: 201 265 6400 F: 201 265 0303

1441 Broadway, New York, New York 10018
T: 212 354 0111
www.osenlaw.com

June 26, 2023

**VIA ECF**
Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *Bartlett, et al. v. Société Générale de Banque au Liban, et al.*, 1:19-cv-00007

Dear Judge Amon:

Plaintiffs respectfully write in response to Defendants' pre-motion letter seeking leave to move for reconsideration (or, in an attempt to impress, for judgment on the pleadings) as a result of *Twitter v. Taamneh*, 143 S. Ct. 1206 (2023).

Defendants argue that *Twitter* overrules *sub silentio* the controlling cases in this Circuit and compels dismissal of Plaintiffs' Second Amended Complaint ("SAC"). Defendants are wrong on both counts. To the contrary, the contrast between the "passive nonfeasance" found inadequate to support aiding and abetting liability in *Twitter* and the pervasive, active, and criminal acts Defendants performed for Hezbollah—including laundering billions of dollars for the Foreign Terrorist Organization ("FTO")—strongly supports the viability of Plaintiffs' claims.

**I.    This Court Remains Bound by Circuit Precedent**

District courts in this Circuit "must follow binding circuit precedent 'unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit'"—and that determination "should almost always be left to the Circuit." *United States v. Dupree*, No. 16-cr-84 (ARR), 2016 WL 10703796, at *4 (E.D.N.Y. Aug. 29, 2016) (citation omitted). Accordingly, "even if a Supreme Court case is 'in tension' with Second Circuit precedent, district courts are required to follow the Circuit's precedent." *Id*. (citation omitted).

*Twitter* is consistent with the Second Circuit precedent in all material respects. First, *Twitter* states that: "the defendant must be generally aware of his role as part of an overall illegal or tortious activity," 143 S. Ct. at 1219, and, "[a]s *Halberstam* makes clear, people who aid and abet a tort can be held liable for *other torts* that were '*a foreseeable risk*' of the intended tort." 143 S. Ct. at 1225 (citations omitted, emphasis added). Likewise, the Second Circuit has held that a "defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021). *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860 (same).

Likewise, on substantial assistance, the Supreme Court affirmed that a "close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, but even more remote support can still constitute aiding and abetting in the right case." *Twitter*,

143 S. Ct. at 1225. Defendants incorrectly argue that the assistance must go to the specific attack, but the Supreme Court makes clear that the "require[ment] that defendants have aided and abetted the act of international terrorism that injured the plaintiffs … does not always demand a strict nexus between the alleged assistance and the terrorist act"—they may have assisted other torts. *Id.* As the Supreme Court explained, describing a case relied on in *Halberstam*, "a defendant might be held liable for aiding and abetting the burning of a building if he intentionally helped others break into the building at night and then, unknown to him, the others lit torches to guide them through the dark and accidentally started a fire." *Id.* at 1224 (quoting *American Family Mutual Ins. Co. v. Grim*, 201 Kan. 340, 345–347, 440 P.2d 621, 625–626 (1968)). The Second Circuit came to the same conclusions—relying on the same *Grim* case. *See Honickman*, 6 F.4th at 496 n.9.

Defendants' arguments about the "knowing" element are a red herring—the Supreme Court explained that it does not require knowledge of the attacks: "The 'knowing' part of that inquiry is therefore designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (*even if not always the particular terrorist act*)," 143 S. Ct. at 1229 (emphasis added). This Court already credited allegations (*before* the Circuit issued its recent decisions) that "Defendants knowingly provided Hezbollah with wide-ranging financial services … that were integral to financing Hezbollah's terroristic attacks." ECF No. 164 at 23.

## II.     *Twitter* Supports Plaintiffs' Claims

In *Twitter*, the Supreme Court considered two kinds of aiding and abetting claims by victims of the ISIS terrorist attacks on the Reina nightclub in Istanbul. *See* 143 S. Ct. at 1215. The first alleged that three social media companies were liable for injuries caused by the Reina attack because they "fail[ed] to stop ISIS from using their platforms" to post recruiting and propaganda videos. *Id.* at 1227. The second alleged that Google was liable because it "reviewed and approved ISIS videos on YouTube as part of its revenue-sharing system and thereby shared advertising revenue with ISIS." *Id*. at 1230.

The Court rejected liability under both theories, but for very different reasons. For the first, the Court found that Twitter's alleged conduct amounted only to "passive nonfeasance," and in the absence of affirmative misconduct, the Court explained, "a strong showing of assistance and scienter would thus be required" to support liability. *Id*. at 1227. For Google, the Supreme Court never suggested that these allegations amounted to mere "passive nonfeasance" or were not sufficiently culpable to support liability. Instead, it observed that the plaintiffs had "allege[d] nothing about the amount of money that Google supposedly shared with ISIS," observing that if it "shared only $50 with someone affiliated with ISIS," aiding and abetting liability would be inappropriate. *Id*. at 1230.

Here, Defendant's conduct was more than active—it was criminal and wide-ranging. It was so "pervasive and systemic," *id.*, it was literally called "The System" in Lebanon. *See* SAC ¶ 11 (alleging that Defendants "participate[d] in a criminal enterprise sometimes known in Lebanon as 'The System,'" which "launder[ed] billions of U.S. dollars annually, … provide[d] Hezbollah with financial services and resources, … and help[d] to further facilitate Hezbollah's terrorist activities by enabling the IJO's operational funding, including its operations in Iraq from 2003 to 2011."). In over 800 pages, the SAC details a vast series of crimes Defendants committed on Hezbollah's behalf, including laundering proceeds of drug and arms trafficking. Moreover, Hezbollah maintained liaisons at most of the banks. *See id.*, ¶ 1325. Two Defendants were designated by the

U.S. for their assistance to Hezbollah, as was the chairman of a third (whose bank was targeted in an Israeli air strike). This is easily "conscious and culpable conduct." *Twitter*, 143 S. Ct. at 1228.

Defendants erroneously argue that *Twitter* "requires more than assistance to a terrorist organization, such that a terrorist act is a foreseeable consequence." In fact, the Supreme Court distinguished the *Twitter* allegations from "allegations involving aid to a known terrorist group [that] would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts." 143 S. Ct. at 1228. Thus, if a defendant "systemically and pervasively assisted ISIS"—a terrorist group—then "defendants could be said to aid and abet every single ISIS attack." *Id.* at 1229.

Indeed, far from "the 'mere' provision of material support," this Court found that Plaintiffs "allege a wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers." ECF No. 164 at 24. Defendants' conduct constituted "aid that would assist each of [the FTO's] terrorist acts," *Twitter*, 143 S. Ct. at 1228—as this Court explained, "Plaintiffs allege that Defendants knowingly provided Hezbollah with wide-ranging financial services … **that were integral to financing Hezbollah's terroristic attacks**." ECF No. 164 at 23 (emphasis added). *See id.* at 26 (Defendants' "conduct is certainly 'integral' to the Attacks that were ultimately committed.").

The Supreme Court's analysis of the claims against Google makes clear that financing is important assistance for a terrorist group. And here, third-party discovery (which is ongoing) has already shown that Defendants processed "approximately 3,000 transactions totaling **$850 million**" during the relevant period for Hezbollah entities and individuals—*excluding* transactions with Hezbollah-affiliated exchange houses. ECF No. 295 at 36. *See* ECF No. 164 at 2-3 (noting role of exchange houses in money laundering). Needless to say, this is more than "$50."

Furthermore, the *Twitter* defendants' support was not just passive; their awareness of ISIS's use of their platforms was generalized. They made their services "generally available to the internet-using public with little to no front-end screening by defendants." *Twitter*, 143 S. Ct. at 1226. According to the *Twitter* plaintiffs, the social media defendants had no reason to know who was signing up for their platforms and they even "attempted to remove at least some ISIS-sponsored accounts and content after they were brought to their attention." *Id.* at 1226 n.13.

Instead, these platforms were akin to merely providing a "public area" anyone could enter:

> In this case, it is enough that there is no allegation that the platforms here do more than transmit information by billions of people, most of whom use the platforms for interactions that once took place via mail, on the phone, or in public areas. The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts.

*Id.* at 1228. A bank is not like a "public area." The Supreme Court explained that the *Twitter* "plaintiffs identify no duty that would require defendants or other communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends." *Id.* at 1227. Banks, as shown in *Kaplan*, have a duty to "perform due diligence and not provide banking services to terrorist organizations." 999 F.3d at 849 (internal citation omitted).

      This is Defendants' second request for a motion for reconsideration—this time an attempt to convince the Court that Twitter's "passive nonfeasance" is somehow comparable to the "wide-ranging, years-long, knowing scheme of coordination" alleged here. This Court should reject it.[1]

                                         Respectfully submitted,

                                         /s/ Michael Radine

cc:     All Counsel

---

[1] Defendants assert that Plaintiffs' conspiracy claims are "precluded" by *Freeman v. HSBC Holdings PLC*, 57 F. 4th 66 (2d. Cir. 2023). That is incorrect, but does not appear to be included in their requested motion.