UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK (BROOKLYN)

```
----------------------------:
                            :
BARTLETT, et al.,           :  Case No.: 1:19-cv-0007
                            :
               Plaintiff,   :  Brooklyn, New York
                            :  September 27, 2023
        v.                  :  10:07 a.m. - 11:24 p.m.
                            :
SOCIETE GENERALE de BANQUE  :
au LIBAN SAL, et al.;       :
               Defendants.: :
----------------------------:
```

TRANSCRIPT OF STATUS CONFERENCE HEARING
BEFORE THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiff:<br>Robert Bartlett | OSEN LLC<br>BY:  Gary M. Osen, Esq.<br>Michael Radine, Esq.<br>Ari Ungar, Esq.<br>Tab Turner, Esq.<br>Dina Gielchinsky, Esq.<br>1900 Moore Street - Suite 272<br>Hackensack, NJ 07601 |
| For Plaintiff: | MOTLEY RICE LLC<br>BY:  John M. Eubanks, Esq.<br>28 Bridgeside Boulevard<br>Mt. Pleasant, SC 29464 |
| For Defendant:<br>Societe Generale | ASHCROFT LAW FIRM, LLC<br>BY:  Brian Leske, Esq.<br>200 State Street<br>Boston, MA 02109 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                      Appearances (Continued)

 2

 3      For Defendant:      DECHERT, LLP
        Fransabank SAL      BY:  Michael H. McGinley, Esq.
 4                               Tamer Mallat, Esq.
                            2929 Arch Street
 5                          Philadelphia, PA 19104

 6      For Defendant:      SQUIRE PATTON BOGGS LLP
        Middle East         BY:  Mitchell Rand Berger, Esq.
 7      Africa Bank              Gassan A. Baloul, Esq.
                                 Joseph S. Alonzo, Esq.
 8                          1211 Avenue of the Americas
                            New York, New York 10036
 9
        For Defendant:      DLA PIPER LLP US
10      Byblos Bank         BY: Erin Collins
                            1251 Avenue of the Americas
11                          New York, New York 10020

12      For Defendant:      MAYER BROWN, LLP
        Bank Audi           BY:  Alex C. Lakatos, Esq.
13                          1999 K Street NW
                            Washington, DC 20037
14

15      For Defendant:      MAYER BROWN LLP
        Banque Libano       BY:  Mark G. Hanchet, Esq.
16      Francaise SAL            Robert W. Hamburg, Esq.
                            1221 Avenue of the Americas
17                          New York, New York 10020

18      For Standard        SULLIVAN & CROMWELL LLP
        Chartered Bank      BY:  Andrew Finn, Esq.
19                          125 Broad Street
                            New York, New York 10004
20
        For KBC             ORRICK, HERRINGTON & SUTCLIFFE
21                          BY:  Aaron Rubin, Esq.
                            51 West 52nd Street
22                          New York, New York 10019

23

24

25


            AMM TRANSCRIPTION SERVICE - 631.334.1445
```

1           THE COURT:  Good morning.  Ms. Chan,

2    could you call the case, please.

3           THE DEPUTY CLERK:  This is civil cause

4    for a status conference, Docket 19-cv-0007; Bartlett

5    et al. versus Société Générale de Banque au Liban

6    SAL, et al.

7           Before asking the parties to state their

8    appearance, I would like to note the following:

9    Persons granted remote access to proceedings are

10   reminded of the general prohibition against

11   photographing, recording and rebroadcasting of court

12   proceedings.  Violation of these prohibitions may

13   result in sanctions, including removal of

14   court-issued media credentials, restricted entry to

15   future hearings, denial of entry to future hearings,

16   or any other sanctions deemed necessary by the

17   Court.

18          Will the parties please make their

19   appearances for the record, starting with the

20   plaintiff.

21          MR. OSEN:  Good morning, Your Honor.

22   This is Gary Osen of Osen LLC, on behalf of the

23   Bartlett plaintiffs.

24          MR. EUBANKS:  This is John Eubanks from

25   Motley Rice LLC, on behalf of the Bartlett

```
 1    plaintiffs.

 2              THE COURT:  Who all do we have here for

 3    plaintiff?  I -- my understanding is that there were

 4    more folks here.

 5              MR. RADINE:  Yeah.  Good morning.  This

 6    is Michael Radine, Osen LLC, on behalf of

 7    plaintiffs.

 8              MR. UNGAR:  Good morning, Your Honor.

 9    This is Ari Ungar on behalf of the Bartlett

10    plaintiffs.

11              THE COURT:  Is there anybody else there,

12    Mr. Osen?

13              MR. OSEN:  Yes, Your Honor.  I believe

14    Tab Turner and Dina Gielchinsky are also on on

15    behalf of the plaintiffs.

16              THE COURT:  Okay.  Anybody else on behalf

17    of plaintiff?

18              Okay.  So on behalf of Société Générale?

19              MR. LESKE:  Brian Leske with the Ashcroft

20    Law Firm is here on behalf of SGBL.

21              THE COURT:  Okay.  And Fransabank?

22              MR. MCGINLEY:  Good morning.  This is

23    Michael McGinley of Dechert LLP, on behalf of

24    Fransabank.  I'm also here on behalf of BLOM Bank.

25              THE COURT:  Okay.  Anybody with you, sir?
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MR. MCGINLEY:  I believe my colleague
 2   Tamer Mallat is on, but I'll pause for a second.
 3              THE COURT:  Anybody else on behalf of
 4   Fransabank and BLOM Bank?
 5              Okay.  On behalf of -- if you're -- if
 6   you just answered the question, Mr. McGinley, you
 7   might have been muted.
 8              So far, one party, one attorney has
 9   entered their appearance for Fransabank and
10   BLOM Bank, Michael McGinley; is that's correct?
11              MR. MCGINLEY:  That's correct.  I was
12   asking -- I believe that my colleague, Tamer Mallat,
13   who's not in the office with me, but is in a
14   different office -- I believe he joined the call, so
15   I was just prompting him to state his appearance if
16   he is, in fact, on the line.
17              THE COURT:  Mr. Mallat?
18              MR. MALLAT:  I am on the line.  This is
19   Tamer Mallat of Dechert, joining from New York.
20              THE COURT:  All right.  If you want us to
21   have an accurate record of who's on the call, you do
22   need to speak and say your name when I call your
23   party, okay, everyone?
24              All right.  Middle East Africa Bank,
25   Defendant Lebanon and Gulf Bank and Fenicia Bank?
```

1          MR. BERGER:  Yes.  Good morning.  This is

2     Mitchell Berger from Squire Patton Boggs.  And for

3     those three defendants, I'm joined by my colleagues,

4     Gassan Baloul and Joseph Alonzo.

5          THE COURT:  Okay.  Good morning to you,

6     all.

7          How about Byblos Bank, Bank of Beirut and

8     Bank of Beirut and the Arab Countries?

9          MS. COLLINS:  Hi.  You have Erin Collins

10    from DLA Piper on the line on behalf of those banks.

11         THE COURT:  Okay.  Anybody else with you,

12    Ms. Collins?

13         Somebody just dialed in, potentially.

14         Somebody else -- anybody else on behalf

15    of Byblos, Bank of Beirut and Bank of Beirut and the

16    Arab Countries, other than Ms. Collins?

17         All right.  On behalf of defendant, Bank

18    Audi?

19         MR. LAKATOS:  Good morning.  This is Alex

20    Lakatos with Mayer Brown on behalf of Bank Audi.  I

21    do not have anyone else with me.

22         THE COURT:  Thank you.

23         Defendant, Banque Libano-Francaise; who's

24    here for that bank?

25         MR. HANCHET:  This is Mark Hanchet.  With

1    me is Robert Hamburg, both from Mayer Brown, on

2    behalf of Banque Libano-Francaise.  There's no one

3    else.

4                THE COURT:  Okay.  Thank you.

5                And Jammal Trust Bank SAL and defendant,

6    Dr. Muhammad Baasiri, anybody here?  Is that -- they

7    are somewhat differently situated.

8                Now, because we are here with regard to

9    the modification of protective order, I'm also

10   expecting counsel for Standard Chartered Bank, a

11   non-party.

12               Is anybody here on behalf of Standard

13   Chartered Bank?

14               MR. FINN:  Good morning, Your Honor.

15   Andrew Finn from Sullivan & Cromwell LLP, on behalf

16   of Standard Chartered Bank.

17               THE COURT:  Okay.  And is anybody here on

18   behalf of KBC?  I'm sorry.

19               MR. RUBIN:  Yes, Your Honor.  Yes,

20   Your Honor.  This is Aaron Rubin from Orrick,

21   Herrington & Sutcliffe, and I'm here on behalf of

22   KBC Bank NV, New York branch.  No one else here with

23   me.

24               THE COURT:  And would you mind just

25   spelling your last name, sir, just so we can be sure

```
 1    it's correct on the record.
 2              MR. RUBIN:  Of course.  It's R-U-B-I-N.
 3              THE COURT:  That's what I guessed.  And
 4    is it Eric with a "C" or "K"?
 5              MR. RUBIN:  Aaron, actually.  A-A-R-O-N.
 6              THE COURT:  All right.  I just corrected
 7    my own notes and switched it from Erin with an "E"
 8    to Eric.  So sorry about that.
 9              MR. RUBIN:  No problem.
10              THE COURT:  All right.  So anybody else
11    here on behalf of any non-parties?  If so, please,
12    speak up.
13              All right.  Is there anybody else who has
14    joined the call since we started to put appearances
15    on the record who would like to state their
16    appearance and whose behalf they are here?
17              Anybody at all?
18              MR. TURNER:  Your Honor, this is Tab
19    Turner for the plaintiffs.  I was on originally, got
20    kicked off, and got back on while you were talking.
21              THE COURT:  Okay.  And who are you here
22    for, sir?
23              MR. TURNER:  Plaintiffs.
24              THE COURT:  Oh, I'm sorry.  Okay.  I'm
25    putting you in the plaintiff camp.  Okay.  Moving
```

```
 1    your name up.

 2              Okay.  So as the parties know, we're here

 3    today pertaining to a disagreement about the use of

 4    some discovery materials.  I believe that this was

 5    initiated back towards the end of July with an

 6    opening letter motion.  I have various filings in

 7    response, including a July 28th letter from

 8    Sullivan & Cromwell and a reply from the Osen firm

 9    that was filed on August 1st, as well as -- I guess

10    it's a surreply filed by defendants on August 9th, a

11    document 341 in addition to the papers that were

12    filed in the Freeman docket itself.

13              So this is plaintiffs' motion seeking to

14    modify the protective order.  So, Mr. Osen, would

15    you like to start?

16              MR. OSEN:  Sure.  Good morning, Your

17    Honor again.  This is Gary Osen from Osen LLC, on

18    behalf of the Bartlett plaintiffs.

19              I'm happy to proceed in whatever way you

20    want.  I can, obviously, provide a, sort of, full

21    argument in favor of our motion, or I can also just

22    answer any questions Your Honor may have; whatever

23    the Court thinks is most helpful.

24              THE COURT:  You know, as I read the

25    papers, what jumps off the page is the fundamental
```

1    disagreement as to what you're asking the Court to

2    do and what the applicable standard is.  So I think

3    that those are important places to start.

4         Firstly, what specifically are you

5    seeking to do?  I have your proposed order, but, as

6    the non-parties point out, you haven't provided

7    specificity, which documents, which transactions?

8    Nothing specific on which to make any kind of

9    factual finding if I do need to make a finding of

10   compelling need, which you also take issue with.

11        So I really want to understand what

12   you're trying to do and what you think the standard

13   of proof -- guidance should be for the Court.  What

14   standard am I to apply in evaluating your motion?

15        MR. OSEN:  Okay.  Well, it sounds,

16   Your Honor, like it's probably most efficient if I

17   start from the top and work through the questions

18   you -- that you posed specifically with respect to

19   the type of documents and so forth.

20        As Your Honor knows, we filed our motion

21   on July 21st and submitted a proposed order with our

22   motion.  And we represent 12 -- approximately 1,200

23   plaintiffs here in the Bartlett case that are also

24   plaintiffs in the Freeman cases before Judge Chen.

25   Counsel for five of the nine defendants in Freeman

1    are also represented by Mayer Brown, who represents

2    defendants, Bank Audi and Banque Libano-Francaise in

3    the Bartlett case.

4            The Freeman and Bartlett cases parallel

5    one another in other ways as well.  As you know,

6    Your Honor, the Bartlett case involves detailed

7    allegations that the defendant -- all Lebanese banks

8    knowingly provided substantial assistance to

9    Hezbollah and, to a lesser degree, its parent

10   organization, Iran's Islamic Revolutionary Guard

11   Corps.  These are the two sister terrorist

12   organizations that allegedly injured or killed the

13   plaintiffs in this case.

14           In the Freeman case, which started five

15   years before the Bartlett case, it's basically a

16   mirror image of Bartlett in that it involves

17   allegations that the defendants -- all but one of

18   them European banks -- knowingly provided

19   substantial assistance to Iran's Islamic

20   Revolutionary Guard Corps, or IRGC, and then, to a

21   lesser degree, its vassal organization, Hezbollah,

22   again, with the same allegation that those two

23   sister terrorist organizations, you know, were

24   implicated in and authorized, planned, committed the

25   attacks that injured the plaintiffs.

```
 1                    THE COURT:  So quick question.
 2                    MR. OSEN:  Sure.
 3                    THE COURT:  You mentioned that 50 or so
 4      of the plaintiffs in the Freeman case -- you, you
 5      know, made a quick reference to the idea that
 6      there -- are all of those plaintiffs plaintiffs in
 7      the Bartlett case?
 8                    MR. OSEN:  There is some -- there are
 9      plaintiffs in Bartlett who are not in Freeman and
10      some in Freeman who are not in Bartlett, but they
11      are substantially the same universe.
12                    THE COURT:  Okay.  I mean, because that
13      was one of the issues that Sullivan & Cromwell
14      raised in their letter in terms of the lack of
15      over -- lack of complete overlap.  The plaintiffs
16      are not the same.
17                    Do you agree with that as a factual
18      matter?
19                    MR. OSEN:  Materially, no, I don't agree
20      with that.
21                    THE COURT:  Well, they either are the
22      same people or they aren't, Mr. Osen.
23                    MR. OSEN:  Well, Your Honor, there are --
24      there are over 1,200 plaintiffs.
25                    THE COURT:  I'm aware.  I'm asking you
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1   about Freeman.

2             MR. OSEN:  Yes.  Understood.

3             THE COURT:  Are the plaintiffs in Freeman

4   100 percent included in Bartlett; yes or no?

5             MR. OSEN:  No.

6             THE COURT:  Thank you.  Go ahead.

7             MR. OSEN:  But I don't think -- sorry,

8   Your Honor, but I don't think that makes any

9   difference legally.

10            THE COURT:  I disagree, but go ahead.

11            MR. OSEN:  Okay.  Okay, so without going

12   into the long procedural history of the Freeman

13   case, the short version is that Freeman 1 was

14   dismissed for failure to state a claim, went up on

15   appeal.  And both -- I should say both Freeman 1 and

16   2 were dismissed.

17            But Freeman 1 went up on appeal to the

18   Second Circuit, and it was dismissed -- or its

19   conspiracy claims were dismissed, and the dismissal

20   was -- I'm sorry.  The plaintiffs' conspiracy claims

21   which had been dismissed were affirmed and -- albeit

22   on other grounds.

23            In the meantime, Freeman 2 was stayed

24   while the appeal was pending.  And after that was

25   decided, the Court waited until the Supreme Court

1    decided the case of *Twitter v. Taamneh* before

2    holding a status conference.  So the status

3    conference was held, as Your Honor knows, on June

4    27th of this year, and it related to plaintiffs'

5    motion to amend primarily the -- primarily the

6    Freeman 2 case.  Again, I'm oversimplifying a little

7    bit, but that that's where we stand.

8            So during that conference, the plaintiffs

9    explained that -- and this is a quote from that

10   conference -- that part of what we envision in

11   amending Freeman 2 would be to ask the district

12   court in Bartlett to allow us to incorporate certain

13   information we gathered from third-party subpoenas

14   in that case and to include them in some form, under

15   seal or redacted form, in the Freeman Consolidated

16   Amended Complaint.  At that conference, Judge Chen

17   then granted plaintiffs' motion to amend with a

18   second amended complaint due on September 25th.  And

19   that date has since been extended, I believe, to

20   October 17th.

21           So following the conference in late June,

22   plaintiffs met and confirmed with counsel for

23   KBC Bank and SCB -- that is Standard Chartered

24   Bank -- for their consent to use the records in

25   Freeman that they produced in the Bartlett case

1    under the terms that we just described, in terms of

2    being able to include transactional information in

3    redacted form on the public docket and under seal

4    otherwise in the Freeman case for the amended

5    complaint in that action.  And KBC Bank indicated

6    that it didn't object.  And, obviously, Standard

7    Chartered Bank indicated that they would oppose.

8    And then we filed our July 21st motion and proposed

9    order.

10              So I think Your Honor asked, sort of, two

11   questions.  And the first one, let me address the

12   nature of the records or the information.

13              So, obviously, the main focus of Bartlett

14   subpoena records involves various entities

15   principally identified in the Bartlett complaint as

16   being controlled or affiliated with Hezbollah and

17   transactions that went through correspondent banks

18   in New York that would link those Hezbollah entities

19   or individuals to the defendants in this case.

20              And in response to the Bartlett

21   subpoenas --

22              THE COURT:  Mr. Osen, just pause for one

23   moment.

24              MR. OSEN:  Yes.  Sure.

25              THE COURT:  If somebody is not speaking,

1     please put your phone on mute.  Thank you.

2              Go ahead.

3              MR. OSEN:  Sure.  So the third-party

4     banks produced principally spreadsheets of --

5     reflecting funds transactions through their U.S.

6     dollar clearing activities.  And those spreadsheets

7     reflect originators, beneficiaries, correspondent

8     banks, dollar amounts, date of transfer, et cetera,

9     and are, therefore, sort of, the underlying summary

10    of the swift messages that executed those transfers

11    subject to the subpoena.

12             So what we're seeking to do, just to

13    answer Your Honor's first question, is to be able to

14    reference in -- you know, under seal and redacted on

15    the public docket, specific transactions involving

16    not specifically the Bartlett defendants, but the

17    Freeman defendants where they are either the bank

18    for the customer or beneficiary of a transaction

19    where we contend the customer involved is a

20    Hezbollah-controlled entity or Hezbollah operative.

21             And so, therefore, those data points

22    would be incorporated into the plaintiffs' amended

23    complaint in support of their claim that one or more

24    defendants provided substantial assistance to

25    Hezbollah as well as to the IRGC.

```
 1              THE COURT:  Mr. Osen, with all respect,
 2    you've said very little that has not been included
 3    in the papers.  My question to you that was more
 4    specific is -- you've included this, sort of,
 5    high-level summary of the information that you seek
 6    to include, and you describe it as the names of the
 7    alleged Hezbollah-affiliated entities and
 8    individuals in the transaction summaries, the names
 9    of the Freeman defendants which held the relevant
10    accounts, the dollar amounts of the transactions
11    processed on behalf of the relevant
12    Hezbollah-affiliated customers between 2003 and
13    2011 -- which is, obviously, a fairly substantial
14    length of time -- and, where relevant, transaction
15    dates.
16              As I read this, I have no idea if you're
17    seeking to include three lines of data, five
18    transactions or thousands, and it matters in terms
19    of, kind of, what you are seeking to do and whether
20    you can show a compelling need.
21              MR. OSEN:  Well, I can't -- I can't
22    quantify it at the moment, Your Honor, because we're
23    still in the process of going through the data, but
24    I can say -- I think it's reasonable to say it
25    implicates probably thousands of lines of data.
```

1    But, in practice, the way it's reflected in a

2    complaint allegation is that 1,000 transactions

3    might, nonetheless, be a one-sentence summary.

4         So, for example -- and part of the, sort

5    of, opacity, if you will, is just my reluctance to

6    give an example because, obviously, the records are,

7    you know, subject to the protective order, so -- and

8    we're in open court.

9         But to give an example, if you had --

10   let's take an example that's actually not in the

11   record.  So let's assume, for the sake of argument,

12   that there were 500 transactions for the Martyrs

13   Foundation from a donor entity, the Martyrs

14   Foundation being a core Hezbollah institution.

15        Now, let's say there was a sponsoring

16   organization somewhere else in the world that sent

17   500 transactions to the Martyrs Foundation and was a

18   customer of a Freeman defendant.  So the way that

19   would be reflected in the complaint is, you know,

20   customer X had an account with X defendant during

21   the relevant period from this date to that date,

22   that we know about, and transferred, let's say,

23   $5 million in 20 -- in 500 transactions during that

24   period, full stop.

25        That would be the extent of the

1    disclosure, again, under seal and in redaction on

2    the open docket.  And that would be mirrored for

3    multiple customers, depending, obviously, on the

4    particulars of each case.

5              THE COURT:  Okay.  And, you know, in your

6    papers, you seem to imply that I am to interpret the

7    provision of the protective order in the Bartlett

8    case differently than how the non-party, Standard

9    Chartered, thinks I should interpret that provision

10   and the interplay of the application to use

11   discovery elsewhere, you know, in connection with

12   other provisions within the protective order.

13             What do you think the standard is that

14   should be guiding my decision here?

15             MR. OSEN:  Well, I think there are -- we

16   think that there are two different ways that you can

17   look at this.

18             So the first one, which I won't belabor,

19   is simply that the protective order has a provision

20   in C, you know, paragraph C of the protective order,

21   that expressly creates a mechanism for the

22   disclosure we seek.  And you can simply -- you know,

23   under Section C, you can issue the order we've

24   requested.

25             The second alternative view, if you

1    accepted Standard Chartered or defendants' view

2    that, no, no, that provision is just procedural, it

3    doesn't have any, you know, force and effect itself,

4    then you would go to the, sort of, four-part test in

5    this circuit as to whether a party who produced

6    under a protective order "reasonably relied on it."

7          And there are four parts to that test.

8    There's scope, language of the protective order,

9    level of inquiry the Court undertook before granting

10   it, and the nature of the parties' reliance on it.

11   And I'm happy to go through all four, Your Honor,

12   and, sort of, just map out how that plays out in

13   this particular case.

14          THE COURT:  Well, in this instance,

15   the -- you've argued that there's two ways to look

16   at it.  And the first mechanism -- just looking at

17   paragraph C alone, do you actually believe that

18   anybody who entered into the protective order

19   thought that that provision did away with

20   preexisting circuit law on the topic of protective

21   orders?

22          MR. OSEN:  Not at all, Your Honor.

23          THE COURT:  Okay.  So then how could I

24   look at it through that lens?

25          MR. OSEN:  Because the protective order

1   is negotiated between the parties, unless the Court

2   holds a good-cause hearing.  So the question -- of

3   course, by the terms of any protective order, the

4   parties can negotiate, you know, the mechanisms that

5   are -- will be used.  And that's what paragraph C

6   is; it's a negotiated term.

7           THE COURT:  Right.  And I'm asking you

8   if, as a -- basically, a negotiated contract between

9   the various parties who negotiated it and those who

10  then later acted in reliance on it, do you think

11  that they were reading that provision as doing away

12  with *Martindell* and others binding Second Circuit

13  precedent?

14          MR. OSEN:  Well, I don't think *Martindell*

15  has any relevance here whatsoever.  But to be clear,

16  it's -- within the terms of a protective order, the

17  parties can negotiate whatever they want.  And we

18  negotiated it.  And the back and forth on the

19  protective order language makes clear that it

20  contemplated precisely what we were doing here.

21          So that -- that's certainly our view of

22  whether a protective order can take things outside

23  of the, sort of, traditional analysis under circuit

24  law.  But even if you said, look -- even if

25  Your Honor says, look, I don't care about

```
 1    paragraph C, as far as I'm concerned, that doesn't
 2    matter to me.  I want to look at it through the
 3    broader prism of -- you know, assuming that
 4    provision didn't even exist, it's still a four-part
 5    test.  And that four-part test is not just --
 6    reliance is clearly not in play here.  And, you
 7    know, the case law we cited -- Charter Oak Fire.  We
 8    cited In re EPDM -- makes clear that this is not a
 9    close call.
10              THE COURT:  How do you argue that they
11    did not act in reliance on it?
12              MR. OSEN:  Well, Your Honor, if you look
13    at the four -- maybe it's best if I just go through
14    the four --
15              THE COURT:  I really would appreciate if
16    you would actually answer my questions when I ask
17    them.
18              MR. OSEN:  Oh, absolutely, Your Honor.
19    What have I not answered?
20              THE COURT:  I'm asking you how you are
21    taking the position that they did not act in
22    reliance on the protective order.
23              MR. OSEN:  Sure.  So it's a four-part
24    test in the Second Circuit to determine whether a
25    party has reasonably relied.  The first part of the
```

1    test is scope.  Narrow protective orders covering,

2    for example, specific deposition transcripts or

3    settlement agreements are entitled to greater

4    reliance, particularly if the evidence is generated

5    within the litigation itself.

6              But the PO in this case comprises what

7    the EPDM court calls "a blanket protective order

8    that grants sweeping protections to most, if not

9    all, discovery materials produced in the litigation;

10   even discovery materials that a party would have

11   been required to disclose in the absence of a

12   protective order."

13             So the Court says -- and this is a direct

14   quote -- "Although such blanket protective orders

15   may be useful in expediting the flow of pretrial

16   discovery materials, they are, by nature,

17   overinclusive and are, therefore, peculiarly subject

18   to later modification."  That's an end quote from

19   EPDM at 255 F.R.D. at 319.

20             The second thing that the courts look at

21   is the language of the PO, and when "certain

22   non-parties are permitted to access confidential

23   information, and the parties contemplate the

24   confidentiality order may be modified with a court

25   order."  These provisions do not completely undercut

1  the parties' reliance, but the language does reduce

2  the reasonableness of a party's reliance.

3        And that's a quote from *Pasiak v.*

4  *Onondaga*.  That's a case of Westlaw.  2020 Westlaw

5  2781616 at 2.

6        In this case, the PO contemplates the

7  need to disclose to non-parties setting up specific

8  procedures for making such disclosures, including

9  experts and non-testifying consultants.  And also, I

10 note in passing that it also contemplates the use of

11 records in open court at trial.  So that's, again, a

12 factor against it.

13       We then go, Your Honor, to number three,

14 which is the level of inquiry the Court undertook

15 before granting a protective order.  Those that are

16 granted by stipulation between the parties carry

17 less weight than protective orders granted after a

18 hearing to show good cause.

19       And finally, the nature of the parties'

20 reliance on it.  The classic situation in which a

21 party "relies" on a protective order is where the

22 party creates material during the course of the

23 litigation on the understanding that it will be kept

24 confidential; for example, by signing settlement

25 documents or giving confidential testimony.

1          And we cited a case for that, *Allen v.*
2    *City of New York*; 420 F. Supp 2d 295.
3          Here, SCB was legally required to produce
4    the discovery material, even in the absence of a
5    protective order.  And that's because the subpoena
6    sought relevant records in their possession.
7          So the short answer to all of this is
8    that Standard Chartered Bank can't satisfy even one
9    of the four factors for reasonable reliance as it's
10   defined in this circuit.
11         THE COURT:  All right.  Thank you.
12         Would Standard Chartered like to be
13   heard?
14         MR. FINN:  Yes.  Thank you, Your Honor.
15   Andrew Finn from Sullivan and Cromwell.
16         So, Your Honor, I think it's important --
17   and I just -- perhaps, if it makes sense for Your
18   Honor, I can respond to some of the points that
19   plaintiffs' counsel made, starting with the
20   difference between the Freeman cases and this case.
21         Standard Chartered Bank is a defendant in
22   the Freeman set of cases, is not a defendant in this
23   case.  And plaintiffs' counsel said that these cases
24   were parallel of each other or mirror images, and I
25   think, you know, the record demonstrates the very

1    opposite.

2              What the timeline here is, is that

3    Standard Chartered was named as a defendant in the

4    Freeman cases.  All claims against Standard

5    Chartered were dismissed by Judge Chen.  Many of

6    those claims, including aiding and abetting claims

7    that were dismissed, were affirmed on appeal by the

8    Second Circuit.  There's never been discovery

9    authorized in that case.

10             All those claims were dismissed as of

11   June 2020.  And that's very important context for

12   the subpoena here because the subpoena in the

13   Bartlett case that was issued to Standard Chartered

14   by the Bartlett plaintiffs was issued -- I believe

15   it was dated December 2021 and was served in January

16   of 2022.  So more than a year, almost two years

17   after all claims in the Freeman case were dismissed

18   against Standard Chartered Bank.  No discovery had

19   ever been authorized.  Standard Chartered Bank

20   received this subpoena.

21             And as we set forth in some of the

22   exhibits to our letter to Your Honor in response to

23   the motion, following receipt of that subpoena,

24   which asked for -- well, it's very sweeping --

25   called for all transaction records of hundreds of --

```
 1    related to hundreds of entity names, asked for all

 2    compliance records related to those names, as well

 3    as the Bartlett defendants.

 4              And as most third parties to lawsuits do

 5    when they receive a subpoena, particularly a very

 6    broad subpoena like this one, rather than engaging

 7    in litigation and seeking to quash the subpoena

 8    before the Court, you know, a third party tries to

 9    engage in a negotiation to -- rather than fight

10    about the relevance or other aspects, negotiates the

11    terms of what they're going to produce, and that's

12    exactly what happened here.

13              Standard Chartered negotiated with the

14    plaintiffs' counsel.  There was an agreement on a

15    subset of entities.  They would run searches of

16    their transaction data for the correspondent banking

17    data.  And there was a very express condition that

18    Standard Chartered set for doing that, and it's

19    reflected in the correspondence that was exchanged

20    between the parties, which we've included as

21    exhibits to our letter, and, in particular,

22    Exhibits 2, 3, 4 and 5 to our letter.

23              And what that reflects is that Standard

24    Chartered told plaintiffs' counsel, we will run

25    these searches.  You know, as a third party to the
```

1    Bartlett case, we had no basis to, you know, really
2    thoroughly assess what the relevance was of any of
3    these names.  There's a lot of them listed in the
4    subpoena if you look at Exhibit 1 to our letter.
5    But, you know, rather than fight with the
6    plaintiffs, agreed to do these searches on the
7    condition that they would be used only for this
8    case, the Bartlett case, and that they would be
9    confidential.  And so there's back and forth.
10         At the time that Standard Chartered
11   received the subpoena, the protective order was not
12   in place, but we had been told that it was being
13   negotiated between the parties in the case.  And so
14   Standard Chartered waited with plaintiffs' counsel
15   agreement to wait until the protective order would
16   issue.  And upon the issuance of the protective
17   order, confirm with plaintiffs' counsel that the
18   protective order was in place.
19         Plaintiffs' counsel, even as reflected, I
20   believe, in Exhibit 2, informed the in-house staff
21   at Standard Chartered how to properly designate
22   these records as confidential under this protective
23   order.  They said, you can just mark it
24   confidential.  And in producing these documents,
25   Standard Chartered further reflected the -- a --

1    that key restriction in that agreement pursuant to

2    which documents were produced.

3              And, in particular, if you look at the

4    letter at Exhibit 3 of our submission, when

5    producing -- I believe it was the last set of

6    documents in November of 2022, Standard Chartered

7    specifically said that, "As a reminder, the

8    productions and any related communications from SCB

9    New York" -- that's Standard Chartered Bank, New

10   York, where these documents were produced from --

11   "are provided to you for use in the above-referenced

12   matter only."

13             So the first point of a factual reliance

14   on the protective order here, I don't think the

15   record could be clearer.  As a result of this

16   agreed-to production, there were more than --

17   transaction records related to more than 50,000

18   transactions.  And as plaintiffs' counsel said, each

19   one of these transactions has a series of data

20   associated with each one.  There's a -- many banks

21   that are listed as being intermediary banks,

22   beneficiary banks, sending banks, receiving banks,

23   ultimate beneficiaries.  There is a plethora of

24   information about tens of thousands of transactions

25   that occurred over a more than decade, and in some

1    instances, I think, closer to two-decade period from

2    a very large correspondent bank in New York.

3         And so these, these transactions, were

4    produced in good faith to -- you know, pursuant to

5    the protective order.  And when we looked at the

6    protective order, Your Honor, in terms of the

7    question of the scope of it, the way we read it, I

8    think, is the only really natural reading, and a

9    reading that is consistent with how most protective

10   orders in this district and in the Second Circuit, I

11   think, in many cases is structured.  And the

12   structure of it is really twofold.

13        First, there's -- in Section C of the

14   protective order, there's a provision that all

15   discovery material -- no matter if it's designated

16   confidential or not -- is supposed to be used solely

17   for this litigation for -- for the purpose of

18   conducting this litigation, which is defined to be

19   the Bartlett case.

20        There's obviously this next sentence that

21   follows it in Section C that says, "A party may move

22   before the Court in this litigation by letter motion

23   to request permission to use discovery material in

24   another case."

25        Again, there's no standard that was

1    defined there, other than the Second Circuit's

2    standard for modifying a protective order.  And I

3    don't think plaintiffs' counsel today stated any

4    particular standard that would apply, other than the

5    normal, extraordinary-circumstance standard that is

6    reflected in, for example, *TheStreet.com*, Second

7    Circuit case, and the *Martindell* case.

8            But also importantly for the Standard

9    Chartered production, in addition to Section C,

10   Section D and E of this order specifically set out

11   how confidential information is going to be treated.

12   And there's no dispute here that we properly

13   designated these.  These are financial records,

14   fundamentally, which is included in the list of

15   Section D, paragraph 2, under Section D of what

16   qualifies as confidential information:  Financial

17   information, sensitive personal data, sensitive

18   personal financial information.  Banking records

19   are, kind of, the typical types of things that, when

20   they include client names, bank counterparty names,

21   those are the kind of typical thing that is treated

22   as confidential in litigation.

23           Section D, and then Section E,

24   specifically lays out even more restrictive use than

25   just discovery material, generally, that's in

1    Section C.  The use is restricted to the people

2    listed in Section E.  And plaintiffs' counsel

3    mentioned that that includes some third parties,

4    but, you know, what wasn't mentioned is that what's

5    very express here is that those third parties who

6    are allowed to use the material are allowed to use

7    it only for this case.  And that is a fundamental

8    restriction that is reflected throughout the

9    protective order.

10            If you look at paragraph 8 under Section

11   E, it goes on to talk about how protected

12   information shall not be copied, reproduced,

13   summarized, extracted or abstracted by the receiving

14   party, except to the extent doing so is reasonably

15   necessary for conducting this litigation.

16            Your Honor, if plaintiffs' counsel had

17   indicated to Standard Chartered Bank when they

18   issued this subpoena that maybe they would use some

19   of the tens of thousands of records that the bank

20   was producing for some other case, and to try to, in

21   particular, revive claims that had been dismissed

22   for years against Standard Chartered Bank -- I think

23   there would have been a different outcome in how

24   that -- those documents were produced because that

25   would have been on its face improper, we think,

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    under Rule 45 and, frankly, under Rule 26.

2              So in terms of reliance and the scope of

3    the protective order, we think it's fairly clear and

4    that this should be a fairly straightforward

5    determination.  And in addition, I think what's

6    telling here is that while the plaintiffs' counsel

7    referenced to Judge Chen when seeking amendments of

8    the complaints back in July, that plaintiffs'

9    counsel would be seeking some information from this

10   case that was produced by third parties.  There was

11   no request, and there never has been until, frankly,

12   like, a week or two ago, to engage in discovery in

13   the Freeman case.

14             What normally should happen and what,

15   frankly, distinguishes this case from any of the

16   other cases that plaintiffs cite where there is

17   sharing between cases of discovery materials,

18   discovery has never been authorized in the Freeman

19   cases.  That's because the cases were dismissed for

20   failure to state a claim against Standard Chartered

21   Bank.  And we also don't have identity of the

22   parties.  We don't have the same plaintiffs.

23   There's certainly some overlap.

24             But another point of plaintiffs' request

25   is that they're seeking to not only -- the Bartlett

1    plaintiffs are not only seeking to use it in the

2    Freeman cases, but also share it with another set of

3    plaintiffs in this case that's referred to as the

4    "Stevens case," who have different plaintiffs'

5    counsel.  It's a different set of plaintiffs

6    altogether.

7              And also, there's not identity of the

8    defendants.  I don't think any of the defendants in

9    this case, in Bartlett, are defendants in the

10   Freeman set of cases, you know.  And so, Your Honor,

11   I think under the standard set forth in

12   *TheStreet.com*, which, of course, references this

13   *Martindell* decision, which in no way -- the standard

14   is in no way limited to, you know, testimony that is

15   developed in a case.

16             Protective orders are entered, as

17   Your Honor knows, in many commercial cases all the

18   time in this district.  And a case that we cited

19   which I think is particularly on point is the

20   *Arcesium v. Advent Software* case, which is a

21   Southern District case from March of 2022.  And

22   it's, just for the record, 2022 Westlaw 621973.

23             And that was, you know, in some way, a

24   similar situation where the plaintiffs in that case

25   were engaged in discovery, had a protective order

1    that was largely similar to the one in this case.

2    And in that case, the plaintiffs found something in

3    discovery, and they wanted to assert a new claim

4    against the same defendants.  A little bit different

5    from the case here because they want to actually use

6    the material to assert a claim against different

7    defendants.

8            But putting that distinction aside, the

9    plaintiffs wanted to use that material to assert a

10   different claim and bring another lawsuit against

11   the same -- or some of the same defendants.  And the

12   protective order had a use restriction that said

13   you're only to use the material you get in case one

14   for case one, not for other cases.  And the Court

15   found that it was not a compelling need for

16   plaintiffs to use material they found in case one to

17   assert new claims against defendants in another

18   case.

19           So, finally, Your Honor, I'll just touch

20   on the point that you raised about which documents

21   and which transactions.

22           We have been asking plaintiffs' counsel

23   that precise question since this issue was first

24   raised to us in July.  And the best that we've

25   gotten so far is a list of -- from the over 50,000

1    transactions, a list of about 21,000 transactions.

2    And when we asked plaintiffs, could you, please,

3    tell us what it is specifically you want to use, you

4    know, if it is, in fact, you know, something very

5    limited, that would be a very different situation

6    than if it is information from 21,000 transactions

7    over an almost-decade period.  And to date, we still

8    haven't gotten an answer.  And the last answer we

9    got when we asked was that the plaintiffs probably

10   won't know exactly what they want to say until the

11   night that they have to file the amended complaint

12   in the Freeman cases.

13           So, unless Your Honor has any further

14   questions, I think the protective order clearly

15   prevents what plaintiffs are seeking to do.  There's

16   really no prejudice to the plaintiffs here in

17   Freeman, you know, because they have the normal

18   Federal Rules of Civil Procedure that will apply in

19   the Freeman cases.  They've been ongoing for years.

20   And that case should proceed pursuant to the

21   procedures that Judge Chen has set out for an

22   amended complaint.  If the amended complaint

23   survives a motion to dismiss, which we don't think

24   it should, under prevailing Supreme Court law and

25   Second Circuit law -- if it does, for some reason,

1   there'll be discovery.  But that is --

2          THE COURT:  Just a couple follow-ups for

3   you.  I'm sorry.  Do you want to finish out that

4   thought?  We started speaking at the same time.

5          MR. FINN:  No, Your Honor.  I was

6   finished.  I'm happy to answer any questions.

7          THE COURT:  All right.  So you've, you

8   know, suggested that there's no prejudice to the

9   plaintiffs in the Freeman action by not being

10  permitted to use these documents at this time.  And,

11  of course, one of the considerations that courts

12  have looked to in analyzing these questions is

13  really just baseline efficiency, Rule 1, basic

14  principles of court administration, ease of use for

15  the parties.

16         You know, it is -- if they were to seek,

17  you know, authorization to get the -- you know, some

18  basic, you know, document requests going and things

19  like that, and it were granted, wouldn't it be more

20  efficient to just give -- let them cross apply the

21  discovery?

22         MR. FINN:  Well, Your Honor, if that were

23  a scenario that was in place, perhaps, but that is

24  not the scenario here.  We have dismissed claims

25  right now that have been dismissed for years in

1    Freeman.  There's been no discovery authorized.  Had
2    the plaintiffs -- you know, they did, but we
3    actually didn't respond to the request before Judge
4    Chen denied it.
5            But, you know, we think, under different
6    Second Circuit law, that when you have a dismissed
7    claim and a plaintiff is seeking to amend their
8    complaint, that it is improper to permit a plaintiff
9    to engage in discovery in order to try to sift
10   through in this case tens of thousands of
11   transactions, to try to come up with a claim.
12           You know, that is not how Rule 12 is
13   supposed to work in terms of pleading a claim.  The
14   plaintiff is supposed to plead a claim based on
15   information that they have and they have, you know,
16   appropriate access to.  So, really, we think this is
17   an end run around the normal procedures.  And if you
18   look at the cases that the plaintiff has cited, you
19   know, we're -- that is more of the ilk of, you know,
20   two related cases proceeding in discovery.  And, you
21   know, there's some efficiency to be gained then in
22   that sort of scenario, particularly if there's no
23   relevance objections.
24           But again, here, you know, we haven't
25   seen also, if that scenario were to occur, which it

1     hasn't, authorization of discovery in Freeman, we

2     still haven't been provided, which I think would

3     have to be provided to some court at some point,

4     either Your Honor or Judge Chen, what specifically

5     it is that would allow extraordinary discovery

6     before -- in order to amend a complaint, which is

7     something that courts routinely do not permit.

8              THE COURT:  And, you know, as you point

9     out, Rule 12 requires the District Court to take the

10    allegations as alleged in the complaint at face

11    value and assume them to be true.

12             One of the tricky things in these cases

13    involving voluminous bank records is, of course,

14    getting the information.  You said, of course, any

15    information that they actually utilize in the

16    complaint would need to have been obtained lawfully.

17    And that is, of course, right.  But the bank is

18    like -- the banks -- in cases where you're suing a

19    bank, the sole repository of a lot of the key

20    information, how is a plaintiff supposed to plead

21    their, you know, amended complaint just on

22    information and belief they have conducted

23    transactions with, you know, entities that are on

24    the designated watch list; whatever they want to

25    say.  How would that work from your point of view?

1          Obviously, I'm familiar with the

2    complaint in Bartlett and Freeman and many of the

3    other cases, having written extensively in a prior

4    discovery dispute in this case.  But in all candor,

5    you know, how are they supposed to plead with

6    sufficient specificity to survive *Iqbal* without

7    actual information?

8          MR. FINN:  Well, Your Honor, I think that

9    that's obviously a situation that happens in many

10   cases.  And Rule 12 requires that the plaintiff have

11   some information.  And you generally don't get

12   pre-complaint discovery in order to find information

13   and sift through confidential banking records of a

14   bank.

15          I think, actually, with the -- more

16   fundamentally, for these Antiterrorism Act cases,

17   the fundamental -- it really reflects the

18   fundamental flaw in the claims.  And I don't really

19   mean to go into too much of the merits here, but,

20   you know, the problem of all of these claims is that

21   there's no connection that has ever been alleged,

22   nor, to our knowledge, from any of these 50,000-plus

23   transactions that were produced in this case, that

24   reflect whatsoever any connection between Standard

25   Chartered Bank and any terrorist attack.

```
1              And so these claims are all -- always
2    have been premised on very attenuated links that
3    talk about, you know, correspondent banking
4    relationships and have primarily been pled based on
5    public information that has come out through
6    settlements that have resulted, particularly in the
7    Freeman cases, in terms of, you know, sanctions,
8    compliance with several banks with respect to Iran.
9              And so, you know, there is some public
10   information out there, but, you know, fundamentally,
11   that's an issue that every plaintiff must always
12   face, is that you don't -- under the Federal Rules,
13   you don't get pre-complaint discovery to try to
14   plead a claim.  And particularly, you don't get
15   discovery after the Court has already, in Freeman,
16   ruled as to Standard Chartered Bank that no
17   plausible claim has been pled.  I mean, that's what
18   the Court ruled in Freeman -- in the Freeman cases
19   back in 2020.
20             So, you know, that's an issue that, of
21   course, faces everyone.  It faces both sides,
22   frankly, in litigation.  You don't get pre-complaint
23   discovery.
24             THE COURT:  All right.  And just one
25   more, sort of, hypothetical question on background.
```

1          Had there been no protective order in

2     this case, what steps would you have taken regard to

3     responding to the subpoena?

4          MR. FINN:  Your Honor, we would have --

5     number one, we would have thought much more about,

6     you know, particular -- and required plaintiffs to

7     show us why each one of these names on the list was

8     somehow relevant to the Bartlett case.  That would

9     be the first.

10         And the second would be we would have

11    sought a protective order.  It was made very clear

12    to the plaintiffs, as I said, that Standard

13    Chartered was not going to produce anything in the

14    absence of a protective order.  And, you know, in

15    some cases where there isn't a standby protective

16    order, that in this case it did on its face protect

17    any producing party, including third parties -- had

18    that not been in place, had that not been agreed to

19    and so ordered by the Court, we would have sought

20    that protection either through an agreement with the

21    plaintiffs, or if that agreement was not agreed to,

22    sought relief from the Court.

23         THE COURT:  All right.  Thank you very

24    much, Mr. Finn.  Is there anything else you'd like

25    to add before I turn to your defendant counterparts?

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          I don't know who's taking the lead on

2    behalf of the remaining banks, but I, of course,

3    want to hear from them if they would like to be

4    heard.

5          Anything final, Mr. Finn, for now?

6          MR. FINN:  Nothing else.  Thank you.

7          THE COURT:  Okay.  Thank you.

8          So who's taking the lead today?  I have

9    many names on the filings filed on behalf of the

10   defendants.  I don't know if you guys had organized

11   whether Mr. Streeter is the first name, whether --

12   who is going to start today on behalf of the

13   defendants?

14          MR. MCGINLEY:  Yeah.  Hi, Your Honor.

15   This is Mike McGinley from Dechert.  I'll speak on

16   behalf of the defendants.

17          THE COURT:  Okay.

18          MR. MCGINLEY:  And I'll keep --

19          THE COURT:  Yes.  Linda Goldstein used to

20   be the lead for -- on a lot of these calls, so

21   it's -- the -- I encourage Dechert to continue if

22   that's your decision.  Go ahead.

23          MR. MCGINLEY:  Well, I appreciate that,

24   Your Honor, and we certainly miss Linda dearly here,

25   and I think the rest of the defense team does as

1   well.  And I'll keep things brief because obviously

2   a lot has already been discussed.

3          The moving defendants have two related

4   concerns with this request.  The first one is that

5   the plaintiffs just simply misrepresent the nature

6   of Subsection C in the protective order and the

7   governing standard for modifying it.  And then,

8   second and relatedly, this request threatens to

9   undermine the letters rogatory process that's

10  undergo -- that's ongoing right now by signaling to

11  Lebanese authorities that plaintiffs will seek to

12  use discovery in other proceedings, despite the

13  protective order's clear statement that documents

14  produced here will only be used in this litigation.

15         As to the first point, I would just

16  direct Your Honor to our August 9th letter and the

17  attached e-mail correspondence, which reflects the

18  drafting history here.  As that e-mail

19  correspondence demonstrates, the defendants

20  initially objected to the language in Subsection C

21  that the plaintiffs now seek to rely on, precisely

22  because we were worried that they would take this

23  position.

24         In response, plaintiffs expressly stated

25  that the language simply provides a procedure for

1   them to move to "modify the PO."  And obviously,

2   then, that language stayed in.  And so, having

3   secured agreement on the basis of that

4   representation, we think it's just simply

5   disingenuous for them to argue otherwise now.

6           And that's -- it's important to us not

7   only because we don't know what is even in this

8   category of documents that they seek to use, so we

9   don't know if it has to do with the defendants here,

10  but the critical point is it's important to the

11  defendants that the proper standard is applied under

12  the protective order going forward so that there's

13  no confusion.

14          And as I noted, that's particularly

15  concerning because of the ongoing letters rogatory

16  process, you know, we think it's important to

17  enforce the protective order's restrictions and the

18  Second Circuit's limits so that Lebanese authorities

19  aren't given the misimpression that they -- that

20  they're not able to rely on the express language of

21  the protective order when evaluating what to do

22  about bank secrecy.

23          THE COURT:  All right.  Thank you.

24          Would anybody else like to be heard on

25  behalf of the moving defendants?  If so, please

1    state your name and who you represent.

2              All right.  Thank you very much,

3    Mr. McGinley.

4              Now, going back to you, Mr. Osen.  Is

5    there anything you'd like to say in response to Mr.

6    Finn or Mr. McGinley?

7              MR. OSEN:  Just very briefly, Your Honor.

8              So, you know, obviously, Mr. Finn

9    articulated what is essentially the standard back

10   and forth we have with every third party about

11   third-party discovery of banks, and there's nothing

12   unusual in that.

13             I would just point out, again, that we

14   cited to *Charter Oak Fire* and *In re EPDM*.  Those two

15   cases are, we think, not controlling on Your Honor,

16   obviously.  They're district court cases, but they

17   set forth a standard, and there's been no reputation

18   of what that standard is or its applicability to the

19   case here.

20             I'd just add that, in *EPDM*, the party

21   seeking the records wasn't the same party.  It was

22   an intervener who wanted to use the records in a

23   Canadian proceeding.  So even under the most

24   extenuated circumstances, where you have someone

25   who's unrelated to the original litigation, the *EPDM*

1    Court found that it was appropriate and efficient to

2    grant the relief sought.

3            Lastly, just with respect to the point

4    made a moment ago about the Lebanese Bank secrecy

5    issue, I'll just point out, Your Honor, that Section

6    C -- this is, again, negotiated by the parties --

7    specifically has a provision added by the defendant

8    for instances where someone files a request for

9    permission to use discovery material in another case

10   or matter.  The designating party who obtained the

11   customer waiver shall promptly notify the customer

12   of the motion, which customer will have a reasonable

13   opportunity to object to said motion, as will the

14   designating party.

15           So that PO already puts any Lebanese

16   party, including customers who grant waivers, notice

17   that there may be a mechanism by which the materials

18   could be used in another case.  So as far as we're

19   concerned, you know, that's already squarely in the

20   protective order, in its language.  And that's all I

21   have to add.

22           THE COURT:  So what about the issue of

23   prejudice that Mr. Finn alluded to with regard to

24   your ability to amend your complaint, regardless of

25   your access to these materials?  As you know, under

1    Rule 12, you have to provide on -- you know, upon

2    information and belief, good-faith allegations as to

3    why there is a valid theory of the case with the

4    understanding that you wouldn't be ordinarily in a

5    position to provide specific transaction records and

6    things along those lines because discovery hasn't

7    commenced.

8              Why is that not appropriate here?  Why do

9    you need the actual evidence?  And how is this an

10   extraordinary circumstance?

11             MR. OSEN:  Sure.

12             THE COURT:  I mean, that's really, I

13   think, the million-dollar question that hasn't been

14   answered by plaintiff, the -- what your compelling

15   need is, or extraordinary circumstance, given that

16   you can modify on information and belief.

17             MR. OSEN:  Sure.  The case law in this

18   circuit, and, frankly, in JASTA -- that's Justice

19   Against Sponsors of Terrorism Act -- cases

20   generally, is that information-and-belief

21   allegations are routinely rejected as insufficient.

22   And specificity -- I know we're nominally under a

23   Rule 8 standard, but the reality is that court after

24   court applies something more heightened than a

25   Rule 9 standard to JASTA claims.

1          So the practical reality of this is that
2    these, these complaints should be decided on the
3    merits; that is, with the Court having the benefit
4    of the information that is available.  And remember
5    here, Your Honor, this entire exercise, which
6    presents no burden to any defendant in the Bartlett
7    case, no burden to any defendant in the Freeman
8    case -- the plaintiffs have the records.  The
9    plaintiffs have the information.
10          So the only question is whether the
11   Freeman plaintiffs will be able to properly plead on
12   a redacted open docket and under seal in the Freeman
13   case, the full extent of what they know about the
14   Freeman defendant's actionable conduct, and for the
15   Freeman court to have the benefit of a full record
16   as far as is possible without imposing any burden on
17   any party or third party to decide that motion on
18   the merits.
19          THE COURT:  Have you ever made -- have
20   you made any sort of application to Judge Chen to
21   initiate discovery, or Judge Pollak?
22          MR. OSEN:  So, in answer to that
23   question, Your Honor, discovery was stayed in
24   Freeman 1 by Judge Pollak.  It was never sought in
25   Freeman 2 because of the procedural posture of

```
 1    Freeman 1.  And the entire case of Freeman 2, after
 2    its dismissal, but because of the Freeman 1 appeal,
 3    was stayed until the conference in June of this
 4    year.
 5           And so I know Mr. Finn keeps saying
 6    "dismissed claims," but the reality is that
 7    Judge Chen granted plaintiffs' leave to amend.  And,
 8    frankly, the Stevens plaintiffs have -- had never
 9    amended, so they have an amendment as of right in
10    that case.
11           So there's a live case.  It's just an
12    amended complaint, notwithstanding the prior
13    history.  And we think it's both under the case law
14    we cited and practical efficiency, as Your Honor
15    alluded to, and just common sense that materials
16    that are already in the plaintiffs' possession --
17    that is, the Freeman/Bartlett plaintiff habit --
18    albeit, again, it's a fictional Chinese wall between
19    the two, right, the same counsel represent both sets
20    of plaintiffs.
21           So we know what we know, but essentially
22    what Standard Chartered is asking is that we keep
23    what we know from the Freeman court so that the
24    allegations will not be fully and, you know,
25    carefully pled in their totality.  And we don't
```

1    think that's either efficient or appropriate.  The

2    case should be decided on its merits.  There's no

3    prejudice.

4            I mean, the prejudice to SCB, obviously,

5    is that, to the extent the materials they produced

6    incriminate them in some way, that's bad for them,

7    but it's not a prejudice recognized in this context,

8    which is a different question entirely.  There's

9    simply no burden here.  It's entirely, you know, a

10   legal fiction because we already know.  We already

11   have the material.  So we're simply seeking to give

12   the Court the specificity to make clear that the

13   allegations we set forth are plausible.

14           THE COURT:  Have you made an application

15   to Judge Pollak or Judge Chen to seek discovery on

16   the basis of your circumstances that you say are

17   compelling or extraordinary in that case?

18           MR. OSEN:  Yes.  So, Your Honor, we filed

19   a motion that was --

20           THE COURT:  Well, you know what's filed

21   related to this protective order --

22           MR. OSEN:  Right.

23           THE COURT:  -- but I don't think Judge

24   Chen or Judge Pollak would be inclined to modify a

25   protective order issued by another judge.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1            My question is really simple.  Have you

2    filed an application to Judge Chen or Judge Pollak

3    to commence discovery or issue some subpoenas?

4            MR. OSEN:  We have -- we only filed a

5    motion with Judge Chen to allow for constructive

6    discovery in the Freeman 2 case, which Judge Chen

7    denied because of the hearing today.

8            THE COURT:  Right.  All right.

9            So a couple -- one more question for

10   everybody.  And I'll also give the defendants and

11   the non-party, Standard Chartered Bank, an

12   opportunity to respond to anything final.

13           This motion was originally initiated as a

14   letter motion for a pre-motion conference, and it is

15   not -- was not filed as, like, a full motion, but it

16   has been more than briefed as a full motion.

17           So is there any objection, Mr. Osen, to

18   converting the pre-motion conference letter to the

19   motion and incorporating all the subsequent filings

20   as part of the papers?

21           MR. OSEN:  No objection, Your Honor.

22           THE COURT:  All right.

23           Mr. Finn, any objection to converting

24   your responses to these pre-motion conference

25   letters as you're briefed?

```
 1              MR. FINN:  No, Your Honor.

 2              THE COURT:  On behalf of the moving

 3    defendants, Mr. McGinley, any objection?

 4              MR. MCGINLEY:  No, Your Honor, unless one

 5    of my colleagues pipes up, which I do not expect

 6    them to.

 7              THE COURT:  Okay.  Anybody who is on the

 8    line, does anybody object to converting the

 9    pre-motion conference paperwork to the motion

10    itself?

11              Okay.  Is there anything you'd like to

12    say in brief response to Mr. Osen, starting with

13    you, Mr. Finn?

14              MR. FINN:  Just briefly, Your Honor,

15    because it was raised by Mr. Osen.  The two cases

16    that he's relying upon, which I think were

17    referenced in his reply letter, this *EPDM* case and

18    this *Charter Oak* case -- you know, those cases if

19    you look at them are quite distinguishable from this

20    scenario.  *EPDM*, the court referred to the

21    protective order there as a blanket order.

22              And as I described previously, the

23    protective order here, while it has a blanket

24    provision that covers all discovery material, it

25    also has a very particularized protection for
```

```
 1    confidentially designated material, and it's
 2    specific categories, it includes financial
 3    information.  So really, that, sort of, blanket
 4    order type case law really shouldn't apply in this
 5    case.
 6              And then on the *Charter Oak* case, you
 7    know, we all -- that is more of the scenario that
 8    Your Honor's hypothetical went to, where you have
 9    two cases where in the one case there's no doubt
10    that -- first of all, it's the same defendant, and
11    there's no -- which it isn't here.  And there's no
12    question that in the parallel case, there's
13    discovery ongoing, and it's just a more efficient
14    path, which is, you know, very different from the
15    scenario here.
16              You know, and, finally, the suggestion
17    that, you know, somehow these 50,000 records
18    incriminate Standard Chartered Bank, we're still
19    waiting for the plaintiffs to explain that to us.
20    They haven't.  And so, you know, the suggestion of
21    that is, you know, I think, inappropriate until they
22    could actually, you know, show us what they think
23    has anything to do with the Freeman case, and we're
24    still waiting for that.
25              THE COURT:  Mr. McGinley, anything final?
```

1          MR. MCGINLEY:  The only thing very

2    briefly, Your Honor, is Mr. Osen pointed to that

3    last sentence in paragraph C, which, I think, just

4    further highlights that the second sentence is

5    purely procedural.  Neither of those sentences say

6    anything about the substantive standard, which is

7    the *Martindell* standard, and nothing that Mr. Osen

8    said in any way disputed the parties' drafting

9    history.  Thank you.

10          THE COURT:  Okay.

11          All right.  So I want to thank you all

12   for your careful presentation today and your

13   thorough briefing.  I am prepared to rule, and I

14   conclude that, in accordance with the Second

15   Circuit's observation in *S.E.C. v. TheStreet.com*,

16   273 F.3d 222 at 230, it is presumptively unfair for

17   courts to modify protective orders which assure

18   confidentiality and upon which the parties have

19   reasonably relied.

20          I've evaluated the four-part test

21   plaintiff has suggested that I review, but at the

22   end of the day, the Second Circuit's teachings in

23   *TheStreets* and in the *Martindell* case give the Court

24   substantial concern that upending the parties

25   agreed-upon protective order in this case, which did

1   help to facilitate the discovery production, would

2   be fundamentally unfair to the parties who acted in

3   reliance on it.

4   I do find that there was substantial

5   reliance on the protective order that was put into

6   place in this case.  As the parties have

7   demonstrated through the exhibits filed in

8   connection with their motions, the language at issue

9   was carefully negotiated.  The parties went back and

10  forth on it.  And I'm looking to the exhibits to

11  Standard Chartered Bank response filed at ECF 339.

12  They have e-mail correspondence and other

13  documentation illustrating the importance of the

14  protective order being in place prior to producing

15  the records and their reliance not only on the

16  protective order, but on the confidentiality

17  designation specifically as needing to be present in

18  the case prior to their willingness to comply with

19  the subpoena.

20  By permitting the parties to engage in

21  the protective-order process on their own and not

22  burdening the Court, I do not find that the Court's

23  lack of involvement in any way undercuts the

24  strength of this protective order.  To the contrary,

25  one of the stated purposes the Second Circuit has

1    repeatedly looked to in relying on affirming or

2    upholding parties reliance on protective orders is

3    the idea the protective orders facilitate discovery

4    and efficiency.  And although plaintiffs contend

5    that it would be efficient to transfer the discovery

6    in this case over to the other cases, those

7    efficiencies are different than the efficiencies

8    that the Second Circuit recognizes in the

9    protective-order context.

10            By promoting efficiency and permitting

11   the parties to engage in discovery in the way that

12   they have conducted here is important.  It's an

13   important principle that needs to be encouraged and

14   protected, or else all sensitive subpoenas would

15   come back to the Court for litigation, protective

16   orders, and that simply would bring the discovery

17   process to a grinding halt.  So I don't find that

18   the lack of inquiry or lack of involvement in

19   putting a protective order in this case has any

20   weight whatsoever in my determination to enforce the

21   protective order in this case.

22            With regard to the language of the order,

23   as has been discussed at length, the protective

24   order in this case is very clear.  It states that --

25   in paragraph C that all discovery materials, or any

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    copies, summaries or abstracts thereof shall be used

2    solely for the purpose of conducting this

3    litigation, including for purposes of mediating or

4    otherwise attempting to settle this litigation;

5    however, a party may move before the Court in this

6    litigation by letter motion to request permission to

7    use discovery material in another case or matter.

8              So the language as to what material is

9    covered is clear.  There's a mechanism in place to

10   come to the Court.  And I interpret that language to

11   be against the backdrop of preexisting Second

12   Circuit case law at the time that this was drafted.

13             In addition, as the parties have noted,

14   there's a confidentiality designation within

15   paragraph Subsection D of the agreement that

16   specifically provides for additional protections

17   for -- that material that is designated as

18   confidential information, which is how the

19   information is designated here that has been

20   produced by Standard Chartered Bank.

21             Inherent in bank records is the inclusion

22   of sensitive personal data, personal identifiers,

23   all kinds of financial information.  There may be,

24   you know, various sensitive personal data of the

25   type that was specifically designated to be provided

1    special confidential protection under the protective

2    order.

3          So, having reviewed the back and forth

4    between the parties in determining what the language

5    of the protective order should be, I do find that

6    there was substantial reliance by Standard Chartered

7    Bank in the determination to produce these records.

8    And I credit Mr. Finn's representation that, if they

9    were in the position where there was no protective

10   order in place in this case, they would have sought

11   a protective order prior to complying with the

12   subpoena because of the nature of the information

13   sought.

14         So at this juncture, in the absence of

15   any sort of blessing by Judge Pollak or Judge Chen

16   to commence discovery in the other matters, I am

17   denying plaintiffs' motion to modify the protective

18   order without prejudice.

19         If you are -- discovery is commencing,

20   and the discovery may be cross-applied.  You can

21   come back, but there would need to be a change of

22   factual circumstance and the legal circumstances

23   that could flow from that change of factual

24   circumstance to come back, but I do deny the motion.

25         Is there anything else I should do today,

1     Mr. Osen, starting with you?

2               MR. OSEN:  Yes, Your Honor.  Just one

3     question for housekeeping purposes since we have the

4     opportunity to be before you.

5               We have a motion pending for informal

6     conference on our first set of interrogatories that

7     was filed in -- March 3rd, and I was wondering if it

8     would be possible to schedule that conference.

9               THE COURT:  When was that filing made?

10    I -- it's not popping up as a motion on the docket.

11              MR. OSEN:  It was first filed at ECF 318

12    on March 3rd.

13              THE COURT:  Oh, it was filed as a letter,

14    so I think it didn't flag our attention to the same

15    degree it would have if it was a motion.

16              So you're seeking to have it -- so my

17    understanding is that this is -- this is the

18    interrogatories?

19              MR. OSEN:  Yes.

20              THE COURT:  Okay.  And you're looking to

21    schedule another conference?

22              MR. OSEN:  Well, under your rules, as I

23    understand it, the parties had to file a joint

24    letter initially for request of informal conference.

25              THE COURT:  Okay.  I'm going to have to

         AMM TRANSCRIPTION SERVICE - 631.334.1445

1    refresh on this matter to determine whether or not

2    we need a conference.  Unfortunately, because it

3    wasn't filed as a motion, I think it, kind of, slid

4    by under the radar screen.  I do remember the issue,

5    but at the time that this came through, I think we

6    were actively working on the other opinion and

7    engaged in a lot of motion practice in other cases,

8    so I think that the need for a conference might have

9    slipped by us.  So my apologies for that.

10           Mr. McGinley, do you believe this is --

11   we need a conference on this, or do you think this

12   is adequately addressed in the papers?

13           MR. MCGINLEY:  Your Honor, as we present

14   in the papers, we don't think a conference is

15   necessary.  We think that the papers show why it

16   would be inappropriate and premature to proceed with

17   interrogatories at this stage.  Of course, if Your

18   Honor wished to have a conference, we would

19   participate, obviously.

20           THE COURT:  Okay.  Let me take a look at

21   the papers, and we will make a determination as to

22   whether or not we need a conference.

23           But thank you for flagging it, Mr. Osen.

24   I appreciate it.

25           Is there anything else besides that that

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1    I should do today, Mr. Osen?

2              MR. OSEN:  Not on our end, Your Honor.

3              THE COURT:  Okay.  Thank you.

4              Mr. McGinley, on behalf of the moving

5    defendants?

6              MR. MCGINLEY:  Nothing else, Your Honor.

7    Thank you.

8              THE COURT:  Mr. Finn, anything on behalf

9    of Standard Chartered?

10             MR. FINN:  Nothing else.  Thank you,

11   Your Honor.

12             THE COURT:  All right.  Thank you, all.

13   Have a great day.  Take care.

14

15                      0o0

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E
 2
 3        I, Adrienne M. Mignano, certify that the
 4   foregoing transcript of proceedings in the case of
 5   Bartlett, et al., v. Société Générale de Banque au
 6   Liban SAL Docket #20-CR-00144 was prepared using
 7   digital transcription software and is a true and
 8   accurate record of the proceedings.
 9
10
11   Signature   _Adrienne M. Mignano_
12               ADRIENNE M. MIGNANO, RPR
13
14   Date:      September 28, 2023
15
16
17
18
19
20
21
22
23
24
25
```