# EXHIBIT A

**Proposed Brief of Proposed *Amici***

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

ROBERT BARTLETT, et al.,

   *Plaintiffs,*

 v.

SOCIÉTÉ GÉNÉRALE DE BANQUE AU
LIBAN SAL, et al.,

   *Defendants.*

Case No. 19-cv-7 (CBA) (TAM)
(Amon, J.)

## BRIEF OF THE INSTITUTE OF INTERNATIONAL BANKERS AND THE EUROPEAN BANKING FEDERATION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

Paul W. Hughes
Andrew A. Lyons-Berg*
Caleb H. Yong*
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Counsel for* Amici Curiae
*The Institute of International Bankers*
*The European Banking Federation*


**pro hac vice* to be filed

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................................... iii

Interest of the *Amici Curiae* ......................................................................................................... 1

Introduction ..................................................................................................................................... 2

Argument ......................................................................................................................................... 5

    I.    *Twitter*'s analysis of aiding-and-abetting liability represents a sea change from the Second Circuit's prior approach. ................................................. 5

        A.    *Twitter* rejected the formulaic application of *Halberstam* in favor of a focus on a secondary actor's culpability and nexus to the primary wrongdoing. .......................................................................... 5

        B.    The *Twitter* standard sets more stringent constraints on aiding-and-abetting liability than the standard this Court applied in its prior rulings in this case. ...................................................... 9

    II.    Expansive aiding-and-abetting liability under JASTA unfairly burdens legitimate businesses like banks and ultimately undermines anti-terrorism efforts. ..................................................................................... 15

Conclusion ..................................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Bartlett v. Société Générale de Banque*
  *au Liban SAL*, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020)...................3, 9, 10, 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................16

*Berman v. Morgan Keegan & Co.*,
  455 F. App'x 92 (2d Cir. 2012) ...............................................................................14

*Camp v. Dema*,
  948 F.2d 455 (8th Cir. 1991) ......................................................................................9

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) .........................................................................................5

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ............................................................................. *passim*

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ...................................................................................3, 5, 6

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018)................................................................................................18

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021)..............................................................................3, 5, 13

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)..............................................................................5, 6, 10

*Monsen v. Consolidated Dressed Beef Co.*,
  579 F.2d 793 (3d Cir. 1978).............................................................................3, 11, 15

*Nestlé USA, Inc. v. Doe*,
  141 S. Ct. 1931 (2021)................................................................................................18

*Nye & Nissen v. United States*,
  336 U.S. 613 (1949)...................................................................................7, 8, 12, 14

*Oil, Chem. & Atomic Workers Int'l Union v. Dep't of Energy*,
  288 F.3d 452 (D.C. Cir. 2002) ....................................................................................4

*PLB Invs. LLC v. Heartland Bank & Tr. Co.*,
  2021 WL 492901 (N.D. Ill. Feb. 9, 2021) ...............................................................14

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013).........................................................................................2

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)..................................................................................5, 10

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)....................................................................................................18

**Cases—continued**

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023) ................................................................................ *passim*

*Union of Needletrades, Indus. & Textile Emps. v. INS,*
    336 F.3d 200 (2d Cir. 2003) ............................................................................. 4

**Statutes**

18 U.S.C.
    § 2333(a) ................................................................................................... 2, 15
    § 2333(d) ............................................................................................ 1, 2, 4, 16
    § 2333(d)(2) ................................................................................................. 7, 8

Pub. L. 114-222, 130 Stat. 852 (2016) .............................................................. 2, 5, 6

**Other Authorities**

Alan Sykes, *Corporate Liability for Extraterritorial Torts Under the Alien Tort*
    *Statute and Beyond: An Economic Analysis*, 100 Geo. L.J. 2161 (2012) ................................ 16

Financial Action Task Force, *FATF Takes Action to Tackle De-Risking*
    (Oct. 23, 2015) ............................................................................................ 17

Remarks by Thomas J. Curry, Comptroller of the Currency, before the Institute of
    International Bankers (Mar. 7, 2016) ................................................................ 16

Tracey Durner & Liat Shetret, Global Ctr. on Cooperative Security, Oxfam
    International, *Understanding Bank De-Risking and its Effects on Financial*
    *Inclusion* (2015) .......................................................................................... 17

## INTEREST OF THE *AMICI CURIAE*

The Institute of International Bankers (IIB) is the only national association devoted exclusively to representing and advancing the interests of banking organizations headquartered outside the United States that operate in the United States. The IIB's membership consists of internationally headquartered banking and financial institutions from over 35 countries. In the aggregate, IIB members' U.S. operations hold more than $5 trillion—or one-fifth—of this country's total banking assets; provide one-third of small-business loans; and finance more than one-third of infrastructure projects. The IIB frequently appears before this and other federal courts as *amicus curiae* in cases that raise significant legal issues related to banking, including those involving the scope of the Anti-Terrorism Act (ATA), 18 U.S.C. §§ 2331-2333, as amended by the Justice Against Sponsors of Terrorism Act (JASTA), 18 U.S.C. § 2333(d).

The European Banking Federation is the voice of the European banking sector, uniting 32 national banking associations in Europe that together represent some 3,500 banks—large and small, wholesale and retail, local and international—employing about 2.6 million people.

*Amici* and their members have a strong interest in the proper interpretation of the ATA, which, if construed too broadly, would threaten legitimate banking institutions with liability for the routine provision of financial services. Banks with a presence in markets outside the United States—particularly in developing countries burdened by political instability and factional strife—are among the most frequent targets of JASTA claims. It is therefore important to *amici* that federal courts faithfully apply the stringent standard for aiding-and-abetting liability recently recognized by the Supreme Court in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). *Amici* submit this brief to explain the *Twitter* standard, the fundamental departure it represents from prior Second Circuit case law, and the adverse consequences that would result from a more sweeping liability standard.

1

**INTRODUCTION**

*Amici* stand firmly against terrorism. And *amici* fully support efforts by Congress, in enacting the ATA and JASTA, to combat the scourge of international terrorism and to provide compensation to the victims of these odious crimes. As the Supreme Court emphasized in its recent landmark opinion interpreting aiding-and-abetting liability under JASTA, however, Congress did not create a private remedy so limitless as to penalize—and to tar as supporters of terrorism— legitimate commercial enterprises providing routine services in the normal course of business. *See Twitter,* 598 U.S. at 491.

Enacted in 1990, the ATA created a private cause of action for U.S. nationals to recover for injury suffered "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). U.S. nationals harmed by such acts—or their survivors, heirs, or estates—may sue under the ATA to recover treble damages and attorney's fees. *Id*. Courts originally interpreted the ATA to impose liability only on the primary actors directly behind an act of terrorism, precluding ATA claims brought under theories of secondary liability, like aiding and abetting. *Twitter*, 598 U.S. at 483; *see, e.g., Rothstein v. UBS AG*, 708 F.3d 82, 97-98 (2d Cir. 2013) (holding that the ATA does not create liability for aiders and abettors of terrorist acts).

In 2016, Congress responded by enacting JASTA, which allows victims of terrorism to obtain compensation under theories of secondary liability. *See* Pub. L. 114-222, 130 Stat. 852 (2016). JASTA recognizes two forms of secondary civil liability for injuries arising from an act of international terrorism "committed, planned, or authorized" by an entity designated as a foreign terrorist organization (FTO): liability for aiding and abetting a covered act of international terrorism "by knowingly providing substantial assistance" (18 U.S.C. § 2333(d)); and, separately, conspiracy liability (*id.*).

2

Courts, including the Second Circuit, initially interpreted the secondary liability created by JASTA broadly. *See, e.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (discussing "Congress's instruction that JASTA is to be read broadly"); *id.* at 863 (stating that "JASTA aiding-and-abetting liability … does not require proof that the defendant had a specific intent"); *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021) ("The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury."). This Court naturally relied on these and other then-binding Second Circuit precedents when it ruled on Defendants' previous motions to dismiss in this case, concluding that Plaintiffs had stated a claim for aiding-and-abetting liability under JASTA. *See* June 15, 2022, Memorandum & Order (Dkt. 291); *see also Bartlett v. Société Générale de Banque au Liban SAL*, 2020 WL 7089448, at *8-*16 (E.D.N.Y. Nov. 25, 2020).

In *Twitter, Inc. v. Taamneh*, however, the Supreme Court soundly rejected the broad approach to JASTA aiding-and-abetting liability previously embraced by the Second Circuit and other courts of appeals. Contrary to the relaxed scienter and nexus requirements articulated by the Second Circuit, the *Twitter* Court announced that a JASTA aiding-and-abetting claim requires "conscious, voluntary, and culpable participation" by defendants "in the commission of the actionable wrong—here, an act of international terrorism." 598 U.S. at 493-495. Thus, the Court explicitly rejected a vision of JASTA that would make "mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 491 (quoting *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978)). Such an approach "would run roughshod over the typical limits on tort liability and take aiding and abetting far beyond its essential culpability moorings." *Id.* at 503.

Of course, where "there has been an intervening Supreme Court decision that casts doubt on … controlling precedent," "the existing law of [the] circuit must give way." *Union of Needletrades, Indus. & Textile Emps. v. INS*, 336 F.3d 200, 210 (2d Cir. 2003) (quoting *Oil, Chem. & Atomic Workers Int'l Union v. Dep't of Energy*, 288 F.3d 452, 457 (D.C. Cir. 2002)). Under the new standard announced by the Supreme Court in *Twitter*, allegations that Defendants provided routine, arm's-length banking services to some customers that purportedly had vague links to Hezbollah, on the same terms available to all other customers—with no allegation that any specific transactions funded Hezbollah, let alone the Special Groups that perpetrated the attacks in which Plaintiffs were harmed—are insufficient to state a claim under § 2333(d). Plaintiffs' JASTA claim for aiding-and-abetting liability must therefore be dismissed.

More broadly, careful adherence to the *Twitter* standard, with its stringent nexus and scienter requirements, is critical to ensuring that unduly expansive aiding-and-abetting liability under JASTA does not prompt legitimate international banking institutions to withdraw from participating in the financial sectors of politically unstable, conflict-riven countries like Lebanon—thereby potentially pushing financial transactions in such countries further into the shadow economy where terror financing would be even harder to detect. And strictly cabining aiding-and-abetting liability within the limitations Congress has drawn around such JASTA claims is also essential to avoid the separation-of-powers concerns that would be raised by judicial intrusion into the foreign-policy prerogatives of the political branches.

**ARGUMENT**

I. *Twitter*'s analysis of aiding-and-abetting liability represents a sea change from the Second Circuit's prior approach.

    A. *Twitter* rejected the formulaic application of *Halberstam* in favor of a focus on a secondary actor's culpability and nexus to the primary wrongdoing.

First, and as a general matter, *Twitter* moved the law away from rigid adherence to the methodology of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which had characterized the pre-*Twitter* approaches of the Second Circuit and other courts of appeals. *Compare, e.g.*, *Honickman*, 6 F.4th at 494-501 (walking through the three-part, six-factor *Halberstam* test), *with Gonzalez v. Google LLC*, 2 F.4th 871, 901-911 (9th Cir. 2021) (Ninth Circuit decision reversed by the Supreme Court in *Twitter*, similarly applying *Halberstam* formulaically).

**1.** In enacting JASTA, Congress expressly pointed to *Halberstam* as "provid[ing] the proper legal framework" for "civil aiding and abetting . . . liability" under the Act. *See* JASTA § 2(a)(5), 130 Stat. at 852. For this reason, in conducting its analysis of aiding-and-abetting liability under JASTA, the Second Circuit hewed closely to the D.C. Circuit's specific formulations in *Halberstam*. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223, 225 (2d Cir. 2019); *Kaplan*, 999 F.3d at 856; *Honickman*, 6 F.4th at 494, 500. In particular, the Second Circuit—and other courts of appeals—distilled the *Halberstam* framework into two multipart tests for aiding-and-abetting liability.

In the Second Circuit's pre-*Twitter* decisions, the first multipart test identified "three elements for aiding-and-abetting liability" under *Halberstam*:

        "(1) the party whom the defendant aids must perform a wrongful act that causes an injury" (the "aiding party who causes injury" element);

"(2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" (the "general awareness" element);

"(3) the defendant must knowingly and substantially assist the principal violation" (the "substantial assistance" element).

*Honickman*, 6 F.4th at 494 (quoting *Halberstam*, 705 F.2d at 477) (emphases omitted).

Next, to analyze "substantial assistance" element, Second Circuit precedent applied a six-factor sub-analysis also drawn from *Halberstam*, which considered:

"(1) the nature of the act encouraged,

(2) the amount of assistance given by defendant,

(3) defendant's presence or absence at the time of the tort,

(4) defendant's relation to the principal,

(5) defendant's state of mind, and

(6) the period of defendant's assistance."

*Honickman*, 6 F.4th at 500 (quoting *Linde*, 882 F.3d at 329); *see Halberstam*, 705 F.2d at 484-485.

**2.** In *Twitter*, however, the Supreme Court rejected this formulaic interpretation of *Halberstam*'s "legal framework for how [secondary] liability should function." JASTA § 2(a)(5), 130 Stat. at 852; *see Twitter*, 598 U.S. at 493 (noting that "[t]he Ninth Circuit appears to have understood JASTA's approval of *Halberstam*'s 'legal framework' as requiring it to hew tightly to the precise formulations that *Halberstam* used," and explaining that, to the contrary, "any approach that too rigidly focuses on *Halberstam*'s facts or its exact phraseology risks missing the mark.").

Instead, the Court observed, Congress endorsed only *Halberstam*'s general framework, not that opinion's "exact phrasings and formulations." *Twitter*, 598 U.S. at 487. And, the Court further noted, *Halberstam* itself had cautioned that "its formulations should 'not be accepted as immutable components'" but ought "to be 'adapted as new cases test their usefulness.'" *Id*. (quoting *Halberstam*, 705 F.2d at 489). Adapting the *Halberstam* framework to the context of international

terrorism is no small task, given the vastly different character of the case's original context—the secondary liability of the live-in partner of a serial burglar for a killing that occurred during one of the burglaries. The guidance *Halberstam* properly offers in the JASTA context, the Court concluded, does not lie in the particular tests it formulated, but in the "basic thrust" of its analysis, which the Court identified as rooted in the "common law of aiding and abetting." *Id*. at 488 (quoting *Halberstam*, 705 F.2d at 478 n.8).

Surveying this common law of aiding-and-abetting liability, the Court discerned two principles that limit the otherwise unacceptably "boundless" rule (*Twitter*, 598 U.S. at 488) that those who help another to commit a wrongful act share in the primary wrongdoer's liability:

*First*, aiding-and-abetting liability ordinarily attaches only if the secondary actor acts with significant scienter or intent: "some level of blameworthiness" or "truly culpable conduct." *Twitter*, 598 U.S. at 489 (emphasis added). That is, the secondary defendant must have "consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Id.* at 493 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)); *see also id.* ("The phrase 'aids and abets' in § 2333(d)(2), as elsewhere, refers to a *conscious, voluntary, and culpable* participation in another's wrongdoing.") (emphasis added).

*Second*, there must be a close enough relationship between the actions of the secondary actor and the primary wrongdoing, either through "a close nexus between the assistance and the [specific] tort" that harmed the plaintiffs, or because "a secondary defendant's role in an illicit enterprise [is] so systemic that the secondary defendant is aiding and abetting *every* wrongful act committed by that enterprise." *Twitter*, 598 U.S. at 496 (emphasis added). Where a close connection to specific wrongful acts is absent, establishing nexus through "a showing of pervasive and systemic aid" requires such "pervasive, systemic, and culpable assistance to a series of terrorist

activities" that the secondary defendant "form[s] a near-common enterprise" with the terrorists. *Id*. at 502, 506.

The Court cited the facts of *Halberstam* itself—in which a "serial burglar['s] … live-in partner-in-crime" "assist[ed] … in laundering the stolen goods and transforming them into usable wealth" by keeping ongoing business records for the sales of the stolen goods and falsifying related tax returns—as exemplary of assistance that is "so intentional and systematic" that it aids and abets "each and every" wrongful act committed by the principal. *Id*. at 487, 495. The Court emphasized that, to establish nexus, "it is not enough … that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id.* at 495. And "pervasive and systemic aid" must, to attract secondary liability, be given with the aim of "consciously 'participat[ing] in' [the] *series of* tortious acts in order to 'make [*each one*] succeed.'" *Id*. at 496 (quoting *Nye & Nissen*, 336 U.S. at 619) (emphases added).

Taking the *Halberstam* framework commended by Congress to essentially capture these two principles constraining aiding-and-abetting liability, the Court concluded that the *Halberstam* framework converged with "what the text of § 2333(d)(2) demands": that, for aiding-and-abetting liability under JASTA, a defendant must "have given *knowing* and *substantial* assistance to the primary tortfeasor." *Twitter*, 598 U.S. at 491 (emphases added); *see also id.* at 493 ("At bottom, both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core . . . : that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed." [cleaned up]).

In so concluding, the *Twitter* Court refocused the aiding-and-abetting liability inquiry away from *Halberstam*'s specific formulations—the three elements and six factors that the Second Circuit and other courts of appeals had mechanically applied—toward an analysis centered on

(1) the defendant's scienter and (2) its nexus to the primary wrongdoing. These scienter and nexus requirements for aiding-and-abetting liability, moreover, "'should be considered relative to one another' as part of a single inquiry designed to capture conscious and culpable conduct." *Id*. at 504 (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)). "[T]he more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through *intentional* aid that substantially furthered the tort." *Id*. at 506 (emphasis added).

**B. The *Twitter* standard sets more stringent constraints on aiding-and-abetting liability than the standard this Court applied in its prior rulings in this case.**

Not only does the aiding-and-abetting standard articulated in *Twitter* depart from the rigid multipart test previously applied by the Second Circuit, it also substantively requires a much closer nexus to the primary act of terrorism and a much greater degree of culpability as well. The precedent on which the Court previously relied to find that Plaintiffs had stated an aiding-and-abetting claim under JASTA is therefore no longer good law. And the new *Twitter* standard requires the opposite result here.

*1. Nexus*

Following then-prevailing Second Circuit precedent, this Court previously analyzed Defendants' nexus to the primary wrongdoing here using the six *Halberstam* factors for assessing the substantiality of the assistance a defendant gave to the principal terrorist actors. *See Bartlett*, 2020 WL 7089448, at *11. The Court concluded that the *Halberstam* factors tilted in favor of finding substantial assistance. *Id*. at *15. Leaving aside the factor relating to Defendants' state of mind, this conclusion rested primarily on the Court's determination that Defendants' actions were "integral" to the terror attacks in which Plaintiffs were injured, because Hezbollah is alleged to have trained, armed, and directed the Special Groups that perpetrated the attacks, and Defendants

are alleged to have provided banking services to entities that subsequently funneled money to Hezbollah. *Id*. at *12.

Crucially, the Court rejected Defendants' argument that the mere provision of routine banking services—that is, "services [that] are the kind available to any customer," such as "maintaining accounts" and "transferring funds"—cannot constitute substantial assistance. *Id*. at *13. Observing that in *Linde* and *Siegel*, the Second Circuit "indicated that processing wire transfers for terrorists could support a finding of substantial assistance," and reasoning that "wire transfers are a service available to any customer, not only terrorists," the Court concluded that the provision of routine banking services that wind up financially enabling a terrorist organization to support and instigate other militia groups to carry out terror attacks "could support a finding of substantial assistance." *Id*.; *see also id*. at *15 (holding that "[f]inding substantial assistance" based on knowingly processing financial transactions that ended up financing terrorist organizations "would be consistent with … Second Circuit precedents").

While the Court's prior ruling reflected then-controlling Second Circuit precedents, these precedents on the requisite nexus for a JASTA aiding-and-abetting claim have now been thoroughly undermined by *Twitter*. Faced with an essentially analogous contention—that Twitter, Facebook, and Google could be liable merely because they "supplied generally available virtual platforms that ISIS made use of," and "failed to stop ISIS despite knowing it was using these platforms" (*Twitter*, 598 U.S. at 505)—the Supreme Court concluded that nexus was lacking. As the Court warned, aiding-and-abetting liability must not extend so widely that "ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." *Id*. at 489. And while the Court could not "rule out the possibility" of liability in hypothetical "situations where the provider of routine services does so

*in an unusual way* or provides *such dangerous wares* that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack" (*id.* at 502 (emphases added)), where—as here—a claim for JASTA liability is brought against a "provider of routine services" based only on the allegation "that some bad actors took advantage of [those services]," the Court held that such allegations are "insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted th[e] wrongdoers' acts" (*id.* at 502-503).

Indeed, as already noted (*see* page 3, *supra*), the Court in *Twitter* specifically endorsed the proposition that any rule of secondary liability that makes "mostly passive actors *like banks* … liable for all of their customers' crimes by virtue of carrying out routine transactions" would be overbroad. *Id.* at 491 (quoting *Monsen*, 579 F.2d at 799) (emphasis added)). *Twitter* therefore squarely forecloses the proposition that providing routine banking services—at arm's length and on equal terms with any other member of the public—to customers alleged to end up funding illicit organizations is sufficient to establish the requisite nexus for aiding-and-abetting liability. *See also id.* at 504 (faulting the Ninth Circuit for failing to recognize that providing "generally available" services through an "arm's-length relationship with ISIS—which was essentially no different from [the defendants'] relationship with their … other users" undermines the culpability needed to support aiding-and-abetting liability, absent an actual "intent to support ISIS.").

The theory asserted by Plaintiffs here is particularly telling in this regard. Lacking any basis for alleging a true nexus between any defendant and the specific acts of terrorism that harmed them, Plaintiffs are left arguing that essentially the entire Lebanese banking sector is so closely in league with Hezbollah as to bear legal responsibility for "each and every" act of terrorism committed by the group, under *Twitter*'s "pervasive and systemic" involvement exception to the specific nexus requirement. *Twitter*, 598 U.S. at 501, 506. Setting aside the harmful second-order

effects if such a sweeping theory were to prevail (*see* pages 14-15, *infra*), it also goes far beyond the scope of the exception described by the Supreme Court in *Twitter*.

The Supreme Court was careful to note that this systemic-involvement concept must be cabined carefully, lest "aiding-and-abetting liability … blur with conspiracy liability," when the former "lacks the requisite agreement that justifies … extensive conspiracy liability." *Twitter*, 598 U.S. at 496. And allegations that twelve banks "carr[ied] out routine transactions" for their customers as part of an "arm's-length relationship" (*id.* at 491, 504) are simply not of a piece with the "pervasive, systemic, and culpable assistance" that made the *Halberstam* burglar's "live-in partner-in-crime" liable for "each and every" one of his crimes (*id.* at 487, 495, 502). *See also id.* at 497 (explaining that "the facts of *Halberstam* … are useful when determining whether a defendant has so consciously 'participate[d] in' a series of tortious acts in order to 'make [each one] succeed,'" as required by the pervasive and systemic aid exception) (quoting *Nye & Nissin*, 336 U.S. at 619)).

### 2. Scienter

Turning to scienter, the Supreme Court in *Twitter* clarified that much more is required than "the same general awareness that defines *Halberstam*'s second element." 598 U.S. at 504. Rather, aiding-and-abetting liability under JASTA includes a far more stringent requirement that defendants' support or assistance for the terror attacks that harmed plaintiffs be "conscious, voluntary, and culpable." *Id*. at 493. That is, liability requires "that a defendant 'in some sort associate himself with the [terrorist] venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *Id.* at 490 (quoting *Nye & Nissin*, 336 U.S. at 619); *see also id.* at 498-499 (applying this standard to defendant social-media platforms and finding scienter lacking because defendants passively provided communications services to the public without giving ISIS "any special treatment or words of encouragement").

This formulation, which, stated differently, mandates that the secondary defendant was "consciously trying to help or otherwise 'participate in'" the terrorist attack that harmed the plaintiffs (*Twitter*, 598 U.S. at 500), is far more demanding than that adopted by the Second Circuit's pre-*Twitter* cases. As this Court observed in reaffirming its conclusion that Plaintiffs had adequately pleaded scienter, the Second Circuit had adopted an especially broad interpretation of the "general awareness" *Halberstam* element—describing "general awareness" as something "less demanding" than even mere "awareness." Dkt. 291, at 3-4 (quoting *Kaplan*, 999 F.3d at 863). Indeed, the Second Circuit had held expressly that "an absence of proof of intent *is not fatal* to the aiding-and-abetting claim because intent is not itself a *Halberstam* element." *Kaplan*, 999 F.3d at 860 (emphasis added). This prior Second Circuit case law cannot be reconciled with the Supreme Court's insistence that giving "conscious, voluntary, and culpable" assistance to a "foreseeable terror attack" is essential for aiding-and-abetting liability under JASTA. *Twitter*, 598 U.S. at 493, 502.

Thus, to the extent the Court—relying on then-prevailing Second Circuit precedent—previously found scienter adequately pleaded simply through allegations permitting an inference that Defendants were generally aware, from their "anti-money laundering and counter-financing of terrorism" internal procedures, and from "publicly available information," of Hezbollah ties among some of their customers (*see Bartlett*, 2020 WL 7089448 at *9-*10), those allegations are no longer sufficient.

In the first place, although Plaintiffs allege that Defendants implemented anti-money laundering and counter-terrorist financing procedures such as "know your customer" consumer due diligence policies, the "strongest inference" that could be drawn from Defendants' adherence to such international banking norms is that they "should have known" of their customers'

affiliations with Hezbollah, not that Defendants had "actual knowledge" of those affiliations. *Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012); *see id*. at 95-96 (explaining that it is "not the law" that brokerage firms are liable for "aiding and abetting fraud every time a fraudster used brokerage accounts in service of its fraud in a detectable manner"); *PLB Invs. LLC v. Heartland Bank & Tr. Co.*, 2021 WL 492901, at *6 (N.D. Ill. Feb. 9, 2021) (citing *Berman* for the proposition that "know your customer obligations [can] only support an inference of what a bank should have known, not what the bank actually knew."). That Defendants *should have known* that some of their customers had links with Hezbollah falls far short of the blameworthy volitional alignment with terrorist acts that *Twitter* announced is required for scienter: mere lack of care in detecting Hezbollah ties among Defendants' customers does not remotely amount to their "wish[ing] to bring about," or "seek[ing]" the success of, subsequent terror attacks. *Twitter*, 598 U.S. at 490 (quoting *Nye & Nissin*, 336 U.S. at 619).

In fact, as the Supreme Court's holding that the defendant social-media platforms in *Twitter* lacked the requisite scienter to be liable confirms, even actual knowledge of links to terrorist organizations among a bank's customers (not alleged here, in any event) would be insufficient to establish the bank's scienter. The *Twitter* plaintiffs alleged that the defendants "*knew* that ISIS was uploading [terrorism-related] content," but "took insufficient steps to ensure that ISIS supporters and ISIS-related content were removed from their platforms." 598 U.S. at 498 (emphasis added). But the Court held that this type of "passive nonfeasance," when unaccompanied by any other indicia of scienter such as giving ISIS-linked users "special treatment" or affirmatively "encouraging, soliciting, or advising" the commission of the terror attack in which the plaintiffs were harmed, does not support the scienter needed for an aiding-and-abetting claim under JASTA. *Id*. at 498-501. Because plaintiffs "essentially portray[ed] defendants as bystanders, watching

passively as ISIS carried out its nefarious schemes," their "allegations d[id] not state a claim for culpable assistance or participation" in the ISIS-linked attack that harmed plaintiffs. *Id*. at 500-501. Where, as here, there are no non-conclusory allegations that Defendants even had actual knowledge that some of their customers were Hezbollah associates when providing those customers with routine financial services, Plaintiffs fail *a fortiori* to plead the requisite scienter for JASTA aiding-and-abetting liability.

## II. Expansive aiding-and-abetting liability under JASTA unfairly burdens legitimate businesses like banks and ultimately undermines anti-terrorism efforts.

Excluding claims like these—where a bank or other service provider is alleged to have done nothing more than offer its services to the public in the course of its business—from the scope of ATA liability is not only required after *Twitter*, it is also good policy.

**a.** As the Court in *Twitter* recognized, a key problem with expansive aiding-and-abetting liability is that a legitimate business innocently providing services to a wide customer base can become exposed to liability for serious but remote wrongs committed by some of these customers or their associates. The Court cautioned that "if aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." 598 U.S. at 489. The Court particularly worried that a standard of aiding-and-abetting liability without a stringent scienter prerequisite would make "mostly passive actors like banks" liable for their customers' wrongdoing simply "by virtue of carrying out routine transactions." *Id*. at 491 (quoting *Monsen*, 579 F.2d at 799).

This concern is especially acute when JASTA liability is at issue. Because the ATA provides for treble damages (18 U.S.C. § 2333(a)) and JASTA lawsuits often involve hundreds of—indeed, in the present action, over a thousand—plaintiffs, the amount of liability with which defendants are threatened can be staggering. Potential JASTA liability also carries massive

reputational risks, with defendants tarred as playing a role in heinous acts of cruelty and violence. Exposing ordinary businesses to enormous liability and reputational costs for engaging in legitimate, routine commercial activity is unfair—a distortion of the principles that have animated the law of aiding and abetting "for centuries," as the *Twitter* Court explained. 598 U.S. at 493. To avoid the financial and reputational risks threatened by expansive secondary liability under JASTA—not to mention the costs associated with even litigating such cases as a defendant (*see* Alan Sykes, *Corporate Liability for Extraterritorial Torts Under the Alien Tort Statute and Beyond: An Economic Analysis*, 100 Geo. L.J. 2161, 2190-2191 (2012))—these largely faultless defendants will be coerced into "settl[ing] even anemic cases." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).

Moreover, because banks with operations outside the United States in politically unstable or conflict-riven developing countries are frequently targeted by JASTA lawsuits, expansive standards of aiding-and-abetting liability under § 2333(d) would have an outsized impact on the provision of financial services in those countries. To guard against JASTA liability, international banks may choose to drastically curtail their offerings of legitimate financial services in these countries—in particular, they may withdraw entirely from the Lebanese financial system—in a practice known as "de-risking." As the Comptroller of the Currency has warned, de-risking can effectively cut off legitimate businesses and individuals from the financial system, "[a]nd there have been many instances of real human hardship that results when customers find themselves unable to transmit funds to family members in troubled countries." Remarks by Thomas J. Curry, Comptroller of the Currency, before the Institute of International Bankers (Mar. 7, 2016), perma.cc/3VYD-JVFX.

Indeed, according to the inter-governmental Financial Action Task Force, de-risking in the banking sector already "is having a significant impact in certain regions and sectors" and "may drive financial transactions underground which creates financial exclusions and reduces transparency, thereby increasing money laundering and terrorist financing risks." Financial Action Task Force, *FATF Takes Action to Tackle De-Risking* (Oct. 23, 2015), perma.cc/9ST3-T8ZQ. Perversely, the end result of adopting expansive standards of JASTA liability may therefore be to push financial activity in the world's troubled regions out of the open and regulated financial system and into "underground 'shadow banking' systems" where money laundering and terrorist financing can proceed unabated. Tracey Durner & Liat Shetret, Global Ctr. on Cooperative Security, Oxfam International, *Understanding Bank De-Risking and its Effects on Financial Inclusion* 19 (2015), perma.cc/KG84-P2MR.

That prospect is only heightened in the context of cases, like this one, where Plaintiffs have sued essentially a country's entire banking sector. If, as Plaintiffs allege, the Lebanese financial system—indeed, much of the Lebanese economy as a whole—is so inextricably interlinked with terror-financing operations that mere participation in that sector is sufficient to implicate aiding-and-abetting liability under JASTA (*see* pages 10-11, *supra*), then legitimate financial institutions and other businesses would avoid doing any business at all in Lebanon. Crediting overbroad theories of aiding-and-abetting liability, like those that Plaintiffs offer here, would thus jeopardize the availability of legitimate financial services and access to credit for Lebanon's more than five million inhabitants, and those in other similarly situated nations. As *Twitter* construed JASTA, that federal statute is no basis to preclude the ability of innocent Lebanese individuals and businesses from accessing routine, essential financial services.

In sum, faithfully implementing *Twitter*'s demanding prerequisites for aiding-and-abetting liability under JASTA would not only avoid unfairly saddling legitimate financial institutions with massive litigation and reputational risk for providing customers with routine financial services, it would also serve the long-term anti-terrorism goals of the ATA.

**b.** Unduly expansive aiding-and-abetting liability under JASTA also raises significant separation of powers concerns. The Supreme Court has cautioned against judicial recognition of causes of action or of expansive theories of liability where doing so would have "potential implications for the foreign relations of the United States." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1399 (2018). That is, courts should not intrude into the proper "discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)).

Courts would be improperly invading the prerogatives of the political branches in just this way by failing to carefully adhere to "Congress' express limitations on liability under the Anti-Terrorism Act." *Jesner*, 138 S. Ct. at 1405. The ATA, as amended by JASTA, is part of a "comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing." *Id.* Going beyond the ATA's carefully prescribed limitations on liability, as interpreted by the Supreme Court in *Twitter*, would upset this detailed regime, "inappropriate[ly] . . . displac[ing]" the "careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism." *Id.*; *see also, e.g.*, *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937, 1939 (2021) (declining to recognize Alien Tort Statute liability for allegedly aiding and abetting child slavery where the defendant's only domestic conduct was "general corporate activity," because doing so would invade the proper sphere of "[t]he political branches," which, unlike "the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns").

Congress has delineated definite limitations on aiding-and-abetting liability under the ATA, as amended by JASTA. Courts must faithfully abide by those limitations, as definitively interpreted by the Supreme Court in *Twitter*. Any broadening of aiding-and-abetting liability under JASTA would amount to improper judicial intrusion into the foreign-affairs prerogatives of the political branches, raising grave separation-of-powers concerns—in addition to the legal and policy shortcomings described above.

## CONCLUSION

The Court should grant Defendants' motion to dismiss.


Respectfully submitted:

_____
Paul W. Hughes
Andrew A. Lyons-Berg*
Caleb H. Yong*
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Counsel for* Amici Curiae
*The Institute of International Bankers*
*The European Banking Federation*


**pro hac vice* to be filed