

190 Moore Street, Suite 272, Hackensack, New Jersey 07601
T: 201 265 6400 F: 201 265 0303

OSEN LLC
ATTORNEYS AT LAW

1441 Broadway, New York, New York 10018
T: 212 354 0111
www.osenlaw.com

May 20, 2024

**VIA ECF**

Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:** ***Bartlett, et al. v. Société Générale de Banque au Liban, et al.*, 1:19-cv-00007**

Dear Judge Amon:

Plaintiffs respectfully write in response to the Court's May 17, 2024, Minute Order. The Court directed Plaintiffs to provide "a citation for their assertions in footnote 13 of their opposition to the motion to dismiss [381] that Defendants had knowledge of bulk cash originating from high-risk jurisdictions."

Plaintiffs' assertion is supported by a series of allegations, considered together "as a whole." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 865 (2d Cir. 2021).

Plaintiffs alleged in detail that the exchange houses were used to launder hundreds of millions of dollars in bulk cash proceeds from Hezbollah narcotics, conflict diamond, and other illicit operations in and through South America, Africa, and Asia. Third Amended Complaint ("TAC") ¶¶ 99-101, 963-67, 1241-54, 1255-1370, 1426. For example, these operations included what the U.S. Treasury Department called "a complex money laundering scheme moving hundreds of millions of dollars of illicitly derived proceeds through businesses operated by" narcotics kingpin Ayman Joumaa. *Id.* ¶ 1250. "[A] significant portion of the vast quantities of U.S. dollar-denominated banknotes" he and other Hezbollah financiers "obtain and launder from South America, Africa and the Persian Gulf were deposited in and flowed through Lebanese exchange houses and Defendants herein." *Id.* ¶¶ 967, 1249, 1543. The TAC also alleges that the exchange houses were "a key transit point for Hezbollah funds flowing into Iraq to support Hezbollah's proxies and finance attacks on American personnel, including Plaintiffs herein." *Id.* ¶ 1260.

These facts were knowable to Defendants for multiple reasons.

First of all, three of the exchange houses were designated nearly a year before the end of the relevant period, which ran until late 2011 (*see id.* ¶ 6062): "Mr. Joumaa's network used several money changers in Lebanon in order to launder the drug money, including among others, Hassan Ayash Exchange Company, Elissa Exchange Company, and New Line Exchange Trust Company,

all designated SDNTKs on January 26, 2011." *Id.* ¶ 1251.[1] The Treasury Department's designation stated: "Operating in Lebanon, **West Africa, Panama and Colombia**, Joumaa and his organization launder proceeds from their illicit activities – as much as $200 million per month – through various channels, including **bulk cash** smuggling operations and Lebanese exchange houses." *Id.* ¶ 38 n.7 (providing link to designation); ¶¶ 1247, 1250, 1252 (describing designation).

But even before the designations, the TAC alleges that the exchange houses' collection of bulk cash—i.e., large quantities of U.S. dollar banknotes—from high-risk jurisdictions would have been obvious to any bank with a due diligence program. For example:

> [L]ong before the U.S. designation of Elissa Exchange in 2011, it was obvious that the company was a money laundering enterprise. In fact, a 2006 LCB customer due diligence report noted that the Elissa Exchange and its principals were implicated in smuggling cash **out of Africa** through several channels, including **bulk cash** smuggling on flights **from Ghana to Beirut**.

*Id.* ¶ 1289. *See also id.* ¶¶ 1290, 1610.

Plaintiffs alleged that all of the Defendants purported to employ due diligence programs which specifically listed as grounds for scrutinizing accounts "cash" transactions and exchanges of "banknotes"—particularly "from abroad" and without "economic justification." *Id.* ¶¶ 165-66. *See also, e.g.*, *id.* ¶¶ 182-84, 213, 229, 240, 281, 296. These procedures would draw focus to the exchange houses and the sources of their deposits with Defendants. *Id.* ¶ 1686. For example, the *New York Times* reported that auditors identified Hezbollah accounts at LCB with "telltale patterns" of money laundering and that "hundreds of millions of dollars a year sloshed through the accounts, held mainly by Shiite Muslim businessmen in **the drug-smuggling nations of West Africa**, many of them known Hezbollah supporters." *Id.* ¶¶ 109-10. Plaintiffs allege LCB's scienter more granularly than other Defendants' because the U.S. investigation of that bank provided more public details, but the bulk cash laundering system described in the TAC applies equally to all the Defendants. Examples of allegations that Defendants held accounts for exchange houses include *id.* ¶¶ 101, 191, 208, 1685-87, 1758, 1787, 1801-07, 1935-36, 1941, 2075, 2098-99, and 2151-52.

The TAC also provides examples of what it alleges are inherently suspicious transactions. For example, SGBL and LCB were participants in a transaction from New Line Exchange which listed the source of the funds simply as "business" (it was deposited by a drug courier bringing the funds from Ghana to Lebanon). *Id.* ¶¶ 1262-69. Indeed, "[a]ccording to DOJ, at least hundreds of millions of dollars in U.S. banknotes were transported annually from **Benin and other West African countries** to Lebanon"; the "bulk cash was often flown from **Ghana** directly to Beirut's airport" where "Hezbollah personnel would oversee the deliveries and ensure that the funds made their way to Hezbollah's preferred exchange houses." *Id.* ¶¶ 1540-43. *See also id.* ¶¶ 1328-29.

---

[1] Other exchange houses were designated later, also for their role in "laundering money through The System on behalf of Mr. Joumaa, among others." *Id.* ¶ 38 n.7. One major version of the scheme is shown in a *New York Times* graphic provided in the TAC at ¶ 40. *See also id.* ¶¶ 1280, 1328-29. **All emphases are added in this letter.**

   Plaintiffs also alleged that some exchange house accounts held at LCB "migrated to other Defendants in 2011-2012 once Defendant LCB was forced to close the accounts," *id.* ¶ 117, including to MEAB, Lebanon and Gulf Bank, Bank of Beirut and the Arab Countries, Fenicia Bank, Bank Audi, BLOM Bank and Fransabank, *id.* ¶¶ 117, 882, 1293, 1299, 1300, 1340, 1721, 1771-72, 2101, 2164, as well as SGBL, ¶¶ 121, 1582. The TAC alleges that Defendants' willingness to provide financial services to exchange houses after they were "identified" as Hezbollah money laundering entities suggests Defendants knew the pertinent facts about their own exchange house customers before those migrations, as well. *See id.* ¶¶ 118-19. For example, Plaintiffs alleged that "[d]espite Halawi Exchange's blatantly high-risk profile, churning millions of dollars in cash from **Africa** and moving funds to **conflict zones in the Middle East**, Defendant BANK OF BEIRUT continued to facilitate its activities." *Id.* ¶ 2077. *See also id.* ¶ 2076 (quoting U.S. Treasury finding that "Halawi Exchange is known to have laundered profits from drug trafficking and cocaine-related money laundering networks for a leading Hezbollah official and narcotics trafficker").

   The exchange houses' role in laundering bulk cash from high-risk jurisdictions is also indicated by other facts about them. For example, Hassan Ayash Exchange Company was owned by (and named for) "key Joumaa associate Hassan Ayash." *Id.* ¶¶ 1254, 1302 & n.119. The Elissa Exchange was owned by the Kharrubi brothers, who were "narcotics kingpin[s]" (designated during the relevant period) and "prominent members of Hezbollah's BAC." *Id.* ¶¶ 1281, 1332, 1397, 2122. *See also id.* ¶ 1744 (alleging that "Defendant BLOM BANK maintained an account for, and provided financial services to, Ali Muhammad Kharrubi (SDNTK), knowing that he was a prominent and well-known money launderer, narcotics trafficker and BAC operative").

   As alleged in the TAC, Defendants were not passive conduits for the bulk cash flowing through them. Rather, "[t]he banks gained steady streams of U.S. bank notes that helped to maintain the structural Ponzi scheme that sustains Lebanon's sovereign debt and has until recently provided them with steady returns on the sovereign debt they have heavily invested in." *Id.* ¶ 86. *See also id.* ¶¶ 1686-88, 1760, 1806, 1936, 1978, 2081, 2102 (describing flow of "high-volume bulk cash transactions" from exchange houses to Defendants, which Defendants exchange for "high interest rate" deposits with the Central Bank of Lebanon).

            Respectfully submitted,

            /s/ Michael J. Radine

cc:  All counsel