```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
ROBERT BARTLETT, et al.,
                    Plaintiffs,
                                                              NOT FOR PUBLICATION
        -against-                                             **MEMORANDUM & ORDER**
                                                              19-cv-00007 (CBA) (TAM)
SOCIÉTÉ GÉNÉRALE DE BANQUE AU
LIBAN SAL, et al.,

                    Defendants.
----------------------------------------------------------x
```
**AMON, United States District Judge:**

## SUMMARY

This action relates to American nationals who were killed or injured by terrorist attacks abroad ("Attack Victims"). Plaintiffs, who are the Attack Victims themselves or their heirs or successors, brought this action against twelve banking institutions, seeking damages pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). I previously granted a motion to dismiss Plaintiffs' claims of primary liability and successor liability but denied Defendants' motion to dismiss for lack of personal jurisdiction and for failing to state a claim of aiding-and-abetting liability under the ATA. Defendants now move to dismiss all claims in Plaintiffs' Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and renew their arguments that this Court lacks personal jurisdiction under Rule 12(b)(2). For the following reasons, I grant Defendants motion as to primary and successor liability and deny the motion as to personal jurisdiction and aiding-and-abetting liability.

## BACKGROUND

I assume the parties' familiarity with the facts, which are set forth more fully in the Memorandum and Order denying the previous motion to dismiss. (See ECF Docket Entry ("D.E.")

1

# 164 ("M&O 1").) In short, the Attack Victims are United States service members who were allegedly injured in a series of terror attacks perpetrated by Hezbollah in Iraq between 2004 and 2011. Defendants are Lebanese banks that Plaintiffs allege provided financial services to Hezbollah and Hezbollah affiliates. Hezbollah is an entity dedicated to religiously inspired terrorism, and in 1997 was designated by the United States as a Foreign Terrorist Organization ("FTO"). Plaintiffs allege that Defendants knowingly provided Hezbollah with financial services, including access to the U.S. financial system through correspondent bank accounts in New York, and facilitated Hezbollah's terrorist attacks by enabling the organization's operational funding. (See id. 2-8.) They allege that Defendants channeled millions of dollars to Hezbollah in part via accounts owned by Hezbollah-affiliated Specially Designated Global Terrorist ("SDGT") organizations, including Hezbollah's umbrella organizations the Islamic Resistance Support Organization ("IRSO") and the Martyrs Foundation-Lebanon. (Id. 3-5.) The provision of funds in many cases required evasion of counter-terrorism sanctions. (E.g., D.E. # 360 ("Third Amended Complaint" or "TAC") ¶¶ 469, 647, 1770, 1839, 1884.) At least one of the Defendants itself was designated an SDGT due to its coordination with Hezbollah during the relevant time period. (M&O 1 at 6.)

On November 25, 2020, I granted in part and denied in part Defendants' motion to dismiss Plaintiffs' First Amended Complaint. (Id. 1.) I subsequently denied Defendants' second motion to dismiss the Second Amended Complaint which was renewed based on new case law from the Second Circuit. (D.E. # 291 ("M&O 2").)

On June 22, 2023, Defendants sought leave to file a motion for reconsideration in light of the Supreme Court's ruling in Twitter v. Taamneh, 598 U.S. 471, 484-93 (2023). (D.E. # 330.) At a conference held on August 22, 2023, I granted Plaintiffs leave to again amend their complaint to

incorporate material obtained during discovery since the Second Amended Complaint and for Defendants to move to dismiss the newly amended complaint. (Text order dated August 22, 2023.)

Plaintiffs filed their Third Amended Complaint on November 7, 2023. (TAC.) The TAC includes details of transactions Defendants facilitated for Hezbollah-affiliated persons and organizations both during and after the relevant period. (See, e.g., id. ¶¶ 1865-79.) It also includes additional allegations to bolster the allegation that Defendants were aware they were funding terrorist activities. (See, e.g., id. ¶¶ 2132, 2177.) The TAC further added history on the Lebanese economy and allegations about account holders and Defendants' misconduct that post-date the attacks. (See, e.g., id. ¶¶ 189, 647, 1829, 2136.) Defendants[1] filed this motion to dismiss on March 15, 2024 (D.E. # 377 ("MTD")), which Plaintiffs opposed (D.E. # 381).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." A complaint will be dismissed unless the plaintiff states a claim that is "'plausible on its face'" by alleging sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must dismiss a claim if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id. at 679. Although courts will not credit "conclusory

---

[1] The bank Defendants in this matter filed the instant motion to dismiss with the exception of Jammal Trust Bank SAL ("JTB"). (MTD 2 n.1.) JTB had initially moved to dismiss this suit on the ground that it possessed foreign sovereign immunity under 28 U.S.C. § 1604. I denied JTB's motion (D.E. # 221), which JTB appealed to the Second Circuit. The Second Circuit vacated my opinion, finding that immunity may attach when a defendant becomes an instrumentality of a foreign sovereign after a suit is filed, and remanded for a determination of whether JTB is such an instrumentality. Bartlett v. Baasiri, 81 F.4th 28 (2d Cir. 2023). Briefing on that issue was stayed pending certiorari review, (see Text entry dated Nov. 6, 2023), and the Supreme Court denied Plaintiffs' petition for certiorari on April 29, 2024. 144 S. Ct. 1456 (Mem.). Because this issue is on a separate schedule from the non-JTB Defendants' instant motion to dismiss, and because JTB did not join in the instant motion to dismiss, I do not decide at this point whether Plaintiffs' case as to JTB can proceed. For ease of reference, however, I will refer to the moving defendants listed in note 1 to their MTD as "Defendants," even though JTB is not included.

statements" or "[t]hreadbare recitals of the elements of a cause of action," id. at 678, the court must accept as true all material factual allegations and draw all reasonable inferences in the plaintiff's favor, Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013).

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal of a complaint for "lack of personal jurisdiction." The plaintiff has the burden of demonstrating personal jurisdiction. Troma Ent., Inc. v. Centennial Pictures Inc., 729 F.3d 215, 217 (2d Cir. 2013). "[W]hen the issue is decided initially on the pleadings and without discovery, the plaintiff need show only a prima facie case" of personal jurisdiction. Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984). In deciding whether the plaintiff has made such a showing, the pleadings must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor. DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

## DISCUSSION

### I. Personal Jurisdiction

I previously held that Plaintiffs' first amended complaint "plausibly alleges frequent and deliberate use of New York-based correspondent accounts to facilitate the Hezbollah financing which led to Plaintiffs' injuries" in satisfaction of N.Y. C.P.L.R. § 302(a)(1), and that "Defendants' select and repeated use of the New York banking system as an instrument to effect the wrongs of which Plaintiffs complain permits personal jurisdiction here consistent with constitutional due process." (M&O 1 at 44, 46.) I made this determination based on the governing law in Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161 (2d Cir. 2013), and accompanying case law. Defendants now argue that Taamneh requires me to review this determination of personal jurisdiction. (MTD at 46.) In Taamneh, the parties did not brief the issue, and the Supreme Court made no finding, or even mention, of personal jurisdiction. See generally Taamneh, 598 U.S. 471.

4

Defendants read into Taamneh as a requirement of personal jurisdiction "the need to connect a defendant's conduct with the act of international terrorism that injured the plaintiff—not merely to connect a commercial actor (through customers) to a terrorist group." (MTD at 46.) I decline to read Taamneh's finding on aiding-and-abetting liability as changing the law on personal jurisdiction. I therefore decline to alter my prior finding of personal jurisdiction over the Defendants here. (See M&O 1 at 14.)

II.     **Aiding-and-Abetting Liability under JASTA**

The Defendants argue that the reasoning of the Supreme Court's decision in Taamneh requires dismissal of the aiding-and-abetting claim in this action. (MTD at 23.) The ATA, through JASTA, provides for secondary liability against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism." 18 U.S.C. § 2333(d)(2); Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (Amendment). To state a claim for JASTA aiding and abetting, Plaintiffs must plead three statutory elements: "(1) an injury arising from an act of international terrorism; (2) that the act was committed, planned, or authorized by a designated Foreign Terrorist Organization; and (3) that defendants aided or abetted an act of international terrorism by knowingly providing substantial assistance." Atchley v. AstraZeneca UK Ltd., 22 F.4th 204, 216 (D.C. Cir. 2022). Defendants do not dispute that the Attack Victims were injured by an act of international terrorism or that the alleged conduct constitutes attacks committed, planned, or authorized by a designated FTO. (MTD at 23.) Defendants argue that Plaintiffs' TAC fails to meet the standards recently articulated in Taamneh on the knowing and substantial assistance element. (Id.)

A.  **Knowing and Substantial Assistance: Legal Standard**

The proper framework for determining aiding-and-abetting liability under JASTA remains the decision of the U.S. Court of Appeals for the D.C. Circuit in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983). 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 2(a)(5)). Halberstam identifies three elements of aiding-and-abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. Defendants claim the Third Amended Complaint fails to sufficiently allege facts supporting the second and third elements.

   a. **General Awareness**

The general awareness element of aiding-and-abetting liability requires "the secondary actor to be aware that, by assisting the principal, it is itself assuming a role in terrorist activities." Linde v. Arab Bank, PLC, 882 F.3d 314, 329 (2d Cir. 2018) (internal quotation marks omitted) (citing Halberstam, 705 F.2d at 477). I previously found that Plaintiffs met the general awareness standard under Halberstam. (M&O 1 at 24-25.) Defendants argue that Plaintiffs have failed to show general awareness, but they do not articulate how Taamneh altered the analysis, merely citing the Court's admonition that aiding and abetting "has never been boundless." (MTD at 38-39 (quoting 598 U.S. at 488).) The Court in Taamneh provided the same recitation of the general awareness standard as the Second Circuit: "the defendant must be generally aware of his role as part of an overall illegal or tortious activity." 598 U.S. at 486 (citing Halberstam, 705 F.2d at 477). Since there has been no change in the caselaw on this inquiry, I decline to reconsider my prior ruling that Plaintiffs met the general awareness prong.

   b. **Knowing and Substantial Assistance: Framework after Twitter v. Taamneh**

6

Aiding-and-abetting liability requires that Defendants "knowingly and substantially assist[ed] the principal violation." Halberstam, 705 F.2d at 477. In Taamneh, the Supreme Court clarified the pleading standard for knowing and substantial assistance under JASTA. 598 U.S. at 484-93. Plaintiffs in Taamneh were victims of the ISIS terrorist attack at the Reina nightclub in Istanbul who brought JASTA aiding-and-abetting claims against Twitter, Google, and Facebook. Id. at 479. The plaintiffs alleged that the three companies were liable for failing to stop ISIS from using their platforms to post recruiting and propaganda videos and that Google, through its operation of YouTube, was liable because it "reviewed and approved ISIS videos on YouTube as part of its revenue-sharing system and thereby shared advertising revenue with ISIS." Id. at 498, 505. The Court held that neither theory stated a claim for aiding-and-abetting liability. Id. at 505-07. Most notably, the Court cautioned lower courts from "hew[ing] [too] tightly to the precise formulations" and facts in Halberstam when assessing aiding-and-abetting liability, id. at 493, and instead to focus on the "conceptual core" of Halberstam's elements to assess "that the defendant consciously and culpably 'participate[d]' in a wrongful act," id. (quoting Nye & Nissen v. United States, 336 U.S. 613, 619 (1949)). Although the Court did not define "culpable," it distinguished instances of "passive nonfeasance" from culpable conduct, suggesting that giving a terrorist group "special treatment or words of encouragement," or "providing . . . routine services . . . in an unusual way" would suffice. Id. at 498-502. The Taamneh Court also advised lower courts to consider the attenuation or nexus between a defendant's assistance and the act of international terrorism. Although "direct nexus" is not required, "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." Id. at 506. The Court concluded that Defendants "who aid and abet a tort can

7

be held liable for other torts that were 'a foreseeable risk' of the intended tort." Id. at 496 (quoting Halberstam, 705 F.2d at 488).

### B. Knowing and Substantial Assistance: Application to Defendants

#### a. Conscious and Culpable Assistance

The key question is whether Plaintiffs have alleged conscious and culpable participation in acts of terrorism. The Court in Taamneh advised that this determination involves a balancing act, considering "the nature and amount of assistance on the one hand, and the defendant's scienter on the other." Id. at 492-93. That is, "less substantial assistance require[s] more scienter before a court could infer conscious and culpable assistance," whereas "if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." Id. at 492. I applied Taamneh in a recent case before me in which plaintiffs were a group of American citizens killed or injured by terrorist attacks in Iraq and Afghanistan who brought claims against several telecommunications companies alleged to have aided and abetted the terrorist attacks. Zobay v. MTN Grp. Ltd., 695 F. Supp. 3d 301, 301 (E.D.N.Y. 2023). A set of defendants allegedly spearheaded procurement efforts for embargoed dual-use technologies that assisted terrorist campaigns, in addition to facilitating a steady flow of funds to terrorist organizations. Id. at 346. I found these acts distinguishable from the "passive nonfeasance" in Taamneh, namely failing to remove terrorist organizations from their existing social media platforms. Compare id. with Taamneh, 598 U.S. at 500. The relevant defendants in Zobay also had knowledge that the entities they serviced were affiliated with terrorists and continued to partner with, and financially profit from, them, making the assistance conscious as well as culpable. 695 F. Supp. 3d at 346.

The analysis of culpability begins by "recall[ing] the basic ways" that Defendants allegedly assisted Hezbollah. Taamneh, 598 U.S. at 498. As previously discussed at length in M&O 1, the

8

allegations against Defendants amount to "affirmative misconduct"—in short, knowingly laundering and investing vast amounts of money for Hezbollah—as opposed to mere "passive nonfeasance." (Compare M&O 1 at 28 with Taamneh, 598 U.S. at 500.) Defendants' active provision of banking services is more analogous to the telecommunications equipment and services in Zobay than the passive access to platforms provided in Taamneh.[2]

Defendants argue that their conduct cannot amount to knowing and substantial assistance because they provided "routine commercial banking services that are generally available to any bank customer." (MTD at 6.) Although the Court in Taamneh found that defendants' platforms offered nothing more than generally available and routine services available to any member of the public, the Court acknowledged that "[t]here may be . . . situations where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack." Taamneh, 598 U.S. at 502. In Zobay, a defendant claimed that its telecommunication services were part of its routine services, but plaintiffs alleged that defendant engaged in intentional evasion of U.S. sanctions and that the second floor of defendant's Iran offices was "populated by military intelligence officials." 695 F. Supp. 3d at 346. I found it foreseeable based on these "unusual business arrangements that goods and funds would flow to proxy groups and that acts of terror would result." Id. Here, although the services themselves do appear to be routine—maintaining accounts and transferring funds—I find, similar to Zobay, that the "who" and "how" of the services to those clients are pertinent. Plaintiffs allege that Defendants were facilitating millions of dollars in transactions to organizations whose only objectives were to support terrorism. (See, e.g., TAC

---

[2] When there is "mere passive nonfeasance" alleged, the Court in Taamneh decided that "a strong showing of assistance and scienter would [] be required." 598 U.S. at 500. Since I do not find mere passive nonfeasance, I will not conduct this inquiry.

¶¶ 1700, 1831, 1986, 2090.) Further, according to the TAC, Defendants had Hezbollah liaisons within their institutions who facilitated the transactions for those terrorist affiliates. (Id. ¶¶ 1727, 1769, 1891, 1983, 2046, 2083, 2089, 2131, 2153, 6103.) As in Zobay, the active management of these accounts made it foreseeable based on the unusual client relationship that the funds handled by the banks supported terrorist activities. Compare Zobay, 695 F. Supp. 3d at 346 (Defendant had an agreement that "mandates that [defendant] cooperate with the Iranian shareholders" allegedly linked to the IRGC) with Taamneh, 598 U.S. at 499 ("Once the platform and sorting-tool algorithms were up and running, defendants at most allegedly stood back and watched; they are not alleged to have taken any further action with respect to ISIS.") Plaintiffs, therefore, have sufficiently alleged that Defendants consciously and culpably aided and abetted the terrorist acts.

   b. **Nexus**

Defendants also argue that Plaintiffs have not alleged a sufficient nexus because they fail to show that Defendants assisted "the relevant terrorist act itself," rather than aided terrorist "activities in general," comparing the nexus here to the one rejected in Taamneh. (MTD at 32.) As an initial matter, the Court in Taamneh was clear that there need not always be a "strict nexus between the alleged assistance and the terrorist act." 598 U.S. at 497. A close nexus to the specific act may be found, but "even more remote support can still constitute aiding and abetting in the right case." Id. at 496. As an example of what might be the "right case," the Court noted that "[t]here may be . . . situations where the provider of routine services does so in an unusual way" which would ground an inference that the defendant's help "constitute[d] aiding and abetting a foreseeable terrorist attack," or where plaintiffs allege "pervasive, systematic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist attack." Id. at 502.

Plaintiffs' allegations plausibly meet both of these scenarios. Taking them in turn, I note Defendants allegedly opened and serviced accounts for individuals and organizations known to be linked to Hezbollah. (See, e.g., TAC ¶ 1784.) They also employed managers who "served as key facilitators and coordinators for Hezbollah" within their banking departments. (E.g., id. ¶¶ 1983, 2046, 2083.) And the Defendants made efforts to help Hezbollah hide funds from American sanctions. (See, e.g., id. ¶¶ 1697, 1825-26, 1882.) The bespoke servicing of a bank account, including the facilitation of payment transfers, evasion of counter-terrorism sanctions, and the appointing of a liaison within the banks to facilitate the relationship with those accounts linked to terrorism, points to a relationship that is less attenuated than what plaintiffs alleged in Taamneh. In short, according to the TAC, Defendants provided usual services (banking) in a highly unusual way, necessitated by their customers' links with Hezbollah. Plaintiffs' allegations that the customers were known Hezbollah affiliates support the inference that Defendants' provision of banking services foreseeably contributed to Hezbollah's terrorist acts. This satisfies the first "right case" in Taamneh. 598 U.S. at 502 (citing Direct Sales Co. v. United States, 319 U.S. 703 (1943), where a morphine distributor was held liable for a customer's illicit morphine operation when its distribution was tailored to the customer's unique purpose).

Plaintiffs have also alleged Defendants provided such systematic and pervasive assistance to justify liability for every Hezbollah terrorist attack. Defendants have allegedly provided Hezbollah with pervasive, substantial assistance constituting hundreds of millions of dollars of funding and crucial access to Lebanese and international financial networks through Hezbollah's proxies. (E.g., TAC ¶¶ 132, 556, 587, 791, 850, 1270-72, 1621, 1699, 1965.) Most directly, Defendants provided funds to IRSO, whose "mission is to provide Hezbollah with a 'kind of financial and material support.'" (Id. ¶ 424 (quoting Hezbollah Secretary-General Hassan

Nasrallah).) The IRSO's fundraising efforts are "earmarked primarily for the purchase of weapons for Hezbollah terrorist-operations." (Id. ¶ 425.) The U.S. Department of the Treasury listed IRSO as an SDGT for precisely this reason. (Id. ¶¶ 436-42.) The other SDGT customers were designated for their connections with Hezbollah, and it is well-recognized that terrorist organizations operate through affiliates and front groups such that aid to the front group is effectively aid to the terrorist organization. (M&O 1 at 20 n.7 (citing United States v. El-Mezain, 664 F.3d 467, 489 (5th Cir. 2011) and Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 434-35, 442 (E.D.N.Y. 2013)).) The amount and directness of Defendants' aid to Hezbollah and its proxies alleged in the TAC allow the reasonable inference that Defendants financially facilitated each and every Hezbollah-trained terrorist attack. Taamneh, 598 U.S. at 502. Defendants are alleged to have ensured Hezbollah's long-term access to critical funds supporting its terrorist activities while knowing that funds provided to IRSO and other customers were largely earmarked to supporting those terrorist activities. Plaintiffs have therefore alleged Defendants' funding played a sufficiently pervasive and systematic role in Hezbollah-supported terrorist activities to hold Defendants liable for every Hezbollah-supported attack under JASTA. See Zobay, 695 F. Supp. 3d at 348.

   c. **Halberstam Factors**

Finally, as I discussed thoroughly in my prior M&O denying Defendants' motion to dismiss the aiding-and-abetting claims, the six substantiality factors from Halberstam also weigh against dismissal of Plaintiffs' aiding-and-abetting claim. Defendants claim incorrectly that the Halberstam factors are "now obsolete" after Taamneh. (MTD at 26.) The Taamneh Court still engaged with the Halberstam factors but clarified that the six factors should not be regarded "as a sequence of disparate, unrelated considerations without a common conceptual core"; instead, the factors are meant to "capture the essence of aiding and abetting: participation in another's

wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." 598 U.S. at 504. There, the lower court had erred by "focusing . . . primarily on the value of defendants' platforms to ISIS, rather than whether defendants culpably associated themselves with ISIS' actions." Id. (emphasis in original). Thus, although a terrorist venture would undeniably benefit from long-term infusions of capital, the precise question is instead whether the terrorists' ability to benefit from the financial institutions is properly "attributable to any culpable conduct of defendants directed toward" them. Id. Focusing on the conceptual core of aiding-and-abetting liability, these factors, for many of the reasons already discussed, point to significant and culpable action by Defendants.

I find that my prior analysis of the Halberstam factors supports a finding of aiding-and-abetting liability here. The six factors are: (1) nature of the act; (2) amount and kind of assistance; (3) presence at the time of the tort; (4) relation to the tortfeasor; (5) state of mind; and (6) duration of assistance. Halberstam, 705 F.2d at 483–84.

The first factor, nature of the act, "dictates what aid might matter, i.e., be substantial" to the terrorist attacks. Id. at 484. As discussed at length in M&O 1, Hezbollah's terrorist activities are capital-intensive, and given the global sanctions regime, require banks to provide specialized treatment to facilitate the transfer of funds. Defendants' provision of that service, to the tune of hundreds of millions of dollars, suffices as "substantial." Likewise, the second Halberstam factor, the "amount" of assistance, is easily satisfied. (See M&O 1 at 28.)

As explained in my first M&O, the third and fourth Halberstam factors do not weigh strongly in my calculus because, given the nature of terrorist attacks, it would be unreasonable for banks to be present and active in the attacks themselves. (Id. at 28-29.) The fifth and sixth Halberstam factors weigh in favor of liability here. Plaintiffs have plausibly alleged that

Defendants were active business partners channeling funds to Hezbollah, raising the inference that Defendants intended to assist Hezbollah's activities which are chiefly to engage in terror. (See id. at 29.) Plaintiffs also allege that Defendants provided banking services to the alleged customers from at least 2004 to 2011, with certain Defendants providing services to the alleged customers as far back as 1986. (TAC ¶ 420.) Moreover, the Complaint alleges that Defendants continued to provide services to customers even after they knew those entities had been designated SDGT groups. (E.g., id. ¶¶ 646, 1825.) As in Atchley, "[t]he allegations do not describe a one-off transaction by a firm unfamiliar with its counterparty, but a set of enduring, carefully cultivated relationships consisting of scores of transactions over a period of years." [3] 22 F.4th at 224. This factor weighs in favor of finding substantial assistance.

In sum, the Halberstam factors—particularly the first, second, and sixth factors—support a plausible inference of substantial assistance.

### III. Primary and Successor Liability

I previously dismissed Plaintiffs' primary liability claims (M&O 1 at 49), and decline to revisit that decision. Plaintiffs have preserved these claims for appeal.

I also dismissed Plaintiffs' successor liability claim against Société Générale de Banque au Liban SAL ("SGBL") because I found a lack of jurisdiction over SGBL as LCB's successor (as opposed to SGBL's own actions). On April 18, 2024, the New York Court of Appeals ruled that, "where an entity acquires all of another entity's liabilities and assets, but does not merge with that entity, it inherits the acquired entity's status for purposes of specific personal jurisdiction."

---

[3] Defendants filed a notice of supplemental authority on June 26, 2024 providing me with the Supreme Court's grant of certiorari, vacatur, and remand (the "GVR") of the D.C. Circuit's decision in Atchley. (D.E. # 415.) The Supreme Court did not rule on the merits of Atchley and instead remanded for further consideration in light of Taamneh. Defendants further urge me to consider the GVR in connection with the Solicitor General's amicus brief in Atchley (id.), but the amicus brief is not "authority."

14

Lelchook v. Société Générale de Banque au Liban SAL, 41 N.Y.3d 629, 638-39 (2024). The Court of Appeals specifically noted that its holding is contrary to this Court's prior determination of the "nearly identical" issue. Id., at 635 n.2 (citing M&O 2 at 16-17 and Lelchook v. Société Générale De Banque Au Liban Sal, 67 F.4th 69, 81-82 (2d Cir. 2023)). Plaintiffs argue that I should revisit my prior ruling in light of this new decision. (D.E. # 392 at 1.) However, the question of whether a federal court may exercise specific personal jurisdiction over a foreign corporation based solely on its all-cash purchase of another foreign corporation's assets and liabilities remains before the Second Circuit. On April 22, 2024, the Second Circuit ordered supplemental briefing "addressing the effect of the decision of the New York Court of Appeals on the case and the question whether exercising specific personal jurisdiction over SGBL comports with constitutional due process." Lelchook v. SGBL, No. 21-975, Doc. 83 at 2 (Apr. 22, 2024). Because the Second Circuit's decision on the issue is pending, I find it improvident to revisit my decision on primary and successor liability at this time.

## CONCLUSION

For the reasons discussed, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

SO ORDERED.

Dated: September 18, 2024
Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge

15