
190 Moore Street, Suite 272, Hackensack, New Jersey 07601
T: 201 265 6400 F: 201 265 0303

1441 Broadway, New York, New York 10018
T: 212 354 0111
www.osenlaw.com



April 9, 2025

**VIA ECF**
Honorable Taryn A. Merkl
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    ***Bartlett, et al. v. Société Générale de Banque au Liban, et al.*, No. 19-cv-00007**

Dear Magistrate Judge Merkl:

Plaintiffs respectfully request that the Court enter Plaintiffs' proposed expanded discovery order ("Proposed Discovery Order"), attached here as Ex. A.

<h2 style="text-align:center">BACKGROUND</h2>

On May 20, 2022, Plaintiffs moved to compel production in response to their first request for production of documents ("First RFP"). *See* ECF No. 270. The First RFP requested customer records for 687 alleged Hezbollah-affiliated persons (individuals and entities), 592 of which were described in the Second Amended Complaint ("SAC"). Defendants opposed the motion and moved for a protective order, arguing that the First RFP was, *inter alia*, overbroad, unduly burdensome, and required production of information prohibited from disclosure by Lebanese bank secrecy laws. The Defendants suggested delaying discovery by first seeking waivers from their customers followed by a letter rogatory process. *See* ECF No. 276.

On March 31, 2023, the Court largely denied Defendant's motion and objections and on June 8, 2023, entered a production order (the "First Production Order"). *See* ECF Nos. 320, 328. The First Production Order required Defendants to produce certain records relating to 184 alleged Hezbollah-affiliated persons and entities, broken out by each bank at which the SAC alleged they held an account. The Court permitted Defendants to pursue sending letters rogatory to Lebanese authorities for permission to produce records and noted that Defendants "are free to seek individual customer waivers, … but the Court declines to further delay the issuance of letters rogatory." *Id.* at 19 n.16. As the Court explained, "it is not realistic to believe that the named individuals or entities will provide waivers, much less that *all* would" and that "[s]uch efforts are likely to be very time consuming and ultimately unsuccessful, given the identities of some of the key accountholders and the nature of the records Plaintiffs seek." *Id.* at 29-30.

On July 15, 2024, the Lebanese authorities denied leave to produce the records sought by the letters rogatory. *See* ECF No. 421. Thereafter, *for the first time*, each bank began seeking "waivers," and only from the customers identified in the First Production Order for that bank. During the November 18, 2024, conference, Defendants claimed to have obtained 67 waivers, although they have so far declined to provide the waiver documentation or further information on the procedures utilized to obtain the waivers. Nine of the banks made highly limited productions of account statements from "waiving" customers (Bank of Beirut produced nothing and SGBL made its first production after 6pm *tonight*—which was just 39 pages). The Court instructed the

parties to confer on an expanded production order. *See* 11/18/24 Tr. at 39-40.[1]

On December 18, 2024, Plaintiffs provided a draft discovery order to Defendants, requiring production of certain records for Defendants' customers identified from a list of 739 individuals and entities, all of which are described in the Third Amended Complaint ("TAC") and all of which are associated with Hezbollah. On February 21, 2025, rather than send a markup of Plaintiffs' draft, Defendants sent a mark-up of the Court's First Production Order, simply adding a few recitals and the names of a few additional persons Plaintiffs alleged in the TAC were customers of specific Defendants. To bridge the gap, Plaintiffs proposed a phased discovery order, attached as Ex. B, which Defendants also rejected. Their chief objections were: (1) they refused to search for any listed individuals or entities for which Plaintiffs have not yet associated with a particular Defendant and (2) they objected that Plaintiffs had broken out the categories of records sought in the First Production Order more specifically, asserting that "we do not see the need for further specificity." 2/27/25 Ltr., attached as Ex. C, at 2. These objections are unsupportable.

Given those rejections of Plaintiffs' compromise, Plaintiffs request that the Court enter the Proposed Discovery Order (a slightly modified version of the draft order sent to Defendants), which is a straightforward request for account-related documents typical in ATA cases.

## STANDARD OF REVIEW

The standard of review for this motion for a renewed discovery order is governed by Rule 26. As Judge Scheindlin explained in another ATA case against a foreign bank, a discovery order in this context—

> is limited by consideration of the factors set forth in Rule 26(b)(2)(C). With regard to foreign discovery materials, I recognize that ordinarily it may be "reasonable to limit foreign discovery to information [that is] necessary to the action . . . and directly relevant and material," rather than "information that could lead to admissible evidence." But in light of the significant U.S. interest in eliminating sources of funding for international terrorism, and the other factors discussed below, the law governing discovery disputes in *this case must ultimately be the broad discovery rules of the Federal Rules of Civil Procedure*.

*Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 556 (S.D.N.Y. 2012) (emphasis added).

This Court, quoting *Wultz*, also recognized that "[t]he interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty." ECF No. 320 at 21-22 (quoting *Wultz*, 910 F. Supp. 2d at 559). Thus, considerations premised entirely on Defendants' foreign status have little role to play here.

## ARGUMENT

### 1. The Requested Records Are Relevant

This Court has already found Rule 26's standards met in its Order granting Plaintiffs' motion to compel in part and denying Defendants' motion for a protective order. In that decision, the Court explained that it "has little difficulty concluding that discovery related to the 592 names

---

[1] This case was filed six years ago and yet Defendants have managed not to produce a single email, memorandum, or payment (e.g., SWIFT) record or compliance document outside of some KYC documents.

and entities listed in the SAC may yield relevant evidence." *Id.* at 15. The Court further explained that "[t]he information and records that Plaintiffs seek from Defendants are of critical importance to a case alleging 'that Defendants knowingly provided Hezbollah with wide-ranging financial services — including maintenance of accounts, accepting donations from abroad, and processing wire transfers — that were integral to financing Hezbollah's terroristic attacks.'" *Id.* at 28 (quoting Order, *Bartlett*, 2020 U.S. Dist. LEXIS 229921, *60 (E.D.N.Y. Nov. 25, 2020)). And "[n]ot only is the evidence sought by Plaintiffs of central importance to advancing the significant U.S. interest in combatting global terror recognized by JASTA, the bank records they seek are not available through any other means." *Id.* 28-29.

Defendants do not dispute the Court's analysis but have argued that any production order must come with "additional information to proffer about the relevance of the above names and entities as discovery progresses." Ex. C at 2 (quoting ECF No. 320 at 16 n.13). Each name in the Proposed Discovery Order is described in the TAC. The list of 739 names in the Proposed Discovery Order is already narrowly tailored to the Hezbollah-related entities most likely to relate to "evidence" supporting Plaintiffs' claims. *See* 11/18/24 Tr. at 25. It could have been much longer—as the Lebanese Foreign Minister Jebran Bassil publicly stated in 2019, "everyone in Lebanon is a partner of Hizbullah." Pls. Mot. Compel, ECF No. 270-1 at 35 (quoting Schlanger Decl. Ex. F). Indeed, in *Linde*, the court ordered discovery on **15,545** distinct sets of records for recipients of terrorism-related payments. *See id.* at 25 (citing Schlanger Decl., Exs. C and D).

Likewise, in *Miller v. Arab Bank, PLC*, Magistrate Judge Kuo also entered the plaintiffs' proposed discovery order after granting their motion to compel. *See* No. 18-cv-2192, ECF No. 115 (E.D.N.Y. Apr. 14, 2023), attached as Ex. D. That order demanded, as Arab Bank's counsel explained, "that the Bank search for and produce **all** documents involving the accounts **for 677 individuals** and entities over **a six-year period from two decades ago**." *Miller*, ECF No. 113 at 2 (emphasis in original), attached as Ex. E. *Miller* involved a *single* defendant, approximately 50 plaintiffs, and *most of the discovery from Linde*; *Bartlett* involves **13** Defendants and over **1,100** Plaintiffs, many of whom were horrifically injured, and *no* prior discovery.

Defendants also object that "that the list should not be expanded further to include anything other than newly alleged bank-specific customers in the TAC." Ex. C at 1. But that was a limitation the Court imposed at the letter rogatory "stage," ECF No. 320 at 32 n.23—the Court explained that the "require[ment] to narrow or specify customers bank-by-bank as to discovery *for the entire case* is, however, unrealistic." *Id.* at 24. The Court explained that "Plaintiffs lack specific knowledge" as to those relationships, and "Defendants are the only ones with access to that information." *Id.* Again, the Court later asked, "how is [Plaintiffs' counsel] to know which bank to ask for records if there is evidence that certain individual or entity is being financed and that there are finances flowing in their direction … without specificity available in the public domain due to bank secrecy[?]" 11/18/24 Tr. at 25.

According to Defendants, Plaintiffs should not be permitted to ask them to identify their clients until Plaintiffs themselves identify *Defendants'* clients using discovery *other* than from them. The customer relationships alleged so far are simply those Plaintiffs were *fortuitously* able to locate due to their own research and some third-party discovery. That discovery has confirmed some additional customer relationships but is necessarily limited. *All* of this information is, of course, in *Defendants' possession*. Thus, whatever extent "courts should be mindful of the possible burden placed on foreign judiciary by the issuance of letters rogatory," *Pearlstein v. Blackberry Ltd.*, 332 F.R.D. 117, 120 (S.D.N.Y. 2019), that is not relevant for the "entire case."

The likelihood that electronically searching for these 739 names in their customer databases will lead to Defendants identifying more customer relationships is very high. As the Court explained, these "11 foreign defendants" constitute perhaps "three-quarters of the banking industry of Lebanon." 11/18/24 Tr. at 35-36.[2] According to Mr. Bassil, Lebanon does not "accept the classification of Hizbullah as a terrorist organization" meaning Defendants had no (domestic) legal reason not to have Hezbollah-related customers. ECF No. 270-1 at 35 (quoting Schlanger Decl. Ex. F). Indeed, Defendants assert that Plaintiffs have already associated "approximately … half" "of the 600 or more names" with specific Defendants simply using information Plaintiffs were able to locate extrinsically. Ex. C at 2. Post-TAC third-party discovery has also identified several additional accounts associated with specific Defendants.

Moreover, at least several Defendants have previously tracked their Hezbollah-affiliated customers through their own compliance and audit departments. Indeed, Defendants likely have many such records given that their Hezbollah customers or their affiliates were often sanctioned in other countries. For example, Plaintiffs alleged that in June 2020, Byblos Bank (a Defendant) senior compliance officer Antoine Dagher was brutally stabbed to death in a parking garage near his home, and that a subsequent Lebanese television report published internal compliance documents Mr. Dagher reportedly possessed. *See* TAC ¶ 1829. These compliance files included a list of a substantial number of Byblos Bank's Hezbollah clients, demonstrating that the bank tracked this information internally. *Id.* ¶¶ 1830-82. *See also id.* ¶ 215.

Likewise, the United States' verified complaint against Defendant LCB disclosed, among other things, an internal LCB compliance document acknowledging that a United Nations Security Council panel had linked LCB customers including Nazim Ahmad to Hezbollah and its criminal activities. *Id.* ¶ 2240. The LCB memorandum showed that it was aware of this information but dismissed it as "'part of the propaganda and war launched by the Jewish state against Lebanon,' and authorized an *increase* in credit limits for Nazim Ahmad." *Id.*

Finally, SGBL challenges requesting records in its possession "concerning its acquisition of LCB" and "concerning former bank accounts and customers of LCB" that migrated to other Defendants. SGBL contends that while "Judge Merkl's conclusion that accounts migrated from LCB may be relevant to the claims," the Court did not authorize discovery of records relating to that migration. Ex. C at 3. In fact, the Court found that "[d]iscovery regarding these accounts could yield highly relevant evidence regarding Defendants' state of mind and the duration of Defendants' provision of banking services, factors pertinent to analyzing 'general awareness' and 'substantial assistance' under JASTA." ECF No. 320 at 16.

## 2. Identifying Customer Relationships Does Not Establish an Undue Burden

In issuing the First Production Order, where the Hezbollah persons were broken out by bank, the Court rejected Defendants' burden argument, noting that "Plaintiffs largely seek electronically available records, which substantially mitigates concerns about Defendants' burden of production and potential hardship." *Id.* at 29. Of course, that burden is *even less now*, because Defendants have thus far refused to produce records for customers who have not "waived" their

---

[2]       The Court noted that a discovery order of the kind Plaintiffs seek would put "three-quarters of the banking industry of Lebanon [] in the position of violating potentially my order…." *Id.* That is undoubtedly correct and follows directly from this Court's Order overruling Defendants' bank secrecy objections, but the Proposed Discovery Order is strongly grounded in the TAC and entirely consistent with this Court's prior analysis of the scope of relevance in this case. Of course, the fact that Plaintiffs brought one suit against 11 (participating) Lebanese banks, rather than 11 separate suits, should not alter the consequences for any individual Defendant choosing to defy a valid court order.

bank secrecy protections. *See, e.g.*, *Linde v. Arab Bank, PLC*, No. 04-cv-2799 (NG)(VVP), 2007 U.S. Dist. LEXIS 90811, at *10-11 (E.D.N.Y. Dec. 10, 2007) (finding no additional burden where Arab Bank refused to produce certain records because of bank secrecy).[3]

Asking each Defendant to electronically search its customer databases for 739 names does not significantly increase their burden (even if they were willing to produce records for all of their customers, which they are not) because they are only asked to produce customer-specific records from the accounts *they actually held*. (The Proposed Discovery Order generally requires customer-specific production only "to the extent such persons and entities were customers of a Defendant" during the relevant period.) Searching the 739 names *solely to identify bank customers* is not *itself* particularly burdensome (Defendants' previous burden declarations—which are of varying plausibility—notwithstanding). Banks routinely perform countless searches to identify their own customers for myriad non-litigation reasons—for example, identifying targets for marketing materials and responding to requests from regulators, other banks, and their own customers.

Defendants also oppose the types of document categories listed in the Proposed Discovery Order. They assert that "[t]he categories you propose appear to fall within the Court's five categories specified in its June 8, 2023 Order, and we do not see the need for further specificity." Ex. C at 1. It is certainly odd for a *producing party* to resist "further specificity" in a document request rather than demanding it. Plaintiffs fail to see any legitimate basis to resist greater specificity in the Proposed Discovery Order.

The discovery requested is proportional to the needs of the case, the amount in controversy, and the importance of the issues at stake. Plaintiffs are over a thousand Americans who were injured (often brutally) or whose family members were injured or killed while serving their country. The amount in controversy is massive given the grievous injuries and the ATA's treble damages. And courts have noted the role of a suit's policy purposes in determining proportionality, *see e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 306 (S.D.N.Y. 2012), and this Court has noted "the United States' paramount interest in fighting terrorism." ECF No. 320 at 21.

Although Plaintiffs continue to engage in third party discovery with banks in the U.S. (and although Defendants have "the higher burden," *id.* at 28), U.S. clearing banks invariably possess limited transactional data (often only from periods after 2012), and only where they were involved in the transaction. Defendants, on the other hand, naturally have their own records and, "[g]iven the need for internal bank documents and records" *knowledge*, "Defendants are really the only source for the vast bulk of the needed discovery." *Id.* at 31. *See also id.* at 25 (expressing "skeptic[ism] that alternative means are likely to provide" such "highly relevant" evidence).

Lastly, Defendants have vastly greater resources than Plaintiffs. Defendants are large banks with billions in assets collectively. Plaintiffs are injured veterans and Gold Star families.

## CONCLUSION

The Court should enter Plaintiffs' Proposed Discovery Order.

---

[3]     The *Aeropostiale* Court cautioned against "discovery abuses" against foreign defendants like attempts to drive up "the *additional cost* of transportation of documents or witnesses to or from foreign locations rather than finding relevant and probative evidence." 482 U.S. at 546 (emphasis added). The requested evidence is relevant and probative and there is no "additional cost" here, where the requested records are electronic or, if in paper form, can be scanned in Lebanon.

Respectfully submitted,


/s/ Michael Radine
_____

cc:     All Counsel

Encls.