

190 Moore Street, Suite 272, Hackensack, New Jersey 07601
T: 201 265 6400 F: 201 265 0303

1441 Broadway, New York, New York 10018
T: 212 354 0111
www.osenlaw.com

April 30, 2025

**VIA ECF**
Honorable Taryn A. Merkl
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: ***Bartlett, et al. v. Société Générale de Banque au Liban, et al.***, No. 19-cv-00007

Dear Magistrate Judge Merkl:

Plaintiffs write respectfully in response to Defendants' opening letter brief, which mischaracterizes Plaintiffs' Proposed Discovery Order.

***First***, Defendants erroneously assert that the Proposed Discovery Order would "require the Banks to search for and produce documents concerning hundreds of additional names that are not alleged to have banked with the Banks…." Defs.' Br. at 1. Again, the Proposed Discovery Order would merely direct each Defendant to search for the names in the two attached Appendices and produce records *only to the extent such individuals or entities were, in fact, that Defendant's customer*.[1] If a given name was not a Defendant's customer during the relevant period, that Defendant would not be obligated to produce anything for that named individual or entity at all.

From a burden standpoint, this is essentially the same approach set forth in the Court's First Production Order, which also limited production of most records to each bank's own customers. *See* ECF Nos. 320, 328. Indeed, it is narrower than Plaintiffs' first request for production, ECF No. 277-1, which called for production for a list of 687 names whether they were customers or "counterparties in a transaction as opposed to only the bank's customers," as the Court explained. ECF No. 320 at 27. And although the Court did *not* consider that request unreasonable, at least for a later stage of discovery, *see id.* at 24, the Proposed Discovery Order nevertheless narrows the scope of production solely to *each bank's own customers*. This is the antithesis of "group-pleading," as Defendants suggest. Defs.' Br. at 2.

Thus, the only thing each Defendant must do with the list of "hundreds of additional names" is confirm whether they were customers during the relevant period. Defendants ***never*** suggest that simply searching for whether these individuals or entities held accounts during the relevant period is unduly burdensome (a core function for a bank performed every day for non-litigation purposes). In fact, Defendants now admit they *already checked* the approximately 310 of these names that are listed in the First Production Order as a "preliminary determination," confirming (by their own metrics) that they held accounts for over 80% of them. Defs.' Br. at 2 n.3. In a case brought by over 1,100 wounded veterans and Gold Star families, checking whether another 430-odd Hezbollah-affiliated individuals and entities *simply held accounts* at the Defendant banks is far from "entirely disproportionate," as Defendants assert. *Id.* at 2.

---

[1] Requests 2-11 relate to the Appendices. Of these, requests 2-4 and 6-10 explicitly request "electronically maintained categories of documents *to the extent that such persons and entities were customers of a Defendant* at any time during the [defined] time period"; requests 5 and 11 are explicitly limited to records in the "*Customer's* account."

Defendants nonetheless argue that even this request would constitute a "fishing expedition," "lack[ing] specificity," and without evidence to justify the additional names. *Id.* at 2, 3. A list of names detailed in the complaint as closely tied to Hezbollah cannot be more specific. Third-party discovery has already revealed dozens more accounts than Plaintiffs were able to allege in the SAC and nearly a billion dollars in transactions (*without* counting the Hezbollah-affiliated exchange houses). *See* ECF No. 295 at 36. But third-party correspondent banks naturally have less relevant information than Defendants have about their own customers (especially as to SDGTs, as their transfers cannot be processed in the U.S. by correspondent banks). *Aérospatiale* expressly rejected such an approach, which would compel Plaintiffs to scour the world to try to find the *information in Defendants' possession*, as blocking statutes "do not deprive an American court of the power" to order production even where it "may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist.*, 482 U.S. 522, 544 n.29 (1987).

***Second***, Defendants repeatedly assert that this Court "rejected" Plaintiffs' approach of requesting that the banks identify their own customers. Defs.' Br. at 1, 2, 3. To the contrary:

> Defendants' request that Plaintiffs be required to narrow or specify customers bank-by-bank as to discovery for the entire case is, however, unrealistic. Prior to taking discovery, Plaintiffs lack specific knowledge regarding which Hezbollah-associated entities and individuals have been customers (or counterparties to transactions) of each Defendant bank, and **Defendants are the only ones with access to that information**.

ECF No. 320 at 24 (emphasis added).

Instead, Defendants are effectively asking this Court to endorse a rule that Plaintiffs can only ask Defendants to produce records for customers that *Plaintiffs already know about without discovery* from Defendants. They provide *no* support for that proposition and while they cite frequently to *Aérospatiale*, that case obviously does not require Plaintiffs to divine information where "Defendants are the only ones with access to that information," as this Court explained. *Id.*

Defendants nevertheless urge the Court to "adhere to the balanced approach of the June 8, 2023 production order [ECF No. 328] and limit additional discovery to newly alleged customers identified in the [TAC], 'broken down by bank.'" Defs.' Br. at 1. But, again, that order directed that "discovery proceed[] in stages," and was "tailored *for purposes of submitting the first set of letters rogatory to Lebanon*." ECF No. 320 at 24 (emphasis added). And, again, the Court called the request to limit discovery to alleged customer relationships "unrealistic." It explained at length that it was seeking to control *burden*, not limiting the scope of discovery: "Cognizant of Plaintiff's concern that a 'rule' tying the scope of discovery to the allegations in a complaint could run the risk of turning 'complaints into directories,' the Court notes that this ruling does not *limit* discovery to the accounts alleged in the SAC." *Id.* at 32 n.23 (quoting Pls.' Reply, ECF No. 295, at 39). Given the breadth of the complaint and comity concerns, the Court would instead "require discovery to proceed in stages, focused on a manageable number per bank for each set of requests." *Id.*

Plaintiffs have done that here. First, the Proposed Discovery Order requires searching solely for individuals and entities listed in the operative complaint. This narrows the scope further than the Court itself found appropriate. *Id.* Second, the Proposed Discovery Order only requires banks to produce records for their *own* customers, which should result in "a manageable number per bank for each set of requests." Of course, if a Defendant had an extremely long list of *Hezbollah-affiliated* customers, that is a reason to demand *more discovery*, not *less*. *See id.* at 21-

22 (noting U.S. interests in preventing terror financing).

### *Defendants' Aérospatiale Analysis Is Incorrect*

Having not objected to the Court's March 31, 2023, Order, Defendants now essentially seek reconsideration of the Court's analysis of the *Aérospatiale* factors, arguing that they preclude requiring each bank—alleged to have supported acts of terrorism against the United States—to search for the names in the Appendices to determine if they held accounts during the relevant period. This is incorrect for two reasons.

***First***, as Plaintiffs set forth in their opening letter brief, in ATA cases, *Aérospatiale* does not curtail or obviate Rule 26 discovery. As Judge Scheindlin explained, "in light of the significant U.S. interest in eliminating sources of funding for international terrorism … the law governing discovery disputes in *this case must ultimately be the broad discovery rules of the Federal Rules of Civil Procedure*." *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 556 (S.D.N.Y. 2012) (emphasis added). *See also* ECF No. 320 at 21-22 (quoting *Wultz*, 910 F. Supp. 2d at 559); *Miller v. Arab Bank, PLC*, No. 18-cv-2192 (HG)(PK), 2023 U.S. Dist. LEXIS 56810, at *41 (E.D.N.Y. Mar. 31, 2023) ("'[P]rivate tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism,' such as this one, 'vindicate the national and international public interest.'" (quoting *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 218 (E.D.N.Y. 2007)). Indeed, Defendants tellingly avoid discussing ATA decisions involving foreign bank secrecy, despite the fact that this issue often arises in the ATA context.[2]

***Second***, Defendants give no reason to reconsider the Court's *Aérospatiale* analysis performed when overruling Defendants' bank secrecy objections and entering the First Production Order. *See generally* ECF Nos. 320, 328. Defendants suggest that the "expansion" of the Proposed Discovery Order changes the analysis. *See* Defs.' Br. at 3. But the Proposed Discovery Order is *narrower* than the First RFP that was the subject of the Court's March 31, 2023, Order, making the Court's analysis even more applicable here. Again, consistent with the practice in *Linde*, *Miller* and other cases, the First Production Order was "more tailored *for purposes of submitting the first set of letters rogatory to Lebanon*, [and] Plaintiffs ha[d] attempted to craft specific requests based on the information they have at this stage of the case." ECF No. 320 at 24 (emphasis added). This was entirely reasonable both here and in prior cases to ascertain whether the foreign state would be prepared to cooperate in discovery under narrow circumstances and if so, to work to tailor discovery with those comity interests in mind. But where, as here, the foreign state comprehensively declines the letters rogatory requests, courts then assess the requested discovery under Rule 26 with typical considerations for relevance, scope, and burden.

This is illustrated in *Miller*. There, foreign jurisdictions (including Lebanon) declined to cooperate given a narrow list of individuals and entities identified in letters rogatory. The court rejected the argument that requesting a foreign bank search for a "relatively large number" of names "identified" as terrorists, family members, or linked to terrorist organizations changes the comity analysis:

---

[2] Defendants cite only two ATA cases, both for generic propositions. One is a sub-cite to this Court's citation to *Linde v. Arab Bank, PLC* for the proposition that "overruling Defendants' bank secrecy objections may put Defendants 'in a position to pursue avenues for obtaining permission to disclose the information from [the] pertinent government[] and authorities through letters rogatory or other devices.'" Defs.' Br. at 4 (quoting ECF No. 320 at 27). The second is simply a cite to *Weiss v. National Westminster Bank, PLC*, for the definition of the seventh bank secrecy factor. *See id.* at 5 (citing *Weiss*, 242 F.R.D. 33, 56 (E.D.N.Y. 2007)).

> The RFPs are specifically tailored to request bank account and transaction information only as to named individuals whom Plaintiffs have identified as terrorists, martyrs, operatives, FTO leaders, agents, or the family members of these individuals, and charitable organizations and institutions that are or are linked to terrorist organizations. Despite the relatively large number of individuals and organizations, the requests are very specific.

*Miller*, 2023 U.S. Dist. LEXIS 56810, at *33-34 (record citation omitted).

Defendants' other arguments are equally unavailing. For example, as in *Miller*, Defendants have "failed to cite any instance in which" they or any bank "were punished for complying with an American court's discovery order," making their hardship concerns "purely speculative." *Id.* at *42. *See also id.* ("courts considering similar arguments have found them unpersuasive").

Defendants also argue that this Court should not enter the Proposed Discovery Order because doing so "would require each Bank to approach hundreds of names to attempt to secure a waiver." Defs.' Br. at 3. This is doubly wrong. First, each bank *only need approach its own customers*, not "hundreds" (unless they have hundreds of Hezbollah customers, which cannot be a basis for *lessening* their discovery duties). Second, the waiver process is neither a right nor an obligation. As the *Miller* court correctly observed:

> The waiver process, that's really an accommodation to the bank[.] [M]y order was that the information should be turned over anyway and the waiver was to make it easier for you. For the fact that it took a lot of effort was really on the bank…. The bank did not have to go through that process. It … undertook that process to protect itself. **No one told it to do that.**

Ex. 1 hereto (3/20/24 Tr., *Miller*, at 18) (emphasis added). This Court likewise stated that "Defendants are free to seek individual customer waivers," but refused to let that accommodation "delay" the process. ECF No. 320 at 29. As Defendants admit, they have only been able to obtain waivers for (less than) 30% "of confirmed SAC customers," which has "increased" by some unstated amount. Defs.' Br. at 2; 11/18/24 Tr. at 20.

Finally, in a footnote, Defendants quote the Court's statement that "the purpose of the narrower list that I permitted" in the First Production Order was not "to test the waters with regard to what Lebanon was likely to do or, frankly, what the defendants were likely to do, but rather it is how I view my obligations under the *Aérospatiale* case." Defs.' Br. at 1 n.2 (quoting 11/18/24 Tr., *Bartlett*, at 28-30). The Court explained that it imposed the narrower list "to ensure that we were exercising appropriate comity when dealing with foreign entities and ensuring that we do not put foreign defendants in a position where they are faced with the Hobson's choice." *Id.*

Defendants interpret this statement to mean that the Court intended to maintain the requirement that each Defendant need only search for customers that *Plaintiffs* can allege held accounts at that specific bank. But the Court was not assessing Plaintiffs' Proposed Discovery Order, which is only now before it, and had previously observed that "Defendants' request that Plaintiffs … narrow or specify customers bank-by-bank as to discovery for the entire case is … unrealistic," and that "Defendants are the only ones with access to that information." ECF No. 320 at 24. The letters rogatory process approved by the Court was consistent with *Aérospatiale* and international comity; Defendants' invented limitation on discovery is unmoored to either.

### *Plaintiffs Have Provided Sufficient Justification for Each Name*

Although the Court explained that its "ruling does not *limit* discovery to the accounts alleged in the SAC," *id.* at 32 n.23, Plaintiffs have nonetheless provided TAC citations for every requested name. And although neither Rule 26 nor *Aérospatiale* requires Plaintiffs to *prove* the relevance of each topic of discovery, to the extent the TAC's allegations leave the Court with any doubt as to the relevance of any particular name, they can provide additional information.

Defendants also note that "the Lebanese authorities have expressed their willingness to consider requests supported by additional evidence on a case-by-case basis." Defs.' Br. at 4. Indeed, in declining to permit the requested discovery, the Lebanese authorities wrote: "To the extent the 'Court' is able to provide the 'Commission' with additional details concerning money laundering or terrorism financing allegations that are specific to each alleged account, the 'Commission' would be willing to look into such allegations." ECF No. 421-2 at 6.

Comity requires the Court to credit the foreign sovereign's *interests* but it does not require a Court to suspend all disbelief or credit preposterous assertions. No one can seriously believe that the Lebanese authorities require "more details" for notorious Hezbollah operatives and entities based in Lebanon, including numerous SDGTs, such as the Martyrs Foundation and the Islamic Resistance Support Organization that have been designated for almost two decades. Moreover, the "Commission" knows perfectly well how the "money laundering or terrorism financing" worked—the United States effectively shuttered two major Lebanese banks (LCB and JTB) for their rampant support of Hezbollah. And yet, the "Commission" did not permit discovery as to *any* names.

### *SGBL Must Produce "Highly Relevant" Records Relating to the Acquisition of LCB*

SGBL argues the Court "should reject" requests 12 and 13 from the Proposed Discovery Order, Defs.' Br. at 5, which relate to SGBL's acquisition of LCB and the migration of Hezbollah accounts from LCB to other Defendants. SGBL argues that Plaintiffs never raised requesting these records before and the parties never briefed or even met and conferred about them.

But the parties did brief the issue—Defendants objected to the "the broad swaths [Plaintiffs] request" relating to the migration, *see* ECF No. 295 at 9—and the Court ruled on them: "Plaintiffs have shown that discovery regarding the accounts migrated from LCB to the other Defendants would be relevant…. Discovery regarding these accounts could yield highly relevant evidence regarding Defendants' state of mind and the duration of Defendants' provision of banking services…." ECF No. 320 at 16. And as that decision pointed out, Judge Amon also found that "the 'continued provision of financial services to these blacklisted account holders certainly evidences a culpable, or at least willfully blind state of mind.'" *Id.* (quoting *Bartlett*, 2020 U.S. Dist. LEXIS 229921, at *69 (E.D.N.Y. Nov. 25, 2020)).

And the parties did meet and confer about requests 12 and 13. As SGBL's counsel wrote to Plaintiffs, SGBL gave its position on the requests during the parties' January 24, 2025, meet and confer call. *See* Ex. 2 hereto. It is hard to see how further discussion will bridge the gap on what SGBL calls "a far-reaching and unsupported demand." Defs.' Br. at 5. SGBL argues this is "particularly [so] given the Court's dismissal of the successor liability claim against SGBL," but fails to mention that the dismissal was put into serious doubt by *Lelchook v. SGBL*. *See* ECF No. 434 at 15 (observing that the New York Court of Appeals "specifically noted that its holding is contrary to this Court's prior determination of the 'nearly identical' issue," but deferring revisiting the issue) (quoting *Lelchook v. SGBL*, 41 N.Y.3d 629, 635 n.2 (N.Y. 2024)).

                                          Respectfully submitted,

                                          /s/ Michael Radine

cc:      All Counsel

Encls.