# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
AHARON MILLER, et al.,        *    Case Nos. 18-CV-2192(RPK)
                              *              18-CV-4670(RPK)
                              *
            Plaintiffs,       *    Brooklyn, New York
                              *    March 20, 2024
      v.                      *
                              *
ARAB BANK, PLC,               *
                              *
            Defendant,        *
                              *
and a related case.           *
                              *
  * * * * * * * * * * * * * * *
```

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Miller Plaintiffs:     GARY M. OSEN, ESQ.
                               ARI UNGAR, ESQ.
                               AARON SCHLANGER, ESQ.
                               MICHAEL RADINE, ESQ.
                               PETER RAVEN-HANSEN, ESQ.
                               Osen, LLC
                               190 Moore Street, Suite 272
                               Hackensack, NJ 07601

                               ZAHRA DEAN, ESQ.
                               Kohn, Swift & Graf, P.C.
                               1600 Market Street, Suite 2500
                               Philadelphia, PA  19103

For the Pam Plaintiffs:        SUSAN M. DAVIES, ESQ.
                               Fleischman Bonner & Rocco, LLP
                               81 Main Street, Suite 515
                               White Plains, NY  10601

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES:   (Cont'd)


For the Pam Plaintiffs:        EDWARD MACALLISTER, ESQ.
                               Perles Law Firm, P.C.
                               816 Connecticut Avenue NW
                                Suite 12th Floor
                               Washington, DC  20006

For the Defendants:            BRETT INGERMAN, ESQ.
                               DLA Piper, LLP (US)
                               650 S. Exeter Street
                               Baltimore, MD  21209

                               ANTHONY P. COLES, ESQ.
                               ANDREW JAY PECK, ESQ.
                               DLA Piper, LLP, (US)
                               1251 Avenue of the Americas
                               New York, NY  10020

1      (Proceedings commenced)

2           THE COURT:  Civil cause for a status conference,

3      Docket Nos. 18-CV-2192 and 18-CV-4670, Aharon Miller, et al.

4      vs. Arab Bank, Public Limited Company, and Nathan Pam, et al.

5      vs. Arab Bank, Public Limited Company, Magistrate Judge Peggy

6      Kuo presiding.

7           Will the parties present as to the Miller matter

8      please state their appearances beginning with plaintiffs.

9           MR. OSEN:  Good morning, Your Honor.  This is Gary

10     Osen on behalf of the Miller plaintiffs.  I'm joined today by

11     my colleagues, Ari Ungar, Aaron Schlanger, Michael Radine and

12     Peter Raven-Hansen.   And also by Zahra Dean on behalf of

13     Kohn, Swift & Graf also on behalf of Miller plaintiffs.

14          MR. INGERMAN:  Good morning, Your Honor.  It's

15     Brett Ingerman, Tony Coles, and Andrew Peck from DLA Piper on

16     behalf of the defendant, Arab Bank.

17          MS. DAVIES:  Good morning, Your Honor.  This is

18     Susan Davies of Fleischman Bonner & Rocco.  I appear for the

19     Pam plaintiffs.  And also on the call with me is my co-

20     counsel, Edward MacAllister, from (indiscernible).

21          MR. INGERMAN:  And again on behalf of the

22     defendants, Brett Ingerman, Tony Coles, and Andrew Peck.

23          THE COURT:  Good morning, everyone.

24          We are here on a status conference to discuss some

25     discovery issues that were noted in the parties' respective

1    filings last week.

2         I will start with the state of discovery by

3    plaintiffs because I think that is a slightly easier matter

4    to deal with and then we'll move on to the issues with the

5    discovery from Arab Bank.

6         As I understand it, there were some doctors'

7    records with regard to the Miller plaintiffs.

8         What I see from the papers is that for one of the

9    three additional information or the discovery with regard to

10   doctors' records from one of the plaintiffs, one of the

11   plaintiffs has produced remaining records.  There is one

12   plaintiff whose doctor is declining to produce records.  And

13   then there is a plaintiff who no longer recalls the name of

14   the doctor.

15        Mr. Osen, is that correct?

16        MR. OSEN:  Yes, Your Honor.  So Gary Osen, again

17   for the Miller plaintiffs.

18        So there is actually one additional issue which we

19   will also meet and confer with defense counsel on, but you

20   essentially summarized the three that were outstanding.  We

21   are attempting with respect to the doctor to try and find a

22   workaround to get them to produce the records requested.

23        THE COURT:  Okay.  Please do that.  Do you have a

24   date when you think you can get that done?

25        MR. OSEN:  No.  I don't have a firm date.  But I

1    would imagine that in the next couple of weeks we'll know

2    definitively as to the doctor whether they'll produce it in

3    some form.

4            At the moment, it's not an issue from the clients'

5    standpoint, it's a third party that we're trying to work that

6    out with them, but it's possible they'll simply refuse.

7            THE COURT:  Okay.  And then for the plaintiff who

8    no longer recalls the name of the doctor, can the parties all

9    assume that we'll go forward as if there were no additional

10   records?

11           MR. INGERMAN:  This is Brett Ingerman, Your Honor.

12           THE COURT:  Hold on.  Mr. Ingerman, let me ask Mr.

13   Osen.

14           MR. INGERMAN:  Oh, I'm sorry.

15           THE COURT:  And then I'll turn to you.

16           MR. OSEN:  My apologies, Your Honor.  As far as we

17   know, that's a dead end.

18           And just to be clear, this is an internist that the

19   elderly plaintiff had seen a couple of years ago, so I don't

20   think we're going to get very much further with that.  And

21   frankly, I don't think it's particularly probative one way or

22   the other, but we certainly did follow up.

23           THE COURT:  Right.  So I'm just asking since there

24   are no records, that she does not recall the name of the

25   internist and no one can then, therefore, trace back to any

1     records, can we just go forward with the presumption that

2     there are no records for that alleged treatment?

3               MR. OSEN:  From the plaintiffs' standpoint, yes.

4               THE COURT:  Okay.  Mr. Ingerman, what did you want

5     to say?

6               MR. INGERMAN:  Yes, we agree.

7               THE COURT:  Okay.  So for the remaining doctor

8     who's not producing records, please confirm the -- if that --

9     if you are able to come up with a workaround and if it

10    becomes another dead end, then we'll have to deal with that.

11              All right.  So for Mr. Ingerman, with regard to the

12    Miller plaintiffs' discovery, have I addressed all those

13    issues?

14              MR. INGERMAN:  Yes, I think so.  With the exception

15    of, of course, the outstanding plaintiff depositions which we

16    are trying to schedule, yes.

17              THE COURT:  Right.  So for the depositions, we'll

18    deal with that at the end.  I think in general the parties

19    should just work and confer and agree on dates for

20    depositions.

21              MR. INGERMAN:  Okay.

22              THE COURT:  So I'm just -- I want to focus on the

23    document production first.

24              So then let's turn to the Pam plaintiffs.

25              And my understanding is that there were issues with

1     regard to the two estate plaintiffs, Shoshana Spitz and

2     Shoshana Bluth.  The doctor's logs for Shoshana Spitz it

3     sounds like have been produced.  But for Shoshana Bluth, the

4     plaintiffs are continuing to search.

5             Is that right, Ms. Davies?

6             MS. DAVIES:  I have an update to that, Your Honor.

7             For the Estate of Shoshana Bluth, we were able to

8     obtain from her HMO a list of all of the medical conditions

9     for which she sought treatment during the relevant time

10     period which is from 2002 until her death in 2015.

11             We don't have the names of the medical providers,

12     which -- what we agreed to provide in the doctor log, but I'm

13     actually waiting to hear from defense counsel if they are

14     satisfied with just a list of the medical conditions.

15             It would take us somewhat longer to provide a list

16     of doctor names because we'll have to retrieve all of the

17     medical records which have now been archived.  And frankly, I

18     don't know that that would add any valuable information for

19     the defendants.

20             THE COURT:  All right.  So, Mr. Ingerman, did you

21     want to speak to that now or do you want to confirm offline?

22             MR. INGERMAN:  Judge, we are still reviewing that

23     information and we can confer with Ms. Davies offline on that

24     issue.

25             THE COURT:  Okay.  Very good.

1          And so does that address all the issues with

2    regards to plaintiffs' records, Mr. Ingerman?

3          MR. INGERMAN:  Yes.

4          THE COURT:  So then depositions.  Okay.

5          So then with regard to depositions, is there

6    anything the Court needs to get involved in or will the

7    parties simply agree on some dates?  And then if you think

8    it's necessary, let the Court know to so order those dates.

9          MR. INGERMAN:  Yeah.  This is Brett -- yeah, this

10   is Brett Ingerman.

11         I think the parties are working cooperatively to

12   find dates for the remaining plaintiff depositions.

13         THE COURT:  Okay.  And, Mr. Osen, any disagreement

14   with that?

15         MR. OSEN:  No, Your Honor.

16         THE COURT:  And, Ms. Davies?

17         MS. DAVIES:  Your Honor, I'm concerned that defense

18   counsel have agreed to move forward without depositions which

19   they want to conduct in person, but they're doing it with a

20   proviso that there is no material deterioration in the

21   situation in Israel between now and when we're planning to

22   schedule the depositions, which for Pam plaintiffs is the

23   second half of May.

24         And that leaves us in a difficult position and --

25   you know, because it really gives the defense counsel

1    complete discretion as to whether those depositions are going

2    to go ahead as scheduled or not.

3           THE COURT:  Well, you should confer and figure out

4    dates when everybody is available.

5           And if circumstances beyond people's control occur,

6    then you will confer again to make sure to determine whether

7    things should go forward or not.  I'm not sure whether anyone

8    has any unilateral power in that sense, but the parties

9    should be conferring and agreeing.

10          Ms. Davies, what is your concern about that?

11          MS. DAVIES:  That it's -- that it's all dependent

12   on the -- the political situation and the, you know, the

13   complex situation in Israel.

14          THE COURT:  Right.  Well, I don't think it's

15   unreasonable to take that into account, but I also think that

16   no party should unilaterally be able to determine that the

17   deposition is cancelled for whatever reason.

18          You should still confer and say in light of

19   whatever circumstances may have arisen we believe the

20   depositions should be cancelled and then you can confer about

21   whether that is the correct thing.  All right?

22          MS. DAVIES:  Yes, Your Honor.

23          THE COURT:  So I think that the parties should be

24   conferring.  And if there's a disagreement about whether a

25   deposition should be cancelled, then you can make an

1    application to the Court, and of course I will turn to that

2    very quickly.  I'm not sure I'm the best person to make that

3    determination, but depending on the nature of the dispute, it

4    may be that I will be in a position to say yes, it should be

5    cancelled or no, it shouldn't.  Okay.

6         MS. DAVIES:  Thank you, Your Honor.

7         THE COURT:  So let's move on to the production by

8    the bank.

9         As I see it, there are two categories.  One is

10   paper production and the other is the ESI.  So we'll talk

11   about the paper production first.

12        As I understand it, we are focused primarily on the

13   Swift records.  I know that we had talked in the past about

14   other paper records in the nature of Telex and Western Union

15   records, but -- and maybe there is still some lack of clarity

16   there, so let me make sure from Mr. Ingerman whether paper

17   documents are only in the nature of the Swift records and not

18   any other type?

19        MR. INGERMAN:  Yes.  So I can -- I can give the

20   Court a quick overview of that, and this has all been laid

21   out in writing to the plaintiffs.

22        With regard to the Swift records, Your Honor,

23   you'll recall at the last status conference I had committed

24   to the Court to go back to the bank and find out why we had

25   not produced paper Swift records when our document retention

1    policy suggested we should have had them.

2         And based on that investigation, I had learned, as

3    I laid out in my letter to the plaintiffs, that the hard copy

4    Swift records, to the extent they existed, were put in what

5    are called daily jackets.  And the daily jackets are a

6    collection of all of the transaction records for a particular

7    day at a particular branch.

8         And so I laid out for the plaintiffs in that letter

9    the -- what we believed to be the undue burden of having to

10   search the daily jackets.

11        If you do the math during the relevant time period,

12   relevant production time period, you're looking at over

13   200,000 daily jackets in Gaza, the West Bank, Lebanon, and

14   Jordan that would have to be manually searched that are in

15   Arabic for the names of the bank customers who have provided

16   waivers to the bank.  And that would just take tens of

17   thousands of person hours.

18        And I offered to meet and confer with the

19   plaintiffs on that issue, and instead they just teed up the

20   issue in the status -- in their joint status conference

21   report.

22        So with respect to the Swift records, those are, to

23   the extent they exist, they would be in the daily jackets,

24   and those daily jackets have not been searched by the bank.

25        THE COURT:  Okay.  So can we go back to my original

1  question, which is, is it only Swift records or are there

2  other paper records like Telex and Western Union?

3  MR. INGERMAN:  I'm sorry.  I apologize.

4  So there are no -- to the extent there were Western

5  Union paper records, they were stored at the Ramallah Branch.

6  They were searched.

7  We did not produce any, which tells me that there

8  were none responsive to the customers that have waived bank

9  secrecy.  So Western Union, I'm confident that there are no

10  further paper records for Western Union that the bank will

11  produce.

12  With respect to credit card statements, those were

13  maintained by AFS Bahrain, which is a third party over which

14  the bank doesn't have control.

15  To the extent there were -- and also, as we pointed

16  out to the plaintiffs, very few bank customers during this

17  time period got credit cards so we think it's unlikely that

18  there are responsive credit card paper records.

19  With respect to Telex, we have informed the

20  plaintiffs that Arab Bank Palestine didn't use Telex.  To the

21  extent Arab Bank Jordan and Arab Bank Lebanon used Telex,

22  they stopped in 1999, so we don't expect that there are

23  relevant responsive paper Telex records.

24  Emails, to the extent that there were emails

25  related to specific transactions, hard copy emails, those

1   would have been in the customer account files.  Or there

2   might be a chance that they could be in a daily jacket.  I

3   just don't know.

4            And then the checks, the hard copies of the checks,

5   are principally on microfiche, and there might have been a

6   check or two in a daily jacket.

7            So with -- let me just summarize so I can respond

8   directly to your question.

9            Western Union, we don't think there are any

10  additional hard copy documents that are responsive.

11           Credit card statements, we don't think that are any

12  additional hard copy responsive documents.

13           Telex, we don't think there are any additional hard

14  copy responsive documents.

15           Email, if they existed, they were in the customer

16  file or there could be one or -- there could be a few in the

17  daily jackets, I don't know.

18           And the same is true with the checks.

19           And then the Swifts, the Swift records, I've

20  already addressed.

21           THE COURT:  Okay.  So can -- let me then turn --

22  let's focus on Swift.

23           The daily jackets that you described are a -- it

24  sounds like a folder in which for any given day all the bank

25  employees put all the records of transactions in that folder,

1    right?  So they're all --

2              MR. INGERMAN:  Yes.

3              THE COURT:  -- you've described it as organized by

4    date, so that's the general idea, right?

5              MR. INGERMAN:  Yes.

6              THE COURT:  And within the daily jackets, are they

7    organized in a particular way or are they just dumped in?

8              MR. INGERMAN:  Bear with me one second, Your Honor.

9    Let me just look at my notes here.  So I think they were

10   grouped by transaction type within the daily folder, but I

11   don't think they're indexed in any way.

12             THE COURT:  Okay.  And so the transaction types

13   would be the withdrawals, deposits, transfers?

14             MR. INGERMAN:  Yes.

15             THE COURT:  Something like that?

16             MR. INGERMAN:  Yes.

17             THE COURT:  Okay.  So then if we're talking about

18   within each transaction type, they're not -- are the customer

19   names in any particular order?

20             MR. INGERMAN:  No.

21             THE COURT:  Okay.  So they're just dumped in?

22             MR. INGERMAN:  They're just dumped in at the end of

23   each day.

24             THE COURT:  Uh-huh.  Okay.  And so I'm curious how

25   the bank keeps track of how much money a customer has if this

1    is the way things are being done?

2              MR. INGERMAN:  Yeah.  I think that there are

3    account statements in the customer records that the bank

4    keeps track of how much money goes and out of the accounts.

5              THE COURT:  Mm-hmm.

6              MR. INGERMAN:  And those, to the extent we have

7    them from the customer files, have been produced for the

8    customers who have waived bank secrecy.

9              THE COURT:  Okay.  So what you're saying is there

10   is a record of money going in and out of a customer's account

11   and how much, but the other details -- there may be other

12   details that are in paper form that are not contained in

13   those transaction records.

14              And the plaintiff has indicated to the court

15   there's things like where's the money coming from, the

16   customer's account, and vice-versa.

17              You have no other way of ascertaining that

18   information, Attorney Ingerman?

19              MR. INGERMAN:  Well, see, that I don't know.

20   Because what I'd like to do --

21              THE COURT:  Mm-hmm.

22              THE COURT:  -- and what I was going to propose to

23   Your Honor, having read the plaintiffs' status report, is to

24   let us finish the ESI collection, review and production,

25   because some of this information might be in the Core banking

1    system.  I just don't know because we haven't completed it

2    yet.

3            So what I would like to do, given the burden and

4    the amount of paper associated with the daily jackets, is to

5    let us finish the ESI production, see what's in there, and

6    then we can circle back to whether or not the information in

7    the daily jackets is duplicative.  I just don't know.

8            THE COURT:  All right.  So let's talk about -- I

9    didn't mean to turn to the ESI production so quickly, but

10   since you've offered it as an alternative, Mr. Ingerman,

11   let's talk about the ESI because I am concerned at the slow

12   pace of your ESI knowledge.

13           Normally, very early in the discovery, the parties

14   would have talked to their clients about the way in which ESI

15   is stored, what's there, what might not be there, how it's

16   stored, how it can be searched, and you're still trying to

17   figure out what the ESI consists of?

18           Can you just tell me why --

19           MR. INGERMAN:  Yeah.

20           THE COURT:  -- this is such a slow process?

21           MR. INGERMAN:  Well, I think -- let me start with I

22   think the premise of your question is slightly off in that we

23   do know the categories of ESI and we've laid those out for

24   the plaintiffs in various letters.  And we have since hired,

25   I don't know how many months ago, FTI as our IT expert

1   consultant.  Their team is running the ESI review and

2   production.

3          And I don't disagree with you about the slow pace.

4   I mean, I think the explanation goes as follows.

5          We did not begin to search ESI until we understood

6   the universe of customers of the bank in the Middle East that

7   would execute waivers, because the review and capture of the

8   ESI is time consuming and expensive, and so we did not

9   undertake that until we knew which customers were going to

10  waive bank secrecy.

11         Once we had that universe, we released our IT

12  experts to work with another IT expert in the Middle East to

13  begin to gather the information about the ESI.  We have run

14  certain searches.

15         So, for instance, the plaintiffs have given us 673

16  names, as Your Honor will remember, that they want

17  information about.  We ran those names through our various

18  ESI banking systems to first determine which ones were

19  actually customers and which ones were not so that we can

20  actually figure out who we were going to go to get at least

21  ask for bank secrecy waivers.  So we have done that search.

22         And now that we have all the waivers, we don't

23  think we're going to get any more waivers, the FTI folks are

24  working with the bank's internal IT folks and an external

25  vendor in the Middle East to get the searching under way and

1    get it done.

2            The challenge is that these records are 20 years

3    old.  A lot of them are backup tapes for not-active ESI

4    systems.  They're in places like Gaza and the West Bank which

5    are conflict areas.  And so it's just taking a long time.  I

6    acknowledge that.  But I can represent to the Court that we

7    are working diligently to do it.

8            I mean, the bank spent a lot of time and money to

9    get waivers from customers.  That was a Herculean task by the

10   bank and --

11           THE COURT:  Mr. Ingerman, let me just stop you

12   there.

13           The waiver process, what's really an accommodation

14   to the bank, my order was that the information should be

15   turned over anyway and the waiver was to make it easier for

16   you.  For the fact that it took a lot of effort was really on

17   the bank.

18           MR. INGERMAN:  Yes.

19           THE COURT:  The bank did not have to go through

20   that process.  It took, undertook that process to protect

21   itself.  No one told it to do that.  All right?

22           MR. INGERMAN:  Understood, Your Honor.  Understood.

23   Yes.  Understood.

24           So we have -- just so the bank knows, we have

25   weekly calls with -- we the lawyers at DLA have weekly calls

1   with our FTI folks and the IT professionals in the Middle

2   East to ensure that this process is moving forward as quickly

3   as humanly possible.

4           THE COURT:  All right.  So thank you for giving me

5   that background.  But I'm still not, and maybe it doesn't

6   matter, all right, why it has taken so long.

7           But moving forward I am still hearing that there

8   are gaps in knowledge as to what might be contained in what

9   system.  Such that, for example, you raised the issue of

10  going through the Core and CCM record systems to ascertain

11  whether it may contain duplicates of what is in the paper

12  format in the daily jackets.

13          The fact that you don't yet know that is concerning

14  to be because it seems you should know what is in the Core

15  and ECM systems.  You should know whether those systems

16  enable the parties to figure out where the money is going in

17  and out of the customer accounts from.  So I'm --

18          Really, before I accept your alternative of using

19  these systems in lieu of the paper production, I need for you

20  to know better what's there.  I don't know.  You don't know.

21  So how am I supposed to allow you to go forward on that

22  alternative?  How are you even posing that alternative when

23  you don't know what's there?  And when are you going to

24  figure this out?

25          MR. INGERMAN:  Well, Your Honor, I can try to

1    commit to try to come back to the Court within two weeks with

2    an understanding of what we think is on each of the ESI

3    systems.  I mean, we have given general descriptions to the

4    plaintiffs in prior correspondence.

5           So, for instance, we believe to the extent there

6    were checks they're on the microfiche.  To the extent that

7    there were Western Union records, those were -- well, those

8    were paper records so.

9           But I can commit to come back to the Court in two

10    weeks with a status report that will include, I hope, what we

11    think is on the various data sets of ESI so that the Court

12    can, I guess, make an informed decision on my request.

13           THE COURT:  All right.  So I'm going to turn to

14    plaintiffs now and ask them for the information that they're

15    seeking.

16           I know one of the important pieces of information

17    is the source of the funding into the customer accounts.

18    And, indeed, there might also be information as far as where

19    money is going out of the customer accounts to.

20           And then, Mr. Ingerman, it will be on you to figure

21    out where that information resides and how you're going to

22    figure it out and get it.

23           And then I might also suggest that if the volume of

24    searching is onerous (indiscernible) paper, that you do some

25    random searching to figure out what's there and what's

1   feasible and an alternative way of searching.

2          It just can't be, oh, my gosh, there's so much we

3   can't do it at all.  That does not seem to be a proper way of

4   moving forward with discovery.  So --

5          MR. INGERMAN:  Your Honor, if I could just address

6   -- I'm sorry.

7          THE COURT:  Go ahead.

8          MR. INGERMAN:  Just on the, oh, my gosh, there's so

9   much we can't search it, that's not the position of the bank.

10  We identified the daily jacket issue for the plaintiffs and

11  asked to meet and confer.

12         And, you know, if they have -- for instance, if

13  they have targeted dates on which they think that certain

14  transactions may have occurred, you know, we're happy to try

15  to do that.  So we just haven't had a chance to meet and

16  confer with them on the daily jackets.

17         So I just want to be clear the bank is not saying

18  we're simply not going to search them.  We're just saying

19  that in the current state, with over 200,000 daily jackets,

20  that's not feasible, but we're willing to meet and confer

21  with the plaintiffs to see if there are alternative ways to

22  get at the information they're looking for.

23         THE COURT:  All right.  So, Mr. Osen, I'll start

24  with you, and then I'll turn to Ms. Davies.

25         Just address these issues with the eye toward a

1    practical resolution of getting the information that you

2    need.

3              MR. OSEN:  Yes, Your Honor.  Gary Osen for the

4    plaintiffs again.

5              It's very hard to unpack all of that, but I think

6    my overall view is that it's conceptually long.

7              To begin with and to be clear, the paper records,

8    and let's just stick for the moment to Swift, Mr. Ingerman

9    represented to the Court in February that they, quote, "Don't

10   have them in hard copy."  Okay.  So that's the starting

11   point.  He told Your Honor they didn't have them.

12             In his March 8th letter, he said they do have them,

13   but it's too burdensome to search for the reasons he just

14   outlined again.

15             Now, setting aside that we don't agree with the

16   methodology for search of the paper records and how that

17   would have to go about, again, these are -- these are records

18   that are responsive to a court order.

19             We're not in a meet and confer over a document

20   request from last month.  We're talking about records they've

21   known about, they've known have been central to our case from

22   the outset, records that were specifically referenced as

23   important in Your Honor's March 31, 2023 order.

24             So I'm always happy to meet and confer and try to

25   work through problems, but to say we should meet and confer

1    at this late hour I think raises just an issue, a threshold

2    issue of credibility.

3         I want to switch for a moment if I may to the ESI

4    issue, because it will impact the paper records question.

5         So to begin with, we are talking about a process

6    where, according to the bank's IT consultant, they're doing

7    an audit, an inventory currently, and they're preparing right

8    now to acquire and build their initial data map, which is a

9    perfectly reasonable step for any sophisticated IT consultant

10   to do.

11        But in terms that are more accessible for people

12   like me, Arab Bank's -- if Arab Bank's ESI was a construction

13   project for an office building, what we heard from the IT

14   consultant is that they haven't received a copy of the

15   architectural blueprints yet, let alone broken ground on the

16   buildings.

17        So Mr. Ingerman says, well, we didn't really start

18   that process until we started to get waivers from customers.

19        So one response to that, Your Honor, is that -- is

20   the one you gave, which is the waiver process is an

21   accommodation to lessen the sanction for those -- for those

22   records they want to produce.  They're still, of course,

23   withholding the majority of the customer records and have no

24   intention of producing them.  But even if we take that --

25        So the process of inventorying one's ESI,

1    ascertaining what you have, how it works and so forth, is not

2    customer specific.  In fact, Your Honor, searching for

3    specific customers is the easy part.  That's the least labor

4    intensive.  That's the function of actually entering search

5    terms once you've figured out how the system works.

6              So the fact that this is going on now, that is, the

7    blueprint, the data map part of this process, tells you the

8    status of the ESI discovery in this case.

9              So the question is where do we go from here?

10             And again, to begin with, we've asked for, on

11   multiple occasions, and we haven't received even the search

12   terms of SQL queries that the bank has already used.

13             And as Your Honor knows, according to the ESI

14   protocol, we're supposed to have met and conferred on that

15   issue before they searched.  And to -- and the producing

16   parties have both been disclosed.  Those search terms, we

17   haven't gotten them, even for the initial searches that

18   they've done.

19             So our first request is, again, to just get the

20   search terms and SQL that they've already done.

21             I think it's also important to note that we've

22   received no ESI, as far as we know, at all for any records

23   relating to Jordan, Lebanon, or the Palestinian Territories.

24             So Mr. Ingerman, in his letters, says we sent him

25   100 questions.  Well, the reason we sent 100 questions is

1    because we have nothing to work with.

2          We've been flying blind, not only on search terms

3    and SQL queries, but since there isn't any ESI produced,

4    we're having to guess at what their processes are.  And it's

5    now clear that they themselves don't really know what they

6    are.

7          So part of this is just an appeal for far greater

8    transparency than we've experienced to date.

9          And one last footnote just on, because it's

10   referenced in the bank's letter, with respect to ESI from

11   Arab Bank's former New York Branch, we have gotten

12   productions of documents, transactional records, from Arab

13   Bank New York.  The defendant says that that's complete.  We

14   have no reason to disbelieve that.

15         But to be clear, we have not received any files in

16   their native format from Arab Bank New York.  So that

17   includes obviously Excel database files.  And so we asked

18   about that.  And that's still something that's outstanding

19   even for New York.

20         So take that all together and I don't know where we

21   go from here, but what I do know is that, you know, going

22   back to last September, we were told that the bank was

23   searching for emails and hadn't found any.

24         Now we've learned from the bank's letter that the

25   searches they've conducted to date have dealt with

1    identifying account numbers.

2         So which is it?  Are they searching -- were they

3    searching as they claimed last year in detail for emails and

4    for other things or as it now appears they searched to

5    identify customer accounts then reached out to the customers

6    for waivers and are now only starting the ESI process?

7         We just need a straight story, and we need a clear

8    and plausible trajectory for a resolution of this.  Let me

9    pause there.

10        THE COURT:  Okay.  Ms. Davies, did you want to add

11   anything?

12        MS. DAVIES:  Yes, Your Honor.

13        I would just like to reiterate Mr. Osen's request

14   for greater transparency and to this process going forward.

15        It was -- it was as recently as September 29th of

16   last year that Mr. Ingerman told us and this court that there

17   wouldn't be, there wasn't any responsive ESI in Lebanon,

18   Jordan, and the Palestinian Territories.

19        Now we have to question whether at that point

20   defense counsel, in fact, had any sense of what ESI was

21   available.

22        In addition, we've heard a lot from defense counsel

23   that this data is 20 years old.

24        Well, the plaintiffs were also required to produce

25   their personal ESI going back in many instances for more than

1    20 years.

2           And the fact that data is located in what is now a

3    conflict zone, that's only because this data was not

4    identified and collected in a timely manner, Your Honor, but

5    I think the Court recognizes that.

6           THE COURT:  All right.  Thank you.

7           So I think the plea for greater transparency, I

8    hear you on that, and I think that the ESI production should

9    go forward in an orderly way and more quickly than it has to

10   date.

11          And as I mentioned earlier, I am concerned about

12   defense counsel's uncertainty even as of today as to what is

13   contained in the systems and how things are stored.  There

14   was a description in the letters of the CCM System, the Core

15   System, as well as the Swift Alliance Access System towards

16   -- starting in 2004, and so I don't have another good

17   description of what's there.

18          And, Mr. Ingerman, you need to get that information

19   quickly from your client and through the consultant.  You

20   gave a proposal of two weeks and I will give you two weeks to

21   get your arms around what the system looks like, where the

22   information is stored, and how it can be searched.

23          You need to convey that to plaintiffs' counsel and

24   explain it to them in a way that they understand it so it

25   will be fair for them to ask you questions.  All right.  And

1    if it takes 100 or 200 questions, so be it.  It needs to be

2    clear.

3         And so if you're not clear on it, Mr. Ingerman, you

4    need to go back to your client, again through the consultant

5    if necessary.  If the consultant is needed to translate tech

6    to legal, then do that, but that process needs to happen.

7         I had hoped that when you had your IT summit that

8    the IT people could get all this information, but it sounds

9    like it's more just getting the information to the

10   consultant, the defense consultant, so that he can do his job

11   properly.

12        So that blockage of information needs to be

13   unblocked so that information from the bank to the consultant

14   can be full.  And then that information can be conveyed to

15   defense counsel and then to plaintiff's counsel.

16        So in two weeks time I would like to get a report.

17   And this one needs to be joint.

18        Now, I know that (indiscernible) recently was not

19   joint because of the timing.  But this one needs to be I will

20   say primarily through defense counsel because if there needs

21   to be an explanation given, I want you to put that in

22   writing.  But I also want to know what the plaintiffs'

23   concerns may be if there are any.

24        So you need to have given yourselves enough time to

25   talk through all the issues so that can be put forth in the

1    letter.  So it's --

2            You know, I'm going to give you, like I said, two

3    weeks, so that will be April 3rd.  The letter will be filed

4    on April 3rd, which means that all the conversations back and

5    forth need to have occurred well in advance of that date so

6    that any issues can be worked out, and only any unresolved

7    issues will be set forth in that letter filed by April 3rd.

8            All right.

9            MR. INGERMAN:  Your --

10           THE COURT:  So I don't want to have these

11   complaints about getting things at the last minute because

12   you need to have built in the time to confer and answer

13   questions.

14           Mr. Ingerman, what did you want to say?

15           MR. INGERMAN:  Yeah.  Thank you, Your Honor.

16           If we could just have a small adjustment?

17           I was really hoping to have the full two weeks to

18   be able to get the information that the Court has ordered us

19   to provide, so would it be possible to file the joint status

20   report on April 5th so that I have through the 3rd to get as

21   much information as I can and get it communicated to the

22   plaintiffs and then we have two days to put our joint status

23   report together?

24           THE COURT:  All right.  So --

25           MS. DAVIES:  Your Honor.  Your Honor, this is --

1    this is Susan Davies.

2              THE COURT:  Yes.

3              MS. DAVIES:  Could I ask that we not have a status

4    report due on a Friday just because the Sabbath poses a

5    challenge to many of plaintiffs' counsel.

6              THE COURT:  All right.  So why don't I -- I think

7    actually Mr. Ingerman's proposal of a two-step process makes

8    sense, so I will give you until April 3rd, Mr. Ingerman, as

9    you requested, and then the letter can be filed jointly by

10   April 8th, which is a Monday.

11             MR. INGERMAN:  Thank you, Your Honor.

12             THE COURT:  So, Mr. Osen and Ms. Davies, you will

13   get your information by April 3rd.  And then we'll give

14   everybody a few days to talk and file the joint letter by

15   April 8th.

16             I do not require receipt of the information about

17   the systems by April 3rd because I just want the parties to

18   discuss and work things out, and then you can file something

19   jointly on April 8th.  So just April 3rd is the date by which

20   defendant will produce the information about the system to

21   the plaintiffs.  And then I will look at the information.

22             I hope that the joint letter will set forth not

23   only an understanding of the system, but to the extent

24   possible also a plan for how to search the system.

25             Again, the way ESI searches normally or ESI

1    production normally occurs is everybody gets a good feel of

2    how the system works and where the information is stored and

3    how it's stored and then the parties agree on how it's going

4    to be searched, custodians and search terms, for example, and

5    then you do the search.

6         So any party who does the search using search terms

7    without having consulted with the other side first runs the

8    risk of having to redo everything with the appropriate search

9    terms.

10        So again, I don't want to hear complaints about all

11   the work that was extended if that work was done without

12   consultation with the other side first.

13        You may have already run searches, but if those

14   were not agreed-upon or appropriate search terms, you may

15   have to do it all over again.

16        So please consult with each other first, reach

17   agreement on how the searches will be done, and then do the

18   searches, and then do the review and the production.

19        So I do want to also ask, because it was a bit

20   confusing to me, Mr. Ingerman, what an SQL code is?

21        MR. INGERMAN:  It's a -- it's a sequence of method

22   of searching, Your Honor.  Beyond that, you've exhausted my

23   technical knowledge.

24        I will say that the searching that the bank has

25   done, I mean, Mr. Osen continues to complain that we haven't

1    given him search terms, the only search that the bank has

2    done so far is to take the names that the plaintiffs provided

3    to us and run it through the various systems to see which

4    were bank customers and which were not.  So that's the only

5    search we've done so far.  So the only search terms are the

6    names that they gave us.

7              THE COURT:  All right.  But I think you still need

8    to be clear because I'm not sure.  Even if you're just

9    running names, you still have to be transparent and clear

10   about how you did it --

11             MR. INGERMAN:  Yes.  Understood.

12             THE COURT:  -- because --

13             MR. INGERMAN:  Understood.

14             THE COURT:  -- there are also variations on names.

15   You know.  I'm not sure if they're in Arabic versus using

16   Latinized letters.  If that makes a difference.  Spelling,

17   reversal of names, those kinds of things.  Notwithstanding

18   that it seems a simple thing to run names, how you're running

19   the names still matters.

20             MR. INGERMAN:  Understood.

21             THE COURT:  So share that information with

22   plaintiffs' counsel so that it's clear.

23             And then things like I'm not sure what that means

24   is not going to be an acceptable explanation for things going

25   forward, Mr. Ingerman.  I'm not a computer expert either, but

1    I have taken it upon myself to educate myself on how things

2    are set up and how they're run and how and what the

3    possibilities are for searching.

4              So you or someone on your legal team needs to be

5    well versed so that when I have questions about things and

6    nomenclature and codes and methods, someone can answer it.

7              MR. INGERMAN:  Your Honor, you will -- you will --

8              THE COURT:  You may not know the --

9              MR. INGERMAN:  I'm sorry.

10             THE COURT:  Yeah.  Go ahead.

11             MR. INGERMAN:  I was just going to say you will

12   marvel how educated I become in the next --

13             THE COURT:  All right.

14             MR. INGERMAN:  -- two weeks on things.

15             THE COURT:  Well, I hope that is the case.  I would

16   have hoped that it was true today as well, but let's move

17   forward so that we have -- everybody has a clear idea of

18   what's going on.

19             The request has been made to me and it is still

20   pending as far as the paper searches of the Swift documents.

21   I will put that on hold for the moment.

22             But I also think that further discussions between

23   counsel as far as the paper documents is still useful.  So to

24   the extent that plaintiffs' counsel has questions about these

25   daily jackets, you should still continue to answer those

1    questions because it may be that, you know, there are still

2    outstanding questions as to how those paper documents are

3    maintained and whether there is a way to search them in a

4    useful way.

5            I heard the proposal that they be -- that there be

6    certain dates that are targeted.  I'm not entirely sure that

7    that is the way forward, but maybe Ms. Davies and Mr. Osen

8    can try to propose some way of tackling the large volume of

9    paper if that becomes necessary.

10           So it's not off the table yet.  But I am putting a

11   pause on it so that if there is an alternative thorough

12   search of the electronic documents that may end up being more

13   efficient and perhaps also more complete.  So that issue has

14   not gone away.  I'm just tabling it for now so people can

15   focus on the electronic discovery.

16           So I will look at the letter.  And why don't we put

17   a date now on our calendars for discussion.

18           MR. OSEN:  Your Honor?

19           THE COURT:  Mr. Osen?

20           MR. OSEN:  Yes.  I'm sorry, Your Honor.  Could I

21   make a couple of proposals before we get to the next

22   conference date very briefly?

23           THE COURT:  Yes.

24           MR. OSEN:  First of all, I think it would be

25   helpful if Your Honor directed the defendant to produce their

1    search terms and SQL queries that they've performed to date

2    so we have a look at what they actually look like.  From an

3    IT standpoint, that's usually helpful.

4                THE COURT:  So, Mr. Ingerman, can you do that?

5                MR. INGERMAN:  Yes.

6                THE COURT:  All right.  Is there anything --

7                MR. OSEN:  Can we get that by next week, like the

8    27th, or the end of next week, the 29th?

9                MR. INGERMAN:  Yeah.  The 29th is fine.

10               MR. OSEN:  Okay.  Secondly, we would suggest that

11   the Court direct the IT folks to meet on either the April 4th

12   or 5th before the conference -- before the joint status

13   letter so that the parties have an opportunity to actually

14   have competent IT people discuss the contents of whatever we

15   get on April 3rd.

16               THE COURT:  I think IT people should meet.  I

17   actually was thinking they should meet earlier than that,

18   but, Mr. Ingerman?

19               MR. OSEN:  Well, they won't -- it won't be as

20   productive without the benefit of whatever the bank reports

21   back.

22               THE COURT:  Right.

23               MR. OSEN:  So assuming Mr. Ingerman needs until

24   April 3rd, we'd have a short window to do that.

25               THE COURT:  Okay.  So then April 4th, the IT people

1    should meet.  Can that happen sooner?

2         MR. INGERMAN:  Your Honor, just -- yeah, just

3    subject to they're -- assuming they're available, I mean, of

4    course, yes.

5         THE COURT:  Well, please make them available.

6         MR. INGERMAN:  Yes.  Our lead -- yes.  I

7    understand.  It will either be the 4th or the 5th.  I can't

8    imagine both days would be unavailable, so --

9         THE COURT:  Well, I'm going to say the 4th unless

10   it absolutely is not possible.  Because if they meet on the

11   5th, the lawyers are going to complain that you haven't had

12   enough time to digest the information.

13        MR. INGERMAN:  Okay.  So the -- and if there's any

14   issue, I'll come back to the plaintiffs or the Court, but the

15   4th is fine.

16        THE COURT:  All right.  Again, barring any

17   unavoidable problem, the 4th, you must, the parties, the IT

18   people must meet on the 4th.

19        Mr. Osen, is that going to be a problem with your

20   folks?

21        MR. OSEN:  No, Your Honor.

22        I just wanted to address one last proposal on paper

23   records before we get --

24        THE COURT:  Yes.

25        MR. OSEN:  -- you to your next conference.

1          And that is that we would suggest that we provide

2    the defendant an example of a Swift transfer record from the

3    relevant period and ask that they produce the daily jacket

4    file for that one date so we'll make sure there's a date

5    where there will or should be a responsive record.

6          And then if they can produce to us the contents of

7    the daily jacket, of course for this purpose, limited to

8    those records that are related to a customer who gave a

9    waiver, so they don't have to produce the entirety of the

10   file.  But if they give us one, we'll at least know what the

11   contents of a daily jacket look like and that will I think

12   inform our further discussions on the issue.

13        THE COURT:  Okay.  That sounds like a good

14   approach.

15        Mr. Ingerman, is that a problem?

16        MR. INGERMAN:  No, not a problem.

17        THE COURT:  Okay.  All right.  Good.  So you're

18   thinking creatively and I think that's very useful going

19   forward.

20        All right.  So let's schedule another conference.

21   And it is possible for me to have a phone call on the

22   afternoon of Monday April 15th or on April -- 11 o'clock on

23   April 16th.

24        MR. INGERMAN:  Either of those dates work for me,

25   Your Honor.  This is Brett Ingerman.

1          MR. OSEN:  Gary Osen for the Miller plaintiffs,

2     either date I think will be fine.

3          THE COURT:  All right.  And Ms. Davies?

4          MS. DAVIES:  Also both dates work for the Pam

5     plaintiffs.

6          THE COURT:  All right.  So why don't we do this on

7     April 16th at 11 o'clock.  Also by telephone.  All right.  So

8     by then I'll have had a chance to review the joint report and

9     if there are questions for the parties.  And we'll have that

10    conference to walk through any remaining issues.  If there

11    aren't any, then we'll just make a plan for how it will go

12    forward and set some deadlines for the completion of

13    discovery.

14         MR. INGERMAN:  Your Honor, one last thing on behalf

15    of the defendant.

16         I think there is a March 29 substantial completion

17    date for the bank's ESI.  I think in light of our discussion

18    today and Your Honor's orders that deadline is going to be

19    adjourned, but I just wanted to be clear about it.

20         THE COURT:  Yes.  That will need to be moved and it

21    should be moved to a date that we will discuss on April 16th.

22         MR. INGERMAN:  Thank you.

23         MR. OSEN:  One last thing for us, Your Honor.

24         We've been -- we've been trying to schedule

25    30(b)(6) depositions for the customer waiver issue.  Ideally

1    we'd like to do it before the conference on the 16th, but

2    certainly either the week before or that week if possible so

3    defense counsel can confirm -- they don't have to do it this

4    moment -- but we'd just want to have a marker that that's

5    still out there and we'd like to complete it before the first

6    pass of April is concluded.

7         THE COURT:  All right.  So the parties should

8    confer and work out any deposition dates that are necessary

9    for the conference to go forward, for discovery to go

10   forward, and for discovery to get done.  So please confer --

11        MR. INGERMAN:  Yeah.  Your Honor, I don't think --

12        THE COURT:  -- and work out a date.

13        MR. INGERMAN:  Yeah.  I'm not sure those dates are

14   going to work given my trial calendar and the witnesses, but

15   we're happy to meet and confer.

16        Certainly the 30(b)(6) on the waiver issue is not

17   necessary for the ESI conference that we're having, so, but

18   we'll find -- we'll find a mutually agreeable date that

19   works.

20        THE COURT:  All right.  Please confer and --

21        MR. OSEN:  Well, our concern, Your Honor -- I'm

22   sorry, Your Honor -- our concern, as we've told defense

23   counsel, is that we're blocked up pretty much the entire

24   month of May in two other cases, and so we'd --

25        You know, originally this was supposed to be done

1    by the end of March.  It's early April.  And, you know, April

2    is now fast upon us.  If we can't get it done -- and for us

3    this is a video deposition.  So, you know, we want to get it

4    done in April and not push this into June or beyond.  So just

5    considering how long we've been seeking it.

6            THE COURT:  So --

7            MR. INGERMAN:  So, Your Honor, we're into April.

8    the second -- I'm sorry.

9            THE COURT:  Mr. Ingerman, go ahead.

10           MR. INGERMAN:  I was saying we're available the

11   last two weeks in April.  I don't know how the entire month

12   of May could be out of the picture, but there's certainly

13   plenty of availability for us in May.  And this is -- this is

14   not an issue that's urgent, but we need the time to be able

15   to prepare our witness and have everybody available.

16           THE COURT:  All right.  So please confer and get

17   the schedule done as quickly as possible.  I know counsel is

18   busy with other things.  And you should be accommodating for

19   both -- for all counsels' schedules.

20           In terms of the timing, Mr. Osen, is there any

21   reason this needs to be done -- is the conference on April

22   16th going to be contingent on the completion of this

23   deposition or is it simply that after that date you're not

24   available for a long duration?

25           MR. OSEN:  No.  The issue is that the, at least

1    from our perspective, the waiver issue ties into the document

2    production issue.

3          Just to give one example, we have a waiver from a

4    particular customer.  Account records were produced for that

5    customer.  But only for one account and not for another

6    account that we know exists for which we have independent

7    records for.

8          So understanding how they went about this process,

9    including searching for customer records, is the directly

10   relevant to the overall issue we have with the defendant's

11   productions.

12         MR. INGERMAN:  Well, this is the first we're

13   hearing about this.  So if they meet and confer with us about

14   (indiscernible) --

15         THE COURT:  Mr. Ingerman.

16         MR. INGERMAN:  I'm sorry.

17         THE COURT:  Please.  So this is just an example.

18   So the parties should confer.

19         And on an issue like this, Mr. Osen, it is also

20   useful to ask.  It doesn't sound like you need to go through

21   the 30(b)(6) immediately.  Raising it with counsel to say,

22   hey, it sounds like there are two accounts, why did you only

23   produce one, that is a fair topic for a meet and confer

24   between counsel.  Right?  So please have that conference --

25         MR. OSEN:  I only used that -- sorry, Your Honor.

1           THE COURT:  I understand.  I understand.

2           And so please have those conversations, work out

3      the timing of the depositions.  I appreciate that the

4      depositions should go forward as quickly as possible at this

5      point.

6           And if you need the information before we have our

7      conference and it's impossible to arrange that, then you can

8      let the Court know and I can reschedule a conference to a

9      later date if that's what is necessary.

10          And, Mr. Ingerman, from your side, you have a team

11     of people.  And so if you are personally not available,

12     someone else on the team can handle this.  All right.

13          MR. INGERMAN:  Understood.

14          THE COURT:  I just feel like people's schedules are

15     important but should not be determinative of how things move

16     forward.

17          MR. INGERMAN:  I agree, Your Honor.  And there's

18     lot of lawyers on the plaintiffs' side too, so we should be

19     able to find a date that works for everyone.

20          THE COURT:  Well, Mr. Ingerman, I have said that

21     I'm trying to be fair to both sides.  And depending on the

22     importance of the issue to your side or the other and the

23     importance and difficulty of handling that witness, the

24     staffing should be done accordingly.  So it's not a tit for

25     tat kind of thing.  It's just that the parties should work

1  out how who should be handling that particular deposition and

2  the availability of counsel to handle any particular

3  deposition.  Right?

4        MR. INGERMAN:  Understood.

5        THE COURT:  So I don't want there to be undue delay

6  in this case.  It should move forward.

7        But I have also acknowledged that counsel may have

8  unavoidable conflicts, but you should be working proactively

9  to make sure that things are moving forward notwithstanding

10  any one person's availability.  So please do that.

11        All right.  So, Mr. Osen, I've encouraged parties

12  to make themselves available and move things forward as

13  quickly as possible.

14        I did leave you open the possibility that if you're

15  not getting the information that you need that I can move the

16  April 14th  conference back so that you are fully prepared to

17  address the issues at the conference.

18        MR. OSEN:  Understood, Your Honor.  Thank you.

19        THE COURT:  All right.  So, Mr. Osen, are there any

20  other issues to be raised today?

21        MR. OSEN:  Not for the plaintiffs, or the Miller

22  plaintiffs I should say.

23        THE COURT:  All right.  Ms. Davies, anything from

24  you?

25        MS. DAVIES:  Nothing more from the Pam plaintiffs.

1    Thank you, Your Honor.

2         THE COURT:  All right.  And, Mr. Ingerman, for the

3    defendant?

4         MR. INGERMAN:  Nothing further, Your Honor.  Thank

5    you.

6         THE COURT:  All right.  Thank you.  I will look for

7    your joint letter by April 8th, and then the conference to

8    discuss the contents of the letter on April 16th.  Thank you,

9    everybody.

10        (Proceedings adjourned)

11

12        I, CHRISTINE FIORE, court-approved transcriber and

13   certified electronic reporter and transcriber, certify that

14   the foregoing is a correct transcript from the official

15   electronic sound recording of the proceedings in the above-

16   entitled matter.

17

18        *Christine Fiore*

19   _____         March 23, 2024

20        Christine Fiore, CERT

21

22

23

24

25