**VIA ECF**

Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *Bartlett, et al. v. Société Générale de Banque au Liban S.A.L., et al.*, Case No. 19-cv-007 (CBA) (TAM) | Request for Pre-Motion Conference

Dear Judge Amon:

      Moving Defendants (the "Banks")[1] write to respectfully request a pre-motion conference for leave to file a Rule 12(c) motion for judgment on the pleadings, in light of the Second Circuit's decision in *Ashley v. Deutsche Bank*, 2025 WL 2025448 (2d Cir. July 21, 2025) ("*Ashley*"). *Ashley* is the first decision by the Second Circuit to apply the Supreme Court's decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) and *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556 (2025) to JASTA aiding-and-abetting claims against banks, and thus is directly on point in this action. *Ashley* thoroughly rejected theories of liability that Plaintiffs rely upon in this case and therefore, those theories can no longer support Plaintiffs' JASTA aiding-and-abetting claim, or the sprawling sector-wide discovery effort they have embarked on. The Banks' contemplated Rule 12(c) motion has the potential to resolve this litigation, or narrow greatly the issues in dispute, which would hasten an end to this case that implicates 80% of the banking sector in a rebuilding country.[2]

## The *Ashley* Decision

      The *Ashley* plaintiffs were victims of terrorist attacks in Afghanistan allegedly perpetrated by a terrorist "Syndicate" led by al-Qaeda that included the Taliban and the Haqqani Network. 2025 WL 2025448, at *1-2. The plaintiffs claimed that Deutsche Bank, Standard Chartered Bank ("SCB"), and Danske Bank aided and abetted those attacks through the provision of banking services to customers connected to the Syndicate. *Id.* at *1. The *Ashley* plaintiffs advanced several theories of liability, each of which was rejected by the Second Circuit.

      *First*, the plaintiffs alleged that SCB provided commercial banking services to two Pakistani fertilizer companies, whose fertilizer was smuggled into Afghanistan and diverted to make bombs. *Id.* That theory failed because it incorrectly focused on the value of "SCB's services to the Companies" rather than "'whether [SCB] culpably associated' itself with the Syndicate's wrongful actions." *Id.* at *12 (quoting *Twitter*, 598 U.S. at 504). The Second Circuit noted that the plaintiffs had alleged only a "*tenuous* connection between the banking services and the terrorist attacks" as they did *not* allege that SCB: (i) "directly aided the Syndicate in carrying out the bombings" (ii) "took steps to help the downstream actors' exploitation of" the fertilizer; or (iii) "aided [] fertilizer production or its smuggling." *Id.* (emphasis in original).

      *Second*, the *Ashley* plaintiffs alleged that all three defendant banks facilitated money laundering for customers associated with the Syndicate. *Id.* at *4. The court similarly rejected this theory, noting that "it is not enough to say that the defendant assisted the terrorist organization's

---

[1] The Moving Defendants are (1) Société Générale de Banque au Liban S.A.L., (2) Fransabank S.A.L., (3) MEAB Bank s.a.l., (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) LGB Bank s.a.l., (9) Banque Libano Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank S.A.L.
[2] The Banks reserve the right to also address the viability of the conspiracy claim post-*Ashley*.

1

'activities in general.'" *Id.* at *15 (quoting *Twitter*, 598 U.S. at 503). While it was "possible that some of the Banks' transactions in the money laundering schemes produced money that was transferred to the Syndicate and used to facilitate" the attacks, the court squarely rejected a liability "theory based on money's fungibility." *Id.*

*Third*, the plaintiffs alleged that the defendant banks facilitated value-added tax ("VAT") fraud schemes for individuals and companies linked to terrorist financing. *Id.* at *6-7. That theory failed as well, due to the lack of plausible general awareness allegations. The plaintiffs had argued that the banks should have been aware that the tax fraud schemes were a source of terrorist funding or were linked to the Syndicate based on "red flags," such as the suspicious nature of the transactions, the high-risk jurisdictions involved, and the banks' own due diligence obligations, *id.* at *17, but the court held that these allegations rose only to the level of a possibility, rather than a plausibility, and, even so, only "perhaps" supported an inference that the banks were generally aware of possible *tax fraud*, but not of any role in a terrorist activity. *Id.*

### *Ashley* Undermines Plaintiffs' Aiding-And-Abetting Theories Here

*Ashley*'s analysis is instructive and indeed requires that the Court reject the same theories of liability on which the Third Amended Complaint is premised.

1. **Plaintiffs' "Traditional" Aiding And Abetting Theory Is Not Viable Because Plaintiffs Fail To Connect The Banks' Services To The Attacks.**

*Ashley* confirms that JASTA aiding-and-abetting claims require allegations of a "discernable nexus between [a defendant's conduct] and the attacks committed against Plaintiffs." *Id.* at *15. "[T]he defendant must aid and abet a specific act" and "liability only attaches for aiding and abetting a particular terrorist attack." *Id.* at *18. It is not enough "that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id.* (quoting *Twitter*, 598 U.S. at 495).

In *Ashley*, the nexus plaintiffs alleged (which was held *insufficient* to support their aiding-and-abetting claim) was that SCB financed companies that manufactured the ingredients for roadside bombs. Here, Plaintiffs fail to allege *any* discernable nexus between the accounts that the Banks allegedly held and any "particular terrorist attack," or even any link between those accounts and terrorist activities more broadly. Instead, they impermissibly rely on allegations regarding assistance to a "transcendent 'enterprise'" that they deem the "System." Given the absence of any nexus, let alone that the Banks "consciously or culpably sought to make the [Attacks] succeed," *id.* at *11, *Ashley* requires the dismissal of Plaintiffs' aiding-and-abetting claim.

2. **Plaintiffs' Theory That The Banks "Pervasively And Systemically" Assisted Hezbollah Through "The System" Is Not Viable Under *Ashley*.**

*Ashley* confirms that *Twitter* and *Smith & Wesson*[3] impose a "high bar" for basing a JASTA claim on "pervasive, systemic, and culpable" support for a terrorist organization—the only avenue available where, as here, "a 'concrete nexus' to the terrorist attack is lacking." *Id.* at *16. The "pervasive and systemic" exception "begins to blur with conspiracy" and requires conspiracy-like allegations supporting a plausible inference that a defendant's actions "were designed or performed with the intent to aid" the terrorist group in *all* of its activities. *Id.* Defendants must have "actively

---

[3] *Smith & Wesson* reinforced key principles of aiding-and-abetting liability, "albeit [decided] in the context of a different statutory regime." *Id.* at *14.

2

sought to 'associate themselves' with the [terrorist group's] 'operations' or to form 'a near-common enterprise' with the [terrorist group]." *Id.*; *see also Smith & Wesson*, 145 S. Ct. at 1566-67.

That test was not met in *Ashley*, where the plaintiffs posited that "Defendants engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists [and] some of the money must have gone to the terrorists' violent activities." 2025 WL 2025448, at *15. *Ashley* held that "it is not enough to say that facilitating the money laundering operations, which are not themselves [terrorist] entities, results in substantial support to the [terrorists]." *Id*. Nor is it "enough to say that the defendant assisted the terrorist organization's 'activities in general.'" *Id.* (quoting *Twitter*, 598 U.S. at 503). Merely alleging that "the Banks may have opened their doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the Syndicate's pile of resources," was insufficient. *Id.* at *16.

*Ashley*'s reasoning applies with equal force to Plaintiffs' money laundering allegations here. Plaintiffs do not plausibly plead that the Banks – let alone each individual bank, solely on services *it* allegedly provided to *its* own alleged customer(s) and not based on the knowledge or conduct of any other bank – formed "a near common enterprise" or intentionally aligned themselves with Hezbollah. At most, Plaintiffs offer generalized allegations that the Banks' *customers* earned money from criminal activities—not that such funds were laundered through the Banks (or even reached the Banks). In any event, they do not and cannot allege that "the Banks' money laundering operations" (of which there were none) "were designed or performed with the intent to aid" Hezbollah. *Id.*[4] And of course, Plaintiffs' allegations that the Banks facilitated money laundering for a global network that supported Hezbollah's "activities in general" are just the type of allegations that *Ashley* rejected. Plaintiffs' theory of liability based on money laundering for customers that were part of the "System" must be rejected in light of *Ashley*.

### *Ashley* Requires Dismissal Of Plaintiffs' Claims Supported By Now-Rejected Theories

Here, Plaintiffs purport to plead liability that is far broader even than that asserted in *Ashley*. They accuse no fewer than eleven Lebanese banks of aiding Hezbollah via a vast, ill-defined criminal enterprise surrounding it, the so-called "System," to launder money, smuggle diamonds, export firearms, traffic drugs, and evade sanctions around the world. *See* TAC ¶¶ 10, 13. According to Plaintiffs, the Banks did so by holding accounts for any of the individuals and entities identified in the TAC, including car washes, amusement parks, health clubs, restaurants, and supermarkets. *See, e.g.*, TAC ¶ 583. Like the Syndicate in *Ashley*, the "System" in this case cannot support liability.

To the extent the Court is not inclined to dismiss Plaintiffs' aiding-and-abetting claim entirely, it should, alternatively, identify and reject those theories of liability that are not viable after *Ashley*, which would substantially narrow the issues in the case and streamline discovery. *Cf. Weir v. City of New York*, 2021 WL 12160256, at *3 (E.D.N.Y. Apr. 8, 2021) ("a decision on Defendant's motion for judgment on the pleadings, even if only granted in part, may focus discovery and narrow its scope, resulting in a more streamlined discovery process").[5]

---

[4] Although the TAC contains allegations that the Banks provided services at unspecified points in time to customers designated as SDGTs or SDNTKs, these allegations are insufficient. Even if Plaintiffs had plausibly alleged such customer relationships or alleged that any Bank processed a payment for a customer after it was designated an SDGT or SDNTK (they have not), any such customers are not FTOs. As *Ashley* confirms, doing business with sanctioned entities, alone, does not support an inference that a bank intentionally associated itself, or formed a near-common enterprise, with an FTO.

[5] The Court could, for instance, dismiss Plaintiffs' JASTA aiding-and-abetting claim except if supported by plausible allegations that the Banks facilitated transactions for entities that were integral parts of Hezbollah's terrorist apparatus.

3

Respectfully submitted,

| | |
|---|---|
| DECHERT LLP | MAYER BROWN LLP |
| By: */s/ Jonathan R. Streeter* <br> Jonathan R. Streeter <br> Tamer Mallat <br> Julia L. Shea <br> Dechert LLP <br> 1095 Avenue of the Americas <br> Three Bryant Park <br> New York, NY 10036 <br> 212-698-3500 <br> Email: jonathan.streeter@dechert.com <br> Email: tamer.mallat@dechert.com <br> Email: julia.shea@dechert.com <br><br> Michael H. McGinley <br> Dechert LLP <br> Cira Centre <br> 2929 Arch Street <br> Philadelphia, PA 19104 <br> 215-994-4000 <br> Email: michael.mcginley@dechert.com <br><br> *Attorneys for Defendants BLOM Bank SAL, Fransabank SAL, and Bank Audi SAL* | By: */s/ Mark G. Hanchet* <br> Mark G. Hanchet <br> Robert W. Hamburg <br> Benjamin D. Bright <br> Whitney A. Suflas <br> Mayer Brown LLP <br> 1221 Avenue of the Americas <br> New York, NY 10020 <br> 212-506-2500 <br> Email: mhanchet@mayerbrown.com <br> Email: rhamburg@mayerbrown.com <br> Email: bbright@mayerbrown.com <br> Email: wsuflas@mayerbrown.com <br><br> *Attorneys for Defendant Banque-Libano Française SAL* |
| DLA PIPER LLP (US) | SQUIRE PATTON BOGGS (US) LLP |
| By: */s/ Anthony P. Coles* <br> Anthony P. Coles <br> Erin Collins <br> DLA Piper LLP (US) <br> 1251 Avenue of The Americas <br> New York, NY 10020 <br> 212-335-4925 <br> Email: anthony.coles@dlapiper.com <br> Email: erin.collins@dlapiper.com <br><br> Samantha L. Chaifetz <br> 500 8th Street, NW <br> Washington, DC 20004 <br> 202-799-4082 <br> Email: samantha.chaifetz@dlapiper.com | By: */s/ Gassan A. Baloul* <br> Gassan A. Baloul <br> Mitchell R. Berger <br> Squire Patton Boggs (US) LLP <br> 2550 M Street, NW <br> Washington, DC 20037 <br> 202-457-6155 <br> Email: gassan.baloul@squirepb.com <br> Email: mitchell.berger@squirepb.com <br><br> *Attorneys for Defendants MEAB Bank s.a.l., Fenicia Bank S.A.L., and LGB Bank s.a.l.* |

*Attorneys for Defendants Byblos Bank SAL, Bank of Beirut and the Arab Countries SAL, and Bank of Beirut s.a.l.*

ASHCROFT LAW FIRM, LLC

By: */s/ Michael J. Sullivan*
Michael J. Sullivan
Brian J. Leske
Ashcroft Law Firm, LLC
200 State Street, 7th Floor
Boston, MA 02109
617-573-9400
Email: msullivan@ashcroftlawfirm.com
Email: bleske@ashcroftlawfirm.com

*Attorneys for Defendant Société Générale de Banque au Liban S.A.L.*