UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROBERT BARTLETT, et al.,

                              Plaintiffs,

            -against-

SOCIETE GENERALE DE BANQUE AU LIBAN
SAL, et al.,

                              Defendants.

No. 19-cv-7 (CBA) (TAM)

**JOINT MEMORANDUM OF LAW IN SUPPORT OF
MOVING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 4

   I.    Plaintiffs' Claims Here Compared To The Claims In *Ashley*. ......................... 4

   II.   The Second Circuit's *Ashley* Decision. ......................................................... 6

LEGAL STANDARD ............................................................................................ 9

ARGUMENT ....................................................................................................... 10

   I.    Plaintiffs' Aiding-And-Abetting Claim Fails Under *Ashley*. ......................... 10

     A.   The TAC Fails To Allege "A Discernable Nexus" Between The Banks' Services And The Attacks. ................................................................. 10

     B.   The TAC's Reliance On A "Transcendent Enterprise" Is Insufficient To Plausibly Plead Pervasive, Systemic, and Culpable Support. ................... 13

     C.   Plaintiffs Cannot Avoid Their Legal Failures Through Group Pleading And Threadbare Allegations. ....................................................... 15

       1.   Plaintiffs' Generalized And Group Pleading Lacks The Required Specificity For Individual Liability. ...................................................... 15

       2.   Plaintiffs' Theory Based On The Banks' Provision Of Unspecified Services To Certain Hezbollah-Affiliated Customers Is Insufficient Under *Ashley*. ..................... 17

       3.   Plaintiffs' Threadbare Allegations Of "Liaisons" Is Analogous To *Ashley*'s Failed "Rogue" Agency Actor Theory. ..................................... 22

     D.   Plaintiffs' General Awareness Allegations Fail Under *Ashley*. ............... 23

   II.   The TAC Does Not State A JASTA Conspiracy Claim. ................................. 25

     A.   The TAC Does Not Plausibly Allege That The Defendants Conspired With Hezbollah. ................................................................................. 25

     B.   The TAC Does Not Plausibly Allege That The Banks Conspired To Commit An Act Of International Terrorism. ................................................ 28

     C.   The TAC Does Not Plausibly Allege An Overt Act. ................................. 30

CONCLUSION .................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................................10

*Ashley v. Deutsche Bank Aktiengesellschaft,*
    144 F.4th 420 (2d Cir. 2025) ......................................................................... *passim*

*Bernhardt v. Islamic Republic of Iran,*
    47 F.4th 856 (D.C. Cir. 2022) ...............................................................................27, 31

*Cain v. Twitter Inc.,*
    No. 17-cv-02506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018) ....................................28, 29

*Freeman v. HSBC Holdings PLC,*
    57 F.4th 66 (2d Cir. 2023) ............................................................................. *passim*

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................................25, 28

*Havens v. James,*
    76 F.4th 103, 119 (2d Cir. 2023) ............................................................................3, 18

*Hayden v. Paterson,*
    594 F.3d 150 (2d Cir. 2010) ...................................................................................9, 10

*Honickman v. BLOM Bank SAL,*
    6 F.4th 487 (2d Cir. 2021) .....................................................................................21, 23

*Johnson v. Rowley,*
    569 F.3d 40 (2d Cir. 2009) .........................................................................................9

*Kemper v. Deutsche Bank AG,*
    911 F.3d 383 (7th Cir. 2018) ..............................................................................25, 26, 29

*Lively v. WAFRA Inv. Advisory Grp., Inc.,*
    6 F.4th 293 (2d Cir. 2021) .........................................................................................9

*In re Mexican Gov't Bonds Antitrust Litig.,*
    412 F. Supp. 3d 380 (S.D.N.Y. 2019) ..............................................................................16

*O'Sullivan v. Deutsche Bank AG,*
    No. 17-CV-8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .....................................28, 29

*Ocasio v. United States,*
578 U.S. 282 (2016).................................................................................................25, 26

*Ofisi v. BNP Paribas, S.A.,*
77 F.4th 667 (D.C. Cir. 2023)...............................................................................28

*Siegel v. HSBC N. Am. Holdings, Inc.,*
933 F.3d 217 (2d Cir. 2019)..................................................................................18

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
605 U.S. 280 (2025)................................................................................... *passim*

*Twitter, Inc. v. Taamneh,*
598 U.S. 471 (2023)................................................................................... *passim*

*United States v. Peoni,*
100 F.2d 401 (2d Cir. 1938)....................................................................................8

*United States v. Shabani,*
513 U.S. 10 (1994)..................................................................................................25

*United States v. Verners,*
53 F.3d 291 (10th Cir. 1995) ...........................................................................3, 18

*Wildman v. Deutsche Bank Aktiengesellschaft,*
No. 21-CV-04400, 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022).......................12

**Statutes**

18 U.S.C. § 2333(d)(2) ....................................................................................10, 29

Per the Court's August 22, 2025 Minute Order, Moving Defendants (the "Banks")[1] respectfully submit this memorandum of law in support of their Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure in light of the recent decision in *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025).

## PRELIMINARY STATEMENT

*Ashley* is the first Second Circuit decision to apply *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), and *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), to Justice Against Sponsors of Terrorism Act ("JASTA") aiding-and-abetting claims against banks. Applying these precedents, the Second Circuit rejected claims and theories of liability that are indistinguishable from those Plaintiffs advance here. The Court should thus grant this motion.

Like this case, *Ashley* involved claims brought by U.S. nationals killed or injured in attacks that were allegedly supported by a vast web of criminals and terrorists. The *Ashley* plaintiffs referred to this criminal-terrorist conglomerate as the "Syndicate." They sued three international banks under JASTA for aiding and abetting these terrorist attacks by providing banking services to customers allegedly connected to the Syndicate. The Second Circuit rejected these "sweeping" claims, finding them incompatible with the aiding-and-abetting standards in *Twitter* and *Smith & Wesson*. *Ashley*, 144 F.4th 439.

The Third Amended Complaint ("TAC") here suffers from the same shortcomings. Indeed, its allegations are even more attenuated than those rejected by the Second Circuit in *Ashley*. Plaintiffs allege here that *eleven* Banks—representing approximately 80 percent of the Lebanese banking sector—provided generally available, arm's-length, for-profit banking services to

---

[1] The Banks are (1) Société Générale de Banque au Liban S.A.L., (2) Fransabank S.A.L., (3) MEAB Bank s.a.l., (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) LGB Bank s.a.l., (9) Banque Libano Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank S.A.L.

customers in Lebanon who Plaintiffs allege have some connection to the "System"—an amorphous international criminal enterprise akin to *Ashley*'s "Syndicate"—that Plaintiffs say supports Hezbollah. But Plaintiffs do not allege that Hezbollah carried out the Attacks, instead suggesting that Hezbollah might have played a secondary role by training or funding the Shia militia groups responsible for the Attacks, assisting in developing explosive devices, or otherwise providing support to the militia groups that ultimately perpetrated the violence.

The implications of those allegations are untenable. Under Plaintiffs' theory—which in their own words is predicated on the regrettable belief that "everyone in Lebanon is a partner of Hizbullah"—any party who engages in economic activity in Lebanon is exposed to liability under JASTA. *See* Pls' Letter Opening Br. in Supp. of Pls' Proposed Expanded Disc. Order at 3, ECF No. 462. And they make this sweeping claim without alleging that any transaction processed through any Moving Defendant was related to the Attacks. *Ashley* makes clear that such attenuated allegations cannot support a JASTA aiding-and-abetting claim.

*First*, as in *Ashley*, Plaintiffs here fail to allege any discernable nexus between the Banks and the Attacks in Iraq. None of the Banks' supposed customers are alleged to have carried out the Attacks, and there is no allegation that any particular transaction, communication, or action by the Banks facilitated—or was in any way related to—any Attack. Instead, Plaintiffs theorize that some of the funds that the Banks cleared *might* have indirectly reached a terrorist group. That does not cut it. *Ashley* squarely held that "it is not enough" for purposes of JASTA aiding-and-abetting liability "to say that the defendant assisted the terrorist organization's 'activities in general.'" *Ashley*, 144 F.4th at 444 (quoting *Twitter*, 598 U.S. at 503). "JASTA expressly provides that liability only attaches for aiding and abetting a particular terrorist attack." *Id.* at 448. Consequently,

"[o]ne cannot aid and abet an aider and abettor." *Havens v. James*, 76 F.4th 103, 119 (2d Cir. 2023) (quoting *United States v. Verners*, 53 F.3d 291, 295 n.2 (10th Cir. 1995)).

*Second*, to survive dismissal in the absence of a "discernable nexus," *Ashley* made clear that a complaint must otherwise plead that a bank's assistance was so "pervasive and systemic" that it was "designed or performed with the intent to aid" the terrorist group in carrying out its terrorist activities. *Id.* at 445. This is an exceptionally "high bar," *Smith & Wesson*, 605 U.S. at 294, akin to the showing required for conspiracy liability. And the TAC comes nowhere close to surmounting that bar. Plaintiffs allege that the Banks maintained accounts for individuals and entities that were affiliated with the so-called "System." But the Second Circuit rejected a nearly identical pleading tactic in *Ashley*. It held that the *Ashley* plaintiffs could not satisfy JASTA by alleging that "the Banks may have opened their doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the Syndicate's pile of resources." *Ashley*, 144 F.4th at 445. So too here.

*Third*, the Second Circuit's decision in *Ashley* applied the Supreme Court's teachings in *Smith & Wesson* to squarely foreclose the sort of group pleading that Plaintiffs rely on in this case. Here, as there, Plaintiffs cannot premise liability on loosely alleged and undifferentiated customer relationships, conclusory allegations of supposed Hezbollah liaisons, and sparse theories of money laundering attributed to the Lebanese banking industry as a whole. Rather, for aiding-and-abetting liability to attach, a plaintiff must "pinpoint" a "specific [unlawful] transaction" that a *specific* defendant allegedly assisted. *Smith & Wesson*, 605 U.S. at 294. Plaintiffs cannot rely on a customer relationship of *one* specific Bank to assert claims against *another* Bank that is not alleged to have maintained an account for that customer.

*Finally*, Plaintiffs' threadbare allegations that Moving Defendants maintained supposed

Hezbollah liaisons resemble the allegations of rogue intelligence agents in *Ashley* and the rogue dealers in *Smith & Wesson* that both courts rejected. Without more, Plaintiffs cannot pin sweeping liability for a rash of terrorist attacks on Banks that played no role in those atrocities. For the reasons discussed herein, the Banks' motion should be granted.

## BACKGROUND

### I. Plaintiffs' Claims Here Compared To The Claims In *Ashley*.

Plaintiffs in both *Ashley* and this case have tried to premise JASTA liability on allegations of a sprawling, global criminal network that purportedly moved funds and provided access to the U.S. financial system in a manner that supported terrorist organizations.

In *Ashley*, the plaintiffs were U.S. service members (or their family members) who were victims of terrorist attacks in Afghanistan between August 6, 2011, and November 12, 2016, that were allegedly perpetrated by "the Syndicate." 144 F.4th at 428; Am. Compl. ¶¶ 1, 1123, 1128, *Wildman*, No. 21-CV-04400, ECF No. 38. The *Ashley* plaintiffs alleged the existence of an international criminal network—dubbed "the Syndicate"—composed of terrorist organizations, including al-Qaeda, the Taliban, the Haqqani Network, and Lashkar-e-Taiba. *See* 144 F.4th at 427–28; Am. Compl. ¶¶ 1, 89, *Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-CV-04400, 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022), *aff'd sub nom.*, *Ashley*, 144 F.4th 420, ECF No. 38. The *Ashley* plaintiffs alleged that this coordinated network orchestrated sophisticated financial operations to support terrorism, portraying it as an integrated enterprise that mobilized resources to enable the flow of funds for terrorist activities. *See Ashley*, 144 F.4th at 427–28.

Here, Plaintiffs are U.S. service personnel and contractors, and their family members, injured during wartime operations in Iraq. Plaintiffs contend that these Attacks, which occurred between January 12, 2004, and November 14, 2011, were carried out by Shia militia groups—

either paramilitary "Special Groups" or unnamed "terror operatives"—that received some measure of support from Hezbollah. TAC ¶¶ 2469–6068. Plaintiffs here similarly describe a vast and ill-defined criminal enterprise—that they deem "the System"—operating above or around terrorist organizations. Plaintiffs assert that the System consists of Lebanese organized crime families collaborating with Hezbollah. TAC ¶ 12. According to the TAC, this enterprise launders billions of U.S. dollars annually and provides Hezbollah with essential financial services, including access to the U.S. financial system through correspondent banking relationships in New York. TAC ¶¶ 5, 7, 12. As in *Ashley*, there is no allegation that the defendant Banks are members of the System. Rather, the allegation is that the eleven Banks provided services in Lebanon to customers (such as amusement parks, health clubs, restaurants, and supermarkets, *see, e.g.*, TAC ¶ 583) that had connections to the vast and transcendent System, *see, e.g.*, TAC ¶¶ 10, 13. However, unlike *Ashley*, the alleged perpetrators here are not the System but other third-party militia groups.

Indeed, there is an especially weak connection between the Banks and the alleged Attacks in this case. The *Ashley* plaintiffs had alleged that Standard Chartered Bank ("SCB") financed Pakistani companies that manufactured fertilizer that served "as the main ingredient in most of the homemade bombs used by the Syndicate against Americans in Afghanistan." 144 F.4th at 440 (cleaned up). They further alleged that Deutsche Bank, SCB, and Danske Bank provided banking services to money launderers for the Syndicate, which in turn carried out the attacks in Afghanistan. *Id.* at 427.

Here, by contrast, Plaintiffs assert that Shia militia groups committed the Attacks, with support from Hezbollah, and attempt to hold Moving Defendants liable by alleging that they provided banking services to customers connected to the System. Unlike the Syndicate in *Ashley*, the TAC does not allege that Moving Defendants provided services related to bombs, weapons, or

terrorist operations; they do not even allege that the System or Hezbollah itself committed the Attacks. Instead, the TAC advances undifferentiated allegations against no fewer than eleven Lebanese banks of aiding Hezbollah via a transcendent criminal enterprise. *See* TAC ¶¶ 10, 13.

As a result, the allegations here are even more attenuated than *Ashley*. Unlike the *Ashley* plaintiffs' allegation that the Syndicate carried out the attacks at issue there, 144 F.4th at 427, the TAC does *not* allege that the System or Hezbollah carried out the Attacks here. Instead, Plaintiffs allege that the Shia militia groups that perpetrated the Attacks received some secondary support from Hezbollah, as in the planning or designing of the weapons used in the Attacks. *See e.g.*, TAC ¶¶ 2472, 2488, 2496, 2533.

## II. The Second Circuit's *Ashley* Decision.

In *Ashley*, plaintiffs advanced three distinct theories of liability against the defendant banks, which the Second Circuit explicitly rejected. That reasoning is applicable to the allegations here.

*First*, the *Ashley* plaintiffs alleged that SCB and its Pakistani branch provided foreign exchange and export finance services to two Pakistani fertilizer companies (the "Companies") whose product was being systematically smuggled across the Pakistan–Afghanistan border to make improvised bombs used by the Syndicate. Am. Compl. ¶¶ 505, 525–27, 1076, *Wildman*, No. 21-CV-04400, ECF No. 38; *Ashley*, 144 F.4th at 427.

The *Ashley* complaint alleged that both the Companies and SCB had *actual knowledge* that the Companies' fertilizer was being used by terrorists to manufacture roadside bombs to kill Americans. The plaintiffs specifically alleged that the "U.S. Government appealed directly to the Companies to try to prevent terrorists from obtaining CAN. The Government requested that the Companies facilitate better management of the flow of their fertilizer into Afghanistan." *Ashley*, 144 F.4th at 429. But "[t]he Companies refused these requests." *Id.* More importantly, the plaintiffs

alleged that U.S. military personnel pled with executives at SCB "to encourage them to change their practices in order to interdict the flow of CAN to Syndicate terrorists" and yet SCB continued to "provide[] foreign exchange, export finance, and letter-of-credit services to the Companies from 2009 to at least 2016." *Id.* (citation omitted). "In 2010, the Companies 'publicly identified' SCB as 'one of the "major bankers of the company.'"" *Id.*

The Second Circuit concluded that this first theory failed, however, because it incorrectly focused on the value of "SCB's services to the Companies" rather than on "'whether [SCB] culpably associated' itself with the Syndicate's wrongful actions." *Id.* at 440 (alteration in original) (quoting *Twitter*, 598 U.S. at 504). The Second Circuit noted that the plaintiffs had alleged only a "*tenuous* connection between the banking services and the terrorist attacks," as they did *not* allege that SCB: (1) "directly aided the Syndicate in carrying out the bombings"; (2) "took steps to help the downstream actors' exploitation of" the fertilizer; or (3) "aided . . . fertilizer production or its smuggling." *Id.* at 440–41.

*Second*, the plaintiffs alleged that the defendant banks facilitated money laundering for customers associated with the Syndicate by processing funds that helped finance the terrorist attacks. 144 F.4th at 430–32. The plaintiffs alleged that the banks knew that "money laundering is closely connected to terrorist financing." *Id.* at 427. But the Second Circuit similarly rejected this theory, explaining that "it is not enough to say that the defendant assisted the terrorist organization's 'activities in general.'" *Id.* at 444 (quoting *Twitter*, 598 U.S. at 503). While it was "possible that some of the Banks' transactions in the money laundering schemes produced money that was transferred to the Syndicate and used to facilitate" the attacks, it held that plaintiffs could not rely on a "theory [of liability] based on money's fungibility." *Id.*

*Third*, the plaintiffs alleged that the defendant banks were generally aware that they were

playing a role in terrorist activity because they facilitated value-added tax ("VAT") fraud schemes for individuals and companies linked to terrorist financing. *Id.* at 432–33. To support this claim, plaintiffs alleged the existence of various "red flags," such as the suspicious nature of the transactions, the high-risk jurisdictions involved, and the banks' own due diligence obligations. *Id.* at 447. But the court rejected this theory, holding that these allegations suggested that the banks were generally aware of a role in possible *tax fraud*, not a role in terrorism. *Id.*

In addition, *Ashley* recognized that the Supreme Court's recent decision in *Smith & Wesson* reinforced the traditional limits on aiding-and-abetting liability. In that case, Mexico sued seven U.S. firearms manufacturers alleging they aided and abetted the unlawful retail sale of guns that were funneled to Mexican cartels. *Smith & Wesson*, 605 U.S. at 284–85. The complaint advanced three theories of aiding-and-abetting liability: that the manufacturers (1) knowingly supplied firearms to "rogue" dealers who sold illegally to traffickers; (2) failed to impose distribution chain controls that would prevent illegal sales; and (3) made "design and marketing decisions" intended to stimulate cartel demand. *Id.* at 288–90.

The Supreme Court held that the suit was barred because the complaint did not plausibly allege aiding-and-abetting liability. *Id.* at 284–86. Citing *Twitter*, *Smith & Wesson* reiterated the requirement that an "'aider and abettor' must 'participate in' a crime 'as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" *Id.* at 291 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

From that baseline, three principles controlled. *First*, aiding-and-abetting liability typically targets "*specific* wrongful acts," and broader theories that do not involve a concrete nexus between the defendant and the specific wrongful acts demand "pervasive, systemic, and culpable" alignment with the principal actor. *Id.* at 292 (quoting *Twitter*, 598 U.S. at 494, 502). A plaintiff's

burden is heightened when the complaint does "not pinpoint . . . any specific criminal transactions," for example, by failing to allege that a "given manufacturer aided a given firearms dealer, at a particular time and place, in selling guns to a given Mexican trafficker not legally permitted to buy them under a specified statute." *Id.* at 294. *Second*, liability "usually requires misfeasance rather than nonfeasance . . . failures, omissions, or inactions . . . will rarely support liability." *Id.* at 281. *Third*, "routine and general activity that happens on occasion to assist in a crime—in essence, 'incidentally'—is unlikely to count," so an ordinary merchant is not liable merely because it knows some customers will misuse lawful products. *Id.* at 292.

The Second Circuit applied these same principles when rejecting plaintiffs' claims in *Ashley*. It acknowledged that, while "SCB certainly failed to 'impose constraints' on its distribution chain because of downstream bad actors," these were merely "allegations of 'indifferen[ce], rather than assistance.'" *Ashley*, 144 F.4th at 443 (alteration in original) (quoting *Smith & Wesson*, 605 U.S. at 282). This makes sense, the court explained, because "[t]o extend aiding-and-abetting liability to these circumstances risks making a 'manufacturer of goods . . . an accomplice to every unaffiliated retailer whom it fails to make follow the law.'" *Id.* (omission in original) (quoting *Smith & Wesson*, 605 U.S. at 297).

## LEGAL STANDARD

Courts evaluate a motion for judgment on the pleadings pursuant to Rule 12(c) by the same standard that applies to a motion to dismiss under Rule 12(b)(6). *See Johnson v. Rowley*, 569 F.3d 40, 43–44 (2d Cir. 2009). "To survive a Rule 12(c) motion, [the plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (alteration in original) (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)). Conclusory allegations and legal

conclusions are not entitled to the assumption of truth. *Hayden*, 594 F.3d at 161. Rather, the factual allegations must "plausibly give rise to an entitlement to relief," by showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

## ARGUMENT

## I. Plaintiffs' Aiding-And-Abetting Claim Fails Under *Ashley*.

Plaintiffs have failed to state a JASTA claim. Under JASTA, a person injured by an act of international terrorism may recover damages from "any person who aids and abets, by knowingly providing substantial assistance" to "the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). That demanding standard requires plaintiffs to establish three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." *Twitter*, 598 U.S. at 486; *Ashley*, 144 F.4th at 435.

### A. The TAC Fails To Allege "A Discernable Nexus" Between The Banks' Services And The Attacks.

*Ashley* made clear that JASTA liability attaches only where there is a "discernable nexus between [a defendant's conduct] and the attacks committed against Plaintiffs." 144 F.4th at 444. That is, "the defendant must aid and abet a *specific* act." *Id.* at 448 (emphasis added). It is insufficient to allege assistance to a broad terrorist enterprise detached from an actionable wrong. *Id.* (citing *Twitter*, 598 U.S. at 495). This requirement flows directly from *Twitter* and *Smith & Wesson*, which require that plaintiffs plead "truly culpable conduct" by "consciously, voluntarily, and culpably" participating in the discrete events giving rise to injury. *Twitter*, 598 U.S. at 489, 505; *Smith & Wesson*, 605 U.S. at 291–92.

10

The Second Circuit held that plaintiffs' complaint in *Ashley* failed on this basis. The court explained that it was insufficient that SCB allegedly provided financing to companies that manufactured components used in roadside bombs. Those allegations focused on the importance of SCB's services to the Companies, rather than on whether SCB had culpably aligned itself with the terrorist group's conduct. *Ashley*, 144 F.4th at 440. Even though the *Ashley* plaintiffs alleged that SCB financed the manufacture of bomb parts, the Second Circuit found that there was only a "tenuous connection between the banking services and the terrorist attacks" and noted that plaintiffs did not allege that SCB (1) directly supported the Syndicate's bombings; (2) facilitated the exploitation of bomb-making materials; or (3) aided in production or smuggling efforts. *Id.*

Here, the allegations in the TAC are substantially weaker because the alleged banking services are even further removed from terrorist violence than those in *Ashley*. Unlike the banking services which financed the bomb-ingredients in *Ashley*, the TAC, which spans nearly 900 pages, does not identify any *specific* transaction, communication, or service by *any* (let alone *each*) of the Moving Defendants which would show that the Banks *knowingly* facilitated any Attack or any terrorist violence at all.

Instead, the TAC attempts to contrive a nexus between the various Moving Defendants, the System, and the Attacks based on the fungibility of money. The TAC repeatedly asserts, for example, that the System "churns proceeds from . . . illicit activities through Lebanon's banks," and that the banks "help facilitate the transit of illicit proceeds through the United States for the benefit of Hezbollah and its IJO." *See, e.g.*, TAC ¶¶ 47, 156, 171, 190, 207, 220, 235, 247, 258, 272, 286, 301, 314. But *Ashley* expressly rejected the "fungibility theory," holding that even where illicit funds might have ultimately reached a terrorist group, "it is not enough to say that the defendant assisted the terrorist organization's 'activities in general.'" *Id.* at 444 (quoting *Twitter*,

598 U.S. at 503); *see also Smith & Wesson*, 605 U.S. at 294–95 (rejecting liability where the complaint failed to "pinpoint . . . any specific criminal transactions" and rested on a "general accusation" untethered to any attack). Because Plaintiffs fail to allege specific facts tying any of the Moving Defendants to any of the Attacks, their claims necessarily fail as a matter of law.

Unable to allege any link between the Moving Defendants and any of the Attacks, the TAC then attempts to rely on allegations about participation in the supposed "System," and to cast those as sufficient to allege that the Banks provided specific assistance to Hezbollah. But *Ashley* rejected an aiding-and-abetting claim based on nearly identical allegations that the defendant banks "worked with a number of other individuals and organizations who were, sometimes tangentially, involved with the 'international criminal network' that supported the FTOs." *Wildman*, 2022 WL 17993076, at *3. Plaintiffs' claims thus fail because they have offered "no discernable nexus between the money laundering and the attacks committed against Plaintiffs" and "barely offer[ed] any information about the Banks' transactions in the money laundering operations." *Ashley*, 144 F.4th at 444–45.

Just like in *Ashley*, the TAC's reliance on an amorphous "System" is insufficient to support an aiding-and-abetting claim. The alleged "System" does not remotely connect the Moving Defendants' alleged banking services to the violent acts that injured Plaintiffs. In essence, Plaintiffs' theory of liability would hold all participants in the Lebanese economy whose financial activities tangentially played some role in the sweeping "System" liable under JASTA. *Ashley* plainly rejected such an expansive theory of aiding-and-abetting liability, holding that "assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it" is insufficient to state a claim. *Id.* at 448 (quoting *Twitter*, 598 U.S. at 495); *see also Smith & Wesson*, 605 U.S. at 292 (reaffirming that aiding-and-abetting is a "rule of secondary

liability for specific *wrongful* acts," and that liability for broader misconduct requires "pervasive, systemic, and culpable" participation).

## B. The TAC's Reliance On A "Transcendent Enterprise" Is Insufficient To Plausibly Plead Pervasive, Systemic, and Culpable Support.

Where, as here, "a concrete nexus to the terrorist attack is lacking," a plaintiff's only way to establish JASTA liability is to demonstrate "pervasive, systemic, and culpable" support to an organization's terrorist activities, such that a defendant can be said to have aided and abetted every terrorist attack the organization perpetrates. *Ashley*, 144 F.4th at 445 (internal quotation marks omitted). This is an exceptionally "high bar," as confirmed by *Twitter*, *Smith & Wesson*,[2] and *Ashley*. *See Ashley*, 144 F.4th at 445; *Smith & Wesson*, 605 U.S. at 294. Indeed, this "pervasive and systemic" exception "begins to blur with conspiracy" liability. *Ashley*, 144 F.4th at 445. It requires conspiracy-like allegations showing that the defendants' actions "were designed or performed with the intent to aid" the terrorist group in all of its terrorist activities. *Id.* In other words, the defendants must have "actively sought to 'associate[] themselves' with the [terrorist group's] 'operations' or to form 'a near-common enterprise' with the [terrorist group]." *Id.* (first alteration in original); *see also Smith & Wesson*, 605 U.S. at 293–94.

That exception was not satisfied in *Ashley*, and it is not satisfied here. In *Ashley*, the plaintiffs posited that "Defendants engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists [and] some of the money must have gone to the terrorists' violent activities." 144 F.4th at 444. But the Second Circuit held that "it is not enough to say that the defendant assisted the terrorist organization's 'activities in general.'" *Id.* (quoting *Twitter*, 598 U.S. at 503). Merely alleging that "the Banks may have opened their doors

---

[2] As the Second Circuit acknowledged, *Smith & Wesson* reinforced key principles of aiding-and-abetting liability, "albeit in the context of a different statutory regime." *Ashley*, 144 F.4th at 443.

to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the Syndicate's pile of resources," was insufficient. *Id.* at 445. To allege liability, plaintiffs would need to allege that the banks "*actively sought* to 'associate[] themselves' with the Syndicate's 'operations' or to form 'a near common enterprise' with the Syndicate." *Id.* (emphasis added) (quoting *Twitter*, 958 U.S. at 502) ).

Here, too, the TAC does not satisfy this exception. *First*, Plaintiffs fail to allege that any Moving Defendant intentionally aligned with Hezbollah. Plaintiffs allege only that Moving Defendants provided arm's-length and for-profit banking services to customers that were not Hezbollah. They do not allege that Moving Defendants had any active role in laundering money for Hezbollah. Rather, they contend in generalized terms that certain Bank customers derived funds from "criminal activities." *See, e.g.*, TAC ¶¶ 960, 1042, 1084, 1088–89, 1175, 1184. But they do not allege that the Banks knew about or facilitated any of the unspecified criminal activity. Thus, even accepting Plaintiffs' generalized allegations as true, they pertain, at most, to potential financial crimes by Bank customers—but decidedly not to any intentional participation by the Banks in Hezbollah's terrorist activity.

*Second*, Plaintiffs have not alleged that Moving Defendants formed a near-common enterprise with Hezbollah. *Ashley* makes clear that mere allegations that a bank "executed financially suspect transactions writ large" are not enough. *Ashley*, 144 F.4th at 445. And that is all Plaintiffs allege here. The TAC advances a theory that various customers, who might have associated with Hezbollah, might have profited from criminal ventures and that those proceeds, in some unspecified way, were then used to support terrorism. There are no factual allegations that any specific funds were *actually* laundered through the Banks, let alone that the Banks *intended* to aid Hezbollah or the terrorist attacks. As in *Ashley*, these types of generalized and inferential claims

fall short. *See id.* at 444 (explaining that plaintiffs' allegations merely suggest "it [was] possible that some of the Banks' transactions in the money laundering schemes produced money that was transferred to the Syndicate and used to facilitate bombings in Afghanistan" and thus were insufficient to establish aiding-and-abetting liability).

*Third*, *Ashley* explains that, to support pervasive liability, a bank's actions must have been "designed or performed with the intent to aid" all of a group's terroristic activities. *Id.* at 445. Here, the TAC makes no plausible showing of the sort. Indeed, Plaintiffs allege that the Banks participated in the System for financial reasons, not terroristic ones. *See, e.g.*, TAC ¶ 49. And liability cannot be premised solely on a bank doing business with designated parties. *See Ashley*, 144 F.4th at 441 (holding that plaintiffs' claim must show "plausible allegations that [the bank] wanted to help the [terrorist] operation[s] succeed by providing banking services").

In sum, the TAC does not allege pervasive, systemic, and culpable support.

## C. Plaintiffs Cannot Avoid Their Legal Failures Through Group Pleading And Threadbare Allegations.

Unable to tie any Moving Defendant to the terrorist activity at issue, Plaintiffs resort to group pleading and conclusory statements. Neither of those tactics salvage their meritless claims.

### 1. Plaintiffs' Generalized And Group Pleading Lacks The Required Specificity For Individual Liability.

Take group pleading first. *Smith & Wesson* rejected the notion that aggregated and undifferentiated allegations against multiple defendants can state a viable aiding-and-abetting claim. *See* 605 U.S. at 294. The Supreme Court held that each defendant must be individually tied to "pervasive, systemic, and culpable assistance" in furtherance of the alleged criminal conduct. *Id.* (quoting *Twitter*, 598 U.S. at 502). And the allegations must specify how each defendant's conduct contributed to the wrongful act. *Id. Smith & Wesson* thus rejected the "general accusation [] that *all* the manufacturers assist[ed] some number of unidentified rogue gun dealers in making

a host of firearms sales in violation of various legal bars." *Id.* (emphasis added). To state a claim, Plaintiffs must attribute "specific criminal transactions" to a specific defendant. *Id.*

The Second Circuit applied similar principles in dismissing the *Ashley* plaintiffs' claims against one bank defendant, holding that "alleg[ations] that Denmark (where Danske Bank is located) was a hotspot for using VAT fraud for terrorist financing . . . pled at the generality of an entire country, [were] simply too arbitrary and unconnected to any conduct by Danske Bank to support aiding-and-abetting liability." 144 F.4th at 447. As one district court in this Circuit emphasized, "[p]ost-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019).

The TAC here engages in impermissible group pleading based on generalizations about Lebanon. Plaintiffs try to muddle differences between eleven different defendant banks to impute liability to them all. They have repeatedly relied on allegations that certain customers had accounts with certain Banks to argue that all the Banks were providing knowing and substantial assistance to Hezbollah's terrorist acts. *See*, *e.g.*, Pls.' Mem. Law Opp'n Defs.' Mots. Dismiss TAC at 30 (citing TAC ¶ 646), ECF No. 381; *id.* at 31 (citing TAC ¶¶ 443, 5689–90, 1700, 1831, 1986, 2090); *id.* at 32 nn.17–18 (citing TAC ¶¶ 902–04, 1370, 1828, 2051). Plaintiffs cannot explain how one Bank could knowingly and substantially assist a terrorist attack by virtue of a different Bank allegedly holding an account for a customer.

Moreover, in vaguely describing the "System" so broadly as to implicate virtually the entirety of Lebanon (which Plaintiffs' wrongly cast as a terrorist haven), Plaintiffs plead "at the generality of an entire country." 144 F.4th at 447. The Second Circuit specifically rejected that tactic in *Ashley* as "too arbitrary and unconnected to any conduct by" any specific defendant to

support aiding-and-abetting liability. *Id.* Plaintiffs' overbroad conception of JASTA liability would impermissibly hold an entire country's economy liable for the Attacks (and all acts of Hezbollah). *See* Br. of the Inst. of Int'l Bankers & the Eur. Banking Fed'n as Amici Curiae in Supp. of Defs., at 11, ECF No. 373-1. Such an expansive and dangerous theory of liability is expressly forbidden by *Smith & Wesson* and *Ashley*, and must be rejected here.

### 2. Plaintiffs' Theory Based On The Banks' Provision Of Unspecified Services To Certain Hezbollah-Affiliated Customers Is Insufficient Under *Ashley*.

Next, Plaintiffs attempt to establish liability through a daisy chain of speculation. They submit that the Banks indirectly supported a financial "System" which, in turn, allegedly benefited Hezbollah in Lebanon, which in turn gave support to Shia militia groups in Iraq that committed the Attacks. This entire theory rests on amorphous allegations that the Banks provided unspecified services at unspecified times to certain customers allegedly affiliated with the System, and that such support alone is enough to hold the Banks responsible for Attacks that the System allegedly aided and abetted (but did not perpetrate).

Such a network-wide theory of assistance is precisely what *Ashley* rejected. Mere participation in a commercial network—especially one with purposes and operations distinct from Hezbollah, and which is not even itself alleged to have committed the Attacks at issue—does not establish a near-common enterprise. Likewise, allegations that a bank processed a payment for a customer after the customer was designated an SDGT or SDNTK, rather than an FTO, are insufficient to state a claim for aiding and abetting terrorism. As *Ashley* confirms, doing business with sanctioned entities alone does not support an inference that a bank intentionally associated itself, or formed a near-common enterprise, with an FTO. That banks "may have opened their doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the Syndicate's pile of resources," are precisely the sort of allegations that *Ashley* rejected.

144 F.4th at 445. Similarly, the fact that terrorists "took advantage" of ordinary financial services does not establish aiding-and-abetting liability. *Id.* at 437 (quoting *Twitter*, 598 U.S. at 503).

Thus, Plaintiffs claims fail on two fronts. *First*, the TAC makes no alleged direct connection between the Banks, their alleged customers, and the alleged attackers themselves. While substantial assistance can be made to a principal through an intermediary, a vague association is not enough because "JASTA expressly provides that liability only attaches for aiding and abetting a particular terrorist attack." *Ashley*, 2025 WL 2025448, at *18 (2d Cir. July 21, 2025). Consequently, "[o]ne cannot aid and abet an aider and abettor." *Havens*, 76 F.4th at 119 (quoting *Verners*, 53 F.3d at 295 n.2). As explained in *Siegel v. HSBC N. Am. Holdings, Inc.*, the plaintiffs failed to state a claim under JASTA when their allegations were merely that the bank was providing services to Al Rajhi Bank, who they alleged in turn supported al-Qaeda in Iraq. 933 F.3d 217, 224 (2d Cir. 2019). The Second Circuit held that, "[a]t most, the allegations, even when viewed in the light most favorable to the plaintiffs, assert that HSBC was aware that [Al Rajhi Bank] was believed by some to have links to [al-Qaeda] and other terrorist organizations"—which was "insufficient to state a claim for aiding-and-abetting liability under JASTA." *Id.*

The same reasoning holds true here. Plaintiffs' allegations are that the Banks provided banking services to certain Hezbollah-affiliated customers, and that Hezbollah in turn had links to other terrorist cells who carried out the Attacks. That is insufficient to establish liability. *See also Smith & Wesson*, 605 U.S. at 295–97 (rejecting aiding-and-abetting claim based on firearms sales to distributors who supplied "bad-apple dealers" who sold to criminals, because there was no "reason to believe that the manufacturers attend[ed] to the conduct of individual gun dealers, two levels down"); *Ashley*, 144 F.4th at 441 (finding that without direct assistance, a plaintiff has a

"higher burden" and must allege that the defendant was "consciously trying to help or otherwise participate in" the wrongdoing).

*Second*, even if a link to Hezbollah alone were enough—and it is not—Plaintiffs have not presented allegations that could establish that the Banks' relationship with Hezbollah was pervasive and systemic, such that the Banks are culpable for all of Hezbollah's wrongful acts. Plaintiffs attempt to link only a small number of customers to individual Banks. But those alleged links (in and of themselves) cannot support Plaintiffs' contention that those Banks intentionally associated themselves, or formed a near-common enterprise, with Hezbollah. The TAC, in its nearly 900 pages replete with gratuitous references to hundreds of individuals and entities in Lebanon, identifies only fifteen supposed customers of certain Moving Defendants (not all of them) that were designated in the relevant time period. And, far from alleging any unusual or bespoke services that the relevant Moving Defendants offered to these customers—which at least arguably might support an inference of intentional alignment with Hezbollah or terrorism—the TAC does not identify a single payment that any Moving Defendant processed for any such individual or entity after designation or during the relevant period.

Plaintiffs specifically and repeatedly emphasize two alleged customer relationships—Martyrs Foundation and IRSO—which they allege only a *subset* of the Moving Defendants banked. *See, e.g.*, Letter from Michael Radine dated August 12, 2025 (ECF No. 475) at 2. The Court likewise focused on these entities when denying the Moving Defendants' earlier motion to dismiss. *See* ECF 434 at 2. But provision of banking services to *two customers* is insufficient to establish a near-common enterprise, and, even so, close review of the allegations relating to Martyrs Foundation and IRSO reveals just how threadbare they are.

**Martyrs Foundation.** The TAC includes conclusory allegations—without identifying any particular point in time—that certain Moving Defendants (Fransabank, Byblos, BBAC, BLF, and LGB) supposedly held accounts for Martyrs Foundation. However, none of these Moving Defendants is alleged to have effected any transaction for Martyrs Foundation either before or after its designation. *See* TAC ¶¶ 1700–07, 1828, 1831, 1939, 1986, 1988, 2088, 2090.[3] There are no transactions identified with this entity at all.

Moreover, Plaintiffs' allegations about the Martyrs Foundation are self-defeating. The TAC alleges that Martyrs Foundation's exclusive mission is "supporting the families of Hezbollah fighters who died as a result of their attacks on the IDF [Israel Defense Forces]"—*not* attacks on U.S. military personnel in Iraq. TAC ¶¶ 496, 518, 520, 526, 528 (emphasis added). There is thus a basic mismatch between their allegations and their claims. Further, although the TAC alleges that public reports linked the organization to Hezbollah before it was designated by OFAC in 2007, TAC ¶¶ 499–503, only two of these articles appear to actually reference Martyrs Foundation. Those articles simply corroborate the TAC's theory that the organization was used to support the families of Hezbollah operatives—not to support violent terroristic activities. TAC ¶¶ 500, 501;

---

[3] Plaintiffs have previously stated (wrongly) that SGBL is alleged to have held accounts for Martyrs Foundation. Pls.' Mem. Law Opp'n Defs.' Mots. Dismiss TAC at 6 n.1 (relying upon TAC ¶¶ 5689–90), ECF No. 381; *see also id.* 11 (relying upon TAC ¶¶ 1667, 1670). Paragraphs 5689–90 have nothing to do with SBGL; paragraph 1670 alleges SGBL held accounts for Atlas Holding SAL; and paragraph 1667 is part of Plaintiffs' now-dismissed successor liability claim against SGBL, *see* TAC ¶ 6119. As with many other individuals and entities alleged to be SGBL customers during the TAC's relevant period (April 4, 2004-November 14, 2011), these accounts allegedly migrated from LCB following an asset-and-liability transaction that Plaintiffs concede was not approved by the Central Bank until September 8, 2011, *see* TAC ¶ 152, and a due diligence audit process that Plaintiffs concede was not concluded until 2012, *see* TAC ¶¶ 117, 1152, 1573, 1601, 2008. *See also* TAC ¶¶ 6119–21 (alleging now-dismissed SGBL successor liability for LCB accounts "held for Yousser Company for Finance and Investment (SDGT), the Martyrs Foundation – Lebanon (SDGT), Hussein al-Shami (SDGT), Al-Mabarrat Charitable Society, Lebanese Arab Touristic Company, and Al-Aytam Company for General Trading and Fuels" and "Elissa Holding SAL (SDNTK)"); *cf.* ECF No. 223, at 3 n.3. These migrated legacy LCB customer accounts therefore cannot support an independent aiding-and-abetting claim against SGBL. Nor can other alleged LCB customers and accounts that migrated after the last attack support a claim against other Defendants. *See, e.g.*, TAC ¶¶ 717, 845–46, 852–53, 972, 1109, 1149, 1154, 1187, 1194, 1277, 1285, 1299, 1305, 1694, 2005, 2113 (all alleging LCB accounts that were not closed until June 2012 or later).

*see also Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) (acknowledging distinction between general awareness allegations concerning violent activities and those that "report[] only that [the organization] sponsored . . . families and spent money on orphans"). As to the remaining two public source allegations, a review of the underlying sources reveals that the articles are discussing *different* organizations, not the actual Martyrs Foundation referenced in the TAC. *See* TAC ¶¶ 502, 503.

**Islamic Resistance Support Organization (IRSO).** The TAC alleges in conclusory fashion, and without specifying when, that Fransabank, Byblos, BLF, and LGB each maintained an account for IRSO. But despite dedicating numerous paragraphs to IRSO, *see* TAC ¶¶ 9, 17, 125–26, 423–44, 517, 1700–02, 1840, 1843, 1894, 1942, 1986–87, 2117–20, 2135, 2240, the TAC fails to allege that any of these Moving Defendants ever effected a single transaction for IRSO, *see* TAC ¶¶ 1700–07, 1942.[4] Again, the TAC identifies no transactional activity associated with this entity.

Thus, Plaintiffs offer nothing more than conclusory allegations that any Moving Defendants held accounts for these two entities—and they have offered *not a single document* in discovery to substantiate these inflammatory allegations. Yet, they have complained that no Moving Defendant has produced banking materials relating to these entities (ECF No. 475 at 2)— without acknowledging the obvious inference that no such banking materials exist, because no such account relationships exist.

In any event, Plaintiffs cannot rely on these or any other alleged customer relationships to assert claims against *all* the Banks unless Plaintiffs have specifically alleged that *each* Bank banked those specific customers. Thus, the Court could, for instance, dismiss Plaintiffs' JASTA

---

[4] Similarly, the TAC alleges threadbare allegations that MEAB "maintained accounts and provided financial services" for Imam Khomeini Relief Committee, but tellingly it does not specify a single transaction before or after that entity was designated. TAC ¶ 1786.

aiding-and-abetting claim except if supported by plausible allegations that a specific Moving Defendant facilitated transactions for individuals or entities that were integral parts of Hezbollah's terrorist apparatus—in connection with the Attacks—and who Plaintiffs have also specifically alleged had a banking relationship with a particular named Moving Defendant.

### 3. Plaintiffs' Threadbare Allegations Of "Liaisons" Is Analogous To *Ashley*'s Failed "Rogue" Agency Actor Theory.

In an effort to suggest that all the above-captioned defendants, including the Moving Defendants, provided "unusual" or "non-routine" banking service, Plaintiffs allege that Moving Defendants employed individuals who acted as Hezbollah "liaisons." The TAC repeats a set of nearly identical, conclusory allegations against a number of Banks—most of which are pled on "information and belief" or sourced vaguely to supposed and unspecified "published reports." TAC ¶¶ 1663, 1727, 1769, 1891, 1983, 2046, 2083, 2089, 2153. The TAC provides no detail regarding who these individuals were, what their roles at the Banks entailed, or how any Bank knew or should have known of their purported connections to Hezbollah. Each alleged liaison appears only once in the TAC, with no meaningful context, explanation of services performed, or description of any actual conduct connecting them to terrorist activities. *See* TAC ¶ 1491. Plaintiffs do not identify the supposed "published reports," nor do they explain how the liaison theory bears any connection to any alleged Attack.

These alleged customer liaisons are analogous to allegations in *Ashley* that "the Companies were being controlled by rogue members of Pakistan's intelligence agency," which was the basis for plaintiffs' contention that "SCB's 'relationship' with the Companies was not 'routine.'" *Ashley*, 144 F.4th at 441–42. The Second Circuit rejected this theory, explaining that, "based on the complaint's allegations, SCB could not have reasonably foreseen that its services to the Companies were supporting rogue members of that agency." *Id.* Nor did the Second Circuit credit plaintiffs'

citations to "two sources from the relevant time period, which merely surmise that the Companies' refusal to help may have been linked to the agency's influence." *Id.* at 442.

*Smith & Wesson* rejected a similar theory. There, the Supreme Court explained that "Mexico's lead claim—that the manufacturers elect to sell guns to, among others, known rogue dealers," does not confront the fact "that the manufacturers [did] not directly supply any dealers, bad-apple or otherwise." 605 U.S. at 294–95. Because Mexico did not allege that the distributors with whom the manufacturers conducted business lacked independence, the Supreme Court held that the "complaint must offer some reason to believe that the manufacturers attend to the conduct of individual gun dealers, two levels down." *Id.* at 295.

Here, too, the Court should reject Plaintiffs' reliance on unspecified reports to substantiate conclusory allegations that each of the Banks knew about the supposed connections between the alleged liaisons and Hezbollah. Even if these reports were somehow credited, Plaintiffs' theory would still fail because "any subsequently confirmed connection between the [Banks] and the [liaisons] did not taint the nature of [the Banks'] services at the time [they] provided them. [The Banks'] potential support to [Hezbollah] was incidental." *Ashley*, 144 F.4th at 441–42.

### D.  Plaintiffs' General Awareness Allegations Fail Under *Ashley*.

*Ashley* rejected "general awareness" allegations that did not plausibly suggest that defendants were aware that their customers were "'closely intertwined with' the terrorist organization's 'violent terrorist activities.'" *Ashley*, 144 F.4th at 438 (quoting *Honickman*, 6 F.4th at 501). There, the Second Circuit held that it was insufficient for plaintiffs to allege that the defendant banks were aware that some of their customers "were involved in tax fraud" and that the tax fraud schemes were a source of terrorist funding or were linked to the Syndicate based on "red flags," the high-risk jurisdictions involved, and the banks' own due diligence obligations. *Id.* at 447 (quotation marks and citation omitted). These allegations, at most, supported an inference

23

that the banks were generally aware of possible tax fraud, not terrorist activity. *Id.*

The same is true here. Even accepting the TAC's allegations as true, at most they show potential awareness of financial crimes—not terroristic violence. Plaintiffs' reliance on later OFAC designations is similarly unavailing because they do not show that the Banks were aware of Hezbollah ties at the relevant times. *See, e.g.*, TAC ¶¶ 824, 886, 1054, 1120, 1364, 1427. References to public events, vague customer affiliations, or general associations do not plausibly support an inference of general awareness of terrorist activity.

In any event, the TAC's allegations of general awareness are significantly more attenuated than those in *Ashley*, where the court found that at least one defendant bank "was generally aware that its banking services to the Companies indirectly had a connection to the Syndicate's terrorist activities." *Ashley*, 144 F.4th at 439. That was based on a number of allegations. First, an article published in 2011 that "identified the Companies' fertilizer as the 'main ingredient in most of the homemade bombs.'" *Id.* at 439–40. Second, public statements made by a U.S. Congressman regarding the "Companies refus[al] to help the U.S. Government facilitate detection of CAN at the Afghan border." *Id.* Third, the fact that a U.S. military officer specifically told SCB that the Companies' product was (i) the source for the explosive materials used by the Syndicate, (ii) had caused 80 percent of all American bomb casualties, (iii) that the Companies had refused to cooperate to prevent CAN smuggling into Afghanistan, and (iv) that SCB's banking services were crucial to sustain the Syndicate's attacks. *See id.* Nothing like the foregoing is alleged in this case.

\* \* \*

In short, Plaintiffs have failed to establish the elements of general awareness or knowing and substantial assistance for any of the Moving Defendants. The TAC collapses under the exacting

standards articulated in *Ashley*, *Twitter*, and *Smith & Wesson*. And this Court should grant the Moving Defendants' motion for judgment on the pleadings for the aiding-and-abetting claim.

## II. The TAC Does Not State A JASTA Conspiracy Claim.[5]

The TAC also fails to state a conspiracy claim under JASTA. Plaintiffs' allegations with respect to conspiracy are that Moving Defendants "joined Hezbollah and the IRGC's conspiracy to launch terrorist attacks against U.S. and MNF-I personnel in Iraq," and that Moving Defendants joined that conspiracy by "knowingly agreeing to provide Hezbollah with illegal material support in the form of financial services critical to Hezbollah's and the IRGC's capacity to commit terrorist attacks in Iraq." TAC ¶¶ 6100–01 (Count III). Those conclusory allegations are legally insufficient.

### A. The TAC Does Not Plausibly Allege That The Defendants Conspired With Hezbollah.

The TAC fails at the very first step by not plausibly alleging the most basic requirement of any conspiracy: an agreement. This element is the "crux" of any conspiracy claim. *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) (citing *Ocasio v. United States*, 578 U.S. 282, 287 (2016)). And an agreement—which is the actus reus of the claim—is what distinguishes conspiracy from aiding and abetting. *Halberstam v. Welch*, 705 F.2d 472, 477–78 (D.C. Cir. 1983); *United States v. Shabani*, 513 U.S. 10, 16 (1994). The need to allege an illicit agreement is "especially important in business dealings," to ensure that routine financial dealings do not "carry with them the excess baggage of conspiracy." *Kemper*, 911 F.3d at 395.

As the Second Circuit explained in *Freeman v. HSBC Holdings PLC*, a plaintiff asserting a JASTA conspiracy claim must allege an illicit agreement between the defendant and terrorists

---

[5] In its previous opinion, the Court did not address Moving Defendants' motion to dismiss the conspiracy claim in the TAC, *see* Mem. & Order, ECF No. 434, and it declined to reach this point in its decision granting in part and denying in part Moving Defendants' motion to dismiss, *see* Memo & Order, ECF No. 164. But the conspiracy claim is a separate claim that must stand on its own.

that perpetrated the attack in question. 57 F.4th 66, 79 (2d Cir. 2023). And that requires plausible allegations that the defendant and the terrorist perpetrators were "pursuing the same object" and had a "common intent." *Id*. at 79–80. Indeed, it is a basic principle of conspiracy law that "one cannot join a conspiracy through apathy." *Kemper*, 911 F.3d at 395. A contrary rule would impose conspiracy liability on any business that transacted with bad actors. *See id.* Thus, "although 'a conspirator need not agree to commit or facilitate each and every part of the offense,' she must 'reach an agreement with the *specific intent* that' the conspiratorial goal be completed." *Id.* (cleaned up) (quoting *Ocasio*, 578 U.S. at 288).

*Freeman* illustrates the point. There, the Second Circuit affirmed the dismissal of JASTA conspiracy claims—involving many of the same Attacks and plaintiffs as in this case—because the plaintiffs failed to allege a common intent among the defendant banks and the terrorist perpetrators. *Freeman*, 57 F.4th at 80. The court explained: "Nowhere in the Complaint . . . do Plaintiffs plead that the Banks intended to kill or injure U.S. service members in Iraq," and "[i]n the absence of any allegation that the Banks and the terrorist groups engaged in a common pursuit, we cannot identify any agreement that could form the basis of a JASTA conspiracy between the Banks and the terrorist groups." *Id.* (cleaned up).

Plaintiffs' conspiracy claim here suffers from the same flaw. The TAC does not allege that any of the Moving Defendants "intended to kill or injure U.S. service members in Iraq" or that they were engaged in a common pursuit with the perpetrators of the Attacks. At most, the TAC makes the unsupported allegation that the Banks "knowingly agree[d] to provide Hezbollah with illegal material support in the form of financial services." TAC ¶ 6101. That threadbare contention is predicated on *general allegations* that Moving Defendants provided routine (and entirely legal) banking services to customers supposedly associated with Hezbollah—for profit. *See, e.g.*, TAC

¶¶ 1708, 1730, 1787, 1828, 1895, 1941, 1986, 2051, 2088, 2117, 2157. Missing is any plausible allegation that the Banks shared Hezbollah's goal of perpetrating terrorist attacks.

Moving Defendants' alleged participation in the so-called "System" cannot salvage Plaintiffs' conspiracy claim. According to the TAC, the System, which "predates Hezbollah's central involvement," is a nebulous, sprawling network comprising most of Lebanon's banking sector, government, political class, and organized crime families that "churns proceeds from" a litany of "illicit activities through Lebanon's banks and exchange houses" in part to "divid[e] the spoils and ensur[e] that all Lebanese factions are invested in The System's continuation and success." TAC ¶¶ 42–49; *see generally* TAC ¶¶ 12, 86–87.

The TAC's allegations about the System, and Moving Defendants' alleged participation therein, come nowhere close to alleging an "agreement" between the Banks and Hezbollah to pursue a common goal. Plaintiffs themselves allege that the Banks pursued *financial* goals when participating in the System. TAC ¶ 49 ("Many of the participants in The System, including Defendants, actively and knowingly further Hezbollah's illicit activities (including terrorism) because [of] their own financial and political interests . . . ."); TAC ¶ 86 (describing the supposed relationship between Lebanon's commercial banks and Hezbollah as a "marriage of convenience"). The Banks' alleged financial motivation belies any claim that they shared the terrorist goals of the perpetrators.[6]

And as a matter of law, connected or related transactional activity alone, without a shared purpose, is insufficient to assert a conspiracy claim—an *agreement* is required. *See Freeman*, 57 F.4th at 80; *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022) (dismissing

---

[6] Indeed, Plaintiffs do not even allege that the individuals who committed the relevant terrorist attacks, who are based in Iraq, ever participated in the System. *See, e.g.*, TAC ¶¶ 42–49, 86–87.

conspiracy claim where "[t]he complaint states that HSBC was trying to make substantial profits by evading sanctions, whereas al-Qaeda sought to terrorize the U.S. into retreating from the world stage" (cleaned up)); *Halberstam*, 705 F.2d at 478; *Cain v. Twitter Inc.*, No. 17-cv-02506, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018).[7]

The TAC lacks any non-conclusory allegations that the Banks entered into a conspiratorial agreement with the IRGC, Shia militias—or indeed, Hezbollah. Consequently, the most basic element of conspiracy is lacking, and Plaintiffs' conspiracy claim must be dismissed.

## B. The TAC Does Not Plausibly Allege That The Banks Conspired To Commit An Act Of International Terrorism.

Even if Plaintiffs had alleged some shared conspiratorial goal between the Banks and Hezbollah, they would still fail to plausibly allege that the goal was *to commit acts of international terrorism*—the only conspiracy that is actionable under JASTA. *See Freeman*, 57 F.4th at 75–76; *O'Sullivan v. Deutsche Bank AG*, No. 17-CV-8709, 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019); *Cain*, 2018 WL 4657275, at *3 (dismissing JASTA conspiracy claim because "[n]othing in the [complaint] establishes an agreement, express or otherwise, between Twitter and ISIS *to commit terrorist attacks*" (emphasis added)). Indeed, as the D.C. Circuit held, absent allegations of a common scheme between a defendant bank and the terrorist organization that committed the attacks, a plaintiff cannot allege a common law conspiracy claim under the *Halberstam* framework—that also applies to a JASTA conspiracy. *See Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 671 (D.C. Cir. 2023) (affirming dismissal of conspiracy count where the defendant bank and FTO shared no common goal to commit terrorist attacks).

---

[7] The same is true of any allegations that the Banks' assumption of supposedly "blacklisted" former LCB accounts are evidence of a conspiracy with Hezbollah. *See, e.g.*, TAC ¶¶ 1718, 1721–25, 1771, 1808. The TAC itself alleges that these accounts "provided [defendants] with an opportunity to gain additional market share," and thus at most are further evidence of financial motives—not agreements to commit acts of terror. *See, e.g.*, TAC ¶¶ 1729, 1774, 1826, 1892, 1934, 1961, 2048, 2085, 2115, 2182.

Again, the TAC offers nothing beyond purely conclusory allegations that Moving Defendants conspired to commit acts of terrorism. Nor does it muster even a conclusory allegation about a shared intent to commit the relevant terrorist acts. *See, e.g.*, TAC ¶ 12 (contending that "each Defendant conspired with Hezbollah by agreeing to participate in a criminal enterprise sometimes known in Lebanon as 'The System,'" without alleging a shared objective to commit terrorist attacks). And again, Plaintiffs' allegations point in the opposite direction: While alleging that "Hezbollah and the IRGC[]" conspired "to launch terrorist attacks against U.S. and MNF-I personnel in Iraq," Plaintiffs expressly allege that the Banks were "motivated primarily" by financial interests when they allegedly provided routine financial services to the alleged bank customers. TAC ¶¶ 6100–10. Thus, as in other cases where similar conspiracy claims failed, Plaintiffs' allegations "do not suggest that [the Banks] ever agreed to join [any] conspiracy" to commit the terrorist attacks at issue. *Kemper*, 911 F.3d at 395; *Freeman*, 57 F.4th at 80; *see also O'Sullivan*, 2019 WL 1409446, at *9 ("The Complaint pleads no facts from which the Court can infer that Defendants knew that the financial services they provided to various Iranian entities would be directed towards FTOs like Hezbollah, AAI and KH for the purpose of committing violent or life-endangering acts."); *Cain*, 2018 WL 4657275, at *3 ("Plaintiffs point to Twitter's terms of service that every user is subject to, but while that clearly is an 'agreement,' it is hardly relevant to a terrorist conspiracy."). For this additional reason, the TAC's conspiracy claim should be dismissed.[8]

---

[8] Plaintiffs also fail to allege that the Banks "conspire[d] with *the person* who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2) (emphasis added). As with any conspiracy claim, the need for an agreement between a defendant and a perpetrator becomes more important the more "wide-ranging" the alleged conspiracy grows. *Kemper*, 911 F.3d at 395–96. Yet, despite its sweeping theory, the TAC pleads no such allegations. The TAC alleges that the Banks provided routine banking services to entities—including institutions like minimarts, gas stations, and hospitals that offer generic and routine services—that, at best, have an attenuated affiliation with Hezbollah. *See, e.g.*, TAC ¶ 1735 (allegations regarding Cooperative Al-Wafaa SARL, which owns and operates minimarts, "selling food, beverages, and tobacco products," *see* TAC ¶ 714); TAC ¶ 1844 (allegations regarding "Al-Amana SARL, a company that owns gas stations in Lebanon"); TAC ¶ 715 (allegations regarding "Medical Cooperation Co SAL,"

### C.  The TAC Does Not Plausibly Allege An Overt Act.

The problems with the TAC do not stop there. "[A] plaintiff asserting a civil conspiracy claim must adequately plead that their injuries were caused by 'an unlawful overt act' done 'in furtherance of the [coconspirators'] common scheme.'" *Freeman*, 57 F.4th at 80 (second alteration in original). And Plaintiffs' failure to allege this element is another independent basis for dismissal of their conspiracy claim.

As explained above, Plaintiffs' conspiracy claim is grounded in allegations that the Banks provided banking services to customers who were somehow associated with Hezbollah and who participated in the System—each for pecuniary gain. But Plaintiffs' injuries, as alleged, were caused by Attacks perpetrated by militia groups in Iraq that were supported by Hezbollah. *See, e.g.*, TAC ¶ 6098. Accordingly, even if Plaintiffs had adequately alleged that the Banks agreed to join a commercial conspiracy to provide banking services to customers or participate in the System, they would still fail to allege that their injuries were caused by an overt act in furtherance of that commercial conspiracy.

Again, *Freeman* is directly on point. There, the plaintiffs alleged that defendant banks were liable for JASTA conspiracy claims for providing sanctions-violating banking services (an allegation absent in this case) to entities associated with Iran, which supported the groups that perpetrated terrorist attacks (many of the same Attacks in this case). *Freeman*, 57 F.4th at 72–74. The *Freeman* plaintiffs asserted that the commercial conspiracy alleged in the complaint was "a significant factor in the chain of events leading to Plaintiffs' deaths and injuries" and argued that conspiracy liability reaches any conduct that might "foreseeably result" from the conspiracy. *Id*. at

---

which is a hospital network). None of these alleged bank customers is an FTO (or even alleged to be one). None of these alleged bank customers is alleged to have committed the terrorist attacks at issue. None of these alleged bank customers is even alleged to have had any direct contact with the perpetrators of terrorist attacks. And crucially none of these alleged bank customers is alleged to have entered into any conspiracy with the Banks.

80. The Second Circuit rejected the plaintiffs' theory, reasoning that "[t]o hold a defendant liable for a coconspirator's actions merely because they are foreseeable—even though wholly detached from the shared conspiratorial plan—would stretch the concept of civil conspiracy too far beyond its origin." *Id*. at 82.

The same result is required here. Plaintiffs do not allege that they were injured by any act in furtherance of a commercial conspiracy that the Banks allegedly joined for financial reasons. *See also Bernhardt*, 47 F.4th at 873 ("[I]t [is not] plausible to infer that an attack on a secret CIA base in Afghanistan would further HSBC's alleged objective of maximizing profits through the evasion of U.S. sanctions."). Plaintiffs' JASTA conspiracy claim should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, the claims against each of the Moving Defendants should be dismissed, with prejudice.

Dated:  New York, New York
         September 12, 2025

DECHERT LLP

By: */s/ Jonathan R. Streeter*
Jonathan R. Streeter
Tamer Mallat
Julia L. Shea
Dechert LLP
1095 Avenue of the Americas
Three Bryant Park
New York, NY 10036
212-698-3500
Email: jonathan.streeter@dechert.com
Email: tamer.mallat@dechert.com
Email: julia.shea@dechert.com

Michael H. McGinley
Dechert LLP
Cira Centre

MAYER BROWN LLP

By: */s/ Mark G. Hanchet*
Mark G. Hanchet
Robert W. Hamburg
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
212-506-2500
Email: mhanchet@mayerbrown.com
Email: rhamburg@mayerbrown.com

Attorneys for Defendant Banque-Libano
Française SAL

2929 Arch Street
Philadelphia, PA 19104
215-994-4000
Email: michael.mcginley@dechert.com

Attorneys for Defendants BLOM Bank SAL,
Fransabank SAL, and Bank Audi SAL

DLA PIPER LLP (US)

By: */s/ Anthony P. Coles*
Anthony P. Coles
Erin Collins
DLA Piper LLP (US)
1251 Avenue of The Americas
New York, NY 10020
212-335-4925
Email: anthony.coles@dlapiper.com
Email: erin.collins@dlapiper.com

Samantha L. Chaifetz
500 8th Street, NW
Washington, DC 20004
202-799-4082
Email: samantha.chaifetz@dlapiper.com

Attorneys for Defendants Byblos Bank SAL,
Bank of Beirut and the Arab Countries SAL,
and Bank of Beirut s.a.l.

ASHCROFT LAW FIRM, LLC

By: */s/ Michael J. Sullivan*
Michael J. Sullivan
Brian J. Leske
Ashcroft Law Firm, LLC
200 State Street, 7th Floor
Boston, MA 02109
617-573-9400
Email: msullivan@ashcroftlawfirm.com
Email: bleske@ashcroftlawfirm.com

Attorneys for Defendant Société Générale
de Banque au Liban S.A.L.

SQUIRE PATTON BOGGS (US) LLP

By: */s/ Gassan A. Baloul*
Gassan A. Baloul
Mitchell R. Berger
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
202-457-6155
Email: gassan.baloul@squirepb.com
Email: mitchell.berger@squirepb.com

Attorneys for Defendants MEAB Bank
s.a.l., Fenicia Bank S.A.L., and LGB Bank
s.a.l.