UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

ROBERT BARTLETT, *et al*.,                                      :

                                                               :

          Plaintiffs,                              :    **Case No. 19-cv-7 (CBA)(TAM)**

                                                               :

     -against-                                         :

                                                               :

SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN SAL,   :
*et al.*,

                                                               :

          Defendants.                              :

-------------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

PROCEDURAL BACKGROUND.......................................................................... 3

   I.    Defendants' Motion Is Part of a Strategy of Avoiding Discovery. ................... 3

   II.   Defendants' Prior Motions to Dismiss........................................................... 9

ARGUMENT .......................................................................................................... 11

   I.    Defendants' Motion Is a Frivolous Attempt to Stall Discovery...................... 11

      A.   Defendants' Motion Does Not Seriously Seek Judgment on the Pleadings. ............ 11

      B.   Defendants Are Trying to Paper Over Their Refusal to Comply with the Court's Discovery Orders. ................................................................................ 19

   II.   Defendants' Already-Rejected Grounds for Dismissal Remain Baseless. .................... 22

      A.   Defendants Aided the Party that Committed the Attacks. ......................................... 22

      B.   Defendants Were Generally Aware of Their Role in an Overall Tortious and Illegal Scheme................................................................................ 23

      C.   Defendants  Knowingly Provided Substantial Assistance to Hezbollah. ................. 27

   III.   Defendants Do Not Provide Any Grounds to Dismiss Plaintiffs' Conspiracy Claim. ... 31

CONCLUSION....................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Ashley v. Deutsche Bank AG*,
144 F.4th 420 (2d Cir. 2025) .................................................................................... *passim*

*Bartlett v. Société Générale De Banque Au Liban Sal*,
No. 19-cv-7 (CBA) (VMS), 2020 U.S. Dist. LEXIS 229921
(E.D.N.Y. Nov. 25, 2020) ......................................................................................... *passim*

*Bartlett v. Société Générale de Banque au Liban SAL*,
No. 19-cv-7, 2024 U.S. Dist. LEXIS 241810 (E.D.N.Y. Sept. 18, 2024) ......................... *passim*

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
495 F. Supp. 3d 144 (E.D.N.Y. 2020) .................................................................................. 6

*Finan v. Lafarge S.A.*,
No. 22-cv-7831 (NGG) (PK), 2025 U.S. Dist. LEXIS 172784
(E.D.N.Y. Aug. 29, 2025) ............................................................................... 31, 32, 33

*Freeman v. HSBC Holdings PLC*,
57 F.4th 66 (2d Cir. 2023) ............................................................................................ 31

*Havens v. James*,
76 F.4th 103 (2d Cir. 2023) ........................................................................................... 18

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ................................................................................ 1, 16, 24

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ...................................................................................... *passim*

*Kemper v. Deutsche Bank AG*,
911 F.3d 383 (7th Cir. 2018) ......................................................................................... 31

*Linde v. Arab Bank, PLC*,
269 F.R.D. 186 (E.D.N.Y. 2010) ................................................................................... 21

*Linde v. Arab Bank, PLC*,
463 F. Supp. 2d 310 (E.D.N.Y. 2006) ........................................................................... 21

*Siegel v. HSBC Bank USA, N.A.*,
No. 17-cv-6593 (DLC), 2018 U.S. Dist. LEXIS 126152 (S.D.N.Y. July 27, 2018) ............... 16

*Siegel v. HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019) ......................................................................................... 15

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
  605 U.S. 280 (2025)................................................................................................ 14

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)....................................................................................... *passim*

*William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co.*,
  256 F.R.D. 134 (S.D.N.Y. 2009) ............................................................................ 8

**Statutes**

18 U.S.C. § 2331(1)(A)............................................................................................... 31

18 U.S.C. § 2339B ..................................................................................................... 18

## INTRODUCTION

Defendants' latest motion is their fourth dispositive motion *on the pleadings* in the six years since Plaintiffs filed this case. Like their other motions, each of which this Court largely rejected, it baldly mischaracterizes governing law and the complaints' allegations.

This motion is the most baseless to date—it is premised on a recent Second Circuit decision that confirms that "[t]here is no doubt that the conclusions we have reached in the past are **entirely consistent** with *Twitter*'s command that aiding-and-abetting liability is reserved 'to cases of truly culpable conduct.'" *Ashley v. Deutsche Bank AG*, 144 F.4th 420, 437 (2d Cir. 2025) (emphasis added). This Court has already applied *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (*see* ECF No. 434) and those "past" Second Circuit cases: *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), and *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021) (*see* ECF No. 291) to the allegations set forth in this case.

Defendants do *not* move for reconsideration; they do not contend that the Court's previous decisions were wrong. In fact, they do not even *mention* this Court's previous orders. Nor can they bring themselves to ***mention Kaplan at all***, even though the *Ashley* decision specifically affirmed that decision and relied on it extensively. *See* 144 F.4th at 436 ("[I]n *Kaplan v. Lebanese Canadian Bank, SAL*, the plaintiffs sufficiently alleged both the general awareness and knowing and substantial assistance factors."). In sum, Defendants are seeking judgment on the pleadings on issues this Court already decided, without contending that the standard changed or that the Court erred (yet again—the Court noted that Defendants' *second* motion to dismiss "simply reiterate[d] arguments already made," ECF No. 291 at 3). It is not clear what the motion actually asks the Court to *do*–except infer from records Defendants have refused to produce that Plaintiffs cannot ultimately prove their claims.

**Defendant Has Engaged in Prolonged Sanctionable Discovery Conduct**

This motion appears to *actually* be intended to justify Defendants' sanctionable refusal to comply with their discovery obligations.[1] While Defendants have brought *seriatim* motions to dismiss, during the course of *four years* of discovery, **not one Defendant has produced a single email or other internal communications or compliance reports** that this Court found would "provide direct evidence of a bank's subjective awareness of its role in terrorist attacks." ECF No. 320 at 14. Instead, Defendants have decided to defy this Court's March 31, 2023, Order overruling their foreign bank secrecy objections and initially ordering them to produce records for 184 customers (limited for letters rogatory purposes to accounts identified in the Second Amended Complaint as maintained by specific Defendants). *See id.*

Defendants recast their defiance of the Court's production order and refusal to engage in good faith discovery as *Plaintiffs'* problem:

> Plaintiffs … have offered *not a single document* in discovery to substantiate these inflammatory allegations. Yet, they have complained that no Moving Defendant has produced banking materials relating to these entities (ECF No. 475 at 2)—without acknowledging the obvious inference that no such banking materials exist, because no such account relationships exist.

Br. at 21. Defendants' strategy is to refuse to produce self-evidently relevant records responsive to Plaintiffs' discovery requests, use a completely opaque "waiver process" to disclose a small subset of records for customers subject to the Court's March 31 and June 8, 2023, Orders while withholding the most important documents for even *those* customers—and then claim that the "obvious inference" from their willful nonproduction is "that no such banking materials exist[] because no such account relationships exist."

---

[1]    Indeed, Defendants' premotion conference letter requested that the Court "should alternatively … narrow the issues in the case and streamline discovery," ECF No. 474 at 3, although the actual motion makes no such request.

Defendants simply ignore or mischaracterize the Third Amended Complaint ("TAC"). For example, Defendants bizarrely assert that "[t]here are no factual allegations that any specific funds were *actually* laundered through the Banks," Br. at 14, and that Plaintiffs failed to "attribute 'specific criminal transactions' to a specific defendant," *id.* at 16. The TAC is, of course, replete with highly specific allegations of Defendants' illegal money laundering for Hezbollah, many of which are supported by third-party productions of transactional data. Defendants know the Court is aware of these allegations, many of which Plaintiffs highlighted in their prior opposition. Rather than adding further to Defendants' needless briefing, Plaintiffs here and below respectfully direct the Court to Plaintiffs' opposition to Defendants' previous (third) motion to dismiss. *See* ECF No. 382-1 at 10 (providing examples of Defendants' money laundering for Hezbollah-affiliated customers from third party discovery).

Defendants therefore resort to claiming that "Plaintiffs' theory" of the case "in their own words is predicated on the regrettable belief that 'everyone in Lebanon is a partner of Hizbullah.'" Br. at 2 (quoting ECF No. 462). Of course, Defendants know that Plaintiffs were *quoting* the former Foreign Minister of Lebanon on a different subject. *See* ECF No. 462. Again, Defendants know the Court can check the docket, too, but appear confident that their approach will not result in any adverse consequences.

## PROCEDURAL BACKGROUND

### I.    Defendants' Motion Is Part of a Strategy of Avoiding Discovery.

Because this motion appears directed at bolstering Defendants' sanctionable discovery conduct, rather than securing judgment on the pleadings, it is necessary to review the discovery-related procedural history first. Since Plaintiffs filed this case in January 2019, Defendants have fought mightily (and considering the time elapsed, successfully so far) to evade their discovery obligations.

On November 25, 2020, the Court denied Defendants' first motion to dismiss as to Plaintiffs' JASTA claims (Defendants filed a prior motion to dismiss, but Plaintiffs then filed a first amended complaint ("FAC"), ECF No. 105). *See* ECF No. 164. On December 30, 2020, the Court entered an order staying party discovery but expressly providing that "[t]he stay shall expire upon the Second Circuit's issuance of an opinion in" *Kaplan*. The Second Circuit issued the *Kaplan* decision on June 9, 2021, vacating the judgment of the district court dismissing the JASTA claims in that case. The stay thus **expired** on that date.

On June 21, 2021, Defendants asked the Court to again stay discovery until the Second Circuit issued a decision in *Honickman*. *See* ECF No. 198. The Court **denied** Defendants' application on June 25, 2021. Undeterred, Defendants simply refused to undertake their discovery obligations. After several unsuccessful attempts to cajole Defendants into engaging in just a Rule 26(f) conference, Plaintiffs were forced to move to compel their participation. *See* ECF No. 204.

The Court substantively granted the motion, finding that "the Defendants who object to engaging in discovery have not demonstrated good cause to stay all discovery given the age and procedural posture of this case." Oct. 8, 2021, Minute Order. Indeed, the Court found that "given the age and procedural posture of the case, a continued stay risks unfair prejudice to Plaintiffs as staying discovery is likely to cause significant additional delays and/or hamper Plaintiffs' ability to prosecute the instant case." *Id.* At that time, the case's "age" was two years old—now, over six years have passed.

This did nothing to make Defendants produce any discovery. Plaintiffs served their first request for the production of documents ("First RFP") on December 31, 2021. Defendants served boilerplate objections in March 2022, "simply ignore[ed]" the Court's April 18 deadline to meet

and confer, and delayed and obstructed discovery discussions as much as possible. ECF No. 269 at 2. *See id. generally* (detailing Defendants' discovery conduct).

On May 2, 2022, Plaintiffs moved to compel production. *See* ECF No. 270. Defendants cross-moved for a protective order to ensure they would not have to produce anything in this case. *See* ECF No. 275. While those motions were pending, Plaintiffs served interrogatories in June 2022 requesting only the *number* and *amounts* of accounts and fund transfers involving designated terrorists so as not to implicate Defendants' (baseless) bank secrecy objections. However, Defendants refused to provide even numerical answers to six of the seven interrogatories on bank secrecy grounds. *See* ECF No. 318. They only answered Interrogatory No. 7, which asked whether Defendants made relevant disclosures to foreign governments (responding that they had not).

On March 31, 2023—about a year after Plaintiffs moved to compel production—the Court overruled Defendants' foreign bank secrecy objections and ordered them to produce records responsive to the First RFP. *See* ECF No. 320.[2] That order found that "bank account records, transactional records, compliance records, and internal and external communications regarding persons and entities associated with Hezbollah are undoubtedly relevant, as would be documents that provide 'direct evidence of a bank's subjective awareness of its role in terrorist attacks — internal memoranda, e-mails, and the like.'" *Id.* at 14 (quoting *Bartlett v. Société Générale De Banque Au Liban Sal*, No. 19-cv-7 (CBA) (VMS), 2020 U.S. Dist. LEXIS 229921, at *56 (E.D.N.Y. Nov. 25, 2020)). The Court also noted that while Plaintiffs may be able to locate *some* transactional information from third party banks:

> [T]ransactional records are not likely to provide much information about each Defendants' knowledge of its customers or Defendants' general awareness of their customers' activities. Given the need for internal bank documents and records, as

---

[2]    The Court imposed some limitations on the First RFP at this "stage." ECF No. 320 at 16 n.13, 18 n.15, 32 nn. 22 & 23.

discussed above, even if the U.S.-based banks have some records, Defendants are really the only source for the vast bulk of the needed discovery.

*Id.* at 31 (citing *Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 156 (E.D.N.Y. 2020)).

Defendants suggested they pursue bank secrecy "waivers" from their dozens of implicated customers *before* even attempting a letter rogatory, an obvious delay tactic. The Court rejected it:

> As other courts have found, it is not realistic to believe that the named individuals or entities will provide waivers, much less that *all* would…. Defendants may request individual customer waivers, but the Court will not delay other discovery steps for those efforts. Such efforts are likely to be very time consuming and ultimately unsuccessful, given the identities of some of the key accountholders and the nature of the records Plaintiffs seek.

ECF No. 320 at 29. Thus, the Court ruled that Defendants "are free to seek individual customer waivers, … but the Court declines to further delay the issuance of letters rogatory." *Id.*

Indeed, as Plaintiffs later pointed out, seeking waivers is not a right or basis to delay discovery—Magistrate Judge Kuo in *Miller v. Arab Bank, PLC*, No. 18-cv-2192, explained:

> The waiver process, that's really an accommodation to the bank[.] [M]y order was that the information should be turned over anyway and the waiver was to make it easier for you. For the fact that it took a lot of effort was really on the bank…. The bank did not have to go through that process. It … undertook that process to protect itself. **No one told it to do that.**

ECF No. 465 at 4 (quoting ECF No. 465-1) (emphasis added).

On July 15, 2024 (i.e., over another year later), the Lebanese authorities responded to the letter rogatory, unsurprisingly denying permission to produce the requested records. *See* ECF No. 421. Only then—almost three years after the commencement of discovery in June 2021—did Defendants, *for the first time*, began seeking "waivers" (by methods they have declined to disclose). There was no *legitimate* reason to delay seeking waivers. Defendants knew that they would invoke bank secrecy when discovery commenced in 2021. Indeed, the Court specifically informed Defendants they were "free to seek" waivers in March 2023, warning the process would

6

be "very time consuming"—but Defendants did not begin to seek them until over a year later when Lebanon inevitably rejected the letter rogatory request.

Defendants limited their waiver process to the 184 customers identified in the Court's 2023 discovery orders based on the Second Amended Complaint, broken out by bank for letter rogatory purposes. *See* ECF Nos. 320, 328. Plaintiffs noted that Defendants should include additional customers subsequently identified in the TAC filed on October 20, 2023, but Defendants refused. *See* ECF No. 433. On the Court's instruction during the November 18, 2024, conference, Plaintiffs provided on December 18, 2024, a draft discovery order to Defendants, requiring production of certain records for Defendants' customers identified from a list of 739 individuals and entities, all of which are (a) described in the TAC and (b) associated with Hezbollah. *See* ECF No. 462 at 2. Of course, Plaintiffs could not comprehensively identify customers by bank without discovery, but they specified that the banks need only *search* their customer databases for all of the names and then *produce* records *solely for those who were actually customers during the relevant period. See id.* at 4-5. Defendants nevertheless refused, asserting that even a request to produce documents *for just their own Hezbollah-affiliated clients* constituted a fishing expedition "transparently intended to set the groundwork for seeking discovery sanctions." ECF No. 463 at 1-2. This motion remains *sub judice*.

Defendants finally began making small productions in January of this year, but only for allegedly "waiving" customers; Defendants have given no indication they intend to comply with this Court's order compelling production for identified customers regardless of waiver. Worse, Defendants have not produced *any* internal communications or compliance reports that this Court already found were critical. Instead, they have largely produced customer account statements, which list transactions with insufficient detail; some Defendants have also produced *partial*

transaction records such as *parts* of SWIFT messages and some basic KYC materials. Finally, on June 12, 2025, at the conclusion of the six-month deadline given to Defendants to secure customer waivers, *see* November 18, 2024, Minute Order, Defendants reported to Plaintiffs that they had obtained some waivers, but would "continue to seek additional waivers where possible." **Exhibit A**. They also stated they would "produce in the near future" various important records for the waiving customers. *Id.* However, Defendants have not produced *any* records since then.

On June 30, 2025, Plaintiffs' counsel requested to meet and confer with each Defendant to discuss their discovery efforts and their IT systems where electronically stored information ("ESI") and paper documents are maintained. Plaintiffs wrote to each defense firm representing Defendants to set up those meet-and-confers and, "to make [each] call more efficient," requested "some basic information on the banks' IT systems and search processes in advance." **Exhibit B**. Plaintiffs provided a list of basic questions as to those systems and the "[c]urrent search/review status for each system identified." *Id.*

But Defendants refused to discuss anything other than the waiver process itself, writing: "Because Moving Defendants are still in the process of collecting and producing responsive documents, we view Plaintiffs' remaining requests … as premature at this time." **Exhibit C**. Despite Plaintiffs' repeated requests to proceed with the calls, Defendants maintained their position that they would not meet and confer "until after the Banks conclude their document production process." **Exhibit D**.

Defendants' responses make cooperative discovery impossible. *See, e.g.*, *William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("Electronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI."). It is hard to imagine why Defendants cannot provide even

8

rudimentary information on their discovery processes until they each "conclude their document production process." Surely Defendants are aware of what systems they are searching and how. Indeed, the fact that Defendants claim they cannot even provide the "*current* status" of their discovery until their discovery is "*concluded*" is inconsistent with how cooperative discovery is supposed to unfold.

## II.    Defendants' Prior Motions to Dismiss.

As noted above, Defendants' motion for judgment on the pleadings is their *fourth* dispositive motion against Plaintiffs' complaints.

The Court denied Defendants' first motion to dismiss Plaintiffs' aiding-and-abetting claims on November 25, 2020, finding that Plaintiffs sufficiently "allege[d] a wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers," and "any suggestion that Hezbollah's core bankers would be unaware of their *role in those attacks* by providing it banking services necessary to funding those attacks is highly dubious." *Bartlett*, 2020 U.S. Dist. LEXIS 229921, at *60 (emphasis added).

That decision highlighted the FAC's allegations showing Defendants' support for Hezbollah and its terror operations directorate, the Islamic Jihad Organization ("IJO"). The Court credited allegations that the IJO—

> operates a commercial apparatus known as the Business Affairs Component ("BAC"), which raises funds for Hezbollah via money laundering and drug trafficking, as well as via ordinary business enterprises. Much of the money that Hezbollah makes through such commercial activity comes from certain well-known crime networks or "clans" known to be affiliated with Hezbollah. Those networks launder their funds through Lebanese "exchange houses," which facilitate international transfers of large cash deposits through Defendants' accounts in New York while simultaneously funneling money to Hezbollah (including for Hezbollah's use abroad in Iraq).

*Id.* at *29-30 (citations to FAC omitted).

The Court explained that Defendants not only supported the BAC and exchange houses' criminal networks and money laundering operations, but also (1) "umbrella organizations such as the Islamic Resistance Support Organization ('IRSO')" (designated a Specially Designated Global Terrorist ("SDGT") in 2006), which "openly solicits, collects and disperses donations in support of Hezbollah's terrorist activities," *id.* at *31, 33; (2) the Martyrs Foundation—Lebanon (designated in 2007), which channels financial support from Iran to Hezbollah, and "provides financial support to the families of killed or imprisoned Hezbollah members," *id.* at *31; (3) the Imam Khomeini Relief Committee—Lebanon ("IKRC") (designated in 2010), which "funds and operates Hezbollah youth training camps, which are used to recruit future Hezbollah members and operatives," *id.*, at *31-32; and (4) "organizations designated during the relevant timespan as Hezbollah-affiliated SDGTs," *id.* at *33. *See also* Pls. Mem. Opp. Defs. 3d MTD, ECF No. 382-1 at 3-6.

Defendants filed a second motion to dismiss, ostensibly premised on the Second Circuit's subsequent decisions in *Kaplan* and *Honickman*. As the Court correctly noted, however, the "motion to dismiss" was in fact "seeking reconsideration of my earlier order," and was especially pointless as *Kaplan* and *Honickman* "both alter the law *in Plaintiffs' favor*." ECF No. 291 at 3 (emphasis added). The Court thus found that the Circuit decisions did "not undermine the Original M&O's partial denial of Defendants' initial motions to dismiss" Plaintiffs' JASTA claims, *id.*, and denied the motion.

Defendants then filed a *third* motion to dismiss, this time explicitly to "reconsider" the Court's prior denials given the Supreme Court's intervening *Twitter* decision. *See* ECF No. 377. Defendants argued that "[t]he law of JASTA aiding-and-abetting liability has changed dramatically," because "the Supreme Court rejected the principles applied by the Second Circuit

in *Kaplan* and *Honickman*….” *Id.* at 22-23. The Court rejected the argument and found that the TAC accordingly sufficed under *Twitter*: “Plaintiffs … have sufficiently alleged that Defendants consciously and culpably aided and abetted the terrorist acts.” *Bartlett v. Société Générale de Banque au Liban SAL*, No. 19-cv-7, 2024 U.S. Dist. LEXIS 241810, at *54 (E.D.N.Y. Sept. 18, 2024). The Court credited allegations that Defendants provided “bespoke servicing of” bank accounts for “individuals and organizations known to be linked to Hezbollah,” “employed managers who ‘served as key facilitators and coordinators for Hezbollah’ within their banking departments,” and “made efforts to help Hezbollah hide funds from American sanctions” (specifically, “counter-terrorism sanctions”). *Id.* at *55-56 (quoting TAC). All of this constituted “highly unusual” conduct “necessitated by their customers’ links with Hezbollah,” *id.* at *56, and was thus sufficient under *Kaplan*, *Honickman*, and *Twitter*.

Defendants now bring this fourth motion to dismiss, this time styled as a motion for judgment on the pleadings premised on *Ashley*, but they do *not* contend that applicable law “has changed dramatically” or that the Circuit “rejected the principles” it set down “in *Kaplan* and *Honickman*.” Nor do they contend that the Court previously erred. Indeed, they do not even mention the Court’s previous decisions or *Kaplan*.

## ARGUMENT

## I.    Defendants’ Motion Is a Frivolous Attempt to Stall Discovery.

### A.    Defendants’ Motion Does Not Seriously Seek Judgment on the Pleadings.

Despite losing every prior motion to dismiss Plaintiffs’ JASTA claims, Defendants seek judgment on the pleadings because of *Ashley*—a case that confirms that “[t]here is no doubt that the conclusions we have reached in the past are **entirely consistent** with *Twitter*’s command that aiding-and-abetting liability is reserved ‘to cases of truly culpable conduct.’” 144 F.4th at 437.

Defendants do not argue that *Ashley* overturns *Kaplan* or *Honickman*—in fact, their motion does not mention *Kaplan* at all (and barely mentions *Honickman*)—or that it changes the law in any way that would justify a different result than the Court's previous orders. Nor do Defendants argue that the Court had misunderstood *Kaplan*, *Honickman*, or *Twitter* or misapplied them to Plaintiffs' allegations; in fact, they simply ignore this Court's prior decisions.

Of course, *Ashley* does not change the *Twitter* standard this Court already applied. It explained that, "[m]ost significantly, the Supreme Court explained that the common law makes clear that 'passive nonfeasance' is insufficient to support aiding-and-abetting liability without 'a strong showing of assistance and scienter.'" *Id.* (quoting *Twitter*, 598 U.S. at 500). And this Court already found that, "[a]s previously discussed at length in [the Court's November 25, 2020, decision], the allegations against Defendants amount to 'affirmative misconduct'—in short, knowingly laundering and investing vast amounts of money for Hezbollah—as opposed to mere 'passive nonfeasance.'" 2024 U.S. Dist. LEXIS 241810, at *52 (quoting *Twitter*, 598 U.S. at 500).

**Thus, the Court has already ruled on the substance of Defendants' motion for judgment on the pleading.** And because it is not a motion for *reconsideration*, it is unclear what Defendants are asking the Court to do. A motion that asks for nothing is definitionally frivolous.

This is not Defendants' first time repackaging already-rejected arguments to the Court as if they were brand new. In their second motion to dismiss, Defendants raised *Kaplan* and *Honickman*, but—

> Defendants do not argue that the two cases changed the legal standards recited in the Original [Memorandum & Order] so as to justify a different result. Instead, they repeat their arguments that the Second Amended Complaint does not plead facts sufficient to meet the elements of 18 U.S.C. § 2333(d)(2), an argument I expressly rejected in my earlier order. In effect, they are seeking reconsideration of my earlier order.

ECF No. 291 at 2-3. Once again, Defendants have moved to dismiss without contending that the legal standard the Court has applied has changed.

Instead, Defendants essentially (and absurdly) argue that the allegations in the TAC are "indistinguishable from" or even "substantially weaker" and "significantly more attenuated" than those rejected in *Ashley*. Br. at 1, 24. The *Ashley* plaintiffs alleged that the defendants assisted multiple, unrelated schemes, which may have benefited a "Syndicate" of terrorist groups that committed the attacks at issue.

The **primary claim** in *Ashley* was that the UK-based Standard Chartered Bank ("SCB") provided *legal* and "basic commercial banking services" to essentially legitimate fertilizer companies, which "*legally produce[d]*" calcium ammonium nitrate ("CAN") fertilizer and other fertilizers. *Ashley*, 144 F.4th at 428, 441 (emphasis added). An agency within the Department of Defense warned SCB that some of that CAN was used by insurgents in Afghanistan to make bombs. *See id.* at 429-30. According to the *Ashley* court, SCB's customers were not alleged to be "themselves terrorists" or controlled by terrorists; they were at best alleged to be "controlled by rogue members of Pakistan's intelligence agency," although little public source evidence said so (nor did the DoD warnings). *Id.* at 441-42. SCB, like the other defendants, was thus "at least one step removed" from the terrorist groups constituting the "Syndicate." *Id.* at 445. Although SCB continued providing banking services for the fertilizer companies, those services were not facially illegal, and the Circuit noted that the complaint "conspicuously stop[ped] short of alleging that SCB knowingly violated U.S. sanctions or terrorist finance laws." *Id*. at 441 n.15.

The Circuit likened these allegations to those made against the gun manufacturers in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, who likewise broke no laws. Instead, they sold lawful products to legitimate wholesale distributers—but failed to "regulate" downstream

misuse of those products, as the wholesale distributors would sell the guns to ostensibly legitimate retail dealers, and some of *those* dealers were "rogue" and would sell guns to Mexican traffickers, who then delivered them to cartels. 605 U.S. 280, 295-96 (2025). The Court noted that Mexico never claimed the wholesalers "lack independence," *id.* at 295—an important fact Defendants omit from their recitation.

The *Ashley* court explained that in both that case and *Smith & Wesson*, the defendants only demonstrated "passive nonfeasance"—that is, they failed to act to prevent some sort of future wrongdoing by others. 144 F.4th at 443. In *Smith & Wesson*, the manufacturers failed to "'impose constraints on their distribution chains to reduce the possibility of unlawful conduct'"; and in *Ashley*, "SCB certainly failed to 'impose constraints' on its distribution chain because of downstream bad actors, but, without more, these are allegations of 'indifferen[ce], rather than assistance.'" *Id.* (quoting 605 U.S. at 297). As explained above, where a defendant's assistance only comprises "passive nonfeasance," the plaintiffs must allege "a strong showing of assistance and scienter." *Id.* at 437 (quoting *Twitter*, 598 U.S. at 500). This is especially true when the party assisted is not the primary tortfeasor (or its agent or alter-ego) but someone who in turn *chooses* to aid and abet that primary tortfeasor.

Nevertheless, the Second Circuit recognized that "[s]imilar banking services in a different context may lead to a different result," providing the "example" that if SCB had given the fertilizer companies any special treatment, "the context would more readily allow an inference that the failure to act was nonetheless culpable." *Id.* at 443. The *Ashley* court specifically contrasted SCB's "peripheral assistance" to the bespoke "services provided by the bank in *Kaplan*" to its Hezbollah-linked customers. *Id.* at 441. "The bespoke servicing of [Hezbollah] bank account[s]" (and "the

14

evasion of counter-terrorism sanctions" and "appointment of [Hezbollah] liaisons") is, of course, what this Court found plausibly alleged in the TAC. 2024 U.S. Dist. LEXIS 241810, at *56.[3]

In the **second scheme**, *Ashley* defendants allegedly performed money laundering services for parties that funded components of the Syndicate that injured the plaintiffs. Crucially, according to the *Ashley* court, the plaintiffs did not argue that the defendants affirmatively assisted the Syndicate itself, rather that they "fail[ed] to employ robust anti-money laundering and counter-terrorist finance policies, and operat[ed] in high risk terrorist finance jurisdictions...." 144 F.4th at 430 (record citations omitted). Moreover, the bank customers of these money laundering services were largely unrelated to the terrorist organizations comprising the Syndicate, and "it is not enough to say that facilitating the money laundering operations, which are not themselves Syndicate entities, results in substantial support to the Syndicate." *Id.* at 444.

The court compared these allegations to *Siegel v. HSBC N. Am. Holdings, Inc.*, where the plaintiffs alleged that HSBC performed financial services for Al Rajhi Bank ("ARB"), "a large bank with vast operations" that has never been designated. 933 F.3d 217, 224 (2d Cir. 2019). The most the plaintiffs could allege is that ARB "*was believed by some* to have links to ... terrorist organizations"; moreover, they could not they show that any transfers HSBC performed for ARB related to ARB's purported terrorist customers. *Id.* at 224 & n.6.[4] Finally, the transactions in *Siegel* were (ostensibly) ordinary and legal, whereas "in contrast," the transactions in *Kaplan* "violat[ed]" banking regulations. *Kaplan*, 999 F.3d at 858.[5] *See also id.* at 861-63 (distinguishing *Siegel*).

---

[3]    Defendants strangely assert that Plaintiffs do not allege any "bespoke services that the relevant Moving Defendants offered to these customers," without even *mentioning* the Court's contrary findings. Br. at 19.

[4]    In distinguishing *Siegel*, the Circuit in *Kaplan* noted that, "crucially," the *Siegel* plaintiffs admitted that "HSBC, after learning of reports that ARB had customers who were terrorists, terminated its relationship with ARB nearly a year before the relevant terrorist attacks occurred." *Id.* at 862.

[5]    The plaintiffs in *Siegel* alleged that HSBC illegally "stripped" transactions for ARB. Those allegations were correctly rejected by the district court because they were sourced to a deferred prosecution agreement in which HSBC

The *Ashley* plaintiffs also relied on a "fungibility theory," in which the defendants "engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists," but the Circuit found that insufficient under *Honickman*'s focus on foreseeability:

> A "central" tenet of JASTA aiding-and-abetting liability is the "foreseeability principle"—that the defendant is not liable for the principal's wrongs without understanding, to some extent, the foreseeable consequences of the defendant's actions. *See* [*Honickman*, 6 F.4th] at 496-97, 499. A fungibility theory would "evade" that principle entirely. *Id.* at 499.

*Ashley*, 144 F.4th at 444. Here, of course, the Court has repeatedly found that Plaintiffs met the foreseeability standard set forth in *Kaplan*, *Honickman*, and *Twitter*. *See, e.g.*, 2024 U.S. Dist. LEXIS 241810, at *56 ("Plaintiffs' allegations that the customers were known Hezbollah affiliates support the inference that Defendants' provision of banking services *foreseeably* contributed to Hezbollah's terrorist acts.") (emphasis added). *See also id.* at *54; ECF No. 291 at 5.

In the **third scheme**, the plaintiffs alleged that the defendants facilitated various value-added tax ("VAT") fraud schemes. The plaintiffs alleged that the Syndicate had "set up 'VAT fraud cells,'" but could not support "the inference that Defendants knew of [one fraudster's] ties to the Syndicate while executing trades on his behalf, even if they executed fraudulent trades willingly." *Ashley*, 144 F.4th at 443, 446. The plaintiffs could not cite anything "from the public record at the time" that could support the banks' knowledge, *id.* at 446 (quoting *Honickman*, 6 F.4th at 502), largely relying on the "red flag" that he was an Afghan national and "VAT fraud schemes are easy to detect." *Id.* at 447. Other alleged VAT fraud schemes ended long before the attacks. *See id.*

---

admitted to stripping transactions for state sponsors of terrorism, **not** ARB (Saudi Arabia has never been designated a state sponsor of terrorism). The district court noted that "none of those sources are cited as providing a basis to allege that ARB and the defendants had entered into an agreement about stripping or that any of the defendants' transactions with ARB were subject to stripping." *Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593 (DLC), 2018 U.S. Dist. LEXIS 126152, at *3 n.1 (S.D.N.Y. July 27, 2018).

The allegations here are obviously very different from *Ashley*—and, if anything, more detailed and inculpatory than those set forth in *Kaplan*. Like *Kaplan*, this case involves financial services rendered for Hezbollah through various Hezbollah operatives and institutions. Like *Kaplan*, six Defendants here are alleged to have maintained accounts and provided (illegal) financial services to Hezbollah's Martyrs Foundation and provided Hezbollah with "bespoke" banking services, including laundering billions of dollars *in cash* on its behalf. *See* TAC ¶¶ 1596, 1667, 1670, 1700, 1831, 1986, 2090. But the complaint here goes much further, both in terms of the sheer number of alleged Hezbollah customers and their respective roles within Hezbollah's terror apparatus (the IJO). As discussed above, *supra* at 9-10, Defendants laundered criminal proceeds for the BAC and provided illegal services for the IRSO, al-Qard al-Hasan ("AQAH"), and numerous Hezbollah fundraisers and super-facilitators. *See, e.g.*, Pls. Mem. Opp. Defs. 3d MTD, ECF No. 382-1 at 6-8, 13-16, 43-44.

Indeed, contrasting this case—with its allegations of direct assistance to Hezbollah—with *Ashley* highlights the implausibility of the comparison: Whereas SCB gave "passive" and legal assistance to fertilizer companies that were not controlled by or affiliated with the Syndicate, Defendants here engaged in "a wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's core financial service-providers." 2020 U.S. Dist. LEXIS 229921, at *60. Whereas SCB's customers were not alleged to be "themselves terrorists" or controlled by terrorists," here Defendants' customers *were* Hezbollah entities, including core Hezbollah institutions like the Martyrs Foundation, the IRSO, and AQAH. *See* 2020 U.S. Dist. LEXIS 229921, at *33, 64 (listing the Defendants' accounts for "organizations designated during the relevant timespan as Hezbollah-affiliated SDGTs"); 2024 U.S. Dist. LEXIS 241810, at *43 (noting, again, that Plaintiffs "allege that Defendants channeled millions of dollars to Hezbollah

in part via accounts owned by Hezbollah-affiliated S[DGT] organizations, including Hezbollah's umbrella organizations the I[RSO] and the Martyrs Foundation-Lebanon").

And whereas the *Ashley* complaint did not allege that SCB knowing violated any U.S. sanctions or criminal laws, at 144 F.4th at 441 n.15, the Court here credited allegations that Defendants "made efforts to help Hezbollah hide funds from American sanctions." 2024 U.S. Dist. LEXIS 241810, at *55. In fact, whereas SCB's conduct was allegedly "legal," Defendants' financial services violated a range of laws including, for example, 18 U.S.C. § 2339B, which makes the knowing provision of material support (which includes financial services) to a Foreign Terrorist Organization ("FTO") a felony. Indeed, this Court noted that § 2339B convictions have been sustained for support to entities *controlled* by FTOs, and that "FTOs can operate through affiliates and front groups, and that to aid such front groups is to aid the FTO." 2020 U.S. Dist. LEXIS 229921, at *55 n. 7.

Defendants fall back to the assertion that "[o]ne cannot aid and abet an aider and abettor," Br. at 3 (quoting *Havens v. James*, 76 F.4th 103, 119 (2d Cir. 2023)), and that Plaintiffs have only alleged that their customers, "at best, have an attenuated affiliation with Hezbollah," *id.* at 29 n.8. Defendants baldly assert that "Plaintiffs allege only that Moving Defendants provided arm's-length and for-profit banking services to customers that were not Hezbollah. They do not allege that Moving Defendants had any active role in laundering money for Hezbollah." *Id.* at 14.

This not only ignores the entire contents of the TAC but also flies in the face of this Court's decisions, which Defendants refuse to even mention—*again*: "*As previously discussed at length in M&O 1, the allegations against Defendants amount to 'affirmative misconduct'—in short, knowingly laundering and investing vast amounts of money for Hezbollah ….*" 2024 U.S. Dist. LEXIS 241810, at *52 (*quoting Twitter*, 598 U.S. at 500) (emphasis added). The Court has

repeatedly found that "Plaintiffs allege that each Defendant knowingly maintained accounts for and provided vital financial services to Hezbollah and Hezbollah-affiliated entities." 2020 U.S. Dist. LEXIS 229921, at *32. *See also id.* at *45 (crediting allegations that Defendants "facilitate[d] the transfer of millions of dollars for their Hezbollah-affiliated customers"); *id.* at *34 ("In addition to certain Bank Customers' SDGT designations, other reporting and events publicly connected the Bank Customers to Hezbollah.").[6]

### B.   Defendants Are Trying to Paper Over Their Refusal to Comply with the Court's Discovery Orders.

Defendants' argument is not *really* that Plaintiffs' "pleadings" are insufficient, but that Plaintiffs will not be able to *prove* their claims—that is, if Defendants are allowed to continue to defy the Court's orders and make a mockery of discovery. This is evident from Defendants' discussion of their relationships with core Hezbollah entities Martyrs Foundation and IRSO:

> Plaintiffs offer nothing more than conclusory allegations that any Moving Defendants held accounts for these two entities—and they have offered *not a single document* in discovery to substantiate these inflammatory allegations. Yet, they have complained that no Moving Defendant has produced banking materials relating to these entities (ECF No. 475 at 2)—without acknowledging the obvious inference that no such banking materials exist, because no such account relationships exist.

Br. at 21 (emphasis in original, some citations omitted).

Defendants know that the Court already found Plaintiffs' *pleadings* sufficient—which decisions they do not even mention much less ask the Court to reconsider—including specifically

---

[6]     Defendants assert that the TAC "identifies only fifteen supposed customers of certain Moving Defendants (not all of them) that were designated in the relevant time period." Br. at 19. Defendants do not even attempt to justify why a customer need be "designated in the relevant time period"—some entities are designated later for conduct during the period, like Defendant JTB itself (and of course Treasury Department designations are not the sole indicator of an entity's role in terrorism). Defendants clarify later that "Plaintiffs' reliance on later OFAC designations is similarly unavailing because they do not show that the Banks were aware of Hezbollah ties at the relevant times," Br. at 24, but the Court already rejected requiring designations as a basis for general awareness, ECF No. 291 at 4 (citing *Kaplan*, 999 F.3d at 864)—although it also found that "Defendants continued to provide services to customers even after they knew those entities had been designated SDGT groups," 2024 U.S. Dist. LEXIS 241810, at *60-61.

as to their relationships with the Martyrs Foundation and IRSO. *See, e.g.*, 2020 U.S. Dist. LEXIS 229921, at *71 ("The Amended Complaint also includes specific allegations tying the Bank Customers to Defendants, such as IRSO's and the Martyrs Foundation—Lebanon's account numbers at certain Defendant banks.").[7] Defendants also know that Plaintiffs need not "offer documents" on a motion for judgment on the *pleadings*.

Instead, the thrust of Defendants' motion is to convince the Court that it should count *Defendants'* refusal to produce records for most customers in this case against *Plaintiffs*. Defendants argue that *Plaintiffs* must produce evidence of Defendants' banking relationships with the Martyrs Foundation and IRSO and that the "obvious inference" to be drawn from Plaintiffs' failure to independently obtain those financial records is that the banking relationships *do not exist*. Br. at 21.[8] Of course, they do exist, as Plaintiffs have alleged extensively and specifically. *See, e.g.*, TAC ¶ 443 (listing IRSO accounts).[9]

But this Court correctly noted that "Defendants are really the only source for the vast bulk of the needed discovery," especially records showing "Defendants' knowledge of its customers." ECF No. 320 at 31. Plaintiffs therefore submit that the "obvious inference" to be drawn from

---

[7]    Despite providing the account numbers, Defendants still describe Plaintiffs' allegations that "Fransabank, Byblos, BLF, and LGB each maintained an account for IRSO" "conclusory." Br. at 21. Defendants also repeat their previously rejected argument that the "TAC identifies no transactional activity associated with this entity," *id.*, despite knowing that the Court held that "specific allegations concerning when individual wire transfers occurred is a matter for discovery and, if appropriate, summary judgment." 2020 U.S. Dist. LEXIS 229921 at *72.

[8]    Transactional records for the Martyrs Foundation and IRSO are far less likely to arise in productions from third-party banks within this Court's subpoena power, because Martyrs Foundation and IRSO were designated in 2007 and 2006, respectively, which means that U.S. banks would have blocked transactions from that point forward and of course most U.S. correspondent banks profess not to have retained records going back to before 2007. But where third party bank transactions *are* available (through third party discovery) Plaintiffs have been able to identify over **$850 million** that flowed through New York from Hezbollah accounts held by Defendants during the relevant period—*not* including transfers from the BAC's exchange houses.

[9]    For example, "Hezbollah used its television station, Al-Manar, to raise money through the IRSO in support of Hezbollah's terror campaign … (specifying the account numbers for donations, including an account at Defendant BYBLOS BANK.)" TAC ¶ 442.

Defendants' argument is that *Defendants* have no intention of producing records for core Hezbollah terror entities like Martyrs Foundation and IRSO. The Court anticipated just that—the IRSO is "a key Hezbollah fundraiser for violent terrorist attacks," 2020 U.S. Dist. LEXIS 229921, at *55, and Magistrate Judge Merkl noted that actors with "connection[s] to the perpetrators of violent acts" would hardly be expected to provide a waiver and expose themselves to discovery. ECF No. 320 at 30 (quoting *Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006)).

The *Linde* court sanctioned Arab Bank for this same maneuver. There, the plaintiffs argued that sanctions were necessary and appropriate "to prevent defendant from 'affirmatively profiting from gaps in the evidentiary chain that it is solely responsible for creating.'" *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 204 (E.D.N.Y. 2010) (citation omitted). The Court agreed that the "[p]laintiffs are entitled to the sanction requested," because "[t]he Bank must be precluded from making any argument about its state of mind that would find proof or refutation in the withheld documents." *Id.*

Indeed, despite Defendants' longstanding and fundamental discovery abuse, Plaintiffs have gained significant evidence from limited third party productions and data leaks. As Plaintiffs previously explained, third party productions have identified "more than 75 additional Hezbollah-affiliated accounts held by almost 50 accountholders at Defendant banks separate from the 156 identified in the SAC." Pls. Mem. Opp. Defs. 3d MTD, ECF No. 382-1, at 3, 9-10. Leaks include a Lebanese news report publishing Byblos Bank documents created in 2012 or 2013 that listed the names of 30 Hezbollah-affiliated accounts at Byblos, confirming that the bank (1) maintained internal compliance records that track their past and present Hezbollah-affiliated accounts and (2) maintained many of them despite understanding their relationship to Hezbollah. *See id.* at 8-9 and TAC ¶¶ 1830-35. The TAC also describes the data leak of banking information from al-Qard al-

Hasan, a "charity" which Hezbollah runs as its unlicensed internal bank. *See id.* ¶¶ 640-52. The leak shows that *after* Treasury designated AQAH an SDGT in 2007, Defendants Byblos Bank, Fenicia Bank, JTB, LCB, L&G Bank, MEAB Bank, and SGBL continued servicing AQAH, principally through personal accounts held by AQAH employees. *See id.* ¶ 646. *See also* Pls. Mem. Opp. Defs. 3d MTD, ECF No. 382-1 at 6-8.

In sum, Defendants' motion appears intended to implement the same sanctionable strategy here that Arab Bank attempted in *Linde*—using their refusal to comply with their discovery obligations as both a shield (to hide incriminating evidence) and a sword (to argue that their withholding of evidence is proof it does not exist).

## II.    Defendants' Already-Rejected Grounds for Dismissal Remain Baseless.

Defendants challenge the sufficiency of the TAC allegations as to all three elements of aiding and abetting under JASTA as if the Court had not (repeatedly) found that Plaintiffs' complaints satisfied each.

### A.    Defendants Aided the Party that Committed the Attacks.

On the first element, Defendants argue *ad nauseum* that "Plaintiffs do not allege that Hezbollah carried out the Attacks," "they do not even allege that … Hezbollah itself committed the Attacks," and "Hezbollah … is not even itself alleged to have committed the Attacks at issue" Br. at 2, 6, 17. *See also id.* at 4-5, 27 n.6. This is of course the central premise of the TAC, alleged from the very first paragraph. *See, e.g.*, TAC ¶ 1 (alleging that all of the attacks at issue "were committed, planned and authorized by … Hezbollah jointly with the … IRGC"), ¶ 2 ("[e]ach attack … was committed by Hezbollah and the IRGC"). And this Court already found that "the Amended Complaint plausibly alleges that Hezbollah committed the Attacks that injured Plaintiffs." 2020 U.S. Dist. LEXIS 229921, at *72. This argument has nothing to do with *Ashley*, where this element

was not in dispute, *see* 144 F.4th at 439, and Defendants do not give the Court a reason to reconsider its prior determination—they just ignore it.

### B.    Defendants Were Generally Aware of Their Role in an Overall Tortious and Illegal Scheme.

Defendants argue that the Court should find that the TAC fails to allege general awareness. Br. at 24. The Court has already noted that it "previously found that Plaintiffs met the general awareness standard under *Halberstam*," 2024 U.S. Dist. LEXIS 241810, at *48, and in their third motion to dismiss, Defendants "d[id] not articulate how *Taamneh* altered the analysis," because that motion (like the current one) argued for a new result from unchanged law. This Court explained: "*Taamneh* provided the same recitation of the general awareness standard as the Second Circuit," and "[s]ince there has been no change in the caselaw on this inquiry, I decline to reconsider my prior ruling that Plaintiffs met the general awareness prong." *Id.* at *49.

Undaunted, Defendants repeat their argument again—and *again* refuse to acknowledge that this Court has already rejected their argument multiple times; nor do they even attempt to suggest *Ashley* changed the legal standard. Indeed, *Ashley* repeats the same standard from *Twitter*, *Kaplan*, and *Halberstam*: "the defendant also must be 'generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance.'" 144 F.4th at 438 (quoting *Twitter*, 598 U.S. at 486). *Ashley* even affirms *Kaplan*'s observation that "[t]he phrase 'generally aware' connotes 'something less than full, or fully focused, recognition.'" *Id.* (quoting *Kaplan*, 999 F.3d at 863).

This Court cited the exact same formulation for general awareness as did *Ashley*. Relying on Circuit precedent, the court in *Ashley* concluded: "In other words, although a defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury, it must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable."

144 F.4th at 438 (quoting *Honickman*, 6 F.4th at 496).[10] Again, Plaintiffs direct the Court to their prior briefing on this topic. *See* ECF No. 382-1, at 11-16 (providing *exemplar* allegations supporting an inference of awareness); *id.* at 26-27 (showing that Plaintiffs sufficiently alleged general awareness).

Defendants attempt to downplay Plaintiffs' extensive allegations of public sources supporting the inference Defendants knew that their customers were part of Hezbollah (described in detail in Pls. Mem. Opp. Defs. 3d MTD, ECF No. 382-1, at 11-16), pretending instead that Plaintiffs rely solely on the fact that Defendants' customers were part of what Hezbollah calls "the System." *See* Br. at 24.[11]

Defendants inaccurately describe the System allegations as "a sprawling, global criminal network" "operating above or around terrorist organizations," "akin" or even "nearly identical" to "the Syndicate" in *Ashley*. Br. at 2, 4, 5, 12, 27. The Syndicate in *Ashley* referred to "a complex web of terrorists in Afghanistan and Pakistan," including the terrorist groups Al Qaeda, the Haqqani Network, and the Taliban, 144 F.4th at 427-28—these are the terrorist groups that *committed* the attacks at issue in that case. The System is "a criminal enterprise … through which Lebanese-organized crime families" laundered money for Hezbollah." TAC ¶ 12.[12]

---

[10]    Indeed, in *Twitter* and as to the primary claim in *Ashley*, the plaintiffs *did* show general awareness. *See Twitter*, 598 U.S. at 497 ("plaintiffs have satisfied *Halberstam*'s first two elements by alleging both that ISIS committed a wrong and that defendants knew they were playing some sort of role in ISIS' enterprise."); *Ashley*, 144 F.4th at 440 (noting "SCB's general awareness of its indirect role in the Syndicate's bombmaking operations").

[11]    Defendants write that *Plaintiffs* "deem" this criminal enterprise "the System." It is not Plaintiffs' term—rather, it is "a criminal enterprise sometimes *known in Lebanon* as 'The System,'" TAC ¶ 12 (emphasis added) and "this arrangement is sometimes *referred to by Hezbollah and others in Lebanon* as 'The System,'" *id.* ¶ 43 (emphasis added). These allegations must be taken as true for purposes of their motion; but Defendants, who are chief participants in the System, know precisely what it is.

[12]    Defendants state that "there is no allegation that the defendant Banks are members of the System." Br. at 5. Like Defendants' other assertions, this is belied by even a cursory examination of the TAC, which alleges that "Defendants all knowingly agreed to participate in The System." TAC ¶ 13. *See also id.* ¶ 49 ("Many of the participants in The System, *including Defendants*, actively and knowingly further Hezbollah's illicit activities (including

Defendants argue that "in vaguely describing the 'System' so broadly as to implicate virtually the entirety of Lebanon … Plaintiffs plead 'at the generality of an entire country.'" Br. at 16 (quoting *Ashley*, 144 F.4th at 447). But the TAC's discussion of the System merely describes the *mechanism* by which Defendants have long laundered funds for Hezbollah, particularly through exchange houses that convert bulk cash into deposits in Defendant banks that can then flow through the U.S. financial system. This mechanism is not merely alleged; it is documented in dozens of U.S. government findings. *See* TAC ¶¶ 38-40 & n.7, 969, 1243, 1251, 1257-58, 1274, 1281, 1303-04, 1311, 1315, 1332, 1360, 1362, 1367-68, 1378, 1526, 1529-30, 1537, 1548, 1551-54, 1581, and so on.

Defendants therefore contort *Ashley*, which rejected the argument that Danske Bank should have detected VAT fraud schemes because "Denmark (where Danske Bank is located) was a hotspot for using VAT fraud for terrorist financing." 144 F.4th at 447. Plaintiffs have never suggested that Defendants should know anything solely by virtue of doing business in Lebanon— although Hezbollah runs that country far more than any VAT fraudsters *run Denmark*.[13] Instead, the TAC describes in detail how Defendants worked hand-in-glove with Hezbollah to profit from, among other things, its vast narcotics trafficking operations that allowed them to infuse the Lebanese banking system with U.S. bank notes that long sustained a Ponzi scheme by which they artificially sustained Lebanon's peg of its currency to the U.S. dollar. *See* TAC ¶¶ 85-87, 97-98.

Defendants argue that Plaintiffs' allegations relating to the System evidence something more sinister: "Under Plaintiffs' theory—which in their own words is predicated on the regrettable

---

terrorism)" (emphasis added); ¶ 95 ("The owners of Defendant banks were among the primary beneficiaries of The System"); ¶¶ 1770, 1893, 1938, 1984, 2047, 2084, 2114, 2181 (alleging each bank's "role in The System").

[13]    Defendants chide Plaintiffs for describing Lebanon as a "terrorist haven." Br. at 16. Plaintiffs have not used that term and assume that Defendants are again referring to the words of Lebanon's *foreign minister*. That said, even in the few years since Plaintiffs filed this case, numerous bank customers and Defendant JTB itself have been designated. *See* ECF No. 382-1 at 1-3.

belief that 'everyone in Lebanon is a partner of Hizbullah'—any party who engages in economic activity in Lebanon is exposed to liability under JASTA." Br. at 2 (quoting ECF No. 462). *See also id.* at 16-17. As noted above, Defendants are perfectly aware that this is not *Plaintiffs'* "words" or "regrettable belief," but rather a statement by the former **Foreign Minister of Lebanon**.[14]

Finally, Defendants argue that their customers were not closely intertwined with Hezbollah's violent terrorist activities. In the most breathtaking example, Defendants attempt to rehabilitate the *Martyrs Foundation*. Defendants argue the TAC only alleged "that the organization was used to support the families of Hezbollah operatives—not to support violent terroristic activities." Br. at 20. That is a remarkable conclusion to draw. The TAC alleges at length that "the Martyrs Foundation makes payments to families of suicide bombers, serving as an *incentive*" to commit "*mass murder*," TAC ¶ 376 (emphasis added), and "provides funds for Hezbollah terrorists" and "glorifies death in Jihad," *id.* ¶¶ 503-04. The Second Circuit credited allegations describing it as an "integral constituent part[] of Hizbollah," which "was notorious public knowledge at least as of 2004," *Kaplan*, 999 F.3d at 850, 864, *see also Ashley*, 144 F.4th at 441, 445 (citing *Kaplan*), and an SDGT "known to provide financial support to suicide bombers' families," *id.* at 445-46 (citing *Kaplan*).

Defendants also argue that "[t]he TAC alleges that Martyrs Foundation's exclusive mission is 'supporting the families of Hezbollah fighters who died as a result of their attacks on the IDF [Israel Defense Forces]'—*not* attacks on U.S. military personnel in Iraq." Br. at 20 (citing TAC ¶¶ 496, 518, 520, 526, 528). But the TAC never states that the Martyrs Foundation was

---

[14]    What is "regrettable" is that Hezbollah remains a state-within-a state in Lebanon, replete with its own army and a de facto veto over serious reforms the country desperately needs. As a practical matter, this means that Lebanon is extremely unlikely to meaningfully cooperate in discovery in this case. But contrary to Defendants' assertion, Plaintiffs view the vast majority of Lebanese citizens as victims of Hezbollah *and the Defendants* as accomplices who have exploited them mercilessly.

"exclusively" dedicated to those killed attacking the IDF, only that it was "*established … with th[at] goal*." TAC ¶ 496. It supports 5,000 people, "*including*" those "who died during the 2006 conflict with Israel," but not *exclusively*. And although the *Kaplan* complaint alleged that the Martyrs Foundation was "known to subsidize the families of Hizbollah suicide bombers," 999 F.3d at 858, *there were no suicide bombings at issue in that case*. All the attacks in *Kaplan* involved lobbing rockets from Lebanon into Israel. As *Kaplan* makes clear, *there is no need to link support for Hezbollah entities directly to specific attacks*.

More importantly, this Court already found that "Plaintiffs allege that Defendants were facilitating millions of dollars in transactions to organizations whose only objectives were to support terrorism," 2024 U.S. Dist. LEXIS 241810, at *53, "the funds handled by the banks supported terrorist activities," *id.* at *54, "Plaintiffs' allegations that the customers were known Hezbollah affiliates support the inference that Defendants' provision of banking services foreseeably contributed to Hezbollah's terrorist acts," *id.* at *56, and so on.

### C.    Defendants  Knowingly Provided Substantial Assistance to Hezbollah.

Defendants spend much of their time arguing that Plaintiffs have not connected any transfers directly to specific attacks or failed to meet the "pervasive and systemic assistance" standard.[15] The Court has already rejected both arguments *based on Taamneh*:

> A close nexus to the specific act may be found, but "even more remote support can still constitute aiding and abetting in the right case," [where examples include] "situations where the provider of routine services does so in an unusual way" … or where plaintiffs allege "pervasive, systematic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist attack." **Plaintiffs' allegations plausibly meet both of these scenarios.**

2024 U.S. Dist. LEXIS 241810, at *55 (quoting *Twitter*, 598 U.S. at 496, 502) (second emphasis

---

[15]    Defendants repeatedly refer to the standard as "an exceptionally 'high bar,'" Br. at 3, 13. None of the cases they cite refers to an "exceptionally high bar." Defendants have simply added the word "exceptionally."

added). *See also id.* at *56-57 ("Defendants have allegedly provided Hezbollah with pervasive, substantial assistance constituting hundreds of millions of dollars of funding and crucial access to Lebanese and international financial networks through Hezbollah's proxies.").

In the first "scenario," the Court credited Plaintiffs' allegations of Defendants' "bespoke servicing of a bank account, including the facilitation of payment transfers, evasion of counter-terrorism sanctions, and the appointing of a liaison within the banks to facilitate the relationship with those accounts linked to terrorism." *Id.* at *56. In the second "scenario," the Court found that "Defendants have allegedly provided Hezbollah with pervasive, substantial assistance constituting hundreds of millions of dollars of funding and crucial access to Lebanese and international financial networks through Hezbollah's proxies," which was sufficient "to hold Defendants liable for every Hezbollah-supported attack under JASTA." *Id.* at *56-58.[16]

Defendants repeat their unsuccessful argument that Plaintiffs are engaged in "impermissible group pleading based on generalizations about Lebanon. Plaintiffs try to muddle differences between eleven different defendant banks to impute liability to them all." Br. at 16. *See, e.g.*, Defs. Mem. in Supp. 1st MTD, ECF No. 139-1 at 10 n.18. As a result, "Plaintiffs cannot explain how one Bank could knowingly and substantially assist a terrorist attack by virtue of a different Bank allegedly holding an account for a customer." Br. at 16. Of course, Plaintiffs have alleged that *each* Defendant has separately provided knowing and substantial and pervasive and systemic assistance to Hezbollah—indeed, the "Moving Defendants" (that is, all but LCB and JTB) do not suggest who among them should be treated differently. The Court already reviewed

---

[16]    Defendants argue that "*Ashley* explains that, to support pervasive liability, a bank's actions must have been 'designed or performed with the intent to aid' all of a group's terroristic activities," whereas "Plaintiffs allege that the Banks participated in the System for financial reasons, not terroristic ones." Br. at 15 (quoting *Ashley*, 144 F.4th at 445). First, Defendants misquote the actual line from *Ashley*, which observed that the complaint did not allege that "the Banks' money laundering operations were designed or performed with the intent to aid *the Syndicate*." 144 F.4th at 445 (emphasis added). Second, Defendants are confusing their *willingness* to aid Hezbollah's terrorist activities—easily shown by their money laundering operations for the FTO—with their *motivation* for doing so.

Plaintiffs' allegations as to each bank individually, even assembling a chart to show the allegations for each bank. *See* 2020 U.S. Dist. LEXIS 229921, at *33.[17] Again, Defendants do not argue that the Court erred—they just ignore its past decisions entirely.[18]

For example, Defendants spend considerable time trying to wave away allegations that they each employed liaisons with Hezbollah—understandably, as this shows that Defendants worked with the FTO directly. Defendants argue that the liaison allegations are "conclusory" and the TAC "provides no detail regarding who these individuals were," despite the TAC *naming each of them*. *See* TAC ¶¶ 1663, 1727, 1775, 1769, 1891, 1983, 2046, 2083, 2089, 2131, 2153.[19] But Defendants' real argument is that the "Hezbollah liaisons resemble the allegations of rogue intelligence agents [involved in the fertilizer company] in *Ashley* and the rogue dealers in *Smith & Wesson* that both courts rejected." Br. at 4. Except, of course, the Hezbollah liaisons are alleged to work ***for the Defendants***. The unnamed "rogue intelligence agents" alleged in *Ashley* played some role in the fertilizer companies that SCB allegedly serviced, *but they were not alleged to work for SCB*; the "rogue dealers" did not work for the *Smith & Wesson* defendants (they were not even their *customers*). Ignoring this distinction is critical for Defendants, leading them to ask "how any Bank

---

[17]    Defendants appear to suggest that only their relationships with Martyrs Foundation and IRSO, "which they allege only a *subset* of the Moving Defendants banked," count. Br. at 19. This Court has already rejected the argument that this case is limited to these "three Hezbollah-affiliated entities." ECF No. 320 at 9 (the third is the IKRC, which Defendants quietly omit). Defendants also omit the Martyrs Foundation's many commercial fronts alleged in the TAC (and later designated by the U.S. as SDGTs) and, of course, ignore their knowing assistance to key Hezbollah financiers and super-facilitators like Muhammad Bazzi, Adham Tabaja, Saleh Assi, Nazim Ahmad, the Tajideen family, and Imad Bakri. *See* ECF No. 427 at 13-16, 43-44. *See also* TAC ¶¶ 719, 766, 776, 803, and many more.

[18]    To provide another example, Defendants *repeatedly* argue that "*Ashley* squarely held that 'it is not enough' for purposes of JASTA aiding-and-abetting liability 'to say that the defendant assisted the terrorist organization's 'activities in general,'" as if it were some new standard the Court must now contend with. Br. at 2, 7, 11, 13 (quoting *Ashley*, 144 F.4th at 444). But that line is taken from *Twitter*, 598 U.S. at 503, and this Court *already considered it*: "Defendants also argue that Plaintiffs have not alleged a sufficient nexus because they fail to show that Defendants assisted 'the relevant terrorist act itself,' rather than aided terrorist 'activities in general'…." 2024 U.S. Dist. LEXIS 241810, at *54.

[19]    Defendants have not produced a single page of discovery as to any of these individuals.

knew or should have known of their purported connections to Hezbollah." Br. at 22. The TAC makes clear that liaising with Hezbollah was their *job*.[20]

Defendants also argue that Plaintiffs only alleged that Defendants "executed financially suspect transactions writ large" and that "[t]here are no factual allegations that any specific funds were *actually* laundered through the Banks." *Id.* at 14. Of course, Plaintiffs have alleged *specific* amounts that Defendants illegally processed for known Hezbollah entities and individuals throughout the complaint—including highlights from the "'approximately **3,000 transactions totaling $850 million** during [2003 to 2012]" from third party banks," ECF No. 320 (quoting Pls.' Reply, ECF No. 295, at 36), along with millions more Defendants processed for "exchange houses" that were notorious Hezbollah money laundering nodes (most of them designated subsequently for this reason). Plaintiffs have set forth examples in their opposition to Defendants' third motion to dismiss. *See* ECF No. 382-1 at 10. Other allegations of specific transfers include paragraphs 604, 699, 700, 714 n.65, 981, 996, 1021 (a chart listing dozens of specific transactions), 1042, 1054 (a list of specific transactions), 1087, 1088, 1089, 1200, 1204, 1267, 1276, 1329, 1413, 1414, 1497 n.125, 1708 (listing numerous specific transactions), 1709, 1710, and many more. Plaintiffs have also alleged that balances from *identified Hezbollah accounts* migrated from LCB to accounts at other Defendants banks. *See* TAC ¶¶ 117, 714, 766, 766, 801, 875, 1109, 1112 n.109, 1145, 1153, 1168, 1293, and many more.[21]

---

[20]    Defendants also argue that the TAC does not give sufficient details on how the liaisons operated, identify the "published reports" describing them, or connect them "to any alleged Attack." *Id.* But as the Court already explained, the liaisons' role in the banks show Defendants' *pervasive and systemic assistance* to Hezbollah, not a connection to specific attacks.

[21]    For some reason, Defendants drops a footnote which denies various allegations against SGBL relating to its *direct* JASTA liability. *See* Br. at 20 n.3. The footnote does not ask the Court to reconsider its prior finding "that Plaintiffs state a claim against SGBL for direct JASTA liability," 2020 U.S. Dist. LEXIS 229921, at *73, or mention *Ashley* at all. It mischaracterizes the TAC, for example arguing that it does not show SGBL held an account for Martyrs Foundation, while conceding that "paragraph 1670 alleges SGBL held accounts for Atlas Holding SAL," which is a

### III.    Defendants Do Not Provide Any Grounds to Dismiss Plaintiffs' Conspiracy Claim.

Defendants argue that "[t]he TAC also fails to state a conspiracy claim under JASTA." Br. at 25. As they admit, this Court has already declined to dismiss those claims. They do not even pretend *Ashley* has anything to say about conspiracy. They rely principally on *Freeman v. HSBC Holdings PLC*, 57 F.4th 66 (2d Cir. 2023), and *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018),[22] but they also relied extensively on these same cases in their prior motion to dismiss, ECF No. 377-1, and this Court declined to dismiss the claim. Like the rest of their motion, this section adds nothing the Court has not already considered.

However, one case on JASTA *has* been issued since Defendants' last motion—*Finan v. Lafarge S.A.*, No. 22-cv-7831 (NGG) (PK), 2025 U.S. Dist. LEXIS 172784 (E.D.N.Y. Aug. 29, 2025)—but Defendants understandably ignore it. There, the plaintiffs alleged that French cement manufacturing concern Lafarge "conspired with ISIS to promote ISIS's protection racket so as to maintain ISIS's territorial control in the region, and conspired with ISIS and ANF [Al-Nusra Front, the Syrian Al Qaeda branch] to provide material support to ISIS and ANF." *Id.* at *84. The defendants argued ISIS and ANF did not "commit[] an overt act that furthered a shared purpose of its agreement with Defendants," because the defendants did not "share[] in ISIS or ANF's terrorist ideologies"—however, the court found that "does not defeat Plaintiffs' conspiracy claims." *Id.* at *87-88.

---

*designated* Martyrs Foundation front. *See* TAC ¶ 554. It also notes "Plaintiffs' now-dismissed successor liability claim against SGBL," but that is the subject of a pending motion for reconsideration.

[22]    *Kemper* is a primary liability case, not a JASTA case. Under the ATA, primary liability rests on *criminal* conspiracy as the predicate crime. *See* 18 U.S.C. § 2331(1)(A). JASTA involves *civil* conspiracy.

The court agreed with the plaintiffs that the defendants and the terrorist groups had different *motivations*, but "both sides had their own reasons for intending the same thing: ISIS remaining in power." *Id.* at *88 (citation modified). The court explained:

> While Defendants indeed were motivated by an interest in maintaining their cement operations in Syria and excluding competitors from the local market, that interest converged with ISIS's purpose of building and maintaining a geographic stronghold, or "caliphate," from which it could plan terrorist attacks on Americans across the world.

*Id.* With ISIS in power, Lafarge benefited from its "protection racket." *Id.* at *89.

Here, Defendants make the same argument as the *Finan* defendants: "The TAC does not allege that any of the Moving Defendants 'intended to kill or injure U.S. service members in Iraq' or that they were engaged in a common pursuit with the perpetrators of the Attacks," Br. at 26, because "the Banks pursued *financial* goals," *id.* at 27 (emphasis in original). Again, their *motivation* for joining an agreement is irrelevant.

The TAC alleges that "Defendants joined Hezbollah and the IRGC's conspiracy to launch terrorist attacks against U.S. and MNF-I personnel in Iraq"—Defendants' *role* was "to finance these terrorist attacks," which it did "by knowingly agreeing to provide Hezbollah with illegal material support in the form of financial services critical to Hezbollah's and the IRGC's capacity to commit terrorist attacks in Iraq." TAC ¶¶ 6100-01. Defendants' *motivation* was to make money, which was reason enough to aid Hezbollah terrorism: "Many of the participants in The System, including Defendants, actively and knowingly further Hezbollah's illicit activities (*including terrorism*) because their own financial and political interests are dependent on Hezbollah's continued participation in The System." *Id.* ¶ 49 (emphasis added). *See also id.* ¶ 86 (describing Defendants' and Hezbollah's reasons for participating in the System). It constituted its own protection racket and, as the Court noted, allegedly generated "hundreds of millions of dollars of" business for Defendants. 2024 U.S. Dist. LEXIS 241810, at *57, 60.

The acts of terror financing and the acts of terrorism themselves were overt acts made in furtherance of their shared scheme—just as, in *Finan*, "'[i]n furtherance of this conspiracy, ISIS engaged in numerous overt acts both in and expressly aimed at the United States' that caused mortal injuries to Plaintiffs and their relatives." *Finan*, 2025 U.S. Dist. LEXIS 172784, at *88-89 (citation omitted). The overt acts here were brutal Hezbollah attacks on U.S citizens, which Defendants willingly assisted to boost their bottom lines.

## CONCLUSION

Defendant's motion is its fourth motion on the pleadings. It not only wastes the Court's (and Plaintiffs') time, it also makes a further mockery of the discovery process in this case.


Dated: September 26, 2025
      Hackensack, New Jersey

                Respectfully submitted,

                **OSEN LLC**

      By:    /s/ Michael J. Radine
                Michael J. Radine
                Gary M. Osen
                Ari Ungar
                Dina Gielchinsky
                Aaron Schlanger
                190 Moore Street, Suite 272
                Hackensack, NJ 07601
                Tel: (201) 265-6400
                Fax: (201) 265-0303

                **TURNER & ASSOCIATES, P.A.**
                Tab Turner
                4705 Somers Avenue, Suite 100
                North Little Rock, AR 72116
                (501) 791-2277

**MOTLEY RICE, LLC**
Michael Elsner
John Eubanks
28 Bridgeside Boulevard,
P.O. Box 1792
Mount Pleasant, SC 29465
(843) 216-9000

*Attorneys for Plaintiffs*