January 30, 2026

**VIA ECF**

Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    ***Bartlett v. Société Générale de Banque au Liban S.A.L.*, No. 19-cv-0007**
       **Response to Plaintiffs' Notice of New Authority (ECF 512)**

Dear Judge Amon:

Moving Defendants[1] write in response to Plaintiffs' January 27, 2026, letter presenting *Atchley v. AstraZeneca UK Ltd.*, 2026 WL 184415 (D.C. Cir. Jan. 23, 2026), as supplemental authority. ECF 512. Plaintiffs' letter mischaracterizes the Moving Defendants' pending motion for judgment on the pleadings, and the import of *Atchley*, which is neither controlling nor apposite.

***First***, Moving Defendants' argument in this case is that Plaintiffs' complaint fails unless they plausibly allege "a 'concrete nexus' between the bank's services and the attacks complained of" or "*intentional* 'pervasive, systemic, and culpable'" assistance to an organization's terrorist activities." Reply (ECF 488) at 2. That standard is plain from the Second Circuit's controlling decision in *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025), and confirmed by the D.C. Circuit's recent decision in *Atchley*, 2026 WL 184415, at *7 ("The practical upshot is that to survive a motion to dismiss plaintiffs must allege *some* connection between defendants' assistance and the acts that injured them. If they cannot, plaintiffs must instead allege defendants provided a type of pervasive support that demonstrates a 'near-common enterprise' with the terrorist group.").

As Your Honor may recall, at oral argument, Plaintiffs could not articulate any supposed nexus and conceded that the "monstrosity" that is their complaint was pursuing a "pervasive and systemic" theory of liability. 11/10/2025 Hr'g Tr. 23:10–14, 28:25-29:5 (attached as **Exhibit 1**). Plaintiffs' letter relying upon *Atchley*'s supposed rejection of a "direct traceability" theory—in other words, that allegations of transactions directly traceable to the at-issue attacks are required—therefore has no bearing here. ECF 512 at 1.

***Second***, to the extent Plaintiffs seek to revive their "nexus" theory, *Atchley* hurts them rather than helps them. Plaintiffs allege only that the Banks provided arm's-length, for-profit banking services to customers in Lebanon that were neither Hezbollah nor the Shia militias that carried out the attacks in Iraq. *See* Motion (ECF 484-1) at 1, 14; *see Atchley*, 2026 WL 184415, at *5 (attacks must have been "committed, planned, or authorized by a designated Foreign Terrorist Organization" for JASTA liability). They do not allege, as in *Atchley*, that Moving Defendants dealt ***directly*** with the ***actual terrorists*** (or terrorist group) who committed the attacks, much

---

[1] Moving Defendants (the "Banks") are (1) Société Générale de Banque au Liban S.A.L. ("SGBL"), (2) Fransabank S.A.L., (3) MEAB Bank s.a.l., (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) LGB Bank s.a.l., (9) Banque Libano-Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank S.A.L.

less provided those terrorist actors with contemporaneous, local "unusual and unlawful" services that "inevitably" led to the attacks. *Atchley*, 2026 WL 184415, at \*1, 10.[2]

Indeed, "[l]iability does not attach to those who, like the *Taamneh* defendants, passively and tangentially aid terrorists in the ordinary course of their business." *Atchley*, 2026 WL 184415, at \*1; *see id.* at \*13 (contrasting "voluntary, tailored relationship" with arm's-length services). In *Atchley*, the D.C. Circuit found the plaintiffs' allegations sufficient to support both primary liability (*i.e.*, that the defendants' conduct proximately caused the plaintiffs' injuries) and aiding-and-abetting liability because the complaint there told "a localized story that ties defendants' alleged knowing provision of substantial aid to a defined subset of Jaysh al-Mahdi's tortious attacks—conduct that was circumscribed temporally and geographically." *Id.* at \*9. Not surprisingly given its proximate causation finding, the court held that the nexus alleged in *Atchley* was "discernable" "because the complaint's allegations describe how defendants provided tailored, local assistance to Jaysh al-Mahdi at the time and in the immediate vicinity of a defined set of Jaysh al-Mahdi's attacks, which "were the predictable, virtually inevitable fallout of defendants' direct cash and in-kind payments to Jaysh al-Mahdi under the circumstances then prevailing." *Id.* at \*10.

**Third**, in this Circuit, where "a 'concrete nexus' to the terrorist attack is lacking," Plaintiffs must plead particularized allegations that "the Banks' money laundering operations were designed or performed with the intent to aid the [System]." *Ashley*, 144 F.4th at 445. That is a "high bar," and mere allegations that the "Banks … culpably executed financially suspect transactions writ large" will not do—even "assuming the Banks' aid was pervasive and systemic." *Id.* As Moving Defendants demonstrated in their Motion, like in *Ashley*, "the [so-called System in this case] was at least one step removed, and the endpoint of the laundered money was entirely amorphous. As pled, the Banks may have opened their doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the [System]'s pile of resources. That is insufficient." *Id.*

The *Atchley* complaint also included allegations from which the court could infer an elevated degree of scienter—allegations that are not present here, or in *Ashley*. For instance, the *Atchley* court found that Plaintiffs adequately alleged that "defendants had firsthand knowledge" that the Ministry had been taken over by Jaysh al-Mahdi and that its resources were being used to attack Americans. *Atchley*, 2026 WL 184415, at \*11. And *Atchley* included allegations of "unusual" services provided to the terrorist-controlled Ministry, including (i) the payment of substantial cash commissions ("bribes")—typically around 20 percent of the contract value— to secure deals with the Ministry, (ii) the provision of free "off-the-books" goods beyond what the contracts required, (iii) procurement agreements that included "commercially

---

[2] Plaintiffs have maintained, without support, that they may proceed against all of the Banks based on threadbare allegations that some of the Banks provided banking services to "core" Hezbollah institutions, such as Martyrs Foundation, the IRSO, and AQAH. *See* Reply (ECF 488) at 5 (citing Opp. (ECF 484) at 17). As the Court noted at argument, three of the Banks (Bank Audi S.A.L., BLOM Bank S.A.L., and Bank of Beirut S.A.L.) are not alleged to have banked any of those or other "alleged core customers"—a defect Plaintiffs struggled to address. *See* Hr'g Tr. 4:22–6:6; *see also* Reply at 8 & n.3 (discussing Plaintiffs' failure to allege each Bank provided services to each of those "core customers"). And, with respect to the balance of the Moving Defendants, the TAC does not allege that any of them banked AQAH—rather, just that those Banks opened accounts for individuals whose affiliation with AQAH was allegedly revealed a decade after the last attack. *See* Reply at 9. As for Martyrs Foundation and IRSO, the complaint does not identify any transactions effected for those "core customers" during the Relevant Time Period. *Id.* at 8–9; *see also id.* at 8 & n.4 (noting, for example, that SGBL did not bank Martyrs Foundation nor IRSO).

unreasonable" terms, and (iv) continued business dealings even after the arrest of a senior Ministry official "for orchestrating several kickback schemes to funnel millions of U.S. dollars to militia elements." *Id.* at \*12, 13. There are no similar allegations here from which the Court could infer that Moving Defendants intended to participate in or assist Hezbollah's terrorist activities.

***Finally***, Plaintiffs' intensified focus on *Kaplan* is relevant only insofar as it relates to Lebanese Canadian Bank ("LCB"), which is not among the Moving Defendants. Their repeated attempts to attribute to the rest of the Banks allegations of conduct that are specific to LCB and Jammal Trust Bank are plainly precluded by the impermissible group pleading doctrine. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 294 (2025) (rejecting "general accusation [] that *all* the manufacturers assist[ed] some number of unidentified rogue gun dealers in making a host of firearms sales in violations of various legal bars") (emphasis added)).

*    *    *

The D.C. Circuit's decision in *Atchley* cannot salvage Plaintiffs' claims against the Moving Defendants here. To the contrary, it confirms that the Court should grant the Banks' motion for judgment on the pleadings.

Respectfully submitted,


DECHERT LLP

By: */s/ Jonathan R. Streeter*
Jonathan R. Streeter
Tamer Mallat
Julia L. Shea
Dechert LLP
1095 Avenue of the Americas
Three Bryant Park
New York, NY 10036
212-698-3500
Email: jonathan.streeter@dechert.com
Email: tamer.mallat@dechert.com
Email: julia.shea@dechert.com

Michael H. McGinley
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215-994-4000
Email: michael.mcginley@dechert.com

*Attorneys for Defendants BLOM Bank SAL,*
*Fransabank SAL, and Bank Audi SAL*

MAYER BROWN LLP

By: */s/ Mark G. Hanchet*
Mark G. Hanchet
Robert W. Hamburg
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
212-506-2500
Email: mhanchet@mayerbrown.com
Email: rhamburg@mayerbrown.com

*Attorneys for Defendant Banque-Libano*
*Française SAL*

3

DLA PIPER LLP (US)

By: */s/ Anthony P. Coles*
Anthony P. Coles
DLA Piper LLP (US)
1251 Avenue of The Americas
New York, NY 10020
212-335-4925
Email: anthony.coles@dlapiper.com

Samantha L. Chaifetz
500 8th Street, NW
Washington, DC 20004
202-799-4082
Email: samantha.chaifetz@dlapiper.com

*Attorneys for Defendants Byblos Bank SAL,*
*Bank of Beirut and the Arab Countries SAL,*
*and Bank of Beirut s.a.l.*

ASHCROFT LAW FIRM, LLC

By: */s/ Michael J. Sullivan*
Michael J. Sullivan
Brian J. Leske
Ashcroft Law Firm, LLC
200 State Street, 7th Floor
Boston, MA 02109
617-573-9400
Email: msullivan@ashcroftlawfirm.com
Email: bleske@ashcroftlawfirm.com

*Attorneys for Defendant Société Générale*
*de Banque au Liban S.A.L.*

SQUIRE PATTON BOGGS (US) LLP

By: */s/ Gassan A. Baloul*
Gassan A. Baloul
Mitchell R. Berger
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
202-457-6155
Email: gassan.baloul@squirepb.com
Email: mitchell.berger@squirepb.com

*Attorneys for Defendants MEAB Bank*
*s.a.l., Fenicia Bank S.A.L., and LGB Bank*
*s.a.l.*

4

# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ROBERT BARTLETT, et al.,          )
                                  ) Civil Action
              Plaintiffs,         ) No. 19-CV-07 (CBA)
                                  )
vs.                               ) STATUS CONFERENCE
                                  )
SOCIETE GENERALE DE BANQUE AU     ) Brooklyn, New York
LIBAN SAL, et al.,                ) Date:  November 10, 2025
                                  ) Time:  3:30 p.m.
              Defendants.         )
_____

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE
THE HONORABLE JUDGE CAROL BAGLEY AMON
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiffs:        Gary M. Osen, Esq.
                           Michael J. Radine, Esq.
                           Osen LLC
                           190 Moore Street, Suite 272
                           Hackensack, New Jersey  07601
                           201-265-6400

For Defendants:            Michael H. McGinley, Esq.
                           Dechert LLP
                           Cira Centre, 2929 Arch Street
                           Philadelphia, Pennsylvania  19104
                           215-994-4000
                                   -and-
                           Tamer Mallat, Esq.
                           Julia Shea, Esq.
                           Dechert LLP
                           3 Bryant Park
                           1095 Avenue of the Americas
                           New York, New York  10036
                           929-444-1862

(Appearances continued on the next page.)

Court Reporter:            Annette Montalvo
                           Official Court Reporter

*Annette M. Montalvo, CSR, RDR, CRR*
*Official Court Reporter*

2

APPEARANCES:   (Cont'd)


For Defendants:            Brian Leske, Esq.
                           Ashcroft Law Firm, LLC
                           200 State Street, 7th Floor
                           Boston, Massachusetts  02109
                           617-573-9400


For Defendants:            Robert W. Hamburg, Esq.
                           Mark G. Hanchet, Esq.
                           Mayer Brown LLP
                           1221 Avenue of the Americas
                           New York, New York  10020
                           212-506-2500


For Defendants:            Samantha L. Chaifetz, Esq.
                           DLA Piper LLP
                           500 8th Street NW, Suite 5023
                           Washington, DC  20004
                           202-799-4082


For Defendants:            Mitchell R. Berger, Esq.
                           Squire Patton Boggs (US) LLP
                           1211 Avenue of the Americas
                           26th Floor
                           New York, New York  10036
                           212-872-9800




Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

Court Reporter:            Annette M. Montalvo, CSR, RDR, CRR
                           Official Court Reporter
                           United States Courthouse, Room N375
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-804-2711

3

(Proceedings commenced at 3:38 p.m., in open court, to wit:)

THE LAW CLERK:  Good afternoon.

This is oral argument on defendants' motion for judgment on the pleadings in *Bartlett, et al., v. Societe Generale de Banque au Liban SAL*, Docket No. 19-CV-0007.

Will the parties please introduce themselves for the record, starting with the plaintiff.

MR. RADINE:  Good afternoon, Your Honor.

Michael Radine for the plaintiffs, joined by Gary Osen, both of Osen LLC.

THE COURT:  Good afternoon.

MR. McGINLEY:  Good afternoon, Your Honor.

Michael McGinley of Dechert LLP on behalf of Blom Bank, Fransabank, and Bank Audi, and I'm joined by my colleagues Tamer Mallat and Julia Shea.

THE COURT:  Good afternoon.

MR. HAMBURG:  Good afternoon, Your Honor.

Robert Hamburg, Mayer Brown LLP, for Banque Libano-Francaise, with my partner Mark Hanchet.

THE COURT:  Good afternoon.

MS. CHAIFETZ:  Samantha L. Chaifetz from DLA Piper on behalf of Byblos Bank, Bank of Beirut, and Bank of Beirut and the Arab Countries.

THE COURT:  Good afternoon.

4

MR. LESKE:  Brian Leske with the Ashcroft Law Firm for SGBL.

THE COURT:  Good afternoon.

MR. BERGER:  Good afternoon, Your Honor.

Mitchell Berger from Squire Patton Boggs on behalf of three banks: MEAB Bank, Fenicia Bank, and LGB Bank.

THE COURT:  Okay.  Who is going to argue for the defendants?  I realize that counsel represent different defendants, but is there someone who's going to take center stage with this?

MR. McGINLEY:  Yes, Your Honor.  I will.  Michael McGinley from Dechert.  Obviously, if there's a specific question about one of the banks that I don't represent, one of my colleagues can jump in, or if they want to clarify something, they can take the lead.

THE COURT:  Okay.  First of all, everyone can be seated.  And try and speak into the microphones in front of you.

Mr. McGinley, one question that I have is, amongst several, is there is a complaint by you that there is group pleading.

And my question would be, which of the various defendants do you believe have the fewest direct allegations against them?  Because the inference seems to be that the allegations are fewer against some defendants than others.

5

MR. McGINLEY:  That's right, Your Honor.  And, obviously, I want to be careful not to pick and choose amongst my colleagues.  We obviously in the briefing point out that with respect to the three customers that I believe the plaintiffs have really sort of focused in on in this briefing, IRSO, Martyrs Foundation, and AQAH, for all of the banks that are alleged to have maintained an account with them, it is a conclusory allegation that does not talk about actual transactions, let alone transactions connected to attacks, or when those banking relationships existed, either with respect to the designation of any entities or the relevant time period.  But then we also point out that three of the defendants are not alleged to have banked any of those customers.

THE COURT:  And which three defendants are those?

MR. McGINLEY:  It would be Blom Bank, Bank Audi, and Bank of Beirut, Your Honor.

And to emphasize, all of the rest we do still believe those allegations don't support a JASTA claim.

THE COURT:  So you represent Blom Bank and Bank Audi, correct?

MR. McGINLEY:  That's correct, Your Honor.

THE COURT:  And, I'm sorry, who is the third?

MR. McGINLEY:  Bank of Beirut, Your Honor.

THE COURT:  And that's you, Ms. Chaifetz?

6

MS. CHAIFETZ:  That's correct, Your Honor.

THE COURT:  And it's your position that with regard to those three banks, there are no allegations that link the bank to the suspect customers?

MR. McGINLEY:  To those three customers.  That's correct, Your Honor.

THE COURT:  Let me just ask plaintiffs to just address that point, and then I'll hear the balance.

MR. RADINE:  Sure.

THE COURT:  What about the allegations?  They say that there are no links of those three entities to the customers that you say are the most problematic.

MR. RADINE:  Our brief focuses, Your Honor, on those three customers because they raise them in their opening brief.  But as Your Honor has explained in prior decisions, this case is much larger than Martyrs Foundation, IRSO, IKRC. In fact, I'd say the heart of this case is the BAC, the business affairs component.

THE COURT:  Is that an actual entity or a name that you made up?

MR. RADINE:  It is not our term, it's a government -- US government term, I believe, for describing Hezbollah's money laundering system.  But it's composed of countless companies, it's composed of exchange houses that Your Honor found that the defendant banks performed money

7

laundering services for that we pled, and that -- to move narco-terro dollars for Hezbollah.  It includes folks like Nazem Ahmad and his clan.  Reported --

THE COURT:  These are customers of the three banks that I just identified?

MR. RADINE:  All the banks.  And we have in our briefing provided paragraph numbers of not just descriptions in the complaint, but charts for each of these sets of companies, individual companies, companies owned by Kassim Tajideen and his clan, Al Qard al Hasan.

Yes.  And these are companies, individuals, clans, that are designated as SDGTs, specially designated global --

THE COURT:  That are customers of those banks?

MR. RADINE:  That are customers of all these banks, correct.  Your Honor produced a chart, Your Honor may recall, in the first decision that was just entities, customers, designated during the relevant period.  That, of course, is not a requirement for pleading a JASTA case, but on that basis alone Your Honor found that each of the banks had designated Hezbollah customers, whose purpose was, as we have said, and quoting from Your Honor's opinion, the November 25, 2020 one, their purposes, quote, they raised funds for Hezbollah via money laundering and drug trafficking.  Your Honor also noted that they are from certain, quote, well-known crime networks or clans, including the exchange houses.  Again, Your Honor's

8

identifying our allegations, but since we are here on a matter of pleading, all the banks are thoroughly covered by these sets of customers.

THE COURT:  Okay.  Let me just return to you, Mr. McGinley.

Why is this a motion for a judgment on the pleadings as opposed to yet another motion for reconsideration?  Because the Court relied previously -- first of all, I interpreted *Twitter*.  Second of all, I relied on *Kaplan*.  And those -- well, *Kaplan* specifically was reaffirmed in the most recent Second Circuit case.

So why is this a motion for judgment on the pleadings, and why shouldn't my decision be any different than it's been the last three times.

MR. McGINLEY:  Sure, Your Honor.

So there's two predominant reasons.  One is procedural, which is the pleadings have now closed.

THE COURT:  Right.

MR. McGINLEY:  And so we believe that 12(c) was the proper mechanism to say that the pleadings now closed for the state claim.

THE COURT:  I know, but what's the -- that's a distinction without a difference --

MR. McGINLEY:  Sure.

THE COURT:  -- you are talking about the merits of

9

the case.

MR. McGINLEY:  Correct, Your Honor, and I don't mean to interrupt.

So substantively the reason is that *Ashley* has been decided, and we believe that *Ashley* is a case that does alter and in many ways clarify the analysis of how to apply *Twitter* particularly to banks in the banking context.  And what the Second --

THE COURT:  Well, *Kaplan* applied -- was a banking context, right?

MR. McGINLEY:  It was, but it was pre-*Twitter*, Your Honor.

THE COURT:  It reaffirms *Kaplan*, correct?

MR. McGINLEY:  Well, what it says --

THE COURT:  All of our -- this is not to suggest that any of our previous decisions were in error.

MR. McGINLEY:  Slight twist on that, Your Honor. What *Ashley* says is that all of the results of the previous decisions would come out the same way under the Court's analysis in *Ashley*, but it does conduct a different form of analysis.  And what it says about *Kaplan* predominantly is that the facts of *Kaplan* would be the types of facts that you would be looking for in the pervasive and systemic context, but what it says about substantial and knowing assistance is that you have to have a discernible nexus that connects the alleged

10

activities of the defendant and the attacks at issue.  And that it can't merely be --

THE COURT:  Well, not always.  There's the other theory of pervasive.

MR. McGINLEY:  Correct.  And it says if you are going to find that, you still have to find intent to further the terroristic aims, and that it cannot be, for example, the provision of banking services to a transcendent commercial enterprise.  In *Ashley* it was called the syndicate.  Here it's called the system or the BAC.  But in both instances the allegation -- and my friend just a few minutes ago, I think, highlighted this, is that the allegations are about money laundering or what they call narco-terrorism or things that are not about the attacks that happened that injured the plaintiffs in this case.

And so what *Ashley* makes clear is that you have to have a nexus there.  You also have to have intent to bring about those attacks.  It can't merely be that you provided services and that it was foreseeable.  Footnote 12 of *Ashley* is very clear on this.  There were some statements in *Honickman*, for example, Your Honor, that suggested that the foreseeability analysis that could apply in the general awareness prong could be imported into substantial assistance and that the court could say, well, it was foreseeable that by providing banking services, money will eventually flow to a

11

terrorist organization and some attack might happen.

Ashley is very clear that that is not a permissible form of argument, and so that's a big change here, Your Honor, and I think it is fatal to their claims because that is essentially the nature of their claims, is that Your Honor recognized in a previous decision that these are at some level routine commercial banks services. And the theory is that by providing the routine banking services, money then flowed through a network that they called a system, which is a sort of loose and countrywide commercial network that they say involves money laundering. We obviously would dispute that any of our clients participated in that, but even if you are to take their allegations as true, Ashley makes it clear that that's not enough. It can't be that you were aware of or substantially assisted a money laundering operation because this is the antiterrorism act.

The other thing that Ashley is very clear about that I think is crucial on this point is that if you do rely just on foreseeability or just on providing services to a network that is somehow then alleged to be connected to terrorism without a nexus to the attacks, you run the risk of turning JASTA back into a material support statute, which it is not. Material support can be one of the first predicate elements of a JASTA claim, but it is not enough alone. Linde makes that clear for primary liability, Ashley makes it clear for the

12

sake of aiding and abetting.

THE COURT:  How do you distinguish *Kaplan*?

MR. McGINLEY:  How do we distinguish *Kaplan*?

THE COURT:  Yes.

MR. McGINLEY:  So in *Kaplan* --

THE COURT:  *Kaplan* is good law, you agree with that?

MR. McGINLEY:  *Kaplan* is good law, we agree with that, Your Honor.

I do think you have to read *Kaplan* in light of *Ashley*.  *Ashley* is the later in time decision, it's applying *Twitter* to the facts at issue there.  And so to the extent there's anything that's inconsistent between *Ashley* and *Kaplan*, *Ashley* has to control.  And I think what *Ashley* --

THE COURT:  So are you saying -- but in *Ashley* they reaffirmed *Kaplan*.  Isn't that saying that somehow *Kaplan* was wrong because *Ashley* has changed the analysis?

MR. McGINLEY:  Sorry, Your Honor, I think it is a slightly subtle point.  What they say is that the result of *Kaplan* was correct.  They did not say that every single word in the opinion of *Kaplan* remains good law.  Otherwise, there would have been no need to write an opinion in *Ashley*.  What *Ashley* instead does is it says now applying *Twitter*, and importantly *Smith & Wesson*, because *Smith & Wesson* is another decision that's come down both --

THE COURT:  Well, factually, then, if *Kaplan* still

13

is good, how do you distinguish, again, this case from *Kaplan*?

MR. McGINLEY:  Sure, Your Honor.

So, very clearly, in *Kaplan* the allegation is that the bank very intentionally aligned itself.  This was Lebanese Canadian Bank, which was sanctioned by the US government, is no longer in operation.  Aligned itself with the terrorist activities by doing things like denouncing, I believe it was a UN Human Rights report, as the basis of propaganda.  It changed the way that it did banking services.  So, for example, it relieved certain customers of deposit limitations.

THE COURT:  Were the links any clearer or the nexus to actual attacks any clearer in *Kaplan* than they are here?

MR. McGINLEY:  I think they were because the activities of the bank were affirmatively changing the way that they did business for regular customers.

THE COURT:  Isn't that alleged here, to some extent, that they did things for these customers that they wouldn't -- that they didn't do for others?  I mean, they had representatives of Hezbollah in the bank that --

MR. McGINLEY:  No, Your Honor.  There's no allegations that they changed the way that they did their banking in the way that was done by Lebanese Canadian Bank in *Kaplan*.

You know, basically, what was said in *Kaplan* was that Lebanese Canadian Bank changed the way it did things and

14

evaded sanctions regimes by doing bespoke activities.  All that's alleged here is that there was the provision of banking services.  I think it's actually really important to emphasize that for the vast majority, if not nearly all of the allegations, they don't even allege actual transactions that could be traced in any way or discerned as to when they happened, where the money went.  There's, for the most part, just allegations that there was an account, without any other details.  And the allegations here are just that the banking services were provided.

        The liaisons point, Your Honor, is essentially they say there was a customer representative, but that's true of presumably every single customer that a bank has, and, also, the allegations themselves are --

        THE COURT:  Well, not a liaison by a terrorist organization.  They said it was a Hezbollah liaison, correct?

        MR. McGINLEY:  They said that there were employees of the bank that liaisoned with the system and with Hezbollah. There's no details whatsoever about what they believe that to mean, when it happened, what actions were taken.  It's completely threadbare, in the same way that if you look at footnote 14 of *Ashley*, there's an allegation that SGB personnel were aware of, quote, red flags that might suggest money laundering or terrorist financing operations, without any details.  The Second Circuit very clearly said that that

15

sort of vague and undetailed sort of allegation cannot allow a complaint to go forward without any further information.

So that's all that you have here. There's nothing tieing anything about that allegation to any transaction activity, account activity, anything related to any attack whatsoever. And so it is quite different in *Kaplan*.

THE COURT: Well, where was the link to attacks in *Kaplan*?

MR. McGINLEY: So in *Kaplan*, what I understand *Ashley* to be saying is that *Kaplan* is an example of the pervasive and systemic prong. And so what you have in *Kaplan* was essentially the court concluded it was a bank that was captured by the terrorist organization, had aligned itself, had spoken in ways that made it clear that it was aligned with the terrorist organization. The terrorist organization identified bank executives as part of their organization and friends of the organization on public materials, and so there was a full alignment. Here, there is nothing remotely approaching that in terms of any suggestion that any of these banks fully aligned themselves with Hezbollah.

And I think it is important, Your Honor, you might remember, we are here on behalf of 11 banks we have historically been calling the moving banks. There are two other defendants in this case that I think their allegations maybe would have a little more weight with. That would be

16

Lebanese Canadian Bank is a named defendant here, and Jammal Trust Bank, which was also sanctioned and shut down shortly after this case was filed.

I think it's really important, particularly when you're talking about essentially the entirety of the banking sector in Lebanon, to draw distinctions and to not --

THE COURT: For instance -- let me just ask you a question.

Isn't it alleged that Fransabank took over the substantial portion of LCB's black listed accounts?

MR. McGINLEY: It's alleged that accounts migrated. There are -- my recollection, standing here today, if I am incorrect on this, I will correct it for Your Honor, but my recollection is there are no detailed allegations about any account activity with respect to those accounts or how any money flowed from those accounts in a way that went towards an attack at issue in this case.

THE COURT: All right. Is there anything further you wanted to add?

MR. McGINLEY: The one other thing I would say, Your Honor, that I do think is a really important point from *Ashley* that is featured front and center here is this notion that money is fungible and that the opening up economic markets or processing transactions for entities or broadly defined enterprises that may have some connection with

17

terrorism in some tangential way enables --

THE COURT:  Don't they argue that these entities, it's not just some tangential way, don't they argue that these are terrorist organizations that they're doing business with?

MR. McGINLEY:  No, Your Honor.  What they argue is that they are things like hospitals or gas stations or charities or other organizations that are what they say is somehow wrapped into some broad economic enterprise that from what we can tell essentially encompasses nearly all of the Lebanese economy, and that by providing the services to these entities, they are indirectly then providing services to Hezbollah.

I would also point out, Your Honor, they do not allege that Hezbollah carried out these attacks.  The allegation is that the attacks were supported by Hezbollah, but carried out by militia.  And so it's even one step removed even further separation from what was found insufficient in *Ashley*, where the allegations in *Ashley* were that the defendant banks were supporting what they call the syndicate, and the allegation was the syndicate itself carried out the attacks, which in that case were IED explosions in Afghanistan.

You might remember, too, Your Honor, that one of the allegations in *Ashley* that was found to be insufficient was that Standard Chartered Bank banked two fertilizers companies

18

that supplied the key ingredients for IEDs. And the court said that was not enough.

And if that's not enough in *Ashley,* it cannot be enough here. There's nothing remotely close --

THE COURT: So is it your position that the only people that the banks were supporting were entities that had other legitimate business like hospitals and gas stations?

MR. McGINLEY: So the vast majority, that appears to be the case. I'm sure my friends on the other side will stand up and say with respect to the three customers that they allege that we talked about earlier, they would claim that, you know, that that's different.

THE COURT: Is it different? Why isn't it different?

MR. McGINLEY: Well, there's a few reasons, Your Honor. First of all, none of those three -- my understanding is none of those three alleged customers are alleged to have participated in the attacks at issue. For example, their allegations is that Martyrs Foundation supported orphans or families of --

THE COURT: Well, they encouraged attacks. I mean, we'll take care of your family if you go kill somebody, is, you know, encouraging attacks, correct?

MR. McGINLEY: Well, I'm not sure that that's encouraging attacks. Certainly not the attacks at issue here,

19

but there's no allegation about --

THE COURT:  You mean there were no suicide bombers involved here?

MR. McGINLEY:  Well, I believe what was involved here were attacks on US soldiers in Iraq.  So they say that Martyrs Foundation supported suicide bombers in --

THE COURT:  Weren't some of those done by suicide bombers?

MR. McGINLEY:  I am not sure about the specific allegations here, but they say it was for attacks in Israel.

Either way, Your Honor, I am not standing here telling you that that is a crucial distinction.  The crucial distinction is that there's no allegations that suggests that money processed by any of these banks actually did go to those customers because there are no allegations whatsoever other than the threadbare suggestion that they existed as a customer.  Not when they existed as a customer, not any kind of transaction activity.  Nothing about anything showing any kind of flow of money actually going through those organizations.  It is complete conclusory allegation --

THE COURT:  So there is no flow of money, no money laundering that is directed to any of these specific entities, they are -- or the Islamic Resistance Support or the Martyrs Foundation?

MR. McGINLEY:  That's correct.  On the allegation of

20

this complaint, there are no allegations regarding any specific --

THE COURT:  In 800 pages, there's nothing there --

MR. McGINLEY:  No.  They --

THE COURT:  Any specific money laundering that they did for any of these entities or --

MR. McGINLEY:  Not tied to these banks or any transaction that went through the banks that are alleged. It's the mere allegation that an account existed with no detail about when it existed, what was done with the account, nothing.  It is just a conclusory allegation.  And then, obviously, with respect to the three that we identified, there's not even a suggestion that accounts existed.

THE COURT:  You mean with -- well, which three that you identified?  The Martyrs Foundation --

MR. McGINLEY:  No, no.  Sorry, Your Honor.  The three banks that you asked me about earlier.

THE COURT:  Oh, I'm sorry.  Okay.

I'm sorry, do any of the counsel for any of the other defendants wish to be heard?

MR. BERGER:  If I might, briefly.  Maybe I can borrow the microphone.

I hope this speaks for everybody else at this table --

THE COURT:  This is Mr. Berger?

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

21

MR. BERGER:  Mr. Berger, Mitchell Berger, for MEAB Bank, LGB Bank, and Fenicia Bank.

I would simply say on the group pleading question you asked of Mr. McGinley, that it's not either binary or monolithic.  It's not like there's only these three, and then as to everybody else they're in the same bucket.  I would just respectfully invite the Court's attention to pages 8 to 9 and footnote 5 of our reply brief, ECF 488, where we set out in detail as to all of the banks represented at this table what the failings are.

So it's not just like the three Mr. McGinley mentioned.  They're analogous to everybody else, there are plenty, it's there are shades of gray that affect every one of the banks here and it's explained in detail there.  I won't rehash it.

THE COURT:  Why was that in a reply brief, by the way?  Wouldn't that have been more helpful in a --

MR. BERGER:  It was also -- I only mention the reply brief, I guess, because my attention span is shorter than everybody else's, but it recapped what was in the opening brief and in --

THE COURT:  Oh, okay.

MR. BERGER:  -- each contains citation.

THE COURT:  I just remember seeing it more prominently in the reply brief as well.  It might have been in

22

the principle brief.

MR. McGINLEY:  It was, Your Honor.  I think maybe it showed up in more stark relief in the reply brief because my friend's opposition was very focused on those entities and so the reply was obviously necessarily very focused on them as well.

THE COURT:  All right.  Anyone else?  Don't feel like you have to speak.  It's okay.

Plaintiffs' counsel, do you want to be heard?

MR. RADINE:  Yes.  Thank you, Your Honor.  Just very briefly.

First, of course, *Ashley* calls the court, the Circuit's prior decisions, quote, entirely consistent with *Twitter*.  There's no suggestion that *Kaplan*'s reasoning is wrong and happened to come out right factually.

The difference between *Kaplan* and *Ashley*, of course, is that *Ashley* is a case where according to the Court, the plaintiffs alleged that the defendants aided and abetted -- aided and abetters.  You know, it is a more attenuated case. Fatima Fertilizer, for example, an ostensibly legitimate fertilizer company, yes, some of their product ended up in bombs, just as much as nails end up in bombs, and yet hardware stores --

THE COURT:  So how is your case different?  Counsel says that there are no specific -- although you identified

23

these individuals as having accounts, you don't show any transactions involving those accounts that would, you know, suggest this transfer of money or anything else.

MR. RADINE:  Because we keep redoing the same motion, we previously in our brief directed the Court back to our previous opposition --

THE COURT:  Oh, so that's factually wrong, is your view?

MR. RADINE:  That's factually wrong -- oh, yes. This monstrosity that I know you have had to review is replete, especially after third party discovery --

THE COURT:  You said that.  You described your complaint that way.

MR. RADINE:  It's a monstrosity.  It is very long.

But the -- it is replete with allegations of specific transactions.  On page 10 of our opposition to their last motion to dismiss, we supplied a chart with specific dollar amounts from specific transfers.  That alone is simply an example that we put together for the sake of the brief.

In *Kaplan* they are aiding -- the bank, LCB, is aiding and abetting Hezbollah by assisting fronts, charitable fronts like the ones my friend over here says that -- admits that we allege here.  Martyrs Foundation is a charitable front of Hezbollah.  It supports suicide bombers.  He --

THE COURT:  How many banks -- but did the banks

24

actually have accounts for Martyrs Foundation, and how many did?  Just refresh my recollection.

MR. RADINE:  It's in the briefs.  I apologize for not having it in front of me.  But, again, we also include entities that we believe they knew were Martyrs Foundation owned, like Atlas Holdings, like Arch Consulting.

But to add, there were no suicide bombings in *Kaplan*.  Martyrs Foundation, the fact that they -- that LCB was supporting was considered sufficient.  The attacks in *Kaplan* are rocket attacks that were fired from Lebanon into Israel.  Here, the attacks are attacks occurring in Iraq against US forces.

What makes these cases so similar, of course, the *Kaplan* allegations are literally in this case, but what makes them so similar is that you have banks knowingly working with Hezbollah, with the BAC, which is the fundraising component of the Islamic Jihad Organization.  So not just Hezbollah writ large, but the, if you will, the operational or military wing of Hezbollah, moving vast amounts of money, including through money laundering techniques, as this Court has identified before.  They maintain liaisons.  I know it's -- my friend is avoiding trying to admit it, but the allegations in the complaint gives their names.  These are employees whose job it is to work -- help the banks coordinate with Hezbollah, which I would say, by the way, also supports a conspiracy theory

25

that's in our complaint.

But this goes far beyond, I think, *Kaplan*.  The facts that he mentioned about *Kaplan*, the so-called alignment, is not mentioned in *Ashley*.  These are facts that they have tried to suss out from the complaint or from the lower decisions in that case to try to draw a distinction.  But we're talking about the same banks committing the same type of conduct, now substantiated through a huge amount of third party discovery.  There's $850 million that we identify in our third amended complaint with entities many of which are specially designated global terrorists.  We're not the ones trying to besmirch the Lebanese economy.  These are designated terrorists.  And that, by the way, that figure --

THE COURT:  You mean the banks handle $850 million?

MR. RADINE:  Sorry?

THE COURT:  You're saying these bank defendants handled $850 million?

MR. RADINE:  Much more.  That's how much we could get through third party discovery.

THE COURT:  And how did they handle it?  Just refresh my recollection.

MR. RADINE:  They --

THE COURT:  Through their customers?

MR. RADINE:  Sorry?  Through their customers -- that figure actually does not include the exchange houses --

26

THE COURT REPORTER:  Can you lean forward or bring the mic closer to you?

MR. RADINE:  I'm sorry.

The $850 million figure does not include the exchange houses.  It does not include entities that American banks won't bank with, which means that the banking those banks would have done would be through foreign banks, likely beyond this Court's subpoena power.

There are a number of limitations to just that number alone, but, yes, these are amounts of money that the defendants are processing for customers that we show are knowably part of the BAC, part of the IJO fundraising network, and part of Hezbollah's terror campaign.

THE COURT:  Is that what counsel was referring to earlier as hospitals and gas stations?

MR. RADINE:  Many of those fit into that category. Some of them are -- they cover a wide array of entities, but the reason why they get designated by the United States, is because they are identified as what are effectively a large money laundering network.

And we also show that the banks can do this.  Kassim Tajideen can't come here.  He's been a specially designated global terrorist since well into the middle of the relevant period.  But in Lebanon his name can go right on to a corporate formation document.

27

They know who their customers are, and they are moving money for them, knowing that they are part of Hezbollah's military fundraising system.

THE COURT:  All right.  Is there anything further that you wanted to add from plaintiffs?

MR. OSEN:  Your Honor, if I may, just for a moment.

You asked about gas stations a moment ago.

So my colleague just pointed out that the Martyrs Foundation, which is the primary entity discussed in *Kaplan*, controlled and owned Atlas Holding Company, which is itself designated by the United States because it's owned and controlled by the Martyrs Foundation, and, hence, controlled by Hezbollah.  Well, Atlas Holding also runs gas stations amongst its corporate activities.

All of this is part of a fundraising apparatus for Hezbollah.  It's in the complaint, but the complaint is predicated on US government findings in various designations.

So, again, the Martyrs Foundation is an entity that does run hospitals, but it also provides subsidies for Hezbollah fighters and specialized medical care for Hezbollah fighters who are injured.  So that is why the court in *Kaplan* --

THE COURT:  How do you deal with the concept of the fungible money in those circumstances?

MR. OSEN:  So *Kaplan* addressed that, Your Honor, by

28

describing entities that are closely intertwined with the organization's violent activities.

So in the framework of the Second Circuit, it is possible, and this is a point Mr. McGinley made earlier, it is possible for someone in the Second Circuit law to violate the material support statute, 18 USC 2339B, that is, they knowingly give money to Hezbollah, but they don't do it to a part of Hezbollah that foreseeably is involved in violence, that is closely intertwined with its violent activities.

However, and this is what my colleague here was pointing out, the Martyrs Foundation, the Circuit found, was sufficiently intertwined with terrorist activities because it services the military arm of Hezbollah.

The BAC, these entities that the US government -- this network of fundraising, is for the military arm of Hezbollah.  It's not going to their pension fund for widows and orphans, it's going to the organization's military apparatus.  And that's why when they raise money, whether it is through narcotics trafficking, whether it's through gas stations, amusement parks, anything that they make money off of and can convert to cash through the system goes and flows through to the military apparatus of Hezbollah.  That's in the complaint, it's also what the government of the United States has found on multiple occasions.

THE COURT:  Are you relying on the pervasive nature,

29

or do you have a link to specific attacks?  Because *Ashley* talks about linking something to a specific attack.  What link do you make to a specific attack?

MR. OSEN:  We generally rely upon the pervasive conduct, Your Honor.

THE COURT:  So that's your theory?

MR. OSEN:  But one aspect of it crosses over to the other side, and that is that the comanager of the BAC during this time period, Abdallah Safieddine, was also found by the US to have been involved in orchestrating and financing the attacks in Iraq that injured our plaintiffs.

THE COURT:  I'm sorry, who found that?

MR. OSEN:  The US government, and it's in our complaint, linked Abdallah Safieddine, who is the BAC cohead at that time operating out of Tehran, was responsible for facilitating the funding mechanism that facilitated the attacks on US service members.

THE COURT:  The banks funded him?

MR. OSEN:  He's the head of the organization that controls all of these commercial enterprises --

THE COURT:  And the banks funded all of those -- so you're saying the banks funded all of these commercial activities that were encompassed under the BAC, and this guy is the head of the BAC.

MR. OSEN:  Right.  Cohead.

30

THE COURT:  And that's not too attenuated?

MR. OSEN:  I think if we were relying solely on the funding of an attack it would be, but because this activity is so pervasive throughout Lebanon, throughout the conduct of these defendants, who, let's be clear, are alleged to have taken hundreds of millions of dollars in bulk cash from the airport, put it into exchange houses in Lebanon, and then laundered the money back out to make it cleaner and more legitimate through these various corporations, that's an enormous enterprise in which they are heavily engaged and which is the source, we allege, of most of their profits over the last 15 years.

So to say that we are casting aspersions on the Lebanese economy, we're just describing what the US government itself has found.

THE COURT:  All right.

MR. McGINLEY:  May I respond?

THE COURT:  Yes.

MR. McGINLEY:  So I think the exchange here, even -- especially this last point, really puts a highlight on the group pleading problem and the attenuation problem.  We agree with you that this notion that the head or cochair or deputy chair of the BAC is the reason that we're here, is just nowhere to be found in this complaint.  There's no allegation of specific transactions from any of these 11 banks going to

31

that person.

Also, everything you just heard about supposed bringing up money from exchange houses, you might notice, no specific allegations with respect to any of these banks here. None of these banks here have been designated.

Two banks in the case have been designated, LCB and JTB.  And my friend says, and I can't let this slip, he says the *Kaplan* allegations are present in this complaint.  Present with respect to LCB.  Not any of these defendants.  And so you can't take an allegation against LCB, a bank that's now defunct and was put out of business because they were found to support terrorism, and tar it onto banks that have not been held to do so.

My friend also says that *Ashley* did not itself describe the facts of *Kaplan*.  It does.  I point you to page 445 and 446, where the court says that the problem in *Kaplan* was that the bank's client clearly and publicly identified the bank as part of the terrorist organization, the bank violated sanctions laws and granted exceptions to obscure the substance of deposits, including for a client known to provide financial support to suicide bomber families, but that in *Ashley*, even where you had allegations like you do here of supporting a money laundering scheme, it's not enough.  We would say the same thing here.

My friend also, when you pressed him, every single

32

time you pressed him on details, he just zoomed back out to the BAC, or to the system, or to some sweeping generalizations about money laundering.  What he did point you to in some specific way was page 10 of their opposition brief to I think the second motion to dismiss, where he says there's a chart. This is when you asked him about Martyrs Foundation, IRSO, and AQAH.  There's nothing in that chart about any of those organizations.  So, again, they can't point to anything, even on the three customers they claim are at the core of these issues.

The $850 million figure, which is not -- I don't think is in their complaint.  He mentioned it today.  But that's about what they allege to be money laundering.  He said that himself, that it's money laundering.  *Ashley* says that's not enough for either part.  It's not enough for knowing substantial assistance because there's not a nexus, and it's not enough for pervasive and systemic because all that it suggests, at most, is that the banks might have been aware that their services were being used as part of money laundering, but that's different than terrorism and the terrorist attacks at issue here.

And then the last thing I would say, Your Honor, is that at the end of the day, what *Ashley* tells you is that you can't just throw a huge bunch of facts against the wall, allege money laundering, and say that routine services that

33

allow money to flow from one place to another are enough to

hold banks liable for aiding and abetting terrorism.

THE COURT:  Okay.  Thank you very much.

Thank you, ladies and gentlemen.

I'll reserve decision.

(Proceedings concluded at 4:17 p.m.)

*  *  *  *  *

**REPORTER'S CERTIFICATE**

I, ANNETTE M. MONTALVO, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings.

Dated this 14th day of November, 2025.

/s/Annette M. Montalvo
Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

*Annette M. Montalvo, CSR, RDR, CRR*
*Official Court Reporter*