February 10, 2026

**VIA ECF**

Honorable Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:** *Bartlett v. Société Générale de Banque au Liban S.A.L.*, No. 19-cv-0007
Notice of Supplemental Authority – *Murad v. Lafarge S.A.*, No. 23-CV-9186, 2026 WL 270651 (E.D.N.Y. Jan. 30, 2026)

Dear Judge Amon:

Moving Defendants[1] respectfully write to bring to the Court's attention the recent decision in *Murad v. Lafarge S.A.*, No. 23-CV-9186, 2026 WL 270651 (E.D.N.Y. Jan. 30, 2026), attached as **Exhibit A**.

In *Murad*, plaintiffs injured in attacks targeting the Yazidi community in Iraq carried out by ISIS and al-Nusra Front ("ANF") brought JASTA claims for aiding-and-abetting against Lafarge S.A. ("Lafarge"), a cement manufacturer that operated a cement plant in Syria. Lafarge allegedly sold cement to ISIS and made security payments to ISIS and ANF—resources that helped ISIS and ANF to pay fighters' salaries, build bunkers and tunnels, source bomb components and obtain other weapons at the time of the attacks on the Yazidis. *Murad*, 2026 WL 270651, at *1–2.

The court dismissed plaintiffs' JASTA aiding-and-abetting claim with prejudice, and in so doing, joined the growing list of courts in this Circuit that have rejected similar claims in the wake of *Ashley v. Deutsche Bank AG*, 144 F.4th 420 (2d Cir. 2025). *See, e.g.*, *Finan v. Lafarge S.A.*, No. 22-CV-7831, 2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025); *Long v. MTN Grp. Ltd.*, No. 23-cv-5705, 2025 WL 2827899 (E.D.N.Y. Sept. 25, 2025); *Fraenkel v. Standard Chartered Bank*, No. 24-CV-4484, 2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025).

*Murad*'s holdings confirm that this Court should grant Moving Defendants' pending Motion for Judgment on the Pleadings (ECF 483).

***First***, the *Murad* plaintiffs' claim failed because they did not adequately allege that the defendants "'wished to bring about' ISIS's attack … or that they sought through payments and cement provisions 'to make it succeed.'" *Murad*, 2026 WL 270651, at *9 (citing *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 498 (2023)). The court expressly rejected plaintiffs' contention that it was sufficient that the defendants continued to pay ISIS and provide cement when it was "plainly foreseeable" that these payments and supplies would be used to attack Yazidis. *Id.* at *8. Foreseeability, the court explained, did not support aiding-and-abetting liability because it falls short of alleging the intentional misconduct necessary to show conscious and culpable participation: It may "suggest[]

---

[1] Moving Defendants (the "Banks") are (1) Société Générale de Banque au Liban S.A.L. ("SGBL"), (2) Fransabank S.A.L., (3) MEAB Bank s.a.l., (4) BLOM Bank S.A.L., (5) Byblos Bank S.A.L., (6) Bank Audi S.A.L., (7) Bank of Beirut S.A.L., (8) LGB Bank s.a.l., (9) Banque Libano-Française S.A.L., (10) Bank of Beirut and the Arab Countries S.A.L., and (11) Fenicia Bank S.A.L.

the Defendants' potential *knowledge* of the attacks," but does "not plausibly allege a *motivation* to support" the attacks. *Id.* at *9 (emphases added).

*Murad* thus reinforces *Ashley*'s teaching that "a JASTA claim requires *intent* to further a terrorist organization's terrorist activities." *Ashley*, 144 F.4th at 444 (cleaned up) (emphasis added); *accord Long*, 2025 WL 2827899, at *6 n.3 ("strict divide between knowledge and intent" and "the latter is what is needed").

***Second***, the *Murad* plaintiffs' claims failed because they did not identify any "concrete nexus" between Lafarge's alleged support and the specific attacks, nor assistance "so systemic and pervasive that it aided and abetted every single ISIS attack." 2026 WL 270651, at *9. The court rejected plaintiffs' effort to rely on the "timing" of the attacks and the physical "proximity" to Lafarge's cement plant to establish a nexus. *Id*. As the court explained, the allegations did "not link the Defendants' payments directly to ISIS's attack on the Yazidi"; rather, they "'appear[ed] agnostic' to the funds' final use, even if 'some' of them ultimately went to the attack.'" *Id.* (citing *Twitter*, 598 U.S. at 499). Echoing the Second Circuit's statement in *Ashley* that it is not sufficient to merely allege that a defendant's support "end[ed] up in the [terrorists'] pile of resources," 144 F.4th at 445, the *Murad* court explained: Even if some of Lafarge's alleged payments and cement "ultimately went to the attack," the plaintiffs "fail[ed] to show how this cement assisted with the attacks that caused [their] or their relatives' injuries." 2026 WL 270651, at *9. The court found plaintiffs' allegations of systemic assistance to be "conclusory" and "without factual support." *Id*.

The court contrasted the case before it with others where, for example, defendants were alleged to have "affirmatively funded" the FTO "with the specific intent" of furthering terrorist activities or to have "'tailored financial instruments' to circumvent regulatory supervision and controls." *Id*. at *10 (citing *Bonacasa v. Standard Chartered PLC*, No. 22-cv-3320, 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) and *Ranaan v. Binance Holdings Ltd.*, No. 24-cv-0697, 2025 WL 605594 (S.D.N.Y. Feb. 25, 2025)).

***Third***, *Murad* involved allegations of support for terrorism (including direct payments and supplies to FTOs) far more direct and tethered to terrorist violence than anything alleged in this case. Unlike *Murad*, no Moving Defendant is alleged to have made payments to Hezbollah, or directly supplied it with materials to perpetrate attacks. Nor is any Moving Defendant alleged to have had any dealings at all with the Iraqi militia groups that allegedly perpetrated the attacks. And no Moving Defendant is alleged to have intended terrorist violence, much less the attacks at issue in this case. *See* Motion (ECF 483-1) at 14; Reply (ECF 488) at 2. The TAC instead alleges only that Moving Defendants provided for-profit banking services to customers in Lebanon who themselves were not Hezbollah or members of any militia group—not that they provided "tailored financial instruments" or "affirmatively funded" Hezbollah "with the specific intent" to facilitate terrorist operations. *Murad*, 2026 WL 270651, at *10.

That *Ashley* required dismissal despite the more serious and direct allegations in *Murad* makes even clearer that it compels dismissal here.

Respectfully submitted,


| DECHERT LLP | MAYER BROWN LLP |
|---|---|
| By: */s/ Jonathan R. Streeter* | By: */s/ Mark G. Hanchet* |

2

Jonathan R. Streeter
Tamer Mallat
Julia L. Shea
Dechert LLP
1095 Avenue of the Americas
Three Bryant Park
New York, NY 10036
212-698-3500
Email: jonathan.streeter@dechert.com
Email: tamer.mallat@dechert.com
Email: julia.shea@dechert.com

Michael H. McGinley
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
215-994-4000
Email: michael.mcginley@dechert.com

*Attorneys for Defendants BLOM Bank SAL, Fransabank SAL, and Bank Audi SAL*

Mark G. Hanchet
Robert W. Hamburg
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
212-506-2500
Email: mhanchet@mayerbrown.com
Email: rhamburg@mayerbrown.com

*Attorneys for Defendant Banque-Libano Française SAL*

DLA PIPER LLP (US)

By: */s/ Anthony P. Coles*
Anthony P. Coles
DLA Piper LLP (US)
1251 Avenue of The Americas
New York, NY 10020
212-335-4925
Email: anthony.coles@dlapiper.com

Samantha L. Chaifetz
500 8th Street, NW
Washington, DC 20004
202-799-4082
Email: samantha.chaifetz@dlapiper.com

*Attorneys for Defendants Byblos Bank SAL, Bank of Beirut and the Arab Countries SAL, and Bank of Beirut s.a.l.*

ASHCROFT LAW FIRM, LLC

By: */s/ Michael J. Sullivan*
Michael J. Sullivan
Brian J. Leske
Ashcroft Law Firm, LLC
200 State Street, 7th Floor

SQUIRE PATTON BOGGS (US) LLP

By: */s/ Gassan A. Baloul*
Gassan A. Baloul
Mitchell R. Berger
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
202-457-6155
Email: gassan.baloul@squirepb.com
Email: mitchell.berger@squirepb.com

*Attorneys for Defendants MEAB Bank s.a.l., Fenicia Bank S.A.L., and LGB Bank s.a.l.*

3

Boston, MA 02109
617-573-9400
Email: msullivan@ashcroftlawfirm.com
Email: bleske@ashcroftlawfirm.com

*Attorneys for Defendant Société Générale de Banque au Liban S.A.L.*

# EXHIBIT A

2026 WL 270651
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Nadia MURAD et al., Plaintiffs,

v.

LAFARGE S.A. et al., Defendants.

23-CV-9186 (NGG) (PK)
|
Signed January 30, 2026

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

***1** Nadia Murad is one of over 800 plaintiffs (collectively, the "*Murad* Plaintiffs") that bring this action against Defendants Lafarge S.A., Lafarge Cement Holding Limited, and Lafarge Cement Syria S.A. (collectively, the "Defendants") under the Anti-Terrorism Act (18 U.S.C. § 2331 *et seq.*) (the "ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"). (Am. Compl. (Dkt. 37) ¶¶ 47, 50.) The Defendants now move to dismiss the *Murad* Plaintiffs' claims, which seek compensation under JASTA's aiding-and-abetting liability and conspiracy liability provisions. (*See* Mem. of L. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mot.") (Dkt. 64) at 1; 18 U.S.C. § 2333(d)(2)) The Defendants stress that the Amended Complaint does not contain "allegations that even a single [p]laintiff held [ ] citizen status at the time of the acts ... that allegedly caused their injuries." [1] (*Id.*) They also contend that the *Murad* Plaintiffs failed to plead their aiding-and-abetting claims with the requisite specificity. (Defs.' Reply Br. in Supp. of Mot. to Dismiss ("Defs.' Reply") (Dkt. 67) at 1; Defs.' Mot. at 23-24.)

Because the ATA only requires citizenship at that time a suit is filed, the court DENIES IN PART the Defendants' motion. However, because the *Murad* Plaintiffs failed to adequately show that the Defendants "knowingly provide[d] substantial assistance" to the Islamic State in Iraq and Syria ("ISIS") in carrying out the attack in question, the court GRANTS IN PART the Defendants' motion. Accordingly, the court DISMISSES WITH PREJUDICE count one of the Amended Complaint. (*See* Am. Compl. ¶¶ 2597-2607.)

**I. FACTUAL BACKGROUND**

Lafarge S.A. is a building materials manufacturer organized under the laws of France and headquartered in Paris. (Am. Compl. ¶ 51.) It owns Lafarge Cement Holding Limited, a holding company organized under the laws of and headquartered in Cyprus. (*Id.* ¶¶ 51, 53.) It, in turn, is the primary shareholder of Lafarge Cement Syria S.A., a company organized under the laws of Syria and headquartered in Damascus. (*Id.* ¶ 53.) Lafarge Cement Syria S.A. operated a cement plant, located in the Jalabiyeh region of Syria (the "Jalabiyeh Plant"), from approximately May 2010 until September 2014. (*Id.* ¶ 21.)

In 2011, civil war broke out in Syria. (*Id.* ¶¶ 76, 149.) Various armed factions operated within Syria at that time, including ISIS and the Al-Nusra Front ("ANF"), terrorist groups that gained control over large parts of Syria as the civil war progressed. (*Id.* ¶¶ 77-80, 150.) "By March 2013, armed groups had taken over the area around Raqqa and quickly established checkpoints at access roads to the [Jalabiyeh] Plant." (*Id.* ¶ 156.) That same year, Lafarge S.A. and Lafarge Cement Syria S.A. began making payments to intermediaries who purported to pay ISIS and ANF. [2] (*Id.* ¶¶ 22, 33, 164.) They also sold cement to ISIS. (*Id.* ¶¶ 209-11.) Neither Defendants, nor any of their employees, are purported to have "shared or supported the terrorist ideologies or goals of ISIS, ANF or any other [Foreign Terrorist Organization]" ("FTOs"). (Defs.' Mot. at 3.)

**\*2**  On August 3, 2014, ISIS launched an attack on the Yazidi community in the Sinjar region of northwest Iraq.[3] (*Id.* ¶¶ 1, 13.) In that attack, ISIS murdered and kidnapped over ten thousand Yazidis and displaced many more. (*Id.* ¶ 1.) The *Murad* Plaintiffs allege that the money and resources from Defendants' payments helped to pay ISIS fighters' salaries, build bunkers and tunnels, source bomb components, and obtain other weapons when ISIS was carrying out its attacks against the Yazidis. (*Id.* ¶¶ 262-64, 281.) They further allege that ISIS used the Defendants' cement to build the tunnels where Yazidis—including at least one *Murad* Plaintiff's sister—were held captive and tortured. (*Id.* ¶¶ 7, 42, 209, 279, 281.)

After their attacks on the Yazidi community, ISIS seized the Jalabiyeh Plant from Defendants in September 2014. (Am. Compl. ¶ 36.) The *Murad* Plaintiffs do not allege that Defendants made any payments to ISIS or ANF after October 2014. (*See id.* ¶¶ 5, 36, 243, 250.)

## II. PROCEDURAL HISTORY

In December 2023, a subset of the *Murad* Plaintiffs filed suit against the Defendants under the ATA and JASTA. (*See* Compl. (Dkt. 1).) They plead one count of aiding-and-abetting liability and one count of conspiracy liability. (*Id.* ¶¶ 1577-98.) In August 2024, Plaintiffs filed their Amended Complaint, which added the remaining *Murad* Plaintiffs to the litigation. (*See* Am. Compl.) All the *Murad* Plaintiffs allege to have been U.S. nationals at the time that they filed suit. (*Id.* ¶¶ 2606, 2617.) But they do not allege to have been U.S. nationals at the time of ISIS's August 2014 attack on the Yazidi. (Defs.' Mot. at 5.)

The *Murad* Plaintiffs are not the only ones to sue Lafarge over the Jalabiyeh Plant. This case is in fact one of many related ATA actions against the Defendants.[4] In February 2024, the court stayed the *Murad* Plaintiffs' case pending its decision on Defendants' joint motion to dismiss in three of the related cases: *Finan, Foley*, and *Fields* (collectively, "*Finan*"). (*See* Order Granting Stay dated 2/28.2024 (Dkt. 25) at 2.) In August 2025, the court granted in part the Defendants' motion in those cases, dismissing the respective aiding-and-abetting claims in each. *See Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317, at \*25 (E.D.N.Y. Aug. 29, 2025).

After the court's ruling in *Finan*, the Defendants moved to dismiss the *Murad* Plaintiffs' case under Federal Rule of Civil Procedure 12(b)(6). (*See* Defs.' Mot. at 1.)

## III. LEGAL STANDARD

To survive a Rule 12(b) (6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).[5] A claim is plausible when the plaintiff "plead[s] factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663, 129 S.Ct. 1937; *see Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011). Although detailed factual allegations are not required, the pleading standard "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, courts ruling on a motion to dismiss "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555, 127 S.Ct. 1955. This includes conclusory allegations from plaintiffs that they have right of action to sue the defendants.[6] *Soybel v. City of New York*, No. 21-CV-1846 (CBA) (MMH), 2024 WL 5482682, at \*6 n.8 (E.D.N.Y. Mar. 15, 2024) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 126 (2d Cir. 2003)).

## IV. DISCUSSION

**\*3** The Defendants contend that the *Murad* Plaintiffs do not have a right of action to sue under the ATA. They also argue that the *Murad* Plaintiffs have failed to allege that they aided and abetted the ISIS attack on the Yazidis by providing ISIS "knowing and substantial assistance." (Defs.' Reply at 1.) For reasons now discussed, the court disagrees with the Defendants' first argument but agrees with their second.

### A. Right of Action Under the ATA

The parties each argue that the ATA's plain text unambiguously supports their respective interpretations. (*See* Defs.' Mot. at 8-11; Pls.' Opp'n at 8-11.) Even so, they both invoke the statute's purpose and legislative history—along with principles of tort and international law—to resolve any ambiguity in their own favor. (*See* Defs.' Mot. at 11-19; Pls.' Opp'n at 11-14.) The court addresses each set of arguments in turn.

#### 1. The ATA's Statutory Text

"As always, we start with the text of § 2333." *See* *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484, 143 S.Ct. 1206, 215 L.Ed.2d 444 (2023) (citing *Bartenwerfer v. Buckley*, 598 U.S. 69, 74, 143 S.Ct. 665, 214 L.Ed.2d 434 (2023)). In relevant part, that text provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States ...."[7] 18 U.S.C. § 2333(a). The ATA utilizes the Immigration and Nationality Act's definition of a "national of the United States": "[a] citizen of the United States ... or a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22); 18 U.S.C. § 2331(2).

##### a. The Parties' Arguments

The Defendants interpret § 2333(a)'s "national of the United States" requirement to apply "as of the time of the injury-causing act of terrorism." (Defs.' Mot. at 9.) They reason that the term "national of the United States" directly modifies the word "injured." (Defs.' Mot. at 9.) Because "Congress provided a civil remedy only to a 'national of the United States injured' by international terrorism,"[8] the Defendants conclude that § 2333 does not concern injuries to others even if they happen to later become U.S. nationals.[9] (*Id.*) The Defendants also observe that § 2333(a) only allows those nationals or their decedents to sue "therefor." (*Id.* at 10.) That word, they note, "refer[s] back to th[e] defined injury" and "confin[es] the ambit of liability to injuries to U.S. nationals." (*Id.* (quoting *Averbach v. Cairo Amman Bank, No.* 19-CV-0004 (GHW) (KHP), 2020 WL 486860, at \*9 (S.D.N.Y. Jan. 21, 2020)).) Such a "clear statutory mandate," the Defendants say, has been "acknowledged" by other courts in this district. (*Id.* at 9 (collecting cases).)

**\*4** Next, the Defendants contend that their interpretation of the ATA "comports with courts' interpretations of other, similar status requirements in federal statutes." (*Id.* at 10.) They cite two examples. The first discusses a RICO claim predicated on a violation of a federal money laundering statute. There, the court determined that the plaintiff failed to allege that any defendant fit the statutory definition of a "U.S. person" at the time of the offense. That was so even though the defendants later became "U.S. person[s]." (*Id.* at 10 (citing *Wuxi City Runyuan Keji Ziaoe Daikuan Co. Ltd. v. Xuewei Xu*, No. 13-CV-0944 (DDP), 2013 WL 3946549, at \*6 (C.D. Cal. July 30, 2013)).) Second, the Defendants discuss the Alien Tort Statute. They note that the Second Circuit has held that the statute permits actions in which the plaintiffs were "aliens" at the time of the alleged tort. That is the case even if they are not "aliens" by the time of suit. (*Id.* at 10-11 (citing *Mastafa v. Chevron Corp.*, 770 F.3d 170, 175 n.1 (2d Cir. 2014)).)

The *Murad* Plaintiffs see things differently. They conclude that "[t]he plain text of the [ATA] confirms that a plaintiff need only be a U.S. national at the time the lawsuit is filed—not at the time of the alleged injury." (Pls.' Opp'n at 8.) Their analysis highlights that the statute applies to " 'any' national of the United States—not just a subset ...." (*Id.* at 9 (citing *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997))).

The *Murad* Plaintiffs further note that the Defendants' contrary interpretation "is not how courts ordinarily interpret statutes." (*Id.*) Instead, they stress that "the default way" to read a statute "is in the present tense." (*Id.* (citing *Hewitt v. United States*, 606 U.S. 419, 431, 145 S.Ct. 2165, 222 L.Ed.2d 613 (2025))). Such a default reading "must carry even more force here," they say, because "Congress often expressly imposes the precise temporal limitation that Defendants argue is silently imposed here." (*Id.*) For support, the *Murad* Plaintiffs point to another section of the ATA. That section provides aiding-and-abetting liability only against defendants "that had been designated as a[n] [FTO] ... as of the date on which such act of international terrorism was committed, planned, or authorized ...." (*Id.* at 9 (quoting 18 U.S.C. § 2333(d)(2))). The *Murad* Plaintiffs also invoke two "closely related terrorism statutes." (*Id.* at 10.) The first, the Foreign Sovereign Immunities Act, explicitly limits potential plaintiffs to U.S. nationals "at the time [of] the act" of terrorism. (*Id.* (quoting 28 U.S.C. § 1605A(a) (2) (A) (ii)).) The second, which establishes the Crime Victims Fund, defines a "victim" as "a person who ... as of the date on which the international terrorism occurred, was a national of the United States." (*Id.* at 10-11 (quoting 34 U.S.C. § 20106).) The *Murad* Plaintiffs then note that another district court concluded that this difference between the ATA and the Crime Victims Fund was "critical" to interpreting the ATA's U.S. national requirement. (*Id.* (citing *Caballero v. FARC*, No. 18-CV-25337 (KMM), 2020 WL 7481302, at *2 (S.D. Fla. May 20, 2020) [10] ).

*b. Analysis*

**\*5** The court agrees with the *Murad* Plaintiffs. As they explain, the Defendants' focus the word "injured" is misplaced. (Pls.' Opp'n at 14-15.) That word is "in the past tense because a party cannot bring a claim if there has not already been an injury." (*Id.* at 15.) That is true regardless of what the ATA says about citizenship status at that time. Instead, Congress meant what it said by noting that "*[a]ny* national of the United States" could sue. *See* 18 U.S.C. § 2333(a) (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.' " *Gonzales*, 520 U.S. at 5, 117 S.Ct. 1032 (quoting Webster's Third New International Dictionary 97 (1976)). While "Congress of course could have phrased [this portion of] its requirement in language that looked to the past," it did not. [11] *See Hewitt*, 606 U.S. at 431, 145 S.Ct. 2165. Thus, the "straightforward reading" of the ATA requires a plaintiff to be a U.S. national only at the time she sues. (Defs.' Mot. at 9.) Nothing more.

Related statutory provisions confirm this commonsense reading. The *Murad* Plaintiffs cite a parallel provision from the ATA itself, along those in other statutes interpreting the exact term "national of the United States." (*See* Pls.' Opp'n at 9-12); *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86, 137 S.Ct. 1718, 198 L.Ed.2d 177 (2017) (explaining that courts "presume differences in language" within a statute "convey differences in meaning"); *United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) (stating that "the use of different words within the same statutory context strongly suggests that different meanings were intended"). All the Defendants cite to the contrary is two unrelated statutes—a RICO statute and the Alien Tort Statute—neither of which interpret the term "national of the United States." (*See* Defs.' Mot. at 10-11.) For the former, they rely on an unpublished case's reasoning from the Central District of California. *Xuewei Xu*, 2013 WL 3946549, at \*6. And for the latter, the supporting case "assumed without deciding" the question of after-acquired citizenship. *Mastafa*, 770 F.3d at 175 n.1. Thus, the court finds them unpersuasive.

In sum, the ATA's plain text unambiguously provides a right of action to "any national of the United States," not just those who were U.S. nationals at the time of their injury. 18 U.S.C. § 2333(a).

### 2. Alternative Tools of Interpretation

Courts typically "may resort to the legislative history and other canons of statutory construction only if [a statute's] plain language is ambiguous or unclear." *Grajales v. Comm'r of Int. Rev.*, 47 F.4th 58, 62 (2d Cir. 2022); see *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013) ("If the statutory terms are unambiguous, we construe the statute according to the plain meaning of its words."). But if the statutory "terms are ambiguous or unclear, [courts] may consider" those extra-textual sources. *Panjiva, Inc. v. U.S. Customs and Border Prot.*, 975 F.3d 171, 176 (2d Cir. 2020).

As discussed, the *Murad* Plaintiffs' right of action flows from the statute's plain text. However, for the avoidance of doubt the court now explains that the ATA's legislative history—along with contemporaneous understandings of tort and international law—yield the same result. *See Lawrence + Mem. Hosp. v. Burwell*, 812 F.3d 257, 266 (2d Cir. 2016) (noting that although a statute's plain meaning governed, its "legislative history ... strongly support[ed] [the court's] interpretation").

#### a. The Parties' Arguments

The Defendants contend that the ATA's legislative history and purpose, along with principles of tort and international law, "confirm[ ]" that it only provides a right of action to people who were U.S. nationals at the time of their injury. (Defs.' Mot. at 11-18.) The Defendants start by noting that the "legislative history is replete with statements reflecting that [the ATA's] primary purpose" was to provide a civil remedy to "Americans abroad." (*Id.* at 11-12 (collecting statements excerpted from Senate debates).) They further contend that "[t]hese core principles permeated Congress's 2016 enactment of JASTA to supplement" the ATA. (*Id.* at 12-13.) On the contrary, they note that "[n]owhere does the ATA's legislative history provide any indication that Congress anticipated or considered ... such an expansive and malleable class of potential plaintiffs" as to include those with after-acquired citizenship. (*Id.* at 14.) They urge the court to rule against such an "unintended and, potentially, absurd" result, which would "undermine, if not eliminate altogether, the principles of certainty and foreseeability that are central to the ATA and JASTA statutory regime." (*Id.* at 17-18.)

**\*6** Defendants next theorize that the "sensible guardrails" which make up their interpretation of the ATA "promote[ ] principles of tort and international law embedded in the [statute]." (*Id.* at 14.)

They note that permitting plaintiffs to acquire "*post hoc*" rights of action would "conflict" with two "bedrock tort principles." (*Id.* at 14-15.) First, they observe that in tort a plaintiff's cause of action "normally accrues at the time of injury." (*Id.* at 15 (quoting *Litle v. Arab Bank, PLC*, 507 F. Supp. 2d 267, 273 (E.D.N.Y. 2007)).) Second, they warn that the *Murad* Plaintiff's interpretation would violate "core tort law principles of foreseeability." (*Id.* at 15-16 (collecting cases and other authorities).) The Defendants then shift their focus to international law. They posit that the *Murad* Plaintiffs' interpretation would violate the "passive personality principle." That concept limits "a state's jurisdiction to prescribe law with respect to certain conduct outside its territory that harms its nationals." (*Id.* at 16-17.) Separately, they invoke a canon of construction which states that "international comity 'might shorten the reach of a statute.' "[12] (Defs.' Reply at 5 (quoting *In re Picard*, 917 F.3d 85, 100 (2d Cir. 2019)).)

The *Murad* Plaintiffs argue otherwise. They cite supportive statements from Congressional hearings discussing of the ATA's "broad remedial purpose." (Pls.' Opp'n at 13-14.) Thus, they contend that Congress "maximized" the ATA's "deterrent effect" by crafting a statute that "open[ed] the courthouse doors to all injured U.S. nationals." (*Id.* at 14 (citing *Caballero*, 2020 WL 7481302, at \*3).) Relatedly, the *Murad* Plaintiffs note that other "courts have interpreted the ATA's legislative history

expansively," including to determine who has a right of action under § 2333(a). (*Id.* (citing *Miller v. Arab Bank, PLC*, No. 18-CV-2192 (HG) (PK), 2023 WL 2731681, at *13 (E.D.N.Y. Mar. 31, 2023); *Knox v. Palestine Liberation Org.*, 442 F. Supp. 2d 62, 75 (S.D.N.Y. 2006)).)

The *Murad* Plaintiffs then shift to the Defendants' tort and international law arguments, which they assert lack merit. Starting with tort law, the *Murad* Plaintiffs point out that their interpretation of the ATA would not violate the claim-accrual principle that the Defendants cite. (Pls.' Opp'n at 18 (citing Defs.' Mot. at 15).) They note that, in accordance with that principle, the ATA's ten-year statute of limitation still accrues at the time of injury. (*Id.*); *see* 18 U.S.C. § 2335(a) (10-year limitations period). As to the Defendants' foreseeability principle, the *Murad* Plaintiffs note that "in a number of other circumstances, the ATA plainly allows recovery on the basis of terrorist attacks against non-U.S. nationals." (*Id.* at 19 (emphasis omitted).) As examples, they cite U.S. nationals' ability to recover for mental harm and loss of consortium caused by injuries to their non-citizen relatives. (*Id.*) Thus, they conclude that a similar result here is predictable. (*Id.*) The *Murad* Plaintiffs then turn to the Defendants' international law arguments. They see "no reason" why Congress giving *post hoc* U.S. nationals a cause of action would violate the "passive personality principle." (*Id.* at 20.) And even if it did, they list multiple other international law principles that also underpin the ATA. (*Id.* at 19-20.)

### b. Analysis

**\*7** Again, the court agrees with the *Murad* Plaintiffs. "Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly." *Knox*, 442 F. Supp. 2d at 75; *see Miller*, 2023 WL 2731681, at *13 (stating the same about JASTA). As the *Murad* Plaintiffs note, "the snippets of legislative history cited by [the] Defendants" do not persuade otherwise. (Pls.' Opp'n at 16-17.) Those citations "consist almost wholly of excerpts from committee hearings and scattered floor statements by individual lawmakers—the sort of stuff [that is] 'among the least illuminating forms of legislative history.' " *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481, 137 S.Ct. 1652, 198 L.Ed.2d 96 (2017) (quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307, 137 S.Ct. 929, 197 L.Ed.2d 263 (2017)). Plus, those "lowly sources speak at best indirectly to the precise question here": the timing of citizenship required under § 2333(a). *Id.* And even if they were more on point, "unexpected applications" are "virtually guaranteed" when a statute is written in "broad terms." *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 680, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). Thus, a right of action for *post hoc* citizens is in line with the ATA's "broad scope" and strong "deterrent purposes." *See Caballero*, 2020 WL 7481302, at *3, 5.

The Defendants' tort and international law arguments fare no better. As the *Murad* Plaintiffs note, their claims still accrue at the time of injury and produce foreseeable results. (*See* Pls.' Opp'n at 18-19.) Those results are not "absurd," as the Defendants claim. (Defs.' Mot. at 17-18; *see* Pls.' Opp'n at 18-19.) Indeed, at least one prior court in this circuit has addressed that precise question. In *Stansell v. FARC*, the court explained that "[t]here is nothing particularly absurd about" Congress providing a claim to those who acquired U.S. national status after the time of their injury. [13] No. 16-MC-00405 (LGS) (SN), 2022 WL 2530359, at *10 (S.D.N.Y. Mar. 29, 2022), *R. & R. adopted*, 2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022). Regarding international law, the Defendants give no reason that their interpretation of the "passive personality principle" should govern over all other principles that are potentially at issue. (*See* Pls.' Opp'n at 19-20.) True, their invocation of the comity canon is more on point. (*See* Defs.' Reply at 5.) But the ATA is necessarily an extraterritorial statute, expressly targeting "act[s] of international terrorism." 18 U.S.C. § 2333(a). Without more, that canon does not mandate the court to override its "broad" reach that remediates foreign harms. *See Caballero*, 2020 WL 7481302, at *3.

In sum, the legislative history and purpose, as well as principles of tort and international law, confirm what the ATA's plain text commands: A plaintiff need only be a "national of the United States" at the time she files suit. 18 U.S.C. § 2333(a).

### B. Aiding and Abetting Liability

Regardless of whether the *Murad* Plaintiffs have a right of action under the ATA, the Defendants urge the court to dismiss their claims for aiding-and-abetting liability. (*See* Defs.' Mot. at 23-24; Defs.' Reply at 7-10.) The Defendants reason that the *Murad* Plaintiffs failed to allege that they "knowingly provide[d] substantial assistance" to ISIS in carrying out its attack on the Yazidis. [14] 18 U.S.C. § 2333(d)(2); (Defs.' Reply at 7 (citing *Finan*, 2025 WL 2504317, at *19)). For reasons now discussed, the court grants this portion of the Defendants' motion.

#### 1. The Parties' Arguments

**\*8** The Defendants argue that the court should dismiss the *Murad* Plaintiffs' aiding-and-abetting claims because it did the same with "materially identical" claims in *Finan*. (Defs.' Mot. at 23 (citing 2025 WL 2504317, at *20).) They list two reasons why this case is the same. First, the Defendants reason that the *Murad* Plaintiffs failed to allege that they "consciously and culpably" participated in ISIS's attacks on the Yazidi in order to help "make [them] succeed." (Defs.' Reply at 7 (quoting *Twitter*, 598 U.S. at 497, 143 S.Ct. 1206).) The Defendants stress that they did not make "payments to ISIS or ANF because they supported [their] ideology or methods." (*Id.* at 7-8 (quotation omitted).) Nor have the *Murad* Plaintiffs alleged "that [the] Defendants shared ISIS's intention to harm [the Yazidis]." (*Id.* at 8.) Instead, the Defendants reiterate that they paid ISIS and ANF to protect their employees and property, as well as to ensure economic activity after "the cessation of hostilities." (*Id.* (quotation omitted).)

Second, the Defendants contend that the *Murad* Plaintiffs fail to allege the required "concrete nexus" between the Defendants' actions and the Yazidi attacks. (*Id.*) Specifically, they note that the complaint is devoid of any allegation that the alleged payments specifically funded the Yazidi attacks or that ISIS used cement from the Jalabiyeh Plant in that attack. (*Id.* (citing *Finan*, 2025 WL 2504317, at *19).) Instead, the Defendants say, the *Murad* Plaintiffs ask the court to draw "unfounded, speculative inferences ... based on only timing and geographic proximity." (*Id.*) According to the Defendants, the court "rejected similar 'time and place' arguments in *Finan*." [15] (*Id.* (citing 2025 WL 2504317, at *19-20).)

The *Murad* Plaintiffs think otherwise. They say that the Defendants acted consciously and culpably because they knew that their payments and cement would be used "to attack [the] Yazidis." (Pls.' Opp'n at 23.) According to the *Murad* Plaintiffs, this result was "plainly foreseeable" because "ISIS's hostility towards religious minorities was widely known before [hand]." (*Id.*) They cite, for example, a U.S. State Department official's testimony from July 2014 discussing specific prior acts of hostility toward the Yazidis. [16] The *Murad* Plaintiffs note that in the face of these and other "clear signs," the Defendants continued to pay ISIS and providing it cement. (*Id.* at 24.)

Regarding the "concrete nexus" requirement, the *Murad* Plaintiffs argue that their case is distinguishable from *Finan* and *Twitter*. [17] (*See* Pls.' Opp'n at 20-21.) They first focus on *Finan*, in which the plaintiffs alleged that the Defendants made payments aiding and abetting "ISIS violence through at least the end of 2017." (*Id.* at 21 (citing 2025 WL 2504317, at *20).)) There, the court noted that the allegations contained no "concrete nexus" to the attacks at issue and gave no "factual support showing systematic assistance to ISIS or ANF." *Finan*, 2025 WL 2504317, at *20. Here, on the other hand, the *Murad* Plaintiffs observe that their complaint contains specific allegations that Defendants assisted the FTOs "at the precise time" of their attack, which took place "at a location in close proximity" to the Jalabiyeh Plant. (Pls.' Opp'n at 22.)

**\*9** The *Murad* Plaintiffs then move onto *Twitter*. (*Id.* at 21 (citing 598 U.S. at 506, 143 S.Ct. 1206).) There, the Supreme Court "held that internet platforms could not be held liable for aiding and abetting terrorist attacks based on a failure to stop ISIS from uploading media to their platforms." (*Id.* (citing 598 U.S. at 506, 143 S.Ct. 1206).) By contrast, the *Murad* Plaintiffs stress that the Defendants in this case participated in "precisely the kind of affirmative conduct" that courts in this circuit have found "rises to the level of aiding and abetting." [18]

2. Analysis

The court agrees with the Defendants. To state a claim that a defendant "aids and abets" an act of international terrorism, plaintiffs must plausibly allege that the defendant "knowingly provid[ed] substantial assistance" to an FTO. 18 U.S.C. § 2333(d)(2); *see Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (stating the same). The reasoning behind that requirement is to limit liability to "those who consciously and culpably participated in the tort at issue." *Twitter*, 598 U.S. at 506, 143 S.Ct. 1206. Consequently, plaintiffs must allege that the defendants have " 'associated themselves with' the [relevant] attack, 'participated in it as something that they wished to bring about,' or sought 'by their action to make it succeed.' " [19] *Id.* at 498, 143 S.Ct. 1206 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949)). They must also allege that the defendant has "aided and abetted" the specific "act of international terrorism that injured [them]." *Id.* at 497, 143 S.Ct. 1206. Put another way, the plaintiffs need to show a "concrete nexus" between a defendant's conduct and the terrorist acts at issue. *Id.* at 501, 143 S.Ct. 1206. Or they must demonstrate that the defendant's conduct "so systemically and pervasively assisted [the FTO] that defendants could be said to aid and abet every single [ ] attack" by that organization. *Id.* at 501, 143 S.Ct. 1206; *see also Finan*, 2025 WL 2504317, at *20 (stating the same).

The *Murad* Plaintiffs have alleged none of these. They cite nothing in their complaint which contends that the Defendants "wished to bring about" ISIS's attack on the Yazidis, or that they sought through payments and cement provisions "to make it succeed." *See Twitter*, 598 U.S. at 498, 143 S.Ct. 1206 (quoting *Nye & Nissen*, 336 U.S. at 619, 69 S.Ct. 766). The *Murad* Plaintiffs focus on the attack's "plain[ ] foreseeab[ility]." (Pls.' Opp'n at 23.) But while that suggests the Defendants' potential knowledge of the attacks, it does not plausibly allege a motivation to support them. (*See id.*)

As to § 2333(d)(2)'s "concrete nexus" requirement, the *Murad* Plaintiffs' make "time" and "proximity" arguments. (*See id.* at 22.) But these "will not do." *See Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Those allegations do not link the Defendants' payments directly to ISIS's attack on the Yazidi. Like in *Twitter*, those payments "appear agnostic" to the funds' final use, even if "some" of them ultimately went to the attack. *See Twitter*, 598 U.S. at 499, 143 S.Ct. 1206. No different for the cement that ISIS allegedly used from the Jalabiyeh Plant. The *Murad* "Plaintiffs fail to show how this cement assisted with the attacks that caused [their] or their relatives' injuries." [20] *See Finan*, 2025 WL 2504317, at *19. Similarly, the *Murad* Plaintiffs have failed to allege that the Defendants' assistance was so systemic and pervasive that it aided and abetted every single ISIS attack. *See Twitter*, 598 U.S. at 499, 143 S.Ct. 1206. Like in *Finan*, the *Murad* Plaintiffs' complaint contains only "conclusory allegations offered without factual support [to show] systematic assistance to ISIS." *See Finan*, 2025 WL 2504317, at *20. Thus, it demonstrates no "concrete nexus" between the Defendants' actions and the Yazidi attacks. *See Twitter*, 598 U.S. at 501, 143 S.Ct. 1206.

*10 The post-Twitter cases that the *Murad* Plaintiffs cite highlight the deficiencies of their own complaint. (*See* Pls.' Opp. at 21-22.) In *Zobay v. MTN Group Ltd.*, the plaintiffs alleged that "all" the explosive devices at issue used components that the defendants supplied and manufactured. 695 F. Supp. 3d 301, 348 (E.D.N.Y. 2023). In *Bonacasa v. Standard Chartered PLC*, the "gravamen" of the plaintiffs' claims was that the defendant "affirmatively funded" the FTO "with the specific intent" to ease its production of the exact precursor chemicals it used in the attacks on plaintiffs. No. 22-CV-3320 (ER), 2023 WL 7110774, at *11 (S.D.N.Y. Oct. 27, 2023). *Id.* And in *Raanan v. Binance Holdings Ltd.*, the defendant provided the FTO

" 'tailored financial instruments' to circumvent regulatory supervision and controls." No. 24-CV-0697 (JGK), 2025 WL 605594, at *23 (S.D.N.Y. Feb. 25, 2025) (quoting *Standard Chartered*, 2023 WL 7110774, at *11). Although those services were "not directly targeted at the [particular] attacks," the *Binance* plaintiffs alleged systemic and pervasive assistance totaling "at least approximately $60 million" in the immediately preceding years. *Id.* (citing *King v. Habib Bank Ltd.*, No. 20-CV-4322 (LGS), 2022 WL 4537849, at *9 (S.D.N.Y. Sept. 28, 2022)).

Here, the *Murad* Plaintiffs have alleged nothing of the sort. Unlike *Zobay*, they allege that Defendants only funded a narrow subset of ISIS activities. *See* 695 F. Supp. 3d at 348. Unlike *Standard Chartered*, they allege no specific intent to support ISIS's attacks on the Yazidi. *See* 2023 WL 7110774, at *11. And unlike *Binance*, the Defendants' alleged financial assistance totals under "$10 million of value in funds and cement." *See* 2025 WL 605594, at *23; (Pls.' Opp'n at 5). Consequently, the *Murad* Plaintiffs' purported support crumbles upon scrutiny.

In sum, the *Murad* Plaintiffs have failed to plausibly allege that the Defendants "aid[ed] and abet[ted]" ISIS by "knowingly providing substantial assistance" in its attack on the Yazidis. *See* 18 U.S.C. § 2333(d)(2).

### C. Dismissal with Prejudice

The court dismisses count one with prejudice. As the Defendants note, the *Murad* Plaintiffs "have not requested leave to amend ... as to the aiding-and-abetting claim." (Defs.' Reply at 10.) It appears that they failed to do so under a mistaken view of the Defendants' motion. The *Murad* Plaintiffs state that the Defendants "do[ ] not move for dismissal on any grounds other than" that the *Murad* Plaintiffs lack a right of action. (*See* Pls.' Opp'n at 25.) Not so. In their opening brief, the Defendants clearly discuss their alternative ground for dismissing the *Murad* Plaintiffs' aiding-and-abetting claims. (*See* Defs.' Mot. at 23-24.) Of course, "the court should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). But the *Murad* Plaintiffs were aware of *Twitter*'s pleading standard—along with the court's application of that standard to "materially identical" claims in *Finan*—before submitting their amended complaint. (*See* Defs.' Mot. at 23; *see generally* Am. Compl.) Consequently, this is not a case where the "complaint was filed before" courts had "provided guidance about how to adequately plead" the aiding-and-abetting claims. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012).

### V. CONCLUSION

For the foregoing reasons, the court DENIES IN PART the Defendants' motion insofar as they assert that the *Murad* Plaintiffs lack a right of action to sue. However, it GRANTS IN PART the Defendants' motion insofar as they request Rule 12(b)(6) dismissal of the *Murad* Plaintiffs' aiding-and-abetting claims. Accordingly, the court DISMISSES WITH PREJUDICE count one of the Amended Complaint.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2026 WL 270651

**Footnotes**

1     The parties use the terms "U.S. national" and "U.S. citizen" interchangeably. This opinion does the same, given that the differences between the two terms' meanings are not material to this case.

2     The *Murad* Plaintiffs state that these payments "[began] as early as August 2013." (Pls.' Opp'n to Defs.' Mot. to Dismiss (Dkt. 65) at 5 (citing Am. Compl. ¶¶ 34, 164, 166-70, 173).) They also allege that Defendants made additional payments to ISIS in order to bypass armed checkpoints and secure access to their cement plants. (*Id.* ¶¶ 176-80). Additionally, they allege that the Defendants negotiated a long-term revenue sharing agreement with ISIS. (*Id.* ¶¶ 198, 201, 205).

3     The Yazidis "are an ancient ethnic and religious minority group that is principally Kurdish-speaking" and holds distinct religious briefs. (Am. Compl. ¶¶ 99-100.)

4     *See Finan et al. v. Lafarge S.A. et al.*, No. 22-CV-7831 (NGG) (PKK) (E.D.N.Y.); *Fields et al. v. Lafarge S.A. et al.*, No. 23-CV-0169 (NGG) (PKK) (E.D.N.Y.); *Foley et al. v. Lafarge S.A. et al.*, No. 23-CV-5691 (E.D.N.Y.); *Goldman et al. v. Lafarge S.A. et al.*, No. 24-CV-1043 (NGG) (PKK) (E.D.N.Y.); *Black et al. v. Lafarge S.A. et al.*, No. 24-CV-8901 (NGG) (PKK) (E.D.N.Y.); *Shirley et al. v. Lafarge S.A. et al.*, No. 25-CV-4248 (NGG) (PKK) (E.D.N.Y.); *Stallter et al. v. Lafarge S.A. et al.*, No. 25-CV-6749 (NGG) (PK) (E.D.N.Y.); *Wilson et al. v. Lafarge S.A. et al.*, No. 25-CV-1975 (NGG) (PKK) (E.D.N.Y.).

5     When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

6     The parties and other courts refer to a right of action as "statutory standing." *See* (Defs.' Mot. at 2; Pls.' Opp'n at 8); *Soybel v. City of New York*, No. 21-CV-1846 (CBA) (MMH), 2024 WL 5482682, at *6 n.8 (E.D.N.Y. Mar. 15, 2024). But the Second Circuit has "retired the appellation 'statutory standing' because '[it] in fact is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action under the statute.' " *Collins v. N.E. Grocery, Inc.*, 149 F.4th 163, 170 n.4 (2d Cir. 2025) (citing *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)). The court therefore declines to adopt the parties' "defunct term." *Id.*

7     Congress added aiding-and-abetting and conspiracy liability to the ATA through JASTA. *See Twitter*, 598 U.S. at 483, 143 S.Ct. 1206 (discussing 18 U.S.C. § 2333 (d) (2)). Those additions incorporate the same limitations on suit to U.S. nationals as the original ATA. *See* 18 U.S.C. § 2333(d)(2) (adding liability only for "an action under [§ 2333 (a)]"). Thus, the *Murad* Plaintiffs' claims—which are for aiding-and-abetting and conspiracy liability—are subject to the same limitation. *See id.*

8     (Defs.' Reply at 3 (emphasis omitted) (quoting 18 U.S.C. § 2333(a)).)

9     The Defendants elaborate on this point in their Reply Brief. There, they observe that "[i]njured" is a past participle used to describe "national of the United States." (Defs.' Reply at 2.) They explain that "past participles "indicat[e] past or completed action." (*Id.* at 2 (quoting *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008)).) Thus, they reason that an individual suing under § 2333(a) must have—in the past—been a "national of the United States injured" by international terrorism. (*Id.* (quoting 18 U.S.C. § 2333(a)).)

10     The Defendants admonish the court to pay *Caballero* no attention because it concerned "a single plaintiff" who moved for "default judgment" without opportunity for the court "to hear contrary arguments on the merits." (Defs.' Mot. at 19-20.) That warning is unpersuasive. To start, the ATA's statutory text treats a single plaintiff no differently than groups of plaintiffs. *See* 18 U.S.C. § 2333(a). And in default judgment cases like *Caballero*, a court "must find that there is a sufficient basis in the pleadings for the judgment to be entered." 2020 WL 7481302, at *2. Those pleadings must establish a right of action to sue under the relevant statute. *See Collins*, 149 F.4th at 170 n.4 (calling this "a question of whether the particular plaintiff has a cause of action under the statute"). Thus, the court gives due weight to *Caballero*— the only other case to analyze the specific statutory question at issue. (*See* Pls.' Mot. at 11-12.)

11  In response, the Defendants note that certain verb tenses "involve[ ] reference to both past and present." (Defs.' Reply at 2 (quoting *Hewitt*, 606 U.S. at 428, 145 S.Ct. 2165).) The court agrees but finds this to be irrelevant. The fact that the ATA requires a party to have been "injured" in the past does not mean that it requires that party to have been a "national of the United States" at that time. 18 U.S.C. § 2333(a).

12  International comity is the "recognition [ ] one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or other persons who are under the protection of its laws." *In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 144 (2d Cir. 2021).

13  As with *Caballero*, the Defendants urge the court to ignore *Stansell*. (Defs.' Mot. at 20.) They reason that the case "involved a collateral attack by other judgment creditors," was decided "in the context of [ ] jurisdictional (not merits) arguments," and "discussed the issue only in *dicta* once it had rejected [jurisdiction] on other grounds." (*Id.* (citing *Stansell v. FARC*, 16-MC-00405 (LGS) (SN), 2022 WL 2530359, at *9 (S.D.N.Y. Mar. 29, 2022), *R. & R. adopted*, 2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022)).) The court fails to see the relevance of the first two points. And the third does not refute that the opinion was "reasoned" such that the court can treat it as "persuasive authority." (Pls.' Opp'n at 16.)

14  To be sure, "knowingly provid[ing] substantial assistance" to an FTO is insufficient to trigger aiding-and-abetting liability under the ATA. 18 U.S.C. § 2333(d)(2). The statute also requires that the FTO "perform[ed] a wrongful act that cause[d]" the plaintiffs' "injury" and that the defendant is "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). The parties, however, do not dispute that the complaint contains allegations to satisfy these two additional elements. Thus, the court discusses them no further.

15  The Defendants also note that the *Murad* Plaintiffs "failed to allege that Defendants' assistance was so systemic and pervasive as to claim Defendants aided and abetted every single ISIS attack." (Defs.' Reply at 9.) Such an allegation is an alternative route to alleging an aiding-and-abetting claim under the ATA without demonstrating a "concrete nexus" to the specific attacks at issue. *See Finan*, 2025 WL 2504317, at *20 (quoting *Twitter*, 598 U.S. at 501, 143 S.Ct. 1206).

16  (Pls.' Opp'n at 23 (citing *Iraq at a Crossroads: Options for U.S. Policy*, Before the S. Comm. on Foreign Rels., July 24, 2014 (statement of Deputy Assistant Secretary Brett McGurk) at 10-11).)

17  The *Murad* Plaintiffs "do not concede that the allegations in" *Finan* and the other "related actions failed to state viable aiding and abetting claims," but nonetheless "focus on the differing allegations in this action." (Pls.' Opp'n at 21.)

18  (Pls.' Opp'n at 21-22 (citing *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 347-49 (E.D.N.Y. 2023); *Raanan v. Binance Holdings Ltd.*, No. 24-CV-0697 (JGK), 2025 WL 605594, at *23 (S.D.N.Y. Feb. 25, 2025); *Bonacasa v. Standard Chartered PLC*, No. 22-CV-3320 (ER), 2023 WL 7110774, at *11 (S.D.N.Y. Oct. 27, 2023)).)

19  § 2333(d)(2)'s text does not expressly state this requirement. Instead, it is implied from the phrase "aids and abets." *See* 18 U.S.C. § 2333(d)(2). That term was "familiar to the common law" when Congress adopted the ATA. *Twitter*, 598 U.S. at 484, 143 S.Ct. 1206. Such "common-law terms 'bring the old soil' with them" to inform their statutory definition. *Id.* (quoting *Sekhar v. United States*, 570 U.S. 729, 733, 133 S.Ct. 2720, 186 L.Ed.2d 794 (2013)). In this case, "aids and abets ... refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493, 143 S.Ct. 1206.

20  True, the *Murad* Plaintiffs allege that ISIS kept one Plaintiff's sister in a tunnel built with cement from the Jalabiyeh Plant. (Pls.' Opp'n at 23.) But this singular allegation is "an impermissibly thin reed" upon which the *Murad* Plaintiffs

cannot play their entire complaint. (Defs.' Reply at 8-9.); *Ashcroft*, 556 U.S. at 663, 129 S.Ct. 1937. And even if that allegation could support the weight of over 800 plaintiffs, "ISIS seized at least four other cement plants in the region, any of which could have supplied the concrete in question, and none of which was allegedly owned by Defendants." (Defs.' Reply at 9.)

---

**End of Document**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.